**No. 26-5023**
**(Consolidated with 26-5047, 26-5049)**

---

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

UNITED STATES OF AMERICA, *et al.*,
Plaintiffs-Appellees-Cross-Appellants,

v.

GOOGLE LLC,
Defendant-Appellant-Cross-Appellee.

---

On Appeal from the United States District Court
for the District of Columbia
Nos. 20-cv-3010 & 20-cv-3715
Hon. Amit P. Mehta

---

## UNDERLYING DECISIONS FROM WHICH APPEAL ARISES

---

Benjamin J. Horwich
Justin P. Raphael
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000

John E. Schmidtlein
Graham W. Safty
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
(202) 434-5000

Donald B. Verrilli, Jr.
Helen E. White
Kyle A. Schneider
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW
 Suite 500E
Washington, DC 20001
(202) 220-1100
Donald.Verrilli@mto.com

Mark S. Popofsky
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 508-4624

*Counsel for Google LLC*

Pursuant to this Court's Order dated January 23, 2026, Google LLC submits the attached copies of the underlying decisions from which this appeal arises: (1) August 5, 2024 Memorandum Opinion, Case No. 20-cv-3010, Dkt. Nos. 1032 (sealed) and 1033 (redacted); (2) September 2, 2025 Memorandum Opinion, Case No. 20-cv-3010, Dkt. Nos. 1435 (sealed) and 1436 (redacted); (3) December 5, 2025 Memorandum Opinion, Case No. 20-cv-3010, Dkt. No. 1461; and (4) December 5, 2025 Final Judgment, Case No. 20-cv-3010, Dkt. No. 1462.

Dated:  February 23, 2026

Benjamin J. Horwich
Justin P. Raphael
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000

John E. Schmidtlein
Graham W. Safty
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
(202) 434-5000

Respectfully submitted,

/s/ *Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
Helen E. White
Kyle A. Schneider
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW
  Suite 500E
Washington, DC 20001
(202) 220-1100
Donald.Verrilli@mto.com

Mark S. Popofsky
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 508-4624

*Counsel for Google LLC*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 20-cv-3010 (APM)** |
| | ) | |
| **GOOGLE LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

| | | |
|---|---|---|
| **STATE OF COLORADO et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 20-cv-3715 (APM)** |
| | ) | |
| **GOOGLE LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION**</u>

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................. 1

PROCEDURAL HISTORY ................................................................................................... 5

FINDINGS OF FACT............................................................................................................ 7

    I.       PARTIES AND RELEVANT NONPARTIES .................................................. 7

        A.    Parties ................................................................................................... 7

        B.    Key Third Parties ............................................................................... 9

    II.      GENERAL SEARCH ENGINES ................................................................... 13

        A.    Overview ............................................................................................ 13

        B.    How a GSE Works (Greatly Simplified) ......................................... 14

        C.    Types of Queries ............................................................................... 16

        D.    Search Engine Results Page ............................................................ 19

        E.    The Expense of Developing and Maintaining a GSE ..................... 21

        F.    GSE Distribution .............................................................................. 24

            1.    *Default Distribution* .............................................................. 24

            2.    *Other Search Access Points* ................................................. 31

        G.    The Importance of Scale .................................................................. 34

        H.    Artificial Intelligence ...................................................................... 39

        I.    User Data and Privacy ..................................................................... 43

    III.    GOOGLE SEARCH ....................................................................................... 46

        A.    Product Development ........................................................................ 46

        B.    Branding ............................................................................................ 47

        C.    Internal Quality Studies .................................................................. 48

    IV.    OTHER PLATFORMS ................................................................................... 50

        A.    Special Vertical Providers ............................................................... 50

        B.    Social Media Platforms .................................................................... 55

    V.      THE DIGITAL ADVERTISING INDUSTRY .............................................. 57

        A.    Search Advertisements ..................................................................... 57

            1.    *Search Ads on GSEs*.............................................................. 59

            2.    *SVP Search Ads* .................................................................... 67

        B.    Display Ads........................................................................................ 67

        C.    Social Media Ads .............................................................................. 70

        D.    The Marketing Funnel ..................................................................... 72

        E.    Shifting Spend ................................................................................... 76

i

F.    **Text Ads Auctions (Also Greatly Simplified)**.................................................. **81**

    1.    *Pricing Knobs* .................................................................................... *83*

    2.    *Increasing Text Ads Prices* .............................................................. *85*

    3.    *Limiting Advertiser Control* ............................................................. *93*

G.    **SA360** ........................................................................................................ **98**

VI.    **THE RELEVANT CONTRACTS** ......................................................................... **101**

    A.    **Browser Agreements** ................................................................................ **101**

        1.    *The Google-Apple Internet Services Agreement* ................................... *101*

        2.    *Mozilla-Google RSA* ........................................................................ *115*

        3.    *Other Browser Agreements* ............................................................... *118*

    B.    **Android Agreements** ............................................................................... **118**

        1.    *Mobile Application Distribution Agreements* ....................................... *118*

        2.    *Revenue Share Agreements* ............................................................... *123*

        3.    *Mobile Services Information Agreements* ............................................ *133*

**CONCLUSIONS OF LAW** ......................................................................................... **134**

I.    **LEGAL FRAMEWORK** .................................................................................... **134**

II.    **MONOPOLY POWER: GENERAL SEARCH SERVICES** ................................... **136**

    A.    **Principles of Market Definition** ................................................................ **137**

    B.    **General Search Services is a Relevant Product Market.** .................................. **140**

        1.    *Peculiar Characteristics and Uses* ...................................................... *140*

        2.    *Industry or Public Recognition* ........................................................... *144*

        3.    *Unique Production Facilities* .............................................................. *146*

        4.    *Google's Proposed Query Product Market* ........................................... *147*

    C.    **Google Has Monopoly Power in the General Search Services Market.** ............. **152**

        1.    *Direct Evidence* ................................................................................ *154*

        2.    *Indirect Evidence – Market Share* ...................................................... *156*

        3.    *Indirect Evidence – Barriers to Entry* ................................................. *157*

        4.    *Google's Counterarguments* .............................................................. *161*

III.    **MONOPOLY POWER: ADVERTISING MARKETS** ......................................... **165**

    A.    **Search Advertising Is a Relevant Market, But Google Does Not Have Monopoly Power in It.** ........................................................................................... **166**

        1.    *Search Advertising Is a Relevant Product Market.* ............................... *166*

        2.    *Google Does Not Have Monopoly Power in the Search Ads Market.* ......... *180*

    B.    **Google Has Monopoly Power in the General Search Text Ads Market.** ............ **185**

      1.     *General Search Text Ads Is a Relevant Product Market.* .................................... 185

      2.     *Google Has Monopoly Power in the General Search Text Ads Market.* .............. 189

  C.    **The Evidence Does Not Support a Market for General Search Advertising.** .... 191

IV.    **EXCLUSIVE DEALING** ................................................................................ 197

  A.    **"Competition for the Contract" Is No Defense.** ..................................................... 198

  B.    **The *Microsoft* Exclusive Dealing Framework Is Applicable.** ............................ 203

  C.    **The Challenged Agreements Are Exclusive.** .......................................................... 204

      1.     *Browser Agreements* ....................................................................................... 204

      2.     *Android Agreements* ........................................................................................ 210

V.    **EFFECTS IN THE MARKET FOR GENERAL SEARCH SERVICES** ............. 214

  A.    **The Exclusive Agreements Cause Anticompetitive Effects in the General Search Services Market.** .......................................................................................................... 214

      1.     *The Exclusive Agreements Foreclose a Substantial Share of the Market.* ........... 216

      2.     *The Exclusive Agreements Have Deprived Rivals of Scale.* ................................. 226

      3.     *The Exclusive Agreements Have Reduced Incentives to Invest and Innovate.* ...... 236

  B.    **The Exclusive Agreements Do Not Result in Procompetitive Benefits.** .............. 248

      1.     *Benefits in the Market for General Search Services* ............................................. 248

      2.     *Benefits in Other Markets that Redound to the Benefit of the Search Market* ...... 252

      3.     *Cross-Market Benefits* ...................................................................................... 255

VI.    **EFFECTS IN THE MARKET FOR GENERAL SEARCH TEXT ADVERTISING** 258

  A.    **The Exclusive Agreements Foreclose a Substantial Share of the Market.** ......... 258

  B.    **The Exclusive Agreements Allow Google to Profitably Charge Supracompetitive Prices for Text Advertisements.** .................................................................................... 259

  C.    **The Exclusive Agreements Have Allowed Google to Degrade the Quality of its Text Advertisements.** ..................................................................................................... 263

  D.    **The Exclusive Agreements Have Capped Rivals' Advertising Revenue.** .......... 264

VII.    **SA360** ..................................................................................................................... 265

  A.    **The Sherman Act Imposes No Liability on Google for Its Refusal to Grant Feature Parity to Microsoft Ads on SA360.** ............................................................................... 266

  B.    **Plaintiff States Have Not Proven that Google's SA360 Conduct Had Anticompetitive Effects.** ................................................................................................ 271

VIII.  **INTENT AND SANCTIONS** ................................................................................. 272

  A.    **The Court Need Not Make a Finding of Anticompetitive Intent.** ...................... 274

  B.    **The Court Declines to Impose Sanctions.** ............................................................ 275

**CONCLUSION** ........................................................................................................... 276

iii

## <u>INTRODUCTION</u>

The general search engine has revolutionized how we live.  Information that once took hours or days to acquire can now be found in an instant on the internet with the help of a general search engine.  General search engines use powerful algorithms to create what seems like magic.  Enter a search query, and the general search engine will retrieve, rank, and display the websites that provide the exact information the user seeks at that very moment.  And it all happens in the blink of an eye.

General search engines make money by selling digital advertisements.  Type the words "running shoes" into a general search engine, and sellers of running shoes will compete with one another in a split-second auction to place an advertisement on the results page, which if clicked takes the user directly to the seller's website.  This is a highly effective way of reaching consumers.  It is also an incredibly lucrative business.  In 2021, advertisers spent more than $150 billion to reach users of general search engines.

For more than 15 years, one general search engine has stood above the rest: Google.  The brand is synonymous with search.  Once a scrappy start-up founded by two Stanford University students in a rented garage, Google is now one of the world's most valuable companies.  Its parent company, Alphabet Inc., today has a market capitalization (the value of its outstanding shares of stock) of more than $2 trillion.  Much of that value is due to Google's extremely profitable advertising business.

Google's dominance has gone unchallenged for well over a decade.  In 2009, 80% of all search queries in the United States already went through Google.  That number has only grown.  By 2020, it was nearly 90%, and even higher on mobile devices at almost 95%.  The second-place search engine, Microsoft's Bing, sees roughly 6% of all search queries—84% fewer than Google.

1

Google has not achieved market dominance by happenstance.  It has hired thousands of highly skilled engineers, innovated consistently, and made shrewd business decisions.  The result is the industry's highest quality search engine, which has earned Google the trust of hundreds of millions of daily users.

But Google also has a major, largely unseen advantage over its rivals: default distribution.  Most users access a general search engine through a browser (like Apple's Safari) or a search widget that comes preloaded on a mobile device.  Those search access points are preset with a "default" search engine.  The default is extremely valuable real estate.  Because many users simply stick to searching with the default, Google receives billions of queries every day through those access points.  Google derives extraordinary volumes of user data from such searches.  It then uses that information to improve search quality.  Google so values such data that, absent a user-initiated change, it stores 18 months-worth of a user's search history and activity.

The distribution agreements benefit Google in another important way.  More users mean more advertisers, and more advertisers mean more revenues.  As queries on Google have grown, so too has the amount it earns in advertising dollars.  In 2014, Google booked nearly $47 billion in advertising revenue.  By 2021, that number had increased more than three-fold to over $146 billion.  Bing, by comparison, generated only a fraction of that amount—less than $12 billion in 2022.

For years, Google has secured default placements through distribution contracts.  It has entered into such agreements with browser developers, mobile device manufacturers, and wireless carriers.  These partners agree to install Google as the search engine that is delivered to the user right out of the box at key search access points.

2

Google pays huge sums to secure these preloaded defaults. Usually, the amount is calculated as a percentage of the advertising revenue that Google generates from queries run through the default search access points. This is known as "revenue share." In 2021, those payments totaled more than $26 billion. That is nearly four times more than all of Google's other search-specific costs combined. In exchange for revenue share, Google not only receives default placement at the key search access points, but its partners also agree not to preload any other general search engine on the device. Thus, most devices in the United States come preloaded exclusively with Google. These distribution deals have forced Google's rivals to find other ways to reach users.

Google's dominance eventually attracted the attention of antitrust enforcers—the U.S. Department of Justice and nearly every state's Attorney General. They homed in on Google's distribution agreements and in late 2020 filed two separate lawsuits alleging that the agreements and certain other conduct violate Section 2 of the Sherman Act. According to their complaints, Google has unlawfully used the distribution agreements to thwart competition and maintain its monopoly in the market for general search services and in various online advertising markets.

The proceedings that followed have been remarkable. Discovery began in December 2020 and concluded in March 2023. Millions of pages exchanged hands, Google produced petabytes of data, and the parties deposed dozens of witnesses, including high-ranking executives at some of the world's largest technology companies. The court held a nine-week bench trial starting in September 2023. It heard from dozens of live witnesses, including multiple experts, and admitted over 3,500 exhibits. After receiving extensive post-trial submissions, the court held closing arguments over two days in early May 2024. The lawyering has been first rate throughout.

3

After having carefully considered and weighed the witness testimony and evidence, the court reaches the following conclusion: Google is a monopolist, and it has acted as one to maintain its monopoly. It has violated Section 2 of the Sherman Act.

Specifically, the court holds that (1) there are relevant product markets for general search services and general search text ads; (2) Google has monopoly power in those markets; (3) Google's distribution agreements are exclusive and have anticompetitive effects; and (4) Google has not offered valid procompetitive justifications for those agreements. Importantly, the court also finds that Google has exercised its monopoly power by charging supracompetitive prices for general search text ads. That conduct has allowed Google to earn monopoly profits.

Other determinations favor Google. The court holds that (1) there is a product market for search advertising but that Google lacks monopoly power in that market; (2) there is no product market for general search advertising; and (3) Google is not liable for its actions involving its advertising platform, SA360. The court also declines to sanction Google under Federal Rule of Civil Procedure 37(e) for its failure to preserve its employees' chat messages.

This decision is organized as follows. The court begins with a brief procedural history. It then sets forth findings of fact. They are followed by the court's conclusions of law regarding the challenged distribution agreements. The court first addresses market definition and monopoly power, then the exclusionary nature of the conduct (including the contracts' exclusivity), and finally the agreements' anticompetitive effects and Google's procompetitive justifications for them. A discussion of the SA360-related conduct follows. The opinion ends with brief sections on anticompetitive intent, as well as Plaintiffs' request for sanctions. The court has included as an Appendix a list of the names and titles of all witnesses whose testimony is cited in the decision.

## PROCEDURAL HISTORY

On October 20, 2020, the U.S. Department of Justice, joined by 11 States ("U.S. Plaintiffs"), commenced *United States v. Google*, 20-cv-3010 (APM). *See* Compl., ECF No. 1. Pursuant to authority conferred by 15 U.S.C. § 4, U.S. Plaintiffs alleged that Google had violated Section 2 of the Sherman Act by unlawfully maintaining its monopoly in three product markets by entering into exclusive agreements to secure default distribution on nearly all desktop and mobile devices in the United States. *See generally* Am. Compl., ECF No. 94. The alleged markets are general search services, search advertising, and general search text advertising. *Id.* ¶¶ 88–107. U.S. Plaintiffs advanced three Section 2 claims, each corresponding to an alleged market. *Id.* ¶¶ 173–193. They sought a finding of liability, an injunction against the challenged conduct, and structural relief necessary to cure any resulting anticompetitive effects. *Id.* ¶ 194.

On December 17, 2020, 38 States ("Plaintiff States") joined together to bring *State of Colorado v. Google*, 20-cv-3715 (APM) [hereinafter *Colorado v. Google* Docket]. They filed suit pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, in their sovereign or quasi-sovereign capacities as *parens patriae* on behalf of the citizens, general welfare, and economy of each of their states. The *Colorado* complaint adopted the allegations in the U.S. Plaintiffs' complaint but supplemented it in three ways. Compl., *Colorado v. Google* Docket, ECF No. 3 [hereinafter *Colorado* Compl.]. First, Plaintiff States alleged a third advertiser-side market for general search advertising but not one, as U.S. Plaintiffs had, for search advertising. *Id.* ¶¶ 56 n.3, 82–89. Second, they asserted exclusionary conduct by Google that targeted specialized vertical providers, or SVPs. *Id.* ¶¶ 168–189. Third, Plaintiff States claimed that Google had engaged in further exclusionary conduct by using its proprietary advertising platform, SA360, to harm competition

5

in all proposed markets. *Id.* ¶¶ 144–167. Plaintiff States similarly sought declaratory and injunctive relief. *Id.* ¶ 233.

On January 7, 2021, upon Plaintiff States' motion, the court consolidated the two cases for pretrial purposes, including discovery. Order, *Colorado v. Google* Docket, ECF No. 67. The court subsequently consolidated the cases for trial as well. *See* Status Conf. Tr., ECF No. 609, at 10–14. The parties also jointly asked to bifurcate the liability and remedies phases, and the court agreed to do so. *See* Order, ECF No. 264.

Discovery closed on February 23, 2023. Soon after, U.S. Plaintiffs moved for sanctions under Rule 37(e) for Google's failure to preserve relevant chat messages among its employees. Pls.' Mot. for Sanctions, ECF No. 512. The court deferred ruling on the motion pending the presentation of evidence relevant to that issue at trial. Order, ECF No. 610, at 2.

Google also moved for summary judgment in both cases. *See* ECF Nos. 451, 452. The court granted in part and denied in part Google's motions. It entered judgment for Google as to U.S. Plaintiffs' claims related to Android Compatibility Commitments and Anti-Fragmentation Agreements, Google's voice-activated assistant and other "Internet-of-Things" devices, and the Android Open-Source Project. *See United States v. Google LLC*, 687 F. Supp. 3d 48, 78–84, 85–87 (D.D.C. 2023). It also entered judgment in favor of Google on Plaintiff States' theory that Google's targeting of SVPs caused anticompetitive effects in the proposed markets. *Id.* at 78–83. The court permitted the remaining claims to proceed to trial.

Trial commenced on September 12, 2023. Both sides presented exhaustive evidence in support of their various claims and defenses. Dozens of witnesses, including numerous Google employees, third-party witnesses, and several experts, testified live and were subject to lengthy

cross-examination.  The parties entered thousands of exhibits and designated certain deposition testimony into the trial record.  Trial concluded just over nine weeks later on November 16, 2023.

Following trial, each group of Plaintiffs and Google filed separate post-trial briefs, as well as affirmative and responsive proposed findings of fact and conclusions of law.  Those submissions ran into the thousands of pages.  Finally, the court held two days of closing arguments on May 2 and 3, 2024.

## FINDINGS OF FACT

### I.  PARTIES AND RELEVANT NONPARTIES

#### A.  Parties

1.  Plaintiff United States of America, along with Plaintiffs Arkansas, California, Florida, Georgia, Indiana, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Montana, South Carolina, Texas, and Wisconsin—**U.S. Plaintiffs**—filed the lawsuit captioned *United States v. Google*, 20-cv-3010 (APM).  *See* Am. Compl. at 2–3.

2.  Separately, Plaintiffs Colorado, Nebraska, Arizona, Iowa, New York, North Carolina, Tennessee, Utah, Alaska, Connecticut, Delaware, District of Columbia, Guam, Hawaii, Idaho, Illinois, Kansas, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Dakota, Vermont, Virginia, Washington, West Virginia, and Wyoming— **Plaintiff States**—filed the lawsuit captioned *State of Colorado v. Google*, 20-cv-3715 (APM). *See Colorado* Compl.

3.  Alphabet Inc. is the California-based parent company of a collection of businesses, the largest of which is Defendant Google LLC (**Google**).  UPX8085 at 851.[1]  Google was founded

---

[1] This opinion uses the last three digits of Bates numbers on an exhibit to cite the specific pages that support a finding of fact.

in 1998 by two students from Stanford University, Larry Page and Sergey Brin, who left school to create Google, which is a general search engine (GSE).  Trial Tr. at 7292:21–7293:1 (Raghavan) [hereinafter Tr.].  A GSE is software that produces links to websites and other relevant information in response to a user query.  *See infra* Part II.  What started in a rented garage is today one of the world's largest companies.  The Chief Executive Officer (CEO) of Alphabet and Google is Sundar Pichai.  Tr. at 7638:2-12 (Pichai).

4.      Although Google began as a GSE, today its core services include a suite of applications widely used on mobile and desktop devices, including Gmail, Google Drive, Google Maps, Google Photos, Google Play, and YouTube.  *Id.* at 7717:2-12 (Pichai); UPX8085 at 852.

5.      In 2008, Google developed **Android**, an open-source operating system for mobile devices.  *See* Tr. at 7652:1–7653:11 (Pichai).   An open-source system allows third-party developers to create new smart devices and technologies by customizing the Android system to the device or technology.  *See id.* at 7653:2-3 (Pichai) ("[Y]ou can just take the open source project and do whatever you want with it without ever talking to Google"); *id.* at 9414:25–9415:3 (Rosenberg) ("Being open source, [Android is] customizable.  It [i]s something that someone could take with its underlying capabilities and then build on top of and add capabilities to.").  Today, hundreds of millions of mobile devices in the United States run on the Android operating system.  UPX639 at 266.

6.      Also in 2008, Google launched **Chrome**, a web browser.  Tr. at 7646:5-7 (Pichai). A web browser is software that allows users to access websites on the internet, among other things. *See* M. Baker Dep. Tr. at 23:1–27:8.  Chrome was designed to increase the speed and seamlessness of web navigation by users.  Tr. at 7649:11–7650:2 (Pichai).  "Chromium is the underlying engine

which powers Chrome," and it is fully open source, like Android. *Id.* at 7648:21–7649:5 (Pichai). Google is the default search engine on Chrome. *Id.* at 7650:5-9 (Pichai).

7. Google also acquired an online advertising platform, DoubleClick, in 2008, which it developed into what today is known as **SA360**. *Id.* at 1235:5-12 (Dischler); PSX1109. SA360 is a search engine marketing tool, which allows advertisers to purchase digital advertisements across multiple platforms. Tr. at 1234:2–1235:4 (Dischler); *see also infra* Section V.G.

8. In 2022, Google reported Search+ revenues over $162 billion. UPX8085 at 879, 899 (including "other Google owned and operated properties like Gmail, Google Maps, and Google Play"). Between 2014 and 2021, Google's Search+ revenues more than tripled, with gross margins ranging from 76–82% annually. *See* UPX7002.A. The vast majority of Alphabet's revenues (nearly 80%) come from digital advertisements, and historically the largest component has been ads displayed on Google's search engine results page. *See* UPX8085 at 878–89; UPX342 at 824 (attributing approximately 66% of the "company's revenue and $ growth for 10+ years" to search advertising).

## B.   Key Third Parties

9. **Apple Inc.** is a California-based company that "designs, manufactures[,] and markets smartphones, personal computers, tablets, wearables[,] and accessories, and sells a variety of related services." UPX8105 at 172, 175. Those products include the iPhone, iPad, and Mac personal computers (PCs). *Id.* at 175. Each of these devices runs on an Apple-developed, proprietary operating system: iOS for iPhones, iPadOS for iPads, and macOS for Mac computers. *Id.* Unlike Android, Apple's operating systems are not open source. *See* Tr. at 9841:25–9842:5 (Murphy). Apple's products all come preloaded with its proprietary web browser, Safari. *Id.* at

9

632:9-10 (Rangel).  In 2022, Apple's market capitalization was at least $2.8 trillion.  UPX8105 at 173.

10.      **Microsoft Corporation** is a Washington-based company whose products include an operating system called Windows, a web browser called Edge, and various devices, including PCs and tablets.  UPX8094 at 517, 521, 530–31.  In 1998, Microsoft licensed a third-party GSE, MSN Search, for use on its devices.  Tr. at 3545:11-21 (Nadella).  In 2005, Microsoft created its own GSE, which was then known as Live Search.  *Id.* at 3547:3-24 (Nadella).  In 2009, Microsoft launched **Bing**, a GSE.  *Id.* at 3548:4-5 (Nadella).  Microsoft has invested nearly $100 billion into search over the past two decades.  *Id.* at 3510:3-7, 18-21 (Nadella).  Bing's search and news advertising revenue totaled $11.6 billion in 2022.  *See* UPX8094 at 612.  The CEO of Microsoft is Satya Nadella.  Tr. at 3487:2-6 (Nadella).  Microsoft's revenues in 2022 were over $198 billion, with a market capitalization of $2.5 trillion.  UPX8094 at 559, 517.

11.      **Mozilla Corporation** is a California-based company that developed an open-source web browser called Firefox for both desktop and mobile devices.  JX31 at 612, 633.  Today, Mozilla's share in the desktop browser market is about 10% and negligible in the mobile market.  M. Baker Dep. Tr. at 127:24–128:8, 134:9-20.  In 2018, Mozilla generated $435 million in revenues.  *Id.* at 285:12-16 (discussing UPX979 at 414).

12.      **DuckDuckGo (DDG)** is Pennsylvania-based web services company founded in 2008.  Tr. at 1937:4-7 (Weinberg).  It offers a product that is an integrated browser and GSE.  *Id.* at 1962:6-12, 1963:3-16 (Weinberg).  Gabriel Weinberg is the founder and CEO of DDG.  *Id.* at 1937:2-3 (Weinberg).  DDG does not produce its own search results or search advertisements.  It syndicates both from Microsoft.  *Id.* at 3510:8-11, 3520:13-22 (Nadella).  DDG attempts to

differentiate itself from other GSEs through a focus on user privacy. *E.g.*, *id.* at 1937:14-20, 2150:13-18 (Weinberg).

13. **Yahoo** is a California-based provider of general search services and was an early market leader in general search. UPX1053 at 121; Ramalingam Dep. Tr. at 23:2-12. In 1998, the year that Google was founded, Yahoo already had hundreds of millions of users. UPX1053 at 121. By 2009, however, Yahoo had stopped crawling the web and producing its own search results. Instead, it reached a data-sharing and syndication agreement with Microsoft, which provided that the two companies would combine their search engine user data (primarily to compete with Google) and, going forward, Yahoo's search results would be delivered by Bing. *See* DX271; Tr. at 3520:13–3522:9 (Nadella). Yahoo also has popular subject-specific, or "vertical," products, such as Yahoo Sports and Yahoo Finance. Ramalingam Dep. Tr. at 24:14–25:11.

14. **Neeva** was a California-based company incorporated in 2017 that introduced a new GSE in 2019. Tr. at 3670:1-5, 3670:24–3671:1 (Ramaswamy). Neeva was founded by Dr. Sridhar Ramaswamy, a veteran Google Search executive. *Id.* at 3667:3–3669:14 (Ramaswamy). One of Neeva's distinguishing features was that it was a subscription-based service that did not serve advertisements. *Id.* at 3675:22–3679:16 (Ramaswamy). Although Neeva initially licensed Bing's search infrastructure to respond to all queries, by 2022 Neeva responded to about 60% of queries using its own systems, relying on Bing for the remainder. *Id.* at 3739:14-16, 3776:14-21 (Ramaswamy). In May 2023, Neeva shut down and was acquired by Snowflake Inc., an enterprise data company. *Id.* at 3675:1-6 (Ramaswamy). It no longer exists as a GSE. *Id.* at 3675:5-19 (Ramaswamy).

15. **Branch** is a California-based software company that was founded by Stanford graduate students in 2013. *Id.* at 2892:7-24 (Austin). Branch created a search engine for

11

applications using "deep linking" technology, which allows users to search across pages of mobile applications on a particular device and navigate to relevant application results. *Id.* at 2893:18–2894:18, 2897:3-15 (Austin). This "app search engine" required "work[ing] individually with every app company [to] get them to send [] the actual pages inside of the app," which entailed "build[ing] the one-on-one relationship with the app [and] hav[ing] them develop, write custom code." *Id.* at 2898:2-9 (Austin). Unlike a GSE, Branch's product does not index the web and (in its presently deployed version) does not deliver web results. *Id.* at 2957:3-15, 2956:16-24 (Austin); *see also infra* Section VI.B.2.d.

16. **Samsung Electronics Co. Ltd.** is a Korea-based original equipment manufacturer (OEM) of smartphones and other mobile devices that run on the Android platform. *See* UPX639 at 266; Baxter Dep. Tr. at 34:14. Samsung devices "represent the primary competitor to the iPhone in key monetizing regions, such as the US[.]" UPX639 at 266. Samsung develops mobile applications that it preloads onto its devices, including a browser known as S Browser and an app store called the Galaxy Store. Baxter Dep. Tr. at 83:10-24, 91:4-7. Samsung also invests in novel products through its innovation arm, Samsung Next. Tr. at 4485:3-12, 4485:22–4486:14 (Chang).

17. **Motorola Mobility LLC** is an Illinois-based OEM of smartphones that run on the Android platform. JX39 at 794. Motorola and Samsung together manufacture the majority of Android devices in the United States. Tr. at 775:2-5 (Kolotouros). Google acquired Motorola but later sold it to Lenovo Group Ltd. Christensen Dep. Tr. at 15:12-14, 142:12-18.

18. **AT&T Mobility LLC** is a Georgia-based mobile carrier that provides wireless services that connect mobile devices to cellular networks. JX91 at 742. AT&T also sells devices directly to consumers. Ezell Dep. Tr. at 28:4-12. Roughly 30% of the smartphones that it distributes are Android devices. *Id.* at 29:8-25. The other 70% are Apple devices. *Id.*

19.     **T-Mobile US, Inc.** is a Washington-based mobile carrier that provides cellular services and sells mobile devices directly to consumers.  JX95 at 687–88; Tr. at 9313:24-25 (McCallister).  Approximately half of the phones sold by T-Mobile run on Android, and the other half are Apple devices.  Giard Dep. Tr. at 23:16–24:7.

20.     Cellco Partnership, doing business as **Verizon Wireless**, is a New Jersey-based mobile carrier that provides cellular services and sells mobile devices directly to consumers.  JX93 at 487–88; Tr. at 9313:24-25 (McCallister).  It distributes roughly twice as many Apple devices (70%) as Android devices (30%).  Tr. at 1102:21-23 (Higgins).

## II.    GENERAL SEARCH ENGINES

### A.    Overview

21.     Google, Bing, Yahoo, DDG, Ecosia, and Brave are GSEs.  *See, e.g.*, *id.* at 2168:1-4 (Giannandrea); *id.* at 1031:2-10 (Higgins); *id.* at 1942:11-17 (Weinberg); *id.* at 8201:23-24 (Reid).  There is "relatively limited [user] overlap between the general search engines."  *Id.* at 8728:23-24 (Israel).

22.     Bing is Google's largest general search competitor today.  *Id.* at 8094:8-10 (Raghavan).  It is the only rival that crawls the web and generates its own search results.  The next two largest search engines, Yahoo and DDG, syndicate their search results from Bing.  *See id.* at 3520:13-25 (Nadella).

23.     By 2009, 80% of all general search queries, whether entered on a desktop computer or mobile device, flowed through Google.  *Id.* at 4762:4-12 (Whinston) (discussing UPXD102 at 48); *e.g.*, UPX472; *see also* Tr. at 203:21–204:5 (Varian) (Google began measuring its search share against other GSEs monthly in 2009).  That percentage had increased from 80% to 89.2% by 2020.  Tr. at 4761:14–4762:8 (Whinston) (discussing UPXD102 at 47).

13

24.     Google's share of search queries on mobile devices was even higher at 94.9% in 2020.  *Id.* at 4762:19–4763:2 (Whinston) (discussing UPXD102 at 49); *see also* UPX476 at 668 (Google's internal share calculation of 98% of mobile GSE queries in 2019).  The percentage on desktop devices was 84%.  *See* UPX476 at 668.

25.     Google's second-place rival, Bing, receives roughly 6% of all search queries.  Tr. at 4761:12-14 (Whinston) (discussing UPXD102 at 47).  Bing (5.5%), Yahoo (2.2%), DDG (2.1%), and other rivals (0.9%) together see less than 11% of all queries.  *Id.*  Their numbers are even lower on mobile devices.  *Id.* at 4762:19–4763:2 (Whinston) (discussing UPXD102 at 49) (Bing (1.3%), Yahoo (2.1%), DDG (1.5%), and others (0.2%)).  Bing's market share has never risen above 12%.  *See id.* at 4762:4-12 (Whinston) (discussing UPXD102 at 48).

26.     Bing sees more desktop queries than mobile queries because it has greater distribution on Windows desktop devices, where it is the default GSE on the preloaded Edge browser.  *See id.* at 3096:14-18 (Tinter).

## B.     How a GSE Works (Greatly Simplified)

27.     "A general search engine is a tool that you use to search the worldwide web using queries."  *Id.* at 2167:3-4 (Giannandrea).  A GSE attempts to answer all queries by "provid[ing] search results that are relevant to those queries."  *Id.* at 8093:10-12 (Raghavan); *id.* at 182:6-8 (Varian).  "The primary source of information for Search is the web."  UPX194 at 552.

28.     The first step in developing a search engine is to crawl the web.  *Id.* at 552; Tr. at 1774:20-22 (Lehman); *id.* at 2206:14-15 (Giannandrea) ("[S]tep one [of] building a general search engine would be to take a copy of as much of the web as you can.").  GSEs crawl the web using a "crawling bot," which "starts with a list of websites[.]"  Tr. at 2206:17-20 (Giannandrea). The bot "crawls the HTML on those websites and then it looks at the links inside of those web pages and

14

then recursively crawls them." *Id.* And, because websites "are constantly changing and the web is constantly growing," GSEs "constantly recrawl the web to index new content." UPX194 at 552–53.

29. The results of the web crawling are organized into an index. An index is "a database essentially of the whole web that's publicly available that can be returned if [a] user asks for it." Tr. at 2656:17-18 (Parakhin). The development of an index is "a crucial piece of the puzzle," because if a site is not in the index, it will not be presented to users in response to a query. *Id.* at 6303:20-25 (Nayak); *id.* at 2210:21 (Giannandrea) ("What you include in the index matters a lot[.]"). Thus, the more sites in an index, the better. *Id.* at 2212:4 (Giannandrea). Today, only Google and Bing create fulsome web search indexes that generate accessible results. DDG indexes portions of the web to create its own search "modules." *Id.* at 1939:2–1941:16 (Weinberg). And Apple maintains an index of about ▋ billion websites, although it does not presently plan to use that index to offer a results page. *Id.* at 2212:9-14 (Giannandrea); FOF ¶ 302.

30. An index is only useful if the GSE understands what the user is seeking with a query. GSEs "aim to identify spelling errors, annotate the query with synonyms, mark multi-word concepts, generate terms related to the query, and more." UPX213 at 715. Google does this in many ways: through its spelling and synonyms functions, using "query-based salient terms" (QBST) that are likely to show up in a responsive document, and semantic tools, such as query clustering and segmentation. *Id.* at 715–16; *see also* UPX870 at .016–.017.

31. The GSE then must retrieve and rank websites responsive to the query. Common queries can yield a nearly infinite number of potentially responsive sites, so the GSE must include a retrieval system that narrows the volume of responsive links to tens of thousands, as opposed to millions. Tr. at 6331:7-15 (Nayak). The GSE then must rank these several thousand results. It

first must decide which results are worth scoring at a more granular level, and then score those hundreds of sites to determine which top 10 or so should be surfaced to the user. *Id.* at 6331:13–6332:11 (Nayak); *infra* Section II.G.

32.     The above-described culling and sorting process by which a GSE produces search results is illustrated below:



DXD17 at 2.

### C.     Types of Queries

33.     A GSE can supply information from a broad variety of sources, covering nearly any topic.  Tr. at 8708:16-20 (Israel) (agreeing that GSEs "can handle virtually any type of query"). Thus, it is "the first place that you can turn to," and "a place that you go to for the vast majority of your information needs." *Id.* at 3670:6-18 (Ramaswamy); *see also id.* at 6511:11-23 (Whinston) (same); *id.* at 7027:23-25 (J. Baker) ("[A] general search user can get satisfactory responses to multiple queries from multiple sources, all without switching sites."); *id.* at 10471:17-25 (Oard)

("[M]ental process is costly[] and . . . people may just not know about where things are."); *cf. id.* at 8717:17-18 (Israel) ("If I don't know the best source, I may have to try various ones.").

34.     Google classifies its queries by subject matter, and it has developed more than two dozen "level-one" classifications.  *Id.* at 7029:2-16 (J. Baker) (discussing PSDX11 at 17).  Users tend to use a GSE for a short period of time to search for a particular topic and then allow time to pass before using a GSE to search for a different topic.  Put differently, users do not typically search multiple different subject matters during an unbroken time period.  *Id.* at 8419:9-15 (Israel) (discussing DXD29 at 25) (78% of users searched within only one vertical in a short period).  Yet, if viewed over a longer period, users frequently turn to GSEs to search for a broad variety of topics.  *See id.* at 7029:17–7031:11 (J. Baker) (discussing PSXD11 at 19) (showing based on Google sessions data from 2019 and 2021 that nearly 65% of "sessions," defined in the study as a 24-hour period, involved users searching in more than one classified segment).

35.     Many users begin their online information gathering journeys on GSEs.  An analysis by U.S. Plaintiffs' expert Dr. Michael Whinston found that 77% of search sessions on Windows desktop devices began on GSEs.  *Id.* at 4614:12-24 (Whinston).  That 77% figure is arguably lower on mobile devices, on which users are more likely to start searches directly within an application instead of a GSE.  *See id.* at 5875:19–5876:9 (Whinston).

36.     There are two general types of queries on GSEs: noncommercial and commercial.

37.     A noncommercial query is one in which the user seeks to retrieve information that the GSE does not attempt to monetize by delivering a search advertisement.  80% of Google's queries are noncommercial in nature.  *Id.* at 8396:16–8398:17 (Israel); UPX10 at 053 n.6.

38.     Commercial queries, as the name implies, are queries that the GSE perceives are an expression of commercial intent by the user and constitute the remaining 20% of Google's queries.

17

Tr. at 8396:16–8398:17 (Israel); UPX10 at 053 n.6.  Typically, such a query seeks information on a product or a service.  GSEs often serve advertisements on a search engine results page in response to a commercial query.  *See infra* Section V.A.1.  Like Google, only about 20–30% of Bing's queries are commercial and show ads.  Tr. at 3645:13–3646:2 (Nadella).

39.     Navigational queries, which can be either commercial or non-commercial, are a type of query that reflects a user's intent to navigate directly to a particular website.  *Id.* at 185:11-19 (Varian).  GSEs may or may not serve ads on a navigational query.  An example of a navigational query is "Amazon," which may express the user's intent to go to Amazon.com.  *See id.* at 8721:12-13 (Israel) ("[O]ne use of a general search engine[] is as this vehicle to take me to other sites.").  Users often enter navigational queries.  In fact, at a given time, Google's top five queries by query volume are navigational queries, UPX342 at 859, and nearly 12% of all Google queries are navigational queries, Tr. at 8748:22–8749:1 (Israel) (calculation reflected in Whinston Expert Report at 64); *id.* at 8748:25–8749:1 (Israel) (the volume of navigational queries is "significant").  Navigational queries are unique to GSEs, because only a GSE's results page supplies a user with organic links used to navigate to another website.  *See id.* at 4616:23-25 (Whinston) (specialized vertical providers are "not sending you off to other sites" because "they don't have a broad index of the web"); *see infra* Section IV.A.

40.     The number of general search queries has grown dramatically over the last decade, especially on mobile devices.  *See* Tr. at 8442:17–8443:2 (Israel) (discussing DXD29 at 45) ("[O]utput is more than double over this 10-year time period."); *id.* at 7248:4-10 (J. Baker) (discussing PSXD12).

18

**D.        Search Engine Results Page**

41.        GSEs produce information responsive to a query on a search engine results page, or SERP.  The SERP "provid[es] links to websites drawn from a broad index of the web as well as provid[es] additional information[.]"  *Id.* at 4610:21-22 (Whinston); *id.* at 7026:20-22 (J. Baker).

42.        Most SERPs contain some mixture of advertisements, organic links, and vertical offerings.  A sample SERP is illustrated below.



UPX1 at 533.

43.        Organic links, or "blue links," are unpaid search results that allow a user to navigate directly to a website.  Tr. at 2221:15-19 (Giannandrea); *id.* at 6509:25–6510:1 (Nayak).  A GSE determines which links to present by sorting through indexed webpages and presenting relevant results.  *See* UPX8104 at 165; *see also supra* Section II.B; *infra* Sections II.G & II.H.

19

44.     Paid advertisements are typically generated in response to a commercial query and usually appear at the top of a SERP.  *See* UPX1 at 533.  Multiple types of advertisements can appear on a SERP, but the two primary ones are general search text ads (which resemble organic results but are labeled "sponsored" on Google) and shopping ads (which typically consist of a product photograph, vendor identity, and price information).  *See infra* Section V.A.1.

45.     A vertical offering is a category of specialized information that is accessible to users without leaving the SERP.  Tr. at 2336:14-16 (Giannandrea); *id.* at 6509:7-21 (Nayak).  Examples of verticals include information about flights, hotels, and restaurants.  Such information is usually acquired from third parties and is referred to as "structured data."  *Id.* at 8224:18–8225:6 (Reid).  Structured data can come from several sources: specialized vertical providers (like online travel sites), users, merchants, or GSE employees in the field.  *Id.*  Much of "th[is] information is not even on the web."  *Id.* at 8224:24-25 (Reid).  Another example of structured data is a "knowledge graph," which is a database containing useful information about people, places, and things, as well as the connections among them.  *See* Moxley 30(b)(1) Dep. Tr. at 17:17-20; UPX1 at 533.

46.     GSEs enter into data-sharing agreements with partners (usually specialized vertical providers) to obtain structured data for use in verticals.  Tr. at 9148:2-5 (Holden) ("[W]e started to gather what we would call structured data, where you need to enter into relationships with partners to gather this data that's not generally available on the web.  It can't be crawled.").  These agreements can take various forms.  The GSE might offer traffic to the provider in exchange for information (i.e., data-for-traffic agreements), pay the provider revenue share, or simply compensate the provider for the information.  *Id.* at 6181:7-18 (Barrett-Bowen).

47.     As of 2020, Microsoft has partnered with more than 100 providers to obtain structured data, and those partners include information sources like Fandango, Glassdoor, IMDb,

Pinterest, Spotify, and more.  DX1305 at .004, 018–.028; *accord* Tr. at 6212:23–6215:10 (Barrett-Bowen) (agreeing that Microsoft partners with over 70 providers of travel and local information, including the biggest players in the space).

48.     In some limited instances, providers have expressed discomfort with new or continued partnerships with Bing due to its smaller scale.  Tr. at 6187:20-24 (Barrett-Bowen).  For example, ████, an online travel company, refused to share its information with Bing given its limited distribution.  *Id.* at 6188:5-10 (Barrett-Bowen).  Bing, however, has data agreements with other travel providers, including major airlines and platforms like Booking.com, Expedia, and TripAdvisor.  *Id.* at 6212:25–6213:11, 6214:1-2 (Barrett-Bowen); *see id.* at 2678:5-9 (Parakhin); DX1305 at .018–.028.  On another occasion, ███, a provider of ███ information, asked for a financial commitment from Bing, as the amount of traffic provided through the existing Bing-███ data-for-traffic agreement was insufficient.  *See generally* Tr. at 6198–6204 (Barrett-Bowen).  Bing did not agree to ████ terms, in part due to Bing's budgetary constraints, and that partnership ceased.  *Id.* at 6204:13-17 (Barrett-Bowen).

49.     As a third example, Bing displays ██████ information from a single partner— ██████  The "sole reason" for this is Bing's small scale.  *Id.* at 6190:4-12 (Barrett-Bowen).  Since the ██████ industry "is just not a big category" for Bing, it makes sense for Bing to partner with a single provider to obtain as much data as possible, rather than "fragment[] it amongst other partnerships[.]"  *Id.* at 6190:14-23 (Barrett-Bowen).

### E.     The Expense of Developing and Maintaining a GSE

50.     Constructing a GSE is an extremely capital- and human-resource intensive endeavor.  *See id.* at 4765:17-20 (Whinston); *id.* at 3700:14-16 (Ramaswamy) (describing the

building of a search index as a "Herculean problem"). Developing just the technical infrastructure alone requires billions of dollars. *Id.* at 1651:12-25 (Roszak).

51. A competitive analysis performed by Google illustrates the point. In late 2020, Google estimated how much it would cost Apple to create and maintain a GSE that could compete with Google. Google "estimate[d] that the total capital expenditures required [for Apple] to reproduce [Google's technical] infrastructure dedicated to search would be in the rough order of $20[ billion]." UPX2 at 392–93; Tr. at 1644:8-20 (Roszak). Google further estimated that, if Apple needed only half of Google's infrastructure to produce a competitive GSE, it would have to spend $10 billion to get it off the ground, plus $4 billion annually in technical infrastructure. UPX2 at 393. On top of that, if Apple could sustain a business with only one third of Google's engineering and product management costs, it still would cost Apple $7 billion annually. Seven billion dollars was equal to more than 40% of Apple's total research and development expenditure in 2019. *Id.*

52. The cost of maintaining a fully-integrated GSE once built runs into the billions of dollars. In 2020, Google spent $8.4 billion to operate its search engine (excluding revenue share payments). This expense is attributable to a variety of inputs. By way of example, the "petabytes" of user data that Google maintains are "expensive to store[.]" Tr. at 7824:2-3 (Fox); *id.* at 6337:20-21 (Nayak) ("[T]he cost of processing the data goes up if we're talking about large amounts of data."). Certain highly effective ranking mechanisms, such as artificial intelligence-driven models, are computationally more expensive than others because they are costly to train and require significant engineering capabilities. *See id.* at 1931:17-20 (Lehman); *id.* at 6447:11-16, 6452:1-8, 6452:15-19 (Nayak); *id.* at 8278:15-18, 8281:13-24 (Reid).

53.     Adding features to the SERP also dramatically increases costs.  UPX266 at 985 (explaining that "[f]eatures are even more incrementally expensive," such as including web search and video search on a single SERP, which costs about five times more per query than web search alone).  There are many other contributing costs.

54.     Apple itself has estimated that it would cost $6 billion annually (on top of what it already spends developing search capabilities) to run a GSE.  Tr. at 2295:9-16 (Giannandrea); UPX460 at 177.

55.     But building and maintaining a GSE is only half of the cost equation.  Monetizing a GSE is also an expensive proposition.  In 2020, Google spent $11.1 billion to operate its search ads business.  By comparison, it spent $8.4 billion on search (excluding revenue share payments).  Tr. at 4764:12-20 (Whinston) (discussing UPXD102 at 52).  In 2020, Bing earned only $7.7 billion *total* in search ads revenue.  *Id.* at 4765:4-6 (Whinston) (discussing UPXD102 at 52).

56.     As result of the extraordinary resources required to build, operate, and monetize a GSE, venture capitalists and other investors have stayed away from funding new search ventures.  *Id.* at 2261:11-19, 2268:6-7 (Giannandrea) (stating that "a startup could not raise enough money . . . to build a very good, large-scale search engine" because "to build a competitive project is very expensive"); UPX240 at 507 (internal Apple document written by Giannandrea stating that "the reason a better search engine has not appeared is that it's not a [venture capital] fundable proposition even though it's a lucrative business"); Tr. at 3510:24–3512:7 (Nadella) (describing Silicon Valley's view of venture funding of search as the "biggest no fly zone").

57.     New investment has not poured in despite the promise of high profit margins in general search.  *See* UPX635 at 352 (Apple executive noting that "there aren't so many businesses

23

on the planet that have such high marginal profit[] on incremental revenues"); FOF ¶ 8 (describing Google's revenues).

### F. GSE Distribution

58. Search providers have multiple channels to make accessible, or distribute, their GSE to users on mobile and desktop devices. They include but are not limited to: (1) the search bar integrated into browsers; (2) search widgets on Android device home screens; (3) search applications; (4) preset bookmarks within the default browser; (5) downloading an alternate browser; and (6) direct web search (i.e., navigating to www.google.com or www.bing.com). These channels of distribution are known as search access points.

#### 1. Default Distribution

59. The most efficient channel of GSE distribution is, by far, placement as the preloaded, out-of-the-box default GSE. That access point varies by device. On Apple products, it is the integrated search bar in the Safari browser (and to some extent, Apple's voice assistant, Siri, and on-device search, Spotlight). Tr. at 632:9-10 (Rangel); *infra* Section VI.A.1.a. On Android devices, it is the search widget (prominently displayed at the center of the device's home screen) and the search toolbar in the Chrome browser. *See infra* Section VI.B.1. The Chrome browser typically appears on the home screen of Android devices either in the "hotseat"— that is, the row of applications at the bottom of the home screen—or in a folder on the home screen along with other Google applications. Tr. at 797:7-17 (Kolotouros); *see infra* Section VI.B.1. And, on Windows desktop computers, the default access point is the integrated search bar in the Edge browser. Tr. at 3096:14-18 (Tinter). Google is the default GSE on all of these access points except on Edge, where the default GSE is Bing. *Id.* at 540:4-12, 632:6-8 (Rangel).

24

60.     Other browsers, which are not preloaded on devices but can be downloaded, also use an integrated search bar.  *Id.* at 1963:3-12 (Weinberg) (DDG); M. Baker Dep. Tr. at 189:3-12 (Firefox).  Google is the current default search engine on Firefox.  From 2014 through 2017 it was Yahoo.  *See infra* Section VI.A.2.a.  On Firefox, a drop-down menu allows users to select a non-default search provider for the next search without changing the default search engine.  M. Baker Dep. Tr. at 92:11-25.  This is called the "this time, search with" feature.  *Id.*  Those options include SVPs, like Amazon.  *Id.* (listing Bing, Amazon, or DDG as options).

61.     Default settings can be changed by the user.  On all major browsers, users can navigate to the browser's settings and change the default to their preferred GSE.  *See, e.g.*, M. Baker Dep. Tr. at 61:1-4 (Firefox); Tr. at 2630:3–2631:15 (Cue) (discussing DXD6) (Safari); *id.* at 7650:10-17 (Pichai) (Chrome).  No browser allows a user to change the default GSE to a specialized vertical provider, such as Amazon, or to a social media platform.  *Id.* at 7426:21–7427:4 (Raghavan).

62.     Notwithstanding the option to switch, the default remains the primary search access point.  Roughly 50% of all general search queries in the United States flow through a search access point covered by one of the challenged contracts.  *See id.* at 5755:6-11 (Whinston) (discussing UPXD104 at 34–36).  Of that 50%, 28% of those queries are entered into search access points covered by the Google-Apple Internet Services Agreement, 19.4% through Google's agreements with Android OEMs and carriers, and 2.3% through search access points on third-party browsers, such as Mozilla's Firefox.  *See id.*

63.     Another 20% of all general search queries in the United States flow through user-downloaded Chrome, which defaults to Google.  *Id.* at 5762:22–5763:13 (Whinston) (discussing UPXD104 at 37).

64.     Thus, only 30% of queries in the United States run through a search access point that does not default to Google. *See id.* at 5762:22–5763:13 (Whinston) (discussing UPXD104 at 37). (To be clear, those 30% of searches are not all run on GSEs other than Google. A large percentage of those searches still are entered into Google, but through channels other than the default search access points, such as user-downloaded Google Search app or a search on www.google.com.)

65.     That users overwhelming use Google through preloaded search access points is explained in part by default bias, or the "power of defaults." The field of behavioral economics teaches that a consumer's choice can be heavily influenced by how it is presented. *Id.* at 526:7-21 (Rangel) (describing the concept of "choice architecture"). The consensus in the field is that "defaults have a powerful impact on consumer decisions." *Id.* at 526:22-25 (Rangel).

66.     According to U.S. Plaintiffs' expert, Dr. Antonio Rangel, whose testimony the court credits, "the vast majority of individual searches, or queries, are carried out [by] habit," because search is a high frequency activity done on a familiar device that provides an instant response. *Id.* at 543:2-9 (Rangel) ("Habits develop very strongly in those situations of high repetition and immediate feedback."); *see also id.* at 543:14-19 (Rangel) ("When a consumer encounters their devices for the first time and they start searching, they start searching with the default search engine, which for many of them is the case. . . . If that search engine that is the default generates adequate experiences, the consumer will get habitized to that."). A 2020 Google study confirmed this. A group of iOS users were asked what app they would choose to open a link in an email: Chrome, the Google Search app, or Safari? Regardless of the option the user selected, their leading rationale for doing so was "Habit/Regular Usage." UPX757 at 628.

67.     Individuals often are not aware that they are acting out of habit.  Tr. at 542:4-12 (Rangel).  Consequently, when users are habituated to a particular option, they are unlikely to deviate from it.  As Google's behavioral economics team wrote in 2021: "Inertia is the path of the least resistance.  People tend to stick with the status quo, as it takes more effort to make changes." UPX103 at 214; *see also* UPX171 at 190 (2015 Google study based on 26 user interviews; almost half of the users (12) did not notice a surreptitious change from Google to Bing on their iPhone; "People expressed interest (but not huge urgency) to switch back to Google"); Tr. at 7677:5–7682:19 (Pichai) (discussing UPX172, a 2005 letter from Google to Microsoft stating that "most end users do not change defaults").

68.     Many users do not know that there is a default search engine, what it is, or that it can be changed.  Tr. at 548:24–549:3 (Rangel); *id.* at 9942:7-10 (Murphy); *see* UPX123 at 469, 485 (2007 Google study showing that the default homepage on a browser is "[c]onfigurable by user but very few know/care to change it" and that "[u]sers do not always make an active, deliberate choice of a" search engine); PSX216 at 126 (2016 Google-internal email identifying "one fundamental issue [a]s that users on Edge don't even realize they aren't using Google"); UPX66 at 73 (2018 Google study showing substantial user confusion regarding which browser and GSE was in use); UPX2051 at 520 (2020 Google study showing that over half of iPhone users in the United States were "unsure" which GSE powered Safari and concluding that users are "often unaware they're using Google").

69.     Even users who "are not in this habitual mode and [] try to change the default will get frustrated and stop the process" if there is "choice friction."  Tr. at 547:5-16 (Rangel).  "Choice friction" refers to the concept that subtle challenges or barriers make it increasingly more difficult

27

to implement a change.  *Id.* at 554:5-16 (Rangel).  "[T]he more choice friction it takes to change the defaults, the sticker the defaults are."  *Id.* at 554:20-21 (Rangel).

70.     The amount of choice friction varies and depends on many factors.  For instance, default effects are weaker when the product is of poor quality or is unknown to users.  Consumers "start thinking about switching more if the experience is unsatisfactory" or if they have, "over years, developed a very strong preference for a [rival] brand[.]"  *Id.* at 548:15-20 (Rangel).  By contrast, default effects are stronger when the user is satisfied with the product.  *Id.* at 650:22–651:9 (Rangel).

71.     The type of device matters as well.  Default effects are stronger on mobile devices, as opposed to desktop computers, in part because of the smaller interface.  *Id.* at 625:21-23 (Rangel); *id.* at 6311:1-8 (Nayak) ("I think the most salient difference between mobile and desktop is in the user experience. . . . The mobile device has very limited real estate. . . . Whereas, the desktop device, of course, has a lot of real estate to provide your search experience. . . . It's just a very different experience."); *id.* at 9764:6-12 (Murphy) ("[M]obile screens are smaller, hard to change the default, as compared to a PC where the screen is bigger[.]"); *id.* at 3498:14-19 (Nadella) ("[C]hanging defaults today is . . . toughest on mobile platforms because . . . they're locked up on the browser that is allowed, they're locked up with app store access.  So there are many, many sort of friction points on mobile operating systems.").  Also, switching certain default settings on an Android device is arguably harder than on an iPhone.  *See* UPX171 at 186 (iPhone user study participants were "able to switch back with relatively little effort" to Google from Bing); Tr. at 559:23–561:16 (Rangel) (discussing UPXD101 at 25–35) (replacing the Google Search Widget with Bing's rival widget is a 10-step process).

72.     Google understands that switching on mobile is more challenging than on desktop. To illustrate, in 2016 and 2020, Google estimated that if it lost the Safari default placement, it would claw back more search volume on desktop than on mobile. *See* UPX142 at 886 (2016) (Google would recover only 30% on iOS but 70% on MacOS); UPX148 at 826 (2020) (same, projecting 60–80% query loss on iOS); *see also* UPX84 at 728 (2016) ("User behavior is more heavily influenced by default settings on mobile and tablet[.]"); UPX139 at 119 (2020) ("People are much less likely to change [the] default search engine on mobile.").

73.     Google appreciates that increased choice friction discourages users from changing the default. *See* UPX103 at 214 (2021 Google document from Google's Behavioral Economics Team stating that a "[s]eemingly small friction points in user experiences can have a dramatically disproportionate effect on whether people drop or stick"); UPX848 at 612 ("[Y]ou want to think about each step, as small as it might be, and see if there is a way to eliminate it, delay it, simplify it, default it."); UPX172 at 731 ("[O]f the tiny fraction of end users who try to change the default, many will become frustrated and simply leave the default as originally set[.]").

74.     A GSE's placement as the default thus drives search volume through that access point. Tr. at 3689:21-24 (Ramaswamy) (testifying that "the convenience of easy accessibility and tapping into . . . engrained default behaviors are the deciding factors when it comes to whether a search engine gets lots of usage"); *id.* at 7674:6–7675:21 (Pichai) ("[B]ecause you're taking existing users, and by giving them more convenient access points, you're making them search more. . . . Done correctly, and if you're putting a product out in front of users which users like and want to use, yes, defaults can make a difference."). In 2017, over 60% of all queries entered on Google flowed through defaults. UPX83 at 967; *see id.* (60% of iOS queries were through the

29

Safari default, and 80% of Android queries were through defaults secured by the distribution deals).  Far fewer users search directly on Google's website.

75.     Google recognizes that securing the default placement is extremely valuable for monetizing search queries.  In 2017, Google estimated that its default placements drove over half (then 54%) of its overall search revenue, a percentage that had grown since 2014.  UPX83 at 968.  For devices manufactured by Samsung—the largest Android OEM—80% of search revenue earned on those devices in 2016 flowed through default placements secured by the MADAs (Chrome and the Google Search Widget).  *See* UPX639 at 266; UPX660 at 369.  In 2019, about 50% of all search revenue on Android devices flowed through the Google Search Widget.  UPX0316 at 906.  In 2020, Google's internal modeling projected that it would lose between 60–80% of its iOS query volume should it be replaced as the default GSE on Apple devices, UPX148 at 826, which would translate into net revenue losses between $28.2 and $32.7 billion (and over double that in gross revenue losses), UPX1050 at 887.  And in a 2015 presentation, Google expressed confidence in its standing among Apple users, but warned that its position "is still very vulnerable if defaults were to change."  UPX171 at 186.

76.     Neeva exemplifies the importance of search distribution through a readily accessible channel.  Neeva secured the capital and human resources needed to build a search engine. Tr. at 3671:4–3672:13 (Ramaswamy).  Although it initially syndicated search results from Bing, it eventually crawled the web, built an index, and developed a ranking model, which relied heavily on artificial intelligence technology, to generate its own search results for about 60% of its queries.  *Id.* at 3775:9–3776:21, 3739:14-16 (Ramaswamy).  But Neeva was unable "to be even a default provider on things like the major browsers or operating systems," which "was what made [its founders] conclude that it was hard to have Neeva consumer search as a viable business."  *Id.*

at 3701:1-7 (Ramaswamy).  The reason "why Neeva failed . . . was simply because [it] could not get enough users to be in that state where they regularly used Neeva."  *Id.* at 3712:10-12 (Ramaswamy); *id.* at 3677:2-3, 3700:25–3701:7 (Ramaswamy) (testifying that more users on Neeva would result in greater revenues through subscription fees); *id.* at 3724:18-21 (Ramaswamy) ("[I]f a well-funded and exceptionally talented team like Neeva could not even be a provider on most of the browsers, I don't see that as the market working.").

### 2.    *Other Search Access Points*

77.    There are access points other than the default that can be used to distribute a GSE, but those channels are far less effective at reaching users.  That is due in part to users' lack of awareness of these options and the "choice friction" required to reach these alternatives.  FOF ¶¶ 65–73.

78.    Users can download search applications on Apple devices from the App Store or on Android devices from the Google Play Store.  Tr. at 1538:1-4 (Roszak); *id.* at 617:15-22 (Rangel).  But to reach such applications, a user would have to (1) know the application exists and (2) download it.  Those points of choice friction reduce the effectiveness of a search app as a channel of distribution.  To illustrate the point: Google receives only about 10% of its searches on Apple devices through the Google Search App (GSA).  *Id.* at 9758:16–9760:1 (Murphy) (discussing DXD37 at 52); *id.* at 2494:22-24 (Cue) ("[M]ost people are sitting on a browser, they don't really want to go search on an app or a different app from that standpoint.").  (Google does not suffer from this problem on Android devices.  GSA is preloaded on all Android devices sold in the United States.)  *See id.* at 791:25–792:2 (Kolotouros); *see also infra* Section VI.B.1.

79.    Google recognizes that the user-downloaded GSA is an ineffective way to reach users.  A 2018 internal study revealed that over 35% of iOS users did not know they could

download GSA, and most of those who were aware of GSA did not want to install it. *See* UPX139 at 149. Over half of Safari users had not installed GSA, and of those that *had* installed it, over 80% still preferred using Safari. *Id.* at 150.

80.     Another non-default search access point is the bookmarks page on a browser. *See* Tr. at 10195:21–10196:3 (Murphy) (discussing DXD37 at 47). The Safari "Favorites" page, for instance, contains preloaded icons to access Google, Bing, and Yahoo. *Id.* A user also can add a new search engine on that page. But few consumers use this channel, as it first requires finding the Favorites page in a new Safari tab, which requires an "extra click[.]" *Id.* at 10101:19–10102:21 (Murphy). Google itself receives only 10% of its searches on Safari through the bookmark. *Id.* at 9758:16–9760:1 (Murphy) (discussing DXD37 at 52).

81.     Users also can reach GSEs by downloading an alternative browser from an applications store or the web. For example, a user can download Chrome, Edge, or DDG onto an Apple device. This, too, is not an easily accessible search point, as it involves similar choice friction as acquiring a search application. Google receives only 7.6% of all queries on Apple devices through user-downloaded Chrome. *Id.*

82.     To be sure, downloads of an alternative browser occur with greater frequency on Windows desktop computers. On such devices, Edge is the default browser and Bing is the default search engine. *Id.* at 3096:14-20 (Tinter). Yet, Google's search share on Windows devices is 80%, with most of the queries flowing through the Chrome default, which means Chrome was downloaded onto the device. *See id.* at 9737:9-21 (Murphy) (discussing DXD37 at 36, 38). Google's dominance on Windows cannot, however, be attributed simply to the popularity of Chrome. Google had an 80% search share on Windows when Chrome first launched, and that share has remained steady ever since (see below).



Search and Browser Shares on Windows Computers (U.S.)

DXD37 at 38.

83.     Google's dominance on Windows does not, however, undermine the power of defaults.  Google's strong product quality and brand recognition likely weakened the effectiveness of defaults on Windows devices before the introduction of Chrome.  FOF ¶ 70 (switching the default is more common when the default has inferior product quality and branding).  The popularity of Chrome over time only fortified that dominance.  *See* Tr. at 9739:10-17 (Murphy) (discussing DXD37 at 38).

84.     The power of defaults *is* evident, however, from the share of Bing users on Edge. Bing's search share on Edge is approximately 80%; Google's share is only 20%.  *Id.* at 5744:24–5745:20 (Whinston) (discussing UPXD104 at 29).  Even if one assumes that some portion of those Bing searches are performed by Microsoft-brand loyalists, Bing's uniquely high search share on Edge cannot be explained by that alone.  The default on Edge drives queries to Bing.

85.     Finally, users can navigate directly to the GSE on the web to conduct searches— for example, by entering google.com or bing.com in a browser search bar.  *Id.* at 1633:1-8 (Roszak).  This is known as an "organic" search.  But few users search in this way.  On Apple

33

devices, Google receives less than 5% of its query volume through organic searches. *Id.* at 9758:16–9760:1 (Murphy) (discussing DXD37 at 52). On Android devices, that number is only 10%. Sept. 19, 2023 (Sealed Session) Tr. at 23:25–27:2 (Yoo).

### G.     The Importance of Scale

86.     Early on, Google understood that the information gleaned from user queries and click activity were a strong proxy for users' intent and that such information could be used to deliver superior results. *See* UPX251 at 870 ("[M]ost of the knowledge that powers Google, that makes it magical, ORIGINATES in the minds of Google users."); *id.* at 871 ("As people interact with the search results page, their actions teach us about the world."); UPX203 at 906 ("If a document gets a positive reaction, we figure it is good. If the reaction is negative, it is probably bad. Grossly simplified, this is the source of Google's magic.").

87.     Greater query volume means more user data, or "scale." As the most widely used GSE in the United States, Google receives nine times more queries each day than all of its rivals *combined* across all devices. The disparity is even more pronounced on mobile. There, Google receives *nineteen* times more queries than all of its other rivals put together. *See* Tr. at 4761:6-24, 4762:19–4763:2 (Whinston) (discussing UPXD102 at 47, 49).

88.     There are different types of user data. Click data, for example, includes the search results on which a user clicks; whether the user returns to the SERP and how quickly; how long a user hovers over SERP results; and the user's scrolling patterns on the SERP. *See* UPX4 at .004. From such data, a GSE learns not only about the user's interests but also the relevance of the search results and quality of the webpages that the user visits. Tr. at 1767:215–1771:22 (Lehman) (discussing UPX4 at .004).

89.     Another type of user information is query data.  GSEs accumulate query data to, among other things, learn what information users are looking for.  Google's scale means that it not only sees more queries than its rivals, but also more unique queries, known as "long-tail queries." To illustrate the point, Dr. Whinston analyzed 3.7 million unique query phrases on Google and Bing, showing that 93% of unique phrases were only seen by Google versus 4.8% seen only by Bing.  On mobile, where Google has more scale, the disparity was even higher.  *See id.* at 5785:12–5788:1 (Whinston) (98.4% of unique phrases seen only by Google, 1% by Bing; 99.8% of tail queries on Google not seen at all by Bing) (discussing UPXD104 at 44).

90.     Google has used its scale advantage to improve the quality of its search product. At every stage of the search process, user data is a critical input that directly improves quality.

91.     *Crawling.*  GSEs must determine the order in which they crawl the web.  User data helps GSEs determine which sites to crawl, because it allows general search providers to understand the relative popularity of various sites.  *Id.* at 2207:7-9 (Giannandrea).  User data also helps GSEs determine the frequency with which to crawl websites.  *Id.* at 10274:16–10275:1 (Oard).  "Freshness," or the recency, of information is an important factor in search quality.  GSEs "need to know how to recrawl [sites] to make sure that [they] do at all times have a reasonably fresh copy of the web that you are looking at."  *Id.* at 6310:2-5 (Nayak); *see* UPX870 at .013 ("If we build too infrequently, our users could miss out on important news or get stale results[.]"). Popular sites, like the *New York Times*, are worth crawling more often than less visited sites.  Tr. at 2207:3-6 (Giannandrea).

92.     *Indexing.*  While click data is "not particularly important for indexing," query data is: GSEs need to ensure that their index covers queries that are frequently entered.  *Id.* at 2211:13-17 (Giannandrea).  *But see id.* at 10274:16-21 (Oard) (opining that click data helps Google "decide

whether to keep those pages . . . [or] future pages in the index or not"). User data also helps determine where a webpage resides within the larger index. *Id.* at 10274:22–10275:1 (Oard). Google divides its index into tiers. *Id.* Each page is assigned to a tier based on how fresh it needs to be, and the fresher tiers are rebuilt more frequently. *Id.*

93. *Retrieval and Ranking.* Because humans are imperfect, so too are their queries. Google relies on user data to decipher what a user means when a query is typed imprecisely. For example, user data allows Google to identify misspellings and reformulate queries using synonyms to produce better results. *Id.* at 8088:15-24 (Gomes) (spelling, synonyms, and autocomplete use query data to improve); *id.* at 2273:3-15 (Giannandrea) ("reformulation," which is when a user misspells a query and then re-enters it with another spelling, is important to improve spell check); UPX224 at 914 (Google built its spelling technology by "look[ing] at all the ways in which people mis-spell words in queries and text all over the web, and us[ing] that to predict what you actually mean").

94. Google scores potentially relevant results to determine the order in which they are placed, or ranked, on the SERP. Scoring is done using a number of signals and ranking systems, which are technologies that attempt to discern the user's intent and thus identify the most relevant results for a particular query. *See* UPX204 at 243; Tr. at 1764:1-25 (Lehman). Many of these signals, discussed below, rely on user data.

95. Query-based Salient Terms, or QBST, is a Google signal that helps respond to queries by identifying words and pairs of words that "should appear prominently on web pages that are relevant to that query." Tr. at 1807:25–1808:10 (Lehman) (e.g., "1600 Pennsylvania Avenue" and "White House"). QBST is a "memorization system[]" that helps the GSE

"understand facts about the world[.]" *Id.* at 1838:11-25 (Lehman).  It is trained on about 13 months of user data.  *Id.* at 1808:14-20 (Lehman); UPX1007 at 371.

96.     Navboost is another signal that pairs queries and documents through memorizing user click data.  Tr. at 1838:11-25 (Lehman).  It allows Google to remember which documents users clicked after entering a query and to identify when a single document is clicked in response to multiple queries.  *See* UPX196 at 175; Tr. at 1806:2-15 (Lehman) (describing functions of Glue, a "relative" signal to Navboost); *id.* at 2215:3-4 (Giannandrea) (NavBoost "was considered very important").  Prior to 2017, Google trained Navboost on 18 months of user data.  Tr. at 6405:15-25 (Nayak).  Since then, it has trained Navboost on 13 months of user data.  *Id.*  Thirteen months of user data acquired by Google is equivalent to over 17 *years* of data on Bing.  *See id.* at 5793:14-23 (Whinston); *id.* at 10350:8–10351:8 (Oard) (same) (discussing UPXD105 at 50).

97.     More recent ranking signals developed by Google rely less on user data.  Those include RankBrain, DeepRank, RankEmbed, RankBERT, and MUM.  *See* UPX255 at .010; UPX2034.  Known as "generalization" systems, these signals "may not be so good at memorizing facts, but they're really good at understanding language."  Tr. at 1846:18-22 (Lehman).  Such systems are "designed to fill holes in [click] data"; they allow Google to generalize from situations where it has data to situations it does not.  *Id.* at 1896:2-19 (Lehman).

98.     Although these newer systems are less dependent on user data, they were designed with user data and continue to be trained on it, albeit using less volume.  *See id.* at 1845:12-21 (Lehman) (discussing UPX255 at .010–.011) (older signals use up to 1 trillion examples, whereas newer algorithms require only 1 billion); UPX226 at 483 ("Learning from this user feedback is perhaps the central way that web ranking has improved for 15 years.") (discussing BERT and

37

RankBrain); *see also* Tr. at 2652:11-14 (Parakhin) ("The more data of this nature we have, the more we can train algorithms to be better in predicting what is good and what is bad.").

99.     MUM is a large language model (LLM), or "a computational system that tries to, in some way, capture patterns in language." Tr. at 1912:22-23 (Lehman). Whereas RankBERT "exhibited fairly weak performance" on newer scoring metrics, MUM "achieved essentially human-level performance." *Id.* at 1915:10-20 (Lehman). MUM is trained on a subset of the web corpus, as well as some click training data, to allow it to "understand the structure of language and acquire some kind of reasoning abilities." *Id.* at 1919:8-14 (Lehman); *id.* at 6358:8-20 (Nayak).

100.    Google has also developed three newer LLMs: LaMDA, PaLM, and PaLM2. LaMDA was released in 2021 and is focused on conversation; PaLM and PaLM2 expanded on LaMDA and have more capabilities. *Id.* at 6363:22–6364:3 (Nayak). These systems were not built with user data. *Id.* at 6364:13-22 (Nayak).

101.    Google has also developed a Search Generative Experience, which leverages artificial intelligence (AI) in search. *Id.* at 6364:4-12 (Nayak). This experimental product "add[s] generative AI into the search results to enhance them[.]" *Id.* at 8217:3-5 (Reid); *see infra* Section II.H.

102.    The more recent LLM signals did not replace Navboost and QBST in ranking. Tr. at 1931:21-24 (Lehman); UPX190 at 740 ("Navboost remains one of the most power ranking components historically[.]"). Nor did they render the generalization systems obsolete. *See* Tr. at 6366:21–6367:10 (Nayak); *see also* FOF ¶¶ 114–115. LLMs are used as "additional signals that get balanced both against each other as well as against other signals[.]" Tr. at 6367:5-7 (Nayak).

103.    Traditional systems like Navboost can also beat out LLMs (and even generalization systems) in certain aspects of SERP production, like freshness. UPX214 at 696; UPX256 at 185.

104.    To be sure, there are diminishing returns to user data, but that inflection point is far from established.  And, in any event, user data does not become worthless even after the point of diminishing returns.  *See* Tr. at 10078:7-9 (Murphy) ("[T]here's pretty much always diminishing returns, but that doesn't mean they're not valuable even after some diminishing returns have set in."); *id.* at 6337:8-18 (Nayak) ("[T]he value you get from every additional piece of data starts falling," but the overall value "continues to increase a little bit.").

105.    Google continues to maintain significant volumes of data—despite the expense of storing it—because its value outweighs that cost.  *See id.* at 6337:17-25 (Nayak) ("[A]s you get more data, it's more expensive to process."); *id.* at 10349:24–10350:7 (Oard) ("[T]he cost of keeping and using this data goes up with the amount of data that we keep.  The value goes up as well.  And at some point, if the value were to decline to the point where it wasn't worth the cost, people would stop doing it[.] . . . [T]here's a sweet spot where you would stop doing it, and Google hasn't stopped doing it yet."); *id.* at 10079:9-10 (Murphy) ("I would presume if they maintain it and it's costly to maintain it, there's a reason they maintain it.").

106.    For GSEs with little scale, even a small amount of data can result in meaningful improvements.  *Id.* at 10347:7-10 (Oard) ("And when you have very little, then not only do you get better, but you keep getting better at a faster and faster rate up to some point where the rate at which you're getting better starts to slow down."); *id.* at 2047:21–2048:3 (Weinberg) ("[W]e lack the scale to do as much experimentation as we want[.]").

## H.    Artificial Intelligence

107.    "Artificial intelligence is the science and engineering of getting machines, typically computer programs, to exhibit intelligent behavior."  *Id.* at 6339:18-20 (Nayak).  One application of AI enables computers to understand and solve problems without human intervention.

108.    For instance, AI researchers have sought to program "computers to directly understand a document or a passage just based on the words." *Id.* at 1909:5-6 (Lehman). These sorts of programs are known as LLMs or machine-learning models. *See id.* at 2667:25–2668:4 (Parakhin) ("A large language model is the closest that humanity came to producing actual artificial intelligence. It is a system that can look at written text or images, and reason over it and provide answers in a human readable flowing sort of language.").

109.    Beginning in 2015, Google increasingly began to incorporate AI technologies into its search processes. *Id.* at 6341:18–6342:11 (Nayak). Around that time, Google published "a family of deep neuralnets that are called transformers that . . . take an input and spit out an output[.]" *Id.* at 7403:9-17 (Raghavan). This technology, which is incorporated into signals like MUM, allowed Google to rely on less user data and still improve its ranking of search results. FOF ¶¶ 97–101.

110.    For instance, AI technology has accelerated search quality with respect to spelling corrections or semantically related concepts, without relying on user data. Tr. at 3697:7-17 (Ramaswamy). Neeva leveraged machine learning to develop its spell-correction technology, as opposed to relying entirely on user data. *Id.* at 3781:23–3783:20 (Ramaswamy). And if a user were to query "vacuum cleaner for a small apartment with pets," Google's transformer technology helps discern "whether the user wants an apartment, a vacuum cleaner[,] or a pet[.]" *Id.* at 7405:5-11 (Raghavan); *see also* UPX197 at 211 (discussing impact of machine learning on relevance).

111.    AI technologies have the potential to transform search. Tr. at 3696:11–3697:21 (Ramaswamy) ("AI enables search engines to do things that are not really conceivable in a return-a-set-of-links model, which is what commercial search engines generally do today."). Recently, Google and Bing have incorporated generative AI technology into their SERPs by providing "AI-

40

powered answer[s]," which do not rely on user data to produce. *Id.* (generative AI can supplement user data by offering different SERP functionality beyond organic links, such as an "AI-powered answer"). Such answers also can come in the form of AI chatbots, such as Bing's BingChat (now Copilot) and Google's Bard (now Gemini). *Id.* at 8272:9-24 (Reid). The input could be an image or words, and the output may be similarly varied. *Id.* at 7404:8-11 (Raghavan). Neeva also relied on AI-generated search results to differentiate itself from other GSEs and used AI to develop a search product with less user data. *See id.* at 3696:11–3697:21 (Ramaswamy).

112. The integration of generative AI is perhaps the clearest example of competition advancing search quality. Google accelerated and launched its public piloting of Bard one day before Microsoft announced BingChat, the integration of ChatGPT's generative AI technology into Bing to deliver answers to queries. *Id.* at 8272:4-7 (Reid); *id.* at 2670:10–2671:9 (Parakhin). (describing BingChat).

113. AI also has applications in search advertising. "Natural language understanding is a subfield of artificial intelligence" that seeks to "understand what it is a user is trying to get done, going back to the intent." *Id.* at 7376:1-3 (Raghavan). Google applies natural language understanding to its search advertising to better discern user intent and deliver an optimally responsive advertisement. *Id.* at 7376:3-21 (Raghavan).

114. Despite these recent advances, AI has not supplanted the traditional ingredients that define general search. *See* UPX197 at 211 ("There is a lot more to web ranking for which [machine learning] seems much less appropriate."). And it is not likely to do so anytime soon. Tr. at 7531:23–7532:8 (Raghavan) ("I view this as a journey, not as something that happened overnight. And I think what we in the industry have to figure out is how to use the AI . . . tools to do a better and better job of defining the user's intent and giving just the perfect answer. And what I've seen

41

so far is one more step. I think there's a few more steps to go, and I expect that in time, for instance, you will see these language models be able to service queries not only from typewritten prompts, but voice queries, image, camera, as well. And that's a journey that we're still early on."); *id.* at 7530:7-8 (Raghavan) ("It's not the case . . . that everything we do in ten years will be through" LLMs.); *id.* at 7530:9-18 (Raghavan) (Google has no plans to stop crawling and indexing the web in the foreseeable future nor will it stop presenting users with organic links on the SERP); *id.* at 7665:23-25 (Pichai) ("Now with artificial intelligence, I think we are again in the early stages of completely rethinking what's possible for our users.").

115.    Importantly, generative AI has not (or at least, not yet) eliminated or materially reduced the need for user data to deliver quality search results. *Id.* at 3697:17-21 (Ramaswamy) ("[T]he middle problem of figuring out what are the most relevant pages for a given query in a given context still benefits enormously from query click information. And it's absolutely not the case that AI models eliminate that need or supplant that need."); *id.* at 1931:21-24 (Lehman) (MUM "definitely" did not replace traditional data-based signals, like Navboost and QBST). When asked to predict how search engines will work in five or 10 years, Google's former Distinguished Software Engineer, Eric Lehman, testified that while it may be diminished in the future, "there will still be a role for user data[.]" *Id.* at 1924:18–1925:22 (Lehman). This is in part because "deep learning systems are much harder to understand." *Id.* at 6366:21-22 (Nayak). It thus remains vital for Google to "have an infrastructure that [it] understand[s]," i.e., traditional ranking signals. *Id.* at 6366:21–6367:10 (Nayak) ("[T]here is no sense in which we have turned over our ranking to these systems. We still exercise a modicum of control over what is happening and an understandability there.").

42

### I.       User Data and Privacy

116.    Google recognizes that users increasingly care about the privacy of their online activity.  *See generally* UPX1069. *See* Tr. at 7471:5-25 (Raghavan); *id.* at 8994:22–8995:1 (Fitzpatrick) ("[E]xpectations around privacy from our users from, frankly, society across the tech industry, have evolved pretty significantly."); *id.* at 8995:13-16 (Fitzpatrick) (noting that "focus on privacy as a topic has really elevated and increased" recently).  So do browser developers, *see id.* at 2484:6-11 (Cue) (Apple); M. Baker Dep. Tr. at 117:8–118:7 (Mozilla), and other GSEs, Tr. at 3677:19–3679:16 (Ramaswamy) (Neeva); UPX720 at 249–53 (DDG).

117.    Google has a Privacy, Safety, and Security team that focuses, among other things, "on both building proactive privacy protections into [Google] products, as well as building technical privacy protections into [the] systems and infrastructure," and "keeping users safe in [Google] products."  Tr. at 8989:19-24 (Fitzpatrick).  Google surveys users about its privacy offerings. *See, e.g.*, DX183 (2020 study assessing user trust related to privacy).

118.    When Google makes decisions about privacy-focused features, rivals' privacy offerings are "something [Google] keep[s] an eye on" as one of "many" data points."  Tr. at 8998:1-4 (Fitzpatrick).  Google several times has considered undertaking privacy initiatives after looking to rivals. *See, e.g*., UPX811 at 420 (comparing Google to DDG and recommending Google adopt certain features); UPX794 at 146 (same).

119.    But Google also considers the business case for making privacy-focused changes. UPX501 at 520 (2019 email from Raghavan stating that merely because "people care increasingly about privacy" and "DDG is making a lot [of] noise about it," it did not mean that Google needed "a product change"); *see* Tr. at 7411:17-21 (Raghavan) ("And the team that came forward with the proposal said we need to do exactly what [DDG's] doing.  And my pushback was maybe we do,

maybe we don't, but I'd like to see the data on the impact on users, and on our ability to build a good search and search ad system.").

120.     Google believes that there is a trade-off between search quality and user privacy. *See* Tr. at 8998:1-7 (Fitzpatrick) ("But when we're designing, whether it's a product overall, a new feature, or a privacy control or capability, end of the day the question is: How do we do what's right for our users?"); *id.* at 7475:1-2 (Raghavan) (agreeing that an incognito mode feature could be accomplished "[a]s a technical matter," but "[t]hat doesn't make a good product design"); UPX500 at 518 ("DDG might also not be the best model for Google users' privacy needs[.]"); UPX501 at 520 ("I want to see evidence that there's a real impact on Google users, attributable to" privacy.).

121.     The degree of privacy a GSE offers reflects a series of individual design decisions. Whether to track a user's sessions data is one such decision.  According to Google, tracking user sessions is "measurably beneficial to the user experience, including things like []in-session use of context to improve results."  Tr. at 9035:22–9036:1 (Fitzpatrick).  Such data also helps to tailor the advertisements that Google delivers to a user.  *See id.* at 7457:23–7458:9 (Raghavan); *id.* at 9069:15-23 (Fitzpatrick).  DDG, on the other hand, anonymizes user click data and does not track user sessions.  *Id.* at 2050:24–2051:7 (Weinberg).  It therefore cannot discern whether multiple searches are the same user performing different actions.  *Id.* at 2051:3-7 (Weinberg); *id.* at 1944:14-18 (Weinberg) ("[I]f 100 people search for cat pictures today, we don't really know whether it's like one person or 100 different people.").

122.     How a GSE uses IP addresses is another design decision.  Google logs IP addresses and uses them to customize search results.  *See, e.g.*, *id.* at 1772:22–1773:15 (Lehman) ("[K]nowing a person's . . . location can sometimes help understand what it is they're looking

44

for."); *id.* at 1778:16-18 ("[I]n general, showing people search results that are appropriate to their location for a certain query is important[.]").  DDG, in contrast, does not log IP addresses.  Instead, it "use[s] the location that [it] get[s] via the IP address, and then [it] throw[s] it away after the search is done."  *Id.* at 2085:25–2086:1 (Weinberg).

123.    Google also logs IP addresses to enhance security.  *Id.* at 7413:25–7414:10 (Raghavan) (Google logs IP addresses to detect and combat botnets and fraudulent clicks).  DDG "had developed [its] own click fraud systems" that do not require logging of IP addresses.  *Id.* at 2069:10-11 (Weinberg); DX621 at 100.

124.    Another question of privacy design is whether to invite users to "sign in."  Google does so because it believes such functionality improves search results and overall search engine quality.  *See* Tr. at 3737:5-8 (Ramaswamy) (personalization improves search quality).  DDG does not have an option for users to "sign in" to its platform.  *Id.* at 1944:14-15 (Weinberg) ("[E]very time you search on DuckDuckGo, it's like it's your first time[.]").

125.    How much user data a GSE retains also is a measure of privacy.  Google chose to retain 18 months, even though some survey data suggested users preferred a shorter retention period.  UPX996 at 978 (49% of users surveyed would prefer that Google stored one month or less data, and 74% wanted Google to store their data for under one year).  The decision to retain 18 months of a user's data versus fewer months was largely arbitrary.  Tr. at 9013:9-18 (Fitzpatrick) (While Google "felt like it was important to have a default that was greater than that one-year boundary to allow for . . . annual seasonality [of information] to still be preserved," the decision to default to 18 months (as opposed to 13 months) was because 13 "felt like a really weird number" and 18 months "just felt a little . . . better.").

## III.    GOOGLE SEARCH

### A.    Product Development

126.    Google is widely recognized as the best GSE available in the United States. *See, e.g.*, *id.* at 2586:1-2 (Cue) (Apple) ("Google still has the best search engine by far[.]"); DX547 at .002 (Mozilla) ("Google is the clear winner when it comes to product experience and what users want.") (internal quotation marks omitted); Christensen Dep. Tr. at 146:19-23 (Motorola) ("We have a positive opinion about Google Search, as do most consumers I think.  It's – it's fast.  It's reliable.  It performs well for consumers' intended purchase in our opinion."); Giard Dep. Tr. at 33:2-3 (T-Mobile) (Google "provides customers with the best overall device experience[.]"); DX385 at 239 (AT&T) ("Google generates more query volume and monetizes search at higher rates than Bing and Yahoo[.]"); *accord* Tr. at 9429:3 (Rosenberg) (Google) ("[W]e think Search is best in class.").

127.    Although Google significantly outperforms all rivals on mobile devices, Bing's search quality on desktop measures up to Google's.  *See* Tr. at 6048:12-15 (Whinston) (Bing's quality "is very close on desktop" to Google); UPX238 at 667 ("Bing is comparable on desktop . . . and leads in several desktop verticals[.]"); UPX260 at 681 (Bing is comparable to Google for desktop result relevance and outperforms Google on desktop for overall preference).

128.    Google's superior product quality rests in part on its numerous innovations over the years, as depicted below.  *See* Tr. at 9899:21–9900:6 (Murphy) (discussing DXD37 at 140).

46

## Google Has Made Continual Investments That Expand the Use of Search

### Examples of Innovation in Google Search

DXD37 at 140.

129.    "In analyzing potential changes to its Search product, Google considers the needs of users.  Google recognizes that it exists in a competitive landscape and if it does not satisfy users' information needs, users will access information from other search providers (general or otherwise).  Google does not, however, consider whether users will go to other specific search providers (general or otherwise) if it introduces a change to its Search product."  UPX6019 at 365–66.

### B.    Branding

130.    The fact that "Google is used extremely highly across the world . . . contribute[s] to brand formation."  Tr. at 672:20-21 (Rangel); *id.* at 7780:23-24 (Pichai) ("Our brand gets validated by being present as a default in iPhones.").  Google also built brand loyalty and recognition by offering a high quality product.  *Id.* at 5921:22–5922:5 (Whinston); *id.* at 8397:21-22 (Israel) ("Google is building a brand reputation by how well it provides searches.").

131.    Google has long recognized that "the affinity of the Google brand was something that was valued by users[.]"  *Id.* at 361:17-18 (Barton); *see* UPX93 at 904 ("Several factors are believed to affect the choice [of a GSE], including . . . brand strength[.]") (2007); UPX171 at 186

47

("Our brand is in good standing among iPhone users" based on "[k]ey satisfaction and brand affinity metrics[.]") (2015).

132.    Perhaps the best example of Google's brand is that the public uses the term "Google" interchangeably with internet search.  "[T]o search is to Google.  Google is a verb." Tr. at 623:20-21 (Rangel); *see also id.* at 672:14-23 (Rangel) (same); *id.* at 4769:10-16 (Whinston). Moreover, a search for "google.com" is one of the most frequently entered search queries on Bing. *Id.* at 2745:21-25 (Parakhin).

133.    Google's strong brand also benefits its partners.  *See id.* at 7780:21-23 (Pichai) ("Apple benefits and sells more iPhones by having their brand associated with the quality . . . [of] Google Search.").

### C.    Internal Quality Studies

134.    In 2020, Google assessed the impact of degrading aspects of its search quality for about three months, specifically its large ranking components (e.g., Navboost, Synonyms). *See* UPX1082 at 294.  The experiment tested a quality decline of 1 IS point, a measure of search quality equivalent to the loss of two times the information contained on all of Wikipedia.  *See id.*; Tr. at 6323:12-17 (Nayak) ("If we took Wikipedia out of our index, completely out of our index, then that would lead to an IS loss of roughly about a half point."); *id.* at 4771:4–4773:9 (Whinston) (describing this experiment).  This quality-reduction experiment correlated with only a 0.66– 0.99% decline in global search revenue.  UPX1082 at 294.  In short, this study demonstrates that a significant quality depreciation by Google would not result in a significant loss of revenues. *See id.  But see id.* at 6329:22-25 (Nayak) ("[I]f you made much larger IS changes, the relationship might not stay linear.  It might become nonlinear.  There might be inflection points where if you make search much worse, for example, you might actually lose a lot more traffic[.]").

48

135.   Google has at times tracked its competitors' market shares or standing by identifying other GSEs and comparing Google to those rivals.  *See* UPX399 at 965–66 (2014 document referring to Google, Bing, and Yahoo); UPX475 at 744 (2018 email chain and attachment calculating market share against other GSEs); UPX268 at 182 (2020 slide deck comparing Google, Bing, DDG, Qwant, and Ecosia).

136.   When Google evaluates its own quality, it does so by conducting side-by-side experiments with other search engines.  *See* Tr. at 6466:4-18 (Nayak) (discussing UPX2033) (describing side-by-side Google-Bing analysis with respect to queries relating to COVID-19).  These studies involve IS4 rating systems that use human raters to compare results.  *Id.* at 8099:4-25 (Gomes).  In the past, Google has compared its latency and search results quality (using IS differences) to Bing's.  *See id.*; *id.* at 6457:13-21 (Nayak) (discussing UPX2022, a 2017 document comparing Google and Bing's relative latency); *id.* at 7771:12-25 (Pichai).  Google engages in an ongoing evaluation of Bing as part of its work.  *Id.* at 8099:23-25 (Gomes).

137.   Latency measures the speed with which a GSE returns search results and is an important quality metric.  *Id.* at 1345:15-17 (Dischler).  In 2017, Google analyzed its latency relative to Bing and determined that, for certain popular queries on Google, 25% of the time, the SERP took more than three seconds to load.  UPX2026 at 122.  Bing was "dramatically faster[.]"  *Id.* at 123.  Its first result arrived sooner 98% of the time.  *Id.*  This translated to about 300 milliseconds faster than Google.  UPX2022 at 590.  In response, Google launched Project Folly, "an attempt at instituting a set of projects and policies and processes to decrease latency."  Tr. at 6458:12-19 (Nayak).  The project was a success.  *Id.*

138.    Google has also evaluated its privacy protections and IS metrics compared to those of DDG.  *Id.* at 8099:17-19 (Gomes) (Google "use[s] IS4 and human raters to compare against competitors like" DDG).

139.    Google does not compare latency or IS scores with social media platforms like TikTok "because they're very different experiences."  *Id.* at 6467:8-14 (Nayak); *id.* at 8100:4-8 (Gomes) (IS ratings comparison with Facebook is "not something that [Google] could do easily").  The same is true with respect to specialized vertical providers like Amazon.  *See id.* at 8100:1-3 (Gomes).

140.    That said, Google has assessed the competitive threat posed by specialized vertical providers and social media platforms.  For instance, in 2021, Google sought to understand whether younger users relied on social media instead of Google for search; the study concluded that youth have different behaviors that drive their desired search experience, one of which is increased importance on receiving recommendations from individuals.  *Id.* at 8206:24–8208:11, 8249:23–8250:25 (Reid).  Among "Generation Z" participants (defined as participants between the ages of 18–24 who use TikTok daily), 63% reported that they use TikTok as a search engine.  DX241 at .032.  And a 2015 Google User Experience Research study concluded that Google users frequently used specialized vertical providers' mobile applications.  *See* DX62A at .027–.028.

## IV.    OTHER PLATFORMS

### A.    Special Vertical Providers

141.    Specialized vertical providers, or SVPs, are platforms that respond to queries centered on a particular subject matter.  Tr. at 8626:5-12 (Israel).  Examples of SVPs include Amazon, Expedia, and Yelp.  *See id.* at 1031:14-18 (Higgins); *id.* at 2169:3-8 (Giannandrea).

50

142.     Most SVPs do not respond to noncommercial queries, although there are exceptions, e.g., Wikipedia.  *Id.* at 8396:23–8397:3 (Israel).

143.     SVPs are not GSEs.  *E.g.*, *id.* at 8098:4-6 (Gomes).

144.     Once a user is on an SVP's site, the SVP facilitates navigation "only to sites in their segment where [the user] can make a transaction," with some exceptions.  *Id.* at 7032:18-23 (J. Baker).  This is known as a "walled garden" model, where the platform has proprietary, structured data that is not available on the open web.  *Id.* at 8100:11-14 (Gomes).  Thus, an SVP like "Amazon is not a competitor for nav[igational] queries."  *Id.* at 8749:3 (Israel); *see also id.* at 1492:18-22 (Dischler) ("Google offers the full web, to the extent that Google has access to it. Amazon offers the products that are available at Amazon.  It's possible that some products available at Amazon are not available via Google's access on the web, and Amazon may have their own unique inventory.").

145.     Home Depot, for instance, maintains a product catalog of goods that it sells both online and in stores.  *Id.* at 5115:4-11 (Booth); *see also id.* at 8395:14-24 (Israel) (discussing DXD29 at 17) (Home Depot is an SVP in the shopping vertical).  Users of Home Depot's digital platforms can use them to purchase those goods but not navigate to a product-maker's website to make a direct purchase there instead.  *See id.* at 5115:12-14, 5128:22–5129:4 (Booth); van der Kooi Dep. Tr. at 79:11-12 ("It is a search on what is available in the catalog.").

146.     Fact witnesses with industry experience agree that SVPs are different from GSEs. *See, e.g.*, Tr. at 1031:20–1032:2 (Higgins) (stating GSEs involve "anything that's available on the web," while SVPs are "specifically focused on a domain"); *id.* at 2168:5–2169:11 (Giannandrea) (does not consider SVPs to be GSEs); *id.* at 3670:12-13 (Ramaswamy) (GSEs are "best defined in contrast to a specialized search engine"); *id.* at 5230:21-23 (Dijk) (Booking.com is not a GSE).

51

147. Fact witnesses with industry experience also agree that an SVP could not substitute for a GSE as a default search engine. *Id.* at 2171:10-13 (Giannandrea) (agreeing that "users, when they put something in the URL bar of Safari, they have an expectation that it's going to go to a general search engine"); *id.* at 1032:7-20 (Higgins) (stating that he would not recommend that an SVP be set as a default search engine on a Verizon device, because "consumers would like to have some search capability on their devices, and the preference would be for a general as opposed to a specific vertical"); *id.* at 7425:25–7426:14 (Raghavan); M. Baker Dep. Tr. at 217:3-15, 218:8-9 ("The user experience trying to use general search with only Amazon would not be good.").

148. Plaintiff States' expert, Dr. Jonathan Baker, provided an example. If a user enters a query for "UFOs" on Google, they will be presented with nearly 2 billion search results. But that same query on Amazon yields only around 10,000 results, all of which are products for purchase. And if a user searches on Expedia or HomeAdvisor for "UFOs," they will receive no results. Tr. at 7031:21–7032:6 (J. Baker) (discussing PSXD11 at 21).

149. Google's own employees recognize that SVPs are not GSEs. *See id.* at 8098:4-6 (Gomes); UPX911 at 875 ("Amazon is not considered a search site."); Tr. at 183:13-18 (Varian) (agreeing that "Amazon, Apple, and Facebook don't provide general-purpose search engines"); *id.* at 484:20–485:4 (Varian) (Amazon's search results are narrower than Google's "[b]ecause they use different algorithms, different datasets, different history, different understanding of users").

150. Nevertheless, both Google and other GSEs compete against SVPs for certain commercial queries in vertical offerings, such as travel and shopping. *See* Tr. at 3646:3-11 (Nadella); *id.* at 5883:16-22 (Whinston); *id.* at 8202:1-6 (Reid) (listing Amazon, DoorDash, OpenTable, Yelp, and TripAdvisor as competitors for shopping and food queries); *id.* at 7310:5–7312:4 (Raghavan); *see* UPX8085 at 854 ("We face formidable competition in every aspect of our

business, including, among others, from . . . vertical search engines and e-commerce providers for queries related to travel, jobs, and health, which users may navigate directly to rather than go through Google[.]").  Google's internal documents reflect differentiated analysis for "traditional Search engines such as Bing, Yandex, DuckDuckGo and alike" versus "[v]ertical search and apps analysis (including Amazon, Booking, etc.)[.]"  UPX483 at 295.

151.    Google views competition from SVPs as "intense for commercial clicks."  UPX343 at 845.  A 2020 Bank of America study reported that 58% of users search Amazon first when they seek to make an online purchase, as opposed to only 25% who go first to Google, demonstrating Google's secondary status as a starting point for users with high commercial intent.  Tr. at 8425:15–8426:8 (Israel) (discussing DXD29 at 28).  Google thus perceives Amazon as posing a risk of siphoning queries away from Google.  DX126 at .019.

152.    Microsoft recognizes that "if Bing or Google were not doing vertical searches well, or at least not having organic results that people could click to get to vertical search engines," users might bypass GSEs and instead search directly on Amazon from the outset.  Tr. at 3649:23–3650:6 (Nadella).  *But cf. id.* at 1942:18-21 (Weinberg) (DDG does not consider Amazon or other SVPs to be competitors that users are likely to switch to or from).

153.    Even for overlapping queries, GSEs and SVPs can serve as complementary search platforms.  As Dr. Baker opined, "it wouldn't be surprising if, for example, a search user entered a query for red shoes on a general search firm, saw a link to a shopping SVP, and then clicked on it and entered a search for red shoes there.  That would be a natural thing to expect."  *Id.* at 7035:9-13 (J. Baker); *accord id.* at 7435:5-7 (Raghavan) ("Prime members who in any way intend to shop at Amazon might come to Google and do a lot of research before they do it.").

154. For that reason, studies conducted by Google's expert Dr. Mark Israel regarding query overlap do not show that SVPs like Amazon and Yelp belong in the same product market as Google. *See id.* at 8406:5–8407:4 (Israel) (discussing DXD29 at 20) (analysis showing that a query sample of Google's top 25 non-navigational shopping queries attracts more queries weekly on Amazon (3.7 million) than Bing (0.4 million)); *id.* at 8411:3-13 (discussing DXD29 at 21) (finding that Yelp's local query volume is higher than Google's and much higher than Bing's); *see also id.* at 8401:4–8404:15 (Israel) (discussing DXD29 at 18) (analyzing the percentage of searches on GSEs as compared to SVPs for particular verticals).

155. SVPs are often reliant upon GSEs for traffic. *See id.* at 3534:7-23 (Nadella); *id.* at 2645:13-18 (Parakhin); *id.* at 7032:7-15, 7033:13-21 (J. Baker). For instance, Dr. Baker's analysis demonstrated that 33–88% of SVPs' online traffic (depending on the vertical) flows through GSEs, either via organic links or advertisements. *Id.* at 7033:18-21 (J. Baker) (discussing PSXD11 at 25). Although this analysis omits traffic through mobile applications, the conclusion is bolstered by Google's own analysis showing that "Amazon" was Google's fourth highest query by volume in 2018. *See* UPX342 at 859.

156. For this reason, SVPs are top advertisers on GSEs. Tr. at 9209:1-10 (Holden) (travel SVPs like Booking.com and Expedia are some of Google's largest advertisers); *id.* at 4615:11-16 (Whinston) ("[I]f you go and you look which are the biggest advertisers on Google, which are the biggest advertisers on Bing, the answer is specialized search engines. And what it's reflecting is that there's a bunch of traffic they think they can't get directly, you know, otherwise they wouldn't be spending the money to try to get referrals."); *id.* at 5116:3-8 (Booth) (Home Depot is a "large" purchaser of ads on Google, spending "hundreds of millions of dollars"); *see also infra* Section V.A.1.

157. Empirical research—performed by Google—demonstrates that use of SVPs is complementary, rather than cannibalistic. In other words, there is no evidence that increased use of SVPs correlates with a diminished use of Google or other GSEs. *See* UPX344 at 058; UPX436 at 005. For instance, Google's 2019 Project Charlotte study showed that users who were members of SVP loyalty clubs (e.g., Amazon Prime) or who otherwise engaged with SVPs were *more* likely to enter queries on Google. Tr. at 7430:2–7435:20 (Raghavan). Similarly, a 2018 Google analysis concluded that Android users who were active on the Amazon application yielded $2.31 per user in incremental search revenue for Google. UPX335 at 694. More recently, a 2020 Google study found a positive correlation between Amazon application use and query volume on Google, ultimately determining that a user's adoption of any of six major SVP applications—Amazon, eBay, Walmart, Pinterest, Spotify, or Twitter—was related to increased revenues and queries on Google mobile, with no significant change on desktop behavior. Tr. at 8733:1–8738:19 (Israel); PSX562 at 966, 977.

158. SVPs do not view themselves as competing with general search, although they may compete with GSEs' vertical offerings. *See, e.g.*, Tr. at 6580:1-15 (Hurst) (Expedia competes with Google's travel verticals, but not its search product, because users "can't generally search for most of the things [one] search[es] Google for on Expedia . . . Expedia['s] product literally does not work for what I assume is the overwhelming majority of Google general search.").

**B. Social Media Platforms**

159. Users go to social media platforms primarily to interact with others and view photos and videos. *Id.* at 5392:19-24 (Jerath); *cf. id.* at 6943:19-21 (Amaldoss) ("I can say people go to social media for entertainment and Twitter for entertainment. They're not going there to collect

information."). People tend to engage with social media properties for longer sessions than with GSEs. *See id.* at 1408:3-20 (Dischler).

160. Examples of social media platforms are Facebook, Instagram, Twitter, Snapchat, LinkedIn, Pinterest, and TikTok. *Id.* at 3928:2-14 (Lowcock); *id.* at 4840:23-25 (Lim).

161. Industry participants do not consider social media sites to be GSEs. *See, e.g.*, *id.* at 5243:6-8 (Dijk) (TikTok); *id.* at 183:13-18 (Varian) (Facebook).

162. On TikTok, users do not have to enter a query to view content. *Id.* at 7419:16-18 (Raghavan). Instead, they "scroll through a video feed that's based on an algorithm of their engagement with past videos[.]" *Id.* at 7419:23–7420:1 (Raghavan). TikTok does have a search functionality, but if users enter a query on TikTok, the results page only displays content already on TikTok and does not contain links or information from the open web. *Id.* at 7420:22–7421:7, 7421:22-25 (Raghavan). As compared to Google, the user experience on TikTok is "quite different, that's clear." *Id.* at 7424:17-18 (Raghavan).

163. Google's internal studies suggest that younger users may be increasingly using social media for search-related needs. *Id.* at 8202:24–8203:5 (Reid); DX241 at .010 ("63% of daily TikTok users aged 18 to 24 stated that they use TikTok as a search engine in the last week."). The majority of Google users are not in that narrow age range. Tr. at 8261:15–8362:20 (Reid).

164. Still, Google views social media sites like Facebook, Instagram, and TikTok as competitive threats. *See id.* at 7386:23–7387:13 (Raghavan); *see also id.* at 1412:23-25 (Dischler) (Instagram's ad revenue growth is "seen as a competitive threat" by Google); UPX8085 at 854 ("We face formidable competition in every aspect of our business, including, among others, from . . . social networks, which users may rely on for product or service referrals, rather than seeking information through traditional search engines[.]"). For example, Google's Senior Vice President

of Knowledge and Information Products, Dr. Prabhakar Raghavan, explained that TikTok is growing more rapidly than Google, in part due to "an extremely compelling product, especially for a younger demographic." Tr. at 7393:2-15 (Raghavan); *see also id.* at 7401:9-11 (Raghavan) (describing "TikTok's rise" as "mercurial," and stating that he "expect[s] it to grow again at the expense of some of the others").

165. The evidence does not show, however, that increased use of social media corresponds to a decrease in use of Google. In fact, a 2009 Google study showed that users who increase their use of Facebook tend to use Google more often, not less. UPX902 at 020.

## V.   THE DIGITAL ADVERTISING INDUSTRY

166. The digital advertising industry has grown rapidly in the last decade and a half. *See* Tr. at 1393:8-18 (Dischler) (describing "hundreds" of digital advertisers, such as "Meta, with their Facebook and Instagram properties; Amazon; Microsoft; Apple; Snap; various display networks. Netflix has now created an ad platform which is growing very quickly"); *id.* at 1394:2-12 (Dischler) (discussing DX3243); *id.* at 8553:4–8554:14 (Israel) (discussing DXD29 at 120) (digital advertising revenue has grown from about $20 billion in 2008 to over $200 billion in 2021, more than a ten-fold increase).

### A.   Search Advertisements

167. Search advertisements are a form of digital advertising. Search advertisements are paid, or "sponsored," postings published in response to a user's query on a search platform. *Id.* at 1173:15-16 (Dischler). Search advertisements appear on GSEs and SVPs, as well as occasionally on social media platforms.

168. A "signal" within the context of search advertising is an indicator of a consumer's intent to purchase a good or service. *Id.* at 404:25–405:16 (Varian).

169.     Search ads are the product of a uniquely strong signal because they are delivered in response to a user's query.  *See* UPX910 at 753 ("The vast majority of our profits come from search ads, because the signal from a query is s[]o strong.").  "The big idea is that when you search for a product or service, chances are you're interested in purchasing that product or service." UPX428 at .010.

170.     This signal is all the more powerful because it represents the user's declared intent in real time, that is, at the moment the intent is manifest.  *See* UPX910 at 753 (a query for "tennis racquet" is a "strong indicator of interest in buying a tennis racquet," and "[m]uch stronger than what you searched [] three days ago," "[o]r what article you read yesterday"); UPX26 at 764 ("Search ads are an effective form of advertising since queries are a strong signal of user interest and intent and the ads appear immediately after the query is entered."); Daniels Dep. Tr. at 31:4-8 (search consumers express "clear intent").

171.     As a result, advertisers view paid search as particularly efficient at driving conversions.  *See, e.g.*, Tr. at 4854:23–4855:1 (Lim); UPX441 at 802 (JPMorgan Chase email: "Search can drive acquisition based on some of the strongest intent signals made available[.]"); Daniels Dep. Tr. at 31:13-19 (search customers express "the clearest preference" in the digital marketing ecosystem); Alberts Dep. Tr. at 45:18–46:16 ("[P]aid search can be an incredibl[y] powerful way to get in front of the consumer who is . . . actively looking to make a purchase or looking to sign up or enroll."); *see also infra* Section V.D (describing differences in intent among users on various ad channels).  A conversion typically is a sale or, for some goods or services, a new account or enrollment.  Tr. at 4842:7-8 (Lim); *id.* at 5121:1-5 (Booth).

58

*1.      Search Ads on GSEs*

172.     GSEs earn revenue through the sale of search ads.  *Id.* at 361:21–363:16 (Barton); *id.* at 1138:2-5 (Dischler) (the majority of Google's revenue is ad revenue).  When a user clicks on a GSE search ad, they are taken to an advertiser's website or platform and encouraged to complete a sale or some other indicia of conversion.  *Id.* at 1398:11-12 (Dischler).

173.     There is a direct relationship between a GSE's scale and its monetization of search advertising.  *Id.* at 2646:18-22 (Parakhin).  More users on a GSE means more queries, which in turn means more ad auctions and more ad revenue.  *See, e.g.*, *id.* at 5142:3-13 (Booth); *id.* at 6595:12-25 (Vallez); Stein Dep Tr. at 185:14-22.

174.     Google does not serve ads in response to all queries.  FOF ¶¶ 37–38.  It does so only in response to queries that convey a "commercial intent," which Google assesses by determining whether an advertiser is willing to pay for an ad in response to the query.  Tr. at 1170:11-13, 1171:23–1172:1 (Dischler).

175.     There are two primary types of search ads sold on GSEs: (1) general search text ads and (2) shopping ads, or product listing ads (PLAs).  *Id.* at 1177:2-4 (Dischler).  The figure below illustrates how those ad types can appear on a SERP.  Other types of ads that appear on SERPs include local ads, hotel ads, and other travel ads.  *Id.* at 1346:14-23 (Dischler).



DXD3 at 2.

176.    As shown, text ads resemble the organic links on a SERP.  When a user types in a query, text ads generally appear at the top of the SERP with a designation indicating that they are paid advertisements.  On Google, that designation is the word "Sponsored."  *See id.*  Occasionally, a text ad will include an image.  *See* Tr. at 408:7-9 (Varian).



UPXD13.  As depicted in the two prior images, the number of text ads served can vary based on the query.  Google's policy, however, is to serve no more than four text ads on a SERP.  *See* Jain Dep. Tr. at 262:16–263:11 (discussing UPX746).

177.    PLAs, also known as "[s]hopping ads[,] are designed for retail advertisers," that is, sellers of tangible goods.  Tr. at 1353:3 (Dischler); *id.* at 3998:7-9 (Juda).  "The reason why is because when users are shopping, they often want to see pictures and prices and other relevant information about products."  *Id.* at 1353:4-6 (Dischler).

178.    Google developed PLAs both to meet this consumer need and to compete with Amazon's retail offerings.  *Id.* at 1354:3-15 (Dischler).  A depiction of shopping ads on a SERP appears below.



UPX32 at 145.

179.    Text ads differ from PLAs in several ways.  Text ads can be used to advertise almost any product or service.  So, virtually any seller can advertise using a text ad.  *See* Tr. at 408:10-13 (Varian); *id.* at 3810:25–3811:5 (Lowcock); *id.* at 3995:11–3996:9 (Juda).  PLAs, however, are used to market only tangible goods.  *Id.* at 3811:22-24 (Lowcock).

180. A significant portion of Google's search advertisers can purchase a text ad, but not a PLA. *Id.* at 1180:7-24, 1183:13-19 (Dischler); *id.* at 4251:2-9 (Juda) ("[P]roduct listing ads only appear on searches that are more retailer product oriented."); *id.* ("[S]ince text ads offer a more free-flowing way for advertisers to target searches, they will sort of run the whole gamut of the kinds of searches that they may show against."). For example, a financial institution like JPMorgan Chase purchases text ads but not PLAs. *Id.* at 4848:1-11 (Lim). Moreover, many of Google's top advertisers by ad spend are online travel companies that do not purchase PLAs. *See* PSX867.002.

181. Text ads are thus the predominant form of advertising on Google, whether measured by revenue or number of advertisers. Tr. at 1180:25–1181:13, 1476:25–1477:5 (Dischler). In 2020, text ads made up about 80% of Google's search ads by revenue. *Id.*; *id.* at 1282:9-11 (Dischler). In terms of ad types, 52.8% of ad dollars spent on Google come from advertisers who purchase only text ads; 46.9% is generated from advertisers who purchase both text ads and PLAs; and a mere 0.1% is originated by PLA-exclusive advertisers. *Id.* at 4649:5-15 (Whinston) (discussing UPXD102 at 37); *accord* PSX867.003 (54.7% of revenue comes from advertisers who purchase only text ads versus 45.1% from advertisers who buy both text ads and PLAs). When measured by number of advertisers, 92.5% of Google's advertisers purchase only text ads, 5.5 % purchase PLAs and text ads, and 2% purchase only PLAs. PSX867.003; *accord* Tr. at 1476:25–1477:5 (Dischler).

182. Advertisers have significant control over the "copy" of a text advertisement. Tr. at 423:15-20 (Varian); *id.* at 3810:13-23 (Lowcock); *id.* at 1184:16–1185:1, 1185:13-15 (Dischler) ("Q. Would you agree that a text ad gives an advertiser more control when their ad appears on a search engine results page? A. It does."). For example, advertisers can tailor the text of the advertisement to include a heading and description or add "extensions" such as additional site links

or contact information.  *See* UPX12 at .005; Tr. at 1180:3-6 (Dischler).  These are sometimes known as "formats."  Tr. at 4791:1-4 (Whinston); *see id.* at 5128:4-18 (Booth) (discussing PSXD2, Home Depot's use of an extension to promote a Labor Day sale).



UPX12 at .005.

183.    By contrast, advertisers have less input into the final copy of a PLA.  Tr. at 1185:2-15 (Dischler); *id.* at 5133:9-10 (Booth) ("There are fewer controls or ability to be able to custom tailor a product listing ad or a shopping ad.").  Google generates PLAs using machine learning, based on inventory information provided by the advertiser.  *Id.* at 1185:4-6, 1353:7-11 (Dischler) ("The retail advertisers will provide us with a product feed that has structured information which is analogous to an ad creative[.]").

184.    Advertisers also have more control over text ads because they are purchased through keywords.  A query that includes an advertiser's selected keywords might trigger an advertisement from that source.  *Id.* at 1185:16-19 (Dischler).  Advertisers do not select keywords when buying PLAs.  *Id.* at 1185:20-22 (Dischler).  "Shopping campaigns rely on the feeds for letting the engines know when it is relevant to serve [the] product."  UPX926 at 698.  "Since Shopping campaigns are not keyword-based, the information included in [the] product titles and

descriptions will be the main source of what the engines will be crawling before serving ads." *Id.* at 699. *But cf. id.* at 701 (advertisers can use negative keywords to target PLAs); *infra* Section V.F.3.b (discussing negative keywords).

185. Both text ads and PLAs are sold using an auction, although those auctions are different. Tr. at 1197:9-13 (Dischler); *id.* at 3812:9-12 (Lowcock); *see infra* Section V.F (describing text ads auctions). In 2017, Google considered and rejected a combined auction for text ads and PLAs. *See* UPX1013 at .003 (deciding against integration in part because "user intent and advertiser value is different across the units, and as a result advertisers are not bidding on the same thing on Shopping and Text ads"). At present, changes to pricing of text ads auctions does not impact the pricing of PLA auctions. Tr. at 1203:21-24 (Dischler).

186. Both text ads and PLAs are sold on a cost-per-click (CPC) basis. "[T]he advertisers only pay[] if the user clicks on a link within their ad." *Id.* at 1195:14-16, 1177:5-20 (Dischler); UPX1 at 538–39. PLAs cost less than text ads. *See* UPX1013 at .003 ("While PLAs are a great user experience and provide a great deal of advertiser value, the CPCs tend to be lower than text ads."); Tr. at 4650:2-20 (Whinston) (discussing UPXD102 at 39) (concluding that "text ads are more expensive than PLAs" and while "PLA prices have been flat or, if anything, a little decreasing, [] text ad prices have been going up"); *cf. id.* at 4782:23–4783:2 (Whinston) (discussing UPXD102 at 65) (opining that the CPC of text ads has doubled between 2013 and 2021).

187. Google views text ads and PLAs as different products. Tr. at 423:12-14 (Varian); *id.* at 1188:10-16, 1188:25–1189:1 (Dischler) ("[F]rom the perspective of Google, shopping ads and text ads are different products."); PSX191 at 722 ("Shopping and Text Ads are different products with different goals."); *id.* at 723 ("Today these two formats are siloed in their own world

and don't compete[.]"); UPX1084 at 477 (slides summarizing differences between text and shopping ads); UPX440 at 590 ("[W]e believe that both supplement each other and provide useful information to the user."). Accordingly, Google has separate teams for text ads and PLAs, and those teams have different goals. Tr. at 1188:25–1189:3 (Dischler); *id.* at 1498:9-16 (Dischler) (Google plans to continue selling text ads and PLAs as separate products).

188. Retail advertisers, however, often have the same goal when using both types of ads, which is to drive sales. *Id.* at 1183:22-25, 1190:4-8 (Dischler). Accordingly, retail advertisers "often will relatively allocate their budgets on text ads or shopping ads in order to achieve that objective at the lowest possible cost and highest effectiveness." *Id.* at 1355:5-9 (Dischler); *infra* Section V.E.

189. Because tangible goods can be advertised using either a text ad or PLA, both ad types sometimes will appear on the same SERP. Certain retail advertisers attempt to purchase both to maximize their visibility on a given SERP. For example, if a user searches for a particular branded product (e.g., see below entering the query "pampers"), the brand can attempt to "own the SERP" by purchasing the top placements for both text ads and PLAs. *See* Tr. at 5137:14-17 (Booth) ("[T]he SERP has got limited real estate, and so the more that we can take up that real estate, the higher consideration we would have for somebody to select one of our ads.").



UPX12 at .003.

190.    Google recognizes that some advertisers use text ads and PLAs together to maximize their SERP "real estate."  *See* Tr. at 1354:18–1355:5 (Dischler); UPX464 at 155 (PLAs "[c]omplement[] text ads to increase an advertiser's 'shelf space' on SERPs[.]").

191.    An advertiser may also purchase its rivals' branded keywords to "conquest" by diverting rivals' potential customers towards its platform.  *See* Tr. at 3864:19–3865:25 (Lowcock). Conquesting thus is most effective through text advertising, which uses keywords.  *See id.* at 4846:23–4847:8 (Lim) ("branded keywords" are those that contain a firm's "owned and operated terms"); *id.* at 5131:22-25 (Booth) (text ads are better suited to branded keywords, as a query for "Home Depot" is too general to assign to a single product).

192.    Google's market share in the text ads market measured by ad spending is 88%. *See id.* at 4777:21–4779:6 (Whinston) (discussing UPXD102 at 62).  Of those text ad dollars, 45% comes from text ads that are displayed in response to a query entered into a default search access point covered by Google's distribution agreements.  *Id.* at 5772:20–5773:2 (Whinston) (discussing UPXD104 at 39).

*2.      SVP Search Ads*

193.    SVPs also display search ads, which are almost exclusively PLAs.  SVP PLAs also use a feed-based system to select ads.  *See* Alberts Dep. Tr. at 39:22-40:13 (describing Amazon and Target as serving PLAs "powered by product feeds").

194.    In order to place a search advertisement on an SVP, "the client needs to have their product or services available for purchase on the[] online retailer websites."  Tr. at 3854:13-15 (Lowcock); *see, e.g.*, James Dep. Tr. at 105:20-23 ("[A]n Amazon-sponsored product ad would require the . . . advertiser . . . to be selling that product on Amazon.").  A user that clicks on a search ad delivered on an SVP thus will remain on the platform, unlike a click of a GSE search ad that takes the user to the advertiser's website.  *See* Tr. at 485:11-13 (Varian); *id.* at 1398:4-10 (Dischler) ("One particular feature of Amazon's product ads is that since they're also the platform on which products are sold, it means that they can close the loop, which means that anytime a conversion happens, when a purchase event happens, it happens on Amazon.").  SVPs like Amazon take a "cut" of the final sale, which drives their profits.  *See* DX501 at .015–.017.

195.    As a consequence, a firm that does not sell on an SVP also will not advertise on it. For example, because Home Depot does not sell goods on Amazon, it does not purchase search ads on Amazon.  Tr. at 5124:10-23 (Booth).

196.    As of 2023, Google estimates that Amazon's revenues are larger than Google's in retail advertising.  *Id.* at 1403:20-21 (Dischler) (discussing DX231 at .003).

**B.      Display Ads**

197.    A display advertisement is an image or video that appears on a website.  *Id.* at 4848:17-22, 4857:3-5 (Lim).  One type of display ad is a banner ad, which is depicted below at

67

the top and side of the image.  *Id.* at 1195:19-25 (Dischler); UPX274 at 841.  If a user clicks on a display ad, they will be directed to the advertiser's website.  *See* UPX8089 at 398.



UPX274 at 841.

198.     Display ads only run on a website if the site is supported by software that enables the ad's placement.  For Google Ads that software is the Google Display Network.  UPX8056 at .002.  Many websites do not have display advertising on them.  Tr. at 1193:13-18 (Dischler).  Display ads do not appear on a SERP.  *Id.* at 1193:19-21 (Dischler).

199.     Display ads are priced based on the impressions that the advertisement receives.  "An impression is the delivery of an ad," which indicates "a high probability that the user has seen the ad."  *Id.* at 3821:13, 19-20 (Lowcock).  The advertiser pays for a display ad whenever it shows up on a user's screen.  *Id.* at 1177:15-17 (Dischler); UPX1 at 538 ("An impression is counted each time your ad is shown.").  The metric used to price display ads is known as cost-per-mille (or CPM), which is a fixed price per thousand impressions.  UPX26 at 770; Tr. at 1194:16–1195:13 (Dischler).  Display ads sold through Google are priced through auctions that are distinct from those used for text ads or PLAs.  *See* Tr. at 4006:23-25 (Juda).  Display auctions are first-price auctions, where the top bidder wins the ad placement and pays its bid price.  UPX6032 at 655–56.

200.     Display ads are well-suited for creating brand awareness.  UPX26 at 764 ("Display ads . . . aim to build brand recognition[.]").  For instance, if an individual "see[s] a display ad for

a new fuel-efficient Toyota, [they] might think, 'Gee, maybe it's time to buy a new car.'" Tr. at 454:13-20 (Varian) (quoting UPX411 at 638).

201.    Because a display ad is not served to a user in response to a query, advertisers rely on various other signals, both from the ad publisher and the user, in determining where to place a display ad.  Advertisers can elect to place display ads to appear on content-relevant websites (e.g., an ad for a mixer next to an article on baking) or on specific websites.  UPX26 at 769.  As for user signals, *see id.* at 764, advertisers look to place display ads on content-relevant or industry-related websites that the user has visited or whose ads on which the user has clicked, UPX428 at .011; Tr. at 1418:4-8 (Dischler) ("The users'[] interest can be signaled in any number of ways, whether it's visiting a website, whether it's subscribing to a TikTok channel of a golf influencer or in any number of ways.").

202.    A particularly valuable form of display advertising is "retargeted" display ads.  An advertiser uses a consumer's activity on the advertiser's website to tailor a later-appearing display ad on another website.  To illustrate, "[a] retargeted ad would occur, for example, when you bought a product and there was a complimentary product that was associated with that.  So, you could buy a product like ski boots and it would suggest ski equipment or ski mittens." Tr. at 455:6-9 (Varian).  A retargeted display ad can be delivered only *after* the consumer has visited the advertiser's website.  *Id.* at 455:25–456:5 (Varian).

203.    The placement of a retargeted display ad is most valuable within the first hour after the user visits the advertiser's website.  UPX26 at 764–65.  The value of a retargeted ad diminishes as the time increases from the user's visit to the website, because the user is less likely to possess the intent that they had when visiting the site. Tr. at 456:6-17 (Varian).  Take, for instance, a user who visits Best Buy's website and looks at flat-screen TVs but does not make a purchase.  A

retargeted display ad featuring a brand of flat-screen TV will be less effective as time goes on from when the user visited the Best Buy website.

204.     Privacy initiatives can also limit the effectiveness of such targeting techniques. Retargeting data is collected using "cookies" or data about an individual's prior web activity: "The way this works is that an advertiser or agency presents an ad and a list of [] cookies to an ad server network and the network displays the ad to the cookies on the list, if and when these cookies show up on particular website." UPX413 at 735.  Cookies can be limited by third parties.  For instance, after Apple made privacy changes to a new version of iOS, Meta's ability to serve retargeting ads was made "much harder or potentially even not possible in some circumstances."  Levy Dep. Tr. at 172:18-24.

205.     Retargeted display ads cannot replace search ads.  *See* Tr. at 5220:11-22 (Booth).

### C.     Social Media Ads

206.     Social media advertisements are essentially display ads that are integrated into a social media feed.  *See id.* at 5392:3–5393:9 (Jerath); *id.* at 3839:23–3840:2 (Lowcock); van der Kooi Dep. Tr. at 260:21–261:2.

207.     One of the largest providers of social media ads is Meta, which owns Facebook and Instagram.  The bulk of Facebook's social media ads are not considered search ads, although "a very small percentage" do qualify.  Tr. at 8772:13-16 (Israel); *id.* at 458:4-5 (Varian).  Facebook has roughly twice as many advertisers as Google.  *Id.* at 1407:4-11 (Dischler).  Other social media channels include TikTok, LinkedIn, Snapchat, and Pinterest.  *Id.* at 4840:23-25, 4860:6-13 (Lim).

208.     Social media users spend a significant amount of time engaging with the platform, which can provide a greater opportunity for advertisers to engage with potential customers.  *Id.* at 1407:23–1408:20 (Dischler).  Advertisers use social ads "[m]ainly [for] awareness, engagement,

70

and, in some instances, acquisition" where possible. *Id.* at 4841:9-10, 4860:15-22 (Lim).  Social media ads have "a distinctly different role . . . than paid search" ads.  *Id.* at 4841:11-12 (Lim); *see also infra* Section V.D.

209.    Because social media ads are not displayed in response to a query, social media platforms rely on various other signals of a user's intent to determine which ads to display.  Tr. at 1369:18–1370:1 (Dischler) (noting that Facebook's ads do not use keywords).  Those include accounts or channels the user follows, the length of engagement, user clicks on products shown on the feed, etc.  *Id.* at 1418:4-7 (Dischler).

210.    Social media is a growing destination for advertisers.  Meta has been wildly successful in selling social ads on Facebook and Instagram.  Between 2018 and 2021, for example, Meta's ad revenue grew by about 150%.  *See* UPX1019 at 530.  And while TikTok's growth as an ad platform is in its infancy, evidence suggests that it may be particularly well-suited for targeting younger demographics.  DX241 at .010 ("Nearly 50% of Gen Z say they use TikTok, IG for shopping, compared to just 15% of older users.").

211.    Google responded to the dramatic growth in social media ad spend with a new advertising product called "Discovery Ads," or Demand Gen ads.  Discovery ads are placed within a user's feed on YouTube or Gmail.  Tr. at 1196:15–1197:5 (Dischler); UPX33 at 117.  Discovery ads were partially modeled after social media ads on Instagram and Facebook to compete with Meta's offerings.  Tr. at 1197:3-8 (Dischler); UPX29 at 541 ("Google has no *direct* competitor to Facebook's ad offering[.]").  Discovery ads are not sold on SERPs.  Tr. at 1196:22-24 (Dischler).

**D.      The Marketing Funnel**

212.      Advertisers use the different ad channels described—search, display, and social media—to accomplish different marketing goals, sometimes within the same campaign.  Those objectives often are correlated to the ad channel's unique features.

213.      "The purpose of advertising is to capture consumers' attention and drive them through to a point of conversion, and conversion is to purchase a product or service." *Id.* at 3815:6-9 (Lowcock).  Marketing professionals in industry and academia have used a "funnel," pictured below, as a visual depiction of the consumer journey from awareness to purchase.



UPXD103 at 7; Tr. at 3815:11-13 (Lowcock) (summarizing the funnel as "[d]riving awareness, capturing intent, driving consideration, and driving a decision to purchase").

214.      The upper funnel focuses on generating consumer inspiration and awareness of the product.  Tr. at 5121:16-25 (Booth) (e.g., "getting people thinking about performing a [home-improvement] project"); *id.* at 3816:10-11 (Lowcock).  In the middle is the consideration phase, where the consumer evaluates a class of products or a particular product.  *Id.* at 5122:9-10 (Booth); *id.* at 3817:24–3818:2 (Lowcock) ("The middle part of the funnel is to try and drive some sort of

72

. . . behavior so to learn more about the product or service."). The lower funnel seeks to persuade a user to carry out a transaction (e.g., a sale or other metric of conversion). *Id.* at 5121:21-25 (Booth); *id.* at 3818:3-8 (Lowcock).

215. Another way to think about the funnel is in terms of "push" and "pull" ads. "[P]ush ads are essentially an advertiser putting a message out there when a consumer isn't necessarily even looking for something. Pull ads tend to [function when] somebody goes to Google or goes to Bing, is actively looking for something, [advertisers] have the opportunity to be able to respond to that query." *Id.* at 5123:3-11 (Booth) ("So push [] is we're sending our message out. Pull means we're bringing people in who are already in market."); *id.* at 6588:13-20 (Vallez) ("We generally think about search as pull," and "[p]ush ads are generally more what we call upper funnel. They're more video, display, that type of media, social media.").

216. "The customer journey is complex. Consumers don't consume media in a silo, so they experience media across all channels." *Id.* at 3815:2-5 (Lowcock).

217. Marketers view different ad channels in terms of their relative strength at achieving objectives along the funnel. Generally, display ads are superior at establishing product awareness, whereas search ads are more effective at driving conversions. "One way to think about the difference between search and display/brand advertising is to say that search ads help *satisfy* demand, while brand advertising helps to *create* demand." UPX411 at 638 (2008 internal Google email written by Hal Varian) (internal quotation marks omitted) (emphasis added); UPX459 at 871 (same); UPX439 at 112 (same); *accord* Tr. at 1174:20-23 (Dischler) ("If you want to get very broad, to reach a diffuse audience like someone used for TV, the search results page is a less optimal channel because it is [] more focused.").

73

218.    Display ads therefore are considered more effective upper-funnel tools and search ads more effective lower-funnel tools.  Tr. at 3816:1-11, 3816:25–3817:1, 3819:12-17 (Lowcock) ("Display advertising is primarily intended to drive or create demand and drive awareness," while "[s]earch advertising is there to capture intent after you have driven awareness."); *id.* at 6586:24-25 (Vallez) ("[S]earch is more often than not the last step, one of the last steps in that journey."). Search ads can be effective for upper-funnel goals, *see, e.g.*, James Dep. Tr. at 269:22–270:7, but that is not how advertisers largely conceive of them, *see* Tr. at 6881:20–6882:24 (Amaldoss) (discussing PSXD10 at 17) (summarizing based on a subset of record documents and testimony, 64% of advertisers view display ads to be higher up in the funnel than search ads, and 0% consider display to be below search).  Google acknowledges that "[w]hen running Display ads, [advertisers] might not reach those who are actively searching for what" is offered.  UPX8056 at .002; *see also* UPX8089 at 398 ("While the Search Network can reach people while they search for specific goods or services, the Display Network can help you capture someone's attention earlier in the buying cycle.").

219.    Social media ads can be used at multiple stages of the funnel, Tr. at 4861:3-4 (Lim); Ramalingam Dep. Tr. at 151:7-11, but the marketing industry views them primarily as "push ads" to drive brand and product awareness, Tr. at 6588:23–6859:2 (Vallez) (describing social media ads as "push," not "pull" ads, "because the consumer is not intentionally trying to pull information, . . . they're usually getting a feed that's being presented to them, different options, [] which may or may not be relevant to the context which they're in"); *id.* at 4861:24–4864:1 (Lim) (JPMorgan Chase spends three times as much in paid search as in social, all of which is used for lower-funnel goals, whereas its social media spend is targeted to various stages of the funnel); *id.* at 6513:1-5 (Hurst) (Expedia spends on social media for the purpose of "buying an audience"); Dacey Dep.

74

Tr. at 291:18-22 ("The intent of the user is very different and it's a more passive user on paid social; whereas, in search, the intent is significantly higher and we can monetize it in a completely different amount."); Tr. at 5123:24–5124:1 (Booth) (identifying social media ads as push ads "in some cases").

220.    For some industries, however, like clothing and cosmetics, social media ads can be effective for lower-funnel purposes.  DX703 at 704 (Revlon advertising strategy placing social media in the awareness and consideration phases, alongside search in the latter); Tr. at 4892:16-18 (Lim) ("[I]f you're a direct consumer, fashion brand, you may consider paid social lower in the funnel than a bank.").

221.    Advertisers often use different ad channels as complements as part of a "full-funnel strategy."  Tr. at 5122:1-20 (Booth) ("What we try to do or what most advertisers try to do is try to nurture that consumer journey by showing them a bunch of options, presenting that in display or social, and then ultimately leading them down that transaction path."); *id.* at 4894:15-17 (Lim) ("[M]ore often than not, it's a combination of everything that you're doing that's driving that outcome.").  Google itself touts the importance of a "full-funnel" strategy.  UPX8051 at .005 (2022 Google record concluding that "full-funnel marketing has never looked better or been more critical to business success").

222.    The marketing funnel is neither "dead" nor has it become "obsolete" because of the emergence of digital marketing and new ad technologies.  *See* Tr. at 5649:2-13 (Jerath) (discussing DXD14 at 37).  Industry witnesses consistently testified that they continue to use the funnel to shape marketing strategies, even on digital platforms.  *See id.* at 3815:11-15, 3816:12-20 (Lowcock) (IPG); *id.* at 4857–4892 (Lim) (JPMorgan Chase); *id.* at 5121:1-10 (Booth) (Home Depot); *id.* at 5238:9–5239:3 (Dijk) (Booking.com); *id.* at 6512:1–6513:24 (Hurst) (Expedia); *id.*

at 6585:25–6589:2 (Vallez) (Skai); Alberts Dep. Tr. at 45:18–47:8 (Dentsu); Dacey Dep. Tr. at 98:3-22 (TripAdvisor); Daniels Dep. Tr. at 19:14-23 (Thumbtack); James Dep. Tr. at 23:13–24:3 (Amazon); Levy Dep. Tr. at 104:11-18 (Meta); Lien Dep. Tr. at 186:5-15 (Marin); Ramalingam Dep. Tr. at 148:5–151:18 (Yahoo); Soo Dep. Tr. at 285:3–287:11 (OpenTable); Stoppelman Dep. Tr. at 83:4–84:19 (Yelp); Utter Dep. Tr. at 284:11–285:218 (Microsoft).

223.    Even Google has recently and repeatedly recognized the continued vitality of the marketing funnel.  *See* UPX427 at 030 (2019); DX241 at .010 (2021); UPX8051 at .002 (2022) (Google essay touting "full-funnel" strategies using Google Ads); *cf.* Tr. at 1413:10–1414:22 (Dischler) (contending that the funnel is "obsolete" but agreeing that advertisers use it "informally"); *id.* at 7791:7-16 (Pichai) (describing the funnel).

224.    Large advertisers typically organize themselves along ad channels, with different teams and distinct budgets based on ad channel.  *See, e.g.*, Tr. at 4839:12-16 (Lim) (JPMorgan Chase has three departments: paid social, search, and programmatic); *id.* at 6590:23–6591:1 (Vallez) (advertisers generally have multiple teams managing different ad channels); James Dep. Tr. at 187:6-9, 190:9-13 (Amazon has different teams and leadership for paid search, social marketing, display, and video); PSX970 at 668 (advertising agency Tinuiti has different teams for paid search and paid social).

### E.    Shifting Spend

225.    An advertiser will "determine the objectives of their advertising campaign on a campaign basis and they set an overall budget for their entire advertising spend."  Tr. at 3805:2-4 (Lowcock).  From there, the advertiser will determine how to allocate their budget to different channels to meet campaign goals.  *Id.* at 3805:5-10 (Lowcock); *see, e.g.*, UPX926 at 683–84 ("Campaign segmentation should be done at a granular level where you can control the investment

76

amount allocated towards a campaign.  Orienting these campaigns with the customer journey is critical so that you can align all assets housed within the campaign to a common and consistent goal."); Tr. at 4857:12-18 (Lim) ("Paid search budgets are for paid search only.  Where we have investment mobility would be if you think about just digital or just a programmatic investment for a campaign, we could optimize to or from various different websites within that campaign.  But it is not transferable between a programmatic buy across web pages and paid search.  They are distinct and different and separate.").

226.    One common campaign driver is seasonality: Certain times of year are associated with product popularity and purchases.  *E.g.*, DX187 at .069 ("Escape rooms are very seasonal. You're going to see a spike in the summer months, and around the holidays, Christmas.  So, a bit of a mixture of seasonality and available impression.").

227.    Another driver is return on investment (ROI), or return on ad spend (ROAS), which are metrics advertisers use to evaluate the effectiveness of their ad spend.  Advertisers will shift spend to more effective ad channels to maximize their overall ROI.  *See, e.g.*, Tr. at 5340:23–5341:5 (Dijk) (ROI is the "key" metric for decision-making); James Dep. Tr. at 35:19-23 (Amazon bases some of its bidding strategies in part on ROI); Tr. at 5141:14-17 (Booth) ("So we would continue to lean our investment into what is producing the greatest return on advertising spend or ROAS, and that's a consistent practice that our teams are always doing."); DX187 at .066 (ROI is "the top factor affecting short term [] and long term [] spend").

228.    But it is challenging for advertisers to calculate ROI and ROAS.  *See* UPX441 at 803 (privacy measures have made it "more challenging for [JPMorgan Chase's] teams to have real-time access to performance data at a granular level"); Tr. at 3981:14-17 (Lowcock) ("[B]ecause ROI requires confidential client information, . . . the client might not share that data

with us, nor would it then be provided to third parties to optimize ROI."); UPX519 at .001 ("There is no good sense, both within Google and outside, for what the true ROI of advertising channels are (and consequently how they compare).") (2017); UPX506 at .012 ("Overwhelming majority of adv[ertisers are] nowhere closer to measuring ROI," only a "[s]elect few players with the resources can build models" to do so, "but analysis have shown they are all over the place.") (2017).

229.    Google believes that advertisers' ability to calculate ROI has improved significantly in the last six years, in part due to the development of AI and new ad channels, such as social media.  Tr. at 1385:3-12 (Dischler).  Also, now available to advertisers is automated bidding software, which attempts to discern and compare the ROI of different ad types to further the advertiser's business objectives.  *See id.* at 1357:7–1358:19 (Dischler).  These automated tools shift ad spend between social media ads and search ads on GSEs and SVPs.  *Id.* at 1406:4-8 (Dischler).  Google has an automated bidding product, Performance Max, that some of its advertisers use (although not many of its largest).  *Id.* at 1371:4-11, 1372:5-24 (Dischler).

230.    Though advertisers do try to estimate and maximize ROI and ROAS across channels, they do not substitute away significantly from search ads to other channels, like display or social.  These channels are less effective at achieving the same marketing goals as search ads. Advertiser witnesses uniformly testified that purchasing search ads on Google is essential to digital ads campaigns because search ads are uniquely able to capture high-intent consumers.  *See, e.g.*, *id.* at 3826:14-15 (Lowcock) ("I would go so far as search would be mandatory in any advertising campaign."); *id.* at 4849:6-7 (Lim) ("We think of search as an always-on acquisition driver for the firm."); *id.* at 6506:24–6507:1 (Hurst) ("[T]here isn't a great substitute for the volume of high-intent customers you can find on Google."); *id.* at 5236:24–5237:1 (Dijk) ("Google is kind of the

exclusive, dominant . . . pool of high-intent, new customers for us to find."); *id.* at 6585:25–6587:3 (Vallez) (agreeing that no paid media channel better captures user intent than paid search because search reflects "the moment right when they're about to make a decision"); DX412 at 665 (Kohl's presentation showing search spend as unchanging while other ad types, including display, social, and video, fluctuate); Tr. at 5450:6-10 (Jerath) (discussing UPXD103 at 23) (Booking.com record explaining that "Search and Display Ads are not seen as substitutable to one another . . . because they target users in very different situations/environments," and the "resulting performance is very different"). There is no evidence that advertisers have significantly shifted spend away from search ads at any point.

231. Advertisers rely heavily on search ads for traffic and revenue. When advertisers have experimented by turning off search ads for a portion of queries or products, they have lost revenue. *See* Tr. at 422:22-24 (Varian). In 2020, for example, Home Depot—one of Google's largest advertisers—studied the effects of cutting off paid search on its revenue. When it turned off paid search in ▮% of United States markets, its revenue dropped ▮%. PSX676 at 240. Home Depot concluded that for every $1 it invested into paid search, it earned over $▮ in revenue. *Id.*; *accord* Tr. at 5284:6-8 (Dijk) (Booking.com cannot stop purchasing text ads from Google and sustain its business.).

232. When it comes to general search text ads, advertisers have a fixed budget that largely mirrors the relative market shares of Google and Bing. Tr. at 4869:7-23 (Lim) (90% of JPMorgan Chase's search text ad spend is on Google, 10% is on Bing); *id.* at 5141:23-24 (Booth) ("It's industry standard, probably 90 percent versus 8 to 10 percent on Bing."); *id.* at 6501:11-14 (Hurst) (Expedia's spend allocation is 10 to 1, Google to Bing); UPX441 at 803 (Google is a

"[c]ore partner in search due to overwhelming market share").  Advertisers buy nearly all of their text ads from these two GSEs.  Tr. at 4874:10-12 (Lim).

233.    Advertisers consistently testified that shifting significant ad spending from Google to Bing would be ineffective (and unwise) because of Bing's lack of scale.  *Id.* at 4869:7–4870:11 (Lim) ("Bing doesn't have an equivalent volume so we would be unable to move budgets between those two partners."); *id.* at 4875:19–4876:4 (Lim) (stating "there's [nowhere] else to go" once it maximizes spend on Bing); *id.* at 5143:5-24 (Booth) (Home Depot's 90/10 spend split has remained constant); *id.* at 6533:16-20 (Hurst) ("I don't think there is a way to shift enough spend to Bing to make up for that gap.  I'm actually very confident there is not a way to spend that much money in Bing and find all the travelers you had in Google by using one instead of the other."); *id.* at 5282:7-12 (Dijk) ("Q. Are text ads that Booking.com purchases on Bing generally less expensive than on Google?  A. Very difficult to say.  It depends very much on the keywords and the searches.  But as I told to you, it doesn't really matter.  I would gladly spend far more with Bing, but I'm constrained because the demand is clearly not there."); *accord* UPX519 at .017 (Google study reflecting that "Bing was mentioned as having good ROI but too low volume for them to seriously invest").

234.    For advertisers that purchase both text ads and PLAs, the shifting of spend between those two formats is more common.  *See* Tr. at 5181:22–5182:6 (Booth) (Home Depot reshuffles its text ad/PLA spend allocation daily).  But only retail advertisers can shift spend from text ads to PLAs.  *Id.* at 1493:11–1494:3 (Dischler); *id.* at 7580:9-17 (Raghavan) (stating that the determining factor in whether an advertiser could shift spend from text ads to PLAs is whether their products "have visual appeal").

235.   Some of Google's largest advertisers cannot make that shift.  Dr. Raghavan agreed that among Google's top 20 queries in the United States in 2018, only three pertained to a physical product for which advertisers could shift spend from text ads to PLAs.  *See id.* at 7578:8–7580:17 (Raghavan) (discussing UPX342 at 859).

236.   Even for retail advertisers, PLAs are not perfect substitutes for text ads.  *See id.* at 5218:23–5219:5 (Booth) (Home Depot would be unable to use PLAs to advertise a storewide sale).  *But see id.* at 1356:25–1357:3 (Dischler) ("I believe that they're equivalent.  In the view of the advertisers, they're equivalent and substitutable."); *id.* at 1476:20-24 (Dischler) ("[T]he advertiser has a singular business objective which is to sell products, and they could use shopping ads or text ads in order to achieve that business objective for the retail advertisers that are eligible to use shopping ads.").

237.   That said, some retail advertisers are increasingly embracing PLAs and spending more of their search ads budget on that channel.  *Id.* at 5182:7-21 (Booth) (Home Depot's spend is greater on PLAs than text ads); *id.* at 1356:22-24 (Dischler) ("You know, as advertisers become more comfortable, they've been shifting more budgets to shopping ads versus text ads.").

### F.   Text Ads Auctions (Also Greatly Simplified)[2]

238.   Advertisers do not purchase ads on Google in the same way they do in traditional media, like newspapers (e.g., the cost of a half-page ad) or television (e.g., the cost of a 30-second ad during the Super Bowl).  Instead, on Google, advertisers compete with one another through an auction to make an ad purchase.  *Id.* at 463:14-16 (Varian).  These auctions occur in a split second,

---

[2] At trial, Plaintiffs repeatedly confronted Google's ad executives with company records containing their own statements, as well as the statements of their colleagues, regarding Google's text ads auctions.  In many instances, the witness professed to lack an understanding of the record or sought to contextualize it in highly technical ways.  In making these Findings of Fact, the court gives greater weight to the contemporaneous statements contained in the company's internal records, than later trial testimony in which Google employees declined to ratify those statements.

between the time a user enters a query and when the SERP is displayed.  Google designs the auction and controls underlying inputs that can affect the ultimate price generated by the auction. *Id.* at 1197:25–1198:4, 1205:12-18 (Dischler); UPX509 at 869 ("We also directly affect pricing through tunings of our auction mechanisms[.]").  Google runs billions of search ads auctions each day.  Tr. at 1198:24–1199:5 (Dischler).

239.    The auction determines the ads displayed and the order in which they appear on the SERP.  *Id.* at 1198:5-17 (Dischler).  An advertiser whose text ad appears on a SERP only pays Google if a user clicks on the ad.  FOF ¶ 186.  A text ad is priced on "cost per click" (CPC) basis. *Id.*  The price of a text ad "is determined based on the results of the auction, and the maximum cost per click is specified by the advertiser."  Tr. at 1352:13-17 (Dischler).  Google sets a "reserve price" for text ads, or a minimum price below which it will not sell the ad.  *Id.* at 463:20-25 (Varian); *id.* at 1204:15–1205:3 (Dischler).

240.    Google's text ads auction is a classic second-price auction, with modifications. A second-price auction is one where multiple bidders enter the auction, and the winner, instead of paying the price of their highest bid, pays one cent above the first runner-up.  *Id.* at 1200:2-21 (Dischler).  This makes the "second price," or the runner-up's bid, very important.  *Id.* at 1200:22-25 (Dischler).  Google runs a second-price auction because it views it as more advertiser-friendly. *Id.* at 4263:12-16 (Juda).  It is also more efficient for Google, because when the final price is determined by something other than the top bid, advertisers will not "be constantly trying to move their bids up or down to see if they can get the same outcome for less money," which is burdensome for both advertisers and Google's advertising system (which is responsible for "consuming all these changing bids at all times and processing them").  *Id.* at 4264:1-14 (Juda).

241.     An auction winner is not determined solely based its bid.  The auction also relies on certain qualitative metrics, including the quality of the ad and the advertiser's website.  At a high level, the auction captures both the bid and the qualitative factors in the following formula:

$$\textbf{LTV} = \textbf{bid x pCTR} - \boldsymbol{\beta}$$

UPX8 at 054.

242.     In this formula, "bid" represents the advertiser's chosen bid; "pCTR," or predicted click-through rate, is a proxy for the ad quality; and "beta" refers to blindness, which tries to approximate future engagement with ads.  *Id.*; UPX37 at 200, 202–03; UPX442 at 868.  The pCTR is a score between 0 and 1: "[I]f a predicted click-through rate of 0.20 was used in a running shoes query, that would imply that the system thinks there's a one-out-of-five chance that a user is going to click on the ad, or a 20 percent chance."  Tr. at 4281:1-4 (Juda).  The formula's result is an "LTV" score, which refers to the "long-term" value of the ad.  UPX889 at 772–73.  The higher the LTV score, the more likely the ad will win an auction.  *Id.* at 772.

### 1.     *Pricing Knobs*

243.     Google can affect the final price paid for an ad through so-called "pricing knobs" or "pricing mechanisms."  *Id.* at 779, 783.  Google has used three primary pricing knobs to influence prices: (1) squashing, (2) format pricing, and (3) randomized generalized second-price auction.  Google has referred to these levers as "intentional pricing."  UPX509 at 869.

244.     **Squashing** premiered in a launch that Google code-named "Butternut Squash."  *See generally* UPX442.  Squashing artificially raises the pCTR of the runner-up, thereby inflating its overall LTV score.  UPX889 at 784.  This increases the likelihood that the runner-up takes the top spot (even if its bid is not the highest).  *See id.* at 784–86; Tr. at 1221:17–1222:10 (Dischler) (squashing tries "to prevent runaway winners and to create a chance for smaller advertisers to

participate in the auction"). But squashing also "[e]ffectively simulates auction pressure" by making the runner-up more competitive, thereby creating upward pricing pressure on the top-rated bidder. That top bidder must pay more to win the auction so as to offset the runner-up's artificially increased LTV score. UPX889 at 784; Tr. at 1386:6-9, 1383:19-21 (Dischler); *id.* at 4281:17–4283:2 (Juda). As a result, on average, the winner of an auction subject to squashing pays more than they would have absent squashing. *See* Tr. at 1222:3-10 (Dischler); *id.* at 8857:2-13 (Israel).

245.    **Format pricing** is Google's practice of charging advertisers for "formats," or additional text and links that appear on general search text ads. *Id.* at 4254:3-8 (Juda) (discussing DXD11 at 5, 8). A formatted text ad is illustrated below.



DXD11 at 5 (links entitled "Find cars near you," "How it works," and "Getting started"). Formats allow an advertiser to create a customized and complex ad copy that provides the consumer with more information than an ordinary text ad. When first implemented, formats came at no extra cost to advertisers. *See* UPX430 at 580. But in 2017, Google adjusted the auction to impose price increases for formatted ads, after it determined that "strongly increased format prices" resulted in long-term revenue gains. UPX729 at 979; FOF ¶ 250 (discussing the Gamma Yellow experiment).

84

246.     In 2019, Google developed a randomized generalized second-price auction, or **rGSP**, another ad launch that affected pricing.  Tr. at 1222:11-17 (Dischler).  Put simply, rGSP occasionally randomly switches the LTV scores of the two top auction entrants, thereby allowing the runner-up to win the auction despite its originally lower LTV score.  *Id.* at 1222:18–1223:7 (Dischler); UPX1045 at 422; UPX512 at .009–.010.  Much like squashing, rGSP artificially enhances the runner-up's score, creating more competitive auctions and driving up final prices. UPX45 at 840 ("Ads pay a higher price to win with certainty, which increases revenue."); Tr. at 4177:20-25 (Juda) (one way that advertisers can avoid being swapped is to increase their bid to counteract the other LTV score impacts).  rGSP replaced format pricing because it was even more effective at driving revenue.  *See* UPX512 at .002.  Advertisers cannot opt out of rGSP.  Tr. at 4302:9–4305:5 (Juda).

### 2.     *Increasing Text Ads Prices*

247.     Many of Google's ad innovations seek to deliver additional value to advertisers and users.  *See* UPX430 at 577; UPX45 at 838–39.  "[A]nother important objective is the revenue that the platform (Google) makes."  UPX45 at 839.

248.     Google strategically has used pricing knobs to raise text ads prices.  Google's "intentional pricing launches," or "intentional exploration," arose from the concern that it was not capturing in its pricing the full value of the ad to the advertiser.  In other words, Google believed that it could increase ad prices because its pricing was below what advertisers would be willing to pay for an ad.

249.     That intention is perhaps best captured in a January 2018 strategy document titled "How should AQ think about Pricing," which drew on lessons from past pricing experiments and outlined possible future pricing strategies.  UPX509 at 869.  The record observed, "[w]e know

there is still significant upside left in the different auction pricing knobs . . . but we've only dared capture[] a small fraction." *Id.* It then asked: "Should we stop working on pricing exploration despite our belief we're leaving money on the table?" *Id.*; *see also* UPX737 at 462 ("[T]he value created . . . was left underpriced," meaning "that the cost of incremental clicks did not rise along with volume following the original click cost curve."); UPX430 at 578 ("[T]here is a lot of opportunity to increase prices for search ads.").

250.    Google had learned from earlier ad experiments that small but substantial price increases would generate sustained long-term profits. For example, a study conducted in 2017 termed "Gamma Yellow" sought to evaluate the long-term effects of increased format prices. *See* UPX729 at 979. The experiment exposed 15% of advertisers to "strongly increased format prices" for six weeks. *Id.* Google found that "50% of the initial revenue gains stuck" and "found no evidence of notable format opt-out behaviour." *Id.*

251.    In 2017, Google began testing a launch called Momiji. *See generally* UPX36. Momiji sought to determine how much Google could raise prices through format pricing. *See* UPX456 at 274–75; UPX36 at 063, 065–67. Google admitted that it had "no way to say what formats should cost," but it knew that format pricing was the "best knob to engender large price increases." UPX507 at .026. Because it had "no principle to say what the cost should be," Google decided to "follow [its] long term revenue focus." UPX506 at .005 ("So, we follow our long term revenue focus. We put a reasonable price to Top-1 extra clicks and see if advertisers are willing to pay it (if it sticks in an AE). Try to bring the Top-1 headroom down closer to the other position headroom."); *see also* UPX456 at 274 ("We are making this tuning in order to better share in the value that AdWords and formats create, and to raise text ad prices on Google.com."). Acknowledging that it "shouldn't launch" if it thought it would "see large scale format opt out,"

UPX506 at .008, Google nevertheless pushed significant format price increases because its experiments had revealed that advertisers would not drop out in significant numbers, Tr. at 1274:21–1275:3 (Dischler) (Momiji led to an increase in search ads revenue); *see also* UPX36 at 064, 069 (describing Momiji format pricing increases: "We've launched things at 15% and heard nothing" and "[w]e don't see mass opt-out of anything").

252.    Similar studies showed that Google could raise prices using squashing without losing advertisers.  In a 2017 study code-named "Kabocha," Google determined that squashing was "long term revenue positive[.]"  UPX745 at 085.  The study showed that the "stickage factor" after price increases "was also [] roughly 50%," meaning Google "expected 50% of gains to stick post advertiser response to the changes introduced[.]"  UPX737 at 462.

253.    Still, as reflected in the January 2018 strategy document, Google understood that "at any given point in time[,] there is some price or ROI ceiling above which" advertisers may abandon advertising on Google.  UPX509 at 869–70.  To ensure profits while remaining under the "ceiling," Google outlined four paths, two of which involved no "pricing exploration" (thereby leaving "money on the table") and two of which would continue "price exploration."  *Id.* at 871–72.  Google appears to have selected "Path 3," which it termed "Control the walk."  *Id.* at 872. This is the "scenario under which [Google] believe[d] the ceilings are *still high* and [it] want[ed] to maximize [long-term] revenue."  *Id.* (emphasis added).  "This sharing of value implies getting closer to these ceilings without passing them, which we need to do in a controlled pricing environment."  *Id.*  In other words, Google believed that it could raise prices using pricing knobs without losing advertisers—since "ceilings are still high"—thereby growing its revenues.  Google proposed that price changes could be made through "[i]ncidental launches throughout the year,"

and "[p]rice adjustments to the new state of the world would be done once or twice a year through dedicated pricing exploration using existing . . . and [h]olistic . . . tools." *Id.*

254.    Later launches and studies show that is precisely what Google did. UPX745 at 085 (AION six-month advertiser experiment, from early 2018, demonstrating that Google "can confidently increase format prices" because "there is still large headroom in format pricing"); UPX 737 at 462 (stating that AION's "[s]pend response trends to the 15% change have stabilized at roughly half the initial gains, confirming our belief that there is still room for price tuning"); *id.* at 461–64, 476 (Potiron study, from June 2018, showing that "[f]ine grained squashing" showed the same 50% "stickage" in the long term). Increasing prices through format pricing plainly was a success. When it was replaced by rGSP, format pricing had risen to make up about 20% of Google's text ads revenue, measured per thousand queries (also known as revenue per mille, or RPM). *See* UPX512 at .002 (format pricing comprised about 20% of Google's RPM).

255.    The launch of rGSP in 2019 was equally successful. Google's pre-launch experiments indicated that rGSP would increase CPCs for top slot ads on non-navigational queries by 5.91% on PCs and tablets and 4.85% on mobile phones with a long-term "stickage factor" of 40–50%. UPX457 at 258–60. Experiments showed that a 5.74% revenue gain persisted two months after launch. UPX45 at 838; *see also, e.g.*, UPX745 at 085–86 (new launch known as "Stateful Pricing" demonstrated "over \$6 billion in *short term* incremental annual revenue in headroom").

256.    In February 2020, Google reported that the rGSP "tuning point," or increased bid, was about 3.7. UPX466 at 939. This meant that in order for the top bidder to keep its position, it would need to bid 370% more than the runner-up to account for the swapped LTV score. *Id.*; Tr. at 4178:8-14 (Juda); *see id.* at 4177:20-25 (Juda) (one way an advertiser may avoid swapping is by

increasing its bid).  If that bidder was successful, it would ultimately pay significantly more than it otherwise would have for the same ad placement.

257.    Google's records make clear that growing its revenue was a principal goal in launching these price tunings.  *See, e.g.*, UPX51 at 228 ("Main goal: Long-term Revenue"); UPX442 at 868 (Google will use its launch "to recover lost revenue from launches which create value for our users and advertisers, but reduce revenue for Google") (squashing); *id.* (Google "wants to continue launching such advertiser value creating launches, but needs a mechanism to help Google share in the value that [the] launches create"); UPX507 at .004 ("Prices could be higher, and we think we would keep the money," because "[r]evenue gain from higher prices > revenue loss from response" by advertisers) (format pricing); *id.* at .010 (describing philosophy as to "[g]et the highest RPM point possible"); *id.* at .027 (ranking format pricing, squashing, and reserves by "effectiveness," measured as increased RPM); UPX430 at 577 (Google adjusts "the parameters of the auction function in order to improve Long Term Revenue. . . . This work has resulted in products which add several billions of dollars in incremental revenue annually."); UPX45 at 837 (rGSP solves the "difficult problem" and "major priority" of "increasing revenue in auctions with low competition[.]").

258.    In fact, Google used ad launches to meet revenue goals or make up for perceived deficits in its ad revenue growth.  *See, e.g*., UPX745 at 085 (projecting "+4% RPM from standalone pricing launches" and expecting additional billions in "incremental annual revenue" from format pricing and squashing); UPX456 at 298 (predicting at +1.3% revenue increase).  As Dr. Adam Juda, Google's Vice President of Project Management, testified, a positive 20% increase in revenue "was an annual objective that we would try to get to over the course of an entire year." Tr. at 4140:1-20 (Juda); *see id.* at 7549:6-9 (Raghavan) (discussing UPX342 at 824) (same).

259.    And Google met that objective year after year.  As the below chart shows, Google has enjoyed unusually consistent revenue growth from 2010 to 2018 that hovered at or above the 20% expectation.



UPX342 at 824.

260.    If Google grew concerned about meeting its revenue targets, it called for a "Code Yellow effort," where its "top priority" would be to "deliver [] revenue launches" through intentional pricing.  UPX738 at 406; *see* UPX733 at 203–04 (describing the Sugarshack format pricing launch, which was used to meet Google's revenue targets in response to a Code Yellow); UPX514 at 386 (describing ad launches implemented to meet Code Yellow revenue goals).

261.    Google's pricing decisions also reflected an understanding that increasing its revenue in the ways discussed might occasionally come at a cost (or no improvement) to advertisers.  *See* UPX734 at 509 ("cleverer . . . auction pricing" comes "at a cost to advertisers"); UPX507 at .015 ("Sales struggles to explain these [price increases] in terms of user/advertiser value[.]"); UPX889 at 780 (auction pricing mechanisms are "[n]ot designed to increase clicks"); UPX36 at 065 ("[C]urrent system has issues.  We're acknowledging the current CPM space is giving them different prices at the same value.").

262.    For instance, Google claimed that the *primary* motivation for implementing squashing was to help smaller advertisers, but that is not borne out by the record.  Tr. at 1386:10-19 (Dischler) ("The primary reason that we implemented squashing was to prevent certain winner-takes-all dynamics in the auction.  What we were finding is that there were a few large advertisers that were kind of winning every auction in a particular category, and we weren't sure actually whether that was a good user experience.  It was becoming much harder for the runnerup to break through and show up in the top position.").  In fact, after squashing, Google displayed the same ads on about 95% of queries measured by impressions and clicks, generating 88% of its revenue from queries returning the same ads in the top placement.  UPX442 at 872.  In other words, the overwhelming majority of revenues resulted from the same placements before and after squashing.  Moreover, Google measured success not based on improved ranking for smaller advertisers, but by whether a "squashed" auction produced positive revenues for Google.  In one record, Google described squashing as "desirable" when CPCs increased, and "undesirable" when they did not due to "reranking."  UPX737 at 464.  Because squashing produced desirable results 60% of the time, Google believed that "coarse squashing provide[d] overall positive metrics" but was "suboptimal due to these mixed effects."  *Id.*  Google proposed to further refine squashing to optimize revenues.  *Id.* at 464–65.

263.    When it made pricing changes, Google took care to avoid blowback from advertisers.  For instance, records show that Google had concerns about the impact of transparency on their efforts to increase prices.  *See* UPX507 at .015 ("Worry that if we tell advertisers they will be impacted, they will attempt to game us and convince us to abandon the experiment. . . . But, if we don't tell them, they will react more naturally (how they'd react if they believed they couldn't

91

influence our decision at all).”); UPX519 at .003 (“A sudden step function might create adverse reaction.”).

264.    Google therefore endeavored to raise prices incrementally, so that advertisers would view price increases as within the ordinary price fluctuations, or “noise,” generated by the auctions. *See, e.g.*, UPX507 at .023 (describing a 10% CPC increase as “safe” because it is “within usual WoW noise”); UPX519 at .003 (acknowledging that advertisers would notice a 15% price increase, but “this change is to [be] put in perspective with CPC noise,” that is, “50% of advertisers seeing 10%+ WoW CPC changes”); *id.* (comment stating that 15% is “probably an acceptable level of change (from a perception point of view) because these are magnitudes of fluctuations they are used to see[ing]”).

265.    With respect to format pricing, one Google document states: “A progressive ramp up leaves time to internalize prices and adjust bids appropriately[.]”  UPX519 at .003; UPX509 at 870 (stating that “[i]ncremental launches and monitoring should help us manage” the risk that price increases would lead advertisers to “lower[] their bids or modify[] other settings . . . to get back to a given ROI, leading to less revenue for Google than the initial impact hinted to”).  Similarly, in 2020, Google raised prices on navigational queries using multiple knobs and recognized that it was “[o]bviously a very large change that we don’t intend to roll out at once,” instead planning a “[s]low 18 months rollout” to “[l]eave[] time for advertiser[s] to respond rationally[.]”  UPX503 at 034; *id.* at 038 (“A slow roll ensures we don’t shock the system, gives time for advertisers to respond and us to monitor changes and stop early if needed.”); *see also, e.g.*, UPX505 at 312 (prior to implementing squashing, concluding that “[a]dvertisers should perceive AdWords as a consistent system, and not be subject to constant large impacts due to Google changes,” in part to

"improve[] advertiser stickiness"); UPX506 at .018 (Momiji slide deck: "Unlikely that advertisers will notice by themselves and respond.  However, a bad press cycle could put us in jeopardy.").

266.    Google's incremental pricing approach was successful.  In 2018 and 2019, Google conducted ROI Perception Interviews, which raised no red flags about advertisers' attitudes as to ad spending on Google.  *See generally* DX187; DX119.  While advertisers could tell that prices were increasing, they did not understand those changes to be Google's fault.  Google's studies revealed that advertisers facing CPC changes "dominantly attribute[d] these shifts to themselves, competition[,] and seasonality (85%)—not Google."  UPX1054 at 061; *see also* UPX737 at 464 ("They often attribute these changes to things in the world or what they've done, not just things happening on the backend[.]").

267.    When it made these pricing changes, Google did not consider its rivals' text ads pricing.  *See* UPX509 at 959 (Dr. Raghavan querying why "all of the discussion on advertisers' reactions to [Google's] pricing changes seem to presume that this is a 2-person game between the advertiser and [G]oogle," even though it is "really 3 players—the advertisers, [Google], and [its] competitors"); *id.* (noting that "the discussion seems insensitive to where else the advertiser could obtain traffic of similar quality and price").

### 3.    *Limiting Advertiser Control*

268.    Google also depreciated the quality of its text ads product in two primary ways: by reducing the information available to advertisers in Search Query Reports and by loosening keyword matches to create more crowded and higher price-generating auctions.

### a.    Search Query Reports

269.    Google began offering Search Query Reports (SQRs) in 2007 to help advertisers determine whether to add new affirmative or negative keywords to their lists.  UPX526 at 538;

Tr. at 1481:16-20 (Dischler) ("They use it in order to measure their advertiser effectiveness, or they could use it in order to improve the range of keywords that they use in order to be able to target users that are looking for their products or services."). Google was aware that SQRs were "widely used by advertisers of all segments." UPX526 at 539, 556.

270. Prior to 2020, SQRs included all queries that resulted in an ad click, even if there was only a single click (i.e., the "one-click threshold"). *See generally id.* Ostensibly out of privacy concerns, Google removed the one-click threshold. *Id.* at 543. It did so notwithstanding "substantial" projected data loss for advertisers and knowing that specific major advertisers, like Expedia and Booking.com, had stated they would be harmed. *Id.* at 545, 549.

271. Google's own records show that the privacy rationale was suspect. *See id.* at 525 (email from Dr. Juda questioning whether the proposed trimming of the SQR report "could or should be turned into a [privacy-focused thing] without a lot of thought"); *id.* at 531 ("While a query can contain sensitive information, I have the ability to type anybody's SSN into my search box. Therefore, queries are not PII, even if I am the only person ever to search for your SSN."); *id.* (opining that "even when we do share keywords which are identical to the query and contain sensitive information, I would argue our documentation is accurate"); *id.* at 541 (unnamed commentor stating "queries aren't PII"). Some advertisers, as well as U.S. Plaintiffs' expert Dr. Kinshuk Jerath, also view Google's privacy-related justifications with skepticism. Tr. at 3850:5-7 (Lowcock) ("[I]t would be reasonable to continue to share that sort of information with us without breaching privacy regulations."); *id.* at 5473:13-25 (Jerath) ("[T]his is not a valid reason because the search query reports were never using user level data."). Still, Google decided in the fall of 2020 that all queries must receive 50 cookied impressions daily to appear on an SQR. *See* UPX532 at 566 ("This decision is rooted in Google's treating search query data as personal

94

data for this use-case, even though Google has reasonable arguments such data [(i.e., queries)] may not be personal data in many instances.").

272. The less fulsome SQRs negatively impacted advertisers, who already have limited insight into how Google's auctions work. *See, e.g.*, UPX519 at .016 (advertisers "would like to see . . . more transparency in the definition of quality"); Tr. at 3850:16-18 (Lowcock) ("[W]e know what price we paid.  We have no true visibility in the way that the price is determined and how the auction is conducted."); Alberts Dep Tr. at 213:21–214:6 ("[I]t does limit some of the visibility in some of the terms that are triggering keywords that we would not like to match to."); Tr. at 5174:16-20 (Booth) (same); *see also id.* at 5468:6-21 (Jerath) (additional examples).  For instance, JPMorgan Chase estimated that prior to the change, about 5% of the keywords were not visible on SQRs, but afterwards the number rose to 20%.  Tr. at 4866:13–4868:10 (Lim) ("It just gave my team less information to work with.").

273. Google did not inform advertisers how the threshold had changed.  UPX532 at 568 (internal informational Q&A for press inquiries advised not to reveal the threshold for making the SQR "in keeping with our privacy and security policies"); Tr. at 5222:2-19 (Booth); Alberts Dep. Tr. at 166:17-25.  And because advertisers no longer received a report of every query that involved an ad click, advertisers purchased ads on certain queries generating fewer than 50 cookied impressions.  *See* Tr. at 5469:18–5471:12 (Jerath) ("They were buying certain queries but they were not being told . . . which queries they're buying," as if you purchased "a product in a supermarket but they don't tell you what you actually bought."); *id.* at 5471:10-12 (Jerath) ("This is data that you're actually buying.  This is indeed where your spend is going.  You should be entitled to know that at least this is where I spent my money.").

95

274.     Advertisers not only identify the keywords that may trigger participation in an auction, they also can identify so-called "negative keywords," which are keywords that an advertiser selects so as to avoid entry into an auction.  Alberts Dep. Tr. at 214:10-21; Tr. at 400:3-7 (Varian) ("[I]t's the advertiser that provides the keywords.  Google is seeing if those keywords match the query, and then it's determining that.  So it's really the advertisers' choice of keywords that are determining whether it serves an ad.").  Without the single-click information, Google thus not only constrained advertisers' ability to withdraw keywords but also to identify negative keywords to remove themselves from undesirable ad auctions.  *See* Tr. at 5472:11-24 (Jerath).

b.        Keyword Matching

275.     Google also reduced advertisers' ability to remove themselves from certain ad auctions by expanding its "keyword matching" functionality.  "[T]he typical way that advertisers interact with search advertising is using keywords, which is literally the advertiser [] guessing what the users might be querying, which is very complex.  And so doing that for millions of products is sort of an undue burden on advertisers so [Google] came up with an automated system where [it] do[es] more of the matching."  *Id*. at 1353:21–1354:2 (Dischler).

276.     One way Google does this is through "semantic matching," which tries to "understand[] the meaning of [key]words and replac[e] those with analogous words so that things that mean the same thing in a particular language are treated the same way."  *Id.* at 1363:12-16 (Dischler).  The chart below depicts how semantic matching works for the keyword "kids clothing."

New matches for keyword*: +kids +clothing

| kids → children | kids clothing → kidswear | clothing → apparel / outfit |
|---|---|---|
| clothing for young child | nikolai kidswear | creative apparel for kids |
| children's clothing in singapore | tj maxx kidswear | kids outfits |
| kids clothing canada | kids winter wear for girls | kids apparel in citywalk |
| best children's clothing brands | sean jean kids wear | |
| childrens beach clothes | kids wear online | |
| newborn children's clothing | kidswear outlet | |

Note: Table is a sample of matches, not exhaustive.
* Includes both S&R, SNE, and SemPhrase & SemBMM matches (all are new).

DX18 at 721.  Another example is correcting misspellings.  *See* Tr. at 1365:15-22 (Dischler); *see also id.* at 3848:17-20 (Lowcock) (describing "products like keyword matching and broad match modifier, which means the algorithm of a machine that the search engine is running can look for synonyms or understand what might be associated").

277.    Google has changed its keyword matching over time, beginning in 2012.  *Id.* at 4283:13–4284:15 (Juda).  The narrowest category, "expanded match," initially included only the keyword itself or grammatical variations (e.g., plurals) but today includes misspellings.  UPX8055 at .001–.002; Tr. at 5477:15–5478:1 (Jerath) (discussing UPXD103 at 40).  When Google began including misspellings as part of "expanded match," about 25% of advertisers (by ad revenue) opted out of the new feature, including many of Google's largest advertisers, like Amazon.  UPX518 at 573.  Nevertheless, Google removed the opt-out option in 2014, UPX8049 at .003; Tr. at 1478:12-14 (Dischler); *id.* at 4298:6-16 (Juda), despite recognizing that this move would "[r]emove[] control from advertisers," UPX518 at 572.  Thereafter, Google continued to expand the keyword match types.  *See* UPX31 at 471.  There are presently three types: broad match, phrase match, and exact match.  UPX8023 at .001.

UPX31 at 471.

278. Because broader matching enters more advertisers into an auction, it leads to thicker auctions (i.e., more auction participants), which creates upward pricing pressure. Tr. at 1477:18-24 (Dischler); *id.* at 4298:22–4299:1 (Juda). As advertisers cannot opt out of matching, the only way to ensure that a certain query does not trigger an ad is to provide a negative keyword. *Id.* at 4297:23–4298:3 (Juda). But identifying negative keywords is a far more cumbersome way for advertisers to avoid undesirable auctions, a challenge made even more difficult with less information from SQR reports. *See id.* at 5472:11-24 (Jerath).

**G.    SA360**

279. A search engine management tool, or SEM tool, enables advertisers to manage advertising campaigns across different online platforms, including GSEs, SVPs, and social media platforms. *Id.* at 1232:13–1233:18 (Dischler). "Native tools" refer to proprietary software products that allow advertisers to make ad purchases directly on the owner's platform. Google's native tool is Google Ads, and Microsoft's is Microsoft Ads. (Since both Yahoo and DDG use Microsoft's search results, they also rely upon Microsoft Ads as their underlying ad technology.) *Id.* at 1229:16-19, 1232:19–1233:6 (Dischler).

280.     SEM tools are helpful because they take the application programming interface from native tools and apply them in ways that facilitate management of multi-platform advertising campaigns all in one place.  *Id.* at 1234:11-24 (Dischler).

281.     Google owns an SEM tool called Search Ads 360, or SA360.  *Id.* at 1234:2-4 (Dischler).  It was initially developed by a company called DoubleClick, which Google acquired in 2007.  *Id.* at 1235:5-12 (Dischler); *id.* at 3668:23-24 (Ramaswamy).  Google advertised the SEM tool as "a neutral third party, helping [advertisers] achieve the highest return on investment, regardless of the online channel."  PSX1109 at 093.  Google continues to maintain that the "aim of the product" is "to be a neutral third party."  Tr. at 1236:21-23 (Dischler).

282.     Other SEM tool companies include Skai, Marin, and Adobe.  *Id.* at 1423:9-10 (Dischler).  About one third (31%) of all search ads revenue on Google and Bing flows through SEM tools.  *See id.* at 7095:1-24 (J. Baker) (discussing PSXD11 at 73).  SA360 is the market leader, with 76% of all SEM tool ad dollars spent on SA360.  *Id.*

283.     Auction-time bidding (ATB) is a feature available in both the Google Ads and Microsoft Ads native tools.  *Id.* at 1230:4-6, 1240:4-7 (Dischler).  ATB affords advertisers the ability to adjust bidding strategies in real time during ad auctions.  The alternative to ATB— intraday bidding—allows bidding strategies to be updated a few times a day.  Because ATB permits advertisers to adjust their bids in real time, it is more efficient than intraday bidding at allocating ad dollars to achieve their highest return.  *Id.* at 1230:7–1231:9 (Dischler) ("It's beneficial to advertisers, because it's better than the other alternatives.").

284.     ATB has been available on the Google Ads native tool since about 2016.  *Id.* at 1231:10-14 (Dischler).  It has a high adoption rate, meaning that it is popular among advertisers, in part because it yields an improved ROI.  *Id.* at 1231:15-17 (Dischler).

285.     By September 2019, ATB was fully integrated into the Google Ads interface on SA360.  *Id.* at 4308:9-11 (R. Krueger); PSX386 at 607.  It was immensely popular, with an 80% adoption rate and a 15–30% increase in ROI.  PSX386 at 607.  Google viewed the implementation of ATB into Google Ads on SA360 as a "high-complexity" feature that took between two to three years to accomplish.  Tr. at 1425:18-24 (Dischler).  When ATB was introduced in SA360 for Google Ads, Microsoft had ATB available only on its native tool.  *Id.* at 1240:4-7 (Dischler).

286.     In the summer of 2019, Microsoft asked Google to integrate ATB and other features into the Microsoft Ads interface on SA360.  *See id.* at 4309:5–4334:13, 4341:6–4345:2 (R. Krueger).  Google slow-rolled the request.  It instead prioritized continued work on Project Amalgam, which was an effort to overhaul SA360 to introduce it as "a completely new product," including "immediate support for most new Google Ads features and improved support for other channels and search engines, like Microsoft Advertising[.]"  DX282 at .001;  Tr. at 4468:4-15 (R. Krueger); *see id.* at 4745:4–4746:5-11 (Varia) (discussing DX132 at .005).  It also completed the years-long Project Myx, which integrated ATB for Google Ads into SA360.  Tr. at 4691:9-15, 4728:7–4729:7 (Varia).  Microsoft grew increasingly frustrated by Google's inaction, and it eventually requested a CEO-to-CEO level resolution of the matter.  PSX360 at 750.  Notwithstanding these efforts, at the time of trial, ATB still was not integrated into the Microsoft Ads interface on SA360.  Tr. at 5158:9-24 (Booth).

287.     Unlike SA360, other SEM tools offer ATB for Microsoft Ads on their platform.  *See id.* at 6643:7-12 (Vallez) (Skai); Heath Dep. Tr. at 47:3–48:8 (Adobe), 83:7–84:16 (Marin).

288.     With ATB unavailable for Microsoft Ads on SA360, some advertisers have used other SEM tools or Microsoft's native tool to avail themselves of that feature for their Bing ad

spend.  This includes one of SA360's largest advertisers, Home Depot.  *See* PSX441 at 903–04; PSX1203 at 992; Tr. at 5161:22–5162:14 (Booth).

## VI.     THE RELEVANT CONTRACTS

289.     Google has entered into search distribution contracts with two major browser developers (Apple and Mozilla); all major OEMs of Android devices (Samsung, Motorola, and Sony); and the major wireless carriers (AT&T, Verizon, and T-Mobile) in the United States. In 2021, Google paid out a total of $26.3 billion in revenue share under these contracts, an expense listed in its financial statements as "traffic acquisition costs," or TAC.  UPX7002.A; Tr. at 7577:2,7577:20-24 (Raghavan) (discussing DXD21 at 2).  TAC was Google's greatest expense in 2021, almost four times more than all other search-related costs combined.  *See* Tr. at 7577:2,7577:20-24 (Raghavan) (discussing DXD21 at 2); UPX7002.A.

### A.     Browser Agreements

#### *1.     The Google-Apple Internet Services Agreement*

290.     The Internet Services Agreement (ISA) is an agreement between Google and Apple, wherein Google pays Apple a share of its search ads revenue in exchange for Apple preloading Google as the exclusive, out-of-the-box default GSE on its mobile and desktop browser, Safari.  *See generally* JX33 (2016 ISA).  Apple is a crucial partner to Google, in part due to "Apple's sizeable and valuable user base, for which Apple controls distribution."  UPX6024 at 437; Tr. at 9742:1–9743:13 (Murphy) (discussing DXD37 at 40) (over half of all search volume in the United States flows through Apple devices).

#### a.     Current ISA Terms

291.     The parties entered into the current ISA in 2016, JX33, and in 2021 extended it for a period of five years until 2026, JX97 at 357.  Apple can unilaterally extend the agreement by two

years until 2028.  JX97 at 357.  After that point, the agreement can be further extended until 2031 if the parties mutually agree to do so.  *See* Tr. at 2501:17-25 (Cue).  Neither party has the right to unilaterally terminate the ISA prior to its current termination date.  JX33 at 800 ("The parties expressly amend the existing ISA Agreement to remove the right of either party to terminate at will[.]").

292.    The ISA also requires both parties to cooperate to defend the agreement, including in response to regulatory actions.  *Id.* at 801.

293.    Two provisions of the ISA are at the heart of the parties' dispute: (1) the default and revenue share provisions and (2) restrictions on Apple's product development.

### i.    *Default and Revenue Share*

294.    The ISA requires Apple to set Google as the default search engine on Safari for all its devices.  *Id.* at 793.  Under the ISA, a "Default" search engine is one that "will automatically be used for responding to Search Queries initiated from the Web Browser software, unless the End User selects a different third-party search service."  *Id.*

295.    "Search Query" under the ISA is defined as any user input seeking information that is entered on Apple's voice assistant, Siri; its on-device search, Spotlight; or Safari.  *Id.*  Between Siri, Spotlight, and Safari, Apple gets about 10 billion user queries per week.  Roughly 80% of those queries are entered into Safari; Siri and Spotlight thus make up a minority of queries.  Tr. at 2246:11–2247:9 (Giannandrea).

296.    Across all Apple devices, 65% of searches are entered into Safari's default access point, which is the integrated search bar.  This means that across all Apple devices, only 35% of all queries flows through non-default search access points.  UPX1050 at 894.  The numbers are similar for mobile searches: 61.8% of query volume flows through search access points governed

102

by the ISA, and 38.2% of queries are run through non-default search access points. *See* Tr. at 9758:9–9759:22 (Murphy) (discussing DXD37 at 52). *But cf.* UPX138 at 119 (2018 Google estimate of 80% on iOS). Only 5.1% of all searches on iPhones are conducted on a GSE other than Google. *See* Tr. at 9758:9–9759:22 (Murphy) (discussing DXD37 at 52). So, Google receives almost 95% of all general search queries on iPhones.

297. Queries entered through the Safari default (both mobile and desktop) account for 28% of all queries in the United States. *Id.* at 5763:14-22 (Whinston) (discussing UPXD104 at 36).

298. In return for these default placements, Google pays Apple ▉% of its ad revenue on Safari and Chrome, including queries initiated through Safari's default bookmarks. JX33 at 793, 797–98; JX24 at 822. Google pays revenue share on Chrome queries, notwithstanding the fact that Apple does not preload Chrome onto its devices. *See* JX33 at 796–98.

299. In 2022, Google's revenue share payment to Apple was an estimated $20 billion (worldwide queries). Tr. at 2492:22–2493:6 (Cue). This is nearly double the payment made in 2020, which was then equivalent to 17.5% of Apple's operating profit. *Id.* at 2492:2-8 (Cue); *id.* at 5727:20–5728:4 (Whinston) (discussing UPXD104 at 19). Google's 2022 payment under the ISA is more than all of its other revenue share payments combined and is approximately double that combined value. *Id.* at 5727:5-20 (Whinston) (discussing UPXD104 at 19).

### ii. Apple's Product Development

300. Google has long recognized that, if Apple were to develop and deploy its own search engine as the default GSE in Safari, it would come at great cost to Google. *See generally* UPX2. *See* Tr. at 7693:12–7697:12 (Pichai); *id.* at 8094:11–8096:4 (Gomes). For example,

Google projected that without the ISA, it would lose around 65% of its revenue, even assuming that it could retain some users without the Safari default.  *See* UPX1050 at 886.

301.    Apple has taken steps to grow its capacity in search.  In 2018, it hired the former head of Google Search, John Giannandrea, as its Chief of Machine Learning and AI Strategy. Tr. at 2164:18–2165:10 (Giannandrea).   Under his leadership, Apple has made a significant commitment to developing certain foundational elements of a GSE, including crawling and indexing the web and creating a knowledge graph.   *Id.* at 2244:19–2246:9, 2247:14-16 (Giannandrea); UPX659 at 213.  It also has integrated machine learning into its development efforts.  UPX1123 at 511.  Apple has invested ███████████ of dollars and committed █ employees to search development.  Tr. at 2227:18–2229:1 (Giannandrea).

302.    Notwithstanding these investments, Apple has decided not to enter general search at this time.  *Id.* at 2247:17-21 (Giannandrea).  Apple would forego significant revenues under the ISA if it were to do so.  UPX273 at 974 (2016 email from Cue to Apple CEO Tim Cook stating that Apple would have to "jeopardize revenue" if it stopped partnering with Google); UPX460 at 176–77 (internal Apple assessment from 2018, which concluded that, even assuming that Apple would retain 80% of queries should it launch a GSE, it would lose over $12 billion in revenue during the first five years following a potential separation from Google).  It would also have to undertake the risk of consumer backlash, *see* DX374 at .001 (Giannandrea email stating, "there is considerable risk that [Apple] could end up with an unprofitable search engine that [is] also not better for users"), and forgo investment in other areas of product development, Tr. at 2541:13-17 (Cue) ("And so if we took all of our resources and started spending them on search, sure, we could have competed with Google . . . [b]ut that meant we wouldn't have done other things.").

303.     Though it has not launched a full-blown GSE, Apple has introduced and integrated search functionality into its devices.  Its Suggestions feature is one example.  Apple can determine that a query entered into one of its access points does not qualify as a "Search Query," as defined by the ISA, if that "determination is based exclusively on its intent to provide a superior user experience."  JX33 at 793.  In practice, this means that Apple can effectively divert certain queries away from Google through a "suggestion."  *See* Tr. at 2217:10-16 (Giannandrea).  For instance, when a user enters a navigational query into Siri, Spotlight, or Safari, Apple provides a suggested website to the user, which is intended to allow the user to directly navigate to a third-party site and skip the Google SERP entirely.  *See id.* at 2217:3–2218:14 (Giannandrea) (discussing UPXD7).  Apple also uses its own proprietary search index to identify potentially responsive websites.  As depicted below, a user beginning to type "running sneakers" into Safari may be shown a "suggestion" to nike.com, which if tapped will take the user directly to Nike's website.  *Id.* at 2217:17–2218:8  (Giannandrea)  (discussing UPXD7).    Apple  collects  user  data  to  deliver "suggestions."  *Id.* at 2219:18-21 (Giannandrea).  Apple views its Suggestions functionality as providing "a much better user experience."  *Id.* at 2235:6-7 (Giannandrea).



UPXD7.

304.     Google perceived Suggestions as a threat to its search volume.  It believed that Apple's "increasing use of their own variety of suggestions to the user [wa]s pushing the user away from completing the search on" Google.  UPX309 at 823.  This meant that Google could not earn advertising revenue on those queries, which could decrease its overall search revenue on Apple devices.  *See* UPX2010 at 527 (Google analysis estimating a query loss of 10–15% of Safari traffic and a revenue loss of 4–10% of iOS Safari revenue based on Apple Suggestions).

305.     In direct response, Google negotiated a new term in the 2016 ISA, which required that Apple's implementation of the Safari default must "remain substantially similar" to prior implementations.  JX33 at 793 ("**Substantially Similar**" clause); UPX309 at 823 (Suggestions was "why [Google] added into the [ISA] that [Apple] could not expand farther than what they were doing in" 2016 as Google "did not wish for them to bleed off traffic[.]").

306.    Apple has broader authority with respect to Siri.  It may "determine which user inputs constitute Search Queries that will be provided to Google on any basis," not just superior user experience.  JX33 at 794.

307.    At present, Apple does not view the ISA as a limitation on its ability to respond to user queries on Suggestions or Siri.  *See* Tr. at 2534:24–2535:5 (Cue) ("Q. Was one of Apple's goals in 2015 to increase the number of users search queries Apple could answer on its own? A. . . . We still have that.  We're trying to answer more questions on Siri today.  So it's still a goal today."); *id.* at 2345:11-23 (Giannandrea) ("Q. [D]id anything in Google's agreement with Apple, with regard to the Safari browser, did that limit in any way Apple's ability to make these Safari suggestions or Siri suggestions?  A. No. . . . I didn't believe there was any limit to what we could do with respect to these suggestions.").

308.    Another search feature on Apple devices is Spotlight.  Spotlight can be accessed on the iPhone by a single downward swipe, which produces a search bar.  Spotlight is "intended to be sort of a universal search that looks at your own device, but can look up information further afield," including on Safari.  *Id.* at 2204:23–2205:3 (Giannandrea).  It is not a GSE, but Spotlight offers links to websites as if entered directly on Safari.  *Id.* at 2205:16-21 (Giannandrea).  The ISA provides that "Apple shall not be limited in its ability to alter, modify and innovate in Spotlight," but also requires that Apple's "initial implementation of the Spotlight Services for Search Queries within Spotlight shall be generally equivalent to the current implementation of search within Spotlight," though "in future versions of Spotlight, Apple may offer better integrations of the Spotlight Services."  JX33 at 794.

309.    The ISA also addresses Apple's ability to serve ads.  If Apple ever wishes to serve ads on Siri or Spotlight queries or results, it may only do so if it intends "to provide a superior user

107

experience or align with its general advertising principles." *Id.* at 796.   If that threshold requirement is met, Apple is further obligated by the ISA to "offer Google the opportunity to supply such ads or paid listings" before doing so itself. *Id.*   This provision has been described as the "**Right of First Refusal**."

310.   Apple does not presently advertise on Spotlight, nor does it have any plan to do so. Tr. at 2497:11-25 (Cue) (stating that Apple has "no intentions or plans to put ads on Siri or Spotlight," and "today, we have no intentions to put ads on Siri or Spotlight").

311.   Apple also does not "preload any third-party application on [their] devices" and does not intend do so under "any scenario[.]" *Id.* at 2456:2-10 (Cue).   Apple previously tried to preload third-party applications on desktop devices, and determined that "it wasn't the best experience[.]" *Id.* at 2456:13:15 (Cue).

### b.   History of the ISA

312.   The ISA did not start out with Google as the exclusive default GSE.   The first-ever ISA was signed in 2002. *See* JX1 (2002 ISA).   It granted Apple the right to license Google Search, allowing its users to access the Google SERP directly from the "search box" in Apple's web browser. *Id.* at 678.   The contract was not exclusive as to either party: Apple could preload rival search engines, and Google could license its search product to other third parties. *Id.* at 679.   The five-year agreement allowed for either party to terminate the agreement on certain grounds, and it permitted Apple to unilaterally terminate the agreement for any reason after its first year. *Id.* at 680.   The 2002 ISA did not include any payment of revenue share.   Cue 30(b)(6) Dep. Tr. at 26:4-7.

313.     Around 2005, Google initiated the idea of an exchange of revenue share for default exclusivity after it grew concerned that Yahoo might replace Google.  *See* UPX855 at 239–40; UPX992 at 016.  Apple did not ask for revenue share.  *See* Cue 30(b)(6) Dep. Tr. at 26:8–27:2.

314.     The parties subsequently amended the 2002 ISA, providing that Google would pay Apple a one-time sum of $10 million, plus 50% of its annual advertising revenue.  JX2 at 818. As consideration, Apple agreed to preinstall Google as the default GSE on Safari, such that it would "automatically be used for web search unless the user selects another search provider."  *Id.* at 819.  The 2005 amendment was set to terminate after three years, with Apple retaining the right to unilaterally terminate the agreement any time during the last year.  *Id.* at 820.

315.     In 2007, Apple launched the iPhone.  The parties amended the ISA to include the Safari default placement on mobile devices and other platforms.  JX4 at 647 (expanding the definition of "software" to include web browser software for iPhones, iPods, Safari for Windows, etc.).

316.     The 2007 amendment included two notable amendments.  First, it required that "Apple shall not pre-populate the search box with search terms that are not initiated by the end user," but that "queries utilizing auto complete features . . . shall be considered input by the End User."  *Id.*; *see* Tr. at 5001:16–5004:15 (Braddi) (describing Apple top hits, Apple Suggestions, and Google suggestions).

317.     Second, the 2007 amendment secured Google's default status in the Safari search bar not only on the iPhone but also on various other Apple products, including iPods and Safari for Windows.  JX4 at 647–49.  The 2007 amendment also made clear that Google would not pay revenue share to Apple if it decided to create a homepage on Safari that included a search service other than Google.  *Id.*  This term apparently grew out of a worry that Apple might install Yahoo

as a default GSE on a Safari for Windows homepage.  UPX672 at 475–76.  Apple apparently never implemented such a homepage on any version of Safari, so Google remained the only default GSE on Apple devices.

318.    The ISA amendments in 2008 and 2009 were largely without substantive change. *See, e.g.*, JX5 (2008 amendment); JX6 (2009 amendment).

319.    In 2009, Apple sought greater flexibility to grant its users access to other GSEs. Apple sought "[t]he option but not the obligation to set Google as the default search provider" and still receive revenue share.  UPX605 at 269.  Specifically, Apple proposed that it would receive slightly less revenue share for non-default queries (40%) and the full amount (50%) for queries on search access points preset with Google as the default.  *See* UPX675 at 249–50 (Apple redline of ISA).  Google rejected those terms in large part because Apple "could decide to work with an alternate provider for the desktop/Safari search solution," i.e., use Google as the default for some, but not all, locations or product lines/versions.  UPX605 at 270; UPX675 at 250.  Apple's requests did not make it into the updated amendments.  *See* JX9 (2009 amendment changing the revenue share percentages slightly, with no substantive changes); JX12 (2010 amendment extending the 2002 ISA, as amended, until 2014); Tr. at 4998:3-22 (Braddi) (Apple's requests "got dropped out").  The agreement remained exclusive.

320.    In 2012, Apple again sought the flexibility to distribute other GSEs to its users. It sent Google a term sheet requesting that Apple would have "[n]o obligation to use Google search services or to make Google the default" while maintaining its then-revenue share of 50% for all Google searches on Apple devices.  UPX570 at 724.  Google stood firm that "[i]f they wanted to receive revenue share," Apple had to maintain Google as the exclusive Safari default.  Tr. at 5001:8-11 (Braddi).  The resulting amendment, entitled the 2014 Joint Cooperation Agreement,

110

maintained Google as the exclusive default search engine.  *See* JX24 at 822 ("Google shall remain the default search engine" in the United States.).  The 2014 amendment also provided for the creation of "default bookmarks," which required Apple to include a bookmark for Google Search "prominently displayed on the Safari default bookmarks page" and obligated Google to pay revenue share "for all traffic initiated via the Google search bookmark."  *Id.*  Apple, however, was not precluded from offering default bookmarks that linked to rival GSEs, and it reached agreements with Bing and Yahoo for bookmark placement.  *See, e.g.*, DX962 at .003–.004 (Apple-Microsoft promotional agreement providing that Apple will make Bing readily discoverable, including by preloading it as a default bookmark on Safari).  Two years later, Apple and Google entered into the ISA currently in effect.

c.  Microsoft-Apple Negotiations

321.    Apple and Microsoft occasionally have had discussions regarding installing Bing as the default GSE on Safari.  Microsoft has not been successful.  *See generally* Tr. at 2508:3–2531:13 (Cue); *id.* at 3500:9–3504:17 (Nadella).

322.    In 2015, prior to the signing of the 2016 ISA, Microsoft hoped that Bing might replace Google as the default GSE on Safari.  *Id.* at 2508:7-9 (Cue).  As part of its pitch, Microsoft claimed that "increased competition between Microsoft and Google enabled by a search partnership [with Apple] is in Apple's long-term economic interests[.]"  UPX614 at 112.  Microsoft made clear that it was "willing to provide Apple with the majority of profits in a search partnership along with greater levels of flexibility and control over the product experience including user experience and branding," with one example being improved private searching "consistent with the broader Apple value proposition around respecting user privacy[.]"  *Id.*

111

323.     Microsoft understood that it "would have to pay and even subsidize the transfer" for the period of transition and was willing to do so for the long term.  Tr. at 3502:21–3503:8 (Nadella).  Microsoft offered Apple a revenue share rate of 90%, or a little under $20 billion over five years.  UPX614 at 113–14.  It did so recognizing that "there was going to be a period of turbulence of shift," both as a result of the change and assuming that Google would respond by encouraging users to abandon Safari for its browser, Chrome.  Tr. at 3503:22-24, 3504:4-12 (Nadella).  When that offer was not accepted, Microsoft proposed sharing 100% of its Bing revenue with Apple to secure the default or even selling Bing to Apple.  *Id.* at 2511:14-14, 2530:14-21 (Cue).

324.     Microsoft "thought they had great [search] quality and they said that with [Apple's] search volume, they could be even better," but Apple disagreed.  *Id.* at 2510:8-11 (Cue).  Moreover, Apple was concerned that despite the high revenue share percentage, Bing would not be able to bring in sufficient revenues because it was "horrible at monetizing advertising."  *Id.* at 2510:25–2511:11, 2511:24–2512:16 (Cue) ("If you have an inferior search engine, customers wouldn't use it, and so, therefore, I don't know how you could monetize it well.").

325.     Apple evaluated the potential financial impact of replacing Google with Bing.  *See generally* UPX273.  The analysis assumed that Microsoft would initially pay Apple 100% of Bing's revenue share, while Google would continue paying Apple ▮% revenue share if retained as the default.  *Id.* at 975–76.  The analysis showed that if Apple extended the ISA, it would gain about $40 billion from Google in the next five years, and then $70 billion in the following five years.  *Id.* at 974.  This was double the $20 billion Microsoft offered Apple for the first five years.  *Id.* ("Clearly, Microsoft can't commit to these numbers or even anything close to them.").

112

326. In response to this analysis, Apple's Senior Vice President of Services, Eddy Cue, internally proposed that the only way Apple could make the switch was if Microsoft were to guarantee minimum annual revenues of $4 billion the first year and a stepped increases of $1 billion per year over the next four years, for a total of $30 billion in guarantees. *Id.* Still, even that approach would produce revenues well short (by $10 billion) of Apple's expected earnings if it retained Google as the default. *Id.* ("[T]his doesn't match Google ($30B v. $40B) and provides no protection for the following 5 years[.]"). Cue concluded that a Microsoft-Apple deal would only make sense if Apple "view[ed] Google as somebody [they] don't want to be in business with and therefore are willing to jeopardize revenue to get out. Otherwise it [was a] no brainer to stay with Google as it is as close to a sure thing as can be." *Id.*; Tr. at 2528:13-16 (Cue) ("And so Google's a sure thing. They have the best search engine, they know how to advertise, and they're monetizing really well.").

327. Apple proposed to Microsoft that it guarantee revenues (the record is not clear whether the proposal mirrored what Cue suggested above), but Microsoft balked, which Cue expected. Tr. at 2522:3-19, 2518:18-24 (Cue). Regardless, Apple would not have accepted the deal, even if Microsoft had agreed to a guarantee. According to Cue, there was "no price that Microsoft could ever offer [Apple]" to make the switch, because of Bing's inferior quality and the associated business risk of making a change. *Id.* at 2519:10-11 (Cue); *id.* at 2530:17-19 (Cue) ("I don't believe there's a price in the world that Microsoft could offer us. They offered to give us Bing for free. They could give us the whole company.").

328. Google has also analyzed what Microsoft would need to offer Apple in order to win the Safari default. It called this study "Alice in Wonderland," with Alice referring to Microsoft. *See id.* at 1678:16-20 (Roszak). The analysis concluded that in order for Microsoft to match

113

Google's financial contribution, it would have to pay Apple 122% of Bing's revenue share just to equal Google's then-33.75% revenue share. *Id.* at 1683:10-13 (Roszak); UPX674 at 914. Google thus determined that "it will not be possible for Alice to match our payments profitably[.]" UPX674 at 914. Accordingly, during ISA negotiations, Google understood that Bing was not a viable option, which minimized Apple's leverage. *See* Tr. at 7772:12–7773:10 (Pichai).

329. Although Apple has never seriously considered Bing as an option, Microsoft perceives that Apple has used Bing "to bid up the price" in its negotiations with Google and extract a higher revenue share from Google. *Id.* at 3505:6 (Nadella). Microsoft CEO Satya Nadella testified that if, hypothetically, Bing exited the market, there would be a real concern as to whether Google would even pay Apple for default status, given the lack of any other option at all. *Id.* at 3505:12-17 (Nadella).

d.   DDG-Apple Negotiations

330. DDG, because of its brand emphasis on privacy, on multiple occasions has attempted to convince Apple to switch to DDG as the default GSE on Safari's "private browsing mode," a feature in Safari that provides some additional privacy protections beyond the baseline. *Id.* at 1953:3-11, 1973:16-19 (Weinberg).

331. In 2014, Apple for the first time offered DDG as an alternative default search option on Apple devices. This meant that users could change the default on Apple devices to DDG, if they chose to do so. *Id.* at 1972:22–1973:2 (Weinberg). That same year, DDG made its first pitch to serve as the default in Safari private browsing mode. *Id.* at 1973:3-5 (Weinberg). It continued to propose this idea over the following two years and received its first response from Apple in 2016. *Id.* at 1973:6-7 (Weinberg). DDG periodically met with Apple representatives through

2019, but ultimately Apple declined to make the switch. *See generally id.* at 1974–2046 (Weinberg).

332. Upper-level Apple executives never genuinely considered using DDG as the default in Safari's private browsing mode. *Id.* at 2352:21-23, 2361:7-11 (Giannandrea); *id.* at 2506:25–2507:7 (Cue). This is in part because DDG operates as "a veneer on top of other search engines," as it syndicates its results from Bing. *Id.* at 2352:25–2353:8, 2353:22-25 (Giannandrea); *id.* at 2505:10-14 (Cue); *see* DX375; DX377 at .001 (describing DDG for private browsing as "probably a bad idea"). Apple's senior leadership also views DDG's search quality as inferior to Google's. Tr. at 2353:9-11 (Giannandrea); *id.* at 2506:12-16 (Cue) ("[I]t is not a great search engine. . . . [I]t's not good enough.").

e.     Apple's Recent Evaluation of GSEs

333. In 2021, Apple's "Aethon" study demonstrated that, as measured by relevance of results, Google is superior to Bing on all search access points (except desktop queries on Safari). UPX260 at 681. "Google has a much larger lead on Mobile than Desktop[.]" *Id.* Google's relevance advantage was particularly strong for long-tail queries. As to users' overall preferences, Bing outperformed Google on its desktop user interface (for both Safari and Spotlight), but Google tied with Bing as to overall Safari queries and beat out Bing as to Spotlight on mobile. *Id.*

2.     *Mozilla-Google RSA*

334. Google also has a revenue sharing agreement with the browser developer Mozilla, whereby it pays Mozilla ██% revenue share in exchange for the default search placement on the Firefox browser. JX65 at 100, 107. The search access points on Firefox include "the search box" in the browser, "the navigation or location bar," any "search box displayed on a Firefox Startpage," among others. *Id.* at 102–03. If Mozilla implements the "this time, search with" feature on its

115

mobile application, the revenue share paid under the Google-Mozilla agreement drops from ██%
to ██%.  *See id.* at 100, 107.

335.    Google's 2021 revenue share payment to Mozilla was over $400 million, or about
80% of Mozilla's operating budget.  M. Baker Dep. Tr. at 41:18-24; Tr. at 538:7-15 (Rangel)
(discussing UPXD101 at 10).  Mozilla has repeatedly made clear that without these payments, it
would not be able to function as it does today.  *E.g.*, DX547 at .002.

336.    Under the terms of the current Mozilla RSA, either party may terminate the
agreement only upon a breach.  *See* JX31 at 628–29.

a.    Mozilla-Yahoo Partnership

337.    From 2014 through 2017, the default GSE on Firefox was Yahoo, not Google.
Tr. at 630:12-17 (Rangel).  The Mozilla-Yahoo agreement required Yahoo to pay a minimum
annual payment of $375 million, or 70% revenue share, whichever was higher.  DX1012 at .007;
M. Baker Dep. Tr. at 220:19–221:10.

338.    When Mozilla switched the Firefox default GSE from Google to Yahoo, the query
volume for each search provider changed.  Google's share of queries on Firefox abruptly dropped
from between 80–90% to between 60–70%, a 20-point decline.  *See* Tr. at 630:12–631:9 (Rangel)
(discussing UPXD101 at 55).  Yahoo's share, in turn, increased from around 10% to 30% of the
Firefox queries.  *Id.*  Between 2014 and 2017, Google gained back some amount of query share,
but never more than 70%.  *Id.*  When Mozilla reverted the default back to Google in 2017, Google
regained its former query share at Yahoo's expense.  *Id.*

339.    To meet the minimum payment guarantee, Yahoo increased the number of ads it
placed on the SERP, degrading the user experience and ultimately resulting in Mozilla changing
the default back to Google.  M. Baker Dep. Tr. at 236:24–237:9, 239:2-11; *see* UPX898 at 752

("The Yahoo team has been under continual pressure to increase monetization of the SERP, and has been making gradual changes over the last few months, leading to the cumulative experience you see today."); M. Baker Dep. Tr. at 77:18–78:2; Tr. at 6043:14-25 (Whinston).

### b.   Mozilla's Experiments

340.   Mozilla has run experiments to assess a potential switch of the default GSE from Google to a rival.  It tends to run these experiments when its agreements come up for renewal. *See* M. Baker. Dep. Tr. at 269:20–270:21.

341.   In a 2016 experiment, Mozilla switched the default GSE on both new and existing users from Google to Bing.  By the twelfth day, Bing had kept only 42% of the search volume. DX679 at .006.  After some additional time, those numbers dropped to 20–35%, depending on certain variables.  *Id.*  Mozilla's takeaway was that switching the Firefox default to Bing would result in missing revenue targets.  *Id.*

342.   The same year, Mozilla conducted an experiment switching the default GSE to Yahoo. DX729.  Yahoo only retained 16.5% of the total search volume.  *Id.*

343.   In 2017, Mozilla conducted a similar test, with Bing replacing Google.  DX679 at .006.  After 14 days, Bing retained 52.3% of search volume.  *Id.*

344.   From 2021 to 2022, Mozilla once again switched the default GSE to Bing for 0.5% of desktop Firefox users.  *See* DX548 at .002.  As a result, search volume decreased by 7% and ad clicks went down 13%.  *Id.* at .003.  Mozilla found: (1) "35.5% of clients who had their default search engine switched to Bing changed their default to another search engine (26% changed to Google, 9% changed to a search engine other than Bing or Google and the remaining kept Bing);" (2) the "64.5% of clients who did not switch away from Bing contributed a much lower percentage

to total search volume and ad clicks than clients who switched back to Google;" and (3) "65% of users who did not retain Bing as their default engine made the change within the first day[.]"  *Id.*

345.    There is no evidence in the record of Mozilla running any experiments where it switched the default from Google to a non-GSE.

### 3.    *Other Browser Agreements*

346.    Google has comparable agreements with smaller browsers, like Samsung's S Browser, which have been renewed through amendments.  *See, e.g.*, UPX5131 (Google-Opera 2012 Contract); UPX5146 (Google-Opera 2021 Amendment); UPX5210 (Google-UCWeb 2017 Agreement); JX71 (Google-Samsung RSA).

347.    DDG made its private browsing mode default proposal to other browser developers, including Samsung, Mozilla, and Opera, but none of them moved forward with DDG.  Tr. at 2048:9-24 (Weinberg).  DDG's impression was that the common concern shared by these browsers was their contracts with Google.  *Id.* at 2049:21-24 (Weinberg).

### B.    **Android Agreements**

### 1.    *Mobile Application Distribution Agreements*

348.    Google has entered into Mobile Application Distribution Agreements, or MADAs, with all Android OEMs, including Motorola and Samsung, among others.  *See, e.g.*, UPX5206 (Sony); JX49 (Motorola); JX37 (Samsung).  The MADA is a device-by-device license that allows OEMs to use Google's proprietary mobile applications developed for the Android ecosystem. Tr. at 775:9-14, 781:10-11 (Kolotouros).  This suite of applications is referred to as Google Mobile Services (GMS).  *Id.* at 775:9-17 (Kolotouros).  OEMs pay no fee for the GMS license, but Google requires OEMs to preload certain applications in prominent placements.  *See id.* at 9415:16-18 (Rosenberg).

349.    The MADAs may be terminated only by a breach by either party.  *E.g.*, JX49 at 877–78 (Google-Samsung MADA).

350.    As of 2019, about 2.3 billion Android devices were subject to the MADA.  UPX129 at 904.  Google employees were not aware of any non-MADA Android device sold in the United States.  *See* Sept. 19, 2023 (Sealed Session) Tr. at 9:23–10:4, 12:8-10 (Yoo); Tr. at 780:23-25, 791:25–792:2 (Kolotouros).  Moreover, there are no Android OEMs that have revenue share agreements but are *not* MADA signatories.  Tr. at 777:1-15 (Kolotouros); *see also id.* at 778:5-6 (Kolotouros) ("I would say to the extent the RSA generally does not happen unless an OEM has entered into a MADA, that is correct.").

351.    Google views the MADA as securing "baseline distribution of [its] apps on Android[.]"  UPX129 at 904.  Under the MADA, partner OEMs must preload all 11 GMS applications onto a new device, including the Google Search Widget, Chrome, YouTube, Gmail, Google Maps, and Google Drive, among others. *Id.* at 904–05.  Six of these applications, including the Google Search application and Chrome (which both default to Google), cannot be deleted by the user.  *Id.*  Without a MADA, an OEM cannot distribute any one of these GMS applications. Tr. at 779:10–780:16 (Kolotouros).

352.    One of the GMS applications is the Google Play Store, the leading Android app store. *See* UPX129 at 905.  Without a MADA, an OEM cannot distribute the Play Store.  Tr. at 780:23-25 (Kolotouros).  The Play Store contains a set of application programming interfaces (APIs), which support the functionality of all Android applications—both those developed by Google and by third parties. *Id.* at 784:7–786:5 (Kolotouros).  A user cannot effectively utilize GMS applications without having the Google Play Store installed, because the GMS apps' APIs

rely on the Play Store's infrastructure.  UPX125 at 067; *see* Tr. at 3517:18-19 (Nadella) ("And without [the] Google Play [Store], an Android phone is a brick.").

353.    The Play Store is not just technically required, but it also contributes significantly to the user experience.  Carriers view the Play Store as essential.  *See* Tr. at 1025:11-12 (Higgins) ("A device would need to have an app store on it in order to be successful[.]"); Giard Dep. Tr. at 111:18–112:7 (stating the Play Store is "[v]ery important" and "a primary function of allowing customers to access the apps that they want to have [o]n their device"; it "would be extremely difficult for a device to be successful without it"); Ezell Dep. Tr. at 61:1-3 ("[H]aving on the home screen the icon for the Play Store makes sense.  It's a core functionality of the device.").

354.    Samsung, which preloads its own proprietary app store onto its devices, does not see its "Galaxy Store" as replacing the Play Store.  *See* Baxter Dep. Tr. at 91:20-23 ("I can probably count on the number – on one hand the numbers of times that I went into the Galaxy app store.  So it was not a real relevant solution."); *see also* UPX1011 at 290 (Google "believe[s] that the cannibalization of Play store revenue due to Galaxy store is none to minimal," given that most of the popular applications present on the Play Store are absent from the Galaxy Store).

355.    Even Microsoft signed a MADA (thereby preloading the rival Google Search Widget and Chrome) for its Duo mobile devices because it "needed the license from Google[.]" Tr. at 3117:2-3, 3125:19 (Tinter).

356.    Part of the GMS suite of applications is the Google Search Widget (or Quick Search Box).  Signatories of the MADA agree to preload and place the Widget on the default home screen of the device.  *Id.* at 793:21-23 (Kolotouros).  Signatories also receive Chrome, and generally speaking, they agree to place Chrome in the Google applications folder, which appears on the default home screen.  UPX141 at 244.  The MADA requires the Google applications folder to be

on the default home screen, but it does not require its placement on the dock, sometimes known as the "hotseat," as depicted below.   Tr. at 793:15–797:20 (Kolotouros) (discussing default placements).



UPX76 at 184.

357.     Although OEMs must preload the Google Search Widget, users can delete it.  As of 2016, there were about 200,000 logged widget deletions daily but over 2.5 million daily Android activations.  *Id.* at 188.

358.     Nothing in the MADA expressly requires an OEM to preload only the GMS applications.  *See* Christensen Dep. Tr. at 49:25–50:4.  OEMs are, for instance, free to preload a second (or third) browser or search widget.

359.     In practice, however, OEMs recognize that preloading more than one of the same search access points, especially in similar prominent positions, is a suboptimal design that would

121

degrade the user experience.  This overloading of apps is known as "bloatware."  *See* Tr. at 2456:20–2457:8 (Cue).  Even Microsoft avoided adding a Bing search widget on its Duo devices to avoid degrading the user experience.  *See, e.g.*, *id.* at 3126:7-10 (Tinter) ("I do remember us having some conversations that from a user-interface standpoint, it would be really confusing if there were two boxes there, and it wouldn't be a good product for the user.").

360.    As another example, Samsung already preloads a second browser—its proprietary S browser—on all Samsung devices.  Rival browser and GSE providers, like Microsoft, understand that Samsung is extremely unlikely to preload a third browser on Samsung devices.  *See* UPX301 at 646 (2019 Microsoft email: "Therefore to take Edge [Samsung] would either need to ship 3 browsers on the device (Samsung browser, Edge, and Chrome) or drop the Samsung Browser. 3 browsers is DOA," or "dead on arrival"); UPX133 at 811 (internal Microsoft analysis: "On browser, [Samsung is] not willing to ship three browsers on the device.  This is due to overall concerns about the number of applications pre-loaded on the device and concern about operator push back.").

361.    Google recognizes this reality, too.  *See* UPX141 at 819 (describing device configuration with two preinstalled browsers and two default widgets as "[a]llowed but not likely"); Tr. at 1528:6-11 (Yoo) ("[F]rom the angle of like a user experience for these devices, what we understood and what we were trying to convey here was that OEMs want to sell devices, they want to be competitive.  And we thought that having two widgets was a little too much, so that OEMs are not likely to put two widgets on a device.").  Google employees were unable to identify any Android device that is preloaded with two search widgets.  Tr. at 1528:17-20 (Yoo); *id.* at 2877:2–2877:7 (Kartasheva); *id.* at 803:9-16 (Kolotouros).

*2.      Revenue Share Agreements*

362.    A revenue share agreement, or RSA, is a separate agreement from the MADA. Each RSA generally follows a tiered structure, in which a carrier's or OEM's payment is tied to the degree of device exclusivity.  The RSAs are device-by-device, meaning that partners can opt into different tiers based on the device model sold.  The RSAs do not prohibit the preinstallation of social networks like Facebook and Instagram.  *Id.* at 8689:7-9 (Israel).

363.    Although no OEM or carrier is required to enter into an RSA, all do so.  It would be irrational for a profit-maximizing firm to sign a MADA but then forgo at least some revenue share under the RSA.

a.      Carrier RSAs

364.    Google has signed RSAs with each major wireless carrier: Verizon, AT&T, and T-Mobile.  Google's agreement with Verizon has three tiers, whereas its contracts with AT&T and T-Mobile only have two and one, respectively.  *See* JX93 at 515 (2021 Google-Verizon RSA, outlining three tiers); JX91 at 765 (2021 Google-AT&T RSA, outlining two tiers); JX95 at 695–98 (2021 Google-T-Mobile RSA, describing one tier).  All three carrier RSAs may only be terminated should either party breach the contract.  *See* JX93 at 508; JX91 at 758–59; JX95 at 704.

365.    Google has long viewed RSAs with carriers as essential to securing query traffic on Android devices to the exclusion of rivals.  In fact, Google viewed exclusivity on Android devices as "very strategic to Google."  UPX134 at 865.  In a 2011 email, Google executive Chris Barton wrote about then-existing exclusive distribution deals with T-Mobile, Verizon, and Sprint, "I think this approach is really important otherwise Bing or Yahoo can come and steal away our Android search distribution at any time, thus removing the value of entering into contracts with them.  Our philosophy is that we are paying revenue share *in return for* exclusivity."  *Id.* at 869.

123

Another Google employee wrote as part of the same conversation, "The exclusive across all the [A]ndroid search entry points is very strategic to mobile search.  [T]he nightmare scenario is for [Microsoft] (or others) to come and scoop us by simply paying more.  [W]e know they have shown an appetite to do this in the past and will likely do so again to gain traction." *Id.* at 866.  Barton finally added, "We need to incentivize carriers to ship Google using the same approach we at Google have used for many years: 'We will pay for revenue share in return for exclusive default placement.'  This contract is an exchange. . . . Without the exclusivity we are not 'getting' anything.  Without an exclusive search deal, a large carrier can and will ship alternatives to Google[.] . . . Android is by far the greatest opportunity for Search monetization in mobile over the next years and is very strategic to Google.  You can bet that Microsoft and Yahoo will enter into contracts for search on Android through carrier deals if we do not." *Id.* at 865.

> i.   *Verizon*

366.   Verizon's RSA has three tiers: Core, Qualifying, and Preferred.  Google pays Verizon ██% revenue share on devices where the "core" search access points have been preinstalled and defaulted to Google.  *See* JX93 at 515–16 (describing the "Core Devices").  Those include Chrome, the Samsung Browser (on Samsung devices only), and the Google Assistant application. *Id.* at 516.  Verizon also receives ██% revenue share for old devices that comply with the prior RSA terms (i.e., that are grandfathered in).  *See id.* at 515 (describing the "Qualifying Devices"). In exchange for more placements, Google pays more revenue share.  The RSA requires Google to pay Verizon ██% revenue share on Preferred Tier devices (a three-fold increase from Verizon's Core Tier), provided that those devices have several other default Google placements.  *Id.* at 515, 517.  Those include, but are not limited to, the Google Search Widget, Chrome, and the default homepage on the browser.  *See id.* at 517.

367.     Verizon's "Core Devices" tier was developed through negotiations.  Verizon has entered into RSAs with Google for over a decade.  "From 2009–2014, Google paid Verizon 40% revenue share," and from 2014–2020, Google decreased the revenue share, paying Verizon 20%. UPX947 at 105.

368.     The Qualifying Tier devices earn carriers a ▉% revenue share but are only applicable to devices sold during the prior agreement terms and whose configuration conforms to the requirements of the previous agreement.  JX93 at 515.  Verizon previously earned a 20% revenue share on these Qualifying Tier devices but now only earns ▉%.  Tr. at 1049:25–1050:4 (Higgins).

369.     On June 13, 2017, Verizon purchased Yahoo.  *Id.* at 1043:15-18 (Higgins).  One of Verizon's goals was to preload certain Yahoo features, including search, onto its devices.  *See id.* at 1056:11-15 (Higgins).  Verizon raised this with Google in its negotiations for the 2021 Google-Verizon RSA.  *See* UPX1026 at 080–81.

370.     In November 2018, during RSA negotiations, Verizon shared a redline of the draft RSA with Google, striking out the exclusivity provision, which previously read: "Company will not include on the device any alternative search service that is similar to Google Search."  *Id.* at 080.  In that same redline, Verizon sought to limit the search access points governed by the RSA to expand its "flexibility for additional search capabilities on devices."  Tr. at 1056:5-10 (Higgins); *see* UPX1026 at 081.

371.     During those negotiations, Verizon hoped to increase the revenue share it was paid under the RSA.  *See* UPX947 at 105 (a "top Verizon Ask[] to Google" was for "Google to increase revenue share to Verizon from 20% to 23%" under the RSA).

372.     Despite these asks, Google insisted on the tiered revenue share system in effect at the time.  UPX306 at 976–77.  It "advised [that] all go-forward agreements with carriers include exclusivity provisions and exceptions cannot be made."  UPX642 at 198.  Despite Verizon "arguing vigorously . . . to keep [the] contract non-exclusive," *id.*, Google was insistent that Verizon could not preload any other GSE, such as Yahoo Search, and still receive the then-20% revenue share, Tr. at 1075:16-21 (Higgins).  In order for Verizon to preload Yahoo onto its devices, it had to accept the much-lower ▇% revenue share on those models in the Core Tier, which does not require exclusivity.  *See* JX93 at 515.

373.     Verizon viewed the ▇% revenue share as "punitive."  UPX495 at 003.  It conducted a "full revenue impact" assessment if it were to either not renew the RSA or renew but accept the Core Tier to allow it to "commingl[e] search" with Yahoo.  *Id.* at 003–04.  That analysis demonstrated that Verizon's acceptance of the Core Tier revenue share payment would result in a $1.4 billion loss in revenue to the company.  UPX304 at 606; Tr. at 1068:3-5 (Higgins).  This was both due to the decreased revenue share from Google, as well as Yahoo's revenue projections, which indicated "smaller [revenue] relative to the agreement that [Verizon] had with Google."  Tr. at 1090:2-5 (Higgins).

374.     As a result, Verizon determined that "the lower revenue from Yahoo [was] not worth it."  UPX306 at 976.  Instead, it determined that it would preload Yahoo properties that "do not have general search capabilities outside of the app," which would not run afoul of the Preferred Tier requirements.  UPX642 at 198.  Those properties included vertical offerings such as news, finance, and sports.  Tr. at 1093:3-7 (Higgins).  Google and Verizon in fact did agree to a carveout in the RSA that would allow for these vertical properties to be preloaded onto Verizon's Android devices, without demoting them from the Preferred to Core Tier.  *Id.* at 1095:1-7 (Higgins).  Those

126

vertical properties, however, could not serve as a search access point or otherwise direct users to a non-Google GSE.  *Id.* at 1095:13-15 (Higgins).

375.    Ultimately, these negotiations regarding Yahoo verticals became moot because Verizon sold Yahoo shortly before the 2021 RSA was executed.  *See id.* at 1056:16-18 (Higgins).

### ii.    AT&T

376.    AT&T's RSA is very similar to Verizon's, although it does not have a tier for Core Devices.  AT&T may instead choose to enroll its devices in the Preferred Tier, maintain them as Qualifying Devices, or forego any revenue share.  *See* JX91 at 765.

377.    The RSA requires Google to pay AT&T ██% revenue share on Preferred Tier devices provided that all search access points default to Google and those devices preload the Google Search Widget on the default home screen.  *Id.* at 751, 765–68.

### iii.    T-Mobile

378.    T-Mobile's RSA is structured differently than the others.  T-Mobile is compensated for the default placements on Qualifying Devices and Preferred Devices through a $██ bounty per device.  JX95 at 692, 696.  If T-Mobile does not configure a device on an exclusive basis, it is entitled to no bounty at all.  *See id.* at 696.  In the RSA negotiations, the initial term sheet included a tier-based system, where T-Mobile would earn more revenue share in exchange for exclusivity ("Optimized Tier") and less in exchange for a minimum level of device configuration without exclusivity ("Core Tier").  Giard Dep. Tr. at 328:23–330:25.  Google ultimately dropped the Core Tier from the RSA, even though T-Mobile "still wanted to be able to configure devices and receive revenue share from Google for the devices that were nonexclusive," because "Google preferred not to do that."  *Id.* at 330:7-11.

127

379.    It is not economically rational for any profit-maximizing carrier to opt for the lower-revenue share option.  Consequently, all three major carriers under their current RSAs have enrolled all Android devices sold at the highest revenue tier.  Tr. at 1050:18-22 (Higgins) (Verizon, all at Preferred Tier); Ezell Dep. Tr. at 193:5-9 (AT&T, all at Preferred Tier); Giard Dep. Tr. at 39:3-16 (T-Mobile, all distributed devices qualified for bounty).

b.      RSAs with OEMs

380.    Google also has RSAs with the two primary Android OEMs, Samsung and Motorola.  These RSAs cover the relatively small number of Android devices sold directly by OEMs.

381.    Under its current RSA, Samsung receives ▮▮% revenue share for devices complying with prior terms.  JX71 at 404, 417.  Additional incremental revenue share requires Samsung to configure certain search access points to Google.  "Core Devices" per the Samsung RSA must have Google set as the default GSE on the S Browser and must not allow users to change the S Browser default from the browser search bar itself (as opposed to the device settings).  *See id.* at 401, 426–28.  In exchange, Google pays Samsung ▮% revenue share on certain search access points for Core Devices.  *Id.* at 416.

382.    The Samsung RSA also provides for "Enhanced Devices," which requires additional placements beyond the MADA, such as placing Chrome as the default browser (over S Browser) in the hotseat, or dock.  *See id.* at 402–03, 422–24.  The revenue share paid to Samsung is the same for Enhanced Devices and Core Devices (▮%), but that percentage applies to a broader set of search access points.  *Id.* at 402, 416, 422–24.

383.    Nearly all Samsung devices sold in the United States are Enhanced Devices.  Tr. at 921:5-7 (Kolotouros).

128

384.     Motorola's RSA with Google is structured differently.  All devices sold must meet the minimum requirements of the Foundation Tier (preinstallation of Chrome with Google as the default GSE in the device's dock or hotseat).  JX62 at 184, 197.  Motorola then earns at least $███████ monthly in return.  *Id.*  The Premier Tier requires exclusive preinstallation of Google as the default on all search access points on the device, in return for additional monthly payments.  *Id.* at 186–87, 198, 201.  Google estimates that the number of Motorola devices sold by the OEM that are subject to this RSA "is north of 95 percent[.]"  Tr. at 911:11-19 (Kolotouros).

c.     Definitions of Alternative Search Services

385.     All current Android RSAs contain a definition of "alternative search services" that limits the partner's ability to preinstall or promote a different GSE.  The 2021 Google-T-Mobile and 2020 Google-Motorola RSAs define "Alternative Search Service" as "any search service that is substantially similar to Google Search (as determined by Google in its reasonable discretion)."  JX95 at 689 (T-Mobile); JX62 at 177 (Motorola).  The 2021 Google-T-Mobile agreement prohibits T-Mobile, on Preferred Devices, from installing any Alternative Search Service or means of navigating to one; marketing any other Alternative Search Service; suggesting an Alternative Search Service to end users; or adjusting settings that would interfere with Google's default search position.  JX95 at 696–97.  The 2020 Google-Motorola RSA contains similar restrictions.  JX62 at 185, 187.

386.     The 2009 Google-Verizon RSA defined "General Web Search" as "search functionality that produces search results by searching a large proportion of indexable websites, and where such search results may also include, unless excluded herein, other non-website results.  Examples of General Web Search include Google, Yahoo, and Bing search services."  JX16 at 678.

129

387.     That contract did not limit partners' ability to preload "vertical and customizable search functionality such as restaurant search, local business search, application search, and video search" onto covered devices and states that those functions are "not General Web Search" within the meaning of the contract.  *Id.*

388.     The 2021 Google-Verizon RSA defines "Alternative Search Service" as "(a) any web or (b) any on-device search service that in response to queries incorporates multiple vertical search functionalities, and that, in each case of (a) and (b), offers functionality that is substantially similar to Google Search (as determined by Google in its reasonable discretion)[.]"  JX93 at 489. This definition expressly carves out "search within a single mobile application that is limited to content within a particular, single or multiple vertical . . . that provides search results that [are] not substantially similar to Google Search (in its reasonable discretion)[.]"  *Id.*  The 2021 Google-Verizon RSA restricts the installation or promotion of Alternative Search Services, with a limited carve-out for Yahoo verticals, which was never implemented.  FOF ¶¶ 371–375.

389.     The 2021 Google-AT&T RSA defines "Alternative Search Service" as "any application, product, or service, other than Google Search, which, in response to queries, delivers search results consisting of (a) internet content or (b) content from multiple applications on a Device that [is] owned by entities that are not Affiliates of one another, in each case of (a) and (b), in a manner that is substantially similar to Google Search (as determined by mutual agreement of the Parties in accordance with section 7.2)."  JX91 at 743.  The AT&T agreement carves out similar functionality to the Verizon agreement, including any vertical content "that provides search results without searching the internet, other mobile applications, or web pages," providing Spotify and Waze as examples.  *Id.*  The AT&T agreement prohibits AT&T from preloading or otherwise

promoting on Preferred Devices any Alternative Search Services, with limited exceptions. *Id.* at 752, 753–54.

390.    The 2017 Google-Samsung RSA used to define "Alternative Search Service" as "any web search service that is substantially similar to Google Search." JX41 at 967. That definition was changed in 2020, however, to include "any web or on-device search service (including on-device search that incorporates multiple vertical search functionalities) that offers functionality that is similar to Google Search." JX71 at 394. This change resulted from Samsung's preinstallation of an on-device search technology from Branch, discussed *infra* Section VI.B.2.d. The 2020 Google-Samsung RSA limits Samsung's ability to install or promote Alternative Search Services on Enhanced Qualified Devices, with limited exceptions. JX71 at 403, 405.

### d.    Branch

391.    In 2019, Samsung sought to integrate Branch's deep-linking technology onto its devices. Tr. at 2907:11-20, 2908:1-4 (Austin). That technology primarily enables on-device search of mobile applications, but it also has the capacity to serve limited web search results if a user does not have a relevant mobile application on their device. This web search functionality was known as "Discovery." *Id.* at 2894:9–2895:6, 2900:4-12, 2909:16–2910:14 (Austin).

392.    Branch also developed a "Deepview" functionality where, based on partnerships with SVPs, it would allow users who did not have a particular app downloaded to access the SVP's website information directly from the Discovery interface, without reverting to the web. *Id.* at 2916:1-18, 2917:3-13 (Austin).



DX612 at .011.

393.    Branch understood the Google-Samsung RSA to be a roadblock to its distribution, as linking to websites could conflict with the agreement.  *See* Tr. at 2908:18–2909:2 (Austin).  Although Samsung eventually did preinstall Discovery on certain devices, its functionality was diminished.  *See id.* at 2910:21-22, 2921:2-8 (Austin) ("Samsung implemented a number of severe product restrictions based on this concept of linking to the web.").  Branch was limited to a predetermined list of applications so that Samsung could ensure those applications did not link to the web.  *Id.* at 2910:23–2911:9 (Austin).  These restrictions affected Branch's ability to monetize Discovery because monetization was driven by user access.  *Id.* at 2912:22–2913:20 (Austin).

394.    Following this episode, the newly negotiated 2020 Google-Samsung RSA included an amended definition of "Alternative Search Service" as "any web or on-device search service (including on-device search that incorporates multiple vertical search functionalities) that offers functionality that is similar to Google Search."  JX71 at 394.

395.    AT&T also considered installing Branch's technology.  Ultimately, it decided not to partner with Branch after Google refused to clarify whether such a partnership would run afoul

132

of the RSA.  After initially meeting with Branch, AT&T was interested in distributing it, but sought reassurance from Google that if it did so, it would not violate the RSA.  Ezell Dep. Tr. at 237:6-19, 239:15-23.  AT&T felt that it was not "black and white or cut and dry," and that "there might be some risks associated with" partnering with Branch, because it could be "considered a competing or alternative search," which would require AT&T to "forego[] the Internet search revenue from Google and instead just earn[] this on-device search revenue from Branch."  *Id.* at 240:1-5, 242:25–243:9.

396.    Ultimately, AT&T was unable to get a clear response from Google, *see* UPX982 at 686–87 (Google referring AT&T back to the "alternative search services" term without a concrete answer), and thus AT&T declined to preload Branch because it was not worth the risk, Ezell Dep. Tr. at 340:20–341:4 ("[T]he way it was reported back to me was that Google indicated they felt that it was inconsistent with the RSA."); *id.* at 247:1–249:9 ("It didn't appear that the economic upside from Branch was significant enough to . . . potentially put at risk a device not being eligible for our Google Search revenue.").

### *3.    Mobile Services Information Agreements*

397.    In 2021, every wireless carrier entered into a Mobile Services Incentive Agreement (MSIA) with Google, also known as a "go-to-market" agreement, wherein Google pays carriers incentives as consideration for meeting various requirements that are unrelated to search. *See* JX92; JX96; JX94; Tr. at 9460:24–9461:23 (Rosenberg).

398.    The MSIAs are separate and apart from the MADAs and RSAs.  Tr. at 9376:21–9377:8 (McCallister).  They require partners to collaborate with Google as to how the incentive is spent, which goes towards the goal of supporting the sale of Android devices and the Android ecosystem.  *Id.* at 9460:24–9461:23 (Rosenberg); *id.* at 9378:23–9379:1 (McCallister).

133

## **CONCLUSIONS OF LAW**

## I.   **LEGAL FRAMEWORK**

"Section 2 of the Sherman Act makes it unlawful for a firm to 'monopolize.'"  *United States v. Microsoft*, 253 F.3d 34, 50 (D.C. Cir. 2001) (citing 15 U.S.C. § 2).  The offense of monopolization requires proof of two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966).

The D.C. Circuit's decision in *Microsoft* explains how to evaluate claims of monopolization.  The first element—"monopoly power in the relevant market"—consists of two inquiries: (1) market definition, both product and geographic, and (2) power within the relevant market.  *Microsoft*, 253 F.3d at 51.  The plaintiff bears the burden of proof on both.  *Id.*  The second element—"willful acquisition or maintenance" of monopoly power—involves a burden-shifting inquiry.  The plaintiff bears the initial burden of establishing a prima facie case of anticompetitive effects resulting from the challenged conduct.  *Id.* at 58.  If the plaintiff makes out its prima facie case, the burden shifts to the defendant to "proffer a 'procompetitive justification' for its conduct," that is, "a nonpretextual claim that its conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal[.]"  *Id.* at 59. Finally, "[i]f the monopolist asserts a procompetitive justification . . . then the burden shifts back to the plaintiff to rebut that claim."  *Id.*  "[I]f the monopolist's procompetitive justification stands unrebutted, then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit."  *Id.*

134

The court structures its conclusions of law consistent with *Microsoft*'s analytical framework. After first summarizing the principles governing market definition, *infra* Section II.A, the court in Section II.B addresses whether general search services is a relevant product market, and finding that it is, then evaluates in Section II.C whether Google has monopoly power in that market. In Part III, the court considers the three proposed advertiser-side markets. The court finds that Plaintiffs have established two relevant markets—search advertising and general search text advertising—but that Google possesses monopoly power only in the narrower market for general search text advertising. All parties agree that the relevant geographic market is the United States.

The court then determines whether Google has engaged in exclusionary conduct in the relevant product markets. Plaintiffs' primary theory centers on Google's distribution agreements with browser developers, OEMs, and carriers. The court first addresses in Part IV whether the distribution agreements are exclusive under *Microsoft*. Finding that they are, the court then analyzes in Parts V and VI whether the contracts have anticompetitive effects and procompetitive justifications in each market. For reasons that will become evident, the court does not reach the balancing of anticompetitive effects and procompetitive justifications. Ultimately, the court concludes that Google's exclusive distribution agreements have contributed to Google's maintenance of its monopoly power in two relevant markets: general search services and general search text advertising.

In Part VII, the court evaluates Plaintiff States' additional theory of exclusionary conduct: that Google caused anticompetitive effects in the proposed markets by purposely advantaging its own advertising platform over Microsoft's on its search engine management tool, SA360. The court finds that Google's SA360-related conduct does not give rise to antitrust liability for two

135

reasons: (1) as a matter of law, Google has no duty to deal with Microsoft and (2) Plaintiff States did not produce evidence of anticompetitive effects.

Finally, in Sections VIII.A and VIII.B, respectively, the court discusses the intent evidence in this case and Plaintiffs' request for sanctions under Rule 37.

## II.        MONOPOLY POWER: GENERAL SEARCH SERVICES

The Supreme Court has defined "monopoly power" to mean "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). "More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level." *Microsoft*, 253 F.3d at 51. Direct evidence of such pricing power is "rarely available[.]" *Id.* So, "courts more typically examine market structure in search of circumstantial evidence of monopoly power." *Id.* Applying this "structural approach," a court may infer monopoly power "from a firm's possession of a dominant share of a relevant market that is protected by entry barriers." *Id.* Entry barriers are factors "that prevent new rivals from timely responding to an increase in price above the competitive level." *Id.*

Plaintiffs maintain that Google has monopoly power in the product market for general search services in the United States. According to Plaintiffs, Google has a dominant and durable share in that market, and that share is protected by high barriers to entry.

Google counters that there is no such thing as a product market for general search services. What exists instead, Google insists, is a broader market for query responses, in which there is vigorous competition. Google's Post-Trial Br., ECF No. 908 [hereinafter GTB], at 8–15. That market includes a host of other firms that fall outside of Plaintiffs' proposed market, including (1) SVPs like Amazon, Booking.com, and Yelp, (2) social media companies like Meta (which owns Facebook and Instagram) and TikTok, and (3) prominent stand-alone websites, like

136

Wikipedia. *Id.* These firms answer queries and therefore compete with Google. Secondarily, even if there is a product market for general search services, Google argues that it lacks monopoly power in it. The emergence of other search competitors, Google says, proves that barriers to entry are not as high as Plaintiffs claim.

### A.      Principles of Market Definition

The court starts with market definition.[3] "[T]he relevant market is defined as the area of effective competition. Typically this is the 'arena within which significant substitution in consumption or production occurs.'" *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) (quoting AREEDA & HOVENKAMP, FUNDAMENTALS OF ANTITRUST LAW § 5.02 (4th ed. 2017)) (internal quotation marks omitted). A relevant market must include all products that are "reasonably interchangeable by consumers for the same purposes," *Microsoft*, 253 F.3d. at 52 (internal quotation marks omitted), "even though the products themselves are not entirely the same," *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 25 (D.D.C. 2015). Courts should combine different products or services in a single market when "that combination reflects commercial realities." *Grinnell*, 384 U.S. at 572.

Whether goods are reasonable substitutes depends on two factors: functional interchangeability and cross-elasticity of demand. *Sysco*, 113 F. Supp. 3d at 25–26. Functionally interchangeable products are those that consumers view as substitutes for each other. *See id.* The products comprising the relevant market need not be entirely the same. So long as "consumers can substitute the use of one for the other, then the products in question will be deemed 'functionally interchangeable.'" *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 119 (D.D.C. 2004); *see also du Pont*, 351 U.S. at 393 ("Determination of the competitive market for commodities

---

[3] While this legal standard is identified as part of the court's discussion of the general search services market, it also applies to the advertiser-side markets discussed in Part III.

depends on how different from one another are the offered commodities in character or use, how far buyers will go to substitute one commodity for another.").

Cross-elasticity of demand turns on consumers' sensitivity to an increase in price. *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986); *du Pont*, 351 U.S. at 400 ("An element for consideration as to cross-elasticity of demand between products is the responsiveness of the sales of one product to price changes of the other."). That is, "[i]f an increase in the price for product A causes a substantial number of customers to switch to product B, the products compete in the same market." *Sysco* 113 F. Supp. 3d at 25. "The higher these cross-elasticities, the more likely it is that similar products . . . are to be counted in the relevant market." *Rothery Storage*, 792 F.2d at 218.

Courts generally consider two categories of evidence when defining the relevant product market: the "practical indicia" identified by the Supreme Court in *Brown Shoe Company v. United States*, 370 U.S. 294 (1962), and quantitative evidence from expert economists. The *Brown Shoe* "practical indicia" include: (1) industry or public recognition, (2) the product's peculiar characteristics and uses, (3) unique production facilities, (4) distinct customers, (5) distinct prices, (6) sensitivity to price changes, and (7) specialized vendors. *Id.* at 325. According to the D.C. Circuit, "[t]hese indicia seem to be evidentiary proxies for direct proof of substitutability." *Rothery Storage*, 792 F.2d at 218. And while "[t]he *Brown Shoe* practical indicia may indeed be 'old school'" antitrust law, they bind the court. *Sysco*, 113 F. Supp. 3d at 27 n.2.[4]

Quantitative evidence of market definition typically comes in the form of an expert economist conducting a "hypothetical monopolist test." *Id.* at 33 (internal quotation marks

---

[4] Although some jurists have questioned the continued reliance on *Brown Shoe* to define markets, *see FTC v. Whole Foods Market., Inc.*, 548 F.3d 1028, 1058–59 (D.C. Cir. 2008) (Kavanaugh, J., dissenting), Google has not urged the court to abandon consideration of them, *see* GTB at 6–23; Google's Proposed Conclusions of Law, ECF No. 909 [hereinafter GCL], at 1–13; Google's Resp. Proposed Conclusions of Law, ECF No. 911 [hereinafter GRCL], at 3–7.

omitted).  "This test asks whether a hypothetical monopolist who has control over a set of substitutable products could profitably raise prices on those products.  If so, the products may comprise the relevant product market."  *Id.*  None of Plaintiffs' economics experts performed a quantitative hypothetical monopolist test.  That is entirely understandable for the proposed general search services market because search is a zero-priced good to the end user.  The absence of a price is a feature of the user-side market.  *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 978 (9th Cir. 2023) (observing that "there may be markets where companies offer a product to one side of the market for free but profit in other ways, such as by collecting consumer data or generating ad revenue").

Pricing, however, is central to the advertiser-side markets.  Yet none of Plaintiffs' experts performed a hypothetical monopolist test.  The court found this surprising, but its absence is not fatal.  There is no legal requirement that a plaintiff supply quantitative proof to define a relevant market.  *See McWane, Inc. v. FTC*, 783 F.3d 814, 829–30 (11th Cir. 2015).  Authorities cited by Google do not establish otherwise.  *See* GTB at 21.  For instance, Google accurately quotes an Eleventh Circuit decision, stating that "the broader economic significance of a submarket must be supported by demonstrable empirical evidence."  *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1338 (11th Cir. 2010) (quoting *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 998 (11th Cir. 1993)) (internal quotation marks omitted).  But the Circuit's later decision in *McWane* made clear that this is not a hard-and-fast rule.  There, the expert's opinion "did not involve an econometric analysis, such as a cross-elasticity of demand study."  783 F.3d at 829.  Still, the expert's reliance on qualitative economic evidence was sufficient to define the market, because "there appears to be no support in the caselaw for [the] claim that such a technical analysis is always required."  *Id.*

139

Plaintiffs did offer proof of what they say are "real-world" hypothetical monopolist inquiries conducted by Google, as the company routinely measured the effects of price increases on advertiser demand. The court will discuss what Google calls "intentional pricing" as part of the proposed advertiser-side markets, *infra* Section VI.B.

**B.     General Search Services is a Relevant Product Market.**

The evidence at trial established that general search services is a relevant product market and alternative sources for query information, like SVPs and social media sites, are not adequate substitutes. The *Brown Shoe* practical indicia highlight the unique features of a GSE that make it distinct from other platforms. Of course, not every *Brown Shoe* factor is applicable because general search is a free product, so the court does not consider factors related to pricing. The court first addresses the relevant *Brown Shoe* factors and then responds to Google's counterarguments.

*1.     Peculiar Characteristics and Uses*

"The 'product's peculiar characteristics' refers to the general truth that substitutes in the market often have a strong physical and functional relationship." *Rothery Storage*, 79 F.2d at 218 n.4.

No user could confuse a GSE with an SVP or a social media site. Unlike those other products, GSEs are a gateway to the World Wide Web. FOF ¶ 27. The web itself is often (but not always) the source of the answer to a query. (GSEs also secure query responses from structured data, such as knowledge graphs, current travel information, sports score feeds, etc.). FOF ¶¶ 41–45. Search on a GSE therefore is not constrained by subject matter, inventory, or query type. FOF ¶ 33. Google's own query classification system reflects this reality. It tracks queries in more than two dozen different subject matter areas. FOF ¶ 34. Moreover, 80% of Google's queries are noncommercial in nature. FOF ¶ 37. Also, navigational queries—that is, queries entered for the

140

purpose of getting to another site on the web (e.g., "amazon," "home depot," "baltimore sun")—are exclusive to GSEs.  FOF ¶ 39.  Nearly 12% of Google's queries are navigational queries, and according to a 2018 Google weekly query report, its top five queries by query volume were all navigational queries.  *Id.*

By contrast, SVPs are "walled gardens," meaning their query responses are derived from structured data available only on that particular platform.  FOF ¶ 144.  Such data cannot typically be crawled by a GSE.  FOF ¶¶ 45, 144.  Because a user's search is confined to the SVP's structured data, users cannot use an SVP to navigate beyond the platform.  FOF ¶ 144.  For instance, Home Depot maintains a vast product catalog of goods that it sells both online and in stores.  FOF ¶ 145.  Users of Home Depot's digital platforms can purchase those products from Home Depot but cannot navigate to a product-maker's website to make a direct purchase.  *Id.*  In addition, as the name implies, SVPs are typically "specialized" to a particular subject matter (e.g., Amazon for shopping, Expedia for travel, Yelp for local businesses).  FOF ¶¶ 141, 146.  Although some SVPs do answer noncommercial queries, most notably Wikipedia, the vast majority do not.  FOF ¶ 142.  Thus, a user who wishes to acquire different categories of information could not do so from a single SVP and instead would have to take trips to multiple sites.  FOF ¶¶ 33, 147.  Even then, there are some types of queries—like long-tail queries—for which there may not be an SVP to deliver an answer.  FOF ¶ 148.

The product delivered to consumers on a GSE differs significantly from what is produced by an SVP.  When a user enters a query into Google or Bing, the result is a search engine results page, or SERP, which contains organic links that enable the user to navigate to other websites.  FOF ¶¶ 41, 43.  For commercial queries, the Google SERP will include advertisements, which similarly link to other webpages.  FOF ¶ 172.  And, in some cases, the SERP will contain vertical

offerings, which are built on structured data typically sourced from a third-party on topics such as shopping, flights, and hotels.  FOF ¶¶ 42, 45.

On the other hand, SVPs respond to queries with a results page that reflects the data possessed or controlled by the SVP.  Although some SVPs contain links that direct a user to a site external to the SVP's platform (such as an online travel aggregator like Kayak), most do not. FOF ¶ 144.  Similarly, any advertisements that appear on an SVP's results page link to products or services within its own platform.  FOF ¶ 194.  Purchases are typically completed within the SVP itself.  *Id.*  As a result of these distinct features, the business models of GSEs and SVPs are fundamentally different.  A GSE seeks to attract users on the promise that it will accurately and efficiently answer any query and monetize the commercial ones through advertising.  An SVP must attract a user to its site for a commercial purpose to complete a transaction.

Social media sites differ from GSEs in many of the same ways as SVPs.  They too are "walled gardens," primarily driven by user-generated content such as self-uploaded videos on TikTok or photos on Instagram.  FOF ¶ 162.  Searches on social media only yield results from profiles on the platform and do not display web links to external sites (although social media users can navigate to external web content, such as through a link posted by a user or through an advertisement).  *Id.*  There was little evidence presented on the efficacy of social media search. The court thus has no reason to believe that search functionality on social media sites is comparable to that offered by GSEs or even SVPs.

Plaintiffs have sought to distinguish GSEs from other platforms as a "one-stop shop" for all manner of queries, and Google challenges that characterization.  U.S. Plaintiffs' expert, Dr. Michael Whinston, opined that his analysis of Windows query data demonstrated that 77% of users begin their search journeys on GSEs.  FOF ¶ 35.  Plaintiff States' expert, Dr. Jonathan Baker,

conducted an analysis of user search behavior, which showed that nearly 65% of user sessions involved searching in more than one vertical. FOF ¶ 34. Dr. Baker claimed that this analysis proved that general search offers "one-stop shop" convenience. *Id.* Google's expert, Dr. Mark Israel, took a contrary position. He opined that "one-stop shopping" is at odds with how people actually search. Google's sessions data showed that during a "visit" to Google—defined as any series of user activity separated by five minutes of inactivity—the median number of queries is one and that the median length of a visit is 20 seconds. That data, he said, is inconsistent with the notion of "one-stop shopping." Tr. at 8418:1–8419:3 (Israel) (discussing DXD29 at 25).

The court does not find the "one-stop shop" analogy to be apt, but that is no obstacle to recognizing a general search services market. The notion of the "one-stop shop" was useful in a case like *Sysco*, where the ability of a purchaser to obtain all of its requirements in one place was more efficient and less costly than having to place orders with multiple specialty providers. *See* 113 F. Supp. 3d at 16 ("Customers value the breadth of product offerings and the opportunity to aggregate a substantial portion of their purchases with one distributor, allowing them to save costs."). That is not exactly how search works. Users do not necessarily do all their querying at once. Users seek information on different subjects over time. By that thinking, Dr. Israel is right that search is not a "one-stop shop."

But that framing is too narrow. Users always can, and do, return to a GSE to fulfill a broad array of informational needs. And they can do so at little or no cost. A user can search for a tennis racket on Google, then purchase the racket on Walmart.com, and then return to Google to find out the dates for the next U.S. Open with little to no friction (and certainly no actual expense). This may not be "one-stop shopping" in a traditional sense, but the GSE is performing a unique function: It is both a reservoir of information and a conduit to other sources on the web. And it

143

serves that purpose over and over again.  No SVP or social media platform can meet user needs in the same way.  They therefore are not functionally interchangeable with GSEs.

### 2. *Industry or Public Recognition*

Industry or public recognition "matters because [courts] assume that economic actors usually have accurate perceptions of economic realities."  *Rothery Storage*, 792 F.2d at 218 n.4.  Plaintiffs have presented significant evidence that market participants consider GSEs to be a distinct product with no adequate substitutes.

*First*, browser developers recognize that GSEs are a distinct product.  Browsers contain a default search access point, and only GSEs occupy that position.  To install an SVP or a social media site as the default would restrict that key access point to a particular vertical or subset of verticals, creating a poor user experience.  FOF ¶¶ 146–147, 149.  To that end, browsers allow users to switch the search default only to a GSE and not to an SVP or a social media platform.  The available alternative defaults in Chrome, Edge, Firefox, and Safari all are GSEs.  FOF ¶ 61.  Mozilla recognizes that certain SVPs are frequented by its users, and so it has created a unique feature in the desktop version of Firefox that allows users to perform individual searches with SVPs like Amazon or Wikipedia, using the Firefox toolbar.  FOF ¶ 60.  But even Firefox does not allow a user to change the default search engine to an SVP.  FOF ¶ 61.

*Second*, Android OEMs and mobile carriers also consider GSEs to be a distinct product.  By signing the MADA, every Android OEM has installed a GSE—Google—as its default search access point (whether in the Google Search Widget or Chrome).  FOF ¶¶ 59, 350, 363.  No Android phone comes with an SVP or a social media platform installed at the default search access point.  Not surprisingly then, Google's various RSAs with OEMs and carriers define the term "Alternative Search Service" to include platforms similar to Google.  FOF ¶¶ 385–390.  Certain RSAs explicitly

exclude SVPs from the definition. *Id.* Thus, the RSAs prohibit partners from preloading Bing, Yahoo, and DDG but permit preloading of Amazon or Instagram.

*Third*, advertisers consider GSEs to be differentiated from SVPs and social media platforms. The court will have more to say about this in connection with the advertiser-side markets, *see infra* Section III.A.1, but for present purposes it suffices to observe that advertisers do not generally view SVPs and social media to be reasonable substitutes for GSEs.

*Fourth*, Google itself recognizes general search services as a distinct product and separate market. As already noted, Google is the default GSE on Chrome. (Microsoft does the same with Edge, installing Bing as the preset default.) When Google has evaluated its quality against other platforms, it has done so primarily against other GSEs. FOF ¶¶ 136–138. For instance, Google has assessed its SERP quality and latency alongside Bing and has compared its privacy offerings to DDG. *Id.* While Google has conducted some evaluations of SVP and social media users, *see* Google's Resp. Proposed Findings of Fact, ECF No. 912, ¶¶ 13, 15 [hereinafter GRFOF], its employees have testified that it would be difficult or unhelpful to do side-by-side comparisons with SVPs or social media, because of their differentiated product experiences, FOF ¶ 139.

In addition, internal Google documents show that Google, as early as 2009, tracked its "market share" relative only to other GSEs. *See United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 52 (D.D.C. 2011) ("When determining the relevant product market, courts often pay close attention to the defendants' ordinary course of business documents.") (citation omitted). Google has since suspended that practice. The record does not reveal precisely why.

*Finally*, evidence suggests that the public also views GSEs as a distinct product. Dr. Israel testified that there is "relatively limited [user] overlap between the general search engines." Tr. at

145

8728:23-24 (Israel).  This suggests that users see Google and other GSEs as substitutes, such that using Google obviates a need to use another GSE.

>   ### 3.       *Unique Production Facilities*

"If a product requires unique production facilities, and the producer raises the price above the competitive level, the ability of other producers to shift resources to make the product would be limited, and the market definition should be likewise limited." *Rothery Storage*, 792 F.2d at 218 n.4.  For a zero-cost product like a GSE, this factor is of limited application unless slightly modified to use quality as the relevant variable, instead of price.

Imagine if Google's search quality substantially degraded, whether purposely or through neglect.  Would SVPs or social media platforms be able to shift resources to put out a product that resembles a GSE and thereby capture a significant number of dissatisfied Google users?  The answer obviously is no.  Absent extraordinary cost and expense, neither Amazon nor Meta could become a source for noncommercial or navigational queries.  *See infra* Section II.C.3.a.  Wikipedia likewise could not become a source for commercial or navigational ones.  And even if an SVP or social media firm were willing to make the required intense resource commitments, adapting its platform to perform general search functions would take a long time to materialize.  *Cf. Microsoft*, 253 F.3d at 53–54 (stating that substitute products are those that can "constrain pricing in the reasonably foreseeable future, and only products that can enter the market in a relatively short time can perform this function").

*        *        *

Accordingly, the relevant *Brown Shoe* factors warrant recognition of a general search services market.

### 4.       *Google's Proposed Query Product Market*

Google urges that the relevant user-side product is query responses, not general search services.  *See* GTB at 8.  That contention rests largely on the opinions of its expert, Dr. Israel.  He observes that whenever a person seeks information online, they make a choice about where to search, whether on a GSE, an SVP, a website, or a social media platform.  *See, e.g.*, Tr. at 8398:1-17, 8437:1-23 (Israel).  These various sources, although differentiated from GSEs, compete with GSEs for queries and thus act as competitive constraints.  GTB at 9.  Plaintiffs' user-side market for GSEs, Dr. Israel says, artificially cuts out these market actors, many of whom are Google's primary competitors for users.  *Id.* at 10–12.  Those include shopping and local SVPs, like Amazon and Yelp, which fiercely compete with Google to attract users.  Tr. at 8394:25–8395:9 (Israel).

In one sense, Dr. Israel is not wrong.  Google does perceive and respond to competitive pressure from other platforms, particularly SVPs.  FOF ¶ 140.  After all, Google developed verticals like shopping, flights, and hotels in part to provide users with topic-specific results much like SVPs.  *See* GTB at 13; FOF ¶ 45.  Still, the court is unpersuaded by Dr. Israel's query-by-query approach to define the relevant market for several reasons.

*First*, "the relevant market must include all products 'reasonably interchangeable by consumers *for the same purposes*.'"  *Microsoft*, 253 F.3d at 52 (quoting *du Pont*, 351 U.S. at 395) (emphasis added); *see also id.* (affirming the district court's exclusion of "information appliances" from the relevant market "because information appliances fall far short of performing *all of the functions of a PC*") (emphasis added).  No one disputes that an SVP can serve the same purpose as a GSE for an individual query on a particular subject matter.  A user can, for example, use either Google or OpenTable to find a nearby Japanese restaurant, or turn to Google or Amazon to shop for a blender.  But no SVP can fulfill a user's varied needs in the same manner as a GSE.  Few

147

SVPs can provide answers to noncommercial queries or take a user to a desired location on the web through a navigational query. And no SVP can answer long-tail queries like a GSE. Thus, an SVP may be reasonably interchangeable with a GSE for a discrete purpose but for not the "same purposes."

*Second*, "the mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes." *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075 (D.D.C. 1997). That is the lesson learned from the D.C. Circuit's decision in *Whole Foods* and the district court's decision in *Staples*. In *Whole Foods*, the fact that consumers "cross-shopped" between premium and organic supermarkets and ordinary supermarkets did not require the latter's inclusion in the relevant market. 548 F.3d at 1040 (Brown, J.). Likewise, in *Staples*, the court held that office supply superstores constituted a relevant product market even though consumers also purchased such products through other retail outlets. 970 F. Supp. at 1079. A similar analysis applies here. The fact that GSEs may compete for travel queries against Booking.com, shopping queries against Amazon, and local queries against Yelp does not mean that firms that specialize in certain verticals belong in the same product market as GSEs. The fact that users "cross-query" does not require all online query sources be lumped together in the same market.

To challenge this conclusion, Google points to a 2020 Bank of America study, which asked participants where they begin online shopping searches: 58% responded Amazon, only 25% chose Google. FOF ¶ 151. "But the fact that [two firms] 'are direct competitors in some submarkets . . . is not the end of the inquiry[.]'" *Whole Foods*, 548 F.3d at 1040 (Brown, J.) (quoting *United States v. Conn. Nat. Bank*, 418 U.S. 656, 664 n.3 (1974)). The Bank of America study merely demonstrates that Google and Amazon compete for shopping queries, which comprise a minority

of Google's overall queries by type.  FOF ¶ 151; FOF ¶ 38 (80% of queries on Google are non-commercial in nature); *see also* 548 F.3d at 1048 (Tatel, J., concurring) ("That Whole Foods and Wild Oats have attracted many customers away from conventional grocery stores by offering extensive selections of natural and organic products thus tells us nothing about whether [they] should be treated as operating in the same market as conventional grocery stores.").  That Google and Amazon have some overlapping users does not, without more, mean they belong in the same product market.

*Third*, there is nothing improper about aggregating varied query types into a single relevant market.  According to Dr. Israel, the "clustering" of different verticals into a single market is appropriate only when the competitive conditions are similar, that is, when information providers are competing to resolve similar user questions, such as those related to travel.  *See* Tr. at 8400:6-23 (Israel); *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 565 (6th Cir. 2014) ("If the [competitive] conditions are similar for a range of services, then the antitrust analysis should be similar for each of them.").  He acknowledges that there may be submarkets for travel or shopping or local queries, but he rejects an overarching market that collects those submarkets under the umbrella of general search.  *See* Tr. at 8399:7–8400:23 (Israel).

But Dr. Israel's "cluster" market principle does not apply here, because a GSE is better thought of as a "bundle" of offerings.  *Cf. Whole Foods*, 548 F.3d at 1039 (Brown, J.) (recognizing a "cluster" market based on "a core group of particularly dedicated, distinct customers, paying distinct prices").  "Unlike cluster markets, which aggregate a number of individual relevant markets, a bundle market is the collection of products or services that comprise the relevant market where customers value suppliers offering a package of goods and benefit from the 'one-stop shopping' experience."   Kevin Hahm & Loren K. Smith, *Clarifying Bundle Markets and*

149

*Distinguishing Them from Cluster Markets*, 20 ANTITRUST SOURCE 1, 3 (2021).   As already discussed, GSEs are not a "one-stop shop" in the same sense as, say, an office-supply superstore (*Staples*) or a broadline distributor (*Sysco*).   But they are a distinct product because only a GSE can answer *any* query—including, importantly, noncommercial and navigational queries.   *See Grinnell*, 384 U.S. at 572–74 (stating that there is "no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities" and the market concerns "a single basic service" that is "unique," notwithstanding the existence of more specialized competitors).   No SVP can match the breadth and comprehensiveness of a GSE. Thus, even if viewed as a "bundle" of search offerings, GSEs comprise a relevant product market.

*Finally*, the record shows that GSEs and SVPs are complementary goods, undermining Google's contention that users view the two as true substitutes.   *Sysco*, 113 F. Supp. 3d at 31 (observing that it "would be improper to group complementary goods into the same relevant market just because they occasionally substitute for one another") (quoting AREEDA & HOVENKAMP, FUNDAMENTALS OF ANTITRUST LAW ¶ 565b (4th ed. 2017)).   Dr. Baker demonstrated that SVPs receive between 33% to 88% of their traffic, depending on the subject matter area, through a click on a GSE's SERP, whether through an organic link or an advertisement.  FOF ¶ 155.  Not surprisingly then, SVPs are Google's top advertisers.  FOF ¶ 156. This data shows that users are not uniformly bypassing Google and going directly to SVPs, thus confirming that SVPs do not cannibalize searches on Google.

As evidence that SVPs pose a competitive constraint, Dr. Israel analyzed queries on Google, Amazon, and Bing, and found that for Google's top non-navigational shopping queries, Amazon had a significant query volume (3.7 million, as compared to Google's 5.1 million). FOF ¶ 154.  But Dr. Israel's query volume analysis only reveals that users enter a large number of

queries on both Google and Amazon.  Unlike most goods, queries are free, so users face no cost constraint when using more than one site.  Thus, the fact that large numbers of consumers use both Google and Amazon tells the court little about whether Amazon is "reasonably interchangeable" with Google.  (The same is true for Dr. Israel's analysis of queries on Yelp and the Auto, Flights, and Shopping verticals.)

Google's own studies confirm that GSEs and SVPs are complementary goods, not substitutes.  Google's 2019 analysis, entitled "Project Charlotte," showed that users who engaged with SVPs were *more likely* to enter queries on Google.  FOF ¶ 157.  The same is true on mobile applications: A 2020 Google study found a positive correlation between users' activity on SVP applications and query volume on Google, such that a user's adoption of Amazon, eBay, Walmart, Pinterest, Spotify, or Twitter was associated with increased revenues and queries on Google mobile.  *Id.*  Therefore, although SVPs can and do compete with GSEs for certain types of queries, the evidence does not show that such competition has led to less frequent use of GSEs.  Consumers use GSEs and SVPs in a complementary manner to meet their online needs.  *See Microsoft*, 253 F.3d at 52 (products that function "only as a supplement to" the proposed product market are not within the market).

With respect to social media platforms, there is little evidence that they actually compete with GSEs for search queries.  Google presented an internal study suggesting that 63% of daily TikTok users aged 18–24 reported using the platform to perform searches within the last week, FOF ¶¶ 140, 163–164 (citing DX241), but that percentage alone tells the court little about actual substitution between GSEs and TikTok.  Importantly, the study offers no detail on the types of searches performed or the quality of the results.  There also is some evidence—albeit dated—that Facebook use correlates to *more* searching on Google.  FOF ¶ 165.  Thus, although it may be that

there is some growth in search on social media platforms, it is not enough to comprise the "significant substitution" necessary to be grouped into the same product market.

*       *       *

The court therefore rejects Google's proposed query-response market and instead agrees with Plaintiffs that there is a relevant market for general search services.[5]

### C.       Google Has Monopoly Power in the General Search Services Market.

The court turns now to address whether Google possesses monopoly power within the market for general search services.  "While merely possessing monopoly power is not itself an antitrust violation, it is a necessary element of a monopolization charge."  *Microsoft*, 253 F.3d at 51 (citations omitted).  "Monopoly power is the power to control prices or exclude competition." *du Pont*, 351 U.S. at 391.  "More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level."  *Microsoft*, 253 F.3d at 51.  Importantly, a firm need not actually have earned monopoly profits or excluded competition to possess monopoly power. "[T]he material consideration in determining whether a monopoly exists is not that prices are raised and that competition is actually excluded but that *power exists* to raise prices or exclude competition when it is desired to do so."  *Am. Tobacco Co. v. United States*, 328 U.S. 781, 811

---

[5] Dr. Whinston suggested that the so-called "*Cellophane* fallacy" explains substitution away from Google to other platforms, like SVPs.  *See* U.S. Pls.' Proposed Conclusions of Law, ECF No. 838 [hereinafter UPCL], at 6–7.  The *Cellophane* fallacy refers to "the existence of substitution between products resulting from monopoly power rather than reasonable substitutability."  *Id.*  A commercial environment evincing a "high cross-elasticity of demand may, in some cases, be the product of monopoly power rather than a belief on the part of consumers that the products are good substitutes for one another."  *United States v. Eastman Kodak Co.*, 63 F.3d 95, 105 (2d Cir. 1995).  In other words, the dearth of true substitutes in a heavily monopolized market may lead users to substitute to "highly-differentiated," out-of-market products.  *Id.*  In those circumstances, "[t]he existence of significant substitution in the event of further price increases or even at the current price does not tell us whether the defendant already exercises significant market power."  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 471 (1992) (quoting AREEDA & KAPLOW, ANTITRUST ANALYSIS ¶ 340b (4th ed. 1988)) (emphasis omitted).  The court thinks that the *Cellophane* fallacy has little application here.  Amazon is not a "poor substitute" whose use should be understood as evidence of Google's monopoly power.  UPCL at 6.  All evidence points to consumers viewing Google and Amazon as complementary goods that compete in certain submarkets but not as "reasonably interchangeable by consumers for the same purposes[.]"  *du Pont*, 351 U.S. at 395.  The *Cellophane* fallacy is thus not applicable.

152

(1946) (emphasis added).  "It is not necessary that the power thus obtained should be exercised. Its existence is sufficient."  *Id.* (internal quotation marks omitted).

The possession of monopoly power may be proven through direct or indirect evidence. Direct evidence of monopoly power is rare.  "Where evidence indicates that a firm has in fact profitably" raised prices substantially above the competitive level, "the existence of monopoly power is clear." *Microsoft*, 253 F.3d at 51.  More often, courts "examine market structure in search of circumstantial evidence of monopoly power." *Id.*; *see id.* at 57 (observing that "direct evidence [is not required] to show monopoly power in any market").  Under this indirect, structural approach, "monopoly power may be inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers." *Id.* at 51.

A barrier to entry is "[a]ny market condition that makes entry more costly or time-consuming and thus reduces the effectiveness of potential competition as a constraint on the pricing behavior of the dominant firm . . . regardless of who is responsible for the existence of that condition." *S. Pac. Commc'ns Co. v. AT&T*, 740 F.2d 980, 1001 (D.C. Cir. 1984).  "Common entry barriers include: patents or other legal licenses, control of essential or superior resources, entrenched buyer preferences, high capital entry costs[,] and economies of scale." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997); *see also United States v. Syufy Enters.*, 903 F.2d 659, 667 (9th Cir. 1990) (observing that a "network of exclusive contracts or distribution arrangements designed to lock out potential competitors" is a barrier to entry). A plaintiff must not only show that such barriers to entry exist, but that those barriers are "significant[.]" *Microsoft*, 253 F.3d at 82.

Certain market behaviors are not inconsistent with a defendant's possession of monopoly power.  Evidence that a dominant firm invests in research and development is not antithetical to

153

monopoly power.  "[B]ecause innovation can increase an already dominant market share and further delay the emergence of competition, even monopolists have reason to invest in R&D."  *Id.* at 57.  The same is true of decreasing price: "[A] price lower than the short-term profit-maximizing price is not inconsistent with possession or improper use of monopoly power."  *Id.* (citation omitted).  Finally, "[t]he defendant's innocence or blameworthiness . . . has absolutely nothing to do with whether a condition constitutes a barrier to entry" evincing monopoly power.  *AT&T*, 740 F.2d at 1001.

Plaintiffs attempt to prove that Google has monopoly power in the market for general search services through both direct and indirect evidence.  Although they offer little direct evidence, the indirect evidence supporting the structural approach—a dominant market share fortified by barriers to entry—easily establishes Google's monopoly power in search.

### 1.    *Direct Evidence*

Plaintiffs' direct evidence is limited.  They note that Google's immense revenues and large profit margins, FOF ¶¶ 8, 57, 259, allow it to capture significant surplus from the challenged contracts, *see* U.S. Pls.' Proposed Findings of Fact, ECF No. 839 [hereinafter UPFOF], at 27–28; Tr. at 4775:21-24 (Whinston) ("[T]he size of profits and . . . when firms have a really, really big advantage, that is very likely to coincide with market power."); *id.* at 415:8-10 (Varian) (agreeing that in some cases, "large profit is one indicator of monopoly").

In addition, Plaintiffs point to Google's admission that it does not "consider whether users will go to other specific search providers (general or otherwise) if it introduces a change to its Search product."  UPX6019 at 365–66.  Google's indifference is unsurprising.  In 2020, Google conducted a quality degradation study, which showed that it would not lose search revenue if were to significantly reduce the quality of its search product.  FOF ¶ 134.  Just as the power to raise

154

price "when it is desired to do so" is proof of monopoly power, *Am. Tobacco*, 328 U.S. at 811, so too is the ability to degrade product quality without concern of losing consumers, *see* Andrew Chin, *Antitrust Analysis in Software Product Markets: A First Principles Approach*, 18 HARV. J.L. & TECH. 1, 22 n.134 (2004) ("A seller with market power may find it profitable to reduce product quality in the eyes of a captive group of consumers if the seller can thereby reduce production costs or, more generally, if the seller's interests are adverse in some way to the consumers' preferences."). The fact that Google makes product changes without concern that its users might go elsewhere is something only a firm with monopoly power could do. *See Microsoft*, 253 F.3d at 58 (observing that Microsoft's setting "the price of Windows without considering rivals' prices" is "something a firm without a monopoly would have been unable to do").

Other direct evidence presented was less persuasive. Plaintiffs submitted evidence that Google's Senior Vice President of Knowledge and Information Products, Dr. Prabhakar Raghavan, cautioned his team against responding hastily to DDG's privacy initiatives absent a business case for doing so. FOF ¶¶ 138, 118–119. According to Plaintiffs, Google's ability to offer fewer privacy protections—without concern as to a rival's superior privacy offerings—is evidence of monopoly power. *See* U.S. Plaintiffs' Post-Trial Br., ECF No. 838 [hereinafter UPTB], at 53–55.

But using privacy to demonstrate monopoly power is questionable for a host of reasons. For one, Plaintiffs have not established any framework for evaluating whether Google's privacy offerings are suboptimal. Sure, there was evidence that users generally care about privacy. FOF ¶ 116. But Plaintiffs submitted little proof that identified the privacy features users value and, importantly, whether Google declined to adopt such features without any concern that its users would go elsewhere.

Nor is it proof of monopoly power that Google considers the business case for making privacy adjustments. There is some tradeoff between privacy and search quality. FOF ¶¶ 121–125. For example, less information about a user's search history might produce inferior results when the user returns to find more information about a previously searched topic. *See id.*; Tr. at 9905:1-10 (Murphy) ("Privacy is good, but it comes at a tradeoff from quality."). Also, Google's employees convincingly testified that Google refrained from particular privacy measures adopted by rivals to prioritize an improved user experience. FOF ¶ 120. That Google offers fewer privacy protections than DDG without losing users is thus not necessarily indicative of monopoly power. It may just be that users are willing to sacrifice enhanced privacy offerings for improved search functionality.

### 2. *Indirect Evidence – Market Share*

Assessing monopoly power through indirect evidence begins with determining market share. Although there is no minimum percentage, the Supreme Court has recognized that two-thirds of a domestic market can constitute a "predominant share." *Grinnell*, 384 U.S. at 571 (citing *Am. Tobacco*, 328 U.S. at 797). Duration also matters. "Monopoly power must be shown to be persistent in order to warrant judicial intervention[.]" AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 801d (5th ed. 2022) [hereinafter AREEDA].

Plaintiffs easily have demonstrated that Google possesses a dominant market share. Measured by query volume, Google enjoys an 89.2% share of the market for general search services, which increases to 94.9% on mobile devices. FOF ¶¶ 23–24. This overwhelms Bing's share of 5.5% on all queries and 1.3% on mobile, as well as Yahoo's and DDG's shares, which are under 3% regardless of device type. FOF ¶ 25. Google does not contest these figures. Closing Arg. Tr. at 68:17–69:6.

156

Nor is this market dominance of recent vintage. Google has enjoyed an over-80% share since at least 2009. FOF ¶¶ 23–24. That is a durable dominant share by any measure.

### 3. Indirect Evidence – Barriers to Entry

Barriers to entry are essential to establishing monopoly power because the current market share may not reflect the "possibility of competition from new entrants[.]" *Microsoft*, 253 F.3d at 54. "[I]f barriers to entry are high, then market power can be sustainable over a long period of time." Tr. at 4763:21-22 (Whinston). Plaintiffs identify several such barriers to the general search services market: (1) high capital costs, (2) Google's control of key distribution channels, (3) brand recognition, and (4) scale. The court finds that these barriers exist and that, both individually and collectively, they are significant barriers that protect Google's market dominance in general search.

### a. High Capital Costs

"[T]he need for large capital outlays and lengthy construction programs in order to enter the market" is a barrier to entry. *AT&T*, 740 F.2d at 1002; *see Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007) (barriers to entry include "high capital costs, or technological obstacles, that prevent new competition from entering a market in response to a monopolist's supracompetitive prices"); *Syufy Enters.*, 903 F.2d at 667 (structural barriers include "onerous front-end investments that might deter competition from all but the hardiest and most financially secure investors").

Building and maintaining a competitive GSE require an extraordinary upfront capital investment, to the tune of billions of dollars. FOF ¶¶ 50–55. Apple's Chief of Machine Learning and AI Strategy, John Giannandrea, testified that "a startup could not raise enough money . . . to build a very good, large-scale search engine" because "to build a competitive project is very

expensive," amounting to a "multi-billion dollar investment." Tr. at 2261:11-19, 2268:6-7 (Giannandrea); DX374 at 301; *see also* UPX266 at 986 ("[A] world class search engine is at least a \$2–4B/year R&D investment[.]"). Neeva founder, Dr. Sridhar Ramaswamy, testified to the same effect. Tr. at 3672:7 (Ramaswamy) (stating that Neeva required "two substantial [venture capital] funding rounds"). Google's internal estimates also are consistent with this testimony. FOF ¶ 51 (assessing that it would cost Apple billions to compete in the search market). And those capital expenditures are required *before* the additional, multi-billion-dollar investment needed to build and maintain an ad platform or other means of monetization. FOF ¶ 55.

High capital costs thus constitute a substantial barrier to entry. *See Marathon Oil Co. v. Mobil Corp.*, 669 F.2d 378, 381 (6th Cir. 1981) (concluding that the relevant market was "characterized by high barriers to entry because of capital requirements" of about \$1 billion, rendering it "unlikely that a new vertically integrated [] company would enter the market to take [the defendant's] place as a competitor and supplier for independent dealers").

b.      Google's Control of Key Distribution Channels

The D.C. Circuit has described a dominant firm's "control of interconnection with its local distribution facilities" as perhaps the "most critical[]" barrier to entry, which should be considered by looking at the "realities of control[.]" *AT&T*, 740 F.2d at 1002. Plaintiffs point to two sources of Google's control: the challenged contracts and its ownership of Chrome.

Without descending into the contested issues of exclusivity and anticompetitive effects at this juncture, *see infra* Section IV.C & Part V, it suffices to say that Google controls the most efficient and effective channels of distribution for GSEs. It is the exclusive preloaded GSE on all Apple and Android mobile devices, all Apple desktop devices, and most third-party browsers (Edge and DDG are the exceptions). FOF ¶ 59. Rivals cannot presently access these channels of

158

distribution without convincing Google's partners to break existing agreements, all of which are binding for a term of years.  FOF ¶¶ 291, 349, 364; *see infra* Section V.A.1.b; *Syufy Enters.*, 903 F.2d at 667 (a "network of exclusive contracts or distribution arrangements designed to lock out potential competitors" is a barrier to entry).  Even if a new entrant were positioned from a quality standpoint to bid for the default when an agreement expires, such a firm could compete only if it were prepared to pay partners upwards of billions of dollars in revenue share and make them whole for any revenue shortfalls resulting from the change.  *Infra* Section IV.A.  No *current* search engine in the market can compete on those terms.  It is even harder to envision a new entrant doing so.

It is also a "realit[y] of control" that Google is the sole default on Chrome.  *AT&T*, 740 F.2d at 1002.  Queries on user-downloaded Chrome make up 20% of searches conducted in the United States.  FOF ¶ 63.  Though the Chrome default is not alleged to be exclusionary conduct, it is a market reality that significantly narrows the available channels of distribution and thus disincentivizes the emergence of new competition.  Google's near-complete control of the most efficient search distribution channels is a major barrier to entry.

### c.    Brand Recognition

"[T]he need to overcome brand preference established by the defendant's having been first in the market or having made extensive 'image' advertising expenditures[] also constitute[s] barriers to entry."  *AT&T*, 740 F.2d at 1002; *U.S. Anchor Mfg.*, 7 F.3d at 998 ("[I]t is settled that customer brand loyalty may constitute an impediment to competition and thus an aid in the exercise of market power."); *cf. Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 623 (6th Cir. 1999) ("[E]stablishing credibility naturally seems to be a significant barrier to entry, particularly for an enterprise that depends heavily upon reputation, such as certification of medical specialists.").  As U.S. Plaintiffs' expert in behavioral

economics, Dr. Antonio Rangel, opined: "If you have a brand that is so dominant and consumers are not familiar with the others, it's already at ceiling."  Tr. at 649:19-21 (Rangel).

Record evidence firmly establishes that Google's brand is widely recognized and valued. FOF ¶¶ 130–131.  After all, "Google" is used as a verb.  Even on Bing, "google.com" is the number one search.  FOF ¶ 132.  The "entrenched buyer preferences" enjoyed by Google are a major deterrent to market entry.  *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1126 (10th Cir. 2014).

Google's brand recognition also provides its distribution partners with a powerful incentive to retain Google as the default GSE.  FOF ¶ 133.  Google considers its brand as a benefit to its contracting partners, incentivizing them to choose Google.  *See* Tr. at 7780:21-23 (Pichai) ("Apple benefits and sells more iPhones by having their brand associated with the quality . . . [of] Google Search.").  The Google brand also benefits from the "seal of approval" it receives from its partners. *See id.* at 7780:23-24 (Pichai) ("Our brand gets validated by being present as a default in iPhones."); *id.* at 2619:24–2620:4 (Cue) ("It's a great product for our customers, and we wanted our customers to know that they're getting the Google search engine.  I think one of the benefits, for example, that Google gets from Apple is that we are telling the world that Google is the best search engine, because that's what they would expect Apple to pick.").  This mutuality of branding interests makes market entry that much harder.

To be sure, Google's brand recognition is due in no small part to its product quality. FOF ¶ 130.  But as previously stated, "[t]he defendant's innocence or blameworthiness . . . has absolutely nothing to do with whether a condition constitutes a barrier to entry" evincing monopoly power.  *AT&T*, 740 F.2d at 1001.

160

d.      Scale

Finally, Plaintiffs identify scale as a barrier to entry.  A lengthy discussion on the relationship between scale and search engine quality is unnecessary at this stage.  *See infra* Section V.A.2.  It is enough to say for now that scale is an important factor in search quality.  As Google admits, "the volume and availability of user interaction data is one factor that can affect search quality[.]"  Google's Proposed Findings of Fact, ECF No. 835, ¶ 256 [hereinafter GFOF].  Google has a lot of scale, and new entrants struggle to obtain it.  FOF ¶¶ 87, 89.  As Dr. Ramaswamy testified, acquiring users and getting them into the "habit" of using a new product is "tricky."  Tr. at 3699:22 (Ramaswamy).  Securing users to generate scale, in order to then exploit the benefits of scale, is a significant barrier to entry.  *See Microsoft*, 253 F.3d at 55–56 (identifying as an entry barrier that "most developers prefer to write for operating systems that already have a substantial consumer base," such that developers would not similarly support rival operating systems without scale); *see also FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14, 45 (D.D.C. 2023) (same).

4.      *Google's Counterarguments*

Google counters that the barriers to entry are not as high as Plaintiffs suggest.  It points to (1) evidence of new entrants;[6] (2) the emergence of nascent technology like artificial intelligence; and (3) its own emergence in a market that, prior to its entry, was dominated by other firms, most notably Yahoo.  Google also cites the growth of search output (measured by number of queries) as inconsistent with its monopoly power.  None of these contentions demonstrate low barriers to entry.

---

[6] Google also presented expert testimony that SVPs are market entrants that demonstrate low barriers to entry. *See, e.g.*, Tr. at 8438:12-14 (Israel).  But that argument has no force because the relevant market does not include SVPs or social media platforms.

*First*, Google identifies Neeva and DDG as two market entrants during the alleged monopoly maintenance period.  Neeva, it argues, "was able to build and develop a search engine in a relatively short period of time that [Dr. Ramaswamy] believed rivaled Bing and Google with a much smaller venture capital funding."  Closing Arg. Tr. at 59:25–60:3.  Also, "DuckDuckGo exists and . . . they believe they compete in the market."  *Id.* at 60:4-5; *see* GRFOF ¶ 25 (DDG CEO "Gabriel Weinberg testified that he built, and continues to operate, DuckDuckGo at a fraction of Plaintiffs' estimated cost.").

These market entries are not inconsistent with high barriers to entry and Google's possession of monopoly power.  "The fact that entry has occurred does not necessarily preclude the existence of 'significant' entry barriers.  If the output or capacity of the new entrant is insufficient to take significant business away from the [monopolist], they are unlikely to represent a challenge to the [monopolist's] market power.  Barriers may still be 'significant' if the market is unable to correct itself despite the entry of small rivals."  *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1440 (9th Cir. 1995) (citations omitted); *McWane*, 783 F.3d at 832 ("Although the limited entry and expansion of a competitor sometimes may cut against such a finding, the evidence of McWane's overwhelming market share (90%), the large capital outlays required to enter the domestic fittings market, and McWane's undeniable continued power over domestic fittings prices amount to sufficient evidence" to support the conclusion that McWane had monopoly power.).

The tales of DDG and Neeva illustrate *Rebel Oil*'s point.  Both entered the market notwithstanding Google's dominance, but neither has "taken significant business" from Google and they therefore have not posed any meaningful threat to its "market power."  DDG, though in operation since 2008, has barely reached a 2% market share.  FOF ¶ 25; *Surescripts*, 665 F. Supp.

3d at 46–47 ("[T]he ability of one competitor to capture [a relatively minor percentage] of the market does not undermine [the dominant firm's] durable monopoly power protected and perpetuated by barriers to entry."). As for Neeva, it entered and exited within four years. FOF ¶ 14. Google argues that Neeva's failure was caused by its subscription-based model, *see* GRFOF ¶ 25, but that is not the full story. The lack of access to efficient channels of distribution diminished Neeva's ability to grow its user base and significantly contributed to its demise. FOF ¶ 76; *see Multistate Legal Stud., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns*, 63 F.3d 1540, 1555–56 (10th Cir. 1995) (significant entry barriers existed notwithstanding three attempted entries, given that two of them were "largely unsuccessful"). These firms' experiences confirm that high barriers prevent entry of new competitors.

*Second*, the advent of artificial intelligence (AI) has not sufficiently eroded barriers to entry—at least not yet. New technologies may lower, or even demolish, barriers to entry, but such innovation is meaningful only if it can change the market dynamic in the "foreseeable future." *Microsoft*, 253 F.3d at 55 ("[W]ere middleware to succeed, it would erode the applications barrier to entry. . . . [But] middleware will not expose a sufficient number of APIs to erode the applications barrier to entry in the foreseeable future."). Currently, AI cannot replace the fundamental building blocks of search, including web crawling, indexing, and ranking. FOF ¶¶ 114–115. Neeva's experience is again illustrative. Despite building a search engine enhanced by AI technology, FOF ¶¶ 110–111, Neeva could not ride it to market success. AI may someday fundamentally alter search, but not anytime soon. FOF ¶¶ 114–115.

*Third*, Google's early success in dethroning Yahoo as the dominant market player says nothing about the barriers to entry *as they exist today*. For that same reason, Microsoft's impression in *2009* that barriers to entry were low in search carries little weight here. *See* GTB at

163

33 (citing DX430 at 2). The internet of today is a far different animal. Hundreds of millions of dollars is just the opening ante to enter the search market in part because of the internet's dramatic growth; billions are needed to acquire meaningful market share. *See infra* Section IV.A. The next great search engine (if there is to be one) will not be built in a rented garage like Google. *See Microsoft*, 253 F.3d at 56 (stating that this case is not about Microsoft's "initial acquisition of monopoly power," but about its "efforts to maintain this position through means other than competition on the merits").

*Finally*, Google argues that regardless of its market share and any barriers to entry, its lack of monopoly power is confirmed by the dramatic growth in search output and its numerous innovations that have increased search quality. *Cf. Qualcomm*, 501 F.3d at 307 ("The existence of monopoly power may be proven through direct evidence of supracompetitive prices and restricted output."). Dr. Israel opined: "A firm has monopoly power if it can act like a monopol[ist], which means reduce market-wide output. So to establish market power directly, you would need to show that the firm has reduced output relative to some but-for world[.]" Tr. at 8439:8-11 (Israel). But restricted output is simply a form of direct proof. Its absence is not fatal, as indirect evidence suffices to establish monopoly power. *See Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 435–36 (3d Cir. 2016) (treating as direct evidence the absence of "markedly restricted output" but then evaluating indirect evidence of monopoly power).

Also, reduced output is an ill-fitting indicia of monopoly power in a market like search. Google's marginal cost of responding to one additional query is near zero. In such a market, a dominant firm has no incentive to restrict output to earn monopoly profits. *See* H. ØVERBY & JAN ARLID AUDESTAD, INTRODUCTION TO DIGITAL ECONOMICS § 6.2 (2d ed. 2021) (For a digital good like search, "because the marginal cost is zero and [] there is no limit to the number of units that

164

can be produced without increasing the fixed costs[,] . . . the cost per unit produced will be zero independently of the production volume."); *cf. Pac. Eng'g & Prod. Co. of Nev. v. Kerr-McGee Corp.*, 551 F.2d 790, 796 (10th Cir. 1977) (recognizing that in the face of "decreasing marginal costs," a firm "would be tempted to lower price and expand output to reach a lower point on its marginal cost curve").  So, the fact that search output has grown is not inconsistent with monopoly power in search.

*       *       *

For these reasons, the court concludes that Google has monopoly power in the general search services market.

## III.    MONOPOLY POWER: ADVERTISING MARKETS

The court now moves from search to advertising.  Plaintiffs collectively assert that Google has monopoly power in three overlapping advertising markets.  These markets and their relationships are illustrated below.  U.S. Plaintiffs allege the broadest proposed market, search advertising, which includes all advertisements served in response to a query, regardless of the digital platform.  Within the search ads market, Plaintiff States define a general search advertising market that includes only ads served on GSEs.  Finally, both sets of Plaintiffs propose a general search text advertising market, limited to text ads appearing on a GSE's SERP.  Google counters that Plaintiffs' proposed markets do not comport with business realities.  There is, according to Google, one omnibus market for digital advertising, and the markets as alleged exclude various digital ad types that are effective substitutes for Google's text and shopping ads.

165



The court considers each of Plaintiffs' proposed markets under the *Brown Shoe* factors, and, to the extent that it recognizes a market, determines whether Google has monopoly power within it. The court addresses the broadest market first (search advertising), followed by the narrowest (general search text advertising), and then concludes with the one in between (general search advertising). It finds as follows. First, although there is a relevant product market for search advertising, Google does not monopolize it. Second, general search text advertising is a relevant product market in which Google has monopoly power. Finally, a relevant product market for general search advertising does not exist.

### A. Search Advertising Is a Relevant Market, But Google Does Not Have Monopoly Power in It.

#### 1. *Search Advertising Is a Relevant Product Market.*

The search advertising market is the broadest proposed advertiser-side market. It includes all advertisements served in response to a query—whether entered on a GSE, an SVP, or a social media platform. Excluded from this market are display ads, retargeted display ads, and non-search

social media ads (i.e., those that are integrated into a social media feed).  What sets search ads apart, U.S. Plaintiffs assert, is the unique level of real-time, expressed intent discernable from a user's query.  If a user types in "portable bluetooth speaker," the ad platform will recognize the query as one reflecting the user's interest in buying a portable Bluetooth-enabled speaker and will deliver advertisements from retailers that sell such products.  Non-search ads, by contrast, are not delivered in response to a query and therefore are far less effective and precise at determining a user's intent at the time the ad is delivered.  For this reason, U.S. Plaintiffs contend, online advertisers will not significantly substitute away from search to non-search advertisements in response to a small but significant price increase.

Google, on the other hand, argues that it competes within a broader market for digital advertising.  It claims that all forms of digital advertising "provide advertisers the ability to connect with potential customers," and that other ad types identify and respond to user intent as effectively as search ads.  GTB at 15–16.  It points to advertisers' regular movement of spend among various ad types as evidence that, within the broader market of digital advertising, ad dollars are fungible and will be spent on the channel with the strongest return on investment, or ROI.  *Id.*  Technical differences among search ads and other ad types, Google says, do not overcome this market reality.

As before, the court addresses the parties' arguments within the framework of the relevant *Brown Shoe* practical indicia, this time including pricing considerations.  Those factors again are: "[1] industry or public recognition of the submarket as a separate economic entity, [2] the product's peculiar characteristics and uses, [3] unique production facilities, [4] distinct customers, [5] distinct prices, [6] sensitivity to price changes, and [7] specialized vendors."  *Brown Shoe*, 370 U.S. at 325.  Nearly all of these criteria warrant recognizing a search ads product market.

167

*Peculiar Characteristics and Uses.*  Search ads are generated in response to a user query. U.S. Plaintiffs assert that such queries are a well-defined and contemporaneous expression of a user's intent that is unmatched at driving conversions.  That is the defining feature of the proffered market.  Google disputes the notion that search ads uniquely capture and convert user intent.  That construct is outdated, it says.  Social media and display ads can be extremely effective in discerning a user's unexpressed, or latent, intent and driving conversions.  Thus, according to Google, what U.S. Plaintiffs say is unique about search ads is readily achievable through other ad channels.  The court thinks U.S. Plaintiffs have the better of this argument.

Search ads are a direct expression of a user's specific motivation or interest at the time it is entered.  FOF ¶¶ 167, 169–170.  For example, a search ads platform understands the query "Taylor Swift Eras Tour tickets" to mean "I'd like to purchase tickets to see Taylor Swift in concert right now" (or at least "I'm thinking about doing so right now").  That provides ticketing vendors a unique opportunity to connect with a Swiftie who is seeking tickets for a show.

On the other hand, social media, display, and retargeted ads rely on indirect signals to decipher a user's latent intent and thus are less valuable to advertisers.  Such signals include present and past interactions with a webpage, accounts the user follows, videos or photographs the user views, and how the user engages with a post.  FOF ¶¶ 201–202, 208–209; *e.g.*, Tr. at 1418:4-8 (Dischler) ("The users'[] interest can be signaled in any number of ways, whether it's visiting a website, whether it's subscribing to a TikTok channel of a golf influencer[.]").  Consider a TikTok user who regularly watches videos of the Eras Tour.  That user is not necessarily conveying an immediate desire to purchase concert tickets, and a ticket vendor who targets that user with a social media ad is less likely to achieve a conversion than if the user had searched for tour tickets on a GSE.  Search ads are thus unique in their capacity to connect the consumer and vendor at the very

moment the consumer is looking to make a purchase.  FOF ¶¶ 170–171; *cf. United States v. Bazaarvoice, Inc.*, No. 13-cv-00133 (WHO), 2014 WL 203966, at \*24 (N.D. Cal. Jan. 8, 2014) (distinguishing social commerce products from "rating and reviews" online platforms, because social commerce products do not "provide[] potential consumers with product-specific feedback from other consumers at the point of purchase" and "are often focused on brand advertising rather than driving the sale of individual products").

The much-discussed golf-shorts example from trial, illustrated below, makes the same point.



PSXD10 at 25.  The Instagram viewer of a golf-swing video (on the left) might not be in a buying frame of mind—they could just be interested in improving their golf swing.  But even if the user were looking to make a purchase, or the video piqued their desire to do so, such interest could be directed to all manner of golf items—shoes, clubs, shirts, tee times, lessons, etc.  Tr. at 6890:17–6891:23 (Amaldoss) (discussing PSXD10 at 25).  By contrast, the user who enters "golf shorts" into Google is highly likely expressing an interest in buying golf shorts.  *Id.* at 6891:24–6892:12 (Amaldoss) (discussing PSXD10 at 25).  Delivering a search ad in response to directly expressed

intent on Google or Amazon is more likely to result in the sale of golf shorts than a social media ad on Instagram.

Retargeted ads differ from search ads for a similar reason. A retargeted display ad can be served only *after* the user has visited the advertiser's platform. FOF ¶¶ 202–203. For instance, a consumer interested in buying a portable Bluetooth speaker will see a retargeted display ad for, say, a Sonos-brand portable speaker, only if they have previously visited the Sonos website. But a search ad for such a product is presented immediately, regardless of whether the user has previously visited the advertiser's website. The time lag between the user's originally expressed intent and delivery of the retargeted ad makes such ads less effective. FOF ¶ 203 (describing how retargeting signals rapidly grow stale, even after just one hour).

Another unique characteristic of search ads is that they are not limited by privacy features. A user enters a query and gets a result without intermediation from privacy filters. On the other hand, display and retargeted display ads require individualized user information from cookie tracking and audience profiling, which can be disabled or impeded by platforms or the user. FOF ¶ 204.

At bottom, search ads and non-search ads are *not* "roughly equivalent": Search ads better approximate user intent than other ad types, and they do so with immediacy. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997) ("Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively.") (internal quotation marks and citation omitted).

*Industry or Public Recognition.* Advertisers recognize search ads as a distinct product market. *See Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 612 n.31 (1953) (considering

as relevant that "[t]he advertising industry and its customers . . . markedly differentiate between advertising in newspapers and in other mass media").  Advertisers have separate teams for search ads and other types of advertising, like display and social media.  FOF ¶ 224.  They also have separate budgets for those ad channels.  *Id.*

Advertisers uniformly testified that they view search ads as unique because they respond to expressed user intent in real time.  FOF ¶¶ 169–171, 218.  Or, to put it in marketing terms, paid search is a "bottom funnel" ad channel or a "push" ad.  FOF ¶¶ 213, 215, 218.  Recall, the "marketing funnel" is a construct used in the advertising industry to generally depict a consumer's journey from ignorance about a product (at the top of the funnel) to its purchase (at the bottom of the funnel).  FOF ¶¶ 213–224.  Advertisers attempt to correlate ad types with each stage of that journey based on the advertiser's goal: promoting product awareness (upper funnel), addressing a consumer's consideration of a purchase (mid-funnel), or driving sales (lower funnel).  *Id.* Advertisers use the funnel as a framework when determining how to allocate their spending.  FOF ¶¶ 221–222.  They typically consider search as an ad channel better suited for "lower funnel" objectives than social media or display advertising.  FOF ¶¶ 218–220.

Google asserts that the "industry and public recognition" factor weighs against a market for search advertising for two reasons.  *First*, it vigorously contests the relevance of the marketing funnel.  Google protests that the funnel is a dated tool with limited application in today's digital ad market, especially given the explosion of social media advertising.  GTB at 18–20; GRCL ¶ 7. It points to industry records that show greater fluidity among different stages of the funnel, and marketers conceiving of non-search ads as bottom-funnel media.  GTB at 19–20.  Google's point is that advertisers shift spend to the ad type that they believe will return the greatest ROI, which

makes search and non-search digital advertisements reasonably interchangeable and renders the marketing funnel obsolete. *Id.* at 20–23.

It is true that digital advertising has disrupted the traditional marketing funnel construct of a linear consumer journey from product awareness to purchase. But advertisers and even Google still use it, and they continue to view search advertising as unique because of its efficacy in reaching lower-funnel consumers. *See Rothery Storage*, 792 F.2d at 218 n.4 ("The 'industry or public recognition of the submarket as a separate economic' unit matters because we assume that economic actors usually have accurate perceptions of economic realities."); *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 46 (D.D.C. 1998) ("[T]he determination of the relevant market in the end is a matter of business reality—of how the market is perceived by those who strive for profit in it.") (cleaned up). Every industry witness testified that the marketing funnel remains a framework through which they make ad spending decisions. FOF ¶ 222. A recent Google online marketing essay does the same. It contains a depiction of the funnel and touts a "full-funnel" marketing strategy. FOF ¶¶ 221, 223 (citing UPX8051 at .005) (extolling two brands that "meet[] customers where they are. And that means addressing them at every stage of the sales funnel to raise brand awareness, answer questions prepurchase, and nurture people through final decision-making").

Although Google presented marketing strategy documents from various industries that showed some advertisers placing display and social alongside search as bottom-funnel channels, no advertiser viewed search ads as upper funnel. FOF ¶ 218 (based on documents and testimony, 64% of advertisers view display to be higher than search in the funnel, and 0% consider it to be below search). To be sure, there are some products for which social media ads are particularly effective at driving conversions (e.g., cosmetics and apparel), but there are large categories of

products and services for which social media advertising is far less compelling (e.g., financial services). FOF ¶¶ 219–220.

To further underscore the distinction between search and social media ads, consider a new ad product recently introduced by Google: Demand Gen (or Discovery Ads). It is a feed-based ad platform for YouTube and Gmail, developed to better compete for advertising dollars going to Meta properties and TikTok, among others. Before its launch, Google recognized that it did not have an advertising channel that competed effectively for that highly lucrative ad spend. FOF ¶ 211; UPX29 at 541 ("Google has no *direct* competitor to Facebook's ad offering[.]"). And, when describing the audience targeted for Discovery Ads, Google did so with terminology by now familiar to the reader. UPX33 at 145 (describing the social ads buyer as seeking to "create intent" and "find new customers," as compared to the search ads buyer, who aims to "capture a person's declared intent") (2020). Thus, while Google as a *firm* may fiercely compete with Meta's feed-based ads offerings, Google *search* ads do not.

*Second*, Google claims that U.S. Plaintiffs' proposed market fails to account for the public's consideration of different ad channels. Google argues that the market should be defined based on the degree of audience overlap. *See* GTB at 17–18 (citing Tr. at 4634:24–4635:11 (Whinston) ("The overlap between the audiences is really important for the amount of substitution there will be between ad products.")). In other words, ads that target the same audiences should be treated as part of the same ad market. Google contends that "Plaintiffs' ads markets exclude forms of digital advertising that feature a high degree of audience overlap while including those with less overlap." *Id.* at 18. For instance, Google users typically do not also use Bing, FOF ¶ 21, but they *do* frequently use Amazon, FOF ¶ 157; *see, e.g.*, GTB at 17–18, GFOF ¶¶ 1018–1024. So, Google argues, U.S. Plaintiffs are mistaken when they consider search ads on Bing in the same

173

market as Google search ads but not ads shown on Amazon or other platforms where there is user overlap.

This argument misses the point. SVP search ads offerings *are* included in the search ads market. They target their users who express real-time intent with a query. Nor is there anything inconsistent about treating search ads and ads on other platforms, like social media, as distinct products even though they have overlapping audiences. Marketers use them as complements to fulfill their ultimate objective: to drive sales. FOF ¶¶ 221, 225.

*Sensitivity to Price Changes.* U.S. Plaintiffs argue that advertisers do not substitute away from search ads, even in the face of price hikes. Google says otherwise. It contends that advertisers care more about ROI or return on ad spend (ROAS) than any particular advertising channel, and that they move ad spend across different channels to maximize their ROI. For example, Google points out that advertisers increasingly are using tools like its own Performance Max, which helps advertisers optimize their ad spend to yield the best ROI. GFOF ¶¶ 1009–1013; FOF ¶ 229.

But Google's focus on ROI misses the forest for the trees. Products are reasonably interchangeable only if "significant" substitution occurs in response to a price increase. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 543–44 (2018). To be sure, advertisers did testify to shifting spend to maximize ROI. But none said that they have "significantly" shifted ad spend away from search ads. In fact, the opposite is true. Advertisers uniformly said that they would not substitute search ads for another ad type absent some campaign-level reason to do so. FOF ¶¶ 230–231; *see Staples*, 970 F. Supp. at 1074 (courts look to "whether and to what extent purchasers are willing to substitute one for the other"). To the extent that ad dollars are increasingly being spent on other channels, that change reflects the ballooning of the digital advertising market as a whole.

FOF ¶ 166.  There is no evidence that the massive growth of social media ads, for example, has come at the expense of search ads.

The record also shows that to the extent advertisers shift spending, they do so as part of a "full-funnel strategy."   Campaign goals may require a different blend of complementary advertising types to further a firm's objectives.  FOF ¶ 221.  For instance, companies may shift ad spend to more upper-funnel strategies when introducing new products to create awareness but move ad spend to lower-funnel strategies if trying to increase seasonal sales of well-known products.  FOF ¶¶ 226–227.  The fact that advertisers may move money between search and social ads to achieve varying goals does not make them substitutes.  *See Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 782–83 (N.D. Cal. 2022) (concluding that social ads are a distinct market from other online ads due to industry recognition, in part because, in contrast to search ads, "social advertisements help a company find customers who are not already looking for the company's products"); *FTC v. IQVIA Holdings Inc.*, No. 23-cv-06188 (ER), 2024 WL 81232, at *17 (S.D.N.Y. Jan. 8, 2024) ("An agency running an advertising campaign will not have an unlimited budget, so it must make decisions about how to allocate the advertising funds it has.  But the fact that [search] competes with these channels for advertising dollars in a broader market does not necessarily mean those channels are reasonably interchangeable substitutes that must be included in the relevant product market.").

The Nike-Meta episode does not help Google, either.  In 2020, Nike boycotted advertising on Facebook, cutting all of its social spending on the platform for several months.  According to Dr. Israel, Nike reallocated that spend to search and display ads and, when the boycott ended, Nike reverted the money to its social budget.  Tr. at 8517:1–8518:13 (Israel) (discussing DXD29 at 83, 86–87).   Per Google, this demonstrates reasonable interchangeability.   But Dr. Whinston's

175

analysis—which aligns better with Nike's internal studies—shows otherwise.  He convincingly demonstrated that most of the money previously invested into Meta ads was simply reallocated to other social media and display ads.  *Id.* at 10489:10–10495:9 (Whinston) (discussing UPXD106 at 13–14, 16).  In fact, Nike's search ads spend barely increased during the boycott.  *Id.*; *see also* UPX2076 at 152 (as a percentage of Nike's overall ad spend, search grew from 48% to 51% and then returned to 50% post-pause, a minor change).

Google further contends that U.S. Plaintiffs' search ads market fails because U.S. Plaintiffs have presented no econometric modeling on pricing (e.g., a SSNIP test).  GTB at 21–23; GCL ¶ 22; *see Sysco*, 113 F. Supp. 3d at 33–34 (describing a SSNIP test).[7]  But as previously discussed, *supra* Section II.A, such modeling is not required to define a market.

*Unique Production Facilities.*  U.S. Plaintiffs contend that "the uniqueness of production facilities present in the general search services market appl[ies] in the Search Ads market."  UPFOF ¶ 440.  That is not quite right.  U.S. Plaintiffs' search advertising market includes search ads on SVPs, so the two proposed markets do not fully overlap.  Still, search ads production, regardless of the platform, is characterized by certain common components.  A platform must "(1) match Search Ads to consumers' real-time queries, (2) pull those ads into the relevant auction, (3) determine which ads in the auction will be shown, (4) determine where on the [results page] the shown ads will be positioned, and (5) calculate the price for each ad shown, should it be clicked on."  *Id.* ¶ 441.  Display and social ads are produced differently.  FOF ¶¶ 198–199, 204, 206.

---

[7] U.S. Plaintiffs contend that that the pricing evidence relevant to the general search text ads market should be considered as persuasive in the search advertising market as well, because text ads make up 65% of the search ads market.  *See* UPFOF ¶ 589 (citing Tr. at 4797:2-14 (Whinston)).  As the court can define a search advertising market without reliance on such evidence, it discusses the relevance of text ads-specific evidence to the search ads market during the monopoly power inquiry.  *See infra* Section III.A.2.

*Distinct Customers.*  This factor does not support a search ads market, as advertisers who purchase search ads also purchase other ad types, including social media and display ads.

*Distinct Prices.*  Search ads and display ads use different pricing models.  Search ads are sold using a cost-per-click metric, such that advertisers pay only if a user clicks on a search ad.  FOF ¶ 186.  Display ads, on the other hand, generally use a cost-per-mille metric (i.e., cost per 1,000 impressions, or views).  FOF ¶ 199.  This means that advertisers are charged each time a display ad is posted, irrespective of whether a user clicks on the ad.

These different pricing approaches are consistent with the channels' different purposes.  Search ads can be priced per click, as an ad click is in some sense indicative of the ad's effectiveness in satisfying a user's expressed intent.  The effectiveness of display ads is more difficult to measure, as users click on them with less frequency.  FOF ¶¶ 228, 230.  The record contains almost no evidence as to pricing of social media ads.

Google argues that distinct pricing alone is "insufficient to confine a market to search ads, particularly in light of the evidence that different types of ads are priced similarly when adjusted for the outcomes advertisers seek to achieve."  GCL ¶ 30.  True.  But neither U.S. Plaintiffs nor the court have rested solely on distinct pricing in defining a market for search advertising.

*Google's Authorities.*  Google cites *Berlyn v. The Gazette Newspapers*, an unpublished Fourth Circuit case, to argue that all digital ads belong in the same relevant market.  GTB at 17.  There, the plaintiffs attempted to establish a market consisting of "legal and commercial advertising services provided by weekly community newspapers" and a single weekly section in the *Washington Post* dedicated to local news.  73 F. App'x 576, 582 (4th Cir. 2003).  The court rejected that market based on the minimal evidence presented: (1) a single advertising flier touting the efficacy of print ads in local publications relative to radio and TV ads and (2) a *Washington*

*Post* marketing strategy paper discussing radio ads. *See id.* at 583. The court explained that this evidence, "if anything, . . . tends to show that all of these media outlets are within the same product market, to the extent that they are competing for the same limited pool of advertisers' dollars." *Id.* *Beryln* is of limited utility here. There can be no genuine comparison between the paucity of record evidence in *Beryln* versus the mountain of evidence presented in this case. Moreover, this court considered the evidence here in light of the *Brown Shoe* factors, which is something the *Berlyn* court did not need to do on a limited evidentiary record.

Google's other authorities are likewise inapposite. Google cites *Hicks v. PGA Tour, Inc.* for the proposition that "many courts have rejected antitrust claims reliant on proposed advertising markets limited to a single form of advertising." GTB at 15–16 (quoting 897 F.3d 1109, 1123 (9th Cir. 2018)). But "*Hicks* does not apply where," as here, "a plaintiff has alleged that two types of advertising have fundamentally different purposes." *Klein*, 580 F. Supp. 3d at 784. Google also cites to decades-old cases decided at the motion-to-dismiss stage, which rejected Sherman Act claims for failure to adequately allege digital ads markets. *See Kinderstart.com LLC v. Google, Inc.*, No. 06-cv-2057 (JFRS), 2007 WL 831806, at *6 (N.D. Cal. Mar. 16, 2007); *Am. Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851, 858 (E.D. Va. 1999); GCL ¶¶ 19, 26. These cases are inapposite for numerous reasons, including that they predate the digital advertising boom and were decided on the pleadings. *See* GFOF ¶¶ 990–991 ("Digital Advertising is dynamic and growing. . . . Indeed, digital advertising has undergone dramatic change even in just the last few years."). More recent decisions, however, with the benefit of a factual record, have refused to lump together various forms of digital advertising merely because advertisers spend in different channels. *See, e.g.*, *IQVIA*, 2024 WL 81232, at *17.

*      *      *

178

In sum, the *Brown Shoe* factors counsel in favor of finding a relevant market for search advertising. Neither Google's counterarguments nor its legal authorities persuade the court otherwise.

All that said, U.S. Plaintiffs' search ads market is underinclusive in an important way: It excludes certain search advertisements that appear on Amazon known as "product page" ads. Such ads share the defining characteristic of search ads, which is that they are delivered in response to a user query. To illustrate, when an Amazon user queries "coffee," its results page contains ads like PLAs presented on Google. Such ads are included in U.S. Plaintiffs' market. When a user then selects a product—through a PLA or an unpaid result—they are taken to a "product page" that also contains advertisements (see below). These "product page" ads look a lot like PLAs, and they respond to the user's twice-expressed intent (the query and the product selection). *See* Tr. at 8459:8-24 (Israel) (discussing DXD29 at 108). Yet, they are not included in U.S. Plaintiffs' search ads market. *Id.*



DXD29 at 108 (blue boxes depict ads).

These "product page" ads likely generate substantial revenue for Amazon, whose ad business is growing rapidly. *See* DX231 at .003 (Google record from January 2021 estimating that Amazon's "US ads business is nearly the size of Google's US retail ads business today, and is growing at over twice Google's rate."). Dr. Israel testified that these product-page ads make up one third of Amazon's ads overall. Tr. at 8459:16-17 (Israel). Dr. Whinston put Amazon's search ads revenue at $7.6 billion in 2020, excluding product-page ads revenue. *See* Fig. 78, Whinston Expert Report, ECF No. 418-1, at 185. Although the record does not reveal precisely how much revenue Amazon generates from product-page ads, U.S. Plaintiffs' search ads market likely excludes a substantial dollar amount from its market share denominator. This under-inclusivity is not fatal to defining a relevant market for search ads, but it will impact Google's market share, as described *infra* Section III.A.2.b.

### 2. *Google Does Not Have Monopoly Power in the Search Ads Market.*

Although the court concludes that there is a relevant market for search ads, the court finds that U.S. Plaintiffs have not proven that Google possesses sufficient power in that market to make out a Section 2 violation. Recall, there are two types of evidence of monopoly power: (1) direct evidence indicating that a firm can substantially raise prices above the competitive level, and (2) indirect (or structural) evidence permitting the court to infer monopoly power "from a firm's possession of a dominant share of a relevant market that is protected by entry barriers." *Microsoft*, 253 F.3d at 51 (citation omitted). U.S. Plaintiffs have not met their burden with either.

### a. Direct Evidence

As direct evidence, U.S. Plaintiffs have offered proof that Google has profitably raised prices on its general search text ads, a subset of its search ads offerings that is distinct from PLAs.

*See infra* Section III.B.2.   U.S. Plaintiffs urge the court to extrapolate this text ads-specific evidence to infer that Google has monopoly pricing power in the broader search ads market. *See* UPFOF ¶ 589 ("Text Ads constitute approximately 64% of the Search Ads market; Google's pricing power in the Text Ads market therefore confers on Google the ability to control price in a significant portion of the Search Ads market, even without regard to any of Google's other Search Ads products."). *But cf.* FOF ¶ 185 (changes to the text ads auction do not directly impact the PLA auction).

The court declines to make such a simplistic extrapolation to sustain a finding of monopoly power. *Cf. ThermoLife Int'l LLC v. Neogenis Labs Inc.*, No. 18-cv-02980 (DWL), 2021 WL 1400818, at *8–10 (D. Ariz. Apr. 14, 2021) (finding that the court could not "infer" power in a broader market based on power in a narrower one because the plaintiff had not alleged the relative size of the submarket in relation to broader market).   Text ads comprise 64% of the search ads market defined by U.S. Plaintiffs.   Tr. at 4797:7-10 (Whinston).   That is a large number, even if overstated by some degree due to U.S. Plaintiffs' exclusion of Amazon's product-page ads from the calculation.   But Dr. Whinston's analysis of PLA pricing from 2016 to 2021 demonstrates that while Google has raised text ads prices, PLA prices, which comprise approximately 40% of the search ads market, have been stagnant, only showing nominal growth beginning in 2020.   *See id.* at 4650:2-20 (Whinston) (discussing UPXD102 at 39) ("[W]hat you can see here is PLA prices have been flat or, if anything, a little decreasing, and text ad prices have been going up.").   That prices have remained flat in nearly 40% of the market is inconsistent with the notion that Google has monopoly pricing power in the search ads market as a whole.



UPXD102 at 39.

These different pricing trends can be explained by competition (or the lack thereof). Google's ability to profitably raise text ads prices is surely due in part to the lack of any meaningful competition in that submarket—Microsoft is its only true competitor. *See infra* Section III.B.2. The competitive conditions for PLAs are very different. Amazon, as discussed, is a major competitor. Dr. Whinston put Amazon's search ads market share at 19%, a likely underestimate given the exclusion of product-page ads. Fig. 78, Whinston Expert Report, ECF No. 418-1, at 185; Tr. at 8459:16-20 (Israel). Also, many other retailers compete in the PLA space (e.g., Home Depot, Walmart, Target), and though their share is small now, it is likely to grow. *See* Tr. at 8438:12-20, 8550:2-10 (Israel). These competitive market conditions likely explain why Google's PLA prices remained largely unchanged from 2016 to 2021.

Google's lack of pricing power as to PLAs cautions against inferring that Google's pricing power in search text advertising extends to the broader search ads market.

b.       Indirect Evidence

Nor is the court convinced that indirect evidence establishes monopoly power in the market for search ads.

"[A] market share below 50% is rarely evidence of monopoly power, a share between 50% and 70% can occasionally show monopoly power, and a share above 70% is usually strong evidence of monopoly power." *Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 129 (2d Cir. 1981). Dr. Whinston calculated Google's share of the proposed market as 74%, although that is an overestimate given the omission of Amazon's product-page ads. *See* Tr. at 4779:7-15 (Whinston) (discussing UPXD102 at 63). Although Google's market share is some evidence of monopoly power, it is not necessarily "strong evidence." That said, Google's share of the search advertising market has been durable, *id.* (65% market share or more since 2012), despite the market's enormous growth, *id.* at 8874:25–8875:13 (Israel). These markers, taken together, tilt somewhat in favor of a finding of monopoly power.

But "because of the possibility of competition from new entrants, looking to current market share alone can be misleading." *Microsoft*, 253 F.3d at 54 (internal quotation marks and citations omitted); *see also Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 99 (2d Cir. 1998) ("We cannot be blinded by market share figures and ignore marketplace realities, such as the relative ease of competitive entry."); *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 366 (9th Cir. 1988) ("A high market share, though it may ordinarily raise an inference of monopoly power, will not do so in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors.") (citation omitted).

U.S. Plaintiffs have not shown that barriers to entry protect Google's leading share in the search ads market. *Microsoft*, 253 F.3d at 51. Concededly, the capital cost of developing an ad platform is high. *See* UPFOF ¶¶ 581–583. But well-resourced market entrants, and demonstrated growth by those entrants, belie a reality of unconstrained dominance. There is, of course, Amazon's entry and explosive growth in the market. FOF ¶ 196 (Google estimates that Amazon

has surpassed its revenue in retail advertising and is growing at a faster rate).  Other SVPs are more recent market entrants and are looking to grow their search ads business.  *See* Tr. at 8438:12-20 (Israel) ("[W]hat the lesson of commercial verticals has told us is that where there's money to be made, SVPs pop up and they compete for advertising.").  These are not small firms likely to compete only at the margins.  They include mega-retailers looking to aggressively expand their search ads business.  Walmart and Target are two examples.  *Id.* at 8549:9–8550:17 (Israel) (describing Walmart's emergence as a search advertiser); Alberts Dep. Tr. at 40:5-10 (same as to Target).  Online travel sites are another.  Tr. at 5244:12-17 (Dijk) (describing Booking.com's emerging search ads offerings).  It is not surprising then that Google's share of the search ads market has steadily eroded since 2017.  *Id.* at 4779:7-15 (Whinston) (discussing UPXD102 at 63) (declining from near 80% in 2017 to 74% in 2020).  U.S. Plaintiffs thus have not shown that the barriers to entering the search advertising market are comparable to those that protect Google's monopoly in general search.

Meta's experience in search ads does not counsel a different outcome.  U.S. Plaintiffs argue that if a massive digital media company like Meta could not enter search ads successfully, no new entrant can be expected to survive.  UPFOF ¶ 584 (describing Facebook's "multiple unsuccessful attempts to enter the Search Ads market").  But U.S. Plaintiffs acknowledge that the reason for this failure had nothing to do with barriers to entry and instead was due to the difficulty of serving search ads on social media platforms.  *See id.* ¶ 585 ("Google recognizes that, due to the nature of Facebook's product, the social network is ill-suited to offer Search Ads.") (citing Tr. at 1491:21–1492:2 (Dischler) ("The search feature is just not very important on Facebook for searching for products or services or other commercial things.")).  That social media is a poor fit for search ads

184

does not mean that the market is protected by high entry barriers.  It just means that the strength of social media advertising lies elsewhere.

In the end, courts "cannot be blinded by market share figures and ignore marketplace realities, such as the relative ease of competitive entry." *Tops Markets*, 142 F.3d at 98–99.  Here, the court finds that, notwithstanding Google's leading market share, the recent history of new entrants, the strength of those entrants, and their growth show that barriers to entry are not so high as to compel the conclusion that Google has monopoly power in the market for search advertising. *Cf. id.* (finding no monopoly power by a retail supermarket in a local area where barriers to entry were low, despite 72% market share).  U.S. Plaintiffs therefore have not proven a Section 2 violation in the search ads market.

**B.**      **Google Has Monopoly Power in the General Search Text Ads Market.**

*1.      General Search Text Ads Is a Relevant Product Market.*

The court moves next to general search text advertising.  As before, the court applies the *Brown Shoe* factors to determine the relevant product market and then addresses Google's counterarguments.  Each of the relevant *Brown Shoe* criteria warrants recognizing general search text advertising as a relevant product market.

*Peculiar Characteristics and Uses.*  General search text advertisements, or "text ads," are displayed on a SERP in response to a user's query.  FOF ¶¶ 175–176.  Like search ads, they are distinguishable from social media and display ads for the reasons already stated, *supra* Section III.A.1.  Text ads have various unique features that also differentiate them from other types of search ads, most notably shopping ads, or PLAs.

*First*, text ads have the appearance of organic search results and provide web links to the advertiser's site.  FOF ¶ 176.  They can include an image but are largely text-based.  *Id.*  PLAs, on

185

the other hand, are visually driven and appear at the top of the SERP in what is referred to as a "carousel." They are not integrated into the SERP results. FOF ¶¶ 177–178.

*Second*, advertisers write the "copy" for text ads but do not do so for PLAs. FOF ¶ 182. Advertisers value this control because it allows them to highlight discounts, seasonal offerings, new products, or other promotions. *Id.* PLAs offer little content other than a product image, its pricing, and its source. FOF ¶¶ 178, 183. For instance, Home Depot may purchase a PLA to sell a trash can that is currently on sale in response to the query "trash can." But a PLA cannot promote its storewide Labor Day sale, during which all trash cans are 50% off. That information can be conveyed only with a text ad. FOF ¶¶ 179, 182.

*Third*, and perhaps most importantly, text ads are available to a far broader range of advertisers than PLAs. PLAs can feature only tangible goods because they can be depicted visually, whereas text ads may be used to sell all manner of goods and services. FOF ¶ 179. This distinction is crucial. Over 92% of Google's advertisers *only* purchase text ads, while a mere 5.5% of Google's advertisers purchase both. FOF ¶ 181 (only 2% of Google's advertisers purchase PLAs but not text ads); *see also id.* ("In terms of revenue, 52.8% of ad dollars spent on Google came from advertisers who purchase *only* text ads."). Notably, some of Google's largest advertisers are travel sites, FOF ¶ 180, who have no use for PLAs. The breadth of advertiser access and usage is a key distinction between text ads and PLAs.

*Industry or Public Recognition.* Both Google and its advertisers recognize text ads as a distinct product submarket. Google has repeatedly acknowledged that text ads and shopping ads are different products. FOF ¶ 187. It even has different teams for text ads and PLAs. *Id.*

186

Advertisers also recognize each ad type as a distinct product.  Non-retail advertisers emphasized that they simply cannot use PLAs, and thus they view text advertising as its own channel.  FOF ¶¶ 179–180.

Retail advertisers who purchase PLAs view them as a complementary product.  Text ads can be used in conjunction with PLAs to "own the SERP," that is, take up as much real estate on the search results page as possible.  FOF ¶¶ 189–190.  For instance, Amazon's Director of Software Development, Mike James, testified that, from the *advertiser's* perspective, "there are . . . distinct advantages in one ad format over another," and "there are edges where those ad units have their own specific incremental benefits."  James Dep. Tr. at 234:23-24, 235:3-4.  Amazon uses a particular bidding strategy for branded keywords on text ads, which cannot be achieved through PLAs alone.  *See id.* at 95:3-8.  To be sure, text ads and PLAs arguably serve a similar function from a user's perspective, *id.* at 142:4-5, 234:9-19 (stating that "there is an intersection of the purposes that they serve," which is that they "can fulfill the same customer's need"), but marketers view them as distinct products.

Google counters that "what matters for market definition is that many advertisers can and do buy other search ads as substitutes."  GRFOF ¶ 19f.  At trial, Google employees highlighted that certain advertisers shift spend between text ads and PLAs.  FOF ¶ 234.  This, Google contends, is evidence that these ad types are substitutes.  But, as discussed, only retail advertisers can shift spend between text ads and PLAs—only a small minority of all Google advertisers (7.5%) purchase both ad types.  And for reasons already discussed, the reallocation of some spending between text ads and PLAs does not on its own reflect significant substitution: Advertisers may reallocate dollars among ad channels for a variety of campaign- or product-specific reasons.

187

*See supra* Section III.A.1.  Thus, the mere fact that advertisers move some spending between text ads and PLAs does not, without more, make them substitutes.

*Unique Production Facilities.*  Text ads are generated and sold through different means than PLAs.  The appearance and content of text ads is controlled by the advertiser, who has substantial design input.  FOF ¶¶ 182, 184.  In contrast, Google designs PLAs; the advertiser merely supplies the inventory.  FOF ¶ 183.  While both text ads and PLAs are sold through auctions, the auctions are separate.  FOF ¶ 185.  And Google has rejected proposals to integrate the auctions because "user intent and advertiser value is different across the units, and as a result advertisers are not bidding on the same thing on Shopping and Text ads."  UPX1013 at .003; FOF ¶ 185.  Finally, while PLAs appear on SVPs and other platforms, text ads are unique to GSE SERPs.  *Cf.* FOF ¶ 193 (SVP search ads are almost exclusively PLAs).

*Distinct Customers.*  As already discussed, text ads are open to nearly all advertisers, whereas PLAs can feature only tangible goods.

Google counters that "[t]he observation that some advertisers purchase only text ads (and not product listing ads), or do not advertise with certain major SVPs, does not show that general search text advertising is a relevant market because not all potential substitutes need to be equally compelling to all customers."  GCL ¶ 34; *see also* GRCL ¶ 9.  But that argument largely misses the point.  Over 92.0% of Google's advertisers purchase only text ads.  For that large cohort PLAs apparently will not do.  A product that serves less than 10% of advertisers cannot be a substitute for one that serves all of them.

*Distinct Prices.*  Text ads and PLAs are both priced on a cost-per-click, or CPC, basis.  The prices of text ads, however, are higher than those of PLAs.  FOF ¶ 186.  Dr. Whinston's analysis

revealed that while PLA prices remained stagnant or decreased from 2016 to 2020, text ads prices steadily climbed over that same period.  *Id.*

*Sensitivity to Price Changes.*  Over the years, Google has tested whether it can profitably raise its text ads prices by 5% or more without losing substantial advertisers, and the results have been largely consistent—it can.  FOF ¶¶ 238–267; *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338 n.1 (3d Cir. 2016) ("The SSNIP is typically about 5%."); *Sysco*, 113 F. Supp. 3d at 33– 34 (same).  The court will delve further into the details of Google's numerous ad experiments and feature launches, *infra* Section VI.B, but at present it is sufficient to say that the evidence firmly establishes modest advertiser sensitivity to small but significant text ads price increases.  This reality is particularly acute for sellers of services or non-tangible goods, who cannot buy PLAs.

*     *     *

Accordingly, applying the *Brown Shoe* factors, Plaintiffs have proven that general search text ads is a relevant product market.

### 2. Google Has Monopoly Power in the General Search Text Ads Market.

Plaintiffs offer both direct and indirect evidence of Google's monopoly power in the market for general search text advertising.  The court starts with the indirect evidence.

*Indirect Evidence.*  Google possesses a large and durable share in the text ads market, which is protected by significant entry barriers.  In 2020, its market share in the text ads market was 88%, having grown steadily from 80% in 2016.  FOF ¶ 192.  Advertisers confirmed Google's market dominance.  They testified that their text ads spending allocation mirrors Google's and Bing's relative query volumes (i.e., 90% of spend on Google vs. 10% on Bing).  FOF ¶ 232.  They also emphasized that under no circumstances would they spend more than 10% of their text ads dollars on Bing, and that no other platforms were viable substitutes.  FOF ¶ 233.  As one advertising

189

executive put it, once that 10% of ad spend on Bing is exhausted, "there's [nowhere] else to go." Tr. at 4875:19–4876:4 (Lim).

Barriers to entry are high.  Because only GSEs can display text ads, new entrants face the same major obstacles as would the developer of a new GSE.  *Supra* Section II.C.3.  Those barriers are compounded by the additional costs and resources required to build an ad platform to deliver text ads.  FOF ¶ 55 (Google spends $11.1 billion annually on search ads and $8.4 billion on search).  Significant entry barriers thus insulate from erosion Google's longstanding, dominant market share in the text ads market.  Google has monopoly power in this market.

*Direct Evidence.*  It is not necessary here to discuss the specific evidence Plaintiffs have offered to prove that Google priced text ads at supracompetitive levels (or Google's responses to that evidence).  It is sufficient at this point to observe what is undisputed, which is that Google does not consider competitors' pricing when it sets text ads prices.  FOF ¶ 267.  That is "something a firm without a monopoly would have been unable to do." *Microsoft*, 253 F.3d at 57–58 (making that observation as to Microsoft's pricing of Windows); *see also Am. Tobacco Co.*, 328 U.S. at 811 ("[T]he material consideration in determining whether a monopoly exists is not that prices are raised and that competition is actually excluded but that *power exists* to raise prices or exclude competition when it is desired to do so.") (emphasis added).

Google responds that *Microsoft*'s observation does not apply here, because Google does not set ad prices, the auctions do.  GTB at 31 n.1; GFOF ¶ 1144.  But that contention overlooks that Google controls key inputs to the auctions that influence the ultimate price that advertisers pay.  FOF ¶¶ 243–246.  That Google makes changes to its text ads auctions without considering its rivals' prices is something that only a firm with monopoly power is able to do.  And, as will be

discussed, Google in fact has profitably raised prices substantially above the competitive level. That makes "the existence of monopoly power [] clear." *Microsoft*, 253 F.3d at 51.

*        *        *

The court thus concludes that Google has monopolized the market for general search text advertising.

### C.        The Evidence Does Not Support a Market for General Search Advertising.

Finally, the court addresses Plaintiff States' market for general search advertising. General search advertising is alleged to be a submarket of search advertising that "includes all ads that appear on a GSE results page in response to a user query, which overwhelmingly consists of text ads and product listing ads" but also encompasses local ads and travel ads. Pl. States' Post-Trial Brief, ECF No. 900 [hereinafter PSTB], at 8. While the court has found that the record establishes both a broader market (search advertising) and a narrower submarket (general search text ads), the *Brown Shoe* factors do not warrant recognition of a general search ads market.

*Peculiar Characteristics and Uses.*    Plaintiff States' core argument is that all the differences between GSEs and SVPs already described, *supra* Section II.B, support a market solely comprised of search ads that appear on GSE SERPs. Specifically, they claim that "[g]eneral search advertising is a relevant market because all ads on a GSE's results page reach users who are considering the broad range of choices and destinations provided by a GSE." PSTB at 8. Because of a GSE's breadth compared to an SVP, Plaintiff States contend that "GSE users are more likely to be in a research or consideration mindset, whereas SVP users are more likely to be in a purchase mindset." *Id.* at 9. Users can purchase a product directly on an SVP's platform, whereas they cannot do so with Google. FOF ¶¶ 144–145, 194. This makes GSEs "attractive to advertisers

191

seeking to reach users in the mindset of actively researching a topic without having determined a specific purchase destination."  PSTB at 10.

That all makes intuitive sense, and there is some record evidence to support it.  *See, e.g.*, Tr. at 5138:11-14 (Booth) (Home Depot believes that once a user is on their website, it has "a higher likelihood to actually get them to convert"); *id.* at 3860:20-24 (Lowcock) ("So if a user goes to a retailer's website, they've got a high probability and intent to buy.  And if they type something into search, typically they type in the brand and product that they're specifically looking for.  So they know what they're going to do."); *id.* at 6873:7-10 (Amaldoss) (discussing PSX970) (SVPs "are the places [] people can actually buy the product from . . . because these consumers have a very high purchase probability, and they want to close the sale.").

But the fact that users of GSEs may sometimes be higher up in the marketing funnel does not mean that general search ads have a particular use that is distinct from search ads on SVPs.  It just means that advertisers can purchase general search ads to satisfy broader objectives and on a wider range of topics.  *Id.* at 5391:10-23 (Jerath) (stating "search ads are most suited and effective for bottom funnel goals and to some extent for mid-funnel goals").  That is a difference of degree, not kind.

*Industry or Public Recognition.*  There is little industry recognition of a separate general search ads market.  Advertisers testified that text ads are distinct because of their breadth and effectiveness, *supra* Section III.B.1, but that says nothing about whether they recognize a wider general search advertising market that also includes PLAs and other SERP advertising.  Plaintiff States contend that "large, well-known companies like Amazon, Booking.com, and Expedia rely heavily on general search ads to acquire new customers."  PSTB at 15.  But Booking.com and Expedia only buy text ads, not PLAs.  And Amazon's actual testimony suggests

192

that Amazon views text ads and PLAs not as a single product, but as different ones because it uses bid strategies unique to each ad type. *Supra* Section III.B.1.

Plaintiff States further argue that SVPs must purchase ads on GSEs using branded keywords (e.g., "Yelp" or "Expedia") to preempt rivals from doing so and siphoning off users who are potentially interested in their brand, a practice known as "conquesting." *See* PSTB 11–12; Pl. States' Proposed Findings of Fact, ECF No. 902, ¶¶ 36–38 [hereinafter PSFOF]. Because only GSEs accept queries that allow users to navigate directly to external websites, Plaintiff States say, advertisers cannot substitute away from general search ads to SVP ads if they seek to prevent conquesting. PSTB at 12. This all may be true, but it does not support a separate general search ads market. Only text ads, not PLAs, are purchased by keywords and appear similar to organic links on the SERP. FOF ¶ 184. The conquesting concern thus is a feature of the text ads market, not a broader market for general search advertising. FOF ¶ 191.

Finally, Plaintiff States contend that when purchased together, text ads and PLAs allow advertisers to "own the SERP" by taking up treasured real estate on a SERP. PSFOF ¶¶ 10–11. In this way, advertisers consider general search ads as a separate product.

Although Plaintiff States do not put it precisely this way, their argument resembles one for recognition of a "cluster market" that is defined by "a central group of customers for whom 'only [a particular package of goods and services] will do.'" *Whole Foods*, 548 F.3d at 1038 (Brown, J.) (quoting *Grinnell*, 384 U.S. at 574). There is some evidence to support this theory. Some advertisers do in fact purchase both text ads and PLAs to "own the SERP." FOF ¶ 189. And Plaintiff States point to evidence that Google has touted "owning the SERP" as a marketing strategy. FOF ¶ 190.

193

But the court was told little else about such customers.  For instance, the record does not disclose how many advertisers have adopted that strategy and how much they spend and contribute to Google's revenues.  Nor has the court been told whether such advertisers view "owning the SERP" as essential to their marketing strategy, including on Bing, such that no other combination of ad products will do.  *See Whole Foods*, 548 F.3d at 1039 (Brown, J.) (recognizing that a core group of customers can define a market because they "need a complete 'cluster of products,'" the "particular circumstances dictate that the product 'is the only realistic choice,' or "they find the product 'uniquely attractive'") (citation omitted).  Indeed, it is also equally plausible that such advertisers simply view text ads and PLAs as complementary products, rather than as a "clustered" general search ads product.  In sum, there is very little evidence of industry recognition of general search ads as a distinct product market.

With respect to public recognition, Plaintiff States point to evidence that GSEs and SVPs— as platforms—are complements (not substitutes) as proof that general search ads and SVP search ads are also not substitutes.  PSFOF ¶¶ 15–21.  But this argument misses the mark.  Users of GSEs and SVPs may view them as complements to gather information, but that does not mean they feel the same way about the *advertisements* that appear on those platforms.  The record does not reflect any public recognition of general search ads as a separate market.

*Unique Production Facilities.*  Although GSEs and SVPs have different means of production for answering a query, there is substantial overlap as to how the platforms serve advertisements.  PLAs on both platforms are generated from the ad inventory either available on the platform (SVPs) or through a structured data feed (GSEs).  This process does not involve affirmative keywords.  FOF ¶¶ 183–184.  Admittedly, there is an important difference between the breadth of general search ads on GSEs versus search ads on SVPs.  The latter are limited to

194

advertising products available for purchase on the website, whereas the former are not so restricted. Still, that distinction alone is not enough to conclude that general search ads are uniquely produced in a way that sets them apart from similar ads on SVPs.

*Distinct Customers.*  Not all firms who advertise on GSEs purchase search ads on SVPs. For example, the decision to sell a product on Amazon means agreeing to share a portion of any purchase completed on Amazon.  FOF ¶ 194.  Home Depot, for example, does not sell products on Amazon for that reason.  FOF ¶ 195.  Other firms do not buy ads on SVPs because no SVP corresponds to its product or service.  Financial services companies are a good example.  This means that a subset of Google's customers are not SVP search ads buyers, creating a class of customers who purchase only general search ads.  But that class is so broad that this factor only marginally supports the proposed market.

*Distinct Prices.*  Plaintiff States argue that SVP search ads and general search ads are priced differently, because when a purchase is made following an SVP search ad, it is done on the SVP, which takes a "cut" of the purchase price.  In contrast, general search ads lead consumers directly to the advertiser's platform, where the advertiser keeps 100% of the purchase price.  PSFOF ¶¶ 56–57.  This factual distinction is accurate, but the record does not reveal how this difference impacts the pricing of ads on each platform.  It is not established, for instance, how retailers think about pricing for search ads on Google versus search ads on Amazon because of this difference.

Instead of advertiser testimony, Plaintiff States point to three pieces of evidence in support of distinct prices, but none are persuasive.  First, a slide deck by the ad platform Kenshoo (now Skai) notes that advertisers report the cost-per-click on Amazon to be about five times that on Google.  *See* PSFOF ¶ 60 (citing PSX6 at 037).  But that proof is of limited probative value because it compares only PLA ads pricing across platforms, not general search ads pricing (including text

ads).  PSX6 at 037.  Second, Plaintiff States note that Dr. Israel testified that when he adjusted various ad prices to fit within a cost-per-mille metric, general search text ads were significantly more expensive than Amazon ads.  *See* PSFOF ¶ 60 (citing Tr. at 8461:23–8462:13 (Israel) (discussing DXD29 at 62)).  But this time, the comparison excludes PLAs, which are in the proposed general search ads market along with text ads.  Finally, Plaintiff States identify analysis from the clothing retailer North Face (unsupported by designated or trial testimony) showing that North Face calculated its ROI on Google to be a fraction of its ROI on Amazon but nevertheless continued to spend on Google.  This, according to Plaintiff States, is evidence that search ads on GSEs and SVPs are not substitutable.  PSFOF ¶¶ 64–65.  But the weight of this evidence is limited by the particular features of North Face's product, primarily cold-weather apparel.  As stated in the same record, its business is "highly dependent on weather," and GSEs can supply "triggers" that better identify when a user may be in a cold-weather location.  PSX976 at 423–24.  The court will not generalize a peculiar use case into a product market.

*Sensitivity to Price Changes.*  Plaintiff States presented no evidence that advertisers lack reasonable substitutes for general search ads (as a market) in the face of rising prices.  They point to testimony from Joshua Lowcock, Global Chief Media Officer at IPG, for the proposition that major advertising agencies would not recommend that their clients switch away from general search ads should prices increase.  *See* PSTB at 17; PSFOF ¶ 9 (citing Tr. at 3825:12-24 (Lowcock)).  But that testimony was limited to general search *text* ads and did not encompass PLAs.  The same is true of other advertiser testimony the States cite: None of those advertisers purchase PLAs.  *See* PSFOF ¶ 99 (citing testimonies from Booking.com, Expedia, TripAdvisor, Angi, and Yelp).  Ultimately, this factor does not support a separate market for general search ads.

\*          \*          \*

196

The *Brown Shoe* factors counsel against recognizing a market for general search advertising. Plaintiff States' Section 2 claim as to this alleged market fails.

## IV.    EXCLUSIVE DEALING

Before moving forward, it is worthwhile to pause and summarize where we are. The court has found that Plaintiffs have proven that Google has monopoly power in two relevant product markets: general search services and general search text advertising. On the other hand, although the court recognized a separate market for search ads, it found that Google did not have monopoly power in that market. It also rejected a separate general search ads market. As to the latter two markets, the court's Section 2 inquiry proceeds no further.

Because "having a monopoly does not by itself violate § 2," *Microsoft*, 253 F.3d at 58, the next step in the analysis is to determine whether Google has engaged in exclusionary conduct with respect to general search services and general search text advertising. Plaintiffs must prove a second element, which is "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.* at 50 (internal quotation marks omitted). The bulk of Plaintiffs' case focuses on the search distribution contracts—the browser agreements (primarily with Apple and Mozilla) and the Android agreements (the MADAs and RSAs)—which Google allegedly uses to maintain its monopoly in the relevant markets.

According to Plaintiffs, the challenged contracts are unlawful exclusive agreements. They effectively block Google's rivals from the most effective channels of search distribution, namely, the out-of-the-box default search settings. Google is the exclusive default search engine on the Safari and Firefox browsers. Likewise, on all Android devices, the Google Search Widget appears on the home screen and, on all except Samsung devices, Chrome is preloaded as the exclusive

197

browser.  Plaintiffs say that these distribution contracts effectively "lock up" half of the market for search and, by extension, nearly half of the market for general search text ads.  These exclusive deals protect Google's dominant position and shield it from meaningful competition.  Plaintiffs also specify certain contractual provisions that they claim thwart competition.  The ISA, for example, contains provisions arguably restricting Apple's ability to divert queries away from Google and serve search ads, and the RSAs prohibit partners from preloading "alternative search services" on Android devices.

Before turning to the merits of Plaintiffs' arguments, the court considers two threshold matters.  First, Google contends that it is not subject to Section 2 liability because its positions as the default GSE are the product of "competition for the contract" and thus are not exclusionary.  Second, Plaintiffs maintain that the court should eschew *Microsoft*'s exclusive dealing framework in favor of a broader "general Section 2 standard."  UPCL at 14.  The court rejects both arguments.

### A.     "Competition for the Contract" Is No Defense.

Google disputes that the distribution agreements are exclusionary.  Recall, the Supreme Court has drawn a line between exclusionary conduct versus "growth or development as a consequence of a superior product, business acumen, or historical accident."  *Grinnell*, 384 U.S. at 571.  The former violates the Sherman Act; the latter does not.  Google says that it has secured default distribution, not through exclusionary conduct, but by developing a "superior product" through constant innovation.  Google claims that it "has repeatedly outcompeted its rivals . . . on the basis of its superior quality and monetization," and that any "scale benefits achieved from winning customers' business based on competition on the merits [do not] turn[] an otherwise lawful agreement into an unlawful one."  GTB at 50, 56.  Google points out that its partners chose to design their products to have a default GSE, and Google simply has bested its rivals to secure

198

those default positions.  Google also emphasizes its superior "business acumen."  *See id.* at 50–60.  For instance, unlike Microsoft, Google anticipated that there would be increasing demand for search on mobile, and it invested accordingly.  *Id.* at 68.  Thus, Google says, it has won (and continues to win) the defaults through competition as opposed to exclusionary conduct.  *See Paddock Publ'ns, Inc. v. Chi. Trib. Co.*, 103 F.3d 42, 47 (7th Cir. 1996) ("[C]ompetition for the contract makes it possible to have the benefits of exclusivity and rivalry simultaneously.");  *see also Walker v. U-Haul Co. of Miss.*, 734 F.2d 1068, 1074 (5th Cir. 1984) ("The record contains no evidence to undermine the thesis that U-Haul's power was acquired by virtue of its superior product and marketing ability, and the Sherman Act does not punish monopolists whose position has been 'thrust upon' them.") (citation omitted); *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945) ("The successful competitor, having been urged to compete, must not be turned upon when he wins.").[8]

In a sense, Google is not wrong.  It has long been the best search engine, particularly on mobile devices.  FOF ¶¶ 126–127.  Nor has Google sat still; it has continued to innovate in search.  FOF ¶ 128.  Google's partners value its quality, and they continue to select Google as the default because its search engine provides the best bet for monetizing queries.  FOF ¶¶ 126, 133.  Apple and Mozilla occasionally assess Google's search quality relative to its rivals and find Google's to be superior.  FOF ¶¶ 324, 332–333, 340–344.  And Google's rivals have tried to oust it as the

---

[8] This court determined at summary judgment that the so-called "'competition for the contract' defense [could not] be resolved on summary judgment at the *prima facie* stage and [wa]s better left for the procompetitive prong of the *Microsoft* analysis."  *United States v. Google*, 687 F. Supp. 3d 48, 73 (D.D.C. 2023).  Upon further reflection at Google's urging, *see* Closing Arg. Tr. at 243:4-10, the court thinks the defense is better considered here, when determining whether the distribution agreements qualify as exclusionary conduct, *see Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 526 (5th Cir. 1999) (analyzing impact of "qualitative merits of [defendant's] product," including the argument that it "enhanced rather than subverted competition on the merits" at the exclusionary conduct stage); *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 230 (1st Cir. 1983) (citing AREEDA and defining exclusionary conduct as "conduct, other than competition on the merits or restraints reasonably 'necessary' to competition on the merits, that reasonably appears capable of making a significant contribution to creating or maintaining monopoly power").

default GSE. Microsoft, most notably, has pitched Apple on making Bing the default multiple times, and DDG made a bid to be the default for private browsing mode searches on Safari. FOF ¶¶ 321, 330. These firms have not succeeded in part due to their inferior quality. FOF ¶¶ 324, 327, 332. It is also true that Google foresaw that the future of search was on mobile. Microsoft acknowledges that it was slow to recognize the importance of developing a search product for mobile, and it has been trying to catch up—unsuccessfully—ever since. *See infra* Section V.A.3.a.

But these largely undisputed facts are not inconsistent with possessing and exercising monopoly power. Nor do they tell the full story. There is no genuine "competition for the contract." Google has no true competitor. Consider that Google's monopoly in general search has been remarkably durable. Its market share in 2009 was nearly 80%, and it has *increased* since then to nearly 90% by 2020. FOF ¶ 23. Bing, during that same period, has never held a market share above 11%, and today it stands at less than 6%—meaning that Google's biggest rival trails in market share by a whopping 84%. FOF ¶ 25. Yahoo, long ago considered Google's closest competitor, today holds less than 2.5% of the market. *Id.* Thus, over the last decade, Google's grip on the market has only grown *stronger*.

That is not the only evidence of market stasis. Only once in the last 22 years has a rival dislodged Google as the default GSE, and in that case, Mozilla switched back from Yahoo to Google three years later. FOF ¶¶ 337–339. Moreover, there have been only two new market entrants of note in the last 15 years—DDG and Neeva. One of them is no longer in business (Neeva), and the other has achieved a market share of 2.1% (as of 2020) after more than a decade in business. If there is genuine competition in the market for general search, it has not manifested in familiar ways, such as fluid market shares, lost business, or new entrants.

The market reality is that Google is the only real choice as the default GSE.  Apple's Senior Vice President of Services, Eddy Cue, put it succinctly when, in a moment of (perhaps inadvertent) candor, he said: "[T]here's *no price* that Microsoft could ever offer [Apple] to" preload Bing. Tr. at 2519:10-11 (Cue) (emphasis added).  "No price."  Mozilla stated something similar in a letter to the Department of Justice prior to the filing of this lawsuit.  It wrote that switching the Firefox default to a rival search engine "would be a losing proposition" because no competitor could monetize search as effectively as Google. DX547.002.  A "losing proposition."  If "no price" could entice a partner to switch, or if doing so is viewed as a "losing proposition," Google does not face true market competition in search.

Google understands there is no genuine competition for the defaults because it knows that its partners cannot afford to go elsewhere.  Time and again, Google's partners have concluded that it is financially infeasible to switch default GSEs or seek greater flexibility in search offerings because it would mean sacrificing the hundreds of millions, if not billions, of dollars that Google pays them as revenue share.  FOF ¶¶ 319, 320, 370–375, 378 (identifying instances in which Apple, Verizon, AT&T, and T-Mobile have all sought and failed to obtain greater flexibility under the relevant contracts).  These are Fortune 500 companies, and they have nowhere else to turn other than Google.

That was the key takeaway from the testimony of Neeva's founder and former Google Senior Vice President of Ads and Commerce, Dr. Ramaswamy.  The court found him to be a particularly compelling witness.  He put it best.  When the court asked why Google pays billions in revenue share when it already has the best search engine, he answered that the payments "provide an incredibly strong incentive for the ecosystem to not do anything"; they "effectively make the ecosystem exceptionally resist[ant] to change"; and their "net effect . . . [is to] basically

freeze the ecosystem in place[.]" Tr. at 3796:8–3798:22 (Ramaswamy). No one would ever describe a competitive marketplace in those terms. When the distribution agreements have created an ecosystem that has a "strong incentive" to do "nothing," is "resist[ant] to change," and is "basically [frozen] in place," there is no genuine "competition for the contract" in search. It is illusory.

As was true of Microsoft and Windows, Google "may have gained its initial dominance in the [general search services] market competitively—though superior foresight or quality. But this case is not about [Google's] initial acquisition of monopoly power. It is about [Google's] efforts to maintain this position through means other than competition on the merits." *Microsoft*, 253 F.3d at 56; *see Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 (2d Cir. 1979) ("Even if the origin of the monopoly power was innocent, . . . the *Grinnell* rule recognizes that maintaining or extending market control by the exercise of that power is sufficient to complete a violation of § 2."). Google has succeeded in doing just that. Like Microsoft before it, Google has thwarted true competition by foreclosing its rivals from the most effective channels of search distribution. *See infra* Section V.A.2. The result is that consumer use of rival GSEs has been kept below the critical levels necessary to pose a threat to Google's monopoly. *See Microsoft*, 253 F.3d at 71. The exclusive distribution agreements thus have significantly contributed to Google's ability to maintain its highly durable monopoly. *Id.* at 78–79.

Google asserts that this case is unlike *Microsoft* because there, Microsoft radically changed its conduct in response to Netscape's threat and, in so doing, flipped the companies' market shares. Here, by contrast, Google says its conduct has been relatively constant, both before and after its acquisition of dominant market status. *See* Closing Arg. Tr. at 244:13–245:22. But "many anticompetitive actions are possible or effective only if taken by a firm that dominates its smaller

rivals.  A classic illustration is an insistence that those who wish to secure a firm's services cease dealing with its competitors.  Such conduct is illegal when taken by a monopolist because it tends to destroy competition, although in the hands of a smaller market participant it might be considered harmless, or even honestly industrial."  *Berkey Photo*, 603 F.2d at 274–75 (internal quotation marks and citations omitted).  It is Google's status as a monopolist that makes its distribution contracts exclusionary, even if the same conduct did not have that effect when Google first began employing it.

## B.       The *Microsoft* Exclusive Dealing Framework Is Applicable.

Before turning to a more detailed discussion of the market effects, the court addresses the proper analytical framework within which to view the challenged distribution agreements.  From the outset, Plaintiffs have framed this case as one about exclusive dealing.  *See, e.g.*, Am. Compl. ¶¶ 78–79 (Android agreements), 118–119 (Apple), 156 (browser agreements).  Unexpectedly, for the first time post-trial, Plaintiffs contend that the court should eschew considering the agreements through the lens of exclusivity, which they now deem "too narrow," but instead should "opt[] for the general Section 2 standard, even when harm resulted from agreements blocking access to distribution."  UPCL at 13–16.

The court declines to ratify what Google rightly calls a "dramatic post-trial shift[.]"  GRCL at 1.  *Microsoft* compels application of the exclusive dealing framework.  *See* 253 F.3d at 69–70.  That framework requires the court to consider, at the threshold, the degree to which the agreements foreclose the relevant markets.  *Id.*  But because foreclosure is only a "useful screening function," the court also must identify real-world anticompetitive effects that arise from such agreements.  *Id.* at 69; *McWane*, 783 F.3d at 835 (describing foreclosure as a "proxy for

203

anticompetitive harm"). Perhaps that is what Plaintiffs mean by the "general Section 2 standard." UPCL at 14. In any event, the court's analysis follows *Microsoft*.

> **C.       The Challenged Agreements Are Exclusive.**

"Generally, a prerequisite to any exclusive dealing claim is an agreement to deal exclusively." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012) (internal quotation marks and citations omitted). Exclusivity need be neither express nor complete to render an agreement "exclusive" for Section 2 purposes: *De facto* and partial exclusivity may suffice depending on the circumstances. *Id.* at 270, 283.

To illustrate, in *Microsoft*, the D.C. Circuit upheld the trial court's determination that "although not literally exclusive, the deals were exclusive *in practice* because they required developers to make Microsoft's [Java Virtual Machine] the default in the software they developed." 253 F.3d at 75–76 (emphasis added); *see also LePage's Inc. v. 3M*, 324 F.3d 141, 157 (3d Cir. 2003) (Section 2 liability encompasses "arrangements which, albeit not expressly exclusive, effectively foreclosed the business of competitors.") (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365. U.S. 320, 327 (1961)). The court also found that Microsoft's distribution agreements with Internet Access Providers (IAPs) were exclusive, even though browser distribution could be achieved by other "more costly and less effective" means. 253 F.3d at 70. *Microsoft* thus provides the template for evaluating Google's distribution agreements.

> *1.       Browser Agreements*

Google's browser agreements are exclusive insofar as they establish Google as the out-of-the-box default search engine. The Apple ISA requires that Google be preloaded as the exclusive default search engine on all Safari search access points in exchange for ▇% revenue share. FOF ¶ 298. The resulting query volume is substantial. About 65% of queries on all Apple devices

204

(mobile and desktop), and 61.8% on iOS devices (mobile), flow through the Safari default, demonstrating that default placement is a "primary channel[] for distribution of" search. FOF ¶¶ 296–297 (queries entered on Safari (both mobile and desktop) account for 28% of all queries in the United States); *Microsoft*, 253 F.3d at 61.

The Mozilla RSA has a similar effect.  Google is the default GSE on all Firefox search access points, including the navigation bar and the homepage, among others.  FOF ¶ 334.  Google's default placements on Firefox generate 80% of Mozilla's overall operating revenue, demonstrating that the vast majority of query volume on Firefox goes through defaults.  FOF ¶ 335.  Google also has comparable agreements with smaller browsers, like Samsung's S Browser.   FOF ¶ 346; *see also* UPFOF ¶¶ 310–318.

Google mounts several arguments as to why these agreements are not exclusive as a matter of law.

*First*, it asserts that the browser agreements permit the browser to "promote search rivals on the same browser, and Apple and Mozilla have for many years entered into such promotional deals."  GTB at 37.  For instance, Apple's agreement with Microsoft provides that Apple will provide a readily discoverable means of switching the default and will install Bing as a default bookmark.  FOF ¶ 320.  Relatedly, Google's agreement with Mozilla permits the "this time, search with" feature on Firefox, which allows users to select a different search product from its "Awesome Bar" for a given query.  FOF ¶ 60.

The fact that Google's browser partners can contract with its rivals for distribution through less efficient channels does not, however, immunize the challenged agreements from being deemed exclusive.  That is the clear lesson of *Microsoft*.  There, for example, Microsoft's contracts with the leading IAP, America Online ("AOL"), provided that AOL would not "provide software

205

using any non-Microsoft browser except at the customer's request, and even then AOL [would] not supply more than 15% of its subscribers with a browser other than I[nternet] E[xplorer]." 253 F.3d at 68.  The trial court had described this agreement "for all practical purposes" as guaranteeing that Internet Explorer would be AOL's "browser of choice," even though "Microsoft [] permitted AOL to offer Navigator through a few subsidiary channels."  *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30, 53 (D.D.C. 2000).  The trial court held that the agreement was exclusive, and the D.C. Circuit agreed.  The Circuit explained that IAPs were one of the two major channels of distribution, and by reaching agreements with 14 of the top 15 IAPs, Microsoft had "kept usage of Navigator below the critical level necessary for Navigator or any other rival to pose a real threat to Microsoft's monopoly."  *Microsoft*, 253 F.3d at 67.  Similarly here, the mere fact that the browser agreements do not prevent Apple and Mozilla from entering into limited distribution deals with rivals does not render the agreements non-exclusive.

Google's additional counterargument that the ISA is not exclusive because Apple may not want more flexibility under the ISA is without merit.  GRFOF ¶ 68.  A firm that agrees to distribute only a monopolist's product may itself benefit from such an agreement, but that does not render it non-exclusive.  *See id.* at 69 (observing that "exclusivity provisions in contracts may serve many useful purposes").  Google also overlooks that Apple has previously tried to negotiate around exclusivity in the ISA to no avail.  FOF ¶¶ 319–320.  The question of exclusivity turns on "the opportunities for other traders to enter into or remain in [the] market."  *Microsoft*, 253 F.3d at 69 (quoting *Tampa Elec.*, 365 U.S. at 327).  So, even if Apple does not want more flexibility, that is a market reality that heightens the anticompetitive effects of the ISA for "other traders" who might seek to enter the market.

*Second*, Google points out that the ISA does not prevent Apple from preloading a third-party's search application or a third-party browser on its devices. GTB at 38. But market realities matter more than what is theoretically possible. *See Tampa Elec.*, 365 U.S. at 327–28. Apple has made clear it will not design its products to include third-party applications. FOF ¶ 311. Google knows this well. *See* Tr. at 7667:20–7668:18 (Pichai) (testifying that it is common knowledge in the industry that Apple does not preload third-party applications onto its devices). So, even though the ISA contains no express exclusivity provision, its terms in combination with Apple's established business practices means that Google will be the only GSE preloaded on an Apple device. That makes it exclusive. *See LePage's*, 324 F.3d at 157–58 (concluding that agreement was exclusive despite no "express exclusivity requirement," because the arrangement "effectively foreclosed the business of competitors").

The same is true as to Google's contention that the ISA permits Apple to preload its own search widget on mobile devices. *See* GRFOF ¶ 67. There is no record evidence that Apple has developed such a product or intends to do so.

*Third*, Google argues that "users' search behavior [is] not consistent with Plaintiffs' assertion that the agreements were exclusive or *de facto* exclusive," and that ultimately, user choice is determined by quality, not defaults. GTB at 38. It points out that nearly 40% of queries on Apple's mobile devices flow through non-default search access points, such as default bookmarks or organic search. *Id.*; FOF ¶ 296. "This fact, alone," Google says, "confirms that the Safari agreement is not exclusive." GTB at 38. It also highlights the example of Firefox's default change from Google to Yahoo. In 2014, when that change happened, users switched back to Google despite the Yahoo default because users preferred Google. *Id.* And Google cites its own success on Windows PCs, where Google is not the preloaded search default. *Id.* at 38–39. This actual user

207

behavior, Google says, "flatly contradicts Plaintiffs' assertion that browser default agreements are the equivalent of an exclusive distribution agreement." *Id.* at 39.

But the fact that some consumers access search on non-default access points is not dispositive on exclusivity.  On Apple devices, 65% of queries still go through the default. FOF ¶ 296.  That is a "substantial amount of distribution[.]"  *Microsoft*, 87 F. Supp. 2d at 42. Moreover, Google's brand recognition and Yahoo's poor quality were major factors that dampened the default effect on Firefox (and yet there was still a noticeable default effect when Firefox switched from Google to Yahoo).  FOF ¶¶ 370–375; *infra* Section V.A.2.a.  And Google's success on Windows again illustrates that defaults are less effective when the alternative has strong brand recognition and product quality.  FOF ¶ 70.  Even then, the default effect on users who stick with the Edge browser on Windows devices is real, as Bing receives 80% of such queries.  FOF ¶¶ 82– 84 (Google's share on Windows devices overall is 80%, but its share on Edge where it is not the default is only 20%).

To be deemed exclusive, a contract need not foreclose all other avenues of distribution to which consumers might have access.  It is enough that the contract "clos[es] to rivals a substantial percentage of the available opportunities for [] distribution."  *Microsoft*, 253 F.3d at 70.  As will be seen when the court discusses market foreclosure, *infra* Section V.A.1.b, the distribution agreements do just that.

*Fourth*, Google notes that the ISA does not operate to prohibit *users* from accessing rival GSEs.  To be sure, there are other ways for users to access a GSE other than Google on Apple devices and on Firefox.  As noted, Bing and Yahoo are preloaded as default bookmarks on Safari's homepage.  Also, users can download another search engine, download a browser other than Safari from the App Store, or navigate directly to a rival GSE's website for an "organic" search.  *See* GTB

at 39–40.  Similarly, on the desktop version of Firefox, the user can use the Awesome Bar to conduct individual queries on search engines other than Google.  And on both Safari and Firefox, the user can change the default GSE.  But mere user access to these less efficient channels of distribution does not render the browser agreements non-exclusive.

*Microsoft* again illustrates the point.  There, the D.C. Circuit affirmed that Microsoft's agreements with OEMs were exclusive even though they "did not ultimately deprive Netscape of the ability to have access to every PC user worldwide to offer an opportunity to install Navigator," as "Navigator c[ould] be downloaded from the Internet," was "available through myriad retail channels," and could be "mailed directly to an unlimited number of households."  87 F. Supp. 2d at 53; *see* 253 F.3d at 64 (rejecting the argument that Microsoft's licensing agreements with OEMs were not exclusive "because Netscape is not completely blocked from distributing its product," as "although Microsoft did not bar its rivals from all means of distribution, it did bar them from the cost-efficient ones").  The court also found Microsoft's agreement with AOL to be exclusive, even though it allowed users to request a browser other than Internet Explorer.  *See* 253 F.3d at 68–71.

The record here resembles that in *Microsoft*.  Users are free to navigate to Google's rivals through non-default search access points, but they rarely do.  In 2020 only 5.1% of all search queries on iOS devices went to a rival GSE through a non-default access point.  FOF ¶ 296.  That figure aggregates queries run through *all* non-default search access points, including organic searches, bookmarks, and downloaded search applications.  Most non-default queries still go through Google.  "The mere existence of other avenues of distribution is insufficient without an assessment of their overall significance to the market."  *United States v. Dentsply*, 399 F.3d 181, 196 (3d Cir. 2005).  Thus, the fact that a small fraction of Apple and Firefox users search on non-default access points with a rival GSE does not render the browser agreements non-exclusive.

### 2.     *Android Agreements*

Plaintiffs likewise contend that the RSAs and MADAs are exclusive.  Google disputes that characterization.

### a.     MADAs

At summary judgment, the court concluded that "although, by its terms, the MADA is not an exclusive contract, there is a dispute of fact as to whether market realities make it one." *Google*, 687 F. Supp. 3d at 76.  With the benefit of a full trial, the court can now conclude that the MADA is exclusive in practice.

Its exclusivity arises from two contractual requirements and two market realities.  The two contractual requirements are that all MADA signatories must: (1) feature the Google Search Widget in the center of the home screen and (2) place Chrome on the home screen with Google as the default GSE.  FOF ¶¶ 351, 356.  The two market realities are that: (1) the Google Play Store is a must-have on all Android devices, FOF ¶¶ 352–354, and (2) the industry-wide practice is to avoid excessive preloading of applications, or "bloatware," FOF ¶¶ 359–361.  This combination of factors has resulted in all Android OEMs and carriers entering into MADAs, with all Android devices featuring the Google Search Widget and Chrome on the home screen to the exclusion of rivals as a practical matter.  No Android device carries a second search widget and, other than Samsung, no device comes with a second preinstalled browser (and even the S Browser defaults to Google because of the RSA).  *Id.*  These prized placements are extremely effective at driving searches to Google.  To illustrate, Samsung, the largest Android OEM, derives 80% of its on-device search revenue through searches performed via the Google Search Widget and Chrome default.  FOF ¶ 74.

Google offers two primary arguments for why the MADAs are not exclusive.

*First*, Google contends that the MADA's device-by-device optionality allows an OEM to choose either to preload Google's products on some or all of their devices. GTB at 73. That is true, but the argument overlooks the market reality that the Google Play Store is viewed by OEMs as essential to the Android customer experience. FOF ¶¶ 352–354. As Microsoft CEO Satya Nadella put it, without the Play Store, the "phone is a brick." FOF ¶ 352. Even Samsung, which has developed and preloads the Galaxy Store, deems the Play Store essential. FOF ¶ 354. Not surprisingly then, every Android device sold in the United States is subject to the MADA. FOF ¶ 350. That rival app stores might be developed in the future, *see* GRFOF ¶¶ 239–240, is not relevant to the court's assessment of the market realities today. The MADA secures for Google the two most effective search access points—the search widget and the Chrome browser—on all Android devices, device-by-device optionality notwithstanding.[9]

*Second*, Google points out that the MADA does not expressly prohibit OEMs from preloading other search access points on the home screen, like a second search widget or a different browser that defaults to a rival GSE. Google illustrates the point by hypothesizing numerous MADA-compliant configurations that incorporate search access points defaulting to Bing. GTB at 74–76. But market realities make such configurations unrealistic. The industry is concerned with app "bloat," that is, excessive preinstallation of out-of-the-box applications. Too many preloaded apps degrade the user experience. FOF ¶ 359. So, while the MADA formally allows preloading of rivals' widgets or browsers, the industry practice of avoiding app "bloat" means that Android devices rarely come preloaded with non-Google applications.

---

[9] Google notes that the unbundling of GMS in the European Union has not been effective because OEMs still continue to license the Google Search Widget and Chrome. *See* GTB at 81–82. That may be true, but this court's task is not to peer into the future when determining the present effects of the MADA. *See* Section V.A.

Google recognizes this.  It understands that OEMs are unlikely to place two search widgets on a device because to do so would create a negative customer experience.  FOF ¶ 361.  Even Microsoft did not add a second Bing search widget to its mobile devices due to concerns over poor user experience.  FOF ¶ 359.  The same is true of browsers other than Chrome.  OEMs tend not to preload a second browser.  Samsung is an exception.  It preloads its S Browser (in addition to Chrome), but as noted even the S-browser defaults to Google per the Samsung-Google RSA.  FOF ¶ 360.  Because Samsung is unlikely to include a *third* out-of-the-box browser, no GSE can hope to secure that channel of distribution on Samsung devices other than Google.

Google's additional contention that "users who wish to use a rival search service can download its app, widget, or browser, or change the default in the preloaded" browser(s) fares no better.  GTB at 76.  Under *Microsoft*, the mere availability of less efficient and less prominent channels of distribution does not make the MADA non-exclusive.  *See* 253 F.3d at 61.

> b. <u>RSAs</u>

The RSAs between Google and Android device distributors formalize the practical exclusivity of the MADAs.  That has been their purpose from the outset.  FOF ¶ 365 (2011 Google email stating that "Our philosophy is that we are paying revenue share *in return for* exclusivity," "we are not 'getting' anything" without exclusivity, and recognizing that "Microsoft and Yahoo will enter into contracts on Android through carrier deals if we do not").  All of the RSAs contain an "alternative search services" clause.  That clause prohibits Google's Android partners from preloading rival search engines.  It also greatly restricts a partner's ability to promote other GSEs.  In return, the Android partner receives revenue share.  The structure of revenue share payments varies among the RSAs, but the basic barter is revenue share in exchange for default exclusivity.

It is, of course, true that no distributor of Android devices is *required* to enter into an RSA with Google.  They can opt to distribute MADA-compliant devices without earning revenue share.  Also, Google's agreements with Verizon and Samsung permit those partners to retain the option to preinstall another GSE, albeit at a lower revenue share percentage.  FOF ¶¶ 366, 381.  As Google argues, RSA "[p]artners are not prevented from preloading rivals on any devices (and any amount of devices) of their choosing—the only result of doing so is that the partner will not receive the highest revenue share on those devices."  GTB at 77.

This optionality does not make the RSAs any less exclusive.  "[A]ntitrust policy should not differentiate between the manufacturer of widgets that explicitly imposes exclusive dealing on its dealers and the manufacturer that gives such dealers a discount or rebate for dealing exclusively in the manufacturer's widgets," because both "have the 'practical effect' of inducing exclusive dealing."  AREEDA ¶ 1807b (quoting *Tampa Elec.*, 365 U.S. at 326).  While financial incentives to deal exclusively may not thwart competition in the short-term, "[s]uch a scheme is problematic [] when the defendant is a dominant firm in a position to force manufacturers to make an all-or-nothing choice."  *Id.*

That is effectively how the RSAs operate.  No rational market actor would sell a MADA-compliant device without ensuring that it earned search revenue through the RSA.  FOF ¶ 363.  The forgone revenue is simply too great.  For instance, Verizon considered switching away from the Google default but would have had to risk a $1.4 billion loss to do so.  FOF ¶¶ 372–374.  The decision to stick with Google was the only rational choice.  FOF ¶ 379.  Not surprisingly then, Google has identified no Android device presently sold in the United States that is subject to a MADA but not an RSA.  *Id.*

True, some of the RSAs do not present a literal "all-or-nothing choice," as a partner can on a device-by-device basis earn *some* revenue share on a non-exclusive deal, but that distinction is not dispositive. *But see* FOF ¶ 378 (describing the T-Mobile RSA, which requires exclusive default placements as a precondition to *any* payment at all). In *United Shoe Machinery*, an early Clayton Act case, the Supreme Court confronted a similar factual scenario. There, the challenged contractual provision was a "discriminatory royalty clause providing lower royalty for lessees who agree not to use certain machinery . . . other than those leased from the lessor." *United Shoe Mach. Corp. v. United States*, 258 U.S. 451, 457 (1922). The Court held that this clause was exclusionary because "[w]hile the clauses enjoined do not contain specific agreements not to use the machinery of a competitor of the lessor, the practical effect of these drastic provisions is to prevent such use." *Id.* Here too, the Verizon and Samsung RSAs technically provide a non- or less-exclusive option that still allows carriers to earn some revenue share, but "the practical effect" of the tiered system is to induce carriers to select the highest-value tier. And that is precisely how the market has played out. Nearly all RSA-covered devices are presently enrolled at the highest-revenue tier, thus locking in Google as only preloaded GSE. FOF ¶ 379.

The RSAs therefore are properly treated as exclusive agreements.

## V.   EFFECTS IN THE MARKET FOR GENERAL SEARCH SERVICES

### A.   The Exclusive Agreements Cause Anticompetitive Effects in the General Search Services Market.

Merely categorizing Google's distribution agreements as "exclusive" does not answer the question of whether those deals violate Section 2. That is because exclusive agreements are not condemned per se by the antitrust laws, even if they involve a dominant firm. *Microsoft*, 253 F.3d at 69 ("[E]xclusivity provisions in contracts may serve many useful purposes."); *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 983 (10th Cir. 2022) ("Courts repeatedly

explain that exclusive dealing agreements are often entered into for entirely procompetitive reasons and pose very little threat to competition even when utilized by a monopolist."). They can, however, "run afoul of the antitrust laws when used by a dominant firm to maintain its monopoly." *McWane*, 783 F.3d at 832; *see also ZF Meritor*, 696 F.3d at 270 ("The primary antitrust concern with exclusive dealing arrangements is that they may be used by a monopolist to strengthen its position, which may ultimately harm competition.").

"[T]o be condemned as exclusionary, a monopolist's act must have an 'anticompetitive effect.'  That is, the monopolist must harm the competitive *process* and thereby harm consumers. In contrast, harm to one or more *competitors* will not suffice."  *Microsoft*, 253 F.3d at 58. A plaintiff bears the burden to show "that the monopolist's conduct *indeed* has the requisite anticompetitive effect."  *Id.* at 58–59 (emphasis added).  "Even though monopolistic conduct requires proof of actual or threatened consumer harm, the proof need not invariably be elaborate." AREEDA ¶ 651e2.

Anticompetitive effects analysis involves establishing a "causal link."  *Microsoft*, 253 F.3d at 78.  The exclusionary conduct must cause the anticompetitive harm.  As here, when a regulator is seeking only injunctive relief, the standard is somewhat relaxed.  *See id.* at 79.  Courts may "infer 'causation' from the fact that a defendant has engaged in anticompetitive conduct that 'reasonably appear[s] capable of making a significant contribution to . . . maintaining monopoly power.'"  *Id.* (quoting 3 AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 651c, at 78 (1996) [hereinafter AREEDA (1996)]); *id.* (holding that the plaintiff in an "equitable enforcement action" need not "present direct proof that a defendant's continued monopoly power is precisely attributable to anticompetitive conduct"); *accord Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 485 (7th Cir. 2020) (same, citing *Microsoft*); *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 460 (9th Cir.

2021) (same).  Such an inference is appropriate "when exclusionary conduct is aimed at producers . . . of established substitutes."  *Microsoft*, 253 F.3d at 79.

Importantly, causation does not require but-for proof.  The plaintiff is not required to show that but for the defendant's exclusionary conduct the anticompetitive effects would not have followed.  Such a standard would create substantial proof problems, as "neither plaintiffs nor the court can confidently reconstruct . . . a world absent the defendant's exclusionary conduct."  *Id.*  "To some degree, 'the defendant is made to suffer the uncertain consequences of its own undesirable conduct.'"  *Id.* (quoting AREEDA (1996) ¶ 651c, at 78).

The key question then is this: Do Google's exclusive distribution contracts reasonably appear capable of significantly contributing to maintaining Google's monopoly power in the general search services market?  The answer is "yes."  Google's distribution agreements are exclusionary contracts that violate Section 2 because they ensure that half of all GSE users in the United States will receive Google as the preloaded default on all Apple and Android devices, as well as cause additional anticompetitive harm.  The agreements "clearly have a significant effect in preserving [Google's] monopoly."  *Id.* at 71.

The agreements have three primary anticompetitive effects: (1) market foreclosure, (2) preventing rivals from achieving scale, and (3) diminishing the incentives of rivals to invest and innovate in general search.  Plaintiffs also contend that Google's incentives to invest are diminished, but the evidence of that effect is weaker than the others.

>    1.    *The Exclusive Agreements Foreclose a Substantial Share of the Market.*

An exclusive agreement violates the Sherman Act only when its "probable effect is to 'foreclose competition in a substantial share of the line of commerce affected.'"  *Id.* at 69 (quoting *Tampa Elec.*, 365 U.S. at 328).  "The share of the market foreclosed is important because, for the

216

contract to have an adverse effect upon competition, 'the opportunities for other traders to enter into or remain in that market must be significantly limited.'" *Id.* (quoting *Tampa Elec.*, 365 U.S. at 328).  "Substantial foreclosure allows the dominant firm to prevent potential rivals from ever reaching 'the critical level necessary' to pose a real threat to the defendant's business." *ZF Meritor*, 696 F.3d at 286 (quoting *Dentsply*, 399 F.3d at 191).  Plaintiffs thus must "prove the degree of foreclosure" in the relevant markets because of the exclusive deals.  *Microsoft*, 253 F.3d at 69.

### a.      Foreclosure Calculation

U.S. Plaintiffs' expert, Dr. Whinston found that 50% of all queries in the United States are run through the default search access points covered by the challenged distribution agreements. FOF ¶ 62 (28% through the ISA, 19.4% through the MADAs and RSAs, and the remaining 2.3% through third-party browser agreements).  This figure does not include the 20% of all queries in the United States that flow through Google on user-downloaded Chrome.  FOF ¶ 63.

Google does not dispute Dr. Whinston's 50% computation.  Instead, it challenges his very understanding of market foreclosure.  First, Google contends that the proper measure of foreclosure is not market coverage but the percentage of queries available to rivals in a "but-for world" in which the challenged contracts do not exist.  In such a world, the foreclosure number would be far lower because users in large numbers still would use Google.  Second, Google argues that, even if foreclosure is properly analyzed based on default coverage, Dr. Whinston fails to account for rivals' ability to "compete even for those users who access search through" defaults. GTB at 41.  The foreclosure number is thus zero, according to Google.  Finally, assuming that query coverage is the correct measure, Google argues that the court should disaggregate the

217

browser agreements, MADAs, and the RSAs when considering foreclosure figures, which when considered separately are not substantial and therefore not anticompetitive.

### i.    But-For World

Although Dr. Whinston testified that market foreclosure is "ideally" examined against a but-for world, Tr. at 6085:9-19 (Whinston), the law does not require it.

> [T]o demand that bare inference be supported by evidence as to what would have happened but for the adoption of the practice that was in fact adopted or to require firm prediction of an increase of competition as a probable result of ordering the abandonment of the practice, would be a standard of proof if not virtually impossible to meet, at least most ill-suited for ascertainment by courts.

*Standard Oil Co. of Cal. v. United States*, 337 U.S. 293, 309–10 (1949).  A plaintiff thus "is entitled to view the situation as it exists."  *Mytinger & Casselberry, Inc. v. FTC*, 301 F.2d 534, 538 (D.C. Cir. 1962).  "To require that § 2 liability turn on a plaintiff's ability or inability to reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct would only encourage monopolists to take more and earlier anticompetitive action."  *Microsoft*, 253 F.3d at 79; *see also ZF Meritor*, 696 F.3d at 286 (basing foreclosure on the percentage "of the market remaining open," that is, not presently covered by mandatory purchase requirement agreements); *LePage's*, 324 F.3d at 159 (describing market foreclosure based only on real-world effects of discount practices).

Google relies on the D.C. Circuit's decision in *Rambus Inc. v. FTC* to support the need for a but-for world showing.  *See* 522 F.3d 456 (D.C. Cir. 2008).  In that case, the FTC concluded that Rambus had secured its monopoly by making misrepresentations to a standards-setting body about its patent interests, in violation of Section 2.  *Id.* at 461.  The body developed standards that incorporated Rambus's intellectual property.  *Id.* at 460.  The D.C. Circuit reversed the agency's determination.  The court explained that if the standards-setting body, "in the world that would have existed but for Rambus's deception, would have standardized the very same technologies,

218

Rambus's alleged deception cannot be said to have had an effect on competition in violation of the antitrust laws." *Id.* at 466–67. Put differently, the FTC's claim failed because it had not shown that the standards-setting body would have adopted the standard in question but for Rambus's deception. *Id.*

*Rambus* does not establish a categorical rule that the anticompetitive effects of an exclusive agreement must be measured against a but-for world. That case involved deception to a standards-setting organization, a form of exclusionary conduct particularly susceptible to a finding of materiality. *See id.* at 466 ("[A]n antitrust plaintiff must establish that the standard-setting organization would not have adopted the standard in question but for the misrepresentation or omission.") (quoting 2 HOVENKAMP ET AL., IP & ANTITRUST § 35.5 (Supp. 2008)). Indeed, the FTC itself had left open the possibility that the standards-setting organization "would have standardized Rambus's technologies *even if Rambus had disclosed* its intellectual property." *Id.* at 466. In such circumstances, the D.C. Circuit deemed it appropriate to demand proof that Rambus's deception in fact resulted in competitive harm. *See id.* at 466–67. Nowhere, however, did the court suggest that such a strict standard of proof was required to demonstrate anticompetitive effects for other forms of exclusionary conduct, particularly exclusive dealing arrangements. Such a holding would be contrary to *Microsoft*, and the court in *Rambus* nowhere questioned that precedent. *Rambus* therefore does not require Plaintiffs to prove substantial foreclosure against a but-for world.

Consequently, the court does not rely on Dr. Whinston's but-for world "Super Duck" analysis or determine foreclosure against a hypothetical world in which users are offered a GSE "choice screen" out of the box. *See* GTB at 44 (arguing that "Plaintiffs did not attempt to calculate the degree of alleged foreclosure if all browser developers offered a choice screen instead of setting

Google as the default").    Proving   substantial   foreclosure   does   not   require   such   thought

experiments.

### ii.    Zero Foreclosure

Next, Google says that there is no foreclosure at all because the distribution agreements

still permit rivals to compete for queries.  According to Google, "because rivals can compete even

for those users who access search through the browser default, there is no foreclosure" arising from

the browser agreements.  GTB at 41.  Similarly, as to the Android agreements, Google contends

that "[r]ival search engines can compete for incremental promotion on MADA devices, and the

device-by-device nature of the RSAs allows rivals to compete for preinstallation on any of the

OEM's or carrier's devices."  GTB at 80.[10]

As support, Google relies on *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, in which the Third

Circuit observed that, when analyzing foreclosure, the court's concern should "not [be] about

which products a consumer chooses to purchase, but about which products are reasonably available

to that consumer.  For example, if customers are free to switch to a different product in the

marketplace but choose not to do so, competition has not been thwarted—even if a competitor

remains unable to increase its market share."  821 F.3d 394, 403 (3d Cir. 2016) (citation omitted);

*see also Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 997 (9th

Cir. 2010) ("If competitors can reach the ultimate consumers of the product by employing existing

or potential alternative channels of distribution, it is unclear whether such restrictions foreclose

---

[10] To the extent that Google argues that there is no foreclosure because rivals can compete to win the default, *see* GTB at 42 ("[R]ivals can compete for 100% of all queries . . . first by competing to be the default[.]"), that contention misconstrues the foreclosure analysis.  "The central question is whether *after* the Exclusive Agreements were signed [Google's] competitors were able to meaningfully compete or whether they were foreclosed from the market."  *In re Lorazepam Antitrust Litig.*, 467 F. Supp. 2d 74, 82 (D.D.C. 2006) (emphasis added).

from competition *any* part of the relevant market.") (citation omitted).  Because users are "free to switch to a different product," Google contends, the foreclosure number is zero.  GTB at 41.

But neither *Eisai* nor *Allied Orthopedic* stand for the broad proposition that there is no market foreclosure when a dominant firm leaves *some* alternative ways for customers to access rivals.  *Microsoft* rejected that very proposition.  For instance, it treated as exclusive Microsoft's agreement with AOL, even though it permitted AOL to distribute Netscape if customers requested it.  253 F.3d at 68.  It did the same as to the OEM agreements, which left open internet downloads and mailings as a means for users to reach Netscape.  *Id.* at 64, 70; *see Microsoft*, 87 F. Supp. 2d at 53.  The court in *Microsoft* did not say that these contracts caused zero market foreclosure merely because Internet Explorer had other, less-efficient means of reaching users.

The same holds true here.  The court already has found that preloaded default placements are the most efficient channel for reaching search consumers, and Google has secured all the major ones (except the default on the Edge browser preloaded on Windows devices).  FOF ¶ 61.  Sure, users can access Google's rivals by switching the default search access point or by downloading a rival search app or browser.  But the market reality is that users rarely do so.  The fact that exclusive agreements allow users to reach rivals through other means does not make the foreclosure number zero.

### iii.    Aggregation

Finally, Google argues that the court should consider the impact of each type of agreement (e.g., ISA, MADA, RSA) separately when assessing the magnitude of foreclosure.  GTB at 80–82.  That is not how foreclosure is measured under *Microsoft*.

The court largely addressed this argument at summary judgment when it explained that the *Microsoft* court "aggregate[d] foreclosure in the exclusive dealing context," considering smaller

channels of distribution alongside larger ones in arriving at its conclusion that the market had been substantially foreclosed. *Google*, 687 F. Supp. 3d at 68 (citing 253 F.3d at 72) ("Although the ISVs [(Independent Software Vendors)] are a relatively small channel for browser distribution, they take on greater significance because, as discussed above, Microsoft had largely foreclosed the two primary channels to its rivals. In that light, one can tell from the record that by affecting the applications used by 'millions' of consumers, Microsoft's exclusive deals with the ISVs had a substantial effect in further foreclosing rival browsers from the market."); *see also FTC v. Motion Picture Advert. Serv. Co.*, 334 U.S. 392, 395 (1953) (aggregating foreclosure caused by three contested agreements and concluding that "respondent and the three other major companies have foreclosed to competitors 75 percent of all available outlets for this business throughout the United States").

Aggregating the foreclosure effects of the browser and Android agreements is an appropriate way to understand the overall effect of Google's exclusive dealing in the relevant markets. Google's authority, which largely deals with aggregating challenged and lawful conduct, GTB at 82, is inapposite.[11]

*   *   *

The court thus finds that as to the general search services market Plaintiffs have proven that Google's exclusive distribution agreements foreclose 50% of the general search services market by query volume.

---

[11] The parties also disagree as to whether the court can permissibly aggregate the challenged conduct (i.e., the distribution agreements) together with unchallenged conduct (e.g., the placement of Google as the default GSE on user-downloaded Chrome). *See* GTB at 82; U.S. Pls.' Resp. Proposed Conclusions of Law, ECF No. 899 [hereinafter UPRCL], at 14. Because the court finds that the foreclosure figures—which do not include unchallenged conduct—are sufficient to establish significant foreclosure, *infra* Section V.A.1.b, the court need not resolve this dispute.

b.        Significant Foreclosure

To be considered anticompetitive, the market foreclosure must be "significant." *Microsoft*, 253 F.3d at 70–71.  The 50% figure meets that threshold.  *See id.* (stating that "a monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose *less than* roughly 40% or 50% share usually required to establish a § 1 violation") (emphasis added); AREEDA ¶ 1821c ("Percentages higher than 50 percent are routinely condemned when the practice is complete exclusion by a contract of fairly long duration[.]").

Courts also look to certain qualitative conditions when assessing a foreclosure percentage's significance.  *See Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004) ("But while low [foreclosure] numbers make dismissal easy, high numbers do not automatically condemn, but only encourage closer scrutiny[.]"); AREEDA ¶ 1821c (stating that "even relatively high percentages are not necessarily illegal, for there is no 'per se' rule condemning any specific [foreclosure] percentage") (collecting cases).  Such qualitative conditions include the duration of the exclusive agreements, their ease of terminability, the height of barriers to entry, the availability of alternative methods of distribution, and the willingness of consumers to comparison shop.  *See, e.g.*, *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1059 (8th Cir. 2000); *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163–64 (9th Cir. 1997); *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1234 (8th Cir. 1987).  These factors can be thought of as a test of the durability of market foreclosure at a given time.  *See* AREEDA ¶ 1821 (noting that courts analyze "the existence of other factors that give significance to a given foreclosure percentage").  Each favors a finding of significant market foreclosure in this case.

*Duration of Contracts.*  "[S]hort-term" exclusive agreements "present little threat to competition."  *ZF Meritor*, 696 F.3d at 286; *see also In re EpiPen*, 44 F.4th at 988 ("It is axiomatic

223

that short, easily terminable exclusive agreements are of little antitrust concern; a competitor can simply wait for the contracts to expire or make alluring offers to initiate termination.").  Here, the challenged contracts vary in term, but all are above the one year that courts have presumed reasonable under related antitrust provisions.  *See, e.g.*, *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1984) ("Exclusive-dealing contracts terminable in less than a year are presumptively lawful under section 3.").

The 2016 ISA, renegotiated in 2021, consists of a base five-year term with extension options for an additional five years.  Apple can unilaterally exercise a two-year extension, and then the parties can mutually agree to an additional three-year extension.  FOF ¶ 291.  That duration amplifies the significance of the ISA's market foreclosure.  *See Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1301–02 (9th Cir. 1982) (finding a violation of Section 1 based on exclusive dealing where 10-year contracts foreclosed 24% of the market); *ZF Meritor*, 696 F.3d at 286–87 (condemning exclusive contracts, five and seven years in duration, which locked up 85% of the market).

The Mozilla RSA and the Android agreements are shorter, varying in terms of either two or three years, with opportunities for renewal.  *See* JX31 at 628–29 (Mozilla RSA); UPFOF ¶¶ 250, 255 (summarizing terms of MADAs and RSAs).  Such durations, depending on the circumstances, can raise antitrust concerns.  *See Motion Picture Adver. Serv. Co.*, 344 U.S. at 393–96 (in a Section 5 case under the FTC Act, upholding contracts of one year or less, but condemning contract terms ranging from two to five years).  In this case, the Android agreements do raise such concerns because they foreclose 19.4% of the market and, as discussed below, they are not easily terminable. FOF ¶ 62; *see ZF Meritor*, 696 F.3d at 287 (stating that "[t]he significance of any particular contract duration is a function of both the number of such contracts and market share covered by

224

the exclusive-dealing contracts") (citation omitted); *cf. In re Epipen*, 44 F.4th at 988–91, 1006 (holding that two- and three-year exclusive agreements were not anticompetitive where they could be terminated at will and without cause on 90-day written notice or less). As for the Mozilla RSA, although it forecloses a far smaller percentage of the search market, its effect is amplified by the significant foreclosure of larger channels. *See Microsoft*, 253 F.3d at 72.

The absence of meaningful rebidding further aggravates the foreclosure effects. "Even an exclusive-dealing contract covering a dominant share of a relevant market need have no adverse consequences if the contract is let out for frequent rebidding." *In re EpiPen*, 44 F.4th at 988 (quoting AREEDA ¶ 1802g2). Google's partners track rival GSEs' quality and occasionally have engaged with them, FOF ¶¶ 333, 340–344, but the record reflects no meaningful competitive rebidding of the agreements. The more common story is Google's partners renewing the agreements without genuine consideration of an alternative. *See supra* Section IV.A.

*Ease of Terminability.* An exclusive contract that is easily terminable can "negate substantially [its] potential to foreclose competition." *Omega Env't*, 127 F.3d at 1163; *Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994) (stating that "opportunities for competition remain" where the contract's term was three years but it "[could] be cancelled without cause upon six-months' notice"). Google's partners cannot easily exit the agreements. Neither Apple nor Mozilla have a unilateral right to terminate without cause, FOF ¶¶ 291, 336, and the RSAs and MADAs can be terminated only upon breach, FOF ¶¶ 349, 364. There is an added disincentive with the MADA, where termination would result in loss of the GMS license, including the essential Play Store. *See, e.g.*, JX49 at 878 ("[O]n expiration or termination of this Agreement . . . all rights and licenses granted hereunder will immediately cease" and the signatory must "immediately cease

225

reproducing, offering, or distributing" the GMS apps).  The lack of flexibility for partners to exit the distribution agreements reinforces their foreclosure effect.

*Barriers to Entry.*  As already discussed, *supra* Section II.C.3, there are significant barriers to entry to the market for general search services.  This means that new entrants are unlikely to emerge to meaningfully reduce the share of the market foreclosed by the distribution agreements.

*Willingness to Comparison Shop.*  There is no evidence on this record that consumers are apt to comparison shop among GSEs, likely in part due to the friction associated with switching the default or accessing a different search access point.  FOF ¶¶ 69–74; Tr. at 8728:23-24 (Israel) (There is "relatively limited [user] overlap between the general search engines.").

\* \* \*

These factors all demonstrate that Google's distribution agreements foreclose a substantial portion of the general search services market and impair rivals' opportunities to compete.  This is not a market where "a competitor can simply wait for contracts to expire or make alluring offers to initiate termination."  *In re EpiPen*, 44 F.4th at 988.

### 2. *The Exclusive Agreements Have Deprived Rivals of Scale.*

Google's exclusive agreements have a second important anticompetitive effect: They deny rivals access to user queries, or scale, needed to effectively compete.  Scale is the essential raw material for building, improving, and sustaining a GSE.  FOF ¶¶ 86–106.  For more than a decade, the challenged distribution agreements have given Google access to scale that its rivals cannot match.  FOF ¶¶ 87–89.  Google has used that scale to improve its search product and ad monetization.  FOF ¶¶ 90–94, 103–105.  Meanwhile, without access to scale, other GSEs have remained at a persistent competitive disadvantage, and new entrants cannot hope to achieve a scale that would allow them to compete with Google.  FOF ¶¶ 76, 87–89, 106.  Naturally then, GSE

226

distributors prefer Google because of its search quality and because it would be economically irrational to sacrifice the high revenue share. They thus routinely renew the distribution deals with their exclusive terms. In this feedback loop, the revenue share payments "effectively make the ecosystem exceptionally resistan[t] to change" and "basically freeze the ecosystem in place[.]" Tr. at 3797:24–3798:21 (Ramaswamy); *see id.* at 3513:1-3 (Nadella) ("[T]his vicious cycle that [Microsoft is] trapped in can [] become even more vicious because the defaults get reinforced."). That is the antithesis of a competitive market. *See Berkey Photo*, 603 F.2d at 274–75 (While "[a] firm that has lawfully acquired a monopoly position is not barred from taking advantage of scale economies," a "classic illustration" of anticompetitive conduct "is an insistence that those who wish to secure a firm's services cease dealing with its competitors.").

Google acknowledges that a "search engine in the default position receives additional search volume beyond what it would otherwise receive." GRFOF ¶ 85. It also concedes that "user interaction data has some utility for search quality[.]" *Id.* ¶ 139. But it otherwise disputes that the default access points have afforded it a volume of query data that prevents others from competing for search users. It contends that Plaintiffs have failed to establish a link between the agreements, the denial of sufficient scale to rivals, and anticompetitive effects in the market in two ways. First, it maintains that the agreements' default effects are not so strong as to deny rivals' meaningful scale to compete. Second, Google asserts that the role of scale in GSE product quality and monetization is overstated, such that others can compete with less scale if only they were as innovative as Google. The record does not support either position.

a.     The Power of Defaults

Numbers help explain the power of the search default settings. Half of all GSE queries in the United States are initiated through the default search access points covered by the distribution

227

agreements. *See supra* Section V.A.1.  An additional 20% of all searches nationwide are derived from user-downloaded Chrome, a market reality that compounds the effect of the default search agreements.  FOF ¶ 63.  That means only 30% of all GSE queries in the United States come through a search access point that is not preloaded with Google.  Additionally, default placements drive significant traffic to Google.  Over 65% of searches on all Apple devices go through the Safari default.  FOF ¶ 296.  On Android, 80% of all queries flow through a search access point that defaults to Google.  FOF ¶ 74.

All of this makes the defaults extremely valuable.  In 2021, Google spent $26.3 billion in traffic acquisition costs—the revenue share paid to its partners—which is four times more than the company's other search-related costs combined, including research and development.  FOF ¶ 289.  The true value of the defaults is undoubtedly far greater.  Tr. at 9786:6-8 (Murphy) (stating "there's a lot of headroom" between Google's revenues and the price of the distribution agreements).

Google, of course, recognizes that losing defaults would dramatically impact its bottom line.  For instance, Google has projected that losing the Safari default would result in a significant drop in queries and billions of dollars in lost revenues.  FOF ¶¶ 72, 75.  The same would occur if Google were to lose the Android defaults.  Over 50% of all search revenue on Android devices flows through the Google Search Widget alone.  FOF ¶ 74; *see also* FOF ¶ 75 (the Widget and Chrome make up 80% of search revenue on Samsung devices).  The defaults are more than just "incremental promotion."  GRFOF ¶ 96.  They supply Google with unequalled query volume that is effectively unavailable to rivals.

Against this backdrop, Google disputes the power of the default to drive query volume.  It once again points out that users do not seem to have trouble switching to Google when a rival occupies the default.  For instance, when Mozilla changed the Firefox default from Google to

228

Yahoo in 2014, most users "switched back" to Google by changing the default, navigating directly to google.com or searching through Chrome. GTB at 38. Google also points to its status on Windows devices. *Id.* at 39. There, Google is the dominant GSE, even though Windows devices come preinstalled with Microsoft's Edge browser, which defaults to Bing. FOF ¶¶ 82–84. But these examples confirm that the default effect is weaker when the alternative is a dominant firm with high brand recognition backed by a quality product. FOF ¶ 70; *supra* Section II.C.3.c. Otherwise, as Dr. Rangel convincingly explained, the combination of user habit, Google's brand, and choice friction creates a powerful default effect that drives most consumers to use the default search access points occupied by Google. FOF ¶¶ 65–74.

Google's discounting of the default also cannot be squared with Bing's success on the Edge browser on Windows desktops, where Bing is the default GSE. Of the users that remain on Edge, 80% of their searches are conducted using Bing. FOF ¶¶ 83–84. Even if some of that rate is attributable to users who prefer Microsoft products, and therefore consciously do not switch, the default effect no doubt materially contributes to the uniquely high percentage of Bing users on Edge. That added search volume has allowed Microsoft to improve its search quality on desktop devices, to the extent that it is now nearly on par with Google. FOF ¶ 127.

Finally, Google's position on defaults is at odds with many internal records that recognize, from a behavioral standpoint, the power of the default. FOF ¶¶ 66–68, 72–73, 75. It also is contrary to Google's well-documented early recognition of defaults as critical to driving query volume. FOF ¶¶ 67, 73.

b.        The Impact of Scale

Having established that Google gets substantially more queries than its rivals as a result of the defaults, the question becomes how, if at all, that advantage impacts competition. The answer to that question turns on the relationship between scale and a GSE's quality.

The sheer magnitude of Google's query volume, or scale, compared to rivals is startling: Users enter nine times more queries on Google than on all rivals combined. On mobile devices, that multiplier balloons to 19 times. FOF ¶ 87. NavBoost, one of Google's core ranking models, runs on 13 months of Google click-and-query data. FOF ¶¶ 96, 102–103. That is the equivalent of over 17.5 *years* of Bing data. FOF ¶ 96; *see also* FOF ¶¶ 90–94. This wealth of data gives Google greater insight into search behavior in part because it simply sees more queries than other GSEs. *See, e.g.*, FOF ¶ 89 (98.4% of unique phrases seen only by Google, 1% by Bing & 99.8% of tail queries on Google not seen at all by Bing).

Armed with its scale advantage, Google continues to use that data to improve search quality. Google deploys user data to, among other things, crawl additional websites, expand the index, re-rank the SERP, and improve the "freshness" of results (i.e., bring them up to date). FOF ¶¶ 90–94, 103. Click-and-query data also is used to build and train models that algorithmically improve results' relevance and ranking, as well as to run large-format experiments to develop new features. FOF ¶¶ 90–94, 98, 103, 106. Scale also improves search ads monetization. This is intuitive: Understanding which advertisements users click on (or scroll past) enables Google to evaluate ad quality and serve more relevant ads in the future. FOF ¶¶ 105–106. The more precisely targeted an ad, the greater likelihood that it will be clicked, which translates into higher revenues that Google uses to make larger revenue share payments.

The market for GSEs is thus characterized by a type of network effect. *Cf. Microsoft*, 253 F.3d at 49 (discussing network effects in phone services). (1) More user data allows a GSE to improve search quality, (2) better search quality attracts more users and improves monetization, (3) more users and better monetization attract more advertisers, (4) more advertisers mean higher ad revenue, and (5) more ad revenue enables a GSE to expend more resources on traffic acquisition costs (i.e., revenue-share payments) and investments, which enable the continued acquisition of scale. *See* Tr. at 3492:8-25 (Nadella) (describing "network effects" in the market for search); ØVERBY & AUDESTAD, *supra*, § 9.3 (Data network effects are those "in which data collected about users or user behavior is used to improve digital services. Google Search is an example of data network effects since each search query contributes to refining the Google Search algorithm."). The network effects are captured in the illustration below, taken from a Microsoft document.



UPX270 at .001; *see* Tr. at 2646:15-19 (Parakhin) ("Relative traffic, if I have more traffic than my competitors, that participates in multiple feedback loops driving quality and driving index completeness, which in effect is driving quality. . . [I]t is very impactful for revenue.").

Google contends that these effects are dramatically overstated.  It argues that newer ranking models rely on less data, with some driven entirely by AI,  such that today's GSEs depend less on user data to improve quality and compete.  GFOF ¶¶ 305–332.  But the evidence shows otherwise. True, developments in search technology, including greater reliance on large-language models, or LLMs, for ranking, has reduced the need for user data.  FOF ¶¶ 97, 99–101.  Google, however, continues to rely on large volumes of user data at every step of the search journey, and no witness, even from Google, testified that LLMs had sufficiently advanced to supplant user data. FOF ¶¶ 101, 105, 114–115.  There is a reason that Google still retains 18-months of a user's data: It is still highly valuable to Google.

Google also maintains that the quantity of user data is less important than how it is used, and if its rivals had Google's business foresight and drive to innovate, they too could win default distribution.  GTB at 50.  But that position blinks reality.  Apple's flirtation with Microsoft best illustrates this point.  Microsoft has invested $100 billion in search in the last two decades and its quality now matches Google's on desktop search.  FOF ¶¶ 10, 127.  Yet, Microsoft's failure to anticipate the emergence of mobile search caused it to fall behind, and with Google guaranteed default placement on all mobile devices, Microsoft has never achieved the mobile distribution that it needs to improve on that platform.  FOF ¶¶ 24–25.  This perpetual scale and quality deficit means that Microsoft has no genuine hope of displacing Google as the default GSE on Safari. FOF ¶¶ 321–329.  As Apple's Eddy Cue testified, there was "no price that Microsoft could ever offer [Apple]" to prompt a switch to Bing, because it lacks Google's quality.  FOF ¶¶ 323, 326.

Google's massive scale advantage thus is a key reason why Google is effectively the only genuine choice as a default GSE.[12]

That barrier is reinforced by the size of Google's revenue share payments. Consider the following thought experiment. What would it take for a new market entrant to convince Mozilla—a small distribution channel—to walk away from Google as the default? The following would have to happen. First, the new entrant would have to surmount the entry barriers to create a GSE of comparable quality to Google. Second, it would have to build an ads platform that could monetize search on par with Google. Third, it would have to promise to offset any revenue shortfall that might arise either from reduced query volume (because some users would elect to stay with Google) or from inferior ad monetization (because fewer users could mean fewer advertisers and less profitable ad auctions, notwithstanding the quality of its delivery of ads). A new entrant would need billions of dollars to meet these three conditions. And notably, it would have to accomplish this trifecta either by acquiring enough user data through non-default distribution channels (which is improbable) or by developing a technology that would make the need for user data far less important (which is unlikely to happen anytime soon, FOF ¶¶ 102–104, 114–115). The truth is, no new entrant could hope to compete with Google for the default on Firefox or any other browser. Google's query and quality advantage and high revenue share payments are strong incentives simply to stay put.

The end result here is not dissimilar from the *Microsoft* court's conclusion as to the browser market. Just as the agreements in that case "help[ed] keep usage of Navigator below the critical level necessary for Navigator or any other rival to pose a real threat to Microsoft's monopoly,"

---

[12] To be clear, the court is by no means suggesting that query volume *alone* would make a rival GSE more competitive. It still must develop a quality product that satisfies users' needs.

Google's distribution agreements have constrained the query volumes of its rivals, thereby inoculating Google against any genuine competitive threat.  *Microsoft*, 253 F.3d at 71; *Dentsply*, 399 F.3d at 191 (condemning the defendant's exclusionary conduct, which "helps keep sales of competing teeth below the critical level necessary for any rival to pose a real threat to Dentsply's market share").

When "a monopolist's actions are designed to prevent one or more new or potential competitors from gaining a foothold in the market by exclusionary . . . conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general." *LePage's*, 324 F.3d at 159.  No current rival or nascent competitor can hope to compete against Google in the wider marketplace without access to meaningful scale, especially on mobile.  The exclusive distribution agreements have substantially contributed to these anticompetitive market conditions.

### c.        Diminishing Returns of Scale

Finally, Google uses a data experiment to challenge the proposition that Microsoft lacks sufficient scale to compete.  It contends that Microsoft has reached the point of diminishing returns on scale, and that factors other than scale explain the quality differences between the two GSEs.  *See* GRFOF ¶ 139; GFOF ¶¶ 256 (collecting testimony); GTB at 67–69.

For these propositions, Google relies upon a data reduction experiment (DRE) performed by its computer science expert, Dr. Edward Fox.  *See* GFOF ¶¶ 344–406.[13]  The DRE retrained various Google ranking signals (including NavBoost, QBST, Term Weighting, RankBrain, DeepRank, and RankEmbedBert) on an estimate of Bing's quantity of user data.  *Id.* ¶¶ 352–353, 357–370.  It then applied those adjusted models to a sample of Google mobile queries to yield

---

[13] Dr. Fox's experiment and testimony are subject to a *Daubert* motion, ECF No. 443.  Because the court has considered that evidence, but ultimately gives it little weight, the court denies the *Daubert* motion.

234

search results. *Id.* ¶¶ 354–356, 371–376. Those results were scored by human raters. *Id.* ¶¶ 377–379. Dr. Fox concluded that only 2.9% of the quality gap between Google and Bing was attributable to their respective volumes of user interaction data. Tr. at 7848:18-24 (Fox) (discussing DXD26 at 10); *see* GFOF ¶¶ 382–386, 349.

The court found Dr. Fox's experiment to be an interesting exercise but ultimately is unpersuaded by it. If Dr. Fox is right that Google could operate a search engine of equal quality using the amount of data possessed by Bing, one would expect Google to have used the experiment beyond just litigation. If the DRE's conclusions are correct, Google would not need to collect and store the incredible volumes of user data it retains to maintain its quality advantage over Bing. Less need for user data would translate into reduced costs and, possibly, greater privacy protections. FOF ¶¶ 105, 120–125. Yet, Google made no effort to run further experiments to verify Dr. Fox's study, and further, key Google employees were completely unaware of it. *See* Tr. at 1827:5-19 (Lehman); *id.* at 7534:21–7535:18 (Raghavan). If Dr. Fox's results are as powerful as Google suggests, it is odd that Google has done nothing more than present them in this lawsuit.

In any event, Dr. Fox's study in one sense only reinforces the importance of user interaction data. Microsoft has had a search engine since 2005. FOF ¶ 10. In 2009, it struck a deal with Yahoo to, among other things, aggregate the amount of user data available to Bing. FOF ¶ 13. If Dr. Fox is right that Bing's scale has passed the point of diminishing returns, it has taken decades and a substantial acquisition of Yahoo's data to get there. Still, Bing remains well behind Google in absolute scale. That leaves little hope that a smaller firm like DDG or a nascent one can compete with Google. In fact, for Neeva, the inability to attract and retain users, and thus build scale, was a key reason for its demise. FOF ¶ 76.

Finally, Dr. Fox's study does not account for the years of product development made possible by Google's scale. Even if Google's modern data-based signals yield identical results when trained on a fraction of their scale, Google's ability to design and engineer those signals relied on volumes of user data that Bing (nor anyone else) has never had. FOF ¶¶ 98, 105; Tr. at 10318:9-24 (Oard) ("[T]hat's the way Google does it is based in part on Google seeing what works and trying out new ideas, and user-side data is just all over that process. And so that if you have access to more and better user-side data, then you have opportunities to do things here you might not otherwise have. And that's simply not measured in the experiment, right. That experiment of this general design couldn't possibly measure that effect. I mean, you'd have to replay 20 years of search engine development.").

In the end, Google's dismissal of the importance of scale is inconsistent with market realities. Google often warns that competition is "only a click away." However, "[t]he paltry penetration in the market by competitors over the years has been a refutation of [that] theory by tangible and measurable results in the real world." *Dentsply*, 399 F.3d at 194; Tr. at 3796:19-23 (Ramaswamy) (defaults are "enormously powerful," notwithstanding "pious prose around 'competition being a click away'").

### 3. The Exclusive Agreements Have Reduced Incentives to Invest and Innovate.

The distribution agreements have caused a third key anticompetitive effect: They have reduced the incentive to invest and innovate in search. *See 1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 118 (2d Cir. 2021) (stating that anticompetitive effects can "include evidence of [slowed down] innovation") (internal quotation marks omitted); *McWane*, 783 F.3d at 827 (observing that "slow innovation" can be a consequence of exclusive dealing arrangements) (internal quotation marks and citation omitted).

236

For more than a decade, the market for general search services has presented the opportunity to earn outsized profits. Google certainly has reaped the rewards. FOF ¶ 8 (Google Search's 2022 booked revenue was over $162 billion). Yet the general search services market has remained static for at least the last 15 years, with investments largely coming from established players. Only Google and Microsoft have made the sizeable capital investments needed to build a self-sustaining GSE. FOF ¶¶ 10, 55. Smaller competitors do even not compete as fully integrated search engines. Yahoo, once the market leader, no longer crawls the web and instead relies on Microsoft for web results. FOF ¶ 13. DDG operates in the same way. FOF ¶ 12.

Nor has venture capital money rushed in. As Apple's John Giannandrea wrote in 2018: "[T]he reason a better search engine has not appeared is that it's not a VC fundable proposition even though it's a lucrative business." UPX240 at 507; *see also* Tr. at 3510:24–3512:7 (Nadella) (describing Silicon Valley venture funding in search as a "no fly zone"). As a result, DDG and Neeva are the only two notable market entrants in the last 15 years. Each attempted to innovate— DDG on privacy and Neeva through a subscription-based model—but found only limited success (DDG) or left the market altogether (Neeva). FOF ¶¶ 14, 25, 76.

The foreclosure of efficient channels of distribution has contributed significantly to the lack of new investment. Neeva is a case in point. It could not gain a foothold in the market in part because it was relegated to less efficient means of distribution, such as app downloads. Tr. at 3689:15–3694:21 (Ramaswamy). Neeva was unable to gain a position as an alternative default GSE on any mobile device. FOF ¶ 76. Ultimately, Neeva's inability to retain and attract users— and thus acquire scale—was a primary reason for its withdrawal from the market. *Id.* The loss of nascent competitors is a clear anticompetitive effect. *See* AREEDA ¶ 1802d5 (observing that exclusive dealing arrangements that deny smaller firms access to retailers may "impair their ability

to expand, thus becoming more effective competitors with the dominant firm.  Indeed, the smaller [firms] may decline and even be forced to exit from the market").

Plaintiffs offer other examples of how the distribution agreements disincentivize investment and innovation in general search: (1) Google's main rival, Microsoft, has limited its investment due to its limited distribution on mobile; (2) Apple, a fierce potential competitor, remains on the sidelines due to the large revenue share payments it receives from Google; (3) nascent competitors, like Branch, are unable to obtain distribution; and (4) knowing that stagnation will engender no consequences, Google lacks incentives to innovate.  The court addresses each in turn.

a.      Microsoft

Everyone agrees that Google's distribution agreements did not cause Microsoft's *past* underinvestment in search.  Microsoft "missed" the mobile revolution and was unable to improve its browser, Internet Explorer, until it used Google's rendering engine, Chromium.  *See generally* Tr. at 3585–3590 (Nadella).  Some of Microsoft's quality issues also were attributable to its poor index.  *See* DX429 at .021 (Bing is 25 times worse than Google regarding not-in-index issues).  By 2007, Microsoft understood that it was three to five years behind in search and increased investment was needed.  DX424 at .005.  Ultimately, Microsoft committed significant capital to search.  FOF ¶ 10; *see* Tr. at 3510:3-7 (Nadella) ("As per capita to our revenue . . . we've invested a lot, more so than Google has invested, in search. . . . [W]e're the only player other than Google that has continued to invest in search.").  That investment (combined with secured distribution on Windows devices) has allowed Bing to achieve quality parity with Google on Windows desktop devices.  FOF ¶ 127.

238

Today, Microsoft could invest more money in search but chooses not to without assurances of additional distribution on mobile.  *See* Tr. at 3510:13-15 (Nadella) ("Can we invest more?  Of course, any day, you know, everybody wants to invest more.  And in order to invest more, please give me some mobile share and I'll invest more.").  That withholding of additional investment is in part attributable to Google's exclusive search distribution agreements.  As Microsoft's former CEO of Advertising and Web Services, Mikhail Parakhin, testified, "fundamentally it boils down to what kind of a long-term revenue we can achieve. . . . If you don't have [the] ability to effectively distribute [through defaults], it's almost meaningless to invest in the area."  *Id.* at 2643:1-23 (Parakhin).

Google responds that Microsoft's current investment strategy is not evidence of an anticompetitive effect because market actors must take financial risks to compete and Microsoft's unwillingness to take such risks is not an antitrust problem.  *See* GTB at 4, 68 ("Microsoft should not be heard to complain that Google has been too successful or that Microsoft simply cannot invest to improve its search quality *until* Apple replaces Google with Bing as the Safari default.").

What Google says has intuitive appeal, but it does not reflect market realities.  Microsoft stood no realistic chance of beating Google for the Apple default, and there is no evidence of any serious negotiations for Android placements.  No profit-driven firm in Microsoft's position would invest the substantial sums required to enhance its search product when there is little to no genuine opportunity for a default distribution deal.  *See* AREEDA ¶ 725a ("To say that a business firm acts 'rationally' means that it seeks to maximize its profits or its value.  Such a firm does not invest its resources unless it anticipates that the investment will be more profitable than available alternative investments.").  Google's distribution agreements thus appear reasonably capable of having significantly contributed to disincentivizing Microsoft from enlarging its investment in search.

Plaintiff States advance a different theory of anticompetitive harm involving Microsoft. They contend that Bing's limited distribution restricts Microsoft's ability to enter into data-for-traffic agreements with SVPs to secure structured data for use in Bing's vertical offerings. *See* PSTB at 32–33.  Plaintiff States argue that Bing's reduced scale means that it must either forego this data or pay for the data itself.  *Id.*  Google, on the other hand, can simply offer those partners traffic, due to its extraordinary scale.  *Id.*

But the record does not support this theory.  As of 2020, Microsoft had entered into *hundreds* of partnerships to obtain structured data.  FOF ¶ 47.  Bing has had some partnership challenges but none that could be fairly characterized as an anticompetitive effect.  In one instance, Bing understood that a travel SVP refused to partner with it explicitly due to Bing's lack of query volume.  FOF ¶ 48.  But Bing partners with much larger SVPs in the same vertical, like Expedia and Booking.com.  *Id.*  On another occasion, Bing's partnership with ▮▮ broke down when ▮▮ sought a financial commitment (rather than traffic).  *Id.*  But it was not that ▮▮ was unwilling to work with Bing; it was Bing who made a business judgment to forgo the partnership given self-imposed budget limitations and its strong relationship with another ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮  *Id.*  These isolated instances do not demonstrate that Google's contracts have substantially hampered Microsoft's ability to obtain structured data to improve Bing.

b.      Apple

Plaintiffs contend that the billions of dollars that Apple receives in revenue share are, in effect, a payoff to keep Apple on the sidelines of search.  Plaintiffs also maintain that the ISA limits Apple's ability to expand search through its Suggestions feature and prevents Apple from running ads on its Spotlight product.  *See* UPTB at 33–34, 55.  The evidence relating to Apple cannot be cast in such absolute terms and calls for more nuance.

*Entering Search.* Apple has the financial, technological, and human resources to develop or acquire a competing GSE. In 2018, Apple hired the former head of Google Search, John Giannandrea. Tr. at 2164:18–2165:12 (Giannandrea). Since then, Apple has been "investing quite a lot in" search by "building all of the technology [it] would need to build a general-purpose search engine." *Id.* at 2245:2-6 (Giannandrea); *id.* at 2247:14-16 (Giannandrea); FOF ¶ 301 (describing dollars and manpower dedicated to search at Apple). Both Apple and Google understand that Apple could develop its own GSE to replace Google as the default in Safari. FOF ¶¶ 300–301. Apple has decided not to do so thus far. FOF ¶ 302.

The ISA revenue share is an important factor in Apple's calculus. In return for exclusive and non-exclusive default placements (i.e., user-downloaded Chrome and Safari default bookmarks), Google pays Apple ██% of its net ad revenue, which amounted to $20 billion in 2022. FOF ¶¶ 298–299. This is almost double the payment Google made in 2020, which was at that time 17.5% of Apple's operating profit. *Id.* Google pays Apple more in revenue share than it pays all other partners combined. FOF ¶ 299. If Apple were at all inclined to enter the market for general search, it would have to be prepared to lose these large revenue share payments. FOF ¶¶ 302–326.

But the loss of revenue share is not the only reason Apple has not entered the market. There are other costs and risks. Although Apple has built an infrastructure to deliver some search results to its users, it would have to commit billions more to build and maintain a fully functioning GSE. FOF ¶ 302. It also would need to develop an ad platform to monetize searches. Critically, Apple would have to be willing to put its brand reputation—and possibly device sales—at stake if it were to produce an inferior or unpopular product. *See id.* The required investment also would divert capital from other possibly profitable ventures. *Id.* Even if all went well, Apple's own projections

estimate that it would lose over $12 billion in revenue during the first five years following a potential separation from Google. *Id.*

Still, the ultimate question is whether the ISA reasonably appears capable of significantly contributing to keeping Apple on the sidelines of search, thus allowing Google to maintain its monopoly. *See Microsoft*, 253 F.3d at 79. The revenue share payments unquestionably have that effect. The prospect of losing tens of billions in guaranteed revenue from Google—which presently come at little to no cost to Apple—disincentivizes Apple from launching its own search engine when it otherwise has built the capacity to do so. The payments need not be Apple's sole reason for staying out of search to constitute an anticompetitive effect. Plaintiffs are not required to prove that Google's "continued monopoly power is precisely attributable to" the ISA. *Id.*[14]

*"Substantially Similar" Clause.* Plaintiffs' other theories of anticompetitive harm do not fare as well. According to Plaintiffs, Google insisted on modifying the terms of the ISA to constrain Apple from intercepting increasing volumes of commercial queries through its Suggestions feature. UPTB at 33–34. When a user types a query in the Safari search bar, sometimes Safari will "suggest" a relevant link to the user that, if clicked, allows the user to avoid Google entirely. FOF ¶ 303. By 2016, Google viewed Apple's increased use of Suggestions as a threat, because more diversions could translate to fewer revenue-generating search queries. FOF ¶ 304. So, when the parties renegotiated the ISA in 2016, Google insisted on inserting a term in which Apple promised that its use of Google Search as the default in Safari "will remain

---

[14] In its discussion of Apple, Google references the principle that a firm's "make or buy" decision typically does not offend antitrust law. GRCL ¶ 40 (citing *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 709–10 (7th Cir. 1984) (holding that a firm's decision to vertically integrate—the decision to "make or buy" a good or service—typically does not offend antitrust law)); *see also* Tr. at 8698:25–8699:9 (Israel). But that principle has no application here because the question is not whether *Apple's* decision to remain out of search is exclusionary, but whether the exclusivity of ISA has an anticompetitive effect by influencing that decision.

substantially similar to its use" in 2016.  FOF ¶ 305.  This has been termed the "substantially similar" clause.

Google denies that the clause's purpose is to limit Apple's ability to innovate its products. *See* GRFOF ¶¶ 171–172.  Rather, it was meant to ensure that Apple would not divert queries to an SVP, like Amazon, thus leaving Google with a greater proportion of less profitable, noncommercial queries.  *See* GFOF ¶ 1270.

Regardless of its purpose, Plaintiffs have not shown that the "substantially similar" clause has led to any actual competitive harm or threat of such harm.  Both Apple witnesses, Cue and Giannandrea, testified that Apple does not view the "substantially similar" clause as limiting Apple at all on Suggestions, and that Apple has not been restrained by it.  FOF ¶¶ 305, 307.  Nor have Plaintiffs produced any evidence that would suggest that, since 2016, Apple has purposely reduced or limited the number of "suggestions" it offers users.  Plaintiffs thus have not shown that the "substantially similar" clause "indeed" had an anticompetitive effect in the relevant market. *Microsoft*, 253 F.3d at 58–59.

*Advertising on Spotlight.*  Plaintiffs' related theory that the ISA restricts Apple's ability to monetize its on-device search, Spotlight, is also not supported by the record.  Spotlight is primarily an on-device search feature on Apple devices, though it has the capacity to run searches through Safari.  FOF ¶ 308.  Under the ISA, Apple must grant Google the opportunity to deliver search advertisements for on-device searches on Spotlight before it does so itself.  FOF ¶ 309.  This "right of first refusal" in theory prevents Apple from siphoning off advertising dollars from Google. According to Plaintiffs, this provision depresses competition by restricting Apple from expanding its search ads offerings.  UPTB at 34.

243

But the evidence that the "right of first refusal" has an anticompetitive effect—in any market—is thin. Apple presently does not place ads on Spotlight. Nor has it expressed any intention to do so. Tr. at 2497:11-25 (Cue) (stating that Apple had "no intentions or plans to put ads on Siri or Spotlight," and "today, we have no intentions to put ads on Siri or Spotlight"). If Apple seeks to monetize Spotlight in the future, and Google insists on enforcing the clause, then that would be an anticompetitive effect. But there is no evidence in the record that the "right of first refusal" clause is one today. Plaintiffs thus have not shown the "requisite anticompetitive effect." *Microsoft*, 253 F.3d at 58–59.

c.    <u>Branch</u>

Plaintiffs also contend that the distribution agreements prevent the emergence of innovative search-adjacent technologies. The example they cite is Branch. UPTB at 34–35. Branch is not a GSE. It develops a product that, as presently deployed, uses "deep linking" technology to search content within on-device applications, like Yelp. FOF ¶ 15. Plaintiffs do not contend that greater adoption of Branch's technology would either facilitate competition among GSEs or lower entry barriers to the general search market. Instead, Plaintiffs' theory is that Branch's tool, as originally designed, uses the web to provide limited results, UPTB at 35, and thus could one day serve as a competitor to Google as a provider of web information retrieval, U.S. Pls.' Resp. Proposed Findings of Fact, ECF No. 907, ¶¶ 2452–2453 [hereinafter UPRFOF].

According to Plaintiffs, the RSAs' restriction on preinstalling an "alternative search service" caused potential distribution partners to balk at integrating Branch with full functionality. UPTB at 34–35. For instance, in 2019, Samsung, which was a primary investor in Branch, worked to integrate Branch into its devices but grew concerned about whether doing so would affect its relationship with Google. FOF ¶¶ 391–393. Samsung ultimately did preinstall Branch but only at

244

a reduced functionality (fewer searchable apps and no direct linking to mobile websites). *Id.* In 2020, the amended Google-Samsung RSA contained a modified clause that more squarely limited Samsung's ability to preload on-device search. FOF ¶ 394. In addition, when another potential partner, AT&T, requested that Google clarify whether Branch could be preloaded on an RSA-compliant device, Google responded simply by citing the "alternative search services" term. FOF ¶¶ 395–396. AT&T decided not to partner with Branch given the uncertainty and the financial risk of losing revenue share if Google viewed integrating Branch as a breach of the RSA. *Id.*

Google has a different take on the evidence concerning Branch. It claims that the RSAs do not preclude the preloading of Branch, which is available on some RSA-compliant devices. GTB at 93. It also maintains that it never told any partner that integrating Branch would violate the RSA, and that partners declined to preload Branch for reasons other than the RSAs, including quality and data privacy issues. GRFOF ¶¶ 277–280.

Because Plaintiffs claim is that Google's conduct blocked a nascent competitor, the question is not whether the technology "would actually have developed into [a] viable platform substitute[]," but whether such technology has "showed potential" to do so. *Microsoft*, 253 F.3d at 79; *see also id.* (explaining that "nascent threats are merely *potential* substitutes"). In *Microsoft*, for instance, middleware technologies Java and Navigator were deemed nascent threats to Windows because such products, although not then substitutes, had the potential to "take over some or all of Window's valuable platform functions[.]" *Id.* at 53.

The record does not support the conclusion that Branch's technology has shown potential to become a viable platform substitute for Google. Branch's founder and former CEO, Alex Austin, testified that Branch's technology does not "conflict with or overlap with web search[.]" Tr. at 2961:3-4 (Austin). Branch also externally described its "search use case [a]s totally different

and distinct from Google search, and there is zero impact on Google search traffic after implementing Branch." PSX65 at 531; *see also id.* at 532 (outlining significant differences between general web search and Branch). Although Austin stated that Branch "had hopes that over time, as people found they could do more in apps, that eventually some of that web search traffic would actually start to migrate over to this new app search engine and just create more competition in web search overall," he admittedly "didn't have any data, like an experiment data that suggested the impact." Tr. at 2960:13-22 (Austin).

Thus, while there is some evidence that Branch aspired to compete with Google in general search, the nascent-threat evidence here is far weaker than in *Microsoft*. The trial court there "made ample findings that both Navigator and Java showed potential" as nascent threats. 253 F.3d at 879. This court cannot do the same about Branch.

That said, the record evidence does show that the RSAs' "alternative search services" term had some chilling effect on distribution partners' consideration of Branch. Samsung ultimately preloaded a scaled-back version of Branch, and AT&T declined the opportunity to partner with Branch because of the possibility of putting revenue share at risk. FOF ¶¶ 395–396. That chilling effect just did not occur in the general search services market.

### d. Google

Finally, Plaintiffs argue that the absence of genuine competition for general search queries has reduced Google's incentives to innovate its search product, thereby harming consumers. They note that Google spends seven times more on securing defaults than on R&D, FOF ¶ 289, and point to some evidence that its search expenses have declined over the years, *see* UPX249 at 556; UPX260 at 681 (Apple noting that "in recent years, Google has . . . under invest[ed] on desktop"). Plaintiffs also identify instances where Google has reacted to rare competitive pressure by rapidly

246

investing in product improvements or launches.  For example, Plaintiffs point to Google's "Go Big in Europe" campaign, launched in response to the advent of a search engine choice screen on Android devices required by European Union regulators.  UPFOF ¶¶ 1088–1090.  Plaintiffs also cite to some isolated examples of degraded search engine quality, such as a period of stagnation and decline in Google's index size, declining latency, and anecdotal evidence from complaining employees.  *Id.* ¶¶ 1083–1086.

The court is not persuaded.  Google has not sat still despite its dominant market share.  Search has changed dramatically over the last 15 years, largely because of Google.  FOF ¶ 128.  Its SERP, for example, is different today than it was even five years ago.  *Id.*  Moreover, the evidence that Google has left innovative technologies on the shelf, or that its investments in R&D and human capital have fallen behind others in the industry, is sparse.  "Go Big in Europe" is a one-time, discrete episode that is far from robust evidence that Google remains inert absent competition.  In truth, Google's penchant for innovation is consistent with the behavior of a monopolist.  *Microsoft*, 253 F.3d at 57 ("[M]onopolists have reason to invest in R&D," as "innovation can increase an already dominant market share and further delay the emergence of competition[.]").

There is one notable exception, however.  That is Google's launch of its generative AI chatbot Bard (now Gemini) in direct response to Microsoft's announcement of BingChat (now Copilot), which integrates Bing and ChatGPT's AI technology.  FOF ¶¶ 111–112.  This is a clear example of Google responding to competition.

In any event, based on the record as a whole, the court cannot find that the distribution agreements have had an anticompetitive effect by deterring Google from innovating in search.

*     *     *

Plaintiffs have made the required showing of anticompetitive effects in the general search services market, satisfying their prima facie case. The burden now shifts to Google to proffer a "procompetitive justification" for the exclusive distribution agreements. *Microsoft*, 253 F.3d at 59.

**B.      The Exclusive Agreements Do Not Result in Procompetitive Benefits.**

"[I]f a plaintiff successfully establishes a *prima facie* case under § 2 by demonstrating anticompetitive effect, then the monopolist may proffer a 'procompetitive justification' for its conduct." *Id.* The defendant must "present the District Court with evidence demonstrating that the exclusivity provisions have some such procompetitive justification." *Id.* at 72. "If the monopolist asserts a procompetitive justification—a nonpretextual claim that its conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal—then the burden shifts back to the plaintiff to rebut that claim." *Id.* at 59.

Google advances three categories of procompetitive benefits. It submits that the challenged agreements (1) enhance the user experience, quality, and output in the market for general search services, (2) incentivize competition in related markets that redounds to the benefit of the search market, and (3) produce consumer benefits within the related markets. The court concludes that the record does not sufficiently support any of these procompetitive justifications.

### 1.      Benefits in the Market for General Search Services

*First*, Google argues that its browser agreements "allow[] the browser's search functionality to work effectively out of the box," which "ensure[s] convenience for Safari and Firefox users[.]" GTB at 51, 53. As support for this proposition, Google notes the longstanding industry practice of preloading a browser with a default GSE. *Id.* at 51. Indeed, all browsers in

the United States are so designed.  FOF ¶ 59.  This practice, Google contends, is evidence that the browser agreements benefit consumers.  *See In re EpiPen*, 44 F.4th at 989.

But the procompetitive benefit must justify "the specific means here in question, namely exclusive dealing contracts[.]"  *Microsoft*, 253 F.3d at 71; *see id.* at 76 (defendant did not carry its burden when its purported benefit failed to justify the particular contractual clause that made the agreement exclusive).  Assuming Google has established the value of a default placement to competition and consumers, it has not shown that *exclusive* defaults across nearly all key search access points have such utility.

What's more, a non-exclusive default would still provide all the convenience and efficiency benefits that Google touts.  *See* UPRFOF ¶ 2143 ("Plaintiffs are not challenging the concept of a search default or that distributors may recommend a search engine, set a search default, or preinstall search access points.  Plaintiffs are challenging Google's exclusionary contracts that require counterparties to set Google as the exclusive search default.").  For example, Google asserts that "Apple's commitment to providing the best out-of-the-box experience to consumers includes designing the products to be simple to use and work right out of the box" and that "product designs with additional decisional steps for consumers to take can cause users to abandon use of the product."  GFOF ¶¶ 1223, 776.  But Google does not explain why Apple would lack those same incentives absent exclusivity.  Indeed, the original Google-Apple ISA preloaded Google as the default but did not require exclusivity.  FOF ¶ 312; *see* AREEDA ¶ 1822d (stating courts may "consider alternatives to the challenged practice that are less threatening to competition than the challenged practice itself").  The absence of exclusivity did not stunt Apple's product development during that time.  Additionally, Apple in the past has sought greater flexibility with defaults, which

Google rejected. FOF ¶¶ 319–320. Presumably, Apple would not have made that request if it felt that it would harm the consumer experience.

*Second*, Google contends that "the contest to be the default presents search engines the opportunity to" win incremental promotion, thereby incentivizing firms "to make quality improvements to compete for the default position[.]" GTB at 53. That may be true in a competitive market. But as the court already has concluded, there is no genuine competition among GSEs for defaults, *supra* Section IV.A, and there is no record evidence that competition for the default has motivated GSEs to make quality improvements. If anything, Google's near dominance over the defaults for more than a decade has *reduced* the incentive to invest. *See supra* Section V.A.3.

Google notes that "Microsoft highlighted its improvements in search quality over the past years" during its negotiations with Apple. GFOF ¶ 1440. But that only illustrates the importance of real competition for defaults. Microsoft committed resources to search, and Bing's quality followed, because it has access to an efficient channel of distribution: the Edge browser on Windows. FOF ¶ 59. Without such access, it would be where Yahoo or DDG is today, with no real prospect of competing for any default placement. Microsoft's ability to leverage its advantage on Windows is what spurred Microsoft's investment in search, not the unrealistic prospect of replacing Google as a search default on Apple or any other device.

Relatedly, Google argues that the revenue sharing provisions of the agreements introduce price competition for the default that would not exist otherwise, because GSEs are free products. GTB at 53–54. The evidence does not support that assertion. True, Microsoft perceives that Apple has used it as a stalking horse in its negotiations with Google, FOF ¶ 329, but there is no evidence that Google made its revenue share offer to Apple based on a concern that Apple might accept a better price from Microsoft. To the contrary, Google knew there was no prospect that Microsoft

could outbid it.  Google's "Alice in Wonderland" analysis projected that Microsoft would have to offer Apple over 100% revenue share to compete, FOF ¶ 328, and this study turned out to be wholly accurate.  Microsoft *did* offer Apple 100% revenue share plus guarantees, but Apple's executives testified that Bing was never a realistic option to replace Google.  FOF ¶¶ 323–327.  Even Google CEO Sundar Pichai testified that Google took "into account" that Apple had no other viable option "which was why [it] didn't pay the share Apple wanted."  Tr. at 7772:12–7773:10 (Pichai).

Google further claims that "[t]his price competition can also reduce barriers to entry or expansion and facilitate entry from new rivals by allowing them to 'buy' their way into the market."  GTB at 54.  That assertion does not square with market realities.  There is no evidence that entrants have been able to "buy their way into" the market, let alone ante up for default placement.  *Supra* Sections II.C.3 & IV.A.  Google's reliance on *In re Epipen* is unconvincing.  There, "buyers instigated exclusivity to obtain lower prices" in the challenged contracts, and the exclusive deals "were a normal competitive tool in the epinephrine auto-injector market to stimulate price competition."  *In re Epipen*, 44 F.4th at 986, 989.  Here, exclusive deals are a feature of the market only because *Google* has insisted on them, not its distribution partners.  Moreover, it is a market reality that no firm other than Google has held a default on any Apple or Android device for a decade or more, so the distribution agreements have not served as a "normal competitive tool."  And when partners have asked for flexibility on the defaults, perhaps with an eye towards generating competition, Google has resisted.  *E.g.*, FOF ¶¶ 319–320 (Apple); FOF ¶¶ 370–375 (Verizon); FOF ¶ 378 (T-Mobile); FOF ¶¶ 395–396 (AT&T).  Those market realities make this case different from *Epipen*.

*Third*, Google contends that the challenged contracts have led to increased search output due to the efficiency of the default placements and its superior search quality. Google is right that search output has increased significantly, FOF ¶ 40, but it has presented no evidence that default exclusivity—as opposed to a host of other market forces—is a substantial cause of that result. *United States v. Apple, Inc.*, 791 F.3d 290, 334 (2d Cir. 2015) (the challenged conduct must be "necessary" to the justification for it to be procompetitive); *McWane*, 783 F.3d at 841 (same).

Even if the record supported a connection between the exclusive agreements and increased search output, increased output alone is insufficient to outweigh their anticompetitive effects. Output measured by global desktop device shipments grew rapidly during the years of Microsoft's anticompetitive conduct. *See* Tr. at 10456:17–10458:18 (Whinston) (discussing UPXD104 at 39). The D.C. Circuit nevertheless found that Microsoft's conduct violated Section 2. Increased output similarly does not inoculate Google against liability.

### 2. Benefits in Other Markets that Redound to the Benefit of the Search Market

Google also asserts that its revenue share payments facilitate better browsers, improved and lowered cost for smartphones, and increased competition between Apple and Android, all of which redound to the benefit of the general search market by increasing search output. *See Sullivan v. NFL*, 34 F.3d 1091, 1113 (1st Cir. 1994) ("[B]enefits to competition in the relevant market can include evidence of benefits flowing indirectly . . . that ultimately have a beneficial impact on competition in the relevant market itself."); *Epic Games*, 67 F.4th at 990 (same).

*First*, Google contends that its browser agreements promote browser competition, because a better GSE improves the browser experience, and browser developers use the revenue share payments they receive to improve their products. Put simply, better browsers equal better search products. *See* GTB at 62; Tr. at 7646:21-23, 7653:21–7654:1 (Pichai) ("We realized just

252

improving the state of browsers would overall help users use the web more, will increase online activity and increase search usage, including Google's usage."). Google supports its position with the testimony of its expert, Dr. Murphy. *See* Tr. at 9855:11-23 (Murphy). He opined, "[I]f I generate more of a complementary good[], right, I give you a better browser, you're going to do more search, right, that's how I can compete for more search, and just like lower prices expand output, these lower price[s] expand output too, and they're going to expand output not just of search but also out of these complementary products." *Id.* at 9705:19-24 (Murphy). The court accepts that the user experience of a browser is enhanced when the default GSE is excellent, but the evidence shows no more.

The ISA does not require Apple to use revenue share payments to improve Safari, and Google has presented no evidence that Apple does so. Mozilla likely does use its payments from Google to upgrade Firefox (given that those payments make up 80% of its operating budget), but Firefox's contribution to the overall search market is so small that the additional output it produces, at most, marginal procompetitive benefits. FOF ¶ 11. Importantly, even if there is a link between more competitive browsers and search output, Google not shown how the *exclusivity* of its agreements has produced that benefit. Dr. Murphy did not, for example, opine that the exclusivity feature of the distribution agreements was a contributor to increased search output. Moreover, Dr. Murphy conceded that there are multiple reasons why output in search has continued to expand for reasons that have nothing to do with Google as the exclusive default GSE. Tr. at 9710:4-25, 9711:5–9712:22, 10186:6-13 (Murphy).

*Second*, Google claims that the Android agreements promote smartphone competition between Android and Apple devices (inter-brand competition) and among Android devices (intra-brand competition). "This smartphone competition leads to higher-quality, lower-priced devices,

253

thereby increasing usage of mobile devices and expanding search output."  GTB at 89.  Again,

Dr. Murphy asserted that Google's revenue share payments fund the Android ecosystem, enabling

competition with Apple, which results in more consumers searching on all devices.



DXD37 at 100; *see* Tr. at 9855:16-23 (Murphy) ("Since you're going to pass some of that cost

through, one of the ways you do that is through lower prices, but, also, higher quality.  Higher

quality is another way to get more users and, therefore, get more search and, therefore, more search

revenue.  So, this enhances search output, partly by directly encouraging search, because that's

where the payment is coming from, but, indirectly, also, by pushing the . . . platforms.").

But this contention once again falls short.  For one, the evidence is thin that Android device

makers and carriers use Google's revenue share in any of the ways Google suggest.  *See* Giard

Dep. Tr. at 277:25–278:3 (stating that while the revenue share payments could be said to have

subsidized costs to consumers of all services provided by T-Mobile, it would have "helped in a

very minor way"); Christensen Dep. Tr. at 30:9-14 ("Q. Does the fact that the Android operating

system license is free help Motorola develop more competitive devices across different price

points?  A. I think there is not necessarily a direct relationship to that.").  Also, once more, Google

has not shown how the agreements' *exclusivity* is the reason for greater smartphone competition

and thus increased search output.  *See* Tr. at 9847:8–9848:1 (Murphy) (agreeing that expanded

output "comes from many things . . . [l]ots of things are driving it[.] . . . I can't tell you how much

of that is due to that competition [in mobile search], but it's clearly a part of the picture[.]").

If anything, greater output resulting from increased competition between Android devices

and iPhones benefits mainly Google.  Search on those devices occurs primarily through the

defaults, so more searching on those devices means more ad revenue for Google, which only entrenches Google as the default GSE of choice. An out-of-market benefit that "preserve[s] [Google's] power in the [search] market" is not a procompetitive justification for the exclusive distribution agreements. *Microsoft*, 253 F.3d at 71.

### 3. *Cross-Market Benefits*

Google also claims that its distribution agreements create procompetitive benefits within the related markets themselves, which independently justifies their exclusionary effect in the market for search. *See* GCL ¶ 116 ("Procompetitive benefits that accrue in highly complementary markets should be considered in addition to the aforementioned benefits in Plaintiffs' alleged markets."). Put differently, Google says that exclusionary conduct in one market can be excused if it sufficiently promotes competition in another. This is a concept known as cross-market balancing. The parties dispute whether the court can engage in such balancing in a Section 2 case.

The Ninth Circuit recently observed that "[t]he Supreme Court's precedent on cross-market balancing is not clear." *Epic Games*, 67 F.4th at 989; *see NCAA v. Alston*, 594 U.S. 69, 87 (2021) (declining to consider argument by *amici* that "review should instead be limited to the particular market in which antitrust plaintiffs have asserted their injury," when the parties had agreed in the trial court that cross-market balancing was appropriate). The Court has refused to engage in cross-market balancing in cases of *per se* violations. *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 609–10 (1972) ("Our inability to weigh, in any meaningful sense, destruction of competition in one sector of the economy against promotion of competition in another sector is one important reason we have formulated per se rules."). But in two Sherman Act cases the Court did consider with little discussion whether procompetitive benefits in one market justified anticompetitive conduct in a related one. *See Image Tech. Servs.*, 504 U.S. at 482–84 (addressing argument in a

255

Section 2 case that exclusionary conduct in the parts and repairs market was justified by "interbrand competition" in the market for photocopiers); *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104–08, 115–17 (1984) (considering in a Section 1 case a procompetitive rationale regarding the college football tickets market when assessing anticompetitive conduct in the market for college football television).

The court need not, however, resolve this legal question because the record evidence does not support Google's contention that the exclusive agreements have resulted in procompetitive benefits in related markets.

*Browser Market.*  The link between the exclusive agreements and competition in the browser market is weak.  It rests on the presumption that browser developers invest Google's revenue share payments in improving their browsers.  But, as discussed, no evidence shows how Apple uses its revenue share payments, and to the extent Mozilla uses them to improve Firefox, its share of the browser market is so low that it does not move the competitive needle.

*Device Market*.  As to the Android agreements, Google argues that its payments fund the Android ecosystem, which promotes consistency across devices, lowers device prices, and ultimately stimulates competition among Android devices and with iPhones.  But here, too, the evidence is unconvincing.  Google has produced little industry evidence from any OEM or carrier that views the Android agreements and their revenue share payments as enhancing competition among devices.  Google's best evidence is testimony from Brian Higgins, Chief Customer Experience Officer at Verizon.  Higgins shared his view that the Android agreements align incentives between Google and Verizon to promote Android and foster competition with Apple's operating systems.  *See* Tr. at 1097:1-22 (Higgins).  But one partner's testimony is not enough to establish procompetitive benefits in the *market* as a whole.  As Dr. Murphy conceded, the

256

decreasing cost of Android phones was "consistent" with the "MADA barter," but he could not establish causality. *Id.* at 10186:6-13 (Murphy). The rest of the evidence supporting this purported cross-market benefit comes from Google employees, but that testimony is largely speculative, as they have no first-hand knowledge of how Android partners use the revenue share payments. *See* GFOF ¶¶ 1711, 1713.

*Security Upgrades.* Before moving on to the general search text ads market, the court needs to address one more contention. That is Google's argument that the RSAs enhance security in the Android device market because the agreements condition payment on making security upgrades. GTB at 91–92. Google notes that Apple can do this directly, as it is vertically integrated. Tr. at 9856:5-13 (Murphy). By contrast, OEMs historically have failed to prioritize performing security upgrades. *See* GFOF ¶ 1717. Google also points to the testimony from an AT&T representative, who said that security upgrades can involve a significant amount of work, implying that absent the agreements, AT&T might not be as willing to cooperate on device security. *Id.* (citing Ezell Dep. Tr. at 150:2–151:1). That witness, however, heavily caveated his own testimony. *See* Ezell Dep. Tr. at 153:21-25, 154:6-18.

Even if the court were to accept that the RSAs provide some additional incentive to partners to perform security upgrades, Google has not established a connection between that benefit and the agreement's exclusivity. In fact, its CEO Sundar Pichai admitted that incentivizing partners to perform timely security upgrades could be done through a structure other than the RSA. Tr. at 7718:24–7719:1 (Pichai); FOF ¶¶ 397–398 (describing Mobile Service Incentive Agreements).

*     *     *

Google has not met its burden to establish that valid procompetitive benefits explain the need for exclusive default distribution. Accordingly, Plaintiffs have established that Google is

257

liable under Section 2 of the Sherman Act for unlawfully maintaining its monopoly in the market for general search services through its exclusive distribution agreements with browser developers and Android OEMs and carriers.[15]

## VI.   EFFECTS IN THE MARKET FOR GENERAL SEARCH TEXT ADVERTISING

To prove a Section 2 violation in the general search text ads market, Plaintiffs again must show that the exclusive agreements "indeed [have] the requisite anticompetitive effect." *Microsoft*, 253 F.3d at 58–59.   Plaintiffs contend that Google's conduct has caused three anticompetitive effects particular to the text ads market: (1) market foreclosure, (2) supracompetitive text ads pricing, and (3) product degradation through diminished transparency regarding text ads auctions.   As before, Plaintiffs argue that the exclusive deals deprive rivals of scale, which freezes competition in the text ads market in the same manner as in general search.

### A.   The Exclusive Agreements Foreclose a Substantial Share of the Market.

As previously discussed, evaluating an alleged exclusive dealing agreement first requires an estimation of market foreclosure.   *See supra* Section V.A.1.   Recall, the D.C. Circuit has said that "a monopolist's use of exclusive contracts . . . may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation."   *Microsoft*, 253 F.3d at 70; *see also McWane*, 783 F.3d at 837 ("Traditionally a

---

[15] Google argues that Plaintiffs have failed to identify a substantially less restrictive alternative for achieving its proffered procompetitive benefits.  GTB at 69–70.  This requirement, according to Google, stems from the Section 1 case *NCAA v. Alston*, which stated that courts must determine whether the plaintiff has shown that "any procompetitive benefits associated with the [challenged] restraints could be achieved by substantially less restrictive alternative means."  594 U.S. at 101 (internal quotation marks omitted).  Plaintiffs do not dispute that the burden lies with them but remind the court that the principle only applies to "proven competitive benefits."  UPRCL at 22 (citing *Alston*, 594 U.S. at 101).  Because Google has failed to prove that the challenged contracts have procompetitive benefits at all, the court need not reach the issue of least restrictive means.

foreclosure percentage of at least 40% has been a threshold for liability in exclusive dealing cases.").

Here, Dr. Whinston has calculated that Google's distribution agreements foreclose 45% of the text ads market, measured by ad spend.  FOF ¶ 192.  As before, Google does not dispute the underlying methodology used to calculate this figure, but rather mounts various objections as to its sufficiency, each of which the court has already considered and rejected.  *Supra* Section V.A.1.  Google does not make additional arguments specific to the text ads foreclosure percentage.  *See* GTB at 41–47.

The court thus accepts Dr. Whinston's determination that the challenged agreements foreclose 45% of the general search text ads market.  The court also concludes that the market foreclosure is significant in light of same factors that court considered in the general search market.  *See supra* Section V.A.1.b.

### B. The Exclusive Agreements Allow Google to Profitably Charge Supracompetitive Prices for Text Advertisements.

The trial evidence firmly established that Google's monopoly power, maintained by the exclusive distribution agreements, has enabled Google to increase text ads prices without any meaningful competitive constraint.  There is no dispute that the cost-per-click for a text ad has grown over time.  UPFOF ¶¶ 629–637, 652–676; FOF ¶ 186.  Google has used various "pricing knobs" to drive these increases, often between 5% and 15% at a time, without a significant shift in advertiser spending to GSE competitors.  FOF ¶¶ 243–267.  Ad experiments consistently showed Google achieving a "stickage" rate of 50% for its pricing knob adjustments, meaning half of post-launch revenue increases translated into long-term gains.  FOF ¶¶ 252, 254–255.  Google also tweaked the pricing knobs when needed to achieve periodic revenue targets.  FOF ¶¶ 257–260.

Google did so successfully, as its ad revenues have grown consistently at a rate of 20% or more year over year.  FOF ¶ 259.

What's more, there is no evidence that any rival constrains Google's pricing decisions.  In fact, Google admits it makes auction adjustments without considering Bing's prices or those of any other rival.  *See Epic Games*, 67 F.4th at 984 (recounting among the district court's anticompetitive effects findings that "Apple has for years charged a supracompetitive commission" on App Store transactions that it set "without regard" to anything "other than legal action") (Section 1 case).  The only apparent constraint on Google's pricing decisions are potential advertiser outcry and bad publicity.  FOF ¶¶ 263–265.  Google, however, has managed to avoid those pitfalls by ramping up its pricing incrementally, which has allowed advertisers "to internalize prices and adjust bids appropriately[.]"  UPX519 at .003.  Many advertisers do not even realize that Google is responsible for the changes in price.  FOF ¶ 266.  Thus, through barely perceptible and rarely announced tweaks to its ad auctions, Google has increased text ads prices without fear of losing advertisers.

Unconstrained price increases have fueled Google's dramatic revenue growth and allowed it to maintain high and remarkably stable operating profits.  FOF ¶ 289 (citing UPX7002.A); *cf. Microsoft*, 253 F.3d at 50 ("High profit margins might appear to be the benign and necessary recovery of legitimate investment returns . . . , but they might represent exploitation of customer lock-in and monopoly power when viewed through the lens of network economics. . . . The issue is particularly complex because, in network industries characterized by rapid innovation, both forces may be operating and can be difficult to isolate."); *McWane*, 783 F.3d at 838 (considering monopolist's profit margins when analyzing anticompetitive effects, specifically supracompetitive

pricing).  Google in turn has used these monopoly profits to secure the next iteration of exclusive deals through higher revenue share payments.  *Supra* Sections IV.A & V.A.2.b.

Google's counter to this pricing evidence is to focus not on the nominal price increases of text ads, but on their quality-adjusted prices.  *See In re Qualcomm Antitrust Litig.*, 328 F.R.D. 280, 309 (N.D. Cal. 2018) ("The economic term 'quality-adjusted prices' captures both the nominal price and total quality of a particular product.").  Even a monopolist can increase prices to reflect improvements in quality without running afoul of the antitrust laws.  *See Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 381 (3d Cir. 2005) ("Competitive markets are characterized by both price and quality competition, and a firm's comparatively high price may simply reflect a superior product."); *In re HIV Antitrust Litig.*, No. 19-cv-02573 (EMC), 2023 WL 3089820, at *7 (N.D. Cal. Mar. 7, 2023) ("[O]ne product may have the same price as another product.  However, if the first product is of better quality than the second, then [the] first product is actually cheaper than the second.").  Google insists that as text ads prices have grown, so too has their effectiveness.

Google says that its quality-adjusted price in fact has *decreased* over time.  GFOF ¶¶ 1131–1143.  As proof, it points to the increase in click-through rate (i.e., how often an ad is clicked) as a proxy for ad quality, assuming that "higher-quality ads are more likely to be clicked on by users[.]"  *Id.* ¶ 1133; Tr. at 8554:22–8555:20 (Israel) (comparing click-through rate in 2011 of only 10% to click-through rate of over 30% in 2021) (discussing DXD29 at 121); *see also* AREEDA ¶ 403b n.2 ("Better products and other innovations do benefit consumers even though motivated by a firm's desire for monopoly.").  Plaintiffs dismiss this evidence as irrelevant because it does not speak directly to whether the click resulted in a conversion.  *See* UPRFOF ¶ 2269 ("Absent an increase in conversion rates per click, increased CPCs reduce advertiser value.").  But Plaintiffs

261

are too dismissive.  It is not an unreasonable inference that more ad clicks might correspond to better results for advertisers.

That said, the evidence that Google's quality-adjusted ads prices have remained steady, let alone decreased, is weak.  Google has long recognized the inherent difficulty in determining the value of an ad to its buyer.  FOF ¶ 228 (advertisers struggle to quantify ROI).  Its ad launch and experiments reflect as much.  FOF ¶¶ 251, 253.  Instead, what they show is the company, largely through trial and error, attempting to capture the "headroom" between an ad's purchase price and its value to the buyer.  FOF ¶¶ 254–255; UPX507 at .026 (Google admitting that that it had "no way to say what formats should cost").  This evidence does not reflect a principled practice of quality-adjusted pricing, but rather shows Google creating higher-priced auctions with the primary purpose of driving long-term revenues.  FOF ¶¶ 257–265.

Dr. Israel's charting of the increased click-through rate onto the upward trend of CPCs is only so informative.  *See* Tr. at 8569:5–8570:8 (Israel) (discussing DXD29 at 129).  While there is arguably some correlation between click-through rate and ad quality, the strength of the connection is far from certain.  There are other obvious contributors to the increased click-through rate that are wholly unrelated to ad quality.  Such factors include the dramatic expansion of the online marketplace, the shift towards more online purchasing, and the emergence of mobile search. The most the court can conclude from Dr. Israel's mapping of the click-through rate onto the text ads price index is that both have directionally trended upwards.

But even if Google's ads have increased in quality, that by itself would not establish the absence of anticompetitive pricing effects.  "[O]nce monopoly has been achieved and assuming significant entry barriers, the monopolist can set a profit-maximizing price without excessive concern about the behavior of other firms in the market."  *Cf.* AREEDA ¶ 727d (discussing pricing

262

power following price predation to drive out competitors).[16]  That is precisely how Google has approached its ad pricing.  Consider the following hypothetical (in whole numbers).  Say, an advertiser values an ad at $10.  That advertiser would be willing to pay up to $9 for the ad. A second-price auction, however, could result in a final price that is lower, say $5, because the runner-up has capped its price at that amount.  Google has endeavored through the years to capture the "headroom" between the ad's value ($10) and its price.  FOF ¶¶ 254–255.  It has done that by using its tuning knobs to adjust the auction formula so that, in this hypothetical case, it would push the final ad price to upwards of $9.  Google simply could not take this approach in a competitive market.  If it did so, a rival could adjust its auction to charge the advertiser less for the same ad, say, $7.  In the competitive market then, Google still could earn a profit from the sale of an ad, but it could not achieve the *monopoly* profits that it does presently in the absence of rivals.

This is an anti-competitive price effect, irrespective of Google's ad quality.

## C.      The Exclusive Agreements Have Allowed Google to Degrade the Quality of its Text Advertisements.

Google's text ads product has degraded in two ways: (1) advertisers receive less information in search query reports (SQRs) and (2) they no longer can opt out of keyword matching.  FOF ¶¶ 269–278.  Specifically, Google removed information from SQRs that provided advertisers with insight into low-volume queries, which diminished advertisers' ability to tailor their ad strategy in light of such queries.  FOF ¶¶ 272–274.  Similarly, disallowing advertisers from opting out of keyword matching created thicker auctions at the expense of advertiser control. FOF ¶¶ 277–278.  These are arguably small changes, but they reveal Google as a monopolist unconcerned about product changes that have decreased advertisers' autonomy over the auctions

---

[16] To be clear, the court cites this passage not to suggest that Google has engaged in predatory pricing, but for the legal principle only.

they enter and the ads they purchase.  Google has suffered no consequences because it does not operate in a competitive text ads market.[17]

### D.        The Exclusive Agreements Have Capped Rivals' Advertising Revenue.

The exclusive distribution agreements allow Google to maintain its text ads monopoly in much the same way as in the general search services market.  That is, Google's rivals must distribute their GSEs through less efficient, non-default access points, which results in fewer users and fewer ad dollars spent to target those users.  *See supra* Section V.A.2.  With less ad revenue, Google's rivals are limited in their ability to reinvest in quality improvements (both as to search and general search text ads) to attract more users and more ad dollars.  *Supra* Sections V.A.2 & V.A.3.  That cycle puts rivals in no position to compete with Google for the increased ad revenue that accompanies greater query volume.  *See supra* Section IV.A.

Advertising witnesses consistently testified to this reality.  They uniformly cap their text ads spending on Bing at no more than 10% to approximate its relative market share.  FOF ¶ 233.  So, even if Bing's ads were to offer better value than Google's, Bing could not effectively constrain Google's ad pricing.  As one witness put it, once the spending maxes out on Bing, there is simply "[nowhere] else to go."  Tr. at 4875:19–4876:4 (Lim).  By locking in a huge comparative query volume advantage through its exclusive agreements, Google ensures that advertisers will continue

---

[17] Plaintiffs also assert that Google has depreciated SQR quality by removing information that allows advertisers to better approximate the final physical placement of their text ad.  *See* UPFOF ¶¶ 1185–1192.  Google's SQRs used to include an "average position" component, which gave advertisers insight into their ad placement compared to other ads.  *See* UPX8037.  Google changed that metric to be more relative, telling advertisers only the percentage of their ads that appear on a prime location, phasing out average position metrics.  *Id.* at .001; DX2021 at .001.  Now, while advertisers understand how many of their ads reach the top spot, they do not have a similar understanding of the lower positions.  But there was very little advertiser testimony that this change was harmful, and no evidence that it led to increased prices.  *See* Tr. at 5177:11-15 (Booth) (while Home Depot "wouldn't have the same specificity" without the average position metric, the change "certainly wasn't catastrophic").  Amazon's concern about the switch away from the average position insight adds some weight to the analysis, *see* UPFOF ¶¶ 1191–1192, but one advertiser's desire for a particular product feature is not an anticompetitive effect in the market as a whole.

to spend 90% of their text ad dollars with Google, regardless of increases in price or decreases in quality.  That is an anticompetitive effect in the marketplace.

*     *     *

Google has not argued that the contracts generate procompetitive benefits beyond those already addressed and rejected, *supra* Section V.B.  The court thus concludes that Plaintiffs have proven that Google's exclusive distribution agreements substantially contribute to maintaining its monopoly in the general search text advertising market, violating Section 2 of the Sherman Act.

## VII.   SA360

As noted at the start of this opinion, Plaintiff States alone claim that Google engaged in additional exclusionary conduct that centers on SA360, Google's proprietary search engine management tool, or SEM tool.  *See* PSTB at 20–31.  An SEM tool allows advertisers to run online marketing campaigns across multiple platforms in one centralized place.  FOF ¶¶ 279–281.  When it acquired the platform, Google vowed that SA360 would be a "neutral third party."  FOF ¶ 281.  But Google has not acted in that way.  Instead, Plaintiff States say, Google has prioritized and advantaged its own ad platform, Google Ads, over Microsoft's ad platform on SA360.  PSTB at 21–22.  Specifically, they assert that for years Google has intentionally slow-rolled the development and launch of various features for Microsoft Ads that Google has fully integrated into SA360 for Google Ads.  *Id.* at 22–24.  Most critically, Google ignored Microsoft's repeated pleas to integrate auction time bidding (ATB), a feature that permits advertisers to change their bid strategies in real time during auctions.  *Id.* at 24–26; FOF ¶ 286.  ATB remained unavailable for Microsoft Ads on SA360 at the time of trial.  FOF ¶ 286.  According to Plaintiff States, this feature disparity has caused anticompetitive effects in the proposed markets.  They maintain that Google's conduct harmed both "advertisers by diminishing the efficiency of their ad spend on

265

SA360" and "rival GSEs that use Microsoft Ads to attract customers . . . by driving down demand for advertising on these search engines."  PSTB at 29–30.

### A. The Sherman Act Imposes No Liability on Google for Its Refusal to Grant Feature Parity to Microsoft Ads on SA360.

Plaintiff States' SA360 theory falters at the threshold because it conflicts with the settled principle that firms have "no duty to deal" with a rival.  "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."  *Pac. Bell Tel. Co. v. Linkline Comm'n, Inc.*, 555 U.S. 438, 448 (2009).  "Even a monopolist generally has no duty to share (or continue to share) its intellectual or physical property with a rival."  *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) (Gorsuch, J.).  That is because "[c]ompelling" a dominant firm "to share the source of their advantage . . . may lessen the incentive for the monopolist, the rival, or both to invest," and "[e]nforced sharing" requires courts to "act as central planners," "a role for which they are ill suited."  *Verizon Commc'ns Inc. v. Law Off. of Curtis V. Trinko LLP*, 540 U.S. 398, 407–08 (2004); *see also New York v. Meta Platforms*, 66 F.4th 288, 305 (D.C. Cir. 2023) (stating that a Section 2 claim that "suppose[s] that a dominant firm must lend its facilities to its potential competitors" "runs into problems" under *Trinko*).  Therefore, "a firm with no antitrust duty to deal with its rivals at all is under no obligation to provide those rivals with a 'sufficient' level of service."  *Linkline*, 555 U.S. at 444.

Although the Supreme Court has placed a "high value" on the right of firms to refuse to deal with others, it has said that "the right is [not] unqualified."  *Trinko*, 540 U.S. at 408 (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985)).  "Under certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2."  *Id.*  Such circumstances are "limited," *Linkline*, 555 U.S. at 448, however, and the Court has

266

"been very cautious in recognizing such exceptions, because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm," *Trinko*, 540 U.S. at 408.

The "leading case for § 2 liability based on a refusal to cooperate with a rival" is *Aspen Skiing*, a case "at or near the outer boundary of § 2 liability." *Id.* at 408–09.  To fit within the *Aspen Skiing* exception, a plaintiff must make at least two, if not three, showings.  First, "before the defendant refused its competitors access[,] the defendant 'voluntarily engaged in a course of dealing with its rivals.'"  *Meta Platforms*, 66 F.4th at 305 (quoting *Trinko*, 540 U.S. at 409).  Second, the defendant's "unilateral termination of a voluntary (and thus presumably profitable) course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end."  *Trinko*, 540 U.S. at 409 (emphasis omitted); *see also Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 675 (D.C. Cir. 2005) (stating that "in order to prevail upon [a refusal to deal] claim Covad will have to prove Bell Atlantic's refusal to deal caused Bell Atlantic short-term economic loss") (citation omitted); *Novell*, 731 F.3d at 1075 (same).

In *Novell*, then-Judge Gorsuch distilled a third requirement from the Court's prior precedents: "a showing that the monopolist's refusal to deal was part of a larger anticompetitive enterprise, such as . . . seeking to drive a rival from the market or discipline it for daring to compete on price."  731 F.3d at 1075 (citing *Aspen*, 472 U.S. at 597); *see also FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 23 (D.D.C. 2021) ("The larger anticompetitive enterprise that characterizes an *Aspen Skiing* violation, crucially, cannot simply be an intent to harm—or, the flip side of the same coin, to avoid helping—a rival or rivals.") (internal quotation marks omitted).  Because a monopolist may rationally withdraw from a prior course of dealing and suffer short-term losses "to pursue perfectly procompetitive ends—say, to pursue an innovative replacement product of its

267

own," *Novell* also required "a showing that the monopolist's refusal to deal was part of a larger anticompetitive enterprise."  731 F.3d at 1075.

Plaintiff States seek to bypass the "no duty to deal" doctrine entirely.  They assert that "*Trinko* has no application where there is a voluntary, ongoing course of dealing," and that "[e]xclusionary conduct occurring within a voluntary, ongoing commercial relationship is entirely actionable under Section 2."  PSTB at 34.  According to Plaintiff States, the "no duty to deal" principle has been applied only to circumstances not applicable here: when "(i) the business relationship was government mandated, (ii) there was no prior dealing at all, or (iii) any prior dealing had ended."  *Id.* at 33–34.  Here, by contrast, Google has chosen to "engage with another marketplace participant" and even has an agreed-upon "escalation process" by which the two companies raised the SA360 dispute to the CEO level.  *Id.* at 34; *see* PSFOF ¶ 233 (citing PSX671).

The court is unpersuaded that Google's SA360 conduct falls outside the "no duty to deal" framework.  The fact that Google and Microsoft continue to have an ongoing course of dealing as to SA360 does not put this case in a different posture than a case such as *Novell*, where a dominant firm (Microsoft) at first shared its intellectual property with rivals, only to later withdraw it to advantage its own products.  *See* 731 F.3d at 1067–68.  The concerns that animate the no-duty-to-deal principle are equally applicable here.  Primarily, adjudicating Plaintiff States' claim would require the court to act as a "central planner" that endeavors to identify the proper "terms of dealing."  *Trinko*, 540 U.S. at 408.  Their claim requires grappling with a host of questions that the court is ill-equipped to handle, such as: (1) by when, from a technical standpoint, could Google have integrated ATB into Microsoft Ads?, FOF ¶ 285 (noting that it took Google between two to three years to integrate its ATB on SA360); (2) how much advertiser interest in ATB does there need to be for Google to act on Microsoft's request?, *see* DX179 at .009–.010 (Google survey of

268

U.S. Microsoft Ads customers showed that ATB was not among the top 20 features requested for Microsoft Ads in SA360); PSX444 (ATB listed 15th among feature priorities for Microsoft Ads on SA360); and (3) was it improper for Google to commit resources to prioritizing other projects, namely, Projects Amalgam and Myx, FOF ¶ 286, over integrating ATB for Microsoft Ads?  And those thorny questions foreshadow the challenges the court would face in administering a remedy. Any relief presumably would require Google to ensure feature parity on SA360 now and into the future.  A favorable outcome for Plaintiff States thus would mire the court in Google's day-to-day operations.  *See Trinko*, 540 U.S. at 415 ("An antitrust court is unlikely to be an effective day-to-day enforcer of [] detailed sharing obligations.").  The court has learned a lot about Google, but it is "ill suited" for that role.  *Id.* at 408.

To allow a continued course of dealing between rivals to circumvent *Trinko*'s strict limits also would invite uncertainty as to when antitrust liability attaches to otherwise rational business conduct.  *See Linkline*, 555 U.S. at 453 (stating that "antitrust rules 'must be clear enough for lawyers to explain them to clients'") (quoting *Town of Concord v. Bos. Edison Co.*, 915 F.2d 17, 22 (1st Cir. 1990) (Breyer, C.J.)).  This case well illustrates the point.  What standard should Google have used to determine by when it must integrate ATB or other features for Microsoft Ads to avoid a Sherman Act violation?  Caselaw does not provide an answer, and it is difficult to conceive of one that is not highly subjective.  The "no duty to deal" framework is appropriately applied in such circumstances.

Applying *Trinko* then, Plaintiff States have failed to meet their burden of proof.  They have not shown that Google deviated from a voluntarily "course of dealing with its rivals" akin to the one that established a duty to deal in *Aspen Skiing*.  In that case, "the monopolist elected to make an important change in a pattern of distribution that had originated in a competitive market and

269

had persisted for several years." 472 U.S. at 603. That change amounted to a "decision by a monopolist to make an important change in the character of the market." *Id.* at 604. No similar market change was proven here. True, Google did vow that SA360 would be a "neutral third party." FOF ¶ 281. But a vague promise made in marketing materials provides a poor yardstick against which to measure antitrust liability.

In addition, the record does not establish that Google was "willing[] to forsake short-term profits to achieve an important anticompetitive end." *Trinko*, 540 U.S. at 409; *Covad*, 398 F.3d at 675–76. Plaintiff States did not offer any testimony or evidence as to how much Google left on the table by delaying the launch of ATB for Microsoft Ads on SA360. The record does not indicate, for example, how much additional revenue Google would have earned in the first years of an integrated ATB in Microsoft Ads. Plaintiff States made no effort to even ballpark that sum, let alone quantify it.

Finally, Plaintiff States did not show that Google's action was part of "a larger anticompetitive enterprise," such as "seeking to drive [Microsoft] from the market." *Novell*, 731 F.3d at 1075. Part of the explanation for Google's unresponsiveness was that it prioritized progressing work on Project Amalgam, which was in effect a new product launch. FOF ¶ 286. It was not improper for Google to prioritize "an innovative replacement" of SA360 over immediately delivering feature parity to a rival. *See Novell*, 731 F.3d at 1075 ("Neither is it unimaginable that a monopolist might wish to withdraw from a prior course of dealing and suffer a short-term profit loss in order to pursue perfectly procompetitive ends—say, to pursue an innovative replacement product of its own."). That business decision may have come at Microsoft's expense, but it does not give rise to Section 2 liability. *See id.* at 1067–68, 1077

270

(finding no Section 2 liability against Microsoft after it withdrew from sharing its intellectual property with rivals, after initially agreeing to do so, to advantage its own products).

### B. Plaintiff States Have Not Proven that Google's SA360 Conduct Had Anticompetitive Effects.

Plaintiff States' SA360 claim falls short for a second independent reason: They have not shown anticompetitive harm. Plaintiff States contend that "Google's conduct harm[ed] advertisers by diminishing the efficiency of their ad spend on SA360." PSTB at 29. It also "harm[ed] rivals . . . by driving down demand for advertising on these search engines." *Id.* at 30. The evidence does not support either contention.

Plaintiff States produced no advertiser testimony that the lack of ATB on SA360 reduced ad spend efficacy on Bing. No question, the evidence showed that the use of ATB resulted in increased conversions. FOF ¶ 285. But there was no evidence presented of any advertiser who wished to use ATB on Microsoft Ads but was left stuck using the less-effective, intra-day bidding on SA360 as a result of Google's delayed integration. To the contrary, the evidence showed that some advertisers found other ways to place ads on Bing using ATB. For instance, some advertisers moved ad spend from SA360 to Microsoft's native tool, which caused Google to worry that they would move even more spend away from SA360. FOF ¶ 288. Also, at least one major advertiser (Home Depot) began using a rival SEM tool, Skai, to take advantage of ATB for its Bing ad spend *Id.* And even if there were advertisers who desired to use ATB but could not because it was too costly to switch away from SA360, Plaintiff States offered no examples and the overall impact on the market remains uncertain.

As to Google's competitors, the evidence of harm is similarly thin. Plaintiff States point to Dr. Israel's analysis of Bing's share of total spend on SA360 during the relevant time period, showing that the decline of ad spending on Bing accelerated after Google introduced ATB for

Google Ads on SA360.  PSFOF ¶ 268.  The implication is that the lack of feature parity caused advertisers on SA360 to increasingly shift spend away from Bing to Google.  But correlation does not equal causation, and Plaintiff States offered no evidence that any advertiser in fact shifted its ad spend away from Bing because of the absence of feature parity.  *Cf.* FOF ¶ 233 (advertiser testimony that their relative text advertising spend on Google and Bing is constant).

Plaintiff States' best evidence comes from Frederick van der Kooi, the former Corporate Vice President of Advertising at Microsoft, who testified: "The degree to which SA360 does or does not code to our latest features and functionality can impact us to the tune of hundreds of millions of dollars in revenue."  van der Kooi Dep. Tr. at 241:2-5.  But the only evidence substantiating this statement is a series of email threads referencing an internal estimate of Microsoft's lost revenue because of the unavailability of ATB and other key features on SA360.  PSFOF ¶¶ 269–271 (citing PSX745 at 327–28, PSX746, and PSX754 at 336).  Those emails acknowledge the "analyses have been very rough," PSX745 at 327, and describe the loss estimate as "broad assumptions," *id.* at 326; *see also* PSX754 at 255 (describing the figure as "a low precision estimate").  Importantly, no witness testified about the methodology used to produce the loss estimate.  The court will not make an anticompetitive effects finding on such a shaky evidentiary foundation.

*     *     *

Because Google had no duty to deal with Microsoft and, even if it did, Plaintiff States have not established anticompetitive harm, the court finds in favor of Google on the SA360 claim.

## VIII.  INTENT AND SANCTIONS

The final piece of business the court must address is Plaintiffs' contentions concerning Google's intent and their demand that the court sanction Google pursuant to Federal Rule of Civil

Procedure 37(e).  UPTB at 75–76.  Under Rule 37(e), "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court" may order sanctions upon a showing of prejudice or an intent to deny another party use of the information.  Fed. R. Civ. P. 37(e).  Plaintiffs urge the Court to sanction Google for two practices: (1) "its systemic destruction of documents" and (2) its "flagrant misuse of the attorney-client privilege," both of which Plaintiffs also say are "strong indicators that Google knows its conduct is unlawful."  UPTB at 75.

When Plaintiffs speak of "systemic destruction of documents" they mean Google's long-time practice (since 2008) of deleting chat messages among Google employees after 24 hours, unless the default setting is turned to "history on," which preserves the chat.  *Id.* at 76–78.  This failure to retain chats continued even after Google received the document hold notice at the start of the investigative phase of this case.  It was not until Plaintiffs moved for sanctions in February 2023, more than two years after filing suit, that Google changed its policy to automatically save all chats of employees under a legal hold.  Plaintiffs maintain that, as a result of Google's chat-deletion policy, "years' worth of chats—likely full of relevant information—were destroyed" and thus never subject to regulatory scrutiny, "show[ing] that Google knew its practices were likely in violation of the antitrust laws and wanted to make proving that impossible."  *Id.* at 78.  Plaintiffs demand sanctions under Rule 37(e) for Google's failure to preserve chats after it received the litigation hold notice.

As for "flagrant misuse of the attorney-client privilege," that refers to Google's "Communicate with Care" initiative.  Google trained its employees to add its in-house lawyers on "any written communication regarding Rev Share [RSA] and MADA."  *Id.* at 78 (quoting UPX320

273

at 605). It also instructed that, when "dealing with a sensitive issue" via email, to "ensure the email communication is privileged" employees could add a "lawyer in [the] 'to' field," "mark 'Attorney/Client Privileged,'" and "ask the lawyer a question." Pls.' Mot. to Sanction Google & Compel Disclosure of Docs. Unjustifiably Claimed by Google as Att'y-Client Privileged, ECF No. 317, Ex. 1, ECF No. 317-4, at 363.

Google employees assiduously followed that advice. UPTB at 78–79 (collecting examples). As a result, Google's outside counsel in this case initially withheld tens of thousands records on the grounds of privilege, which ultimately were re-reviewed, deemed not privileged, and produced to Plaintiffs. *See* Jt. Status Report, ECF No. 361, at 20–23. This creation of faux privileged materials, Plaintiffs contend, "demonstrates that Google intended to harm competition through its contracting practices and its supposed procompetitive justifications were simply pretext." UPTB at 79.

In addition to these two practices, Plaintiffs also point out that, for years, Google has directed its employees to avoid using certain antitrust buzzwords in their communications. UPFOF ¶¶ 1225–1226. For example, in March 2011, Google prepared a presentation titled, "Antitrust Basics for Search Team," which directed employees to "[a]void references to 'markets,' or 'market share' or 'dominance,'" "[a]void discussions of 'scale' and 'network effects,'" and "[a]void metaphors involving wars or sports, winning or losing." UPX1066 at 880. Eight years later, Google still was telling employees not to "define markets and estimate shares" and to "[a]ssume every document you generate . . . will be seen by regulators." UPX2091 at 584.

### A. The Court Need Not Make a Finding of Anticompetitive Intent.

Plaintiffs seek a finding of "anticompetitive intent," but the court need not make one. UPTB at 75–76. A finding of anticompetitive intent is not an element of a Section 2 violation.

*See Microsoft*, 253 F.3d at 59 (stating that in determining whether conduct is deemed exclusionary "our focus is upon the effect of that conduct, not upon the intent behind it"). "Evidence of intent behind the conduct of a monopolist is relevant only to the extent it helps [a court] understand the likely effect of the monopolist's conduct." *Id.* (citation omitted). Given that the court already has concluded that Google's exclusive dealing agreements have anticompetitive effects in two relevant markets, *supra* Parts V & VI, it is unnecessary to consider intent evidence to further "understand" that conduct.

Still, the court is taken aback by the lengths to which Google goes to avoid creating a paper trail for regulators and litigants. It is no wonder then that this case has lacked the kind of nakedly anticompetitive communications seen in *Microsoft* and other Section 2 cases. *See, e.g.*, *Microsoft*, 253 F.3d at 73 (stating that Microsoft could "use Office as a club" to coerce Apple to adopt Internet Explorer); *McWane*, 783 F.3d at 840 (citing evidence that left "little doubt" that the defendant's program was meant to prevent its rival from "any critical mass market"); *Dentsply*, 399 F.3d at 190 (referencing "clear expressions of a plan to maintain monopolistic power"). Google clearly took to heart the lessons from these cases. It trained its employees, rather effectively, not to create "bad" evidence. Ultimately, it does not matter. Section 2 liability does not rise or fall on whether there is "smoking gun" proof of anticompetitive intent. AREEDA ¶ 1506 (discussing the role of intent evidence in Sherman Act cases).

**B.      The Court Declines to Impose Sanctions.**

On the request for sanctions, the court declines to impose them. Not because Google's failure to preserve chat messages might not warrant them. But because the sanctions Plaintiffs request do not move the needle on the court's assessment of Google's liability. UPTB at 75–76 (requesting evidentiary sanctions such as "a presumption that deleted chats were unfavorable to

275

Google"; "a presumption that Google's proffered justifications are pretextual"; and "a presumption that Google intended to maintain its monopoly").  An adverse evidentiary inference would not change the court's finding that Google lacks monopoly power in the market for search ads or that there is no relevant market for general search ads.  Nor would it change the court's legal conclusion that Google had no duty to deal with Microsoft on its preferred terms as to SA360, nor its finding on the absence of anticompetitive effects, as Google is not likely to have possessed such evidence. *See* AREEDA ¶ 1506 ("[I]n the absence of . . . provable anticompetitive effects, an evil mental state will not serve to condemn it.").  The court therefore declines to sanction Google for its failure to preserve its employees' chat messages.[18]

The court's decision not to sanction Google should not be understood as condoning Google's failure to preserve chat evidence.  Any company that puts the onus on its employees to identify and preserve relevant evidence does so at its own peril.  Google avoided sanctions in this case.  It may not be so lucky in the next one.

## CONCLUSION

For the foregoing reasons, the court concludes that Google has violated Section 2 of the Sherman Act by maintaining its monopoly in two product markets in the United States—general search services and general text advertising—through its exclusive distribution agreements.  The court thus holds that Google is liable as to Counts I and III of the U.S. Plaintiffs' Amended Complaint, Am. Compl. ¶¶ 173–179, 187–193.  To the extent that Counts I and III of the Plaintiff States' Complaint are co-extensive with the U.S. Plaintiffs' Counts I and III, the court finds Google liable.  *Colorado* Compl. ¶¶ 212–218, 226–232.

---

[18] For this same reason, the court denies as moot Plaintiffs' Motion to Take Judicial Notice of Certain Publicly Available Exhibits, ECF No. 843.

The court enters judgment for Google as to Count II of both the U.S. Plaintiffs' Amended Complaint and the Plaintiff States' Complaint, Am. Compl. ¶¶ 180–186; *Colorado* Compl. ¶¶ 219–225, as well as the remainder of Counts I and III of the Plaintiff States' Complaint.

Dated:  August 5, 2024

_____
Amit P. Mehta
United States District Court

**APPENDIX**

## I.   TRIAL WITNESSES

### A.   Fact Witnesses

| Name | Title | Affiliation | Called By |
|---|---|---|---|
| Alex Austin | *former* Chief Executive Officer & Founder | Branch | Plaintiffs |
| Neil Barrett-Bowen | Director, Business Development | Microsoft | Plaintiff States, Google |
| Chris Barton | *former* Strategic Partner & Development Manager | Google | U.S. Plaintiffs |
| Ryan Booth | Senior Manager, Paid Search | Home Depot | Plaintiffs |
| Joan Braddi | Partner Advisor, Global Partnerships | Google | U.S. Plaintiffs, Google |
| Patrick Chang | *former* Director | Samsung NEXT | U.S. Plaintiffs |
| Eddy Cue | Senior Vice President, Services | Apple | U.S. Plaintiffs, Google |
| Arjan Dijk | Senior Vice President & Chief Marketing Officer | Booking.com | Plaintiff States |
| Jerry Dischler | Vice President & General Manager, Ads Team | Google | U.S. Plaintiffs, Google |
| Jennifer Fitzpatrick | Senior Vice President, Core System and Experiences | Google | Plaintiff States, Google |
| John Giannandrea | Chief of Machine Learning and AI Strategy | Apple | U.S. Plaintiffs, Google |
| Ben Gomes | *former* Senior Vice President, Search | Google | Plaintiffs, Google |
| Brian Higgins | *former* Senior Vice President, Device Marketing & Product | Verizon | U.S. Plaintiffs, Google |
| Richard Holden | Vice President, Product Management for Chrome | Google | Plaintiff States, Google |
| Jeffrey Hurst | *former* Chief Operating Officer | Expedia Group | Plaintiff States |
| Adam Juda | Vice President, Project Management | Google | U.S. Plaintiffs, Google |

| | | | |
|---|---|---|---|
| Anna Kartasheva | Senior Manager, Android Sales and Operations Strategy | Google | U.S. Plaintiffs |
| Jim Kolotouros | Vice President, Android Platform Partnerships | Google | U.S. Plaintiffs, Google |
| Ryan Krueger | Product Manager, Search Ads 360 Bidding & Planning Tools | Google | Plaintiff States |
| Eric Lehman | *former* Distinguished Software Engineer | Google | U.S. Plaintiffs |
| Tracy-Ann Lim | Managing Director, Chief Media Officer | JPMorgan Chase | U.S. Plaintiffs |
| Joshua Lowcock | Global Chief Media Officer | Universal McCann, Interpublic Group | Plaintiffs |
| Adrienne McCallister | Vice President, Global Partnerships | Google | U.S. Plaintiffs, Google |
| Satya Nadella | Chief Executive Officer | Microsoft | U.S. Plaintiffs, Google |
| Pandu Nayak | Vice President, Search | Google | Google |
| Mikhail Parakhin | *former* Chief Executive Officer of Advertising & Web Services | Microsoft | Plaintiffs |
| Sundar Pichai | Chief Executive Officer | Google & Alphabet | Google |
| Prabhakar Raghavan | Senior Vice President, Knowledge and Information Products | Google | U.S. Plaintiffs, Google |
| Sridhar Ramaswamy | Co-Founder & Chief Executive Officer | Neeva | Plaintiffs |
| Elizabeth Harmon Reid | Vice President, Search | Google | Google |
| Jamie Rosenberg | Part-Time Advisor | Google | Google |
| Mike Roszak | Vice President, Finance | Google | U.S. Plaintiffs |
| Jonathan Tinter | Corporate Vice President, Business Development | Microsoft | Plaintiffs, Google |
| Paul Vallez | Executive Vice President, Business Development & Partnerships | Skai | Plaintiff States, Google |
| Amit Varia | Director of Product Management | Google | Plaintiff States |
| Hal Varian | Chief Economist | Google | Plaintiffs |

A-2

| Gabriel Weinberg | Chief Executive Officer & Founder | DuckDuckGo | U.S. Plaintiffs |
| Jonathan Yoo | *former* Finance Manager, Android Partnerships | Google | U.S. Plaintiffs |

## B.     Expert Witnesses

| Name | Title | Affiliation | Called By |
| --- | --- | --- | --- |
| Wilfred Amaldoss | Thomas A Finch Jr. Endowment Professor of Business Administration & Professor of Marketing | Duke University Fuqua School of Business | Plaintiff States |
| Jonathan Baker | *former* Law Professor | American University Washington College of Law | Plaintiff States |
| Edward Fox | Professor of Computer Science | Virginia Polytechnic Institute & State University | Google |
| Mark Israel | President & Member of the Global Executive Committee | Compass Lexecon | Google |
| Kinshuk Jerath | Arthur F. Burns Professor of Free & Competitive Enterprise & Advisor in Digital Marketing | Columbia Business School, Media and Technology Program | U.S. Plaintiffs |
| Kevin Murphy | George J. Stigler Distinguished Service Professor Emeritus in Economics | University of Chicago Booth School of Business and the Law School | Google |
| Douglas Oard | Professor | University of Maryland College of Informational Studies & Institute for Advanced Computer Studies | U.S. Plaintiffs |
| Antonio Rangel | Bing Professor of Neuroscience, Behavioral Biology & Economics | California Institute of Technology | U.S. Plaintiffs |
| Michael Whinston | Sloan Fellows Professor of Management and Professor of Applied Economics | Massachusetts Institute of Technology | U.S. Plaintiffs |

## II.    DESIGNATED DEPOSITION TESTIMONY

| Name | Title | Affiliation | Called By |
|------|-------|-------------|-----------|
| Brendan Alberts | Senior Vice President, Head of Search | Dentsu | Plaintiff States, Google |
| Timothy Baxter | *former* President, Chief Executive Officer | Samsung | U.S. Plaintiffs, Google |
| W. Mitchell Baker | Chief Executive Officer | Mozilla | Google |
| Eric Christensen | Executive Director, Software Product Management & Partner Manager | Motorola | Google |
| Matt Dacey | Vice President, Marketing and Global Markets | TripAdvisor | Plaintiff States |
| Alexander Daniels | Founder | Thumbtack | Plaintiff States |
| Jeffrey Ezell | Vice President, Business Development, Mobility Business Unit | AT&T | U.S. Plaintiffs, Google |
| Jeffrey Giard | Vice President, Strategic Partnerships & Business Development in Emerging Products Group | T-Mobile | Google |
| Shirley Health | *former* Senior Director of Microsoft Advertising API Ecosystem | Microsoft | Plaintiff States |
| Sundeep Jain | *former* Vice President, Product Management | Google | Plaintiffs |
| Mike James | Director, Software Development | Amazon | Plaintiffs, Google |
| Daniel Levy | *former* Vice President, Ads & Business Products | Meta | Google |
| Chris Lien | Chairman & Chief Executive Officer | Marin | Google |
| Emily Moxley | *former* Vice President, Search | Google | U.S. Plaintiffs |
| Ramesh Ramalingam | *former* Senior Director, Product Management | Yahoo | U.S. Plaintiffs |
| Debby Soo | Chief Executive Officer | OpenTable | Plaintiff States |
| Mark Stein | Executive Vice President & Chief Strategy Officer | IAN | Plaintiffs |

A-4

A-5

| Jeremy Stoppelman | Chief Executive Officer | Yelp | Plaintiff States |
|---|---|---|---|
| Brian Utter | General Manager, Advertising | Microsoft | Plaintiff States |
| Frederick van der Kooi | *former* Corporate Vice President, Advertising | Microsoft | Plaintiffs |

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 20-cv-3010 (APM) |
| GOOGLE LLC, | ) ) | |
| Defendant. | ) ) | |

|  |  |  |
|---|---|---|
| STATE OF COLORADO et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 20-cv-3715 (APM) |
| GOOGLE LLC, | ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION**

## TABLE OF CONTENTS

**INTRODUCTION** .................................................................................................................. 1

**PROCEDURAL HISTORY** ................................................................................................... 7

**I.   PRETRIAL LIABILITY PHASE** .................................................................................. 7

**II.  LIABILITY DETERMINATION** .................................................................................. 9

**III. REMEDIAL PHASE** ...................................................................................................... 11

    A.  Remedial-Phase Filings and Pretrial Proceedings ............................................. 11

    B.  The Parties' Remedies Proposals ...................................................................... 13

**FINDINGS OF FACT** .......................................................................................................... 16

**I.   GENERATIVE ARTIFICIAL INTELLIGENCE** ........................................................ 17

    A.  Key Terms ........................................................................................................ 17

    B.  AI and Search .................................................................................................. 19

        1. Integrating AI Features into Search ................................................................ 19

        2. AI Chatbots .................................................................................................... 22

        3. AI Assistants .................................................................................................. 25

        4. On-Device AI .................................................................................................. 27

    C.  LLMs ................................................................................................................ 28

        1. How LLMs Work (Greatly Simplified) ........................................................ 28

        2. The Limitations of LLMs ............................................................................... 30

        3. Grounding ...................................................................................................... 32

    D.  The GenAI Market .......................................................................................... 36

        1. Participants ..................................................................................................... 36

        2. Competition Among GenAI Companies .......................................................... 40

        3. GenAI's Impact on GSE Usage ...................................................................... 43

**II.  SEARCH ACCESS POINTS** ......................................................................................... 46

    A.  Access to Search Through GenAI Products ....................................................... 46

    B.  Circle to Search ................................................................................................ 48

    C.  Google Lens ...................................................................................................... 48

**III. GOOGLE'S DISTRIBUTION CONTRACTS: AMENDMENTS & WAIVERS** .......... 49

    A.  OEMs ................................................................................................................ 49

1. Samsung ................................................................................................................ 49

2. Motorola .............................................................................................................. 53

B. Carriers ...................................................................................................................... 55

C. Mozilla ....................................................................................................................... 57

D. Waiver Letters ............................................................................................................ 57

**CONCLUSIONS OF LAW** ................................................................................................. 58

**I.   LEGAL FRAMEWORK** .............................................................................................. 58

A. General Principles ...................................................................................................... 58

B. Causation .................................................................................................................... 63

1. The Strength of the Causal Connection ............................................................. 64

2. Causation Standard Applicable to Certain Remedies ....................................... 72

**II.  SUFFICIENCY OF THE LIABILITY-PHASE FINDINGS** ........................................... 74

**III. FRUITS OF GOOGLE'S UNLAWFUL CONDUCT** ..................................................... 82

A. Freedom from Threats ................................................................................................ 82

B. Scale ........................................................................................................................... 89

C. Revenue ...................................................................................................................... 95

D. Google's Objection .................................................................................................... 97

**IV. THE INCLUSION OF GENERATIVE AI PRODUCTS** ................................................. 99

**REMEDY-SPECIFIC CONCLUSIONS OF LAW** ............................................................ 104

**I.   ADEQUACY OF PROHIBITORY INJUNCTIVE RELIEF ONLY** ............................ 104

**II.  STRUCTURAL REMEDIES** ..................................................................................... 111

A. Chrome Divestiture .................................................................................................. 112

B. Contingent Android Divestiture ............................................................................... 118

**III. ADDITIONAL "CORE REMEDIES"** ....................................................................... 119

A. Payment Ban ............................................................................................................ 119

B. Data-Sharing Remedies ........................................................................................... 128

1. Justification for Data Sharing .......................................................................... 129

2. Search Index ..................................................................................................... 136

3. Knowledge Graph ............................................................................................. 148

4. User-Side Data Remedies ................................................................................. 151

5. Ads Data ........................................................................................................... 164

C.  Syndication Remedies.................................................................................................... 168

    1. Search Syndication....................................................................................................... 168

    2. Search Text Ads Syndication........................................................................................ 180

    3. Contingent Search Text Ads Syndication.................................................................... 186

D.  Choice Screens................................................................................................................ 187

IV. ADDITIONAL BEHAVIORAL REMEDIES................................................................... 191

A.  Ad Transparency & Advertiser Control Remedies........................................................ 192

    1. Search Query Reports .................................................................................................. 192

    2. Keyword Matching ...................................................................................................... 196

    3. Access to Data Reports ............................................................................................... 198

    4. Search Text Ads Auction Changes .............................................................................. 199

B.  Public Education Fund.................................................................................................... 201

C.  Publisher-Related Remedies .......................................................................................... 203

V.  ANTI-CIRCUMVENTION,  ANTI-RETALIATION,  AND  ADMINISTRATIVE
REMEDIES ........................................................................................................................... 206

A.  Anti-Circumvention and Anti-Retaliation Remedies..................................................... 206

B.  Technical Committee ...................................................................................................... 210

C.  Investment Notification Requirement............................................................................. 213

D.  Self-Preferencing Prohibitions....................................................................................... 215

VI. EFFECTIVE DATE AND TERM OF FINAL JUDGMENT ....................................... 219

VII. REMAINING PROVISIONS ......................................................................................... 221

A.  Definition of "Google" .................................................................................................. 221

B.  Fees and Costs................................................................................................................. 222

CONCLUSION ......................................................................................................................... 222

APPENDIX................................................................................................................................ 224

**INTRODUCTION**

Last year, this court ruled that Defendant Google LLC had violated Section 2 of the Sherman Act: "Google is a monopolist, and it has acted as one to maintain its monopoly."  The court found that, for more than a decade, Google had entered into distribution agreements with browser developers, original equipment manufacturers, and wireless carriers to be the out-of-the box, default general search engine ("GSE") at key search access points.  These access points were the most efficient channels for distributing a GSE, and Google paid billions to lock them up.  The agreements harmed competition.  They prevented rivals from accumulating the queries and associated data, or scale, to effectively compete and discouraged investment and entry into the market.  And they enabled Google to earn monopoly profits from its search text ads, to amass an unparalleled volume of scale to improve its search product, and to remain the default GSE without fear of being displaced.  Taken together, these agreements effectively "froze" the search ecosystem, resulting in markets in which Google has "no true competitor."

Much has changed since the end of the liability trial, though some things have not.  Google is still the dominant firm in the relevant product markets.  No existing rival has wrested market share from Google.  And no new competitor has entered the market.  But artificial intelligence technologies, particularly generative AI ("GenAI"), may yet prove to be game changers.  Today, tens of millions of people use GenAI chatbots, like ChatGPT, Perplexity, and Claude, to gather information that they previously sought through internet search.  These GenAI chatbots are not yet close to replacing GSEs, but the industry expects that developers will continue to add features to GenAI products to perform more like GSEs.

The emergence of GenAI changed the course of this case.  No witness at the liability trial testified that GenAI products posed a near-term threat to GSEs.  The very first witness at the

1

remedies hearing, by contrast, placed GenAI front and center as a nascent competitive threat. These remedies proceedings thus have been as much about promoting competition among GSEs as ensuring that Google's dominance in search does not carry over into the GenAI space. Many of Plaintiffs' proposed remedies are crafted with that latter objective in mind.

The question now is what to do about Google's violations. Precedent requires fashioning antitrust remedies that "effectively pry open to competition a market that has been closed" by a monopolist's "illegal restraints." *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947). Denying the fruits of the violation is a valid objective, and so, too, is ensuring that anticompetitive behavior will not recur in the same or related ways. The court has broad discretion to impose remedies to accomplish those aims.

Notwithstanding this power, courts must approach the task of crafting remedies with a healthy dose of humility. This court has done so. It has no expertise in the business of GSEs, the buying and selling of search text ads, or the engineering of GenAI technologies. And, unlike the typical case where the court's job is to resolve a dispute based on historic facts, here the court is asked to gaze into a crystal ball and look to the future. Not exactly a judge's forte.

Because of what is at stake, the remedies phase has been contentious. The parties have seen eye-to-eye on very little. In Google's view, there is little work to be done. The only appropriate remedy is to enter an injunction that prohibits it from entering into exclusive distribution agreements, which would include its GenAI products, the Gemini app and Google Assistant. Google says it has already stripped from its existing contracts the provisions that the court found had an exclusionary impact, so the market is now effectively unfettered and open to competition. It also urges the court to do nothing more because the GenAI technology space is

highly competitive, and any further restrictions would unfairly hobble it in that fight. Google asks that the final judgment be for a term of three years.

Plaintiffs believe that far more must be done. Simply enjoining Google's bad acts, as Google insists, would maintain the status quo. Plaintiffs therefore have put forward a comprehensive slate of remedies, whose component parts, they claim, work together both to revive competition in the general search market and to protect the GenAI market from suffering the same fate as search. Plaintiffs' proposals can be collected into three general categories: (1) structural remedies; (2) behavioral remedies; and (3) administrative, anti-retaliation, and anti-circumvention remedies. Plaintiffs ask that the judgment remain in place for up to 10 years.

Because of the number and complexity of the parties' proposed remedies, the court does not recite its conclusions and reasoning in detail in this introduction. But here are the top-line determinations:

- Google will be barred from entering or maintaining any exclusive contract relating to the distribution of Google Search, Chrome, Google Assistant, and the Gemini app. Google shall not enter or maintain any agreement that (1) conditions the licensing of the Play Store or any other Google application on the distribution, preloading, or placement of Google Search, Chrome, Google Assistant, or the Gemini app anywhere on a device; (2) conditions the receipt of revenue share payments for the placement of one Google application (e.g., Search, Chrome, Google Assistant, or the Gemini app) on the placement of another such application; (3) conditions the receipt of revenue share payments on maintaining Google Search, Chrome, Google Assistant, or the Gemini app on any device, browser, or

search access point for more than one year; or (4) prohibits any partner from simultaneously distributing any other GSE, browser, or GenAI product.

- Google will not be required to divest Chrome; nor will the court include a contingent divestiture of the Android operating system in the final judgment. Plaintiffs overreached in seeking forced divesture of these key assets, which Google did not use to effect any illegal restraints.

- Google will not be barred from making payments or offering other consideration to distribution partners for preloading or placement of Google Search, Chrome, or its GenAI products. Cutting off payments from Google almost certainly will impose substantial—in some cases, crippling—downstream harms to distribution partners, related markets, and consumers, which counsels against a broad payment ban.

- Google will have to make available to Qualified Competitors certain search index and user-interaction data, though not ads data, as such sharing will deny Google the fruits of its exclusionary acts and promote competition. The court, however, has narrowed the datasets Google will be required to share to tailor the remedy to its anticompetitive conduct.

- Google shall offer Qualified Competitors search and search text ads syndication services to enable those firms to deliver high-quality search results and ads to compete with Google while they develop their own search technologies and capacity. Such syndication, however, shall occur largely on ordinary commercial terms that are consistent with Google's current syndication services.

- Google will not have to present users with choice screens on its products or encourage its Android distribution partners to do the same. Precedent requires courts to avoid remedies that compel product design requirements, and in any event, choice screens have not been shown to enhance competition among GSEs.

- Google will not be required to share granular, query-level data with advertisers or provide them with more access to such data. Nor will it have to restore an "exact match" keyword bidding option. Plaintiffs did not establish that these remedies would promote competition in the search text ads market.

- Google will be compelled to publicly disclose material changes it makes to its ad auctions to promote greater transparency in search text ads pricing and to prevent Google from increasing prices by secretly fine-tuning its ad auctions.

- Google will not have to underwrite a nationwide public education campaign. That remedy does not fit Google's violations and its terms are too indefinite.

- Google will not have to modify its policies to offer website publishers more choice in how Google uses their content. This remedy bears no relationship to Google's unlawful acts and is an improper demand to implement overly regulatory requirements.

- Google will not be subject to an investment reporting requirement. It, too, bears no relationship to Google's anticompetitive conduct.

5

- Google will not be subject to anti-retaliation, anti-circumvention, or self-preferencing provisions. The first two restrictions are too vague and do not comport with the requirements of Federal Rule of Civil Procedure 65(d). There is no legal or factual basis for the last.

The court will establish a Technical Committee to assist Plaintiffs and the court in implementing and enforcing the final judgment. The term of that judgment will be six years, and it will become effective 60 days after entry, except for those provisions relating to the Technical Committee, which will go into effect immediately.

This opinion is organized as follows: The court begins by recounting the liability- and remedial-phase histories of this case. In that same section the court sets forth the parties' competing remedies proposals. The court then makes its Findings of Fact. Those factual findings were drafted with the primary objective of updating the reader on market developments since the close of the liability phase and therefore are less detailed than those in the liability opinion. The court then turns to explaining its Conclusions of Law. That section sets forth the general antitrust principles that will guide the court's evaluation of remedies and addresses various remedies-related disputes of law. Next are Remedy-Specific Conclusions of Law. That section will detail the court's rationale for adopting, rejecting, or modifying the parties' proposed remedies. The court makes extensive findings of fact in that section as well. Finally, the court concludes with a directive to the parties to meet and confer and present by September 10, 2025, a joint revised final judgment that is consistent with this Memorandum Opinion. As with the liability opinion, the court includes as an Appendix a list of the names and titles of all witnesses whose remedies-phase trial or deposition testimony is cited in this decision.

The court is grateful to all counsel for their professionalism and zealous advocacy during these remedies-phase proceedings.

## PROCEDURAL HISTORY

### I.    PRETRIAL LIABILITY PHASE

This case began on October 20, 2020, when the U.S. Department of Justice and 11 states ("U.S. Plaintiffs") filed an antitrust complaint against Google pursuant to authority conferred by Section 4 of the Sherman Act, 15 U.S.C. § 4.  *See* Compl., ECF No. 1; *see also* Am. Compl., ECF No. 94 [hereinafter Am. Compl.] (including 14 states).  U.S. Plaintiffs asserted three violations of Section 2 of that law, each corresponding to an alleged product market in the United States.  Am. Compl. ¶¶ 173–193.  Those markets were general search services, search advertising, and general search text advertising.  *Id.* ¶¶ 88–107.  The crux of U.S. Plaintiffs' complaint was that Google illegally maintained a monopoly in these markets by entering into exclusive agreements to secure default distribution for its GSE on nearly all desktop and mobile devices in the United States.  *See id.* ¶¶ 111–165.  U.S. Plaintiffs sought a finding of liability, an injunction against the challenged conduct, and structural relief necessary to cure any resulting anticompetitive effects.  *Id.* ¶ 194.

Roughly two months later, 38 additional states and territories ("Plaintiff States"), filed *State of Colorado v. Google*, 20-cv-3715 (APM) [hereinafter *Colorado v. Google* Docket], under Section 16 of the Clayton Act, 15 U.S.C. § 26.  Compl., *Colorado v. Google* Docket, ECF No. 3 [hereinafter Colorado Compl.], ¶¶ 21–23.  Their complaint largely mirrored U.S. Plaintiffs' but supplemented it in three primary ways.  Plaintiff States: (1) alleged an additional advertiser-side market for general search advertising but did not adopt U.S. Plaintiffs' broader market for search advertising, *id.* ¶¶ 56 n.3, 82–89; (2) asserted exclusionary conduct by Google that targeted

specialized vertical providers, which are internet companies that provide search services focused on niche markets such as travel (e.g., Expedia or TripAdvisor), restaurant reservations (e.g., OpenTable), or shopping (e.g., Amazon or eBay), *id.* ¶¶ 168–199; and (3) claimed that Google had engaged in additional exclusionary conduct by using its proprietary advertising tool, SA360, to harm competition in the relevant markets, *id.* ¶¶ 144–167. Plaintiff States likewise sought declaratory and injunctive relief. *Id.* ¶ 233.

The court consolidated the two cases for both pretrial and trial proceedings. Order, *Colorado v. Google* Docket, ECF No. 67; Status Conf. Tr., ECF No. 609, at 10–14. At the parties' request, the court bifurcated the proceedings into liability and remedies phases. *See* Order, ECF No. 264.

Following a lengthy period of merits discovery, the court granted in part and denied in part Google's motions for summary judgment in both cases. *See generally United States v. Google LLC*, 687 F. Supp. 3d 48 (D.D.C. 2023). In *United States v. Google*, the court entered judgment in Google's favor with respect to those portions of U.S. Plaintiffs' claims that related to Android Compatibility Commitments and Anti-Fragmentation Agreements, Google's voice-activated assistant and other "Internet-of-Things" devices, and the Android Open-Source Project. *Id.* at 85–87. In *Colorado v. Google*, the court found in Google's favor with respect to Plaintiff States' theory that Google's exclusionary acts directed at specialized vertical providers—namely, placing restrictions on the visibility of their content on Google's search engine results page ("SERP") and coercing them to share data—had not caused anticompetitive effects in the proposed markets. *Id.* at 78–83. The remaining claims proceeded to trial.

8

## II.   LIABILITY DETERMINATION

The liability trial commenced on September 12, 2023, and concluded on November 16, 2023.  After receiving testimony from dozens of witnesses; reviewing thousands of pages of exhibits and deposition designations; considering the parties' post-trial briefs, proposed findings of fact, and proposed conclusions of law; and hearing from the parties at closing arguments over two days, the court issued its liability findings on August 5, 2024.  The court held that Google had violated Section 2 of the Sherman Act by maintaining a monopoly in certain product markets through exclusionary conduct.  *See generally United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024) [hereinafter *Google*].

The court identified three relevant product markets: general search services, search advertising, and general search text advertising.[1]  *Id.* at 109–16, 125–33, 136–38.  The court did not find a separate general search advertising market, as alleged by Plaintiff States.  *Id.* at 139–42.  The court determined that Google had monopoly power in the general search services and general search text advertising markets but not the search advertising market.  *Id.* at 117–24, 133–36, 138–39.

Having found that Google had monopoly power in two relevant product markets, the court's Section 2 inquiry proceeded to analyze whether Google engaged in exclusionary conduct in those markets.  *See id.* at 142–52.  Plaintiffs challenged certain contracts between Google and other companies as unlawful exclusive agreements.  The court held that (1) agreements between Google and browser developers, such as Apple and Mozilla, were exclusive insofar as they established Google as the out-of-the-box default search engine; (2) mobile application distribution agreements ("MADAs") between Google and Android original equipment manufacturers

---

[1] The parties agreed that the United States is the relevant geographic market.  *See Google,* 747 F. Supp. 3d at 107.

9

("OEMs") were exclusive in practice; and (3) revenue share agreements ("RSAs") between Google and Android device distributors—both OEMs and wireless carriers—formalized the practical exclusivity of the MADAs. *Id.* at 146–52.

Because merely characterizing Google's challenged contracts as "exclusive" did not answer whether those agreements violated Section 2, the court next evaluated whether they caused anticompetitive effects in the relevant markets—they did. *See id.* at 152–81. First, the court held that the agreements caused significant anticompetitive effects in the general search services market. *Id.* at 152–71. The court found that Google's distribution agreements (1) foreclosed a substantial portion of the general search services market and impaired rivals' opportunities to compete, *id.* at 153–59; (2) denied rivals access to the volume of user queries and the resulting data, or "scale," needed to compete effectively, *id.* at 159–64; and (3) reduced other companies' incentive to invest and innovate in search, *id.* at 165–71.

The court rejected Google's procompetitive justifications for the distribution agreements. It concluded that the contracts did not "(1) enhance the user experience, quality, and output in the market for general [search] services, (2) incentivize competition in related markets that redounds to the benefit of the search market, [or] (3) produce consumer benefits within the related markets." *Id.* at 171; *see also id.* at 171–77. Accordingly, the court held that Google violated Section 2 of the Sherman Act by maintaining its monopoly in the general search services market through exclusive distribution agreements. *Id.* at 177.

As for the general search text advertising market, the court reached similar conclusions. It found that the exclusive agreements (1) foreclosed a substantial share of the market; (2) allowed Google to increase text ads prices without any meaningful competitive constraint; (3) permitted Google to degrade the quality of its text ads offerings; and (4) capped rivals' advertising revenue,

thereby decreasing their ability to reinvest in quality improvements and attract more users and ad dollars. *Id.* at 177–82. Google did not offer any procompetitive justifications beyond those the court had already rejected in the general search services market. *Id.* at 181. The court therefore held that Google's exclusive agreements also violated Section 2 of the Sherman Act in the general search text ads market. *Id.*

That left Plaintiff States' additional claim concerning Google's use of its search engine management tool, SA360. SA360 allows advertisers to run online marketing campaigns across multiple platforms all in one place. *Id.* at 181. According to Plaintiff States, Google promised that it would not self-preference its own proprietary ad platform, Google Ads, on SA360, but it did just that when it implemented certain features for Google Ads but not for Microsoft's ad platform, Microsoft Ads. *Id.* This lack of feature parity, Plaintiff States asserted, placed Microsoft at a competitive disadvantage in the relevant markets. *See id.*

The court found in favor of Google. It concluded that, under Supreme Court precedent, Google had no duty to deal with its rival Microsoft, and in any event, Plaintiff States had failed to demonstrate the SA360 conduct resulted in any anticompetitive harm in the relevant markets. *Id.* at 181–85.

Lastly, the court declined to make a finding of anticompetitive intent, as it is not an element of a Section 2 violation, and it did not sanction Google for its failure to preserve certain evidence. *Id.* at 186–88.

## III. REMEDIAL PHASE

### A. Remedial-Phase Filings and Pretrial Proceedings

The remedial phase began September 18, 2024, with entry of a scheduling order that set aside approximately six months for discovery to be followed by a three-week evidentiary hearing.

11

*See* Order, ECF No. 1043.  At the outset, the court ordered Plaintiffs to submit a high-level framework of potential remedies, *see id.*, which they did on October 8, 2024, *see* Notice of Pls.' Proposed Remedy Framework, ECF No. 1052.  Thereafter, Plaintiffs filed their initial proposed final judgment on November 20, 2024.  *See* Notice of Pls.' Proposed Final J., ECF No. 1062. Google submitted its initial proposed final judgment on December 20, 2024.  *See* Notice of Def.'s Proposed Final J., ECF No. 1108.  Both parties then submitted revised proposed final judgments in anticipation of the remedies trial.  *See* Pls.' Revised Proposed Final J., ECF No. 1184-1 [hereinafter Pls.' RPFJ]; Def. Google LLC's Proposed Final J., ECF No. 1185 [hereinafter Google's RPFJ].  Discovery concluded on April 9, 2025.  *See* Order, ECF No. 1043.

The evidentiary hearing ran from April 22, 2025, to May 9, 2025.  Each side presented hundreds of exhibits, *see, e.g.*, ECF Nos. 1220, 1228, 1233, 1234, 1238, 1268, 1283, 1339, 1340, and the court heard from nearly 50 witnesses via live testimony and deposition designations, *see* List of Anticipated Live Witnesses, ECF No. 1210-1; List of Anticipated Witnesses by Dep. Designation, ECF No. 1210-2.

Following the evidentiary presentation, the parties made extensive post-hearing submissions, including proposed findings of fact and conclusions of law and replies in support. *See* Def.'s Proposed Findings of Fact, ECF No. 1346 [hereinafter Google's PFOF]; Def.'s Proposed Conclusions of Law, ECF No. 1347 [hereinafter Google's Br.]; Pls.' Remedies Post-Trial Br., ECF No. 1348 [hereinafter Pls.' Br.]; Pls.' Remedies Proposed Findings of Fact, ECF No. 1349 [hereinafter Pls.' PFOF]; Pls.' Remedies Responsive Proposed Findings of Fact, ECF No. 1364 [hereinafter Pls.' RPFOF]; Pls.' Remedies Responsive Post-Trial Br., ECF No. 1365 [hereinafter Pls.' Reply]; Def.'s Responsive Proposed Findings of Fact,

12

ECF No. 1366 [hereinafter Google's RPFOF]; Def.'s Responsive Proposed Conclusions of Law, ECF No. 1367 [hereinafter Google's Reply].

The court heard closing arguments on May 30, 2025. *See* Order, ECF No. 1362.

### B.       The Parties' Remedies Proposals

Not surprisingly, the parties' proposed remedies are dramatically different. The wide gulf separating them reflects a fundamental disagreement over the scope of appropriate antitrust remedies and the court's authority to impose them.

Plaintiffs have offered what they say is a "comprehensive and unitary framework" of remedies that will "reinforce each other to restore competition." Remedies Hr'g Tr. at 13:20-24 (Opening Arg.) [hereinafter Rem. Tr.]. Their proposed final judgment covers the full spectrum of equitable remedies available under the case law.

Most significantly, Plaintiffs demand structural relief. They seek an immediate forced divesture of Google's web browser Chrome. Pls.' RPFJ § V.A. They also ask the court to include a contingent divestiture of Google's operating system, Android, in the event the initial remedies fail or Google circumvents them. *Id.* § V.C.

Plaintiffs' next class of proposed remedies, broadly speaking, are behavioral remedies. These are remedies that would compel Google to undertake affirmative acts or bar it from certain conduct beyond restrictions on contracting. The proposed remedies in this category are many. They include (in order of their appearance in Plaintiffs' RPFJ):

1.       prohibiting Google from making any search-related payments to distribution partners, with one limited exception, *id.* § IV.A–G;

2.       requiring Google to provide advance notice of certain acquisitions and investments, *id.* § IV.H–I;

3.      forbidding Google from using proprietary assets like YouTube, Android, and Gemini to self-preference its own search or advertising products, *id.* § V.B;

4.      compelling Google to share search index data and certain user and advertising data with "Qualified Competitors," *id.* § VI.A, C–F;

5.      ordering Google to allow website publishers and content creators to opt out of Google crawling their web pages and domains for inclusion in Google's search index and for training its GenAI models and products, *id.* § VI.B;

6.      requiring Google to grant licenses to "Qualified Competitors" to syndicate search results and general search text ads from Google, *id.* §§ VII.A–G, VIII.E;

7.      compelling Google to provide advertisers enhanced performance data and a bidding-control feature known as "exact match," as well as disclose material changes to its ad auctions, *id.* § VIII.A–D;

8.      mandating choice screens on Google products that would allow users to select the GSE they wish to use, and permitting Google to pay device distributors (other than Apple) for offering choice screens on existing devices, *id.* § IX.A–D; and

9.      launching a nationwide public education campaign, underwritten by Google, that would inform consumers about different GSE options and how to switch GSEs.  (This last remedy is sought solely by Plaintiff States, *id.* § IX.E.)

14

Plaintiffs also ask the court to establish a Technical Committee that would assist them in enforcing the judgment and to require Google to appoint an internal compliance officer. *Id.* § X.A–D. They additionally seek a general prohibition against retaliatory acts by Google, *id.* § X.E, and a prohibition on conduct designed to circumvent the terms of the judgment, *id.* § X.F. Plaintiffs propose that the judgment last for up to 10 years and that the court retain jurisdiction to enforce it. *Id.* §§ XI–XII.

Google's proposed remedies are far narrower. Google says the court can do little more than enter a prohibitory injunction that bars it from entering or maintaining any unlawful exclusive distribution agreement for the term of the judgment. *See* Google's Br. at 3–4. Such an injunction "ensures that partners and consumers get the benefit of competition, while prohibiting the forms of contractual provisions the Court deemed exclusive." *Id.* at 3. Google would have the court enter an order that:

1. prohibits Google from bundling Google Search, Chrome, Google Assistant, or the Gemini app with Google Play or other Google apps in their OEM agreements, Google's RPFJ § III.A–D;

2. bars Google from entering any contract with an OEM or wireless carrier that prevents the partner from preloading or otherwise promoting alternative GSEs, browsers, or AI assistants, *id.* § III.E–G;

3. prevents Google from conditioning payments to OEMs and wireless carriers on the required installation of Google Search, Chrome, Google Assistant, or Gemini on more than one search access point or device, *id.* § III.H–J; and

4. allows browser developers like Apple and Mozilla to set different GSEs as defaults across various modes and platforms and to promote other search

services, and grants them the option to change default search settings annually, *id.* § III.K–L.

Notably, Google also includes provisions to prevent exclusive distribution of two GenAI products, Google Assistant and the Gemini app, on Android devices. *See id.* § III.C–D, G–J. Google also proposes a compliance regime with annual reporting and an internal compliance officer. *Id.* § IV. It would have the judgment expire in three years. *Id.* § V.

Plaintiffs agree that Google's prohibitory equitable remedies are appropriate and generally propose the same, *see* Pls.' RPFJ § IV, but contend that such minimal relief will merely "maintain the status quo" and do nothing to restore competition, Pls.' Br. at 3.

## FINDINGS OF FACT

The court's primary purpose in this Findings of Fact section is to update the reader on developments that have affected the relevant product markets since the liability trial concluded. These findings are therefore far less extensive and detailed than those contained in the court's liability opinion. The court's main factual findings are woven into the Remedy-Specific Conclusions of Law section, as that is the more natural place to evaluate and weigh the evidence.

In this section, the court focuses on three main topics: (1) GenAI technology and products; (2) new search access points; and (3) changes to Google's search distribution agreements. As to the first topic, the court covers the basics of GenAI technology, GenAI products that perform functions akin to GSEs, and the main players in the GenAI space and the competition among them. The court then discusses Google's Gemini app as a search access point, as well as two new search access points, Circle to Search and Google Lens. Last, the court updates the record as to Google's distribution contracts.

16

## I.    GENERATIVE ARTIFICIAL INTELLIGENCE

### A.    Key Terms

1.    "Artificial intelligence is the science and engineering of getting machines, typically computer programs, to exhibit intelligent behavior." *Google*, 747 F. Supp. 3d at 52 ¶ 107 (citation omitted).

2.    Generative artificial intelligence ("GenAI") is a type of artificial intelligence that uses machine-learning techniques to generate new data, including text, images, sound, code, and other media.  *See* Rem. Tr. at 149:8-12 (Durrett) (GenAI is "a sort of sub-field of artificial intelligence that uses machine-learning techniques to generate structured outputs, which might be, for example, long chunks of text or images."); *id.* at 3315:23–3316:2 (Collins) ("Generative AI is about producing information, so producing content."); *id.* at 4057:16-19 (Hitt) (stating that people use GenAI to "generate some kind of new content or give [them] a new idea"); PXR0102 at -700 ("Generative AI goes a step further" than traditional AI "by creating new data (e.g., text, image, sound) similar to its training data—pattern creation.").[2]  Machine learning blends computer science with statistics to learn how to solve problems based on exposure to data.  *See* Rem. Tr. at 148:25–149:7 (Durrett) (discussing PXRD003 at 6).

3.    Large language models ("LLMs") are a type of GenAI model that takes text or other types of data as inputs and then generates text or other outputs based on predictions.  *See id*. at 149:13-16 (Durrett).  Language modeling is "the task of predicting the most likely next token in a sequence given a prior sequence of tokens," where one can think of a "token" as a short word or

---

[2]  This opinion uses the last three digits of Bates numbers on an exhibit to cite the specific pages that support a finding of fact.  The parties' demonstratives are cited in the manner that they appear in the parties' respective proposed findings of fact.  *See* Pls.' PFOF; Google's PFOF.

small unit of language. *Id.* at 152:16–153:8 (Durrett). The ability to predict the next token relies on both the quality of the model and the amount of input data. *See id.* at 154:20–155:3 (Durrett).

4.      The relationship among the above-discussed types of AI can be visualized as follows:



PXRD003 at 6; *see also* Rem. Tr. at 148:16–149:16 (Durrett) (discussing this slide).

5.      Most LLMs are "transformer" models. Rem. Tr. at 155:4-9 (Durrett) ("[T]he most typical method of implementing large language models these days is a model called the transformer."). Transformers are a neural model—a computational model that attempts to mimic the way the human brain works—that uses billions of parameters to predict the probability of the next token. *Id.* at 155:9-22 (Durrett). Google released a paper in 2017 that ushered in the use of transformers, and Google's transformer architecture is now the backbone of modern LLMs. *See id.* at 3318:17–3319:7 (Collins) ("Transformers was a model, an AI model architecture that Google invented in 2017 that all modern AI models are based on."); *id.* at 2447:25–2448:13 (Pichai)

18

("[A]bout a decade ago, Google invented transformers and . . . they are now the backbone of what are called large language models.").

### B. AI and Search

#### 1. Integrating AI Features into Search

6. GenAI technologies have increasingly become incorporated into search products. *See Google*, 747 F. Supp. 3d at 53–54 ¶¶ 109–113 (describing how AI technology has influenced and invigorated search processes); Collins Rem. Dep. at 24:11–25:9 (discussing how Gemini GenAI models are incorporated into Search-related features and Search-related enhancements); *id.* at 28:20-21 ("Google Search will deploy Gemini models as part of building their product . . . ."). Google and other companies incorporate GenAI technologies into their search products today. *See* Parakh Rem. Dep. at 25:13–26:1 (describing Google's effort to incorporate "a large number of GenAI ideas" into Search through Project Magi, which eventually became AI Overviews); Rem. Tr. at 3601:4-9 (Reid) (agreeing that Google is incorporating and has incorporated AI technology and LLM technology into Google Search); *id.* at 2455:16-18 (Pichai) ("[W]e have deeply used AI technologies for well over a decade across our most important products. Obviously Search."); *id.* at 1020:23–1021:5, 1024:16–1025:22 (Schechter) (describing how Microsoft has incorporated GenAI technologies into Bing); *see also id.* at 2458:12–2459:5 (Pichai) (predicting that "AI technology is going to deeply transform Google Search").

7. One way Google incorporates GenAI technologies in Search is through a feature known as "AI Overviews." Rem. Tr. at 2456:25–2457:4 (Pichai) ("And recently we have launched something called AI [O]verviews. It uses a custom Gemini-based model to give users for any query overall context, a summary, and then helps them explore sources on the web, and it's been one of the most popular features we've launched in Google Search."); *id.* at 3609:2-6 (Reid)

19

(agreeing that AI Overview incorporates GenAI into Search). It was introduced in 2024. *See* PXR0037 at -229.

8. When a user enters a query in Google Search, AI Overviews "will take the search results that come back and use a[n] [LLM] to produce a summary of those results" that can be seen at the top of the SERP "as a kind of brief natural language description of what the search engine found." Rem. Tr. at 149:21–150:4 (Durrett); *see also id.* at 4539:11-14 (Jerath) (describing AI Overviews as "a new kind of section that Google has included in its search engine results page, and it shows basically an AI summary response to a query"); *id.* at 3550:2-8 (Reid) (discussing how AI Overviews is part of the main search results page and includes "an overview in response to the user's question and pulls together relevant webpages about it").

9. A depiction of AI Overviews on a mobile Google SERP is illustrated below:



PXRD005 at 10; Rem. Tr. at 646:14–647:19 (Hsiao) (discussing this slide).

20

10.     AI Overviews are not triggered in response to every search query.  *See* Rem. Tr. at 3550:5-15 (Reid) (stating that an AI Overview appears "whenever we think that it is both high quality information and a net add to the page"); Parakh Rem. Dep. at 81:1–83:8, 83:13–84:7 (whether AI Overviews appears on a page depends on relevance signals and other signals generated from Search results); *see also* N. Fox Rem. Dep. at 188:17–192:22 (discussing AI Overview–eligible queries); *accord* Rem. Tr. at 3617:22–3618:16 (Reid) (agreeing that she believes the percentage of queries triggering an AI Overview response "will continue to increase over time" and that she reported as much to Google's Board of Directors).  Their introduction has had a generally positive effect on Search—Google has seen an increase in both consumer satisfaction and volume of queries.  Rem. Tr. at 3615:12–3616:2 (Reid) (agreeing that people who use AI Overviews use Search more and are more satisfied with their results); *id.* at 3616:6–3617:4 (Reid) (stating that Google Search queries in the United States have increased 1.5% to 2% since the introduction of AI Overviews); PXR0038 at -303 ("[P]eople who use AI Overviews actually use Search more and are more satisfied with their results."); *see also* Rem. Tr. at 2459:6-13 (Pichai) (observing that users are now asking "longer" and "more complex" questions due to Google's incorporation of GenAI search features).  Some evidence suggests that placement of features like AI Overviews on the SERP has reduced user interactions with organic web results (i.e., the traditional "10 blue links").  *See* Parakh Rem. Dep. 193:19–194:15, 194:18-25, 195:16-20 (agreeing that there is a sentiment within Google that Google's first-party search features reduce users' interactions with third-party results); PXR0158 at -910 ("[W]hen AI Overviews appear, pages that appear as a corroborating link [in AI Overviews] get more clicks than if the page had appeared as a traditional 'blue link' listing for that query."); *see also* PXR0001 at -612 to -613

21

(discussing a drop in interactions with organic web results where Google's WebAnswers appears on the SERP); Parakh Rem. Dep. 21:12-14 (describing WebAnswers as another GenAI product).

11.    Google recently integrated a new GenAI feature in Search called "AI Mode." Rem. Tr. at 2490:14–2491:21 (Pichai); *see also id.* at 3352:4–3355:12 (Reid) (describing AI Mode as one of the "modes on Search that allow people to sort of dig deeper on some aspect of Search"). Google's early experience with AI Mode shows that consumers are asking longer questions than in traditional Search. *Id.* at 2490:25–2491:5 (Pichai). Google "expect[s] it to . . . become a deeper part of the Search experience." *Id.* at 2491:9-21 (Pichai).

### 2.    AI Chatbots

12.    Another type of GenAI consumer-facing product is a "chatbot," which is available on both desktop and mobile devices. *See id.* at 2461:21-23 (Pichai) ("There are many companies, both big and small, which are both building models, as well as using models to build chatbots or Generative AI applications."); *id.* at 1025:23–1026:5 (Schechter) (discussing how Microsoft's Copilot is accessible both on mobile and desktop); *id.* at 4062:25–4064:13 (Hitt) ("[A]t least for the data we've seen from OpenAI, desktop is—I think at least the majority of the queries come through desktop."). Some examples include OpenAI's ChatGPT, Anthropic's Claude, xAI's Grok, Microsoft's Copilot, and Google's Gemini. *Id.* at 4044:18–4045:19 (Hitt) (discussing RDXD-32.020).

13.    Chatbots are based on the LLMs described above. They serve different purposes than GSEs albeit with some overlap. *Id.* at 2457:5–2458:9 (Pichai) (describing the "areas of overlap" between AI chatbots and Google Search but noting that there are "entirely different use cases as well"); *id.* at 385:18–388:8 (Turley) (describing the relationship between Google Search and ChatGPT as a Venn diagram (discussing PXR0176 at -126)); *id.* at 3541:18–3543:15 (Reid)

(recognizing that the use cases for GSEs and GenAI chatbots "are not identical but they do overlap in a number of places" like "a Venn diagram"); N. Fox Rem. Dep. at 74:20–76:8, 76:20-21, 76:23–77:11 (describing the relationship between GSEs and GenAI chatbots as "a Venn diagram" that is "quite overlapping" but not "fully overlapping"); *see also* Rem. Tr. at 3373:16–3376:2 (Collins); *id.* at 205:10–206:15 (Durrett).  When a user submits a query to a chatbot, the underlying GenAI model makes a prediction about the answer, drawing upon the data used to train the model. *Compare* Rem. Tr. at 155:4-22 (Durrett) ("[The transformer] takes as input this sequence of tokens and outputs this probability distribution over all of these words in the vocabulary."), *with Google*, 747 F. Supp. 3d at 38–39 ¶¶ 27–32 (describing how a GSE works by responding to queries via retrieving and ranking websites responsive to the query from an information index).

14.    Like a GSE, consumers can interact with AI chatbots by entering information-seeking queries.  *See Google*, 747 F. Supp. 3d at 39–41 ¶¶ 33–39 (discussing types of queries presented to GSEs); Rem. Tr. at 382:5-17 (Turley) (stating that "asking questions" is "one of the core-use cases that people came to ChatGPT for"); *id.* at 2457:12-14 (Pichai) ("[F]or certain types of queries, you can look—you can either ask a search engine or you can go to a chatbot and ask a similar question."); *id.* at 656:8-13 (Hsiao) ("There is definitely truth to the fact that people use [GenAI] products to do what we would call informational tasks.").  Thus, chatbots perform an information-retrieval function like that performed by GSEs.  *Compare Google*, 747 F. Supp. 3d at 38–39, 41 ¶¶ 27–32, 41–42 (explaining how a GSE works and depicting a sample SERP), *with* Rem. Tr. at 636:8–647:23 (Hsiao) (walking through how a sample query and response would look in the Gemini app (discussing PXRD005)); *id.* at 695:16–700:5, 701:7–704:3, 706:23–707:22 (Shevelenko) (walking through a sample query and response on Perplexity's website (discussing

PXRD006)); *see also infra* Findings of Fact [hereinafter FOF] ¶¶ 36–46 (discussing "grounding" an LLM in search data).

15.    Chatbots often include citations and links to websites when responding to information-seeking queries.  Rem. Tr. at 405:8–406:18 (Turley) ("We do that by allowing users to see high-quality links inside ChatGPT for areas that they may want to read more about."); *id.* at 696:13-25, 698:15–699:7, 701:7–702:11 (Shevelenko) (Perplexity's answer engine responses present users with LLM-generated responses, and within those responses, Perplexity provides weblink citations and a list of web sources).

16.    A sample chatbot response to a query is illustrated below.



PXRD005 at 3; Rem. Tr. at 637:23–638:5 (Hsiao) (discussing the Gemini results page displayed on this slide).

17.    But chatbots have many use cases that traditional GSEs do not, including composing text, generating code, and creating novel images and video. *See* Rem. Tr. at 4058:1-4 (Hitt) ("There's a lot of applications that GenAI can do that are not suitable for Search, and a lot of things Search does that may not be well suited for GenAI, at least the way [that] consumers are using it now."); *id.* at 2457:5–2458:9 (Pichai) (observing that "there are areas of overlap" between Google Search and GenAI chatbots but that "there are completely . . . different use cases as well," and identifying coding, image generation, and video generation as "typical use cases which Search hasn't done in the past"); *id.* at 3541:18–3543:15, 3629:19-24 (Reid) (explaining that "what is the right tool for a question evolves over time," and listing homework help, companionship, and brainstorming as use cases for which people typically choose chatbots over search). A person may enter a short prompt and receive various forms of media rather than the traditional "10 blue links" returned by a GSE. *Compare Google*, 747 F. Supp. 3d at 41–42 ¶¶ 41–46 (explaining what appears on a SERP and depicting a sample SERP), *with* Rem. Tr. at 2457:17–2458:2 (Pichai) ("If you're a developer trying to build an application, you can go on and have these chatbots write you large sections of code . . . .  In the Gemini app, you can go type in a short prompt and it will create a video for you, it will generate a whole video for you, and those are novel use cases. You can go to Chat GPT and generate images."); PXR0176 at -125 ("ChatGPT already provides answers without 10 blue links, in a simple experience, with natural contextual conversational follows ups.").

### 3.    AI Assistants

18.    In an earlier phase of this case, the court discussed Google's voice assistant product. *See United States v. Google LLC*, 687 F. Supp. 3d at 86 (explaining at summary judgment that Google Assistant "is a virtual assistant that can respond to voice commands to perform various tasks" (internal quotation marks and citation omitted)). Google has been upgrading that product

to the Gemini Assistant, which incorporates LLM technology and GenAI functionality. *See* Rem. Tr. at 668:15–670:13 (Hsiao) (discussing the upgrade of Google Assistant to Gemini Assistant). The Gemini Assistant comes preloaded on certain Android devices. *Id.* at 3900:14-20 (Samat).

19.    Other companies have voice-assistant capabilities built into their chatbots. *See, e.g.*, *id.* at 744:3-25 (Shevelenko) (discussing voice-assistant capabilities built into Perplexity's app).

20.    Google's GenAI Assistant can be accessed on a smartphone through both a voice command (a "wake word" or "hot word" like "hey Google") or a "long press" of the power button for several seconds. *See id.* at 635:6-20 (Hsiao) (explaining what a hot word is and that it can activate the Gemini app on Android devices); PXR0571 at -389 (Gemini–Samsung Commercial Agreement calling out "Hey Google" and "Hey Gemini" as hot word invocations); Kim Rem. Dep. at 173:14–174:2.

21.    Today, new Android devices come with a default assistant, which gets triggered when a user hits a hardware button known as the action button. Rem. Tr. at 710:17-19 (Shevelenko).

22.    Over the longer term, GenAI companies are striving to transform chatbots into a kind of "[s]uper [a]ssistant." *Id*. at 375:2-8, 375:22-24 (Turley). A super assistant would be able to help perform "any task" requested by the user. *Id.* at 375:2-8 (Turley); *id.* at 387:12–388:8 (Turley) (providing example of a request to buy shoes and the super assistant identifying options and completing the transaction); *id.* at 666:22–667:12 (Hsiao) (Google developing the Gemini app as an AI assistant to "help people solve their everyday problems"). Search is a necessary component of this product vision. *Id.* at 388:9–389:6, 424:3-8 (Turley).

26

*4.    On-Device AI*

23.    AI functionality on a smartphone can be delivered through a cloud-based AI model or an on-device AI model (or both). *Id.* at 2518:5–2519:24 (Nieh). An on-device AI model is stored entirely on a device and data is not transmitted to the cloud, meaning that an application running an on-device model can provide faster responses and enhanced privacy. *See id.* Google's on-device LLM is called Gemini Nano. *Id.* at 3956:10-15 (Samat). Google's Gemini app runs on cloud-based models, not Gemini Nano. *Id.* at 3956:16-19 (Samat).

24.    AICore is an Android software module developed by Google that supports the use of on-device LLMs such as Gemini Nano. *Id.* at 3955:25–3956:4 (Samat); Collins Rem. Dep. at 55:1–56:12. AICore currently only supports Google's on-device Gemini Nano model. Rem. Tr. at 1557:6–1558:1 (Mickens) (opining that models running inside AICore "have to be blessed by Google"); Collins Rem. Dep. at 56:13-22; *see also* Rem. Tr. at 3966:19-23 (Samat) (describing AICore as "kind of a container around Google's Gemini Nano model"). To run Gemini Nano on-device in an accelerated way, AICore takes advantage of specialized smartphone hardware accelerators known as tensor processing units ("TPUs") and neural processing units ("NPUs"), which can execute the necessary mathematical computations with efficiency and speed. Rem. Tr. at 3961:13–3964:2 (Samat); *see also id.* at 1553:5–1554:19 (Mickens) (explaining that NPUs/TPUs result in "an increase in model execution efficiency").

25.    AICore does not prevent other models from accessing a device's NPU or TPU. *Id.* at 3964:19–3965:19 (Samat). Other on-device model providers could work with OEMs and chip manufacturers to access a device's accelerators. *Id.* at 3965:23–3966:11 (Samat). But an OEM may not want to add a second system service alongside AICore and may prefer "to simply ship with a system service that allowed for plug-and-play use of models." *Id.* at 1558:2-9 (Mickens).

27

26.    The capacity to run multiple on-device AI models can be limited by the device's storage and random-access memory ("RAM").  *See id.* at 3966:12–3968:6 (Samat) (stating that "how many different models can exist [on a single device] kind of depends on how big the models are" but that "right now there would be no problem on these premium devices having multiple models on storage" and that "practically speaking, . . . when you're using one, you have it in RAM, and then when you're not using it, you swap it out and you swap the other one in").  A single device may still have multiple on-device models—Samsung devices, for example, have both Gemini Nano and Samsung's own model, Gauss, on the device.  Kim. Rem. Dep. at 69:24–70:13; Rem. Tr. at 3959:19–3960:3, 3968:7-15 (Samat).

## C.    LLMs

### 1.    *How LLMs Work (Greatly Simplified)*

27.    As discussed, language modeling is "the task of predicting the most likely next token in a sequence given a prior sequence of tokens," where one can think of a "token" as a short word or small unit of language.  Rem. Tr. at 152:16–153:8 (Durrett).  As an example, a user may enter a query into an LLM that asks it to complete a sentence, such as "Once upon a time, there was a ____," or to answer a specific question, such as "When was Abraham Lincoln born?"  *Id.* at 154:3-19 (Durrett) (discussing PXRD003 at 10).  Without human supervision, the model can predict the next token—for example, that "Once upon a time, there was a <u>war between two kingdoms</u>" or that Abraham Lincoln was born in 1809.  *See id.* (Durrett) (discussing PXRD003 at 10 (noting these answers)).  The ability to predict the next token relies on both the quality of the model and the amount and quality of the data inputs.  *See id.* at 154:20–155:3 (Durrett); *id.* at 163:15-17 (Durrett) ("One very important process of the training process for base large language models is to remove a lot of . . . data that is not helpful.").

28

28. The development of a successful LLM begins with an untrained model. *See id.* at 156:1-6 (Durrett). Such a model is "pre-trained" by exposing it to large amounts of data. *See id.* at 155:23–156:16 (Durrett); *id.* at 4024:24–4026:9 (Hitt). By exposing the model to so much data, the parameters of the model can be updated to enable it to make predictions that reflect the information in that data. *See id.* at 156:12-15 (Durrett). That pre-training creates a base (or foundation) model. *See, e.g., id.* at 155:23–156:16 (Durrett) (discussing PXRD003 at 12–13); *id.* at 3348:3-12 (Collins); *id.* at 4017:8–4018:25 (Hitt) (discussing RDXD-32.006)

29. Data for pre-training LLMs is gathered from many sources, primarily from public web pages. *See id.* at 4025:6–4028:22 (Hitt) (discussing RDXD-32.009 (identifying "[p]ublicly accessible data," "[l]icensed data from third parties," and "[h]uman evaluation data" as data used by Google and its competitors to pre-train models)); *id.* at 156:1-6 (Durrett) ("So starting from a[n] essentially untrained version of the transformer model, we can expose it to large amounts of text which are typically gathered from the web."). For example, Google uses its Google Common Corpus ("GCC") to pre-train its Gemini GenAI models. *See id.* at 184:10-15 (Durrett); *id.* at 3346:8-17 (Collins). GCC is a dataset that involves large amounts of information scraped from the web and stored in a repository called Docjoins, which is "a data structure that Google uses to store URLs." *See id.* at 183:25–185:6 (Durrett) (discussing PXRD003 at 38); *see also* PXR0185 at -116 to -117 ("The main corpus of Docjoins is a large repository of the documents publicly available on the web and visited at least once by Googlebot in the last few months. It currently consists of over ███ documents. . . . By comparison, the external Common Crawl corpus is much smaller, with only a bit over 3 B in the latest release."); Rem. Tr. at 224:18–227:13 (Durrett) (discussing PXR0185).

30.     After a model is pre-trained, "[t]here is a second stage called post-training where models are exposed to data that imparts the different capabilities that [the creators] want them to have." Rem. Tr. at 159:21-23 (Durrett); *id.* at 3341:12-15 (Collins) ("Pretraining is the first process in model training.  And so—it occurs once.  And the subsequent training process is called post training which is modifying, further modifying that pretrained model.").  For instance, if the model's creators want the model to be good at writing code or answering questions, then they can post-train the model on data particular to these areas.  *Id.* at 159:23–160:15 (Durrett) (discussing PXRD003 at 15); *id.* at 3350:24–3351:2 (Collins) (agreeing that "an example" of post-training "would be fine-tuning a foundation model to be able to answer Q and A").  All-purpose models can be post-trained to accomplish more than one task through exposure to large numbers of datasets encompassing broad collections of information.  *See id.* at 160:18–161:1 (Durrett) (discussing PXRD003 at 16).

31.     One way to ensure high-quality training data is to filter it or remove unnecessary or unhelpful data.  *Id.* at 4028:13-22 (Hitt) ("[N]ot all data that's out there winds up being useful for training.  It is a common business practice to filter your models in various ways, remove duplicates, remove spam, garbage, inappropriate content.  There's a lot of stuff out there that you don't want to put into your models . . . ."); *id.* at 163:15–165:15 (Durrett) (describing how one data corpus was filtered down to only .14% of open-source data); *id.* at 165:25–166:25 (Durrett) (describing how filtering improves model performance).

### 2.     *The Limitations of LLMs*

32.     Even with high-quality filtered data, there are still limitations as to how accurately an LLM can respond to prompts.  *Id.* at 167:6–168:11, 172:23–173:21 (Durrett) (discussing limitations of LLMs); *id.* at 382:18–383:14 (Turley) (discussing limitations with ChatGPT's

30

functionality).  The capabilities of an LLM are limited by the content of its training data and when that training occurs, and their accuracy is similarly circumscribed by content and timing. Importantly, (1) if information is not in an LLM's training data, it will not be able to produce a factual response to a query that seeks such information; (2) LLMs can provide reasonably accurate responses for frequently seen data but struggle to do so for lesser-known information; and (3) LLMs can forget the content of data they have previously been exposed to and thus cannot store information in a "lossless way."  *See id.* at 158:24–159:19, 161:5–162:6, 171:13–172:21 (Durrett) (discussing these issues).

33.    As noted, one key limitation is that LLMs have a knowledge cutoff.  *Id.* at 167:9– 168:7 (Durrett) (discussing PXRD003 at 21).  An LLM trained on data last updated in October 2024, for example, could not answer queries asking about Taylor Swift's 2025 engagement to Travis Kelce.  *See, e.g.*, *id.*; *see also id.* at 384:4-13 (Turley) (discussing how LLMs "do not contain current events" as "[t]hey're only ever limited to things that were . . . present in the training data at the time of its training, and they don't update live").  Retraining an LLM on an updated dataset "takes weeks or months" and thus the LLM would be unable "to answer a user's query about stuff that had happened the same day using this kind of mechanism."  *Id.* at 167:24–168:7 (Durrett). Moreover, training is costly.  *See id.* at 167:9–168:7 (Durrett) (discussing PXRD003 at 21 (noting that adding more recent documents to pre-training data is expensive)).

34.    Another limitation is the problem of so-called "hallucinations," facts made up by GenAI products "that are maybe probable to be true but not actually true."  *Id.* at 383:2-9 (Turley); *id.* at 1035:13-15 (Schechter) ("A hallucination is essentially a statement that might sound factual but is really just generated by the language model.").  If a user poses a query that asks for information outside of its training data, the LLM can generate an incorrect response based on what

31

it views to be the most probabilistic response. *Id.* at 172:23–173:21 (Durrett) (discussing this phenomenon); *id.* at 1036:1-9 (Schechter) (noting that if an LLM "doesn't have access to the right tools such as search or, you know, it was just told to give a response even if you don't know the answer, it will do its best to give a response and generate a response that it thinks you'd be satisfied with").

35.    In summary, an LLM "is great at generating content and can generate novel content but might include mistakes.  It is also retrained infrequently, so it won't have [any] up-to-the-minute factual information anyway." *Id.* at 174:5-8 (Durrett).  These limitations can be termed "factuality" and "recency" issues. *See id.* at 383:10-14 (Turley).

### 3.    Grounding

36.    "Grounding" and retrieval-augmented generation ("RAG") provide a solution to problems of factuality and recency. *See id.* at 168:13–169:17, 170:14–171:12 (Durrett); *id.* at 2853:6–2854:1, 2933:18-23 (Allan); *id.* at 3366:19–3367:10 (Collins).

37.    "[G]rounding is anchoring the output of a model on factual information or [an] external database." *Id.* at 3336:4-7 (Collins); *see also id.* at 3511:9-25 (Reid) (describing grounding as an LLM "ask[ing] for web results . . . to maybe fill in information it doesn't have, to correct information"); *id.* at 3634:11-14 (Reid) (agreeing that "grounding is when an LLM model uses some class of data, often from the web, in order to improve the accuracy of its response"). RAG is "[t]he process of accessing additional knowledge through a kind of information retrieval." *Id.* at 168:18-20 (Durrett); *id.* at 3835:11–3836:13 (Cue) (describing generally how through RAG techniques a chatbot can produce responses from identified relevant weblinks).  RAG is a grounding technique, and the terms are sometimes used interchangeably. *Id.* at 170:14–171:12 (Durrett); *see also id.* at 2853:6–2854:1 (Allan).

38.      An LLM is grounded by taking the query the user enters and referring to an outside database such as a search index. *See id.* at 169:5-17 (Durrett); *id.* at 3366:24–3367:2 (Collins); *id.* at 2853:6–2854:1 (Allan); *id.* at 3634:11-14 (Reid). The grounding model then surfaces that information from the outside database and feeds that information into the LLM to generate a response to the query. *Id.* at 169:5-17 (Durrett). Through grounding, LLMs can "pull[] in material that is relevant to the query, or at least believed to be relevant to the query, and then instruct[] the [GenAI] model to use that information to make references to that, and so that's where you might see the equivalent of links in a [GenAI] output." *Id.* at 2853:6–2854:1 (Allan).

39.      Grounding reduces an LLM's hallucinations and improves its factuality. *Id.* at 3370:15–3371:1 (Collins); *id.* at 3634:8-25 (Reid); *id.* at 170:14–171:12 (Durrett); *see also* PXR0040 at -177 to -178, -202 to -203; PXR0105 at -305. LLMs can receive grounded information from the web to generate a response. Grounding also allows an LLM to "validate its responses, fact-check information, or even perform more complex tasks like analyzing sentiment across the web to tailor its responses." PXR0040 at -203; *see also* Rem. Tr. at 169:24–174:22 (Durrett) (explaining that, since LLMs have issues storing information in a lossless way and can more accurately predict answers based on more common information, grounding allows them to invoke a search engine and anchor the responses in reality (discussing PXRD003 at 23–26)); *see also id.* at 3530:16–3631:3 (Reid) (agreeing that GenAI chatbots "need to incorporate aspects of a search engine" in order to "answer[] a wide range of information needs").

40.      Grounding likewise provides a solution to the recency issue, because the LLM can pull from and incorporate up-to-date information. *See* Rem. Tr. at 168:13–169:17 (Durrett) (explaining that by querying a GSE through grounding, an LLM can provide an answer to a question not in its training data); *id.* at 4155:4-7 (Hitt) (stating that "one of the applications of

grounding" is "to bring in facts . . . that are real time and could not have been . . . in the training dataset").

41.    Grounding provides LLMs an opportunity to integrate search capabilities into the models as it permits LLMs to access content beyond its training data, such as web pages in a search index.  *See id.* at 3835:11–3836:13 (Cue); *see also id.* at 640:1–641:20 (Hsiao) (describing how the Gemini model calls upon Search to ground its response with web content and also provides links to the underlying web content); *id.* at 3638:23–3640:19 (Reid) (discussing PXR0105); PXR0105 at -305 (discussing "Search grounding," which "allows the Gemini model to check Search results before generating an answer" or "[i]n other words: Gemini model treats Google Search like a corpus for [RAG]").

42.    Through grounding, GenAI products can translate user prompts into search queries, send those queries to a search engine, and then incorporate information from the retrieved search results into their AI-generated responses.  *See, e.g.*, Rem. Tr. at 399:21–401:11 (Turley) (describing how ChatGPT could incorporate search results); *id.* at 1022:16–1023:8 (Schechter) (explaining that Microsoft's chatbot "will write a query," send that query to Bing, "[a]nd then just as if you were a human, the results are then returned, and then the chat is able to read those results"); *id.* at 1025:23–1026:5, 1030:13–1031:10 (Schechter) (further explaining how Microsoft GenAI products incorporate Bing search results); *id.* at 3835:21–3836:2 (Cue) ("And what happens is when you type something in to Search, it uses a search index to retrieve what are the first 10 hits, let's call it, that you would typically see that are linked.  The LLM now reads all of those 10 links and goes out and gathers all of the information, this is the RAG concept, . . . and it's now able to provide the answer or the results.").

34

43.    Successful grounding in search requires a high-quality search application program interface, or API.  *See id.* at 392:11–394:16 (Turley) (discussing quality issues with third-party search providers, which compelled OpenAI to build its own search index); *id.* at 1022:6–1023:8, 1039:5-20 (Schechter) (explaining that GenAI products treat search results as fact, so the quality of search results directly impacts the quality of GenAI responses); Pls.' Cromwell Rem. Dep. at 74:25–75:20 (explaining that "Copilot relies heavily on how Bing is ranking the results of the search, so the quality of the Bing index . . . will determine the ordering of . . . the citations that are going into . . . Copilot").  An API is a connection between computers or software programs that allows them to communicate and interact.  Liab. Tr. at 784:10-20 (Kolotouros); *id.* at 1234:11-18 (Dischler).

44.    To ground its Gemini models, Google uses a proprietary technology called FastSearch.  Rem. Tr. at 3509:23–3511:4 (Reid).  FastSearch is based on RankEmbed signals—a set of search ranking signals—and generates abbreviated, ranked web results that a model can use to produce a grounded response.  *Id.*  FastSearch delivers results more quickly than Search because it retrieves fewer documents, but the resulting quality is lower than Search's fully ranked web results.  *Id.*

45.    Google does not make FastSearch directly available to third parties through an API.  *Id.* at 3512:1-5 (Reid).  Rather, the technology is integrated into a Google Cloud offering called Vertex AI, which is available to third parties to ground on Google Search results or other data sources.  *Id.* at 3339:5–3340:13 (Collins); *id.* at 3512:1-5 (Reid); *id.* at 3637:18–3646:12 (Reid) (discussing PXR0105 at -305 and PXR0153 at -478).  Vertex customers do not, however, receive the FastSearch-ranked web results themselves, only the information from those results.  *Id.* at 3512:18–3513:4 (Reid).  Google limits Vertex in this manner to protect its intellectual property.

35

*Id.* at 3513:6-12 (Reid).  Google has multiple Vertex grounding agreements with third parties.  *Id.* at 3647:5–3648:4 (Reid) (discussing PXR0153 at -488).

46.  Google also uses the Vertex service to ground web results for the Gemini app.  *Id.* at 3640:1–3641:12 (Reid).  The Gemini app, however, receives through Vertex access to portions of other Search features, like the Knowledge Graph, *see infra* Remedy-Specific Conclusions of Law [hereinafter RCOL] § III.B.3, that are not available to third parties.  *Id.* at 3648:5–3649:20 (Reid) (discussing PXR0153 at -481).

### D.    The GenAI Market

#### 1.    Participants

47.  **Google** has incorporated AI technologies into its most important products, including Search.  *See id.* at 2455:16-18 (Pichai) ("[W]e have deeply used AI technologies for well over a decade across our most important products.  Obviously Search."); *id.* at 3329:13-16 (Collins) ("Q. At this point in time, Mr. Collins, are there any products at Google of significance that generative AI has not been integrated into? A. No."); *id.* at 3601:4-9 (Reid) (agreeing that Google has been incorporating AI and LLM technology into Search for years).  In February 2023, Google released its own GenAI chatbot, Bard.  *See id.* at 2498:19-25 (Pichai).  Bard has since transformed into the Gemini app, which is a GenAI chatbot product that relies on Gemini LLM models to produce results.  *See id.* at 3627:22–3628:12 (Reid); Pancholi Rem. Dep. at 51:14-23; Rem. Tr. at 625:6-15 (Hsiao).  AI Overviews is a GenAI search feature based on a branch of the Gemini LLM family.  N. Fox Rem. Dep. at 36:9-14, 36:17-19, 36:21-23.

48.  **Anthropic** is an American AI technology company that builds and pre-trains its own GenAI foundational model.  Rem. Tr. at 794:1-6 (Shevelenko); *id.* at 3334:12-21 (Collins).  Its consumer-facing chatbot application is known as Claude.  *Id.* at 4044:25–4045:15 (Hitt); N. Fox

Rem. Dep. at 275:11-18.  Google has invested in Anthropic.  Rem. Tr. at 3641:12–3642:5 (Reid); Br. of Anthropic PBC et al. as *Amici Curiae*, ECF No. 1279-1, at 6–8.

49.    **DeepSeek** is a Chinese technology company that released its eponymous chatbot to much fanfare and explosive growth in December 2024.  Rem. Tr. at 2459:24–2460:2 (Pichai) ("Last December, DeepSeek launched from China within a month, you know.  Literally, I mean, there have been tens of millions of users downloading them on Android and iOS and using them."); *id.* at 4038:23-25 (Hitt) ("You see entrants like Grok or DeepSeek, that may not have existed six months ago, are now able to reach the level of performance to wind up in the top ten of these models."); *id.* at 685:4-23 (Hsiao) ("It's explosive growth.  There's new entrants . . . .  You know, Grok, DeepSeek, all sort of new emerging models that are really, really strong." (discussing RDXD-04.007 to .008 and RDX0048)).  DeepSeek has open-sourced a pre-trained foundation model, which at least one company, Perplexity, has used to post-train and develop its GenAI offerings.  *Id.* at 798:22–799:10 (Shevelenko).

50.    **Meta** is an American technology company that builds and pre-trains its own GenAI models in the "Llama" family.  *Id.* at 3334:16-18 (Collins) ("Meta produces a competitive model called Llama that . . . recently surpassed a billion downloads . . . ."); *see also id.* at 794:1-6 (Shevelenko).  The Llama models are trained on data derived from open sources.  *See id.* at 165:10-15, 167:1-5 (Durrett).  Meta's standalone chatbot offering is Meta AI.  *See id.* at 4044:18–4045:19 (Hitt) (discussing RDXD-32.020); *see also id.* at 2461:24–2462:2 (Pichai).  Meta integrates its GenAI into its proprietary platforms, such as Facebook, Instagram, and WhatsApp.  *Id.* at 506:23–508:12 (Turley); RDX0091 at -016; RDX0151 at -007; RDX0355 at -029; Rem. Tr. at 4045:22–4046:24 (Hitt) ("Meta, who primarily distributes their GenAI products through their other properties like Instagram and WhatsApp and Facebook has also had success in getting these

products into consumers' hands."). Google has partnered with Meta to provide a Search API for Meta to ground its LLMs. *See* Pancholi Rem. Dep. at 69:8–70:11; N. Fox Rem. Dep. at 278:7-16; *see also* PXR0101.

51.    **Microsoft Corporation** is an American technology company whose offerings include GenAI products in addition to its Windows operating system, Edge browser, and Bing GSE. *See Google*, 747 F. Supp. 3d at 36 ¶ 10; Rem. Tr. at 1020:23–1021:59, 1021:19-23 (Schechter) (describing "New Bing," which incorporates LLM technology into Bing's existing search technology); *id.* at 1024:16–1025:5 (Schechter) (describing Copilot Answers, which uses "LLM technology to . . . summarize the results that are on the" Bing SERP); *id.* at 1025:6-22 (Schechter) (describing Bing's "Copilot Search" feature, which uses an LLM to present search results in a magazine format with a combination of images, text, and links); *id.* at 1025:23–1026:5 (Schechter) (describing Microsoft's consumer AI application "Copilot"). Microsoft has integrated Copilot into Edge and Bing, both as a vertical and through Copilot Answers, which is Microsoft's AI-powered search feature analogous to Google's AI Overviews. Rem. Tr. at 1024:5–1025:22, 1076:17-19 (Schechter). Microsoft licenses some AI models from OpenAI for Bing and Copilot that it fine-tunes when needed but uses other AI models as well. *See id.* at 1038:17–1039:2, 1044:1-9, 1081:9-17 (Schechter). Microsoft grounds some of the queries made through its Copilot products on Bing search results. *See id.* at 1026:6-11, 1030:13–1032:17 (Schechter).

52.    **OpenAI** is an American AI company that offers both a user-facing AI chatbot, known as ChatGPT, as well as a developer API for building AI applications on top of OpenAI's models. *Id.* at 373:2-10, 374:10–375:21 (Turley). OpenAI pre-trains its own foundation model. *Id.* at 794:1-6 (Shevelenko). ChatGPT offers a free version of its product and a paid subscription version that gives the user access to more sophisticated AI models. *Id.* at 376:14–379:3 (Turley).

OpenAI previously sought out a partnership with Google for grounding, but Google declined. *Id.* at 413:1–416:3 (Turley) (discussing PXR0181). ChatGPT has proven to be an immensely popular and fast-growing product, with over 100 million daily active users as of the end of 2024. *See id.* at 491:18–494:8 (Turley) (discussing PXR0072); *id.* at 512:22–513:4 (Turley) (agreeing that, among other strengths, OpenAI has "one of the fastest-growing products of all time" (discussing RDX0355 at -005)); *id.* at 3827:13–3828:11 (Cue) (discussing the growth of ChatGPT). In December 2024, Apple began integrating ChatGPT and OpenAI technology into its devices to power Apple Intelligence, Apple's AI experience integrated into its devices, in exchange for revenue share payments. *Id.* at 3832:4–3833:11, 3838:17–3839:18 (Cue); *id.* at 468:1-18, 468:23–469:7, 499:12-25 (Turley); *id.* at 500:1-24 (Turley) (discussing RDX0148 at -001).

53.    **Perplexity** is an American AI company that seeks to provide users an "answer machine." *Id.* at 694:8-21 (Shevelenko) (describing Perplexity's product as "an answer machine" where users first "ask questions in natural language"; then Perplexity "run[s] a search, identify[ing] high-quality sources from across the Internet that are relevant to that query," "retrieve[s] those snippets," "rank[s] them," and "use[s] different large language models to synthesize the information in a way that's responsive to the original query"; and finally the user receives "an answer in text form with citations showing where the information comes from"). Perplexity does not train its own foundational model but rather relies on foundational models pre-trained by other GenAI companies (like Meta and DeepSeek) and post-trains them from there. *Id.* at 794:1-12, 798:16–799:10 (Shevelenko). Perplexity's consumer-facing products include its website (Perplexity.ai), a web app, mobile apps, and a recently launched web browser that integrates its GenAI. *Id.* at 694:22–695:5, 748:21–749:7 (Shevelenko). Though most of Perplexity's consumers use the company's free chatbot through which it earns some revenue through ads placed below

39

query responses, it also offers a paid subscription version. *Id.* at 703:8–705:5 (Shevelenko). Like other GenAI companies, Perplexity's valuation has surged over the past couple of years. *Id.* at 731:24–733:12 (Shevelenko) (discussing Perplexity's $1 billion valuation in spring 2024 and $9 billion valuation in December 2024).

54. **xAI** is an American AI company associated with X (formerly Twitter) that recently released its Grok GenAI product. *Id.* at 2461:14-25, 2478:16-24 (Pichai); *id.* at 3334:12-24 (Collins); *id.* at 4045:4-15, 4048:1-10 (Hitt). Grok is trained on xAI's own foundation model. *Id.* at 794:1-6, 798:22-25 (Shevelenko). xAI integrates Grok into X. *Id.* at 4050:21-22 (Hitt).

55. **Other companies** in the GenAI space include DuckDuckGo, which offers a "Duck.ai" chat service where users can interact with third-party GenAI offerings like ChatGPT, Claude, or Meta AI. *See id.* at 1005:13–1007:23 (Weinberg).

### 2. Competition Among GenAI Companies

56. The GenAI space is highly competitive. *See id.* at 503:25–504:4 (Turley) (Q. And let's talk about the [GenAI] space . . . . You consider that space to be very competitive; correct? A. Yes, absolutely."); *id.* at 3335:19-23 (Collins) ("[Q.] How would you describe the current level of competition with respect to foundation models as compared to the course of competition over the years that you've seen? A. [It] is the most competitive market I've ever worked in."); *id.* at 685:4-8 (Hsiao) ("Q. How would you describe the competitive space that the Gemini app occupies? A. I would say I don't think I've seen a more fierce competition ever in my 20-some years of working in technology.").

57. There have been numerous new market entrants. *See id.* at 685:9-13 (Hsiao) ("It's explosive growth. There's new entrants. . . . You know, Grok, DeepSeek, all sort of new emerging models that are really, really strong." (discussing RDXD-04.007 to .008)); *id.* at 4038:22–4039:4

40

(Hitt) ("You see entrants like Grok or DeepSeek, that may not have existed six months ago, are now able to reach the level of performance to wind up in the top ten of these models."); *id.* at 2459:21-23 (Pichai) ("You have seen over the last few months as many people have launched chatbots.  Very quickly, these chatbots reach tens of millions of users.").

58.     GenAI firms have access to a lot of capital.  *See id.* at 4048:15–4049:20 (Hitt) ("[A] lot of firms have demonstrated they've been able to raise resources, you know, resources that might be substantial. . . .  So in terms of capital, I think that seems to be, at the moment, plentiful."); *see, e.g.*, *id.* at 498:8-14 (Turley) (agreeing that OpenAI recently announced that it has raised an additional $40 billion in capital at a valuation of $300 billion); Liab. Tr. at 3599:10–3600:21 (Nadella) (agreeing that, as of the liability phase, Microsoft had invested over $13 billion in OpenAI).

59.     There is constant jockeying for a lead in quality among GenAI products and models.  *See* Rem. Tr. at 3334:25–3335:9 (Collins) ("The top labs and companies are always leapfrogging each other and kind of jockeying for the top position.  And then the models also compete on individual capability . . . .  [T]he model competition happens both in terms of the best kind of overall model as well as the best model for specific-use cases."); *id.* at 687:15–688:2 (Hsiao) ("[N]o model ever demonstrates a significant lead over the others.  If it is better, it's sort of a little better, and then another provider will come and make their model like a little bit better than the previously best one.  So it's very—it's very tight."); *id.* at 4036:22–4039:4 (Hitt) (opining, in sum, that this is a "very active space, constantly changing position" with "[n]ewer models tend[ing] to outperform others" and "different models perform[ing] differently").  Today, Google's models do not have a distinct advantage over others in factuality or other technical benchmarks. *Id.* at 4037:9–4040:13 (Hitt) (discussing RDXD-32.015 to .016); *cf. id.* at 212:24–214:23, 216:9–

218:17 (Durrett) (declining to opine on whether Google's models are superior to the models produced by its competitors).

60.    A variety of GenAI products have achieved widespread usage.  For instance, OpenAI calculated its share of the U.S. market as of December 2024 to be approximately 85%, with Claude at 3%, Gemini at 7%, and Perplexity and Copilot making up the remainder.  *Id.* at 485:22–490:14 (Turley) (discussing RDX0355 at -029); *see also id.* at 512:22–513:4 (Turley) (OpenAI has "one of the fastest-growing products of all time.").  Google estimated that as of March 28, 2025, its Gemini app had roughly 140 million daily queries, with ChatGPT at 1.2 billion, MetaAI at over 200 million, Grok at 75 million, DeepSeek at 50 million, and Perplexity at 30 million.  *See id.* at 684:9-22 (Hsiao) (discussing RDXD-04.008).

61.    Rival GenAI products have had some success in obtaining distribution with OEMs and other companies.  OpenAI, for instance, has partnered with Apple, T-Mobile, Yahoo, DuckDuckGo, and Microsoft.  *See id.* at 468:1-18, 468:23–469:7, 499:12-25 (Turley) (describing OpenAI's partnership with Apple); *id.* at 3838:21–3839:18 (Cue) (discussing Apple's evaluation of GenAI products and how it chose OpenAI); Giard Rem. Dep. at 51:18–52:5 (discussing T-Mobile's partnership with OpenAI); Rem. Tr. at 1278:1-6 (Provost) (stating that Yahoo "work[s] with OpenAI . . . on AI summarization"); *id.* at 1005:22–1006:1 (Weinberg) (discussing Duck.ai's incorporation of models developed by OpenAI, Anthropic, or Meta); *id.* at 1044:1-9 (Schechter) (confirming that Microsoft licenses LLMs from OpenAI to incorporate into Bing).  Perplexity has a distribution deal with Motorola under which Motorola will preload Perplexity's application onto new smartphones, although the agreement is not exclusive, the application will not be on the home screen, and it will not be available via a wake word.  *See* Rem. Tr. at 717:18–719:18 (Shevelenko); *see also id.* at 3905:3-19 (Samat) (stating that Motorola will have its own assistant called "MotoAI,

which includes Perplexity and CoPilot accessible on the device, invoked by a dedicated hardware button."). Perplexity continues to negotiate with other OEMs and browser developers. *See id.* at 714:14-17, 749:17-23 (Shevelenko). Motorola has also agreed to partner with Microsoft's Copilot. *See id.* at 363:18-22 (Fitzgerald).

62. Google has entered into distribution and promotion agreements for the Gemini app. *See* RDX0432 (Google–Samsung Gemini Commercial Agreement); RDX0423 (Google–Motorola Google One AI Premium OEM Promotion Agreement); RDX0428 (Google–Lenovo Marketing Agreement).

### 3. *GenAI's Impact on GSE Usage*

63. GenAI products may be having some impact on GSE usage. *See* Rem. Tr. at 3818:20–3819:4, 3827:23–3828:11, 3846:25–3847:3 (Cue) (testifying that the volume of Google Search queries in Apple's Safari web browser declined for the first time in 22 years perhaps due to the emergence of GenAI chatbots). But GenAI products have not eliminated the need for GSEs. PXR0176 at -123 ("ChatGPT already expanded what is possible for parts of Search, but users don't yet use ChatGPT for the full range of Search needs."); Rem. Tr. at 648:2–649:21 (Hsiao) (testifying that Google tracks so-called "cannibalization" of Google Search by GenAI chatbots and the Gemini app is not diverting queries from Google Search to a significant degree today); *id.* at 3846:25–3847:17 (Cue) (attributing the recent decline in Safari's search volume to increasing usage of GenAI apps but recognizing these apps must improve to compete with Google Search); *id.* at 21:2-5 (Opening Arg.) (Plaintiffs' counsel acknowledging that general search and GenAI "are different but overlapping products" and that GenAI "is not a replacement for [s]earch today); *see also Google*, 747 F. Supp. 3d at 53 ¶¶ 111, 114 (finding during the liability phase that "AI

43

technologies have the potential to transform search" but "AI has not supplanted the traditional ingredients that define general search").

64.    AI Overviews has potentially strengthened Google's position in the GSE market. Since its introduction, Google Search queries in the United States have increased 1.5 to 2%. Rem Tr. at 3616:6–3617:4 (Reid) (conceding this); *see also* PXR0033 at -244 ("With our AI advancements across Search, including . . . AI Overviews . . . we've already increased Search usage by more than hundreds of millions of queries a month in the U.S. alone."). At present, more than ▮% of Search queries trigger an AI Overviews response. N. Fox Rem. Dep. at 188:23–189:15 (as of October 2024, approximately ▮% of U.S. Search queries trigger an AI Overviews response (discussing PXR0033 at -244)); Parakh Rem. Dep. at 76:22–77:2 (stating roughly "▮, ▮ percent" of U.S. queries triggered an AI Overviews response); *see also* Rem. Tr. at 2490:19-21 (Pichai) (agreeing that 1.5 billion Search users interact with AI through AI Overviews); Parakh Rem. Dep. at 64:6-14 (AI Overviews "serve[s] answers at scale to billions of people.").

65.    Certain types of queries with commonplace usage in GSEs are not within the current use cases of GenAI products. This includes navigational queries. *Compare* Rem. Tr. at 702:13–703:1 (Shevelenko) ("[N]avigational queries are not a core use case of Perplexity."), *with Google*, 747 F. Supp. 3d at 40 ¶ 39 ("Google's top five queries by query volume are navigational queries and nearly 12% of all Google queries are navigational queries." (internal citations omitted)). Further, commercial queries are not, at present, a common use case for GenAI applications and thus far have not cannibalized commercial queries on GSEs. Rem. Tr. at 657:5–662:3 (Hsiao) (discussing the absence of cannibalization today but believing future cannibalization may occur based on the quality of a model, its pre-training data, and its grounding capabilities);

44

*id.* at 3837:12–3838:15 (Cue) (AI chatbots have not mastered commercial queries, but chatbot developers are increasingly introducing commercial concepts).

66. Even so, "there's nothing which is fundamentally different between commercial and non-commercial queries." *Id.* at 2460:16–2461:11 (Pichai). GenAI companies hope to attract more commercial queries, which could be monetized with ads. *See, e.g.*, *id.* at 658:13–659:15 (Hsiao) ("[T]he providers will try to build great shopping experiences or commercial experiences."); *id.* at 2460:16–2461:11 (Pichai) (referencing ChatGPT's launch of a shopping experience to support the prediction that commercial use of chatbots will increase); *id.* at 662:5–663:21 (Hsiao) (discussing Google's desire to kick Gemini to Search with respect to commercial queries to monetize on the ads served on Search); *see also id.* at 256:11-22 (Fitzgerald) (Gemini does not currently serve ads or receive ad revenue with its query responses). The expectation is that GenAI products will come to serve these needs. *See id.* at 2460:19–2461:11, 2492:24–2494:4 (Pichai) (predicting that GenAI products will "undoubtedly" be used to answer more commercial queries, citing ChatGPT's launching a shopping experience as an example, and that the Gemini app "will overall expand [Google's] ability to serve users' information needs"); *id.* at 3837:21–3838:15 (Cue) (observing that "you're already starting to see" GenAI chatbots answer commercial queries and launch shopping experiences and that "it's clear that [companies] have to go in those directions, and they will," because that's "where there's financial opportunity"); *id.* at 3543:19–3544:9 (Reid) ("[W]e have signs that [GenAI chatbots] want to get more and more in [the] business [of commercial searches]."); *see also id.* at 3544:1-9 (Reid) (shopping features in Perplexity); *accord id.* at 659:16–661:13 (Hsiao) (explaining that a GenAI chatbot would likely need to be grounded with a search index or with retailers' databases in order to answer commercial queries,

45

so that it "know[s] actively what are the current products available for sale and what are their prices").

## II.    SEARCH ACCESS POINTS

### A.    Access to Search Through GenAI Products

67.    GenAI products have the potential to provide access points to GSEs. Smutny Rem. Dep. at 23:8-13 (identifying GenAI products such as Copilot that are "grounded in search" as "potential future search entry points"). That prospect, however, has not yet fully materialized given GenAI's myriad other use cases. Pls.' Cromwell Rem. Dep. at 40:15-17 ("Q. Mr. Cromwell, is Copilot's purpose to drive traffic to Bing?  A. No."); *see also* Rem. Tr. at 672:2–674:1 (Hsiao) (describing the other use cases for Gemini and the fact that content on the Gemini app is often entirely newly generated); *cf. id.* at 3546:13–3547:3 (Reid) (stating that she did not believe the Gemini app to be a search access point because it "doesn't really cause a user to build up this mental model, [to] go to the Gemini app in order to get to Search").

68.    Google has contemplated developing GenAI products to serve as search access points as a business strategy. *See* PXR0113 at -844 (Google presentation recognizing that "[t]he Search landscape is changing," pointing to "[n]ew AI access points" such as "chatbots LLM" and stating that "[t]o continue to drive Search growth & diversification in this new environment, we must introduce new user access points" including by "embedd[ing] [a] Search experience" in "Browsers/Search Engines (alongside AI chatbots) and Mobile Apps (AI/non-AI)"); Rem. Tr. at 3608:21–3609:1 (Reid) (agreeing that Google is exploring and testing new Search entry points); *id.* at 662:5–665:8 (Hsiao) (discussing commercial queries and a desire for Gemini to kick back to Search as it relates to these queries for monetization purposes).

46

69.     Within the Gemini app, as of the evidentiary hearing, users can access Search via the "related search" function, which is accessible via a "G" icon that appears in response to certain queries.  *See* Rem. Tr. at 641:21–647:20 (Hsiao) (explaining what the "G" button in the Gemini app does, including corroborating answers and providing search-related topics).  After the Gemini app generates a response to a query, one typically grounded in Search, a user can click the "G" icon and will be presented with "Search related topics."  *See id.* (Hsiao) (discussing PXRD005 at 7–10).  Should the user click one of those Search related topics, the user will "get a screen" that is "sort of a traditional Google Search results page."  *Id.* at 647:15-20 (Hsiao) (discussing PXRD005 at 7–10).

70.     This functionality was built "as an early feature that was really around trying to help with hallucinations" but has not always been present and is "very rarely clicked."  *Id.* at 665:3–6 (Hsiao); *id.* at 642:2-5 (Hsiao) (stating that Google had previously removed the "G" button).

71.     Today, the Gemini app drives little traffic to Google Search.  *Id.* at 665:7-8 (Hsiao) ("I would say Gemini does not drive much, if any, meaningful traffic to Search today."); *id.* at 4059:24–4061:8 (Hitt) (stating that "[o]nly a very small fraction" of queries yield the "G" button and lead the user to "actually even consider going to Search, and then only a small fraction of those actually wind up in Search" (discussing RDXD-32.030)); *see also id.* at 664:16–665:2 (Hsiao) ("I actually think if the user has to search after using Gemini, it's a failure of the product.  Like, the point of Gemini is to help you answer the question and help you get things done with the AI. If you then have to use another tool, you know, that's not our desired outcome . . . .").

### B.    Circle to Search

72.    "Circle to Search" is a recently launched search access point by Google for Android devices.  It allows a user to execute a query by simply drawing a circle on a device's display screen.  *See id.* at 243:10–244:14 (Fitzgerald); *id.* at 2494:5-16 (Pichai); *id.* at 3553:13–3555:16 (Reid); *id.* at 3907:17–3908:22 (Samat).  Circle to Search returns a SERP in response to the "circled" query.  *Id.* at 244:9-14 (Fitzgerald); 2494:8-16 (Pichai); 3554:16-24 (Reid); *see also id.* at 3602:21-23 (Reid) (agreeing that a user "can access Search through Circle to Search").

73.    An OEM must modify its user interface to allow Circle to Search to operate, but the search functionality itself is built on the open-source Android platform.  *Id.* at 3908:25–3910:24, 3979:19-24 (Samat).  An OEM can select the default search engine that will answer the query, which may be Google or some other search product that has the capacity to execute a "circle" query.  *See id.* at 3908:25–3910:24 (Samat) (confirming that Circle to Search can be used with a search application other than Google and discussing Perplexity's visual search offering).

### C.    Google Lens

74.     "Google Lens" is a recent visual search capability built into Chrome.  *See id.* at 1639:10–1640:7 (Tabriz) (stating that Google Lens "uses AI" and is "built by the [S]earch team" and agreeing that "Google Lens and Circle to Search" can be viewed as "search features or search products").  "[I]nstead of searching using text," a user "take[s] an image and search[es] based on that image" with Search "providing results based on what that image is."  *Id.* at 3823:11-21 (Cue) ("So if I were to search [using Google Lens], for example, I could take an image of this water, it's called 'Deer Park,' and it would search for Deer Park Water and give the results."); *see also id.* at 1657:3-14 (Tabriz).

48

75.     Google Lens's current integration in Chrome only works if Google Search is set as the default GSE in the browser.  *Id.* at 1656:22–1659:9 (Tabriz) (describing how visual search works with and without Google Search as the default GSE).

76.      Apple and Google entered into an agreement to bring Google Lens functionality to Apple devices in August 2024, with Google paying a revenue share on ads clicked on Google Lens-generated SERPs.  *Id.* at 3823:22–3825:2 (Cue).

## III.     GOOGLE'S DISTRIBUTION CONTRACTS: AMENDMENTS & WAIVERS

77.     Since the conclusion of the liability trial, Google has entered into several additional agreements, amended agreements, or extended agreements to distribute its Search and GenAI products.  *See Google*, 747 F. Supp. 3d at 89–106 ¶¶ 289–396 (chronicling the at-issue browser agreements, MADAs and RSAs); PXR0567 (June 2024 amendment to Google–Samsung Google Mobile RSA); PXR0515 (December 2024 amendment to the Google–AT&T Google Mobile RSA); PXR0571 (January 2025 Google–Samsung Gemini Commercial Agreement); PXR0535 (June 2024 Google–Motorola Google One AI Premium OEM Promotion Agreement); PXR0541 (February 2025 amendment to Google–Motorola/Lenovo Google Mobile Incentive Agreement); PXR0543 (February 2025 Google–Motorola Gemini Fund Agreement); PXR0370 (March 2024 Google–Mozilla contract extension); PXR0610 (March 2024 Google–T-Mobile RSA notice of renewal).

### A.     OEMs

#### 1.     Samsung

78.     On July 1, 2024, Google and Samsung entered into an agreement amending the Google Mobile RSA.  *See* Rem. Tr. at 237:17–240:14 (Fitzgerald); *see* PXR0567; RDX0424.  This amendment merely extended the provisions of the original RSA through March 31, 2025.

49

*See* PXR0567; *see also Google*, 747 F. Supp. 3d at 103 ¶¶ 380–383 (discussing the Google–Samsung RSA).

79.    On April 19, 2025, mere days before the start of the remedial hearing, Google and Samsung entered into an RSA lasting until September 30, 2025, with a retroactive effective date of April 1, 2025.  Rem. Tr. at 317:8–319:11 (Fitzgerald); *see also* PXR0608.  This agreement covers the United States only.  *See* Rem. Tr. at 347:9-11 (Fitzgerald) (discussing PXR0608 and RDXD-02.002); PXR0608 at -046 § 1.69.  It provides for revenue share payments on an access-point-by-access-point and device-by-device basis for both new devices and installed-base devices (i.e., devices already in circulation).  *See* Rem. Tr. at 347:12–348:8 (Fitzgerald) (discussing RDXD-02.002); PXR0608 at -044 § 1.49.  This means that "Samsung has the choice device by device whether it wants to meet . . . the requirements that would open them up for promotional payment" and can choose which "access points" are set to Google Search.  *See* Rem. Tr. at 347:12–348:8 (Fitzgerald) (discussing RDXD-02.002).  Under this RSA, access points include the Google Search widget on the device's default home screen and the Chrome browser in the "hot seat," the application dock at the bottom of the device's screen.  *Id.* at 347:23–348:4 (Fitzgerald); *see also* PXR0608 at -064 to -065 (Attach. C-1).  Revenue share payments depend on device category, can apply to new and installed-base devices, and range between ■% to ■%.  *See* PXR0608 at -060 to -062 (Attach. A).

80.    Under the April 2025 RSA, Samsung is not required to exclusively distribute any Google product or service, and the agreement explicitly states that Samsung may work with another GSE, assistant, or GenAI service.  *See* Rem. Tr. at 348:9–349:14 (Fitzgerald) (discussing PXR0608 at -049 § 9.1, and RDXD-02.002).  Further, the RSA contains no Gemini promotion requirements, which is covered by a separate agreement.  *Id.* at 349:12-18 (Fitzgerald).

81.     That separate agreement is the Gemini Commercial Agreement, a worldwide agreement between Google and Samsung governing GenAI services.  *See id.* at 349:15-21 (Fitzgerald); *see also* PXR0571; RDX0432.  The agreement went into effect on January 1, 2025, and continues through December 31, 2027, with an automatic one-year renewal through December 31, 2028.  *See* Rem. Tr. at 245:14–246:4 (Fitzgerald); PXR0571 at -363.

82.     Pursuant to the Gemini Commercial Agreement, Google agrees to make revenue share payments from Samsung's "implementation of a certain Gemini experience on its Android phones and tablets" for consumers.  PXR0571 at -364 ("Background" section); *see also* Rem. Tr. at 246:7–247:1 (Fitzgerald).  Samsung only receives payments on "Gemini Qualified Devices," which must meet certain preinstallation, placement, default, and usage requirements.  Rem. Tr. at 247:7–249:4, 251:4-12, 253:15–256:10 (Fitzgerald); PXR0571 at -368 to -369 § 2.3; *id.* at -384 to -389 (Attach. A, A-1, A-2, and B).

83.     To qualify as a Gemini Qualified Device, a new Samsung device must be preinstalled with the Gemini app placed in the App Tray, either in alphabetical order or next to the Play Store Icon.  *See* Rem. Tr. at 255:9-18 (Fitzgerald); *see also* PXR0571 at -389 (Attach. B).  As for installed-base devices, the Gemini app must be installed at the end of the Samsung App Tray.  Rem. Tr. at 255:9-20 (Fitzgerald); *see also* PXR0571 at -389 (Attach. B); Rem. Tr. at 256:5-8 (Fitzgerald) (confirming that installed-base devices are devices already in circulation).  Further, Samsung must set the long-press side key and the "hot word" to invoke the Gemini app by default.  *See* Rem. Tr. at 254:18–255:5, 255:21–256:4 (Fitzgerald); *id.* at 255:24–256:4 (Fitzgerald) (discussing how invocation of Gemini via "Hey Google" or "Hey Gemini" is required to receive a revenue payment); PXR0571 at -389 (Attach. B).  Google may choose other Gemini entry-point offerings during device setup, and Samsung must install AICore and Gemini Nano if the device

51

meets applicable technical requirements. Rem. Tr. at 247:22–248:23 (Fitzgerald); *id.* at 248:24–250:8 (Fitzgerald) (explaining that AICore is a way to run an on-device LLM and Gemini Nano is the on-device LLM); PXR0571 at -368 to -369 § 2.3(c)(i), (d).

84.    Under the Gemini Commercial Agreement, Google makes fixed payments, bounty payments, and revenue share payments to Samsung. *See* Rem. Tr. at 250:11–253:14 (Fitzgerald); PXR0571 at -384 to -385 (Attach. A).

85.    Samsung can receive fixed payments that total up to $█ million per month if the Gemini Qualified Devices meet certain "Key Performance Indicators" ("KPIs") based on usage. *See* Rem. Tr. at 250:22–251:12 (Fitzgerald); PXR0571 at -384 (Attach. A), -386 to -387 (Attach. A-1). These payments can vary based on whether KPIs are met. *See* Rem. Tr. at 251:4-9 (Fitzgerald); PXR0571 at -384, (Attach. A); *see also* Kim Rem Dep. at 173:7-9, 173:12 (agreeing that Samsung receives more money when it preinstalls Gemini on more devices).

86.    As for bounty payments, Samsung receives up to $█████ per device for activation of Gemini Qualified Devices in the United States. *See* Rem. Tr. at 251:14–252:9 (Fitzgerald); PXR0571 at -384 (Attach. A), -388 (Attach. A-2). The amount of the bounty payment depends on the geographic location of the device and whether the device is new or part of the installed base. *See* PXR0571 at -388 (Attach. A-2).

87.    As for revenue share payments, Samsung receives █% of "Net Gemini Ad Revenue" and "Net Gemini Subscription Revenue" per month. *See* Rem. Tr. at 252:10–253:14 (Fitzgerald); *see* PXR0571 at -384 to -385 (Attach. A). "Net Gemini Ad Revenue" is defined as █% of all ad revenue generated on Gemini Qualified Devices. *See* PXR0571 at -364 to -365 §§ 1.9, 1.19; *id.* at -367 § 1.39. "Net Gemini Subscription Revenue" is defined as █% of all subscription revenue generated on Gemini Qualified Devices. *See id.* at -364 to -365 § 1.9; *id.* at

-367 §§ 1.40, 1.50; *see also* Rem. Tr. at 256:11-18 (Fitzgerald) (stating that Google receives subscription revenue on the advanced version of Gemini).

88.     The Gemini Commercial Agreement does not limit Samsung's ability to work with GenAI services other than Gemini.  *See* Rem. Tr. at 350:21–351:12 (Fitzgerald); PXR0571 at -371 § 4.7.  Further, other device entry points remain available to other GenAI services, including additional side-key buttons, hot words, or placement in the hot seat or on the default home screen.  Rem. Tr. at 351:21–353:13 (Fitzgerald).  Finally, the Gemini Commercial Agreement provides a mechanism for the parties to exit annually.  *Id.* at 350:4-20 (Fitzgerald); PXR0571 at -375 to -376 § 8.4(a); *see also* RDXD-02.002.

89.     As of the evidentiary hearing, the Samsung-Google MADA has lapsed in the United States.  *See* Rem. Tr. at 353:15–354:15 (Fitzgerald) (stating that Samsung has no obligation to put either the Google Search widget or Chrome on devices in the United States to receive revenue payments under the RSA); *see also Google*, 747 F. Supp. 3d at 97–99 ¶¶ 348–358 (discussing the Samsung-Google MADA).

### 2.     *Motorola*

90.     Google has entered additional agreements with Motorola and its parent company, Lenovo.  *See* Rem. Tr. at 258:4–261:16 (Fitzgerald) (discussing PXR0535); *id.* at 354:16–359:2 (Fitzgerald) (discussing RDXD-02.003); *see also* PXR0541 (February 2025 amendment to Google–Motorola/Lenovo Google Mobile Incentive Agreement); RDX0442 (same); PXR0535 (June 2024 Google–Motorola Google One AI Premium OEM Promotion Agreement); PXR0537 (June 2024 Google–Lenovo Marketing Agreement); PXR0543 (February 2025 Google–Motorola Gemini Fund Agreement).

91.     In June 2024, Google and Motorola signed a marketing agreement, whereby Motorola received $█ million from Google to promote Google services, including Gemini, in the United States and elsewhere with respect to Motorola's Razr and Edge devices.  Laflamme Rem. Dep. at 43:11–45:2, 45:4-10, 45:13–47:1, 47:5–48:5; PXR0537 at -280 to -281 (Attach. A).  During the term of the agreement, which lasted from June 1, 2024, to December 31, 2024, Motorola was restricted from using the funds to market non-Google assistive services, including other GenAI assistive services.  *See* Laflamme Rem. Dep. at 46:21–47:1, 47:5–48:5; PXR0537 at -280 (Attach. A).  Motorola viewed the additional funding received from Google as bringing it closer to where Motorola sought to be with revenue share payments.  Laflamme Rem. Dep. at 49:16-20, 50:1-6.

92.     Also in June 2024, Google and Motorola entered into an agreement to offer "AI Premium," with an end date of September 30, 2025.  Rem. Tr. at 259:14-16 (Fitzgerald); PXR0535 at -164.  Under this agreement, Motorola is required to preinstall the Gemini app and Google One, which is a cloud storage solution, on the default home screen of four devices.  *See* Rem. Tr. at. 259:22–261:14, 357:13–358:15 (Fitzgerald); PXR0535 at -067 to -068 § 2.2.  Google agreed to pay Motorola a bounty for Gemini app subscriptions pursuant to this agreement.  PXR0535 at -069 to -070 § 4.1.  The agreement is also non-exclusive, meaning that it does not restrict or limit Motorola from preloading or determining the placement of third-party apps beyond the placement and setup requirements listed.  Rem. Tr. at 358:19–359:2 (Fitzgerald); PXR0535 at -068 § 2.3.

93.     In February 2025, Google and Motorola signed a Gemini funding agreement lasting from January 1, 2025, to December 31, 2025.  *See* Laflamme Rem. Dep. at 71:6–72:1; PXR0543 at -653, -667.  This agreement allocates $█ million for Gemini-related marketing activities.  *See* Laflamme Rem. Dep. at 72:9–73:3; PXR0543 at -656 § 4.1; *id.* at -668 (Attach. A).

54

94.    Around the same time, Google and Motorola also amended their RSA with an effective date of January 1, 2025.  *See Google*, 747 F. Supp. 3d at 103 ¶¶ 380, 384 (discussing Motorola's RSA with Google); PXR0541; RDX0442; Laflamme Rem. Dep. at 34:13-16.

95.    In amending the RSA, Motorola sought to both increase its revenue share payments and gain flexibility in partnering with other companies.  Laflamme Rem. Dep. at 36:9–38:13.  The amended RSA increases some of the revenue share payments, provides for revenue share payments on an access-point-by-access-point and device-by-device basis for devices sold in the United States, removes Search widget and Chrome placement obligations for devices sold in the United States, and provides no restrictions on preloading alternative search or GenAI services, meaning that Motorola could still receive payments under the RSA while having other GSE or GenAI providers on the same device.  *See* Rem. Tr. at 355:18–357:2 (Fitzgerald); PXR0541 at -196 to -197 §§ 2.3, 2.9, 2.10; *id.* at -199 to -200 §§ 2.17, 2.18; *see also* Laflamme Rem. Dep. at 56:18–57:2, 57:5–58:4.  That said, Motorola receives less revenue share if it does not fulfill certain placement requirements, such as Chrome as the default browser in the application dock or the Google Search widget on the default home screen.  *See* Laflamme Rem. Dep. at 69:15–70:11, 70:14-18; PXR0541 at -199 to -200 § 2.18.

**B.    Carriers**

96.    Google has also extended RSAs with U.S. carriers, including AT&T, Verizon, and T-Mobile.  *See* Ezell Rem. Dep. at 24:20–25:6 (stating that AT&T entered into a short-term extension from December 2024 to September 2025); PXR0515 (December 2024 amendment to Google–AT&T Mobile RSA); RDX0438 (same); PXR0597 (January 2025 amendment to Google–Verizon RSA); RDX0440 (same); PXR0610 (March 2024 Google–T-Mobile RSA notice of renewal).

97.     The December 2024 AT&T amendment provides for revenue share payments on an access-point-by-access-point and device-by-device basis. *See* Rem. Tr. at 361:1–7 (Fitzgerald); Ezell Rem. Dep. at 27:5–28:15 ("[T]he biggest change in the new extension is that . . . [AT&T] can elect to work with Google on a particular search entry point, but that doesn't obligate [it] to work with Google on another search entry point."); PXR0515 at -119 to -120 § 2.5, -123 (Attach. B). Further, the agreement places no restrictions on promoting alternative search services. *See* Rem. Tr. at 361:1-4 (Fitzgerald); PXR0515 at -120 § 2.8. To receive a revenue share payment for a particular device, AT&T must satisfy certain requirements, such as placement obligations or Chrome as a default browser. Ezell Rem. Dep. at 28:16–29:1; *see also* PXR0515 at -123 to -124 (Attach. B).

98.     Verizon and Google amended its RSA in January 2025, effective from January 1, 2025, through September 30, 2025. *See* PXR0597 at -320, -323; Rem. Tr. at 359:8-13 (Fitzgerald). Like AT&T's amended RSA, Verizon's amendment provides for revenue share payments on an access-point-by-access-point and device-by-device basis and no restrictions on alternative search services. *See* Rem. Tr. at 359:14-20 (Fitzgerald); PXR0597 at -321 to -322 §§ 2.4, 2.5, 2.9; *id.* at -324 (Attach. B).

99.     T-Mobile had previously exercised an option to extend its RSA for an additional year through June 2025. *See* PXR0610 (March 2024 email exercising extension option); *see also Google*, 747 F. Supp. 3d at 102–03 ¶¶ 378–379 (describing the T-Mobile RSA). By the time of the evidentiary hearing, Google and T-Mobile were in discussions regarding a new agreement. *See* Rem. Tr. at 361:23–362:10 (Fitzgerald). Consistent with the Verizon and AT&T agreements, Google proposed that the revenue share payments be access point by access point and device by device and that there be no restrictions on alternative search, assistant, or GenAI services. *Id.* at

362:11-19 (Fitzgerald) (discussing RDXD-02.006).  Further, Google proposed that there need not be any Assistant preinstallation requirements.  *Id.* at 362:11-21 (Fitzgerald) (discussing RDXD-02.006).  Under Google's proposal, T-Mobile could configure its device to preinstall alternatives to Google Search and Gemini and still receive revenue payments.  *Id.* at 363:1-5 (Fitzgerald).

### C.     Mozilla

100.    Mozilla exercised an option under its existing RSA with Google to extend it for an additional year, with an expiration date of December 1, 2026.  *See id.* at 3166:10–3167:4 (Mullheim); PXR0370 (March 13, 2025, email); *see also Google*, 747 F. Supp. 3d at 96 ¶¶ 334–336 (discussing the Google–Mozilla RSA whereby Mozilla earns revenue share payments in exchange for Google's default search placement on the Firefox browser).

### D.     Waiver Letters

101.    Right before the evidentiary hearing, Google sent letters waiving certain obligations contained in its agreements with Motorola, AT&T, and Verizon.  *See* Rem. Tr. at 357:3-12, 359:21–360:3, 361:9-17, 369:3-10 (Fitzgerald); PXR0607 (April 17, 2025, waiver letter to Motorola); PXR0606 (April 17, 2025, waiver letter to AT&T); PXR0609 (April 17, 2025, waiver letter to Verizon).

102.    The Motorola letter waived Google Assistant requirements in Motorola's RSA and clarified that there are no restrictions in the RSA on alternative assistive services.  *See* Rem. Tr. at 357:3-12 (Fitzgerald); PXR0607; *see also* Laflamme Rem. Dep. at 64:5–65:19 (Motorola wanted the February 2025 extension to resolve ambiguity around whether partnership with other GenAI products would violate the RSA).

103.    The AT&T and Verizon letters waived restrictions on alternative assistive and GenAI services and changed Google Assistant to an "à la carte" access point, meaning that the

carriers could decide whether to have Assistant and receive revenue share payments, rather than be subject to an all-or-nothing requirement. *See* Rem. Tr. at 359:21–360:18, 361:9-17 (Fitzgerald); *see also* PXR0606; PXR0609. These waiver letters made clear that partners could preinstall alternative search or GenAI products and still receive revenue share payments. *See* Rem. Tr. at 360:1-6, 361:18-21 (Fitzgerald).

## CONCLUSIONS OF LAW

In this section, the court sets forth conclusions of law that will frame its later evaluation of the parties' proposed remedies. The court here covers: (1) the general legal principles of antitrust remedies; (2) the sufficiency of the liability-phase factual findings to support the proposed remedies; (3) the "fruits" of Google's exclusionary conduct; and (4) the propriety of including GenAI firms and products within the scope of remedies.

## I.    LEGAL FRAMEWORK

### A.    General Principles

It is the duty of the district court, upon finding a violation of the antitrust laws, to redress the violation and restore competition. *See United States v. U.S. Gypsum Co.*, 340 U.S. 76, 88 (1950); *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972). The remedy in a Section 2 enforcement action "must seek" to "unfetter a market from anticompetitive conduct," "deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future." *United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001) [hereinafter *Microsoft III*] (en banc) (internal quotation marks and citations omitted).[3]

---

[3] The D.C. Circuit, quoting Supreme Court precedent, has identified a fourth remedial objective: "terminate the illegal monopoly." *Microsoft III*, 253 F.3d at 103 (quoting *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968)). On remand, the district court deemed this an improper objective in that case. *New York v. Microsoft Corp.*,

An appropriate remedy "restor[es] conditions in which the competitive process is revived," *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1231 (D.C. Cir. 2004), and is "tailored to fit the wrong creating the occasion for the remedy," *Microsoft III*, 253 F.3d at 107; *see Ford*, 405 U.S. at 575 (emphasizing that the relief ordered "must fit the exigencies of the particular case" (internal quotation marks and citation omitted)); *accord* 3 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 650a(2)(D) (5th ed. & Supp. 2025) [hereinafter AREEDA & HOVENKAMP] ("[T]he relief must be reasonably tailored to prevent a recurrence of the challenged practices and, to the extent practicable, to restore competitive conditions to the dominated market."). The district court is vested with broad discretion in crafting the remedial decree. *Ford*, 405 U.S. at 573 (collecting cases); *Microsoft III*, 253 F.3d at 105 ("[A] district court is afforded broad discretion to enter that relief it calculates will best remedy the conduct it has found to be unlawful.").

The ordinary starting point is an injunction terminating the anticompetitive conduct. *See Ford*, 405 U.S. at 575 (stating that the relief ordered should "assure the public freedom from" continuation of the exclusionary acts (citation omitted)); *see also Microsoft III*, 253 F.3d at 106. But "relief, to be effective," must often "go beyond the narrow limits of the proven violation." *Gypsum*, 340 U.S. at 90; *see New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 148 (D.D.C. 2002) [hereinafter *New York I*] (recognizing that "equitable relief beyond a mere injunction against repetition of the act is generally appropriate" where "a monopolist has consummated an exclusionary act" (quoting 3 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 653c (2d ed. 2000))), *aff'd*, *Massachusetts*, 373 F.3d 1199. Accordingly, "the district court is 'empowered to fashion appropriate restraints on [the defendant's] future activities both to avoid a

_____

224 F. Supp. 2d 76, 100–01 (D.D.C. 2002). This court, however, need not decide this issue, because there are independent reasons that remedies designed to eliminate the defendant's monopoly—i.e., structural remedies—are inappropriate in this case. Moreover, Plaintiffs are not advocating for monopoly termination as a rationale to support their remedies. *See* Pls.' Reply at 3; Rem. Tr. at 4756:11–4757:1 (Closing Arg.).

recurrence of the violation and to eliminate its consequences.'" *Massachusetts*, 373 F.3d at 1216

(quoting *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 697–98 (1978) [hereinafter

*NSPE*])*; see United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 724 (1944) ("Equity has

power to eradicate the evils of a condemned scheme by prohibition of the use of admittedly valid

parts of an invalid whole."); *accord* 3 AREEDA & HOVENKAMP ¶ 653f ("[E]quitable relief properly

goes beyond merely 'undoing the act'; the proper relief is eradicating all the consequences of the

act and providing deterrence against repetition; and any plausible doubts should be resolved

against the monopolist.").

Consistent with that authority, the court may prohibit "practices connected with acts

actually found to be illegal," *Gypsum*, 340 U.S. at 89, including practices "which are of the same

type or class as unlawful acts," *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 132

(1969) (citation omitted); *see Massachusetts*, 373 F.3d at 1233 (concluding that the district court

"did not abuse its discretion by adopting a remedy that denie[d] Microsoft the ability to take the

same or similar actions to limit competition in the future"); *accord* 3 AREEDA & HOVENKAMP

¶ 653f ("[I]njunctive relief must be tailored with sufficient breadth to ensure that a certain 'class'

of acts, or acts of a certain type or having a certain effect, not be repeated.").  It may even impose

affirmative obligations on the defendant.  *See Massachusetts*, 373 F.3d at 1215 (approving

"forward-looking" provisions requiring Microsoft to disclose certain APIs and communications

protocols, even though "non-disclosure of this proprietary information had played no role in our

holding Microsoft violated the antitrust laws").

Behavioral remedies, then, need not be confined to "end[ing] specific illegal practices."

*Int'l Salt Co.*, 332 U.S. at 401; *see New York I*, 224 F. Supp. 2d at 107 (acknowledging

"unquestionable legal authority which indicates that the Court may address conduct beyond the

precise parameters of that found to violate the antitrust laws"). Nor must they be narrowly directed at "restor[ing] the status quo ante." *Ford*, 405 U.S. at 573 n.8. Rather, they must "represent[] a reasonable method of eliminating the consequences of the illegal conduct." *NSPE*, 435 U.S. at 698 (upholding an injunction "go[ing] beyond a simple proscription against the precise conduct previously pursued"); *see Massachusetts*, 373 F.3d at 1216, 1218 (applying *NSPE*'s "reasonable method" standard to "forward-looking" mandatory disclosure provisions); *see also Bausch & Lomb*, 321 U.S. at 726 (summarizing Supreme Court precedents as "uphold[ing] equity's authority to use quite drastic measures to achieve freedom from the influence of the unlawful restraint of trade," provided such measures "reasonably tend[] to dissipate the restraints and prevent evasions").

Structural relief, such as divestiture or dissolution, is also available to redress a Section 2 violation. The "most drastic, but most effective, of antitrust remedies," *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961), and perhaps "the most important," *id.* at 331, structural measures are "designed to eliminate the monopoly altogether" and therefore "require[] a clearer indication of a *significant causal connection* between the conduct and creation or maintenance of the market power," *Microsoft III*, 253 F.3d at 106 (quoting 3 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 653b (1st ed. 1996)). Courts have traditionally ordered such remedies where the monopoly arose by merger or acquisition, *see Microsoft III*, 253 F.3d at 105, and where "other measures will not be effective to redress a violation," *E. I. du Pont*, 366 U.S. at 327; *see also Microsoft III*, 253 F.3d at 49 (observing that "[c]onduct remedies may be unavailing" in cases involving technologically dynamic markets "because innovation to a large degree has already rendered the anticompetitive conduct obsolete"); *accord* 3 AREEDA & HOVENKAMP ¶ 653c1 (explaining that "[t]he rationale for a 'structural' remedy is that injunctive

61

relief is inadequate" and "[t]he case for a breakup remedy is strongest with respect to acquired assets").

The harshness of a remedy is not reason alone to reject it. *See E. I. du Pont*, 366 U.S. at 327. On the contrary, those who violate the antitrust laws cannot "avoid an undoing of their unlawful project on the plea of hardship or inconvenience." *Id.* at 326–27 (citation omitted); *see FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1033 (D.C. Cir. 2008) ("Even remedies which 'entail harsh consequences' would be appropriate to ameliorate the harm to competition from an antitrust violation." (quoting *E. I. du Pont*, 366 U.S. at 327)). Antitrust actions would be "futile exercise[s]" indeed "if the Government prove[d] a violation but fail[ed] to secure a remedy adequate to redress it." *E. I. du Pont*, 366 U.S. at 323.

Of course, the district court's equitable powers are not without limits. As the Supreme Court has made clear, the ends of equity are ill-served by punishing the monopolist for past transgressions, *Int'l Salt*, 332 U.S. at 401; prohibiting "all future violations of the antitrust laws," *Zenith Radio*, 395 U.S. at 133; or providing aid to a particular competitor, *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993). Further, the "[m]ere existence of an exclusionary act does not itself justify full feasible relief against the monopolist to create maximum competition." *Microsoft III*, 253 F.3d at 106 (quoting 3 AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 650a (1st ed. 1996)). And the court must be sensitive to remedies that risk substantially stifling technological innovation or impairing consumer welfare. *See Massachusetts*, 373 F.3d at 1219 (affirming the district court's rejection of a remedy that would work a "substantial" effect upon Microsoft's incentive to innovate and thereby harm consumers); *see also United States v. Am. Tobacco Co.*, 221 U.S. 106, 185 (1911) (counseling that antitrust violations should be remedied with "as little injury as possible to the interest of the general public" and with

62

"proper regard" for relevant private interests); *New York I*, 224 F. Supp. 2d at 100 ("Equitable relief in an antitrust case should not 'embody harsh measures when less severe ones will do . . . .'" (quoting 2 AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 325a (2d ed. 2000))).

Ultimately, when crafting a remedial decree, judges must "be mindful . . . of their limitations" and approach the task with "a healthy dose of judicial humility." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 106–07 (2021). After all, judges "are neither economic nor industry experts," and "[a]n antitrust court is unlikely to be an effective day-to-day enforcer of a detailed decree." *Id.* at 102 (internal quotation marks and citation omitted). Thus, "[w]hen it comes to fashioning an antitrust remedy, . . . caution is key." *Id.* at 106.

## B.    Causation

Causation plays an important role in calibrating the scope of a remedial decree. The relief granted should not "exceed[] evidence of a causal connection" between the defendant's anticompetitive behavior and its dominant position in the relevant market. *Massachusetts*, 373 F.3d at 1234.

To make that determination in this case, the court must resolve two threshold issues: (1) the strength of the causal connection required to impose certain remedies and (2) the types of remedies to which that standard applies. Both sides agree that an order enjoining Google's exclusionary practices is appropriate where the requisite causal connection is found only through inference. *See* Pls.' Br. at 10–11; Google's Br. at 12. Turning to the decree's outer limits, the parties further agree that structural remedies must satisfy a heightened causation standard—namely, the standard set forth in *Microsoft III*: "a clearer indication of a *significant causal connection* between the conduct and creation or maintenance of the market power." *Microsoft III*, 253 F.3d at 106 (quoting 3 AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 653(b) (1st ed. 1996)); *see* Pls.' Br. at 10–12;

63

Google's Br. at 17, 24–25. The rub, then, is how to evaluate more robust behavioral remedies that fall between these two poles.

### 1. The Strength of the Causal Connection

In a redux of its liability-phase defense, Google contends that *Microsoft III* demands a showing of but-for causation as to every remedy except the narrowest one—an injunction against the specific conduct held unlawful. Google's Br. at 5–7, 17–24; Google's Reply at 3–5; *see also Google*, 747 F. Supp. 3d at 152–55 (discussing Google's but-for argument at the liability phase). According to Google, "a clearer indication of a significant causal connection" is synonymous with a showing of but-for causation, and this court cannot grant any additional relief unless it finds that Google would not have maintained its monopoly in the relevant markets absent its exclusive distribution agreements. Google's Br. at 5–7, 17–24; *see also id.* at 23 ("The but-for analysis in this case is more straightforward than in many cases because the exclusionary conduct is limited to specific terms of identifiable contracts."). To justify greater relief, Plaintiffs had to show that Google's market dominance would have declined or that Google would not have enjoyed market advantages "but for" the exclusive distribution agreements, which they failed to do. *See id.* at 21 (arguing that Plaintiffs failed to establish a causal link because they "did not attempt to identify the market share that purportedly would have shifted to other search engines if Google had entered only non-exclusive agreements, the amount of data that rivals purportedly would have needed to improve their quality or monetization, or the scale that rivals supposedly would have obtained if not for the exclusionary conduct").

Google's reliance upon *Microsoft III* for this proposition is misplaced. An extended discussion of that case is necessary to understand why.

64

In *Microsoft III*, the trial court found that Microsoft had violated Section 2 of the Sherman Act in part because it had closed off distribution channels for nascent Netscape and Java technologies, which Microsoft perceived as threats to its dominance in the operating systems market. *Microsoft III*, 253 F.3d at 68–70, 75–76. On appeal, Microsoft urged the D.C. Circuit sitting en banc to reject that liability finding because the necessary causal link between Microsoft's foreclosure of distribution channels and its maintenance of an operating system monopoly was missing. *Id.* at 78. To support that contention, Microsoft pointed to the trial court's factual finding that "[t]here is *insufficient* evidence to find that, absent Microsoft's actions, Navigator and Java already would have ignited genuine competition in the market for Intel-compatible PC operating systems." *Id.* (emphasis added).

The court rejected Microsoft's argument. It explained that no authority stood for the "proposition that, as to § 2 *liability* in an equitable enforcement action, plaintiffs must present direct proof that a defendant's continued monopoly power is precisely attributable to its anticompetitive conduct." *Id.* at 79. Instead, causation based on inference—that is, whether the exclusionary conduct "reasonably appears capable of making a significant contribution to maintaining monopoly power"—was an appropriate standard to establish liability in those cases. *Id.* (citations omitted) (cleaned up). Such inference is appropriate, the court said, whether (as in this case) the conduct was "aimed at producers of established substitutes" or (as in *Microsoft III*) directed at "nascent threats." *Id.* But in no event did government enforcers need to make a but-for showing to establish liability. "To require that § 2 liability turn on a plaintiff's ability or inability to reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct would only encourage monopolists to take more and earlier anticompetitive action." *Id.* The court also pointed to the practical problem of proof. "Neither plaintiffs nor the court can confidently

65

reconstruct a product's hypothetical technological development in a world absent the defendant's exclusionary conduct." *Id.* A more relaxed causation standard for establishing liability was thus appropriate, as the defendant should be "made to suffer the uncertain consequences of its own undesirable conduct." *Id.* (quoting 3 AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 651c (1st ed. 1996)).[4]

But the court did not end its discussion of causation there. It reminded that causation is also relevant for determining antitrust remedies. *See id.* at 80 ("Microsoft's concerns over causation have more purchase in connection with the appropriate remedy issue, *i.e.*, whether the court should impose a structural remedy or merely enjoin the offensive conduct at issue."). That is not something the trial court had appreciated. It had ordered splitting Microsoft into an applications company and an operating systems company, without either holding an evidentiary hearing or providing an adequate explanation. *Id.* at 48, 101–03. These procedural deficiencies required a remand. *Id.* at 103. The trial court would have to consider anew whether "it should impose a structural remedy or merely enjoin the offensive conduct at issue." *Id.* at 80. In that context, the Court of Appeals explained that the standard of proof to sustain a structural remedy was more demanding than establishing causation by inference. "[S]tructural relief . . . 'requires a clearer indication of a *significant causal connection* between the conduct and creation or maintenance of the market power.'" *Id.* at 106 (alteration omitted) (quoting 3 AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 653b (1st ed. 1996)). The Court of Appeals then observed that

---

[4] AREEDA & HOVENKAMP continues to support the "reasonably appears capable" standard and the underlying proposition that "the defendant is made to suffer the uncertain consequences of its own undesirable conduct." 3 AREEDA & HOVENKAMP ¶ 651g. Moreover, this proposition applies at both the liability and remedies stages. *See id.* at ¶ 653f ("It is thus proper to invoke again the proposition that the monopolist bears the risk of the uncertain consequences created by its exclusionary acts. . . . [T]he proper relief is eradicating all the consequences of the act and providing deterrence against repetition; and any plausible doubts should be resolved against the monopolist."); *id.* at ¶ 650a(2)(B) ("[I]t is always appropriate to deprive the defendant of the continuing benefits of past misbehavior. In devising the 'tailored' remedies for this purpose, reasonable doubts will ordinarily be resolved against the defendant.").

the trial court "expressly [had] not adopt[ed] the position that Microsoft would have lost its position in the [operating system] market but for its anticompetitive behavior." *Id.* at 107. "If the court on remand is unconvinced of the causal connection between Microsoft's exclusionary conduct and the company's position in the [operating system] market, it may well conclude that divestiture is not an appropriate remedy." *Id.*

Google reads *Microsoft III* as effectively requiring a showing of but-for causation for any remedy greater than "an injunction against continuation of [the unlawful] conduct." Google's Br. at 23–24 (quoting *Microsoft III*, 253 F.3d at 106). It urges the court to reject Plaintiffs' remedies for a failure of proof "because the record does not show that Google 'would have lost its position in the relevant markets but for its anticompetitive behavior.'" *Id.* at 23 (quoting *Microsoft III*, 253 F.3d at 107) (alterations omitted)). But Google's interpretation stretches *Microsoft III* beyond recognition.

To state the obvious, the Court of Appeals did not use that simple, familiar phrase "but for" when describing the remedies causation standard. (Nor did the AREEDA & HOVENKAMP treatise on which it relied, for that matter.) Importantly, the court remanded the matter for further proceedings, even though it acknowledged "the District Court expressly did not adopt the position that Microsoft would have lost its position in the [relevant] market but for its anticompetitive behavior." *Microsoft III*, 253 F.3d at 107. In other words, the plaintiffs had not established but-for causation at the liability phase. If divestiture was dead on arrival for want of such connection, a remand would have been unnecessary. The Court of Appeals simply could have directed the trial court to enter a prohibitory injunction. But that is not what it did. Presumably, the structural remedy, as well as the other "conduct remedies," *see id.* at 48, remained available even without proof of but-for causation.

Google's reading of *Microsoft III* is further undercut by the D.C. Circuit's reasoning. When it comes to analyzing causation, the Court of Appeals explained, plaintiffs and courts alike face a fundamental "proof problem": the "inability to reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct." *Id.* at 79. The D.C. Circuit is not alone in recognizing this evidentiary predicament. The Supreme Court has likewise concluded that but-for causation "would be a standard of proof if not virtually impossible to meet, at least most ill-suited for ascertainment by courts" in exclusive dealing cases. *Standard Oil Co. of Cal. v. United States*, 337 U.S. 293, 309–10 (1949). So, too, have leading scholars. Since *Microsoft III*, Areeda and Hovenkamp have continued to endorse the "reasonable inference" standard on the ground that "[m]any exclusionary practices, just like many negligence torts, are one-of-a-kind situations in which it is impossible to prove that an outcome would have been different absent the violation." AREEDA & HOVENKAMP ¶ 657a2. "Once the challenged events have occurred, the alternative reality can never be re-created." *Id.* "For this reason," the authors submit, "the government suitor need not show that competition is in fact less than it would be in some alternative universe in which the challenged conduct had not occurred. It is enough to show that anticompetitive consequences are a naturally-to-be-expected outcome of the challenged conduct." *Id.*

This problem is no less intractable at the remedies stage than it was at the liability stage. (Google does not say otherwise.) To reconstruct the but-for world would require the court to determine how Google Search and its rivals would have evolved had Google not secured exclusive default placement for more than 10 years across the most effective channels of distribution. Such an exercise is even more challenging in cases, like this one, involving technology markets. As the D.C. Circuit observed in *Microsoft III*, even "six years seems like an eternity in the computer industry"; during that period, "firms, products, and the marketplace are likely to have changed

68

dramatically." 253 F.3d at 49. If judges could accurately chart the path innovation would have taken, we would work on Wall Street (or the Las Vegas Strip), not Constitution Avenue. Of course, judicial decision-making is informed by the opinions of economic experts. But not even Google's expert claimed "to be able to precisely specify a but-for world" "in a case like this." Rem. Tr. at 4215:16-18 (Murphy); *see id.* at 4215:9-12 (Murphy) ("The idea that I could tell you, and the world will look just like this, nobody is going to do that. And nobody is going to do that in this case, nobody is going to do it in most cases.").

Lest any doubts remain, the decisions implementing *Microsoft III*'s remedial directives laid them to rest. On remand, Microsoft pressed a virtually identical argument to the one Google raises here. *Compare New York I*, 224 F. Supp. 2d at 147 (Microsoft claiming that the plaintiffs were "entitled to no more than a simple proscription against the offensive conduct" because there was no proof that Microsoft's rivals "would have achieved near ubiquitous distribution," evolved into viable platform substitutes, and "thereby eliminated Microsoft's monopoly" "absent the 12 Microsoft acts found to be anticompetitive"), *with* Google's Br. at 17 (Google claiming that the record evidence does not justify relief beyond a prohibitory injunction because Plaintiffs have not shown that Google's rivals "would have achieved [sufficient] scale" to "displace[]" Google's monopoly position "in the absence of its search distribution agreements"). The district court unequivocally rejected Microsoft's argument. Its position, the district court reasoned, "demand[ed] of Plaintiffs precisely what the appellate court deemed to be largely unattainable" and overlooked the fact that the appellate court "was well aware of [the liability-phase] finding" that but-for causation had not been established, yet "did not indicate that Plaintiffs must overcome it in order to obtain a remedy exceeding a mere proscription of the illegal conduct." *New York I*, 224 F. Supp. 2d at 147–48. On appeal, the D.C. Circuit, again sitting en banc, unanimously

69

"affirm[ed] the district court's remedial decree in its entirety." *Massachusetts*, 373 F.3d at 1204. At no point did it question the district court's causation analysis.

Google contorts these decisions to tease out its desired standard. With respect to *New York I*, Google trains its focus on the lone instance in which the district court mentioned but-for causation. It asserts that "the district court rejected a proposed remedy that would have 'place[d] the Java technology "on equal footing" with Microsoft's technology' because '[t]here is no evidence that Java would today possess "equal footing," in terms of distribution, with Microsoft, *but for* Microsoft's anticompetitive conduct.'" Google's Br. at 6 (alterations in original) (emphasis added by Google) (quoting *New York I*, 224 F. Supp. 2d at 262). That finding, however, came amidst a discussion of the plaintiffs' proposal on remand that Microsoft be ordered to distribute Java, a victim of Microsoft's exclusionary conduct. *New York I*, 224 F. Supp. 2d at 260. The district court declared this remedy inappropriate because it amounted to "nothing more than 'market engineering.'" *Id.* at 262 (citation omitted). Far from "facilitating entry," the district court explained, mandatory Java distribution would "manipulat[e]" the market, *id.* at 262, and "single[] out" a particular competitor by "anoint[ing] [it] with special treatment not accorded to other competitors in the industry," *id.* at 189. Such "favoritism" was clearly antithetical to both the purpose of the antitrust laws and binding precedent. *Id.* at 189 (collecting cases); *see Brooke Grp.*, 509 U.S. at 224 ("It is axiomatic that the antitrust laws were passed for 'the protection of *competition*, not *competitors*.'" (emphasis in original) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962))). The D.C. Circuit agreed. *See Massachusetts*, 373 F.3d at 1231 ("There is a real difference. . . between redressing the harm done to competition by providing aid to a particular competitor and redressing that harm by restoring conditions in which the competitive process is revived and any number of competitors may flourish (or not) based upon

70

the merits of their offerings."). Thus, the "significant causal connection" standard played no role in either court's rejection of the "Java Distribution" remedy. The finding highlighted by Google merely reinforced the district court's conclusion that opening the unlawfully foreclosed channels of distribution to competition on the merits does not mean filling them with a rival product, especially where the record did not support such an outcome.

Google's reading of *Massachusetts* fares no better. As Google tells it, the D.C. Circuit squarely rejected the argument that "the district court erred in applying a 'stringent but-for test' of causation in determining whether 'advantages gained by Microsoft could be considered a fruit of Microsoft's illegality.'" Google's Br. at 6 (quoting *Massachusetts*, 373 F.3d at 1233). But it was the appellants (a group of states led by Massachusetts)—not the district or appellate court—that characterized the district court's causation standard in this way. *See Massachusetts*, 373 F.3d at 1233 ("Massachusetts also complains the district court erred in applying a 'stringent but-for test' of causation in determining whether 'advantages gained by Microsoft could be considered a fruit of Microsoft's illegality.'"); Br. for Pls.-Appellants, *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004) (Nos. 02-7155 & 03-5030), 2003 WL 22340413 ("The district court erred as a matter of law in the causation burden it applied to analyzing the fruits of Microsoft's illegality, imposing a stringent but-for test before the advantages gained by Microsoft could be considered a fruit of Microsoft's illegality."). In any event, the D.C. Circuit nowhere discredited the district court's approach to analyzing causation or its findings as to the strength of the causal connection established—a point Google does not contest. *See* Google's Br. at 6 (emphasizing that "an *en banc* D.C. Circuit unanimously 'affirmed the district court's remedial decree in its entirety'" (alteration and citation omitted)). Against that backdrop, this court is hard-pressed to conclude that *Microsoft III* and its progeny require plaintiffs to satisfy such a demanding standard.

71

### 2.    *Causation Standard Applicable to Certain Remedies*

Having determined that "significant causal connection" is not tantamount to but-for causation, the court turns to the second threshold issue—the types of remedies to which the former standard applies.    Google accords substantial weight to *Microsoft III*'s instruction that "the antitrust defendant's unlawful behavior should be remedied by 'an injunction against continuation of that conduct'" absent evidence of a significant causal connection.    *Microsoft III*, 253 F.3d at 106 (quoting 3 AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 650a (1st ed. 1996)); *see* Google's Br. at 5–7, 23–24.    With that language, Google says, the D.C. Circuit drew a sharp line between a simple proscription of exclusionary practices and all other remedies.    Google's Br. at 5–7; Google's Reply at 3–5.    Whereas the former may be imposed based on inference—what the D.C. Circuit characterized as a "rather edentulous" standard of causation, *Microsoft III*, 253 F.3d at 79—the latter are justified only when a plaintiff has met the heightened "significant causal connection" test.    Google's Reply at 3–5.

Here again, Google divorces the quotation from its context.    *Microsoft III* did not address any remedies beyond "the structural remedy of divestiture" and "an injunction against continuation of [the defendant's illegal] conduct."    *Microsoft III*, 253 F.3d at 105–07 (citation omitted). *New York I* did on remand, and it did not adopt the rigid dichotomous framework Google espouses.

By the district court's own account, the remedial decree in that case "exceed[ed] a mere proscription of the precise conduct found to be anticompetitive and [was] forward-looking in the parameters of the relief provided."    *New York I*, 224 F. Supp. 2d at 193.    It even included "affirmative measures."    *Id.* at 194.    The court adopted such greater measures even though it also found that the significant causal connection needed to support structural remedies was lacking.    *Id.* at 185–86 (rejecting proposal to make Internet Explorer open source, which the court viewed as a

structural remedy, because "the court is unconvinced that there exists a sufficient relationship between the liability findings and" the proposed "open-sourcing of IE"), *id.* at 177–78 (imposing a reasonable royalty as a condition to receiving Microsoft's APIs, communications protocols, and related technical information, because a royalty-free disclosure of Microsoft's intellectual property was tantamount to a divestiture, for which the required causal connection was lacking).

Rather than apply the "significant causal connection" test to all but the narrowest behavioral remedies, as Google urges here, the district court considered the "proportionality between the strength of the evidence of the causal connection and the severity of the remedy." *New York I*, 224 F. Supp. 2d at 102. Its task was to "assess the strength of the causation evidence that established liability and tailor the relief accordingly." *Id.* The district court thus viewed the potential remedies along a spectrum, with an injunction against the unlawful conduct on one end (the least severe) and structural remedies such as divestiture on the other (the most severe). Consistent with that approach, the standard of causation applied must be commensurate with the nature of the relief sought: The more drastic the remedy, the greater the causal connection required to support it. Put another way, the applicable causation standard reflects the court's level of confidence that the challenged conduct significantly contributed to the defendant's maintenance of its monopoly. *See id.* at 102–03.

This court will follow *New York I*'s sound approach. It comports with the element of proportionality underlying the core tenets of antitrust remedies and equitable relief more broadly. *See, e.g.*, *Ford*, 405 U.S. at 575 (instructing district courts to model their remedial decrees to "fit the exigencies of the particular case" (citation omitted)); *Salazar v. Buono*, 559 U.S. 700, 718 (2010) (plurality op.) ("A court must find prospective relief that fits the remedy to the wrong or injury that has been established."); *Hammon v. Barry*, 813 F.2d 412, 425 (D.C. Cir. 1987) (stating

73

that "the remedy crafted to address a violation must be tailored to fit that violation" and observing that this principle "is rooted in the rich traditions of equity" and "holds true in remedying violations of statutory and constitutional rights, as well as rights protected at common law"). And it was not disturbed on appeal. *See Massachusetts*, 373 F.3d at 1204 ("affirm[ing] the district court's remedial decree in its entirety").

## II.    SUFFICIENCY OF THE LIABILITY-PHASE FINDINGS

The court now turns to the parties' dispute over the sufficiency of the liability-phase findings to support the various proposed remedies. All agree that those findings are sufficient to enjoin Google's continued use of exclusive agreements to distribute its GSE. *See* Google's Br. at 12; Pls.' Br. at 4; *see also Microsoft III*, 253 F.3d at 106. Where they diverge is whether those findings support the greater remedies sought by Plaintiffs.

According to Plaintiffs, no more is needed than the liability findings to support each of their proposed remedies, including the divestiture of Chrome. Those findings, Plaintiffs say, establish that "Google's conduct contributed significantly and substantially to Google's monopoly power." Pls.' Br. at 9. Quoting from the liability opinion, Plaintiffs point to various passages in which the court wrote that the exclusive agreements "significantly contributed," had a "significant effect," or "substantially contributed" to Google's ability to preserve its monopoly. *Id.* at 9–10 (quoting *Google*, 747 F. Supp. 3d at 145, 153, 163). Thus, additional factual findings are unnecessary to establish the requisite "significant causal connection" for any proposed remedy. *Id.* at 10.

Google thinks otherwise. It maintains that "the Court's liability opinion expressly applied only a more 'relaxed' causation standard, not the more stringent standard required for Plaintiffs' sweeping *remedies.*" Google's Br. at 18 (internal citation omitted). By relying on the "edentulous"

74

"reasonably appears capable" standard, Google argues, the court's liability findings support no more than an inference that Google's exclusive distribution contracts significantly contributed to maintaining Google's monopoly power. *Id.* at 18–19; *see Microsoft III*, 253 F.3d at 79, 106–07 (recognizing that the "reasonably appears capable" standard is equivalent to an inference of causation). The court therefore would have to make additional factual findings to establish the "significant causal connection" required to impose structural or behavioral remedies, and Plaintiffs have failed to carry that burden. Google's Br. at 17–24.

The court thinks that neither side has it quite right. Plaintiffs' suggestion that the court can simply pluck sentences from the liability opinion without further scrutiny fails to acknowledge that the court did apply an "edentulous" causation standard at the liability stage, consistent with the legal principles articulated in *Microsoft III*. *Google*, 747 F. Supp. 3d at 153 (identifying the "key question" as whether "Google's exclusive distribution contracts reasonably appear capable of significantly contributing to maintaining Google's monopoly power in the general search services market"). The reality is that the court did not make factual findings with an eye towards meeting a stricter remedies causation standard—that was not the task at hand.

At the same time, Google presents the court with a false premise: that the liability findings are frozen within the confines of the edentulous test. Google cites no authority that prevents the court from returning to its liability decision and the underlying factual record to determine whether the evidence presented established causation by a strong inference or a weak one, or even by direct evidence.

In that sense, *Microsoft III* does not provide an analogous evidentiary template. There, proof of causation was hard to come by because Microsoft targeted its exclusionary conduct at emerging technologies outside the relevant product market. That fact "added uncertainty" about

a causal connection "inasmuch as nascent threats are merely *potential* substitutes." *Microsoft III*, 253 F.3d at 79. Here, by contrast, Google's exclusionary conduct was "aimed at producers of established substitutes"—including new entrants—thereby creating greater certainty that the exclusive agreements contributed to Google's maintenance of its monopoly. *See id.* (suggesting there is "added uncertainty" present in inferring causation when conduct is directed at a "nascent" competitor but expressing no similar misgivings when directed at "established substitutes"); *Google*, 747 F. Supp, 3d at 113 ("[U]sers see Google and other GSEs as substitutes . . . ."). This court therefore can more easily look to its liability findings for a stronger causal relationship than could the courts in *Microsoft III*.

Google disputes this distinction from *Microsoft III*. Google's Reply at 3. It says that Plaintiffs' failure of proof is even *more* evident here because it requires no guesswork about the future of "nascent" competition. *Id.* Google points out that Plaintiffs offered no evidence that any browser developer, OEM, or wireless carrier wanted to set any GSE other than Google as the preloaded default, and adds that there is "zero evidence" that Apple would have entered the GSE fray if only its agreement with Google were non-exclusive. *Id.* Google continues that the circumstances that led to its legal *acquisition* of market power preceded and persisted into the unlawful monopoly period, thereby making its *maintenance* of a dominant position attributable to factors other than the exclusive deals. Among other things, Google asserts that, before the start of the maintenance period, it already possessed a significant share advantage (80% of all search queries); "natural barriers to entry . . . were already in place"; it had acquired greater scale than its rivals; and it had developed the technologies that made it the world's best GSE. Google's Br. at 20.

Google's critique of the liability findings goes too far. Some of it can be dismissed as demanding more than the law requires. As already discussed, Plaintiffs were not required to establish anticompetitive effects by hypothesizing a but-for world. But Google also ignores that a "monopoly will almost certainly be grounded in part in factors other than a particular exclusionary act." 3 AREEDA & HOVENKAMP ¶ 651g. Only rarely will anticompetitive conduct be the sole or primary explanation for the maintenance of monopoly power. A monopolist cannot avoid stiffer remedies simply because it can point to lawful reasons for its market success.

By finding Google liable for violating Section 2 of the Sherman Act, the court has already determined that Google's exclusive distribution agreements significantly contributed to the maintenance of its monopoly power. *Google*, 747 F. Supp. 3d at 153. The question, then, is how much confidence the court has in that assessment. Ultimately, the remedy selected, and the way in which it is tailored, must reflect the strength of the causal connection between the anticompetitive behavior and the maintenance of monopoly power.

With these principles in mind, the court looks to its liability opinion and the underlying record to assess the strength of the causation evidence. At the outset, the court can dispatch with the notion that the distribution agreements were the sole reason Google maintained its monopoly. The court reaffirms what it wrote in its liability decision:

> Google has not achieved market dominance by happenstance. It has hired thousands of highly skilled engineers, innovated consistently, and made shrewd business decisions. The result is the industry's highest quality search engine, which has earned Google the trust of hundreds of millions of daily users.

*Google*, 747 F. Supp. 3d at 31. The court also recognized that Google's overwhelming market share in mobile search is attributable, at least in part, to Microsoft "missing" the mobile revolution, placing it on the back foot in competing against Google. *Id.* at 165–66.

Notwithstanding its innovation and successful business strategy, Google still used illegal restraints to maintain its monopoly. It was "'not entitled to maintain and magnify' the relevant network effects by entrenching its dominance through anticompetitive conduct." *See In re Google Play Store Antitrust Litig.*, Nos. 24-6256, 24-6274, 25-303, 2025 WL 2167402, at *18 (9th Cir. July 31, 2025). That is precisely what the liability-phase record established.

The court found that the agreements had four main anticompetitive effects: they (1) foreclosed a substantial portion of the relevant markets, thus "impair[ing] rivals' opportunities to compete," *Google*, 747 F. Supp. 3d at 159; (2) "den[ied] rivals access to user queries, or scale, needed to effectively compete," *id.*; (3) "reduced the incentive to invest and innovate in search," *id.* at 165; and (4) "enabled Google to increase text ads prices without any meaningful competitive constraint," thereby allowing Google to earn "monopoly profits to secure the next iteration of exclusive deals through higher revenue share payments," *id.* at 178; *see also id.* at 162 (image of "network effects" flywheel). These effects did not persist independently. Together, they enabled Google to widen the moats and pull up the drawbridges to ward off competition.

Start with market foreclosure. "Substantial foreclosure allows the dominant firm to prevent potential rivals from ever reaching 'the critical level necessary' to pose a real threat to the defendant's business." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 286 (3d Cir. 2012) (quoting *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005)). At the liability phase, the court found that half of all user queries in the United States run through the defaults secured by the distribution agreements and that the agreements contained terms that protected Google from competition. *See Google*, 747 F. Supp. 3d at 153. Some contract terms did so directly. For example, through their RSAs, Android partners were generally barred from preloading, marketing, or suggesting rival search services. *Id.* at 103–04 ¶¶ 385–390. Other terms were less direct. The

78

agreements were multi-year deals that gave partners limited flexibility to exit them. *Id.* at 157–58. The result was a market in which the "more common story [was] Google's partners renewing the agreements without genuine consideration of an alternative," *id.* at 158, and where "there [was] no genuine 'competition for the contract,'" *id.* at 144.

Google's scale advantage—discussed in more detail below, *see infra* Conclusions of Law [hereinafter COL] § III.B—played an important role in entrenching Google's dominance. Google did not dispute during the liability phase that, by locking up the defaults, it received more queries than it would have without them, or that the user-interaction data it acquired "[had] some utility for search quality." *Google*, 747 F. Supp. 3d at 159. Rivals had no hope of accessing default queries (except Bing on Windows desktop devices), thereby allowing Google to grow its data advantage. *Id.* at 160. The resulting divide is enormous. Google receives nine times more queries each day than its rivals combined, and 19 times more on mobile. *Id.* at 49–50 ¶ 87. The volume of click-and-query data that Google acquires in 13 months would take Microsoft 17.5 *years*. *Id.* at 51 ¶ 96, 161. To be fair, that scale advantage cannot be fully explained by exclusive search distribution. The record is clear that many users access Google through channels other than contracted-for defaults (largely through user-downloaded Chrome), *see id.* at 45 ¶¶ 63–64, and some users would switch back to Google if another GSE were set as the default, *see id.* at 97 ¶¶ 340–345, 148. Still, Google's data advantage is so great that it would blink reality to characterize the agreements' contribution to that disparity as only marginally impactful. The agreements allowed Google to persistently widen the data moat, ensuring that rivals could not achieve a degree of quality that would pose a threat to Google.

The distribution agreements also discouraged investment by existing market actors and new entrants. Microsoft executives said that they would invest even more in search if Microsoft

79

had more opportunities for default distribution on mobile. *Id.* at 165–66. To be sure, Microsoft was late to the mobile revolution, *id.*, but Google's stranglehold on default distribution enshrined that decision as a fatal error from which Microsoft would never recover. That is not how a competitive market should work. Google also did not have to worry about new market entrants. Silicon Valley venture capital funds viewed search as a "no fly zone." *Id.* at 165 (quoting Liab. Tr. at 3510:24–3512:7 (Nadella)). Some of that reluctance to invest, although by no means all, can be attributed to Google's exclusive agreements. In a market already protected by high barriers to entry, Google's tying up of the most efficient channels of distribution on multi-year contracts almost certainly discouraged new entrants from trying to surmount them.

And then there is Apple. The court found that "[t]he prospect of losing tens of billions in guaranteed revenue from Google—which presently come at little to no cost to Apple— disincentivizes Apple from launching its own search engine when it otherwise has built the capacity to do so." *Id.* at 168. Remedies-phase testimony from Eddy Cue, Apple's Senior Vice President of Services, confirmed that finding. Cue testified that he couldn't say he "would disagree with" the court's statement "that it was a disincentive for [Apple] to do a search engine based on the payments that [Apple was] receiving from Google. . . . It's a significant amount of money." Rem. Tr. at 3825:15-20 (Cue). Cue added that Apple still was unlikely to enter the search business because "Google does an amazing job." *Id.* at 3826:9-10 (Cue). Even so, Cue's testimony establishes that Google's high revenue share payments deterred Apple from trying to capture for itself all the advertising rents that flow through the Safari browser's default search box.

Finally, default status meant default monopoly profits, which Google used to lock in the next round of distribution agreements. *Google*, 747 F. Supp. 3d at 161, 177–78. As Neeva founder and former Google Senior Vice President of Ads and Commerce, Dr. Sridhar Ramaswamy, put it:

the revenue share payments "provide an incredibly strong incentive for the ecosystem to not do anything"; they "effectively make the ecosystem exceptionally resist[ant] to change"; and their "net effect . . . [is to] basically freeze the ecosystem in place." *Id.* at 145 (alterations in original) (quoting Liab. Tr. at 3796:8–3798:22 (Ramaswamy)). Microsoft's CEO, Satya Nadella, similarly described Google's distribution advantage as creating a "vicious cycle that [Microsoft is] trapped in" because the "defaults get reinforced." *Id.* at 159 (alteration in original) (quoting Liab. Tr. at 3513:1-3 (Nadella)). Google's high revenue share payments, a clear by-product of the exclusive agreements, only reinforced a marketplace "exceptionally resistant to change." *Id.* No evidence presented during the remedies phase contradicted this finding. If anything, in their *amicus* submissions, Google's partners uniformly emphasized the importance of Google's revenue share payments to their own product innovation and operations and strongly opposed Plaintiffs' proposed payment ban. *See generally* Apple Inc.'s Amicus Br., ECF No. 1303; Br. of *Amicus Curiae* Mozilla Corp. in Support of Neither Party, ECF No. 1296-2; Br. of *Amicus Curiae* Motorola Mobility, LLC, ECF No. 1306-1; Br. of Amicus Curiae Samsung Electronics Co., LTD. in Support of Def.'s Opp'n to Certain Proposed Remedies, ECF No. 1293-2.

This summary recitation of the court's findings demonstrates that the court's liability determination was supported by more than the barest of inferences. The evidence presented required no guesswork about the exclusive agreements' impacts on competition—they "froze" the search ecosystem in place. In that way, the liability findings here support a stronger causal connection than the one sustained in *Microsoft III* and on remand in *New York I*. There was no similar finding that Microsoft's actions "froze" the market in place. In this case, by contrast, Google's exclusive agreements made certain that no competitor would try to lay siege to the castle.

The court is thus satisfied that its liability findings support at least some of the proposed behavioral remedies. But, as explained later, those findings do not support the requested structural relief. *See infra* RCOL § II.

## III.    FRUITS OF GOOGLE'S UNLAWFUL CONDUCT

Antitrust remedies must "deny to the defendant the fruits of its statutory violation." *Microsoft III*, 253 F.3d at 34 (citations omitted); *see supra* COL § I.A. "[T]he fruits of a violation," however, "must be identified before they may be denied." *Massachusetts*, 373 F.3d at 1232. The court identifies those fruits in this section. Google's anticompetitive behavior produced at least three: (1) freedom from threats; (2) scale; and (3) revenue. After addressing each, the court responds to Google's objection.

### A.    Freedom from Threats

Google's exclusive distribution agreements have allowed it to operate free of any genuine competition for more than 10 years. *See* Pls.' Br. at 5 (identifying freedom from threats as a fruit); Rem. Tr. at 4732:12-22 (Closing Arg.) (Google's counsel identifying freedom from threats as a fruit without waiving objection to liability determination). The Court of Appeals reached a similar conclusion in *Massachusetts*. *See* 373 F.3d at 1233 (affirming the district court's finding that the fruit of Microsoft's anticompetitive conduct, which foreclosed avenues of distribution for nascent middleware products, was its "freedom from the possibility [that] rival middleware vendors would pose a threat to its monopoly of the market for Intel[-]compatible PC operating systems").

Google's distribution agreements have helped to entrench Google as the default search engine on hundreds of millions of desktop and mobile devices throughout the United States. They accomplish this directly by locking up "the most efficient and effective channels of distribution"—namely, the out-of-the-box default search access points—for years at a time. *Google*, 747 F. Supp.

3d at 120 (concluding that "Google controls the most efficient and effective channels of distribution for GSEs" because "[i]t is the exclusive preloaded GSE on all Apple and Android mobile devices, all Apple desktop devices, and most third-party browsers"); *id.* at 44 ¶ 59 (listing the out-of-the-box default search access points by device and browser); *id.* at 157–58 (determining that Google's contracts foreclose a substantial share of the general search market in part because they last between two and five years, with opportunities for renewal, and Google's partners cannot easily terminate them). Taken together, the search access points covered by the challenged agreements account for roughly 50% of all search queries issued in the United States. *Id.* at 44 ¶ 62, 153.

To appreciate the full effect of these contracts, however, one must look beyond their express terms. Google's unlawful agreements allowed it to capitalize on two powerful forces within the general search services market: default bias and network effects. *Id.* at 45 ¶ 65 (finding that default bias partially explains why users overwhelmingly use Google through preloaded search access points); *id.* at 161–62 (describing how Google benefits from network effects).

Start with default bias: Because most users (often unknowingly) act out of habit, habituating users to a particular option makes them unlikely to deviate from it. *Id.* at 45 ¶¶ 66–67. Search engines are no exception, as behavioral economists and Google itself have long recognized. *See id.* at 45–47 ¶¶ 65–74 (discussing evidence of default bias, including testimony from U.S. Plaintiffs' expert in behavioral economics, Dr. Antonio Rangel, and Google's own assessments); *id.* at 121 (crediting testimony from Dr. Ramaswamy that getting users into the "habit" of using a new product is "tricky" (quoting Liab. Tr. at 3699:22 (Ramaswamy))); Hunt Allcott et al., *Sources of Market Power in Web Search: Evidence from a Field Experiment* 2–3 (Nat'l Bureau of Econ. Rsch., Working Paper No. 33410, 2025), https://perma.cc/D528-U2U8

[hereinafter Allcott Study] (finding that 44% of users who accepted a small payment to change their default GSE from Google to Bing for two days and continued to use Bing thereafter did so because "they forgot to switch back or were too lazy to do so"). Indeed, many users are not even aware that there is a default search engine, much less how to change it. *Google*, 747 F. Supp. 3d at 45–46 ¶ 68.

Were they to try to change the default, moreover, they may not succeed. The more "choice friction"—i.e., obstacles—a user encounters when switching the default, the less likely they are to implement that change. *Id.* at 46–47 ¶¶ 69–73. Even seemingly minor obstacles, such as using a smaller interface, clicking through multiple screens, or downloading a new app, can discourage users from switching the default and accessing a rival search engine. *Id.* at 46–48 ¶¶ 69, 71–73, 78, 80–81; *see* UPX0103 at -214 ("Seemingly small friction points in user experiences can have a dramatically disproportionate effect on whether people drop or stick."). Choice friction thus bolsters the power of defaults. *Google*, 747 F. Supp. 3d at 46 ¶ 73 (finding that Google understands "increased choice friction discourages users from changing the default"); *see* UPX0172 at -731 ("[O]f the tiny fraction of end users who try to change the default, many will become frustrated and simply leave the default as originally set . . . ."). In short, people tend to stick with the status quo because it represents the path of least resistance.

The evidence presented at the remedial hearing identified yet another way in which default placement matters: it limits users' exposure to alternatives, leading them to underestimate the quality of rival products. Allcott Study at 1, 5–6. In a recent academic study, users were offered a small payment to change their default GSE from Google to Bing on their desktop web browsers[5] for 14 days. *Id.* at 2 (discussing the "Switch Bonus" treatment group). Of those who accepted,

---

[5] During the liability phase, the court found that "Bing's search quality on desktop measures up to Google's" and that "switching on mobile is more challenging than on desktop." *Google*, 747 F. Supp. 3d at 46 ¶ 72, 56 ¶ 127.

one-third (33%) affirmatively opted to keep using Bing after the test period ended. *Id.* Nearly two-thirds (64%) of those new Bing users reported that the product was better than expected, while 59% said that they had grown accustomed to using it. *Id.* at 2–3. According to the authors of the study, "[t]hese answers suggest that Google users' lack of experience with Bing is a significant driver of Google's large share at baseline in our sample." *Id.* at 3; *see id.* at 5 (concluding that "our findings confirm that defaults play an important role" in maintaining Google's market dominance and explaining that "Google's default position is effective because it ensures that users are never exposed to Bing, and hence never learn about it"). Plaintiff States' behavioral economics expert Dr. Michael Luca similarly testified that "[s]earch engines are at least, in part, an experience good," meaning a consumer "need[s] to have experience with the good to fully understand [its] quality." Rem. Tr. at 1891:12-17 (Luca); *see also id.* at 587:19-23 (Rangel) ("[T]here's strong evidence in the Allcott study . . . that there [is] a sizeable number of Google users who don't have well-formed preferences . . . with alternative options because they have not been exposed to them."); *id.* at 1894:6-10 (Luca) ("[P]eople didn't tend to know as much about Bing. So just giving them a couple days of experience seemed to have an impact on their beliefs, leading them to more favorably view Bing after gaining experience with it relative to before." (discussing Allcott Study)).

To be sure, default bias can be weakened by various factors. *Google*, 747 F. Supp. 3d at 46 ¶¶ 70–71 (observing diminished default effects on desktop devices and with products that are of poor quality or that have low brand recognition). But the fact remains that a GSE's placement as the default drives query volume through that search access point. *Id.* at 47 ¶ 74. And when the search access point in question is "by far" the best avenue for reaching users, the volume of queries it commands is, unsurprisingly, "significant." *Id.* at 44 ¶ 59 ("The most efficient channel of GSE

distribution is, by far, placement as the preloaded, out-of-the-box default GSE."); *id.* at 160 ("[D]efault placements drive significant traffic to Google."). At the time of the liability trial, default placements drove 70% of all U.S.-based queries to Google. *Id.* at 44–45 ¶¶ 62–64 (totaling the percentage of U.S.-based queries entered into the search access points covered by the challenged contracts (50%) and user-downloaded Chrome (20%),[6] all of which default to Google); *id.* at 160 (underscoring that default placements "supply Google with unequalled query volume that is effectively unavailable to rivals"); *see id.* at 47 ¶ 74, 89 ¶ 296, 160 (finding that a substantial majority of queries on Apple and Android devices are submitted through search access points that default to Google); *see also id.* at 159 (noting Google's admission that a "search engine in the default position receives additional search volume beyond what it would otherwise receive" (citation omitted)).

In a market where queries are currency, this feature makes default placements "extremely valuable" real estate—a reality Google well understands. *Id.* at 47 ¶ 75, 160 (finding that Google recognizes that "securing the default placement is extremely valuable for monetizing search queries" and "losing defaults would dramatically impact its bottom line").

Google, like other GSEs, primarily monetizes search queries through the sale of search ads. *Id.* at 63 ¶ 172. More search queries means more ad auctions means more ad revenue. *Id.* ¶ 173. By driving query volume, then, default placements directly drive revenue—in Google's case, to the tune of tens of billions of dollars each year. *Id.* ("There is a direct relationship between a GSE's scale and its monetization of search advertising."); *id.* at 47 ¶ 75 (Google estimating that over half (54%) of its overall search revenue flowed through its default placements in 2017); *id.*

---

[6] Chrome is Google's web browser, and its out-of-the-box default search access point—the address bar, also known as the omnibox—is set to Google Search. *Google*, 747 F. Supp. 3d at 35 ¶ 6, 44 ¶ 59. As the court noted in its liability opinion, "[t]hough the Chrome default is not alleged to be exclusionary conduct, it is a market reality that significantly narrows the available channels of distribution and thus disincentivizes the emergence of new competition." *Id.* at 120.

at 160 (Google projecting that losing the Safari and Android defaults would cost it billions of dollars in lost revenue).

Revenue is not the only advantage default placement confers.  Greater query volume also yields greater user data, or "scale."  *Id.* at 49–50 ¶ 87; *see* UPX0227 at -134 ("Every [user] interaction gives us another example, another bit of training data: for *this* query, a human believed *that* result would be most relevant.").  And scale, it is well established, directly improves both the quality and monetization of a GSE.  *Google*, 747 F. Supp. 3d at 50 ¶ 90 ("[U]ser data is a critical input that directly improves [search] quality."); *id.* at 161 ("Scale also improves search ads monetization."); *see also id.* at 52 ¶ 104 (noting that "there are diminishing returns to user data," but "that inflection point is far from established" and "user data does not become worthless even after the point of diminishing returns").  Google utilizes user data "[a]t every stage of the search process," from crawling and indexing to retrieval and ranking.  *Id.* at 50–52 ¶¶ 86–106, 161.  User data further helps Google understand which ads capture users' attention, enabling it to better evaluate ad quality and serve more relevant ads in the future.  *Id.* at 161; *see id.* at 55 ¶ 121 (finding that users' sessions data "helps to tailor the advertisements that Google delivers to [them]").  These improvements in search quality and ad monetization ultimately translate into higher revenue, as superior search results attract additional users and more targeted ads generate more clicks.  *Id.* at 161–62; *see id.* at 65 ¶ 181, 66–67 ¶ 186, 77 ¶ 239 (finding that text ads constitute "the predominant form of advertising on Google, whether measured by revenue or number of advertisers" and are sold on a cost-per-click basis, meaning the advertiser pays only if the user clicks on the ad).

This interplay among queries, data, quality, and revenue creates a positive feedback loop, known as "network effects."  *Id.* at 161–62.  In the market for general search services, this phenomenon manifests as follows: "(1) More user data allows a GSE to improve search quality,

(2) better search quality attracts more users and improves monetization, (3) more users and better monetization attract more advertisers, (4) more advertisers mean higher ad revenue, and (5) more ad revenue enables a GSE to expend more resources on traffic acquisition costs (i.e., revenue share payments) and investments, which enable the continued acquisition of scale." *Id.* at 161.

To be clear, default bias and network effects are features of the general search market; they did not arise because of Google's exclusive dealing. But the challenged contracts, which blocked rivals' access to key distribution channels and steered half of all U.S.-based queries to Google, ensured that Google would reap the greatest benefit from these market forces. While Google amassed an arsenal of user data, its rivals were starved of scale—"the essential raw material for building, improving, and sustaining a GSE." *Id.* at 159. Without an efficient means of reaching users, and thus no real prospect of acquiring scale, rivals and other market players have largely refrained from investing in general search, despite the promise of high profit margins. *Id.* at 165.

The upshot of this exclusionary regime is that "Google's dominance has gone unchallenged for well over a decade." *Id.* at 31; *see id.* at 145 ("Like Microsoft before it, Google has thwarted true competition by foreclosing its rivals from the most effective channels of search distribution. The result is that consumer use of rival GSEs has been kept below the critical levels necessary to pose a threat to Google's monopoly." (internal cross-reference omitted)); *id.* at 163 ("Google's distribution agreements have constrained the query volumes of its rivals, thereby inoculating Google against any genuine competitive threat."). As in *Massachusetts*, this "freedom from the possibility" other GSEs "would pose a threat to its monopoly" justifies the remedies discussed below that seek to "pry open" the channels of distribution Google has long had all to itself. 373 F.3d at 1233 (alteration and citation omitted).

**B.      Scale**

As set out above, the fact that Google has received substantially more queries than its rivals due in part to its exclusive distribution agreements means that Google has acquired significantly more scale. *Google*, 747 F. Supp. 3d at 159 ("For more than a decade, the challenged distribution agreements have given Google access to scale that its rivals cannot match.").  In this subsection, the court dives further into the importance of scale as a fruit of Google's exclusive distribution arrangements.

The record confirms Google's "massive" scale advantage. *Id.* at 162.  As of 2020, nearly 90% of all U.S.-based queries are entered through search access points that flow to Google.  *Id.* at 38 ¶ 23.  Google's share is even higher (95%) on mobile devices, *id.* ¶ 24, which experience stronger default effects, *id.* at 46 ¶ 71.  That translates into billions of Google searches conducted every day.  *Id.* at 31.

When viewed alongside rivals' scale, these figures are even more staggering.  "Users enter nine times more queries on Google than on all rivals combined.  On mobile devices, that multiplier balloons to 19 times.  NavBoost, one of Google's core ranking models, runs on 13 months of Google click-and-query data.  That is the equivalent of over 17.5 *years* of Bing data."  *Id.* at 161 (internal citations omitted); *see id.* at 49–50 ¶ 87, 51 ¶ 96.

Importantly, Google's scale advantage encompasses more than just volume; it also exhibits extraordinary breadth.  An analysis of 3.7 million unique phrases searched on Google and/or its biggest competitor, Bing, over a seven-day period showed that 93% were seen solely by Google while just 4.8% were seen solely by Bing.  *Id.* at 50 ¶ 89; Liab. Tr. at 5785:12–5789:13 (Whinston) (discussing UPXD104 at 44).  On mobile devices, where Google has greater scale, the disparity was even higher.  *Google*, 747 F. Supp. 3d at 50 ¶ 89.

Google's scale advantage is particularly pronounced with respect to long-tail, local, and fresh queries. Long-tail queries refer to queries containing less common, more distinctive phrases. *Id.*; *see* UPX1079 at -996 to -000 (Google document illustrating head, torso, and tail queries and providing examples of each). Any particular long-tail query, by definition, appears only rarely, but collectively, they make up a "significant" portion of overall search traffic. Liab. Tr. at 1811:4-25 (Lehman); *see* UPX1079 at -996 (describing long-tail queries as "the vast number of queries we see rarely or even just once" and identifying them as approximately one-third of total query volume and 90% of all distinct queries); DX0678 at -030 (Microsoft document depicting similar information); Allcott Study at 29 (finding that "more than 38.7 percent of" Bing queries over 12 months in 2021 and 2022 were "for rare queries that are searched less than 100 times"); *see also* Rem. Tr. at 396:4-7 (Turley) (estimating that "a bit more than half of what our users want to do in ChatGPT relies on long-tail queries, on things that don't come up so often").

Local queries, as their name suggests, are limited in geographic scope and "deal[] with information or locations in the real world." Rem. Tr. at 1018:1-5 (Schechter). The results returned in response to such queries thus depend on the user's physical location, which is one of the many datapoints Google collects about users. *Google*, 747 F. Supp. 3d at 55 ¶ 122 ("Google logs IP addresses and uses them to customize search results."); Rem. Tr. at 1018:4-16 (Schechter) (explaining that "contextual information about the user"—e.g., "where they might be, where they typically are, where they work, where they live"—matters when answering local queries); Liab. Tr. at 2660:22–2661:4, 2771:18-20 (Parakhin) (stating that, for local queries, "the results will and have to change depending on where you are" and "even small" shifts in location "can change the results dramatically"); *see, e.g.*, *id.* at 2660:22–2661:2 (Parakhin) (contrasting a search for "President of the United States," whose results would be the same no matter where you are in the

world, with a search for "best restaurants near me," whose results would differ depending on your location); UPX8104 at -170 (Google Search primer stating that the results for "football" would likely differ between U.S.- and U.K.-based users). Given the geographically specific nature of the information they seek, local queries tend to be long-tail queries. Liab. Tr. at 2661:13-16 (Parakhin).

Fresh queries ask about trending topics or recent events. Rem. Tr. at 1016:20–1017:15 (Schechter) (offering the example of why flags at the White House were flying at half-staff on a particular day). Consequently, the meaning of such queries can change over time. *Id.*; UPX0194 at -553 ("For some queries, results are stable over time, whereas for others, Search results can change rapidly. For example, when you search for [us open], you might want different results during different times of the year. In June, you might want the results about the Golf tournament. In September, you might want to see live tennis scores. On the other hand, if your query is [thomas jefferson], you should expect to see roughly the same results, unless Jefferson is the sequel to Hamilton!" (brackets in original)). To answer these questions, then, a search engine must be able to decipher what a user means and "realiz[e] something has changed within the world." Rem. Tr. at 1016:16-17 (Schechter). "[T]he results should change" as well. *Id.*; *see also id.* at 403:11–404:1 (Turley) (discussing the problems associated with "stale" information).

Google is better equipped to handle these types of queries in part because it simply sees more of them. *Google*, 747 F. Supp. 3d at 49–50 ¶¶ 86–90, 161–62. Specifically, Google's scale advantage affords it greater insight into what information users are looking for and which results they find relevant and authoritative. *Id.* at 50 ¶¶ 88–89 (describing the utility of click data and query data); *see also* UPX0227 at -134 ("A central premise of language understanding is that words are defined by the responses that they elicit from people. . . . So, to understand language,

91

we need to see lots and lots of instances of people reacting to words.  Our search logs provide that. . . .  Every [user] interaction gives us another example, another bit of training data: for *this* query, a human believed *that* result would be most relevant."); UPX0226 at -483 ("Every time someone does a search, we give out some hopefully useful search results, but we also get back crystal-clear user feedback: this search result is better than that one."); UPX0251 at -872 ("The source of Google's magic is this two-way dialogue with users.  With every query, we give a little knowledge, and get a little back."); Liab. Tr. at 2644:20–2645:11 (Parakhin) ("[I]f this query was issued previously and people already clicked on certain results and read them, . . . it gives you a lot of information [about] which results are actually good or not, and you can memorize them."); *id.* at 1772:22–1773:15 (Lehman) ("[K]nowing a person's . . . location can sometimes help understand what it is they're looking for."); UPX0194 at -554 (highlighting "location" as a "great example[]" of a "clue[] about the user to better understand their intent").

Such insight, in turn, enables Google to deliver superior search results.  *See Google*, 747 F. Supp. 3d at 39 ¶¶ 30–32, 49–52 ¶¶ 86–106 (recognizing that Google leveraged its insight into user intent into serving quality results); *id.* at 96 ¶ 333 (crediting 2021 Apple study's findings that, as measured by relevance of results, Google outperforms Bing on all but one search access point and Google's lead is "particularly strong for long-tail queries"); UPX0862 at -707 ("[W]e've had a lot of success in using query data to improve our information about geographic locations, enabling us to provide better local search."); *see also* UPX0194 at -556 ("Understanding the meaning of a query is crucial to returning good answers."); UPX0226 at -483 ("Learning from this user feedback is perhaps the central way that web ranking has improved for 15 years."); Liab. Tr. at 2675:14-24 (Parakhin) ("[T]he less frequent [the] query and the more specific it is, like location specific which makes it less frequent, the higher probability that it will benefit from scale."); *id.* at

92

5786:16–5788:8, 5789:17-23 (Whinston) (concluding that "the differentiator is in the tail" when analyzing the unequal distribution of unique phrases seen by Google versus Bing).

Because Google better understands what information users want, it is also better equipped to build a search index that contains web pages responsive to a wide range of user queries. *See Google*, 747 F. Supp. 3d at 50 ¶¶ 91–92; Rem. Tr. at 4091:2-4 (Hitt) (acknowledging that Google has the largest search index of any GSE). Query data helps a GSE understand what web pages to crawl and how frequently. *See Google*, 747 F. Supp. 3d at 50 ¶ 91. And building and maintaining a comprehensive and fresh search index is essential to answering user queries, especially those of the long-tail variety. Liab. Tr. at 6303:18-25, 6307:18-23, 6308:12–6309:1 (Nayak) ("[C]omprehensiveness of the index is crucial to being able to serve long-tail queries" because such queries seek less common, more specific information.); *Google*, 747 F. Supp. 3d at 50 ¶ 91 ("'Freshness,' or the recency, of information is an important factor in search quality. GSEs 'need to know how to recrawl sites to make sure that they do at all times have a reasonably fresh copy of the web that you are looking at.'" (alterations and citations omitted)); Liab. Tr. at 6304:1-21 (Nayak) ("[I]f you want to search the web effectively, you need to keep your index up-to-date.").

For these reasons, Google incorporates user data into every step of the search process. As the court's liability-phase findings made clear, Google's vast collection of user data has not gathered proverbial dust on Google's servers over the past decade. Just the opposite—Google has continuously deployed user data to, among other things, determine which websites to crawl, in what order, and at what frequency; construct and organize its search index to ensure that it covers a wide range of subject matter and sources (and thus a diverse array of queries); enhance the "freshness" of results (i.e., bring them up to date); create signals and models that assess results'

relevance and establish their ranking; and run large-format experiments to develop new features. *Google*, 747 F. Supp. 3d at 49–52 ¶¶ 86–106, 161; *see, e.g.*, Liab. Tr. at 6316:22–6318:6 (Nayak) (observing that queries issued on mobile devices tend to have "more location-focused intents" than those issued on desktop devices and therefore "one of the signals that does go into Google Search is . . . is it a desktop query or is it a mobile query"); *see also Google*, 747 F. Supp. 3d at 52 ¶ 105 ("Google continues to maintain significant volumes of data—despite the expense of storing it— because its value outweighs that cost."). In the words of one Google presentation, "Search can look like magic . . . . But really it's just about building signals . . . to identify user intent and match it to relevant documents." UPX0194 at -557. Because the knowledge derived from users' data provides "a strong proxy for users' intent," such data supplies "a critical input" for GSEs, including Google. *Google*, 747 F. Supp. 3d at 49–50 ¶¶ 86, 90.

For rival search engines, whose scale pales in comparison to Google's, long-tail, local, and fresh queries pose the greatest challenge. Without a wealth of user data to draw from, they struggle to answer such queries. *See* Rem. Tr. at 1016:11–1020:22 (Schechter) (Bing struggles with long-tail, local, and fresh queries in part because it sees them infrequently); *id.* at 825:25–826:10 (Weinberg) (DuckDuckGo performs worse than Google in part because "most of the queries we see are relatively new to us"). That further jeopardizes their chances of achieving scale, as a search engine's failure to deliver quality search results undermines its ability to attract and retain users. *See id.* at 1017:21-25, 1080:11-17 (Schechter) (stating that "[t]he quality of the experience that users have essentially drives retention" and users lose trust in a search engine when they're not given accurate and relevant information); Parakh Rem. Dep. at 196:1-4 ("[E]very time we've sort of worked on quality in [Google Search], users return. They value it. It provides them with their daily need."); Liab. Tr. at 2251:24–2252:7 (Giannandrea) ("[T]he tail requirement is pretty

onerous" because users "would become suspicious if they knew something existed and they couldn't find it."). Thus, what for Google manifests as a dazzling flywheel of queries and quality has the opposite effect for rivals: it keeps them stuck in place, or worse, causes a downward spiral of scale and revenue.

Scale, then, is more than a mere reflection of Google's size; it is a cornerstone of Google's success. By ensuring that half of all queries—and the legion of user data that accompanies them— flow exclusively to Google, the challenged contracts have directly and significantly contributed to Google's scale advantage.

### C.    Revenue

Google's exclusive distribution deals have increased not only the amount of data streaming into its servers, but also the amount of revenue pouring into its coffers. The foregoing discussion identified three ways in which these agreements improve Google's monetization of search: (1) Google can serve more ads to users; (2) Google can serve more effective ads to users; and (3) Google can reinvest the revenue generated through (1) and (2) in product development and securing distribution to secure even more users, thereby perpetuating this cycle. *See supra* COL § III.A.

The evidence presented at the liability trial "firmly established" a fourth way in which the challenged contracts enable Google to grow its revenue: by exercising its monopoly power to "increase text ads prices without any meaningful competitive restraint." *Google*, 747 F. Supp. 3d at 177–78. By using so-called "pricing knobs," Google has artificially inflated the prices of text ads for the principal purpose of driving revenue growth. *See id.* at 77–84 ¶¶ 238–267 (explaining how Google has consistently raised prices without considering rivals' pricing decisions, making improvements in ad quality, or providing added value for users or advertisers); *id.* at 178–79

95

(emphasizing that "Google admits it makes auction adjustments without considering Bing's prices or those of any other rival" and that the "evidence does not reflect a principled practice of quality-adjusted pricing, but rather shows Google creating higher-priced auctions with the primary purpose of driving long-term revenues"). It has even used these price-tuning mechanisms to hit periodic revenue targets. *Id.* at 82 ¶¶ 258–260.

This strategy has been successful because Google took pains to make it virtually imperceptible. Google recognized that its price increases would be hard to explain to advertisers. *Id.* at 82–84 ¶¶ 261–266. So, it simply did not disclose them. Instead, Google raised its prices incrementally—often between 5% and 15% at a time—so that advertisers would attribute these increases to the ordinary price fluctuations, or "noise," generated by the ad auctions, rather than pin them on Google. *Id.* at 83 ¶ 264, 178. The incremental approach worked. According to Google's surveys, advertisers could tell that prices were increasing, but they did not understand those changes to be Google's doing. *Id.* at 84 ¶ 266. Consequently, Google has been able to raise its prices largely without losing advertisers. *Id.* at 178.

Unconstrained by rivals' pricing, the prices of text ads have increased over time. *Id.* As search volume grew alongside ad prices, *see id.* at 41 ¶ 40, Google's revenue growth has been nothing short of astonishing. From 2010 to 2018, Google's ad revenue grew at a steady annual rate of 20% or more. *Id.* at 82 ¶ 259. In 2014, Google booked nearly $47 billion in advertising revenue. *See* UPX7002.A at -001. By 2021, that number had more than tripled to over $146 billion. *Id.*; *see also Google*, 747 F. Supp. 3d at 32, 35 ¶ 8. Google has used these monopoly profits to secure the next iteration of exclusive distribution deals, paying out billions of dollars in revenue share each year. *See Google*, 747 F. Supp. 3d at 88–89 ¶ 289, 178. The result, as witness

after witness attested, is that Google's distribution partners "cannot afford to go elsewhere." *Id.* at 145.

###### D.   Google's Objection

Google insists that the court must go further and *quantify* the portion of scale and revenue attributable to Google's unlawful conduct to establish them as fruits.  Google's Reply at 6–8. Google points to no case requiring such mathematical precision, and this court has found none.

The closest Google comes is the D.C. Circuit's acknowledgement in *Massachusetts* that "[t]he district court [in *New York I*] specifically rejected the idea that [Internet Explorer] was the fruit of Microsoft's anticompetitive conduct, finding, 'neither the evidentiary record from the liability phase, nor the record in this portion of the proceeding, establishes that the present success of [Internet Explorer] is attributable entirely, or even in predominant part, to Microsoft's illegal conduct.'"  *Massachusetts*, 373 F.3d at 1232 (alteration omitted) (first quoting *New York I*, 224 F. Supp. 2d at 185 n.81; and then citing *id.* at 244 n.121); *see* Google's Br. at 23.  But Google makes too much of the district court's statement.

That finding concerned the "Open-Source Internet Explorer" provision, which would have required Microsoft to disclose "all source code" underlying its Internet Explorer web browser and make that code available to competitors on a "royalty-free," "non-exclusive," and "perpetual" basis. *Massachusetts*, 373 F.3d at 1227–28; *see New York I*, 224 F. Supp. 2d at 241 (describing consequence of open-sourcing software).  The "attributable entirely, or even in predominant part" text is contained in a footnote and is part of the court's response to the plaintiffs' argument that Internet Explorer's success was a "fruit" of Microsoft's anticompetitive acts.  *New York I*, 224 F. Supp. 2d at 185 n.81.  But neither the court in *New York I* nor the D.C. Circuit in *Massachusetts* suggested that a market consequence qualifies as a fruit of anticompetitive conduct *only if* it can

97

be "attributable entirely" or in "predominant part" to such acts. *See id.* at 244 n.121 (noting how Plaintiffs failed to offer *any* testimony "in the remedy phase to establish that [Internet Explorer] was the 'fruit' of the anticompetitive conduct"). Neither set such a high bar for determining fruits. Nor could they, as such a stringent standard would be at odds with the Supreme Court's pronouncement that district courts are "empowered to fashion appropriate restraints" on a defendant "to eliminate [the] consequences of a violation." *NSPE*, 435 U.S. at 697. Requiring that fruits must be "attributable entirely" or in "predominant part" to the unlawful act would allow a monopolist to continue benefitting from its violation simply by merely pointing to *some* lawful factors for its success, and it would hamstring trial courts in the exercise of their equitable authority to restore competition. That cannot be what the *New York I* or the *Massachusetts* courts intended.

In any event, both the district and appellate court ruled that the "Open-Source Internet Explorer" provision was properly analyzed as a structural remedy. *Massachusetts*, 373 F.3d at 1230, 1232–33; *New York I*, 224 F. Supp. 2d at 186. These decisions thus merely confirm the more stringent "clearer indication of significant causal connection" standard applicable to structural remedies and the plaintiffs' failure to satisfy it with respect to their proposed open-source remedy. No authority, therefore, requires the court to calibrate precisely how much additional scale or revenue Google received as a result of the exclusive agreements to treat them as fruits of the violation.

## IV.    THE INCLUSION OF GENERATIVE AI PRODUCTS

The final question the court must address before analyzing the parties' proposed remedies is whether the remedial decree should encompass GenAI technologies and the companies that create them.  The answer is yes, at least in some respects.[7]

For starters, Google itself concedes that imposing restrictions on how it promotes and distributes Google Assistant and the Gemini app is a valid exercise of the court's power to prohibit acts "of the same type or class" as the unlawful acts.  Google's Br. at 14–15; *see Zenith Radio*, 395 U.S. at 132.  In short, Google cannot use the same anticompetitive playbook for its GenAI products that it used for Search.  *See Massachusetts*, 373 F.3d at 1216 (confirming the district court's power "to fashion appropriate restraints on [the defendant's] future activities . . . to avoid a recurrence of the violation" (quoting *NSPE,* 435 U.S. at 697)).

As to the data-sharing and syndication remedies, Pls.' RPFJ §§ VI.A, VI.C–F, VII.A–G, VIII.E, which are available to "Qualified Competitors," *id.* § III.U, there is ample evidence that GenAI chatbots grounded in general search perform an information-retrieval function that is similar to GSEs.  *See* FOF ¶¶ 12–16, 36–43.  True, they approach this task in different ways, with GenAI chatbots producing text, images, and other content in response to a user query rather than the traditional "10 blue links" returned by a GSE.  *Compare Google*, 747 F. Supp. 3d at 38–41 ¶¶ 27–42 (explaining how a GSE works, the different types of queries, and depicting a sample SERP), *with* FOF ¶¶ 12–17 (explaining how a GenAI chatbot works); *accord* FOF ¶ 15 (finding that GenAI products often include citations and links to websites when responding to information-seeking queries).  GenAI chatbots can also perform functions that GSEs cannot and vice versa.

---

[7] There is a separate question as to how Google's scale advantage in Search affects the performance of its GenAI models and products, which the court addresses when tailoring the data sharing and syndication remedies.  *See infra* RCOL § III.B, C.

*See* FOF ¶¶ 17, 63, 65.  Because their functionality only partially overlaps, GenAI chatbots have not eliminated the need for GSEs.  *See* FOF ¶¶ 63, 65; *see also Google*, 747 F. Supp. 3d at 53–54 ¶¶ 114–115 (finding that "AI has not supplanted the traditional ingredients that define general search" and that GenAI "has not (or at least, not yet) eliminated or materially reduced the need for user data to deliver quality search results").

Nevertheless, the capacity "to fulfill a broad array of informational needs" constitutes a defining feature of both products, as Google implicitly acknowledges.  *Google*, 747 F. Supp. 3d at 110–11 (discussing the "peculiar characteristics and uses" of GSEs when defining the relevant product market for purposes of determining liability); *see* Google's RPFJ § VI.N (defining "Third-Party General Search Service" to include "a web search service that can respond to a broad range of search query categories and offers functionality that is substantially similar to Google Search"); *id.* § VI.O (defining "Third-Party Generative AI Assistive Service" to include "a stand-alone mobile software application that is a generative artificial intelligence chatbot that has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information").  And it is that capacity that renders GenAI a potential threat to Google's dominance in the market for general search services.  Indeed, Google's own witness, Apple executive Eddy Cue, testified that the volume of Google Search queries in Apple's Safari web browser had declined for the first time in 22 years likely due to the emergence of GenAI chatbots.  Rem. Tr. at 3818:20–3819:4, 3827:23–3828:11, 3846:24–3847:3 (Cue); *see also* FOF ¶ 63.  And when asked what it would take for a competitor "to provide genuine competition to Google for Apple's default on Safari," Cue replied, "I don't think the incumbents can do it . . . .  The people that have the opportunity to do it are" those "leveraging the new technologies, . . . the Perplexities, the OpenAIs of the world . . . ."  *Id.* at 3845:15–3846:2 (Cue);

100

*see id.* at 3848:5-15 (Cue) ("[I]f AI had not come about, I don't know what [one] could do" to "aid in the competitive landscape."). As further evidence of how these products are shifting the competitive landscape, Cue revealed that Apple is "actively looking at" adding a GenAI product as a search option in its Safari web browser and expects to do so in the coming year. *Id.* at 3834:21– 3835:10 (Cue).

Google protests that GenAI products are neither "part of the relevant markets" nor "tied 'to [Plaintiffs'] theory of liability'" and therefore cannot be included in the remedial decree. Google's Br. at 61 (quoting *New York I*, 224 F. Supp. 2d at 136). But Google's reliance on *New York I* is once again misplaced.

There, the trial court extended its remedies to products that were not strictly the "middleware" that was the focus of the liability proceedings. *See New York I*, 224 F. Supp. 2d at 128–30 (including servers and network computing within the scope of remedies). Middleware in the liability phase included products like Netscape and Java, which were written for multiple operating systems. *See Microsoft III*, 253 F.3d at 53. When crafting the mandatory-disclosure provisions, the court in *New York I* expressly rejected the argument that other "new technologies"—which were not addressed in the court's liability opinion—were not "a proper subject of the remedy in this case because they [were] not truly 'middleware' as that term was used in the liability phase." *New York I*, 224 F. Supp. 2d at 121, 128. The district court instead considered whether the technologies at issue "ha[d] the capacity to function in a manner similar to that of traditional middleware" and "ha[d] been shown to presently have a reasonable possibility of 'dissipating the restraints' on trade imposed by [the defendant]." *Id.* at 128–29 (alteration omitted) (quoting *Bausch & Lomb*, 321 U.S. at 726). Applying that test, the district court expanded the scope of the remedy to "provide substantial protection for server/network computing by

101

requiring Microsoft to disclose [certain] technical information" to competitors, reasoning that "[s]uch assistance [was] appropriate as it look[ed] toward the new model of the 'platform threat' and [sought] to ensure that the ill effects of Microsoft's conduct [were] not felt in this related area of the industry."  *Id.* at 129; *see id.* at 193 ("The mandatory disclosures between Microsoft's monopoly product and server operating systems acknowledge the competitive significance of server/network computing as the newest type of 'platform threat' to Microsoft's dominance in the relevant market.  The disclosures mandated by the Court will likely prove beneficial to the development of middleware platforms and the functional equivalent of the middleware platform provided by server operating systems.").  The same reasoning applies here.

Google's own product development decisions further undermine its stance on excluding GenAI products from the remedial decree.  Since the liability trial, Google has deepened the integration between Search and GenAI by incorporating AI Overviews into its SERP and introducing AI Mode, both of which "are expanding the types of queries [users] are typing into Google Search."  Rem. Tr. at 2489:24–2491:21 (Pichai); *see* FOF ¶¶ 6–11.  That integration shows no signs of slowing.  Rem. Tr. at 3617:22–3618:16 (Reid) (agreeing that she believes the percentage of queries triggering an AI Overview response "will continue to increase over time" and that she reported as much to Google's Board of Directors); *id.* at 2491:14-21 (Pichai) ("[O]ver time, I expect [AI Mode] to . . . become a deeper part of the Search experience."); *id.* at 2458:12–2459:5 (Pichai) (predicting that "AI technology is going to deeply transform Google Search"); *see* FOF ¶¶ 6–11.

Google's reliance on this court's prior treatment of Branch is equally unavailing.  *See* Google's Br. at 61.  It is true that the court rejected Plaintiffs' contention that "the [challenged] distribution agreements prevent[ed] the emergence of innovative search-adjacent technologies"

like Branch. *Google*, 747 F. Supp. 3d at 169–70.  But it did so because "[t]he record [did] not support the conclusion that Branch's technology ha[d] shown potential to become a viable platform substitute for Google."  *Id.* at 170.  As Branch's own CEO and documents attested, Branch "[did] not conflict with or overlap with web search" and "its search use case [was] totally different and distinct from Google search."  *Id.* (internal quotation marks and citations omitted).  When it comes to GenAI technologies, however, the evidence overwhelmingly points the other way.  Accordingly, the final judgment will reach GenAI technologies and companies.

Before moving forward, one important definitional issue must be addressed.  Plaintiffs propose in their RPFJ that the term "Qualified Competitor" mean:

> [A] Competitor who meets the Plaintiffs' approved data security standards as recommended by the Technical Committee and agrees to regular data security and privacy audits by the Technical Committee, who makes a sufficient showing to the Plaintiffs, in consultation with the Technical Committee, of a plan to invest and compete *in the GSE and/or Search Text Ads markets*, and who does not pose a risk to the national security of the United States.

Pls.' RPFJ § III.U (emphasis added).  "Competitor" in turn "means any provider of, or potential entrant in the provision of, a General Search Engine (GSE) or of Search Text Ads in the United States."  *Id.* § III.G.  Because the use case for a GenAI product like ChatGPT is not limited to the GSE market, FOF ¶ 17, OpenAI and similar firms, like Anthropic and Perplexity, arguably would not be "Qualified Competitor[s]," as presently defined.  To leave no doubt that the remedies extend to such companies, the court will revise the definition of "Qualified Competitor" in two ways by (1) modifying the term "Competitor" to include "GenAI Product[s]"[8] and (2) adding "or with"

---

[8] The revised definition would thus read: "'Competitor' means any provider of, or potential entrant in the provision of, a General Search Engine (GSE) or of Search Text Ads in the United States, or a GenAI Product in the United States."  *See also* Pls.' RPFJ § III.K (defining "GenAI Product").  Of course, for a "Competitor" to become a "Qualified Competitor," it would have to demonstrate to Plaintiffs and the Technical Committee that it has "a plan to invest and compete in [or with] the GSE and/or Search Text Ads markets . . . ."  *Id.* § III.U.

after "plan to invest and compete in," such that an eligible firm must be one with a "plan to invest and compete in or with the GSE and/or Search Text Ads markets." *See* Rem. Tr. at 4899:13-16 (Closing Arg.) (defining "Qualified Competitor" as a competitor who plans to compete "with" Google in the monopolized markets and who satisfies the additional criteria set forth in § III.U of Plaintiffs' RPFJ).

<u>**REMEDY-SPECIFIC CONCLUSIONS OF LAW**</u>

Having established the appropriate evidentiary and remedial scope for evaluating the parties' RPFJs, the court must now "provide an adequate explanation for the relief . . . ordered" and "explain[] how its remedies decree would accomplish [the] objectives" set forth in *Microsoft III*. *Microsoft III*, 253 F.3d at 103; *see Alston*, 594 U.S. at 102–03 (cautioning that a court should not "impose a duty that it cannot explain or adequately and reasonably supervise" (cleaned up)). Google's proposed prohibitory injunctive relief provides an appropriate starting point, so the court begins there. Those remedies are important insofar as they afford distributors greater flexibility to partner with Google's rivals than they had under the agreements the court found to be anticompetitive. That class of remedies is not, however, sufficient to restore competition in the monopolized markets, so the court then will proceed to consider the extensive slate of relief sought by Plaintiffs.

## I.    ADEQUACY OF PROHIBITORY INJUNCTIVE RELIEF ONLY

Google would have this court go no further than its proposed remedies, the central feature of which is an injunction against those provisions of the MADAs, the RSAs, and the browser agreements that the court deemed exclusive. Google's Br. at 11–16. Among other things, Google's proposed judgment would bar Google from: (1) conditioning an OEM's licensing of Google Play or any other Google software on that OEM also distributing or preloading Search or

Chrome, Google's RPFJ § III.A–B; (2) entering any agreement with an OEM or wireless carrier that conditions the payment of Consideration[9] or the licensing of any Google software on the partner not preloading or carrying any other GSE or browser, *id.* § III.E–F; and (3) conditioning payments to OEMs and wireless carriers upon their preloading or placement of Search or Chrome on multiple points of access to those products, *id.* § III.H– I. Under its proposal, Google still would be permitted to pay OEMs and wireless carriers for default distribution or other on-device placement of "any Google product or service." *Id.* § III.M. Google also would be permitted to pay Browser Developers, including Apple, to set Search as the default GSE, so long as the Browser Developer (1) can promote other GSEs and (2) is permitted to set a different GSE on different operating system versions or in a privacy mode and makes changes, if desired, on an annual basis. *Id.* § III.K–L.

Taken together, these prohibitions grant GSE distributors far more freedom to partner with firms other than Google. For instance, OEMs would be able to license the Play Store or any other Google software application without having to place Google Search or Chrome on the device. Google's Br. at 13. OEMs and carriers would be able to preload different GSEs on a device-by-device, access-point-by-access-point basis. *Id.* at 13–14. Motorola, for instance, could make different GSEs the search widget default on different devices without putting at risk revenue share from Google. Additionally, RSAs can no longer offer higher revenue share percentages for exclusive tiers. *Id.* at 13. This provision had the practical effect of causing distributors to set all of their device defaults to Google to receive the benefit of a higher revenue share percentage. *See Google*, 747 F. Supp. 3d at 152 ("Nearly all RSA-covered devices are presently enrolled at the highest-revenue tier, thus locking in Google as [the] only preloaded GSE."). And Apple could

---

[9] Google defines "Consideration" to mean "any monetary payment; provision of preferential licensing terms; technical, marketing, and sales support; or hardware or software certification or approval." Google's RPFJ § VI.C.

preload GSEs on a device-by-device basis (i.e., Safari for Mac versus Safari for Windows), and install different GSEs for different search modes, like private browsing. *Id.* at 15–16.

Google's proposed judgment also reaches beyond its Search, Chrome, and Play Store products. It would bar conditioning the licensing of Search, Chrome, or Google Play on an OEM also preloading or distributing the Google Assistant Application or the Gemini app. Google's RPFJ § III.C–D. Google cannot condition the payment of Consideration or the licensing of Google Play or another Google application on OEMs refraining from distributing a third-party GenAI service. *Id.* § III.G. It would also bar Google from conditioning payment for distribution of Google Assistant Application or the Gemini app on preloading or placement of Search or Chrome and vice versa. *Id.* § III.H–J. Under these provisions, an OEM could license the Google Play Store without any obligation to preload the Google Assistant or Gemini app. Google's Br. at 14. Similarly, an OEM or wireless carrier could simultaneously preinstall Google Search and a non-Google GenAI product, like ChatGPT, Perplexity, or Claude, or a rival GSE and the Gemini app. *Id.* at 13–14.

Google's proposed contracting prohibitions are an important step towards restoring competition to the relevant markets. They will afford distributors the choice to preload, distribute, and feature non-Google products that was largely unavailable under the prior agreements. "By freeing up firms to make substitute choices, an injunction can increase the range of competitive alternatives to a firm." Herbert Hovenkamp, *Structural Antitrust Relief Against Digital Platforms*, 7 J.L. & INNOVATION 57, 101 (2024) [hereinafter *Structural Antitrust Relief*]; *see also id.* at 98 ("[A]n injunction that opens up participant choice can serve to diminish monopoly power significantly."). Such optionality is particularly meaningful in the present moment. GenAI

products have emerged as a competitive threat to the traditional GSE, and Google cannot be permitted to leverage its dominance in general search to the GenAI product space.

These proceedings already have had a prophylactic effect on Google. It has updated its RSAs to align with its proposed remedies. Rem. Tr. at 2471:4–2472:21, 2480:19-23 (Pichai). Its new agreements remove restrictions on the placement and promotion of alternative search services and now permit distributors to select search products on a device-by-device, access-point-by-access-point basis. *See generally* FOF ¶¶ 77–103. They also make clear that GenAI apps are not "alternative search services." *See, e.g.*, FOF ¶¶ 94–95 (discussing February 2025 amendment to Google–Motorola/Lenovo Google Mobile Incentive Agreement). And only weeks before the remedies trial began, Google sent letters to three of its Android distribution partners waiving RSA provisions that constrained their ability to preinstall and promote "Alternative Assistive Products." FOF ¶¶ 101–103. This eve-of-trial waiver removed any uncertainty as to whether partners could preload and promote GenAI products other than Gemini.

All of this is a good start, but Google's proposed remedies do not go far enough. If there is a market that needs to be "pr[ied] open," it is the market for general search services. *See Int'l Salt*, 332 U.S. at 401. As the court found during the liability phase, the general search market has been "frozen" for over 10 years. *See Google*, 747 F. Supp. 3d at 145. Google's distribution agreements have caused substantial market foreclosure. Fifty percent "of all queries in the United States are run through the default search access points covered by the challenged distribution agreements." *Id.* at 153. Another 20% flow through Google on user-downloaded Chrome, which further narrows the portion of the market available to rivals. *Id.* at 45 ¶ 63. What's more, there has been a paucity of market entry, and no genuine rival has emerged. *Id.* at 144–45. Google's dominance in fact *grew* during the maintenance period, with its market share increasing

107

from 80% in 2009 to 89.2% by 2020. *Id.* at 38 ¶ 23. On mobile, its market share sits at nearly 95%. *Id.* ¶ 24. Still today, "Google has no true competitor." *Id.* at 144.

Merely excising the exclusive provisions from Google's distribution agreements will not unleash competition. Google's remedies fail to address any illegally obtained fruit of those agreements other than the "freedom" from competition that it enjoyed for more than a decade. *See supra* COL § III.A. They do nothing to "eliminate" the *consequences* of its exclusionary acts. *See NSPE*, 435 U.S. at 697. Google simply retains too many advantages that are derived in part from its decade-long vice grip on default distribution, including its quality, data volume, and capacity to monetize search queries. These advantages are particularly pronounced for mobile search. *See Google*, 747 F. Supp. 3d at 46 ¶ 71, 49–50 ¶ 87 (discussing stronger default effects on mobile devices and Google's scale dominance on mobile devices).

Even with newfound flexibility, distributors still are likely to select Google as its primary, if not only, default GSE. *See, e.g.*, Rem. Tr. at 3830:6-10 (Cue) ("So we have to pick what's best for our customers, and today, that is still Google."). That reality is due in large part to the "network effects" that characterize the general search market. *Google*, 747 F. Supp. 3d at 161–62; *see supra* COL § III.A. These network effects reinforced the distribution agreements' exclusivity and Google's dominant position. In such a market, prying open competition is not as simple as prohibiting the exclusionary conduct.

The Ninth Circuit recently recognized as much. It approved remedies in the *In re Google Play Store Antitrust Litigation* case that go beyond a mere prohibition of anticompetitive conduct. Google was ordered to affirmatively grant third-party Android app stores access to the Google Play Store's catalog of apps and to allow such stores or platforms to be distributed through the Play Store. *In re Google Play Store*, 2025 WL 2167402, at *15–20. Central to affirming those

108

remedies was a record "replete with evidence that Google's anticompetitive conduct entrenched its dominance, causing the Play Store to benefit from network effects." *Id.* at *18. The remedies the court approved were designed "to ameliorate consequences 'intertwined within the network effects' that Google [had] enjoyed as a monopolist," *id.* at *16, and had "unfairly enhanced," *id.* at *18. "Once the [district] court established, based on trial evidence, that network effects were among the consequences of Google's anticompetitive conduct, the court was permitted to shape relief targeted to those effects." *Id.* at *19.

The Ninth Circuit is not alone in this understanding. Professors Areeda and Hovenkamp have stated that, "[w]hen the defendant has acquired and maintained its position by a single practice, such as exclusive dealing, then perhaps we can have some confidence that a prohibition of the practice will result in an increasingly competitive market." 3 AREEDA & HOVENKAMP ¶ 653a. But the same confidence is not warranted when a market exhibits network effects. "[A] 'network' monopoly . . . may have to be forced open by more aggressive means." *Id.* The treatise identifies telecommunications (AT&T) and computer operating systems (Microsoft) as two such markets. *Id.*; *id.* ¶ 653i2. General search is certainly another. *Google*, 747 F. Supp. 3d at 161–62.

Professors Areeda and Hovenkamp do accept that "aggressive means" are unnecessary where "technology renders the existing system obsolete." 3 AREEDA & HOVENKAMP ¶ 653a; *see also Microsoft III*, 253 F.3d at 49 (acknowledging authorities that suggest entrenchment in technologically dynamic markets characterized by network effects "may be temporary, because innovation may alter the field altogether"). Google seemingly shares that view. It believes that the integration of AI technologies into search has made traditional search more competitive. *See* Google's PFOF ¶¶ 988–996. But the market has shown otherwise. Microsoft has incorporated

AI into its search products, leading Microsoft to believe it has closed the quality gap, at least on desktop. *Id.* ¶¶ 992–996; *see also* FOF ¶ 53. But no new distributor has selected Bing as a default GSE, and to the court's knowledge, Bing has not gained market share because of its product development. Neeva provides another example. It built its search engine on AI technology but ultimately could not compete without greater distribution and left the market. *Google*, 747 F. Supp. 3d at 47 ¶ 76, 122–23. AI has unquestionably improved general search, but it has not yet fundamentally altered market dynamics. *See, e.g.*, FOF ¶¶ 6–11 (describing Google's AI innovations in Search); *id.* ¶¶ 63–66 (describing GenAI's impact on GSEs).

Google's distribution agreements have unfairly amplified the powerful network effects that characterize the search market. Stripping away the exclusivity of those contracts is a good start to unwind those advantages, so the court will accept those terms. But those prohibitions will not alone restore competition to a market that has not had any in more than a decade.

Before moving to Plaintiffs' remedies, the court modifies a few aspects of Google's prohibitory injunction. First, as drafted, Google can make revenue share payments to Browser Developers, so long as such agreements allow the Browser Developer to annually set a different GSE at various search access points across different devices. *See* Google's RPFJ § III.K. Google's proposed final judgment, however, contains no similar one-year term for its OEM and wireless carrier agreements. Google explains in a post-hearing memorandum that it did not include such a restriction because its remedies already strip the relevant agreements of those terms that the court determined made them exclusive. Def.'s Resp. to the Court's July 29, 2025 Minute Order, ECF No. 1425. But Google overlooks that the length of those contracts contributed to stifling competition, too. The court found that "[r]ivals cannot presently access [default] channels of distribution without convincing Google's partners to break existing agreements, *all of which* are

110

binding for a term of years." *See Google*, 747 F. Supp. 3d at 120 (emphasis added). The court made no distinction as between the anticompetitive effects of the durations of the browser agreements and the durations of the MADAs and RSAs. Accordingly, the court will impose the same one-year option as a condition of payments to OEMs and wireless carriers.

Second, at present, Section III.K of Google's RPFJ provides that agreements with Browser Developers shall expressly permit them to "promote any Third-Party General Search Service." That provision is underinclusive: it excludes GenAI products. Just as Google cannot secure on browsers exclusivity for its GSE, it cannot secure exclusivity for its GenAI products on browsers or a Browser Developer's device. Section III.K therefore shall extend to any "GenAI Product," as that term is defined in Section III.K of *Plaintiffs'* RPFJ (as opposed to Google's definition of "Third Party Generative AI Assistive Service," which is limited only to "stand-alone mobile" GenAI "chatbot[s]," Google's RPFJ § VI.O, and not all GenAI products). And to leave no doubt that Apple falls within the revision, Section III.L of Google's RPFJ shall be modified to make clear that Google is prohibited from entering into an exclusive agreement with Apple to distribute any Google GenAI product either in any Safari mode or on any Apple mobile or desktop device.

Third, Google's definition of "Gemini Assistant Application" is too narrow. The definition does not contemplate the possibility that Google may launch a new GenAI product during the judgment period, whose distribution could raise exclusivity concerns. The parties' joint proposed final judgment should address this definitional issue.

## II.    STRUCTURAL REMEDIES

The court now turns to Plaintiffs' proposed remedies, starting with what is perhaps the most controversial: the immediate divestiture of Chrome. The court addresses the contingent divestiture of Android in this section, as well.

111

### A.    Chrome Divestiture

Under Section V.A of Plaintiffs' RPFJ, Google would be compelled to sell its Chrome web browser—as well as Chromium, the open-source platform underlying Chrome and other web browsers—and would be prohibited from "releas[ing] any other Google Browser during the term of this Final Judgment absent approval by the Court." Pls.' RPFJ § V.A; *see also id.* § III.F (defining "Chrome" to include Chromium). This remedy reflects Plaintiffs' concern that Google will be able to maintain its dominant position in the relevant markets through the continued ownership and control of Chrome. *See id.* § V; Pls.' Br. at 32–35.

The case for Chrome divestiture is straightforward: Google sets its own GSE as the default in Chrome. *Google*, 747 F. Supp. 3d at 35 ¶ 6. Chrome is a very popular browser, and its default constitutes a particularly important search access point, accounting for 20% of all searches in the United States. *Id.* at 45 ¶ 63. "Though the Chrome default is not alleged to be exclusionary conduct," the court explained in its liability decision, "it is a market reality that significantly narrows the available channels of distribution and thus disincentivizes the emergence of new competition." *Id.* at 120; *see* PXR0218 at -542 to -543 (Google document stating that Chrome "driv[es] value" by "[s]erv[ing] as a key distribution channel for Search and assistive technologies"); *see also* Rem. Tr. at 1662:18-23 (Tabriz) (stating that Chrome is the most popular web browser in the world today); *id.* at 2153:10-21 (Chipty) ("Chrome has been the most widely used browser in the U.S. in the last ten years, according to StatCounter." (discussing PXRD012 at 22)). Plaintiffs thus believe that ordering Google to divest Chrome would "open a critical, contestable access point to rivals with the aim of counteracting the anticompetitive effects of Google's durable monopolies" and "prevent Google from using Chrome as a tool to unfairly advantage its search product." Pls.' Br. at 35–36. A divestiture is therefore warranted to redress

112

the harms of Google's antitrust violation and prevent its recurrence.    Pls.' Br. at 35–37; Pls.' RPFJ § V.

In a sense, the Chrome divestiture proposed by Plaintiffs is less radical than the break-up proposed in *Microsoft III*.  A forced sale of Chrome is not "designed to eliminate the monopoly altogether."  *Microsoft III*, 253 F.3d at 106 (citation omitted).  Not even Plaintiffs' expert in industrial organization economics, Dr. Tasneem Chipty, believes that the remedy would dislodge Google from its market primacy, at least not in the short term.  *See* Rem. Tr. at 2154:11–2155:7 (Chipty) (estimating that Chrome divestiture would result in a 7% share shift from Google to rivals (discussing PXRD012 at 25)).  Still, Plaintiffs from the outset have treated the Chrome divestiture as a structural remedy.  Rem. Tr. at 30:11–31:4 (Opening Arg.).  So, the court does, too.

The Chrome default undoubtedly contributes to Google's dominance in general search. *See Google*, 747 F. Supp. 3d at 120.  And under Supreme Court precedent, the fact that neither Google's ownership of Chrome nor its self-preferencing of Google Search in Chrome was found to be anticompetitive is not a per se bar to this remedy.  *See, e.g.*, *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 256 (1959) (upholding an order requiring the defendants to divest "lawfully acquired" stock because "it may be utilized as part of the conspiracy to effect its ends"); *United States v. Paramount Pictures*, 334 U.S. 131, 152 (1948) ("[E]ven if lawfully acquired, [the defendants' acquisitions] may have been utilized as part of the conspiracy to eliminate or suppress competition in furtherance of the ends of the conspiracy.  In that event divestiture would likewise be justified."); *see also Bausch & Lomb*, 321 U.S. at 724 (affirming district courts' "power to eradicate the evils of a condemned scheme by prohibition of the use of admittedly valid parts of an invalid whole" (collecting cases)).

113

But the complete divestiture of Chrome is a poor fit for this case.  For one, the D.C. Circuit has instructed that "divestiture is a remedy that is imposed only with great caution, in part because its long-term efficacy is rarely certain."  *Microsoft III*, 253 F.3d at 80; *see also* 3 AREEDA & HOVENKAMP ¶ 653c ("The rationale for a 'structural' remedy is that injunctive relief is inadequate. Even so, a court-induced restructuring of a firm is attended by many uncertainties.").  And in cases like this one, which do not implicate the "traditional[]" and "particularly appropriate" justifications for divestiture (terminating monopolies formed by mergers and acquisitions), *Microsoft III*, 253 F.3d at 105 (first quoting *E. I. du Pont*, 366 U.S. at 329; and then quoting *Ford Motor*, 405 U.S. at 573), courts have ordered such relief only after determining that less severe remedies likely would prove inadequate.  *See Int'l Boxing Club*, 358 U.S. at 258 (affirming an order of divestiture based on the district court's finding that "this was the only effective means at hand by which competition in championship events might be restored"); *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250–52 (1968) (explaining that district courts "may, if circumstances warrant, accept a formula for [restoring competition] by means less drastic than immediate dissolution or divestiture" but ultimately instructing the district court to consider "other, and if necessary more definitive" measures because that objective had not been achieved 10 years after judgment); *E. I. du Pont*, 366 U.S. at 327 ("If the Court concludes that other measures will not be effective to redress a violation, and that complete divestiture is a necessary element of effective relief, the Government cannot be denied the latter remedy because economic hardship, however severe, may result.").  Plaintiffs have not shown that their behavioral remedies will be ineffective without the immediate divestiture of Chrome.

What's more, Plaintiffs do not satisfy this Circuit's "clearer indication of a significant causal connection" test for structural remedies.  *Microsoft III*, 253 F.3d at 106 (emphasis and

114

citation omitted). As discussed above, the court's liability findings support a strong inference that Google's exclusive distribution agreements significantly contributed to maintaining its monopoly power. *See supra* COL § II. But the record also contains ample evidence that lawful conduct played an important role in Google's maintenance of its monopoly. That includes its best-in-class search quality, consistent innovations, investment in human capital, strategic foresight, and brand recognition. *See Google*, 747 F. Supp. 3d at 31. The contribution of these factors to Google's success is not disputed. To be sure, in some sense even these attributes can be traced back to Google's exclusive distribution agreements: Google's access to default distribution allowed it to amplify network effects to maintain its market advantages by a means other than competition. *See id.* at 161–63. But the court's task is to discern between conduct that maintains a monopoly through anticompetitive acts as distinct from "growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). After two complete trials, this court cannot find that Google's market dominance is sufficiently attributable to its illegal conduct to justify divestiture. Because the record does not support the requisite heightened causal connection, "wisdom counsels against adopting radical structural relief." *Microsoft III*, 253 F.3d at 80.

The remedy also extends beyond the conduct Plaintiffs seek to redress. It was Google's control of the Chrome default, not its ownership of Chrome as a whole, that the court highlighted in its liability finding. *See Google*, 747 F. Supp. 3d at 120–21. Ordering Google to sell one of its most popular products, one that it has built "from the ground up" and in which it has invested (and continues to invest) billions of dollars, in the hope of opening a single channel of distribution to competition—and not even one that was unlawfully foreclosed by the challenged contracts— cannot reasonably be described as a remedy "tailored to fit the wrong creating the occasion for the

115

remedy." *Microsoft III*, 253 F.3d at 107; Rem. Tr. at 2466:23–2468:3 (Pichai); *id*. at 1634:23–1636:2 (Tabriz) (discussing PXR0215 at -257). Further, as a legal matter, the divestiture of Chrome exceeds the proper scope of relief. "All parties agree that the relevant geographic market is the United States." *Google*, 747 F. Supp. 3d at 107. Chrome, however, is not so geographically confined. The vast majority—over 80%—of its monthly active users are located outside the United States. Rem. Tr. at 1619:23–1620:6 (Tabriz). Plaintiffs do not try to make the case that a divestiture of Chrome to just U.S.-based users is feasible. *See generally* Pls.' Br. at 37–40.

Quoting *E. I. du Pont*, Plaintiffs contend that divestiture represents "the 'surer, cleaner remedy.'" Pls.' Reply at 23 (quoting *E. I. du Pont*, 366 U.S. at 334). But this matter bears no resemblance to *E. I. du Pont*. That case involved a vertical acquisition of a large percentage of General Motors stock by E. I. du Pont, which the Supreme Court previously held violated Section 7 of the Clayton Act. *E. I. du Pont*, 366 U.S. at 318–19 (citing *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 607–08 (1957)). In that context, the Court observed that "complete divestiture is peculiarly appropriate in cases of stock acquisitions which violate § 7" and that the "very words of § 7 suggest that an undoing of the acquisition is a natural remedy." *Id.* at 328–29. This, of course, is neither a Section 7 case nor one involving a monopoly created via merger or acquisition.

But more to the point, there would be nothing "natural" about a Chrome divesture. It would be incredibly messy and highly risky. *See Microsoft III*, 253 F.3d at 106 ("One apparent reason why courts have not ordered the dissolution of unitary companies is logistical difficulty."); *see also* Rem. Tr. at 1684:20-22 (Tabriz) (agreeing that "attempting to divest Chrome from Google [would] present logistical difficulty"). Chrome does not run as a standalone business. At the most basic level, it depends on Google for a host of administrative functions, such as finance, marketing, and

116

human resources.  Rem. Tr. at 1682:9-16 (Tabriz).  It also is deeply reliant on Google's "hyperscale" technical systems and infrastructure.  *Id.* at 2525:10-19 (Nieh) (describing Google's underlying infrastructure as an "engineering marvel" that enables "all of Google's products to be able to operate at the enormous scale to service billions of users").  Chrome relies on Google's back-end systems and engineering personnel for, among other things, account sign-in and authentication, data storage and management at a global scale, and cybersecurity.  *Id.* at 1682:20–1684:17 (Tabriz); 2532:23–2534:7 (Nieh) ("If you were to, say, spin off Chrome and its functionality and, I think, re-creating the Google infrastructure would be hard, if not impossible.");  *id.* at 2540:7–2547:21 (Nieh) (discussing RDXD-17.020 to .024).  And then there are the host of Google's private APIs that Chrome is dependent upon and that are critical to its product performance and functionality.  These include safe browsing, price tracking, translation, and automatic updates, to name a few.  *Id.* at 2536:10–2539:24 (Nieh) (discussing RDXD-17.019).  Chrome would be a shell of the product that it is today without access to those APIs.  *See id.*

Even if, as Plaintiffs suggest, these dependencies could somehow be re-created or made available to a new owner, *see* Pls.' Br. at 39—and that is a big "if"—the court is highly skeptical that a Chrome divestiture would not come at the expense of substantial product degradation and a loss of consumer welfare.  *See* Rem. Tr. at 1688:14–1689:9 (Tabriz) (expressing concern that divestiture of Chrome would at best result in "a product that is a shadow of current Chrome" that has "regressed in quality and security" and thereby impact users).  That concern extends to the Chromium open-source project and other Chrome-based products.  *See* Rem. Tr. at 2554:12–2557:12 (Nieh).

117

Put simply, Plaintiffs have not met their heavy burden to warrant the "radical structural" remedy of a forced divestiture of Chrome and the Chromium open-source project. *See Microsoft III*, 253 F.3d at 80.

### B.    Contingent Android Divestiture

Section V.C of Plaintiffs' RPFJ proposes "contingent structural relief." If five years after entry of judgment "Plaintiffs demonstrate by a preponderance of the evidence that either or both monopolized markets have not experienced a substantial increase in competition," Google would be required to "divest Android unless Google can show by a preponderance of the evidence that its ownership and control of Android did not significantly contribute to the lack of a substantial increase in competition." Pls.' RPFJ § V.C. Plaintiffs could seek other structural relief, as well. *See id.* ("[T]he Court may impose additional structural relief, *including* the divestiture of Android." (emphasis added)).

According to Plaintiffs, a contingent Android divestiture is necessary "to ensure the final judgment effectively accomplishes its fundamental purpose and Google is sufficiently disincentivized not to seek to circumvent the final judgment." Pls.' Br. at 63. Absent such a remedy, Plaintiffs contend, Google will be "incentivized to continue to use Android to preference Google Search and other Google products," and the presence of such contingency will serve as "a necessary backstop to disincentivize attempts at circumvention and ensure that the monopolized markets enjoy a substantial increase in competition." *Id.* at 63–64.

The court does not dwell on this proposed remedy for long. It suffers from similar legal infirmities as the Chrome divestiture. *See supra* RCOL § II.A. Plaintiffs have never alleged that Google's ownership or use of its Android operating system causes anticompetitive effects in the relevant markets, and they have not explained how a future sale of Android would promote

competition in those markets.  A sale of Android also would reach beyond the U.S. market.  The remedy therefore does not fit the wrong.  *See Microsoft III*, 253 F.3d at 107.  And, as discussed, Plaintiffs have not satisfied the stricter causal standard required to impose structural relief. *See supra* RCOL § II.A.

Plaintiffs also did not present any evidence to justify a contingent structural remedy.  They offered no proof to support the feasibility of a sale of Android or the anticipated market effects of a contingent remedial provision or an actual future sale.  And none other than Plaintiffs' own expert expressed skepticism about a contingent divestiture.  Though not offering a firm opinion about the remedy, Dr. Chipty agreed that a contingent Android divestiture "seemed to go too far." Rem. Tr. at 2200:19–2201:7 (Chipty).  There can be no remedy absent a factual basis to support it.

## III.  ADDITIONAL "CORE REMEDIES"

The court now turns to what Plaintiffs describe as additional "core remedies" necessary to restore competition.  Pls.' Br. at 19.  These include: (1) a ban on payments to distributors, (2) data-sharing remedies, (3) syndication requirements, and (4) choice-screen implementation.

### A.  Payment Ban

The most far-reaching remedy in this category is a prohibition on Google making nearly all search-related payments to distributors.  Pls.' RPFJ § IV.A–B, E.[10]  That includes any form of consideration for default or preferential placement as well as revenue share payments.  *See id.*  The dollar amounts at stake are staggering.  In 2021, Google paid more than $26 billion in "traffic acquisition costs" to distribution partners.  *Google*, 747 F. Supp. 3d at 88–89 ¶ 289.  That number has likely grown since.  For that reason, this proposal holds the greatest immediate consequence

---

[10] Plaintiffs allow for one limited exception: payments to Android distributors, for up to a year after the entry of judgment, who opt to display a choice screen on search access points on existing devices.  *See* Pls.' RPFJ § IX.A. The court discusses the proposed choice screen remedy in RCOL § III.D below.

for Google's distribution partners.  If accepted, it would have profound impacts on them and the related markets in which they operate.

The rationale for a payment ban is straightforward: It would pry open the market to competition.  The revenue share payments shape the market for general search services in Google's favor.  They "provide an incredibly strong incentive for the ecosystem to not do anything"; they "effectively make the ecosystem exceptionally resist[ant] to change"; and their "net effect [is to] basically freeze the ecosystem in place."  Liab. Tr. at 3796:8–3798:22 (Ramaswamy); Rem. Tr. at 816:3-13 (Weinberg) (stating that Google's revenue share payments create "a strong financial incentive to have [distributors] steer users towards Google and away from alternatives").

A payment ban in theory could bring about a much-needed thaw.  Distributors would have to look to other GSEs to earn revenue share, thereby stimulating competition among Google's rivals to secure default distribution.  Rem. Tr. at 2140:21–2142:19 (Chipty) (predicting 31% potential share shift to competitors attributable to payment ban remedy);[11] *id.* at 792:24–793:8 (Shevelenko) (describing "true freedom" as distributors being able to pick the best GenAI product without "fearing lost revenue or lower rev-share rates").  It also could encourage new entrants, including Apple.  *Id.* at 2141:4-15 (Chipty) (concluding that the payment ban "would increase the chance of entry into general search, especially by Apple"); *id.* at 3825:8-20 (Cue) ("I can't say I would disagree with [the court's] statement" that "it was a disincentive for [Apple] to do a search engine based on the payments that [it] w[as] receiving from Google").

---

[11] Although not essential to its conclusion, the court did not find Dr. Chipty's share-shifting exercise to be persuasive. The potential 31% market shift of queries to competitors struck the court as too speculative and not grounded in realistic assumptions about market behavior.  For instance, Dr. Chipty initially stated that her calculations assumed that distributors would switch to a default GSE other than Google to earn some revenue share, Rem. Tr. at 2143:12-14 (Chipty), but she later acknowledged that such a switch might not occur on "day one," *id.* at 2146:12-16 (Chipty). In any event, there are reasons beyond the uncertainty of Dr. Chipty's share-shifting exercise to reject Plaintiffs' complete payment ban.

In addition, as discussed, revenues are a "fruit" of Google's exclusionary conduct. *See supra* COL § III.C.  A payment ban would be one way to deny Google the fruits of its statutory violation—it could shift revenues historically enjoyed by Google to other GSEs.  *See* Herbert Hovenkamp, *Antitrust and Platform Monopoly*, 130 YALE L.J. 1952, 2017 (2021) [hereinafter *Platform Monopoly*] (suggesting that Google's practice of "making . . . payments" for defaults "could . . . be enjoined").

Though the bases for a payment ban are sound, the court declines to impose such a remedy at this time.  Two main reasons counsel against it.

*First*, if adopted, the remedy would pose a substantial risk of harm to OEMs, carriers, and browser developers.  *See Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1235 (8th Cir. 2010) ("Fashioning appropriate equitable antitrust relief requires that courts balance the benefit to competition against the hardship or competitive disadvantage the remedy may cause."); *see also Am. Tobacco Co.*, 221 U.S. at 185 (stating that antitrust remedies must accord "proper regard" for relevant private interests).  Distributors would be put to an untenable choice: either (1) continue to place Google in default and preferred positions without receiving any revenue or (2) enter distribution agreements with lesser-quality GSEs to ensure that some payments continue.  Rem. Tr. at 4250:2-17 (Murphy) (describing the "Hobson's choice" faced by Google's distribution partners (discussing RDXD-33.023)).  Both options entail serious risk of harm.

The first would not promote competition and in fact would likely advantage Google, at least in the short term.  On "day one" post-judgment, distributors will have no real alternative: because Google is the best search provider, they likely will maintain it as the default GSE, if for no other reason than to avoid alienating their customers.  *See, e.g.*, Rem. Tr. at 3829:3–3830:10 (Cue) ("I don't see any change that we can do that would satisfy our customers.  That's the

fundamental issue with this. So we have to pick what's best for our customers, and today, that is still Google."); *id.* at 2145:20-23 (Chipty) (agreeing that "there might be distributors who decide on day one to keep Google because Google is better and they may not want to disrupt their user experience"). Google thus would continue to receive a disproportionate volume of search queries for a fraction of the cost. Freed of having to pay billions in revenue share, Google's profits would *increase*. Not paying Apple alone would result in a windfall worth tens of billions of dollars. *Google*, 747 F. Supp. 3d at 90 ¶ 299 (finding that Google's revenue share payment to Apple in 2022 was an estimated $20 billion).[12] Google then could use those profits to improve its products and monetization, further propagating the network effects flywheel that has proven so difficult to disrupt. *See id.* at 162.

As for the second option, even if distributors were, at some point, to select a different GSE or a GenAI product to provide search functionality, without Google in the mix, they likely would earn less than they do now for two reasons. For one, a sizeable number of users would switch back to Google, thereby reducing the revenue share a distributor could earn from the new provider. Rem. Tr. at 2139:8-11 (Chipty) (acknowledging that Google "could recover some of the[] lost queries based on historical recovery rates"). Additionally, with Google sidelined from competition, rivals would pay less than Google did to secure default or preferential placement. Both sides' economic experts agreed that such an outcome was likely. *Id.* at 2287:11–2288:5 (Chipty) ("[U]ntil rivals would have the chance to significantly improve their product quality, it is quite possible that in the remedial world payments will be lower. And in the initial years."); *id.* at 4253:18–4254:5 (Murphy) (opining that he would "expect to see lower payments to partners" with

---

[12] The court recognizes that the Apple payment figure is a worldwide number, *see Google*, 747 F. Supp. 3d at 90 ¶ 299, but Plaintiffs' proposed payment ban makes no distinction between payments to secure domestic versus worldwide distribution of Search, *see* Pls.' RPFJ § IV.B. In any event, Google undoubtedly pays Apple billions of dollars for domestic distribution.

"the highest valued customer for your promotion [(Google)] off the table"). So, too, did industry executives. *See, e.g.*, Kim Rem. Dep. at 46:23–47:1 ("If Google is not paying [Samsung] . . . , I don't think other companies are willing to pay as much or I don't think they are willing to negotiate with us."); Laflamme Rem. Dep. at 82:13–83:2, 83:5–84:14 (preventing Google from paying revenue shares "essentially removes the baseline of what others would need to pay," such that "the value that would come to [Motorola] would decline quite significantly"); Giard Rem. Dep. at 128:1-7 (If Google were barred from competing to place its GSE on T-Mobile devices, "it would reduce the overall revenue [T-Mobile] ha[s] to support the promotion and distribution of Android."); Rem. Tr. at 3135:5-8 (Muhlheim) (stating that Mozilla's U.S.-based revenue "would drop precipitously if we had to go with another provider because there isn't another provider that can provide the compensation for th[e] traffic [it] ha[s]"); Standal Rem. Dep. at 54:16-19 ("So if [Opera (a small browser developer) doesn't] have a competitive situation in the market, it could be hard for us to negotiate an agreement with another provider.").

The complete loss or reduction of payments to distributors is likely to have significant downstream effects on multiple fronts, some possibly dire. They could include:

- Lost competition and innovation from small developers in the browser market. *See, e.g.*, Rem. Tr. at 3134:20–3135:19 (Muhlheim); Standal Rem. Dep. at 55:12-16 (stating that for Opera the loss of payments from Google "would make it hard for [it] to continue to invest in innovative solutions that [it] provide[s] for the US audience"). Mozilla, in particular, fears that lower revenue share payments could "potentially start a downward spiral of usage as people defected from our browser, which . . . could at the end of the day put Firefox out of business." Rem. Tr. at 3135:14-19 (Muhlheim); *see also*

123

*Google*, 747 F. Supp. 3d at 96 ¶ 335 ("Mozilla has repeatedly made clear that without these [revenue share] payments, it would not be able to function as it does today.").

- Fewer products and less product innovation from Apple. Rem. Tr. at 3831:7-10 (Cue) (stating that the loss of revenue share would "impact [Apple's] ability at creating new products and new capabilities into the [operating system] itself"). The loss of revenue share "just lets [Apple] do less." *Id.* at 3831:19 (Cue).

- Less investment in the U.S. market by Android OEMs, which would reduce competition in the U.S. mobile phone market with Apple. Kim Rem. Dep. at 43:14-22 ("[I]f [Samsung is] not getting paid from Google in the revenue share that [it's] currently getting, I think it will probably make [Samsung's] position much weaker to innovate and provide . . . the latest technology and better services to our customer. . . . [W]e might face . . . a very difficult situation to continue our business."); Laflamme Rem. Dep. at 77:18–78:19 ("If [Motorola] were not to receive [revenue share payments], it would have significant financial burdens on [its] business. . . . [A]dvanced resources in North America . . . would be put at risk if [it] were to lose this funding."); *see also* Boulben Rem. Dep. 70:2-10 ("It is much more costly for [Verizon] to promote an [Apple] device than an Android device . . . . So the more the Android ecosystem loses share in the Verizon customer base, the more costly it is for Verizon, and that weighs on our [profit and loss].").

- Higher mobile phone prices and less innovative phone features.  Kim Rem. Dep. at 44:12-19 ("[S]ome of [Samsung] product[s] could end up increasing prices or defeature our product[s] to manage the profit, which will make our position very weaker in the market and especially in U.S."); Ezell Rem. Dep. at 127:21–128:1 ("[O]ne of the ways [AT&T] can help offset some of the cost of th[e] device subsidy and make the devices more affordable to consumers is to have the ability to seek distribution or revenue share agreements with search, but also other services."); Giard Rem. Dep. at 115:25–116:10 ("[T]hose restrictions would prevent Google from entering into agreements similar to what [T-Mobile] ha[s] with the Android Activation Agreement, . . . the revenues from which [it] use[s] to help prop up the Android ecosystem through subsidies . . . et cetera."); Boulben Rem. Dep. at 44:3-8 (stating that Verizon's RSA with Google "help[s] and fund[s] the promotion of devices and offset[s]" billions in subsidies).

The court cannot predict to any degree of certainty that one or more of these effects will in fact occur.  But the risk is far from small, which is reason enough not to proceed with the remedy. *See Alston*, 594 U.S. at 107 ("Courts reviewing complex business arrangements should . . . be wary about invitations to 'set sail on a sea of doubt.'" (quoting *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 284 (6th Cir. 1898))); *Platform Monopoly* at 2016 ("[N]o antitrust remedy should be compelled without a relatively clear appreciation of the likely effects.").

Plaintiffs acknowledge the possibility of adverse market effects from a complete payment ban but implore the court to focus on the task of restoring competition to the relevant product markets.  Rem. Tr. at 4901:15–4906:12 (Closing Arg.).  They believe that, although there may be

125

short-term harm to some market actors, they will benefit in the long run from increased competition. Pls.' Br. at 25–26; *see also* Rem. Tr. at 2287:11–2289:16 (Chipty). Acting in equity, however, the court cannot be so myopic. It must consider the harms that might befall other market actors, even if that means, as here, forgoing a remedy that could help restore competition. *See Microsoft III*, 253 F.3d at 106 ("Mere existence of an exclusionary act does not itself justify full feasible relief against the monopolist to create maximum competition." (quoting 3 AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 650a (1st ed. 1996))).

*Second*, if one or more of these adverse market impacts were to come to pass, it would harm consumer welfare. That could manifest in various ways, including higher prices, less innovation, and less competition. Plaintiffs' expert Dr. Chipty did not dispute that such harms might arise in the short term. Rem. Tr. at 2288:23–2289:5 (Chipty). She believed, however, that consumer welfare would increase in the long run as more product choices emerge, though she could not say how long that might take. *Id.* But "[c]ourts must exercise care to ensure that the cost of correcting the market failure does not exceed the anticompetitive injury visited on consumers." *Ginsburg*, 623 F.3d at 1235 n.4 (quoting E. Thomas Sullivan, *The Jurisprudence of Antitrust Divestiture: The Path Less Traveled*, 86 MINN. L. REV. 565, 613 (2002)); *see also Am. Tobacco Co.*, 221 U.S. at 185 (instructing that antitrust remedies should accomplish their ends with "as little injury as possible to the interest of the general public"). Dr. Chipty's testimony did not give the court that assurance.

The Allcott study provides further support for a cautious approach. The study modeled a scenario that made Bing the default GSE across desktop web browsers. Allcott Study at 34–36. According to the authors, "[t]his approximates proposed bans on Google's payments for default positions, which would likely result in Bing—the second largest search engine—outbidding other

126

search engines for defaults." *Id.* at 35.  The study estimated that such an intervention would lead to Google's market share falling significantly but would come at "the cost of a *large reduction* in consumer surplus,"[13] "as permanently inattentive users, including users with strong preferences for Google, are defaulted into a less-preferred option." *Id.* at 35–36 (emphasis added); *see* Rem. Tr. at 4252:21–4253:17 (Murphy) (discussing this finding).  A prediction of a "large reduction in consumer surplus" likewise favors judicial restraint. *See Massachusetts*, 373 F.3d at 1219 ("[N]ot even the broad remedial discretion enjoyed by the district court extends to the adoption of provisions so likely to harm consumers.").

The court well recognizes what eschewing a payment ban may mean for competition. Due to Google's massive financial advantage and its superior monetization, distributors will be incentivized to stick with Google because it can pay more, thus leaving in place the very forces that "effectively [have made] the ecosystem exceptionally resist[ant] to change." *Google*, F. Supp. 3d at 145 (quoting Liab. Tr. at 3796:8–3798:22 (Ramaswamy)).  Continuing payments also could blunt the effectiveness of the remedies imposed. *E.g.*, Rem. Tr. at 2179:10–2181:10 (Chipty) (explaining that allowing Google to continue paying for defaults would maintain the "status quo" even when coupled with an injunction against its unlawful conduct).

Still, the court thinks allowing Google to continue making payments is more palatable now than when the liability phase concluded.  Then, venture funding in "Internet search" was considered Silicon Valley's "biggest no fly zone." Liab. Tr. at 3512:5-7 (Nadella); *see also Google*, 747 F. Supp. 3d at 43 ¶ 56.  Today, established technology companies are making, and start-ups are receiving, hundreds of billions of dollars in capital to develop GenAI products that pose a threat to the primacy of traditional internet search.  FOF ¶¶ 56–66 (describing competition

---

[13] Consumer surplus is "the difference between the price of a good and what consumers would be willing to pay for that good." *Nat'l Rural Telecom Ass'n v. F.C.C.*, 988 F.2d 174, 182 (D.C. Cir. 1993).

in the space and early impact on search products). The money flowing into this space, and how quickly it has arrived, is astonishing. *See, e.g.*, *id.* ¶ 58. These companies already are in a better position, both financially and technologically, to compete with Google than any traditional search company has been in decades (except perhaps Microsoft). They also are moving towards monetizing on commercial queries. *Id.* ¶ 66. These new realities give the court hope that Google will not simply outbid competitors for distribution if superior products emerge. It also weighs in favor of "caution" before disadvantaging Google in this highly competitive space. *See Alston*, 594 U.S. at 106 ("[C]aution is key.").

So, for now, Google will be permitted to pay distributors for default placement. There are strong reasons not to jolt the system and to allow market forces to do the work. *See id.* ("Judges must remain aware that markets are often more effective than the heavy hand of judicial power when it comes to enhancing consumer welfare."). Still, "judges must be open to clarifying and reconsidering their decrees in light of changing"—or unchanging— "market realities." *Id.* at 106–07. The court is thus prepared to revisit a payment ban (or a lesser remedy)[14] if competition is not substantially restored through the remedies the court does impose.

### B.    Data-Sharing Remedies

Section VI of Plaintiffs' RPFJ contains a multi-faceted set of data-sharing remedies. Plaintiffs believe these remedies will provide Google's rivals and new entrants "the necessary ingredients to not only improve the quality of their existing [search] services but also create new search features and other innovations in the medium to long term." Pls.' Br. at 40. These remedies

---

[14] One possibility is allowing Google to make payments for distribution but not for default distribution, also referred to as "unconditional revenue share." *See, e.g.*, Rem. Tr. at 4367:21–4368:5 (Murphy). Plaintiffs have not proposed that remedy as an alternative to a payment ban, and the court did not hear fulsome testimony from an expert economist about the incentives such a regime might create. Without a more substantial record on such a remedy, the court is presently ill-equipped to consider it.

are designed primarily to deny Google a key fruit of its anticompetitive conduct—scale—and to help rivals overcome that deficit. *Id.* at 43–46; *see supra* COL § III.B.

The Section VI remedies require Google to make available to Qualified Competitors on a periodic basis: (1) certain Search Index data, Pls.' RPFJ § VI.A; (2) three sets of User-side Data, *id.* § VI.C–D; and (3) certain Ads Data, *id.* § VI.E–F. The court first addresses the justification for the data-sharing remedies and then addresses each category of shared data.

### 1.    *Justification for Data Sharing*

The rationale for these remedies is tied directly to a key liability finding: the distribution agreements allowed Google to lock in its sizeable scale advantage over its rivals. The court found that, for more than a decade, Google's distribution agreements gave "Google access to scale that its rivals [could not] match." *Google*, 747 F. Supp. 3d at 159. The exclusive nature of those agreements meant that rivals did not have "access to user queries . . . needed to effectively compete." *Id.* Conversely, as even Google conceded, default placements meant that Google "receive[d] additional search volume beyond what it would otherwise receive." *Id.* (citation omitted).

Google put that additional query volume to good use. It "deploy[ed] user data to, among other things, crawl additional websites, expand the index, re-rank the SERP, and improve the 'freshness' of results (i.e., bring them up to date)." *Id.* at 161; *see also id.* at 50–51 ¶¶ 90–94. Aided by powerful network effects, Google was able to super-charge its scale advantage into an insurmountable quality and monetization advantage. *See id.* at 161–62. "Google's massive scale advantage thus is a key reason why Google is effectively the only genuine choice as a default GSE." *Id.* at 162–63. "No current rival or nascent competitor can hope to compete against Google in the wider marketplace without access to meaningful scale, especially on mobile." *Id.* at 163.

These market realities remain today, notwithstanding the emergence of GenAI technology. *See, e.g.*, *id.* at 162 (recognizing that "developments in search technology, including greater reliance on [LLMs], . . . has reduced the need for user data" but that there was no evidence "that LLMs had sufficiently advanced to supplant user data"); FOF ¶ 63 (GenAI products have not eliminated the need for GSEs); *id.* ¶ 43 (search grounding of a GenAI product requires a high-quality search API).

In light of these findings and the strength of the underlying causation evidence, the court agrees with Plaintiffs that data sharing "represents a reasonable method of eliminating the consequences of the illegal conduct," *NSPE*, 435 U.S. at 698, and is "well within the range of ordinary Sherman Act remedies," *Platform Monopoly* at 2011; *see id.* (discussing "information pooling" as possibly "permit[ting] the emergence of more evenly competitive firms undermining scale economies, and could actually increase the range of positive network effects"); 3 AREEDA & HOVENKAMP ¶ 653i2 (discussing "pooling" of data as an antitrust remedy for "search engines that depend on large amounts of user data" and stating that pooling "would improve search results for everyone, and thus consumer welfare"); *see also In re Google Play Store*, 2025 WL 2167402, at *16–17 (affirming a remedy requiring Google to share its catalog of apps with rivals to "overcome" the defendant's "illegally amplified network effects by giving [rivals] a fair opportunity to establish themselves" (internal quotation marks and alteration omitted)); *Massachusetts*, 373 F.3d at 1216–25 (affirming compelled disclosure of APIs and communications protocols to enable interoperability between Microsoft's Windows operating system and rival middleware vendors).

Making data available to competitors would narrow the scale gap created by Google's exclusive distribution agreements and, in turn, the quality gap that followed. *See supra* COL § III.B (explaining how greater scale enables GSEs to answer more queries and improve

search quality); Rem. Tr. at 2163:1-2 (Chipty) ("[T]he data-sharing remedies would directly work to lower the scale barrier."). Data sharing would be particularly helpful to smaller search engines, who would not only "get better, but . . . keep getting better at a faster and faster rate up to some point" at which diminishing returns set in. *Google*, 747 F. Supp. 3d at 52 ¶ 106 (quoting Liab. Tr. at 10347:7-10 (Oard)); *see also id.* at 52 ¶ 104 (noting that the point of diminishing returns to user data "is far from established" and such data "does not become worthless even after [that] point"); *cf.* 3 AREEDA & HOVENKAMP ¶ 653i2 (observing that with a data "pooling" remedy "search engines with smaller databases to begin with would benefit more than those with larger ones").[15]

One clear area where data sharing would help promote more competition is a GSE's ability to respond to "long-tail" queries. As discussed, these are uncommon or unique queries that make up a large percentage of searches, and Google sees long-tail queries in orders of magnitude greater than its next closest rival, Bing. *See supra* COL § III.B. Because it sees such queries far more often, Google is more adept at answering them. *See id.* Data-sharing remedies thus can help to close the sizeable advantage Google has in answering long-tail queries, thereby improving product quality and attractiveness to new users. *See, e.g.*, Smutny Rem. Dep. at 51:17-22 ("[U]nless you're sharing tail queries, the information is not terribly useful for a search engine to improve its own product and bridge the scale-gap.").

---

[15] Admittedly, compelled data sharing may not benefit an established large GSE like Bing, at least for desktop search. The Allcott study estimated that with access to Google's long-tail data Bing's quality on desktop would improve, as measured by click-through rate, i.e., the ratio of users who click on a specific link or ad as compared to the number of total users who view it. *See* Allcott Study at 29–31; *id.* at 31 ("Our estimates imply that if Bing had access to Google's data, [click through rate] would increase from 23.5 percent to 24.8 percent."). But that quality improvement would translate to only a very modest shift in market share for Bing. In what the authors called a "more speculative exercise," they estimated a change of roughly one percent based on "findings of modest economies of scale . . . and a weak demand response to quality improvements." *Id.* at 36–37. The Allcott study, however, is limited in an important respect. The authors' findings and modeling concerned "desktop search in browsers," *id.* at 5, a platform on which Bing has default distribution and quality comparable to Google, *Google*, 747 F. Supp. 3d at 38 ¶ 26, 56 ¶ 127. Arguably, Bing's quality would increase at a higher rate with more access to long-tail data on mobile, where Bing is far inferior to Google. *See id.* at 38 ¶¶ 24–25 (describing Bing's 1.3% share of search queries on mobile compared to Google's 94.9% share). That could produce a larger overall share shift in favor of Bing.

The need for a data-sharing remedy is heightened by the court's decision not to adopt a payment ban. Qualified Competitors will have to continue to compete with Google on price to gain distribution. So, their competitive advantage will have to come from innovation and differentiating their search services from Google's. *Cf.* 3 AREEDA & HOVENKAMP ¶ 653i2 (discussing "pooling" remedy and stating that "[s]earch engines could continue to compete in search algorithms or other features"). That is not something a Qualified Competitor can reasonably do without access to scale. *See Google*, 747 F. Supp. 3d at 163 ("No current rival or nascent competitor can hope to compete against Google in the wider marketplace without access to meaningful scale, especially on mobile.").

Google makes two overarching objections to the data-sharing remedies, one legal and one factual. The legal objection is Google's attempt to draw parallels to the open-source Internet Explorer remedy rejected by the district court in *New York I*, a decision affirmed by the D.C. Circuit in *Massachusetts. See, e.g.*, Google's Br. at 33–39; *see also New York I*, 224 F. Supp. 2d at 185–86, 240–45; *Massachusetts*, 373 F.3d at 1227–31. But the two are not the same. There, the plaintiffs had proposed that Microsoft "disclose and license all source code for all Browser software [and that the license] grant a royalty-free, non-exclusive perpetual right on a non-discriminatory basis to make, use, modify and distribute without limitation products implementing or derived from Microsoft's source code." *Massachusetts*, 373 F.3d at 1227–28 (alteration in original). The district court rejected the open-source remedy for multiple reasons. First, "the open-source IE proposal 'ignore[d] the theory of liability in this case,' which was directed at Microsoft's unlawful 'response to cross-platform applications, not operating systems,'" and thus "the proposed remedy would directly benefit makers of non-Microsoft operating systems" even though their harm "was indirect." *Id.* at 1228 (quoting *New York I*, 224 F. Supp. 2d at 185). "Second, the

proposal would 'provide [a] significant benefit to competitors but [has] not been shown to benefit competition.'" *Id.* (alterations in original) (quoting *New York I*, 224 F. Supp. 2d at 185). And third, the rationale repeatedly invoked by Google, *see, e.g.*, Google's Br. at 35–38, the "proposal would work a 'de facto divestiture' and therefore should be analyzed as a structural remedy," *Massachusetts*, 373 F. 3d at 1228 (quoting *New York I*, 224 F. Supp. 2d at 186).

None of those concerns are present here. To start, Plaintiffs' data-sharing remedies are directly tied to the theory of liability in this case. As already discussed, Google's scale advantage is a fruit of its exclusive distribution agreements, and it is appropriate under the Sherman Act to deny Google that fruit through disclosure of the data it accumulated and used to maintain its monopoly. Furthermore, the sharing of scale-dependent data will enhance other companies' ability to compete with Google in the monopolized markets by enabling them to improve their quality and monetization and thereby take advantage of the network effects phenomenon that has been pivotal to Google's success. In *Massachusetts*, the D.C. Circuit made clear that the disclosure of "proprietary information" at a level that would "bolster" rivals' ability to challenge the monopolist and "potential[ly] . . . increase" rival products' capacity to threaten the monopolist's product does not run afoul of the antitrust laws. *Massachusetts*, 373 F.3d at 1215, 1221 (quoting *New York I*, 224 F. Supp. 2d at 172). Finally, the volume and breadth of data sharing ordered here will not work a de facto divestiture of Google's intellectual property and therefore need not be treated as a structural remedy that must be supported by "a clearer indication of a *significant causal connection* between the conduct and creation or maintenance of the market power." *Microsoft III*, 253 F.3d at 106 (citation omitted). As will be discussed, the court has narrowed Plaintiffs' proposals both to fit the wrong and to address Google's concerns about divulging proprietary components of its

133

Search infrastructure. *Cf. Massachusetts*, 373 F. 3d at 1231 (stating that the open-source Internet Explorer provision would "divest[] Microsoft of much of the value of its intellectual property").

Google also asserts that Plaintiffs' data-sharing remedies would have market-distorting effects that would not restore competitive conditions. Google's Br. at 34, 39–43. Google's expert in economics and industrial organization, Dr. Kevin Murphy, opined that requiring periodic data disclosures—for up to 10 years—would reduce Google's incentive to innovate because the company would not be able to keep the returns from its Search investments for itself. *See* Rem. Tr. at 4246:2–4248:11 (Murphy) ("Sharing things on an ongoing basis . . . tend[s] to have a greater [dampening] effect, because innovation is about the future, not so much about the past."); *see also id.* at 4241:23–4244:9 (Murphy). At the same time, these measures also would diminish Qualified Competitors' incentives to innovate by allowing them to free ride on Google's innovations rather than apply their own technical prowess. *Id.* at 3200:11–3201:6 (Israel) ("[I]f Google, for the entire length of the [judgment] period, is required to turn over all of its data, [then] that creates this free riding problem . . . ."). According to Dr. Murphy, "progress happens through the competitive process," and what may be perceived as "duplication of effort" is actually a valuable force driving product differentiation and ultimately enhancing consumer welfare. *Id.* at 4210:8–4213:2 (Murphy). By providing a "shortcut," Dr. Murphy added, the proposed data-sharing regime would "speed things up" but with some loss in innovation incentives. *Id.*

The court does not discount the importance of this concern; indeed, it was a key reason why the D.C. Circuit decided against broader disclosure of Microsoft's proprietary information in *Massachusetts*. *See* 373 F.3d at 1219 ("The effect upon Microsoft's incentive to innovate would be substantial; not even the broad remedial discretion enjoyed by the district court extends to the

134

adoption of provisions so likely to harm consumers."). That said, there are several reasons to believe that the adverse effects of data sharing are not as strong as Google suggests.

Plaintiffs' expert, Dr. Chipty, opined that the proposed data-sharing provisions would stimulate greater competition and thereby motivate Google to continue to innovate, because as competitors improve their products, Google will need to keep pace, even if it means having to disclose some innovations to rivals. Rem. Tr. at 2160:22–2161:13 (Chipty). Dr. Chipty acknowledged the free-rider problem but believed that competitors would have ample incentive to invest to differentiate their products from Google's, both to attract users and to secure distribution. *Id.* at 2166:12–2167:18 (Chipty); *see* 2B AREEDA & HOVENKAMP ¶ 421h ("If network[] [effects] are significant, providing ever increasing returns to firms as users on one or both sides of a platform increase, then undifferentiated entry seems almost impossible. For example, a firm that decided today to compete with Facebook or Google by offering precisely the same services would almost certainly fail."). Furthermore, there is no argument (much less evidence) that Google's profit motive will dissipate, as Search—specifically, search advertising—forms the backbone of Google's revenue stream. *Google*, 747 F. Supp. 3d at 35 ¶ 8. Finally, given the ongoing GenAI arms race, Google will have to continue to invest billions and innovate in this highly competitive space just to keep up. *See* Rem. Tr. at 4034:13–4039:4 (Hitt); FOF ¶¶ 56–62. In this moment of all moments, Google cannot afford to abandon or scale back its investment in search technologies, given the importance of grounding to GenAI products and the integration of GenAI into Search, through AI Overviews and AI Mode, which is likely only to deepen.[16] *See* FOF ¶¶ 6–11, 36–43.

---

[16] For these reasons, the court disagrees with Dr. Murphy's parsing of Google's incentives between the "Search side of the house" and "the AI dimension." Rem. Tr. at 4255:22–4257:20 (Murphy). The integration of Search and GenAI does not support such a sharp dichotomy.

In any event, as will be discussed in greater detail below, Plaintiffs' data-sharing proposals will be modified to mitigate their impact on Google's and competitors' innovation incentives. For example, provisions directly implicating Google's proprietary ranking technologies can be removed. The number and frequency of disclosures are likewise subject to modification. The court will "tailor[]" the proposed data-sharing remedies "to fit the wrong" committed by Google. *Microsoft III*, 253 F.3d at 107.

### 2. *Search Index*

Plaintiffs seek to compel disclosure of certain data contained in Google's Search Index to Qualified Competitors. Pls.' RPFJ § VI.A.1–3. Their RPFJ defines "Search Index" to mean "any databases that store and organize information about websites and their content that is crawled from the web, gathered from data feeds, or collected via partnerships, from which Google selects information to provide results to users in response to general search queries." *Id.* § III.X. Google would be required to make available, "at marginal cost," the following information: (1) the unique identifier (DocID) for each document in the search index and a notation sufficient to denote duplicates of such documents; (2) a DocID to URL map (i.e., data that corresponds the unique DocID to a page's address on the web); and (3) for each DocID "a set of signals, attributes, or metadata associated with each DocID that are derived in any part from User-side Data including but not limited to (A) popularity as measured by user intent and feedback systems including Navboost/Glue, (B) quality measures including authoritativeness, (C) time that the URL was first seen, (D) time that the URL was last crawled, (E) spam score, (F) device-type flag, and (G) any other specified signal the [Technical Committee] recommends to be treated as significant to the ranking of search results." *Id.* § VI.A.1–3. Google would have to make this data available "on a

136

periodic basis to be determined by Plaintiffs in consultation with the [Technical Committee]." *Id.* § VI.A.

A search index is essentially a database of publicly available web pages that can be returned in response to a user query. *Google*, 747 F. Supp. 3d at 38–39 ¶ 29. A comprehensive and current index is critical to returning high-quality search results. Google has been able to grow its web search index and improve its search results due in part to the high volume of queries that it receives relative to other GSEs. *Id.* at 49–52 ¶¶ 86–106; *see supra* COL § III.B. To understand why, a brief overview on building a search index is helpful.

Google starts by crawling trillions of web pages. Rem. Tr. at 3436:17-18 (Reid). Not all pages are created equal, however. Lots of pages, for example, are filled with spam or are duplicates. *Id.* at 3436:17–3437:2 (Reid). Google assigns a score to the pages it crawls, and it endeavors to exclude from its web search index pages without value to users, such as spam-heavy or pornographic pages. *Id.* at 3440:3-11, 3442:21–3443:14 (Reid). Google also relies on various "ranking signals" to collect information about web pages and differentiate among them. *Id.* at 2786:25–2787:14 (Allan); *id.* at 3440:3-7 (Reid). Signals range in complexity. There are "raw" signals, like the number of clicks, the content of a web page, and the terms within a query. *Id.* at 2854:19–2855:25 (Allan). These signals can be created with simple methods, such as counting occurrences (e.g., how many times a web page was clicked in response to a particular query). *Id.* at 2859:3–2860:21 (Allan) (discussing Navboost signal). At the other end of the spectrum are innovative deep-learning models, which are machine-learning models that discern complex patterns in large datasets. *Id.* at 2856:17–2857:19 (Allan) (discussing UPX0191 at -211); *id.* at 2860:23–2862:3 (Allan) (discussing RankEmbedBERT signal as a deep-learning model); *see also*

UPX0191 at -185 ("Deep models find and exploit patterns in vast data sets. They add unique capabilities at high cost.").

Google uses signals to score and rank web pages. *Id.* at 2793:5-13 (Allan) (discussing RDXD-20.018). Signals are often aggregated to create additional signals, which themselves may be combined to form even more signals. *Id.*; *id.* at 2787:10-14 (Allan). Google has developed various "top-level" signals that are inputs to producing the final score for a web page. *Id.* at 2793:5–2794:9 (Allan) (discussing RDXD-20.018). Among Google's top-level signals are those measuring a web page's quality and popularity. *Id.*; RDX0041 at -001. Signals developed through deep-learning models, like RankEmbed, also are among Google's top-level signals. Rem. Tr. at 2860:23–2862:6 (Allan); *see also* PXR0171 at -097; PXR0172 at -143.

Signals developed on user-interaction data play an important role in search index development. Quality and popularity signals, for instance, help Google determine how frequently to crawl web pages to ensure the index contains the freshest web content. *Google*, 747 F. Supp. 3d at 50 ¶ 91 (citing Liab. Tr. at 2207:7-9 (Giannandrea)); Rem. Tr. at 2874:7–2875:6 (Allan); *id.* at 3437:13–3438:25 (Reid). (So, too, does the spam score. Rem. Tr. at 2874:7–2875:6 (Allan); *id.* at 3436:17–3438:25 (Reid); *id.* at 3442:21–3444:6 (Reid).[17]) Query data is also important to ensuring that the search index contains the pages that are responsive to users' queries. *Google*, 747 F. Supp. 3d at 50 ¶ 92 (citing Liab. Tr. at 2211:13-17 (Giannandrea)). If a web page is not in the index, it likely will not be presented in response to a user query. *Id.* at 38 ¶ 29 (citing Liab. Tr. at 6303:20-25 (Nayak)). *But see* Rem. Tr. at 2876:6-2878:7 (Allan) (discussing the possibility that an un-crawled page could still be represented in a search index through links from a crawled page).

---

[17] Concededly, the record does not establish the extent to which the spam score involves user-interaction data as an input.

Thus, the more comprehensive the search index, the more likely it is to return useful results. *See Google*, 747 F. Supp. 3d at 38–39 ¶¶ 29–30.

Search index quality is critically important not only for traditional search engines, but also for emerging GenAI products. LLM-driven chatbots now routinely incorporate into their responses fresh information from the internet or other sources through a process known as grounding. FOF ¶¶ 36–46. Retrieval-augmented generation, or RAG, is a grounding technique. FOF ¶ 37. Whereas before, an LLM's response was time-limited by the end date of its training data and prone to hallucinations, FOF ¶¶ 32–35; Rem. Tr. at 172:23–173:15 (Durrett), through grounding an LLM can now access content beyond its training data, such as web pages in a search index, to provide more recent and more accurate information (though it does not fully eliminate the problem of hallucinations), FOF ¶¶ 39–42; *see also* Rem. Tr. at 173:22–174:22 (Durrett); *id.* at 660:17–661:13 (Hsiao) (discussing how through grounding a GenAI chatbot could respond to commercial queries); *id.* at 3835:11–3836:13 (Cue) (describing generally how through RAG techniques a chatbot can produce responses from identified relevant weblinks).

The size of Google's index gives it a key competitive advantage over existing small GSEs, like DuckDuckGo, and emerging companies in the GenAI space, like ChatGPT. Witnesses testified to what is known in the industry as the "80–20 problem." Building a search index that can answer 80% of queries is capital intensive but attainable in the short to medium term. Rem. Tr. at 838:25–839:1 (Weinberg) ("[Y]ou can get to an 80/20 pretty quickly."); *id.* at 394:21–397:7 (Turley) (describing ChatGPT's goal to answer 80% of queries with its own search index and the difficulties associated with answering the remaining 20%). Answering the remaining 20%, which comprises long-tail queries, is particularly challenging because it requires the index to contain very specific and often obscure sources. *See id.* at 395:22–397:7 (Turley); *id.* at 404:2-7

(Turley) ("When sources are less common, we may not know that they even exist, and we may, thus, not discover what makes the best source.").

Granting Qualified Competitors access to Google's search index can help address the 80–20 problem and improve search quality. *See id.* at 840:22–842:3 (Weinberg) (predicting that access to Google's search index would be "very useful" for DuckDuckGo, including to build out its long-tail index); *id.* at 409:11–410:22 (Turley) ("[A]ccess to the data that underlies Google's index . . . would accelerate the development of [OpenAI's] own index."). Apple executive Eddy Cue perhaps explained it best (this time advertently), *see Google*, 747 F. Supp. 3d at 144, when he responded to the court's question, "what would it take for either an existing competitor or a nascent competitor to provide genuine competition to Google for Apple's default on Safari?" Rem. Tr. at 3845:15-18 (Cue). Cue did not believe any existing GSE could dethrone Google but predicted a GenAI product might if it evolved in one important way:

> To me, the only thing that's keeping them from potentially doing that is, again, *growing their search index. They have to get better at the search index part.* They're very good at their LLMs. You know, they've already built large language models that are as good or better than most. What that will do is create a product that gives better results, new capabilities. You know, those are things that people are interested in today.

*Id.* at 3846:3-10 (Cue) (emphasis added). He continued that, if there were "a way to accelerate [GenAI products'] ability to having bigger search indexes," they could emerge as a competitive threat to Google. *Id.* at 3848:16-18 (Cue).

The search-index data-sharing remedy thus satisfies the governing test—it "represents a reasonable method of eliminating the consequences of the illegal conduct." *NSPE*, 435 U.S. at 698; *see Bausch & Lomb*, 321 U.S. at 726 ("The test is whether or not the required action reasonably tends to dissipate the restraints and prevent evasions."); *In re Google Play Store*, 2025 WL 2167402, at *17 (holding that compelling Google to grant access to its Play Store's catalog of

140

apps was a "reasonable method of eliminating the consequences of [Google's] illegal conduct" (citation omitted)).

Nevertheless, this court is not prepared to go as far as Plaintiffs request. Plaintiffs' Search Index data demand is overly broad and is not "tailored to fit the wrong creating the occasion for the remedy." *Microsoft III*, 253 F.3d at 107.

To begin, the definition of "Search Index" sweeps in data that is only remotely related to Google's scale advantage. It includes databases that store information "gathered from data feeds" and "collected via partnerships." Pls.' RPFJ § III.X. That is data supplied by third parties. *See* Rem. Tr. at 3445:4-24 (Reid) (describing agreements to provide feeds from social media companies, such as X, Instagram, and TikTok, and real-time information, such as sports scores, flight data, and hotel inventory). Plaintiffs put forward no evidence that Qualified Competitors are unable to acquire such data on ordinary commercial terms. The limited record evidence on this subject strongly suggests that they can. *See Google*, 747 F. Supp. 3d at 166–67 ("As of 2020, Microsoft had entered into *hundreds* of partnerships to obtain structured data."); Rem. Tr. at 408:23–409:3 (Turley) (OpenAI has "partner[ed] with some publishers" to acquire web content); *id.* at 1242:23–1243:6 (Provost) (describing Yahoo's content partnerships with Trip Advisor, Yelp, and Sky Scanner). The final judgment therefore will reflect a definition of Search Index that extends only to "databases that store and organize information about websites and their content that is crawled from the web." *See* Pls.' RPFJ § III.X. This amendment is intended to limit the data shared only to what is contained in Google's web search index. *See* Rem. Tr. at 3447:14–3453:15 (Reid) (discussing Google's other various indexes that include data not crawled from the web, including video, images, and verticals).

141

Further, the court cannot accept the remedy's indefinite aspects. *See Int'l Salt*, 323 U.S. at 400 ("[I]t is desirable . . . that the decree be as specific as possible, not only in the core of its relief, but in its outward limits, so that parties may know their duties and unintended contempts may not occur."). The RPFJ identifies specific types of data associated with DocIDs but leaves the final dataset open to further addition by preceding that list with the expansive phrase "including but not limited to." *See* Pls.' RPFJ § VI.A.3. It also empowers the Technical Committee at any time during the term of the judgment to designate for sharing other signals "significant to the ranking of search results." *Id.* Google is entitled to know precisely what data from the Search Index it must share and when. These indefinite terms will be excised.

So, too, will the requirement of making available any signal, attribute, or metadata "derived in any part from User-side Data." *Id.* This demand goes too far. Plaintiffs offered no evidence as to what the volume of signals, attributes, or metadata might be. It is almost certainly vast.[18] Rem. Tr. at 2792:2-7 (Allan) ("It's not one signal; it's not two signals. I'm not even sure how many signals it is, but it is many of the signals that are used for ranking."). The remedy is likely to reach highly engineered signals that have only a modest connection to "raw" user data. *Id.* at 2802:2-8 (Allan). Think of it this way. A top-level signal is like a pyramid. The top-level signal itself is the pyramid's capstone, and each supporting level is a group of sub-signals that are inputs that ultimately produce a top-level signal score. Under Plaintiffs' proposal, so long as some foundational-level sub-signal is derived from User-side Data, Google would have to disclose any higher-ranking signal that relies on the sub-signal all the way up to the top-level signal. It would have to do so even if those higher-ranking signals are primarily the product of engineering and

---

[18] Plaintiffs, in their briefing, represent that their Search Index proposal includes only "three static signals," Pls.' Br. at 43, suggesting that sub-signals are not included. But the way the RPFJ is written ("including but not limited to") indicates otherwise.

innovation.  The court will not sanction forced sharing of signals that are so attenuated from raw user data.

For similar reasons, the court declines to mandate sharing of two of the datasets specified by Plaintiffs that rely in part on user-interaction data.  They are "popularity as measured by user intent and feedback systems including Navboost/Glue" and "quality measures including authoritativeness" associated with each DocID.  *See* Pls.' RPFJ § VI.A.3.  Taking the latter first, "quality measures" are constructed largely from sources other than user data.  For instance, a key quality signal is PageRank, which captures a web page's quality and authoritativeness based on the frequency and importance of the links connecting to it.  *Id.* at 2795:19–2797:21 (Allan); PXR0356 at -744 ("PageRank . . . is a single signal relating to distance from a known good source, and it is used as an input to the Quality score.").  PageRank was a key early innovation that separated Google from the competition and is now "widely known."  Rem. Tr. at 2795:19–2796:25 (Allan).  Concededly, some of Google's quality sub-signals are scale dependent.  *See id.* at 2802:5-8 (Allan) (discussing RDXD-20.022); *id.* at 2875:10-15 (Allan).  But they are the exception, as Plaintiffs seemed to acknowledge when questioning Google's expert in computer science and information retrieval, Dr. James Allan.  *See* Rem. Tr. at 2875:10-11 ("Do you understand that most of Google's quality signal is derived from the webpage itself?").  Requiring Google to share a top-level quality signal merely because some minor sub-component not identified on this record relies on user data exceeds what is appropriate to fit the wrong.

As for the popularity ranking, the case for disclosure suffers from a proof problem. Plaintiffs have not shown to what extent that signal is constructed from user data or how it benefits from Google's scale.  Two exhibits suggest that popularity is based on "Chrome visit data" and "the number of anchors," which is a measure that quantifies the number of links between pages

and is used to promote well-linked documents. *See* PXR0171 at -095 to -098; PXR0356 at -744 (popularity signal (P*) "uses Chrome data"). The former appears to be a type of user-interaction data—albeit from Chrome visits, not through key default distribution channels—but the court can say no more, as Plaintiffs offered no testimony on the matter. The court will not force data sharing based on an uncertain record.[19]

What remains, then, of Plaintiffs' proposed Search Index data disclosure requirement is the following: (1) the unique DocID for each document, including a notation as to duplicates; (2) a DocID to URL map; (3) the first time a URL was seen; (4) when the URL was last crawled; (5) spam score; and (6) device-type flag. The compelled disclosure of this data is a reasonable and proportional means of remediating the harm caused by Google's exclusive agreements. Receipt of this narrowed dataset will still enable rivals to overcome the scale gap by allowing them to more quickly build a competitive search index—one that is robust in volume, freshness, and utility. *See, e.g.*, Rem. Tr. at 409:16–410:22 (Turley) (stating that search index data would allow OpenAI to build its search index "faster" and "would allow us to build a better product faster"); *id.* at 3848:5–3949:17 (Cue) (disclosure would "accelerate [competitors'] ability to hav[e] bigger search indexes"); *id.* at 840:22–842:13 (Weinberg) (disclosure of search index information will "jump start building . . . indexes at scale").

The DocID of web pages, the DocID to URL map, and information relating to duplicates will help Qualified Competitors identify and crawl more web pages with valuable content and do so more efficiently. *See* RDX0062 at -006 (stating that "[d]e-duplication" allows Google to

---

[19] Because the gaps in the evidentiary record counsel against ordering Google to disclose these signals, the court need not consider Google's additional argument that such disclosure would allow competitors to mimic or reverse engineer Google's key ranking signals. *See* Google's Br. at 39–43; Rem. Tr. at 2800:15–2802:18 (Allan) (discussing RDXD-20.021 to .022); *id.* at 2802:19–2803:9 (Allan) (discussing RDXD-20.023); *cf. Massachusetts*, 373 F.3d at 1219 (affirming the trial court's denial of broader API disclosures due to concerns about "cloning" that would allow rivals "to 'mimic' the functionality of Microsoft's products rather than to 'create something new'").

"reduce the 1 trillion web links" that it extracts to the "100 [billion]" that it processes for possible indexing). The information relating to Google's crawl schedule will allow rivals to determine the frequency of crawling a site to ensure the freshest data from a site is stored in the index. *See Google*, 747 F. Supp. 3d at 50 ¶ 91. The spam score will allow rivals to avoid crawling web pages of low value and focus only on those with helpful content. *See, e.g.*, Rem. Tr. at 841:4-10 (Weinberg) (stating that spam scores would "immediately be used to plug holes" and "build out these crawlers to know what sites to prioritize more"). Finally, the device-type flag will enable competitors to close the mobile scale gap by identifying and focusing on mobile-friendly websites in their crawls, to ensure that mobile advertiser–friendly sites are in the index. *See* Liab. Tr. at 2649:15–2650:19 (Parakhin).

Two things are important to note about these narrowed sets of Search Index data. The first is that Google will not be required to produce data that is largely a product of engineering and innovation. As Google suggests, even this limited data will reveal some proprietary information, *see* Rem. Tr. at 3446:15-22 (Reid), but the encroachment will be minimal. *Compare id.* at 3462:10-12 (Reid) (stating that disclosure of the DocIDs would reveal a "smaller amount" of proprietary information), *with id.* at 3462:9–3463:3 (Reid) (describing popularity and quality as "fundamental ranking signals"). Notably, the narrowed Search Index data that Google will be required to disclose is comparable to what it once shared under an agreement with an existing partner, Yahoo Japan. *See id.* at 3084:14–3093:6 (J. Adkins) (comparing terms of § 2.9 of the 2010 Yahoo Japan agreement with Plaintiffs' RPFJ § VI.A); PXR0598 (2010 Google–Yahoo Japan agreement).

The second is that, even with the shared Search Index information, rivals still will have to invest considerable resources in building out their own search index. The actual data crawled is

145

not subject to disclosure.  So, competitors will have to build the crawlers, crawl the web pages, extract the web page information, and process the data to create a competitive search index.  *See id.* at 841:17–842:3 (Weinberg); RDX0062 at -004 to -013 (describing process of building a search index).  They will have to invest and innovate to compete with Google.

Before moving on, two other aspects of Plaintiffs' Search Index data-sharing proposal warrant the court's attention.

First, there is the frequency of disclosure.  Plaintiffs would have Google make the data available on a "periodic basis to be determined by Plaintiffs in consultation with the [Technical Committee]."  Pls.' RPFJ § VI.A.  Presumably, Plaintiffs want periodic sharing so that Qualified Competitors have the freshest search index data.  *See* Rem. Tr. at 3446:23–3447:11 (Reid) (Search Index disclosure on a periodic basis rather than a one-time basis would reveal "more about freshness in various ways.").

The court declines such a remedial requirement.  Qualified Competitors will receive a one-time snapshot of the relevant data contained in Google's Search Index at or around the time they are so certified by Plaintiffs.  Periodic data disclosure over the course of years goes beyond what is needed to "cure the ill effects of the illegal conduct."  *See Ford Motor Co.*, 405 U.S. at 575 (quoting *Gypsum*, 340 U.S. at 88).  A one-time disclosure of Google's current Search Index data "will reveal what Google thinks is important and relevant," Rem. Tr. at 4815:4-6 (Closing Arg.) (Google's counsel), and will enable Qualified Competitors to build their own search indexes to answer long-tail queries, thereby giving them the kick start they need to compete.  Further, a one-time disclosure minimizes the risk of free riding identified by Google's expert economist and acknowledged by Plaintiffs.  *See id.* at 3200:14–3201:6 (Israel); *id.* at 2165:12–2166:11 (Chipty).  For Qualified Competitors to compete, they must innovate and differentiate their product from

146

Google's rather than simply feeding off Google's work. *See id.* at 4211:11–4212:13 (Murphy). The court's limiting of the data disclosure also is consistent with the lessons of *Massachusetts*. *See* 373 F.3d at 1218 (stating that "expanded but not unlimited disclosure 'represents a reasonable method' of facilitating entry of competitors" (quoting *NSPE*, 435 U.S. at 698)).

The last matter concerns the cost of the Search Index data-sharing remedy. Plaintiffs propose that Google make that data available at "marginal cost." *See* Pls.' RPFJ § VI.A. Their RPFJ does not include a definition of that term. During closing arguments, Plaintiffs represented that the term is meant to capture the cost to Google to collect and furnish data to a Qualified Competitor. *See* Rem. Tr. at 4788:20–4789:12 (Closing Arg.) (Plaintiffs' counsel); *see also* RDX0705 at -007 ("The term 'marginal cost' [as used in Plaintiffs' RPFJ] means the ordinary course definition of 'marginal cost,' which is the direct total production cost of producing an additional unit of a good or service, and here would be determined by calculating the change in direct total production cost resulting from Google [] providing the additional unit(s) of services . . . .").

The court believes that this cost provision "fits the exigencies" of this case and is therefore appropriate for four reasons. *See Int'l Salt*, 332 U.S. at 401. First, making Google's Search Index data available at marginal cost ensures that Google will not be able to offer the dataset at an "unreasonably high price." *In re Google Play Store*, 2025 WL 2167402, at *19–20 (approving remedial term allowing Google to receive a "reasonable fee" to implement security and compliance measures to carry out the app-store distribution remedy, because allowing Google to charge more would allow it to charge third-party app stores the "same unreasonably high price"). Second, the court cannot look to ordinary commercial terms to set a price. The court received no evidence about a market for such data—it seemingly does not exist—and Google offered no method of how

147

to value it.  The court thus would bear responsibility for the "ongoing supervision . . . necessary to regulate the price and nonprice terms" of the data transactions.  *See* 3 AREEDA & HOVENKAMP ¶ 653b2.  The court is ill-suited for such a role.  *See Alston*, 594 U.S. at 102 ("Judges must be wary, too, of the temptation to specify 'the proper price, quantity, and other terms of dealing'—cognizant that they are neither economic nor industry experts." (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004))).  Third, the Search Index data that directly implicates Google's proprietary ranking systems—popularity and quality—are no longer part of the remedy, thereby protecting the value of those aspects of Google's investments in Search both now and in the future.  Fourth and finally, each Qualified Competitor is entitled only to a one-time disclosure of a finite, closed dataset.

Pricing this data at marginal cost thus does not raise the same concerns as the open-source Internet Explorer provision did during the *Microsoft* litigation.  *See Massachusetts*, 373 F.3d at 1230; Google's Br. at 35–37.  Whereas the plaintiffs in that case demanded the disclosure of all source code used to build Internet Explorer—Microsoft's core intellectual property—the disclosure ordered here will encompass only web page identifiers and basic information about each web page.  This data is no doubt valuable.  But for both legal and practical reasons, it need not be priced above marginal cost.

### 3. Knowledge Graph

In addition to data comprising some of Google's Search Index, Plaintiffs propose requiring Google to share with Qualified Competitors "databases consisting of information sufficient to recreate Google's Knowledge Graph, including local information."  Pls.' RPFJ § VI.A.4.  Such disclosure would occur "on a periodic basis to be determined by Plaintiffs in consultation with the [Technical Committee]."  *Id.* § VI.A.

Google's Knowledge Graph is a database containing useful information about people, places, and things along with what connects them together. *Google*, 747 F. Supp. 3d at 42 ¶ 45; Rem. Tr. at 2804:5-9 (Allan). The database is enormous. It contains five billion entities and 500 billion connections among them. Rem. Tr. at 2805:4-6 (Allan). Google uses the Knowledge Graph to help interpret queries and to return factual results. *Id.* at 2805:22–2806:18 (Allan); *see also id.* at 3477:19–3478:7 (Reid). The data used to create the Knowledge Graph is derived from both structured data—think of data in a table format—and unstructured data, such as a web page. *Id.* at 2879:15–2880:18 (Allan). One of the structured data sources is Google's Geo Index, which contains its local information, such as for restaurants and other small businesses. *Id.* at 2881:15-23 (Allan). An example of such data is the opening and closing times of a store. The local business directly supplies that information, or it might come from a user who submits it to Google. *Id.* at 2884:4–2886:12 (Allan). According to Professor Allan, Google developed the Knowledge Graph in the face of a "huge track record in the research community of fail[ing]" to develop similar products as a search input. *Id.* at 2805:12-21 (Allan).

Plaintiffs say that the compelled disclosure of Knowledge Graph data "is meant to allow rivals to overcome Google's scale advantage in obtaining content to build its Knowledge Graph." Pls.' Br. at 44. Their justification for the remedy is two-fold. "Due to Google's scale, publishers are incentivized to permit Google to crawl web content, while blocking rival's web crawlers." *Id.* Also, "Google's Geo Index benefits from users being incentivized to create content for Google, including information about businesses such as locations, hours, or even richer data such as restaurant menus." *Id.* at 44–45.

The court declines to adopt the Knowledge Graph data proposal because it is not "tailored to fit the wrong creating the occasion for the remedy." *Microsoft III*, 253 F.3d at 107. The "wrong"

committed by Google was to lock up the key channels of distribution to the exclusion of its rivals, thereby affording Google a massive scale advantage.  *Google*, 747 F. Supp. 3d at 159–163. "Scale," in this context, means "[g]reater query volume" that translates to "more user data."  *Id.* at 49–50 ¶ 87.  The Knowledge Graph is not, however, directly derived from user data.  Its underlying data comes from over ███ data feeds and pipelines, including from third parties.  Rem. Tr. at 3470:15–3471:10 (Reid) (discussing RDXD-28.013).  Google then undertakes multiple steps to process that data, with the assistance of thousands of employees and contractors, so that the Knowledge Graph can be used to deliver accurate and fresh query responses.  *Id.* at 3471:11–3478:7 (Reid) (discussing RDXD-28.013 to .014).  The Knowledge Graph is thus not the product of Google's scale advantage, in the sense that it relies on queries or other interaction data that Google collected from users.  Rem. Tr. at 3478:8-17 (Reid) (stating that click-and-query data does not play a "particularly meaningful" role in building the Knowledge Graph).

Plaintiffs do not dispute this.  They nevertheless contend that the Knowledge Graph data is scale dependent because the size of Google's user base and its ability to direct traffic to web pages incentivize third parties, like publishers and local businesses, to share information with Google that it does not with smaller search engines.  Pls.' Br. at 44 (citing Pls.' PFOF ¶ 581); *see* Pls.' PFOF ¶¶ 583–590.  Google's exclusive access to such web content, Plaintiffs argue, gives it a comparative advantage in building the Knowledge Graph.  Pls.' PFOF ¶¶ 586–588.

The court is unpersuaded.  There is some record support for the proposition that Google has broader access to crawl websites than other GSEs and GenAI product developers.  *See, e.g.*, Liab. Tr. at 2656:19–2658:24, 2766:8-21 (Parakhin); Rem. Tr. at 404:2–405:6, 406:12–408:12 (Turley).  But Plaintiffs produced scant evidence of the prevalence of this phenomenon, *cf.* Rem. Tr. at 3439:1-20 (Reid) (stating that "[i]t's not very common" that a publisher opts out of being

crawled by non-Google firms), and no evidence about how such disparity would impact the development of a rival Knowledge Graph, *id.* at 2880:21–2881:3 (Allan) (acknowledging that "[t]o the extent that Google is using web pages to build Knowledge Graph," it would have an advantage over search engines that do not have access to those pages, but without establishing the extent of such advantage). The compelled disclosure of billions of datapoints within the Knowledge Graph cannot be justified on such a thin record.

Plaintiffs also rely on Google's Geo Index as an example of how Google's scale incentivizes users to supply information to Google, but that, too, misses the mark. Witnesses testified that local businesses have more incentive to send relevant information to Google (e.g., opening and closing times) because it has the most users and therefore is more likely to direct traffic to the business. *See id.* at 832:10–833:13 (Weinberg); *id.* at 1018:17–1019:9 (Schechter). No doubt Google's large user base is due in part to its scale advantage. But the connection between that advantage and how Google acquires Geo Index data is too attenuated to sustain its compelled disclosure. The data comes primarily from vendors, not from Google users entering queries. That Google's popularity has attracted businesses that supply it with information is only remotely related to the exclusionary agreements. The proposed disclosure of Knowledge Graph data is therefore not a proper remedy.

### 4. *User-Side Data Remedies*

#### a. The User-Side Datasets at Issue

Plaintiffs' next data-disclosure proposal involves compelled sharing of "User-side Data." Pls.' RPFJ § VI.C. Plaintiffs define "User-side Data" to mean:

> all data that can be obtained from users in the United States, directly through a search engine's interaction with the user's Device, including software running on that Device, by automated means. User-side Data includes information Google collects when

answering commercial, tail, and local queries. User-side Data may also include datasets used to train (at all stages of training including pre-training and filtering, post-training, fine-tuning) Google's ranking and retrieval components, as well as GenAI models used for Google's GenAI Products.

*Id.* § III.BB.  In simple terms, User-side Data is data that Google collects from the pairing of a user query and the returned response.  It also can be thought of as user-interaction data or "click-and-query" data.  Rem. Tr. at 842:20–843:4 (Weinberg); *id.* at 1247:23–1248:4 (Provost).  Examples of such data include the web link or vertical information the user clicks on, how long a user hovers over a link, and whether the user clicks back from a web page and how quickly.  *Google*, 747 F. Supp. 3d at 50 ¶ 88; Rem. Tr. at 842:20–843:4 (Weinberg).  User-interaction data is the raw material that Google uses to improve search services.  *Google*, 747 F. Supp. 3d at 50 ¶ 90 ("At every stage of the search process, user data is a critical input that directly improves [search] quality."); *see also* Rem. Tr. at 843:5-12 (Weinberg) (describing "feeding in the clicks and other things" into algorithms to improve search results).

Under the proposed remedy, Google must make available to Qualified Competitors, "at marginal cost" and on a "periodic basis to be determined by the Plaintiffs in consultation with the [Technical Committee]," the following datasets:

1. User-side Data used to build, create, or operate the GLUE statistical model(s);

2. User-side Data used to train, build, or operate the RankEmbed model(s); and

3. The User-side Data used as training data for GenAI Models used in Search or any GenAI Product that can be used to access Search.

Pls.' RPFJ § VI.C.  Google uses the first two datasets to build search signals and the third to train and refine the models underlying AI Overviews and (arguably) the Gemini app.  Pls.' Br. at 45–46.[20]

First some background about these datasets.  Glue is essentially a "super query log" that collects a raft of data about a query and the user's interaction with the response.  Rem. Tr. at 2808:2–2809:6 (Allan).  The data underlying Glue consists of information relating to (1) the query, such as its text, language, user location, and user device type; (2) ranking information, including the 10 blue links and any other triggered search features that appear on the SERP, such as images, maps, Knowledge Panel, People also ask, etc.; (3) SERP interaction information, such as clicks, hovers, and duration on the SERP; and (4) query interpretation and suggestions, including spelling correction and salient query terms.  *Id.* at 2809:8–2812:20 (Allan) (discussing RDXD-20.026 to .028).  An important component of the Glue data is Navboost data.  *See id.* at 2808:16-20 (Allan) ("Glue contains . . . Nav[b]oost information."); Liab. Tr. at 6403:3-5 (Nayak) ("Glue is just another name for [N]avboost that includes all of the other features on the page.").  Navboost is a "memorization system" that aggregates click-and-query data about the web results delivered to the SERP.  Liab. Tr. at 1804:8–1805:22, 1806:8-15 (Lehman).  Like Glue, it can be thought of as "just a giant table."  *Id.* at 1805:6-13 (Lehman).  Importantly, the remedy does not force Google to disclose any models or signals built from Glue data, only the underlying data itself.  Rem. Tr. at 2809:3-4 (Allan).

---

[20] The court says this dataset "arguably" extends to the Gemini app because, even though it is not expressly referenced in Plaintiffs' post-trial brief, Plaintiffs consider Gemini to be a Search Access Point and therefore Gemini is a "GenAI Product that can be used to access Search."  Rem. Tr. at 2171:13–2172:5 (Chipty); *see* Pls.' RPFJ § III.V (defining "Search Access Point" to include "GenAI Products that can retrieve and display information from a GSE, including links to websites").

RankEmbed and its later iteration RankEmbedBERT are ranking models that rely on two main sources of data: ▮▮% of 70 days of search logs plus scores generated by human raters and used by Google to measure the quality of organic search results.  Liab. Tr. at 6322:15–6325:15, 6448:12-25 (Nayak); *id.* at 6364:23-6365:15 (Nayak) (discussing DXD-17.016); *id.* at 7863:18–7864:1 (E. Fox).  The RankEmbed model itself is an AI-based, deep-learning system that has strong natural-language understanding.  This allows the model to more efficiently identify the best documents to retrieve, even if a query lacks certain terms.  PXR0171 at -086 ("Embedding based retrieval is effective at semantic matching of docs and queries"); RDX0060 at -009; Liab. Tr. at 6355:25–6356:20 (Nayak); *see also* Rem. Tr. at 2819:21–2823:22 (Allan) (discussing how deep-learning models work).  RankEmbed particularly helped Google improve its answers to long-tail queries.  Liab. Tr. at 6356:21-25 (Nayak).  RankEmbed is trained on 1/100th of the data used to train earlier ranking models yet provides higher quality search results.  Liab. Tr. at 1846:8-22 (Lehman).  Among the underlying training data is information about the query, including the salient terms that Google has derived from the query, and the resultant web pages.  Rem. Tr. at 2832:5–2834:11 (Allan) (discussing RDXD-20.042 to .043).  Again, the remedy seeks only the underlying data, not the model itself or any ranking signal produced.

The final category of User-side Data is that which trains GenAI models used in Search or in GenAI products.  As discussed above, LLMs are type of GenAI model.  FOF ¶ 3.  LLMs are mainly pre-trained on large amounts of text, typically gathered from the web.  FOF ¶¶ 27–29; Pls.' PFOF ¶ 70.  That pre-training creates a base (or foundation) model, which is then post-trained (or fine-tuned) on collections of data so that the base model can perform specialized tasks, such as solving math problems, answering questions, or creating computer code.  FOF ¶ 30; Rem. Tr. at 159:21–161:4 (Durrett) (discussing PXRD003 at 15–16).  Google does not use click-and-query

154

data to pre-train its base Gemini models. Rem. Tr. at 3342:1-5, 3347:6-8 (Collins). It considered doing so but did not find that the benefits of pre-training on search data to be worth the cost. *Id.* at 3347:9-16 (Collins). (Evidently, Google's competitors do not use click-and-query data to train base models, either. *See* Google's PFOF ¶ 985 (citing testimony to that effect from Microsoft and OpenAI witnesses)).

The Google Search team post-trains Gemini base models for search-specific uses. One such post-training model is MAGIT, which is a generator model used to fine-tune the Gemini base model to produce text responses in the desired format for AI Overviews. Rem. Tr. at 177:6–179:11 (Durrett) (discussing PXRD003 at 30–33). Google uses "Search data" to train its MAGIT model. *Id.* at 179:13–180:1 (Durrett) (citing Parakh Rem. Dep. at 154:13-15).

Google's vast trove of User-side Data is a fruit of its anticompetitive agreements, *see supra* COL § III.B, and for that reason compelled sharing of some of that data is a "reasonable method of eliminating the consequences" of Google's conduct. *NSPE*, 435 U.S. at 698. Witnesses from rival companies testified that access to Google's user-interaction data would allow them to improve their GSE, particularly in responding to long-tail queries. *See, e.g.*, Rem. Tr. at 842:20–845:9 (Weinberg) (stating that access to Google's user-interaction data "would enable [DuckDuckGo to], essentially, probably accelerate by years the ability to create indexes at scale and just improve the quality of DuckDuckGo, especially in the long-tail"); *id.* at 1019:10–1020:18 (Schechter) (agreeing that access to queries that Bing had not seen before potentially would improve pattern-matching recognition); *id.* at 1247:25–1249:5 (Provost) (stating that "[a]ny incremental data is going to be helpful to [Yahoo] in being more successful in building better products for our users"). Higher quality query responses, especially to long-tail queries, would

155

put rivals in a better position to compete with Google.  *See supra* COL § III.B (discussing long-tail queries).

But just as Plaintiffs' Search Index data-sharing remedy goes too far, so too does their User-side Data–sharing proposal in one respect.  The court starts with the demand for data used to train GenAI Models, then turns to the Glue dataset, and concludes with the RankEmbed dataset.

*Training Data for Gemini Models.*  Evidence that Google deploys user-interaction data to train Gemini models for Search or the Gemini app was sparse.  Plaintiffs established that Google uses "Search data" to train the MAGIT model, which helps deliver AI Overview responses, but never explained what type of "Search data" is used, how much, or its significance in the model's training.  Rem. Tr. at 178:6-180:1 (Durrett) (discussing PXRD003 at 33); *id.* at 3366:5-18 (Collins).  More fundamentally, Plaintiffs did not establish that Google's scale advantage in Search translates into a quality advantage in GenAI search-assisted responses.  *See, e.g.*, Rem. Tr. at 216:21–218:17 (Durrett) (opining only that "there's a logical implication of [his] opinion" that "the ability to retrieve from the search index and then produce results in a RAG context would be better than if a poorer-quality search index were used," and not opining on "whether Google's GenAI products are superior to the GenAI products of its competitors").  The evidence did not show, for instance, that Google's GenAI product responses are superior to other GenAI offerings due to Google's access to more user-interaction data.  If anything, the evidence established otherwise: The GenAI product space is highly competitive, and Google's Gemini app, for instance, does not have a distinct advantage over chatbots in factuality and other technical benchmarks.  FOF ¶¶ 56–62.  So, even if Google uses some "Search data" to post-train Gemini models used in Search or its GenAI products, sharing that data is not warranted to promote competition.

156

*Glue Data.*  The sharing of the dataset underlying the Glue statistical models, on the other hand, presents a stronger case for inclusion in the final judgment.  Again, the data in question is largely raw user-interaction data that associates queries and results with user interactions, such as clicks, hovers, and other aspects of a user's journey on and from the SERP.[21]  This is the bread and butter of Google's scale advantage.  Recall, Google trains Navboost on 13 months of user data, which is the equivalent of over 17 *years* of data received by Bing.  *Google*, 747 F. Supp. 3d at 51 ¶ 96; Liab. Tr. at 6433:15–6434:2 (Nayak) (explaining that training on 13 months of user data means the "queries and clicks" collected from "all users" worldwide); UPX0005 at -811 ("Glue Cache (13 months)").  This scale advantage is attributable in part to the exclusive agreements, and aided by unlawfully amplified network effects, it has enabled Google to maintain its monopoly status.  Forcing Google to share this data is an appropriate way to address the harm of its anticompetitive conduct.  *See In re Google Play Store*, 2025 WL 2167402, at *16 (affirming remedy requiring Google to grant third-party Android app stores access to the Google Play Store catalog of apps where the district court had "repeatedly emphasized that the catalog-access remedy is intended to ameliorate the consequences 'intertwined with the network effects' that Google has enjoyed as a monopolist in a two-sided platform market").

*RankEmbed Data.* As for compelled sharing of "User-side Data used to train, build, or operate the RankEmbed model(s)," Pls.' RPFJ § VI.C.2, the court believes such disclosure is appropriate as well.  The data underlying RankEmbed models is a combination of click-and-query data and scoring of web pages by human raters.  Liab. Tr. at 6448:20-25 (Nayak).  Plaintiffs concede that Google would not have to turn over the scoring data.  Pls.' RPFOF ¶ 1152.  But the

---

[21] Plaintiffs disclaim that they seek as part of the data underlying the Glue model "the ranking signals, information retrieval scores, the query interpretation that triggers Knowledge Panels[,] and the salient terms for a given user query." Pls.' RPFOF ¶ 1151.

click-and-query data is the fruit of Google's unlawful conduct, which Google uses to build a quality advantage over its rivals. The RankEmbed data is a "small fraction" of Google's overall traffic, Liab. Tr. at 6449:17-25 (Nayak), but the RankEmbed models trained on that data have directly contributed to the company's quality edge over competitors. As Dr. Pandu Nayak, Google's Vice President of Search, testified at the liability trial: "RankEmbedBERT was again one of those very strong impact things, and it particularly helped with long-tail queries where language understanding is that much more important." Liab. Tr. at 6356:21-25 (Nayak). It is important to emphasize again that Plaintiffs do not demand that Google reveal the RankEmbed models themselves or the signals they produced, only the data used to train those models. This is a reasonable method of addressing the consequences of Google's unlawful conduct.

Google will be required to share Glue and RankEmbed data with a Qualified Competitor at least twice. A more than one-time disclosure is reasonable given the importance of updating training data with fresh information. *See* Liab. Tr. at 6449:1-3 (Nayak) (discussing how RankEmbedBERT needs to be retrained to reflect fresh data); *id*. at 7829:1–7832:16 (E. Fox) (discussing DXD-26.004 (discussing frequency of how often ranking components like Navboost and RankEmbedBERT are "refreshed")).[22] The court, however, intends to set a cap on the number of such disclosures that can occur during the term of the judgment. A cap protects against Qualified Competitors free riding on Google's data, and it will lessen the burdens associated with implementing privacy measures that will have to be applied before disclosure occurs. *See* RCOL § III.B.4.b.ii. Consultation with the Technical Committee before setting a cap is

---

[22] The court, by contrast, limited the Search Index data disclosure to one time, because Qualified Competitors with access to a one-time snapshot of Google's Search Index will be able to use it to develop their own. To be sure, successive disclosures would grant a Qualified Competitor fresher Search Index data. But the court believes that, with the Search Index data, a Qualified Competitor will receive information about websites that Google crawls with greater frequency. With that knowledge, a Qualified Competitor can maintain a fresh search index on its own accord.

critical, however, as that determination will be informed in part by the utility of the datasets disclosed after appropriate privacy-enhancing techniques are applied.

### b.    Google's Objections

Two of Google's objections merit attention. First, Google asserts that the disclosure of User-side Data will allow Qualified Competitors to train an LLM to mimic Google's ranking of web pages in response to a query. Google's Br. at 42; Google's PFOF ¶ 651. It maintains that a remedy that enables a rival to create a "functional substitute" is untenable under *Massachusetts* and *New York I*. Google's Br. at 42. Second, Google contends that the court must reject the proposed data-sharing remedies, because they fail to spell out the "extensive measures [that] would need to be taken to anonymize the data before it could be disclosed." *Id.* at 43. That lack of specificity, Google claims, will make it "impossible" for "Google or the Court to determine whether Google [is] providing the data required by the 'User-Side Data' provision 'while safeguarding personal privacy and security,' since Plaintiffs have arrogated to themselves the unilateral power to decide what these terms actually mean at some future time." *Id.* (quoting Pls.' RPFJ § VI.C). Neither of these objections warrants forgoing the narrowed User-side Data–sharing remedy.

### i.    Google's mimicking objection

Google's concern about the mimicking of its search rankings is overstated. It relies on Dr. Allan's testimony that a Qualified Competitor could feed the disclosed User-side Data into an LLM and, through a fine-tuning process, come to "mimic Google's ranking." *See* Rem. Tr. at 2834:12–2836:8, 2843:5-17, 2934:11–2935:21 (Allan). But Dr. Allan qualified his opinion to say that he was not asserting that with User-side Data a Qualified Competitor using an LLM could match Google's quality; rather, his "goal was to look at whether they could improve their systems,

159

not whether they could be as good as Google." *Id.* at 2946:24–2949:2 (Allan). Helping competitors improve their search engines is precisely what this remedy is designed to accomplish. And that objective is clearly authorized under *Massachusetts*. *See* 373 F.3d at 1215, 1221 (upholding disclosures that would "bolster" rivals' ability to challenge the monopolist and "potential[ly] . . . increase" rival products' capacity to threaten the dominant product).

In any event, mimicking Google Search would be no easy task. For starters, this remedy requires only disclosure of underlying data; it will be up to Qualified Competitors to engineer the technology and develop the infrastructure to make use of it. Those are important variables that Dr. Allan acknowledged would factor into whether a Qualified Competitor could mimic Google. Rem. Tr. at 1550:20–1551:23 (Mickens) (discussing portion of Dr. Allan's deposition contained in PXRD010 at 63). What's more, the models that utilize this data hardly represent the bulk of Google's Search-related technologies. As Dr. Allan explained, he was not opining that a Qualified Competitor could replicate Google's search infrastructure. Some components, perhaps, but "it would be a long slog to get through all of them." *Id.* at 2950:3-2952:8 (Allan) (discussing PXR0172). Additionally, Plaintiffs have clarified that some of the key information underlying Glue and RankEmbed data that Dr. Allan relied on for his opinion—including, query-based and document salient terms—is not included within the definition of User-side Data. Pls.' RPFOF ¶¶ 1151–1152; Rem. Tr. at 2832:22–2834:11 (Allan). The court can only speculate how that narrowing affects the prospect of mimicking Glue or RankEmbed models.

In addition, some of Dr. Allan's mimicking concerns are mitigated by the court's narrowing of the remedy. For instance, Dr. Allan opined that a Qualified Competitor could mimic all of Google's top-level ranking signals using a combination of certain known top-level signals, like quality and popularity, and other data. Rem. Tr. at 2834:12–2836:8, 2956:4-12 (Allan). The court

160

is not requiring the disclosure of those ranking signals.  The court also will cap the number of times a Qualified Competitor can receive datasets.  Qualified Competitors therefore will not usually have datasets as fresh and robust as Google's.  Google, meanwhile, will continue to update its own datasets with fresh information on a routine basis.  *See* Liab. Tr. at 7829:1–7832:16 (E. Fox) (discussing DXD-26.004 (discussing frequency of how often ranking components like Navboost and RankEmbedBERT are "refreshed")).

There is also one other important way in which the actual datasets to be shared dampen mimicking concerns: they will be subject to privacy-enhancing techniques that will diminish their full utility.  Rem. Tr. at 1147:10–1148:14, 1164:18–1165:8 (Evans) (discussing the privacy-utility tradeoff); *id.* at 3676:24–3678:18 (Culnane) (same).  As discussed further in the next section, applying those techniques to promote user privacy will result in the release of less than the full datasets.  *Id.* at 1154:2–1160:20 (Evans) (explaining loss of records when using a privacy-enhancing technique known as k-anonymity, and discussing example of Google's data disclosure under the European Digital Marketing Act where Google's privacy filters resulted in the exclusion of 99% of queries).  Dr. Allan did not opine that with a diminished dataset a Qualified Competitor still could effectively mimic Google.

These factors make this remedy different than the disclosure remedy of "extremely broad scope" rejected in *New York I* and affirmed in *Massachusetts*.  *Massachusetts*, 373 F.3d at 1219; *see also New York I*, 224 F. Supp. 2d at 173–77, 226–33.  In that case, the district court refused to adopt a remedy that sought "vast disclosures and royalty-free licensing of technical information" that the plaintiffs claimed was justified to prevent Microsoft from engaging in *future* conduct that fell outside the conduct determined to be unlawful.  *New York I*, 224 F. Supp. 2d at 173–74.  The

161

court found that the proposed disclosures sought to "broadly facilitat[e] interoperation in markets unrelated to the monopoly market" and thus were "without basis." *Id.* at 175.

The court also rejected the "over-broad" remedy because "it [was] likely [to] enable wholesale copying or cloning of Windows . . . ." *Id.* at 175–76. The plaintiffs' proposed disclosure of technical information centered on their conception of "interoperability," which the court found was really "an aspiration of perfect interoperation" that equated "interoperability with 'interchangeability.'" *Id.* at 227. Under the plaintiffs' proposal, a "Windows client would not be 'interoperable' with a non-Microsoft server unless Microsoft's competitors have the information necessary to ensure that their server operating systems can provide Windows clients *with every service* that a Microsoft server operating system provides." *Id.* at 227–28 (emphasis added). The court was concerned that this type of comprehensive sharing of technical information would "enable the cloning of Windows." *Id.* at 228. As the court put it, the plaintiffs sought disclosures that "would likely provide other software companies with the equivalent of *the blueprints* not only to the Windows operating system for PCs, but also the server version of Windows." *Id.* at 229 (emphasis added). "Once provided with the equivalent of the blueprints for Windows, competitors would have little trouble, and comparatively less cost, writing their own implementation of everything valuable in Windows . . . ." *Id.*

The User-side Data remedy is fundamentally different. Importantly, it is tethered to an appropriate remedial objective: the goal of denying Google the fruit of its violations. It also poses no threat to reveal the "blueprints" to Google's search infrastructure and technology. Dr. Allan never testified that disclosure of Glue and RankEmbed data would enable a Qualified Competitor to "writ[e] their own implementation of everything valuable in [Google]." *Id*. Further, the remedy involves no compelled disclosure of intellectual property or trade secrets, such as algorithms,

162

ranking signals, or post-trained LLMs used to deliver GenAI results.  Plaintiffs also have made clear that they are not seeking even modest proprietary data, such as query- and document-salient terms or human-rater scores.  The sharing of raw user data does not pose the same risks of "cloning" that were present in *New York I*.  And finally, the limited disclosure ordered here will not dampen Google's incentive to innovate, *see supra* RCOL § III.B.1, a consequence the court in *New York I* feared but this court does not.  *See New York I*, 224 F. Supp. 2d at 176–77; *see also Massachusetts*, 373 F.3d at 1219–20.

### ii.     Google's privacy objection

Next, Google opposes release of any User-side Data because of the associated risks to user privacy.  Google's Br. at 34–35, 43–44.  This is a valid concern.  Both sides presented privacy experts who agreed that the disclosure of User-side Data without applying adequate anonymization and privacy-enhancing techniques would reveal sensitive user information.  Rem. Tr. at 1136:14–1138:18 (Evans); *id.* at 3680:25–3684:5 (Culnane).  Think of a search query from a user in a small town regarding a rare health condition.  Even if the user's name is not included in the data, context could reveal their identity.  *See id.* at 3682:8-20 (Culnane) ("[I]t doesn't require that personally identifiable information to be there in order to perform a reidentification."); *see also id.* at 3521:13–3522:6 (Reid) (explaining that "users' queries can be very private without containing sort of direct personally identifiable information" and explaining how context of a search could identify a user).

Both experts agreed, however, that user privacy could be preserved with appropriate privacy-enhancing techniques and methods, such as adding noise, generalization, and k-anonymity.  *Id.* at 1133:5-15, 1163:20–1165:8 (Evans) (explaining that there are multiple privacy-enhancing techniques that could be used, that they could be used together to preserve privacy, and

that the at-issue data "can be safely shared by Google in a way that assures privacy while providing utility"); *id.* at 3730:2-12 (Culnane) (stating that Google could "share some data" and adequately achieve privacy safeguards); *see also id.* at 1142:12–1146:23 (Evans) (discussing noise); *id.* at 1154:19–1156:10 (Evans) (discussing generalization, suppression, and query-intent grouping to satisfy k-anonymity).

That is not to say that protecting privacy will be easy.  Anonymizing and securing datasets as large as those underlying Glue and RankEmbed, while attempting to optimize their usefulness, no doubt will be challenging.  *See id.* at 3809:3–3810:4 (Culnane) (discussing privacy issues with query strings and URLs); *see supra* RCOL § III.B.4.b.i.  At the same time, the court does not accept that the lack of particulars is fatal to the User-side Data–sharing remedy.  It is entirely appropriate for the court (and Plaintiffs) to rely on the Technical Committee to "facilitate the resolution of potentially complex and technologically nuanced disputes between [Google] and others over the practical workings of" the final judgment.  *Massachusetts*, 373 F.3d at 1244 (citation omitted).  The court therefore is unpersuaded by Google's contention that the User-side Data–sharing remedy is too vague to adopt and implement because it does not precisely spell out important privacy safeguards.

5.      *Ads Data*

The final component of Plaintiffs' data-sharing proposal is Ads Data.  Pls.' RPFJ § VI.E. Plaintiffs define "Ads Data" to mean "data related to Google's selection, ranking, and placement of Search Text Ads in response to queries, including any User-side Data used in that process."  *Id.* § III.A.  The remedy would require Google to

> provide Qualified Competitors, at marginal cost, the following Ads
> Data, in addition to any data made available by Google via the APIs
> required under Sections VII and VIII: Ads Data used to operate,
> build or train AdBrain models or other models used in Ads targeting,

retrieval, assessing ad relevance, bidding, auctioning (including predicted click-through rates (pCTR)), formatting, or content generation.

*Id.* § VI.E.  Like the User-side Data remedy, Google would be required to "use ordinary course techniques to remove any Personally Identifiable Information" and apply appropriate privacy-enhancing techniques before making the data disclosure.  *Id.* § VI.F.

Plaintiffs' Ads Data–sharing remedy is premised on the court's liability determination that "[s]cale also improves search ads monetization."  *Google*, 747 F. Supp. 3d at 161; *see* Pls.' PFOF ¶ 713.  "Understanding which advertisements users click on (or scroll past) enables Google to evaluate ad quality and serve more relevant ads in the future.  The more precisely targeted an ad, the greater likelihood that it will be clicked, which translates into higher revenues that Google uses to make larger revenue share payments."  *Google*, 747 F. Supp. 3d at 161 (citation omitted); *see also* Rem. Tr. at 3304:16–3305:4 (Israel) (agreeing that "scale improves search ad monetization," and "all else equal," "more scale improves ads quality").  Based on these findings, Plaintiffs posit that "[t]he Ads Data[–]sharing remedies will increase competition in the [general] search text ads marketplace by enabling rivals to overcome the scale barrier."  Pls.' PFOF ¶ 714.  Plaintiffs say they seek disclosure only of the "raw Ads Data serving as inputs into the components of Google's Auction and Prediction stack."  Pls.' RPFOF ¶ 1169.  The court finds that this remedy is both too broad and suffers from a failure of proof.

The parties disagree about the precise scope of the Ads Data remedy, *see, e.g.*, Pls.' RPFOF ¶ 1169, but Plaintiffs concede that it at least includes conversion data from advertisers.  *See generally id.* ¶¶ 1169–1184 (not disputing that the Ads Data remedy would require such disclosure); RDX0708 at -005 to -006 (Plaintiffs' interrogatory response stating that Ads Data would include "raw data, from whatever source (e.g. users, advertisers, or Google) that serves as

165

an input to the models referenced above"); Rem. Tr. at 4410:9-11 (Muralidharan). Google "join[s] up with the clicks" the conversion data it receives to determine if the "ad [had] value or not." Rem. Tr. at 4408:3–4410:17 (Muralidharan). An example of conversion data is whether a user made a purchase or how long the user spent on a web page, even if the user did not get to the site by clicking a Google text ad. *Id.* It also can include information about loyalty programs and actual store visits. *Id.* at 4410:1-6, 4416:5-13 (Muralidharan). Advertisers view their data with Google, especially conversion data, to be "particularly sensitive" because it can provide competitive insight into business strategies and their outcomes. *Id.* at 4418:13–4419:14 (Muralidharan). Google agrees not to share such data with anyone absent the advertiser's consent. *Id*. at 4419:15-18, 4420:25–4421:12 (Muralidharan); RDX0130 at -005 (Google Analytics Terms of Service stating that Google will not share the advertiser's customer data without consent). This type of advertiser-supplied data, which does not come directly from user interaction with Google, is steps removed from the type of data at scale that the court views as the primary fruit of Google's distribution agreements.

Not only is the remedy's scope too broad, but the court lacks basic information about what data is subject to disclosure. Plaintiffs would have Google reveal all data "used to operate, build or train AdBrain models or other models . . . ." Pls. RPFJ § VI.E. The court heard no specific testimony about "AdBrain models," *see* Rem. Tr. at 4402:5–4406:14 (Muralidharan) (Google's counsel mentioning AdBrain when reading the proposed remedy but not eliciting specific testimony), and the term appears nowhere in Plaintiffs' post-trial submissions. Plaintiffs also have not specified what "other models" might be implicated.

Nor have Plaintiffs come forward with sufficient evidence showing how Ads Data–sharing will increase competition in the general search text ads market. Plaintiffs conceded in closing

166

argument that the lone seller of digital ads that they called to testify—adMarketplace—does not today meet the definition of Qualified Competitor. *Id.* at 4770:10–4771:11 (Closing Arg.) (agreeing that adMarketplace would be eligible for data-sharing remedies only "to the extent [it] was able to build technology and had a plan to build technology that . . . they could use to partner with an entrant or another general search engine").[23]  That stands in sharp contrast to the GSE product market, for which Plaintiffs called multiple current competitors (Bing, Yahoo, and DuckDuckGo) and emerging ones (ChatGPT and Perplexity) to advocate for those data-sharing remedies.  Notably, Plaintiffs did not ask the only other actor in the search text ads market—Microsoft—to comment on the Ads Data–sharing remedy.  *See Google*, 747 F. Supp. 3d at 138–39; Rem. Tr. at 848:22–849:12 (Weinberg) (DuckDuckGo syndicates ads from Microsoft); Liab. Tr. at 61:20-22 (Opening Arg.) (Yahoo syndicates ads from Microsoft).

Lastly, the court agrees with Google's expert in industrial organization economics, Dr. Mark Israel, that competition in the general search text ads market does not stand on its own, but is driven by competitive conditions in the market for GSEs.  Rem. Tr. at 3191:24–3192:18 (Israel).  Advertisers will go to whichever GSE wins the competition for queries.  *Id.* at 3193:19–3195:14 (Israel).  Greater competition in the general search text ads market will follow only if there is greater competition in the market for GSEs.  *Id.* at 3194:22–3195:3 (Israel).  The data bears this out.  As the liability-phase evidence showed, advertisers consistently allocate about 90% of their ad spend with Google and 10% with Bing—percentages that almost precisely track each company's share of the GSE market.  *Google*, 747 F. Supp. 3d at 76 ¶¶ 232–233; *see also id.* at 138.  There is little evidence that competition would be enhanced if, say, with raw ads data from

---

[23] adMarketplace belatedly seeks to file an amicus brief to rebut this concession.  *See* adMarketplace, Inc.'s Mot. for Leave to File Br. as *Amicus Curiae* in Support of Pls., ECF No. 1423.  That request comes far too late.  The court will deny adMarketplace's request by a separate Minute Order.

Google, Microsoft were able to serve higher quality ads or improve its search text ads monetization. Rem. Tr. at 3196:2–3197:12 (Israel).

Plaintiffs cite some testimony and documents to suggest otherwise, *see, e.g.*, Pls.' PFOF ¶ 721, but that evidence does no more than stand for the unremarkable proposition that better ad quality improves the user experience and poor ad quality can drive users away, *see, e.g.*, Rem. Tr. at 4614:10–4615:16 (Chipty) (discussing PXR0246 at -156 and PXR024 at -033 and -064). It does not establish that Bing would be able to siphon off users from Google or that more advertisers would flock to Bing if only its ad quality or monetization improved.

In sum, given the poor fit and dubious efficacy of the Ads Data remedy, the court declines to adopt it.

## C.    Syndication Remedies

### 1.    Search Syndication

#### a.    The Remedial Terms

The next category of behavioral remedies that Plaintiffs urge involves the syndication of search results by Google to Qualified Competitors. "Syndication" in this context means an arrangement whereby one GSE provides another GSE the results and content for its SERP. Rem. Tr. at 2957:25–2958:6 (J. Adkins). Section VII of Plaintiffs' RPFJ provides:

> Google must take steps sufficient to make available to any Qualified Competitor, at no more than marginal cost of this syndication service, a syndication license whose term will be ten (10) years from the date the license is signed, and which will require Google, via real-time API(s), to make the following information and data available in response to each query issued or submitted by a Qualified Competitor . . . .

Pls.' RPFJ § VII.A. The data that Google must produce as to each query includes:

1.      Data sufficient to understand the layout, display, slotting, and ranking of all items or modules on the SERP, including but not limited to the mainline content and sidebar content and sitelinks and snippets;

2.      Ranked organic search results obtained from Google database or index, regardless of whether such web content was obtained by crawling the Internet or by other means;

3.      Search features that enable query corrections, modification, or expansion like spelling, synonyms, autocomplete, autosuggest, related search, "did you mean," "people also ask," and any other important query rewriting features identified by the [Technical Committee];

4.      Local, Maps, Video, Images, and Knowledge Panel search feature content; and

5.      FastSearch results (fast top organic results).

*Id.* To emphasize the comprehensiveness of the remedy, Plaintiffs state that Google must provide information "the same as if the Qualified Competitor's query had been submitted through Google.com." *Id.* And Google must make the syndicated content available "with latency and reliability functionally equivalent to what Google provides for its own SERP." *Id.* § VII.C.1. Also, Google would have to allow any Qualified Competitor with a pre-existing syndication license with Google to terminate its existing agreement and opt into the remedies available under the final judgment. *Id.* § VII.G.1.

Plaintiffs also propose that Qualified Competitors would be freed of any limitations on the use of the data that they receive from Google. Google "may impose no restrictions on use, display, or interoperability with Search Access Points, including of GenAI Products, provided, however, that Google may take reasonable steps to protect its brand, its reputation, and security." *Id.* § VII.B. Qualified Competitors would have complete discretion over which results and features to display. *Id.* And "Google may not place any conditions on how any licensee may use syndicated

169

content," and it may not use or retain any queries or information that it receives from a Qualified Competitors for its own products. *Id.*

Plaintiffs recognize that an unlimited syndication right for 10 years could create dependency on Google and disincentivize Qualified Competitors from investing to improve their own GSE. So, Plaintiffs propose that access to syndicated results would "decline over the course of a 10-year period with an expectation that licensees will become independent of Google over time through investment in their own search capabilities." *Id.* § VII.C.2. The applicable rate of decline is to be determined in consultation with the Technical Committee. *Id.*

There is one last important piece to the proposed syndication remedy. Qualified Competitors would be permitted to submit "synthetic or simulated queries" to Google. *Id.* § VII.E. These are essentially made-up queries, by a human or machine, that a Qualified Competitor could ask Google to run to test towards developing its own GSE. Rem. Tr. at 2813:3–2814:3, 2852:5-20 (Allan). Plaintiffs and the Technical Committee would determine a maximum number of allowable synthetic queries. Pls.' RPFJ § VII.E.

### b. Evaluating the Search Syndication Remedy

The court agrees with Plaintiffs that a syndication remedy satisfies *NSPE*'s "reasonable method" standard, but it is far too broad as proposed and must be narrowed.

The rationale for the syndication remedy is straightforward. It will take time for a Qualified Competitor to build its own search index and the capacity to deliver high-quality search results. *See* Rem. Tr. at 424:18–425:24 (Turley) (stating that developing a high-quality search index is a multi-year project). But poor results from the start could doom the enterprise before it gets off the ground, as users may not give a competitor a second look if it cannot deliver quality results from the outset. *Id.* at 834:10-19 (Weinberg) (discussing "rage quit queries").

170

Syndication addresses that problem. It would enable Qualified Competitors to compete in the short term as they work towards developing a GSE that can independently compete against Google. *See id.* at 425:1-10 (Turley) ("The syndicated search results would be helpful now. . . because it allows us to immediately to improve quality of the product on . . . the dimension of real-time information and currency, and allows us to focus on building out the parts on which we can most differentiate . . . ."); *id.* at 828:20–829:1 (Weinberg) (stating syndication "in the short term" would help close "[scale] gaps"). It would aid, in particular, in answering long-tail and local queries and queries for which freshness is important. *See id.* at 425:1-10 (Turley); *id.* at 827:3-12 (Weinberg). Even Google's primary syndication witness, Director of Product Management Jesse Adkins, agreed that "search syndication can provide a bridge until a new search engine can become a fully independent search engine." *See id.* at 3023:16–3024:14 (J. Adkins) (discussing PXR0189); *see id.* at 3027:10-12 (J. Adkins) ("A search engine can use other search services in its early days while it's building its own search engine to augment their own results and to improve."). Syndication therefore is a "reasonable method" of addressing the effects of Google's anticompetitive acts.

But just because the syndication remedy is reasonable does not mean that it is a proper fit in Plaintiffs' proposed form. The court narrows it in multiple ways.

*First*, the scope of syndication will be restricted. Plaintiffs' syndication requirement is exceedingly broad. It includes not only organic web results, but seemingly all features that appear on the SERP and related data. Google must provide for each query access to "mainline content and sidebar content and sitelinks and snippets" and "Local, Maps, Video, Images, and Knowledge Panel search feature content," with no apparent limitation. Pls.' RPFJ § VII.A. It also must supply

171

the data that would help understand how *Google* would lay out, display, slot, and rank "all items or modules on the SERP." *Id.*

The forced wholesale sharing of such features and related data goes beyond what is appropriate to close the scale gap. Further, the breadth of information that Google would have to disclose would enable Qualified Competitors to effectively replicate how Google delivers its SERPs. How else to explain Plaintiffs' insistence that Google must provide information that is "the same as if the Qualified Competitor's query had been submitted through Google.com"? *Id.* § VII.A; *see Massachusetts*, 373 F.3d at 1218–19 (addressing "cloning Microsoft's software and mimic[king] its functionality"). Plaintiffs' remedy also has no commercial equivalent. No current Google customer receives such broad syndication services. Rem. Tr. at 3434:13 (Reid) (stating that the search syndication remedy is "not really a standard syndication deal"); *id.* at 3478:20–3479:17 (Reid). And Plaintiffs have offered no proof that any other search syndicator offers anything comparable. *Cf. New York I*, 224 F. Supp. 2d at 137 (rejecting proposed definition of "middleware" because its breadth "threatens to interfere with ordinary and legitimate commercial practices inherent in Microsoft's participation in the software industry").

Even the "[r]anked organic search results" syndication term is too broad. Pls.' RPFJ § VII.A.2. It requires Google to supply those results "regardless of whether such web content was obtained by crawling the Internet *or by other means*." *Id.* (emphasis added). But, as discussed, some of the information that appears on Google's SERP is obtained from third parties and therefore is not scale dependent. *See supra* RCOL § III.B.3. Plaintiffs do not assert (much less demonstrate) that a Qualified Competitor cannot acquire that information on its own for display it on its own SERP. *See* Rem. Tr. at 3482:14–3483:1, 3508:14–3509:7 (Reid) (noting that what is on a third-party SERP is for the third-party to figure out and that Google's syndication contracts allow the

172

partner to supplement the syndication feed provided by Google to deliver search results). The court thus limits Section VII.A.2 to "ranked organic *web* search results obtained from crawling the web." *Cf. id.* at 3493:1-8 (Reid) (interpreting "organic search results" to "refer to all parts of a page that aren't ads").[24]

Google's syndication obligations under Section VII.A shall be consistent with its current syndication agreements. A Qualified Competitor who opts into the syndication remedies shall receive organic results and features on terms no less favorable than a current licensee as of the date the judgment is entered. That means Google must provide to a Qualified Competitor its Local, Maps, Video, Images, and Knowledge Panel features that it provides under current agreements. *See id.* at 3482:17–3483:1 (Reid) (stating Google syndicates a subset of its Knowledge Graph); *id.* at 3491:12–3492:12 (Reid) (discussing syndication of subunits of Local); *id.* at 3498:21–3499:1 (Reid) (testifying about syndication of video and images in "select cases"). It also must provide user-facing query-rewriting features, but not those on the back end. *See id.* at 3496:3-20 (Reid) (discussing syndication of such features).

Plaintiffs acknowledge that their syndication remedy goes beyond ordinary commercial terms. *See* Pls.' Br. at 40–41. They defend their approach, however, on the ground that, "[u]nlike commercial syndication arrangements, the syndication provisions in Plaintiffs' proposal are designed to help rivals and entrants create independent offerings over the course of the remedial period." *Id.* The court appreciates Plaintiffs' instincts. But the court's must differ. "Judges must be wary . . . of the temptation to specify 'the proper price, quantity, and other terms of dealing'— cognizant that they are neither economic nor industry experts." *Alston*, 594 U.S. at 102 (quoting *Trinko*, 540 U.S. at 408). And although "Congress has been liberal in enacting remedies to enforce

---

[24] If there are technical feasibility issues with syndicating only crawled web results, Google shall so advise the court.

the antimonopoly statutes[,] . . . in no instance has it indicated an intention to interfere with ordinary commercial practices." *Bausch & Lomb*, 321 U.S. at 728.  The court therefore believes that when it comes to a remedy like syndication for which there is an established market and which requires Google to deal with a Qualified Competitor, it is best to hew closely to ordinary commercial terms.

*Second*, Google will *not* be required to provide syndication services at "no more than . . . marginal cost."  *See* Pls.' RPFJ § VII.A.  Pricing shall be based on "financial terms no worse than those offered to any other user of Google's search syndication products."  *Cf. id.* § VIII.E (pricing term for Search Text Ads Syndication).  This change is necessary for the compelling reasons set forth in the *amicus* brief submitted by Brave Software, Inc., a small U.S.-based web browser and GSE developer.  Br. of *Amicus Curiae* Brave Software, Inc. in Support of Neither Party, ECF No. 1304-1 [hereinafter Brave Br.].  Brave is the only U.S. company other than Google and Microsoft that "has built the technology to crawl the web and construct a search index capable of generating all of its own search results."  *Id.* at 1.  As Brave points out, syndication at "marginal cost" for a term of years would create perverse incentives.  It would encourage market entry by "white label" GSEs in the short term—that is, a GSE that would seek simply to present Google search results under a different brand name.  *See id.* at 5–9.  Such entrants could exist for years at nominal cost and will lack the incentive to differentiate and invest for the long term.  *See id.* Plaintiffs' expert, Dr. Chipty, recognized this risk, testifying that the syndication remedy could create a free-rider problem, whereby "rivals would [not] have incentives to innovate in the future if [they] could take advantage of Google's innovation."  Rem. Tr. at 2165:12–2166:11 (Chipty). By requiring a Qualified Competitor to pay a market rate for syndication, a Qualified Competitor

174

will be incentivized to invest in its own search index and search technology to lower the marginal cost of a query response.  *See* Brave Br. at 22–23.

Ordering Google to syndicate at "marginal cost" also would interfere with a different product market: the one for search syndication.  *See* Brave Br. at 9–12.  There is such a market in the United States, with at least two suppliers other than Google: Microsoft and Brave.  Rem. Tr. at 1084:3-13 (Schechter); *id.* at 4031:23–4032:3 (Hitt).  Under Plaintiffs' proposed pricing term, "no independent GSE . . . could sell its search results at or below Google's marginal cost and still cover its own costs, much less earn a profit."  Brave Br. at 10.  Brave "rel[ies] on this revenue stream" and would lose income, *id.*, and with little prospect of profiting from syndication, independent GSEs like Brave "will cease or decrease investment in maintaining (let alone improving) their search indices," *id.* at 10–11.  Syndication with Google at "marginal cost" therefore will reduce, if not eliminate, competition in the market for syndicated search results.  Equity cannot countenance such an outcome.  *See New York I*, 224 F. Supp. 2d at 136 ("Court[s] must be 'careful to avoid constructions of § 2 [of the Sherman Act] which might chill competition, rather than foster it.'" (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993)).

*Third*, the syndication license shall be for five, not 10 years.  Witnesses consistently described syndication as a near-term solution that would enable Qualified Competitors to offer high-quality results while working towards building a search index that could compete with Google's.  *See, e.g.*, Rem. Tr. at 424:20–425:24 (Turley); *id.* at 828:20–829:9, 844:19–845:9 (Weinberg); *id.* at 2164:2-13 (Chipty) (describing syndication as "an immediate solution that would give rivals the ability to more rapidly create consumer-facing products").  No witness, however, said that such a solution required a 10-year license.  Nick Turley, Head of Product for ChatGPT, thought that if ChatGPT could not build an index within five years that "can stand on

its own feet that we are proud of, that would be something that I'd want to re-evaluate about our strategy." *Id.* at 426:16-25 (Turley). Brave's experience suggests that a Qualified Competitor could become independent of Google perhaps even faster.[25] A five-year license will force Qualified Competitors to wean themselves from Google's syndication services more quickly.

*Fourth*, Qualified Competitors' use of Google's syndication services in the first year will be capped at 40% of annual queries. Establishing this query cap is consistent with the record evidence that competitors are capable of building search technologies that will allow them to answer 80% of user queries "pretty quickly." *See* Rem. Tr. at 838:25–839:7 (Weinberg); *see also id.* at 394:17–395:21 (Turley) (OpenAI set an initial goal of serving 80% of its traffic from its own search index because "serving 80 percent is a lot more tractable."); *id.* at 796:8-17 (Shevelenko) (Perplexity is approaching the point where increasing the size of its search index that it built for $10 million may help with quality only "somewhat."); *see also Google*, 747 F. Supp. 3d at 36–37 ¶ 14 (Neeva was able to serve responses to 60% of queries within three years). It is the last 20%—long-tail and other rare queries—where Google's scale advantage gives it the competitive edge that is hard to overcome. Rem. Tr. at 395:11-17 (Turley) ("[O]nce you get into the final 20 percent, there are so many queries that our users might be interested in . . . that rely on sources that we see very, very rarely, if at all, or they may require sources we don't even know exist that are on the web . . . ."); *id.* at 989:19-22 (Weinberg) ("I think it's pretty clear that people leave DuckDuckGo for Google because of long tail searches."). Imposing a cap, therefore, is consistent with the notion that Qualified Competitors should rely on syndicating responses with Google only for rare queries. *See* Brave Br. at 19–20.

---

[25] *Cf. Brave Search Removes Last Remnant of Bing from Search Results Page, Achieving 100% Independence and Providing Real Alternative to Big Tech Search*, BRAVE (Apr. 27, 2023), https://perma.cc/2F5M-SZDY (Brave began delivering 100% of results from its own search index within approximately two years).

The court sets the first-year cap at the higher mark of 40%, however, because the record is not clear as to how rare a query must be to be considered in the long tail. The Allcott study examined all Bing desktop searches over 12 months in 2021 and 2022 and determined that "more than 38.7 percent of searches are for rare queries that are searched less than 100 times." Allcott Study at 29. The court sets a 40% cap in the first year consistent with the study's finding.

The court also intends to adopt a tapering provision that reduces the percentage of queries all Qualified Competitors can annually syndicate from Google. *See* Brave Br. at 16–17. The court is tempted to reduce the cap in equal increments over the license's five-year term (i.e., a 40% cap in year one, a 32% cap in year two, a 24% cap in year three, etc.). But as the developments in this case show, the pace of technological innovation is not so linear. Given the technical nature of this subject (and the humility with which judges must approach crafting a remedial decree), the court will call on the Technical Committee to assist in devising an approach that facilitates competition but incentivizes Qualified Competitors to move promptly to become independent of Google.

*Fifth*, the court rejects Plaintiffs' demand that "Google may not place any conditions on how any licensee may use syndicated content." Pls.' RPFJ § VII.B. Google's ordinary-course syndication agreements contain restrictions on how a licensee may use search results. Rem. Tr. at 2996:22–2998:14 (J. Adkins); *see Bausch & Lomb*, 321 U.S. at 728 (cautioning against "interfer[ing] with ordinary commercial practices"). For instance, licensees are prohibited from "scraping, indexing, or crawling" the syndicated search results. Rem. Tr. at 2996:22–2998:14 (J. Adkins) (discussing RDX0046 at -003 § 1.4 and RDX0420 at -007 to -008 § 3.1). These types of restrictions are meant to protect Google's intellectual property. *See id.* at 3479:21–3480:17 (Reid). Such use restrictions are common industry practice. *Id.* at 990:10-16 (Weinberg) (Microsoft restricts DuckDuckGo's use of syndicated search results); *id.* at 1071:20–1072:18 (Schechter)

(discussing RDX0380 at -002 to -003 § 4 (Use of the Services term in Microsoft syndication agreement)); *id.* at 1277:10-14 (Provost) (Microsoft limits Yahoo's ability to use search results for "algorithmic training or reverse engineering").   Even Google's agreement with Yahoo Japan contains such restrictions.   *Id.* at 3114:10-23 (J. Adkins) (discussing PXR0598 at -734 § 9.4(b)). Also, the purpose of this remedy is to provide a short-term measure for Qualified Competitors to compete as they improve their own search capabilities, not an additional means to facilitate that development.   Other remedies serve that latter purpose.   Ordinary commercial restrictions on use therefore are consistent with the objective of the search syndication remedy.

*Sixth*, Google will not be required to receive and respond to synthetic queries.   According to Plaintiffs, synthetic queries and storing of their results can improve search quality.   Pls.' PFOF ¶¶ 749–754.   Such queries can "improve ranking," *id.* ¶ 749, and "will assist Qualified Competitors to improve their quality through experimentation," Pls.' RPFOF ¶ 1189.   But these claims suffer from a lack of proof.   None of Plaintiffs' industry witnesses testified to the relationship between synthetic queries and quality improvement, or that synthetic queries are ordinarily allowed under U.S.-market syndication agreements to improve search quality.   Rem. Tr. at 1277:2-9 (Provost) (stating that under Yahoo's syndication agreement with Microsoft it is permitted to send synthetic queries to perform non-descript "testing").   Also, the theory behind synthetic queries is not consistent with the search syndication remedy.   The opportunity to syndicate with Google, once more, is meant to help a Qualified Competitor compete until it becomes an independent GSE, not as a way to improve search results.

Plaintiffs rely on two unpersuasive pieces of evidence to support the synthetic query remedy.   They point to DuckDuckGo CEO Gabriel Weinberg's testimony to support a connection between synthetic queries and improved ranking, but the cited testimony refers only to *syndicated*

search results. Pls.' PFOF ¶ 749 (citing Rem. Tr. at 832:2-9 (Weinberg) (responding to a question about the benefit of storing "syndicated responses and corresponding user-side data")). Plaintiffs mainly hang their hat on Google's syndication agreement with Yahoo Japan, which grants Yahoo Japan permission to submit synthetic queries and store their results "to assist in its search quality evaluations." *See* PXR0598 at -723 § 2.7(c). But Plaintiffs offered no evidence as to what "search quality evaluations" means under the agreement. Google, on the other hand, offered testimony that the term exists so that Yahoo Japan can ensure that *Google's* syndicated results conform to Japanese law. Rem. Tr. at 3111:15–3112:15 (J. Adkins). Plaintiffs offered no contrary evidence, and Google's explanation is consistent with the fact that the agreement permits Yahoo Japan to submit synthetic inquiries only "to scrape the sections of Google's Japanese Sites." *See* PXR0598 at -723 § 2.7(c). That is a different purpose for synthetic queries than proposed by Plaintiffs.

*Seventh*, Google will not be required to syndicate FastSearch results. Pls.' RPFJ § VII.A.5. Recall, FastSearch is a technology that rapidly generates limited organic search results for certain use cases, such as grounding of LLMs, and is derived primarily from the RankEmbed model. FOF ¶ 44. Google does not use FastSearch results for its SERP. Rem. Tr. at 3510:8-11 (Reid). And it does not directly syndicate FastSearch results. FOF ¶ 45. Rather, FastSearch results are delivered through Vertex, Google's cloud-based grounding product. *Id.* Given FastSearch's function, forced syndication of its results is an ill-fitting remedy. That data will not help GSEs improve search results. *See* FOF ¶ 44 (FastSearch results are less reliable than results from the Search product). Its primary use case is grounding for GenAI products, but Plaintiffs have not asked the court for a remedy that would forbid Google from refusing a Qualified Competitor's request to receive services through Vertex. The court will not require Google to create a syndication service for FastSearch results, when it does not do so now.

*     *     *

The syndication remedy, albeit narrowed, will serve its intended purpose: Qualified Competitors will be able to deliver high-quality web results for five years while they build their own search index and search stack. Google will not be able to refuse a Qualified Competitor's syndication request.[26] *Cf.* Rem. Tr. at 411:21–420:6 (Turley) (discussing PXR0181). At the same time, the narrowed remedy strikes an important balance. It addresses Google's concerns that the forced syndication contemplated by Plaintiffs exceeds ordinary commercial terms and places its intellectual property at risk. It also lays to rest Google's contention that the syndication remedy places the court in the role of a "central planner," as syndication agreements with Qualified Competitors generally will have to follow ordinary commercial terms and therefore will not need to be customized. Google's Br. at 51–52 (quoting *Alston*, 594 U.S. at 103). The final syndication remedy is thus "tailored to fit the wrong creating the occasion for the remedy." *Microsoft III*, 253 F.3d at 107.

### 2. *Search Text Ads Syndication*

#### a.    The Remedial Terms

To complement their search syndication remedy, Plaintiffs also propose that Google be required to syndicate Search Text Ads to Qualified Competitors. Pls.' RPFJ § VIII.E. Plaintiffs use the term "Search Text Ads" as shorthand for "a general search text advertisement, which is an ad that resembles an organic link on a SERP." *Id.* § III.Y. This definition aligns with the court's liability findings that Google does not have monopoly power in the broader search ads market,

---

[26] And to the extent Google argues that the data-sharing and syndication remedies should be rejected as impermissible "[e]nforced sharing" or "compell[ed] negotiation between competitors" under *Trinko*, *see* Google's Br. at 44, 52 (quoting *Trinko*, 540 U.S. at 408, 415), the Ninth Circuit recently rejected that very argument. *See In re Google Play Store*, 2025 WL 2167402, at *17 (clarifying that *Trinko*'s proposition that "forced sharing" creates "tension with the underlying purpose of antitrust law" arose out of a question as to whether the refusal to deal with rivals supported a finding of Section 2 *liability*, not as to the propriety of ordering a defendant already found liable to deal with rivals).

180

*see Google*, 747 F. Supp. 3d at 133–136, but that its exclusionary conduct had an anticompetitive effect in the general search text ads market, *see id.* at 177–181.

The Search Text Ads syndication remedy has multiple components: "Google must take steps sufficient to make available to any Qualified Competitor a Search Ads Syndication License whose term will be ten (10) years from the date the license is signed." Pls.' RPFJ § VIII.E. Google must provide "latency, reliability, and performance functionally equivalent to what Google provides for Search Text Ads on its own SERP." *Id.* The syndication service shall extend to all types of Search Text Ads that appear on Google's SERP. *Id.* Google must offer it "on financial terms no worse than those offered to any other user of Google's Search Text Ads syndication product, e.g., AdSense for Search, or any other current or future products offering syndicated Search Text Ads." *Id.* Qualified Competitors also "must have the right to set a minimum [cost per click ("CPC")] for ads syndicated . . . to appear on their website." *Id.*

Google cannot discriminate against Qualified Competitors who opt into this remedy. It "must include Qualified Competitors in its Search Partner Network," which is a collection of Google's ad syndicators' sites. *Id.* It also "must make the purchase of ads syndicated under this Paragraph available to advertisers on a nondiscriminatory basis comparable to, and no more burdensome than, the availability of Google's other Search Text Ads." *Id.*

There is more. Google also must deliver a slew of data associated with a syndicated ad. "For each syndicated ad result, Google must provide to the Qualified Competitor all Ads Data related to the ads provided to the Qualified Competitor, including the identity of the advertiser and CPC paid, and conversion data where available, without restrictions on use of the Ads Data including restrictions on using it to market or solicit advertisers for Qualified Competitors' own advertising products." *Id.* Further, "Google may impose no restriction on use, display, or

181

interoperability with Search Access Points, including of GenAI products, provided, however, Google may take reasonable steps to protect its brand, its reputation, and security." *Id.* It also "may not place any conditions on how any Qualified Competitor may use or display syndicated [ad] content . . . including on scraping, indexing, or crawling the syndicated results." *Id.* Finally, Google "may not retain or use (in any way) syndicated queries or other information it obtains . . . for its own products and services." *Id.*

As for the advertisers themselves, Plaintiffs' RPFJ enshrines their power to choose. Advertisers must have "the option to appear on each individual Qualified Competitor's sites on a site-by-site basis (i.e. an advertiser can choose to appear as a syndicated result on a Qualified Competitor's site regardless of whether it opts into the Search Partner Network or chooses to appear on any other site, including Google.com)." *Id.* Google already allows advertisers to make these choices. Rem. Tr. at 2959:8-15 (J. Adkins) (agreeing that "Google's advertisers choose whether to advertise on the ad syndicator sites" and stating that "for every search campaign and shopping campaign, there is an opt-out for the search partner network, which includes all of our search partners or publishers"). The court therefore adopts the advertiser-choice aspect of Plaintiffs' remedy but only insofar as such choice is consistent with Google's current advertiser terms and policies.

The rest of the remedy merits more discussion.

b.      Evaluating the Search Text Ads Syndication Remedy

Google already offers a search text ads syndication product called AdSense for Search. *Id.* at 2957:18–2958:23 (J. Adkins). When a syndicator receives a user query, its sends Google an ad request, and Google then runs an auction to select the ads for that request and serves the results into an "iframe" on the syndicator's website. *Id.* at 2959:25–2960:14 (J. Adkins). If an ad is

182

clicked, the advertiser will pay for the click, with Google and the syndicator sharing the revenue. *Id.* at 2958:24–2959:6 (J. Adkins).

Like the search-syndication remedy, the compelled syndication of Search Text Ads is an appropriate short-term measure designed to "pry open" the relevant markets. *See Int'l Salt Co.*, 332 U.S. at 401. As explained in the liability opinion, Google's monetization of general search text ads is a key component in the flywheel that has made its monopoly so durable. *See Google*, 747 F. Supp. 3d at 163. Because Google has more users, it has more advertisers, and with more advertisers, it has more dollars to improve its GSE and pay for distribution. *See id.* at 162. In the face of such formidable headwinds, allowing Qualified Competitors to syndicate Search Text Ads from Google is essential to facilitating competition. It will provide a new entrant a means of serving high-quality ads that it can monetize from the start. Rem. Tr. at 852:15–854:3 (Weinberg). That revenue can be reinvested to improve search quality, gain distribution, and perhaps build a proprietary ad platform. *See id.* It is also possible that an independent ad platform could emerge to compete with Google and Microsoft, which are the only current suppliers of general search text ads in the United States. *Id.* at 849:14-25 (Weinberg) (discussing the "hope" that "there might be more" ad networks to compete with Google and Microsoft); *id.* at 1813:14–1814:9 (Epstein) (discussing possibility of building a "custom solution" for a new search engine).

But as with their search syndication remedy, Plaintiffs' search text ads syndication proposal strays too far from ordinary commercial terms. *See Alston*, 594 U.S. at 102; *Bausch & Lomb*, 321 U.S. at 728. The remedy therefore will be narrowed. The court's changes address many of the concerns about market effects raised by Google's expert, Dr. Israel. Rem. Tr. at 3205:12–3211:12 (Israel).

183

*First*, Google may place ordinary-course restrictions on the use or display of syndicated ad content. That includes limitations designed to guard against "trick-to-click" schemes, ensure the proper ordering of ads, guarantee ad quality, protect the advertiser, and prevent ad misuse. *Id.* at 2972:4–2976:3 (J. Adkins) (discussing RDX0066); *id.* at 2979:5–2984:10 (J. Adkins); RDX0420 at -004 to -006 § 2.2. Google also may place restrictions on "scraping, indexing, or crawling" syndicated results. Rem. Tr. at 2988:9–2989:3 (J. Adkins) (discussing RDX0420 at -007 to -008 § 3.1); *id.* at 2990:22–2991:1, 2991:16–2992:10 (J. Adkins) (discussing RDX0047 at -004 § 9). Qualified Competitors still will retain some amount of flexibility in the formatting and display of syndicated ads. *Id.* at 2976:6-12 (J. Adkins).

*Second*, Google need not grant Qualified Competitors the right to set a minimum cost per click for syndicated ads. That is not an ordinary term of Google's syndication contracts. *Id.* at 2992:11–2993:6 (J. Adkins).

*Third*, Google will be permitted to retain or use syndicated queries for its own products and services, in the same manner it presently uses such information to "build, improve, and maintain" its ad infrastructure. *Id.* at 2993:16–2994:15 (J. Adkins).

*Fourth*, Google will not be required to provide the Qualified Competitor "all Ads Data related to the ads provided." This is not data that Google currently provides to ad syndicators. *Id.* at 2968:24–2971:23 (J. Adkins) (Google does not provide this information to preserve the confidential nature of advertisers' proprietary business information). Nor is it clear what competitive purpose the broad data disclosure would serve. The ads data is of benefit to the entity that has the relationship with the advertiser, and that is Google, not the Qualified Competitor. *Id.* at 2958:18-20 (J. Adkins). The effort to analogize the broad disclosure of syndicated ads data to Google's agreement with Yahoo Japan is misplaced. Under that agreement, Yahoo Japan has the

184

advertiser relationship, not Google. *Compare* Pls.' PFOF ¶¶ 774, 811 (citing PXR0598 at -749 to -750 (App. 2)), *with* Rem. Tr. at 3016:20–3017:3 (J. Adkins) (under agreement with Yahoo Japan, Yahoo Japan has its own ad business and the relationship with advertisers); *id.* at 3093:7–3096:6, 3121:20–3122:2 (J. Adkins) (describing ads data that Google discloses to Yahoo Japan as "Yahoo Japan's advertiser data" that Yahoo Japan uses to prepare performance reports for advertisers).

*Fifth*, to coincide with the five-year license for search syndication, the Search Ads Syndication license shall be for five years, not 10. Google notes that its typical ads syndication agreement is two years to allow the parties to renegotiate, *id.* at 2963:24–2964:14 (J. Adkins), but in this remedial posture, a longer license is appropriate to afford a Qualified Competitor greater certainty to develop its capacity to compete.

*Sixth*, Google shall be required to provide on a non-discriminatory basis "latency, reliability, and performance functionality equivalent to what Google provides" to other syndicators of its search text ads, not "equivalent to what Google provides for Search Text Ads on its own SERP." Pls.' RPFJ § VIII.E; Rem. Tr. at 2964:15–2965:22 (J. Adkins).

One term shall remain unchanged. That is, the Search Text Ads License shall be based on "financial terms no worse than those offered to any other user of Google's Search Text Ads syndication products." Pls.' RPFJ § VIII.E. That term is, in effect, a most-favored-nation pricing clause. It will prevent Google from charging an inflated price to Qualified Competitors, and it will provide Qualified Competitors certainty about their costs for a five-year term and facilitate building search capacity in a predictable way. In that sense, the term is pro-competitive. *See* Rem. Tr. at 4067:20–4070:13 (Hitt) (most-favored-nation clauses can involve pricing terms, can have "significant procompetitive benefits," and are common (discussing RDXD-32.038 (illustrating quality and pricing most-favored nation clauses))). *But see id.* at 3210:21–3211:12 (Israel) (most-

favored-nation pricing will discourage Google from offering a better deal to any one syndicator, because Google would have to make the same deal available to all Qualified Competitors).

### 3.    *Contingent Search Text Ads Syndication*

Plaintiffs also propose a contingent remedy relating to the syndication of Search Text Ads. Pls.' RPFJ § VII.D.  That remedy would become available if, after five years, Plaintiffs can prove "by a preponderance of the evidence that either or both monopolized markets have not experienced a substantial increase in competition." *Id.*  If the triggering condition occurs, Google would have to syndicate Search Text Ads "at no more than [] marginal cost." *Id.*

The final judgment will not contain the proposed contingent remedy.  Plaintiffs have not shown how "marginal cost" syndication will benefit competition.  Perhaps the idea is that lowering the cost of delivering ads to near zero will free up capital, which Qualified Competitors can then put toward product innovation or improvements.  But there is no guarantee that a Qualified Competitor would use cost savings for such purposes—the Plaintiffs' RPFJ imposes no such requirement.

Even if it did, receiving syndicated ads at marginal cost could "unintentionally suppress procompetitive innovation." *Alston*, 594 U.S. at 102.  A new GSE might very well conclude that building a proprietary ads platform is not worth the expense if it can acquire search text ads from Google in the future at marginal cost.  Also, new entrants to the search text ads market will be deterred, knowing that they would not be able to compete if Google were ordered to make its search text ads available at marginal cost.  Finally, the provision would make it "impossible for anyone else to compete" if it were to come into effect.  Rem. Tr. at 3256:21–3257:8 (Israel). Ads syndication customers can purchase search text ads from other platforms.  *Id.* at 2993:7-12 (J. Adkins) ("[A]lmost entirely our partners are able to use other search ad providers.").

186

If Google's text ads were made available at a depressed price, no GSE would look to buy from Microsoft, the only other current supplier of search text ads. Such a competition-impairing effect requires the court to reject the remedy. *See Alston*, 594 U.S. at 102.

### D.     Choice Screens

The final component of Plaintiffs' "core remedies" is the implementation of choice screens. A "choice screen is fundamentally a user interface that asks the consumer to make an explicit choice among a number of products." Rem. Tr. at 532:11-14 (Rangel). Plaintiffs' Choice Screens remedy consists of three parts.

The first pertains to Google Devices (such as its mobile phone, Google Pixel). For new devices, Google must either display a "Search Access Point Choice Screen" or preinstall a Google Search Access Point that implements a "Default Search Choice Screen." Pls.' RPFJ § IX.B; *see also id.* § IX.D.1–2 (defining "Search Access Point Choice Screen" and "Search Default Choice Screen"). Google must do the same on existing devices or, alternatively, delete the Search Access Point. *Id.* § IX.B. If Chrome is offered as an option on a Search Access Point Choice Screen, then Google must display a Default Search Engine Choice Screen[27] upon selecting the browser. *Id.*

The second part of the remedy is directed at "Google Browsers," namely, Chrome. Pls.' RPFJ § IX.C. "Google must display a Search Default Choice Screen on every new and existing instance of a Google Browser where the user has not previously affirmatively selected a default GSE for that Google Browser . . . ." *Id.*

The third component is directed at third parties. Recognizing that the court cannot compel third parties to act, Plaintiffs would allow Google to offer incentive payments for choice screen

---

[27] The court assumes that a "Search Default Choice Screen," a "Default Search Choice Screen," and a "Default Search Engine Choice Screen" are one and the same.

adoption.  Google must give distributors of "non-Apple, third-party Device[s]" under a current distribution agreement the option to display a Search Access Point Choice Screen or Search Default Choice Screen, in exchange for revenue share payments for the shorter of the remaining life of the device or one year.  *Id.* § IX.A.

In simple terms, these provisions would enable users to choose a GSE at various search access points and to select a default GSE on a search access point, where there is one.  Pls.' Br. at 28.  Users would be asked to make a GSE selection upon first-time device use and then again on an annual basis.  *Id.* § IX.D.1.c, 2.c.  These choice screens would be designed by Google in the first instance, in accordance with certain specifications; reviewed by the Technical Committee; and approved by Plaintiffs.  *Id.* § IX.D.

The purpose behind offering users a choice screen is to blunt the "power of defaults." *See Google*, 747 F. Supp. 3d at 45 ¶ 65, 159–161; Rem. Tr. at 536:10-14 (Rangel) ("[I]ntroducing choice screens will help to reduce the biases in consumer's choice, both in search and search applications, associated with previous defaults.").  As the court found, "the combination of user habit, Google's brand, and choice friction creates a powerful default effect that drives most consumers to use the default search access points occupied by Google."  *Google*, 747 F. Supp. 3d at 160.  The largest percentage of search queries flow through default search access points, making "the defaults extremely valuable."  *Id.*  In theory, a choice screen could dampen the default effect. It would give the user the option to select Google or a different GSE with minimal choice friction. A remedy that promotes user choice is unquestionably consistent with the goals of antitrust law. *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 102, 107 (1984) (emphasizing that "Congress designed the Sherman Act as a consumer welfare prescription," and viewing actions that "widen consumer choice" as "procompetitive" (internal

quotation marks and citations omitted)); *see also Structural Antitrust Relief* at 98 ("[A]n injunction that opens up participant choice can serve to diminish monopoly power significantly."). And more choice could translate into increased consumer welfare. *See* Rem. Tr. at 556:4–558:4 (Rangel) (concluding that the introduction of choice screens, standing alone, is unlikely to harm consumer welfare and will positively impact consumers who prefer an alternative search engine (discussing PXRD004 at 24–25)); *see also Structural Antitrust Relief* at 82 ("From a welfare standpoint, the optimal remedy in this situation is a choice screen placed on new devices or browsers . . . .").

The court, however, declines to impose the proposed choice screen remedies for multiple reasons.

*First*, "[t]he case law is unwavering in the admonition that it is not a proper task for the Court to undertake to redesign products." *New York I*, 224 F. Supp. 2d at 158. "Antitrust scholars have long recognized the undesirability of having courts oversee product design . . . ." *Id.* (quoting *United States v. Microsoft Corp.*, 147 F.3d 935, 948 (D.C. Cir. 1998) [hereinafter *Microsoft II*]). Yet, that is what Plaintiffs' proposed remedy would have the court do. By judicial fiat, Plaintiffs would have Google "disclose each Choice Screen" and "its plan for implementing that Choice Screen" to Plaintiffs and the Technical Committee at least 60 days before its display. Pls.' RPFJ § IX.D. The Technical Committee in turn would "consult[] with a behavioral scientist"— presumably to promote optimal choice-screen architecture and implementation—and thereafter advise Plaintiffs on Google's technical compliance. *Id.* It would be left to Plaintiffs to "approve any Choice Screen offered pursuant to [the] Final Judgment." *Id.* The RPFJ does not expressly contemplate a role for the court in this process, but any product change would bear the court's imprimatur, either by judicial mandate or court-ordered financial incentive. Either way, a compelled product design is not an appropriate use of the court's equitable powers.

*See Massachusetts*, 373 F.3d at 1210 (commending the district court for "remedying the anticompetitive effect of" Microsoft's conduct "without intruding itself into the design and engineering of the Windows operating system").

*Second*, forcing Google to redesign its *own* products is not an appropriate remedy. This case was always about Google's distribution agreements with third parties, not its product design. The court has broad authority to restrain conduct of "the same type or class" as the acts deemed unlawful. *Zenith Radio*, 395 U.S. at 132 (citation omitted). *Zenith Radio* does not, however, empower courts "to say that clearly *lawful* practices may be enjoined simply because they will weaken the antitrust violator's competitive position." *New York I*, 224 F. Supp. 2d at 109 (emphasis added). Plaintiffs have never asserted that Google's decision to use Google Search as the default for its own products violates the Sherman Act, *see supra* RCOL § II.A; *infra id.* § V.D. Such self-promotion, in fact, appears consistent with industry practice: Microsoft makes Bing the default on Edge, and DuckDuckGo integrates its GSE and browser. *See Google*, 747 F. Supp. 3d at 36 ¶ 12, 38 ¶ 26. True, conduct that is otherwise lawful when committed by a non-monopolist can be deemed anticompetitive when performed by a dominant firm. *See id.* at 145–46. But when it comes to Google installing its own GSE as the default on its own products, Plaintiffs have never even so much as hinted that such conduct is anticompetitive.

*Third*, choice screens are not likely to change the competitive landscape under current or even near-term market conditions. Plaintiffs' economic experts have acknowledged as much. Liab. Tr. at 6091:3-21 (Whinston) (testifying that choice screens would shift "less than 1 percent of the U.S. market share"); Rem. Tr. at 2187:4-17 (Chipty) ("We know from Europe that when users are given a choice today, they will overwhelmingly choose Google."). And the real world offers proof. The European Commission has mandated the display of choice screens on Android

190

devices since 2020,[28] yet there has been little shift in market share away from Google.  Rem. Tr. at 4224:19–4225:2 (Murphy); *id.* at 537:14-21 (Rangel) (citing recent study finding that choice screen introduction decreased Google's market share in Europe between .5% and 1.5%); Google's PFOF ¶ 35.  Academic modeling predicts a similar outcome.  *See* Allcott Study at 1, 35 (modeling choice screen scenario in the "U.S. desktop search market" and concluding that "Google's market share declines only slightly (1.3 percentage points), and consumer surplus rises modestly by $0.07"); *id.* at 35–36 ("Choice screens increase consumer surplus, but they barely move the needle in terms of market shares.").

Some of the blame for European choice screen ineffectiveness may lie with its design.  *See* Rem. Tr. at 537:22–538:3 (Rangel).  But ultimately, until there is a competitive alternative to Google in terms of quality—and there is not today at least for mobile search—a choice screen offers no genuine "choice" to users.  *Id.* at 2188:6-11 (Chipty) ("[C]hoice screens don't really create a contest between Google and rivals, because . . . users today have not experienced other search products."); *id.* at 3849:4-7 (Cue) (Apple would "do a choice screen, but it's not going to matter.  It's not going to matter until one of the choices is actually really valuable that provides new capabilities.").  The court declines to impose a remedy whose prospect of promoting competition is dim.

## IV.    ADDITIONAL BEHAVIORAL REMEDIES

Plaintiffs urge the adoption of two additional behavioral remedies that they say will "bolster the restoration of competition."  Pls.' Br. at 55.  The first is a group of four remedies aimed at benefitting advertisers.  Pls.' RPFJ § VIII.A–D.  The second, sponsored by Plaintiff States alone, is the establishment of a public education campaign.  *Id.* § IX.E.  Also, within this section, the

---

[28] *See Your Android, Your Choice*, ANDROID (Mar. 29, 2024), https://perma.cc/9E86-NWNR.

court considers a third group of remedies focused not on advertisers but on Google's relationship with publishers of web content.  *Id.* §§ IV.C, VI.B; *see also* Pls.' Br. at 44 n.11.

### A.    Ad Transparency & Advertiser Control Remedies

Plaintiffs propose a set of four remedies aimed at promoting transparency in Google's sale of search text ads and advertiser control in spending ad dollars.  *See* Pls.' Br. at 55–58.  The first and third, respectively, would force "Google to provide advertisers with specific, granular performance-related data for their ads . . . and would bar Google from restricting advertisers from exporting the data for use in in-house or non-Google third party tools."  Pls.' Br. at 55; *see* Pls.' RPFJ § VIII.A, C.  The second requires Google to make a "true exact match" option available to advertisers "when selecting the keyword match type for a particular keyword."  Pls.' Br. at 57; *see* Pls.' RPFJ § VIII.B.  The last "seeks to make visible Google's changes to its [ad] auction rules."  Pls.' Br. at 57; *see* Pls.' RPFJ § VIII.D.

#### 1.    Search Query Reports

The first of these remedies is about providing advertisers with individual, query-level ads data.  This remedy arises from the court's liability findings about Search Query Reports, or SQRs.  SQRs supply advertisers with data that allows them to evaluate the effectiveness of their ad spend on a keyword basis.  *Google*, 747 F. Supp. 3d at 84 ¶ 269.  In 2020, Google made changes to the SQR, ostensibly on privacy grounds, that reduced the amount of information that advertisers received on keywords that correlated with low-clicked ads.  *Id.* at 84–85 ¶¶ 270–271.  Advertiser witnesses during the liability phase described how that change had reduced their visibility into the terms triggering their text ads.  *Id.* at 85 ¶¶ 272–274; *see also* Rem. Tr. at 1378:23–1380:14 (Vallez) (discussing diminished receipt of keyword-level data from Google).  The court found that Google's trimming of the SQR reports was an anticompetitive effect of Google's exclusionary

conduct. *Google*, 747 F. Supp. 3d at 180. Though a small change, the action "reveal[ed] Google as a monopolist unconcerned about product changes that have decreased advertisers' autonomy over the auctions they enter and the ads they purchase." *Id.*

Plaintiffs now ask the court to restore the pre-2020 SQRs, and then some. Plaintiffs' remedy would require Google, "[f]or each Search Text Ad served or clicked, [to] make available to advertisers at the individual ad level for the preceding 18-month period, data showing the query, keyword trigger, match type, cost-per-click (CPC), click-through-rate (CTR), SERP positioning, long-term value (LTV), conversion data, and any other metric necessary for the advertiser to evaluate its ad performance." Pls.' RPFJ § VIII.A. Google would be required to make this data available via "an API that permits advertisers to download raw data in real time, generate reports and summaries, and perform other analytical functions to assess ad spend, ad performance, and in-campaign organization (including the ability to assess incremental clicks generated by Search Text Ads)." *Id.* Google also would have to provide such data at least monthly through "autogenerated summaries accessible through the Google ads system interface." *Id.*

Plaintiffs' desire to rectify what the court found was an anticompetitive effect of Google's exclusionary conduct is understandable. After all, remedial relief should strive to "cure the ill effects of the illegal conduct." *Ford Motor Co.*, 405 U.S. at 575 (quoting *Gypsum*, 340 U.S. at 88). But Plaintiffs' SQR remedy is not "tailored to fit the wrong creating the occasion for the remedy." *Microsoft III*, 253 F.3d at 107.

Google already provides all but one of the ad metrics that Plaintiffs include in their remedy. It does so in aggregated form, meaning query-level data is shared as to all clicked-on ads collectively. Rem. Tr. at 4427:21–4430:25, 4433:17–4434:10 (Muralidharan). A sample SQR is depicted below. It shows that Google provides various advertising metrics as to the query

193

("Search term" column) and the keyword ("Keyword" column) that triggered the ad.  The "Impr."

column reflects the number of ads clicked, and the remaining columns provide data across those

clicked ads.  Rem. Tr. at 4428:1-24, 4429:24–4430:8, 4433:17–4434:10 (Muralidharan)

(discussing RDXD-34.017, shown below).



Plaintiffs' remedy would have Google go further.  It would be required to provide data as

to *each* text ad placement on the SERP, meaning Google would have to disaggregate data and

deliver it on a per ad basis.  *See* Rem. Tr. at 4433:20–4434:10 (Muralidharan).  It also would have

to provide data as to an ad that was displayed but not clicked on by the user (and for which Google

received no payment).  *Id.* at 4430:9–4432:10 (Muralidharan).  This would lead to an "explosion

of the amount of information" reported to advertisers.  *Id.* at 4434:9-10 (Muralidharan).  The

remedial unbundling of aggregated impression data thus far outstrips the court's limited findings

about Google's degradation of SQR reports.

Nor have Plaintiffs convincingly shown that added data disclosure will stimulate

competition.  Plaintiffs called no expert to opine as to the market effects of the SQR remedy.

Rem. Tr. at 2201:16-24 (Chipty) (acknowledging that she offered no opinion on the Section VIII

194

remedies); *id.* at 4567:5–4570:8, 4577:12–4579:3 (Jerath) (not opining on whether more granular data would stimulate competition in the GSE or search text ads market). They instead relied on the testimony of Paul Vallez, Executive Vice President of Strategic Business Development and Product Partnerships for Skai, a search engine management tool company, for the proposition that the SQR remedy "would also foment competition by increasing advertisers' ability to optimize between search platforms." Pls.' Br. at 56 (citing Pls.' PFOF ¶¶ 875–876). Vallez testified that the SQRs have become "less valuable over time" because of Google's removal of low-volume query data, Rem. Tr. at 1383:12-21 (Vallez), and stated generally that Skai's preference is to get data "at the most granular level" to drive better performance, *id.* at 1377:9–1378:22 (Vallez). He added that more granular data "would give us the ability to make more informed recommendations, and some of those *could lead* to budget shifting, but it's not necessarily geared just for that." *Id.* at 1385:7-11 (Vallez) (emphasis added). Finally, he agreed that having data at the keyword level would "further improve the quality of the products related to reducing friction and shifting spend between search engine platforms." *Id.* at 1378:3-10 (Vallez).

That is not compelling evidence that the SQR remedy would "foment competition by increasing advertisers' ability to optimize between search platforms." Pls.' Br. at 56 (citing Pls.' PFOF ¶¶ 875–876). At most, Vallez said that keyword-level data could help facilitate the shifting of ad spend to a new platform. He did not suggest, however, that having it would materially influence market dynamics. The court determined at the liability stage that advertisers allocate their ad spend to "largely mirror[] the relative market shares" within the GSE market. *Google*, 747 F. Supp. 3d at 76 ¶ 232. Nothing from the remedies-phase hearing affected that finding. So, while advertisers would benefit from more data, the competitive juice from the SQR remedy is not worth the squeeze.

195

One other point bears brief mention. The SQR remedy provides that "Google *must* make available to advertisers . . . any other metric necessary for the advertiser to evaluate its ad performance." Pls.' RPFJ § VIII.A (emphasis added). Plaintiffs say this term is necessary to "future-proof" the SQR remedy "and build in flexibility to include new metrics." Pls.' PFOF ¶ 866; *see* Rem. Tr. at 4538:1-12, 4573:20–4574:11 (Jerath). Perhaps, but it also is likely to create administrative headaches for the court. It potentially opens the door to advertisers asking for all manner of data, leading to conflicts over disclosure with Google that the court will have to resolve. Rem. Tr. at 1396:13–1398:9 (Vallez) (agreeing the SQR remedy appears "open-ended" and seemingly would allow an advertiser to ask for query-level data regarding, among things, geolocation, email information, and age); *id.* at 4573:12–4576:17 (Jerath) (agreeing the term is likely to spawn conflicts between advertisers and Google). That is not a fate the court wishes to tempt. *See New York I*, 224 F. Supp. 2d at 100 (stating the court should not "adopt overly regulatory requirements which involve the judiciary in the intricacies of business management" (citation omitted)).

### 2. *Keyword Matching*

The next ads remedy also arises from a product degradation finding. The court determined that an additional anticompetitive effect of Google's exclusionary acts was its recission in 2014 of advertisers' ability to opt out of expanded keyword matching. *Google*, 747 F. Supp. 3d at 85–87 ¶¶ 275–278, 180. Before 2014, advertisers could elect to purchase ads only on exact keyword matches or minor grammatical variants. *Id.* at 86 ¶ 277. Discontinuing this option, and subjecting advertisers to broader match parameters, had the effect of "thickening" auctions—that is, increasing the number of advertisers who would enter one. *Id.* at 87 ¶ 278. More bidders in an auction led to higher prices, thus generating more revenue for Google. *See id.* The court found

196

that this, too, was an example of Google disregarding advertiser preferences without suffering any market consequence—an anticompetitive effect of Google's exclusionary conduct. *See id.* at 180.

Plaintiffs now ask the court to reinstate the true match option. *See* Pls.' Br. at 57; Pls.' RPFJ § VIII.B. "Google must make available to advertisers a keyword matching option such that, when an advertiser chooses this matching option for a given keyword, the advertisers' ad will be eligible for the ad auction only when a query's content exactly matches with no variation to the keyword selected by the advertiser." Pls.' RPFJ § VIII.B. Plaintiffs' remedy adds that "[t]his same matching option must also be made available for use with negative keywords," *id.*, that is, keywords selected by the advertiser to signal that it does not wish to enter an auction, *see Google*, 747 F. Supp. 3d at 85 ¶ 274, 87 ¶ 278.

The court declines to adopt the proposed remedy. The court's hesitance is not about fit— the remedy is an "exact match," so to speak—but its currency. *See Microsoft III*, 253 F.3d at 49 (discussing the "enormous practical difficulties for courts considering the appropriate measure of relief in equitable enforcement actions" when years have passed since the conduct occurred, particularly in the technology space).

Google discontinued the advertiser opt-out from expanded match in 2014. It is now more than a decade later. *See id.* (raising concerns about formulating remedies six years after Microsoft had first engaged in the conduct deemed anticompetitive). Plaintiffs offered no non-expert advertising industry witness during the remedies phase to discuss the *current* need for the Keyword Matching remedy. At both trials, Plaintiffs relied mainly on their expert in digital marketing, Dr. Kinshuk Jerath. During the liability phase, he provided factual background about Google's elimination of an exact match option. *See* Liab. Tr. at 5477:15–5480:17, 5482:10-15 (Jerath). The court relied on this testimony to infer that Google's market dominance, reinforced by the exclusive

197

agreements, allowed it to change its product without concern for advertisers' loss of autonomy. *See Google*, 747 F. Supp. 3d at 180. During the remedies phase, Plaintiffs called Dr. Jerath only in their rebuttal case to respond to Dr. Israel's testimony that autobidding had eliminated or reduced the need for a true exact match option. Rem. Tr. at 4545:4–4547:18 (Jerath). He opined that, even with autobidding, "true exact match still has a role to play" and "would be useful for advertisers," because keywords match ads to queries whereas autobidding focuses on bids. *Id.*

"[S]till has a role" and "would be useful" is a thin reed on which to support a remedial request. And there is strong evidence pointing the other way. *See, e.g.*, *id.* at 4439:1–4442:13 (Muralidharan) (Google's Vice President of Product, Search Ads, doubting whether an exact match option would be "useful" to advertisers and explaining why autobidding largely obviates exact match). The court will not order Google to make a product change absent some persuasive evidence of competitive benefit.

### 3. Access to Data Reports

Plaintiffs seek to compel Google to make available even more ads data than what the SQR remedy would require. Section VIII.C of the RPFJ ("Access to Data Reports") would prohibit Google from "limit[ing] the ability of advertisers to export in real time (by downloading through an interface or API access) data or information relating to their entire portfolio of ads or advertising campaigns bid on, placed through, or purchased through Google, including data relating to placement or performance (including conversion and conversion value data)." Pls.' RPFJ § VIII.C. Plaintiffs specify that the data must include "all of the information contained in or used by Google in its Google Analytics, Ads Data Hub, Google Ads Data Manager, BigQuery, or Store sales and visitor measurement products, on the most granular and detailed level." *Id.*

198

This remedy wildly misses the mark. The court's liability opinion nowhere addressed the availability of real-time data to advertisers. Plaintiffs never alleged any unlawful conduct relating to lack of access to such data. Nor did they allege that it was an anticompetitive effect stemming from its exercise of monopoly power. Further, the products at issue were barely mentioned at the liability phase. *E.g.*, Liab. Tr. at 2143:9-14 (Weinberg) (referencing Google Analytics); *id.* at 6603:15–6604:12, 6653:2–6655:13 (Vallez) (discussing "Google Ad Manager" in the context of SA360); *id.* at 6816:13 (Kreuger) (referring to "an advertiser's own data hub"); *see also* Rem. Tr. at 3271:5–3272:2 (Israel) (verifying the absence of testimony). The court received some information about them during the remedies phase, *see* Rem. Tr. at 4435:14–4437:5 (Muralidharan), but that testimony only confirmed a lack of connection to the court's liability findings. The legal and factual predicates for the Access to Data Reports remedy are simply lacking.

### 4.    *Search Text Ads Auction Changes*

The last of Plaintiffs' ad transparency remedies would require Google to disclose changes to its search text ads auctions. Pls.' RPFJ § VIII.D. Plaintiffs would have Google provide, "[o]n a monthly basis," to them and the Technical Committee "a report outlining all changes made to its Search Text Ads auction in the preceding month" and specifying the changes "Google considers material." *Id.* Google also must supply a copy of its public notice of the change or submit "a statement why no public disclosure is necessary." *Id.* Plaintiffs believe that mandated public reporting of auction changes will help advertisers. It will allow them "both to respond to auction changes and recognize when Google adjusts its pricing knobs to increase search text ad prices." Pls.' Br. at 57.

For its part, Google questions the need for the remedy and emphasizes the heavy administrative burden the disclosure regime would impose. Google's PFOF ¶¶ 1159–1163. It also suggests that forced disclosure might reveal trade secrets, *id.* ¶ 1161, and further criticizes the remedy for allowing Plaintiffs to unilaterally determine when a public disclosure made by Google is inadequate, Google's Br. at 69.

The court agrees that requiring Google to publicize certain auction changes is an appropriate remedy. The liability opinion detailed how for years Google's adjustments of its ad auctions led to higher text ad prices that escaped notice by advertisers. *See Google*, 747 F. Supp. 3d at 79–84 ¶¶ 247–267, 177–78. That practice was intentional. "When it made pricing changes, Google took care to avoid blowback from advertisers," and it "endeavored to raise prices incrementally, so that advertisers would view price increases as within the ordinary price fluctuations, or 'noise,' generated by the auctions." *Id.* at 83 ¶¶ 263–264. Google's surreptitious pricing practices left advertisers in the dark, and it facilitated Google's earning of monopoly profits. *See id.* at 178 ("[T]hrough barely perceptible and rarely announced tweaks to its ad auctions, Google has increased text ads prices without fear of losing advertisers.").

Plaintiffs' disclosure remedy properly seeks to curb Google's shrouding of its pricing practices. *See United States v. AT&T*, 552 F. Supp. 131, 150 (D.D.C. 1982) (stating that antitrust remedies "must leave the defendant without the ability to resume the actions which constituted the antitrust violation in the first place"); *see also Microsoft III*, 253 F.3d at 107 (identifying as an objective of antitrust remedies "ensur[ing] there remain no practices likely to result in monopolization in the future" (quoting *United Shoe*, 391 U.S. at 250)). Advertisers have decried the "black box" that is the pricing of search text ads on Google. *See* Liab. Tr. at 3850:8-18 (Lowcock); *id.* at 5484:14–5485:1, 5495:3-7 (Jerath). Still, even with the limited information they

do receive, advertisers develop bidding strategies based on auction rules and respond to changes when they occur. Rem. Tr. at 4551:2–4552:17, 4596:6-22 (Jerath). Plaintiffs' remedy would increase the flow of information to advertisers, allowing them to make more educated decisions about their ad spend. *See id.* at 4554:18–4555:22 (Jerath) (discussing effect of Section VIII remedies generally). It also would prevent Google from continuing to make pricing changes in darkness.

The court, however, is concerned about the burden that the remedy, as drafted, places on Google. It must report "all changes made to its Search Text Ads auction." Pls.' RPFJ § VIII.D. That could entail thousands of disclosures per year. Rem. Tr. at 4444:16-19 (Muralidharan); *see also id.* at 4444:23–4446:15 (Muralidharan) (discussing the administrative difficulties with determining what a "change" is). *But see* Liab. Tr. at 1206:10-15 (Dischler) (testifying that only a "fraction" of ad-related experiments become actual ad "launches"). The court will task Plaintiffs and the Technical Committee to develop parameters that inform Google what types of auction changes must be brought to Plaintiffs' and the Technical Committee's attention, with the corollary objective of moderating the reporting burden on Google. Those parameters should seek to target "ad launches" or other changes that Google anticipates will exceed some threshold percentage price increase for the typical advertiser. *See, e.g.*, Liab. Tr. at 1205:19–1214:11 (Dischler). Plaintiffs and the Technical Committee also shall ensure any public disclosure of an ad auction change (if not already made by Google) avoids revealing Google's trade secrets.

### B.    Public Education Fund

Plaintiff States propose a remedy that they alone sponsor: that Google underwrite a public education campaign. Pls.' RPFJ § IX.E. Plaintiff States would have Google "fund a nationwide advertising and education program designed to inform users of the outcome of this litigation, the

remedies in this Final Judgment, the purpose of the remedies to restore competition and improve consumer choice, and the mechanisms available to consumers to exercise choice in the selection of GSEs." *Id.*; Rem. Tr. at 1872:16–1873:4 (Luca) (the public education fund would promote learnings about the "outcomes of the case and the remedies that have been imposed," "alternative search engines," and "how to select and navigate to an alternative search engine"). The Technical Committee would "assess the design and funding level" for approval by Plaintiff States and the court. And there is an added wrinkle: the Technical Committee also would "assess the role of short-term incentive payments in achieving the goals of the Public Education Fund." Pls.' RPFJ § IX.E.

Plaintiff States' proposal has some surface appeal. The liability opinion discussed at length how defaults and habit influence consumers' use of GSEs; "[m]any users do not know that there is a default search engine, what it is, or that it can be changed"; and switching a default GSE can be technically difficult. *Google*, 747 F. Supp. 3d at 45–47 ¶¶ 65–73. By increasing consumer awareness, a public education campaign could stimulate more competition. Moreover, the Allcott Study suggests that modest monetary incentives could encourage users to try, and ultimately switch, to other GSEs. Allcott Study at 19–21.

Still, the court declines to sign off on a public education campaign. That remedy is not "tailored to fit the wrong." *Microsoft III*, 253 F.3d at 107. Plaintiff States have not shown any connection between the distribution agreements and the public's perceptions of other GSEs besides Google or changing the default. Rem. Tr. at 1909:19-22 (Luca) (not offering the opinion "that Google's contracts had any [e]ffect on consumer awareness about the choices they have for search [engines]").

202

What's more, the lack of specifics is fatal. *See Int'l Salt*, 332 U.S. at 400 (demanding specificity in a remedial decree "so that parties may know[] their duties and unintended contempts may not occur"). Most glaringly, Plaintiff States presented no evidence about how much Google can expect to spend to develop and maintain a nationwide public education campaign, or how long the campaign would last. In closing arguments, counsel suggested—much to the court's surprise— that this would be a "nine-figure campaign." Rem. Tr. at 4996:19–4997:17 (Closing Arg). That amount could ascend to even greater heights if, as Plaintiffs States seem to suggest, Google might have to underwrite the cost of paying users to try other GSEs. The court will not impose a remedy whose price tag is so ill-defined and seemingly boundless.

## C.      Publisher-Related Remedies

The court now shifts to remedies aimed at Google's relationship with publishers of website content. There are two such remedies. The first would prohibit Google from maintaining an agreement with a publisher that either (1) gives Google exclusive access to the publisher's web content or data or (2) prohibits the publisher from making its content or data available to a rival on more favorable terms (a "most favored nation" clause in favor of Google). Pls.' RPFJ § IV.C. The second would require Google to provide greater flexibility to publishers to opt out of Google's use of their content or domain to develop a Google product. *Id.* § VI.B. This remedy would enable a publisher, for example, to allow Google to crawl its website contents for inclusion in Google's search index but decline to make that content available to train an LLM. Google would be required to offer the right to opt out on a product-by-product basis. *See id.*

Two concerns appear to animate these proposals. Plaintiffs worry that Google will use its financial advantage to block rivals (including GenAI firms) from gaining access to publisher

203

content or receiving such content on more favorable terms than Google. Plaintiffs want to prohibit Google from cornering the market on content just as it has done with default GSE distribution.

Additionally, Plaintiffs seek to address an increasingly existential problem faced by publishers and digital content creators: diminishing traffic to their websites. GenAI products use online content both to train and fine-tune their LLMs and, through RAG-enabled search, to improve the relevancy and accuracy of their responses to user queries. *See* FOF ¶¶ 28–30, 36–43. Because those responses typically consist of comprehensive narrative summaries that synthesize information from multiple sources rather than an assortment of individual links, users are navigating to publishers' websites less often than through traditional search. *See* FOF ¶¶ 10, 17. Publishers consequently are seeing less traffic on their websites, resulting in reduced monetization and revenue. *See generally* Br. of *Amicus Curiae* News/Media Alliance in Support of Neither Party, ECF No. 1327.

With Google specifically, publishers are caught between a rock and a hard place. Because publishers rely heavily on Google to drive traffic to their sites, they have little choice but to allow Google to crawl their content for inclusion in Google's search index. *See id.* at 7. Publishers, however, might want to deny Google permission to use its content to train and appear in its GenAI offerings, like AI Overviews, unless compensated. *See id.* at 11–14. But Google does not offer such full optionality. Its offering is more limited. It makes available a control option called "Google Extended," which allows publishers to opt out of Google using their content to train its foundation models or to ground the Gemini app and the Cloud product (Vertex AI). Rem. Tr. at 3512:1-17, 3654:7-15 (Reid). Publishers cannot, however, opt out of Google's use of their content to fine-tune Google's Search models or for display in AI Overviews. *Id.* at 3654:16-20, 3660:4-21 (Reid); *see* Pls.' PFOF ¶¶ 605, 610. So, say, a publisher did not want Google to display its

content in AI Overviews.  It could accomplish that under Google Extended only by opting out of being crawled altogether.  But that is not a tenable choice, as it may mean the publisher's absence from Google's search index and its non-appearance on the SERP, which is critical to directing user traffic to their site.  *See* Parakh Rem. Dep. at 215:7–216:17; N. Fox Rem. Dep. at 310:17–311:17.

The court declines to adopt either of Plaintiffs' proposed publisher-related remedies.  As to the first, it lacks a factual basis.  Plaintiffs presented no evidence that Google has entered into an exclusive content agreement with any publisher.  Plaintiffs point only to the testimony of OpenAI executive Nick Turley, *see* Pls.' PFOF ¶ 413 (citing Rem. Tr. at 423:9-15, 462:6-11(Turley)), but he did not say he had ever encountered an *exclusive* agreement between Google and a publisher.  Rem. Tr. at 423:9-15 (Turley) (testifying about "content silos" but not exclusive agreements); *id.* at 462:6-11 (Turley) (testifying that Google has been able to "pay a lot . . . more" and secure most-favored-nation status but not identifying any exclusive agreement).  On the other hand, Google's expert in the economics of information and information technology, Dr. Lorin Hitt, offered unrebutted testimony that publishers have *not* gravitated toward such agreements.  Rem. Tr. at 4025:25–4027:9, 4070:4-13 (Hitt).  As he put it, "everybody's working with everybody else." *Id.* at 4070:5 (Hitt).  Google has identified multiple publishers that have entered into content agreements with both Google and one or more competitors.  Google's PFOF ¶ 1182 (citing RDX0414, RDX0474, RDX0477, RX0416, RDX0410, and RDX0468).  As for most-favored-nation clauses, Dr. Hitt testified—again, unrebutted—that such clauses are common in the industry and have some procompetitive benefits.  Rem. Tr. at 4068:7–4070:13 (Hitt).  There is no factual basis to restrict Google's content agreements with publishers.

The record is similarly lacking as to enhancing publisher control.  The court heard evidence about Google's opt-out offerings, but no testimony from a single publisher.  The court does not

205

doubt that publishers face new challenges because of GenAI technologies, but there can be no cure without evidence to support it.

In any event, the conduct and proposed remedy fall well outside the scope of these proceedings. It was Google's contractual arrangements with GSE distributors, not website publishers, that gave rise to liability under the Sherman Act. Directing Google to offer greater optionality to publishers does not fit the wrong; nor is its limiting of publisher opt-out of the same type or class as its exclusionary acts.

## V.    ANTI-CIRCUMVENTION, ANTI-RETALIATION, AND ADMINISTRATIVE REMEDIES

Plaintiffs have included four remedial measures under the general heading "Anti-Circumvention, Anti-Retaliation, and Administrative Remedies." Pls.' Br. at 65–71. They include (1) separate anti-retaliation and anti-circumvention provisions, Pls.' RPFJ § X.E–F; (2) establishment of a Technical Committee to assist in administering the final judgment, *id.* § X.A; (3) a requirement that Google provide the Technical Committee with notice of acquisitions and investments made by Google in certain categories of companies, *id.* § IV.H–I; and (4) a bar on "self-preferencing" conduct, *id.* § V.B.

### A.    Anti-Circumvention and Anti-Retaliation Remedies

In Section X.E, Plaintiffs propose a general prohibition against retaliation. "Google must not retaliate in any form against a person because it is known to Google that the person is or is contemplating" various acts. Those acts include: (1) competing against, or facilitating competition against, "a Google-affiliated GSE or a Google-affiliated Search Text Ads product"; (2) "filing a complaint related to Google's compliance with this Final Judgment"; (3) acting in support of any

206

effort "related to Google's compliance with this Final Judgment"; and (4) "exercising any of the options or alternatives provided for under this Final Judgment." Pls.' RPFJ § X.E.1–4.

In Section X.F, Plaintiffs include a general prohibition against conduct that seeks to circumvent the terms of the final judgment. "Google is enjoined from enforcing or complying with any provision in any existing or future contract, agreement, or understanding which is otherwise prohibited in this Final Judgment." The provision enumerates three categories of prohibited acts: (1) "any conduct designed to replicate the effect of any behavior found by the Court to violate the Sherman Act"; (2) "any conduct substantially similar to conduct prohibited by another Section of this Final Judgment or designed to evade any obligation imposed by this Final Judgment"; and (3) "any conduct with the purpose or effect of evading or frustrating the intended purposes of this Final Judgment." *Id.* § X.F.1. The prohibitions are "worldwide in scope and are applicable to Google's conduct or contracts regardless of where it occurred or purports to apply." *Id.* § X.F.2. Plaintiffs' RPFJ also includes a host of section-specific "mini" anti-circumvention clauses. *Id.* §§ IV.J, V.D, VI.G, VII.H, VIII.F, IX.F, X.G.

Plaintiffs say that these provisions are necessary because, "[a]bsent concrete remedies to prevent Google from repeating its monopolist playbook, Google is likely to repeat it again in the future." Pls.' Br. at 65. As support, Plaintiffs point to testimony from Perplexity's Chief Business Officer Dmitry Shevelenko. *Id.* at 65–66 (citing Pls.' PFOF ¶ 421). He testified about a social media post where he stated that Google operates like a "mob boss" with respect to OEMs and wireless carriers, and further expressed that the distribution agreements are like "a gun to [their] head[s]" insofar as Google can cut off revenue share if they "do anything they don't like." Rem. Tr. at 723:7-21 (Shevelenko) (discussing PXR0314); *id.* at 726:6-21 (Shevelenko). Plaintiffs also point to instances when an OEM (Motorola) feared retaliation from Google if it struck a deal with

207

Microsoft and a carrier (AT&T) worried that adding Perplexity as an alternative assistant service might breach the RSA.  Pls.' Br. at 66 (citing Pls.' PFOF ¶¶ 340, 421, 424); *see* Laflamme Rem. Dep. at 108:14–110:15 (discussing PXR0139 at -177); Ezell Rem. Dep. at 47:3–48:14.

These proposed remedies fail on both legal and evidentiary grounds.

Plaintiffs do not dispute that the final judgment is subject to Federal Rule of Civil Procedure 65(d), which requires that every order granting an injunction must "describe in reasonable detail . . . the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1)(C); *see* Pls.' Br. at 73 (arguing that the Technical Committee provision satisfies Rule 65(d)); Pls.' Reply Br. at 4–5 (arguing that their RPFJ satisfies Rule 65(d)).  The Supreme Court has interpreted that rule to require "explicit notice of precisely what conduct is outlawed," *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974), and the D.C. Circuit has "held injunctions to be too vague . . . when they include, as a necessary descriptor of the forbidden contract, an undefined term that the circumstances of the case do not clarify," *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009).  The "meaning" of an injunction's terms "is constrained by the context in which they are actually used in the injunction."  *Nat'l Org. for Women v. Operation Rescue*, 37 F.3d 646, 657 (D.C. Cir. 1994).

Neither the anti-retaliation nor the anti-circumvention provisions satisfy the Rule 65(d) standard.  The anti-retaliation provision broadly proscribes retaliation "in any form," without providing any specifics about what type of conduct might constitute a retaliatory act.  Pls.' RPFJ § X.E.  Distinguishing retaliation from sharp-elbowed business conduct cannot be easily determined without some metes and bounds.

The main anti-circumvention provision is likewise too vague.  It would bar Google from "conduct designed to replicate the *effect* of any behavior found by the Court to violate the Sherman

208

Act." *Id.* § X.F.1. (emphasis added). Plaintiffs' focus on "effects" sweeps in a host of possible anticompetitive conduct that bears no resemblance to the exclusive agreements the court found unlawful. The prohibition on "substantially similar" conduct is likewise flawed. *Id.* The D.C. Circuit has rejected that type of comparator language as lacking the necessary detail when unaccompanied by exemplars. *See Philip Morris*, 566 F.3d at 1137 (first citing *Gulf Oil Corp. v. Brock*, 778 F.2d 834, 843 (D.C. Cir. 1985) (order enjoined "substantially similar" conduct without further specification and provided no examples of what would be "similar"); and then citing *Common Cause v. Nuclear Reg. Comm'n*, 674 F.2d 921, 926–27 (D.C. Cir. 1982) (order enjoined conduct "similar in nature" without further specification and provided no examples of what would be "similar")). Finally, a bar on "any conduct with the purpose or effect of evading or frustrating the intended purposes of [the] Final Judgment" is so ambiguous as to offer scant notice of what conduct would violate the judgment. Pls.' RPFJ § X.F.1. And, to top it all off, the anti-circumvention provision is "worldwide in scope," even though the only relevant geographic market is the United States. *Id.* § X.F.2; *see Google*, 747 F. Supp. 3d at 107. The "mini" anti-circumvention provisions fare no better, as they typically contain the same boilerplate text that "Google may not undertake any action or omission with the purpose or effect of circumventing or frustrating the purposes of this Section or any of its provisions." *See, e.g.*, Pls.' RPFJ §§ IV.K, VI.G, VII.H, VIII.F, IX.F, X.G.[29]

The anti-retaliation provision also rests on a shaky evidentiary foundation. Shevelenko's colorful description of Google is no more than lay opinion testimony based on the "spirit" of his conversations with unidentified persons at OEMs and carriers. Rem. Tr. at 723:14-21

---

[29] The only differently worded provision is Section IV.J, which states that "Google may not make payments permitted under Paragraphs IV.A, B, E, or G with the purpose or effect of circumventing or frustrating the purposes of this section." Other than identifying a category of conduct—making payments—this provision is as ambiguous as the other "mini" anti-circumvention provisions.

209

(Shevelenko).[30]  Such opinion testimony not backed by any actual examples of retaliation carries little weight.  The other evidence cited by Plaintiffs—expressions of concern by partners about *possible* retaliation by Google—also does not move the needle.  This lack of evidence stands in contrast to the findings of *actual* retaliation by Microsoft that supported the anti-retaliation measures imposed in that case.  *See New York I*, 224 F. Supp. 2d at 166–67 ("The factual and liability findings in this case evidence a practice by Microsoft of threatened and actual retaliation against Apple and Intel . . . ."); *id.* at 212 ("The factual and liability findings in this case portray a practice by Microsoft of threatened and actual retaliation against software and hardware vendors for engaging in action which promotes or supports non-Microsoft middleware.").  The court therefore rejects both the anti-retaliation and anti-circumvention provisions proposed by Plaintiffs.

###    B.    Technical Committee

Plaintiffs propose that the court establish a Technical Committee to facilitate enforcement of and compliance with the final judgment.  *See* Pls.' RPFJ § X.A.  Google urges the court not to do so.  Google's Br. at 72–74.  Its primary complaint is about the Committee's broad responsibilities, which it says runs afoul of its "Due Process rights and Article III."  *Id.* at 72.  Google also protests the Committee's composition and the selection process.  *Id.* at 73.  As contemplated by Plaintiffs, the Technical Committee would consist of five members.  Pls.' RPFJ § X.A.3.  U.S. Plaintiffs and Plaintiff States each would select one member and Google would select a third.  *Id.*  That trio, known as the "Standing Committee Members," together would choose the other two if not by consensus, then by a majority vote (two of the three must agree on an added member).  *Id.*  Google says that this process effectively means that it would appoint only one of the five members.  Google's Br. at 73.

---

[30] The court on hearsay grounds did not allow Plaintiffs to elicit the content of those communications for their truth. Rem. Tr. at 723:22–724:5 (Shevelenko).

The establishment of a Technical Committee to assist the plaintiffs and the court in enforcing equitable antitrust remedies is not unusual. The district court overseeing the Microsoft–U.S. consent decree approved such a body to help with enforcement. *See United States v. Microsoft*, 231 F. Supp. 2d 144, 196–200 (D.D.C. 2002) [hereinafter *Microsoft IV*]; *see also Massachusetts*, 373 F.3d at 1243–44 (affirming this approval). More recently, the Ninth Circuit did the same in *In re Google Play Store*. *See* 2025 WL 2167402, at *22. The court there observed that a technical committee "comports with federal courts' long history of utilizing appointed experts and provides a process to review and resolve inevitable disputes between the parties— ideally without further need for judicial intervention." *Id.*

Google's objection that the Technical Committee will wield too much authority is largely mooted by the court's narrowing of some proposed remedies and its rejection of others. The Technical Committee no longer will have responsibilities relating to (1) divestiture, Pls.' RPFJ §§ III.B, F, V.A, C; (2) additional Search Index signals, *id.* § VI.A.3; (3) Ads Data, *id.* § VI.F; (4) the frequency of data disclosures, *id.* § VI.A, C; (5) other query rewriting features, *id.* § VII.A.3; (6) synthetic queries, *id.* § VII.E; (7) choice screens, *id.* § IX.D; or (8) a public education campaign, *id.* § IX.E.

The Technical Committee still will carry out important functions. It will (1) advise Plaintiffs about potential Qualified Competitors, *id.* § III.U; (2) recommend reasonable data security standards applicable to Qualified Competitors, *id.* § X.A.7.b; (3) advise about an appropriate cap on User-side Data disclosure, *id.* § VI.C; (4) consult with Plaintiffs about appropriate User-side Data security and privacy safeguards, *id.* § VI.D; (5) help formulate a tapering rate for search syndication, *id.* § VII.C.2; (6) audit Qualified Competitors' use of search syndication services, *id.* § VII.C.3; and (7) receive disclosures from Google about Search Text

211

Ads auction changes, *id.* § VIII.D.  These are largely process responsibilities.  They fall squarely within the Committee's proper "role [of] providing technical competence to the [Plaintiffs] in [their] enforcement of the decree."  *Massachusetts*, 373 F.3d at 1244.  None are a "substitute for the enforcement authority of [Plaintiffs]" or the court.  *Id.* (citation omitted).

Certainly, Plaintiffs and the Technical Committee will have to establish standards and processes.  That will be part of the "practical workings" of the final judgment.  *Massachusetts*, 373 F.3d at 1244 (citation omitted).  In no sense, however, will the Committee be "mak[ing] up the terms [of the final judgment] as they go along."  Google's Reply at 23.  The court therefore approves forming a Technical Committee as part of the final judgment.

Google's concerns over the Technical Committee's composition and selection process are without merit.  Google seems to believe it deserves an equal seat at the table.  Google's Br. at 73.  But that misconstrues the Committee's purpose.  Its role is "to inform and assist the Government in its enforcement efforts," *Massachusetts*, 373 F.3d at 1244, not to act as a "neutral arbiter," Google's Br. at 73; *see also Microsoft IV*, 231 F. Supp. 2d at 197 (describing the Technical Committee as the "enforcement arm of the government").  Google compares this Technical Committee to the one established in *Microsoft*, pointing out that the committee in that case had three members—one member selected by each side and the third selected collectively by the first two.  Google's Br. at 73 (citing *Microsoft IV*, 231 F. Supp. 2d at 196–97).  But there is nothing sacrosanct about a three-person committee.  And Google simply presumes that its chosen member will disagree with the other two as to who will join them.  There is no reason to believe that such an outcome is inevitable.

The court will change the Technical Committee proposal in one respect.  Section X.A.2 of Plaintiff's RPFJ lists the subject matters of expertise that the Committee members in combination

must possess: "software engineering, information retrieval, artificial intelligence, economics, and behavioral science." To that list the court adds "data privacy and data security." Such expertise will be needed to address the important data privacy and data security issues arising from the Search Index and User-side Data remedies.

### C.    Investment Notification Requirement

Plaintiffs propose that Google provide them with notice before it completes a broad range of transactions with other firms. Pls.' RPFJ § IV.H–I. Google would have to report to Plaintiffs its intent to "acquire any interest in, or part of, any company; enter into a new joint venture, partnership, or collaboration; or expand an existing joint venture, partnership, or collaboration, with any company that competes with Google in the GSE or Search Text Ads market or any company that controls a Search Access Point or GenAI product." *Id.* § IV.H. Google would have to provide notice 30 days in advance of closing, and its disclosure would have to conform to the regulatory notice requirements under the Hart–Scott–Rodino Antitrust Improvements Act of 1976 ("HSR"), 16 C.F.R. Part 803—though Google would not have to provide notice if the transaction already is subject to HSR reporting. *Id.* § IV.I.1–.2.[31] In effect, the remedy would require reporting of transactions under the relevant HSR reporting thresholds. Rem. Tr. at 5008:25–5009:3 (Closing Arg.) ("[W]e're talking the approach of [HSR], but we're saying . . . the thresholds should not apply."). Google would not be permitted to complete a proposed transaction until 30 calendar days after submitting all requested information. *Id.* § IV.I.2.

---

[31] The Hart–Scott–Rodino Antitrust Improvements Act of 1976 "establish[ed] notification and waiting requirements for large acquisitions and mergers," in order "to facilitate Government identification of mergers and acquisitions likely to violate federal antitrust laws before the proposed deals are consummated." *Pharm. Rsch. & Mfrs. of Am. v. FTC*, 790 F.3d 198, 199 (D.C. Cir. 2015). For 2025, the "minimum size of transaction threshold" to trigger reporting requirements is $126.4 million. *See New HSR Thresholds and Filing Fees for 2025*, FED. TRADE COMM'N, https://perma.cc/XK22-ZAZN (last visited Aug. 27, 2025).

Plaintiffs defend this notice requirement as an anti-circumvention provision. *See* Pls.' Br. at 68 ("This minimally burdensome provision prevents circumvention of Plaintiffs' remedies by informing Plaintiffs of transactions related to markets that Google has monopolized and products that serve as critical inputs to these monopolized markets."). As Plaintiffs see it, such notice will enable them "to intervene before any acquisition or join[t] venture by Google undercuts the final judgment's efforts to restore competition," *id.* at 70, and "to understand how a marketplace is evolving at a time of great change," Rem. Tr. at 5010:1-2 (Closing Arg.).

The court in *New York I* rejected a similar, albeit significantly broader, reporting remedy. There, the plaintiffs wanted Microsoft "to report its investments, regardless of size or significance, in a wide array of technologies and businesses," which the plaintiffs argued would "assist law enforcement authorities in monitoring Microsoft's investment activities for violations of the antitrust laws." *New York I*, 224 F. Supp. 2d at 191–92; *see id.* at 265 ("Plaintiffs have included in their remedy proposal a provision which requires Microsoft to provide Plaintiffs with written notice of its investments in computer and electronic product manufacturing, computer and computer peripheral equipment and software wholesalers, telecommunications, cable networks and program distribution, finance and insurance, and computer system design, as well as its acquisition of an exclusive license of technology or intellectual property 60 days in advance of such investment."). In declining to impose the remedy, the court observed that this provision "is so far removed from any liability in this case, it is difficult to understand the manner in which Plaintiffs believe such a provision will satisfy the objectives of an antitrust remedy." *Id.* at 192.

The same can be said about Plaintiffs' Investment Notification Requirement. The remedy is not tailored to fit Google's unlawful conduct, as the court's liability determination involved no anticompetitive acquisition or joint venture by Google. Granting Plaintiffs' request would be

tantamount to attempting to restrain future violations of the antitrust laws that are not related to the unlawful acts, which the court cannot do. *See Zenith Radio*, 395 U.S. at 133.

## D.    Self-Preferencing Prohibitions

In Section V.B of their RPFJ, Plaintiffs ask the court to restrict Google from engaging in a wide array of "self-preferencing" behavior. Under that amorphous label, Plaintiffs would have the court not allow Google to:

1.    make any GSE, Search Access Point, GenAI Product, or On-Device AI explicitly or implicitly mandatory on Android Devices, for example, by preventing interoperability between Android AICore or a Google Grounding API and Competitor products and services in the GSE or Search Text Ads markets;

2.    reduce, prevent, or otherwise interfere with the distribution of a Competitor['s] GSE, Search Access Point, or GenAI Products;

3.    degrade any aspect of quality, including the features, functionality, or user experience, on a Competitor's GSE, Search Access Point, or GenAI Products;

4.    explicitly or implicitly, directly or indirectly, prevent or discourage manufacturers or other Android partners (e.g., carriers) from working with Competitors' GSE, Search Access Point, or GenAI Products;

5.    explicitly or implicitly, directly or indirectly, punish or penalize manufacturers or other Android partners (e.g., carriers) that work with Competitors' GSE, Search Access Point, or GenAI Products; or

6.    otherwise use its ownership and control of Android to explicitly or implicitly, directly or indirectly, force or coerce manufacturers or other Android partners (e.g., carriers) to (i) work with Google's GSE or GenAI Products or (ii) give Google's products and services any better treatment than given Competitors' products.

Pls.' RPFJ § V.B.

Plaintiffs envision these restrictions as anti-circumvention measures. Pls.' Br. at 70–71; Rem. Tr. at 5011:17–5012:6, 5014:1-7 (Closing Arg.). "With the distribution remedies prohibiting many contractual means of distributing Google Search," they say, "Google may well turn to self-

preferencing, especially with Android, as a substitute." Pls.' Br. at 70. The self-preferencing prohibitions are therefore "necessary to ensure that 'there remain no practices likely to result in monopolization in the future.'" *Id.* (quoting *Microsoft III*, 253 F.3d at 103).

Plaintiffs cite various product integrations as examples of Google self-preferencing its own products. The primary one is Google's development of AICore, an Android software module developed by Google that supports the use of Google's on-device LLM, Gemini Nano. *See id.*; FOF ¶ 24. Plaintiffs offer additional examples of "self-preferencing," too. They include: (1) the availability of Google Lens—a visual search feature that returns results in response to an image or screenshot—only if Google Search is set as the default on Chrome; (2) an integrated shortcut in the Chrome address bar (by typing @Gemini) to run queries through Gemini; (3) making Gemini the primary agent in Chrome; and (4) the integration of Circle to Search into Android—a feature that enables users to initiate a Google search without having to switch apps by circling an object on their screen. *See* Pls.' Br. at 70–71; Pls.' PFOF ¶¶ 551–552, 554–555, 557–558, 560–561; *see also* FOF ¶¶ 72–76 (discussing Circle to Search and Google Lens).

The court rejects Plaintiffs' self-preferencing prohibitions for reasons both legal and factual. First the legal problem. The self-preferencing actions that Plaintiffs seek to preemptively stamp out are not "of the same type or class as [the] unlawful acts" that the court found Google to have committed. *See Zenith Radio*, 395 U.S. at 132 (citation omitted). They are not "other related unlawful acts." *Id.* at 133 (citation omitted). Nor are they "legal conduct which, by [their] relation to the illegal and anticompetitive conduct, perpetuates the antitrust violator's restraint on trade." *New York I*, 224 F. Supp. 2d at 108. The court made no finding in the liability phase that Google's giving preferential treatment to its own search product was unlawful. Such conduct was hiding in plain sight: Google Search is the default search engine on Chrome. Plaintiffs were aware of the

216

"market reality" that 20% of searches conducted in the United States occur through the Chrome default, *see Google*, 747 F. Supp. 3d at 120, but they never alleged that such self-preferencing was illegal.  The court did have before it one alleged anticompetitive act of self-preferencing—Google's leveraging of SA360 to advantage its own ad platform over Microsoft's—but the court found Google not liable for that conduct.  *See id.* at 181–85.  Plaintiffs may fear that Google will come up with new ways to use other products to enhance the availability of its search offerings and that such behavior *could* prove to be anticompetitive.  But the court cannot simply enjoin "all future violations of the antitrust laws."  *Zenith Radio*, 395 U.S. at 133; *see Massachusetts*, 373 F.3d at 1223–24 ("[W]hen the district court undertakes to block the untraveled roads by adopting a forward-looking provision, its discretion is necessarily less broad because, without liability findings to mark the way, it is in danger of imposing restrictions that prevent the defendant from forging new routes to serve consumers.").

The bar on self-preferencing also goes too far in that it would hamstring Google's ability to compete.  Take, for example, Plaintiffs' proposal to prohibit Google from self-preferencing Gemini in Chrome.  Such a restriction would set Google apart from its competitors.  It is commonplace for companies in the GenAI space to leverage their own products to distribute their GenAI technologies.  Meta, for instance, delivers its GenAI models through Instagram and WhatsApp.  FOF ¶ 50.  xAI makes Grok available through X.  FOF ¶ 54.  Microsoft has integrated Copilot into Edge and Bing, both as a vertical and through Copilot Answers (Microsoft's AI-powered search feature analogous to Google's AI Overviews).  FOF ¶ 51.  And emerging GenAI companies are doing the same.  Perplexity, for example, recently launched a web browser that integrates its own answer engine.  FOF ¶ 53.  The court will not hobble Google's competitiveness by prohibiting self-preferencing of its own GenAI technologies, when that is precisely how the

217

emerging—and highly competitive—GenAI marketplace operates. *See Bausch & Lomb*, 321 U.S. at 728 (observing that Congress, "in enacting remedies to enforce the antimonopoly statutes," has not "indicated an intention to interfere with ordinary commercial practices"); *see also* FOF ¶¶ 56–61.

Plaintiffs' self-preferencing prohibitions also suffer from a lack of proof. Take Plaintiffs' concerns about AICore. Plaintiffs seem to worry that the presence of AICore on an Android device will crowd out other on-device AI models because AICore blocks access to the specialized hardware needed to run such models, including TPUs and NPUs. *See* Pls.' PFOF ¶¶ 567–573; Pls.' RPFOF ¶¶ 1243–1244; Rem. Tr. at 3962:11-20 (Samat); *id.* at 1556:5-9 (Mickens) ("AICore is a gatekeeper, if you will, for access to the TPU/NPU accelerators . . . ."). But AICore does not block other on-device models from accessing this hardware. FOF ¶ 25; Rem. Tr. at 3964:24–3965:1 (Samat) ("It's not the case that the presence of AICore excludes other on-device models from running on these devices."); *see also id.* at 3966:6-11 (Samat) (Google has not "architected [AICore] in a way that provides any special capabilities" to accessing TPUs or NPUs). And there are devices on the market now that contain more than one on-device AI model. FOF ¶ 26.

Plaintiffs' concerns about Google using Google Lens and Circle to Search anticompetitively exemplify the breadth and ambiguity of the proposed self-preferencing remedy. Google Lens is a feature of Google Search, and if a Chrome user does not have Google Search as the default, the user cannot access Google Lens (except through Google.com). FOF ¶¶ 74–75. Thus, Google Lens is simply a design feature of Google Search. It is not an example of self-preferencing.

Nor is Circle to Search. That new search access point is available through open-source Android and requires an OEM to modify its user interface to permit circling on a screen.

218

FOF ¶¶ 72–73; Rem. Tr. at 3908:25–3910:25 (Samat).  The OEM then selects the search engine that will answer the query (a visual one), which may be Google or some other search product. FOF ¶ 73 (citing Rem. Tr. at 3908:25–3910:24 (Samat) (confirming that Circle to Search can be used with a search application other than Google and discussing Perplexity's visual search offering)).  Circle to Search therefore is not a case of Google self-preferencing its own search product.  It is another channel of search distribution.  Like other channels, the court's remedies are designed to make that channel available to rivals through competition.

This is not to say the court is insensitive to the risk of circumvention given, for example, Google's aggressive efforts to avoid creating a paper trail for regulators and litigants.  *See Google*, 747 F. Supp. 3d at 187.  The court remains prepared to modify the decree or otherwise act should Google's compliance become an issue.

## VI.    EFFECTIVE DATE AND TERM OF FINAL JUDGMENT

The parties disagree about the term of the final judgment, as well as its effective date. Plaintiffs propose 10 years, with the possibility of early termination by mutual consent or if Google fully complies and can show that the combined market share of its rivals is greater than 50%. Pls.' RPFJ § XII.  Plaintiffs ask that the final judgment become effective 30 days after it is entered. *Id.*  Google, on the other hand, asks for a three-year term, Google's RPFJ § V.C, and an effective date 120 days after entry of the final judgment, *id*. § V.A.

The court believes that a six-year term is appropriate.  That term accounts for the court's expectation that it will take one year to establish the Technical Committee and the processes necessary for execution.  Among the administrative challenges the court envisions include (1) establishing guidelines to identify Qualified Competitors, (2) Google's development of any

219

infrastructure needed to carry out its data-sharing and syndication obligations, and (3) the all-important application of privacy-enhancing techniques to anonymize User-side Data.

Google's proposed term of three years is simply too short. As Plaintiffs rightly point out, Google's monopoly has endured for more than a decade, with little meaningful market entry. Pls.' PFOF ¶¶ 938, 940–941. Moreover, regulatory efforts in Europe that began five years ago to instill greater competition, such as a forced choice screen and, more recently, compelled data-sharing, have not moved the needle. Rem. Tr. at 2174:23–2175:19 (Chipty). And then there is the expected time, measured in years, it will take for a competitor to develop the capacity to compete with Google. A three-year term, with no dispensation for ramp-up time, is not enough for the remedies to have positive market impacts. It also is too short a timeline for the court to "clarify[] and reconsider[]" the final judgment "in light of changing market realities"—or the lack of such change. *Alston*, 594 U.S. at 106–07; *see also United Shoe*, 391 U.S. at 251 (describing the court's "duty . . . to modify the decree so as to assure the complete extirpation of the illegal monopoly").

On the other hand, the court is mindful that "'continuing supervision of a highly detailed decree' could wind up impairing rather than enhancing competition," *Alston*, 594 U.S. at 102 (quoting *Trinko*, 540 U.S. at 415), and "that markets are often more effective than the heavy hand of judicial power when it comes to enhancing consumer welfare," *id.* at 106. Plaintiffs' proposed 10-year term runs the risk of growing stale in these fast-moving times, where GenAI technologies are breaking barriers seemingly at light speed. For the first time in over a decade, there is a genuine prospect that a product could emerge that will present a meaningful challenge to Google's market dominance. As Apple's Eddie Cue put it:

> [F]or the first time, I think there's an opportunity [to challenge Google] because there's new technology. . . . And until there was some change in technology that kind of revolutionizes or changes something, I don't think there's anything that going to change

220

> Google being the best. . . .  [W]e're seeing some real . . . investment
> by taking LLMs and search indexes and combining those two things
> to provide what I think is potentially a better experience. . . .  So this
> is an interesting and, I think, a great time for customers.

Rem. Tr. at 3827:13–3829:2 (Cue).  Technological advancement and product differentiation are

what will change market dynamics, not a decade-long judicial decree.  For that reason, the court

believes that a five-year term, plus an additional one year to put the infrastructure and processes

in place to implement the remedies, is appropriate.

This term is consistent with the five-year term adopted in *Microsoft*.  There, the settling

plaintiffs, including the United States, requested a five-year term for the decree, departing from

the usual 10 years, "because of the pace of technological change in the computer industry" and

because a 10-year term risked "becom[ing] highly regulatory in nature."  *Microsoft IV*,

231 F. Supp. 2d at 195.  The court agreed with the five-year term in part due to the industry's

"constant and rapid change."  *See New York I*, 224 F. Supp. 2d at 183–84.

As to the effective date, the final judgment shall take effect 60 days after it is entered,

except as to those portions of Section X.A of the Plaintiffs' RPFJ that require the parties to take

steps toward forming the Technical Committee and that address the start of its work, which will

be effective immediately.

## VII.   REMAINING PROVISIONS

### A.   Definition of "Google"

The court directs the parties to a minor issue likely to cause major administrative

headaches: Plaintiffs' definition of "Google."  Plaintiffs define the term to mean "Defendant

Google, LLC, a limited liability company organized and existing under the laws of the State of

Delaware, headquartered in Mountain View, California, its parent Alphabet, Inc., their successors

and assigns, subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their

221

directors, officers, managers, agents, and employees." Pls.' RPFJ § III.L. It is hard to conceive of anyone at Alphabet or any Alphabet-related entity excluded from this definition.

The definition's breadth poses problems for implementing parts of the final judgment proposed by Plaintiffs. For example, Google's appointed compliance officer "must supervise the review of Google activities to ensure they comply with this Final Judgment." *Id.* at § X.B.3. Surely, Plaintiffs do not intend for the compliance officer's duties to reach such Alphabet subsidiaries like YouTube, Nest, or Waymo. Additionally, Plaintiffs would have "all officers and employees of Google" receive a copy of the final judgment, trained annually on the final judgment and antitrust laws, and certify that they have read the final judgment. *Id.* § X.B.4.a, c, d, f. Alphabet reportedly now has over 185,000 employees. *See Alphabet Inc. (GOOGL)*, STOCK ANALYSIS, https://perma.cc/2B6A-AEB6 (last visited Sept. 1, 2025). Plaintiffs cannot reasonably believe that such wide-ranging notice and compliance measures are appropriate.

The court takes no position on this issue. It will leave it to the parties in the first instance to constrain the definition of "Google" and to reach—hopefully, mutually agreeable— implementation provisions.

### B.    Fees and Costs

The court will not include in the final judgment Section XIV of Plaintiffs' RPFJ, which awards fees and costs to Plaintiffs. A request for such an award will have to be made by separate motion.

### CONCLUSION

For the reasons discussed, the court accepts, with its modifications, Google's proposed remedies in full and adopts Plaintiffs' proposed remedies in part. The parties shall meet and confer and, by September 10, 2025, submit a revised final judgment that is consistent with this

222

Memorandum Opinion.  That revised final judgment shall reconcile Section III of Google's RPFJ

and those portions of Plaintiffs' RPFJ, as modified, that the court has agreed to adopt.  Any request

for clarification or any dispute that may arise should be set forth in a Joint Status Report filed on

that same date, which identifies the issue and sets out the parties' respective positions.


Dated:  September 2, 2025

                                                        Amit P. Mehta
                                              United States District Court Judge

## APPENDIX

### I.    LIVE WITNESSES

#### A.    Fact Witnesses

| Name | Title | Affiliation | Called By |
|---|---|---|---|
| Jesse Adkins | Director of Product Management | Google | Google |
| Eli Collins | Vice President of Product, Google DeepMind | Google | Google |
| Eduardo Cue | Senior Vice President of Services | Apple | Google |
| Adam Epstein | Co–Chief Executive Officer & President | adMarketplace | Plaintiffs |
| Peter Fitzgerald | Vice President of Platforms & Devices Partnerships, Global Partnerships | Google | Plaintiffs |
| Sissie Hsiao | *former* General Manager of Gemini App | Google | Plaintiffs |
| Eric Muhlheim | Chief Financial Officer | Mozilla Corporation | Google |
| Omkar Muralidharan | Vice President of Product, Search Ads | Google | Google |
| Sundar Pichai | Chief Executive Officer | Google | Google |
| Brian Provost | Senior Vice President & General Manager, Yahoo Search | Yahoo | Plaintiffs |
| Elizabeth Hamon Reid | Vice President of Google Search | Google | Google |
| Sameer Samat | President of the Android Ecosystem | Google | Google |
| Michael Schechter | Vice President of Growth, Bing | Microsoft | Plaintiffs |
| Dmitry Shevelenko | Chief Business Officer | Perplexity | Plaintiffs |
| Parisa Tabriz | Vice President of Engineering & General Manager for Chrome | Google | Plaintiffs |
| Nick Turley | Head of Product, ChatGPT | OpenAI | Plaintiffs |
| Paul Vallez | Executive Vice President, Strategic Business Development & Product Partnerships | Skai | Plaintiffs |
| Gabriel Weinberg | Chief Executive Officer | DuckDuckGo | Plaintiffs |

224

## B.    Expert Witnesses

| Name | Title | Affiliation | Called By |
|---|---|---|---|
| James Allan | Professor | Manning College of Information and Computer Sciences at the University of Massachusetts Amherst | Google |
| Tasneem Chipty | Founder & Managing Principal | Chipty Economics, LLC | Plaintiffs |
| Chris Culnane | Principal & Consultant | Castellate Consulting Ltd. | Google |
| Greg Durrett | Associate Professor of Computer Science | The University of Texas at Austin | Plaintiffs |
| David Evans | Professor of Computer Science | University of Virginia | Plaintiffs |
| Lorin Hitt | Zhang Jindong Professor of Operations, Information & Decisions | University of Pennsylvania | Google |
| Mark Israel | Founding Partner | Econic Partners | Google |
| Kinshuk Jerath | Arthur F. Burns Professor of Free & Competitive Enterprise & Professor of Business | Columbia Business School | Plaintiffs |
| Michael Luca | Professor | Johns Hopkins University Carey Business School | Plaintiffs |
| James Mickens | Gordon McKay Professor of Computer Science | Harvard University | Plaintiffs |
| Kevin Murphy | George J. Stigler Professor of Economics (Emeritus) | University of Chicago Booth School of Business and Department of Economics | Google |
| Jason Nieh | Professor of Computer Science & Co-Director of the Software Systems Laboratory | Columbia University | Google |
| Antonio Rangel | Bing Professor of Neuroscience, Behavioral Biology & Economics | California Institute of Technology | Plaintiffs |

## II.    DESIGNATED DEPOSITION TESTIMONY

| Name | Title | Affiliation | Called By |
|---|---|---|---|
| Frank Boulben | Chief Revenue Officer, Verizon Consumer Group | Verizon | Google |
| Eli Collins | Vice President of Product, Google DeepMind | Google | Plaintiffs |
| Robert Cromwell | Vice President of Engineering | Microsoft | Plaintiffs; Google |
| Jeffrey Ezell | Vice President of Business Development | AT&T | Plaintiffs |
| Nicholas Fox | Senior Vice President, Knowledge & Information | Google | Plaintiffs |
| Jeffrey Giard | Vice President of Strategic Partnerships & Business Development | T-Mobile | Plaintiffs |
| Jay Kim | Head of the Customer Experience Office | Samsung | Google |
| Francois Laflamme | Chief Marketing & Strategy Officer | Motorola | Plaintiffs |
| Neal Pancholi | Director, Search Partnerships | Google | Plaintiffs |
| Phiroze Parakh | Trust Lead, Google Search | Google | Plaintiffs |
| David Smutny | Associate General Counsel, Competition Litigation | Microsoft | Google |
| Jan Standal | Senior Vice President of Product Marketing & Communication | Opera | Google |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-3010 (APM) |
| | ) | |
| GOOGLE LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| STATE OF COLORADO et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-3715 (APM) |
| | ) | |
| GOOGLE LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

### I.      INTRODUCTION

The age-old saying "the devil is in the details" may not have been devised with the drafting of an antitrust remedies judgment in mind, but it sure does fit.

On September 2, 2025, the court issued a Memorandum Opinion ("Remedies Opinion"), ECF No. 1435 [hereinafter Rem. Op.], following its determination that Defendant Google LLC had maintained monopolies in the general search services and general search text advertising markets through exclusive distribution agreements in violation of Section 2 of the Sherman Act. *See United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024).  The Remedies Opinion

recounted the case's procedural history; made new findings of fact, particularly with respect to emerging generative AI ("GenAI") products; discussed the legal principles animating the court's decision; and determined the scope of remedies sufficient to "pry open" the markets closed by Google's antitrust violations. The court agreed that Google's proposed prohibitory injunctions were a start. Rem. Op. at 107. But it also held that, to be effective, the remedies should include some of Plaintiffs' proposed behavioral remedies, including disclosure of information about Google's search index, compelled sharing of certain user data, and forced syndication of search results and search text ads, as well as a Technical Committee to assist Plaintiffs with their enforcement efforts. The court rejected more severe proposals, such as the divestiture of Chrome, mandated choice screens, and a complete payment ban, among others. *Id.* at 3–6.

The court then directed the parties to meet and confer and present a joint proposed final judgment consistent with the Remedies Opinion's findings and conclusions. *See id.* at 222–23.

That is when the devil reared its head. As has been true during much of this five-year-long litigation, the parties continued to see eye-to-eye on little, even with the benefit of the Remedies Opinion. They submitted two competing final proposed final judgments reflecting their respective interpretations of the Remedies Opinion with accompanying briefs explaining their positions. *See* Pls.' Br. in Supp. of Pls.' Final Proposed Final J., ECF No. 1442 [hereinafter Pls.' Br.]; Pls.' Br., Pls.' Final Proposed Final J., ECF No. 1442-1 [hereinafter Pls.' FPFJ]; Def. Google LLC's Br. in Supp. of Entry of its Proposed Final J., ECF No. 1441 [hereinafter Google's Br.]; Google's Br., App. to Google's Br., ECF No. 1441-1 [hereinafter Google's App'x]; Google's Br., Def. Google LLC's Proposed Final J., ECF No. 1441-2 [hereinafter Google's FPFJ].

The parties convened before the court on October 8, 2025, for a hearing on those proposed final judgments ("October 8th hearing"). *See* Tr. of Hr'g on Final J. Proceedings, ECF No. 1447

2

[hereinafter Hr'g Tr.]. A week later, Plaintiffs filed a Notice of Substitute Provisions offering modified versions of certain provisions in their proposed prohibitory injunctions that purported to reflect an updated understanding of the court's Remedies Opinion. *See* Pls.' Notice of Substitute Provisions, ECF No. 1449 [hereinafter Pls.' Suppl.]. Google responded a few days later. *See* Def. Google LLC's Resp. to Pls.' Suppl., ECF No. 1451 [hereinafter Google's Suppl.].

Having now heard hundreds of hours of testimony, reviewed thousands of pages of exhibits and briefing, and considered all the relevant law and authorities across both the liability and remedies phases, the court at long last enters the Final Judgment against Google. While the Remedies Opinion broadly established the court's remedy-specific conclusions of law, the court now explains with more granularity the reasons for adopting, rejecting, or modifying the specific provisions of the parties' most recent proposed final judgments. *See United States v. Microsoft Corp.* (*Microsoft III*), 253 F.3d 34, 103 (D.C. Cir. 2001) (en banc) (holding that the district court must "provide an adequate explanation for the relief . . . ordered" and "explain[] how its remedies decree would accomplish [the] objectives" of antitrust remedies established by the Supreme Court); *cf. Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 (2004) ("No court should impose a duty to deal that it cannot explain or adequately and reasonably supervise." (citation omitted)).

Rather than regurgitate the whole of the Remedies Opinion or scrutinize every word of the parties' proposals, this opinion highlights the parties' major disagreements and explains how the court resolves them in the Final Judgment. For completeness, the court also includes an Appendix identifying the finer differences between the parties' proposals and the language the court ultimately adopts.

## II.    GENERAL PRINCIPLES

The court starts with three preliminary points.  *First*, in their briefs and at the October 8th hearing, the parties repeatedly offered as a basis for advancing their positions that, by deciding in the Remedies Opinion to impose or modify a certain remedy, the court had "adopted" text from the party's proposed final judgment, or that their proposed provisions "track" the Remedies Opinion while the other's depart.  *See, e.g.*, Hr'g Tr. at 21:13-17; *id.* at 41:18–42:10; Pls.' Br. at 11–12, 28–29; Google's Br. at 10, 13, 15.  Such arguments rest on an incorrect assumption.  As emphasized at the hearing, to the extent the court "adopted" anything offered by a party, it was a proposed remedy as a general concept, not the text offered to define it.  Hr'g Tr. at 21:18–22:3. "It is a federal court's judgment, not its opinion, that remedies an injury."  *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023).  The court exercises its remedial authority in this case through the Final Judgment; the Remedies Opinion and the one at hand merely explain the exercise of this authority. *See Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring); *cf. Trump v. CASA, Inc.*, 606 U.S. 831, 930 n.3 (2025) (Jackson, J., dissenting).

*Second*, the court reiterates the scope of its remedial authority.  "The remedy in a Section 2 enforcement action 'must seek' to 'unfetter a market from anticompetitive conduct,' 'deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future.'"  Rem. Op. at 58 & n.3 (quoting *Microsoft III*, 253 F.3d at 103).  Supreme Court precedent "uphold[s] equity's authority to use drastic measures to achieve freedom from the influence of the unlawful restraint of trade," as long as such measures "reasonably tend[] to dissipate the restraint and prevent evasions."  *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 726 (1944).  But the "[m]ere existence of an exclusionary act

4

does not itself justify full feasible relief against the monopolist to create maximum competition."
*Microsoft III*, 253 F.3d at 106 (citation omitted); *see also* Rem. Op. at 62–63.

Though these broad principles framed the court's task, the evidence (or lack of it) was the key to deciding whether to adopt or reject a proposed remedy. After all, "[t]here can be no remedy absent a factual basis to support it." Rem. Op. at 119. The court considered and rejected proposed remedies that could not be sufficiently justified by evidence. *See, e.g.*, *id.* at 119–28 (rejecting a payment ban because of anticipated harms to third parties); *id.* at 164–68 (declining to require Ads Data–sharing because Plaintiffs did not offer sufficient evidence as to how it would increase competition in the general search text ads market); *see also id.* at 128 n.14 (declining to consider a partial payment ban because of a lack of evidence). The court continues to be guided by the evidence in fashioning the specific terms of the Final Judgment.

*Finally*, "it is well settled that once the Government has successfully borne the considerable burden of establishing a violation of [antitrust] law, all doubts as to the remedy are to be resolved in its favor." *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 & n.18 (1961) (first citing *Bausch & Lomb*, 321 U.S. at 726; then citing *Loc. 167 of Int'l Bhd. of Teamsters v. United States*, 291 U.S. 293, 299 (1934)). Plaintiffs in this case have successfully borne this burden. *See Google*, 747 F. Supp. 3d at 32. Where any doubts remained after considering the evidence and the parties' positions, the court has deferred to Plaintiffs as to the appropriate remedial terms. *See also* Rem. Op. at 60 (citing 3 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 653f (5th ed. & Supp. 2025) [hereinafter AREEDA & HOVENKAMP] ("[A]ny plausible doubts should be resolved against the monopolist.")); *id.* at 66 n.4 (citing 3 AREEDA & HOVENKAMP ¶ 650a(2)(B) ("[I]t is always appropriate to deprive the defendant of the continuing

benefits of past misbehavior.  In devising the 'tailored' remedies for this purpose, reasonable doubts will ordinarily be resolved against the defendant.")).

With this understanding, the court now turns to those terms.  The court begins by addressing several definitions that are fundamental to the reach and effect of the Final Judgment. It then turns to the prohibitory injunctions and required data-sharing and syndication remedies. The court concludes by explaining how the Final Judgment will be enforced, in particular the Technical Committee's operations and the court's retention of jurisdiction.  The provisions not addressed in this opinion can be found in the Appendix.

## III.    DEFINITIONS

### A.    GenAI-Related Terms

GenAI plays a significant role in these remedies.  As a refresher, between the liability and remedies phases, GenAI burst on to the scene as a formidable nascent threat to general search engines (GSEs).  Rem. Op. at 2; *see also id.* at 99 ("[T]here is ample evidence that GenAI chatbots grounded in general search perform an information-retrieval function that is similar to GSEs."). The remedies phase thus became "as much about promoting competition among GSEs as ensuring that Google's dominance in search does not carry over into the GenAI space."  *Id.* at 2; *see also id.* at 106–07 ("GenAI products have emerged as a competitive threat to the traditional GSE, and Google cannot be permitted to leverage its dominance in general search to the GenAI product space.").

The court determined that GenAI products and companies should be included in the remedies insofar as GenAI products and GSEs share the capacity to "fulfill a broad array of informational needs."  *Id.* at 99–101; *see also id.* at 45–46 ¶ 66.  The court rejected Google's insistence that GenAI products should be excluded because they were outside the relevant markets

or untethered to Plaintiffs' theory of liability. *See id.* at 101. Expanding the scope of the remedies to include GenAI, the court held, was both within the court's authority and appropriate to ensure that Google's illegal conduct could not reverberate into that emerging market. *Id.* at 101–02 (citing *New York v. Microsoft Corp.* (*New York I*), 244 F. Supp. 2d 76, 128–29, 193 (D.D.C. 2002)).

Despite this, the parties maintain drastically different understandings of how a GenAI product should be defined for purposes of the Final Judgment. Plaintiffs would have "GenAI Product" mean "any application, software, service, feature, tool, functionality, or product that involves or makes use of Generative AI capabilities or models." Pls.' FPFJ § IX.J. Google offers no similar umbrella definition. Rather, in an effort to narrow the universe of GenAI products swept into the Final Judgment, it offers several different terms referring to discrete GenAI products or categories of products that have among their "principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information." *See* Google's FPFJ § IX.K, L, Y, Z.

The court adopts Plaintiffs' definition of "GenAI Product" with Google's specification that a GenAI Product, for purposes of this decree, have "among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information." *See* Final J., ECF No. 1462 [hereinafter FJ], § IX.J.

Google's discrete terms are too narrow. Taken together, they have the potential to exclude Google GenAI products beyond Google Gemini and Google Assistant or any product that is not strictly "a user-facing mobile software application . . . that makes use of generative AI capabilities or models." *See* Google's FPFJ § IX.K, L; *see also* Pls.' Br. at 28–29.

But Plaintiffs' proposed definition is exceedingly broad. The parties' shared definition of "GenAI" (as opposed to "GenAI Product") is "a type of artificial intelligence that creates new

content including but not limited to text, images, code, classifications, and other media using machine learning models." *See* Pls.' FPFJ § IX.I; Google's FPFJ § IX.H; *see also* Rem. Op. at 17 ¶ 2. Products that "involve[] or make[] use of [such] capabilities or models" encompass a near infinite swath of industries and products having nothing to do with GSEs or the illegal conduct at issue. *See* Google's Br. at 2–5.

GenAI products and companies were expressly included in the Final Judgment because of the growing integration of GenAI into search products. *See* Rem. Op. at 19 ¶ 6. But search and GenAI are not completely interchangeable. *See* Remedies Hr'g Tr., ECF Nos. 1393–1420 [hereinafter Rem. Tr.], at 21:2-5 (Opening Arg.) (Plaintiffs' counsel acknowledging that search and GenAI "are different but overlapping products" and that GenAI "is not a replacement for [s]earch today"); Rem. Op. at 43 ¶ 63. At least for now, GSEs and GenAI products have use cases not shared by the other. *See* Rem. Op. at 44 ¶ 65. Narrowing Plaintiffs' definition to products that have "among [their] principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information" better fits the purpose of including GenAI products within the remedial scheme.

Plaintiffs themselves acknowledge that the court "was clear that the final judgment shall extend to any GenAI Product with the 'capacity to fulfill a broad array of informational needs.'" Pls.' Br. at 28–29 (quoting Rem. Op. at 100). Yet in the same breath, they argue that "Google's attempt to restrict what GenAI Products are covered by the final judgment based on their form or 'principal function' . . . excludes relevant Google GenAI Products from the final judgment [and] ignores any possibility that nascent GenAI competitors may disrupt Google's market dominance through future innovations." *Id.* at 29. Although Plaintiffs stated later that it was "not [their] intention" to sweep in GenAI technologies such as those powering non-information-retrieval

8

functions in Google products like Photos, Gmail, or Drive, Hr'g Tr. at 114:5–115:9; *see* Google's Br. at 2–3, their proposal unequivocally does so.

For these reasons, the court has adopted the definition of "GenAI Product" described above.[1]  *See* FJ § IX.J.  The modification makes adopting Plaintiffs' definition of "Third-Party GenAI Product" appropriate.  *See* FJ § IX.CC; Pls.' FPFJ § IX.FF.  The court also adopts Plaintiffs' definition of "Google GenAI Product."  *See* FJ § IX.N; Pls.' § IX.N.  Finally, the court adopts Google's definition of "Google Assistant Application," as Plaintiffs' addition of "and . . . any Google GenAI Product" would have swallowed the rest of the definition into a nullity. *See* FJ § IX.M; Pls.' FPFJ § IX.M; Google's FPFJ § IX.K.

## B.    "Qualified Competitor" and "Competitor"

Because the data-sharing and syndication remedies are designed to directly benefit potential competitors in the relevant markets, it is necessary to define which emerging or extant competitors are eligible to enjoy them—that is, to determine who is a "Qualified Competitor."

To start, the court has adopted Plaintiffs' version of "Competitor."  *See* FJ § IX.E.  The parties' proposed definitions are not so far off, but Google's includes several qualifications. *Compare* Pls.' FPFJ § IX.E, *with* Google's FPFJ § IX.D.  Plaintiffs' version is simpler and reflects the court's directive to include GenAI; the court did not intend to broaden the definition of a Competitor to then narrow it again in unnecessary ways.  *See* Rem. Op. at 103–04 & n.8.

The parties agree that a Qualified Competitor should meet certain data security standards, agree to regular data security and privacy audits, not pose a risk to the national security of the United States, and make a sufficient showing of a plan to invest and compete in or with the GSE

---

[1] The court sees no material distinction between the definition of "GenAI Product" it has adopted and Plaintiffs' suggestion that their definition of "GenAI" should be left intact with their definitions of "Google GenAI Product" and "Third-Party GenAI Product" limited only to those products that can "fulfill a broad array of informational needs." Hr'g Tr. at 115:5-20.

9

and/or Search Text Ads markets.[2]  *See* Pls.' FPFJ § IX.W; Google's FPFJ § IX.T.  These criteria will ensure that the data-sharing and syndication remedies fulfill their intended purpose of increasing competition in the relevant markets.  *See* Rem. Op. at 129–36, 170–71.

The biggest disagreement among the parties concerns Google's proposal that a Qualified Competitor not only be initially certified as one but also annually recertified on those same criteria. *See* Google's FPFJ § IX.T.  Google points out that, because Qualified Competitors will be given an enormous quantity of valuable rights and data, "the incentives for mischief . . . will be enormous."  Hr'g Tr. at 26:13-18.  Google reasons that bad actors that are initially certified as Qualified Competitors could easily abandon a previously demonstrated "plan to invest and compete in or with" the relevant markets and potentially pose privacy and security risks or simply become a white label of Google.  *Id.* at 26:13–28:4.  In the absence of a recertification requirement, Google contends, the remedies could incentivize harmful or even anti-competitive behavior or allow it to escape detection.

Plaintiffs object to the recertification requirement as "unnecessary red tape."  *Id.* at 22:5-7.  Although they agree that a Competitor that abandons its plans to compete should be decertified, Plaintiffs argue that obvious, established contenders like Microsoft's Bing should not be subject to a yearly burden to continue to benefit from the remedy.  *Id.* at 22:5-8.  Putting up annual roadblocks burdening all Qualified Competitors rather than calling out Qualified Competitors on an individual basis "when there's suspicion" is, to Plaintiffs, an example of a "red-tape hoop" that Qualified Competitors must jump through that will delay getting "to a world where there's competition."  *Id.* at 25:4-11, 37:6-23.

---

[2] The court expressly revised the language "plan to invest and compete in" to "plan to invest and compete *in or with*" the relevant markets.  *See* Rem. Op. at 103–04 (emphasis added).  Google's FPFJ does not reflect this revision. *See* Google's FPFJ § IX.T ("plan to invest and compete with").  The court assumes this was error.

The court agrees with Google that an annual recertification requirement is prudent. The court shares Google's concern about companies initially certified as Qualified Competitors who might abandon their professed intent to compete and improperly take advantage of data releases or other remedies. *See id.* at 23:2–24:12. Some companies that already compete or have maintained their intent to compete in the relevant markets, such as Microsoft, DuckDuckGo, and OpenAI, will face no "red tape" in getting recertified. For new market participants, requiring them to make an annual showing of their continued intent to compete with Google should not prove to be overly burdensome.

Plaintiffs advance an audit procedure as an alternative to a recertification requirement. *Id.* at 25:4-11. But audits are conducted in hindsight, not with foresight. By the time a reason to initiate an audit arises, the mischief has likely already occurred, potentially with enormous consequences not only for Google but for its users whose data may be shared with a Qualified Competitor gone rogue. And Plaintiffs' suggestion that Qualified Competitors warranting decertification will be readily noticeable from their market activities (or lack thereof) suffers from the same infirmity. *See id.* at 24:16-25. By the time mischief's effects are felt in the market, it may be too late. To arrive at a "world where there's competition," the remedies must ensure that their purpose is effected through the entirety of the judgment period. An annual recertification requirement is a relatively simple prophylactic measure to keep bad actors from escaping detection. The court trusts that the Technical Committee and Plaintiffs will establish a recertification process that is neither difficult nor burdensome. *See id.* at 27:10-14.

Finally, Google would put the burden on the court to determine, sometimes in consultation with the Technical Committee, whether a Competitor meets the required data security standards, poses a national security risk to the United States, and has made a sufficient showing of a plan to

11

compete in or with the relevant markets. *See* Google's FPFJ § IX.T. Though Plaintiffs have hedged on this point, *see infra* Section VIII, the Final Judgment is enforced by Plaintiffs. *See Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1243 (D.C. Cir. 2004) ("[U]ltimately the power to enforce the terms of the decree rests with the government." (quoting *United States v. Microsoft Corp.* (*Microsoft IV*), 231 F. Supp. 2d 144, 198 (D.D.C. 2002))); *see also* Pls.' Br. at 21–24. And the Technical Committee exists to serve Plaintiffs in that effort. *See Massachusetts*, 373 F.3d at 1244; *see also In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 954 (9th Cir. 2025) (establishing a Technical Committee to "provide[] a process to review and resolve inevitable disputes between the parties—ideally without further need for judicial intervention").

As Google often emphasized in its remedies-phase briefs, "courts should never aspire to the role of central planners and must be sensitive to the possibility that the continuing supervision of a highly detailed decree could wind up impairing rather than enhancing competition." Def.'s Proposed Conclusions of L., ECF No. 1347, at 10 (internal quotation marks omitted) (quoting *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 102–03 (2021)). The court therefore adopts Plaintiffs' version, whereby those determinations are made by Plaintiffs, in consultation with the Technical Committee. *See* FJ § IX.V; *see also infra* Section VIII.

### C.    "Device"

Google proposes that a "Device" covered by the Final Judgment exclude devices running on the ChromeOS operating system.[3] Google's FPFJ § IX.F. It points out that "Plaintiffs never challenged agreements with companies that manufacture Chromebooks, let alone established that those agreements harm competition" and that the court rejected Plaintiffs' proposed self-preferencing ban. Google's Br. at 7–8 (citing Rem. Op. at 216–17). Google also contends that

---

[3] Google adopted the term "Covered Device" while Plaintiffs use "Device." *Compare* Pls.' FPFJ § IX.H, *with* Google's FPFJ § IX.F. The court opts to use "Device." *See* FJ § IX.H.

placing conditions on the distribution of Chrome could not be achieved with respect to devices running on ChromeOS because "the Chrome browser is the UI [user interface] for . . . a ChromeOS device or Chromebook." *Id.* at 8 (quoting Rem. Tr. at 3892:17-20 (Samat) (alteration in original)). In fact, Chrome and ChromeOS are so integrated that Google has not yet been able to separate them. *Id.* (citing Rem. Tr. at 2611:6-23 (Nieh)).

The court finds this reasonable. Plaintiffs insist that allowing Google to exclude ChromeOS-based devices would permit it to enter "nakedly exclusive" agreements with manufacturers of ChromeOS devices. *See* Pls.' Br. at 26–27; Hr'g Tr. at 117:24–118:8. The court does not share Plaintiffs' concern. Exclusive distribution of Chrome by a manufacturer of a ChromeOS device is not the kind of anticompetitive agreement that has been at issue in this case. Unlike distribution on Android or Apple devices or on a third-party browser, Chrome is a necessary component of a ChromeOS device. And although Google Search is the default search engine on Chrome, the court previously rejected a self-preferencing ban in part because Plaintiffs never pursued a theory of liability based on this fact. Rem. Op. at 216–17. Without a factual basis to support restricting exclusive distribution of Chrome on ChromeOS devices, the court cannot order Google be enjoined from entering into such agreements. *Cf. Google*, 747 F. Supp. 3d at 152 ("[E]xclusive agreements are not condemned per se by the antitrust laws, even if they involve a dominant firm."). The court also finds it reasonable to exclude ChromeOS-based devices from the remedies altogether, rather than, as Plaintiffs suggest, identifying individual provisions from which they are carved out. Hr'g Tr. at 117:19–118:8.

"Device" will thus expressly exclude "any device on which the ChromeOS operating system or a successor to the ChromeOS operating system is installed." *See* FJ § IX.H. Plaintiffs' definition is otherwise consistent with the court's interpretation of the part of Google's remedies

that proposed optionality as to the default GSE on a given access point on a device-by-device basis. *See* Pls.' FPFJ § IX.H ("'Device' or 'device' means any single smartphone, tablet, laptop, or desktop. For clarity, any two devices are different devices, even if they are the same make and model (e.g., two Samsung Galaxy S25s are two devices; two Apple iPhone 16 Pros are two devices)."); Rem. Op. at 105. This definition ensures that optionality will exist at the level of the individual device. *See* Pls.' Br. at 27.

### D.    "Google"

Finally, a few words on the definition of "Google." The parties have addressed the court's previous concern about the breadth of Plaintiffs' originally proposed definition, *see* Rem. Op. at 221–22, by cabining it to those people or entities "controlling or overseeing Google Search (including syndicated products), Search Text Ads (including syndicated products), the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any related Google GenAI Product." *See* Pls' FPFJ § IX.L; Google's FPFJ § IX.J.

The court adopts Plaintiffs' final proposed definition, which includes Google's "affiliates, partnerships, and joint ventures" and is written with an eye towards preventing Google from simply moving its anticompetitive conduct to a sister company. *See* Pls' FPFJ § IX.L. To this, the court also adds: "For clarity, the term 'affiliates' includes any Alphabet, Inc.–related entity that controls or oversees the aforementioned products." *See* FJ § IX.L. This definition will capture Alphabet subsidiaries like DeepMind that are separate from Google but work with it to develop Google products relevant for purposes of these remedies. *See* Hr'g Tr. at 123:5-23; *see also* Rem. Tr. at 625:1–626:3 (Hsiao); *id.* at 3341:8-21, 3348:7-22 (Collins). Google should not be able to avoid the terms of the Final Judgment by how Alphabet chooses to organize itself.

14

## IV.   PROHIBITORY INJUNCTIONS

The court previously acknowledged that Google's proposed prohibitory injunctions were a good starting place to remedy its illegal conduct. Rem. Op. at 104. But they did not alone go far enough, either as a class of remedies or as injunctive relief itself.

As injunctive relief, Google's proposals addressed the core of its anticompetitive conduct—its exclusive distribution agreements. *See Google*, 747 F. Supp. 3d at 32–33. The proposed provisions broadly would have offered Google's distribution partners more flexibility to contract with companies other than Google for search and search-related products. Rem. Op. at 105–06. The court agreed that Google should indeed be barred from entering into those exclusive agreements, but also added that (1) like Browser Developers, original equipment manufacturers (OEMs) and wireless carriers should be given the opportunity to set a different GSE at various search access points across different devices on an annual basis; (2) Browser Developers should expressly be permitted to promote any Third-Party General Search Service or Third-Party GenAI Product; and (3) Google should not be permitted to contract with Apple to exclusively distribute any Google GenAI product either in any Safari mode or on any Apple mobile or desktop device. *Id.* at 110–11.

In their final proposed final judgments, the parties presented slightly different versions of Google's originally proposed provisions reflecting different understandings of the court's instructions and holdings. The major disagreements here are whether (1) Google GenAI Products should be subject to lesser restrictions; (2) prohibited conditioning of one Google product on a partner's acceptance of another product is limited to actual agreements; (3) distribution contracts must terminate after one year; and (4) provisions applicable to Browser Developers and Apple should be different from those applicable to Android devices.

A.      **Effect of Inclusion of GenAI**

Google appears for the most part to have heeded the court's ruling that GenAI be incorporated into the remedies generally, *see id.* at 99–104, and that it be written into certain provisions specifically, *see, e.g.*, *id.* at 111.  *See generally* Google's FPFJ § III.  But its proposed text includes a semantic head fake to afford greater flexibility for distributing its GenAI products. For example, Google broadly proposes being barred from conditioning the licensing of "Google Play or *any other Google software application*" on the distributing, preloading, placing, displaying, using, or licensing of the Google Search or Chrome applications.   *Id.* § III.A–B (emphasis added).  This prohibition would prevent Google from, say, tying distribution of Google Maps to a partner's acceptance of Search or Chrome.  But Google proposes dropping the "any other Google software application" language when it comes to distributing its GenAI products. Google would bar itself from conditioning the licensing of only "the Google Search Application, the Chrome Browser Application, or Google Play" on the distributing, preloading, placing, displaying, using, or licensing of its GenAI products, including Gemini and Google Assistant.  *Id.* § III.C–D.  In other words, under Google's proposal, it could say to a partner, "We'll license Google Maps but only if you also distribute Gemini."  Google employs similar methods of relaxing restrictions that would otherwise prevent it from entering exclusive agreements in other provisions about GenAI.  *Compare, e.g.*, Google's FPFJ § III.H–I, *with id.* § III.J; *id.* § III.L–M, *with id.* § III.N.

Google defends this subtle yet material distinction by arguing that GenAI was "not part of Plaintiffs' theory of liability or the Court's liability determination" either with respect to Google's conduct or its products.  *See* Google's Br. at 11.  Provisions that regulate the licensing of Google GenAI products or revenue-share agreements (RSAs) pertaining to such products should be

narrower than parallel provisions for Search or Chrome, Google insists, because the former are "forward-looking provisions" where the court's "discretion is necessarily less broad," and a broader remedy creates the "danger of imposing restrictions that prevent the defendant from forging new routes to serve consumers." *Id.* at 10–12. Accordingly, Google believes it should be able "to retain the right to condition, for example, the Google Maps and YouTube apps on the exclusive distribution of Google GenAI and Google Assistant," because none of these products are "monopoly products." Hr'g Tr. at 59:4–62:18; *see also* Pls.' Br. at 5.

Adopting Google's proposal would be self-defeating. *See* Rem. Op. at 62 ("Antitrust actions would be 'futile exercise[s]' indeed 'if the Government prove[d] a violation but fail[ed] to secure a remedy adequate to redress it." (alterations in original) (quoting *E. I. du Pont*, 366 U.S. at 323)). To repeat once more, Google cannot be permitted to replay its illegal conduct with its GenAI products. Google's arguments have for the most part already been considered and rejected by the court. *See id.* at 99–104.

It is simply not true that the injunctive relief must be so tightly shrink-wrapped around the exact contours of liability. *See Nat'l Soc'y of Pro. Eng'rs v. United States* (*NSPE*), 435 U.S. 679, 698 (1978) (affirming injunctive relief that went "beyond a simple proscription against the precise conduct previously pursued"); *accord* 3 AREEDA & HOVENKAMP ¶ 653f ("[I]njunctive relief must be tailored with sufficient breadth to ensure that a certain 'class' of acts, or acts of a certain type or having a certain effect, not be repeated."). As Google recognizes, *see* Google's Br. at 11, the court can also enjoin "'practices connected with acts actually found to be illegal,' including practices 'which are of the same type or class as unlawful acts,'" Rem. Op. at 60 (first citing *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 89 (1950); then citing *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 132 (1969)). Employing "the same anticompetitive playbook for its

17

GenAI products that it used for Search," *id.* at 99, would surely be within the same type or class as Google's unlawful exclusionary acts with respect to Search.

At the October 8th hearing, Google contended that it should be permitted to condition its GenAI products in the same way that, for example, Microsoft has been conditioning distribution of its GenAI product, Copilot, on other applications "given the nascent nature of the market and given the level and the degree of competition" and because "Google doesn't have market power in Gemini." Hr'g Tr. at 61:5–64:5; *see also* Google's Br. at 13. The court is unpersuaded.

Besides the representation made by counsel at the hearing, no evidence has been presented that Microsoft in fact conditions distribution of Copilot on other applications, or that any other company does so with their respective GenAI products. *See* Rem. Op. at 217 (finding that Microsoft has integrated Copilot into Edge and Bing, but not that Microsoft bundles Copilot with other applications). Even if they did, the point of these remedies is not to ensure that Google maintains parity with competitors—it is to ensure that others can effectively compete in these markets. *Cf. Massachusetts*, 373 F.3d at 1231 (Section 2 remedies must "restor[e] conditions in which the competitive process is revived."); 3 AREEDA & HOVENKAMP ¶ 650a(2)(D).

Moreover, Google's argument that it should not be prevented from pursuing creative licensing regimes with its GenAI products because of its relative lack of power in that market is unconvincing. Remedies need not be strictly limited to "monopoly products" or even products for which the monopolist has any leverage in the market. The *New York I* court recognized this when it approved the inclusion of new technologies that "ha[d] the capacity to function in a manner similar to that of" the middleware that was the focus of liability in the remedies decree. 224 F. Supp. 2d at 129. And the D.C. Circuit affirmed that decision. *See Massachusetts*, 373 F.3d at 1204. Even Google's own proposed provisions, by their own terms and by Google's

18

characterization, include products not at issue in liability or for which findings of fact about market power were never established. *See* Google's FPFJ § III.A–B (referring to "Google Play *or any other Google software application*" (emphasis added)); Google's Br. at 11. Google acknowledges that even those products would fall within the court's authority to enjoin other conduct "of the 'same type or class' as the violations." Google's Br. at 11 (citation omitted).

To be certain, the D.C. Circuit has cautioned that when "adopting a forward-looking provision," the court's "discretion is necessarily less broad because . . . it is in danger of imposing restrictions that prevent the defendant from forging new routes to serve consumers." *Massachusetts*, 373 F.3d at 1224. But that discretion is not so constricted that it prohibits the court from imposing remedies to prevent the same unlawful conduct from occurring again in a meaningfully overlapping context. *See id.* at 1233 ("The district court certainly did not abuse its discretion by adopting a remedy that denies Microsoft the ability to take the same or similar actions to limit competition in the future rather than a remedy aimed narrowly at redressing the harm suffered by specific competitors in the past.").

In sum, the court declines to accept the relaxed injunctive relief Google proposes with respect to GenAI products. Those provisions related to such products shall be parallel to the provisions related to non-GenAI Google products in the way that Plaintiffs propose.[4] *See* FJ § III.A–D, H–J, M.

---

[4] Google also characterizes the court's description of its recent Gemini Commercial Agreement with Samsung as "recogniz[ing] this distinction" between GenAI and non-GenAI products with respect to access-point optionality. *See* Google's Br. at 12–13 (discussing Rem. Op. at 50–56). The court simply described these agreements to demonstrate that the liability decision was already influencing the way Google was contracting with its partners, *see* Rem. Op. at 107, not to define the scope of the Final Judgment when it comes to the distribution of GenAI products.

### B.      Scope of Prohibited Conditioning

The parties appeared to agree throughout the remedies phase about the constraints on Google's ability to condition the distribution of one piece of software on another.  *See* Rem. Op. at 106.  Apparently, not so.

Google's proposed injunctive relief prevents it from entering or maintaining agreements that contain an express conditioning term.  But Plaintiffs' proposals ban conditioning altogether, regardless of whether it has been memorialized in an agreement.  *Compare* Google's FPFJ § III.A–J ("Google shall not enter or maintain any agreement . . . that conditions . . . ."), *with* Pls.' FPFJ § III.A–J ("Google shall not condition . . . .").

Plaintiffs urge acceptance of their version to prevent Google from not only entering into agreements that contain an express conditioning term, but also declining to enter agreements that would not.  Pls.' Br. at 3.  They allege that "[i]n a meeting, Google confirmed that . . . Google intends to reserve the right to conditionally refuse to license the Play Store based on whether the device manufacturers opt to distribute Google Search–related products." *Id.*  Google emphatically denies having made this representation, Hr'g Tr. at 54:1–56:10, but still defends its proposed language on the basis that "Plaintiffs did not establish, and the Court did not find, that Google engaged in any 'conditioning' that did not involve an agreement," *see* Google's Br. at 9–10, and that Plaintiffs' proposed language invites potential misinterpretation by partners, *see* Hr'g Tr. at 56:11-16.

The court has already explained that injunctive relief need not be surgically drawn around the exact contours of liability.  *See supra* Section IV.A.  But more to the point, conditional refusals to deal are as pernicious as conditional deals committed to writing.  *Cf. OJ Com., LLC v. KidKraft, Inc.*, 34 F.4th 1232, 1247 (11th Cir. 2022) ("Conditional refusals to deal—i.e., one firm unilaterally

refusing to deal with another firm unless some condition is met—and exclusive dealing [are] synonymous." (cleaned up)); *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520 (5th Cir. 2022) ("[C]onditional refusals to deal are functionally equivalent to exclusive-dealing arrangements." (citing *OJ Com.*, 34 F.4th at 1247)); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 193 (3d Cir. 2005) (analyzing exclusionary business practices as if they were exclusive agreements because such practices were "as effective as those in written contracts").  A prohibition on Google's anticompetitive conduct would be fundamentally flawed if, for example, Google were prohibited from entering into an agreement that expressly conditions the licensing of the Play Store on the distribution of Search but were permitted to decline a request to license Google Play because the partner would not preinstall Search on its devices. *See* Pls.' Br. at 3.  After all, this court must "end the illegal conduct and . . . make every effort to protect against conduct of the same type or class." *New York I*, 224 F. Supp. 2d at 189.

Plaintiffs' language is not impermissibly vague, as Google suggests.  Google's Br. at 10. It is straightforward:  Google shall not condition.  Google protests that "Plaintiffs have not explained whether the act of 'condition[ing]' purportedly could reach even a trivial statement by a single Google employee that does not result in an actual agreement," Google's Br. at 10, and that it is at risk of being brought into a contempt proceeding over a potential misunderstanding during negotiations, Hr'g Tr. at 56:9-16.  These concerns are overstated.  The court is confident that "trivial" statements will not result in contempt proceedings and that if there is a non-trivial allegation of breach, the Final Judgment's enforcement procedures will provide an adequate path to resolution. *See generally* FJ § VII.

Google swears that "there's not going to be any conditioning of the type" and that it is "100 percent certain that [the court] would find that to be a violation of the decree, and that [it]

will not take place." Hr'g Tr. at 57:1-4. Then it should have no problem with a decree that expressly prohibits "any conditioning of the type." The court therefore adopts Plaintiffs' language that "Google shall not condition." *See generally* FJ § III.

### C.    Annual Termination

At the liability phase, the court determined that "[t]he lack of flexibility for partners to exit the distribution agreements reinforces their foreclosure effect." *Google*, 747 F. Supp. 3d at 158. This lack of flexibility came from both the agreements' durations and the fact that they were not easily terminable. *Id.* The court thus approved of provisions giving Browser Developers, OEMs, and wireless carriers an annual opportunity to reset the search product at different access points across different devices. Rem. Op. at 110–11.

Google believes that multi-year agreements with a right to opt out annually without termination fees offer sufficient flexibility. In fact, it argues, a multi-year agreement with annual opt-outs would *increase* the contracting options for partners, including opting out of their agreements after one year, if they wish. Google's Br. at 14; Hr'g Tr. at 74:19–75:5. Google insists that partners want these choices and that providing them will foster greater competition. Hr'g Tr. at 75:6-13.

Plaintiffs see it differently. They urge that an applicable agreement must "terminate[] no more than one year after the date it is entered." Pls.' FPFJ § III.K. Stressing that Google's prior agreements were hard to terminate, Plaintiffs argue that Google's proposal would still permit it to find creative ways to make termination difficult or to discourage opting out, such as by annually increasing RSA payments or imposing other burdens. Pls.' Br. at 7 & n.2.

The court holds that a hard-and-fast termination requirement after one year would best carry out the purpose of the injunctive relief.

22

Recall, the liability phase "record reflects no meaningful competitive rebidding of the agreements. The more common story is Google's partners renewing the agreements without genuine consideration of an alternative." *Google*, 747 F. Supp. 3d at 158. Requiring contracting parties to reevaluate their positions and renegotiate their agreements each year would create regular opportunities for competitive rebidding. Competitors in the industry would be on regular notice as to when an agreement between a Browser Developer, OEM, or wireless carrier and Google is coming to an end and be able to prepare accordingly to enter a competitive bid when that time comes. *See* Hr'g Tr. at 73:19–74:8. A bright-line, one-year term also will simplify enforcement. *See* Pls.' Br. at 7; Hr'g Tr. at 73:11-18 (Plaintiffs' counsel suggesting that adopting Google's language would in fact be less efficient than Google represents because it may require "mini economic trial[s]" on potential multi-year contracts "to see whether or not the incentives overwhelm what should be the right of termination"); *see also id.* at 67:24–69:6 (Plaintiffs' counsel approving of an omnibus agreement for the required separate agreements for different Operating System versions and privacy modes across different devices as long as each agreement must be renegotiated each year). *But see* Google's Br. at 14 & n.2 (describing Plaintiffs' proposal as increasing administrative burden because the optionality Plaintiffs seek could be achieved in a single agreement).

The court is skeptical of Google's contention that its proposal would give partners *more* flexibility. In theory, partners have always had a choice. But in practice, Google has held all the cards. *Google*, 747 F. Supp. 3d at 158; Hr'g Tr. at 80:1-5. Knowing that contracts will come to

an end annually gives them a bit of the leverage they previously lacked and, importantly, will create frequent opportunities for genuine competition.[5]

Courts have presumed under related antitrust provisions that exclusive contracts ending within a year are reasonable.  *Google*, 747 F. Supp. 3d at 157.  Given the aggregation of factors contributing to the exclusive agreements' substantial foreclosure of the market, the hard-and-fast yearly termination requirement will help to "pry open" that market.  *See* FJ § III.K–M.

### D.        Browser Developers and Apple

The parties' proposals with respect to Browser Developers and Apple differed from the start, and they have only diverged further.  Plaintiffs originally proposed that Google could "enter or maintain any agreement requiring" either a Browser Developer or Apple to set Google Search (and for Apple, also any Google GenAI Product) as the default search engine or product only if that agreement applies to just one Operating System Version and one Privacy Mode at a time.  Pls.' FPFJ § III.L–M.  They also clarified that "this provision does not prohibit Google from negotiating multiple such agreements with" a Browser Developer or Apple "as long as no agreement is conditioned on another."  *Id.*  Google, on the other hand, proposed that it could enter such an agreement as long as the Browser Developer or Apple is permitted "on an annual basis to set a different Default Search Engine in the United States for any Operating System Version and/or Privacy Mode offered by the Browser Developer [or Apple] without foregoing any payments attributable to an Operating System Version or Privacy Mode where Google Search remains set as

---

[5] Google takes issue with a yearly termination requirement as "impermissibly regulat[ing] third parties."  Google's Br. at 13.  But antitrust remedies directed at agreements that unlawfully foreclose markets will necessarily affect relevant third parties to some degree.  That is unavoidable.  *See, e.g.*, *New York I*, 224 F. Supp. 2d at 152–56 (approving restrictions on Microsoft's ability to enter certain agreements with third party OEMs); *cf. E. I. du Pont*, 366 U.S. at 326 ("[C]ourts are authorized, indeed required, to decree relief effective to redress the violations, whatever the adverse effect of such a decree on private interests.").

the Default Search Engine."[6]   Google's FPFJ § III.L; *id.* § III.M–N.   Plaintiffs maintain that Google's provision would allow it to require Apple to set Google as the default search engine on every instance of Safari on every Apple device at every access point as long as it did so one year at a time.   Pls.' Br. at 8–9; Hr'g Tr. at 72:3-15.   But Google is adamant that its provision would allow a Browser Developer or Apple on an annual basis to "mix and match" across Operating Systems or Privacy Modes without any impact on their revenue share.   Hr'g Tr. at 77:14–78:10. It insists that the only difference between its provisions and Plaintiffs' is the issue of yearly termination and administration.   *Id.* at 78:11–79:8.

At the October 8th hearing, Plaintiffs justified their proposal in part by stating that they understood the court "to permit some more exclusive dealing on browsers and Apple."   *Id.* at 70:4–16.   More specifically, they said, "We read Your Honor's opinion to suggest that you would be okay with more all-or-nothing type agreements, where Google would buy, for example, all iPhones in the United States, the standard Safari mode default, where Apple can't change a single device to a different default.   We find that troubling, but if they were going to do that, we want it to be limited to the mode and the operating system."   *Id.* at 69:7-13.   In response, the court clarified it did not intend for there to be daylight between restrictions on Google's ability to contract with respect to Android devices and those with respect to Browser Developers and Apple.   *Id.* at 70:25–71:15.   Plaintiffs told the court that this was "welcome news," *id.* at 71:16, and that they would "love to rewrite" those provisions, *id.* at 87:23–88:22.[7]

---

[6] Because the court has already found that applicable restrictions should not be relaxed with respect to GenAI products and that agreements permitted under the prohibitory injunctions must terminate after one year, *see supra* Sections IV.A, C, the court discusses these provisions without addressing those differing elements of the parties' proposals. The court also does not discuss the one element of these provisions that is undisputed—that Browser Developers and Apple are expressly permitted to promote any Third-Party General Search Service and Third-Party GenAI Product. *See* Pls.' FPFJ § III.L–M; Google's FPFJ § III.L–N.

[7] As far as the court can tell, Plaintiffs appear to have understood the court to "permit some more exclusive dealing" with respect to Browser Developers and Apple because it read the court's description of Google's original revised

Following this exchange, Plaintiffs submitted new proposals for its provisions regarding Browser Developers and Apple. *See* Pls.' Suppl. These revised provisions tightened the restrictions to mirror those imposed on Android partners. They would prevent Google from conditioning consideration for (1) setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product on any browser access point (including alternative modes) or any proprietary Apple feature or functionality (such as Safari, Siri, Spotlight, and any Privacy Mode) on a device on (2) setting the same product on any other browser access point or proprietary Apple feature or functionality on that same device or any other device in the United States. *See* Pls.' Suppl. § III.L–M. In other words, Plaintiffs propose that the same access-point-by-access-point and device-by-device optionality it proposes for Android devices apply also to browsers and Apple devices.

The Final Judgment will include, over Google's objection, Plaintiffs' revised provisions regarding Browser Developers and Apple. *See* FJ § III.L–M.

As a threshold matter, the court rejects Google's contention that it cannot consider Plaintiffs' updated provisions because they were presented "after the evidentiary record is closed and after briefing and argument on the parties' [proposed final judgments]." *See* Google's Suppl. at 5. Plaintiffs have not relied on new evidence. And Google has had a fulsome opportunity to respond at both the October 8th hearing and in writing. Furthermore, in crafting the Final Judgment, the court is not beholden to the exact language the parties have proposed at any stage.

---

proposed final judgment and its acknowledgment that "[a]ll of this is a good start" as adopting that description for purposes of the Final Judgment. *See* Rem. Op. at 105–07 ("Under its proposal . . . Google also would be permitted to pay Browser Developers, including Apple, to set Search as the default GSE, so long as the Browser Developer (1) can promote other GSEs and (2) is permitted to set a different GSE on different operating system versions or in a privacy mode and make[] changes, if desired, on an annual basis. . . . And Apple could preload GSEs on a device-by-device basis (i.e., Safari for Mac versus Safari for Windows), and install different GSEs for different search modes, like private browsing."). As previously explained, *see supra* Section II, any "approvals" of a proposed remedy did not signal the court's embrace of the proposal's specific text.

26

The court makes this determination with the evidentiary record already before it, as well as the benefit of the parties' arguments and submissions.

Google's merits objections to Plaintiffs' updated proposals are largely a reprise of its position that the prohibitory injunctions must be limited to the narrowest reading of the court's liability findings. For example, Google stresses multiple times that Plaintiffs only established that the "purported 'exclusivity' arose from Apple having agreed for the term of the contract not to 'pre-select a different default search engine in Safari's private browsing mode' or 'offer a different default search engine on different Apple devices (e.g., *different defaults on mobile versus desktop devices*).'" *Id.* at 1 (quoting Pls.' Post-Trial Br., ECF No. 896, at 36); *see also id.* at 2–3 (referring to the court's representation at the October 8th hearing that it had understood Plaintiffs' reference to device-level optionality as being relevant to the device type). Maybe so, but the court can fashion a remedy that goes "beyond a simple proscription against the precise conduct previously pursued." *NSPE*, 435 U.S. at 698; *see supra* Section IV.A.

Google also argues that device-by-device and access-point-by-access-point optionality is unnecessary to include in the provision applicable to Apple. Because Apple, too, is an OEM, Google states, all the other provisions in the prohibitory injunction will also apply to Apple. Google's Suppl. at 3. This is only partly true.

The court held at the liability phase that "(1) agreements between Google and browser developers, such as Apple and Mozilla, were exclusive insofar as they established Google as the out-of-the box default search engine; (2) mobile application distribution agreements ("MADAs") between Google and Android [OEMs] were exclusive in practice; and (3) [RSAs] between Google and Android device distributors—both OEMs and wireless carriers—formalized the practical exclusivity of the MADAs." Rem. Op. at 9–10 (citing *Google*, 747 F. Supp. 3d at 146–52).

In doing so, it evaluated separately the Apple Internet Services Agreement (ISA) and Browser Developer agreements on one hand and the Android agreements on the other, because the way Google Search was distributed across those agreements differed.  For Apple and Browser Developers, Search is integrated into specific search access points, such as Safari, Siri, and Spotlight on Apple devices, and the search box, navigation or location bar, and search box displayed on the Startpage on Mozilla's Firefox browser. *See Google*, 747 F. Supp. 3d at 44 ¶ 59; *id.* 96 ¶ 334.  For Android devices, on the other hand, Search is primarily distributed through individual applications, such as the Google Search Widget and Chrome, and bundled with others like YouTube and Google Maps as part of the MADAs. *Id.* at 97–100 ¶¶ 348–361.  Apple does not contract for Google services through applications the way Android partners do.  So, while Apple is indeed an OEM, those provisions that prevent Google from conditioning payment or licensing of *applications* on the distribution of one another do not apply to Apple.  This objection therefore falls flat.

Finally, Google maintains that "[t]he additional provision applicable to agreements setting Google Search as the Default Search Engine in a Third-Party Browser has always differed in some respects from the provisions directed to certain devices because a browser default is only one search access point on a device.  There is no logical basis for distinguishing between individual devices or access points in the context of a browser default, which is why no one even suggested such a concept until Plaintiffs raised it this month."  Google's Suppl. at 4 (emphasis omitted). Google overlooks the fact that Browser Developers can also be OEMs—notably, for instance, Samsung. *Google*, 747 F. Supp. 3d at 35–37 ¶¶ 9, 16.  Others may emerge in the future.  Plaintiffs' proposal ensures that a device manufacturer that also has a proprietary browser could contract for browser placement with different competitors.  The court acknowledges that at present firms that

are only Browser Developers (e.g., Mozilla) may not have the ability to select a default search engine on a device-by-device basis.  But because express recognition of such optionality would deny Google "the ability to take the same or similar actions to limit competition in the future," *Massachusetts*, 373 F.3d at 1233, the court thinks deference to Plaintiffs is warranted here. *See E. I. du Pont*, 366 U.S. at 334; *supra* Section II.

### E.    Other Provisions

The court addresses two final provisions of the proposed prohibitory injunctive relief, each proposed by Plaintiffs or Google alone.  The court adopts neither.

*First*, Plaintiffs propose a provision that reads: "Google shall not enter or maintain any exclusive contract relating to the distribution of Google Search, the Google Search Application, the Chrome Browser Application, the Google Assistant Application, and any Google GenAI Product in the United States."  Pls.' FPFJ § III.N.  This is far too broad and vague a term.

Federal Rule of Civil Procedure 65(d) requires that every order granting an injunction "describe in reasonable detail . . . the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1)(C).  Plaintiffs defend the provision essentially as being designed to catch what is "not allowed."  Hr'g Tr. at 87:12–88:3; *see also* Pls.' Br. at 12 ("Section III.N prevents any inadvertent gap between the remedies opinion and the final judgment regarding the treatment of exclusive contracts relating to the distribution of Google Search, Chrome, Google Assistant, and the Gemini app.").  But that is exactly the kind of ban on unspecified conduct that Rule 65(d) is designed to prevent. *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) ("[Rule 65(d)] requires that those enjoined receive explicit notice of precisely what conduct is outlawed."); *cf. Gulf Oil Corp. v. Brock*, 778 F.2d 834, 843 (D.C. Cir. 1985) (rejecting order that enjoined "substantially similar" conduct without explaining what would be similar).  The provision tracks what Plaintiffs describe as "the

Court's directive that . . . the final judgment bar 'any exclusive contract,'" Pls.' Br. at 12 (quoting Rem. Op. at 3), but again, the Final Judgment is what restrains Google, not an opinion. Rule 65(d) requires specificity, not vague language that might fill undefined "gaps." *See United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009) ("[W]e have held injunctions to be too vague when they enjoin all violations of a statute in the abstract without any further specification . . . ." (citing *SEC v. Wash. Inv. Network*, 475 F.3d 392, 407 (D.C. Cir. 2007))).

The court can understand Plaintiffs' desire to include a provision that "helps prevent a recurrence of the unlawful conduct by ensuring that Google cannot adopt novel forms of the exclusive distribution the Court condemned." Pls.' Br. at 12 (citing *Microsoft II*, 253 F.3d at 103). But the court cannot enjoin "all future violations of the antitrust laws." *Zenith Radio*, 395 U.S. at 133. The Final Judgment's enforcement provisions, including the court's retention of jurisdiction, should provide an avenue for addressing any allegation of noncompliance or circumvention.[8]

*Second*, Google proposes a provision that reads: "Nothing in this Final Judgment shall otherwise prohibit Google from providing Consideration to a manufacturer or wireless carrier with respect to any Google product or service in exchange for such entity's distribution, placement on any access point, promotion, or licensing of that Google product or service." Google's FPFJ § III.O. Apparently, Google drafted this provision in response to Plaintiffs' previously proposed payment ban. Pls.' Br. at 13. The court has rejected for now that proposed remedy. Rem. Op. at 119–28. Because this provision otherwise adds nothing of value to the Final Judgment, the court declines to adopt it.

---

[8] Plaintiffs' counsel also stated that "[i]f those provisions [enjoining Google from locking up device or access-point flexibility] were also changed to where everyone, including Apple and browsers, had device-by-device and access-point-by-access-point flexibility, I don't know if I could name a type of exclusive agreement right now that would be captured by III.N." Hr'g Tr. at 88:4-12. Because the court adopts Plaintiffs' modified §§ III.L and III.M, *see supra* Section IV.D, Plaintiffs' concern should be placated.

## V.    DATA-SHARING

The chief conflict regarding the data-sharing remedy has to do with Google's proposal that the data be shared subject to a license governing use. *See* Google's FPFJ § IV.C.4.

Required sharing of certain data is justified to "narrow the scale gap created by Google's exclusive distribution agreements and, in turn, the quality gap that followed." Rem. Op. at 130. Google has acquired a massive scale advantage in part because its exclusive distribution agreements have enabled Google to see far more queries than any of its rivals. *Google*, 747 F. Supp. 3d at 49–50 ¶¶ 86–90. Those queries gave Google data that helped improve the quality of Search, which in turn attracted more users and improved monetization, reinforcing the flywheel of network effects that entrenched Google's monopoly. *Id.* at 161–62. Because antitrust remedies must "deny to the defendant the fruits of its statutory violation," *Microsoft III*, 253 F.3d at 103 (citations omitted), and because scale is a significant fruit of Google's exclusive distribution agreements, *see* Rem. Op. at 89, the court held that sharing data—specifically, of Web Search Index[9] Data and User-side Data—"represents a reasonable method of eliminating the consequences of [Google's] illegal conduct," Rem Op. at 130 (quoting *NSPE*, 435 U.S. at 698). The data would give competitors the opportunity to boost quality while they continue to innovate to set themselves apart competitively from Google. *See id.* at 145–46; *see also id.* at 130 (citing *In re Google Play Store*, 147 F.4th at 947 (affirming an information-sharing remedy that would "overcome [Google's] illegally amplified network effects by giving rival stores a fair opportunity to establish themselves" (cleaned up))).

---

[9] The Final Judgment adopts Google's "Web Search Index" rather than Plaintiffs' "Search Index." *See* FJ § IX.FF; Appendix; Google's App'x at 1. Google's term and definition more closely aligns with the court's prior directive that this definition should exclude data from Google's various other indexes not crawled from the web. *See* Rem. Op. at 141.

Google proposes that any data required to be shared under the Final Judgment be subject to a license governing use.  That license would "include a requirement that the Qualified Competitor commit not to share or sell the datasets, and shall use the datasets for the exclusive purpose of serving users located in the United States through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product."  Google's FPFJ § IV.C.4.  The Final Judgment should forbid Qualified Competitors from selling the data they receive to unknown third parties, Google argues, because the data-sharing remedy is meant to furnish Qualified Competitors tools to compete in the relevant markets, not to give them an easy way to "turn a quick profit in a manner that violates user privacy (including Google's own terms of service)."  Google's Br. at 20.

In general, the court agrees that data should be shared subject to a license, but with modifications that incorporate some of Plaintiffs' objections.

## A.      Restriction on Sharing or Selling Data

Plaintiffs' main concern raised at the October 8th hearing about the licensing proposal was that restricting Qualified Competitors from selling or sharing data from the jump would "artificially constrain them right now before we even know who they are, what their new product might be, [or] how they might innovate on that."  Hr'g Tr. at 47:3–48:1.

As to the restriction on selling data, Plaintiffs argue that any Competitor whose intention is only to sell data rather than earnestly use it to compete would be screened out from the start, as such a firm would not be certified as a Qualified Competitor.  *Id.* at 47:3-11.  When pressed to offer a scenario in which it would be appropriate for a Qualified Competitor to simply sell the data to a third party, regardless of whether that third party has an interest in developing a GSE, counsel for Plaintiffs could only relay that those specific scenarios are as of now unknown.  They noted only that it is possible, for example, that a Qualified Competitor would want to sell a product that

includes the data, and the Final Judgment should not preemptively preclude them from doing so without letting that scenario unfold. *See id.* at 49:5-17.

As to the restriction on sharing data, Plaintiffs worry that such a license would prevent Qualified Competitors from sharing data with a partner in a joint venture, for example "with an AI company to improve search results or innovate new search-oriented products." Pls.' Br. at 15; *see also* Hr'g Tr. at 48:18–49:19. Google does not flatly oppose the possibility of such a joint venture, but it points out that it "would need to understand whether the joint venture partner is actually doing something that is related to the purposes of this remedy." Hr'g Tr. at 53:10-24.

With all this in mind, the court agrees that it is appropriate to subject Qualified Competitors to a license that prohibits them from sharing or selling the data received under the Final Judgment. But those Qualified Competitors will be able to petition the Technical Committee (or the court, if necessary) for relief from that constraint.

The court has serious concerns about allowing Qualified Competitors unbridled use of this valuable data. Even with appropriate privacy safeguards in place, User-side Data is still likely to contain highly sensitive information about individual users. *See* Rem. Op. at 163. And allowing a Qualified Competitor simply to sell the data to make a profit would be inconsistent with the purpose of this remedy. But at the same time, the court also agrees that Qualified Competitors should not be prevented from entering joint ventures or otherwise innovating with this data. After all, data-sharing is meant to give competitors a hand in setting themselves apart from Google. *See id.* at 145–46. Because the real-world effects of the data-sharing remedy have not yet been borne out, there is value in leaving slightly ajar the door to the possibility that some form of sharing or selling the data would be reasonable. *See also* Hr'g Tr. at 52:22–53:3 (Plaintiffs' counsel stating that they are more concerned about the hurdles put up for sharing and would be willing to write

33

out the sale provision); *id.* at 53:21-24 (Google's counsel stating that a Qualified Competitor and its potential partner getting approval and providing Google with notice and some transparency would be "something that makes sense").

### B.    "Exclusive Purpose"

Next, Plaintiffs take issue with Google's proposed limitation that Qualified Competitors use the data "for the exclusive purpose of serving users . . . through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product." *See* Google's FPFJ § IV.C.4.  They read this language as permitting Qualified Competitors to use the data "only for 'serving' users results," but not to improve algorithms or products.  Pls.' Br. at 15.

The court does not read the proposed text so narrowly.  That provision does not require a Qualified Competitor to only serve users "results."  It does not limit how the data is used, whether directly to serve query results or to improve algorithms or products, as long as the *end* purpose of such use is to develop a product in the relevant markets that is competitive in quality.

Google itself maintains that "these terms are intended to require Qualified Competitors to use the disclosed data solely to compete in the appropriate markets rather than turn a quick profit." Google's Br. at 20; *see also* Hr'g Tr. at 42:25–43:20 (Google's counsel agreeing with the court that the intention behind this phrase is not how Plaintiffs characterized it).  If it becomes evident during the judgment period that Google does in fact intend to use this language to essentially neutralize the remedy, the court will reconsider it.  But for now, the court finds this limitation reasonable.

### C.    Burden on Qualified Competitors

Plaintiffs worry that "Qualified Competitors who currently sell data or search results (for example to GenAI companies) would also be forced, at significant expense, to make the choice of

34

either maintaining a second copy of their data or systems untouched by the data at issue or shut down that business." Pls.' Br. at 15.

The court is unsure of Plaintiff's concern. Nothing in the Final Judgment would prevent a Qualified Competitor from selling its *own* search results and its *own* search results data, even if such products used Google's proprietary data as an input in some way. And companies like the GenAI companies Plaintiffs refer to that could benefit from the data in a way that is consistent with the purpose of the remedy can themselves seek to be certified as Qualified Competitors. Lastly, if there is some compelling reason a Qualified Competitor must sell the data that is consistent with the purpose of this remedy, it may petition the Technical Committee (or the court) to do so. *See supra* Section V.A.

### D.      Location of Users Served

Google would specify that the consumers served by use of the data be "located in the United States." Google's FPFJ § IV.C.4. Plaintiffs argue that, under Google's provision, a Qualified Competitor that currently serves search results worldwide using one system would be forced to exert considerable effort into building anew or maintaining separate infrastructure to use Google's data for the purpose of only serving users "located in the United States." Pls.' Br. at 15. At the hearing, the court asked counsel for Google how this would be feasible as a practical matter. Hr'g Tr. at 44:3-45:21. Counsel for Google responded that "that may be a [T]echnical [C]ommittee issue that . . . depending on how these competitors operate . . . [the Technical Committee] can resolve," *id.* at 45:14-17, but that ultimately what that phrase attempts to prevent is data getting into the hands of competitors who would use the data to develop products, whether search or unrelated to search, outside of the United States or that do not include the United States because "[t]hat's outside the scope of what this case was about," *id.* 45:2-8. Though the court understands

35

Google's concern, given the practical difficulties the language may produce, the court believes that excising the phrase would avoid confusion. The court is willing to revisit this issue if necessary, with input from the Technical Committee.

*    *    *

The provision imposing a license for shared data will thus be as follows: "The data specified in Sections IV.A and B will be shared pursuant to a license governing use. The terms of the license shall include a requirement that the Qualified Competitor commit not to share or sell the datasets unless authorized by the Technical Committee or the Court and shall use the datasets for the exclusive purpose of serving users through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product." FJ § IV.C.3. To be clear, the license requirement is not meant to allow Google to impose further burdens on Qualified Competitors. Nor is it meant to be an "artificial hurdle[]" to Qualified Competitors' ability to innovate. *See* Hr'g Tr. at 52:20-21. As drafted by the court, this provision will simply ensure that execution of this remedy remains moored to its purpose. To facilitate execution of this remedy, the court has also included in the Final Judgment a provision requiring that Plaintiffs and the Technical Committee, with input from Google, create a template for such a license within six months of the effective date of the Final Judgment. *See* FJ § IV.C.3.

## VI.    SEARCH SYNDICATION

Because it will take time for Qualified Competitors to develop high-quality competitive GSEs even with the data-sharing remedy, the court found that requiring Google to syndicate its search results would provide a much-needed "bridge" for Qualified Competitors to deliver quality search results that will foster short-term competition with Google. Rem. Op. at 170–71 (quoting Rem. Tr. at 3023:16–3024:14 (J. Adkins) (agreeing that "search syndication can provide a bridge

36

until a new search engine can become a fully independent search engine")). But it also determined that the information syndicated would be narrower than what Plaintiffs proposed and that syndication would be subject to a license restricting use, as "the purpose of this remedy is to provide a short-term measure for Qualified Competitors to compete as they improve their own search capabilities, not an additional means to facilitate that development. Other remedies serve that latter purpose." *Id.* at 178.

Consistent with the Remedies Opinion, the parties' proposals include some version of a search syndication license. *See* Pls.' FPFJ § V.A–B; Google's FPFJ § V.A–B. They differ in substantial ways, however. Mainly, the parties disagree on whether the terms of the search syndication license should (1) be restricted to those "no less favorable" than those in existing licenses or to "ordinary commercial" terms; (2) permit Google to restrict display of search results; (3) permit sub-syndication; and (4) last for a term of five years regardless of whether such term might extend beyond the six-year judgment period.

### A.    "No Less Favorable" versus "Ordinary Commercial" Terms

####    1.    *License Terms Generally*

Originally, Plaintiffs had proposed an exceedingly broad search syndication remedy. They proposed, among other things, that Google would be required to provide search syndication services only at marginal cost and could not place any conditions or restrictions on how a Qualified Competitor could use or display the syndicated content. Rem. Op. at 168–70. The court narrowed many of these provisions largely because they strayed too far from terms found in licensing agreements in the existing search syndication market. *Id.* at 173–74 (quoting *Bausch & Lomb*, 321 U.S. at 728 ("Congress has been liberal in enacting remedies to enforce the antimonopoly

37

statues. But in no instance has it indicated an intention to interfere with ordinary commercial practices.")).

In making this determination, the court used phrases like the following: that a "Qualified Competitor who opts into the syndication remedies shall receive organic results and features on terms *no less favorable than* a current licensee"; "when it comes to a remedy like syndication for which there is an established market and which requires Google to deal with a Qualified Competitor, it is best to hew closely to *ordinary commercial terms*"; and "[p]ricing shall be based on 'financial terms *no worse than* those offered to any other users of Google's search syndication products.'" *Id.* at 173–74 (emphases added) (citation omitted). The court's overarching point was that the terms of a syndication license should not be unmoored from commercial realities already in place.

The parties have picked from this section of the Remedies Opinion the phrases that, they believe, best fit their purposes. Phrases like "no less favorable than," "no worse than," and "least restrictive" appear throughout Plaintiffs' proposal. *See* Pls.' FPFJ § V.A–B. Google's, on the other hand, consistently refers to "ordinary commercial" terms. *See* Google's FPFJ § V.B. The parties have sparred over what these terms mean and whether they track the court's opinion. *See* Pls.' Br. at 18–20; Google's Br. at 25–29.

For the most part, the court is wary of Google's blanket reliance on "ordinary commercial" terms. First, Google's use of "ordinary commercial" terms is ambiguous. As Plaintiffs point out, it is unclear what an "ordinary commercial" term with respect to any limitation currently is or how it may change over time. Pls.' Br. at 19. To be fair, the court used "ordinary commercial terms" in the Remedies Opinion, so Google cannot be faulted for grasping onto that language. But it did

38

not intend for that phrase to convey an effective veto to Google over the search syndication terms merely because a term or some combination of terms is not deemed "ordinary."

But that is precisely how Google would have the court apply it.  If a Qualified Competitor proposes a term that is not "ordinary" or typical to Google's existing syndication agreements, Google wants to be able to reject it.  Such an ability would inhibit the innovation this remedy attempts to encourage.  For example, potential Qualified Competitor DuckDuckGo operates a GSE that seeks to set itself apart by focusing on user privacy.  Br. of Amicus Curiae Duck Duck Go, Inc. in Supp. of Pls.' FPFJ, ECF No. 1446-1 [hereinafter DuckDuckGo Br.], at 4; *Google*, 747 F. Supp. 3d at 36 ¶ 12.  In an amicus brief, DuckDuckGo worries that, under Google's proposed provisions, Google would be able to refuse to syndicate search results to privacy-focused GSEs like DuckDuckGo's by saying that a provision ensuring a certain degree of user-data protections is not "ordinary" to Google's existing syndication agreements.  DuckDuckGo Br. at 5.  Qualified Competitors hoping to compete by offering unique services or features may therefore be forced to either forego the syndication remedy or abandon developing what sets them apart.  *Id.* at 5–6.

Save one exception, the court will adopt Plaintiffs' language over Google's use of "ordinary commercial" terms.  Because these provisions are many, the court will discuss two areas where these differences were particularly contentious: pricing and display restrictions.

### 2.    Pricing

The court held that Google would not be required to provide syndication services at "no more than . . . marginal cost."  Rem. Op. at 174.  Because the availability of marginal-cost syndication from Google would disincentivize new syndication market entrants and potentially harm current providers of search syndication services, the court wrote that "[p]ricing shall be based

39

on 'financial terms no worse than those offered to any other user of Google's search syndication products.'" *Id.* at 173–74 (citation omitted).

And yet Google took a different tack. It now proposes that "Google will offer these syndication services on a non-discriminatory basis to Qualified Competitors at market rates consistent with ordinary commercial terms agreed to by other users of Google's search syndication products." Google's FPFJ § V.B.3.

Its main objection to the court's language, which Plaintiffs have adopted, is that it would create the same problems the court contemplated would arise from a "marginal cost" provision. A most-favored-nation pricing term, Google protests, would result in syndication licenses with pricing terms cherry-picked from, for instance, discounted organic search syndication pricing offered to partners who also syndicate search text ads, sometimes at prices below marginal cost. Google's Br. at 26. Ordinarily, Google says, such discounted pricing is offered because the discount is offset by the revenue Google expects from the ad syndication. *Id.* Google argues that being required to offer the discounted rate to a Qualified Competitor where Google cannot expect the same revenue to offset it would "'interfere with' and 'reduce, if not eliminate, competition in the market for syndicated search results'" for the same reasons the court determined marginal-cost pricing would. *Id.* (quoting Rem. Op. at 175).

Google's concern is overstated. The court thinks it is unlikely that a Qualified Competitor will syndicate search results from Google but not search text ads. After all, it is through search text ads (and other forms of advertising) that GSEs generate revenue. While it may be possible that a Qualified Competitor will syndicate search results from Google but search text ads from elsewhere or not at all, until such arrangements come to fruition, the court is disinclined to alter

40

the Final Judgment in a way that permits Google to dictate pricing with Qualified Competitors based on existing commercial terms reached with Google's profit motive in mind.

Similarly, that most-favored-nation pricing would "substantially impact[] Google's monetization expectation," Google's Br. at 26, is of no moment.  Google's "monetization expectation" is a fruit of its illegal conduct.  *See* Rem. Op. at 95–97.  "Those who violate the [Sherman] Act may not reap the benefits of their violations and avoid an undoing of their unlawful project on the plea of hardship or inconvenience."  *E. I. du Pont*, 366 U.S. at 326–27.  The Final Judgment's pricing provisions may result in syndication agreements that depart from the way Google has historically contracted or made its revenue.  *See* Google's Br. at 26–27.  But that is an acceptable consequence of remedying Google's illegal conduct.  *Microsoft III*, 253 F.3d at 103 (holding that Section 2 remedies must "deny to the defendant the fruits of its statutory violation" (internal citation and quotation marks omitted)).

### 3.    *Restriction on Display of Search Results*

Originally, it was Plaintiffs who sought to enable Qualified Competitors to "effectively replicate how Google delivers its [search engine results pages ("SERPs")]."  Rem. Op. at 172 ("How else to explain Plaintiffs' insistence that Google must provide information that is 'the same as if the Qualified Competitor's query had been submitted through Google.com'?" (citation omitted)).  Now, Plaintiffs accuse Google of attempting such a result.  Hr'g Tr. at 98:15–99:1. And they are right.  Google now proposes that it be "permitted to place its ordinary commercial restrictions on the use and display of its syndicated results and content."  Google's FPFJ § V.B.8. At the October 8th hearing, Google's counsel explained that its typical syndication-display restrictions include requiring a "Powered by Google" branding insignia, preventing the licensee from changing the order of the syndicated search results, or simply preventing the licensee from

41

"using the syndicated results in manners other than the way Google . . . presents them."  Hr'g Tr. at 106:19–107:10.  Google believes it should be able to continue to impose these restrictions under the Final Judgment.

Plaintiffs aver that if Google can limit Qualified Competitors' display of the syndicated search results to, for example, the "10 blue links" in the way they are displayed on Google's own SERPs, a GenAI company like OpenAI would not be able to "repackag[e] it" as they or their consumers would see fit.  *Id.* at 98:15–99:1; *see also* Rem. Tr. at 389:17–390:2 (Turley) (OpenAI is "not trying to recreate the type of experience that [a consumer] would find on Google.com where you see ten blue links."); Hr'g Tr. at 98:18-21 ("[Google's] provision says they can put ordinary commercial restrictions on the use and display of syndicated Search results.  That is what we worry about would create a world of Google clones.").  Because of these concerns, Plaintiffs propose that Google may not impose such restrictions "beyond the least restrictive terms Google provides under any current search syndication agreements."  Pls.' FPFJ § V.B.6.

The court agrees with Plaintiffs.  Google frames its proposal in part by arguing that oftentimes a Qualified Competitor *wants* to be able to adopt Google's branding "as part of the reason why they're syndicating from Google."  Hr'g Tr. at 109:9-18.  That may be true for some current licensees.  But for a Qualified Competitor—who, to reiterate, can only be certified if it can demonstrate a plan to invest and compete in or with the GSE and/or Search Text Ads markets— becoming a Google clone or marketing itself as one seems an unlikely desire.  The syndication remedy is meant to give Qualified Competitors a boost in quality while they develop competitive products, not to pose as Google in the meantime.  And at least one potential Qualified Competitor in the GenAI space has explicitly expressed a desire to depart from Google's familiar ten blue

links format.  At bottom, allowing Google to require licensees to display results to replicate Google's SERPs would be at odds with what this remedy is designed to achieve.[10]

*    *    *

In sum, both pricing and non-pricing restrictions or limitations in a search syndication license pursuant to the Final Judgment shall be, for the most part, defined by Plaintiffs' language, on "least restrictive," "no less favorable," or "no worse" terms.  The Final Judgment will retain the use of "ordinary commercial" terms to protect against Qualified Competitors using the syndication agreement in a manner than exceeds its intended purpose.  *See* Rem. Op. at 184 (citing Rem. Tr. at 2988:9–2989:3, 2990:22–2992:10 (J. Adkins) (discussing Google's ordinary restrictions on scraping, indexing, and crawling in its current syndication agreements)).

A final word on Google's objections:  Google contends that Plaintiffs' proposed license restrictions contradict the court's previous assurance that "Qualified Competitors generally will have to follow ordinary commercial terms and therefore will not need to be customized."  Google's Br. at 28–29 (quoting Rem. Op. at 180).  Google takes this quote out of context.  The court made this assurance in response to Google's concern that the syndication remedy would put the court in the role of a "central planner."  Rem. Op. at 180 (citation omitted).  Google should take the court at its word that it has no intention of becoming a "central planner."  Indeed, adopting Plaintiffs' terms will avoid this.  Google appears to believe that, unless it alone gets to say what terms are ordinary, each license will be a custom-made patchwork of terms causing Google insurmountable challenges.[11]  But there is more certainty in the universe of terms that are the "least restrictive" or

---

[10] As to use, Google explains Qualified Competitors should not be permitted to use syndicated data to feed into their LLMs for training.  Hr'g Tr. at 107:11–108:1.  The court agrees the Final Judgment should not permit this.  *See id.* at 108:19–109:2.  But the court does not believe that is what Plaintiffs seek or that the Final Judgment in fact permits it.
[11] In response to the court's note in the Remedies Opinion that "[i]f there are technical feasibility issues with syndicating only crawled web results, Google shall so advise the court," Rem. Op. at 173 n.24, Google now lists a

43

that are "no less favorable." In any event, Google cannot "avoid an undoing of [its] unlawful project on the plea of hardship or inconvenience." *See E. I. du Pont*, 366 U.S. at 326–27.

Lastly, for both the search and search text ads syndication remedies, the court will also require that Plaintiffs and the Technical Committee, with input from Google, create a template for such syndication licenses within 60 days of the effective date of the Final Judgment. *See* FJ §§ V.B, VI.B.

### B.    Sub-Syndication

The court agrees with Google that Qualified Competitors should not be able to sub-syndicate the search results they syndicate from Google under the Final Judgment. *See* Google's FPFJ § V.B.11. Plaintiffs object, arguing that sub-syndication is a standard permission in the existing syndication market and that, because it is not apparent yet whether a Qualified Competitor would "need" to sub-syndicate, the Final Judgment should not foreclose them from doing so upfront. Hr'g Tr. at 93:3-16.

But Google has it right: "Allowing Qualified Competitors to sub-syndicate Google's results . . . is entirely divorced from the Court's reasoning that new general search engine entrants should receive syndication from Google for the purpose of improving . . . *their own* SERPs." Google's Br. at 22 (citing Rem. Tr. at 4805:4-6 (Closing Arg.) (Plaintiffs' counsel stating that it's their "view that the syndication remedy should not be available to people who just want to syndicate")). Given that search syndication is meant to provide a Qualified Competitor a way to serve high-quality results while it develops its own products, the court does not see why a Qualified Competitor would "need" to sub-syndicate to accomplish that purpose. *See* Rem. Op. at 170–71.

---

host of "technical feasibility issues." *See* Google's Br. at 29. The court is not at this time convinced that these issues are so burdensome the features subject to syndication must be limited to those that Google "provides under current standard search syndication agreements." *See id.* As explained above, Google overstates how "bespoke" the syndication agreements with Qualified Competitors will be. *See id.*

And that some syndication agreements today, including Google's, permit some level of sub-syndication does not warrant expanding the purpose of the syndication remedy. *See* Pls.' Br. at 20; Hr'g Tr. at 93:19–94:8; *see also id.* at 105:6–106:6 (Google's counsel stating that sub-syndication is not a widespread practice and usually limited to the licensee's affiliate, and that in those agreements where Google does permit sub-syndication, it retains an absolute right to reject it).

### C.    Duration

A syndication license pursuant to the Final Judgment will be for a term of five years, regardless of when Google's syndication service is made available to the Qualified Competitor, for both search and search text ads syndication.

Despite the court's holding to that effect, *see* Rem. Op. at 175–76, Google has added that a syndication license will be for a term of five years, *unless* there are fewer than five years remaining before the end of the judgment period. Googe's FPFJ § V.A. In that case, Google proposes, the license will be for a term lasting the remainder of the judgment period. *Id.* In practice, what that means is that only a Qualified Competitor that comes onto the scene during the first year of the Final Judgment will enjoy a full five-year syndication term.

The court does not dwell on this long. It held that the syndication license would be for five years based on testimony from potential Qualified Competitors that five years would be enough time in which to become independent of Google. Rem. Op. at 175–76 (citing Rem. Tr. at 426:16-25 (Turley)); *id.* at 176 n.25 (citing to article detailing that Brave began delivering search results exclusively from its own search index within about two years). And as DuckDuckGo points out, allowing these syndication licenses to terminate at the end of the judgment period could permit Google to simply run out the clock on license negotiations, especially as the judgment period draws

to a close.  DuckDuckGo Br. at 6–7.  The syndication remedy as Google would have it would not fulfill its purpose for a Qualified Competitor that becomes certified in year five of the six-year judgment period; the Qualified Competitor would simply not have enough time with the syndicated data to develop a competitive GSE in the meantime.  *See* Rem. Op. at 175–76; Hr'g Tr. at 110:10–111:8.  What's more, were the court to adopt Google's proposal, the incentive for Qualified Competitors to come forward would diminish over the period remaining on the Final Judgment. Such an outcome would benefit only Google, not competition.

## VII.    SEARCH TEXT ADS SYNDICATION

"Because Google has more users, it has more advertisers, and with more advertisers, it has more dollars to improve its GSE and pay for distribution."  Rem. Op. at 183.  And because Qualified Competitors would be attempting to compete "[i]n the face of such formidable headwinds," the court held that Qualified Competitors should also be able to syndicate search text ads from Google as a "short-term measure designed to 'pry open' the relevant markets."  *Id.*

For the same reasons search syndication licenses will be restricted on "no less favorable terms" and other similar language used by Plaintiffs rather than Google's "ordinary commercial" terms, the same will be true, for the most part, for search text ads syndication.  *See generally* FJ § VI.  The restriction on scraping, indexing, and crawling will remain on ordinary commercial terms.  *Id.* § VI.B.6.  The provision regarding the duration of such licenses will also be the same.[12] *Id.* § VI.B.

---

[12] The restriction on display will be slightly different.  *See* FJ § VI.B.6.  The court previously held that "Google may place ordinary-course restrictions on the use or display of syndicated content."  Rem. Op. at 184.  Unlike in search syndication, Google presented evidence of the specific ways search text ads syndication without ordinary-course restrictions on display or use could harm advertisers and ad quality.  *See id.* (citing Rem. Tr. at 2972:4–2976:3, 2979:5–2984:10 (J. Adkins)).  That said, the court does not adopt Plaintiffs' narrow enumeration of permissible justifications for imposing such restrictions.  *See* Pls.' FPFJ § VI.B.6.

The search text ads syndication remedy differs in one important way from the search syndication remedy.  The court previously contemplated the possibility of new entrants into the ad platform market.  *See* Rem. Op. at 183 ("It is also possible that an independent ad platform could emerge to compete with Google and Microsoft, which are the only current suppliers of general search text ads in the United States.").  Becoming an independent ad platform in the search text ads market takes a near-insurmountable effort in part due to Google's monopoly.  *See* Rem. Tr. at 1794:12–1797:3 (Epstein) (describing "cold start" problems).  To be competitive, a potential new entrant would need to be able to offer publishers syndication of high-quality ads.  *See id.* at 1798:16–1799:16 (Epstein); *see also* Pls.' Br. at 20.  So, while sub-syndication of search results would be inappropriate for Qualified Competitors looking to compete in search for the reasons explained above, *see supra* Section VI.B, sub-syndication of search text ads would be a useful bridge for a Qualified Competitor looking to compete with Google's ad platform.  Sub-syndication will thus be permitted for search text ads only if "such Qualified Competitor has been certified as a Competitor to a Google ads platform (e.g., Google Ads)."  FJ § VI.B.9.

## VIII.  ENFORCEMENT

From the beginning, the provisions related to the Technical Committee have been contentious.  The court will not rehash the parties' arguments or go over their final proposals with a fine-tooth comb here.   Rather, the court will explain at a high level its approach to the relevant provisions.

The court has been clear that a Technical Committee is an appropriate instrument to assist Plaintiffs in their enforcement efforts, as it "comports with federal courts' long history of utilizing appointed experts and provides a process to review and resolve inevitable disputes between the parties—ideally without further need for judicial intervention."  Rem. Op. at 211 (quoting *In re*

*Google Play Store*, 147 F.4th at 954). A Technical Committee that is the "enforcement arm of the government," *Microsoft IV*, 231 F. Supp. 2d at 197, embodies the principle that with the government's broad authority to enforce the antitrust laws comes discretion with how violations should be redressed, *see F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 170–71 (2004) ("A Government plaintiff . . . must seek to obtain the relief necessary to protect the public from further anticompetitive conduct and to redress anticompetitive harm. And a Government plaintiff has legal authority broad enough to allow it to carry out this mission. . . . '[I]t is well settled that once the Government has successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor.'" (quoting *E. I. DuPont*, 366 U.S. at 334)); *see also Ford Motor Co. v. United States*, 405 U.S. 562, 575 (1972).

Throughout the remedies phase, Plaintiffs have vigorously insisted that the court's rulings and the case law make clear that "ultimately the power to enforce the terms of the decree rests with the government." Pls.' Br. at 21 (quoting *Massachusetts*, 373 F.3d at 1243). In their most recent brief, they took issue with Google's attempts at squeezing Plaintiffs out of various enforcement activities and roping the court into resolving disputes instead. *Id.* at 20–21. They also accused Google of attempting to "empower Google to delay or stymie enforcement at every turn simply by objecting." *Id.* at 21. Plaintiffs' FPFJ reflects these objections. *See generally* Pls.' FPFJ § VII.

Yet at the hearing, Plaintiffs appeared to surrender their position. From the jump, they conceded that Google should have full opportunity to object to any detail of the Final Judgment's execution. *See* Hr'g Tr. at 18:24–19:10. And despite the clear textual differences in the parties' FPFJs and briefs, Plaintiffs' counsel effectively agreed that "there is substantively no difference between the language that [Plaintiffs have] proposed, at least with respect to Google's ability to

48

object and bring things to the Court's attention, and what [Google has] proposed." *Id.* at 20:11–21:2.

Plaintiffs' counsel tried to assure the court that it is "free to delegate any of those elements [of enforcement] entirely to the [T]echnical [C]ommittee, entirely to [P]laintiffs." *Id.* at 34:7-14. But the court is frankly at a loss for how it can square this with their simultaneous position that "there is no such decision that ends with [Plaintiffs] and the [T]echnical [C]ommittee" and that "Google can object to everything and almost anything that would then require [the court's] resolution." *Id.* at 19:20–20:5.

The court is wary of being called in as a referee to the minutiae of the Final Judgment's execution and enforcement. Nevertheless, because the parties agree that Google should have a broad right to object, the court will grant it. *See* FJ § VII.A.7.k. This should put to rest Google's blanket objections to Plaintiffs' alleged attempts at taking decision-making authority from the court. Google's Br. at 30–32. The parties offer the assurance that they will elevate for judicial consideration only the most important conflicts. *See* Hr'g Tr. at 19:24–20:5; 26:7-12. The court is skeptical. Still, it adopts Google's express right to object with cautious optimism that the parties will keep their word.

Although Google will have an express right to object, the court affords some deference to Plaintiffs' provisions in this section of the Final Judgment. *See generally* FJ § VII; *see also* Appendix. Google appears to protest any function carried out by the Technical Committee that goes beyond mere "technical competence," characterizing the broad oversight and investigative functions Plaintiffs propose as "an end-run around the Court's rejection of the Plaintiffs' anticircumvention and anti-retaliation proposals." *See* Google's Br. at 32–33. Yet, the Technical Committee established in *New York I* and affirmed by *Massachusetts* had much of these same

49

broad functions. *See* Second Modified Final J., *United States v. Microsoft Corp.*, No. 98-cv-1232, ECF No. 889 (D.D.C. Mar. 22, 2009). None of these responsibilities are a "substitute for the enforcement authority of [Plaintiffs]" or the court. Rem. Op. at 212 (citing *Massachusetts*, 373 F.3d at 1244).

Finally, to keep the court updated on the progress of executing the Final Judgment, Plaintiffs, with input from the Technical Committee, shall submit a status report within 90 days of the effective date of the Final Judgment and then on future dates as set by the Court. FJ § VII.E.1.

## IX.    RETENTION OF JURISDICTION

Last but not least, the court addresses its retention of jurisdiction. The Supreme Court was explicit in *United States v. United Shoe Machinery Corp.* that, where the government is entitled to relief in a Section 2 case, the "court's power" to order additional relief to remedy an earlier antitrust violation "is clear," even after the judgment period has passed. 391 U.S. 244, 251 (1968); *accord* 2A AREEDA & HOVENKAMP ¶ 325a ("[A] court's involvement is not necessarily ended once its decree is issued."); *id.* ¶ 325c2 ("Antitrust decrees may reserve the court's jurisdiction to order additional or modified relief." (citing *United States v. United Shoe Mach. Corp.*, 110 F. Supp. 295 (D. Mass. 1953), *aff'd per curiam*, 347 U.S. 521 (1954))). Both parties' proposals would preserve this court's jurisdiction accordingly.

Plaintiffs' proposal that it be permitted to file suit against Google for a period of four years after the expiration of the Final Judgment for any violations of the Final Judgment committed during the judgment period is not, as Google argues, the impermissible creation of a cause of action. *See* Google's Br. at 38–39. It is simply a part of the court's retention of its jurisdiction to enable Plaintiffs to enforce the Final Judgment.

50

That said, the court will not determine now, as Plaintiffs propose, what Plaintiffs must show to alter the judgment and to what standard Google will be held in response. *Compare* FJ § XI.A, *with* Pls.' FPFJ § XI.A. The court will address those specifics if and when the time comes.

## X.    CONCLUSION

It bears repeating that "Google is a monopolist, and it has acted as one to maintain its monopoly." *Google*, 747 F. Supp. 3d at 32. In crafting the Final Judgment, the task of this court was to "unfetter a market from anticompetitive conduct, . . . deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future," *Microsoft III*, 253 F.3d at 103 (internal quotation marks and citations omitted), even if the remedies ordered would "entail harsh consequences," *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1033 (D.C. Cir. 2008) (quoting *E. I. du Pont*, 366 U.S. at 327). The terms of the Final Judgment have been designed to do just that consistent with established Section 2 legal principles.

The Final Judgment accompanies this Memorandum Opinion.

Dated:  December 5, 2025

Amit P. Mehta
United States District Judge

# APPENDIX

## I.    JURISDICTION

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| The Court has jurisdiction over the subject matter of this action and over Google. | This Court has jurisdiction over the subject matter of this action and over Google LLC. | This Court has jurisdiction over the subject matter of this action and over Google LLC. |

## II.    APPLICABILITY

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| This Final Judgment applies to Google and to each of its officers, directors, agents, employees, subsidiaries, successors and assigns; and to all other persons in active concert or participation with Google who have received actual notice of this Final Judgment by personal service or otherwise. | This Final Judgment applies to Google and to each of its officers, directors, agents, employees, subsidiaries, successors, and assigns. | This Final Judgment applies to Google and to each of its officers, directors, agents, employees, subsidiaries, successors, and assigns; and to all other persons in active concert or participation with Google who have received actual notice of this Final Judgment by personal service or otherwise. |

## III.    PROHIBITORY INJUNCTIONS

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| A.    Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of the Google Search Application on any device sold in the United States. | A.    Google shall not enter or maintain any agreement with a manufacturer that conditions the licensing of Google Play or any other Google software application on that manufacturer also distributing, preloading, placing, displaying, using, or licensing the Google Search Application on Covered Devices sold in the United States. | A.    Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of the Google Search Application on any device sold in the United States. |
| B.    Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of the Chrome Browser Application on any device sold in the United States. | B.    Google shall not enter or maintain any agreement with a manufacturer that conditions the licensing of Google Play or any other Google software application on that manufacturer also distributing, preloading, placing, displaying, using, or licensing the Chrome Browser Application on Covered Devices sold in the United States. | B.    Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use or license of the Chrome Browser Application on any device sold in the United States. |
| C.    Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or | C.    Google shall not enter or maintain any agreement with a manufacturer that conditions the licensing of the Google Search | C.    Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or |

| license of the Google Assistant Application on any device sold in the United States. | Application, the Chrome Browser Application, or Google Play, on the manufacturer also distributing, preloading, placing, displaying, using, or licensing the Google Assistant Application on Covered Devices sold in the United States. | license of the Google Assistant Application on any device sold in the United States. |
|---|---|---|
| D.  Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of any Google GenAI Product on any device sold in the United States. | D.  Google shall not enter or maintain any agreement with a manufacturer that conditions the licensing of the Google Search Application, the Chrome Browser Application, or Google Play, on the manufacturer also distributing, preloading, placing, displaying, using, or licensing Google GenAI Assistant Application on Covered Devices sold in the United States. | D.  Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of any Google GenAI Product on any device sold in the United States. |
| E.  Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party General Search Service on any device sold in the United States. | E.  Google shall not enter or maintain any agreement with a manufacturer or wireless carrier that conditions (i) Consideration or (ii) the license of Google Play or any Google software application, on that manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party General Search Service on Covered Devices sold in the United States. | E.  Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party General Search Service on any device sold in the United States. |
| F.  Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party Browser on any device sold in the United States. | F.  Google shall not enter or maintain any agreement with a manufacturer or wireless carrier that conditions (i) Consideration or (ii) the license of Google Play or any Google software application, on that manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party Browser on Covered Devices sold in the United States. | F.  Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party Browser on any device sold in the United States. |
| G.  Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or | G.  Google shall not enter or maintain any agreement with a manufacturer or wireless carrier that conditions (i) Consideration or (ii) the license of Google Play or any Google software application, on that manufacturer or wireless carrier | G.  Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or |

| | | |
|---|---|---|
| licensing any Third-Party GenAI Product on any device sold in the United States. | refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party GenAI Assistive Service on Covered Devices sold in the United States. | licensing any Third-Party GenAI Product on any device sold in the United States. |
| H.  Google shall not condition the payment for preload of, placement of, or assignment of an access point for the Google Search Application for one device on any other preload, placement, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States. | H.  Google shall not enter or maintain any agreement with a manufacturer or wireless carrier that conditions the payment for preload, placement, or assignment of an access point for the Google Search Application on the preload, placement, or assignment of any other access point to any of Google Search, the Google Search Application, the Chrome Browser Application, the Google Assistant Application, and/or a Google GenAI Assistant Application on Covered Devices sold in the United States.  For the avoidance of doubt, Google shall only contract with such partners with respect to such access points on a device by device basis. | H.  Google shall not condition the payment for preload, placement, or assignment of an access point for the Google Search Application for one device on any other preload, placement, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States. |
| I.  Google shall not condition the payment for preload of, placement of, or assignment of an access point for the Chrome Browser Application for one device on any other preload of, placement of, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States. | I.  Google shall not enter or maintain any agreement with a manufacturer or wireless carrier that conditions the payment for preload, placement, or assignment of an access point for the Chrome Browser Application on the preload, placement, or assignment of any other access point to any of the Google Search Application, the Chrome Browser Application, the Google Assistant Application, and/or a Google GenAI Assistant Application on Covered Devices sold in the United States. For the avoidance of doubt, Google shall only contract with such partners with respect to such access points on a device by device basis. | I.  Google shall not condition the payment for preload, placement, or assignment of an access point for the Chrome Browser Application for one device on any other preload, placement, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States. |
| J.  Google shall not condition the payment for preload of, placement of, or assignment of an access point for the Google Assistant Application or any Google GenAI Product for one device on any other preload, placement, or assignment of an access point for the Google Search Application, the Chrome Browser | J.  Google shall not enter or maintain any agreement with a manufacturer or wireless carrier that conditions the payment for preload, placement, or assignment of an access point for the Google Assistant Application or a Google GenAI Assistant Application on the preload, placement, or assignment of any other | J.  Google shall not condition the payment for preload, placement, or assignment of an access point for the Google Assistant Application or any Google GenAI Product for one device on any other preload, placement, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the |

| | | |
|---|---|---|
| Application, the Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States. | access point to any of the Google Search Application and/or the Chrome Browser Application on Covered Devices sold in the United States. For the avoidance of doubt, Google shall only contract with such partners with respect to such access points on a device by device basis. | Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States. |
| K. Google shall not enter or maintain any agreement requiring or conditioning Consideration on the distribution of, preload of, placement of, display of, use of, license of, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product in the United States unless the agreement terminates no more than one year after the date it is entered. | K. Google shall not enter or maintain any agreement with a manufacturer or wireless carrier requiring the preload, placement, or assignment of an access point on Covered Devices in the United States to any of the Google Search Application, the Chrome Browser Application, the Google Assistant Application, and/or a Google GenAI Assistant Application for a period of more than one year, unless the agreement allows the manufacturer or wireless carrier to terminate the agreement on an annual basis and does not charge a fee for terminating. | K. Google shall not enter or maintain any agreement requiring or conditioning Consideration on the distribution, preload, placement, display, use, license, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product in the United States unless the agreement terminates no more than one year after the date it is entered. |
| L. Google shall not condition (1) Consideration for a Browser Developer setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product on any browser access point (including alternative modes such as Privacy Mode) on any Device on (2) the Browser Developer setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product on any other browser access point on that same Device or any other Device in the United States. Any agreement containing a default condition permitted by this provision must expire after one year and must expressly permit the Browser Developer to promote any Third-Party General Search Service and Third-Party GenAI Product.[1] | L. Google shall not enter or maintain any agreement requiring a Browser Developer to set Google Search as the Browser Default Search Engine in a Third-Party Browser in the United States unless the agreement (i) permits the Browser Developer on an annual basis to set a different Default Search Engine in the United States for any Operating System Version and/or Privacy Mode offered by the Browser Developer without foregoing any payments attributable to an Operating System Version or Privacy Mode where Google Search remains set as the Default Search Engine; and (ii) expressly permits the Browser Developer to promote any Third-Party General Search Service or Third-Party GenAI Product in the United States. | L. Google shall not condition (1) Consideration for a Browser Developer setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product on any browser access point (including alternative modes such as Privacy Mode) on any Device on (2) the Browser Developer setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product on any other browser access point on that same Device or any other Device in the United States. Any agreement containing a default condition permitted by this provision must expire after one year and must expressly permit the Browser Developer to promote any Third-Party General Search Service and Third-Party GenAI Product. |

[1] Originally: "Google shall not enter or maintain any agreement requiring a Browser Developer to set Google Search as the Browser Default Search Engine in a Third-Party Browser in the United States unless the agreement (i) applies to no more than one Operating System Version and no more than one Privacy Mode, (ii) terminates no more than one year after the date it is entered, and (iii) expressly

| | | |
|---|---|---|
| M. Google shall not condition (1) Consideration for Apple setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product with respect to any proprietary Apple feature or functionality, including Safari, Siri, Spotlight, and any Privacy Mode within those products, on one Device on (2) Apple setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product with respect to any proprietary Apple feature or functionality on that same Device or any other Device in the United States. Any agreement containing a default condition permitted by this provision must expire after one year and must expressly permit Apple to promote any Third-Party General Search Service and Third-Party GenAI Product.[2] | M. Google shall not enter or maintain any agreement requiring Apple, Inc. ("Apple") to set Google Search as the Default Search Engine in the United States with respect to any proprietary Apple feature or functionality, including Siri and Spotlight, unless the agreement complies with Section III.L above.<br><br>N. Google shall not enter or maintain any agreement requiring Apple to distribute any Google GenAI Assistant Application in any Apple web browser or on any Apple mobile or desktop device in the United States unless the agreement expressly permits Apple to promote any Third-Party General Search Service or Third-Party GenAI Product in the United States. | M. Google shall not condition (1) Consideration for Apple setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product with respect to any proprietary Apple feature or functionality, including Safari, Siri, Spotlight, and any Privacy Mode within those products, on one Device on (2) Apple setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product with respect to any proprietary Apple feature or functionality on that same Device or any other Device in the United States. Any agreement containing a default condition permitted by this provision must expire after one year and must expressly permit Apple to promote any Third-Party General Search Service and Third-Party GenAI Product. |
| N. Google shall not enter or maintain any exclusive contract relating to the distribution of Google Search, the Google Search Application, the Chrome Browser Application, the Google Assistant Application, and any Google GenAI Product in the United States. | [No similar provision.] | [No similar provision.] |
| [No similar provision.] | O. Nothing in this Final Judgment shall otherwise prohibit Google from providing Consideration to a manufacturer or wireless carrier with respect to any Google product or service in exchange for such entity's distribution, placement on any access point, promotion, or licensing of that Google product or service. | [No similar provision.] |
| O. Nothing in this Final Judgment shall prohibit Google from | P. Nothing in this Final Judgment shall prohibit Google from | N. Nothing in this Final Judgment shall prohibit Google from |

permits the Browser Developer to promote any Third-Party General Search Service and Third-Party GenAI Product. For clarity, this provision does not prohibit Google from negotiating multiple such agreements with a Browser Developer as long as no agreement is conditioned on another."

[2] Originally: "Google shall not enter or maintain any agreement requiring Apple to set Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product in the United States with respect to any proprietary Apple feature or functionality, including Safari, Siri, and Spotlight, unless the agreement (i) applies to no more than one Operating System Version and no more than one Privacy Mode, (ii) terminates no more than one year after the date it is entered, and (iii) expressly permits Apple to promote any Third-Party General Search Service and Third-Party GenAI Product. For clarity, this provision does not prohibit Google from negotiating multiple such agreements with Apple as long as no agreement is conditioned on another."

| | | |
|---|---|---|
| distributing the Google Search Application, the Google Assistant Application, and any Google GenAI Product through a single Application Programming Kit (APK) as long as the licensee has the option to disable end-user access to any of those applications and services that the licensee declines to license. | distributing the Google Search Application, the Google Assistant Application, and a Google GenAI Assistant Application through a single Application Programming Kit (APK) as long as the licensee has the option to disable end-user access to any of those applications and services that the licensee declines to license. | distributing the Google Search Application, the Google Assistant Application, and any Google GenAI Product through a single Application Programming Kit (APK) as long as the licensee has the option to disable end-user access to any of those applications and services that the licensee declines to license. |

## IV.    REQUIRED DISCLOSURES OF DATA

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| A. Google's Search Index: Within thirty (30) days of a Qualified Competitor's certification pursuant to Section IX.W, Google shall make available to such Qualified Competitor, at marginal cost, to Qualified Competitors the following data related to Google's Search Index: <br> 1. for each document in the Google Search Index, a unique identifier (DocID) and another notation sufficient to denote all the documents Google considers duplicates of each other; <br> 2. a DocID to URL map; and <br> 3. for each DocID, the (A) time that the URL was first seen, (B) time that the URL was last crawled, (C) spam score, and (D) device-type flag. <br> This information shall be provided for all websites in the full Search Index Google uses for searches on Google.com, the Google Search Application, or any other current or future Google general search products. Nothing in Section IV is intended to transfer intellectual property rights of third parties to index users. | A. Google's Web Search Index: For the term of this Final Judgment, Google will make available, at Marginal Cost, to Qualified Competitors the following data related to Google's Web Search Index on a non-discriminatory basis while safeguarding personal privacy and security: <br> 1. for each document in the Google Web Search Index a unique identifier (DocID) and another notation sufficient to denote all the documents Google considers duplicates of each other; <br> 2. a DocID to URL map; and <br> 3. for each DocID the following set of associated data: (A) time that the URL was first seen, (B) time that the URL was last crawled, (C) spam score, and (D) device-type flag. <br> 4. This information must be provided for all websites in the Web Search Index Google uses for searches on Google.com, the Google Search App, or future Google general search products. <br> 5. Google must make this information available to Qualified Competitors on a one-time basis at or around the time they are so certified as a Qualified Competitor. <br> 6. Nothing in this Section IV is intended to transfer intellectual property rights of third parties to index users. | A. Google's Web Search Index: Within thirty (30) days of a Qualified Competitor's certification pursuant to Section IX.V, unless granted additional time, Google shall make available, at marginal cost, to Qualified Competitors the following data related to Google's Web Search Index: <br> 1. for each document in the Google Web Search Index, a unique identifier (DocID) and another notation sufficient to denote all the documents Google considers duplicates of each other; <br> 2. a DocID to URL map; and <br> 3. for each DocID, the (A) time that the URL was first seen, (B) time that the URL was last crawled, (C) spam score, and (D) device-type flag. <br> The information shall be provided for all websites in the full Web Search Index Google uses for searches on Google.com, the Google Search Application, or any future Google general search products. Nothing in Section IV is intended to transfer intellectual property rights of third parties to index users. |

| | | |
|---|---|---|
| B. <u>User-Side Data</u>: For the term of this Final Judgment, Google shall make available, at marginal cost, to Qualified Competitors the following User-side Data on a non-discriminatory basis while safeguarding personal privacy and security:<br><br>   1.  User-side Data used to build, create, or operate the GLUE statistical model(s); and<br><br>   2.  User-side Data used to train, build, or operate the RankEmbed model(s).<br><br>Google shall make this data available to Qualified Competitors at least twice, with the exact number and frequency of such disclosures to be determined by the Court after consultation with Plaintiffs and the Technical Committee (TC). Any cap on the number of such disclosures shall be informed, in part, by the utility of the datasets disclosed after appropriate privacy-enhancing techniques have been applied. For clarity, this Section IV.B shall not require disclosure of intellectual property or trade secrets, such as algorithms, ranking signals, or post-trained LLMs. | B. <u>User-Side Data</u>: For the term of this Final Judgment, Google will make available, at Marginal Cost, to Qualified Competitors the following User-side Data on a non-discriminatory basis while safeguarding personal privacy and security:<br><br>   1.  User-side Data used to build, create, or operate the GLUE statistical model(s); and<br><br>   2.  User-side Data used to train, build, or operate the RankEmbed model(s).<br><br>   3.  For the avoidance of doubt, "User-side Data" for purposes of Section IV includes only the underlying data, not the model itself or any ranking signal or score, spam score, information retrieval score, information satisfaction score, query interpretation information, query suggestion information, query-based salient term, or document salient term.<br><br>   4.  The number of times a Qualified Competitor may receive a dataset will be capped by the Court after consultation with the Technical Committee. The cap on the number of such disclosures will be informed, in part, by the utility of the datasets disclosed after appropriate privacy-enhancing techniques have been applied. | B. <u>User-Side Data</u>: For the term of this Final Judgment, Google shall make available, at marginal cost, to Qualified Competitors the following User-side Data on a non-discriminatory basis while safeguarding personal privacy and security:<br><br>   1.  User-side Data used to build, create, or operate the GLUE statistical model(s); and<br><br>   2.  User-side Data used to train, build, or operate the RankEmbed model(s).<br><br>Google shall make this data available to Qualified Competitors at least twice, with the exact number and frequency of such disclosures to be determined by the Court after consultation with Plaintiffs and the Technical Committee (TC). Any cap on the number of such disclosures shall be informed, in part, by the utility of the datasets disclosed after appropriate privacy-enhancing techniques have been applied. For clarity, this Section IV.B shall not require disclosure of intellectual property or trade secrets, such as algorithms, ranking signals, or post-trained LLMs. |
| C. <u>User-Side Data Sharing Administration</u>: | C. <u>User-Side Data Sharing Administration</u>: These remedies are intended to make this data available in a way that provides suitable security and privacy safeguards for the data the Google must share. | C. <u>User-Side Data Sharing Administration</u>: |
|    1.  Plaintiffs, in consultation with the TC, shall promptly determine the appropriate User-side Data privacy and security safeguards to be applied before Google shares the data specified in Section IV.B with Qualified Competitors. Google shall have up to six (6) months from the date that the Plaintiffs, in |    1.  Before this data specified in Paragraph IV.B is shared with Qualified Competitors, Google shall apply adequate anonymization and privacy-enhancing techniques to ensure the data is anonymized and secured, while attempting to optimize its usefulness. |    1.  Plaintiffs, in consultation with the TC, shall promptly determine the appropriate User-side Data privacy and security safeguards to be applied before Google shares the data specified in Section IV.B with Qualified Competitors. Google shall have up to six (6) months from the date that the Plaintiffs, in |

| | | |
|---|---|---|
| consultation with the TC, determine such privacy and security safeguards to implement the technology and provide any notice necessary to comply with this Section IV, and Google shall be deemed to have implemented the technology once Plaintiffs, in consultation with the TC, determine that the technology, including privacy and security safeguards, is fully functional. | 3. Google will have up to six (6) months from the date that security and privacy safeguards are finally determined to implement the technology and provide any notice necessary to comply with this Section IV.C.2. | consultation with the TC, determine such privacy and security safeguards to implement the technology and provide any notice necessary to comply with this Section IV, and Google shall be deemed to have implemented the technology once Plaintiffs, in consultation with the TC, determine that the technology, including privacy and security safeguards, is fully functional. |
| 2. Google shall provide sufficient information about each dataset such that Qualified Competitors can reasonably understand what it contains, including but not limited to a description of what the dataset contains, any sampling methodology used to create the dataset, and any anonymization or privacy-enhancing technique that was applied. Plaintiffs, in consultation with the TC, may impose restrictions on what information Google shares under this Section IV.C.2 for the purposes of (i) promoting data privacy and security and (ii) ensuring privacy and security safeguards are effectively applied. | 2. Google must provide sufficient information about each dataset such that Qualified Competitors can reasonably understand what it contains, including but not limited to a description of what the dataset contains, any sampling methodology used to create the dataset, and any anonymization or privacy-enhancing technique that was applied. Plaintiffs, in consultation with the Technical Committee, may recommend restrictions on what information Google shares under this Paragraph IV.C.2 for the purposes of (i) promoting data privacy and security and (ii) ensuring privacy and security safeguards are effectively applied. | 2. Google shall provide sufficient information about each dataset such that Qualified Competitors can reasonably understand what it contains, including but not limited to a description of what the dataset contains, any sampling methodology used to create the dataset, and any anonymization or privacy-enhancing technique that was applied. Plaintiffs, in consultation with the TC, may impose restrictions on what information Google shares under this Section IV.C.2 for the purposes of (i) promoting data privacy and security and (ii) ensuring privacy and security safeguards are effectively applied. |
| [No similar provision.] | 4. The data specified in Paragraph IV.A and B will be shared pursuant to a license governing use. The terms of the license shall include a requirement that the Qualified Competitor commit not to share or sell the datasets, and shall use the datasets for the exclusive purpose of serving users located in the United States through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product. | 3. The data specified in Sections IV.A and B will be shared pursuant to a license governing use. The terms of the license shall include a requirement that the Qualified Competitor commit not to share or sell the datasets unless authorized by the Technical Committee or the Court and shall use the datasets for the exclusive purpose of serving users through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product. Within six (6) months of the Effective Date of this Final Judgment, Plaintiffs and the Technical Committee, with input from Google, shall create and submit to the Court a template for such license. |

## V.    REQUIRED SYNDICATION OF SEARCH RESULTS

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| A.  <u>Search Syndication License</u>: Google shall take steps sufficient to make available to any Qualified Competitor, on financial terms no worse than those offered to any other user of Google's search syndication products, a syndication license whose term will be five (5) years from the date the license is signed, and which shall require Google, via real-time API(s), to make the following information and data available in response to each query issued or submitted by a Qualified Competitor:<br><br>1.  both desktop and mobile versions of the ranked organic web search results obtained from crawling the web;<br><br>2.  the user-facing query-rewriting features that Google provides under any of its current search syndication agreements as of the date of entry of this Final Judgment, including user-facing Search Features that enable query correction, modification, or expansion; and<br><br>3.  the Local, Maps, Video, Images, and Knowledge Panel Search Feature content that Google provides under any of its current search syndication agreements as of the date of the entry of this Final Judgment. | A.  <u>Search Syndication</u>: Google must take steps sufficient to make available to any Qualified Competitor a syndication agreement whose term will be five (5) years from the date Google's search syndication service, as set forth in this Final Judgment, is made available to the Qualified Competitor, unless there are fewer than five (5) years remaining before expiration of the term of the Final Judgment, in which case the term will be the remainder of the term of the Final Judgment.  Google must make available under the syndication agreement the following information and data in response to each query submitted by a Qualified Competitor:<br><br>1.  Both desktop and mobile versions of the ranked organic web search results obtained from crawling the web (i.e., the ten blue links) that Google provides under current standard search syndication agreements;<br><br>2.  the user-facing query-rewriting features that Google provides under current standard search syndication agreements, including user-facing features that enable query correction, modification, or expansion; and<br><br>3.  the Local, Maps, Video, Images, and Knowledge Panel search feature content that Google provides under current standard search syndication agreements.  For the avoidance of doubt, Google is not required to syndicate content in a manner inconsistent with its third-party content license agreements. | A.  <u>Search Syndication License</u>: Google shall take steps sufficient to make available to any Qualified Competitor, on financial terms no worse than those offered to any other user of Google's search syndication products, a syndication license whose term will be five (5) years from the date the license is signed, and which shall require Google, via real-time API(s), to make the following information and data available in response to each query issued or submitted by a Qualified Competitor:<br><br>1.  both desktop and mobile versions of the ranked organic web search results obtained from crawling the web;<br><br>2.  the user-facing query-rewriting features that Google provides under any of its current search syndication agreements as of the date of entry of this Final Judgment, including user-facing Search Features that enable query correction, modification, or expansion; and<br><br>3.  the Local, Maps, Video, Images, and Knowledge Panel Search Feature content that Google provides under any of its current search syndication agreements as of the date of entry of this Final Judgment. |
| B.  <u>Search Syndication License Terms</u>: The search syndication license specified in Section V.A shall have the following additional features: | B.  <u>Search Syndication Agreement Terms</u>:  The search syndication agreement must have the following additional features: | B.  <u>Search Syndication License Terms</u>: The search syndication license in Section V.A shall have the following additional features: |

| | | |
|---|---|---|
| 1. Google shall make syndicated content available via an API. | 1. Google will make syndicated content available via an API. | 1. Google shall make syndicated content available via an API. |
| 2. Google shall provide responses with latency and reliability functionally equivalent to what any other user of Google's search syndication products would receive as of the date of entry of this Final Judgment. | 2. Google will provide Qualified Competitors with latency and reliability functionally equivalent to what Google ordinarily provides to other users of Google's search syndication products with respect to queries originating in the United States. For the avoidance of doubt, Google's obligations do not extend to latency and reliability differences that result from differences in product implementation, users, or are otherwise outside of Google's syndication products. | 2. Google shall provide Qualified Competitors with latency and reliability functionally equivalent to what any other user of Google's search syndication products would receive as of the date of entry of this Final Judgment. For the avoidance of doubt, Google's obligations do not extend to latency and reliability differences that result from differences in product implementation, users, or are otherwise outside of Google's syndication products. |
| 3. Google shall provide the license on a non-discriminatory basis to any Qualified Competitor on terms no less favorable than the most favorable terms Google provides under any current search syndication agreements as of the date of entry of this Final Judgment. | 3. Google will offer these syndication services on a non-discriminatory basis to Qualified Competitors at market rates consistent with ordinary commercial terms agreed to by other users of Google's search syndication products with respect to queries originating in the United States. | 3. Google shall provide the license on a non-discriminatory basis to any Qualified Competitor on terms no less favorable than the most favorable terms Google provides under any current search syndication agreements as of the date of entry of this Final Judgment. |
| 4. Syndication shall start with significant access to the data required by Section V.A above and decline over the course of five (5) years with an expectation that Qualified Competitors will become independent of Google over time through investment in their own search capabilities. Qualified Competitors' use of Google's search syndication services in the first year of a syndication license available under Section V.A shall be capped at 40% of the Qualified Competitors' annual queries. The scope of allowable syndication beyond the first year of a syndication license available under Section V.A shall be determined by the Plaintiffs in consultation with the TC. | 4. Qualified Competitors' use of Google's syndication services in the first year will be capped at 40% of Qualified Competitors' annual U.S. queries and decline over the course of a 5-year period with an expectation that Qualified Competitors will become independent of Google over time through investment in their own search capabilities. The pace of this tapering, the methods for measuring and determining the percentage, and the application of the percentage will be determined by the Court upon consultation with the Technical Committee in a manner that facilitates competition while incentivizing Qualified Competitors to move promptly to become independent of Google. | 4. Qualified Competitors' use of Google's syndication services in the first year will be capped at 40% of Qualified Competitors' annual U.S. queries and decline over the course of a 5-year period with an expectation that Qualified Competitors will become independent of Google over time through investment in their own search capabilities. The pace of this tapering, the methods for measuring and determining the percentage, and the application of the percentage will be determined by the Court upon consultation with Plaintiffs and the Technical Committee in a manner that facilitates competition while incentivizing Qualified Competitors to move promptly to become independent of Google. |
| 5. Google may not consent to Qualified Competitors exceeding syndication limits set by Plaintiffs, and Qualified Competitors shall | 6. Google may not consent to Qualified Competitors exceeding syndication limits, and Qualified Competitors must submit to the | 5. Google may not consent to Qualified Competitors exceeding syndication limits, and Qualified Competitors shall submit to the TC |

| | | |
|---|---|---|
| submit to their TC audits of syndication frequency and scope. The frequency and content of these audits shall be determined by the Plaintiffs in consultation with the TC. | Technical Committee audits of syndication frequency and scope. The Technical Committee will make recommendations regarding the frequency and content of these audits, and the Court will have final authority over their frequency and scope. | audits of syndication frequency and scope. The frequency and content of these audits shall be determined by the Plaintiffs in consultation with the TC. |
| 6. Google may impose no restrictions or conditions on how a Qualified Competitor uses, displays, or integrates information or services obtained under this Section V beyond the least restrictive terms Google provides under any current search syndication agreements as of the date of entry of this Final Judgment. | 7. The only permitted use of the information and data that Qualified Competitors obtain from Google pursuant to this Section V is to display the search results to the end user who submitted the associated query, for the exclusive purpose of serving users located in the United States through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product. | 6. Google may impose no restrictions or conditions on how a Qualified Competitor uses, displays, or integrates information or services obtained under this Section V beyond the least restrictive terms Google provides under any current search syndication agreements as of the date of entry of this Final Judgment. |
| 7. Qualified Competitors may elect, in their sole discretion, which queries (some or all) for which they will request syndicated results and which syndication components to display or use and may do so in any manner they choose, except that Google may impose restrictions on the display or use of syndication components no less favorable than what it provides under any current search syndication agreements as of the date of entry of this Final Judgment. | 5. Qualified Competitors may elect, in their sole discretion, the queries (of those that are eligible for syndication pursuant to paragraph V.B.4) for which they will request syndicated results and which syndication components to call for.<br><br>8. Google may impose its ordinary commercial terms and policies. For the avoidance of doubt, Google is permitted to place its ordinary commercial restrictions on the use and display of its syndicated results and content. Google is also permitted to place its ordinary commercial restrictions on scraping, indexing, crawling, or otherwise storing or analyzing the syndicated results and content. | 7. Qualified Competitors may elect, in their sole discretion, which queries (some or all) for which they will request syndicated results and which syndication components to display or use and may do so in any manner they choose, except that Google may impose restrictions on the display or use of syndication components no less favorable than what it provides under any current search syndication agreements as of the date of entry of this Final Judgment. Google is also permitted to place its ordinary commercial restrictions on scraping, indexing, or crawling the syndicated results and content. |
| 8. It shall be the Qualified Competitor's sole discretion to determine how much information to share with Google regarding the end-user, except that Google may require a Qualified Competitor to share information with Google regarding the end-user, on terms no less favorable than what any other user of Google's search syndication products would receive as of the date of entry of this Final Judgment, as is | 9. It will be the Qualified Competitor's sole discretion to determine how much information to share with Google regarding the end-user, except that Google may impose its ordinary commercial terms as is necessary for the purposes of (1) search syndication functionality; (2) spam and abuse detection; and (3) legal or regulatory compliance. | 8. It shall be the Qualified Competitor's sole discretion to determine how much information to share with Google regarding the end user except that Google may require a Qualified Competitor to share information with Google regarding the end user, on terms no less favorable than what any other user of Google's search syndication products would receive as of the date of entry of this Final Judgment, as is |

| | | |
|---|---|---|
| necessary for the purposes of (1) basic search syndication functionality; (2) spam and abuse detection; and (3) legal or regulatory compliance. | | necessary for the purposes of (1) basic search syndication functionality; (2) spam and abuse detection; and (3) legal or regulatory compliance. |
| 9. Google may not retain or use (in any way) syndicated queries or other information it obtains under Section V.A for its own products and services beyond the most limited retention and use permitted under any of Google's current search syndication agreements as of the date of entry of this Final Judgment. | 10. Google is permitted to retain or use data collected from Qualified Competitors in provisioning of the service under Section V for Google's own products and services to the same extent Google retains or uses data in the ordinary course from other users of its search syndication service. | 9. Google may not retain or use (in any way) syndicated queries or other information it obtains under Section V.A for its own products and services beyond the most limited retention and use permitted under any of Google's current search syndication agreements as of the date of entry of this Final Judgment. |
| 10. For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States. Synthetic queries are not eligible for syndication under this Final Judgment. | 11. For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States, from human end users of the Qualified Competitor. Queries from a syndicator of the Qualified Competitor and synthetic queries are not eligible for syndication under the Final Judgment. | 10. For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States, from human end users of the Qualified Competitor. Queries from a syndicator of the Qualified Competitor and synthetic queries are not eligible for syndication under the Final Judgment. |
| [No similar provision.] | 12. If Google in good faith believes a Qualified Competitor is in breach of the terms of its agreement, it may exercise its rights under the agreement. Google must also provide simultaneous notice to the Technical Committee of the breach and the actions Google is taking in light of the breach. | 11. If Google in good faith believes a Qualified Competitor is in breach of the terms of its agreement, it may exercise its rights under the agreement. Google must also provide simultaneous notice to the Technical Committee of the breach and the actions Google is taking in light of the breach. |
| [No similar provision.] | [No similar provision.] | Within sixty (60) days of the Effective Date of this Final Judgment, Plaintiffs and the Technical Committee, with input from Google, shall create and submit to the Court a template for such license. |
| C. Existing Syndication Agreements: The provisions of this Section V shall have no effect on any existing Google syndication agreements with third parties or on its ability to enter into syndication agreements with third parties other than Qualified Competitors, except that Google shall permit any entity with an existing syndication agreement who becomes a Qualified Competitor, | C. Existing Syndication Agreements: The provisions of this Section V will have no effect on any existing Google search syndication agreements with third parties or on Google's ability to enter into search syndication contracts with third parties other than Qualified Competitors, except that Google must permit any entity with an existing search syndication agreement who becomes a | C. Existing Syndication Agreements: The provisions of this Section V will have no effect on any existing Google search syndication agreements with third parties or on Google's ability to enter into search syndication agreements with third parties other than Qualified Competitors, except that Google shall permit any entity with an existing search syndication agreement who |

| | | |
|---|---|---|
| at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section V. | Qualified Competitor, at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section V. | becomes a Qualified Competitor, at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section V. |

## VI.   SEARCH TEXT AD AUCTION CHANGES AND SEARCH TEXT ADS SYNDICATION

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| A. Search Text Ads Auction Changes: Within a reasonable period of time after the Technical Committee's appointment, Plaintiffs shall submit a proposal to the Court, informed by the Technical Committee's views, by which Google shall periodically provide the Technical Committee and Plaintiffs a report outlining all changes to its Search Text Ads auction meeting certain parameters and, for each such change, (1) Google's public disclosure of that change or (2) a statement why no public disclosure is necessary. Plaintiffs' proposal shall detail the types of changes that must be disclosed, the frequency of disclosure, the steps to mitigate undue burden on Google, and the steps to ensure any public disclosure of an ad auction change (if not already made by Google) avoids revealing Google's trade secrets, in accord with the Court's instructions in its September 2, 2025, Memorandum Opinion. Plaintiffs have the right to challenge any disclosure they deem inadequate. For the avoidance of doubt, Google need not report on auction experiments, which are generally tested on some fraction of Google's Search Text Ads traffic, but Google shall disclose changes to the Search Text Ads auction that result from any such auction experiments. | A. Search Text Ads Auction Changes: Within a reasonable period of time after the Technical Committee's appointment, Plaintiffs and the Technical Committee shall submit a proposal to the Court, by which Google shall periodically provide the Technical Committee and Plaintiffs a report outlining all changes to its Search Text Ads auction meeting certain parameters and, for each such change, (1) Google's public disclosure of that change or (2) a statement why no public disclosure is necessary. The proposal shall detail the types of changes that must be disclosed, the frequency of disclosure, the steps to mitigate undue burden on Google, and the steps to ensure any public disclosure of an ad auction change (if not already made by Google) avoids revealing Google's trade secrets, in accord with the Court's instructions in its September 2, 2025, Memorandum Opinion. For the avoidance of doubt, Google need not report on auction experiments, which are generally tested on some fraction of Google's Search Text Ads traffic. Should any of these auction experiments result in ad auction launches that fall within the types of changes that must be disclosed under this Section, Google shall disclose such changes to Plaintiffs and the Technical Committee. | A. Search Text Ads Auction Changes: Within a reasonable period of time after the Technical Committee's appointment, Plaintiffs shall submit a proposal to the Court, informed by the Technical Committee's views, by which Google shall periodically provide the Technical Committee and Plaintiffs a report outlining all changes to its Search Text Ads auction meeting certain parameters and, for each change, (1) Google's public disclosure of that change or (2) a statement why no public disclosure is necessary. Plaintiffs' proposal shall detail the types of changes that must be disclosed, the frequency of disclosure, the steps to mitigate undue burden on Google, and the steps to ensure any public disclosure of an ad auction change (if not already made by Google) avoids revealing Google's trade secrets, in accord with the Court's instructions in its September 2, 2025, Memorandum Opinion. Plaintiffs have the right to challenge any disclosure they deem inadequate. For the avoidance of doubt, Google need not report on auction experiments, which are generally tested on some fraction of Google's Search Text Ads traffic, but Google shall disclose changes to the Search Text Ads auction that result from any such auction experiments. |
| B. Search Text Ads Syndication: Google shall take steps sufficient to make available to any Qualified Competitor a Search Ads Syndication License whose term will be five (5) years from the date the license is | B. Search Text Ads Syndication: Google must take steps sufficient to make available to any Qualified Competitor a Search Text Ads syndication agreement whose term will be five (5) years from the date | B. Search Text Ads Syndication: Google shall take steps sufficient to make available to any Qualified Competitor a Search Text Ads Syndication License whose term will be five (5) years from the date the |

| signed. The Search Text Ads syndication agreement shall have the following additional features: | Google's Search Text Ads syndication service, as set forth in this Final Judgment, is made available to the Qualified Competitor, unless there are fewer than five (5) years remaining before expiration of the term of the Final Judgment, in which case the term will be the remainder of the term of the Final Judgment. The Search Text Ads syndication agreement must have the following additional features: | license is signed. The Search Text Ads syndication agreement shall have the following additional features: |
|---|---|---|
| 1. Google shall provide latency, reliability, and performance functionally equivalent to what Google provides any other user of Google's Search Text Ads syndication products, e.g., AdSense for Search, or any other current or future products offering syndicated Search Text Ads. Search Text Ads syndication licenses to Qualified Competitors shall include all types of Search Text Ads (including any assets, extensions, or similar Search Text Ad variations) available through its syndication products. For the avoidance of doubt, Google shall only provide syndication for queries that originate in the United States. | 1. Google will provide latency, reliability, and performance functionally equivalent to what Google ordinarily provides to other users of Google's Search Text Ads syndication products, e.g., AdSense for Search, with respect to queries originating in the United States. For the avoidance of doubt, Google's obligations do not extend to latency, reliability, and performance differences that result from differences in product implementation, users, or are otherwise outside of Google's syndication products.<br><br>3. Google will make available to Qualified Competitors all types of Search Text Ads (including any assets, extensions, or similar Search Text Ad variations) that are available through its Search Text Ads syndication products. | 1. Google shall provide latency, reliability, and performance functionally equivalent to what Google ordinarily provides to other users of Google's Search Text Ads syndication products, e.g., AdSense for Search, or any other current or future products offering syndicated Search Text Ads. Search Text Ads syndication licenses to Qualified Competitors shall include all types of Search Text Ads (including any assets, extensions, or similar Search Text Ad variations) available through its syndication products. For the avoidance of doubt, Google's obligations do not extend to latency, reliability, and performance differences that result from differences in product implementation, users, or are otherwise outside of Google's syndication products. |
| 2. Google shall provide the Search Ads Syndication License to Qualified Competitors on financial terms no worse than those offered to any other user of Google's Search Text Ads syndication products. | 2. Google will offer these syndication services on a non-discriminatory basis to Qualified Competitors at market rates consistent with ordinary commercial terms agreed to by other users of Google's Search Text Ads syndication products, e.g., AdSense for Search, with respect to queries originating in the United States. | 2. Google shall provide the Search Text Ads Syndication License to Qualified Competitors on financial terms no worse than those offered to any other user of Google's Search Text Ads syndication products. |
| 3. Google shall not require Qualified Competitors to share more information with Google regarding the end-user than it requires from any other user of Google's Search Text Ads syndication products. | 11. It will be the Qualified Competitor's sole discretion to determine how much information to share with Google regarding the end-user, except that Google may impose its ordinary commercial terms for the | 3. Google shall not require Qualified Competitors to share more information with Google regarding the end user than it requires from any other user of Google's Search Text Ads syndication products. |

| | | |
|---|---|---|
| | purposes of (1) ad syndication functionality; (2) spam and abuse detection; and/or (3) legal or regulatory compliance. | |
| 4. The only permitted use of the information and data that Qualified Competitors obtain from Google pursuant to this Section VI is to display the ad results to the end user who submitted the associated query, as further detailed in this section. | 7. The only permitted use of the information and data that Qualified Competitors obtain from Google pursuant to this Section VI is to display the ad results to the end user who submitted the associated query, for the exclusive purpose of serving users located in the United States through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product. | 4. The only permitted use of the information and data that Qualified Competitors obtain from Google pursuant to this Section VI is to display the ad results to the end user who submitted the associated query, as further detailed in this section, except as permitted by Section VI.B.9. |
| 5. Google shall (i) make the purchase of ads syndicated under this Section VI.B available to advertisers on a nondiscriminatory basis comparable to, and no more burdensome than, the availability of Google's other Search Text Ads; (ii) include Qualified Competitors in its Search Partner Network; and (iii) provide advertisers the option to appear on each individual Qualified Competitor's sites on a site-by-site basis (i.e., an advertiser can choose to appear as a syndicated result on a Qualified Competitor's site regardless of whether it opts into the Search Partner Network or chooses to appear on any other site, including Google.com) to the same extent advertisers have such choice for any Google Search Text Ads Syndicator as of the date of entry of this Final Judgment. | 4. Google will make the purchase of ads syndicated under this Section VI available to advertisers on a nondiscriminatory basis comparable to, and no more burdensome than, the availability of Google's other Search Text Ads, and must offer advertisers the choice to opt into showing ads on Qualified Competitors' websites, consistent with Google's ordinary commercial terms, policies, and functionality offered to other users of Google's Search Text Ads syndication products. | 5. Google shall (i) make the purchase of ads syndicated under this Section VI.B available to advertisers on a non-discriminatory basis comparable to, and no more burdensome than, the availability of Google's other Search Text Ads and (ii) include Qualified Competitors in its Search Partner Network. |
| 6. Qualified Competitors shall have the same formatting flexibility available to any other user of Google's Search Text Ads syndication products, shall be free to use other providers of syndicated search ads or display their own ads, | 5. Qualified Competitors shall have the same formatting flexibility with respect to the Search Text Ads syndicated pursuant to this Judgment as Google makes available to other users of Google's Search Text Ads syndication products. | 6. Qualified Competitors shall have the same formatting flexibility available to any other user of Google's Search Text Ads syndication products, shall be free to use other providers of syndicated search ads or display their own ads, |

| | | |
|---|---|---|
| and shall not be required to provide Google ads with preferential placement over equivalent ads requested from other sources. Google may place only ordinary-course restrictions on the use or display of syndicated ad content intended to guard against "trick or click" schemes, ensure the proper ordering of ads, guarantee ad quality, protect the advertiser, or prevent ad misuse, and may place restrictions on scraping, indexing, or crawling syndicated results, but such restrictions shall be no more restrictive than those applied to any other user of Google's Search Text Ads syndication products. | 6. Qualified Competitors shall be free to use other providers of syndicated search ads or display their own ads, and Qualified Competitors shall not be required to provide Google ads with preferential placement over equivalent ads requested from other sources.<br><br>8. Google may impose its ordinary commercial terms and policies. For the avoidance of doubt, Google is permitted to place its ordinary commercial restrictions on the use and display of its syndicated ads. Google is also permitted to place its ordinary commercial restrictions on scraping, indexing, crawling, or otherwise storing or analyzing the syndicated ads. | and shall not be required to provide Google ads with preferential placement over equivalent ads requested from other sources. Google may place only ordinary-course restrictions on the use or display of syndicated ad content, but such restrictions shall be no more restrictive than those applied to any other user of Google's Search Text Ads syndication products. Google is also permitted to place its ordinary commercial restrictions on scraping, indexing, or crawling the syndicated ads. |
| 7. Google may only retain or use (in any way) syndicated queries or other information it obtains under this Section VI.B to "build, improve, and maintain" its ad infrastructure in the same manner it used such information as of the date of entry of this Final Judgment. | 9. Google is permitted to retain or use data collected from Qualified Competitors in provisioning of the service under Section VI for Google's own products and services for the purpose of building, improving, and maintaining its ads infrastructure and shared ads systems. Google's use of Qualified Competitors' data for these purposes will be the same as Google's use of data from other users of its Search Text Ads syndication products. | 7. Google is permitted to retain or use data collected from Qualified Competitors in provisioning of the service under Section VI for Google's own products and services for the purpose of building, improving, and maintaining its ads infrastructure and shared ads systems. Google's use of Qualified Competitors' data for these purposes will be the same as Google's use of data from other users of its Search Text Ads syndication products. |
| 8. Google need not grant Qualified Competitors the right to set a minimum cost per click for syndicated ads unless failing to do so would violate Section VI.B.1. | 10. Google need not grant Qualified Competitors the right to set a minimum cost per click for syndicated ads. | 8. Google need not grant Qualified Competitors the right to set a minimum cost per click for syndicated ads unless failing to do so would violate Section VI.B.1. |
| 9. For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States, from human end users. Synthetic queries are not eligible for syndication under the Final Judgment. | 12. For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States, from human end users of the Qualified Competitor. Queries from a syndicator of the Qualified Competitor and synthetic queries are not eligible for syndication under the Final Judgment. | 9. For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States, from human end users. Synthetic queries are not eligible for syndication under the Final Judgment. Queries from a syndicator of the Qualified Competitor are not eligible for syndication under the Final Judgment, unless such Qualified Competitor has been certified as a |

| | | Competitor to a Google ads platform (e.g., Google Ads). |
|---|---|---|
| 10. If Google in good faith believes a Qualified Competitor is in breach of the terms of its agreement under this Section VI, Google may exercise its rights under the agreement. Before exercising such rights, Google shall first provide simultaneous notice to the Technical Committee and the Plaintiffs of the breach and the actions Google is taking in light of the breach. Google shall provide this notice in time such that Plaintiffs have a reasonable period of time to raise objections. If Plaintiffs object and seek a resolution by the Court, Google may not take any action until the later of (i) two weeks after Plaintiffs seek Court intervention, if the Court does not act, or (ii) until further order of the Court, if the Court intervenes. | 13. If Google in good faith believes a Qualified Competitor is in breach of the terms of its agreement, it may exercise its rights under the agreement. Google must also provide simultaneous notice to the Technical Committee of the breach and the actions Google is taking in light of the breach. | 10. If Google in good faith believes a Qualified Competitor is in breach of the terms of its agreement under this Section VI, Google may exercise its rights under the agreement. Before exercising such rights, Google shall first provide simultaneous notice to the Technical Committee and the Plaintiffs of the breach and the actions Google is taking in light of the breach. Google shall provide this notice in time such that Plaintiffs have a reasonable period of time to raise objections. If Plaintiffs object and seek a resolution by the Court, Google may not take any action until the later of (i) two weeks after Plaintiffs seek Court intervention, if the Court does not act, or (ii) until further order of the Court, if the Court intervenes. Google may seek expedited consideration from the Court if the circumstances warrant such treatment. |
| 11. Google shall be entitled to propose additional terms to the Search Text Ad syndication agreements with Qualified Competitors as necessary to guarantee ad quality, protect advertisers, and prevent ad misuse. Qualified Competitors are free to reject these proposed additional terms. Google shall provide simultaneous notice to the Technical Committee and the Plaintiffs of any such term and allow Plaintiffs a reasonable period of time to raise objections. If Plaintiffs object and seek a resolution by the Court, Google may not modify its Search Text Ad syndication agreements under this Section VI until the later of (i) two weeks after Plaintiffs seek Court intervention, if the Court does not act, or (ii) until further order of the Court, if the Court intervenes. | 14. Google will be entitled to propose additional terms to the Search Text Ad syndication agreements with Qualified Competitors as necessary to guarantee ad quality, protect advertisers, and prevent ad misuse. | 11. Google shall be entitled to propose additional terms to the Search Text Ad syndication agreements with Qualified Competitors as necessary to guarantee ad quality, protect advertisers, and prevent ad misuse. Qualified Competitors are free to reject these proposed additional terms. Google shall provide simultaneous notice to the Technical Committee and the Plaintiffs of any such term and allow Plaintiffs a reasonable period of time to raise objections. If Plaintiffs object and seek a resolution by the Court, Google may not modify its Search Text Ad syndication agreements under this Section VI until the later of (i) two weeks after Plaintiffs seek Court intervention, if the Court does not act, or (ii) until further order of the Court, if the Court intervenes. Google may seek expedited |

68

| | | consideration from the Court if the circumstances warrant such treatment. |
|---|---|---|
| 12. Qualified Competitors may elect, in their sole discretion, which queries (some or all) for which they will request syndicated search text ad results and which syndication components to display or use and may do so in any manner they choose, except that Google may impose restrictions on the display or use of syndication components no less favorable than what it provides under current search text ad syndication agreements as of the date of entry of this Final Judgment. | 15. Qualified Competitors may elect, in their sole discretion, the queries for which they will request syndicated ad results. | 12. Qualified Competitors may elect, in their sole discretion, the queries for which they will request syndicated ad results. |
| [No similar provision.] | [No similar provision.] | Within sixty (60) days of the Effective Date of this Final Judgment, Plaintiffs and the Technical Committee, with input from Google, shall create and submit to the Court a template for such license. |
| C. Existing Syndication Agreements: The provisions of this Section VI shall have no effect on any existing Google search text ad syndication agreements with third parties or on its ability to enter into search text ad syndication agreements with third parties other than Qualified Competitors, except that Google shall permit any entity with an existing search text ad syndication agreement who becomes a Qualified Competitor, at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section VI. | C. Existing Syndication Agreements: The provisions of this Section VI will have no effect on any existing Google Search Text Ad syndication agreements with third parties or on Google's ability to enter into Search Text Ad syndication contracts with third parties other than Qualified Competitors, except that Google must permit any entity with an existing Search Text Ad syndication agreement who becomes a Qualified Competitor, at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section VI. | C. Existing Syndication Agreements: The provisions of this Section VI shall have no effect on any existing Google Search Text Ad syndication agreements with third parties or on Google's ability to enter in Search Text Ad syndication agreements with third parties other than Qualified Competitors, except that Google shall permit any entity with an existing Search Text Ad syndication agreement who becomes a Qualified Competitor, at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section VI. |

## VII.   COMPLIANCE, ADMINISTRATION, AND ENFORCEMENT PROCEDURES

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| A.   Technical Committee: | A.   Technical Committee: | A.   Technical Committee: |
| 1.   Within sixty (60) days of entry of this Final Judgment, the Court will appoint, pursuant to the procedures below, a five-person Technical Committee ("TC") to assist in | 1.   Within sixty (60) days of entry of this Final Judgment, the Court will appoint, pursuant to the procedures below, a five-person Technical Committee ("TC") to | 1.   Within sixty (60) days of entry of this Final Judgment, the Court will appoint, pursuant to the procedures below, a five-person Technical Committee to assist in |

| enforcement of and compliance with this Final Judgment. | assist in enforcement of and compliance with this Final Judgment. | enforcement of and compliance with this Final Judgment. |
|---|---|---|
| 2. The TC members shall be experts in some combination of software engineering, information retrieval, artificial intelligence, economics, behavioral science, as well as data privacy and data security. No TC member may have a conflict of interest that could prevent them from performing their duties in a fair and unbiased manner. In addition, unless Plaintiffs specifically consent, no TC member: | 2. The TC members must be experts in some combination of software engineering, information retrieval, artificial intelligence, economics, behavioral science, and data privacy and data security. No TC member may have a conflict of interest that could prevent them from performing their duties in a fair and unbiased manner. In addition, unless the Court approves, no TC member: | 2. The TC members shall be experts in some combination of software engineering, information retrieval, artificial intelligence, economics, behavioral science, and data privacy and data security. No TC member may have a conflict of interest that could prevent them from performing their duties in a fair and unbiased manner. In addition, unless the Court so approves, no TC member: |
| a. may have been employed in any capacity by Google or any Competitor to Google within the six-month period directly predating their appointment to the TC; | a. may have been employed in any capacity by Google or any Competitor to Google within the six-month period directly predating their appointment to the TC; | a. may have been employed in any capacity by Google or any Competitor to Google within the six-month period directly predating their appointment to the TC; |
| b. may have been retained by any party as a consulting or testifying expert in this action; or | b. may have been retained as a consulting or testifying expert by any part in this action; or | b. may have been retained by any party as a consulting or testifying expert in this action; or |
| c. may perform any work for Google or any Competitor of Google during the time that they serve on the TC and for one (1) year after ceasing to serve on the TC. | c. may perform any work for Google or any Competitor of Google during the time that they serve on the TC and for one (1) year after ceasing to serve on the TC. | c. may perform any work for Google or any Competitor of Google during the time that they serve on the TC and for one (1) year after ceasing to serve on the TC. |
| 3. Within thirty (30) days of entry of this Final Judgment, Plaintiff United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States, and Google shall each select one member of the TC, and a majority of those three members will then select the remaining two members. Plaintiff United States' appointee shall serve as chair. The selection and approval process shall be as follows: | 3. Within thirty (30) days of entry of this Final Judgment, Plaintiff United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States, and Google will each select one member of the TC, and a majority of those three members will then select the remaining two members. Plaintiff United States' appointee will serve as chair. The selection and approval process will be as follows: | 3. Within thirty (30) days of entry of this Final Judgment, Plaintiff United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States, and Google shall each select one member of the TC, and a majority of those three members will then select the remaining two members. Plaintiff United States' appointee shall serve as chair. The selection and approval process shall be as follows: |
| a. As soon as practicable after submission of this Final Judgment to the Court, the Plaintiffs as a group shall identify to Google the individuals they propose to select as their designees to the TC, and Google shall identify to Plaintiffs | a. As soon as practicable after submission of this Final Judgment to the Court, the Plaintiffs as a group will identify to Google the individuals they propose to select as their designees to the TC, and Google will identify to Plaintiffs | a. As soon as practicable after submission of this Final Judgment to the Court, the Plaintiffs as a group shall identify to Google the individuals they propose to select as their designees to the TC, and Google shall identify to Plaintiffs |

| | | |
|---|---|---|
| the individual it proposes to select as its designees. No party may object to a selection on any ground other than failure to satisfy the requirements of Section VII.A.2 above. Any such objection shall be made within ten (10) business days of receipt of notification of selection. | the individual it proposes to select as its designee. No party may object to a selection on any ground other than failure to satisfy the requirements of Paragraph VII.A.2 above. Any such objection must be made within ten (10) business days of the receipt of notification of selection. | the individual it proposes to select as its designee. No party may object to a selection on any ground other than failure to satisfy the requirements of Section VII.A.2 above. Any such objection shall be made within ten (10) business days of receipt of notification of selection. |
| b. The Plaintiffs shall apply to the Court for appointment of the persons selected pursuant to Section VII.A.3.a) above. Any objections to the eligibility of a selected person that the parties have failed to resolve between themselves will be decided by the Court based solely on the requirements stated in Section VII.A.2 above. | b. The Plaintiffs will apply to the Court for appointment of the persons selected pursuant to Paragraph VII.A.3.a above. Any objections to the eligibility of a selected person that the parties have failed to resolve between themselves will be decided by the Court based solely on the requirements stated in Paragraph VII.A.2 above. | b. The Plaintiffs shall apply to the Court for appointment of the persons selected pursuant to Section VII.A.3.a above. Any objections to the eligibility of a selected person that the parties have failed to resolve between themselves will be decided by the Court based solely on the requirements stated in Section VII.A.2 above. |
| c. As soon as practicable after their appointment by the Court, the three members of the TC selected by the Plaintiffs and Google (the "Standing Committee Members") shall identify to the Plaintiffs and Google the persons that they in turn propose to select as the remaining members of the TC. The Plaintiffs and Google shall not object to these selections on any grounds other than failure to satisfy the requirements of Section VII.A.2 above. Any such objection shall be made within ten (10) business days of receipt of notification of the selection and shall be served on the other party as well as on the Standing Committee Members. | c. As soon as practicable after their appointment by the Court, the three members of the TC selected by the Plaintiffs and Google (the "Standing Committee Members") will identify to the Plaintiffs and Google the persons that they in turn propose to select as the remaining members of the TC. The Plaintiffs and Google must not object to these selections on any grounds other than failure to satisfy the requirements of Paragraph VII.A.2 above. Any such objection must be made within ten (10) business days of the receipt of notification of the selection and must be served on the other party as well as on the Standing Committee Members. | c. As soon as practicable after their appointment by the Court, the three members of the TC selected by the Plaintiffs and Google (the "Standing Committee Members") shall identify to the Plaintiffs and Google the persons that they in turn propose to select as the remaining members of the TC. The Plaintiffs and Google shall not object to these selections on any grounds other than failure to satisfy the requirements of Section VII.A.2 above. Any such objection shall be made within ten (10) business days of receipt of notification of selection and shall be served on the other party as well as on the Standing Committee Members. |
| d. The Plaintiffs shall apply to the Court for appointment of the persons selected by the Standing Committee Members. If the Standing Committee Members cannot agree on the fourth or fifth members of the TC, that member or members shall be appointed by the Court. Any objection by Plaintiffs or Google to the eligibility of the person selected by | d. The Plaintiffs will apply to the Court for appointment of the persons selected by the Standing Committee Members. If the Standing Committee Members cannot agree on the fourth or fifth members of the TC, that member or members will be appointed by the Court. Any objection by Plaintiffs or Google to the eligibility of the person selected by | d. The Plaintiffs shall apply to the Court for appointment of the persons selected by the Standing Committee Members. If the Standing Committee Members cannot agree on the fourth or fifth members of the TC, that member or members shall be appointed by the Court. Any objection by Plaintiffs or Google to the eligibility of the person selected by |

71

| | | |
|---|---|---|
| the Standing Committee Members which the parties have failed to resolve among themselves shall also be decided by the Court based solely on the requirements stated in Section VII.A.2 above. | the Standing Committee Members which the parties have failed to resolve among themselves will also be decided by the Court based solely on the requirements stated in Paragraph VII.A.2 above. | the Standing Committee Members which the parties have failed to resolve among themselves shall also be decided by the Court based solely on the requirements stated in Section VII.A.2 above. |
| 4. The Standing Committee Members shall serve for an initial term of thirty-six (36) months; the remaining members shall serve for an initial term of thirty (30) months. At the end of a TC member's term, the party that originally selected them may, in its sole discretion, either request re-appointment by the Court to additional terms of the same length, or replace the TC member in the same manner as provided for in Section VII.A.3 above. In the case of the fourth and fifth members of the TC, those members shall be re-appointed or replaced in the manner provided in Section VII.A.3 above. | 4. The Standing Committee Members will serve for an initial term of thirty-six (36) months; the remaining members will serve for an initial term of thirty (30) months. At the end a TC member's term, the party that originally selected them may, in its sole discretion, either request re-appointment by the Court to additional terms of the same length, or replace the TC member in the same manner as provided for in Paragraph VII.A.3 above. In the case of the fourth and fifth members of the TC, those members will be re-appointed or replaced in the manner provided in Paragraph VII.A.3 above. | 4. The Standing Committee Members shall serve for an initial term of thirty-six (36) months; the remaining members shall serve for an initial term of thirty (30) months. At the end of a TC member's term, the party that originally selected them may, in its sole discretion, either request re-appointment by the Court to additional terms of the same length, or replace the TC member in the same manner as provided for in Section VII.A.3 above. In the case of the fourth and fifth members of the TC, those members shall be re-appointed or replaced in the manner provided in Section VII.A.3 above. |
| 5. If Plaintiffs determine that a member of the TC has failed to act diligently and consistently with the purposes of this Final Judgment, or if a member of the TC resigns, or for any other reason ceases to serve in their capacity as a member of the TC, the person or persons that originally selected the TC member shall select a replacement member in the same manner as provided for in Section VII.A.3 above. | 5. If any party determines that a member of the TC has failed to act diligently and consistently with the purposes of this Final Judgment, they may petition the Court for removal of that member. If a member of the TC is removed by the Court, resigns, or for any other reason ceases to serve in their capacity as a member of the TC, the person or persons that originally selected the TC member will select a replacement member in the same manner as provided for in Paragraph VII.A.3 above. | 5. If any party determines that a member of the TC has failed to act diligently and consistently with the purposes of this Final Judgment, they may petition the Court for removal of that member. If a member of the TC is removed by the Court, resigns, or for any other reason ceases to serve in their capacity as a member of the TC, the person or persons that originally selected the TC member shall select a replacement member in the same manner as provided for in Section VII.A.3 above. |
| 6. Promptly after appointment of the TC by the Court, the Plaintiffs shall enter into a Technical Committee Services Agreement ("TC Services Agreement") with each TC member that grants the rights, powers, and authorities necessary to permit the TC to perform its duties under this Final Judgment. Google shall indemnify each TC member and hold them harmless against any losses, claims, | 6. Promptly after appointment of the TC by the Court, the Plaintiffs will enter into a Technical Committee Services Agreement ("TC Services Agreement") with each TC member that grants the rights, powers, and authorities necessary to permit the TC to perform its duties under this Final Judgment. Google must indemnify each TC member and hold them harmless against any losses, claims, | 6. Promptly after appointment of the TC by the Court, the Plaintiffs shall enter into a Technical Committee Services Agreement ("TC Services Agreement") with each TC member that grants the rights, powers, and authorities necessary to permit the TC to perform its duties under this Final Judgment. Google shall indemnify each TC member and hold them harmless against any losses, claims, |

| | | |
|---|---|---|
| damages, liabilities or expenses arising out of, or in connection with, the performance of the TC's duties, except to the extent that such liabilities, losses, damages, claims, or expenses result from misfeasance, gross negligence, willful or wanton acts, or bad faith by the TC member. The TC Services Agreements shall include the following: | damages, liabilities or expenses arising out of, in connection with, the performance of the TC's duties, except to the extent that such liabilities, losses, damages, claims, or expenses result from misfeasance, gross negligence, willful or wanton acts, or bad faith by the TC member. The TC Services Agreement must include the following: | damages, liabilities, or expenses arising out of, or in connection with, the performance of the TC's duties, except to the extent that such liabilities, losses, damages, claims, or expenses result from misfeasance, gross negligence, willful or wanton acts, or bad faith by the TC member. The TC Services Agreements shall include the following: |
| a. The TC members shall serve, without bond or other security, at the cost and expense of Google on such terms and conditions as the Plaintiffs approve, including the payment of reasonable fees and expenses. | a. The TC members will serve, without bond or security, at the cost and expense of Google on such terms and conditions as the parties agree, including the payment of reasonable fees and expenses. To the extent that the parties cannot agree on the terms of a TC Services Agreement, the parties will submit such disagreement to the Court for resolution. | a. The TC members shall serve, without bond or other security, at the cost and expense of Google on such terms and conditions as the parties agree, including payment of reasonable fees and expenses. To the extent that the parties cannot agree on the terms of a TC Services Agreement, the parties will submit such disagreement to the Court for resolution. |
| b. The TC Services Agreement shall provide that each member of the TC must comply with the limitations provided for in Section VII.A.2 above. | b. The TC Services Agreement will provide that each member of the TC must comply with the limitations provided for in Paragraph VII.A.2 above. | b. The TC Services Agreement shall provide that each member of the TC must comply with the limitations provided for in Section VII.A.2 above. |
| 7. The TC shall have the following powers and duties: | 7. The TC has the following powers and duties: | 7. The TC shall have the following powers and duties: |
| a. The TC shall have the power and authority to monitor Google's implementation of and compliance with its obligations under this Final Judgment, in the manner describe further herein. | b. The TC will have the power to advise and make recommendations about the standards to be applied for assessing, and the ultimate determination of whether a third party should qualify as a Qualified Competitor for purposes of this Final Judgment, *see* Paragraph IX.T. | a. The TC shall have the power and authority to monitor Google's implementation of and compliance with its obligations under this Final Judgment, in the manner described further herein. |
| | d. The TC will have the power to advise Plaintiffs and the Court about an appropriate cap on User-side Data disclosures to be made to Qualified Competitors, *see* Paragraph IV.B.4. | |
| | e. The TC will have the power to advise Plaintiffs and the Court about appropriate User-side Data security and privacy safeguards, *see* Paragraph IV.C. | |

73

| | | |
|---|---|---|
| | f. The TC will have the power to audit Qualified Competitors' use of search and search text ads syndication services, *see* Paragraph IX.T. | |
| | g. The TC will have the power to conduct data security and privacy safeguard audits of Qualified Competitors, *see* Paragraph IX.T. | |
| | h. The TC will have the power to advise Plaintiffs and the Court about an appropriate tapering rate for search syndication, *see* Paragraph V.B.4. | |
| | i. The TC will have the power to develop and propose parameters that inform Google what types of Search Text Ads auction changes must be brought to the attention of Plaintiffs and the Technical Committee, and receive disclosures from Google about Search Text Ads auctions changes, *see* Paragraph VI.A. | |
| b. The TC shall have the power to recommend reasonable data security standards applicable to Qualified Competitors, which shall be approved by the Plaintiffs. | c. The TC will have the power to recommend reasonable data security standards applicable to Qualified Competitors, which will be submitted to the Court for review and determination, *see* Paragraph IX.T. | b. The TC shall have the power to recommend reasonable data security standards applicable to Qualified Competitors, which shall be approved by the Plaintiffs. |
| c. The TC may, on reasonable notice to Google: | j. The TC may make reasonable and proportional requests necessary to perform its duties, on reasonable notice to Google, to: | c. The TC may, on reasonable notice to Google: |
| 1. interview, either informally or on the record, any Google personnel, who may have their individual counsel present; any such interview will be subject to the reasonable convenience of such personnel and without restraint or interference by Google; | 1. interview any Google personnel, who may have counsel present; any such interview will be subject to the reasonable convenience of such personnel and without restraint or interference by Google; | i. interview, either informally or on the record, any Google personnel, who may have their individual counsel present; any such interview will be subject to the reasonable convenience of such personnel and without restraint or interference by Google; |
| 2. inspect and copy any document in the possession, custody, or control of Google personnel; | 2. provide non-privileged documents and records in its possession, custody, or control; | ii. inspect and copy any document in the possession, custody, or control of Google personnel; |

74

| | | |
|---|---|---|
| 3. obtain reasonable access to any system or equipment to which Google personnel have access; | 3. obtain reasonable access to systems or equipment to the extent necessary to perform testing regarding appropriate User-side Data security and privacy safeguards, *see* Paragraph IV.C; and | iii. obtain reasonable access to any system or equipment to which Google personnel have access; |
| 4. obtain reasonable access to, and inspect, any physical facility, building or other premises to which Google personnel have access; and | 4. obtain reasonable access to any physical facilities, building or other premises to the extent necessary to perform testing regarding appropriate User-side Data security and privacy safeguards, *see* Paragraph IV.C. | iv. obtain reasonable access to, and inspect, any physical facility, building, or other premises to which Google personnel have access; and |
| 5. require Google personnel to provide documents, data and other information, and to submit reports to the TC containing such material, in such form as the TC may reasonably direct. | [No similar provision. | v. require Google personnel to provide documents, data, and other information, and to submit reports to the TC containing such material, in such form as the TC may reasonably direct. |
| [No similar provision.] | 5. To the extent that Google and the TC cannot agree on the reasonable scope of any such request, the parties may submit such disagreement to the Court for resolution. | [No similar provision.] |
| d. The TC shall have access to Google's source code and algorithms, subject to a confidentiality agreement, as approved by the Plaintiffs and to be agreed to by the TC members pursuant to Section VII.A.8 below, and by any staff or consultants who may have access to the source code and algorithms. The TC may study, interrogate and interact with the source code and algorithms in order to perform its functions and duties, including the handling of complaints and other inquiries from third parties. | [No similar provision.] | d. The TC shall have access to Google's source code and algorithms, subject to a confidentiality agreement, as approved by the Plaintiffs and to be agreed to by the TC members pursuant to Section VII.A.8 below, and by any staff or consultants who may have access to the source code and algorithms. The TC may study, interrogate, and interact with the source code and algorithms in order to perform its functions and duties, including the handling of complaints and other inquiries from third parties. |
| e. The TC shall receive complaints from Google's | [No similar provision.] | e. The TC shall receive complaints from Google's |

| | | |
|---|---|---|
| Compliance Officer (as described in Section VII.B below), third parties, or the Plaintiffs and handle them in the manner specified in Section VII.C below. | | Compliance Officer (as described in Section VII.B below), third parties, or the Plaintiffs and handle them in the manner specified in Section VII.C below. |
| f. The TC shall report in writing to the Plaintiffs, initially every three (3) months for three (3) years and thereafter every six (6) months until expiration of this Final Judgment, the actions it has undertaken in performing its duties pursuant to this Final Judgment, including the identification of each business practice reviewed and any recommendations made by the TC. | k. The TC must report in writing to the parties, initially every three (3) months for three (3) years and thereafter every six (6) months until expiration of this Final Judgment, the actions it has undertaken in performing its duties pursuant to this Final Judgment. | f. The TC shall report in writing to the Plaintiffs, initially every three (3) months for three (3) years and thereafter every six (6) months until expiration of this Final Judgment, the actions it has undertaken in performing its duties pursuant to this Final Judgment, including the identification of each business practice reviewed and any recommendations made by the TC. |
| g. Regardless of when reports are due, when the TC has reason to believe that there may have been a failure by Google to comply with any term of this Final Judgment, or that Google is attempting to circumvent any provision of this Final Judgment or the intended purposes of this Final Judgment, the TC shall immediately notify the Plaintiffs in writing setting forth the relevant details. | [No similar provision.] | g. Regardless of when reports are due, when the TC has reason to believe that there may have been a failure by Google to comply with any term of this Final Judgment, or that Google is attempting to circumvent any provision of this Final Judgment or the intended purposes of this Final Judgment, the TC shall immediately notify the Plaintiffs in writing setting forth the relevant details. |
| h. TC members may communicate with third parties about how their complaints or inquiries might be resolved with Google, so long as the confidentiality of information obtained from Google is maintained. | [No similar provision.] | h. TC members may communicate with third parties about how their complaints or inquiries might be resolved with Google, so long as the confidentiality of information obtained from Google is maintained. |
| i. The TC may hire at the cost and expense of Google, with prior notice to Google and subject to approval by the Plaintiffs, such staff or consultants (all of whom must meet the qualifications of Sections VII.A.2.a–c) as are reasonably necessary for the TC to carry out its duties and responsibilities under this Final Judgment. The compensation of any person retained by the TC shall be based on reasonable and | l. The TC may hire at the cost and expense of Google, with prior notice to Google and subject to approval by the parties, such staff or consultants (all of whom must meet the qualifications of Paragraphs VII.A.2.a-c) as are reasonably necessary for the TC to carry out its duties and responsibilities under this Final Judgment. The compensation of any person retained by the TC will be based on reasonable and | i. The TC may hire at the cost and expense of Google, with prior notice to Google and subject to approval by the Plaintiffs, such staff or consultants (all of whom must meet the qualifications of Sections VII.A.2.a–c) as are reasonably necessary for the TC to carry out its duties and responsibilities under this Final Judgment. The compensation of any person retained by the TC shall be based on reasonable and |

76

| | | |
|---|---|---|
| customary terms commensurate with the individual's experience and responsibilities. | customary terms commensurate with the individual's experience and responsibilities, and subject to approval by the parties. To the extent that the parties cannot agree on such a request, the parties will submit such disagreement to the Court for resolution. | customary terms commensurate with the individual's experience and responsibilities. |
| j. The TC shall account for all reasonable expenses incurred, including agreed upon fees for the TC members' services, subject to the approval of the Plaintiffs. Google's failure to promptly pay the TC's accounted-for costs and expenses, including for agents and consultants, shall constitute a violation of this Final Judgment and may result in sanctions imposed by the Court. Google may, on application to the Court, object to the reasonableness of any such fees or other expenses only if Google has conveyed such objections to the Plaintiffs and the TC within ten (10) calendar days of receiving the invoice for such fees or other expenses. On any such application, (a) Google shall bear the burden to demonstrate unreasonableness; (b) Google shall establish an escrow account into which it deposits the disputed costs and expenses until the dispute is resolved; and (c) the TC members shall be entitled to recover all costs incurred on such application (including reasonable attorneys' fees and costs), regardless of the Court's disposition of such application, unless the Court expressly finds that the TC's opposition to the application was without substantial justification. | m. The TC must account for all reasonable expenses incurred, including agreed upon fees for the TC members' services, subject to the approval of the parties. To the extent that the parties cannot agree on the reasonableness of such expenses, the parties will submit such disagreement to the Court for resolution. | j. The TC shall account for all reasonable expenses incurred, including agreed upon fees for the TC members' services, subject to the approval of the Plaintiffs. Google's failure to promptly pay the TC's accounted-for costs and expenses, including for agents and consultants, shall constitute a violation of this Final Judgment and may result in sanctions imposed by the Court. Google may, on application to the Court, object to the reasonableness of any such fees or other expenses only if Google has conveyed such objections to the Plaintiffs and the TC within ten (10) calendar days of receiving the invoice for such fees or other expenses. On any such application, (a) Google shall bear the burden to demonstrate unreasonableness; (b) Google shall establish an escrow account into which it deposits the disputed costs and expenses until the dispute is resolved; and (c) the TC members shall be entitled to recover all costs incurred on such application (including reasonable attorneys' fees and costs), regardless of the Court's disposition of such application, unless the Court expressly finds that the TC's opposition to the application was without substantial justification. |
| [No similar provision.] | a. For the avoidance of doubt, neither the TC nor Plaintiffs will have the right to make final decisions as to the requirements of this Final Judgment. Google will have the right to object to and be | k. Google may object to and be heard by the Court on any recommendation from the TC or Plaintiffs as to the interpretations or substantive requirements of this Final Judgment. |

| | | |
|---|---|---|
| | heard by the Court on any recommendation from the TC or Plaintiffs as to the interpretations of or substantive requirements of this Final Judgment. | |
| 8. Each TC member, and any consultants or staff hired by the TC, shall sign a confidentiality agreement prohibiting disclosure of any information obtained in the course of performing his or her duties as a member of the TC or as a person assisting the TC, to anyone other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, or the Court. All information gathered by the TC in connection with this Final Judgment and any report and recommendations prepared by the TC shall be treated as Highly Confidential under the Protective Order in this case, and shall not be disclosed to any person other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, and the Court except as allowed by the Protective Order entered in the Action or by further order of this Court. No member of the TC may make any public statements relating to the TC's activities. | 8. Each TC member, and any consultants or staff hired by the TC, must sign a confidentiality agreement prohibiting disclosure of any information obtained in the course of performing his or her duties as a member of the TC or as a person assisting the TC, to anyone other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, or the Court. All information gathered by the TC in connection with this Final Judgment and any report and recommendations prepared by the TC must be treated as Highly Confidential under the Protective Order in this case, and must not be disclosed to any person other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, and the Court except as allowed by the Protective Order entered in the Action or by further order of this Court. No member of the TC may make any public statements relating to the TC's activities. | 8. Each TC member, and any consultants or staff hired by the TC, shall sign a confidentiality agreement prohibiting disclosure of any information obtained in the course of performing his or her duties as a member of the TC or as a person assisting the TC, to anyone other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, or the Court. All information gathered by the TC in connection with this Final Judgment and any report and recommendations prepared by the TC shall be treated as Highly Confidential under the Protective Order in this case, and shall not be disclosed to any person other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, and the Court except as allowed by the Protective Order entered in the Action or by further order of this Court. No member of the TC may make any public statements relating to the TC's activities. |
| B. <u>Internal Compliance Officer</u>: | C. <u>Internal Compliance Officer</u>: | B. <u>Internal Compliance Officer</u>: |
| 1. Google shall designate, within thirty (30) days of entry of this Final Judgment, an employee of Google as the internal Compliance Officer with responsibility for administering Google's antitrust compliance program and helping to ensure compliance with this Final Judgment. | 1. Google shall designate, within 30 days of entry of this Final Judgment, an internal Compliance Officer who shall be an employee of Google with responsibility for administering Google's antitrust compliance program and helping to ensure compliance with this Final Judgment. | 1. Google shall designate, within thirty (30) days of entry of this Final Judgment, an employee of Google as the internal Compliance Officer with responsibility for administering Google's antitrust compliance program and helping to ensure compliance with this Final Judgment. |
| 2. Within seven (7) days of the Compliance Officer's appointment, Google shall identify to the Plaintiffs the Compliance Officer's name, business address, telephone number, and email address. Within fifteen (15) days of a vacancy in the | 2. Within seven (7) days of the Compliance Officer's appointment, Google must identify to the Plaintiffs the Compliance Officer's name, business address, telephone number, and email address. Within fifteen (15) days of a vacancy in the | 2. Within seven (7) days of the Compliance Officer's appointment, Google shall identify to the Plaintiffs the Compliance Officer's name, business address, telephone number, and email address. Within fifteen (15) days of a vacancy in the |

| | | |
|---|---|---|
| Compliance Officer position, Google shall appoint a replacement and identify to the Plaintiffs the replacement Compliance Officer's name, business address, telephone number, and email address. Google's initial or replacement appointment of the Compliance Officer is subject to the approval of the Plaintiffs. | Compliance Officer position, Google must appoint a replacement and identify to the Plaintiffs the replacement Compliance Officer's name, business address, telephone number, and email address. | Compliance Officer position, Google shall appoint a replacement and identify to the Plaintiffs the replacement Compliance Officer's name, business address, telephone number, and email address. Google's initial or replacement appointment of the Compliance Officer is subject to the approval of the Plaintiffs. |
| 3. The Compliance Officer shall supervise the review of Google activities to ensure that they comply with this Final Judgment. The Compliance Officer may be assisted by other employees of Google. | 3. The Compliance Officer shall supervise the review of Google's activities to ensure that they comply with this Final Judgment. The Compliance Officer may be assisted by other employees of Google. | 3. The Compliance Officer shall supervise the review of Google activities to ensure that they comply with this Final Judgment. The Compliance Officer may be assisted by other employees of Google. |
| 4. The Compliance Officer shall be responsible for performing the following activities: | 4. The Compliance Officer shall be responsible for performing the following activities: | 4. The Compliance Officer shall be responsible for performing the following activities: |
| a. within thirty (30) days after entry of this Final Judgment, distributing a copy of the Final Judgment to all officers and directors of Google; | a. within 45 days after entry of this Final Judgment, distributing a copy of the Final Judgment to all officers and directors of Google; | a. within forty-five (45) days after entry of this Final Judgment, distributing a copy of the Final Judgment to all officers and directors of Google; |
| b. distributing a copy of this Final Judgment to any person who succeeds to a position described in Section VII.B.4.a above within thirty (30) days of the date the person starts that position. | b. promptly distributing a copy of this Final Judgment to any person who succeeds to a position described in Paragraph VII.C.4.a; | b. promptly distributing a copy of this Final Judgment to any person who succeeds to a position described in Section VII.B.4.a above; |
| c. ensuring that those persons designated by Section VII.B.4.a above are annually trained on the meaning and requirements of this Final Judgment and the U.S. antitrust laws and advising them that Google's legal advisors are available to confer with them regarding any question concerning compliance with this Final Judgment or the U.S. antitrust laws; | c. ensuring that those persons designated in Paragraph VII.C.4.a are annually briefed on the meaning and requirements of this Final Judgment and the U.S. antitrust laws and advising them that Google's legal advisors are available to confer with them regarding any question concerning compliance with this Final Judgment or the U.S. antitrust law; | c. ensuring that those persons designated by Section VII.B.4.a above are annually briefed on the meaning and requirements of this Final Judgment and the U.S. antitrust laws and advising them that Google's legal advisors are available to confer with them regarding any question concerning compliance with this Final Judgment or the U.S. antitrust laws; |
| d. obtaining from each person designated in Section VII.B.4.a above an annual written certification that he or she: (i) has read and agrees to abide by the terms of this Final Judgment; and (ii) has been advised and understands that his or her failure | d. obtaining from each person designated in Paragraph VII.C.4.a an annual written certification that he or she: (i) has read and agrees to abide by the terms of this Final Judgment; and (ii) has been advised and understands that his or her failure to comply with this | d. obtaining from each person designated in Section VII.B.4.a above an annual written certification that he or she: (i) has read and agrees to abide by the terms of this Final Judgment and (ii) has been advised and understands that his or her failure |

| | | |
|---|---|---|
| to comply with this Final Judgment may result in a finding of contempt of court; | Final Judgment may result in a finding of contempt of court; | to comply with this Final Judgment may result in a finding of contempt of court; |
| e. maintaining a record of all persons to whom a copy of this Final Judgment has been distributed and from whom the certification described in Section VII.B.4.d above has been obtained; | e. maintaining a record of all persons to whom a copy of this Final Judgment has been distributed and from whom the certification described in Paragraph VII.C.4.d has been obtained; | e. maintaining a record of all persons to whom a copy of this Final Judgment has been distributed and from whom the certification described in Section VII.B.4.d above has been obtained; |
| f. annually communicating to all employees that they may disclose to the Compliance Officer, without reprisal for such disclosure, information concerning any violation or potential violation of this Final Judgment or the U.S. antitrust laws by Google, and establishing a confidential avenue for any employee to report potential violations. | [No similar provision.] | [No similar provision.] |
| g. establishing and maintaining the website provided for in Section VII.C.2.a below; | f. establishing and maintaining the website provided for in Paragraph VII.D.2.b; | f. establishing and maintaining the website provided for in Section VII.C.2.a below; |
| [No similar provision.] | g. preparing the Annual Compliance Report described in Paragraph VII.B.2 and any Interim Report requested as described in Paragraph VII.B.3.a; | [No similar provision.] |
| h. receiving complaints from third parties, the TC, and the Plaintiffs concerning Google's compliance with this Final Judgment and following the appropriate procedures set forth in Section VII.C below; | h. receiving complaints from third parties or the Plaintiffs concerning Google's compliance with this Final Judgment and following the appropriate procedures set forth in Paragraph VII.D; | g. receiving complaints from third parties, the TC, and the Plaintiffs concerning Google's compliance with this Final Judgment and following the appropriate procedures set forth in Section VII.C below; |
| i. maintaining a record of all complaints received and action taken by Google with respect to each such complaint; and | i. maintaining a record of all complaints received and action taken by Google with respect to each such complaint; and | h. maintaining a record of all complaints received and action taken by Google with respect to each such complaint; and |
| j. ensuring Google retains all relevant documents and electronically stored information, regardless of medium or form, related to this Final Judgment and all complaints received and or action taken by Google with respect to any complaint. | j. ensuring employees retain all relevant documents and electronically stored information, regardless of medium or form, regarding all complaints received pursuant to Paragraph VII.D.1 and action taken by Google with respect to any such complaint. | i. ensuring Google retains all relevant documents and electronically stored information, regardless of medium or form, related to this Final Judgment and all complaints received and/or action taken by Google with respect to any complaint. |
| 5. Google shall within thirty (30) days further appoint a senior | [No similar provision.] | 5. Google shall within thirty (30) days further appoint a senior |

| | | |
|---|---|---|
| business executive, who has visibility into any Google entity with obligations under this Final Judgment, whom Google shall make available to update the Court on Google's compliance at regular status conferences or as otherwise ordered. | | business executive, who has visibility into any Google entity with obligations under this Final Judgment, whom Google shall make available to update the Court on Google's compliance at regular status conferences or as otherwise ordered. |
| 6.   Google shall retain (if it has not already) a licensed attorney in good standing in California to collect documents and interview employees and generally review Google's document retention practices and Google's compliance with its legal discovery obligations under this case and final judgment.  This attorney shall be retained for a term no shorter than eighteen (18) months.  This attorney (and any team this attorney assembles) shall present to the Audit and Compliance Committee (or any successor Board Committee) on the retention of documents and Google's compliance with its discovery obligations. | [No similar provision.] | [No similar provision.] |
| C.   Voluntary Dispute Resolution: | D.   Voluntary Dispute Resolution: | C.   Voluntary Dispute Resolution: |
| 1.   Third parties may submit complaints concerning Google's compliance with this Final Judgment to the Plaintiffs, the TC, or the Compliance Officer. | 1.   Third parties may submit complaints concerning Google's compliance with this Final Judgment to the Plaintiffs or the Compliance Officer. | 1.   Third parties may submit complaints concerning Google's compliance with this Final Judgment to the Plaintiffs, the TC, or the Compliance Officer. |
| 2.   Third parties, the TC, or Plaintiffs in their discretion may submit to the Compliance Officer any complaints concerning Google's compliance with this Final Judgment.  Without in any way limiting their authority to take any other action to enforce this Final Judgment, the Plaintiffs may submit complaints to the Compliance Officer whenever doing so would be consistent with the public interest. | 2.   Submissions to the Compliance Officer.<br><br>a. Third parties or Plaintiffs in their discretion may submit to the Compliance Officer any complaints concerning Google's compliance with this Final Judgment.  Without in any way limiting their authority to take any other action to enforce this Final Judgment, the Plaintiffs may submit complaints related to Google's compliance with this Final Judgment to the Compliance Officer whenever doing so would be consistent with the public interest. | 2.   Third parties, the TC, or Plaintiffs in their discretion may submit to the Compliance Officer any complaints concerning Google's compliance with this Final Judgment.  Without in any way limiting their authority to take any other action to enforce this Final Judgment, the Plaintiffs may submit complaints to the Compliance Officer whenever doing so would be consistent with the public interest. |

| | | |
|---|---|---|
| a. To facilitate the communication of complaints and inquiries by parties, the Compliance Officer shall place on Google's website, in a manner acceptable to the Plaintiffs, the procedures for submitting complaints. To encourage whenever possible the informal resolution of complaints and inquiries, the website shall provide a mechanism for communicating complaints and inquiries to the Compliance Officer. | b. To facilitate the communication of complaints and inquiries by parties, the Compliance Officer shall place on Google's corporate website, in a manner reasonably acceptable to the Plaintiffs, the procedures for submitting complaints. To encourage whenever possible the informal resolution of complaints and inquiries, the website must provide a mechanism for communicating complaints and inquiries to the Compliance Officer. | a. To facilitate the communication of complaints and inquiries by parties, the Compliance Officer shall place on Google's website, in a manner acceptable to the Plaintiffs, the procedures for submitting complaints. To encourage whenever possible the informal resolution of complaints and inquiries, the website shall provide a mechanism for communicating complaints and inquiries to the Compliance Officer. |
| b. Google has thirty (30) days after receiving a complaint to attempt to resolve or to reject it. | c. Google shall have 30 days after receiving a complaint to attempt to resolve or to reject it. | b. Google has thirty (30) days after receiving a complaint to attempt to resolve or to reject it. |
| c. Within thirty (30) days of receiving a complaint, the Compliance Officer shall advise the TC and Plaintiffs of the nature of the complaint and its disposition. The TC may then propose to the Plaintiffs further actions consistent with this Final Judgment, including consulting with Plaintiffs regarding the complaint. | [No similar provision.] | c. Within thirty (30) days of receiving a complaint, the Compliance Officer shall advise the TC and Plaintiffs of the nature of the complaint and its disposition. The TC may then propose to the Plaintiffs further actions consistent with this Final Judgment, including consulting with Plaintiffs regarding the complaint. |
| 3. The Compliance Officer, third parties, or the Plaintiffs in their discretion may submit to the TC any complaints concerning Google's compliance with this Final Judgment. | [No similar provisions.] | 3. The Compliance Officer, third parties, or the Plaintiffs in their discretion may submit to the TC any complaints concerning Google's compliance with this Final Judgment. |
| a. The TC shall investigate the complaints it receives and shall consult with the Plaintiffs regarding its investigation. At least once during its investigation, and more often when it may help resolve the complaints informally, the TC shall meet with the Compliance Officer to allow Google to respond to the substance of the complaints and to determine whether the complaints can be resolved without further proceedings. | | a. The TC shall investigate the complaints it receives and shall consult with the Plaintiffs regarding its investigation. At least once during its investigation, and more often when it may help resolve the complaints informally, the TC shall meet with the Compliance Officer to allow Google to respond to the substance of the complaints and to determine whether the complaints can be resolved without further proceedings. |

| | | |
|---|---|---|
| b. Following its investigation, the TC shall advise Google and the Plaintiffs of its conclusion and its proposal for cure. | | b. Following its investigation, the TC shall advise Google and the Plaintiffs of its conclusion and its proposal for cure. |
| c. Reports and recommendations from the TC may be received into evidence by the Court in connection with any effort by any Plaintiff to enforce this Final Judgment but shall not be otherwise made available in any other court or tribunal related to any other matter. No member of the TC shall be required to testify by deposition, in court, or before any other tribunal regarding any matter related to this Final Judgment. | | c. Reports and recommendations from the TC may be received into evidence by the Court in connection with any effort by any Plaintiff to enforce this Final Judgment but shall not be otherwise made available in any other court or tribunal related to any other matter. No member of the TC shall be required to testify by deposition, in court, or before any other tribunal regarding any matter related to this Final Judgment. |
| d. The TC may preserve the anonymity of any third-party complainant where it deems it appropriate to do so upon the request of the Plaintiffs or the third party, or in its discretion. | | d. The TC may preserve the anonymity of any third-party complainant where it deems it appropriate to do so upon the request of the Plaintiffs or the third party, or in its discretion. |
| D.  Compliance Inspection: | B.  <u>Annual Compliance Report and Compliance Inspection</u>: | D.  Compliance Inspection: |
| 1.  Without in any way limiting the sovereign enforcement authority of each of the Colorado Plaintiff States, the Colorado Plaintiff States shall form a committee to coordinate their enforcement of this Final Judgment.  Neither a Co-Plaintiff State nor a Colorado Plaintiff State may take any action to enforce this Final Judgment without first consulting with the United States and with the Colorado Plaintiff States' enforcement committee. | 1.  Without limiting the sovereign enforcement authority of each of the Plaintiff States, the Plaintiff States will form a committee to coordinate their enforcement of this Final Judgment ("Plaintiff States' Committee").  No Plaintiff State shall take any action to enforce this Final Judgment without first consulting with the United States and with the Plaintiff States' Committee. | 1.  Without in any way limiting the sovereign enforcement authority of each of the Colorado Plaintiff States, the Colorado Plaintiff States shall form a committee to coordinate their enforcement of this Final Judgment.  Neither a Co-Plaintiff State nor a Colorado Plaintiff State may take any action to enforce this Final Judgment without first consulting with the United States and with the Colorado Plaintiff States' enforcement committee. |
| [No similar provision.] | 2.  Google will prepare and submit, on an annual basis, a written report describing its compliance with this Final Judgment ("Annual Compliance Report"). | [No similar provision.] |
| 2.  For the purposes of determining or securing compliance with this Final Judgment or of determining whether this Final Judgment should be modified or vacated, upon written request of an | 3.  To determine and enforce compliance with this Final Judgment, upon written request and on reasonable notice to Google and subject to any lawful privilege, a duly authorized representative of the | 2.  For the purposes of determining or securing compliance with this Final Judgment or of determining whether this Final Judgment should be modified or vacated, upon written request of an |

| | | |
|---|---|---|
| authorized representative of the Assistant Attorney General for the Antitrust Division (after consultation with the Co-Plaintiff States and the Colorado Plaintiff States' enforcement committee) or of the Attorney General of a Co-Plaintiff State or the Attorney General of a Colorado Plaintiff State (after consultation with the United States and the Colorado Plaintiff States' enforcement committee), as the case may be, and reasonable notice to Google, Google shall permit, from time to time and subject to legally recognized privileges, authorized representatives, including agents retained by any Plaintiff: | United States (after consultation with the Plaintiff States' Committee) or of the Attorney General of a Plaintiff State (after consultation with the United States and the Plaintiff States' Committee), may: | authorized representative of the Assistant Attorney General for the Antitrust Division (after consultation with the Co-Plaintiff States and the Colorado Plaintiff States' enforcement committee) or of the Attorney General of a Co-Plaintiff State or the Attorney General of a Colorado Plaintiff State (after consultation with the United States and the Colorado Plaintiff States' enforcement committee), as the case may be, and reasonable notice to Google, Google shall permit, from time to time and subject to legally recognized privileges, authorized representatives, including agents retained by any Plaintiff: |
| [No similar provision.] | a. request from Google no more than one interim written report per year ("Interim Report"), under oath if requested, regarding Google's compliance with this Final Judgment; | [No similar provision.] |
| a. to have access during Google's office hours to inspect and copy, or at the option of the Plaintiff, to require Google to provide electronic copies of all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Google relating to any matters contained in this Final Judgment; and | b. make reasonable requests to Google for production of non-privileged documents and records in its possession, custody, or control sufficient to verify the matters contained in Google's Annual Compliance Report or Interim Report; and | a. to have access during Google's office hours to inspect and copy, or at the option of the Plaintiff, to require Google to provide electronic copies of all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Google relating to any matters contained in this Final Judgment; and |
| b. to interview, either informally or on the record, Google's officers, employees, or agents, who may have their individual counsel present, relating to any matters contained in this Final Judgment. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Google. | c. subject to the reasonable convenience of Google and without restraint or interference from it, interview officers, employees, or agents of Google, who may have counsel present, sufficient to verify the matters contained in Google's Annual Compliance Report or Interim Report. | b. to interview, either informally or on the record, Google's officers, employees, or agents, who may have their individual counsel present, relating to any matters contained in this Final Judgment. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Google. |
| 3. Upon the written request of an authorized representative of the Assistant Attorney General for the Antitrust Division (after consultation with the Co-Plaintiff States and the | [No similar provision.] | 3. Upon the written request of an authorized representative of the Assistant Attorney General for the Antitrust Division (after consultation with the Co-Plaintiff States and the |

84

| | | |
|---|---|---|
| Colorado Plaintiff States' enforcement committee) or of the Attorney General of a Co-Plaintiff State or the Attorney General of a Colorado Plaintiff State (after consultation with the United States and the Co-Plaintiff States' enforcement committee), Google shall submit written reports or respond to written interrogatories, under oath if requested, relating to any matters contained in this Final Judgment. | | Colorado Plaintiff States' enforcement committee) or of the Attorney General of a Co-Plaintiff State or the Attorney General of a Colorado Plaintiff State (after consultation with the United States and the Colorado Plaintiff States' enforcement committee), Google shall submit written reports or respond to written interrogatories, under oath if requested, relating to any matters contained in this Final Judgment. |
| [No similar provision.] | 4. No information or documents obtained by the means provided in this section shall be divulged by the United States or the Plaintiff States to any person, except in the course of legal proceedings to which the United States is a party, or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law. | [No similar provision.] |
| [No similar provision.] | 5. If, at the time information or documents are furnished by Google to the United States or the Plaintiff States, Google identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Google marks each pertinent page of such material, "Confidential and Sensitive Commercial Information Subject to Rule 26(c)(1)(G)" then the United States shall give 10 business days' notice prior to divulging such material in any legal proceeding. | 4. If, at the time information or documents are furnished by Google to the Plaintiffs, Google identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Google marks each pertinent page of such material, "Confidential and Sensitive Commercial Information Subject to Rule 26(c)(1)(G)," then the Plaintiffs shall give five (5) business days' notice prior to divulging such material in any legal proceeding, unless good cause is shown for a shorter notice period. |
| [No similar provision.] | 6. Google shall have the right to claim protection from public disclosure, under the Freedom of Information Act, 5 U.S.C. § 552, or any other applicable law or regulation, for any material it submits to the United States or the Plaintiff States under this Final Judgment. After appropriate consideration of such claim of | 5. Google shall have the right to claim protection from public disclosure, under the Freedom of Information Act, 5 U.S.C. § 552, or any other applicable law or regulation, for any material it submits to the Plaintiffs under this Final Judgment. After appropriate consideration of such claim of protection, Plaintiffs, as the case may |

|  | protection, the United States or the Plaintiff States, as the case may be, will either assert that the material is protected from disclosure under law or give Google 10 business days' notice of its intent to disclose the material. | be, will either assert that the material is protected from disclosure under law or give Google ten (10) business days' notice of its intent to disclose the material. |
|---|---|---|
| [No similar provision.] | [No similar provision.] | E.  Status Reports to the Court: 1.  Plaintiffs, with input from the Technical Committee, shall file a status report within ninety (90) days of the Effective Date of this Final Judgment, and then on future dates as set by the Court, updating the Court as to the enforcement of and Google's compliance with this Final Judgment. |

## VIII.   EFFECTIVE DATE AND EXPIRATION

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| The Final Judgment will take effect sixty (60) days after the date on which it is entered (the "Effective Date"), and Plaintiffs shall report the date on which Google has substantially implemented all provisions of this Final Judgment, except for Section VII.A, which shall take effect immediately upon entry.  Unless the Court grants an extension or early termination is granted, this Final Judgment will expire six (6) years from the Effective Date.  This Final Judgment may be terminated upon notice by the United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States' enforcement committee, and Google that continuation of this Final Judgment is no longer necessary to restore competition in the monopolized markets. | A.   Subject to the outcome of any motion to stay this Final Judgment pending appeal, this Final Judgment shall take effect 60 days after the date on which it is entered, except that the portions of Section VII.A that require the parties to take steps toward forming the Technical Committee and that address the start of its work shall take effect immediately. <br><br>B.   Pursuant to Local Rule 54.2, the deadline for any motion under Federal Rule of Civil Procedure 54(d)(2)(B) and the proceedings as to any such motion shall be held in abeyance pending the conclusion of any appeals from this Final Judgment. <br><br>C.  Unless this Court grants an extension, this Final Judgment will expire on the sixth anniversary of the date on which it takes effect. | The Final Judgment will take effect sixty (60) days after the date on which it is entered (the "Effective Date"), and Plaintiffs shall report the date on which Google has substantially implemented all provisions of this Final Judgment, except for Section VII.A, which shall take effect immediately upon entry.  Unless the Court grants an extension or early termination is granted, this Final Judgment will expire six (6) years from the Effective Date.  This Final Judgment may be terminated upon notice by the United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States' enforcement committee, and Google that continuation of this Final Judgment is no longer necessary to restore competition in the monopolized markets. |

## IX.   DEFINITIONS

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| A.  "API"  or  "application programming interface" means a mechanism that allows different | A.  "API"  or  "application programming interface" means a mechanism that allows different | A.  "API"  or  "application programming interface" means a mechanism that allows different |

| | | |
|---|---|---|
| software components to communicate with each other. | software components to communicate with each other. | software components to communicate with each other. |
| B. "Apple" means Apple, Inc., a corporation organized and existing under the laws of the State of California, headquartered in Cupertino, California, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees. | [No similar provision.] | B. "Apple" means Apple Inc., a corporation organized and existing under the laws of the State of California, headquartered in Cupertino, California, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees. |
| C. "Browser Developer" means a developer, owner, or operator of a Third-Party Browser and includes, by way of example, Apple, Mozilla Corp., and Samsung Electronics Co., Ltd. | B. "Browser Developer" means a developer, owner, or operator of a Third-Party Browser and includes, by way of example, Apple, Mozilla Corp., and Samsung Electronics Co., Ltd. | C. "Browser Developer" means a developer, owner, or operator of a Third-Party Browser and includes, by way of example, Apple, Mozilla Corp., and Samsung Electronics Co., Ltd. |
| D. "Chrome Browser Application" means the browser software application currently marketed by Google as "Google Chrome" and its successors. | C. "Chrome Browser Application" means the browser software application currently marketed by Google as "Google Chrome" and its successors. | D. "Chrome Browser Application" means the browser software application currently marketed by Google as "Google Chrome" and its successors. |
| E. "Competitor" means any provider of, or potential entrant in the provision of (i) a General Search Engine (GSE) in the United States, (ii) Search Text Ads in the United States, or (iii) a GenAI Product in the United States. | D. "Competitor" means any provider of, or potential entrant in the provision of (i) a General Search Engine (GSE) in the United States, (ii) Search Text Ads in the United States or (iii) a Third-Party GenAI Product in the United States. For the avoidance of doubt, "Competitor" does not include specialized vertical search providers, whether or not they offer a GenAI product. | E. "Competitor" means any provider of or potential entrant in the provision of (i) a General Search Engine (GSE) in the United States, (ii) Search Text Ads in the United States, or (iii) a GenAI Product in the United States. |
| F. "Consideration" means anything of value, including monetary payment; provision of preferential licensing terms; technical, marketing, and sales support; developer support; or hardware or software certification or approval. | E. "Consideration" means any monetary payment; provision of preferential licensing terms; technical, marketing, and sales support; developer support; or hardware or software certification or approval. | F. "Consideration" means anything of value, including any monetary payment; provision of preferential licensing terms; technical, marketing, and sales support; developer support; or hardware or software certification or approval. |
| G. "Default Search Engine" means a search engine that is set by a Browser Developer to respond to user queries if a user takes no action to select a particular search engine. | G. "Default Search Engine" means a search engine that is set by a Browser Developer to respond to user queries if a user takes no action to select a particular search engine. | G. "Default Search Engine" means a search engine that is set by a Browser Developer to respond to user queries if a user takes no action to select a particular search engine. |
| H. "Device" or "device" means any single smartphone, tablet, laptop, or desktop. For clarity, any two devices are different devices, even if they are the same make and model | F. "Covered Device" means a smartphone, tablet, laptop, or desktop, excluding any device on which the ChromeOS operating system or a | H. "Device" or "device" means any single smartphone, tablet, laptop, or desktop, excluding any device on which the ChromeOS operating system or a successor to the |

| | | |
|---|---|---|
| (e.g., two Samsung Galaxy S25s are two devices; two Apple iPhone 16 Pros are two devices). | successor to the ChromeOS operating system is installed. | ChromeOS operating system is installed. For clarity, any two devices are different devices, even if they are the same make and model (e.g., two Samsung Galaxy S25s are two devices; two Apple iPhone 16 Pros are two devices). |
| I. "GenAI" or "Generative AI" is a type of artificial intelligence that creates new content including but not limited to text, images, code, classifications, and other media using machine learning models. | H. "GenAI" or "Generative AI" is a type of artificial intelligence that creates new content including but not limited to text, images, code, classifications, and other media using machine learning models. | I. "GenAI" or "Generative AI" is a type of artificial intelligence that creates new content including but not limited to text, images, code, classifications, and other media using machine learning models. |
| J. "GenAI Product" means any application, software, service, feature, tool, functionality, or product that involves or makes use of Generative AI capabilities or models. It can include GenAI Search Access Points. | [No similar provision.] | J. "GenAI Product" means any application, software, service, feature, tool, functionality, or product that involves or makes use of Generative AI capabilities or models and has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information. |
| K. "General Search Engine" or "GSE" means software or a service that produces links to websites and other relevant information in response to a user query or prompt. | I. "General Search Engine" or "GSE" means software or a service that produces links to websites and other relevant information in response to a user query or prompt, and that attempts to answer all queries (rather than only regarding particular topics). "General Search Engine" or "GSE" also has the meaning defined and used in the Court's Memorandum Opinion of August 5, 2024, ECF 1032. | K. "General Search Engine" or "GSE" means software or a service that produces links to websites and other relevant information in response to a user query or prompt and that seeks to fulfill a broad array of informational needs. |
| L. "Google" means (1) Defendant Google LLC, a limited liability company organized and existing under the laws of the State of Delaware, headquartered in Mountain View, California; (2) its successors and assigns, subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures controlling or overseeing Google Search (including syndicated products), Search Text Ads (including syndicated products) the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any related Google GenAI Product; and | J. "Google" means Defendant Google LLC, a limited liability company organized and existing under the laws of the State of Delaware, headquartered in Mountain View, California; (2) its successors and assigns, subsidiaries, divisions, and groups controlling or overseeing Google Search (including syndicated products), Search Text Ads (including syndicated products), the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any Google GenAI Assistant Application; and (3) the directors, officers, managers, | L. "Google" means (1) Defendant Google LLC, a limited liability company organized and existing under the laws of the State of Delaware, headquartered in Mountain View, California; (2) its successors and assigns, subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures controlling or overseeing Google Search (including syndicated products), Search Text Ads (including syndicated products), the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any related Google GenAI Product; and |

| | | |
|---|---|---|
| (3) the directors, officers, managers, agents, and employees of such entities specified in this Section IX.L who oversee Google Search (including syndicated products), Search Text Ads (including syndicated products) the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any related Google GenAI Product. | agents, and employees of such entities specified in this Paragraph IX.J who oversee Google Search (including syndicated products), Search Text Ads (including syndicated products), the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any Google GenAI Assistant Application. | (3) the directors, officers, managers, agents, and employees of such entities specified in this Section IX.L who oversee Google Search (including syndicated products), Search Text Ads (including syndicated products), the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any related Google GenAI Product. For clarity, the term "affiliates" includes any Alphabet Inc.–related entity that controls or oversees the aforementioned products. |
| M. "Google Assistant Application" means (1) the user-facing mobile assistive service software application marketed by Google as "Google Assistant" and its successors and (2) any Google GenAI Product. | K. "Google Assistant Application" means the user-facing mobile assistive service software application marketed by Google as "Google Assistant" and its successors. | M. "Google Assistant Application" means the user-facing mobile assistive service software application marketed by Google as "Google Assistant" and its successors. |
| N. "Google GenAI Product" means any GenAI Product offered by Google including by way of example, the stand-alone user-facing mobile software application currently marketed by Google as the "Google Gemini" application (and that application's functionally equivalent successors). | L. "Google GenAI Assistant Application" means the stand-alone user-facing mobile software application currently marketed by Google as the "Google Gemini" application (and that application's functionally equivalent successors) and any future user-facing software application owned by Google or its affiliates that makes use of generative AI capabilities or models and has among its principal functions answering information-seeking prompts across a wide variety or topics using a broad range of publicly available information, provided, however, that this term shall not include Google Search, the Google Search Application, the Chrome Browser Application, or the Google Assistant Application. | N. "Google GenAI Product" means any GenAI Product offered by Google, including by way of example, the stand-alone user-facing mobile software application currently marketed by Google as the "Google Gemini" application (and that application's functionally equivalent successors). |
| O. "Google Play" means the user-facing mobile software application distribution service currently marketed by Google as the "Play Store" and its successors. | M. "Google Play" means the user-facing mobile software application distribution service currently marketed by Google as the "Play Store" and its successors. | O. "Google Play" means the user-facing mobile software application distribution service currently marketed by Google as the "Play Store" and its successors. |
| P. "Google Search" means the web search and search advertising services offered by Google at Google.com. | N. "Google Search" means the web search and search advertising services offered by Google at Google.com. | P. "Google Search" means the web search and search advertising services offered by Google at Google.com. |

| | | |
|---|---|---|
| Q. "Google Search Application" means the user-facing mobile online search software application currently marketed by Google as the "Google app" or the "Google Search app" (and its successors). | O. "Google Search Application" means the user-facing mobile online search software application currently marketed by Google as the "Google app" or the "Google Search app" (and its successors). | Q. "Google Search Application" means the user-facing mobile online search software application currently marketed by Google as the "Google app" or the "Google Search app" (and its successors). |
| R. The terms "include" and "including" should be read as "including but not limited to," and any use of either word is not limited in any way to any examples provided. | [No similar provision.] | R. The terms "include" and "including" should be read as "including but not limited to," and any use of either word is not limited in any way to any examples provided. |
| S. "Marginal Cost" or "marginal cost" means the direct total production cost of producing an additional unit of a good or service, which is determined by calculating the change in direct total production cost resulting from Google providing the additional unit(s) of data or services required under this Final Judgment. | P. "Marginal Cost" means the direct total production cost of producing an additional unit of a good or service, as determined by calculating the change in direct total production cost resulting from providing the additional unit(s) of data or services. | S. "Marginal Cost" or "marginal cost" means the direct total production cost of producing an additional unit of a good or service, which is determined by calculating the change in direct total production cost resulting from Google providing the additional unit(s) of data or services required under this Final Judgment. |
| T. "Operating System Version" means a particular desktop or mobile operating system including, by way of example, Microsoft Windows, Apple iOS, Apple Mac OS, Apple iPad OS, or Android. | Q. "Operating System Version" means a web browser version or a version of any proprietary Apple feature or functionality, including Siri and Spotlight, designed to be installed and used on a particular desktop or mobile operating system including, by way of example, Microsoft Windows, Apple iOS, Apple Mac OS, Apple iPad OS, or Android. | T. "Operating System Version" means a web browser version or a version of any proprietary Apple feature or functionality, including Siri and Spotlight, designed to be installed and used on a particular desktop or mobile operating system including, by way of example, Microsoft Windows, Apple iOS, Apple Mac OS, Apple iPad OS, or Android. |
| U. "Person" or "person" means any natural person, corporate entity, partnership, association, joint venture, government entity, or trust. | [No similar provision.] | [No similar provision.] |
| [No similar provision.] | R. "Plaintiff States" means the States and Commonwealths of Arkansas, California, Georgia, Florida, Indiana, Kentucky, Louisiana, Michigan, Missouri, Mississippi, Montana, South Carolina, Texas, and Wisconsin, Colorado, Nebraska, Arizona, Iowa, New York, North Carolina, Tennessee, Utah, Alaska, Connecticut, Delaware, District of Columbia, Guam, Hawaii, Idaho, Illinois, Kansas, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, | [No similar provision.] |

| | | |
|---|---|---|
| | Puerto Rico, Rhode Island, South Dakota, Vermont, Virginia, Washington, West Virginia, and Wyoming. | |
| V. "Privacy Mode" means a mode within a web browser or an Apple product or service such as Siri or Spotlight that is designed to offer a preconfigured privacy setting and includes, by way of example, Private Browsing in Apple Safari, Private mode in Mozilla Firefox, and Secret mode in Samsung Internet. | S. "Privacy Mode" means a mode within a web browser that is designed to offer a preconfigured privacy setting and includes, by way of example, Private Browsing in Apple Safari, Private mode in Mozilla Firefox, and Secret mode in Samsung Internet. | U. "Privacy Mode" means a mode within a web browser or an Apple product or service such as Siri or Spotlight that is designed to offer a preconfigured privacy setting and includes, by way of example, Private Browsing in Apple Safari, Private mode in Mozilla Firefox, and Secret mode in Samsung Internet. |
| W. "Qualified Competitor" means a Competitor who meets the Plaintiffs' approved data security standards as recommended by the Technical Committee and agrees to regular data security and privacy audits by the Technical Committee, who makes a sufficient showing to the Plaintiffs, in consultation with the Technical Committee, of a plan to invest and compete in or with the GSE and/or Search Text Ads markets, and who does not pose a risk to the national security of the United States. | T. "Qualified Competitor" means a Competitor who applies to be so designated and: (i) meets the data security standards as determined by the Court in consultation with the Technical Committee; (ii) agrees to and satisfactorily passes regular data security and privacy audits by the Technical Committee; (iii) does not pose a risk to the national security of the United States, as determined by the Court; and (iv) makes a sufficient showing of a plan to invest and compete with General Search Engines and/or Search Text Ads providers, as determined by the Court in consultation with the Technical Committee. To remain eligible as a Qualified Competitor, the Competitor must apply for re-certification on an annual basis and establish that it continues to meet the criteria set forth in (i) – (iv). To continue to be in compliance with (iv) for purposes of re-certification, the Qualified Competitor must show that it is making sufficient efforts to invest and compete with General Search Engines and/or Search Text Ads providers. Google will have the right to object to and be heard by the Court on the qualification of, and continuing eligibility of, any proposed Qualified Competitor, including on the basis of noncompliance with data security, privacy, or contractual access or use restrictions. | V. "Qualified Competitor" means a Competitor who meets the Plaintiffs' approved data security standards as recommended by the Technical Committee and agrees to regular data security and privacy audits by the Technical Committee; who makes a sufficient showing to the Plaintiffs, in consultation with the Technical Committee, of a plan to invest and compete in or with the GSE and/or Search Text Ads markets; and who does not pose a risk to the national security of the United States. To remain eligible as a Qualified Competitor, the Competitor must apply for re-certification on an annual basis starting from the date of original certification as a Qualified Competitor and establish that it continues to meet the definition of a Qualified Competitor. The Technical Committee shall establish appropriate procedures for the re-certification process. |

| | | |
|---|---|---|
| X. "Search Access Point" means any software, application, interface, digital product, or service where a user can enter a query or prompt and, in response to at least some user queries or prompts, receive (or be directed to a place to receive) a response that includes information from a GSE, including links to websites. Search Access Points include OS-level Search Access Points, browsers (including Search Access Points within browsers such as browser address bars), search apps, and GenAI Products that can retrieve and display information from a GSE, including links to websites. | [No similar provision.] | W. "Search Access Point" means any software, application, interface, digital product, or service where a user can enter a query or prompt and, in response to at least some user queries or prompts, receive (or be directed to a place to receive) a response that includes information from a GSE, including links to websites. Search Access Points include OS-level Search Access Points, browsers (including Search Access Points within browsers such as browser address bars), search apps, and GenAI Products that can retrieve and display information from a GSE, including links to websites. |
| Y. "Search Feature" in Google Search means any user-facing content on a SERP that is not an organic link. Search Features include images, featured snippets, hotel units, query expansion features like auto-complete, "did you mean" prompts, spelling corrections, and related searches. | [No similar provision.] | X. "Search Feature" in Google Search means any user-facing content on a SERP that is not an organic link. Search Features include images, featured snippets, hotel units, query expansion features like auto-complete, "did you mean" prompts, spelling corrections, and related searches. |
| AA. "Search Text Ad" means a general search text advertisement, which is an ad that resembles an organic link on a SERP. Search Text Ads can include images and often appear at the top of the SERP with a designation indicating that they are paid advertisements. "Search Text Ad" also includes Search Text Ads appearing in or in connection with Google AI Overviews. | U. "Search Text Ad" means a general search text advertisement, which is an ad that resembles an organic text link on a search engine results page. "Search Text Ad" also has the meaning defined and used in the Court's Memorandum Opinion of August 5, 2024, ECF 1032, at 60, and includes Search Text Ads appearing in or in connection with Google AI Overviews. | Y. "Search Text Ad" means a general search text advertisement, which is an ad that resembles an organic link on a SERP. Search Text Ads can include images and often appear at the top of the SERP with a designation indicating that they are paid advertisements. "Search Text Ad" also includes Search Text Ads appearing in or in connection with Google AI Overviews. |
| BB. "SERP" or "Search Engine Results Page" means the results provided by a search engine, in response to a user query, including links and other features and content, including from a broad index of the web. | [No similar provision.] | Z. "SERP" or "Search Engine Results Page" means the results provided by a search engine, in response to a user query, including links and other features and content, drawn from a broad index of the web. |
| [No similar provision.] | V. "Specialized Vertical Provider" means a platform that responds to queries with information centered on a particular subject matter. | [No similar provision.] |
| CC. "Technical Committee" or "TC" means the five-person committee of experts appointed by the Court pursuant to Section VII.A. | W. "Technical Committee" or "TC" means the five-person committee of experts appointed by the Court pursuant to Paragraph VII.A. | AA. "Technical Committee" or "TC" means the five-person committee of experts appointed by the Court pursuant to Section VII.A. |

| | | |
|---|---|---|
| DD. "Third-Party Browser" means any web browser that is not Google Chrome or another proprietary Google web browser and includes, by way of example, Apple Safari, Mozilla Firefox, and Samsung Internet. | X. "Third-Party Browser" means any web browser that is not Google Chrome or another proprietary Google web browser and includes, by way of example, Apple Safari, Mozilla Firefox, and Samsung Internet. | BB. "Third-Party Browser" means any web browser that is not Google Chrome or another proprietary Google web browser and includes, by way of example, Apple Safari, Mozilla Firefox, and Samsung Internet. |
| [No similar provision.] | Y. "Third-Party GenAI Assistive Service" means a user-facing software application not owned by Google or its affiliates that makes use of generative AI capabilities or models and has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information. | [No similar provision.] |
| FF. "Third-Party GenAI Product" means any GenAI Product that is not owned by Google. | Z. "Third-Party GenAI Product" means any application, software, service, feature, tool, functionality, or product not owned by Google or its affiliates that involves or makes use of generative AI capabilities or models and has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information. For clarity, "Third-Party GenAI Product" does not include specialized vertical search services, whether or not they offer a GenAI Product. | CC. "Third-Party GenAI Product" means any GenAI Product that is not owned by Google. |
| EE. "Third-Party General Search Service" means a web search service that can respond to a broad range of search query categories and offers functionality that is substantially similar to Google Search, and is not owned by Google or its affiliates. | AA. "Third-Party General Search Service" means a web search service that can respond to a broad range of search query categories and offers functionality that is substantially similar to Google Search, and is not owned by Google or its affiliates. | DD. "Third-Party General Search Service" means a web search service that can respond to a broad range of search query categories and offers functionality that is substantially similar to Google Search and is not owned by Google or its affiliates. |
| GG. "User-side Data" means all data that can be obtained from users in the United States, directly through a search engine's interaction with the user's Device, including software running on that Device, by automated means. User-side Data includes information Google collects when answering commercial, tail, and local queries. | BB. "User-side Data" means all data that can be obtained from users in the United States, directly through a search engine's interaction with the user's device, including software running on that device, by automated means. User-side Data includes information Google collects when answering commercial, tail, and local queries. | EE. "User-side Data" means all data that can be obtained from users in the United States, directly through a search engine's interaction with the user's Device, including software running on that Device, by automated means. User-side Data includes information Google collects when answering commercial, tail, and local queries. |
| Z. "Search Index" means any databases that store and organize | CC. "Web Search Index" means databases that store and organize | FF. "Web Search Index" means databases that store and organize |

| | | |
|---|---|---|
| information about websites and their content that is crawled from the web. | information about websites and their content that is crawled from the web. For the avoidance of doubt, it does not include Google's vertical indexes or its video, images, or other specialized indexes that contain information not crawled from the web. | information about websites and their content that is crawled from the web. For the avoidance of doubt, it does not include Google's vertical indexes or its video, images, or other specialized indexes that contain information not crawled from the web. |

## X.    THIRD-PARTY RIGHTS

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| Nothing in this Final Judgment is intended to confer upon any other persons any rights or remedies of any nature whatsoever or by reason of this Final Judgment other than the right to submit complaints to the Compliance Officer and the TC. | Nothing in this Final Judgment is intended to confer upon any other persons any rights or remedies of any nature. | Nothing in this Final Judgment is intended to confer upon any other persons any rights or remedies of any nature whatsoever or by reason of this Final Judgment other than the right to submit complaints to the Compliance Officer and the TC. |

## XI.    RETENTION OF JURISDICTION AND ENFORCEMENT OF FINAL JUDGMENT

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| A.   Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders or directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification of any of its provisions (including an order to divest any relevant Google business), for the enforcement of compliance with this Final Judgment, and for the punishment of any violation of this Final Judgment.  For example, Plaintiffs may request that the Court revisit its decision on a payment ban, including but not limited to a ban on default payments, if competition is not substantially restored by this Order.  In any motion to modify this Final Judgment, Plaintiffs need not show any change in circumstances, but need only demonstrate that modification is necessary to achieve the intended purposes of this Final Judgment to restore competition in the monopolized markets.  In any action to | This Court retains jurisdiction for the purpose of enabling any of the parties to this Final Judgment to apply for such further orders or directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify or terminate any of its provisions, and to enforce compliance. | A.   Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders or directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification of any of its provisions, for the enforcement of compliance with this Final Judgment, and for the punishment of any violation of this Final Judgment. |

| | | |
|---|---|---|
| enforce this Final Judgment, Google must show by a preponderance of the evidence that its actions are in compliance with this Final Judgment. | | |
| B.  The Court may act *sua sponte* to issue orders or directions for the construction or carrying out of this Final Judgment, for the enforcement of compliance, and for the punishment of any violation. | [No similar provision.] | [No similar provision.] |
| C.  This Final Judgment should be interpreted to give full effect to the procompetitive purposes of the U.S. antitrust laws and to restore the competition the Court found was harmed by Google's illegal conduct. | [No similar provision.] | [No similar provision.] |
| D.  For a period of four (4) years following the expiration of this Final Judgment, if any Plaintiff has evidence that Google violated this Final Judgment before it expired, that Plaintiff may file an action against Google in this Court requesting that the Court order (1) Google to comply with the terms of this Final Judgment for an additional term of at least four (4) years following the filing of the enforcement action; (2) all appropriate contempt remedies; and (3) additional relief needed to ensure Google complies with the terms of this Final Judgment. | [No similar provision.] | B.  For a period of four (4) years following the expiration of this Final Judgment, if any Plaintiff has evidence that Google violated this Final Judgment before it expired, that Plaintiff may file an action against Google in this Court requesting that the Court order (1) Google to comply with the terms of this Final Judgment for an additional term of at least four (4) years following the filing of the enforcement action; (2) all appropriate contempt remedies; and (3) additional relief needed to ensure Google complies with the terms of this Final Judgment. |
| E.  In connection with a successful effort by any Plaintiff to enforce this Final Judgment against Google, whether litigated or resolved before litigation, Plaintiff may request that the Court order Google to reimburse that Plaintiff for the fees and expenses of its attorneys, as well as all other costs, including experts' fees, incurred in connection with that effort to enforce this Final Judgment, including in the investigation of the potential violation. | [No similar provision.] | [No similar provision.] |

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 20-cv-3010 (APM)** |
| | ) | |
| **GOOGLE LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| **STATE OF COLORADO et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 20-cv-3715 (APM)** |
| | ) | |
| **GOOGLE LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>FINAL JUDGMENT</u>

WHEREAS, Plaintiffs United States of America, and the States and Commonwealths of Arkansas, California, Georgia, Florida, Indiana, Kentucky, Louisiana, Michigan, Missouri, Mississippi, Montana, South Carolina, Texas, and Wisconsin, by and through their respective Attorneys General ("Co-Plaintiff States"), filed their Complaint on October 20, 2020, and their Amended Complaint on January 15, 2021;

AND WHEREAS, Plaintiffs Colorado, Nebraska, Arizona, Iowa, New York, North Carolina, Tennessee, Utah, Alaska, Connecticut, Delaware, District of Columbia, Guam, Hawaii, Idaho, Illinois, Kansas, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire,

New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Dakota, Vermont, Virginia, Washington, West Virginia, and Wyoming ("Colorado Plaintiff States") filed their Complaint on December 17, 2020;

AND WHEREAS, the Court conducted a trial and entered Findings of Fact and Conclusions of Law in both actions on August 5, 2024;

AND WHEREAS, the Court entered judgment finding Google liable for violating Section 2 of the Sherman Act by unlawfully maintaining its monopolies in the general search services and general search text advertising markets;

AND WHEREAS, the Court conducted a further remedies trial and entered additional Findings of Fact and Conclusions of Law on September 2, 2025;

NOW THEREFORE, upon the record at trial and all prior and subsequent proceedings, it is hereby ORDERED, ADJUDGED, AND DECREED:

## I.     JURISDICTION

The Court has jurisdiction over the subject matter of this action and over Google LLC.

## II.    APPLICABILITY

The Final Judgment applies to Google and to each of its officers, directors, agents, employees, subsidiaries, successors, and assigns; and to all other persons in active concert or participation with Google who have received actual notice of this Final Judgment by personal service or otherwise.

## III.   PROHIBITORY INJUNCTIONS

A.     Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of the Google Search Application on any device sold in the United States.

B.      Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of the Chrome Browser Application on any device sold in the United States.

C.      Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of the Google Assistant Application on any device sold in the United States.

D.      Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of any Google GenAI Product on any device sold in the United States.

E.      Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party General Search Service on any device sold in the United States.

F.      Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party Browser on any device sold in the United States.

G.      Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party GenAI Product on any device sold in the United States.

H.      Google shall not condition the payment for preload, placement, or assignment of an access point for the Google Search Application for one device on any other preload, placement,

or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States.

I.     Google shall not condition the payment for preload, placement, or assignment of an access point for the Chrome Browser Application for one device on any other preload, placement, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States.

J.     Google shall not condition the payment for preload, placement, or assignment of an access point for the Google Assistant Application or any Google GenAI Product for one device on any other preload, placement, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States.

K.     Google shall not enter or maintain any agreement requiring or conditioning Consideration on the distribution, preload, placement, display, use, license, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product in the United States unless the agreement terminates no more than one year after the date it is entered.

L.     Google shall not condition (1) Consideration for a Browser Developer setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product on any browser access point (including alternative modes such as Privacy Mode) on any Device on (2) the Browser Developer setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product on any other browser access point on that same

Device or any other Device in the United States.  Any agreement containing a default condition permitted by this provision must expire after one year and must expressly permit the Browser Developer to promote any Third-Party General Search Service and Third-Party GenAI Product.

M.      Google shall not condition (1) Consideration for Apple setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product with respect to any proprietary Apple feature or functionality, including Safari, Siri, Spotlight, and any Privacy Mode within those products, on one Device on (2) Apple setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product with respect to any proprietary Apple feature or functionality on that same Device or any other Device in the United States.  Any agreement containing a default condition permitted by this provision must expire after one year and must expressly permit Apple to promote any Third-Party General Search Service and Third-Party GenAI Product.

N.      Nothing in this Final Judgment shall prohibit Google from distributing the Google Search Application, the Google Assistant Application, and any Google GenAI Product through a single Application Programming Kit (APK) as long as the licensee has the option to disable end-user access to any of those applications and services that the licensee declines to license.

## IV.    REQUIRED DISCLOSURES OF DATA

A.      <u>Google's Web Search Index</u>: Within thirty (30) days of a Qualified Competitor's certification pursuant to Section IX.V, unless granted additional time, Google shall make available, at marginal cost, to Qualified Competitors the following data related to Google's Web Search Index:

       1.      for each document in the Google Web Search Index, a unique identifier (DocID) and another notation sufficient to denote all the documents Google considers duplicates of each other;

       2.      a DocID to URL map; and

       3.      for each DocID, the (A) time that the URL was first seen, (B) time that the URL was last crawled, (C) spam score, and (D) device-type flag.

This information shall be provided for all websites in the full Web Search Index Google uses for searches on Google.com, the Google Search Application, or any future Google general search products.  Nothing in Section IV is intended to transfer intellectual property rights of third parties to index users.

       B.      <u>User-Side Data</u>: For the term of this Final Judgment, Google shall make available, at marginal cost, to Qualified Competitors the following User-side Data on a non-discriminatory basis while safeguarding personal privacy and security:

       1.      User-side Data used to build, create, or operate the GLUE statistical model(s); and

       2.      User-side Data used to train, build, or operate the RankEmbed model(s).

Google shall make this data available to Qualified Competitors at least twice, with the exact number and frequency of such disclosures to be determined by the Court after consultation with Plaintiffs and the Technical Committee (TC).  Any cap on the number of such disclosures shall be informed, in part, by the utility of the datasets disclosed after appropriate privacy-enhancing techniques have been applied.  For clarity, this Section IV.B shall not require disclosure of intellectual property or trade secrets, such as algorithms, ranking signals, or post-trained LLMs.

C.     <u>User-Side Data Sharing Administration</u>:

1.     Plaintiffs, in consultation with the TC, shall promptly determine the appropriate User-side Data privacy and security safeguards to be applied before Google shares the data specified in Section IV.B with Qualified Competitors.  Google shall have up to six (6) months from the date that the Plaintiffs, in consultation with the TC, determine such privacy and security safeguards to implement the technology and provide any notice necessary to comply with this Section IV, and Google shall be deemed to have implemented the technology once Plaintiffs, in consultation with the TC, determine that the technology, including privacy and security safeguards, is fully functional.

2.     Google shall provide sufficient information about each dataset such that Qualified Competitors can reasonably understand what it contains, including but not limited to a description of what the dataset contains, any sampling methodology used to create the dataset, and any anonymization or privacy-enhancing technique that was applied. Plaintiffs, in consultation with the TC, may impose restrictions on what information Google shares under this Section IV.C.2 for the purposes of (i) promoting data privacy and security and (ii) ensuring privacy and security safeguards are effectively applied.

3.     The data specified in Sections IV.A and B will be shared pursuant to a license governing use.  The terms of the license shall include a requirement that the Qualified Competitor commit not to share or sell the datasets unless authorized by the Technical Committee or the Court and shall use the datasets for the exclusive purpose of serving users through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product.  Within six (6) months of the Effective Date of this Final Judgment,

7

Plaintiffs and the Technical Committee, with input from Google, shall create and submit to the Court a template for such license.

## V.   REQUIRED SYNDICATION OF SEARCH RESULTS

A.   <u>Search Syndication License</u>: Google shall take steps sufficient to make available to any Qualified Competitor, on financial terms no worse than those offered to any other user of Google's search syndication products, a syndication license whose term will be five (5) years from the date the license is signed, and which shall require Google, via real-time API(s), to make the following information and data available in response to each query issued or submitted by a Qualified Competitor:

1.   both desktop and mobile versions of the ranked organic web search results obtained from crawling the web;

2.   the user-facing query-rewriting features that Google provides under any of its current search syndication agreements as of the date of entry of this Final Judgment, including user-facing Search Features that enable query correction, modification, or expansion; and

3.   the Local, Maps, Video, Images, and Knowledge Panel Search Feature content that Google provides under any of its current search syndication agreements as of the date of entry of this Final Judgment.

B.   <u>Search Syndication License Terms</u>: The search syndication license in Section V.A shall have the following additional features:

1.   Google shall make syndicated content available via an API.

2.   Google shall provide Qualified Competitors with latency and reliability functionally equivalent to what any other user of Google's search syndication products

8

would receive as of the date of entry of this Final Judgment.  For the avoidance of doubt, Google's obligations do not extend to latency and reliability differences that result from differences in product implementation, users, or are otherwise outside of Google's syndication products.

3.      Google shall provide the license on a non-discriminatory basis to any Qualified Competitor on terms no less favorable than the most favorable terms Google provides under any current search syndication agreements as of the date of entry of this Final Judgment.

4.      Qualified Competitors' use of Google's syndication services in the first year will be capped at 40% of Qualified Competitors' annual U.S. queries and decline over the course of a 5-year period with an expectation that Qualified Competitors will become independent of Google over time through investment in their own search capabilities.  The pace of this tapering, the methods for measuring and determining the percentage, and the application of the percentage will be determined by the Court upon consultation with Plaintiffs and the Technical Committee in a manner that facilitates competition while incentivizing Qualified Competitors to move promptly to become independent of Google.

5.      Google may not consent to Qualified Competitors exceeding syndication limits, and Qualified Competitors shall submit to the TC audits of syndication frequency and scope.  The frequency and content of these audits shall be determined by the Plaintiffs in consultation with the TC.

6.      Google may impose no restrictions or conditions on how a Qualified Competitor uses, displays, or integrates information or services obtained under this

Section V beyond the least restrictive terms Google provides under any current search syndication agreements as of the date of entry of this Final Judgment.

7. Qualified Competitors may elect, in their sole discretion, which queries (some or all) for which they will request syndicated results and which syndication components to display or use and may do so in any manner they choose, except that Google may impose restrictions on the display or use of syndication components no less favorable than what it provides under any current search syndication agreements as of the date of entry of this Final Judgment. Google is also permitted to place its ordinary commercial restrictions on scraping, indexing, or crawling the syndicated results and content.

8. It shall be the Qualified Competitor's sole discretion to determine how much information to share with Google regarding the end user except that Google may require a Qualified Competitor to share information with Google regarding the end user, on terms no less favorable than what any other user of Google's search syndication products would receive as of the date of entry of this Final Judgment, as is necessary for the purposes of (1) basic search syndication functionality; (2) spam and abuse detection; and (3) legal or regulatory compliance.

9. Google may not retain or use (in any way) syndicated queries or other information it obtains under Section V.A for its own products and services beyond the most limited retention and use permitted under any of Google's current search syndication agreements as of the date of entry of this Final Judgment.

10. For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States, from human end users

10

of the Qualified Competitor.  Queries from a syndicator of the Qualified Competitor and synthetic queries are not eligible for syndication under the Final Judgment.

11.    If Google in good faith believes a Qualified Competitor is in breach of the terms of its agreement, it may exercise its rights under the agreement.  Google must also provide simultaneous notice to the Technical Committee of the breach and the actions Google is taking in light of the breach.

Within sixty (60) days of the Effective Date of this Final Judgment, Plaintiffs and the Technical Committee, with input from Google, shall create and submit to the Court a template for such license.

C.    Existing Syndication Agreements: The provisions of this Section V shall have no effect on any existing Google search syndication agreements with third parties or on Google's ability to enter into search syndication agreements with third parties other than Qualified Competitors, except that Google shall permit any entity with an existing search syndication agreement who becomes a Qualified Competitor, at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section V.

## VI.    SEARCH TEXT AD AUCTION CHANGES AND SEARCH TEXT ADS SYNDICATION

A.    Search Text Ads Auction Changes: Within a reasonable period of time after the Technical Committee's appointment, Plaintiffs shall submit a proposal to the Court, informed by the Technical Committee's views, by which Google shall periodically provide the Technical Committee and Plaintiffs a report outlining all changes to its Search Text Ads auction meeting certain parameters and, for each change, (1) Google's public disclosure of that change or (2) a statement why no public disclosure is necessary.  Plaintiffs' proposal shall detail the types of changes that must be disclosed, the frequency of disclosure, the steps to mitigate undue burden on

11

Google, and the steps to ensure any public disclosure of an ad auction change (if not already made by Google) avoids revealing Google's trade secrets, in accord with the Court's instructions in its September 2, 2025, Memorandum Opinion.  Plaintiffs have the right to challenge any disclosure they deem inadequate.  For the avoidance of doubt, Google need not report on auction experiments, which are generally tested on some fraction of Google's Search Text Ads traffic, but Google shall disclose changes to the Search Text Ads auction that result from any such auction experiments.

B.      <u>Search Text Ads Syndication</u>: Google shall take steps sufficient to make available to any Qualified Competitor a Search Text Ads Syndication License whose term will be five (5) years from the date the license is signed.  The Search Text Ads syndication agreement shall have the following additional features:

1.      Google shall provide Qualified Competitors latency, reliability, and performance functionally equivalent to what Google ordinarily provides to other users of Google's Search Text Ads syndication products, e.g., AdSense for Search, or any other current or future products offering syndicated Search Text Ads.  Search Text Ads syndication licenses to Qualified Competitors shall include all types of Search Text Ads (including any assets, extensions, or similar Search Text Ad variations) available through its syndication products.  For the avoidance of doubt, Google's obligations do not extend to latency, reliability, and performance differences that result from differences in product implementation, users, or are otherwise outside of Google's syndication products.

2.      Google shall provide the Search Text Ads Syndication License to Qualified Competitors on financial terms no worse than those offered to any other user of Google's Search Text Ads syndication products.

3.      Google shall not require Qualified Competitors to share more information with Google regarding the end user than it requires from any other user of Google's Search Text Ads syndication products.

4.      The only permitted use of the information and data that Qualified Competitors obtain from Google pursuant to this Section VI is to display the ad results to the end user who submitted the associated query, as further detailed in this section, except as permitted by Section VI.B.9.

5.      Google shall (i) make the purchase of ads syndicated under this Section VI.B available to advertisers on a non-discriminatory basis comparable to, and no more burdensome than, the availability of Google's other Search Text Ads and (ii) include Qualified Competitors in its Search Partner Network.

6.      Qualified Competitors shall have the same formatting flexibility available to any other user of Google's Search Text Ads syndication products, shall be free to use other providers of syndicated search ads or display their own ads, and shall not be required to provide Google ads with preferential placement over equivalent ads requested from other sources.   Google may place only ordinary-course restrictions on the use or display of syndicated ad content, but such restrictions shall be no more restrictive than those applied to any other user of Google's Search Text Ads syndication products.   Google is also permitted to place its ordinary commercial restrictions on scraping, indexing, or crawling the syndicated ads.

7.      Google is permitted to retain or use data collected from Qualified Competitors in provisioning of the service under Section VI for Google's own products and services for the purpose of building, improving, and maintaining its ads infrastructure

and shared ads systems.  Google's use of Qualified Competitors' data for these purposes will be the same as Google's use of data from other users of its Search Text Ads syndication products.

8.      Google need not grant Qualified Competitors the right to set a minimum cost per click for syndicated ads unless failing to do so would violate Section VI.B.1.

9.      For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States, from human end users. Synthetic queries are not eligible for syndication under the Final Judgment.  Queries from a syndicator of the Qualified Competitor are not eligible for syndication under the Final Judgment, unless such Qualified Competitor has been certified as a Competitor to a Google ads platform (e.g., Google Ads).

10.      If Google in good faith believes a Qualified Competitor is in breach of the terms of its agreement under this Section VI, Google may exercise its rights under the agreement.  Before exercising such rights, Google shall first provide simultaneous notice to the Technical Committee and the Plaintiffs of the breach and the actions Google is taking in light of the breach.  Google shall provide this notice in time such that Plaintiffs have a reasonable period of time to raise objections.  If Plaintiffs object and seek a resolution by the Court, Google may not take any action until the later of (i) two weeks after Plaintiffs seek Court intervention, if the Court does not act, or (ii) until further order of the Court, if the Court intervenes.  Google may seek expedited consideration from the Court if the circumstances warrant such treatment.

11.      Google shall be entitled to propose additional terms to the Search Text Ad syndication agreements with Qualified Competitors as necessary to guarantee ad quality,

14

protect advertisers, and prevent ad misuse.  Qualified Competitors are free to reject these proposed additional terms.  Google shall provide simultaneous notice to the Technical Committee and the Plaintiffs of any such term and allow Plaintiffs a reasonable period of time to raise objections.  If Plaintiffs object and seek a resolution by the Court, Google may not modify its Search Text Ad syndication agreements under this Section VI until the later of (i) two weeks after Plaintiffs seek Court intervention, if the Court does not act, or (ii) until further order of the Court, if the Court intervenes.  Google may seek expedited consideration from the Court if the circumstances warrant such treatment.

12.     Qualified Competitors may elect, in their sole discretion, the queries for which they will request syndicated ad results.

Within sixty (60) days of the Effective Date of this Final Judgment, Plaintiffs and the Technical Committee, with input from Google, shall create and submit to the Court a template for such license.

C.     Existing Syndication Agreements: The provisions of this Section VI shall have no effect on any existing Google Search Text Ad syndication agreements with third parties or on Google's ability to enter in Search Text Ad syndication agreements with third parties other than Qualified Competitors, except that Google shall permit any entity with an existing Search Text Ad syndication agreement who becomes a Qualified Competitor, at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section VI.

**VII.    COMPLIANCE, ADMINISTRATION, AND ENFORCEMENT PROCEDURES**

A.    <u>Technical Committee</u>:

1.    Within sixty (60) days of entry of this Final Judgment, the Court will appoint, pursuant to the procedures below, a five-person Technical Committee to assist in enforcement of and compliance with this Final Judgment.

2.    The TC members shall be experts in some combination of software engineering, information retrieval, artificial intelligence, economics, behavioral science, and data privacy and data security.  No TC member may have a conflict of interest that could prevent them from performing their duties in a fair and unbiased manner.  In addition, unless the Court so approves, no TC member:

a.    may have been employed in any capacity by Google or any Competitor to Google within the six-month period directly predating their appointment to the TC;

b.    may have been retained by any party as a consulting or testifying expert in this action; or

c.    may perform any work for Google or any Competitor of Google during the time that they serve on the TC and for one (1) year after ceasing to serve on the TC.

3.    Within thirty (30) days of entry of this Final Judgment, Plaintiff United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States, and Google shall each select one member of the TC, and a majority of those three members will then select the remaining two members.  Plaintiff United States' appointee shall serve as chair.  The selection and approval process shall be as follows:

a.      As soon as practicable after submission of this Final Judgment to the Court, the Plaintiffs as a group shall identify to Google the individuals they propose to select as their designees to the TC, and Google shall identify to Plaintiffs the individual it proposes to select as its designee.  No party may object to a selection on any ground other than failure to satisfy the requirements of Section VII.A.2 above.  Any such objection shall be made within ten (10) business days of receipt of notification of selection.

b.      The Plaintiffs shall apply to the Court for appointment of the persons selected pursuant to Section VII.A.3.a above.  Any objections to the eligibility of a selected person that the parties have failed to resolve between themselves will be decided by the Court based solely on the requirements stated in Section VII.A.2 above.

c.      As soon as practicable after their appointment by the Court, the three members of the TC selected by the Plaintiffs and Google (the "Standing Committee Members") shall identify to the Plaintiffs and Google the persons that they in turn propose to select as the remaining members of the TC.  The Plaintiffs and Google shall not object to these selections on any grounds other than failure to satisfy the requirements of Section VII.A.2 above.  Any such objection shall be made within ten (10) business days of receipt of notification of selection and shall be served on the other party as well as on the Standing Committee Members.

d.      The Plaintiffs shall apply to the Court for appointment of the persons selected by the Standing Committee Members.  If the Standing Committee Members cannot agree on the fourth or fifth members of the TC, that member or

17

members shall be appointed by the Court.  Any objection by Plaintiffs or Google to the eligibility of the person selected by the Standing Committee Members which the parties have failed to resolve among themselves shall also be decided by the Court based solely on the requirements stated in Section VII.A.2 above.

4.      The Standing Committee Members shall serve for an initial term of thirty-six (36) months; the remaining members shall serve for an initial term of thirty (30) months. At the end of a TC member's term, the party that originally selected them may, in its sole discretion, either request re-appointment by the Court to additional terms of the same length, or replace the TC member in the same manner as provided for in Section VII.A.3 above.  In the case of the fourth and fifth members of the TC, those members shall be re-appointed or replaced in the manner provided in Section VII.A.3 above.

5.      If any party determines that a member of the TC has failed to act diligently and consistently with the purposes of this Final Judgment, they may petition the Court for removal of that member.  If a member of the TC is removed by the Court, resigns, or for any other reason ceases to serve in their capacity as a member of the TC, the person or persons that originally selected the TC member shall select a replacement member in the same manner as provided for in Section VII.A.3 above.

6.      Promptly after appointment of the TC by the Court, the Plaintiffs shall enter into a Technical Committee Services Agreement ("TC Services Agreement") with each TC member that grants the rights, powers, and authorities necessary to permit the TC to perform its duties under this Final Judgment.  Google shall indemnify each TC member and hold them harmless against any losses, claims, damages, liabilities, or expenses arising out of, or in connection with, the performance of the TC's duties, except to the extent that

18

such liabilities, losses, damages, claims, or expenses result from misfeasance, gross negligence, willful or wanton acts, or bad faith by the TC member.  The TC Services Agreements shall include the following:

a.        The TC members shall serve, without bond or other security, at the cost and expense of Google on such terms and conditions as the parties agree, including payment of reasonable fees and expenses.  To the extent that the parties cannot agree on the terms of a TC Services Agreement, the parties will submit such disagreement to the Court for resolution.

b.        The TC Services Agreement shall provide that each member of the TC must comply with the limitations provided for in Section VII.A.2 above.

7.        The TC shall have the following powers and duties:

a.        The TC shall have the power and authority to monitor Google's implementation of and compliance with its obligations under this Final Judgment, in the manner described further herein.

b.        The TC shall have the power to recommend reasonable data security standards applicable to Qualified Competitors, which shall be approved by the Plaintiffs.

c.        The TC may, on reasonable notice to Google:

i.        interview, either informally or on the record, any Google personnel, who may have their individual counsel present; any such interview will be subject to the reasonable convenience of such personnel and without restraint or interference by Google;

19

ii.    inspect and copy any document in the possession, custody, or control of Google personnel;

iii.    obtain reasonable access to any system or equipment to which Google personnel have access;

iv.    obtain reasonable access to, and inspect, any physical facility, building, or other premises to which Google personnel have access; and

v.    require Google personnel to provide documents, data, and other information, and to submit reports to the TC containing such material, in such form as the TC may reasonably direct.

d.    The TC shall have access to Google's source code and algorithms, subject to a confidentiality agreement, as approved by the Plaintiffs and to be agreed to by the TC members pursuant to Section VII.A.8 below, and by any staff or consultants who may have access to the source code and algorithms.  The TC may study, interrogate, and interact with the source code and algorithms in order to perform its functions and duties, including the handling of complaints and other inquiries from third parties.

e.    The TC shall receive complaints from Google's Compliance Officer (as described in Section VII.B below), third parties, or the Plaintiffs and handle them in the manner specified in Section VII.C below.

f.    The TC shall report in writing to the Plaintiffs, initially every three (3) months for three (3) years and thereafter every six (6) months until expiration of this Final Judgment, the actions it has undertaken in performing its

20

duties pursuant to this Final Judgment, including the identification of each business practice reviewed and any recommendations made by the TC.

g.    Regardless of when reports are due, when the TC has reason to believe that there may have been a failure by Google to comply with any term of this Final Judgment, or that Google is attempting to circumvent any provision of this Final Judgment or the intended purposes of this Final Judgment, the TC shall immediately notify the Plaintiffs in writing setting forth the relevant details.

h.    TC members may communicate with third parties about how their complaints or inquiries might be resolved with Google, so long as the confidentiality of information obtained from Google is maintained.

i.    The TC may hire at the cost and expense of Google, with prior notice to Google and subject to approval by the Plaintiffs, such staff or consultants (all of whom must meet the qualifications of Sections VII.A.2.a–c) as are reasonably necessary for the TC to carry out its duties and responsibilities under this Final Judgment.  The compensation of any person retained by the TC shall be based on reasonable and customary terms commensurate with the individual's experience and responsibilities.

j.    The TC shall account for all reasonable expenses incurred, including agreed upon fees for the TC members' services, subject to the approval of the Plaintiffs.  Google's failure to promptly pay the TC's accounted-for costs and expenses, including for agents and consultants, shall constitute a violation of this Final Judgment and may result in sanctions imposed by the Court.  Google may, on application to the Court, object to the reasonableness of any such fees or other

expenses only if Google has conveyed such objections to the Plaintiffs and the TC within ten (10) calendar days of receiving the invoice for such fees or other expenses.  On any such application, (a) Google shall bear the burden to demonstrate unreasonableness; (b) Google shall establish an escrow account into which it deposits the disputed costs and expenses until the dispute is resolved; and (c) the TC members shall be entitled to recover all costs incurred on such application (including reasonable attorneys' fees and costs), regardless of the Court's disposition of such application, unless the Court expressly finds that the TC's opposition to the application was without substantial justification.

k.      Google may object to and be heard by the Court on any recommendation from the TC or Plaintiffs as to the interpretations or substantive requirements of this Final Judgment.

8.      Each TC member, and any consultants or staff hired by the TC, shall sign a confidentiality agreement prohibiting disclosure of any information obtained in the course of performing his or her duties as a member of the TC or as a person assisting the TC, to anyone other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, or the Court.  All information gathered by the TC in connection with this Final Judgment and any report and recommendations prepared by the TC shall be treated as Highly Confidential under the Protective Order in this case, and shall not be disclosed to any person other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, and the Court except as allowed by the Protective Order entered in the Action or by further order of this Court.  No member of the TC may make any public statements relating to the TC's activities.

B.      Internal Compliance Officer:

1.      Google shall designate, within thirty (30) days of entry of this Final Judgment, an employee of Google as the internal Compliance Officer with responsibility for administering Google's antitrust compliance program and helping to ensure compliance with this Final Judgment.

2.      Within seven (7) days of the Compliance Officer's appointment, Google shall identify to the Plaintiffs the Compliance Officer's name, business address, telephone number, and email address.  Within fifteen (15) days of a vacancy in the Compliance Officer position, Google shall appoint a replacement and identify to the Plaintiffs the replacement Compliance Officer's name, business address, telephone number, and email address.  Google's initial or replacement appointment of the Compliance Officer is subject to the approval of the Plaintiffs.

3.      The Compliance Officer shall supervise the review of Google activities to ensure that they comply with this Final Judgment.  The Compliance Officer may be assisted by other employees of Google.

4.      The Compliance Officer shall be responsible for performing the following activities:

a.      within forty-five (45) days after entry of this Final Judgment, distributing a copy of the Final Judgment to all officers and directors of Google;

b.      promptly distributing a copy of this Final Judgment to any person who succeeds to a position described in Section VII.B.4.a above;

c.      ensuring that those persons designated in Section VII.B.4.a above are annually briefed on the meaning and requirements of this Final Judgment and

the U.S. antitrust laws and advising them that Google's legal advisors are available to confer with them regarding any question concerning compliance with this Final Judgment or the U.S. antitrust laws;

d.      obtaining from each person designated in Section VII.B.4.a above an annual written certification that he or she: (i) has read and agrees to abide by the terms of this Final Judgment and (ii) has been advised and understands that his or her failure to comply with this Final Judgment may result in a finding of contempt of court;

e.      maintaining a record of all persons to whom a copy of this Final Judgment has been distributed and from whom the certification described in Section VII.B.4.d above has been obtained;

f.      establishing and maintaining the website provided for in Section VII.C.2.a below;

g.      receiving complaints from third parties, the TC, and the Plaintiffs concerning Google's compliance with this Final Judgment and following the appropriate procedures set forth in Section VII.C below;

h.      maintaining a record of all complaints received and action taken by Google with respect to each such complaint; and

i.      ensuring Google retains all relevant documents and electronically stored information, regardless of medium or form, related to this Final Judgment and all complaints received and/or action taken by Google with respect to any complaint.

5.      Google shall within thirty (30) days further appoint a senior business executive, who has visibility into any Google entity with obligations under this Final Judgment, whom Google shall make available to update the Court on Google's compliance at regular status conferences or as otherwise ordered.

C.      Voluntary Dispute Resolution:

1.      Third parties may submit complaints concerning Google's compliance with this Final Judgment to the Plaintiffs, the TC, or the Compliance Officer.

2.      Third parties, the TC, or Plaintiffs in their discretion may submit to the Compliance Officer any complaints concerning Google's compliance with this Final Judgment.  Without in any way limiting their authority to take any other action to enforce this Final Judgment, the Plaintiffs may submit complaints to the Compliance Officer whenever doing so would be consistent with the public interest.

a.      To facilitate the communication of complaints and inquiries by parties, the Compliance Officer shall place on Google's website, in a manner acceptable to the Plaintiffs, the procedures for submitting complaints.  To encourage whenever possible the informal resolution of complaints and inquiries, the website shall provide a mechanism for communicating complaints and inquiries to the Compliance Officer.

b.      Google has thirty (30) days after receiving a complaint to attempt to resolve or to reject it.

c.      Within thirty (30) days of receiving a complaint, the Compliance Officer shall advise the TC and the Plaintiffs of the nature of the complaint and its disposition.  The TC may then propose to the Plaintiffs further actions consistent

with this Final Judgment, including consulting with Plaintiffs regarding the complaint.

3. The Compliance Officer, third parties, or the Plaintiffs in their discretion may submit to the TC any complaints concerning Google's compliance with this Final Judgment.

a. The TC shall investigate the complaints it receives and shall consult with the Plaintiffs regarding its investigation. At least once during its investigation, and more often when it may help resolve the complaints informally, the TC shall meet with the Compliance Officer to allow Google to respond to the substance of the complaints and to determine whether the complaints can be resolved without further proceedings.

b. Following its investigation, the TC shall advise Google and the Plaintiffs of its conclusion and its proposal for cure.

c. Reports and recommendations from the TC may be received into evidence by the Court in connection with any effort by any Plaintiff to enforce this Final Judgment but shall not be otherwise made available in any other court or tribunal related to any other matter. No member of the TC shall be required to testify by deposition, in court, or before any other tribunal regarding any matter related to this Final Judgment.

d. The TC may preserve the anonymity of any third-party complainant where it deems it appropriate to do so upon the request of the Plaintiffs or the third party, or in its discretion.

D.      Compliance Inspection:

1.      Without in any way limiting the sovereign enforcement authority of each of the Colorado Plaintiff States, the Colorado Plaintiff States shall form a committee to coordinate their enforcement of this Final Judgment.  Neither a Co-Plaintiff State nor a Colorado Plaintiff State may take any action to enforce this Final Judgment without first consulting with the United States and with the Colorado Plaintiff States' enforcement committee.

2.      For the purposes of determining or securing compliance with this Final Judgment or of determining whether this Final Judgment should be modified or vacated, upon written request of an authorized representative of the Assistant Attorney General for the Antitrust Division (after consultation with the Co-Plaintiff States and the Colorado Plaintiff States' enforcement committee) or of the Attorney General of a Co-Plaintiff State or the Attorney General of a Colorado Plaintiff State (after consultation with the United States and the Colorado Plaintiff States' enforcement committee), as the case may be, and reasonable notice to Google, Google shall permit, from time to time and subject to legally recognized privileges, authorized representatives, including agents retained by any Plaintiff:

a.      to have access during Google's office hours to inspect and copy, or at the option of the Plaintiff, to require Google to provide electronic copies of all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Google relating to any matters contained in this Final Judgment; and

b.      to interview, either informally or on the record, Google's officers, employees, or agents, who may have their individual counsel present, relating to

27

any matters contained in this Final Judgment.  The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Google.

3.      Upon the written request of an authorized representative of the Assistant Attorney General for the Antitrust Division (after consultation with the Co-Plaintiff States and the Colorado Plaintiff States' enforcement committee) or of the Attorney General of a Co-Plaintiff State or the Attorney General of a Colorado Plaintiff State (after consultation with the United States and the Colorado Plaintiff States' enforcement committee), Google shall submit written reports or respond to written interrogatories, under oath if requested, relating to any matters contained in this Final Judgment.

4.      If, at the time information or documents are furnished by Google to the Plaintiffs, Google identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Google marks each pertinent page of such material, "Confidential and Sensitive Commercial Information Subject to Rule 26(c)(1)(G)," then the Plaintiffs shall give five (5) business days' notice prior to divulging such material in any legal proceeding, unless good cause is shown for a shorter notice period.

5.      Google shall have the right to claim protection from public disclosure, under the Freedom of Information Act, 5 U.S.C. § 552, or any other applicable law or regulation, for any material it submits to the Plaintiffs under this Final Judgment.  After appropriate consideration of such claim of protection, Plaintiffs, as the case may be, will either assert that the material is protected from disclosure under law or give Google ten (10) business days' notice of its intent to disclose the material.

Case 1:20-cv-03010-APM   Document 1462   Filed 12/05/25   Page 29 of 35

E.        Status Reports to the Court:

1.        Plaintiffs, with input from the Technical Committee, shall file a status report within ninety (90) days of the Effective Date of this Final Judgment, and then on future dates as set by the Court, updating the Court as to the enforcement of and Google's compliance with this Final Judgment.

## VIII.  EFFECTIVE DATE AND EXPIRATION

This Final Judgment will take effect sixty (60) days after the date on which it is entered (the "Effective Date"), and Plaintiffs shall report the date on which Google has substantially implemented all provisions of this Final Judgment, except for Section VII.A, which shall take effect immediately upon entry.  Unless the Court grants an extension or early termination is granted, this Final Judgment will expire six (6) years from the Effective Date.  This Final Judgment may be terminated upon notice by the United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States' enforcement committee, and Google that continuation of this Final Judgment is no longer necessary to restore competition in the monopolized markets.

## IX.    DEFINITIONS

A.        "API" or "application programming interface" means a mechanism that allows different software components to communicate with each other.

B.        "Apple" means Apple Inc., a corporation organized and existing under the laws of the State of California, headquartered in Cupertino, California, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

C.      "Browser Developer" means a developer, owner, or operator of a Third-Party Browser and includes, by way of example, Apple, Mozilla Corp., and Samsung Electronics Co., Ltd.

D.      "Chrome Browser Application" means the browser software application currently marketed by Google as "Google Chrome" and its successors.

E.      "Competitor" means any provider of or potential entrant in the provision of (i) a General Search Engine (GSE) in the United States, (ii) Search Text Ads in the United States, or (iii) a GenAI Product in the United States.

F.      "Consideration" means anything of value, including any monetary payment; provision of preferential licensing terms; technical, marketing, and sales support; developer support; or hardware or software certification or approval.

G.      "Default Search Engine" means a search engine that is set by a Browser Developer to respond to user queries if a user takes no action to select a particular search engine.

H.      "Device" or "device" means any single smartphone, tablet, laptop, or desktop, excluding any device on which the ChromeOS operating system or a successor to the ChromeOS operating system is installed.  For clarity, any two devices are different devices, even if they are the same make and model (e.g., two Samsung Galaxy S25s are two devices; two Apple iPhone 16 Pros are two devices).

I.      "GenAI" or "Generative AI" is a type of artificial intelligence that creates new content including but not limited to text, images, code, classifications, and other media using machine learning models.

J.      "GenAI Product" means any application, software, service, feature, tool, functionality, or product that involves or makes use of Generative AI capabilities or models and

has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information.

K.      "General Search Engine" or "GSE" means software or a service that produces links to websites and other relevant information in response to a user query or prompt and that seeks to fulfill a broad array of informational needs.

L.      "Google" means (1) Defendant Google LLC, a limited liability company organized and existing under the laws of the State of Delaware, headquartered in Mountain View, California; (2) its successors and assigns, subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures controlling or overseeing Google Search (including syndicated products), Search Text Ads (including syndicated products), the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any related Google GenAI Product; and (3) the directors, officers, managers, agents, and employees of such entities specified in this Section IX.L who oversee Google Search (including syndicated products), Search Text Ads (including syndicated products), the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any related Google GenAI Product.  For clarity, the term "affiliates" includes any Alphabet Inc.–related entity that controls or oversees the aforementioned products.

M.      "Google Assistant Application" means the user-facing mobile assistive service software application marketed by Google as "Google Assistant" and its successors.

N.      "Google GenAI Product" means any GenAI Product offered by Google, including by way of example, the stand-alone user-facing mobile software application currently marketed by Google as the "Google Gemini" application (and that application's functionally equivalent successors).

O. "Google Play" means the user-facing mobile software application distribution service currently marketed by Google as the "Play Store" and its successors.

P. "Google Search" means the web search and search advertising services offered by Google at Google.com.

Q. "Google Search Application" means the user-facing mobile online search software application currently marketed by Google as the "Google app" or the "Google Search app" (and its successors).

R. The terms "include" and "including" should be read as "including but not limited to," and any use of either word is not limited in any way to any examples provided.

S. "Marginal Cost" or "marginal cost" means the direct total production cost of producing an additional unit of a good or service, which is determined by calculating the change in direct total production cost resulting from Google providing the additional unit(s) of data or services required under this Final Judgment.

T. "Operating System Version" means a web browser version or a version of any proprietary Apple feature or functionality, including Siri and Spotlight, designed to be installed and used on a particular desktop or mobile operating system including, by way of example, Microsoft Windows, Apple iOS, Apple Mac OS, Apple iPad OS, or Android.

U. "Privacy Mode" means a mode within a web browser or an Apple product or service such as Siri or Spotlight that is designed to offer a preconfigured privacy setting and includes, by way of example, Private Browsing in Apple Safari, Private mode in Mozilla Firefox, and Secret mode in Samsung Internet.

V. "Qualified Competitor" means a Competitor who meets the Plaintiffs' approved data security standards as recommended by the Technical Committee and agrees to regular data

32

security and privacy audits by the Technical Committee; who makes a sufficient showing to the Plaintiffs, in consultation with the Technical Committee, of a plan to invest and compete in or with the GSE and/or Search Text Ads markets; and who does not pose a risk to the national security of the United States. To remain eligible as a Qualified Competitor, the Competitor must apply for re-certification on an annual basis starting from the date of original certification as a Qualified Competitor and establish that it continues to meet the definition of a Qualified Competitor. The Technical Committee shall establish appropriate procedures for the re-certification process.

W.     "Search Access Point" means any software, application, interface, digital product, or service where a user can enter a query or prompt and, in response to at least some user queries or prompts, receive (or be directed to a place to receive) a response that includes information from a GSE, including links to websites. Search Access Points include OS-level Search Access Points, browsers (including Search Access Points within browsers such as browser address bars), search apps, and GenAI Products that can retrieve and display information from a GSE, including links to websites.

X.     "Search Feature" in Google Search means any user-facing content on a SERP that is not an organic link. Search Features include images, featured snippets, hotel units, query expansion features like auto-complete, "did you mean" prompts, spelling corrections, and related searches.

Y.     "Search Text Ad" means a general search text advertisement, which is an ad that resembles an organic link on a SERP. Search Text Ads can include images and often appear at the top of the SERP with a designation indicating that they are paid advertisements. "Search Text Ad" also includes Search Text Ads appearing in or in connection with Google AI Overviews.

Z.      "SERP" or "Search Engine Results Page" means the results provided by a search engine, in response to a user query, including links and other features and content, drawn from a broad index of the web.

AA.     "Technical Committee" or "TC" means the five-person committee of experts appointed by the Court pursuant to Section VII.A.

BB.     "Third-Party Browser" means any web browser that is not Google Chrome or another proprietary Google web browser and includes, by way of example, Apple Safari, Mozilla Firefox, and Samsung Internet.

CC.     "Third-Party GenAI Product" means any GenAI Product that is not owned by Google.

DD.     "Third-Party General Search Service" means a web search service that can respond to a broad range of search query categories and offers functionality that is substantially similar to Google Search and is not owned by Google or its affiliates.

EE.     "User-side Data" means all data that can be obtained from users in the United States, directly through a search engine's interaction with the user's Device, including software running on that Device, by automated means.  User-side Data includes information Google collects when answering commercial, tail, and local queries.

FF.     "Web Search Index" means databases that store and organize information about websites and their content that is crawled from the web.  For the avoidance of doubt, it does not include Google's vertical indexes or its video, images, or other specialized indexes that contain information not crawled from the web.

## X.   THIRD-PARTY RIGHTS

Nothing in this Final Judgment is intended to confer upon any other persons any rights or remedies of any nature whatsoever or by reason of this Final Judgment other than the right to submit complaints to the Compliance Officer and the TC.

## XI.   RETENTION OF JURISDICTION AND ENFORCEMENT OF FINAL JUDGMENT

A.   Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders or directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification of any of its provisions, for the enforcement of compliance with this Final Judgment, and for the punishment of any violation of this Final Judgment.

B.   For a period of four (4) years following the expiration of this Final Judgment, if any Plaintiff has evidence that Google violated this Final Judgment before it expired, that Plaintiff may file an action against Google in this Court requesting that the Court order (1) Google to comply with the terms of this Final Judgment for an additional term of at least four (4) years following the filing of the enforcement action; (2) all appropriate contempt remedies; and (3) additional relief needed to ensure Google complies with the terms of this Final Judgment.

Dated:  December 5, 2025

_____
Amit P. Mehta
United States District Judge

**CERTIFICATE OF SERVICE**

I hereby certify that the sealed material in this filing will be dispatched for filing on February 23, 2026 to the Clerk of the United States Court of Appeals for the District of Columbia Circuit by uploading to the Court's Box.com Repository for Sealed Filings.  I certify that, in addition to service via the Court's CM/ECF system of public material, service of sealed material has been made on February 23, 2026 by electronic mail to the following, who represent all parties entitled to receive the material under seal pursuant to Circuit Rule 47.1:

Matthew A. Waring
matthew.waring@usdoj.gov

Philip J. Levitz
philip.levitz@ag.ny.gov

Jonathan Sallet
jonathan.sallet@coag.gov

Jacob Frasch
jfrasch@attorneygeneral.gov

Jayme L. Weber
jayme.weber@azag.gov

Brandon H. Garod
brandon.h.garod@doj.nh.gov

Amanda Wentz
amanda.wentz@arkansasag.gov

Robert Koch
robert.a.koch@doj.oregon.gov

Tessa Gellerson
tessa.gellerson@dc.gov

Diamante Smith
diamante.smith@oag.texas.gov

Norman Lee Morris III
Lee.Morris@ago.ms.gov

Scott A. Mertens
mertenss@michigan.gov

Lee Istrail
lee.istrail@myfloridalegal.com

Mary Frances G. Jowers
mfjowers@scag.gov

Gabe Johnson-Karp
gabe.johnson-karp@wisdoj.gov

Paula L. Blizzard
paula.blizzard@doj.ca.gov

Asyl Nachabe
NachabeA@ag.louisiana.gov

Sarah Mader
sarah.mader@ohioago.gov

Jonathan Farmer
Jonathan.Farmer@ky.gov

Logan B. Winkles
lwinkles@law.ga.gov

Dated:  February 23, 2026

Respectfully submitted,

*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
*Counsel for Google LLC*