Nos. 26-5023, 26-5047, 26-5049

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

UNITED STATES OF AMERICA, et al.,

*Plaintiffs-Appellees-Cross-Appellants,*

*v.*

GOOGLE LLC,

*Defendant-Appellant-Cross-Appellee.*

————————————

On Consolidated Appeals from the
U.S. District Court for the District of Columbia
Case Nos. 20-cv-3010 (APM) & 20-cv-3715 (APM)

————————————

**BRIEF OF WASHINGTON LEGAL FOUNDATION
AS AMICUS CURIAE SUPPORTING
DEFENDANT-APPELLANT AND REVERSAL**

————————————

Cory L. Andrews
WASHINGTON LEGAL FOUNDATION
2009 Massachusetts Ave., NW
Washington, DC 20036
(202) 588-0302
candrews@wlf.org

*Counsel for Amicus Curiae
Washington Legal Foundation*

May 29, 2026

## CERTIFICATE AS TO PARTIES, RULINGS, RELATED CASES AND CORPORATE DISCLOSURE STATEMENT

Under D.C. Circuit Rule 28(a)(1), the undersigned counsel of record certifies:

### A.   <u>Parties and Amici</u>

All known parties are accurately listed in the parties' February 23, 2026 combined certificates. Since then, Washington Legal Foundation, Brave Software, Inc., Mozilla Corporation, Apple Inc., and Samsung Electronics Co., Ltd have each notified the Court of their intent to file an amicus brief in this appeal. On May 28, 2026, former antitrust enforcers Terry Calvnani, William Kolasky, Tad B. Lipsky Jr., and Joe Sims filed an amicus brief with the Court (ECF# 2175581).

### B.   <u>Rulings Under Review</u>

The rulings under review are the Memorandum Opinion on Liability (Dkt. No. 1033, August 5, 2024) (Mehta, J.), the Memorandum Opinion on Remedies (Dkt. No. 1436, September 2, 2025) (Mehta, J.), the Final Memorandum Opinion (Dkt. No. 1461, December 5, 2025), and the accompanying Final Judgment (Dkt. No. 1462, December 5, 2025) (Mehta, J.).

## C.    <u>Related Cases</u>

This Court resolved related appeals in *United States of America et al. v. Google LLC & Brad Greenspan*, No. 24-5006; *In re: Brad Greenspan*, No. 25-5007; and *United States et al. v. Google LLC & Apple Inc.*, No. 26-5016. Currently pending before the Court is *In re: Brad Greenspan*, No. 26-5022. WLF is unaware of any other related case.

## D.    <u>Rule 26.1 Disclosure</u>

Washington Legal Foundation has no parent company, issues no stock, and no publicly held company owns a ten percent or greater interest in it.

<u>/s/ Cory L. Andrews</u>

## STATEMENT ON AUTHORSHIP,
## MONETARY CONTRIBUTIONS, AND SEPARATE BRIEFING

No party's counsel authored any part of this brief and no one, other than Washington Legal Foundation and its counsel, contributed money intended to fund the brief's preparation and submission. Fed. R. App. P. 29(a)(4)(E).

As a public-interest nonprofit dedicated to both free markets and the rule of law, WLF's brief is necessary to emphasize the broader consequences of the district court's unprecedented expansion of remedial duties to deal under federal antitrust law. These issues raise vital questions about the proper limits of equitable relief under Section 2 of the Sherman Act—questions that extend far beyond the immediate interests of the parties and will shape antitrust enforcement in dynamic markets for many years to come.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................ii

GLOSSARY ...................................................................................iv

INTEREST OF AMICUS CURIAE............................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 1

ARGUMENT ....................................................................................5

I.   THE DECREE EXCEEDS THE EQUITABLE LIMITS OF ANTITRUST
     RELIEF............................................................................................5

     A.   Antitrust remedies must be tailored to the proven
          violation .............................................................................6

     B.   The district court applied inconsistent standards of
          causation and tailoring ..........................................................9

     C.   The decree reaches nascent GenAI markets never
          adjudicated at trial.............................................................10

     D.   Ongoing Technical Committee supervision exceeds
          judicial competence ...........................................................12

