**NOT YET SCHEDULED FOR ORAL ARGUMENT**

# United States Court of Appeals
# for the District of Columbia Circuit

## No. 26-5023

UNITED STATES OF AMERICA, *et al.*,

*Plaintiffs-Appellants,*

*v.*

GOOGLE LLC,

*Defendant-Appellee.*

*On Appeal from United States District Court for the District of Columbia in Nos. 1:20-cv-3715-APM, 1:20-cv-3715-APM, Honorable Amit P. Mehta, U.S. District Judge*

**BRIEF FOR *AMICUS CURIAE* ALDEN ABBOTT IN SUPPORT OF NEITHER PARTY**

IAN SIMMONS
SERGEI ZASLAVSKY
CATHERINE A. WARD
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300

*Counsel for Amicus Curiae Alden Abbott*

**TABLE OF CONTENTS**

Page

STATEMENT OF INTEREST OF *AMICUS CURIAE*..............................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................2

RELEVANT BACKGROUND ..........................................................................5

ARGUMENT ...................................................................................................7

I.    There Are Well-Established Requirements and Principles that Govern Section 2 Remedies In A Monopoly Maintenance Case. .......7

II.    Plaintiffs Must Satisfy the Applicable But-For Causation and Proportionality Requirements in Order To Justify "Extensive Equitable Relief." ..............................................................................11

    A.    Remedies Beyond Cessation of the Conduct Require a "Significant Causal Connection" Between Google's Anticompetitive Conduct and Its Maintenance of Monopoly Power. ................................................................11

    B.    The GenAI Data-Sharing and Syndication Remedy Is an Example of the District Court Failing to Meet The Requisite Causal Standard in Crafting Its Remedies. ...............14

CONCLUSION ...............................................................................................19

i

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Brown Shoe Co. v. United States,*
370 U.S. 294 (1962) ........................................................................18

*Brown v. Plata,*
563 U.S. 493 (2011) ........................................................................12

*Ford Motor Co. v. United States,*
405 U.S. 562 (1972) ................................................................... 10, 11

*Ginsburg v. InBev NV/SA,*
623 F.3d 1229 (8th Cir. 2010) .........................................................5, 11

*Massachusetts v. Microsoft Corp.,*
373 F.3d 1199 (D.C. Cir. 2004) ................................................ 11, 18, 19

*New York v. Microsoft Corp.,*
224 F. Supp. 2d 76 (D.D.C. 2002) ........................................ 7, 17, 18, 19

*Ragsdale v. Wolverine World Wide, Inc.,*
535 U.S. 81 (2002) ..........................................................................12

*Salazar v. Buono,*
559 U.S. 700 (2010) ........................................................................12

*United States v. Google LLC,*
747 F. Supp. 3d 1 (D.D.C. 2024) ............................................ 10, 13, 14, 16

*United States v. Google LLC,*
803 F. Supp. 3d 18 (D.D.C. 2025) ............................................... passim

*United States v. Microsoft Corp.*
253 F.3d 34 (D.C. Cir. 2001) ..................................................... passim

**Other Authorities**

3 Phillip Areeda & Herbert Hovenkamp, Antitrust Law (2d ed. 2002) ................2, 8

A. Douglas Melamed, *Afterword: The Purposes of Antitrust Remedies*, 76
Antitrust L.J. 359 (2009) ...................................................................7

Charles A. James, *The Real Microsoft Case and Settlement*, Antitrust, Fall
2001 ...........................................................................................9

E. Thomas Sullivan, *The Jurisprudence of Antitrust Divestiture: The Path
Less Traveled*, 86 Minn. L. Rev. 565 (2002) .......................................10

Herbert Hovenkamp, *Antitrust and Platform Monopoly*, 130 Yale L. J. 1952 (2021)..................................................................................................17

John E. Lopatka & William H. Page, *A (Cautionary) Note on Remedies in the* Microsoft *Case*, Antitrust, Summer 1999 ........................................................7

*United States v. Google LLC*,
Case No. 20-cv-3010, Dkt. 1463 (D.D.C. Dec. 5, 2025) ................................4, 11

**STATEMENT OF INTEREST OF *AMICUS CURIAE***

*Amicus curiae* Alden Abbott is a former General Counsel of the Federal Trade Commission who has testified before Congress numerous times and has an interest in ensuring the antitrust laws are enforced in furtherance of their intended purposes. This interest is particularly acute in dynamic technology markets.

