ORAL ARGUMENT NOT YET SCHEDULED

**No. 26-5023**
**(Consolidated with Nos. 26-5047, 26-5049)**

IN THE
# United States Court of Appeals
# for the District of Columbia Circuit

UNITED STATES OF AMERICA, ET AL.,
*Plaintiffs-Appellees-Cross-Appellants*,

*v.*

GOOGLE LLC,
*Defendant-Appellant-Cross-Appellee*.

On Appeal from the United States District Court for the
District of Columbia, Nos. 20-cv-3010, 20-cv-3715
Hon. Amit P. Mehta

**BRIEF OF FORMER ANTITRUST ENFORCERS**
**AS *AMICI CURIAE* IN SUPPORT OF NEITHER PARTY (CORRECTED)**

Sean P. Gates
ILLOVSKY, GATES & CALIA LLP
155 N. Lake Avenue
Suite 800
Pasadena, CA 91101
(626) 508-1715

*Counsel for Amici*
*Former Government Enforcers*

## CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES

**A. Parties and Amici.**

Except for the following, all parties, intervenors, and amici appearing before the district court and in this court are listed in the combined certificate as to parties, rulings, and related cases, and corporate disclosure statement filed on February 23, 2026, Document #2160428:

> Terry Calvani
>
> William Kolasky
>
> Abbott (Tad) B. Lipsky, Jr.
>
> Joe Sims

**B. Rulings Under Review.**

The rulings under review are listed in the combined certificate as to parties, rulings, and related cases, and corporate disclosure statement filed on February 23, 2026, Document #2160428.

**C. Related Cases.**

Counsel is unaware of any related case involving substantially the same parties and the same or similar issues.

/s/ Sean P. Gates
Sean P. Gates

i

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS,  AND RELATED CASES ............i

TABLE OF AUTHORITIES................................................................................. iii

INTEREST OF *AMICI* .........................................................................................1

SUMMARY ...........................................................................................................2

ARGUMENT .........................................................................................................3

    I.     Section 2 Requires "Anticompetitive" Conduct as Distinguished from Competition on the Merits. ...................................3

        A.     The conduct must be "anticompetitive." ...................................5

        B.     The conduct must have an anticompetitive effect. ....................6

        C.     The conduct must be causally linked to the maintenance of monopoly power. .......................................................................7

    II.    The District Court Applied the Wrong Legal Standard. .......................9

        A.     The court erred by applying the "reasonably appears capable" standard to determine whether the conduct caused anticompetitive effects..............................................................9

        B.     The standard for the first causal link is but-for causation. .......10

        C.     The difference between the two standards is critical................13

CONCLUSION ....................................................................................................18

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985) ................................................................. 4, 5

*Auraria Student Hous. at the Regency, Ltd. Liab. Co. v. Campus Vill. Apartments,
  Ltd. Liab. Co.*,
  843 F.3d 1225 (10th Cir. 2016) ................................................ 6

*Barry Wright Corp. v. ITT Grinnell Corp.*,
  724 F.2d 227 (1st Cir. 1983) ................................................... 14

*Bd. of Trade v. United States*,
  246 U.S. 231 (1918) ............................................................... 14

*Brooke Grp. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) ......................................................... 4, 6, 13

*Brunswick Corp. v. Riegel Textile Corp.*,
  752 F.2d 261 (7th Cir. 1984) .............................................. 13, 18

*Cargill, Inc. v. Monfort of Colo., Inc.*,
  479 U.S. 104 (1986) ................................................................. 4

*Dippin' Dots, Inc. v. Mosey*,
  476 F.3d 1337 (Fed. Cir. 2007) .......................................... 13, 18

*E & L Consulting, Ltd. v. Doman Indus.*,
  472 F.3d 23 (2d Cir. 2006) ............................................ 11, 12, 18

*Elecs. Communs. Corp. v. Toshiba Am. Consumer Prods.*,
  129 F.3d 240 (2d Cir. 1997) ..................................................... 7

*In re EpiPen Epinephrine Injection, Mktg., Sales Pracs. & Antitrust Litig.*,
  44 F.4th 959 (10th Cir. 2022) ................................................ 15

