ORAL ARGUMENT NOT CURRENTLY SCHEDULED

No. 26-5023, Consolidated with Nos. 26-5047, 26-5049

In The

# United States Court of Appeals for the D.C. Circuit

UNITED STATES OF AMERICA, ET AL.,

*Plaintiffs-Appellees/Cross-Appellants,*

v.

GOOGLE LLC,

*Defendant-Appellant/Cross-Appellee.*

Appeals from the United States District Court
for the District of Columbia
Nos. 20-cv-3010 & 20-cv-3715 (Hon. Amit P. Mehta)

**AMICUS BRIEF OF BRAVE SOFTWARE, INC.
IN SUPPORT OF NEITHER PARTY URGING
AFFIRMANCE IN PART AND REVERSAL IN PART**

Gary A. Bornstein
Yonatan Even
Andrew C. Finch
CRAVATH, SWAINE & MOORE LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
gbornstein@cravath.com
(212) 474-1000

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), undersigned counsel for amicus curiae Brave Software, Inc. ("Brave") states that:

**Parties and Amici.**  All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Plaintiffs' Certificate as to Parties, Rulings, and Related Cases (App. Dkt. 2160541), except that an amicus brief was also filed in the district court by Public Knowledge, and in this Court, Brave, Washington Legal Foundation, Mozilla Corporation, Apple Inc., Samsung Electronics Co., Ltd., the Former Antitrust Enforcers, the Law and Economics Scholars, Alden Abbott, Economists and Legal Scholars, and Professors Hunt Allcott and Matthew Gentzkow received the Parties' consent to participate as amici curiae in these proceedings.

**Rulings Under Review.**  References to the rulings at issue appear in the Parties' Certificates as to Parties, Rulings, and Related Cases (App. Dkts. 2160428, 2160541).

**Related Cases.**  A list of related cases appears in the Parties' Certificates as to Parties, Rulings, and Related Cases (App. Dkts. 2160428, 2160541).

i

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 26.1 and D.C. Circuit Rule 26.1, counsel for amicus curiae Brave certifies that Brave has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

## STATEMENT REGARDING CONSENT TO FILE, SEPARATE BRIEFING, AND AUTHORITY TO FILE

Pursuant to D.C. Circuit Rule 29(b), the undersigned counsel for amicus curiae Brave states that all parties have consented to Brave's participation as amicus curiae. Pursuant to D.C. Circuit Rule 29(d), the undersigned counsel for amicus curiae Brave states that a separate brief is necessary because the perspective that amicus curiae brings is distinct from those in the briefing submitted by Google and those likely to be submitted by other amici curiae. As further detailed below, Brave is one of only three general search engines in the United States (alongside Google and Bing) that has developed a search index capable of generating all of its own search results. Brave is also one of the few companies that competes with Google in both relevant antitrust markets (the market for general search services and the market for search text ads) *and* in the browser space, which the district court found to be a related market in this case. Brave therefore has unique insight into how Google's conduct has affected competition in the relevant markets and how the Final Judgment's remedies can help address those effects.

Brave files this amicus brief under Federal Rule of Appellate Procedure 29(a) and D.C. Circuit Rule 29.

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), Brave states that:

(i)     no party's counsel authored the brief in whole or in part;

(ii)    no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and

(iii)   no person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

# **TABLE OF CONTENTS**

GLOSSARY OF ABBREVIATIONS .................................................................. vii

INTRODUCTION & INTEREST OF AMICUS CURIAE ......................................1

ARGUMENT ......................................................................................................4

     I.     The Search Syndication License Should Have a Lower Query Cap...............................................................................................4

          A.     The Record Evidence Supports Limiting the License to Ten Percent of a QC's U.S. Queries.................................5

          B.     A Forty Percent Query Cap Would Unduly Interfere with Existing Search Syndication. .......................................8

     II.     The Data-Sharing and Search Syndication Remedies Should Not Be Available to GenAI Companies. .......................................11

CONCLUSION .................................................................................................15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*New York v. Microsoft Corp.*,
    224 F. Supp. 2d 76 (D.D.C. 2002)....................................................................10

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993)........................................................................................14

