**No. 26-5023**

**(Consolidated with Nos. 26-5047 & 26-5049)**

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

UNITED STATES OF AMERICA, ET AL.,
Plaintiffs-Appellees–Cross-Appellants

v.

GOOGLE LLC,
Defendant-Appellant–Cross-Appellee

On Appeal from the
United States District Court for the District of Columbia
Civ. Nos. 20-3010 & 20-3715
Hon. Amit P. Mehta

## BRIEF OF *AMICUS CURIAE*
## GREGORY J. WERDEN
## IN SUPPORT OF APPELLANT AND REVERSAL

GREGORY J. WERDEN
1029 N. Stuart St. #310
Arlington, VA  22201
703-527-5128
gregwerden@gmail.com

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................ii

GLOSSARY ........................................................................................ v

INTEREST AND INDEPENDENCE OF *AMICUS CURIAE* ...........................1

INTRODUCTION ................................................................................1

STATEMENT OF THE CASE ...............................................................3

SUMMARY OF ARGUMENT ...............................................................5

ARGUMENT.......................................................................................6

I.   THE DISTRICT COURT WRONGLY CONDEMNED
     GOOGLE FOR COMPETING ON THE MERITS....................................6

     A.  Competition on the Merits Is Lawful .....................................6

     B.  Google Competed on the Merits ............................................8

     C.  The District Court Did Not Require Harm to Competition..............10

II.  THE DISTRICT COURT WRONGLY HELD THAT GOOGLE
     ENGAGED IN ANTICOMPETITIVE EXCLUSIVE DEALING ...............12

     A.  Google Did Not Leverage its Partners...................................12

     B.  Exclusive Contracts Did Not Harm Google's Rivals .......................14

     C.  The District Court Applied the Wrong Causation Test .....................17

III. ROBUST BEHAVIORAL REMEDIES ARE UNWARRANTED.............20

     A.  Condemned Conduct Did Not Cause a Loss of Competition ..........20

     B.  Condemned Conduct Did Not Bear Fruit.......................................23

CONCLUSION..................................................................................24

CERTIFICATE OF COMPLIANCE.........................................................25

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985) ............................................................6–7

*Bostock v. Clayton Cnty., Georgia*,
  590 U.S. 644 (2020) ...............................................................17

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ...............................................................13

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
  592 U.S. 351 (2021)................................................................17

*In re: EpiPen Mktg., Sales Practice & Antitrust Litig.*,
  44 F.4th 959 (10th Cir. 2022)................................................13

*Int'l Salt Co. v. United States*,
  332 U.S. 392 (1947) ...............................................................21

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984).............................................................12–14

*LePage's Inc. v. 3M*,
  324 F.3d 141 (3d Cir. 2003) (en banc)................................... 7

*Massachusetts v. Microsoft Corp.*,
  373 F.3d 1199 (D.C. Cir. 2004) (en banc).......................21, 23

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
  435 U.S. 679 (1978) .............................................................. 22

*New York v. Meta Platforms, Inc.*,
  66 F.4th 288 (D.C. Cir. 2023)................................................. 6

*NicSand, Inc. v. 3M Co.*,
  507 F.3d 442 (6th Cir. 2007) (en banc)................................13

*N. Pac. Ry. Co. v. United States*,
  356 U.S. 1 (1958)..............................................................13–14

ii

## Cases—Continued                                                     Page(s)

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013) .......................................................... 10

*NYNEX Corp. v. Discon, Inc.*,
  525 U.S. 128 (1998) ............................................................................ 10

*Price Waterhouse v. Hopkins*,
  490 U.S. 228 (1989).............................................................................17

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
  614 F.3d 57 (3d Cir. 2010) ..................................................................13

*Rambus Inc. v. FTC*,
  522 F.3d 456 (D.C. Cir. 2008) ...................................................... 10, 17

*Standard Oil Co. of New Jersey v. United States*,
  221 U.S. 1 (1911) ................................................................................20

*Standard Oil Co. of California v. United States*,
  337 U.S. 293 (1949) ............................................................................19

*S. Pac. Commc'ns Co. v. AT&T Co.*,
  740 F.2d 980 (D.C. Cir. 1984) ............................................................. 7

*Times-Picayune Pub. Co. v. United States*,
  345 U.S. 594 (1953) ............................................................................13