II.  THE DECREE WILL IMPERIL INNOVATION AND GROWTH IN THE
     DIGITAL ECONOMY.......................................................................14

CONCLUSION ...............................................................................16

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Apple Inc. v. Pepper*,
   587 U.S. 273 (2019) ...................................................................... 1

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985) ................................................................ 2, 13

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...................................................................... 1

*FTC v. Actavis, Inc.*,
   570 U.S. 136 (2013) ...................................................................... 1

*Massachusetts v. Microsoft Corp.*,
   373 F.3d 1199 (D.C. Cir. 2004) ............................................. 5, 8, 13, 16

*Nat'l Collegiate Athletic Ass'n v. Alston*,
   594 U.S. 69 (2021) .................................................................. 6, 14

*PDK Labs. Inc. v. DEA*,
   362 F.3d 786 (D.C. Cir. 2004) ...................................................... 10

*People Who Care v. Rockford Bd. of Educ.*,
   111 F.3d 528 (7th Cir. 1997) .......................................................... 6

*United States v. District of Columbia*,
   897 F.2d 1152 (D.C. Cir. 1990) ...................................................... 4

*United States v. Humana*,
   2012 WL 7170464 (D.D.C. Oct. 22, 2012) ...................................... 6, 7

*United States v. Microsoft Corp. (Microsoft III)*,
   253 F.3d 34 (D.C. Cir. 2001) (en banc) .................. 5, 6, 8, 10, 13, 14, 16

*United States v. Microsoft Corp.*,
   56 F.3d 1448 (D.C. Cir. 1995) ........................................................ 6

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ...................................... 2, 5, 6, 12, 13, 16

*Authorities upon which we chiefly rely are marked with asterisks.

# TABLE OF AUTHORITIES
(*continued*)

**Page(s)**

**Statutes:**

15 U.S.C. § 2 ...................................................................................... 16

**Miscellaneous Sources:**

Philip E. Areeda & Herbert Hovenkamp,
*Antitrust Law* (1996) .............................................................................. 8

Frank H. Easterbrook, *On Identifying Exclusionary Conduct*,
61 Notre Dame L. Rev. 972 (1986) ...................................................... 12

Frank H. Easterbrook, *The Chicago School and Exclusionary
Conduct*, 31 Harv. J.L. & Pub. Pol'y 439 (2008) ................................. 15

Frank H. Easterbrook, *The Limits of Antitrust*,
63 Tex. L. Rev. 1 (1984) ....................................................................... 16

Michael Porter, *Competitive Strategy* (1980) .......................................... 15

## GLOSSARY

GenAI                    Generative Artificial Intelligence

§ 2                      Section 2 of the Sherman Act, 15 U.S.C. § 2

*Microsoft III*          *United States v. Microsoft Corp.*,
                         253 F.3d 34 (D.C. Cir. 2001) (en banc)

WLF                      Washington Legal Foundation

## INTEREST OF AMICUS CURIAE

Washington Legal Foundation is a nonprofit, public-interest law firm and policy center with supporters nationwide. WLF promotes free enterprise, individual rights, limited government, and the rule of law. It often appears as amicus curiae in important antitrust cases. *See, e.g., Apple Inc. v. Pepper*, 587 U.S. 273 (2019); *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). WLF submits this brief solely on the remedies issue presented in the cross-appeals.

The aim of antitrust law is to protect free-market competition, which delivers better goods and services at lower prices. The district court's far-reaching remedies decree upends that vital goal. If affirmed, that decree will erode the procompetitive aims of antitrust law and invite rent-seeking lawsuits by rivals desiring court-ordered access to a competitor's proprietary assets. Because the decision below imposes duties to deal that are untethered to a corresponding violation and unproven to restore competition, the Court should reverse.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Antitrust law does not grant competitors the right to ride free on a rival's success. In our free-market system, a business—even one found to

hold monopoly power—may choose with whom it will transact. Antitrust law places only modest limits on this discretion. A monopolist that ends an established, profitable course of dealing must have a rational business justification. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608–11 (1985). This is not a high bar. The monopolist need not maximize competition. It certainly need not assist competitors. It must merely act sensibly from a competitive business vantage.