The antitrust laws prohibit anticompetitive conduct that harms competition. Antitrust remedies in a monopoly maintenance case are intended to terminate the unlawful conduct and prevent its recurrence, and remediate proven harm to competition caused by the illegal conduct. Antitrust remedies that go further than that or that are not narrowly designed to achieve those goals can undermine the purpose of the antitrust laws by inhibiting the very robust competition that those laws are intended to promote.

Mr. Abbott respectfully submits this brief in his individual capacity and in support of neither party, to clarify the legal standard that governs antitrust remedies—a standard based on the findings of the District Court as to the ways in which the challenged conduct was unlawful and was shown to have harmed competition in the market as whole.[1]

---

[1] No party, or counsel for a party, authored this brief in whole or in part. No one contributed money to fund this brief. O'Melveny & Myers LLP represents Google in other matters unconnected to this brief.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

In *United States v. Microsoft Corp.*, this Court stated that "[m]ere existence of an exclusionary act does not itself justify full feasible relief against the monopolist to create maximum competition." 253 F.3d 34, 106 (D.C. Cir. 2001) (en banc) (quoting 3 Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 650a, at 67 (2d ed. 2002)). The Court noted that, as a baseline, "the antitrust defendant's unlawful behavior should be remedied by 'an injunction against continuation of that conduct.'" *Id.* (quoting 3 Areeda & Hovenkamp, Antitrust Law ¶ 650a, at 67). By contrast, "more extensive equitable relief, particularly remedies such as divestiture designed to eliminate the monopoly altogether, . . . require a clearer indication of significant causal connection between the conduct and creation or maintenance of the market power." *Id.* at 107 (quoting 3 Areeda & Hovenkamp, Antitrust Law ¶ 653b, at 91–92). "Absent such causation, the antitrust defendant's unlawful behavior should be remedied by 'an injunction against continuation of that conduct.'" *Id.* at 106. (quoting 3 Areeda & Hovenkamp, Antitrust Law ¶ 650a, at 67).

Having adopted this heightened causation standard for structural or other remedial relief, this Court in *Microsoft* reversed the District Court's decision granting structural relief, noting, among other things, that the court "expressly did not adopt the position that Microsoft would have lost its position in the OS market

but for its anticompetitive behavior." *Id.* at 107 (quoting Findings of Fact ¶ 411 ("There is insufficient evidence to find that, absent Microsoft's actions, Navigator and Java already would have ignited genuine competition in the market for Intel-compatible PC operating systems.")). It added that "[i]f the court on remand is unconvinced of the causal connection between Microsoft's exclusionary conduct and the company's position in the OS market, it may well conclude that divestiture is not an appropriate remedy." *Id.*

As described in greater detail below, the best reading of *Microsoft*'s heightened causation standard for structural or other remedial relief that goes beyond enjoining the anticompetitive conduct in question is that the plaintiff must show, and the District Court must find, that the defendant's monopoly power would not have been maintained but for the illegal conduct, or that the remedy is reasonably calculated to restore competitive conditions that would have existed but for that conduct. Applying this test requires examining the counterfactual of what would have happened absent that conduct, just as courts regularly do in other contexts such as measuring damages in antitrust cases.

This but-for causation standard is particularly important in antitrust cases because of the danger that structural relief or other behavioral relief poses where that relief goes beyond enjoining the anticompetitive conduct in question and causes harm to competition. "Fashioning appropriate equitable antitrust relief

3

requires that courts balance the benefit to competition against the hardship or competitive disadvantage the remedy may cause." *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1235 (8th Cir. 2010).