*McWane, Inc. v. FTC*,
  783 F.3d 814 (11th Cir. 2015) ............................................... 15

*Multistate Legal Studies v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns*,
  63 F.3d 1540 (10th Cir. 1995) ................................................. 6

*New York v. Actavis PLC*,
  787 F.3d 638 (2d Cir. 2015) ................................................ 5, 7

iii

*Nynex Corp. v. Discon*,
    525 U.S. 128 (1998) ................................................................. 6

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
    797 F.2d 370 (7th Cir. 1986) .................................................. 14

*Pac. Bell Tel. Co. v. linkLine Communs., Inc.*,
    555 U.S. 438 (2009) ........................................................... 3, 13

*PSI Repair Servs. v. Honeywell, Inc.*,
    104 F.3d 811 (6th Cir. 1997) .................................................. 6

*Rambus Inc. v. FTC*,
    522 F.3d 456 (D.C. Cir. 2008) ...................................... 6, 11, 17

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
    842 F.3d 883 (5th Cir. 2016) .................................................. 6

*S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*,
    740 F.2d 980 (D.C. Cir. 1984) ................................................ 5

*Spectrum Sports v. McQuillan*,
    506 U.S. 447 (1993) ............................................................... 4

*Town of Concord v. Bos. Edison Co.*,
    915 F.2d 17 (1st Cir. 1990) ................................................ 5, 13

*United States v. Aluminum Co. of Am.*,
    148 F.2d 416 (2d Cir. 1945) .................................................. 14

*United States v. Google LLC*,
    747 F. Supp. 3d 1 (D.D.C. 2024) ...................... 9, 10, 14, 16, 17, 18

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ............................................................ 3, 7

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ...................... 5, 6, 7, 8, 9, 10, 14

*Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko*, LLP,
    540 U.S. 398 (2004) ............................................................... 3

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) .................................................. 5

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
    549 U.S. 312 (2007) .............................................................. 17

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012)................................................................. 15

**Other Authorities**

ABA ANTITRUST LAW SECTION, MONOPOLIZATION AND DOMINANCE HANDBOOK
  (2d ed. 2021) ...................................................................................... 13

Ankur Kapoor, *What Is the Standard of Causation of Monopoly?*, Antitrust,
  Summer 2009 ...................................................................................... 12

Antitrust Modernization Comm'n, Report and Recommendations (2007)............ 13

Douglas H. Ginsburg & Koren W. Wong-Ervin, *Challenging Consummated
  Mergers Under Section 2*, Competition Policy Int'l, N. Am. Column (May 25,
  2020) ................................................................................................... 10

\* Authorities upon which *Amici* chiefly rely are marked with asterisks.

## INTEREST OF *AMICI*[1]

*Amici*, former government enforcers who served in the United States Department of Justice Antitrust Division and the Federal Trade Commission, have an interest in ensuring that the antitrust laws develop in furtherance of their intended purposes. *Amici* are:

- Terry Calvani served as a Commissioner of the Federal Trade Commission from 1983 to 1990.

- William Kolasky is a Senior Counsel at Hughes Hubbard & Reed LLP. He served as Deputy Assistant Attorney General in the Antitrust Division of the United States Department of Justice from 2001 to 2002.

- Abbott (Tad) B. Lipsky, Jr. is an Adjunct Professor of Law at George Mason University Antonin Scalia School of Law. He served as Deputy Assistant Attorney General in the Antitrust Division of the United States Department of Justice from 1981 to 1983. He more recently served as co-chair of the Transition Team for the Federal Trade Commission following the election of President Donald Trump in 2016 and as Acting Director of the Federal Trade Commission Bureau of Competition in 2017.

- Joe Sims served as Deputy Assistant Attorney General in the Antitrust Division of the United States Department of Justice from 1975 to 1978.

---

[1] All parties have consented to the filing of this amicus brief. No counsel for a party has authored this brief in whole or in part, and no party, party's counsel, or any other person—other than *amici curiae* or their counsel—has contributed money that was intended to fund preparing or submitting this brief.