**Other Authorities**

Allcott, *et al.*, *Sources of Market Power in Web Search:  Evidence from a
    Field Experiment* (Nat'l Bureau of Econ. Rsch., Working Paper
    No. 33410, 2025), https://perma.cc/D528-U2U8 .............................................7, 8

*Brave Search Removes Last Remnant of Bing from Search Results Page,
    Achieving 100% Independence and Providing Real Alternative to Big
    Tech Search*, BRAVE (Apr. 27, 2023), https://brave.com/blog/search-
    independence/ ..................................................................................................6

## GLOSSARY OF ABBREVIATIONS

| Abbreviation | Document |
|---|---|
| Adkins Decl. | Decl. of J. Adkins in Support of Google Motion for Partial Stay Pending Appeal, D. Ct. Dkt. 1471-03 |
| Allcott Br. | Amicus Brief of Hunt Allcott and Matthew Gentzkow, App. Dkt. 2175892 |
| API | Application programming interface |
| Brave Br. | Amicus Brief of Brave Software, Inc. filed in the remedies proceeding before the district court, D. Ct. Dkt. 1333 |
| Final Judgment or FJ | Final Judgment (Dec. 5, 2025), D. Ct. Dkt. 1462 |
| Final Judgment Opinion or FJ Op. | Memorandum Opinion accompanying Final Judgment (Dec. 5, 2025), D. Ct. Dkt. 1461 |
| GenAI | Generative artificial intelligence |
| Google Br. | Principal Brief of Appellant Google LLC, App. Dkt. 2174652 |
| GSE | General search engine |
| Liability Opinion or Liab. Op. | Memorandum Opinion (Liability Phase) (Aug. 5, 2024), D. Ct. Dkt. 1033 |
| LLM(s) | Large language model(s) |
| QC(s) | Qualified Competitor(s) |
| Remedies Opinion or Rem. Op. | Memorandum Opinion (Remedies Phase) (Sep. 2, 2025), D. Ct. Dkt. 1436 |
| Rem. Tr. | Transcript (Remedies Phase Trial), D. Ct. Dkts. 1393-1420 |
| SERP | Search engine results page |

## <u>INTRODUCTION & INTEREST OF AMICUS CURIAE</u>

Brave is a private company that operates its own web browser and search engine.

Brave launched the **Brave browser** in 2016; it is a secure, privacy-focused web browser that blocks third-party ads and data trackers.

Brave launched **Brave Search** in June 2021.  Brave is one of only three companies in the United States (the others being Google and Microsoft) that has built the technology to crawl the web and construct a search index capable of generating all of its own search results.  As the district court recognized, Brave's status as an "independent GSE" differentiates it from nearly all other GSEs in the United States, which typically obtain most or all of their search results from another GSE and repackage those results for display to their users.  (Rem. Op. 174-75.)  Such "white-label GSEs" (like Yahoo! and DuckDuckGo) compete for search users, but they do not compete in the generation of organic search results.

In addition to producing organic search results for users who access Brave Search directly, Brave syndicates its search results for use by third parties through its **Brave Search API**.  Today, the vast majority of Brave's revenue derives from the Brave Search API.  This revenue has grown rapidly in recent years as GenAI companies use the Brave Search API to augment and ground their results.  Without the opportunity to sell its search results at a competitive rate,

1

Brave's incentive to invest and innovate in its search index would plummet, as would its ability to compete as a GSE.

The Final Judgment seeks to promote the entry and growth of independent GSEs (like Brave and Bing) that would compete with Google in the generation of organic search results. Brave is the rare company that, despite Google's monopolistic conduct, took on the challenge of building an independent GSE and succeeded (the only other being Microsoft). Brave therefore has unique insight into how Google's conduct has increased barriers to entry and how the Final Judgment's remedies can help entrants overcome those barriers.

Google asks this Court to vacate the Final Judgment's search syndication, search text ads syndication, and data-sharing remedies on the ground that the district court did not ensure that these remedies are tailored to "restore what Google's supposed wrongdoing took away, rather than confiscate what Google had lawfully achieved." (Google Br. 88.) In Brave's view, Google's exclusive distribution agreements undoubtedly shielded it from competition and entrenched its scale advantage. That scale advantage, reinforced by network effects, gave Google "an insurmountable quality and monetization advantage," even over well-capitalized entrants. (Rem. Op. 129.)