*Trump v. CASA, Inc.*,
  145 S. Ct. 2540 (2025) ........................................................................20

*United States v. Dentsply Int'l, Inc.*,
  399 F.3d 181 (3d Cir. 2005)................................................................13

*United States v. E.I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956) ............................................................................. 6

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966)............................................................................. 6

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) (en banc)......................... 2, 7, 10, 16–21, 23

## Cases—Continued <span style="float:right">Page(s)</span>

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.,*
  549 U.S. 312 (2007) ............................................................... 11

*ZF Meritor, LLC v. Eaton Corp.,*
  696 F.3d 254 (3d Cir. 2012) ..................................................13

## Statutes

Clayton Act, Section 3,
  15 U.S.C. § 14 .............................................................. 14, 19

Sherman Act, Section 2,
  15 U.S.C. § 2 ..................................... 2–3, 5–7, 16–17, 19–20

## Miscellaneous

Areeda, Phillip & Donald F. Turner,
  3 *Antitrust Law* (1978) ........................................................ 7

Bork, Robert H.,
  *The Antitrust Paradox* (1979) ..........................................6–7

Bray, Samuel L. & Paul B. Miller, *Getting into Equity*,
  97 Notre Dame L. Rev. 1763 (2022) .....................................20

Edmunds, George F., Remarks,
  21 Cong. Rec. 3151–52 (1890)................................................ 6

Senate Committee on the Judiciary, *Unlawful Restraints
  and Monopolies*, S. Rep. No. 63-698 (1914)..........................14

Walker, Albert H., *Who Wrote the Sherman Law?*,
  73 Cent. L. Rev. 257 (1911)................................................... 6

*Webster's Third New International Dictionary* (1971) ............................. 22

# GLOSSARY

GSE             general search engine

Partners        entities with which Google had distribution arrangements

Plaintiffs      plaintiffs in 20-3010 and 20-3715, collectively

## INTEREST AND INDEPENDENCE OF *AMICUS CURIAE*

Gregory J. Werden served in the Antitrust Division of the U.S. Department of Justice for more than forty years. His antitrust scholarship has been cited by more than 1000 law review articles and more than 20 decisions by federal courts.

Gregory J. Werden certifies that no party's counsel authored any part of the brief, and no party, counsel, or any other person contributed funds for the preparation of the brief. All parties consented to the filing of the brief.

## INTRODUCTION

Two Stanford University students founded Google in 1998. *United States v. Google LLC*, 747 F. Supp. 3d 1, 31, 35 (D.D.C. 2024) ('*Google* II'). By 2009, Google's "general search engine" ('GSE') handled 80% of U.S. GSE queries. *Id.* at 31. Google earned "the trust of hundreds of millions of daily users" by creating the "highest quality search engine." *Id.*

Skill, foresight, and industry drove Google's continuing success. Google "foresaw that the future of search was on mobile," *id.* at 144, and Google created Android, *id.* at 35. It became the world's leading mobile operating system, and Google distributed its GSE on Android devices. Google also created Chrome, *id.* at 35, which became the world's leading internet browser, and Google distributed its GSE through Chrome.

Plaintiffs alleged that Google began anticompetitive "exclusive dealing" at an specified date after 2009. *Id.* at 146. The district court ruled that, by engaging in "exclusive dealing," Google unlawfully maintained a monopoly, in violation of Section 2 of the Sherman Act. *Id.* at 187–88. But the court's own findings demonstrate that Google's "exclusive dealing" did not materially contribute to the maintenance of its market leading position.

The district court (*see id.* at 106–07, 142–49, 152–58, 171–72) took guidance from *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc). The central facts of *Microsoft*, however, are nothing like those here. Microsoft departed from competition on the merits, but Google did not. Microsoft leveraged its partners to obtain exclusivity, but Google did not. And Microsoft squelched a threat to its market position, but Google did not.

Microsoft's position in PC operating systems was threatened by technology that could have eroded the "applications barrier to entry." *See id.* at 53–55. Ample evidence showed that the threat was real and that Microsoft killed it through conduct confirmed by this Court not to have been competition on the merits. *Id.* at 50, 56, 62, 65, 70–79.

The facts here are different. Plaintiffs did not allege that Google squelched a threat to its market position. Nor did Plaintiffs allege that Google departed from competition on the merits. And Plaintiffs did not demonstrate

that any of Google's GSE rivals would have been more successful but for Google's "exclusive dealing." But none of that mattered to the district court.