Antitrust law protects *competition*—not competitors. The Supreme Court has long protected a firm's right to refuse to deal with competitors, recognizing that forced cooperation risks stifling the innovation and investment that drives economic growth. *See Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP,* 540 U.S. 398, 407–08 (2004). In *Trinko*, the Supreme Court cabined *Aspen Skiing*'s "duty to deal" to its rarefied facts and warned that further expansion could deter procompetitive conduct and burden courts with tasks ill-suited to their competence. *Id.* at 408–09.

Plaintiffs here did not bring a duty-to-deal claim. Yet the district court thrust sweeping duties to deal on Google anyway. It correctly rejected several of Plaintiffs' more aggressive demands, including

divestiture of Chrome and a ban on search-related payments. It recognized evidentiary weaknesses and the potential for those remedies to harm third parties, consumers, and innovation. Even so, it went too far when it imposed on Google ongoing affirmative duties to deal that go beyond the scope of any proven violation and exceeded the equitable limits of antitrust relief.

The decree compels Google to disclose certain proprietary search-index metadata and some user-side data to "Qualified Competitors" and to syndicate search results and search-text ads on ordinary commercial terms under court oversight. (Dkt. No. 1436: 132–40, 168–86); (Dkt. No. 1461: 9–11, 36–47). Yet these obligations—affirmative duties to deal that Google never voluntarily assumed—rest on a tenuous causal chain and scant evidence that forced sharing will remedy the consequences of any violation found.

One of the district court's justifications for these remedies was that "scale" is a "significant fruit" of Google's unlawful conduct. (Dkt. No. 1436: 89, 97). Yet the court itself acknowledged that Google's scale advantage owes much to its lawful innovation and competition. (Dkt. No. 1033: 13, 199, 226). Even so, the court declined to calculate "how much

additional scale or revenue Google received as a result of the exclusive agreements to treat them as fruits of the violation." (Dkt. No. 1436: 89). The decree thus imposes affirmative duties without evidence that such forced sharing will restore competition or even prove profitable for Google. (Dkt. No. 1436: 136–40).

The district court's approach decouples remedy from proven liability, flouting the longstanding rule of equity that the "scope of the remedy is determined by the nature and extent of the violation the decree seeks to cure." *United States v. District of Columbia,* 897 F.2d 1152, 1157 (D.C. Cir. 1990). Even in antitrust, decrees cannot serve as vehicles for addressing broader market issues beyond the violation. Courts may not sally forth in search of other wrongs to right. The decision below thus transforms antitrust law from a shield against exclusionary conduct into a sword for rivals seeking court-mandated access to another firm's hard-won assets.

To be sure, the district court rejected several of Plaintiffs' most aggressive proposals, including divestiture of Chrome, a broad payment ban, mandated choice screens, and granular advertiser data sharing. Even so, the decree still exceeds the equitable bounds of antitrust relief

4

by imposing court-created duties to deal that are untethered from the proven violations and insufficiently justified by the record.

In doing so, the district court's decree not only circumvents *Trinko*'s careful limits, but it directly conflicts with this Court's rigorous causation requirement for antitrust remedies in *United States v. Microsoft Corp. (Microsoft III)*, 253 F.3d 34 (D.C. Cir. 2001) (en banc), and *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004). Without correction, the decree will imperil innovation in search and generative AI (GenAI) by imposing duties to deal in a market that the liability trial never examined.

## ARGUMENT

### I.    THE DECREE EXCEEDS THE EQUITABLE LIMITS OF ANTITRUST RELIEF.

Antitrust remedies may "seek to unfetter a market from anticompetitive conduct," "deny to the defendant the fruits of its statutory violation," and "ensure that there remain no practices likely to result in monopolization in the future." *Microsoft III*, 253 F.3d at 103 (cleaned up). These objectives, however, are not a license for judicial creativity.

Antitrust remedies must hew closely to the proven basis for the defendant's liability. They must be "tailored to fit the wrong creating the occasion for the remedy" and rest on evidence, not speculation. *Microsoft III*, 253 F.3d at 107. In short, the "remedy must be tailored to the violation, rather than the violation's being a pretext for the remedy." *People Who Care v. Rockford Bd. of Educ.*, 111 F.3d 528, 534 (7th Cir. 1997) (Posner, J.).