The final remedial Memorandum Opinion, *United States v. Google LLC*, 803 F. Supp. 3d 18 (D.D.C. 2025), contains certain remedies that are not justified under the *Microsoft* causation standard. The District Court, among other things, required Google to make available to 'Qualified Competitors,' including GenAI companies that are outside the relevant general search services market, certain search index and user-interaction data (though not ads data) "as such sharing will deny Google the fruits of its exclusionary acts and promote competition." 803 F. Supp. 3d at 38.[2] Google will also be required to offer "Qualified Competitors search and search text ads syndication services to enable those firms to deliver high-quality search results and ads to compete with Google while they develop their own search

---

[2] The District Court defined "Qualified Competitor": "a Competitor who meets the Plaintiffs' approved data security standards as recommended by the Technical Committee and agrees to regular data security and privacy audits by the Technical Committee; who makes a sufficient showing to the Plaintiffs, in consultation with the Technical Committee, of a plan to invest and compete in or with the GSE and/or Search Text Ads markets; and who does not pose a risk to the national security of the United States. To remain eligible as a Qualified Competitor, the Competitor must apply for re-certification on an annual basis starting from the date of original certification as a Qualified Competitor and establish that it continues to meet the definition of a Qualified Competitor. The Technical Committee shall establish appropriate procedures for the re-certification process." *United States v. Google LLC*, Case No. 20-cv-3010, Dkt. 1462, at 34–35 (D.D.C. Dec. 5, 2025) ("Final Judgment").

technologies and capacity.  Syndication shall occur largely on ordinary commercial terms that are consistent with Google's current syndication services." *Id.*  Stating that "[s]earch index quality is critically important not only for traditional search engines, but also for emerging GenAI products," *id.* at 113, the District Court's remedial order will force Google to share significant proprietary data with well-heeled competitors in connection with a product—Generative AI—for which there are no liability findings, much less causation findings that satisfy the standard described above.   For that reason, and for the reasons expressed below, the syndication and data sharing remedies are unwise and unfounded.

## RELEVANT BACKGROUND

After a nearly 3-week evidentiary hearing, the District Court issued its remedies opinion in *United States v. Google LLC*, following its earlier finding that Google violated Section 2 of the Sherman Act through maintaining a monopoly in the general search services and search text advertising markets.  803 F. Supp. 3d 18.  In doing so, the District Court articulated several guiding principles for imposing antitrust remedies.  The remedy "'must seek' to 'unfetter a market from anticompetitive conduct,' 'deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future.'"  *Id.* at 67 (quoting *Microsoft Corp.*, 253 F.3d at 103).  Further, antitrust remedies must be proportional to the particular causation evidence that established

liability in the first place. *Id.* at 76 (discussing *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 102 (D.D.C. 2002)).

Ultimately, the District Court imposed both remedies requiring Google to cease the conduct found unlawful and remedies that went further. Among other things, the District Court barred Google from entering or maintaining any exclusive distribution agreement related to Google Search, Chrome, Google Assistant, and the Gemini app. *Id.* at 37. It imposed a one-year term condition on revenue share payments to original equipment manufacturers ("OEMs") and wireless carriers, matching the existing condition for browser developers. *Id.* at 97. And, importantly, the District Court imposed data-sharing and syndication remedies, forcing Google to provide certain search index and user-interaction data and offer search and search text ads syndication services not just to its general-search-engine competitors, but also to GenAI companies that are outside the general search services market. *Id.* at 37–38.

The District Court is requiring Google to share data with GenAI companies even though it acknowledged that generative artificial intelligence is a dynamic and rapidly changing technological watershed where competition is thriving and Google does not enjoy a decisive competitive advantage. In particular, the District Court discussed that while there are some areas of 'overlap' between Google Search and GenAI chatbots, many GenAI applications are not suitable for Search

and many functions of Search are not suitable for GenAI.  *Id.* at 49.  The District

Court also recognized the record evidence that mobile phones do the lion's share of

work in terms of Search and that mobile phones have the capacity to run multiple

AI models.  *Id*. at 51.  And the District Court highlighted that "GenAI firms have

access to a lot of capital."  *Id.* at 58.  Despite these recognitions, the District Court

extended its syndication and data remedies to GenAI companies whose products,

the District Court recognized, are not in the general search market it had defined.