*Amici* respectfully submit this brief in support of neither party to clarify the proper legal standard for determining whether conduct is "exclusionary" under the Sherman Act Section 2. *Amici* are concerned that the district court did not apply the correct legal standard. Specifically, the district court applied the wrong standard to determine whether the challenged conduct caused anticompetitive effects. The adoption of the district court's standard could lead courts to mistakenly condemn procompetitive conduct.

## SUMMARY

Section 2 is aimed at conduct that destroys competition, not competitive conduct. To be true to this purpose, courts must jealously guard legitimate competition, even by a monopolist. They must avoid constructions of Section 2 that chill competition.

The principal task of an antitrust court is therefore to distinguish between anticompetitive conduct and legitimate competition. The task is difficult. Both can exclude or weaken rivals. And discerning between the two cannot be done by merely examining the facts. Courts must also apply the correct legal standards.

To begin, the challenged conduct must be fairly characterized as "anticompetitive," "exclusionary," or "predatory"—all synonyms for conduct that is, at least, something other than competition on the merits. But that characterization is not enough. The conduct must also have anticompetitive effects. That is, the conduct must *cause* anticompetitive effects.

2

That causal link is essential. The same effects—exclusion or weakening of competitors, for instance—may also be caused by legitimate competition. Sufficient proof of causation is therefore imperative. The legal standard for this causal link must be rigorous, lest the courts mistakenly condemn competitive conduct.

The district court, however, applied a weak causal standard, a standard developed for another purpose. This was legal error. And if this lenient standard is allowed to take hold, courts will fail in their principal task.

## ARGUMENT

### I. Section 2 Requires "Anticompetitive" Conduct as Distinguished from Competition on the Merits.

The offense of monopolization under Section 2 of the Sherman Act requires not only "(1) the possession of monopoly power" but also "(2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *see also Pac. Bell Tel. Co. v. linkLine Communs., Inc.*, 555 U.S. 438, 447-48 (2009) ("Simply possessing monopoly power and charging monopoly prices does not violate § 2 …"). In other words, "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." *Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398, 407 (2004).

Because the "law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself,"

3

the courts "have been careful to avoid constructions of § 2 which might chill competition, rather than foster it." *Spectrum Sports v. McQuillan*, 506 U.S. 447, 458 (1993).  This principle applies to competition by monopolists; "[it] is in the interest of competition to permit dominant firms to engage in vigorous competition." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 116 (1986) (internal quotes omitted)).  The task for the antitrust court, then, is to distinguish "between practices which tend to exclude or restrict competition on the one hand, and the success of a business which reflects only a superior product, a well-run business, or luck, on the other."  *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604 (1985).

To accomplish this end, the offense of monopolization requires (i) some form of conduct—other than competition on merits—that (ii) has an anticompetitive effect, which (iii) enables the monopolist to acquire or maintain monopoly power. *See Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) ("If circumstances indicate that below-cost pricing could likely produce its intended effect on the target, there is still the further question whether it would likely injure competition in the relevant market.").  This chain may be illustrated thus:

| ANTICOMPETITIVE CONDUCT | | ANTICOMPETITIVE EFFECTS | → | MAINTAIN MONOPOLY POWER |

4

### A. The conduct must be "anticompetitive."

*First*, to be actionable under Section 2, the challenged conduct must be "fairly characterized" as "anticompetitive," that is, "exclusionary" or "predatory." *Aspen Skiing*, 472 U.S. at 605 ("If a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory." (internal quotation omitted)). As this Court has recognized, however, whether any particular act is "exclusionary, rather than merely a form of vigorous competition, can be difficult to discern." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001). "After all, almost all business activity, desirable and undesirable alike, seeks to advance a firm's fortunes at the expense of its competitors." *Town of Concord v. Bos. Edison Co.*, 915 F.2d 17, 21 (1st Cir. 1990).