However, the portion of the search syndication remedy requiring Google to provide QCs with search results for up to 40% of their U.S. queries goes

too far.  To be properly tailored to the scale advantage that Google unlawfully maintained, the search syndication license should cover only the queries that Google's scale advantage enables it to handle effectively in a way that smaller GSEs cannot.  That subset is closer to 10% of a QC's annual queries.  A broader remedy risks harming the competition that the Final Judgment properly seeks to facilitate.  (**Section I**.)

Google also argues that, even if the data-sharing and syndication remedies stand, the district court erred in extending those remedies to GenAI companies that do not offer or seek to offer a GSE.  (Google Br. 95-98.)  Brave agrees.  GenAI products are not part of the market for general search services. Rather, many GenAI companies are *customers* of existing independent GSEs like Brave, purchasing GSE search results to augment and ground their models. Providing GenAI companies with access to Google's search index and search results, even if they do not intend to develop GSE capabilities and ultimately offer GSE results to consumers, would impair or eliminate competing GSEs' ability to sell their own search results to GenAI companies, thereby stifling a key area of competition among GSEs.  (**Section II**.)

## ARGUMENT

### I.    THE SEARCH SYNDICATION LICENSE SHOULD HAVE A LOWER QUERY CAP.

Google asks this Court to vacate the search syndication remedy set forth in Section V of the Final Judgment in part because the district court did not ensure that the remedy is narrowly tailored to address only "the particular effects of Google's supposed unlawful conduct on its market position."  (Google Br. 89.)

Brave only partially agrees.  The record demonstrated that Google's anticompetitive conduct, such as conditioning payments for search traffic on obtaining exclusive default status on search access points, allowed it to maintain a massive scale advantage over potential competitors.  Google therefore receives significantly more—and more unique—queries than its competitors.  (Rem. Op. 89 (providing statistics); *see also* Liab. Op. 226.)  Simply by virtue of having *seen* more queries, Google is better at *responding* to certain queries than its competitors.  (Rem. Op. 91-93 (describing how Google's scale advantage enables it "to deliver superior search results," especially for rare queries).)  Yet the existing search syndication remedy goes beyond what is needed to address that advantage.  In doing so, the remedy counterproductively limits competing GSEs' ability to syndicate their own search results, which is a critical source of revenue for Google's GSE competitors.

4

Brave respectfully submits that any search syndication remedy should be refined, through remand if necessary, so that the required syndication license does not exceed 10% of a QC's U.S. search queries. This will align the remedy with the record evidence and prevent undue interference with independent GSEs' ability to compete.

**A.    The Record Evidence Supports Limiting the License to Ten Percent of a QC's U.S. Queries.**

The search syndication license is not intended as a substitute for competing GSEs' development of their own search index. It is instead a "bridge" remedy, intended to "enable Qualified Competitors to compete in the short term as they work towards developing a GSE that can independently compete against Google" in the long term. (*Id.* at 170.) The district court therefore correctly determined that the license should be limited to only those queries "where Google's scale advantage gives it the competitive edge that is hard to overcome." (*Id.* at 176.) The Final Judgment's 40% query cap far overshoots that mark, even taking into account the expectation that the cap will taper down over time.

The record is clear: Even under the full weight of Google's monopoly and without the benefit of any of the remedies available to QCs through the Final Judgment, GSEs "are capable of building search technologies that will allow them to answer 80% of user queries 'pretty quickly.'" (*Id.* (quoting Rem. Tr. 838:25-839:7 (Weinberg)).) That fact enjoyed widespread support during the remedies

5

proceeding.  (*See, e.g.*, Rem. Tr. 33:11-24 (U.S. Opening Statement) (describing the "80/20 problem" as a "common industry term"); *id.* 838:25-839:7 (Weinberg) ("[Y]ou can get to an 80/20 pretty quickly."); *id.* 394:17-395:21 (Turley) (OpenAI's initial goal of serving 80% of its traffic from its own search index is a "reasonable milestone" because "serving 80 percent is a lot more tractable").)