In finding Google liable under Section 2, the district court committed fundamental errors of law. The court relieved Plaintiffs of the burden to demonstrate that Google departed from competition on the merits, and the court relieved Plaintiffs of the burden to demonstrate that Google's "exclusive dealing" produced an actual anticompetitive effect.

## STATEMENT OF THE CASE

Plaintiffs filed two suits alleging that Google violated Section 2 of the Sherman Act, 15 U.S.C. 2, by engaging in anticompetitive "exclusive dealing" to maintain inextricably linked monopolies in GSEs and in the associated advertising. The district court consolidated the cases then bifurcated them into liability and remedy phases.

On August 4, 2023, the district court granted in part Google's motion for summary judgment, but the court denied the motion in critical respects. *United States v. Google LLC*, 687 F. Supp. 3d 48 (D.D.C. 2023) ('*Google* I'). The court rejected Google's contention that Plaintiffs "must show that the conduct is by nature anticompetitive, as opposed to conduct that is 'competition on the merits.'" *Id.* at 66.

3

The district court's August 4, 2024, liability opinion condemned Google for unlawful "exclusive dealing" with its Partners—browser developers, makers of mobile devices, and wireless carriers. *Google* II, 747 F. Supp. 3d at 142–43, 146–71, 177–81. Plaintiffs were not required to prove, and did not prove, that Google's "exclusive dealing" deprived rivals of distribution they otherwise would have gotten. *Id.* at 153.

The district court's September 2, 2025, remedies opinion indicated that the court would order relief beyond enjoining the conduct found unlawful. *United States v. Google LLC*, 803 F. Supp. 3d 18 (D.D.C. 2025) ('*Google* III'). The court ruled that Google should be compelled to endow actual and potential GSE rivals with competitively valuable data and should be compelled to perform searches for rivals.

On December 5, 2025, the district court issued a Final Judgment ordering the relief previously outlined, along with an opinion explaining the Judgment. Mem. Op. *United States v. Google LLC*, Nos. 20-3010 & 20-3715 (D.D.C. Dec. 5, 2025). Section III of the Final Judgment bars Google from contracting for exclusive distribution. Section IV requires Google to share a wealth of search-related data. And Section V requires Google to enter into syndication arrangements with rivals, i.e., to perform searches for them.

**SUMMARY OF ARGUMENT**

**I.** Section 2 of the Sherman Act distinguishes unlawful anticompetitive conduct from lawful competition on the merits. Google competed on the merits in all respects, including its distribution arrangements with Partners. The district court did not enquire into whether Google departed from competition on the merits and held Google liable merely on the basis that it got more favorable distribution than rivals.

**II.** The district court's findings demonstrate that Google did not leverage its Partners and that its Partners did not deny Google's GSE rivals distribution that they would have gotten but for Google's "exclusive dealing." Thus, Google did not engage in anticompetitive "exclusive dealing." The court condemned Google's "exclusive dealing" without regard to whether the condemned contractual terms materially affected competition.

**III.** Without evidence that the condemned conduct caused any actual loss of competition, the district court ordered relief going well beyond enjoining the condemned conduct. The court imposed what it labeled "robust behavioral remedies," although they are, in fact, structural remedies. The court asserted that the remedies ordered were necessary to deny Google the fruits of unlawful conduct, but it had not found that the condemned conduct bore any fruit.

## ARGUMENT

### I. THE DISTRICT COURT WRONGLY CONDEMNED GOOGLE FOR COMPETING ON THE MERITS

#### A. Competition on the Merits Is Lawful

Section 2 of the Sherman Act distinguishes unlawful anticompetitive conduct from lawful competition on the merits. Section 2 was drafted by Senate Judiciary Committee Chairman George F. Edmunds. *See* Albert H. Walker, *Who Wrote the Sherman Law?*, 73 Cent. L. Rev. 257, 258 (1911). When asked by a fellow Senator whether Section 2 condemned a man for achieving "a monopoly" "by virtue of his superior skill," Senator Edmunds emphatically rejected the idea. 21 Cong. Rec. 3151–52 (1890).

The Supreme Court quoted this exchange. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 390 n.15 (1956). And the Court held that Section 2 prohibits "the willful acquisition or maintenance" of monopoly "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). *See New York v. Meta Platforms, Inc.*, 66 F.4th 288, 302 (D.C. Cir. 2023).