Here the district court went too far. It compelled Google to share its proprietary search-index metadata and certain user-interaction data with rivals. It also ordered Google to syndicate search results and text ads. These are not mere prohibitory injunctions. They are affirmative, ongoing duties to deal—court-created obligations that Google never voluntarily assumed and that *Trinko* insists courts should hesitate to impose. 540 U.S. at 408.

## A. Antitrust remedies must be tailored to the proven violation.

The same antitrust considerations govern both the liability and remedies phases. *Nat'l Collegiate Athletic Ass'n v. Alston,* 594 U.S. 69, 102 (2021) ("[S]imilar considerations apply when it comes to the remedy."); *see United States v. Humana*, 2012 WL 7170464, at *2 (D.D.C.

6

Oct. 22, 2012) ("[T]he proposed final judgment must remedy only the anticompetitive behavior alleged in the complaint and it must not go beyond that.") (citing *United States v. Microsoft Corp.*, 56 F.3d 1448, 1459 (D.C. Cir. 1995)).

Without a prior course of dealing, there is no evidence that the district court's preferred course will be profitable, no reason to infer that Google's otherwise lawful refusal was unjustified, and nothing to guide the court in determining what terms to impose on Google's forced sharing arrangement. The violations the court found here involved exclusive agreements that restricted distribution *partners'* ability to carry rival search services. The court's remedies instead compel Google to provide its *rivals* with access to its proprietary search assets and results.

Consider the mismatch. The district court's liability finding rested on exclusive distribution agreements that foreclosed Google's partners from providing rivals key access points. (Dkt. No. 1436: 152–71). Yet the data-sharing and syndication remedies target Google's scale advantage without proof that forced access will close any quality gap or that rivals will use the data to innovate rather than free-ride. (Dkt. No. 1436: 129–36 [data sharing], 168–86 [syndication]).

7

This Court has been clear. In *Microsoft III*, it vacated broad remedial provisions that went beyond the violations found and risked impairing rather than enhancing competition. 253 F.3d at 103–07. It emphasized that remedies must be "reasonably necessary" and must avoid unnecessary burdens. *Id.* at 106. Quoting the leading treatise, the Court stressed that the "[m]ere existence of an exclusionary act does not itself justify full feasible relief against the monopolist to create maximum competition." *Id.* at 106 (quoting 3 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 650a, at 67 (1996)).

In *Massachusetts*, the Court similarly rejected any remedy lacking this link. It refused to compel disclosures that would allow rivals to "clone" Windows, which would have denied returns on innovation unrelated to any violation. *Massachusetts*, 373 F.3d at 1218–20. It also rejected forced code alterations that would ease rivals' paths to customers, noting the advantages of "positive network effects" derived from Microsoft's lawful conduct. *Id.* at 1210–12. Remedies, the Court insisted, must address "consequences of the illegal conduct," not pave roads for competitors beyond liability determinations. *Id.* at 1215–16.

The district court's decree fails to heed this Court's guidance.

8

**B.    The district court applied inconsistent standards of causation and tailoring.**

The district court applied shifting standards when deciding which remedies to impose. Its selective application of causation and tailoring principles is striking. The court itself acknowledged evidentiary weaknesses for some remedial proposals. It rejected a full ban on search-related payments and mandatory ads-data sharing for insufficient proof of any net competitive benefit to third parties, innovation, or consumers. (Dkt. No. 1436: 119–28, 164–68). Yet it applied a more attenuated causal connection standard to justify forced data-sharing and syndication. It was willing to impose affirmative, ongoing duties to deal even though the link between those remedies and the specific exclusionary conduct found at liability was no less attenuated.

This selective approach risks punishing success rather than remedying exclusionary conduct. The court acknowledged that much of Google's scale derives from lawful sources—superior product quality, network effects, and substantial investment in innovation—rather than solely from any exclusionary agreements. (Dkt. No. 1436: 89–97). Forcing Google to share the fruits of its lawful conduct therefore goes beyond

9

curing any violation—it converts a remedy for exclusionary acts into a tax on advantages derived from lawful innovation and investment.