## ARGUMENT

**I.      There Are Well-Established Requirements and Principles that Govern
Section 2 Remedies In A Monopoly Maintenance Case.**

As the en banc D.C. Circuit explained in *Microsoft*, the default remedy for

an antitrust defendant's unlawful behavior is "an injunction against [the]

continuation of that conduct."  253 F.3d at 106 (internal quotation omitted); *see*

*also* John E. Lopatka & William H. Page, *A (Cautionary) Note on Remedies in the*

Microsoft *Case*, Antitrust, Summer 1999, at 25, 26 ("The starting point . . . is an

order prohibiting the defendant from engaging in the proven illegal conduct.").

That tailored default remedy makes sense:  "[R]emedies are hard to get right and,

when suboptimal, can undermine antitrust objectives by interfering with markets

and prohibiting or deterring procompetitive conduct."  A. Douglas Melamed,

*Afterword: The Purposes of Antitrust Remedies*, 76 Antitrust L.J. 359, 368 (2009).

In a monopoly maintenance case, remedies appropriately focus on ending the

behavior at the heart of the alleged Section 2 violation because "there is no unfairness or disincentive to meritorious competition in simply . . . ordering the monopolist to stop" the anticompetitive conduct. 3 Areeda & Hovenkamp, Antitrust Law ¶ 653b, at 98.

Remedies that go beyond preventing the continuation or recurrence of unlawful conduct raise more difficult issues. This Court emphasized that the "[m]ere existence of an exclusionary act does not itself justify full feasible relief against the monopolist to create maximum competition." *Microsoft*, 253 F.3d at 106 (quoting 3 Areeda & Hovenkamp, Antitrust Law ¶ 650a, at 67). The Court went on to explain that "more extensive equitable relief, particularly remedies such as divestiture designed to eliminate the monopoly altogether, . . . require a clearer indication of significant causal connection between the conduct and the creation or maintenance of the market power." *Id.* at 107 (quoting 3 Areeda & Hovenkamp, Antitrust Law ¶ 653(b), at 91–92).

That "clearer"—and heightened—causation requirement for equitable relief beyond the default injunction against proven anticompetitive conduct stands in marked contrast to the standard applied in the liability phase of a monopoly maintenance case, where "[c]ourts may 'infer "causation" from the fact that a defendant has engaged in anticompetitive conduct that reasonably appear[s] capable of making a significant contribution to . . . maintaining monopoly power.'"

*United States v. Google LLC*, 747 F. Supp. 3d 1, 153 (D.D.C. 2024) (alteration in original).  In the remedies context, establishing a "significant causal connection" requires establishing but-for causation between the proven anticompetitive conduct and competitive conditions allowing the monopolist to maintain its monopoly. *Microsoft*, 253 F.3d at 107.  A structural remedy intended to restore competition to the relevant market therefore requires proof, not just what the illegal conduct was "reasonably capable" of,  but also that the conduct actually harmed competition and either sustained or enhanced defendant's monopoly power, or damaged or destroyed some kind of market attribute—*e.g.*, an important supplier, resource, or distribution channel—that would have led to genuine competition.  The purpose of these remedies is the "[r]estoration" of "lost competition."  Charles A. James, *The Real Microsoft Case and Settlement*, Antitrust, Fall 2001, at 58, 61; *see also Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) ("The relief in an antitrust case must be 'effective to redress the violations' and 'to restore competition.'").

This Court in *Microsoft* applied these principles.  The Court took note of the District Court's finding that "[t]here is insufficient evidence to find that, absent Microsoft's actions, Navigator and Java already would have ignited genuine competition in the market for Intel-compatible PC operating systems."  253 F.3d at 107 (quoting Findings of Fact ¶ 411).  The Court remanded the case, stating that, "[i]f the court on remand is unconvinced of the causal connection between

9

Microsoft's exclusionary conduct and the company's position in the OS market, it may well conclude that divestiture is not an appropriate remedy." *Id.*

In addition, even if a plaintiff can satisfy the heightened causation threshold for more extensive equitable relief, this Court requires that any extensive relief "must represent[] a *reasonable* method of eliminating the consequences of the illegal conduct." *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1216 (D.C. Cir. 2004) (alteration in original) (internal quotation omitted) (emphasis added). "Fashioning appropriate equitable antitrust relief requires that courts balance the benefit to competition against the hardship or competitive disadvantage the remedy may cause." *Ginsburg*, 623 F.3d at 1235; *see also* E. Thomas Sullivan, *The Jurisprudence of Antitrust Divestiture: The Path Less Traveled*, 86 Minn. L. Rev. 565, 613 (2002) ("Courts must exercise care to ensure that the cost of correcting the market failure does not exceed the anticompetitive injury visited on consumers."). In other words, it is essential that courts "fit the decree" to the particulars of the case. *Ford*, 405 U.S. at 573; *Microsoft*, 253 F.3d at 107 (relief "should be tailored to fit the wrong creating the occasion for the remedy").