To be "condemned as exclusionary," therefore, the conduct must "harm the competitive *process*." *Microsoft*, 253 F.3d at 58. Thus, whatever its metes and bounds, anticompetitive conduct is something "other than competition on the merits." *Id.* at 56; *see also id.* at 62 (conduct that protects market power "through a means other than competition on the merits" is "anticompetitive"); *id.* at 65 (same); *S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*, 740 F.2d 980, 999 n.19 (D.C. Cir. 1984) (defining exclusionary as "conduct, other than competition on the merits or restraints reasonably 'necessary' to competition on the merits").[2]

---

[2] *See also Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 452-53 (7th Cir. 2020) (defining exclusionary as "impairing rivals' opportunity to compete in a way that is inconsistent with 'competition on the merits'"); *New York v. Actavis PLC*, 787 F.3d 638, 652 (2d Cir. 2015) (exclusionary conduct is "conduct that impedes competition through means other than competition on the merits"); *Multistate Legal Studies v.*

## B. The conduct must have an anticompetitive effect.

*Second*, the conduct "must have an anticompetitive effect in order to form the basis of a monopolization claim." *Rambus Inc. v. FTC*, 522 F.3d 456, 464 (D.C. Cir. 2008). "Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws." *Brooke Grp.*, 509 U.S. at 225. An antitrust plaintiff must, therefore, "demonstrate that the monopolist's conduct indeed has the requisite anticompetitive effect." *Microsoft*, 253 F.3d at 58-59 (citations omitted). The conduct must "harm[] competition, not just a competitor." *Id.* at 59; *see also Brooke Grp.*, 509 U.S. at 225-26 (conduct must have an effect on the monopolist's rivals and injure competition).

Put another way, the antitrust plaintiff must prove a causal connection between the conduct and anticompetitive effects. *See, e.g.*, *Nynex Corp. v. Discon*, 525 U.S. 128, 139 (1998) (unless challenged agreements "harmed the competitive process, they did not amount to a conspiracy to monopolize"); *Auraria Student Hous. at the Regency, Ltd. Liab. Co. v. Campus Vill. Apartments, Ltd. Liab. Co.*, 843 F.3d 1225, 1240 (10th Cir. 2016) (requiring certain proof to enable the court to assess whether a defendant's "conduct truly causes harm to competition"); *Actavis PLC*,

---

*Harcourt Brace Jovanovich Legal & Prof'l Publ'ns*, 63 F.3d 1540, 1550 (10th Cir. 1995) (defining predatory conduct as practices that "impair opportunities of rivals and are not competition on the merits or are more restrictive than reasonably necessary for such competition"); *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 891-92 (5th Cir. 2016) (defining anticompetitive conduct as "conduct, other than competition on the merits or restraints reasonably necessary to competition on the merits") (internal quotes omitted); *PSI Repair Servs. v. Honeywell, Inc.*, 104 F.3d 811, 822 (6th Cir. 1997) (same).

787 F.3d at 651 (upholding injunctive relief based on "a strong showing that Defendants' conduct would cause irreparable harm to competition"); *Elecs. Communs. Corp. v. Toshiba Am. Consumer Prods.*, 129 F.3d 240, 246 (2d Cir. 1997) (affirming dismissal because challenged conduct "cannot harm competition, and therefore cannot serve to further an alleged monopolization scheme").

In *Microsoft*, for instance, this Court upheld the lower court's findings that the government failed to prove that certain agreements caused a "substantial effect upon competition" but met its burden for others. *Microsoft*, 253 F.3d at 71 ("Because plaintiffs failed to demonstrate that Microsoft's deals with the ICPs have a substantial effect upon competition, they have not proved the violation of the Sherman Act."); *id.* at 72 ("Microsoft's exclusive deals with the ISVs had a substantial effect in further foreclosing rival browsers from the market").

### C. The conduct must be causally linked to the maintenance of monopoly power.

*Third*, there must be a "causal link" between the conduct (or more properly, the anticompetitive effect) and the acquisition or maintenance of monopoly power. *Microsoft*, 253 F.3d at 79; *see also Grinnell*, 384 U.S. at 570-71 (plaintiff must prove "willful acquisition or maintenance of [monopoly] power"). In *Microsoft*, for instance, this Court thoroughly detailed how the defendant had engaged in exclusionary conduct that, in fact, caused a host of anticompetitive effects, resulting in the exclusion of certain nascent competitive technologies. *Microsoft*, 253 F.3d at 58-78. As "a final parry," the defendant argued that the government had not proven a second causal link—"a causal link between [its] anticompetitive conduct, in

particular its foreclosure of [the technologies], and the maintenance of [its] … monopoly." *Id.* at 78. In other words, the defendant argued that even if its conduct excluded the nascent technologies, the government had failed to show that the exclusion allowed the defendant to maintain its monopoly power.