Brave's own experience—cited by the district court (Rem. Op. 176)—demonstrates that the so-called "80/20 problem" is closer to a "90/10 problem." When Brave Search launched in June 2021, it was able to respond to *87%* of user queries on its own; Brave relied on a syndication license from Bing to respond to the remainder.  Within less than a year, Brave could respond to *93%* of user queries independently.  By April 2023—less than two years after launch—Brave had achieved *100%* search independence.[1]

Notably, Brave achieved this independence without access to Google's click-and-query data, search index data, or any other Google data that will be made available to QCs under the Final Judgment.  Access to that additional data will "accelerate *by years* the ability to create indexes at scale[,] . . . especially" for rare queries.  (Rem. Tr. 843:24-844:18 (Weinberg) (emphasis added); *see also*

---

[1] *See Brave Search Removes Last Remnant of Bing from Search Results Page, Achieving 100% Independence and Providing Real Alternative to Big Tech Search*, Brave (Apr. 27, 2023), https://brave.com/blog/search-independence/.

*id.* 409:11-410:22 (Turley) (access to Google data would allow OpenAI to "have a better product faster").)  With the benefit of the Final Judgment remedies, QCs should have little difficulty achieving 90% search independence within the first year of the license term.

The district court acknowledged this overwhelming record evidence (Rem. Op. 176) but fixed the query cap at 40% based on a single study of Bing desktop searches that found, for the twelve months of search data surveyed, that "more than 38.7 percent of searches are for rare queries that are searched less than 100 times."  (*Id.* at 177 (quoting Allcott, *et al.*, *Sources of Market Power in Web Search:  Evidence from a Field Experiment* 29 (Nat'l Bureau of Econ. Rsch., Working Paper No. 33410, 2025), https://perma.cc/D528-U2U8) (the "Allcott Study").)  Based on this study alone, the district court concluded that "the record is not clear as to how rare a query must be to be considered in the long tail" and therefore chose to set the initial cap "at the higher mark of 40%."  (*Id.*)

The district court's reliance on this statement from the Allcott Study is misplaced.  The goal of the search syndication remedy is to allow QCs to rely on Google for the limited set of queries for which, because of its scale advantage, only Google can provide high-quality responses.  But it is only the rarest of queries—the ones that require massive amounts of query data to respond to effectively—for which QCs require a "bridge."  (*Id.* at 171.)  The Allcott Study neither attempted to

define nor quantified that subset of queries.  Rather, it simply identified, as a numerical matter, the percentage of Bing desktop searches that were searched "less than 100 times" in the twelve months studied.  (*Id.* at 177 (quoting Allcott Study at 29).)  Nothing in the Allcott Study suggests that a GSE entrant cannot readily build a search index capable of responding to most of those queries on its own. (*See* Allcott Br. 3.)

Correcting for that misplaced reliance, the record evidence is clear: Witness after witness consistently put the **upper bound** of these difficult queries at 20% of user queries, even without the additional assistance available to QCs under the Final Judgment.

**B.    A Forty Percent Query Cap Would Unduly Interfere with Existing Search Syndication.**

To the extent that there is any uncertainty as to whether Google's scale advantage has perpetuated a "90/10 problem" or a "60/40 problem"—or somewhere in between—the district court erred in choosing the "higher mark" of 40%.

Putting aside Google's arguments about necessary causal effect, the competitive costs of "erring high" are severe.  The search syndication remedy, by its terms, interferes with existing search syndication efforts by Brave and Bing. Currently, with rare exceptions, Google does not sell access to its search results in the United States, and when it does, the license is extremely limited.  (*See* Rem.

Tr. 3499:7-3502:10 (Reid); Rem. Tr. 2994:24-2996:25 (Adkins).)  The search syndication remedy compels Google to start doing so, all but guaranteeing diversion of business away from independent GSE competitors like Brave and Bing.  Under the Final Judgment, with a 40% query cap, existing and prospective syndication customers of Brave and Bing could source up to 40% of their syndication needs directly from Google, at heavily discounted "ordinary" commercial rates that ratchet downward through MFN-like provisions.  (*See* FJ § V.A (search syndication licenses are to be offered "on financial terms no worse than those offered to any other user of Google's search syndication products"); FJ Op. 40 (Google's existing contracts contain "discounted organic search syndication pricing offered to partners who also syndicate search text ads, sometimes at prices below marginal cost"); *see also* Adkins Decl. ¶ 25 (Google charges its few existing search syndication customers prices "well below" where Google would otherwise "choose to price [such] services" if offering the license as a standalone product to all competitors).)  In all likelihood, it will be the rare QC that chooses to buy from Brave or Bing what it can access more cheaply from the industry leader.