The Supreme Court's *Aspen* decision endorsed Robert Bork's articulation of the principle: "If a firm has been 'attempting to exclude rivals on some basis other than efficiency,' it is fair to characterize its behavior as

predatory." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) (quoting Robert H. Bork, *The Antitrust Paradox* 138 (1979)).

The *Aspen* decision also endorsed the Areeda-Turner articulation of the principle: "'[E]xclusionary' comprehends at the most behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way." *Id.* at 605 n.32 (quoting 3 Phillip Areeda & Donald F. Turner, *Antitrust Law* ¶ 626b, at 78 (1978)). This Court already had endorsed the Areeda-Turner formulation. *S. Pac. Commc'ns Co. v. AT&T Co.*, 740 F.2d 980, 999 n.19 (D.C. Cir. 1984).

Synthesizing *Grinnell* and *Aspen*, the Third Circuit declared that, "A monopolist willfully acquires or maintains monopoly power when it competes on some basis other than the merits." *LePage's Inc. v. 3M*, 324 F.3d 141, 147 (3d Cir. 2003) (en banc).

This Court also indicated that competition on the merits is lawful under Section 2. To affirm Microsoft's liability, the Court determined that it had maintained a monopoly "not through competition on the merits, but through unlawful means." *United States v. Microsoft Corp.*, 253 F.3d 34, 50 (D.C. Cir. 2001) (en banc); *see id.* at 56, 62, 65 (upholding condemnation of conduct that was "other than competition on the merits").

### B. Google Competed on the Merits

A GSE is enormously expensive to develop and operate. *Google* II, 747 F. Supp. 3d at 42–43. A GSE recoups costs "by selling digital advertisements" on about 20% of queries. *Id.* at 31, 40. "More users mean more advertisers, and more advertisers mean more revenue." *Id.* at 32. And a GSE attracts users by enhancing search quality or improving distribution.

"The most efficient channel of GSE distribution is, by far, placement as the preloaded, out-of-the-box default GSE." *Id.* at 44. Microsoft's Edge browser is preloaded on Windows devices, with its Bing GSE as the default. *Id.* at 36, 44. To secure distribution for its GSE, Google developed the Chrome browser, partnered with other browser developers, and partnered with makers of Android mobile devices and wireless carriers. *Id.* at 89–106.

Default distribution boosts a GSE's usage and hence its advertising revenue. The distributor gets a negotiated share of the revenue and thus prefers to partner with the GSE that generates the most revenue from the default. The district court correctly found that: "The market reality is that Google is the only real choice as the default GSE." *Id.* at 144.

The boost from default distribution is not decisive because users can "change the default to their preferred GSE" or download another browser. *Id.* at 44–45, 48. Bing was the only GSE preset as a default on Windows

8

devices, but 80% of searches from Windows devices used Google's GSE. Most of the 80% used user-downloaded Chrome, and the rest used Edge with the default GSE changed by users to Google. *Id.* at 48–49.

Mozilla developed the Firefox browser. When Mozilla set Yahoo! as the default GSE on Firefox, 60–70% of Firefox queries went to Google. *Id.* at 96. When Mozilla set Google as the default, it experimented by switching the default to Bing for a tiny fraction of users. Many users changed the default, and others reduced Firefox usage. *Id.* at 97. In a 2021–22 experiment, 35.5% of users changed the default, and 73% of them changed it to Google. *Id.*

Apple's Safari browser originated 28% of U.S. GSE queries. *Id.* at 89. Microsoft sought the Safari default for Bing, but Apple "never seriously considered Bing as an option." *Id.* at 94–95. The district court credited an analysis finding that, to match Google's offer of a 33.75% revenue share, Microsoft would have needed to offer a share of 122%. *Id.* at 95.

Android devices originated 19% of U.S. GSE queries. Id. at 44. Google's contracts with makers of Android devices required preinstallation of Google Chrome and the Google Search Widget, as well as "prominent placements" for both. *Id.* at 98–100, 150. The contracts were not exclusive, but prominent placements were scarce, and Google's Android Partners decided against pre-installing redundant applications. *Id.* 99–100, 150.

In exchange for distribution on Android devices, Google shared revenue with wireless carriers and device makers. Google paid carriers a higher share for "more placements," and all chose to maximize their revenue. *Id.* at 100–03. Arrangements with device makers were similar. *Id.* at 103. Google bought all the distribution its Android Partners chose to sell. *Id.* at 103–04, 151.