Without a tighter causal connection, there is no basis to conclude that Google's refusal to deal was unjustified. Nor is there any principled way for the court to decide the terms of the forced arrangement. This inconsistency matters. When a court demands a stronger causal showing to reject some remedies but accepts a weaker showing to justify others, it risks converting the remedial phase into a vehicle for achieving outcomes that go beyond curing the proven violation. Again, remedies must be "reasonably necessary" to address the consequences of the violation and must not impose unnecessary burdens. *Microsoft III*, 253 F.3d at 106. The district court's decree flunks that test.

C.    **The decree reaches nascent GenAI markets never adjudicated at trial.**

"[I]f it is not necessary to decide more, it is necessary not to decide more." *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in judgment). Yet the decree extends remedies to GenAI products and companies that were never part of the relevant markets or theory of liability litigated at trial. (Dkt. No. 1436: 99–103); (Dkt. No. 1461: 6–9). GenAI emerged only after

10

the liability trial as a nascent competitive threat. (Dkt. No. 1461: 2). To be sure, the court's remedies opinion contains extensive "findings" about GenAI's emergence as a nascent competitive threat to traditional general search engines. (Dkt. No. 1436: 16–46). But those post-hoc statements came *after the liability phase*, in which the relevant product markets and Google's exclusionary conduct were adjudicated solely on general search services and search-text advertising—*not* GenAI.

The district court cited no evidence that Google's exclusive deals actually foreclosed competition in GenAI or that forced data-sharing or syndication will "pry open" that space. (Dkt. No. 1436: 101–02). It made no finding that Google engaged in exclusionary conduct directed at GenAI competitors. It conceded that Google had no "distinct advantage" among GenAI products; Google's Gemini tool had fewer than 25% of the daily active users of OpenAI's ChatGPT. (Dkt. 1436: 41–42). By forcing Google to facilitate rivals' entry into this adjacent, rapidly evolving market it never examined at trial, the court has not remedied past exclusionary conduct—it has created a new regulatory regime for a market it never adjudicated.

11

Because GenAI was not part of the liability case, the district court's extension of affirmative duties to deal rests on rank speculation about future competitive dynamics rather than on proof that the proven violations produced anticompetitive effects in GenAI. *Trinko* disfavors exactly this approach. It cautions against using antitrust remedies to impose regulatory-style sharing obligations in markets where the defendant's conduct has not been proven to have caused harm. 540 U.S. at 407–09.

Antitrust law does not require a monopolist to subsidize its rivals' entry into adjacent or emerging markets. As Judge Easterbrook has cautioned, the chief "sin" of forced sharing is "putting on defendants a burden they often cannot carry." Frank H. Easterbrook, *On Identifying Exclusionary Conduct*, 61 Notre Dame L. Rev. 972, 980 (1986). Yet that is precisely what the decree does—it compels Google to underwrite competitors' development of GenAI products by granting them access to Google's proprietary index and search results.

### D.    Ongoing Technical Committee supervision exceeds judicial competence.

Beyond its substantive overreach, the district court's decree also creates serious problems of judicial administration. It creates ongoing

regulatory oversight for six years—a Technical Committee charged with overseeing data releases and recertifying "Qualified Competitors." (Dkt. No. 1461: 11); (Dkt. No. 1436: 210–13). Even the syndication remedy, though nominally imposed on "ordinary commercial terms," remains subject to ongoing Technical Committee investigation and judicial supervision of pricing, access, and compliance throughout the life of the decree. (Dkt. No. 1461: 11); (Dkt. No. 1436: 210–13, 219).

Under the decree, not only have the courts become "central planners"—something antitrust law seeks to avoid, *see Trinko*, 540 U.S. at 408—but worse, here they are centrally planning on a rather blank slate. Nothing in the law justifies exceeding *Aspen Skiing*'s "outer boundary" in this way. *Id.* at 409.

This framework converts what purports to be arm's-length market negotiation into regulated dealing under continuing court superintendence—precisely the sort of supervisory burden that *Trinko* insists federal judges are ill-suited to shoulder. 540 U.S. at 408–09. This Court has likewise warned against antitrust decrees that turn courts into ongoing regulators. *See Microsoft III*, 253 F.3d at 103–07; *Massachusetts*, 373 F.3d at 1243–44. The decree creates precisely that burden.