These principles informing the propriety and proportionality of equitable antitrust relief echo how courts have long thought about the function of remedies generally. The Supreme Court has made clear that that the "scope of the remedy must be proportional to the scope of the violation, and the order must extend no

further than necessary to remedy the violation." *Brown v. Plata*, 563 U.S. 493, 531 (2011); *see also Ragsdale v. Wolverine World Wide, Inc*., 535 U.S. 81, 89 (2002) (stating that a remedy must be "tailored to the harm suffered"); *Salazar v. Buono*, 559 U.S. 700, 718 (2010) ("A court must find prospective relief that fits the remedy to the wrong or injury that has been established.").

**II.     Plaintiffs Must Satisfy the Applicable But-For Causation and Proportionality Requirements in Order To Justify "Extensive Equitable Relief."**

**A.     Remedies Beyond Cessation of the Conduct Require a "Significant Causal Connection" Between Google's Anticompetitive Conduct and Its Maintenance of Monopoly Power.**

The District Court's remedies qualify as "more extensive equitable relief" because they go well beyond an injunction against the continuation of the kind of distribution agreements that the District Court found to be anticompetitive. The remedies include compulsory "data sharing" and "syndication" remedies. *See generally* Final Judgment. Amicus takes no position on liability, and thus takes no position on the District Court's cease-the-unlawful-conduct remedies.

As explained above, before the Court even considers relief beyond terminating the conduct that the District Court held violated Section 2 and preventing its recurrence, Plaintiffs must satisfy the "significant causal connection" requirement. *See Microsoft*, 253 F.3d at 107 (internal quotation omitted). The District Court did not find that, *but for* the unlawful distribution agreements,

Google's monopoly power in the "general search services" and "general text advertising" product markets would have been eliminated or materially reduced or that the unlawful agreements undermined market conditions that would have threatened Google's monopoly. "The reality is that the court did not make factual findings with an eye towards meeting a stricter remedies causation standard—that was not the task at hand." *Google*, 803 F. Supp. 3d at 77. And yet: "No authority, therefore, requires the court to calibrate precisely how much additional scale or revenue Google received as a result of the exclusive agreements to treat them as fruits of the violation." *Id.* at 90.

If anything, the District Court's findings suggest that Google's search and advertising products have long beaten out the competition "through superior foresight or quality." *Microsoft*, 253 F.3d at 56. For instance:

- In 2009 "80% of all general search queries, whether entered on a desktop computer or mobile device, flowed through Google." *Google*, 747 F. Supp. 3d at 38. This was during a period before Google was alleged to have engaged in illegal monopoly maintenance.

- The District Court found that Google "has long been the best search engine, particularly on mobile devices." *Id.* at 144.

- The District Court found that Google "has continued to innovate in search" despite its dominant market share. *Id.*

- "Google's partners value its quality, and they continue to select Google as the default because its search engine provides the best bet for monetizing queries." *Id.* Competitors "have not succeeded [in winning competitions for default placement] in part due to their inferior quality." *Id.*

- "Google foresaw that the future of search was on mobile. Microsoft acknowledges that it was slow to recognize the importance of developing a search product for mobile, and it has been trying to catch up—unsuccessfully—ever since." *Id.*

The statements do not establish that, but for the unlawful agreements, Google's monopoly power would not have been maintained or that "genuine competition" would have been "ignited" in the relevant markets. *See Microsoft*, 253 F.3d at 107.