This Court, however, found no support for the "proposition that, as to § 2 *liability* in an equitable enforcement action," antitrust plaintiffs, having already proven anticompetitive effects, "must present direct proof that a defendant's continued monopoly power is precisely attributable to its anticompetitive conduct." *Id.* at 79. Instead, the Court held that the necessary causal link could be inferred from anticompetitive conduct that "reasonably appears capable of making a significant contribution to … maintaining monopoly power." *Id.* at 79.

The Court found this "rather edentulous test for causation" sufficient in the case of nascent technologies because to "require that § 2 liability turn on a plaintiff's ability or inability to reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct would only encourage monopolists to take more and earlier anticompetitive action." *Id.* Thus, to prove the causal link between the defendant's anticompetitive conduct and the maintenance of monopoly power, the question was not whether the nascent competitive technologies "would actually have developed into viable platform substitutes," but rather whether the anticompetitive effect of excluding the "nascent threats … is reasonably capable of contributing significantly to a defendant's continued monopoly power." *Id.* The Court explained that "it would be inimical to the purpose of the Sherman Act to allow monopolists free reign

8

to squash nascent, albeit unproven, competitors at will—particularly in industries marked by rapid technological advance and frequent paradigm shifts." *Id.*

*      *      *

To summarize, there are two links in the causal chain of monopolization: (1) the challenged anticompetitive conduct must cause an anticompetitive effect, such as exclusion of rivals, and (2) that effect, in turn, must be causally linked to the maintenance or acquisition of monopoly power.

## II. The District Court Applied the Wrong Legal Standard.

### A. The court erred by applying the "reasonably appears capable" standard to determine whether the conduct caused anticompetitive effects.

The district court correctly recognized that "[t]he exclusionary conduct must cause the anticompetitive harm." *United States v. Google LLC*, 747 F. Supp. 3d 1, 152 (D.D.C. 2024). Indeed, 19 pages of the court's opinion come under the section heading, "The Exclusive Agreements *Cause* Anticompetitive Effects in the General Search Services Market." *Id.* at 152-71 (emphasis added).

But, citing this Court's analysis of the causal link between the anticompetitive effects and the maintenance of monopoly power, the district court applied the edentulous "reasonably appears capable" standard:

> Anticompetitive effects analysis involves establishing a "causal link." *Microsoft*, 253 F.3d at 78. The exclusionary conduct must cause the anticompetitive harm. As here, when a regulator is seeking only injunctive relief, the standard is somewhat relaxed. *See id.* at 79. Courts may "infer 'causation' from the fact that a defendant has engaged in anticompetitive conduct that 'reasonably

9

> appear[s] capable of making a significant contribution to ... maintaining monopoly power.'" *Id.*

747 F. Supp. 3d at 152-53. The court then identified the "key question" as whether "Google's exclusive distribution contracts reasonably appear capable of significantly contributing to maintaining Google's monopoly power in the general search services market?" *Id.* at 153.

This was error. Simply put, the district court misread *Microsoft*. As discussed above, this Court's articulation of the "reasonably appears capable" standard *followed* its determination that the defendant's conduct had indeed *caused* anticompetitive effects. *Microsoft*, 253 F.3d at 78-79. This Court applied the indulgent standard to determine whether the proven effects—exclusion of nascent rivals—allowed the monopolist to maintain its monopoly, not whether the challenged conduct caused those effects. *Id.*; *see also* Douglas H. Ginsburg & Koren W. Wong-Ervin, *Challenging Consummated Mergers Under Section 2*, Competition Policy Int'l, N. Am. Column (May 25, 2020) (rejecting assertion that "conflates the *Microsoft* court's standard for proving competitive effects with its standard for establishing causation. … Of critical importance is that the court's causation standard was conditioned on its having found anticompetitive effects."), *available at* https://perma.cc/M33Y-Z2HQ.