For a company like Brave, for which search syndication comprises the vast majority of revenue, this interference will be devastating.  Even a temporary reduction in this critical revenue stream risks limiting Brave's ability to invest in

9

search result generation—or worse, forcing it to exit the search market altogether.[2]

(*See* Rem. Op. 175 (recognizing the consequences to existing syndicators); *see generally* Brave Br. §§ I.A-B.)  As the district court itself acknowledged:  "Equity cannot countenance such an outcome."  (Rem. Op. 175 (citing *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 136 (D.D.C. 2002)).)

Notably, the competitive effects of erring low, rather than erring high, are far less severe.  If the district court were correct, and some QCs struggled to build the capability to respond to 40% of user queries in the near term, a lower query cap will not meaningfully interfere with the remedy's goal of facilitating the rapid entry of commercially viable GSEs.  Assume, for example, that a new entrant can quickly build a GSE capable of independently responding to 60% of user queries, and it obtains under the Final Judgment a license to source from Google responses to an additional 10% of its queries.  That QC can still syndicate results from other suppliers to fill the gap between the 10% supplied by Google and the 60% achieved on its own.  The record evidence shows that Brave and Bing

---

[2] That the remedy is limited to QCs is cold comfort.  The Final Judgment defines a QC to include any entrant with a "plan to invest and compete in *or with* the GSE *and/or* Search Text Ads markets."  (FJ § IX.V (emphasis added).)  That is broad enough to encompass the panoply of existing and potential purchasers of syndicated search results:  It includes white-label GSEs that do not generate their own search results but nonetheless seek to compete with Google to sell search text ads, and it includes GenAI companies with no intent to compete as a GSE but which rely on syndicated search results from existing independent GSEs to "ground" their models (*see* Section II, below).

currently fill this gap and do so at quality levels on par with Google.  (*See* Rem. Tr. 1052:17-1053:8 (testimony of Bing witness that, on several metrics, Bing is ahead of Google); Brave Br. 21 (noting that internal quality tests rank Brave at 0.98 to Google's 1.00).)  And of course, whereas a high cap may push competitors like Brave to exit, a low cap can always be adjusted in a year or two if it proves inadequate.

In sum, the district court's order requiring Google to syndicate its search results should be modified to require that those licenses be limited to the queries most directly impacted by Google's scale advantage.  Anything greater is unnecessary to remedy the harm from Google's anticompetitive conduct and risks harming existing independent GSEs that syndicate their search results, while providing little to no additional short-term benefit to new entrants.

## II.    THE DATA-SHARING AND SEARCH SYNDICATION REMEDIES SHOULD NOT BE AVAILABLE TO GENAI COMPANIES.

Google argues that the district court erred by extending the data-sharing and search syndication remedies to GenAI companies that do not seek to offer a GSE.  (Google Br. § II.C.)  Brave agrees.  The Final Judgment's remedies are intended to promote competition *in the market for general search services*. (*See* Rem. Op. 107 ("If there is a market that needs to be 'pr[ied] open,' it is the market for general search services.").)  Extending these remedies to GenAI companies that do not intend to participate in that market would interfere with

11

existing search syndication and cause competitive harm to the market participants (*i.e.*, GSEs) that the remedies are intended to help.

The record established that Google has unlawfully maintained a monopoly in the general search services market. (Liab. Op. 152.) The district court recognized that GenAI products are not part of that market. (*See id.* at 41 ("AI has not supplanted the traditional ingredients that define general search."); Rem. Tr. 4766:4-17 (Court) (competing as a GenAI product grounded in general search is not the same as competing "in the GSE market as [the court] defined it").) Unlike the general search services market, the GenAI space is in flux, with several entrants having access to "a lot of capital," vying for distribution deals, and continuing to make quality improvements. (Rem. Op. 40-43.) While there may come a time when GenAI products, in and of themselves, are viewed as reasonable substitutes for GSEs, that time has not come, and that finding was not made in this case. (*Id.* at 43 ("GenAI products have not eliminated the need for GSEs.").)