## C. The District Court Did Not Require Harm to Competition

From "a century of case law on monopolization," this Court, sitting en banc, distilled the principle that, "to be condemned as exclusionary," conduct "must harm the competitive *process* and thereby harm consumers. In contrast, harm to one or more *competitors* will not suffice." *Microsoft*, 253 F.3d at 58. A plaintiff must prove the harm, *id.*, and that harm must be "to competition itself." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998); *see Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013); *Rambus Inc. v. FTC*, 522 F.3d 456, 463–67 (D.C. Cir. 2008).

In a pre-trial ruling, the district court discarded the only principled basis for distinguishing harm to competition from harm to competitors. The court resolved a dispute over "what the *prima facie* case entails" by rejecting Google's contention that "Plaintiffs must show that the conduct is by nature anticompetitive, as opposed to conduct that is 'competition on the merits.'" *Google* I, 687 F. Supp. 3d at 66.

The district court ultimately grounded liability on the fact that Google got better distribution than its rivals. *See Google* II, 747 F. Supp. 3d at 120, 145, 150, 153, 159, 180–81. But that fact cannot be the basis for liability because Google's Partners unilaterally decided to sell "default distribution," and Google competed on the merits to buy it. *See supra* p. 9, *infra* pp. 15–16.

The district court condemned Google for marketplace success, just as the lower courts in *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312 (2007). Defendant, Weyerhaeuser, invested, innovated, and achieved a leading position among hardwood sawmills in the Pacific Northwest. *Id.* at 315. A jury found that Weyerhaeuser monopolized hardwood lumber by outbidding rival sawmills for the critical input— hardwood logs. *Id.* at 316–17. But the Supreme Court set the verdict aside.

The Supreme Court observed that outbidding rivals to acquire logs was the "very essence of competition," and the Court thus required clear evidence that Weyerhaeuser departed from competition on the merits. *Id.* at 323, 325–26. Here, outbidding rivals to acquire distribution was the "very essence of competition," but the district court required no evidence that Google departed from competition on the merits. That was legal error.

11

## II. THE DISTRICT COURT WRONGLY HELD THAT GOOGLE ENGAGED IN ANTICOMPETITIVE EXCLUSIVE DEALING

### A. Google Did Not Leverage its Partners

The district court asserted that "exclusive deals are a feature of the market only because *Google* has insisted on them," explaining that, "when partners have asked for flexibility on the defaults, . . . Google has resisted." *Google* II, 747 F. Supp. 3d at 173. But Google's resistance did not matter because it was "the only real choice as the default GSE." *Id.* at 144.

Google's Partners concluded that exercising flexibility was irrational. They determined that it was "financially infeasible to switch default GSEs or seek greater flexibility in search offerings because it would mean sacrificing the hundreds of millions, if not billions, of dollars that Google pays them as revenue share." *Id.* at 145. This critical fact negates the court's assertion that exclusivity was the product of Google's insistence.

Google's Partners independently decided to preference one GSE over others, and they chose Google. "Google's partners value its quality, and they continue to select Google as the default because its search engine provides the best bet for monetizing queries." *Google* II, 747 F. Supp. 3d at 144. This finding implies that Google did not engage in "leveraging."

The power to impose undesired non-price terms of trade is termed "leverage," and exercising that power is "leveraging." *See Jefferson Parish*

12

*Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 n.20 (1984); *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6–7 (1958).

Absent leveraging, contractual exclusivity does not offend antitrust law. *E.g.*, *In Re: EpiPen Mktg., Sales Practices & Antitrust Litig.*, 44 F.4th 959, 989–90 (10th Cir. 2022); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 74, 78 (3d Cir. 2010); *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 454–56 (6th Cir. 2007) (en banc).

And leveraging does not require a contract; threatening to terminate a beneficial relationship can suffice. *E.g.*, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 458–59 (1992) (tying); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 185, 190 (3d Cir. 2005) (exclusive dealing).

The centrality of leveraging to tying violations is well established. *See Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 611 (1953) (The "essence of illegality in tying arrangements is the wielding of monopolistic leverage."); *Hyde*, 466 U.S. at 12–16 (using the term "forcing"). But exclusive dealing is just like tying.