The decree also threatens to erode the very competition it claims to promote. By subjecting even "ordinary commercial" syndication to ongoing Technical Committee oversight, the decree risks locking rivals into long-term dependency on Google rather than encouraging them to develop independent capabilities. Beyond that, data-sharing without strong safeguards also creates privacy and security risks for users whose queries feed Google's systems. The district court acknowledged all these risks yet proceeded anyway. (Dkt. No. 1436: 136–40).

In sum, equitable remedies must be tailored to the proven violation, not used as a vehicle to address broader conduct untethered from liability. *See Alston*, 594 U.S. at 102; *Microsoft III*, 253 F.3d at 107. Because the decree violates that limit, this Court should reverse.

## II. UPHOLDING THE DECREE WILL IMPERIL INNOVATION AND GROWTH IN THE DIGITAL ECONOMY.

The decree's defects are not theoretical. They will impose concrete harms. By compelling access to the fruits of Google's investment in search quality and scale, the decree reduces returns on future investment in both search and GenAI. Leading firms have less incentive to innovate when rivals can obtain the benefits of that investment by judicial decree. Consumers ultimately will bear the cost.

14

Forced data-sharing and syndication could also chill investment in search quality and GenAI. Why invest heavily in a better index or more capable models if rivals can obtain the fruits of that investment by judicial fiat? The district court's own findings show Google's scale advantage stems in large part from lawful conduct. (Dkt. No. 1436: 82–97). Yet the decree treats all scale as tainted. If all search rivals can now demand (and receive) equivalent data by judicial decree, it could dampen incentives for leading firms to innovate in the first place.

Such rent-seeking also invites overdeterrence. Outside the easiest cases, a court cannot distinguish competition from exclusion. "*Every* indicator of exclusion also is present with efficient competition. Both predators and efficient producers undercut rivals and gain market share." Frank H. Easterbrook, *The Chicago School and Exclusionary Conduct*, 31 Harv. J.L. & Pub. Pol'y 439, 443 (2008). This threat of overdeterrence is not merely ironic; it is corrosive to the vital workings of our economy. It risks returning antitrust law to a time when leading business-school textbooks promoted antitrust litigation as a strategic device to halt competitors' growth. *See, e.g.*, Michael Porter, *Competitive Strategy* 85–86 (1980).

Any firm with an eye on a market rival's assets now has a clear roadmap: sue, prove some exclusionary conduct in one market, then demand court-ordered access to the winner's crown jewels in another. Again, *Trinko* warned precisely against this. 540 U.S. at 408 ("The cost of false positives counsels against an undue expansion of § 2 liability.").

Antitrust remedies exist to protect the competitive process and foster incentives to innovate—not to transfer a competitor's hard-won proprietary assets by judicial decree. As Judge Easterbrook has warned, "Judicial errors that tolerate baleful practices are self-correcting while erroneous condemnations are not." Frank H. Easterbrook, *The Limits of Antitrust*, 63 Tex. L. Rev. 1, 3 (1984). Leaving the district court's decree in place invites precisely this kind of irreversible error.

## CONCLUSION

The district court's remedies decree exceeds the equitable limits of antitrust relief. By imposing court-created duties to deal without proof that they will remedy the specific violations found, it conflicts with this Court's precedents in *Microsoft III* and *Massachusetts* and with the Supreme Court's decision in *Trinko*. This Court should reverse.

Respectfully submitted,

/s/ Cory L. Andrews
Cory L. Andrews
WASHINGTON LEGAL FOUNDATION
2009 Massachusetts Ave., NW
Washington, DC 20036
(202) 588-0302
candrews@wlf.org

May 29, 2026

17

## CERTIFICATE OF COMPLIANCE AND SERVICE

I certify that:

(i)    This brief complies with the brief length limits in the Rules. It contains 3,047 words.

(ii)    This brief complies with the format, typeface, and type-style requirements of Fed. R. App. P. 32(a)(4)–(6) because it has been prepared using Microsoft Office Word and is set in 14-point Century Schoolbook font.

(iii)    I electronically filed this brief with the Clerk via the CM/ECF system, which will serve all parties automatically.

/s/ Cory L. Andrews
Cory L. Andrews
*Counsel for Amicus Curiae*

May 29, 2026