These distinctions are reflected in the *Microsoft* case. There, this Court noted that Microsoft's unlawful conduct had significantly harmed Navigator. "Microsoft's deals with [internet service providers] clearly have a significant effect in preserving its monopoly; they [kept] usage of [the] Navigator [browser] below the critical level necessary for Navigator or any other rival to pose a real threat to Microsoft's monopoly." *Microsoft*, 253 F.3d at 66, 71. Yet, the Court held that those findings satisfied only the more relaxed standard for liability, explaining that it "ha[d] found a causal connection between Microsoft's exclusionary conduct and its continuing position in the operating systems market *only through inference*." *Id.* at 106–07 (emphasis added). The same appears true here where the District Court found that the unlawful conduct was "reasonably capable" of harming competition, but it did not find that the conduct actually harmed competition in the market as a whole, much less set forth in any sense the metes and bounds or scope of the harm to the market as juxtaposed against a counterfactual.

**B.** **The GenAI Data-Sharing and Syndication Remedy Is an Example of the District Court Failing to Meet The Requisite Causal Standard in Crafting Its Remedies.**

The District Court ordered a number of remedies that go far beyond enjoining the conduct found to be unlawful without the requisite causation showing. No remedy is more emblematic of this problematic approach than the remedial decree's Gen AI data-sharing and syndication requirements. The District Court will require Google to provide its data and offer search and search text ad syndication not only to rival general search engines, but to Gen AI competitors operating outside the relevant market.

Data-sharing and syndication is far removed from the conduct the District Court found to be unlawful—Google's challenged distribution agreements. To justify this remedy, the District Court needed to find either (1) that the defendant's monopoly power would not have been maintained but for the illegal conduct, or (2) that the remedy is reasonably calculated to restore competitive conditions that would have existed but for that conduct. *Supra* at 3–4. As discussed above, the District Court did not make the first finding. Nor did it make the second: in fact, the District Court's own findings show the remedy is untethered from restoring competitive conditions that would have existed but for Google's challenged distribution agreements.

***The remedy addresses a separate product market from the one at issue in***

***the case.*** The District Court made the explicit finding that GenAI operates in a distinct product market from General Search Engines. 803 F. Supp. 3d at 55–60 (defining the "GenAI Market" as separate from the search market). The District Court explained in the liability opinion that "AI has not supplanted the traditional ingredients that define general search [and] it is not likely to do so anytime soon." 747 F. Supp. 3d at 53. And it reiterated in the remedies opinion a year later that "GenAI chatbots are not yet close to replacing GSEs." 803 F. Supp. 3d at 36. The market at which the remedy is aimed *did not even exist* when plaintiffs filed suit against Google.

***The District Court found that the "GenAI space is highly competitive."*** 803 F. Supp. 3d at 57. This is critical, as it shows no intervention is needed to restore competitive conditions in GenAI. "There have been numerous new market entrants. . . . GenAI firms have access to a lot of capital. . . . There is constant jockeying for a lead in quality among GenAI products and models." *Id.* at 58–59. This is not a competition problem in search of a remedy or market that needs to be "pried open." The GenAI companies have no trouble keeping up without the court's help: "[t]he evidence did not show . . . that Google's GenAI product responses are superior to other GenAI offerings due to Google's access to more user-interaction data." *Id*. at 123. "Google's Gemini app . . . does not have a distinct advantage over chatbots in factuality and other technical benchmarks." *Id*.

These findings are contrary to the idea that forcing Google to share data with GenAI companies is needed to restore competition that would have existed but for Google's challenged distribution agreements.

The District Court justified the AI data-sharing and syndication remedies by analogizing to *Microsoft*, where the court extended "the mandatory-disclosure provisions" to technologies that "had the capacity to function in a manner similar to that of traditional middleware."  803 F. Supp. 3d at 92 (quoting *Microsoft*, 224 F. Supp. 2d at 128–29).  But the middleware analogy does not work here.  In *Microsoft*, "Plaintiffs proceeded to trial on the theory that Microsoft had acted anticompetitively in an effort to boost its own middleware and stifle rival middleware because those products posed a potential 'platform threat."  224 F. Supp. 2d at 172.  Microsoft's anticompetitive acts suppressed middleware.  The remedies (mandatory disclosure of APIs and communication protocols) enhanced the interoperability of middleware products with Windows, and thus helped restore the competitive conditions that would have existed had Microsoft not suppressed middleware.  *Id.* at 171–73.  There is no similar nexus between the remedy and the liability findings here: there are no findings that Google suppressed the development of GenAI like Microsoft suppressed middleware.  The *Microsoft* court refused to go beyond remedies tightly linked to the theory of liability, rejecting the proposition that "clearly lawful practices may be enjoined simply

because they will weaken the antitrust violator's competitive position." *Id.* at 109. That is exactly what the GenAI data-sharing and syndication remedy would do in *Google* though—give GenAI companies a leg up without any finding that this help is needed to restore competitive conditions that would have existed but for the illegal conduct.