### B. The standard for the first causal link is but-for causation.

While the causal connection between a defendant's anticompetitive conduct and anticompetitive effects is often obvious, in cases where there are multiple or mixed causes or outcomes, this Court and others apply a but-for standard.

Take this Court's decision in *Rambus*. There, the defendant engaged in conduct that was clearly *not* competition on the merits: "misrepresentations, omissions, and other [deceptive] practices." *Rambus*, 522 F.3d at 463. The deception led to one of two possible outcomes: (1) the avoidance of contractual restraints on pricing or (2) the adoption of the defendant's proprietary technology by a standard-setting organization, thereby excluding rival technologies. *Id.* This Court held that the first outcome was not anticompetitive, but the second was. *Id.* Thus, even assuming the deception made adoption of the technology "somewhat more likely," this Court held that the government failed to prove the deception caused an anticompetitive effect, i.e., that "the standard-setting organization would not have adopted the standard in question but for the misrepresentation or omission." *Id.* at 464, 466 (internal quotations omitted). As the Court put it, if the organization, "in the world that would have existed but for [the] deception, would have standardized the very same technologies, [the] deception cannot be said to have had an effect on competition in violation of the antitrust laws." *Id.* at 466-67.

Another case illustrates the flipside, where there are two possible causes. The plaintiff *E & L Consulting* claimed a monopolist's exclusive distribution contract caused anticompetitive effects, the exclusion of rivals. *E & L Consulting, Ltd. v. Doman Indus.*, 472 F.3d 23, 29-31 (2d Cir. 2006). The court, however, recognized another potential cause. The plaintiffs had not asserted that the monopolist had gained its position illegally. *Id.* at 29. The question, then, was whether the alleged anticompetitive effect was caused by the challenged contract or was a natural consequence of the monopolist's legitimately acquired market position.

11

Applying the but-for test, the Second Circuit held that the plaintiff failed to show the contract caused anticompetitive effects:

> The only detriment to competition alleged to result from the … agreement is that "end-users of lumber and finished wood products have fewer options to purchase their required supplies and are now required to pay artificially inflated prices." This, by itself, is not a sufficient allegation of harm to competition caused by the exclusive distributorship, again, because the alleged single source and price increase, even if monopolistic, is something [the monopolist] can achieve without the aid of a distributor.

*Id.* at 30.  Put differently, the alleged facts did not show that but for the exclusive agreement, the outcome would be different.  As the court explained, "appellants' hypothesizing of an unreasonable effect on competition fails because such a vertical arrangement provides no monopolistic benefit to [the monopolist] that it does not already enjoy and would not continue to enjoy if the exclusive distributorship were enjoined." *Id.* at 29.

*     *     *

In sum, to show that challenged conduct causes anticompetitive effects, a Section 2 plaintiff must show but-for causation.  *See, e.g.*, Ankur Kapoor, *What Is the Standard of Causation of Monopoly?*, Antitrust, Summer 2009, at 38, 40 ("The D.C. Circuit rulings in *Microsoft* and *Rambus* may be reconciled by focusing on the two distinct links in the chain of causation from conduct to monopoly. The first causal link is between conduct and exclusion; the second is between exclusion and the acquisition or maintenance of monopoly power.").  If the same competitive result would have occurred but for the conduct, there is no violation of Section 2.  *See*

12

*Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 265 (7th Cir. 1984) (holding that Section 2 is not violated if, but for the conduct, the same market power would have merely been "diverted" to another); *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1347 (Fed. Cir. 2007) (monopolization claim based on fraudulently obtaining patent "requires that the patent would not have issued but for the patent examiner's justifiable reliance on the patentee's misrepresentation or omission").