Instead, as things currently stand, many GenAI companies are *customers* (or prospective customers) of existing GSEs. GenAI products like chatbots are powered by LLMs that are trained to respond to user queries through exposure to massive amounts of data. (*Id.* at 29-30.) But LLMs are generally static; once trained and made available to the public, they are not updated. (*Id.* at 31.) To maintain the accuracy and freshness of an LLM's output over time,

GenAI companies rely on a technique called "grounding." That is, the LLM cross-checks its responses against an existing outside database (like a GSE's search index) to "ground" them in reality. (*Id.* at 32-34.) As the district court recognized, "[s]uccessful grounding in search requires a high-quality search [API]." (*Id.* at 35.) Indeed, several GenAI companies rely on the Brave Search API to obtain Brave's organic search results to ground their responses.

The district court nonetheless modified the Final Judgment's definition of a "Qualified Competitor" to include GenAI companies, regardless of whether they intend to compete in the general search services market, thereby extending these companies the benefit of remedies intended to facilitate entry and growth *by GSEs*. (*Id.* at 103-04.) The district court acknowledged that these companies intend to use the remedies to build "a better AI product"—technology that does not "quite fit[]" in the "GSE market as [the court] defined it." (Rem. Tr. 4765:8-4767:7.) But then it based its decision on the *potential* that such GenAI companies may pose a "threat to Google's dominance in the market for general search services" in the future. (Rem. Op. 100.)

By attempting to artificially accelerate that potential future outcome, the district court risks causing actual and imminent harm to current and future independent GSEs. The ability to sell syndicated search results into the rapidly growing GenAI industry presents a major business case for Brave's (and other

13

independent GSEs') continued investment in search result generation.  Giving

GenAI companies that do not seek to become GSEs access to Google's search

results and search-related data would materially impair or destroy that business

case.  For the duration of the remedy, these companies would likely use Google's

search results rather than the results provided by independent GSEs like Brave.  In

the longer term, these companies would use Google's data to build their own

search indices that they can use to ground their models.  (*See* Rem. Tr. 409:16-

410:22 (Turley) (testifying that OpenAI would use the data-sharing remedies to

"accelerate the development of [its] own index" and the search syndication license

to ground its LLM).)  Thus, both during the remedies term and after, existing and

new independent GSEs alike risk being unable to profit from the sale of syndicated

search results to GenAI companies.

There is no basis for the district court to extend remedial help to

GenAI companies that do not intend to develop their own GSEs—and that are thus

outside the general search services market at issue in this case.  Certainly, the

district court should not do so at the expense of competition within a market that

has actually been monopolized by Google.  *See Spectrum Sports, Inc. v.

McQuillan*, 506 U.S. 447, 458 (1993) ("[C]ourts have been careful to avoid

constructions of § 2 [of the Sherman Antitrust Act] which might chill competition,

rather than foster it.").

14

## CONCLUSION

Brave respectfully submits that, if the Court affirms the search syndication remedy (Section V of the Final Judgment), it should limit the license to no more than 10% of a QC's annual U.S. search queries.  Brave further submits that the Court should reverse the district court's decision to extend the search syndication and data-sharing remedies to GenAI companies that do not intend to compete as independent GSEs.

Dated:  May 29, 2026                Respectfully submitted,

By:  /s/  *Gary A. Bornstein*

**CRAVATH, SWAINE & MOORE LLP**

Gary A. Bornstein
Yonatan Even
Andrew C. Finch
Two Manhattan West
375 Ninth Avenue
New York, New York 10001
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700
gbornstein@cravath.com
yeven@cravath.com
afinch@cravath.com

*Counsel for Brave Software, Inc.*

15

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned certifies:

1.  This document complies with the word limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), this document contains 3,379 words.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  May 29, 2026                    /s/  *Gary A. Bornstein*
                                        Gary A. Bornstein

                                        *Counsel for Brave Software, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 29, 2026, I electronically filed the foregoing

document using the CM/ECF system.  I further certify that all participants in this

case are registered CM/ECF users and will be served through the CM/ECF

system.


Dated:  May 29, 2026                     */s/  Gary A. Bornstein*
                                         Gary A. Bornstein

                                         *Counsel for Brave Software, Inc.*