With exclusive dealing, leveraged trading partners are required to forgo profitable dealing with third parties. *See, e.g.*, *id.* at 45 (O'Connor, J., concurring); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 285 (3d Cir. 2012). The Supreme Court's definition of tying explicitly includes this fact

13

pattern. *See N. Pac.*, 356 U.S. at 5–6. Congress viewed tying and exclusive dealing as a single restraint when enacting Section 3 of the Clayton Act, 15 U.S.C. § 14. *See Unlawful Restraints and Monopolies*, S. Rep. No. 63-698, at 6 (1914). In *Hyde,* the Supreme Court divided on whether to classify the conduct tying or exclusive dealing. *Compare Hyde*, 466 U.S. at 9–24 (tying) *with id.* at 44–46 (exclusive dealing) (O'Connor, J., concurring).

## B. Exclusive Dealing Did Not Harm Google's Rivals

The district court condemned Google's "exclusive dealing" on the basis that it "ensure[d] that half of all GSE users in the United States will receive Google as the preloaded default on all Apple and Android devices." *Id.* at 153. But the court's findings demonstrate that "exclusive dealing" is not what ensured that Google's GSE was the preloaded default on Apple and Android devices. Google secured favorable distribution by competing on the merits to secure mutually beneficial arrangements with its Partners.

The district court found that "revenue share payments shape the market for general search services in Google's favor." *Google* III, 803 F. Supp. 3d at 102. These payments are an integral part of a healthy competitive process, and the court found that a "reduction of payments to distributors is likely to have significant downstream effects on multiple fronts, some possibly dire." *Id.* at 104.

14

Without contractual obligations to preference Google's GSE, but all other things being equal, Apple still would have made Google's GSE the default in every copy of Safari. *Google* II, 747 F. Supp. 3d at 144–45, 162–63. Doing so earned Apple $20 billion annually in shared advertising revenue. *Id.* at 90. Making Microsoft's Bing the default GSE would have earned Apple much less revenue. *Id.* at 94–95, 144–45. Apple similarly rejected the idea of using Duck Duck Go as the default GSE in just the "private browsing mode" due to its "inferior" quality. *Id.* at 95–96.

While Google's GSE was the default in Firefox, Mozilla conducted controlled experiments by switching the default away from Google for a tiny fraction of Firefox users. The results indicated that Mozilla's best option was to make Google's GSE the default for every Firefox user. *Id.* at 97.

The district court held that Google's arrangements with Partners were "exclusive dealing" because they required the Partners to make Google's GSE the default or grant a preference to Google. *Id.* at 93–94, 100–03, 142–43, 146–52. The court did not hold the revenue-share payments unlawful or prohibit them going forward. *Google* III, 803 F. Supp. 3d at 37, 102–07. The court's cogent rationale for permitting revenue-sharing payments going forward confirms that they were competition on the merits, and they are not what made Google's arrangements with Partners "exclusive dealing."

For exclusive dealing "to have an adverse effect on competition, the opportunities for other traders to enter into or remain in that market must be significantly limited." *Microsoft*, 253 F.3d at 69 (internal quotation marks omitted). That was true here, in the district court's view, because "50% of all queries in the United States run through the default search access points covered by the challenged distribution agreements." *Google* II, 747 F. Supp. 3d at 153–54, 157–58.

But Google's "exclusive dealing" did not limit the opportunities of Google's GSE rivals. The district court's findings establish that Google's Partners voluntarily preferenced Google's GSE to maximize their revenue from advertising. *Id.* at 144–45. Absent Google's "exclusive dealing," just as many queries would have run through the default search access points preferencing Google.

The obligations in Google's contracts with Partners memorialized the choices they made to maximize their revenue. And memorializing them gave Google desired business certainty. The theoretical possibility that Google's Partners could have acted differently without contractual obligations is too thin a reed to support Section 2 liability. The district court's findings indicate that Google's Partners would have preferenced Google's GSE in the same ways and to the same extent absent contractual obligations to do so.

## C. The District Court Applied the Wrong Causation Test

This Court's *Rambus* decision demanded proof of but-for causation to establish anticompetitive effects under Section 2. *Rambus*, 522 F.3d at 466–67. At issue was deception in a standard-setting process, and the Court held that the deception "cannot be said to have had an effect on competition in violation of the antitrust laws" if the same standard would have been set "but for" the conduct. *Id.* at 466–67.