Beyond making the requisite causation findings, courts imposing equitable remedies that go beyond the cessation of illegal conduct must take care to ensure the remedies are proportional to the proven harm to competition and do not risk doing more harm than good for consumers and competition. Proposed compulsory sharing obligations, like any antitrust remedy, "should be evaluated by its success in increasing output, decreasing prices, improving product quality, or spurring innovation—that is, by the same criteria that we generally adopt as goals for the antitrust laws." Herbert Hovenkamp, *Antitrust and Platform Monopoly*, 130 Yale L. J. 1952, 2006 (2021); *cf. Brown Shoe Co. v. United States*, 370 U.S. 294, 344 (1962) (explaining that the Sherman Act protects "competition, not competitors").

This Court's opinion in *Massachusetts* controls on this point. There, the States argued that the District Court's API-disclosure remedy described above was inadequate because it limited the number and detail of the API disclosures. *Massachusetts*, 373 F.3d at 1218. The Court scrutinized the "breadth" and "depth" of the States' proposed remedy, and then concluded that the District Court

"reasonably balanced its goal of enhanced interoperability with the need to avoid requiring overly broad disclosure, which it determined could have adverse economic and technological effects[.]" *Id.* at 1218, 1222. The Court pointed in particular to the District Court's findings that the States' preferred remedy could undermine "Microsoft's incentive to innovate," could allow rivals to "clone Microsoft's software and mimic its functionality," and "would deny 'Microsoft the returns from its investment in innovation.'" *Id.* at 1218–19. In this Court's view, compulsory licensing "would work a 'de facto divestiture.'" *Id.* at 1228; *see Microsoft*, 224 F. Supp. 2d at 177–78 ("To require Microsoft to license intellectual property in the absence of a reasonable royalty . . . constitutes a divestiture of one of [its] most valuable assets."), *aff'd Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004).

In contrast to *Microsoft*, the *Google* District Court imposed forced-sharing remedies that were untethered to the theory of liability, and that threaten competitive harm associated with forced sharing (such as reducing Google's innovation and investment incentives) without producing any clear benefit. Requiring a defendant to share data with companies in a market not at issue in the litigation, that the defendant was not found to have harmed, and that the court found to be competitive is deeply at odds with controlling precedent and doctrine. The remedy would serve as a troubling precedent if allowed to stand.

# CONCLUSION

For the foregoing reasons, this Court should faithfully apply the well-established requirements and principles that govern Sherman Act Section 2 equitable relief in a monopoly maintenance case.

Dated:  May 29, 2026

Respectfully submitted,

*/s/Ian Simmons*

Ian Simmons (D.C. Bar No. 439645)
Sergei Zaslavsky (D.C. Bar No. 1010425)
Catherine A. Ward (D.C. Bar No. 90025775)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC  20006-4061
Telephone:    +1 202 383 5300
Facsimile:    +1 202 383 5414
isimmons@omm.com
szaslavsky@omm.com
cward@omm.com

Attorneys for *Amicus Curiae*
Alden Abbott

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limitation of the Federal Rules of Appellate Procedure and the D.C. Circuit Rules. The document contains 4,357 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1).

This document complies with the typeface and type style requirements of the Federal Rules. The document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

*/s/Ian Simmons*

Ian Simmons

# CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2026, I caused the foregoing document to be electronically filed through this Court's CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Respectfully submitted,

*/s/Ian Simmons*

Ian Simmons (D.C. Bar No. 439645)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC  20006-4061
Telephone:    +1 202 383 5300
Facsimile:     +1 202 383 5414
isimmons@omm.com

Attorneys for *Amicus Curiae*
Alden Abbott