### C. The difference between the two standards is critical.

This higher standard is necessary. As a core principle, antitrust legal standards must avoid chilling the very competition the statutes were designed to preserve, including legitimate competition by firms with monopoly power. *Brooke Grp.*, 509 U.S. at 223. Especially in the context of Section 2, the Supreme Court has insisted on exacting standards, else firms refrain from aggressive competition "to avoid potential antitrust liability." *linkLine*, 555 U.S. at 452. The standards must therefore provide discernable boundaries.[3] "The challenge for an antitrust court lies in stating

---

[3] Antitrust standards "must be designed with the knowledge that firms ultimately act, not in precise conformity with the literal language of complex rules, but in reaction to what they see as the likely outcome of court proceedings." *Town of Concord*, 915 F.2d at 22; *see also id.* ("Finally, we shall take account of the institutional fact that antitrust rules are court-administered rules. They must be clear enough for lawyers to explain them to clients."). Rules that are ambiguous, difficult to apply, or turn on after-the-fact determinations may discourage the very conduct the antitrust statutes were meant to protect. *See, e.g.*, ABA ANTITRUST LAW SECTION, MONOPOLIZATION AND DOMINANCE HANDBOOK 86 (2d ed. 2021) ("ambiguous and uncertain legal standards may make monopolists fearful of aggressive, procompetitive business strategies"); Antitrust Modernization Comm'n, Report and Recommendations 89 (2007) ("Section 2 standards should be clear and predictable in application"), *available at* https://perma.cc/DY3L-CMWL.

13

a general rule for distinguishing between exclusionary acts, which reduce social welfare, and competitive acts, which increase it." *Microsoft Corp.*, 253 F.3d at 58.

The standard for showing that conduct causes anticompetitive effects does much of the heavy lifting. *The causal link ensures that the effects are due to anticompetitive conduct and not some other cause, most importantly, not competition on the merits*.

Take this case. Do the exclusive distribution agreements "reasonably appear capable of significantly contributing to maintaining Google's monopoly power"? *Google LLC*, 747 F. Supp. 3d at 153. Under that toothless standard, probably yes. After all, exclusive contracts, by definition, exclude. *See Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918) ("Every agreement concerning trade … restrains. To bind, to restrain, is of their very essence.").

But so too competition on the merits. Legitimate competition can exclude competitors and thus reasonably appear capable of contributing to the maintenance of a monopoly position. *See, e.g.*, *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 235 (1st Cir. 1983) ("After all, even the most competitive of price cuts may hurt rivals …"). But Section 2 does not require a monopolist to pull its competitive punches. *See, e.g.*, *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945) ("The successful competitor, having been urged to compete, must not be turned upon when he wins."); *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 375 (7th Cir. 1986) ("a firm with lawful monopoly power has no general duty to help its competitors … by … pulling its competitive punches").

By applying the wrong standard, the district court failed to address whether the challenged contracts or competition on the merits excluded Google's rivals.

Let us explain. It is instructive to ask: Why did browser developers, mobile device manufacturers, and wireless carriers make Google their default search engine? Why did they refuse to switch to competing search engines?

The district court never answers these questions. In contrast to other exclusive-dealing cases, for example, we see no finding that the monopolist coerced companies to enter the contracts. *Compare ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 277 (3d Cir. 2012) (rehearsing "considerable evidence" that monopolist "wielded its monopoly power to effectively force every direct purchaser … to enter into restrictive long-term agreements"), *and McWane, Inc. v. FTC*, 783 F.3d 814, 819 (11th Cir. 2015) (monopolist "announced to its distributors that … unless they bought all of their domestic fittings from [the monopolist], they would lose their rebates and be cut off from purchases for 12 weeks"), *with In re EpiPen Epinephrine Injection, Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 989 (10th Cir. 2022) ("in the absence of any coercion" exclusive contracts reflected competition on the merits).

Instead, we see finding after finding that companies chose Google's search engine for its superior quality. For starters, the district court found that Google had gained its market position through skill, foresight, and industry, which led to the creation of a superior product:

> Google has not achieved market dominance by happenstance. It has hired thousands of highly skilled engineers, innovated consistently, and made shrewd

> business decisions.  The result is the industry's highest quality search engine, which has earned Google the trust of hundreds of millions of daily users.

*Id.* at 31.  The court also found that customers selected Google because it was a superior product:

> [Google] has long been the best search engine, particularly on mobile devices.  Nor has Google sat still; it has continued to innovate in search.  Google's partners value its quality, and they continue to select Google as the default because its search engine provides the best bet for monetizing queries.  Apple and Mozilla occasionally assess Google's search quality relative to its rivals and find Google's to be superior.