The *Rambus* decision did not impose a special burden because the conduct was deception, *id.* at 463–64, and doing so would not have made sense. While exclusive dealing "may serve many useful purposes," *Microsoft*, 253 F.3d at 69, deception serves none. The district court, thus, committed legal error in holding that the *Rambus* causation requirement did not apply in an exclusive dealing case. *Google* II, 747 F. Supp. 3d at 154–55.

The district court misread *Microsoft* to hold that, "when a regulator is seeking only injunctive relief, the standard is somewhat relaxed" in proving anticompetitive effects. *Id.* at 152–53 (citing *Microsoft*, 253 F.3d at 79). This Court could not have read *Microsoft* that way in rendering the *Rambus* decision because a regulator (the Federal Trade Commission) imposed only injunctive relief. *Rambus*, 522 F.3d at 459, 462.

17

*Microsoft* applied a relaxed standard to the "link between Microsoft's anticompetitive conduct . . . and the maintenance of Microsoft's operating system monopoly." *Microsoft*, 253 F.3d at 78. Plaintiffs were required to demonstrate "the requisite anticompetitive effect." *Id.* at 58–59. And they did so. *See, e.g.*, *id.* at 65–66 (deterred PC makers "from installing a second browser"), 70 ("severely restricted Netscape's access to those distribution channels leading most efficiently to . . . usage share").

The district court articulated no sense in which Google's conduct caused an anticompetitive effect. The court merely declared that the applicable standard "does not require but-for proof" and that Plaintiffs did not need "to show that but for the defendant's exclusionary conduct the anticompetitive effects would not have followed." *Google* II, 747 F. Supp. 3d at 153.

A "but-for causation test isn't the most demanding." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 376 (2021) (Gorsuch, J. concurring). It "directs us to change one thing at a time and see if the outcome changes." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 656 (2020). A "standard less than but-for . . . represents a decision to impose liability without causation." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 282 (1989) (Kennedy, J., dissenting).

The district court asserted that applying a but-for standard "would create substantial proof problems." *Google* II, 747 F. Supp. 3d at 153. But the problems the court identified do not arise in proving anticompetitive effects; they arise in proving that demonstrated anticompetitive effects contributed materially to maintenance of monopoly. *See id.* (quoting *Microsoft*, 253 F.3d at 79 (referring to problems in proving that "exclusion of nascent threats" maintained Microsoft's monopoly)).

On proof problems, the district court (*id.* at 154) also quoted *Standard Oil Co. of California v. United States*, 337 U.S. 293 (1949), which entirely dispensed with proof of anticompetitive effects for claims under Section 3 of the Clayton Act. *Id.* at 307–14. But Section 3 is now read to require proof of anticompetitive effects, even if a lesser effect might suffice under the Clayton Act than under the Sherman Act. *See Microsoft*, 253 F.3d at 69.

Because the district court did not require Plaintiffs to satisfy any recognized causation standard, the court's assertions phrased in causal terms are unwarranted legal conclusions rather than factual findings. For example, the court asserted that Google's "exclusive dealing" "deprived rivals of scale" and "reduced incentives to invest and innovate." *Google* II, 747 F. Supp. 3d at 159, 165. But the court found no cognizable causation.

19

## III.  ROBUST BEHAVIORAL REMEDIES ARE UNWARRANTED

### A.  Condemned Conduct Did Not Cause a Loss of Competition

The "broader and deeper the remedy the plaintiff wants, the stronger the plaintiff's story needs to be." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2558 (2025) (quoting Samuel L. Bray & Paul B. Miller, *Getting into Equity*, 97 Notre Dame L. Rev. 1763, 1797 (2022)). Application of this basic principle to Section 2 of the Sherman Act began in *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1 (1911).

The Supreme Court observed that, "ordinarily," an "adequate measure of relief would result from restraining the doing of [the condemned] acts in the future." *Id.* at 77. However, when monopoly "has been brought about in violation of the statute," the court has a duty to "dissolve the combination found to exist in violation of the statute." *Id.* at 77–78.