747 F. Supp. 3d at 144 (citations omitted).  In contrast, Google's competitors offered admittedly inferior products:

> Google's rivals …. have not succeeded in part due to their inferior quality.  It is also true that Google foresaw that the future of search was on mobile.  Microsoft acknowledges that it was slow to recognize the importance of developing a search product for mobile, and it has been trying to catch up—unsuccessfully—ever since.

*Id.* at 144.

True, the district court found that "Google pays huge sums to secure these preloaded defaults."  *Id.* at 32.  But the court also found that the size of these payments reflects the superiority of Google's product.  The payments were "calculated as a percentage of the advertising revenue that Google generates from queries run through the default search access points."  *Id.*  According to the district court, the amount of advertising revenue depends on the quality of the search engine; higher-quality results attract more users, more users means more queries, more

16

queries means more advertisements, and more advertisements means higher revenues. *Id*. at 31, 74-76. Importantly, the court made no finding that the payments were predatory, e.g., that Google sacrificed short-run profits to protect its monopoly. *See Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 323 (2007) ("A predatory-bidding scheme requires a buyer of inputs to suffer losses today on the chance that it will reap supracompetitive profits in the future.").

The court also found that because Google's offering was superior, customers did not switch to rival search engines. For instance, the court found that customers "[n]aturally … prefer Google because of its search quality and because it would be economically irrational to sacrifice the high revenue share. They thus routinely renew the distribution deals with their exclusive terms." 747 F. Supp. 3d at 159. Putting a finer point on it, one company told the Department of Justice that switching the "default to a rival search engine 'would be a losing proposition' because no competitor could monetize search as effectively as Google." *Id*. at 145.

Given these findings, the question before the court was whether the browser developers, mobile device manufacturers, and wireless carriers refused to switch to rival search engines *because of* the allegedly anticompetitive exclusive contracts or *because of* Google's superior product (i.e., due to competition on the merits). To answer this question, the court needed to ask whether but for the exclusive contracts, the partners would have switched. After all, if they would not have switched in the absence of the contracts, the contracts cannot have caused anticompetitive effects, let alone substantial anticompetitive effects. *See, e.g.*, *Rambus*, 522 F.3d at 466-67;

17

*E & L Consulting*, 472 F.3d at 29-3; *Brunswick*, 752 F.2d at 265; *Dippin' Dots*, 476 F.3d at 1347.

But the district court never asked that question. Instead, the court attributed the impacts on rivals to the exclusive contracts because they appeared "reasonably capable" of causing the effect. *See, e.g.*, *Google LLC*, 747 F. Supp. 3d at 166 ("Google's distribution agreements thus appear reasonably capable of having significantly contributed to disincentivizing Microsoft from enlarging its investment in search."); *id.* at 167-68 (agreement "reasonably appears capable of significantly contributing to keeping Apple on the sidelines of search"). Thus, for instance, the court characterized as anticompetitive that "Google's partners have concluded that it is financially infeasible to switch default [search engines] or seek greater flexibility in search offerings because it would mean sacrificing the hundreds of millions, if not billions, of dollars that Google pays them as revenue share," *id*. at 145, without ever identifying how this outcome resulted from anticompetitive conduct rather than competition on the merits.

## CONCLUSION

By applying the wrong standard for causation, the district court failed at its chief duty: distinguishing between anticompetitive conduct and legitimate competition. This Court should clarify that to show that conduct has an anticompetitive effect, a Section 2 plaintiff must show but-for causation.

DATE: May 28, 2026                    Respectfully submitted,

                                      */s/ Sean P. Gates*
                                      Sean P. Gates
                                      ILLOVSKY, GATES & CALIA LLP
                                      155 N. Lake Avenue
                                      Suite 800
                                      Pasadena, CA  91101
                                      (626) 508-1715

                                      *Counsel for Amici*
                                      *Former Government Enforcers*

19

**CERTIFICATE OF COMPLIANCE**

The brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) and D.C. Cir. R. 28(c) because this brief contains 4,654 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

*/s/ Sean P. Gates*

Sean P. Gates

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on May 29, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Sean P. Gates*

Sean P. Gates