In *Microsoft*, this Court adapted this rule to the offense of monopoly maintenance. The Court first observed that the district court can "impose a structural remedy or merely enjoin the offensive conduct at issue." *Microsoft*, 253 F.3d at 80. Then the Court explained that structural relief is warranted only when the district court has a "measure of confidence that there has been an actual loss to competition that needs to be restored." *Id.*

20

To avoid the conclusion that the remedy here should "merely enjoin the offensive conduct at issue," the district court declared that "robust behavioral remedies" require less confidence about lost competition than structural remedies. *See Google* III, 803 F. Supp. 3d at 70–76. But the confidence level here is precisely zero because Plaintiffs were "not required to show that but for the defendant's exclusionary conduct the anticompetitive effects would not have followed." *Google* II, 747 F. Supp. 3d at 153.

More to the point, the district court's "robust behavioral remedies" are actually structural remedies. These remedies directly alter market structure by endowing Google's rivals with critical capabilities and resources. Providing competitors with valuable data and syndication services is a "structural remedy" in the same way as providing Microsoft's competitors with its browser source code was in *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1227–31, 1233 (D.C. Cir. 2004) (en banc).

The district court correctly noted that, "Precedent requires fashioning antitrust remedies that 'effectively pry open to competition a market that has been closed' by a monopolist's 'illegal restraints.'" *Google* III, 803 F. Supp. 3d at 36 (quoting *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947)). But the court failed to appreciate that no market was "closed by" illegal conduct in the proper, causal sense of the words.

21

In explaining its rationale for "robust behavioral remedies," the district court asserted that Google's "exclusive dealing" "caused" anticompetitive effects. *Id.* at 95–97, 116. But the court's findings demonstrate that Google's "exclusive dealing" was not *a* cause, much less *the* cause, of its preferential distribution. *See supra* pp. 14–16. If the market was closed, Google's skill, foresight, and industry closed it.

The district court asserts that the requiring Google to share data "represents a reasonable method of eliminating the consequences of the illegal conduct." *Google* III, 803 F. Supp. 3d at 108, 114, 122 (quoting *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 698 (1978)). But a remedy cannot reasonably be said to "eliminate the consequences of the illegal conduct" when liability is premised on anything less than but-for causation.

A "consequence" is "something that is produced by a cause or follows from a form of necessary connection or from a set of conditions: a natural or necessary result." *Webster's Third New International Dictionary* (1971) (first definition). In this sense, the district court did not find that the conduct it condemned had anticompetitive "consequences."

### B.  Condemned Conduct Did Not Bear Fruit

The district court also declared that "robust behavioral remedies" are necessary and proper to deny Google "the fruits of its statutory violation." *Google* III, 803 F. Supp. 3d at 38, 81–89, 107–09 (quoting *Microsoft*, 253 F.3d at 103). But the court's reasoning makes clear that fruit identified by the court did not grow from the branches of condemned conduct.

Analogizing to this Court's analysis in *Massachusetts*, 373 F.3d at 1233, the district court asserted that "freedom from threats" is fruit of default distribution at search access points accounting for half of U.S. search queries. *Google* III, 803 F. Supp. 3d at 81–85. But Plaintiffs alleged no threats to Google's market position, and the court found none.

In explaining what led to "freedom from threats," the district court focused on "default placements" and associated revenue-share payments, but the court condemned neither. The Final Judgment prohibits the conduct condemned by the court but explicitly (and rightly) permits Google to "pay distributors for default placement." *Id*. at 107; *see id*. at 37, 103–07, 109.

The district court asserted that another fruit of condemned conduct was "scale" advantage. *Id*. at 85–88. But Google's scale advantage existed before any condemned conduct. *See supra* p. 3. Google's scale advantage arguably

was cemented by default placement and revenue-share payments, but the court neither condemned nor prohibited that conduct.

Finally, the district court asserted that "revenue" was fruit of the condemned conduct. *Id.* at 88–89. Although Google earned substantial revenue from its distribution deals with Partners, the court did not find that any part of the revenue was due to the exclusivity of the deals, and the remedy does not preclude earning even greater revenue going forward.

## CONCLUSION

This Court should reverse the district court's liability decision and dismiss the cases.

Respectfully submitted,

May 29, 2026

Gregory J. Werden
1029 N. Stuart St. #310
Arlington, VA  22201
703-527-5128
gregwerden@gmail.com

24

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limit of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Cir. Rule 32(e)(1), the brief contains 5114 words, as counted by Microsoft Word version 2605.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the brief was prepared in Microsoft Word, using 14 pt. Georgia, a proportionally spaced typeface.

Gregory J. Werden
Dated: May 29, 2026