# ORAL ARGUMENT NOT YET SCHEDULED
## Nos. 26-5023, 26-5047, 26-5049

I N  T H E
# United States Court of Appeals
# for the District of Columbia Circuit

UNITED STATES OF AMERICA, et al.,

*Plaintiffs-Appellees-Cross-Appellants,*

v.

GOOGLE LLC,

*Defendant-Appellant-Cross-Appellee.*

On Appeal from the
United States District Court for the District of Columbia
Nos. 1:20-cv-3010, 1:20-cv-3715 (Hon. Amit P. Mehta)

## RESPONSE BRIEF AND OPENING BRIEF ON CROSS-APPEAL FOR THE UNITED STATES AND CO-PLAINTIFF STATES (PAGE PROOF)

STANLEY E. WOODWARD, JR.
  *Associate Attorney General*

STEPHANIE A. GRECO
  *Deputy Assistant Attorney General, Litigation*

ETHAN S. HOFFMAN
  *Counsel to the Assistant Attorney General*

TRAVIS R. CHAPMAN
GRANT FERGUSSON
KARL E. HERRMANN
RYAN T. KARR
CLAIRE M. MADDOX
MICHAEL G. MCLELLAN
  *Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION

DANIEL E. HAAR
NICKOLAI G. LEVIN
PATRICK M. KUHLMANN
MATTHEW A. WARING
  *Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave., N.W.
Room 3224
Washington, D.C. 20530-0001
(202) 532-4186
matthew.waring@usdoj.gov

(additional counsel in signature block)

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned certifies:

## A.    Parties and Amici

Except for the parties listed below, all parties, intervenors, and amici appearing before the district court and in this Court are listed in Plaintiffs' Certificate as to Parties, Rulings, and Related Cases filed on February 23, 2026.

The following parties have filed amicus briefs or notices of intent to file in this Court: Brave Software, Inc.; Washington Legal Foundation; Mozilla Corporation; Apple Inc.; Samsung Electronics Company, Ltd.; Terry Calvani, William Kolasky, Abbott B. Lipsky, Joe Sims; Law & Economics Scholars; Alden Abbott; Gregory J. Werden; Economists and Legal Scholars; Hunt Allcott, Matthew Gentzkow; OpenAI OpCo, LLC.

## B.    Rulings Under Review

The references to the rulings at issue in Plaintiffs' Certificate as to Parties, Rulings, and Related Cases filed on February 23, 2026, remain accurate.

## C.  Related Cases

The certification as to related cases in Plaintiffs' Certificate as to Parties, Rulings, and Related Cases filed on February 23, 2026, remains accurate.

s/ Matthew A. Waring
Matthew A. Waring
*Counsel for the United States*

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES ..................................................................i

TABLE OF AUTHORITIES.............................................................vi

GLOSSARY .....................................................................................xv

INTRODUCTION ..............................................................................1

JURISDICTIONAL STATEMENT ...................................................7

STATEMENT OF ISSUES................................................................8

STATUTES AND REGULATIONS ...................................................9

STATEMENT OF THE CASE .........................................................10

    A.    General Search Engines and Their Ads. .................................10

    B.    Google's Control of Search Defaults Prevents Effective
        Competition. ...........................................................................13

        1.    Preloaded defaults are a critical distribution channel for
             GSEs. ...............................................................................13

        2.    For years, Google paid distributors tens of billions of dollars
             annually to be the exclusive default GSE............................14

        3.    Google's control of the defaults deprived rivals of the means
             to compete effectively. ......................................................18

    C.    The District Court Found Google Violated Section 2. .............21

    D.    The District Court Imposed Significant Remedies for Google's
        Monopolization. ......................................................................29

STANDARD OF REVIEW ...............................................................37

SUMMARY OF ARGUMENT .........................................................38

ARGUMENT ...................................................................................49

  I.    The District Court Correctly Found That Google Unlawfully
      Maintained Two Monopolies. .................................................49

    A.    The District Court Correctly Found that Google Had Monopoly
        Power in Both Relevant Markets...........................................49

1. The district court's extensive findings establish Google's monopoly power in both markets ............................................. 52

2. Google's challenges to the general-search-services market are meritless, confirming its monopoly power in that market. .................................................................... 56

3. Google's challenge to the finding of general-search-text-ads monopoly power is meritless. ............................................... 64

B. The District Court Correctly Held that Google Engaged in Anticompetitive Conduct. ........................................................ 65

1. The district court correctly held that the browser agreements were exclusive. ................................................. 66

2. The district court correctly found multiple anticompetitive effects ................................................................................... 74

3. Even crediting Google's browser-agreement arguments, the court's liability determinations should stand ..................... 104

II. Google's Challenges To The Remedy Are Meritless. ................. 108

A. The District Court Did Not Abuse Its Discretion in Ordering the Data-Sharing and Syndication Remedies. ....................... 108

B. The District Court Did Not Abuse Its Discretion by Including Certain GenAI Products in the Remedy. ............................... 121

CROSS-APPEAL .................................................................................... 124

The District Court Did Not Follow The Governing Legal Framework When Rejecting A Payment Ban. ..................................................... 126

A. Congress Has Set Forth an Order of Priorities in Government Antitrust Enforcement Actions. ............................................. 126

B. The District Court Did Not Ensure Its Decree Effectively Restored Competition. ............................................................. 129

1. The district court failed to determine whether a payment ban was necessary for effective relief. ................................ 129

Page

2.  The district court improperly elevated other considerations above effective relief............................................................132

3.  The district court misapplied case law in failing to comply with *du Pont*....................................................................139

C.  The Error Requires Immediate Correction. ..........................142

CONCLUSION ..............................................................................144

CERTIFICATE OF COMPLIANCE..................................................149

CERTIFICATE OF SERVICE...........................................................150

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AD/SAT, A Divison of Skylight, Inc. v. Associated Press,*
181 F.3d 216 (2d Cir. 1999) .............................................................58

*Aerotec International, Inc. v. Honeywell International, Inc.,*
836 F.3d 1171 (9th Cir. 2016).........................................................72

*Babb v. Wilkie,*
589 U.S. 399 (2020)........................................................................112

*Barry Wright Corp. v. ITT Grinnell Corp.,*
724 F.2d 227 (1st Cir. 1983) ......................................................23, 75

*\*Brown Shoe Co. v. United States,*
370 U.S. 294 (1962).......................................... 22, 23, 50, 51, 52, 57

*Brown v. Plata,*
563 U.S. 493 (2011)........................................................................113

*California v. American Stores Co.,*
495 U.S. 271 (1990)........................................................................140

*Chase Manufacturing, Inc. v. Johns Manville Corp.,*
84 F.4th 1157 (10th Cir. 2023) ......................................................105

*Conwood Co., L.P. v. United States Tobacco Co.,*
290 F.3d 768 (6th Cir. 2002)......................................................83, 84

*Dream Big Media Inc. v. Alphabet Inc.,*
No. 24-4968, 2025 WL 3485388 (9th Cir. Dec. 4, 2025).....................59

*Eastman Kodak Co. v. Image Technical Services, Inc.,*
504 U.S. 451 (1992)..........................................................................82

---

\*      Authorities upon which we chiefly rely are marked with asterisks.

Page(s)

*Eisai, Inc. v. Sanofi Aventis U.S., LLC,*
821 F.3d 394 (3d Cir. 2016) ..............................................................97

*Endure Industries, Inc. v. Vizient Inc.,*
164 F.4th 405 (5th Cir. 2026) ...........................................................51

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.,*
542 U.S. 155 (2004)..........................................................................140

*Fishman v. Estate of Wirtz,*
807 F.2d 520 (7th Cir. 1987)...........................................................138

*Ford Motor Co. v. United States,*
405 U.S. 562 (1972)....................................38, 111, 122, 127, 136, 138

*FTC v. Actavis, Inc.,*
570 U.S. 136 (2013)........................................... 45, 79, 101, 102, 103

*FTC v. H.J. Heinz Co.,*
246 F.3d 708 (D.C. Cir. 2001) ..........................................................50

*FTC v. Meta Platforms, Inc.,*
775 F. Supp. 3d 16 (D.D.C. 2024) .....................................................92

*FTC v. Motion Picture Advertising Service Co.,*
344 U.S. 392 (1953)...........................................................................97

*FTC v. Penn State Hershey Medical Center,*
838 F.3d 327 (3d Cir. 2016) ..............................................................37

*FTC v. Wilh. Wilhelmsen Holding ASA,*
341 F. Supp. 3d 27 (D.D.C. 2018) .....................................................53

*Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc.,*
386 F.3d 485 (2d Cir. 2004) ........................................... 54, 55, 82, 137

*Gilbertville Trucking Co. v. United States,*
371 U.S. 115 (1962).........................................................................129

Page(s)

*Ginsburg v. InBev NV/SA,*
623 F.3d 1229 (8th Cir. 2010) ........................................... 139, 140, 141

*Herron v. Fannie Mae,*
861 F.3d 160 (D.C. Cir. 2017) ..........................................................64

*Huerta v. Ducote,*
792 F.3d 144 (D.C. Cir. 2015) ..........................................................90

*In re EpiPen Marketing, Sales Practices & Antitrust Litigation,*
44 F.4th 959 (10th Cir. 2022) ..........................................................97

\*In re Google Play Store Antitrust Litigation,*
147 F.4th 917 (9th Cir. 2025) ..............2, 47, 62, 88, 110, 118, 119, 120

*In re Google Play Store Antitrust Litigation,*
664 F. Supp. 3d 981 (N.D. Cal. 2023) ................................................96

*In re White,*
64 F.4th 302 (D.C. Cir. 2023) ........................................................129

*International Boxing Club of N.Y., Inc. v. United States,*
358 U.S. 242 (1959) ........................................................................112

*International Salt Co. v. United States,*
332 U.S. 392 (1947) .............................................................. 113, 135

*Klein v. Facebook, Inc.,*
580 F. Supp. 3d 743 (N.D. Cal. 2022) ...............................................94

*Law v. NCAA,*
134 F.3d 1010 (10th Cir. 1998) ......................................................134

*LePage's Inc. v. 3M,*
324 F.3d 141 (3d Cir. 2003) ............................................................84

*Liu v. SEC,*
591 U.S. 71 (2020) ..........................................................................132

*Massachusetts v. Microsoft Corp.,
373 F.3d 1199 (D.C. Cir. 2004)...5, 38, 48, 108, 111, 113, 114, 115, 123

McWane, Inc. v. FTC,
783 F.3d 814 (11th Cir. 2015)............................... 55, 67, 75, 82, 85, 87

Musgrave v. Warner,
104 F.4th 355 (D.C. Cir. 2024).........................................................38

National Society of Professional Engineers v. United States,
435 U.S. 679 (1978)...................................................... 2, 111, 112, 138

NCAA v. Alston,
594 U.S. 69 (2021)................................................. 108, 120, 137, 138

New York ex rel. Schneiderman v. Actavis PLC,
787 F.3d 638 (2d Cir. 2015) .................................................................53

New York v. Actavis, PLC,
No. 14 CIV. 7473, 2014 WL 7015198 (S.D.N.Y. Dec. 11, 2014) ..........53

New York v. Meta Platforms, Inc.,
66 F.4th 288 (D.C. Cir. 2023)..........................................................72

*New York v. Microsoft Corp.,
224 F. Supp. 2d 76 (D.D.C. 2002) .................... 5, 30, 114, 115, 118, 123

North American Soccer League, LLC v. U.S. Soccer Federation, Inc.,
883 F.3d 32 (2d Cir. 2018) ..............................................................82

Northern Pacific Railway Co. v. United States,
356 U.S. 1 (1958)..........................................................................137

Novell, Inc. v. Microsoft Corp.,
731 F.3d 1064 (10th Cir. 2013).......................................................105

NYNEX Corp. v. Discon, Inc.,
525 U.S. 128 (1998).......................................................................94

Page(s)

*Ohio v. American Express Co.*,
    585 U.S. 529 (2018) ............................................................... 49, 58, 60

*Optronic Technologies, Inc. v. Ningbo Sunny Electronic Co.*,
    20 F.4th 466 (9th Cir. 2021) ..................................................... 112, 120

*Otter Tail Power Co. v. United States*,
    410 U.S. 366 (1973) ................................................................ 101, 139

*Palmer v. BRG of Georgia, Inc.*,
    498 U.S. 46 (1990) ......................................................................... 101

*Perioperative Services & Logistics, LLC v. United States Department of Veterans Affairs*,
    57 F.4th 1061 (D.C. Cir. 2023) ......................................................... 91

*PhantomALERT Inc. v. Apple Inc.*,
    -- F.4th --, 2026 WL 2131786 (D.C. Cir. July 24, 2026) ............... 62, 76

*Rambus Inc. v. FTC*,
    522 F.3d 456 (D.C. Cir. 2008) ......................... 44, 84, 92, 93, 94, 95, 98

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979) ....................................................................... 137

*Retractable Technologies, Inc. v. Becton Dickinson & Co.*,
    842 F.3d 883 (5th Cir. 2016) ............................................................ 75

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986) .......................................................... 58

*Schine Chain Theatres v. United States*,
    334 U.S. 110 (1948) ....................................................................... 112

*Shea v. Kerry*,
    796 F.3d 42 (D.C. Cir. 2015) ............................................................ 60

*Smith v. District of Columbia*,
    No. 21-7006, 2022 WL 758070 (D.C. Cir. Mar. 4, 2022) .................... 38

*SmithKline Corp. v. Eli Lilly & Co.*,
575 F.2d 1056 (3d Cir. 1978) ......................................83

*SmithKline Corp. v. Eli Lilly & Co.*,
427 F. Supp. 1089 (E.D. Pa. 1976) .................................83

***Southern Pacific Communications Co. v. AT&T Co.*,
740 F.2d 980 (D.C. Cir. 1984) ........................ 43, 44, 75, 88

*Standard Oil Co. of Cal. v. United States*,
337 U.S. 293 (1949) ...................................................92

*Tampa Electric Co. v. Nashville Coal Co.*,
365 U.S. 320 (1961) ..........................................51, 67, 71

*Tennessee Valley Authority v. Hill*,
437 U.S. 153 (1978) ....................................... 126, 128

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001) ..........................................50

*U.S. Horticultural Supply v. Scotts Co.*,
367 F. App'x 305 (3d Cir. 2010) ....................................59

*United Shoe Machinery Corp. v. United States*,
258 U.S. 451 (1922) ...................................................71

*United States v. American Tobacco Co.*,
221 U.S. 106 (1911) ........................ 126, 138, 139, 141, 142

*United States v. Anthem, Inc.*,
855 F.3d 345 (D.C. Cir. 2017) .................................37, 79

*United States v. Continental Can Co.*,
378 U.S. 441 (1964) ...................................................50

*United States v. Crescent Amusement Co.*,
323 U.S. 173 (1944) ..................................................139

Page(s)

*United States v. Dentsply International, Inc.*,
  399 F.3d 181 (3d Cir. 2005) ............................................. 75, 77, 87, 89

\*United States v. E. I. du Pont de Nemours & Co.*,
  366 U.S. 316 (1961) ................................2, 6, 7, 48, 49, 125, 126, 127,
  ................................................128, 129, 133, 134, 136, 139, 141, 142

*United States v. E. I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956) ...............................................................51, 52

*United States v. E. I. du Pont De Nemours & Co.*,
  177 F. Supp. 1 (N.D. Ill. 1959) ..................................................133, 142

*United States v. Google LLC*,
  No. 25-5016, 2025 WL 880552 (D.C. Cir. Mar. 21, 2025) ...........29, 131

*United States v. Google LLC*,
  778 F. Supp. 3d 797 (E.D. Va. 2025) ...............................................96

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966) ...............................................................88, 111

\*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) .... 1, 2, 3, 24, 25, 26, 29, 30, 36, 37, 38, 41,
  ...42, 44, 46, 47, 51, 60, 62, 63, 64, 66, 67, 68, 69, 70, 71, 72, 75, 76, 77,
  ...78, 79, 81, 83, 84, 87, 88, 89, 90, 91, 92, 93, 94, 95, 97, 101, 102, 104,
  .................... 105, 107, 109, 110, 111, 113, 114, 118, 119, 122, 123, 124

*United States v. Microsoft Corp.*,
  87 F. Supp. 2d 30 (D.D.C. 2000) ....................................................67

*United States v. Microsoft Corp.*,
  84 F. Supp. 2d 9 (D.D.C. 1999) ...............................................69, 101

*United States v. Oakland Cannabis Buyers' Co-operative*,
  532 U.S. 483 (2001) ....................................................................128

*United States v. Philadelphia National Bank*,
  374 U.S. 321 (1963) .......................................................................62

# TABLE OF AUTHORITIES—Continued

Page(s)

*United States v. Topco Associates, Inc.*,
  405 U.S. 596 (1972)................................................................135

*United States v. Union Pacific Railroad Co.*,
  226 U.S. 470 (1913)................................................................127

*United States v. United Shoe Machinery Corp.*,
  391 U.S. 244 (1968)................................................ 111, 119, 127, 142

*United States v. United Shoe Machinery Corp.*,
  110 F. Supp. 295 (D. Mass. 1953)......................................................119

*United States v. United States Gypsum Co.*,
  340 U.S. 76 (1950).....................................................................112

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLC*, 540 U.S. 398 (2004)..................................................137

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  395 U.S. 100 (1969)................................................ 113, 122

*\*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012) .......................67, 71, 72, 77, 78, 82, 83, 87

**Statutes**

15 U.S.C. § 1 .............................................................. 60, 107

*15 U.S.C. § 2 ................................. 1, 4, 21, 29, 42, 46, 71, 76, 83, 84, 88,
  ...................................................... 92, 101, 105, 107, 113

*15 U.S.C. § 4 ........................................................... 39, 48, 110, 141

15 U.S.C. § 26 .......................................................................141

28 U.S.C. § 1291 .....................................................................7

28 U.S.C. § 1331 .....................................................................7

28 U.S.C. § 1337(a)..................................................................7

Page(s)

28 U.S.C. § 1343 .................................................................7

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (updated May 2026) ..............................3, 31, 75, 83, 101, 111, 128, 138

U.S. Department of Justice & Federal Trade Commission, *Merger Guidelines* § 4.3 (2023) .......................................................50

# GLOSSARY

GenAI            Generative Artificial Intelligence

GSE              General Search Engine

IAP              Internet Access Provider

ISA              Internet Services Agreement between Apple and Google

MADA             Mobile Application Distribution Agreement

OEM              Original Equipment Manufacturer

SVP              Specialized Vertical Provider

# INTRODUCTION

Google maintained its monopolies in general search services and general-search-text advertising by paying over $26 billion annually in long-term agreements making Google the exclusive default search engine on browsers and devices. In opinions totaling over 500 pages, the district court detailed how those agreements foreclosed roughly half the search market and starved rivals of the data necessary to improve their products, thus preventing effective competition. This was a straightforward violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, under *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc).

The court found that improving search-engine quality requires obtaining user data at scale and that, by foreclosing the default channel for search distribution, the agreements "persistently widen[ed] the data moat" between Google and its competitors, "ensuring that rivals could not achieve a degree of quality that would pose a threat to Google." JA__(Rem.Op.79). Google's agreements also gave it a stranglehold over distribution—preventing rivals from efficiently reaching consumers and making search a "no fly zone" for venture-capital investment.

JA__(Liab.Op.237). This conduct was unlawful: even if a firm has lawfully acquired a monopoly, it "'is not entitled to maintain and magnify' the relevant network effects by entrenching its dominance through anticompetitive conduct." *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 949 (9th Cir. 2025).

To remedy Google's violations, the court properly enjoined Google's exclusive contracting practices and ordered data-sharing and syndication remedies to alleviate Google's ill-gotten scale and revenue advantages so rivals can compete effectively with Google. JA__(Rem.Op.108); JA__(Rem.Op.130) (data-sharing); JA__(Rem.Op.171) (syndication). These remedies were reasonable measures to "restore competition," *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961), and "eliminat[e] the consequences of the illegal conduct," *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 698 (1978).

Google argues the court "piled error upon error." Br.37. But, throughout the proceedings below, Google demanded showings that "the law does not require," JA__(Liab.Op.218), "stretche[d] *Microsoft[]* beyond recognition," JA__(Rem.Op.67), and made legal arguments that

2

are "simply not true," JA__(F.J.Op.17). Google now ignores key factual findings and repeats many erroneous arguments, asking this Court to create rigid and anemic legal rules ungrounded in law or policy.

For instance, Google claims that "an agreement that *permits* a counterparty to deal with rivals cannot be exclusive." Br.70. False. *Microsoft* held that agreements making certain products the "default" and agreements controlling the most efficient channel of distribution were exclusive. 253 F.3d at 70-71, 76. And Google argues that its conduct cannot be unlawful because it offered the "best product and the best price." *E.g.*, Br.6. Again, false. Even if Google had the best product and price, it did not have the right to hobble its rivals through exclusionary contractual conditions. *See* Phillip E. Areeda & Herbert Hovenkamp*, Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶651d (updated May 2026) (hereinafter, Areeda) ("conduct that prevents actual or potential rivals from competing or that impairs their opportunities to do so effectively" is anticompetitive).

Google also attacks strawmen instead of the court's actual findings and reasoning. For instance, Google claims that the court found it liable for mere "competition on the merits." *E.g.*, Br.44-45. But

the court distinguished "exclusionary conduct" from "growth or development as a consequence of a superior product, business acumen, or historical accident," JA__(Liab.Op.198), and made clear "this case" is "about [Google's] efforts to maintain [its] position *through means other than competition on the merits*," JA__(Liab.Op.202) (emphasis added). Google violated Section 2 because, "[l]ike Microsoft before it," Google "thwarted true competition by foreclosing its rivals from the most effective channels of search distribution" through long-term exclusive deals. *Id.*

The court thus agreed with Google that conduct is not exclusionary simply because "a competitor remains unable to increase its market share." JA__(Liab.Op.220); Br.39, 48-49. But the court found *more* than that here: rivals were not merely *unable* to get more share but *blocked* from doing so by Google's long-term exclusive agreements. By foreclosing half of the search market for years-long periods, the agreements deprived rivals of the data and scale they needed to improve their quality and compete effectively. Google then used its monopoly profits from its agreements to secure new long-term exclusive

deals, and the exclusionary cycle perpetuated itself. JA__(Liab.Op.226-34). Google does not challenge these findings as clearly erroneous.

Google likewise accuses the court of basing remedies on its "subjective 'confidence' in its liability determinations." Br.93. In fact, the court applied the "proportionality" standard from *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 102 (D.D.C. 2002), *aff'd sub nom. Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004) (en banc), which Google has endorsed elsewhere as "the appropriate legal framework" for causation, Google LLC's Response to Plaintiffs' Proposed Final Judgment ¶¶87, 93, *United States v. Google LLC*, No. 1:23-cv-000108-LMB-JFA (E.D. Va. Sept. 19, 2025), ECF No. 1761. And the court made *five pages of findings* on the causal connection between Google's conduct and its monopolies, JA__ (Rem.Op.77-82)—findings that Google does not challenge and that belie Google's claim that the court "excused a lack of causation findings," Br.90.

Google demands "clear rules for how businesses can conform their conduct to the law." Br.85. But the applicable law is clear—a monopolist may not lock up the most efficient distribution channels and prevent its rivals from competing effectively. Google simply broke that rule, and

while doing so, covered its tracks by systematically destroying internal employee communications, including for several years *after* receiving a litigation hold, JA__(Liab.Op.273), and training employees "not to create 'bad' evidence" that could be used by "regulators and litigants," JA__(Liab.Op.275). After a decade-plus of monopolization and five-plus years of litigation, the court correctly held Google accountable.

But, as Plaintiffs' cross-appeal explains, the court committed one legal error in rejecting Plaintiffs' request for a ban on Google's search-related payments to distributors (a payment ban). Courts have a "duty" to provide complete and effective relief for antitrust violations, *du Pont*, 366 U.S. at 327-28, but the court never determined whether a payment ban was needed for complete and effective relief. Indeed, the court recognized that, "[d]ue to Google's massive financial advantage and its superior monetization," without a payment ban "distributors will be incentivized to stick with Google because it can pay more, thus leaving in place the very forces that effectively have made the ecosystem exceptionally resistant to change." JA__(Rem.Op.127) (cleaned up). But the court nonetheless rejected a payment ban based on potential harm to Google's business partners and, in turn, the

6

possibility of "downstream effects" in other markets. JA__(Rem.Op.123). That was legal error under *du Pont* because such considerations are secondary to restoring competition in the relevant market and thus come into play only when choosing among two or more *effective* remedies.

While the court might "revisit" a payment ban later, JA__(Rem.Op.128), correcting this error now is important. Emerging Gen AI products pose "a potential threat to Google's dominance," JA__(Rem.Op.100), and a competitive window may close if Google can continue using its monopoly profits—fruits of its monopolizing conduct—to squelch the threat.

## JURISDICTIONAL STATEMENT

The district court has jurisdiction under 28 U.S.C. §§ 1331, 1337(a), 1345, and entered judgment on December 5, 2025, JA__(Dkt.1462). Google timely appealed. JA__(Dkt.1472). Plaintiffs timely cross-appealed. JA__(Dkt.1484-85); *see* JA__(Dkt.1466). This Court's jurisdiction rests on 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

Google's appeal raises:

1.      Whether the district court properly defined a market for general search services given its unchallenged factual findings that general search engines have unique characteristics and uses, are recognized in the industry as distinct products, and require extraordinary investments of time and capital to produce.

2.      Whether the district court correctly found that Google has monopoly power in the relevant market for general-search-text advertising given that Google charges supracompetitive ad prices and enjoys dominant market share protected by barriers to entry.

3.      Whether the district court appropriately found Google's long-term agreements setting it as the only preset default general search engine on browsers and devices—the most efficient channel of search distribution—to be exclusive in practice under *Microsoft*.

4.      Whether the district court properly found that Google's long-term distribution agreements harmed competition by substantially foreclosing access to the general-search market, denying rivals scale (a

critical input in search), and reducing incentives for entry and investment.

5. Whether the district court permissibly exercised its discretion in (i) ordering data-sharing and syndication remedies to redress Google's ill-gotten data and scale advantages from the violations and (ii) extending those remedies to GenAI companies with plans to compete against general search engines to prevent Google from repeating its anticompetitive conduct to quash the potential threat from GenAI.

Plaintiffs' cross-appeal raises:

Whether the district court erred by rejecting a payment ban without first determining whether a remedy lacking a payment ban would effectively redress Google's violations and restore competition in the monopolized markets.

## STATUTES AND REGULATIONS

Pertinent statutes are in the Addendum.

## STATEMENT OF THE CASE

### A. General Search Engines and Their Ads.

Millions of Americans use general search engines (GSEs) to find information on the internet. A GSE compiles a search index by "crawl[ing] the web" and copying web pages into its database. JA__(Liab.Op.14-15). When users submit queries to the GSE, it retrieves the most relevant web pages; ranks them for responsiveness; and returns links to the top results. JA__(Liab.Op.15-16, 19).

Most queries are "noncommercial," meaning that "the GSE does not attempt to monetize [them] by delivering a search advertisement." JA__(Liab.Op.17). But when a query conveys commercial intent—e.g., because it "seeks information on a product or service"—a results page generally displays both advertisements and "organic links" (i.e., unpaid search results that link directly to web pages). JA__(Liab.Op.17-20). The two primary types of ads on GSEs are text ads and "product listing ads." JA__(Liab.Op.59).



JA__(Liab.Op.60).

Text ads "resemble" organic links and are "the predominant form of advertising on Google." JA__(Liab.Op.60-62). Text ads "can be used to advertise almost any product or service," and advertisers purchase them by bidding to have their ads shown in response to keywords, i.e., words contained within a user's query. JA__(Liab.Op.61, 63-64). Product listing ads, by contrast, "are used to market only tangible

11

goods." JA__(Liab.Op.61). Thus, many advertisers can purchase only text ads. JA__(Liab.Op.62).

User data—e.g., what queries users enter and what results they select—are "critical input[s]" for GSEs. JA__(Liab.Op.34-35). More data, or "scale," enable a GSE to improve its quality by crawling the web for more popular sites, ensuring its index covers frequent queries, and serving more relevant results. JA__(Liab.Op.34-36). Improved quality, in turn, attracts more users, thereby increasing advertising revenue. JA__(Liab.Op.231). And increased revenue can be spent on "traffic acquisition"—i.e., buying distribution—and investments in the GSE, enabling the continued acquisition of scale. *Id.* "This interplay among queries, data, quality, and revenue creates a positive feedback loop, known as 'network effects.'" JA__(Rem.Op.87). But if a GSE cannot access sufficient user data, a negative feedback loop ensues, with the GSE unable to improve its quality and, in turn, unable to compete effectively for distribution and advertising revenue. JA__(Rem.Op.88).

Google has long been the dominant GSE in the United States. In 2009, it received 80% of U.S search queries. JA__(Liab.Op.13). By 2020, that share had grown to nearly 90%—and nearly 95% on mobile

12

devices. JA__(Liab.Op.13-14). Microsoft's Bing GSE, "Google's second-place rival," receives just 6% of all U.S. queries, and only 1.3% of U.S. mobile queries. JA__(Liab.Op.14).

## B. Google's Control of Search Defaults Prevents Effective Competition.

Google has blocked effective competition in search through its longstanding control over the primary search distribution channel: preloaded defaults. JA__(Liab.Op.204-26).

### 1. Preloaded defaults are a critical distribution channel for GSEs.

Relatively few users access a GSE by navigating to its web address (e.g., www.google.com). Instead, most use other "search access points," such as the integrated search/navigation bar in web browsers; search "widget" applications; freestanding search applications; or browser bookmarks. JA__(Liab.Op.24, 31-34).

For GSEs, the "most efficient channel" among these "is, by far, placement as the preloaded, out-of-the-box default GSE" on a device. JA__(Liab.Op.24). On an Apple product, this means being preset as the default GSE for the integrated search/navigation bar in the Safari browser. *Id.* On an Android device, it means being preset as the default

GSE in Google's Chrome browser and having the GSE's search widget preloaded on the home screen. *Id.*

Defaults powerfully influence user behavior. Although users can access a non-default GSE by changing the default or downloading a new browser, search widget, or search application, JA__(Liab.Op.25, 31), "the market reality is that users rarely do so," JA__(Liab.Op.221). "Many users do not know that there is a default search engine, what it is, or that it can be changed." JA__(Liab.Op.27). And even users aware of the default may be discouraged from switching to a different GSE by "choice friction"—i.e., the difficulty locating and changing search settings or downloading different apps (especially on mobile devices). JA__(Liab.Op.27-28).

### 2. For years, Google paid distributors tens of billions of dollars annually to be the exclusive default GSE.

Recognizing that "[a] GSE's placement as the default [] drives search volume," JA__(Liab.Op.29), Google entered into agreements that paid browser companies, phone manufacturers (OEMs), and wireless carriers a share of its search-advertising revenue to make Google the exclusive preloaded default GSE on their devices and browsers. *E.g.*, JA__(Liab.Op.101). By 2021, Google was paying distributors *$26.3*

*billion per year* under these contracts—almost four times all its other search-related costs combined. *Id.*

### a. Browser agreements

Google paid to be the exclusive out-of-the-box default GSE on major web browsers. JA__(Liab.Op.115, 118). Most prominently, Google has long been the contractually-mandated exclusive default GSE in Apple's Safari browser. JA__(Liab.Op.101). Google's initial GSE license to Apple did not require exclusivity—Apple could also preload other GSEs. JA__(Liab.Op.108). But in 2005, "after it grew concerned that Yahoo might replace Google," Google began paying Apple a share of its search-advertising revenue in exchange for default exclusivity. JA__(Liab.Op.109).

That arrangement continued for over twenty years, even as Apple repeatedly "sought greater flexibility to grant its users access to other GSEs." JA__(Liab.Op.110-11). In 2009 and 2012, Apple sought the option to make other GSEs the default while still receiving revenue share. JA__(Liab.Op.110). "Google stood firm that '[i]f they wanted to receive revenue share,' Apple had to maintain Google as the exclusive Safari default." *Id.*

### b. *Agreements with Android OEMs*

Google also contracted with OEMs of Android mobile devices to secure default status.

*MADA.* The Mobile Application Distribution Agreement (MADA) licensed Google's proprietary Android apps to OEMs, including Motorola and Samsung. Most prominently, the MADA licensed the Google Play Store, an app store essential to the Android user experience and required to run other Google apps. JA__(Liab.Op.118-20). The MADA license was royalty-free; in exchange, OEMs had to place Google's search widget on their devices' home screens and preload Chrome (on which Google is the default GSE) and the Google Search app. *Id.*

Although the MADA nominally allowed OEMs to preload additional browsers and search widgets, only Samsung did. JA__(Liab.Op.121-22, 210). OEMs consider preloading duplicative apps "a suboptimal design that would degrade the user experience." JA__(Liab.Op.121-22).

*Revenue Share Agreements.* Google agreed to pay search-revenue share to Samsung and Motorola in exchange for making Google

the default on certain search access points. JA__(Liab.Op.128-31). The agreements also prohibited preinstalling or promoting any "Alternative Search Service" that was "substantially similar to Google Search." JA__(Liab.Op.129-31).

### c. Wireless-carrier agreements

Because consumers buy most Android devices from wireless carriers, JA__ (Liab.Op.128), Google agreed to pay search-revenue share to Verizon, AT&T, and T-Mobile in exchange for making Google the exclusive default on certain search access points. JA__(Liab.Op.123). The agreements also prohibited preinstalling or promoting rival search services. JA__(Liab.Op.129-31).

Although OEMs and carriers could distribute Android devices without entering into a revenue-share agreement, they did not do so because "[t]he foregone revenue is simply too great." JA__(Liab.Op.213). Thus, the revenue-share agreements had "the 'practical effect' of inducing exclusive dealing," forcing distributors "to make an all-or-nothing choice." *Id.*

### 3. Google's control of the defaults deprived rivals of the means to compete effectively.

Google's agreements ensured that it would receive the lion's share of search queries. In total, roughly 50% of U.S. queries flowed through search access points covered by these exclusive-default agreements. JA__(Liab.Op.25). Another 20% of queries were on user-downloaded Chrome, which likewise defaults to Google. *Id.* Google's "default placements [thus] dr[o]ve significant traffic to Google." JA__(Liab.Op.228). Indeed, Google received "nine times more queries each day than all of its rivals *combined*," and *nineteen* times more on mobile devices. JA__(Liab.Op.34). Rivals thus were systematically disadvantaged in competing for future deals.

### a. Google denied rivals the scale needed to compete effectively with Google.

"Greater query volume means more user data, or 'scale.'" JA__(Liab.Op.34). GSEs collect "click data" with every query, including which results a user clicks on, how long the user spends on the results page, and whether the user returns to the results page after clicking on a link. *Id.* They also accumulate "query data" to learn more about "what information users are looking for." JA__(Liab.Op.35).

18

"At every stage of the search process, user data is a critical input that directly improves quality." JA__(Liab.Op.35). User data help GSEs determine which sites to add to their indices and interpret queries (e.g., misspelled queries). JA__(Liab.Op.35-36). User data are also critical to ranking sites based on their relevance to a query. JA__(Liab.Op.36-39). User data "help[] determine where a webpage resides within the larger index" and help answer long-tail queries that are rarely entered. JA__(Liab.Op.35-36). And user data are used "to run large-format experiments to develop new [GSE] features." JA__(Liab.Op.230).

The agreements denied Google's rivals access to the user data "needed to effectively compete." JA__(Liab.Op.226). As a result, "other GSEs have remained at a persistent competitive disadvantage, and new entrants cannot hope to achieve a scale that would allow them to compete with Google." *Id.* Meanwhile, Google used its "startling" "scale advantage" to widen the gap further. JA__(Liab.Op.230). For example, Google used thirteen months' worth of user data to train a ranking signal, but obtaining the same amount of data would take Microsoft over seventeen *years*. JA__(Liab.Op.37). The diversion of user data to Google disproportionately hurts rivals: "[f]or GSEs with little scale,

19

even a small amount of data can result in meaningful improvements."

JA__(Liab.Op.39).

### b. Greater query volume inflates Google's revenue at rivals' expense.

"There is a direct relationship between a GSE's scale and its monetization of search advertising." JA__(Liab.Op.59). With more queries, a GSE can run more ads. *Id*. Moreover, advertisers allocate spending among GSEs based on market share. JA__(Liab.Op.264). Thus, because Google receives 90% of queries, advertisers will spend roughly 90% of their text-ad dollars on Google. JA__(Liab.Op.79). Additionally, "[u]nderstanding which advertisements users click on (or scroll past) enables Google to evaluate ad quality and serve more relevant ads in the future," generating more clicks and revenue. JA__(Liab.Op.230). And because Google lacks meaningful competition, Google can increase ad prices. JA__(Liab.Op.259).

Conversely, lack of access to scale and users has hamstrung rivals financially. Blocked from effective distribution, rival GSEs could not make enough money to compete. Neeva, a short-lived rival, was a case in point. Founded by a former Google executive and based on a subscription model, JA__(Liab.Op.11), Neeva successfully "secured the

capital and human resources needed to build a search engine,"
JA__(Liab.Op.30). Neeva built its own search index, developed a
ranking model that leveraged AI, and could answer 60% of queries
itself. *Id.* But Neeva "could not gain a foothold in the market in part
because it was relegated to less efficient means of distribution."
JA__(Liab.Op.237). It consequently shut down within four years of
launching its GSE. JA__(Liab.Op.163).

## C.  The District Court Found Google Violated Section 2.

In 2020, the United States and eleven states (U.S. Plaintiffs), and
38 jurisdictions, led by Colorado, sued Google for violating Section 2; the
suits were consolidated.[1] After extensive discovery, the record closed in
June 2022. *See* Dkt.357.3-4.

Following summary-judgment proceedings and a ten-week trial
involving testimony from 48 live witnesses, another 40 testifying by
designation, and 4,598 admitted exhibits, the court applied the legal
framework from *Microsoft* and found that Google had unlawfully

---

[1]     The Colorado Plaintiffs brought additional allegations not
relevant to this appeal.

maintained monopolies in general-search-services and general-search-text-advertising markets.

***Monopoly Power in General Search.*** The court first defined a general-search-services market. JA__(Liab.Op.140-46). The court applied the "'practical indicia' identified by the Supreme Court in *Brown Shoe Company v. United States*, 370 U.S. 294 (1962)," JA__(Liab.Op.138), and found that GSEs and other products were not "reasonably interchangeable by consumers for the same purposes," JA__(Liab.Op.147-48). The court found that GSEs perform the "unique function" of answering all queries and directing users elsewhere on the web. JA__(Liab.Op.143-44). GSEs were not reasonably interchangeable, for that purpose, with social media platforms and "specialized vertical providers" (SVPs)—i.e., platforms answering queries on a particular subject matter (e.g., Expedia for travel). JA__(Liab.Op.50). In particular, GSEs and SVPs were "complementary goods," not "true substitutes." JA__(Liab.Op.150).

The court then found that Google had monopoly power in the general-search-services market due to its 89% market share—nearly 95% on mobile devices—and the market's high entry barriers: enormous

capital costs, Google's control of key distribution channels, and Google's dominant brand. JA__(Liab.Op.152-161).

*Monopoly Power in Search Text Ads.* The court also defined a general-search-text-advertising market. JA__(Liab.Op.185-89). Again applying *Brown Shoe*, the court found that text ads are not reasonably interchangeable with other ads. *Id*. The court held that Google had monopoly power in this market given Google's 88% market share, high barriers to entry, and direct evidence of monopoly power: Google sets prices without "consider[ing] competitors' pricing" and "profitably raised prices substantially above the competitive level." JA__(Liab.Op.189-91).

*Prima Facie Case.* The court next found that Plaintiffs had established a *prima facie* case that Google's distribution agreements were anticompetitive.

At the outset, the court recognized anticompetitive conduct as "conduct, other than competition on the merits or restraints reasonably 'necessary' to competition on the merits, that reasonably appears capable of making a significant contribution to creating or maintaining monopoly power." JA __(Liab.Op.199.n.8) (quoting *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 230 (1st Cir. 1983) (Breyer, J.)).

The court rejected Google's argument that its contracts resulted from successful "competition for the contract." JA__(Liab.Op.198-203). In particular, the record established that "[t]here is no genuine 'competition for the contract,'" JA__(Liab.Op.200), due in significant part to the anticompetitive effects of Google's agreements, *see* JA__(Liab.Op.201-02).

The court then found that Google maintained its monopolies "through means other than competition on the merits," JA__(Liab.Op.202), explaining that Google's contracts were "exclusive" under *Microsoft*, JA__(Liab.Op.204-214), and exclusionary in effect, JA__(Liab.Op.214-247, 258-265).

1.     The court found that Google's browser agreements "are exclusive [under *Microsoft*] insofar as they establish Google as the out-of-the-box default search engine." JA__(Liab.Op.204). While developers could reach "limited distribution deals" with other GSEs, the remaining distribution channels were much less efficient. JA__(Liab.Op.206). Likewise, while users could navigate on their own to rival GSEs, "they rarely do." JA__(Liab.Op.209).

24

The court similarly found the MADAs "exclusive in practice." JA__(Liab.Op.210). Under the MADA, to license the must-have Google Play Store, Android OEMs had to put the Google Search Widget on their home screens and preload the Chrome browser, which effectively excluded rival apps because OEMs generally do not preload multiple applications of the same kind. *Id.*

The court also found that Google's revenue-share agreements with Android OEMs and wireless carriers "formalize[d] the practical exclusivity of the MADAs" by prohibiting Android partners from preloading rival GSEs. JA__(Liab.Op.212). Although Android distributors were not *required* to sign revenue-share agreements, "[n]o rational market actor would sell a MADA-compliant device without ensuring that it earned search revenue." JA__(Liab.Op.213).

2. Next, the court found that the exclusive contracts were prima facie anticompetitive under *Microsoft* because they foreclosed a significant portion of the relevant markets and had other anticompetitive effects.

The court found that the agreements foreclosed 50% of the search market—the share of queries run through default search access points

25

covered by Google's agreements, JA__(Liab.Op.217, 222)—which constituted significant foreclosure, JA__(Liab.Op.223) (citing *Microsoft*, 253 F.3d at 70-71). That Google's contracts were years-long and "not easily terminable" "amplifie[d] the significance of [this] market foreclosure." JA__(Liab.Op.224). Moreover, there was no competitive rebidding for the agreements, with partners renewing "without genuine consideration of an alternative." JA__(Liab.Op.225).

Additionally, the agreements "den[ied] rivals access to user queries, or scale, needed to effectively compete." JA__(Liab.Op.226). "Scale is the essential raw material for building, improving, and sustaining a GSE," and the agreements ensured that rivals "cannot hope to achieve a scale that would allow them to compete with Google." *Id.* This created a "feedback loop" in which distributors continued to pick Google as the default because of its superior quality and monetization ability, "freez[ing] the ecosystem in place." JA__(Liab.Op.227).

Finally, the agreements "reduced the incentive to invest and innovate in search." JA__(Liab.Op.236). Google's revenue-share payments to Apple ($20 billion in 2022) "unquestionably" contributed to

"keeping Apple on the sidelines of search" and "disincentivize[d] Apple from launching its own search engine when it otherwise has built the capacity to do so." JA__(Liab.Op.241-42). Thus, the revenue-share payments from Google to Apple had "an anticompetitive effect" apart from their foreclosure of actual rivals. JA__(Liab.Op.242).

Furthermore, rival GSEs' inability to access efficient channels of distribution discouraged venture-capital funding and rivals' own investment. JA__(Liab.Op.237). For example, it was irrational for Microsoft to invest more in search "when there is little to no genuine opportunity for a default distribution deal." JA__(Liab.Op.239). And venture-capitalists treated search as a "no fly zone" because without the ability to acquire users and scale, even a high-quality GSE could not be profitable. JA__(Liab.Op.237).

Applying similar reasoning, the court found that Plaintiffs established a prima facie case in the general-search-text-advertising market. The agreements foreclosed 45% of the market, which was significant "in light of [the] same factors" in the general-search-services market. JA__(Liab.Op.259). Moreover, the agreements further harmed competition in the general-search-text-ad market by enabling Google to

increase prices, "often between 5% and 15% at a time," through "pricing knobs"—i.e., mechanisms by which "Google can affect the final price paid for an ad." JA__(Liab.Op.259-60). They allowed Google to degrade ad quality by giving advertisers less information and reducing advertisers' control over matching their ads with search keywords. JA__(Liab.Op.263-64). And they compelled advertisers to spend most of their general-search-text-ad dollars with Google, capping rivals' revenue and thus their ability to invest in their products. JA__(Liab.Op.264).

*No Procompetitive Justifications.* Because Plaintiffs established a prima facie case, the burden shifted to Google to show procompetitive justifications for its conduct. The court found that "the record d[id] not sufficiently support any of [Google's] procompetitive justifications." JA__(Liab.Op.248). Google failed to show that many of its purported justifications required exclusivity. *E.g.*, JA__(Liab.Op.249) (browsers working out of the box); JA__(Liab.Op.252) (increased search output); JA__(Liab.Op.253) (better browsers); JA__(Liab.Op.257) (device security). And the court found "no record evidence that competition for

the default has motivated GSEs to make quality improvements."

JA__(Liab.Op.250).

Because Google had not established procompetitive benefits, the

court held that Google had violated Section 2 in both relevant markets.

JA__(Liab.Op.257-58, 265).

### D. The District Court Imposed Significant Remedies for Google's Monopolization.

Following additional discovery and a three-week evidentiary

hearing,[2] the court issued a 223-page opinion. JA__(Rem.Op.). The court

recognized that under *Microsoft*, an antitrust remedy "must seek" to

achieve the remedial objectives of "unfetter[ing] a market from

anticompetitive conduct," "deny[ing] to the defendant the fruits of its

statutory violation, and ensur[ing] that there remain no practices likely

to result in monopolization in the future." JA__(Rem.Op.58) (quoting

*Microsoft*, 253 F.3d at 103).

The court also recognized that the remedy "must reflect the

strength of the causal connection between the anticompetitive behavior

---

[2] Apple filed an untimely motion to intervene in the remedies phase. *United States v. Google LLC*, No. 25-5016, 2025 WL 880552 (D.C. Cir. Mar. 21, 2025).

and the maintenance of monopoly power." JA__(Rem.Op.77). The court applied the "proportionality" standard from *New York v. Microsoft,* under which "[t]he more drastic the remedy, the greater the causal connection required to support it." JA__(Rem.Op.73).

Applying that standard, the court found that Google's agreements "significantly contributed to the maintenance of its monopoly power" and justified remedies beyond a mere prohibition on Google's unlawful conduct. JA__(Rem.Op.77, 82). Although the agreements were not the "sole reason Google maintained its monopoly," JA__(Liab.Op.77), their effects "enabled Google to widen the moats and pull up the drawbridges to ward off competition," JA__(Rem.Op.78). They empowered Google to exploit "default bias" and "network effects"—it "amassed an arsenal of user data" while "starv[ing]" rivals of the same; improved its GSE with the data, getting more users and advertising revenue; and spent some of that bounty on the next round of exclusionary agreements. JA__(Rem.Op.87-88). These findings established "a stronger causal connection than the one sustained in *Microsoft.*" JA__(Rem.Op.81).

The court next identified the "fruits" of the unlawful conduct that Google should be "denied": freedom from threats, scale, and revenue.

JA__ (Rem.Op.82). First, Google's agreements "have allowed it to operate free of any genuine competition for more than 10 years," JA__(Rem.Op.82), justifying remedies "that seek to 'pry open' the channels of distribution Google has long had all to itself," JA__(Rem.Op.88). Next, the agreements put rivals at a scale disadvantage that "ke[pt] them stuck in place, or worse, cause[d] a downward spiral of scale and revenue." JA__(Rem.Op.95). Last, Google's agreements had improved its "monetization of search," and Google used "these monopoly profits" to secure future exclusive deals. JA__(Rem.Op.95-96).

Having identified these fruits, the court rejected Google's argument that the court must "*quantify* the portion of scale and revenue attributable to Google's unlawful conduct." JA__(Rem.Op.97). "[N]o case" supported Google's argument, and "such a stringent standard would be at odds with the Supreme Court's pronouncement that district courts are 'empowered to fashion appropriate restraints' on a defendant to 'eliminate [the] consequences of a violation.'" JA__(Rem.Op.97-98).

***Prohibited Conduct.*** The court enjoined multiple restrictions in the contractual provisions creating exclusivity (largely following

31

Google's proposal). JA__(Rem.Op.105). The court permitted Google to pay distributors (including Apple) to be the default GSE as long as distributors could change defaults each year and set different defaults in different operating-system versions or browsing modes (e.g., "privacy mode"). JA__ (Rem.Op.105, 110).

The court rejected Plaintiffs' request for a broader "payment ban" (including payments not conditioned on exclusivity).[3] Plaintiffs argued that a payment ban would prevent Google from using the fruits of its statutory violation to continue buying defaults and thereby subverting the remedy. Additionally, the ban would redress the independent anticompetitive harm from Google's payments to Apple, which disincentivized Apple from entering the search market. *See* JA__(Liab.Op.242).

The court agreed with Plaintiffs that a payment ban could "stimulat[e] competition" by forcing distributors "to look to other GSEs to earn revenue share" and potentially encouraging new entry. JA__(Rem.Op.120). And it acknowledged that if Google could continue

---

[3] Plaintiffs' proposal would have allowed *some* payments from Google to distributors, including payments unrelated to search and payments for advertising in app stores. JA__(Pls.'.RPFJ. §§ IV.E-G).

paying revenue share, "distributors will be incentivized to stick with Google because it can pay more, thus leaving in place the very forces that 'effectively [have made] the ecosystem exceptionally resist[ant] to change'" and potentially "blunt[ing] the effectiveness of the remedies imposed." JA__(Rem.Op.127).

But the court declined to impose a payment ban because of possible harm to distributors, leading to "downstream effects" in "related markets." JA__(Rem.Op.120, 123-25). The court could not "predict to any degree of certainty that one or more of these effects will in fact occur," but it thought the risk "reason enough not to proceed" with a payment ban. JA__(Rem.Op.125). It also worried that, if any of these risks materialized, that could reduce "consumer welfare." JA__(Rem.Op.126).

The court suggested that continued revenue sharing was "more palatable now than when the liability phase concluded" because GenAI companies were in better financial position to compete than current GSEs. JA__(Rem.Op.127-28). But the court stated that it was "prepared to revisit a payment ban (or lesser remedy) if competition is not

substantially restored through the remedies the court does impose." JA__(Rem.Op.128).[4]

***Required Conduct.*** The court held that although prohibitory relief was "a good start," "Google's proposed remedies do not go far enough." JA__(Rem.Op.107). "Merely excising the exclusive provisions from Google's distribution agreements will not unleash competition," the court found, because such relief would not "address any illegally obtained fruit" of Google's agreements and would leave Google in a "dominant position," JA__(Rem.Op.108), particularly given that the search market is marked by network effects, JA__(Rem.Op.87-88).

The court first rejected Plaintiffs' request that Google divest Chrome, finding insufficient causation for divestiture. JA__(Rem.Op.114-15).[5] But the court required Google to share certain data with "Qualified Competitors."[6] Sharing data with rivals would

---

[4] The court declined to consider "unconditional revenue share" because Plaintiffs had not proposed that remedy and the record on it was thin. JA__(Rem.Op.128.n.14).

[5] Plaintiffs do not cross-appeal the divestiture ruling.

[6] A "Qualified Competitor" is a competitor that meets data security and privacy standards and demonstrates that it has "a plan to invest and compete in or with" in a relevant market. JA__(Rem.Op.103-04).

eliminate "the consequences of the illegal conduct," JA__(Rem.Op.130), and deny Google the scale-related "fruit" of its violations, JA__(Rem.Op.133). The court modified Plaintiffs' data-sharing proposal to "mitigate the[] impact on Google's and competitors' innovation incentives." JA__(Rem.Op.136). Specifically, Google must provide a "one-time snapshot" of certain search-index data, which will give Qualified Competitors a "kick start" on building their own search indexes. JA__(Rem.Op.146). And Google must share certain user-side data, which are "the raw material that Google uses to improve search services," JA__(Rem.Op.152), to enable rivals to improve their products and compete with Google, JA__(Rem.Op.155).

Google also must "syndicate" search results to Qualified Competitors for five years—i.e., "provide[] another GSE the results and content for its [results page]." JA__(Rem.Op.168, 175). "It will take time for a Qualified Competitor to build its own search index and the capacity to deliver high-quality search results." JA__(Rem.Op.170). Syndication enables rivals to deliver quality results in the short term "as they work towards developing a GSE that can independently compete against Google." JA__(Rem.Op.171).

Furthermore, Google must syndicate text ads to Qualified Competitors for five years. JA__(Rem.Op.185). Allowing competitors to syndicate Google's ads is "essential to facilitating competition," as it will mitigate Google's financial advantage accrued partially through anticompetitive conduct. JA__(Rem.Op.183).

Wary of dictating syndication terms, the court looked to "commercial realities already in place," JA__(F.J.Op.38), holding that the syndication remedies' terms should be the "least restrictive" and "no less favorable" or "no worse" than those in Google's existing agreements, JA__(F.J.Op.43). And to encourage Qualified Competitors to develop their own capabilities, the court capped Qualified Competitors' use of Google's search-syndication services in the first year of the license at 40% of queries, with that percentage decreasing over the five-year term. JA__(Rem.Op.177).

***Technical Committee.*** The court established a Technical Committee, as in *Microsoft,* to aid Plaintiffs with enforcing the decree by advising on potential Qualified Competitors and recommending data-security and privacy standards, among other things. JA__(Rem.Op.211-12).

36

***GenAI.*** The court held that the remedies should encompass GenAI companies, to prevent Google from "us[ing] the same anticompetitive playbook for its GenAI products that it used for Search." JA__(Rem.Op.99). Google itself proposed including GenAI products in the prohibitory injunction. *Id.* And the court concluded that GenAI companies with a "plan to invest and compete in or with" the relevant markets would also be eligible for the data-sharing and syndication remedies. JA__(Rem.Op.103-04). It explained that GenAI companies are "a potential threat to Google's dominance in the market for general search services," JA__(Rem.Op.100), and Google thus should not be able to use its anticompetitive advantages to stunt them.

***Final Judgment.*** Following another hearing, the court resolved open issues regarding the text of the Final Judgment and entered judgment. JA__(F.J.); JA__ (F.J.Op.).

## STANDARD OF REVIEW

This Court reviews conclusions of law de novo and factual findings for clear error. *Microsoft*, 253 F.3d at 50-51. "[D]efinition of the relevant market is a factual question dependent upon the special characteristics of the industry involved." *FTC v. Penn State Hershey Med. Ctr.*, 838

F.3d 327, 335 (3d Cir. 2016) (quotation marks omitted). Findings of anticompetitive effect are also reviewed for clear error. *See United States v. Anthem, Inc.*, 855 F.3d 345, 368 (D.C. Cir. 2017). If a party does not challenge the district court's findings as clearly erroneous, the Court must accept them. *Smith v. Dist. of Columbia*, No. 21-7006, 2022 WL 758070, at *4 (D.C. Cir. Mar. 4, 2022).

A district court is "clothed with 'large discretion' to fit the decree to the special needs of the individual case." *Ford Motor Co. v. United States,* 405 U.S. 562, 573 (1972). The remedy is reviewed "only for abuse of discretion." *Massachusetts*, 373 F.3d at 1207. A "material" legal error is an abuse of discretion. *Musgrave v. Warner*, 104 F.4th 355, 365 (D.C. Cir. 2024).

## SUMMARY OF ARGUMENT

Google largely attacks opinions the district court did not write, disregarding key factual findings and the court's actual reasoning. Google's repeated claims of legal error are based on incorrect assertions of the governing law, including *Microsoft*, which controls key aspects of this appeal. The decision below should be affirmed except for its rejection of the payment ban—which the cross-appeal shows was based

on a legal error under controlling precedent on government antitrust remedies under 15 U.S.C. § 4.

**I.A.** The court properly found that Google had monopoly power in general-search-services and general-search-text-advertising markets. To assess monopoly power, courts generally define a relevant market and then determine whether the defendant has the power to control prices or exclude competition in that market. As to the general-search-services market, Google contests the market's existence but *not* the court's finding that Google has monopoly power in that market. As to the general-search-text-advertising market, Google contests the court's finding of monopoly power but *not* the market's existence. Both challenges fail.

1. The court properly defined a general-search-services market excluding SVPs. That market definition was grounded in extensive, unchallenged factual findings that, as a matter of commercial reality, GSEs and SVPs are not reasonably interchangeable by consumers for the same purposes. The court found that GSEs perform a "unique function" that SVPs cannot (answering queries in multiple areas and linking to other websites); industry actors (including Google) treat SVPs

39

as outside the general-search-services market; SVP firms cannot readily produce GSE products; and GSEs and SVPs are complementary goods because consumers' use of SVPs *increases*, rather than decreases, their use of GSEs. Google's claim that all these findings should be ignored because of the "commercial reality" that GSEs only make money on commercial queries that SVPs answer fails thrice over. It is forfeited because Google's market-definition position below was radically different. It is incorrect because under the law, the question here is whether GSEs and SVPs are reasonably interchangeable by *consumers for the same purposes*. And it is immaterial because GSEs make money on multiple types of queries that SVPs do not answer; thus, even narrowing the lens to queries making GSEs money would not show clear error in the court's market definition.

2.     Nor does Google show clear error in the court's finding of monopoly power in general-search-text advertising. Google ignores the court's findings that Google has charged supracompetitive text-ad prices without regard for rivals' prices; that direct evidence alone proves Google's monopoly power. And Google's argument that the text-ad market is "derivative" of the general-search-services market fails; SVPs

do not produce general-search-text ads and thus would not be participants in this market even if they were part of the search market.

**I.B.** The court correctly held that Google's agreements with browser developers, OEMs, and wireless carriers were exclusive deals that harmed competition and lacked procompetitive benefits. On appeal, Google challenges only the court's holding that the browser agreements were anticompetitive. That challenge lacks merit. The court correctly concluded that the agreements were exclusive in practice and found (in unchallenged findings) that they had multiple anticompetitive effects.

1. The court properly found that the browser agreements were exclusive deals under *Microsoft*. The court found that the agreements both expressly required that Google be the only preset default GSE in browsers—the most efficient search-distribution channel by far—*and* were exclusive in practice because they foreclosed all but a few insignificant alternative means of search distribution.

Google's attacks on this holding fail. The limited leeway that browser developers had to distribute rival GSEs under Google's agreements does not disprove the agreements' exclusivity under

*Microsoft*, which held exclusive agreements permitting limited distribution of rivals. Google's attempt to downplay the effect of defaults cannot overcome the court's unchallenged findings that defaults powerfully affect search behavior.

2. Google's oft-repeated refrain that it was held liable for "competition on the merits" is fiction. The court was clear that Google maintained its monopolies "through means other than competition on the merits." *E.g.*, JA__(Liab.Op.202); *id.* (Google "thwarted true competition"). Google's agreements foreclosed rivals from competing for a substantial portion of queries; deprived rivals of the scale needed to improve their quality and compete effectively; and disincentivized actual and potential rivals (like Apple) from investing in search. Those are quintessential harms to competition.

Google's argument rests on a fanciful view of the factual record and a narrow, unsupportable definition of anticompetitive conduct. Under controlling precedent, anticompetitive conduct under Section 2 comprises "conduct, other than competition on the merits or restraints reasonably 'necessary' to competition on the merits, that reasonably appear[s] capable of making a significant contribution to creating or

maintaining monopoly power." *S. Pac. Commc'ns Co. v. AT&T Co.*, 740 F.2d 980, 999 n.19 (D.C. Cir. 1984). That is exactly what the district court found: Google's agreements foreclosing rivals, denying them needed scale, and disincentivizing entry and investment maintained its monopolies "through means other than competition on the merits." JA__(Liab.Op.202). And the agreements "clearly ha[d] a significant effect in preserving [Google's] monopoly." JA__(Liab.Op.216).

Contrary to Google's assertions, anticompetitive conduct is not limited to affirmatively interfering with customers' ability to choose a rival offer. Conduct also is anticompetitive if it harms rivals' ability to *make* competitive offers by, e.g., foreclosing rivals from the market, raising their costs, or strengthening barriers to entry. Google harmed competition in just that way: shutting rivals out of large swaths of the market for years-long periods, thus depriving them of query volume they needed to compete effectively with Google.

That distributors acquiesced in Google's demand for default exclusivity to receive a cut of Google's monopoly rents makes no difference. A contract can contain both features counterparties like *and* anticompetitive conditions, and Google was held liable for the latter.

Accordingly, Google's observation that "win[ning] more customers" will always deny rivals scale misses the mark. Google's agreements went beyond merely "win[ning]" customers; Google imposed anticompetitive conditions locking rivals out of the default distribution channel for years-long periods, which prevented rivals from competing effectively on quality.

Google's arguments that the court used the wrong legal standard to identify anticompetitive conduct are meritless. Although Google contends that the court erred in using the reasonably-appears-capable standard to find anticompetitive conduct, *Southern Pacific* and *Microsoft* both incorporated—either expressly or implicitly—that standard as part of the determination of anticompetitive conduct. That standard denotes when it is reasonable to infer that conduct other than competition on the merits "significantly contributed" to the monopoly.

*Amici* demand a more stringent but-for standard based on *Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008). But *Rambus* followed the exclusionary-conduct standard from *Microsoft*; the FTC's claim failed because it did not meet that standard.

Google also is wrong that, as a matter of law, exclusive dealing cannot be exclusionary without "insistence" that the counterparty cease dealing with rivals. The law is clear that "insistence" is not required. In any event, the decision below *found* that Google "insisted on" exclusive dealing, in findings Google does not challenge as clearly erroneous. Google conditioned revenue-sharing on exclusivity and demanded deals that were all-or-nothing as to default GSE status in the United States (the relevant geographic market). Moreover, Google admits that anticompetitive "insistence" includes "inducements" "with strings attached," which the court also found present. Google's massive revenue-share payments made it economically irrational for distributors to switch default GSEs, thereby inducing exclusivity.

Google's argument that Apple's disincentive to enter general search was not cognizable anticompetitive harm also fails. Paying a potential rival to stay away from a market is a prototypical collusive anticompetitive effect. That effect can occur even when the payments are profitable for the incumbent, as *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013), illustrates.

3. Even assuming arguendo that Google's arguments regarding the browser agreements were correct—and they are not—this Court should still affirm. For instance, even if the district court erred in classifying the browser agreements as exclusive, the court's numerous findings of the agreement's *actual* anticompetitive effects in the marketplace would still make out a prima facie case under Section 2's general inquiry into their competitive effects. Moreover, the judgment also can be affirmed based on the Android agreements alone, which Google does not contest were exclusive and which foreclosed 19.4% or more of the market—sufficient for substantial foreclosure under *Microsoft*. And the judgment can be affirmed based on the court's holding that Google monopolized the general-search-text-ads market, for which the court made additional findings of actual anticompetitive effects—that the agreements allowed Google to charge supracompetitive text-ad prices, degrade its ad quality, and cap rivals' ad revenue—which Google has not challenged.

**II.A.** The court properly exercised its discretion in requiring Google to share certain data with, and syndicate search results and ads to, Qualified Competitors. The court properly applied the

proportionality causation standard from *New York v. Microsoft*. Google's defendant-friendly spins on the remedial causation standard contravene precedent and Google's endorsement of the proportionality standard in other litigation.

Google's attacks on the court's causation findings are meritless. Google contends that the court did not find its conduct had *any* effect on competition, but this simply ignores *five pages* of findings on that point. And *Microsoft* and *Google Play Store* both belie Google's argument that the court needed to measure the amount of market share Google gained through its violation and remedy only that share increase. Courts are neither required nor well positioned to engage in such exercises. Antitrust remedies should stop the violation and restore competition, not micromanage the market. And in eliminating the consequences of a violation, the court need only select a reasonable method, which both the data-sharing and syndication remedies are.

**II.B.** The district court properly extended the remedy to GenAI products. Google itself proposed applying the judgment's prohibitory aspects to GenAI, and it does not explain why the data-sharing and syndication provisions deserve different treatment. And Google's

arguments that the remedy cannot reach technologies beyond the liability findings contradict *Massachusetts*, where this Court upheld remedies doing just that.

**Cross-Appeal.**  The court committed legal error in denying Plaintiffs' requested payment ban. Congress has set forth a clear order of priorities for antitrust remedies in government enforcement actions under 15 U.S.C. § 4: courts' first and foremost "duty" is to "effectively redress proved violations of the antitrust laws." *Du Pont*, 366 U.S. at 323. Under this longstanding precedent, courts must ensure that relief is effective to redress the violation and restore competition to the relevant market *before* they may consider the interests of third parties. The court here, however, did not follow that order of priorities. The court acknowledged that a payment ban "could help restore competition," JA__(Rem.Op.126), and that the lack of a payment ban "leav[es] in place the very forces that 'effectively [have made] the ecosystem exceptionally resist[ant] to change,'" JA__(Rem.Op.127). Yet it rejected a payment ban because of its potential effects on third-party distributors outside the relevant markets and the short-term outcomes

a ban could cause. Neither consideration justifies forgoing a payment

ban if necessary for effective relief in the monopolized markets.

## ARGUMENT

Google unlawfully monopolized two markets, preventing effective

search competition for over a decade. In trying to evade accountability,

Google attacks rulings the district court never made, based on incorrect

legal assertions and incomplete and inaccurate descriptions of the

court's thorough factual findings. The court's actual (and unchallenged)

findings establish liability under *Microsoft*, and the court's choice of

remedies was sound—except for its denial of a payment ban, which

contravened *du Pont*.

**I.  The District Court Correctly Found That Google Unlawfully Maintained Two Monopolies.**

**A.  The District Court Correctly Found that Google Had Monopoly Power in Both Relevant Markets.**

The court applied the correct framework for assessing monopoly

power, and the court's unchallenged factual findings easily establish it.

Courts generally analyze monopoly power by first defining the

relevant market. The "relevant market" is "the area of effective

competition," which typically is where "significant substitution in

consumption or production occurs." *Ohio v. Am. Express Co.*, 585 U.S.

529, 543 (2018) (*Amex*). Market definition is "a deeply fact-intensive inquiry," *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001) (Sotomayor, J.), as "Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one," *Brown Shoe*, 370 U.S. at 336. A relevant market consists of products (product market) and locations (geographic market). *Id.* at 324.

To define a product market, courts examine "the reasonable interchangeability of use [by consumers] or the cross-elasticity of demand between the product itself and substitutes for it." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 718 (D.C. Cir. 2001) (alteration in original). "[W]ithin [a] broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe*, 370 U.S. at 325. Product markets can be overlapping, *United States v. Cont'l Can Co.*, 378 U.S. 441, 456-57 (1964) (markets for metal containers, glass containers, and metal and glass containers for certain uses), or concentric, *Brown Shoe*, 370 U.S. at 325 (submarkets may exist within product market). "There may be effective competition among a narrow group of products," making that "narrow group a relevant market, even if competitive constraints from

significant substitutes are outside the group." U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* § 4.3 (2023).

Courts frequently define product markets and submarkets by applying the "practical indicia" of reasonable interchangeability from *Brown Shoe*: "industry or public recognition" of the market, "the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325; *Endure Indus., Inc. v. Vizient Inc.*, 164 F.4th 405, 412 (5th Cir. 2026) (*Brown Shoe* factors are a "classical measure[] of market definition").[7] And courts similarly analyze reasonable interchangeability for geographic markets. *Tampa Elec. Co. v. Nash. Coal Co.*, 365 U.S. 320, 327-28 (1961).

Once a market is defined, courts assess monopoly power—"the power to control prices or exclude competition." *Microsoft*, 253 F.3d at 51 (quoting *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)). Such power may be proved directly, but "[b]ecause such direct proof is only rarely available, courts more typically examine

---

[7]    Courts also commonly use the "hypothetical monopolist test." JA__(Liab.Op.138).

market structure in search of circumstantial evidence of monopoly power." *Id.* "[M]onopoly power may be inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers." *Id.*

### 1. The district court's extensive findings establish Google's monopoly power in both markets.

Applying this framework, the court properly found that Google had monopoly power in general-search-services and general-search-text-advertising markets in the United States.[8] Google has not challenged any finding as clearly erroneous.

*General Search Services*. Considering the *Brown Shoe* factors, the court properly found a relevant market for general search services. The court found that other platforms, such as subject-matter-specific SVPs and social media services, were not reasonably interchangeable with GSEs for the same purposes. JA__(Liab.Op.140-48).

The court first found that GSEs have "peculiar characteristics and uses." JA__(Liab.Op.140-41). GSEs "perform[] a unique function" for consumers, serving as "both a reservoir of information and a conduit to

---

[8] The parties agreed the United States is the geographic market. JA__(Liab.Op.135).

other sources on the web." JA__(Liab.Op.143); *see, e.g.*, *FTC v. Wilh.*

*Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 48 (D.D.C. 2018) (marine

water treatment products and services had "unique purposes" and other

products "could [not] replace the[ir] critical functions"). "No SVP" can

"meet user needs in the same way." JA__(Liab.Op.144). Unsurprisingly,

therefore, "the record show[ed] that GSEs and SVPs are complementary

goods" that consumers use together, not "true substitutes" for each

other. JA__(Liab.Op.150). "SVPs are Google's top advertisers" *and*

*receive as much as 88% of their traffic from Google*, *id.*, and SVP use is

correlated with *greater* use of Google, JA__(Liab.Op.150-51); *see New*

*York v. Actavis, PLC*, No. 14 CIV. 7473, 2014 WL 7015198, at \*14-15

(S.D.N.Y. Dec. 11, 2014) (two drug classes were "not substitutes" but

"complements" because 70% of patients taking one class also took the

other), *aff'd*, 787 F.3d 638 (2d Cir. 2015).

"Industry or public recognition" likewise supported a

general-search market because "market participants consider GSEs to

be a distinct product." JA__(Liab.Op.144). The court found, for example,

that browser developers did not allow users to switch a browser's

default search access point to an SVP because doing so would "restrict

that key access point to a particular vertical or subset of verticals, creating a poor user experience." *Id.* Only a GSE can answer the entire range of users' queries, JA__(Liab.Op.150); thus, users "have an expectation that" a browser's default is "going to go to a [GSE]." JA__(Liab.Op.52) (quoting Apple executive).

Even more tellingly, *Google itself* considered GSEs a separate market. Google long tracked its market share "relative only to other GSEs," and it "evaluated its quality" "primarily against other GSEs," JA__(Liab.Op.145); *see Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 498 (2d Cir. 2004) (industry recognition supported generic warfarin market where "generic manufacturers treat each other as the entities which most directly affect their pricing and output decisions"). As Google's chief economist pithily wrote in 2021, "if Google were to disappear, people would just switch to Bing." JA__(UPX0340.059).

Finally, GSEs required "unique production facilities" involving extraordinary, billion-dollar investments, which were not required for SVPs. JA__(Liab.Op.146). Thus, "[a]bsent extraordinary cost and expense, neither Amazon [an SVP] nor Meta [which owns two social media platforms] could become a source for noncommercial or

navigational queries" and "capture" GSE users. *Id.*; *see Geneva Pharms.*, 386 F.3d at 499 (finding lack of "evidence that other generic pharmaceutical manufacturers could quickly and easily have entered the warfarin market"). Given these unchallenged findings, the court correctly defined a general-search market.

The court then found that Google had monopoly power in this market, given its "89.2% share," increasing "to 94.9% on mobile devices," JA__(Liab.Op.156), and significant entry barriers from high capital costs, Google's control of the key distribution channels, and Google's dominant brand, JA__(Liab.Op.157-161); *see McWane, Inc. v. FTC*, 783 F.3d 814, 823 (11th Cir. 2015) (90-95% market share "much higher" than usually required).

***General Search Text Advertising***. The court again applied the *Brown Shoe* indicia and found that neither non-search ads nor other types of search ads (such as product listing ads) were reasonably interchangeable with general-search-text ads. Search ads are distinct from non-search ads because search ads respond to "a user's specific motivation or interest at the time [a search] is entered," JA__(Liab.Op.168); are not sensitive to price changes,

JA__(Liab.Op.174); and are priced per click instead of per display, JA__(Liab.Op.177). And text ads are not reasonably interchangeable with other search ads because text ads have a unique appearance, JA__(Liab.Op.185); advertisers write copy only for text ads, JA__(Liab.Op.186); text ads can be bought by any advertiser, whereas product listing ads only work for physical goods, *id.*; the industry recognizes text ads as distinct, JA__(Liab.Op.186-87); and text ads are "unique" to GSE results pages, JA__(Liab.Op.188). The court, therefore, properly found a general-search-text-ad market.

In this market, the court correctly found that Google had monopoly power with an 88% market share and "significant entry barriers." JA__(Liab.Op.189). It also found direct evidence of monopoly power: Google "does not consider competitors' pricing when it sets text ads prices," and "in fact has profitably raised prices substantially above the competitive level." JA__(Liab.Op.190-91).

### 2. Google's challenges to the general-search-services market are meritless, confirming its monopoly power in that market.

Google does not challenge most of the court's analysis finding a general-search-services market. Though Google takes rhetorical

potshots at *Brown Shoe*, it does not challenge the court's reliance on the *Brown Shoe* factors. *See* JA__(Liab.Op.138.n.4). Nor does it show clear error in any of the court's factual findings. And while Google repeatedly claims legal error, Google does not articulate what purported legal error the court committed. Indeed, it *agrees* that the market-definition standard is reasonable interchangeability. Br.78.

Instead, Google makes a panoply of assertions divorced from the decision and its arguments below. Start with Google's claim that the court found SVPs and GSEs not reasonably interchangeable "because they have different 'business models.'" Br.80. The court acknowledged that "[t]he products comprising the relevant market need not be entirely the same" provided "consumers can," and do, "substitute the use of one for the other." JA__(Liab.Op.137). The problem for Google was that a mound of evidence showed that consumers usually cannot and do not substitute SVPs and GSEs for each other—in fact, many users reach SVPs through GSEs, JA__(Liab.Op.54-55), and SVP use is correlated with *greater* use of Google, JA__(Liab.Op.151).

Thus, the court's point in mentioning GSEs' and SVPs' business models *once* during its *twelve-page* discussion of the general-search

market was that they are not "differentiated" products serving the same purpose, as in Google's cases. Br.81; *see Amex*, 585 U.S. at 537-39 (Amex's transaction platform served the same purposes as Visa's and Mastercard's platforms); *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 229 (2d Cir. 1999) (advertisers would switch from "rush" electronic ad-delivery services to physical carriers or non-rush electronic delivery following price increases). Rather, GSEs are *different* products "performing a unique function" for consumers that SVPs cannot. JA__(Liab.Op.143).

Google's claim that the court ignored "commercial realities," Br.84, likewise misdescribes the decision. The court repeatedly looked to "commercial realities," JA__(Liab.Op.137, 150), and found that they decisively cut against Google. Industry actors (including Google) view GSEs as a distinct market, JA__(Liab.Op.144-45), and courts "assume that [such] actors usually have accurate perceptions of economic realities," *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 219 n.4 (D.C. Cir. 1986). Consumers uniquely value GSEs' "'bundle' of search offerings." JA__(Liab.Op.150). And the evidence *refuted* Google's argument that "users switch from Search to SVPs frequently,"

Br.83[9]; consumers do not use GSEs less when they use SVPs more because the two are complementary goods. JA__(Liab.Op.150); *see* JA__(UPX0344.058) (Google "found no evidence" of users' "being active on large online retailers" leading to "a meaningful shift in query volume of 'shoppy' queries away from Google"). As Google acknowledges elsewhere, Google Answering Br.48, *Dream Big Media Inc. v. Alphabet Inc.*, 2025 WL 4648148 (9th Cir. Feb. 3, 2025), complementary goods are *not* in the same market, *see Dream Big Media Inc. v. Alphabet Inc.*, No. 24-4968, 2025 WL 3485388, at *2 (9th Cir. Dec. 4, 2025); *U.S. Horticultural Supply v. Scotts Co.*, 367 F. App'x 305, 310 (3d Cir. 2010).

Faced with this array of findings, Google tries to pivot. Google now argues that under *Amex*, market definition must "account[] for how [a] firm earns money," Br.83, and that accordingly, only competition for commercial queries—which purportedly includes SVPs—matters, Br.84. That contradicts what Google argued below: that the relevant market

---

[9]     Google's statement that the "uncontested evidence" showed frequent switching between Google and SVPs is misleading. Br.83. Google cites evidence of the total query volume on Google vs. Amazon for selected shopping queries and on Google vs. Yelp for selected local queries. Br.83. But the court expressly found that evidence uninformative because absolute query numbers say little about whether consumers *switch* between Google and SVPs. JA__(Liab.Op.150-51).

"must be assessed based on the commercial realities of how *consumers* use general search engines and whether they view other sources of *information*" as reasonable substitutes. Dkt.834.2 (emphases added). At trial, Google advocated a "market for query responses," JA__(Liab.Op.136), that included noncommercial sites like Wikipedia, along with social media platforms, JA__(Liab.Op.136-37). Google has thus forfeited the argument—"never made below"—that only commercial queries matter. *Shea v. Kerry*, 796 F.3d 42, 56 (D.C. Cir. 2015).

Google's reliance on *Amex* is also misplaced. *Amex* did not announce new rules for market definition governing all cases; it addressed market definition in a Section 1 case involving a simultaneous "two-sided transaction platform[]" (credit-card transactions). *Amex*, 585 U.S. at 545. Google Search is not that kind of platform, as Google admitted below. JA__(UPX6033.669).

Outside the two-sided-transaction-platform context, reasonable interchangeability is typically analyzed from consumers' perspective because "the ability of consumers to turn to other suppliers restrains a firm from raising prices above the competitive level." *Microsoft*, 253

F.3d at 51. And the court found that, from consumers' perspective, GSEs serve a valuable and "unique function" of answering *all* queries, JA__(Liab.Op.143), that other products do not. Consumers do not care which queries GSEs make money on.

In any event, even if market definition turned on "how [Google] makes money," SVPs would not be reasonable substitutes for GSEs. Google earns money from ads on navigational queries to particular websites, JA__(Liab.Op.92), which account for 12% of all Google queries and which SVPs cannot answer, JA__(Liab.Op.18). Google also makes money from noncommercial queries by syndicating its search results, JA__(Rem.Tr.3021:3-3022:6), and by using noncommercial queries as a loss-leader to attract commercial queries, JA__(UPX0334.084) (Google's chief economist explained that Google answers queries about "ancient history" so people will use Google to "buy frying pan[s]"). Even for commercial queries, SVPs often cannot compete because "in many product categories, SVPs don't exist." JA__(Liab.Tr.6864:16-17).

That leaves Google to argue that, as a matter of law, SVPs' ability to answer *some* commercial queries means they must be in "the market." Br.77. That argument fails for several reasons. First, a

61

product like Google Search can be in multiple markets, *see supra* pp.50-51, and the relevant market depends on "the antitrust question in th[e] case," *Google Play Store*, 147 F.4th at 935. GSEs and SVPs may compete in certain other markets, but Plaintiffs' claim here was that Google restrained competition among GSEs by locking up defaults that only GSEs occupied. Thus, the question before the court was whether a relevant market limited to GSEs existed such that Google could significantly harm competition within it, *cf. United States v. Phila. Nat'l Bank*, 374 U.S. 321, 357 (1963) (defining relevant market where the effect on competition is "direct and immediate"), and the evidence showed that it did. Indeed, Google's own study showed that it could harm general-search competition: "it would not lose search revenue if [it] were to significantly reduce the quality of its search product." JA__(Liab.Op.154); *see PhantomALERT Inc. v. Apple Inc.*, -- F.4th --, 2026 WL 2131786, at *5 (D.C. Cir. July 24, 2026) (market definition can include consideration of whether "quality decreases" would reduce profitability).

Second, substitution for a distinct purpose does not compel a finding of reasonable interchangeability. In *Microsoft*, for example, this

Court excluded "information appliances" from the relevant market for PC operating systems because they did not "perform[] all of the functions of a PC" and thus most consumers bought them "only as a supplement to their PCs." *Microsoft*, 253 F.3d at 52. The district court found the same dynamic here: "an SVP may be reasonably interchangeable with a GSE for a discrete purpose"—i.e., an individual query—"but [not for] the 'same purposes.'" JA__(Liab.Op.148).

Finally, *Microsoft* refutes Google's argument that the relevant market must include SVPs because Google "perceive[s]" competitive pressure from SVPs. Br.79. In *Microsoft*, middleware threatened Microsoft's monopoly, but this Court held it outside the relevant market because "middleware is not now interchangeable with Windows." 253 F.3d at 54. So too here.

Because the court properly found a general-search-services market, it follows that the court did not err by excluding SVPs—which do not provide general search services—because they are not participants in that market. And because Google's challenge to this market fails, so too does its argument that Google lacks monopoly

power in the market (which rests solely on its challenge to the market's existence).

### 3. Google's challenge to the finding of general-search-text-ads monopoly power is meritless.

Google's brief does not challenge the existence of the general-search-text-ads market; Google has thus forfeited any such challenge. *Herron v. Fannie Mae*, 861 F.3d 160, 165 (D.C. Cir. 2017). While Google does assert that it lacks monopoly power in that market, its argument falters.

To begin, Google does not argue clear error in the court's finding of monopoly power in text ads through direct evidence of Google's pricing practices. *Supra* p.56. Supracompetitive pricing without regard for rivals is "'something a firm without a monopoly would have been unable to do,'" JA__(Liab.Op.190) (quoting *Microsoft*, 253 F.3d at 57-58), and sufficient by itself to show monopoly power.

As to indirect evidence, Google argues that the text-ads market is "derivative" of the search market, so they must fall together. But neither falls because Google has shown no error in defining a general-search market. *See supra* Section I.A.2. In any event, Google

disregards the court's finding that general-search-text ads are "unique to GSE [results pages]"—SVPs do not produce general-search text ads. JA__(Liab.Op.188). Thus, even assuming SVPs were reasonable substitutes for GSEs in search, it would not disturb the general-search-text-ads market; SVPs do not participate in that market.

Google argues that text "[a]dvertisers will go to *whichever GSE* wins the competition for queries," Br.84 (emphasis added) (citing JA__(Rem.Op.167)), but the emphasized text gives the game away. The court found that advertisers allocate text-ad spending *among GSE*s based on GSEs' market shares (roughly 90% Google, 10% Bing, JA__(Liab.Op.79)), as SVPs' ads are not reasonable substitutes for monopoly-priced text ads. It did not find that advertisers would substitute SVP ads for GSEs' search-text ads.

## B. The District Court Correctly Held that Google Engaged in Anticompetitive Conduct.

The court correctly held that Google's distribution agreements were anticompetitive. It found that these exclusive agreements harmed the competitive process by foreclosing a substantial portion of the market (50%, not counting the 20% unavailable to rivals due to Google's control of Chrome); depriving rivals of the scale needed to compete

effectively; and disincentivizing rivals' investment (including Apple's potential entry). And it found that Google failed to establish valid procompetitive benefits for exclusivity.

Google leaves most of the court's careful analysis unanswered. It does not argue that the court erred in condemning the Android agreements or rejecting its procompetitive justifications. Nor does it challenge—or even acknowledge—the court's findings establishing the browser agreements' multiple anticompetitive effects. Instead, Google advances incorrect legal rules that purportedly required judgment in Google's favor.

### 1. The district court correctly held that the browser agreements were exclusive.

The court followed *Microsoft* in holding that the browser agreements—which expressly made Google the *exclusive* default GSE and consigned rivals to "less efficient channels" for multi-year periods—are exclusive. JA__(Liab.Op.205). Google's arguments that these agreements were nonexclusive as a matter of law flout established precedent.

a. Exclusive-dealing analysis "look[s] past the terms of the contract to ascertain the relationship between the parties and the effect

of the agreement 'in the real world.'" *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012). An agreement is exclusive if it expressly or practically "prevent[s] lessees or purchasers from using or dealing in the goods, etc., of a competitor." *Tampa Elec.*, 365 U.S. at 327; *Microsoft*, 253 F.3d at 75 (deals can be "exclusive in practice"). "'[T]otal foreclosure' is not required for an exclusive dealing arrangement to be unlawful, nor is complete exclusivity required with each customer." *ZF Meritor*, 696 F.3d at 283; *see, e.g.*, *McWane*, 783 F.3d at 821-22, 842 (agreements with "exceptions" exclusive).

Thus, *Microsoft* classified agreements as "exclusive" even though they were "not literally exclusive." 253 F.3d at 75. Microsoft's First Wave Agreements with independent software vendors "were exclusive in practice because they required developers to make Microsoft's [Java Virtual Machine] the default in the software they developed." *Id.*; *see id.* at 76 ("exclusive as a practical matter"). Similarly, an agreement with AOL—the largest internet access provider (IAP)—was exclusive because, "for all practical purposes," it guaranteed that Microsoft's browser (Internet Explorer) would be AOL's "browser of choice." *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30, 53 (D.D.C. 2000).

67

Following *Microsoft*, the court held that "Google's browser agreements are exclusive insofar as they establish Google as the out-of-the-box default search engine." JA__(Liab.Op.204). Default placement is "by far" "[t]he most efficient channel of GSE distribution," JA__(Liab.Op.24), and Google paid distributors massive revenue share to be the exclusive GSE at this "primary search access point," JA__(Liab.Op.25).

Specifically, under the Internet Services Agreement (ISA), Apple must preload Google as the default GSE on *all* Safari search access points. JA__(Liab.Op.204). The ISA thus ensures that, as a practical matter, "Google will be the only GSE preloaded on an Apple device." JA__(Liab.Op.207). Apple could not, for example, make a GSE that collects less user information than Google the default in Safari's privacy mode, even though many users highly value privacy. *See* JA__(Liab.Op.43). Similarly, Mozilla must make Google the default GSE on *all* Firefox search access points. JA__(Liab.Op.205).

The court recognized that the agreements permitted "limited distribution deals with [Google's] rivals" that were far more inefficient than default distribution, JA__(Liab.Op.205-06), which was also the

case in *Microsoft*. For example, IAPs—one of "the two most efficient channels" for distributing browsers—had to make Internet Explorer the default, but they could provide customers with other browsers on request (with a cap varying from 15% to 50% of users). *United States v. Microsoft Corp.*, 84 F. Supp. 2d 9, 69, 73 (D.D.C. 1999). AOL could provide a link to a customized version of Navigator. *Id.* at 81. Apple had to make Internet Explorer the default in Apple's MAC OS operating system but could bundle non-Microsoft browsers with MAC OS. *Id.* at 95-96. Additionally, users could download Navigator over the Internet. *Id.* at 47. And independent software vendors had to set Microsoft's Java as the default, but "wary and sophisticated" developers could distribute software compliant with non-Microsoft Java. *Id.* at 108.

Thus, following "the clear lesson of *Microsoft*," the court held that "[t]he fact that Google's browser partners can contract with its rivals for distribution through less efficient channels" did not render the agreements non-exclusive. JA__(Liab.Op.205). Just as in *Microsoft*, the distribution channels left open to Google's GSE rivals were "far less effective at reaching users" "due in part to users' lack of awareness of these options and the 'choice friction' required to reach these

alternatives." JA__(Liab.Op.31). For example, "few consumers use"

browser bookmarks to other GSEs "as it first requires finding the

Favorites page in a new Safari tab, which requires an 'extra click.'"

JA__(Liab.Op.32). Likewise, "few users search" by typing a rival's

address in a browser. JA__(Liab.Op.33). Thus, Google's agreements

were exclusive in practice for the same reasons as in *Microsoft*:

| *Microsoft* | *Google* |
|---|---|
| Default Most Efficient Distribution Channel | Same |
| Default Exclusivity | Same |
| Limited Distribution of Rivals Allowed | Same |
| Other Distribution Channels Open | Same |
| Users Can Download Rivals' Software | Same |
| Microsoft Requested Exclusivity | Google "[I]nsisted" on Exclusivity |
| Inducements Offered | Same |

b.      Google does not challenge these findings as clearly erroneous

but instead attempts to circumvent them by misstating the law and the

record. Google argues that the browser agreements contain "no express

exclusivity provision" prohibiting preloading rival GSEs. Br.70-71. But

it is well-settled that "even though a contract does 'not contain specific

agreements not to use the (goods) of a competitor,'" it is exclusive "if 'the

practical effect . . . is to prevent such use.'" *Tampa Elec.*, 365 U.S. at 326

(quoting *United Shoe Mach. Corp. v. United States*, 258 U.S. 451, 457

(1922)). And, regardless, the agreements *were* expressly exclusive, in

that they required developers to set *every default* GSE to Google.

JA__(Liab.Op.204-05).

Google fares no better arguing that the agreements cannot be

exclusive because they "*permit[]* a counterparty to deal with rivals" by

distributing their GSEs through less-effective channels. Br.70.

"Exclusivity need be neither express nor complete to render an

agreement 'exclusive' for Section 2 purposes: *De facto* and partial

exclusivity may suffice depending on the circumstances."

JA__(Liab.Op.204) (citing *ZF Meritor*, 696 F.3d at 270, 283). Indeed,

Google's rule cannot be reconciled with *Microsoft*'s holding that

agreements allowing dealing with rivals through less efficient channels

were exclusive. *See supra* pp.68-70; Areeda ¶1800a3 ("'default'

agreements limiting a buyer's initial choice but permitting a subsequent

change" can be sufficient for exclusivity). Moreover, Google's approach

would make no sense: a monopolist could require every buyer in the

market to purchase 99% of its requirements from the monopolist

without dealing "exclusively." *See ZF Meritor*, 696 F.3d at 284 (foreclosure from agreements covering 90% of customers' needs was "no different" than foreclosure from "complete exclusive dealing arrangements with 90% of the customer base").

Google's authorities do not upset these longstanding precedents. In *Aerotec International, Inc. v. Honeywell International, Inc.*, the court merely criticized the plaintiff for not providing "the actual terms of the agreements" and instead relying on "unspecified transactions." 836 F.3d 1171, 1181 (9th Cir. 2016). Likewise, in *New York v. Meta Platforms, Inc.*, this Court did not repudiate *Microsoft* but rather simply affirmed the district court's case-specific determination that the conduct was not exclusionary. 66 F.4th 288 (D.C. Cir. 2023). Unlike the conduct in *Meta*, the agreements here did not leave distributors "entirely free" to deal with rivals, *id.* at 304, but instead permitted only "limited distribution deals," JA__(Liab.Op.206).

Google insists that users "find their way to the GSE they prefer" despite the default. Br.73. But the court's unchallenged findings that "[m]any users do not know that there is a default" or "that it can be changed," JA__(Liab.Op.27), prove otherwise. And even users who try to

change the default may fail to do so given "choice friction" that impedes switching. *Id.* Thus, defaults "supply Google with unequalled query volume that is effectively unavailable to rivals," and "are more than just 'incremental promotion.'" JA__(Liab.Op.228). Indeed, Google's own documents recognize defaults "can be a powerful strategic weapon" that "[c]ould be an easy way to grow and defend market share," JA__(UPX0123.485), and that without exclusivity, a distributor "can and will ship alternatives to Google," JA__(UPX0134.865). And Google "projected that losing the Safari default would result in a significant drop in queries and billions of dollars in lost revenues." JA__(Liab.Op.228).

Without claiming error, Google tries to undermine these findings by pointing to the court's statement that defaults "are less effective when the alternative has strong brand recognition and product quality." Br.73. But, in the episodes Google references, the court still found strong default effects. While Google receives 80% of queries on Windows PCs *overall*, "[t]he default on Edge drives queries to Bing"—with Bing receiving 80% of the searches on that *browser*. JA__(Liab.Op.32-33). Similarly, while some Firefox users switched back to Google when

Mozilla changed its default to Yahoo, there was still "a noticeable default effect." JA__(Liab.Op.208). Moreover, Google's brand recognition and quality advantage are themselves "trace[able] back to Google's exclusive distribution agreements." JA__(Rem.Op.115).

Similarly, Google is wrong that the court found the agreements exclusive because just one GSE can be the default. Br.71-72. That conflates the existence of a default with exclusivity as to the default: The agreements were exclusive because in the relevant market, they required developers to set *every* default GSE on *every* device to Google, for multiple years. *See* JA__(Liab.Op.204-05). As the court found, "exclusive deals are a feature of the market only because *Google* has insisted on them, not its distribution partners." JA__(Liab.Op.251); *infra* pp.98-100. Finally, Google points to limited carveouts in Google's agreement with Apple in a few foreign countries, but such provisions have no impact on the Apple agreement's exclusivity in the relevant geographic market of the United States. Br.73; *see* JA__(JX0024.822).

### 2. The district court correctly found multiple anticompetitive effects.

Google sanitizes the record and misstates the law in arguing that the browser agreements reflect only competition on the merits. The

74

court applied this Court's standard for anticompetitive conduct and found, *inter alia*, that the agreements harmed competition by blocking rivals from the distribution and scale necessary to compete effectively. Google thus did not win the competitive race "fair and square." Br.46. After obtaining a lead on its rivals, Google placed obstacles in their lanes to ensure they could not catch up.

a. Conduct is anticompetitive when it "harm[s] the competitive *process* and thereby harm[s] consumers." *Microsoft*, 253 F.3d at 58. In the monopolization context, anticompetitive conduct comprises "conduct, other than competition on the merits or restraints reasonably 'necessary' to competition on the merits, that reasonably appear[s] capable of making a significant contribution to creating or maintaining monopoly power." *S. Pac.*, 740 F.2d at 999 n.19;[10] *see also*

---

[10] *Accord, e.g.*, *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 891 (5th Cir. 2016); *McWane*, 783 F.3d at 833; *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005); *Barry Wright*, 724 F.2d at 230 (Breyer, J.); Areeda ¶651g; *cf.* Brief for the United States as Amicus Curiae at 23, *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, No. 24-917 (U.S. Dec. 1, 2025) ("the bedrock definition of anticompetitive conduct" is conduct "that excludes competition on some basis other than efficiency"). Given that the court applied this law, Google's references to the *Duke Energy* brief, Br.44, 52, do nothing for it.

*PhantomALERT*, 2026 WL 2131786, at *2 ("Anticompetitive conduct under the Sherman Act means protection of a monopoly position 'through a means other than competition on the merits.'"). This definition both screens out conduct that is solely competition on the merits and ensures that the defendant's conduct made a significant contribution to creating or maintaining its monopoly. *Microsoft*, 253 F.3d at 62, 79.[11]

The court expressly recognized these legal principles. *E.g.*, JA__(Liab.Op.197, 215) ("having a monopoly does not by itself violate § 2"; thus, "the monopolist must harm the competitive *process* and thereby harm consumers"); JA__(Liab.Op.199.n.8) (anticompetitive conduct is "conduct, other than competition on the merits," that "reasonably appears capable of making a significant contribution to creating or maintaining monopoly power"). And it correctly applied them, finding that Google's agreements had multiple anticompetitive

---

[11] *Microsoft*'s burden-shifting framework accounts for the fact that conduct may contain both competition on the merits and harm to competition. A plaintiff must initially show an anticompetitive effect to establish a prima facie case. The burden then shifts to the defendant to establish a procompetitive justification. If both are shown, they must be "balance[d]." 253 F.3d at 58-59.

effects, "impair[ing] rivals' opportunities to compete" and "clearly ha[ving] a significant effect in preserving [Google's] monopoly." JA__(Liab.Op.216, 226) (quoting *Microsoft*, 253 F.3d at 71). In particular, for years-long periods, the foreclosure from the agreements denied rivals both the distribution necessary to reach users and the scale necessary to develop better GSEs, thereby "inoculating Google against any genuine competitive threat." JA__(Liab.Op.234).

In the general-search-services market, the court found three reinforcing anticompetitive effects. **First**, the agreements "foreclose[d] a substantial portion of the general search services market," JA__(Liab.Op.226); such foreclosure can "prevent potential rivals from ever reaching the critical level necessary to pose a real threat to [a monopolist's] business," JA__(Liab.Op.217) (quoting *ZF Meritor*, 696 F.3d at 286); *see Dentsply*, 399 F.3d at 191 (exclusive deals "help[ed] keep sales of competing [products] below the critical level necessary for any rival to pose a real threat to [defendant's] market share"). The browser and Android agreements together foreclosed 50% of the market. JA__(Liab.Op.217); *see Microsoft*, 253 F.3d at 70 ("less than []40%" may

77

suffice).[12] And the effect was "amplifie[d]" by the five-year term of the

Apple ISA, JA__(Liab.Op.224); the "absence of meaningful rebidding,"

JA__(Liab.Op.225); the "significant barriers to entry,"

JA__(Liab.Op.226); and the "friction" discouraging users from choosing

a different GSE, *id.*

**Second**, the agreements "den[ied] rivals access to user queries, or

scale, needed to effectively compete," JA__(Liab.Op.226), also a classic

anticompetitive effect, *see ZF Meritor*, 696 F.3d at 271. "Scale is the

essential raw material for building, improving, and sustaining a GSE,"

JA__(Liab.Op.226), and the agreements gave Google "additional search

volume beyond what it would otherwise receive," JA__(Liab.Op.227),

while simultaneously "constrain[ing] the query volumes of its rivals,"

JA__(Liab.Op.234).

The presence of "network effects" exacerbated the harm to rivals

from the foreclosure. As the court explained,

> (1) More user data allows a GSE to improve search quality,
> (2) better search quality attracts more users and improves
> monetization, (3) more users and better monetization attract
> more advertisers, (4) more advertisers mean higher ad

---

[12]     The court correctly measured foreclosure by coverage. *See
Microsoft*, 253 F.3d at 70 (foreclosure measures "percentage of the
*available* opportunities" "clos[ed] to rivals" (emphasis added)).

revenue, and (5) more ad revenue enables a GSE to expend more resources on traffic acquisition costs (i.e., revenue-share payments) and investments, which enable the continued acquisition of scale.

JA__(Liab.Op.231). As a result, "other GSEs have remained at a persistent competitive disadvantage, and new entrants cannot hope to achieve a scale that would allow them to compete with Google." JA__(Liab.Op.226). This "feedback loop" blocks competition by "basically freez[ing] the ecosystem in place." JA__(Liab.Op. 227); *cf. Microsoft*, 253 F.3d at 55 (discussing the "chicken-and-egg" situation).

**Third**, Google's long-term exclusive agreements "reduced the incentive to invest and innovate in search," JA__(Liab.Op.236), another anticompetitive effect, *see Anthem*, 855 F.3d at 361. Search became a "no fly zone" for venture-capital funding, JA__(Liab.Op.237), and Microsoft limited its investment in search partially because "there is little to no genuine opportunity for a default distribution deal," JA__ (Liab.Op.239). Additionally, over $20 billion of revenue-share payments annually "unquestionably" help "keep[] Apple on the sidelines of search," JA__(Liab.Op.242), with Google effectively paying Apple to "stay away from [its] market," *Actavis*, 570 U.S. at 152.

In the general-search-text-ads market, the court found largely the same anticompetitive effects. JA__(Liab.Op.258-264). Additionally, the agreements enabled Google to charge supracompetitive prices and degrade ad quality. JA__(Liab.Op.259-64). "Google in turn has used these monopoly profits to secure the next iteration of exclusive deals." JA__(Liab.Op.261). Meanwhile, the agreements ensure that "advertisers will continue to spend 90% of their text ad dollars with Google, regardless of increases in price or decreases in quality." JA__(Liab.Op.264-65).

b. Google's leitmotif that it was condemned for "competition on the merits," Br.34, contradicts the district court's legal holdings and robust factual findings of anticompetitive effects. The court considered and rejected the idea that Google's exclusive agreements were mere "competition on the merits." JA__(Liab.Op.202). In asking for judgment as a matter of law, Google disregards the court's actual reasoning and controlling precedent.

To begin, Google selectively quotes the court's statement that the "key question" is whether the agreements "reasonably appear capable of significantly contributing to maintaining Google's monopoly power,"

Br.40, to argue that the court failed to distinguish "competitive acts" from "exclusionary conduct," Br. 43. Google disregards both the court's prior recognition that plaintiffs must also establish "conduct[] other than competition on the merits," JA__(Liab.Op.199.n.8),[13] and its express finding that Google "maintain[ed its monopoly] position *through means other than competition on the merits*," JA__(Liab.Op.202) (emphasis added). Indeed, Google concedes multiple times that the court "held that Google was not competing on the merits." Br.48-49. Thus, by Google's own admission, there is nothing to its argument.

Google also proffers incorrect legal rules that inappropriately constrict the scope of anticompetitive conduct, variously contending that the conduct must "prevent[] a defendant's rivals from winning even if they have a better product or make a better offer," Br.30, "depriv[e] a consumer of the freedom to accept a better offer," Br.38, or "interfere with customers' ability to obtain and choose the offer they prefer," Br.54. These forms of exclusionary conduct are not exhaustive. "[T]he means of illicit exclusion" are "myriad," *Microsoft*, 253 F.3d at 58, and a monopolist's conduct is "examined through a special lens: Behavior that

---

[13] *See also* JA__(Liab.Op.199); JA__(Rem.Op.115).

81

might otherwise not be of concern—or that might even be viewed as procompetitive—can take on exclusionary connotations when practiced by a monopolist," *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 488 (1992) (Scalia, J., dissenting).

In particular, a monopolist harms the competitive process when it "threatens to defeat or forestall the corrective forces of competition and thereby sustain or extend [its] agglomeration of power." *Id.* Accordingly, courts have found many types of conduct hobbling rivals to be exclusionary, including conduct that "deprive[s] rivals of the opportunity to achieve the minimum economies of scale necessary to compete," *ZF Meritor*, 696 F.3d at 270-71, 285; denies them access to a critical input, *Geneva Pharms.*, 386 F.3d at 508; "rais[es] [] rivals' costs sufficiently to prevent them from growing into effective competitors," *McWane*, 783 F.3d at 832; or raises barriers to entry, *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 42-43 (2d Cir. 2018). As discussed above, *supra* pp.77-80, the court found that Google's agreements did all those things, thereby "imped[ing] its rivals'

opportunity to make . . . a better offer," Br.3.[14] Contrary to Google's

claim, *id.*, Plaintiffs were not required to show that distributors would

have chosen rivals hamstrung by Google's anticompetitive practices—

the hamstringing is enough by itself.

Google's cramped rules for finding anticompetitive conduct would

leave it free to take many actions that could significantly harm

competition, such as destroying all its competitors' servers and

kidnapping their best engineers. That conduct would not itself prevent

customers from accepting "the best offer," but would unlawfully

maintain Google's monopolies through means other than competition on

the merits. *See Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768,

788 (6th Cir. 2002) (monopolist violated Section 2 by destroying rival's

---

[14] Contrary to Google's suggestion, anticompetitive conduct is not limited to conduct excluding "'equally efficient' competitor[s]." Br.60. *Microsoft* found anticompetitive conduct extinguishing a "threat" to Microsoft's monopoly from nascent competitors lacking a product in the market, let alone an equally efficient one. 253 F.3d at 71, 79. Exclusive deals "imposed by a monopolist" are "of special concern" because they can deny rivals the "opportunity" to become effective competitors. *ZF Meritor*, 696 F.3d at 271. Moreover, less efficient firms are "usually essential to preserving effective competition." Areeda ¶651b4. Such firms can constrain the exercise of market power (e.g., price increases) and grow more efficient over time. *See id.*; *SmithKline Corp. v. Eli Lilly & Co.*, 427 F. Supp. 1089, 1128 (E.D. Pa. 1976), *aff'd*, 575 F.2d 1056 (3d Cir. 1978).

sales materials); *Rambus*, 522 F.3d at 464 (agreeing with *LePage's Inc. v. 3M,* 324 F.3d 141, 153 (3d Cir. 2003) (en banc), that *Conwood* is "a good illustration of the type of exclusionary conduct that will support a § 2 violation"). Google concedes that there are other types of anticompetitive effects outside the exclusive-dealing context, Br.60.n.8, but offers no precedent or policy reason for why the types of anticompetitive effects are constricted in exclusive-dealing claims.

Instead, Google engages in misdirection. Google observes that any "conduct that helps a firm win more customers and gain scale can be expected to deny rivals scale." Br.50. Google's rivals, however, were denied scale not through ordinary competition but through Google's contractually locking rivals out of the most efficient distribution channels for years-long periods. Likewise, the court did not "reason backwards" from Google's success to find anticompetitive conduct, Br.48; it reasoned *forward* from the agreements' anticompetitive conditions to Google's continuing monopoly power. That is, even assuming that Google's agreements had some attractive features for distributors, Br.44-45, Google's anticompetitive conditions ensured that no better offers would come along, *cf. Microsoft,* 253 F.3d at 68-71

("attractive price" in agreements was not anticompetitive but exclusivity in same agreements was).[15]

Relatedly, Google finds no refuge in the court's findings regarding its quality advantages, Br.45-47, which the court attributed in significant part to Google's anticompetitive agreements, *see* JA__(Liab.Op.226-34). "[T]he government need not demonstrate that the [conduct] was the sole cause" of the monopolies. *McWane*, 783 F.3d at 839. Moreover, Google ignores the evidence that the agreements effectively prevented rivals—whatever their quality—from reaching many users who "do not know that there is a default search engine," JA__(Liab.Op.27), and will not discover other GSEs better suited for their individual needs. Thus, Neeva built its own search engine enhanced by GenAI, JA__(Liab.Op.30-31), but failed primarily because it could not reach users, JA__(Liab.Op.237).[16] Google likewise overlooks

---

[15] Similarly, Google was not held liable for Microsoft's past missteps, Br.49, but for preventing Microsoft from catching up by foreclosing it from efficient distribution and disincentivizing its investment in search, JA__(Liab.Op.239).

[16] *See also, e.g.*, JA__(Liab.Tr.564:18-567:24) (Apple switched a default from Google Maps to Apple Maps in 2012 and most users stayed with Apple Maps despite its "inferior" quality); JA__(Liab.Tr.5755:5-5756:25) (Pls.' expert economist) (33% is "the share of U.S. queries that

findings that "Bing's search quality on desktop measures up to Google's," JA__(Liab.Op.46); that a 2017 Google study determined that Bing was "dramatically faster" for "certain popular queries," JA__(Liab.Op.49); and that DuckDuckGo responds to the considerable user demand for increased privacy, JA__(Liab.Op.10-11, 43).

Google also wrongly attributes its contractual exclusivity to browsers' product designs. Br.45. While browsers have a single default GSE per search-access point, it was Google's contracts—not any design choice—that required complete *exclusivity* as to the default (i.e., every browser, in every mode (e.g., private mode), setting Google as the default GSE for years).[17] Indeed, the court found that nothing in Apple's iPhone design necessitated setting Google as the exclusive default GSE on all Safari modes on all iPhones for at least five years, as evidenced by the fact that the first ISA "was not exclusive as to either party."

---

Google's exclusive defaults make unavailable even to a much stronger rival").

[17] Apple's "Suggestions" feature used an Apple-proprietary search index to suggest answers to certain queries entered into the Safari navigation bar, allowing users to "directly navigate to a third-party site." JA__(Liab.Op.105). But although Suggestions diverted certain queries away from Google, Google—not rivals—remained the default GSE on the critical Safari access point.

JA__(Liab.Op.108). And DuckDuckGo discussed with developers being the default in privacy mode, JA__(Liab.Op.114-15, 118), but Google's agreements prohibited that, JA__(Liab.Op.102, 118).

Likewise, the case law refutes Google's suggestion, Br.46, that nominal "competition" for defaults insulates it from liability. *See, e.g.*, *ZF Meritor*, 696 F.3d at 285 (the theory that rivals could steal defendant's customers "simply has not proved to be realistic"); *Dentsply*, 399 F.3d at 189 (exclusive deals anticompetitive although "rivals could theoretically convince" distributors to drop defendant's products). A core concern with exclusive deals (especially long-term ones) is that a monopolist can use them "to prevent [rivals] from *growing into effective competitors*," *McWane*, 783 F.3d at 832 (emphasis added); *Microsoft*, 253 F.3d at 71 (rivals kept "below the critical level necessary" to represent "a real threat to Microsoft's monopoly")—exactly the case here.[18]

---

[18] Amicus Brave Software states that it has "succeeded" at building an independent GSE answering all queries, "despite Google's monopolistic conduct," which "undoubtedly shielded [Google] from competition and entrenched its scale advantage." Brave.Br.2. But Brave does not threaten Google: "[s]till today, 'Google has no true competitor.'" JA__(Rem.Op.108).

Finally, Google is wrong to argue that any scale advantage it has—and disadvantage for its rivals—is irrelevant because "Google won it long ago." Br.51. Scale is not static. "Initial innovation notwithstanding," a monopolist may not weaponize "network effects" to "entrench[] its dominance." *Google Play Store*, 147 F.4th at 949. Section 2 prohibits "the willful acquisition or *maintenance*" of monopoly power. *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (emphasis added). Here, the court found Google illegally maintained its monopolies, JA__(Liab.Op.248), shifting the burden to Google to establish procompetitive justifications. Google failed to carry that burden because its purported justifications were not supported by the record, JA__(Liab.Op.257-58)—a determination which Google has not challenged on appeal.

c. Google also insists the court erred because the reasonably-appears-capable standard does not govern "whether conduct is exclusionary *in the first place.*" Br.40. But *Southern Pacific* and *Microsoft* make clear that the reasonably-appears-capable standard *is* part of the determination of anticompetitive conduct under Section 2. *S. Pac.*, 740 F.2d at 999 n.19; *Microsoft,* 253 F.3d at 62, 79; *see supra* n.10

(collecting cases). That standard denotes when it is reasonable for the factfinder to infer that conduct (other than mere competition on the merits) harmed competition in a way that significantly contributed to the acquisition or maintenance of the monopoly. *Microsoft*, 253 F.3d at 62, 79; *supra* pp.75-76. By making such a showing here, Plaintiffs established a prima facie case of unlawful monopoly maintenance. *See Dentsply*, 399 F.3d at 187 ("Unlawful maintenance of a monopoly is demonstrated by proof that a defendant has engaged in anti-competitive conduct that reasonably appears to be a significant contribution to maintaining monopoly power." (citing *Microsoft*, 253 F.3d at 79)).

Google notes that *Microsoft* discussed the reasonably-appears-capable standard in a separate "*Causation*" section after the "*Anticompetitive Conduct*" section. Br.40-41. But the "causation" discussion merely glossed the causal connection in the earlier "anticompetitive conduct" determination—it did not adopt a *different* standard for causation. In that earlier determination, this Court held that Microsoft's conduct had "a significant effect in preserving its monopoly," *Microsoft*, 253 F.3d at 71—the very link in the causal chain discussed in the later "*Causation*" section. The "*Causation*" section

simply revisited that analysis in rejecting Microsoft's counterargument that the district court's anticompetitive-effects analysis should have incorporated a higher causation standard. *Id.* at 78.[19]

Google also suggests that the reasonably-appears-capable standard applies only to exclusion of nascent competitors. Br.42.n.6. But *Microsoft* stated clearly that the standard applies "when exclusionary conduct is aimed at producers of nascent competitive technologies *as well as when it is aimed at producers of established substitutes*." 253 F.3d at 79 (emphasis added).

Amici go further than Google, contending that plaintiffs must prove that conduct is the but-for cause of an "anticompetitive effect" *before* proving causation under the reasonably-appears-capable standard. Former.Fed.Enforcers.Br.9-13. But "ordinarily this court will not entertain an *amicus*'s argument if not presented by a party." *Huerta*

---

[19]     The court here noted that there was little substance separating the parties' positions on the correct standard for establishing a prima facie case: "Whether conceived as a one-step or two-step inquiry, the *prima facie* case boils down to one fundamental question: Has the plaintiff shown that the monopolist's conduct harmed competition?" Dkt.626.23.

*v. Ducote*, 792 F.3d 144, 151 (D.C. Cir. 2015).[20] Regardless, the argument is wrong.

Though *Microsoft* referenced the "but for" world in finding restrictions on modifying the Windows desktop to be anticompetitive, 253 F.3d at 62, *Microsoft* found many other acts to be anticompetitive without any reference to a but-for showing. Instead, *Microsoft* found the "requisite anticompetitive effect," 253 F.3d at 58-59, based on how the conduct (other than competition on the merits) contributed to protecting Microsoft's monopoly power. For instance, a restriction on modifying the Windows boot sequence had "a substantial effect in protecting Microsoft's market power" and therefore was "anticompetitive." *Id.* at 62. Product integration "protect[ed] Microsoft's monopoly" and thus was "anticompetitive." *Id.* at 65. Microsoft's deals with IAPs had "a significant effect in preserving its monopoly." *Id.* at 71. Certain independent-software-vendor deals were prima facie "anticompetitive" because they had "a substantial effect in preserving Microsoft's monopoly." *Id.* at 72. Other independent-software-vendor deals

---

[20] At most, Google presented the argument "skeletal[ly],'" forfeiting it. *Perioperative Servs. & Logistics, LLC v. U.S. Dep't of Veterans Affs.*, 57 F.4th 1061, 1067 (D.C. Cir. 2023).

"protected Microsoft's monopoly" and thus were "anticompetitive." *Id.* at 76. And Microsoft's deception of developers "served to protect its monopoly" and "therefore was anticompetitive." *Id.* at 77. In short, "*Microsoft* teaches[] [that] an anticompetitive effect is anything that 'has a substantial effect in protecting [a firm's] market power, and does so through a means other than competition on the merits.'" *FTC v. Meta Platforms, Inc.*, 775 F. Supp. 3d 16, 54 (D.D.C. 2024) (quoting *Microsoft*, 253 F.3d at 62).

Moreover, *Microsoft* rejected a but-for standard because hinging liability on "a plaintiff's ability or inability to reconstruct the hypothetical marketplace absent a defendant's conduct would only encourage monopolists to take more and earlier anticompetitive action." *Microsoft*, 253 F.3d at 79; *cf. Standard Oil Co. of Cal. v. United States*, 337 U.S. 293, 309-10 (1949) (but-for proof "would be a standard of proof if not virtually impossible to meet, at least most ill-suited for ascertainment by courts").

In arguing to the contrary, amici misread *Rambus*. There, the FTC alleged that Rambus violated Section 2 by not disclosing patents to a standard-setting organization, JEDEC, setting dynamic-random-

access-memory standards. 522 F.3d at 459. Rambus did not dispute its monopoly power. *Id.* at 463. Thus, "the critical question [was] whether Rambus engaged in exclusionary conduct." *Id.*

On that issue, the Commission found that "[h]ad Rambus fully disclosed its intellectual property, 'JEDEC either [1] would have excluded Rambus's patented technologies from the JEDEC [dynamic-random-access-memory] standards, or [2] would have demanded [reasonable-and-nondiscriminatory] assurances, with an opportunity for *ex ante* licensing negotiations,'" to lower licensing fees. 522 F.3d at 463. On review of the Commission's decision, this Court "assume[d] without deciding" that the first possibility would have been anticompetitive—"if Rambus's more complete disclosure would have caused JEDEC to adopt a different (open, non-proprietary) standard, then its failure to disclose harmed competition." *Id.* But there was "insufficient evidence" to support that theory. *Id.* at 464. And the second possibility did not support a prima facie claim because deception is not exclusionary when its only effect is to "raise[] the price secured by a seller." *Id.* Following *Microsoft*, the Court explained that conduct is exclusionary if it "impair[s] rivals in a manner tending to bring about or

protect a defendant's monopoly power," and "an otherwise lawful monopolist's use of deception simply to obtain higher prices normally has no particular tendency to exclude rivals and thus to diminish competition." *Id.*; *see NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 136-37 (1998) (regulatory fraud "raising telephone service rates" did not establish harm to the "competitive process").

Amici latch onto *Rambus*'s statement, 522 F.3d at 466-67, that there would be no harm to competition "if JEDEC, in the world that would have existed but for Rambus's deception, would have standardized the very same technologies," Former.Fed.Enforcers.Br.11. But that statement simply reflected the Commission's own description of the second possibility (higher licensing fees with the same standard). 522 F.3d at 461. *Rambus* never said "but-for" proof was *always* required for anticompetitive conduct. *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 801 (N.D. Cal. 2022). To the contrary, *Rambus* endorsed the exclusionary-conduct standard from *Microsoft* focusing on the impairment of rivals' ability to compete. 522 F.3d at 464.

Moreover, *Rambus* said nothing about exclusive-dealing claims (which were not at issue), and could not have overruled the *en banc*

*Microsoft* Court's exclusive-dealing framework. The district court scrupulously followed that framework here, finding as a factual matter that Google's long-term exclusive default agreements *in fact* harmed the competitive process by foreclosing half the search market for years-long periods and depriving rivals of the scale they needed to compete for future deals. Indeed, "Google did not dispute during the liability phase that, by locking up the defaults, it received more queries than it would have without them." JA__(Rem.Op.79). This clear harm to *competition* was unlike the (legally insufficient) second possibility in *Rambus*, which was that Rambus's silence merely "rais[ed] prices (*without an effect on competitive structure*)." 522 F.3d at 466 (emphasis added).

A but-for standard not only conflicts with *Microsoft*—it would be particularly inappropriate in this case given "the lengths to which Google [went] to avoid creating a paper trail for regulators and litigants." JA__(Liab.Op.275). Google failed to retain chat messages "even after Google received the document hold notice at the start of the investigative phase of this case," doing so only after Plaintiffs moved for sanctions years later. JA__(Liab.Op.273). It trained employees to add lawyers to "sensitive" communications and made "faux privilege[]"

claims. JA__(Liab.Op.273-74). And it "directed its employees to avoid using certain antitrust buzzwords," e.g., "market share," "dominance," "scale," and "network effects." JA__(Liab.Op.274). The court was rightly "taken aback" by this conduct, which explained why this case "lacked the kind of nakedly anticompetitive communications" in other cases. JA__(Liab.Op.275). Google should not be rewarded for this egregious conduct. *See United States v. Google LLC*, 778 F. Supp. 3d 797, 873 (E.D. Va. 2025) ("Google's systemic disregard of the evidentiary rules regarding spoliation of evidence and its misuse of the attorney-client privilege may well be sanctionable."); *In re Google Play Store Antitrust Litig.*, 664 F. Supp. 3d 981, 992-94 (N.D. Cal. 2023) (sanctioning Google for "intend[ing] to subvert the discovery process," failing to preserve evidence, and "falsely assur[ing] the Court" otherwise).

d.     Google also errs legally and factually in arguing that exclusive dealing cannot be exclusionary without proof of "insistence" (e.g., "coercion"). Br.58-61. To start, Google has again changed course from below. While it said coercion was relevant, JA__(Liab.Closing.Tr.129:20-130:2), it never argued for such a strict legal requirement. In any event, exclusive deals can be anticompetitive

without coercion and even if the customer prefers exclusivity. *See, e.g.*, *FTC v. Motion Picture Advert. Serv. Co., Inc.*, 344 U.S. 392, 395-96 (1953) (condemning exclusive contracts although they "were beneficial to the distributor and preferred by [purchasers]"); *Microsoft*, 253 F.3d at 68-71 (considering only whether exclusive deals foreclosed rivals and harmed competition).

Indeed, Google's own authorities establish that "[c]oercion" "is unnecessary to establish a successful exclusive dealing case," *In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, 44 F.4th 959, 996 (10th Cir. 2022); that "exclusive dealing arrangements instigated by the customer" can be anticompetitive, *id.* at 995 n.14; and that "there is no set formula" for determining whether exclusive dealing harms competition, *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 403 (3d Cir. 2016). And Google's cases involve very different facts; the deals there did not prevent rivals from developing better products or services, as Google's did. In *EpiPen*, the plaintiff had "clear success" competing against the defendant. 44 F.4th at 989 n.11. In *Eisai*, there was no evidence of "substantial foreclosure or anticompetitive effects." 821 F.3d

at 407. And in *Rambus*, there were no allegations that the deception impaired rivals' quality. 522 F.3d at 461.

Nevertheless, the court found several forms of "insistence" here. The court found that "exclusive deals are a feature of the market only because *Google* has *insisted* on them, not its distribution partners." JA__(Liab.Op.251) (emphasis added). For example, Apple twice sought "greater flexibility," proposing in 2009 and 2012 that it have the option but not the obligation to set Google as the default and still receive revenue share. JA__(Liab.Op.110-11). Google refused, and Apple acquiesced. *Id.*

Google fails to explain away this evidence. The court found that Google's agreements harmed competition "[f]or more than a decade" before its decision in 2024. JA__(Liab.Op.226). Even assuming the violation began in 2014, as Google does, the 2012 negotiations produced a 2014 agreement effective for years afterwards. JA__(Liab.Op.110-11). Moreover, based on its prior experiences with Google, Apple "concluded that it [was] financially infeasible to switch default GSEs or seek greater flexibility in search offerings." JA__(Liab.Op.201).

Google's view that Apple's requests were unreasonable does not change the bottom line—Apple sought greater flexibility and was rebuffed. Moreover, Google's rhetoric that it would be "money for nothing" to pay revenue share on non-default queries, Br.64, contradicts the market realities that Google pays Apple revenue share on queries on user-downloaded Chrome, JA__(Liab.Op.103); JA__(JX0033.797), and Bing, DuckDuckGo, and Yahoo pay revenue share without default placement, JA__(DX0962.053-57); JA__(DX0946.912, 915); JA__(DX0924.256, 259, 261); JA__(DX1027.886, 888, 891).

Finally, Google claims that two "statements" by the court are "unsupported by the record," Br.65, but does not argue that those findings are clearly erroneous. Nor, importantly, does it claim that the court clearly erred in finding more broadly that Google—not developers—"insisted on" exclusivity, JA__(Liab.Op.251), and that Apple did not want it, JA__(Liab.Op.110-11).

Regardless, the record amply supports those statements. First, the cited testimony shows that in 2012 "Google stood firm that '[i]f they wanted to receive revenue share,' Apple had to maintain Google as the exclusive Safari default." JA__(Liab.Op.110) (quoting Liab.Tr.5001:8-

11). The witness testified that Apple tried to remove its obligation to make Google the default search provider in Safari, JA__(Liab.Tr.4999:4-6), but that obligation "remained in place" because Apple "wanted to receive revenue share," JA__(Liab.Tr.5001:8-11). Second, the cited document shows that Google rejected Apple's 2009 proposal for greater flexibility because Apple could "use Google as the default for some, but not all, locations or product lines/versions." JA__(Liab.Op.110) (citing UPX0605.269). That was an "issue[]," as well as a "risk[]," for Google, and revenue share without default placement would be a "tax" in Google's view. JA__(UPX605.270); *see also* JA__(Liab.Tr.5069:20-5070:12).

The court also found "all-or-nothing" deals. *Contra* Br.61.n.8. The ISA required Apple to make Google the Safari default on *all* devices across *all* search access points in the United States. JA__(Liab.Op.204). Likewise, Mozilla must make Google the default on *all* Firefox search access points. JA__(Liab.Op.205). Limited carveouts in the Apple ISA for a few foreign markets do not change the fact that the agreement is "all-or-nothing" *in the relevant U.S. market.*

The court also found "inducements" with "strings attached." Br.58. Google's massive revenue-share payments make it "financially infeasible to switch default GSEs or seek greater flexibility in search offerings." JA__(Liab.Op.201). Google's payments are at least as inducing as those in *Microsoft*, on which Google relies. Br.57; *see Microsoft*, 84 F. Supp. 2d at 80, 77, 108 (Microsoft granted AOL favorable placement and gave "valuable things" to independent software vendors).

e. Google is also wrong that disincentivizing Apple from entering the general-search market is not anticompetitive. Br.53. Agreements to allocate markets are generally per se illegal, *see, e.g.*, *Palmer v. BRG of Georgia, Inc.,* 498 U.S. 46, 49-50 (1990) (per curiam), and courts have condemned "agreements not to compete" under Section 2, *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377 (1973); *see* Areeda ¶703d ("even the unaccepted solicitation to divide a market could make out the conduct element of a monopoly maintenance" claim).

More specifically, a "large and unjustified" payment inducing a rival to "stay away from the [defendant's] market" "can bring with it the risk of significant anticompetitive effects." *Actavis*, 570 U.S. at 158.

Thus, it is far from "perverse," as Google argues, that the more Google pays, "the more unlawful its conduct." Br.53. Such a payment can "induce" the rival to abandon competition and instead share the "monopoly profits that would otherwise be lost in the competitive market." *Actavis*, 570 U.S. at 154. Thus, while simply offering customers an attractive price is not anticompetitive conduct (unless predatory), *Microsoft*, 253 F.3d at 68, paying actual or potential rivals not to compete is heartland anticompetitive conduct.[21]

As the court found, the Apple ISA "unquestionably" helped prevent potential competition from Apple in the general-search-services market. JA__(Liab.Op.241-42). Apple invested heavily to develop its search capacity, including hiring Google's head of search. JA__(Liab.Op.103-04, 241). Google "underst[oo]d that Apple could develop its own GSE to replace Google as the default in Safari," JA__(Liab.Op.241), with its CEO identifying Apple as a potential search competitor, JA__(Tr.7693:11-7698:11). Google employees discussed "Apple's ability and likely plan to build web answers and a general

---

[21] *Microsoft* came before *Actavis* and did not address situations like the one there—and here—where a market incumbent's payments to a counterparty "prevent the risk of competition." *Actavis*, 570 U.S. at 157.

search engine," noting that the ISA "may be lucrative enough" to keep Apple at bay. JA__(UPX0339.683-84). And Google explored "marketing spend" as "a way to mitigate the risk of Apple (potentially) launching its own search engine, replacing [Google] as a default." JA__(UPX0002.390). Thus, Google paid Apple billions in revenue share—17.5% of Apple's operating profit—"when it already has the best search engine" because "the payments 'provide[d] an incredibly strong incentive for the ecosystem to not do anything.'" JA__(Liab.Op.201, 241).[22]

The court's holding does not portend antitrust liability for "*any* firm" contracting for an input rather than building it in-house. Br.53. Even where a monopolist's payments preventing actual or potential competition establish a prima facie case, a defendant "may show in the antitrust proceeding that legitimate justifications are present." *Actavis*, 570 U.S. at 156. Here, Google failed to show such justifications—and does not challenge the rejection of its justifications on appeal.

---

[22]    *Actavis* disproves Google's suggestion that sharing profits cannot be anticompetitive. Br.54.

f.      Google's claim that the decision leaves firms without guidance on how to compete lawfully, Br.52, falls flat. This case follows *Microsoft*, which itself drew on "a century of case law on monopolization." 253 F.3d at 58, 68-69. And defendants can establish a valid "procompetitive justification" for their conduct, *id.* at 59, which Google failed to do, JA__(Liab.Op.248-58). Thus, Google's call for "clear rules," Br.85, amounts to a plea for new defendant-friendly protections.

Google's lament is particularly rich given the abundant evidence that it knew that exclusivity gave it a significant leg up. As Google's chief scientist confessed, "We don't have better algorithms than anyone else. We just have more data." JA__(UPX0856.345). Google thus recognized that "its position '[was] still very vulnerable if defaults were to change,'" JA__(Liab.Op.30), and used exclusive deals to ensure they did not. Anyone reading *Microsoft* would know such actions risked liability.

### 3.      Even crediting Google's browser-agreement arguments, the court's liability determinations should stand.

Even assuming they were meritorious, none of Google's browser-agreement arguments would undermine the court's liability

determinations. Even if the agreements were not exclusive, that does not make them lawful. "[S]pecific rules for common forms of alleged misconduct," such as exclusive dealing, are exceptions to Section 2's "general inquiry" into the conduct's competitive effects. *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) (Gorsuch, J.).

Below, Plaintiffs argued—before and after trial, *contra* Br.69— that the agreements were anticompetitive whether analyzed under the general Section 2 standard or an exclusive-dealing framework, JA__(Pls.'.Opp'n.Summ.J.15-18, 40-43); JA__(Pls.'.Pre-Trial.Br.3.n.2). The court chose to apply the latter, but its extensive findings of anticompetitive harm, *see supra* pp.77-80, make out a prima facie case under the general standard too, *see, e.g.*, *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1171-76 (10th Cir. 2023) (suggesting that plaintiff alleged a prima facie case under the general standard or an exclusive-dealing framework); *Microsoft*, 253 F.3d at 61 (license restriction preventing OEMs from installing rival browsers condemned under general standard).

Even under an exclusive-dealing framework, a holding that the browser agreements are lawful would not require reversal because

liability could rest on the Android agreements alone. Through the MADA, Google leveraged its "must-have" Play Store to secure "prized placements" for Chrome and Google Search Widget that are "extremely effective at driving searches to Google." JA__(Liab.Op.210). And the Android revenue-share agreements "formalize[d] the practical exclusivity of the MADAs" and "greatly restrict[ed] a partner's ability to promote other GSEs." JA__(Liab.Op.212). Together, they foreclosed 19.4% of the market, JA__(Liab.Op.217), depriving rivals of data that would enable them to compete more effectively, *see* JA__(Liab.Op.39) ("For GSEs with little scale, even a small amount of data can result in meaningful improvements."). And that share rises to 39% if calculated from available queries not otherwise covered by the browser agreements (30%) and Google's control of Chrome (20%) (19.4% of 50%).[23] JA__(Liab.Op.217).

Regardless of whether the foreclosure share would be 19.4% or higher, it would suffice to establish substantial foreclosure under

---

[23] Plaintiffs explained below that channels controlled by Google— apart from the unlawful agreements—should be accounted for by including them in the foreclosure number itself or by adjusting the requisite level of foreclosure. JA__(Pls.'.Proposed.Conclusions.Law.25- 26).

*Microsoft*, which explained that "exclusive contracts" may violate Section 2 even though they "foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation." *Microsoft*, 253 F.3d at 70. And it found exclusive deals covering "a relatively small channel" (without a precise percentage measure) anticompetitive, *id.* at 72, given the foreclosure of other channels. Thus, the foreclosure from the Android agreements suffices to establish a prima facie case.

Finally, Google's browser-agreement arguments leave untouched the court's holding that Google monopolized the general-search-text-ads market. The court found that Google's conduct had additional anticompetitive effects in that market. *Contra* Br.74-75. It "ensure[d] that advertisers will continue to spend 90% of their text ad dollars with Google," JA__(Liab.Op.264-65), notwithstanding Google's price increases and quality degradation, JA__(Liab.Op.259-64). These unchallenged findings sustain liability in the general-search-text-ads market.

## II. Google's Challenges To The Remedy Are Meritless.

### A. The District Court Did Not Abuse Its Discretion in Ordering the Data-Sharing and Syndication Remedies.

The data-sharing and syndication remedies were well within the "broad remedial discretion enjoyed by the district court." *Massachusetts*, 373 F.3d at 1219. Recognizing that "caution is key," JA__(Rem.Op.128) (quoting *NCAA v. Alston*, 594 U.S. 69, 106 (2021)), the court made thorough findings regarding both the requisite causal connection between Google's conduct and its continuing monopolies and the need for data-sharing and syndication to address consequences of Google's violations. Google's challenges to these remedies misrepresent the law and the court's findings.

1. Before determining remedies, the court "return[ed] to its liability decision and the underlying factual record to determine whether the evidence presented established causation by a strong inference or a weak one." JA__(Rem.Op.75). The answer was clear: Google's agreements "significantly contributed to" the maintenance of its monopolies. JA__(Rem.Op.77). Google "received more queries than it would have without [the defaults]," and thus was able "to persistently widen the data moat, ensuring that rivals could not achieve a degree of

quality that would pose a threat to Google." JA__(Rem.Op.79). Google's

foreclosure of the market "almost certainly discouraged new entrants."

JA__(Rem.Op.80). And "Google's high revenue share payments, a clear

by-product of the exclusive agreements," JA__(Rem.Op.81), were "used

to lock in the next round of distribution agreements," JA__(Rem.Op.80),

further perpetuating Google's dominance.

Thus, the evidence "required no guesswork about the exclusive

agreements' impacts on competition—they 'froze' the search ecosystem

in place" and "made certain that no competitor would try to lay siege" to

Google's position. JA__(Rem.Op.81). And the record "support[ed] a

stronger causal connection than the one sustained in *Microsoft*." *Id.*[24]

The court then found that limited data-sharing and syndication

were needed to remedy certain consequences of Google's conduct.

Data-sharing "would narrow the scale gap created by Google's exclusive

distribution agreements," JA__(Rem.Op.130), enabling rivals to

"improve their quality and monetization and thereby take advantage of

---

[24] *Microsoft* involved an "Intel-compatible PC operating systems" market and exclusionary conduct directed at products—browsers and JAVA—*outside* that market. 253 F.3d at 51, 60, 74. Here, by contrast, the court found that Google's conduct caused harm *in* the relevant markets *to* rival GSEs. *E.g.*, JA__(Liab.Op.226, 263-64).

the network effects phenomenon that has been pivotal to Google's success," JA__(Rem.Op.133). As in *Google Play Store*, "[o]nce the court established, based on the trial evidence, that network effects were among the consequences of Google's anticompetitive conduct, the court was permitted to shape relief targeted to those effects." 147 F.4th at 950; JA__(Rem.Op.109).

The court found that syndication would likewise address consequences of Google's conduct. Syndicating results "would enable Qualified Competitors to compete in the short term as they work towards developing a GSE that can independently compete against Google." JA__(Rem.Op.171). Syndicating text ads would similarly address Google's unlawfully enhanced monetization advantage. JA__(Rem.Op.183). Thus, syndication would deny Google "freedom from threats"—a fruit of its violation. JA__(Rem.Op.82).

2.      Google's attack on these remedies is meritless. In government antitrust cases, a court has broad authority to "prevent and restrain [antitrust] violations." 15 U.S.C. § 4. *Microsoft* distilled Supreme Court precedent into four mandatory goals for remedies in such cases—goals Google never discusses. The decree "must seek" to

"unfetter [the] market from anticompetitive conduct," "terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future." *Microsoft*, 253 F.3d at 103 (quoting *Ford*, 405 U.S. at 577, and *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968)).

Given these weighty objectives, antitrust remedies are "*not* limited to the restoration of the status quo ante," *Ford*, 405 U.S. at 573 n.8 (emphasis added), as Google suggests, Br.88. Rather, they should seek to "deprive the defendants of any of the benefits of the illegal conduct," *Grinnell*, 384 U.S. at 577, and "restor[e] conditions in which the competitive process is revived," *Massachusetts*, 373 F.3d at 1231.

And on appeal, the question before this Court is "whether the relief represents a reasonable method of eliminating the consequences of the illegal conduct." *Pro. Eng'rs*, 435 U.S. at 698. This standard reflects the district court's remedial discretion and appropriately makes "the monopolist bear[] the risk of the uncertain consequences created by its exclusionary acts." Areeda ¶653f.

Google's arguments contradict these guiding principles. Google claims that an injunction against the unlawful conduct is a "baseline" that a court must specially "justify moving beyond." Br.86. Not so. "If all that was done was to forbid a repetition of the illegal conduct, those who had unlawfully built their empires could preserve them intact. They could retain the full dividends of their monopolistic practices and profit from the unlawful restraints of trade which they had inflicted on competitors." *Schine Chain Theatres v. United States*, 334 U.S. 110, 128 (1948). To deprive the fruits of the violation and restore competition, remedies often "must go beyond the narrow limits of the proven violation." *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 262 (1959) (quoting *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 90 (1950)); *accord Pro. Eng'rs*, 435 U.S. at 698; *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 486 (9th Cir. 2021).

Google likewise argues that antitrust decrees "must extend no further than necessary." Br.86. Tellingly, Google's authorities for this assertion are a private plaintiff's age-discrimination case, *Babb v. Wilkie*, 589 U.S. 399, 413-14 (2020), and a case applying the statutory narrow-tailoring requirement of the Prison Litigation Reform Act,

112

*Brown v. Plata*, 563 U.S. 493, 531 (2011). *Antitrust* precedent rejects Google's narrow-tailoring approach. Antitrust courts are "not obliged to assume, contrary to common experience, that a violator of the antitrust laws will relinquish the fruits of his violation more completely than the court requires him to do." *Int'l Salt Co. v. United States*, 332 U.S. 392, 400 (1947). Thus, they may "restrain acts which are of the same type or class as [the] unlawful acts." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 132 (1969). They may also order "forward-looking provisions" addressing conduct that "played no role in [the] holding [that the defendant] violated the antitrust laws." *Massachusetts*, 373 F.3d at 1215. For instance, in *Massachusetts*, this Court affirmed the requirement that Microsoft disclose application programming interfaces "beyond the functionality of the middleware at issue in [the] decision on liability" to "facilitat[e] the entry of competitors into a market from which Microsoft's unlawful conduct previously excluded them." *Id.* at 1218.

Of course, not every Section 2 violation "justif[ies] full feasible relief against the monopolist to create maximum competition." *Microsoft*, 253 F.3d at 106. The scope of the appropriate remedy

depends on the "causal connection between [the defendant's] anticompetitive conduct and its dominance in the [relevant] market." *Massachusetts*, 373 F.3d at 1234. That was *Microsoft*'s point in saying that a remedy should be "tailored to fit the wrong." 253 F.3d at 107.

Here, the court assessed the relevant causal connection under the proportionality standard from *New York v. Microsoft*, 224 F. Supp. 2d at 102. Under that standard, an "injunction against continuation of [the unlawful] conduct" requires only evidence that the conduct "reasonably appear[s] capable" of significantly contributing to the monopoly, *Microsoft*, 253 F.3d at 106 (alteration in original)—the minimum for the court to infer the conduct significantly contributed to the monopoly. At the other end of the spectrum, structural relief generally requires a "clearer indication of a significant causal connection between the conduct and creation or maintenance of the market power." *Id.* (cleaned up). For remedies in between—like the data-sharing and syndication here[25]—there should be "proportionality between the strength of the

---

[25] Google suggests that any remedy requiring "sharing" information or resources with rivals is akin to "a literal breakup" of the monopoly, and that the remedies here resemble the open-source remedy in *Massachusetts*. Br.87. Both contentions are wrong. *Massachusetts*

evidence of the causal connection and the severity of the remedy." *New York*, 224 F. Supp. 2d at 102.

Google assails the decision below as improperly based on "a self-assessment of [the court's] 'confidence' in its liability-stage findings," Br.92, but that is precisely what the proportionality standard—which looks to *the strength of the evidence*—calls for. Google has elsewhere endorsed that standard as supplying "the appropriate legal framework." *See supra* p.5. And Google's claim that the standard "stymies appellate review" fails; this Court had no trouble reviewing the district court's proportionality determinations in *Massachusetts*. 373 F.3d at 1222.

3.     Google's assertions that the court failed to find its conduct "had *any concrete effect at all*," Br.94, and that the court's findings "suggest[] that market outcomes would have been the same" without the violation, Br.7, are willfully blind to the court's five pages of

upheld a sharing remedy without treating it as structural. 373 F.3d at 1218. And the open-source remedy in *Massachusetts* would have given rivals a perpetual, royalty-free license to Microsoft's source code, *id.* at 1230, which is not the case here. Google need not "produce data that is largely a product of engineering and innovation," JA__(Rem.Op.145), and will be compensated for data-sharing, JA__(Rem.Op.148), and syndication, JA__(Rem.Op.174, 185).

causation findings, JA__(Rem.Op.74-82). The court found that Google's conduct had multiple concrete effects that substantially contributed to Google's monopolies: it increased Google's scale advantage; made investing in search less viable; and made distributors dependent on working with Google, JA__(Rem.Op.79-81). In short, the court found exactly what Google calls for—that the unlawful conduct "*in fact*" "affect[ed] [the] market." Br.94.

Google has not challenged these findings as clearly erroneous, and the evidence supporting them was powerful. Google never persuasively explained (and does not explain here) why it was paying *$26 billion* annually for defaults if rivals had no chance of winning them anyway. And evidence showed that Google was concerned about losing defaults: for example, Google's first exclusive deal with Apple was motivated by Google's "concern[] that Yahoo might replace Google." JA__(Liab.Op.109).

Likewise, ample evidence showed that any switch in defaults would have shifted substantial queries to rivals, *see supra* pp.72-74, and that where rivals gain access to greater scale, they improve their quality. On Windows desktops, where Bing is the default on the Edge

116

browser, the "added search volume has allowed Microsoft to improve its search quality," "to the extent that it is now nearly on par with Google." JA__(Liab.Op.229).

Google wrongly argues that distributors' expressed preferences for Google while it was locking up defaults means there was no causation. Br.90-91. That distributors chose Google *while it was impairing rivals' ability to compete* does not support Google's claim that that impairment had no effect. Nor does it show clear error in the court's finding that the impairment in fact *had* a significant effect in protecting Google's monopolies.[26]

4.    Google's true complaint appears to be that the court did not *quantify* the anticompetitive effect from Google's agreements. Google contends that the court needed to find "what ground" "rivals would have gained" absent Google's violation, Br.89-90, and then "restore" only that

---

[26]    Google falsely claims that "Plaintiffs tried" unsuccessfully to show what ground Google's rivals would have gained absent its violations. Br.89-90. Plaintiffs' expert projected what market share would shift to rivals if the court banned Google from paying for defaults *now*. JA__(Rem.Op.120). Plaintiffs never undertook to show exactly what would have happened absent Google's decade-plus unlawful monopolization because doing so was not required.

but-for world, Br.88. *Microsoft* and *Google Play Store* rejected that argument.

*Microsoft* rejected a but-for standard just like Google's, holding that "neither plaintiffs nor the court can confidently reconstruct a product's hypothetical technological development in a world absent the defendant's exclusionary conduct." 253 F.3d at 79. This difficulty "is no less intractable at the remedies stage than it was at the liability stage," especially where, as here, the conduct occurred for over a decade in an evolving industry. JA__(Rem.Op.68-69). Even Google's expert acknowledged that "nobody is going to" present a but-for world "in this case" or "in most cases." JA__(Rem.Tr.4215:9-12); *see New York*, 224 F. Supp. 2d at 147-48 (rejecting but-for standard because it "demand[ed] of Plaintiffs precisely what the appellate court deemed to be largely unattainable"). Indeed, under *Microsoft*, but-for proof is not required even for a divestiture.[27]

---

[27] *Microsoft* vacated and remanded the divestiture order, instructing the district court to assess whether the causal connection between Microsoft's conduct and its market position supported divestiture. 253 F.3d at 45, 105-06. That remand "would have been unnecessary" if divestiture required a but-for showing, JA__(Rem.Op.67), since the district court had already rejected "the position that Microsoft would

Google wrongly suggests that in citing two damages cases,

*Microsoft* held that the scope of equitable relief should be determined

with a but-for yardstick. Br.91. *Microsoft*'s point in citing those cases,

which vacated damages awards after reversing certain liability

theories, was that if the basis for liability is narrowed on appeal, the

district court must reconsider whether the remedy ordered remains

appropriate. 253 F.3d at 104-05. As noted above, *Microsoft* elsewhere

rejected but-for tests.

*Google Play Store* recently rejected a similar but-for argument.

The Ninth Circuit upheld a remedy granting third-party app stores

access to the Play Store's app catalog, which enjoyed network effects

that Google's unlawful conduct reinforced. 147 F.4th at 931-33. Google

insisted that "some of the Play Store's network effects must owe to '[its]

lawful [first-mover] advantage,' rather than any illegal conduct," but

the court held that the law "does not require that an injunction only

---

have lost its position in the [relevant] market but for its anticompetitive behavior," *Microsoft*, 253 F.3d at 107. Likewise, in *United Shoe*, the Supreme Court told the district court to consider divestiture, 391 U.S. at 250-52, even though the district court had not found but-for causation, *United States v. United Shoe Mach. Corp.*, 110 F. Supp. 295, 344-45 (D. Mass. 1953) (finding that "United's control [of the market] does not rest solely" on ordinary competition).

touch the consequences of a defendant's conduct." *Id.* at 949 (citing *Optronic*, 20 F.4th at 486). It sufficed that "network effects were among the consequences of Google's anticompetitive conduct" and the remedy "offer[ed] a 'reasonable method'" of reducing those effects. *Id.* at 950.

So too here. The court found that the consequences of Google's conduct included unlawfully enhanced scale, quality, and monetization advantages. JA__(Rem.Op.78-97). And it concluded that the data-sharing and syndication remedies would be a "reasonable method of eliminating th[os]e consequences." JA__(Rem.Op.130).

In addition to contradicting precedent, Google's but-for approach to remedies is impractical and inappropriate. Google suggests that a court must assess the share of the market that a defendant's unlawful conduct "captured," Br.93, and then somehow "restore" that share, Br.88. But even if a court could reliably measure the share shift from a defendant's conduct, a court cannot simply reverse it; a court's role is to "enforc[e] a policy of competition," *Alston*, 594 U.S. at 73, not engineer market outcomes.

Finally, Google argues that "plaintiffs' 'evidentiary predicament' was that evidence supporting their remedial proposal did not exist here,

not that such evidence could never exist anywhere." Br.91. But as explained above, Google is demanding an evidentiary showing the law does not require, and plaintiffs' only "evidentiary predicament" was due to Google's litigation misconduct. *See supra* pp.95-96.

## B. The District Court Did Not Abuse Its Discretion by Including Certain GenAI Products in the Remedy.

The court did not abuse its discretion in allowing certain companies offering GenAI products to be Qualified Competitors under the decree.

1. As the court recognized, "[t]he emergence of GenAI changed the course of this case." JA__(Rem.Op.1). GenAI products were hardly on the map by the liability trial in 2023. *See* Dkt.357.3-4. But by the 2025 remedies hearing, testimony "placed GenAI front and center as a nascent competitive threat" to Google Search. JA__(Rem.Op.2).

In the remedies hearing, the court heard "ample evidence that GenAI chatbots grounded in general search"—i.e., able to generate a response from information in a search index—"perform an information-retrieval function that is similar to GSEs." JA__(Rem.Op.99). Although such products have "not eliminated the need for GSEs," they are "a potential threat to Google's dominance in the market for general search

services." JA__(Rem.Op.100). An Apple executive testified that GenAI firms may pose a *greater* threat to Google in the coming years than Google's current rivals. JA__(Rem.Tr.3845:13-3846:2).

2.      Given GenAI's increased potential as a threat to Google, the court properly extended the remedy to GenAI technologies. Prohibiting Google's unlawful contracting practices as to GenAI was a quintessential exercise of courts' "broad power to restrain acts which are of the same type or class as [the] unlawful acts," *Zenith*, 395 U.S. at 132, and "ensure that there remain no practices likely to result in monopolization in the future," *Microsoft*, 253 F.3d at 103.

Likewise, extending the data-sharing and syndication remedies to GenAI firms was critical to "pry" the market "open to competition." *Ford*, 405 U.S. at 577-78. GenAI firms face the same scale disadvantage and barriers to entry as other would-be search competitors, and the data-sharing and syndication remedies help address those obstacles. JA__(Rem.Op.139, 171).

3.      Google's objections that GenAI was not part of the relevant markets or liability findings contradict its own position below. Google itself proposed extending the decree's prohibitory relief to GenAI,

122

Dkt.1185.2-5, recognizing that it was appropriate for the court to enable GenAI products "to compete on the merits for distribution," Dkt.1359.15. Google does not explain why applying prohibitory relief to GenAI is appropriate but other relief is not.

*Microsoft* also belies Google's argument that the remedy cannot touch technologies beyond the liability findings. The district court there found that network and server-based technologies, though different from the middleware considered at liability, had a similar ability to threaten traditional operating systems. *New York*, 224 F. Supp. 2d at 129. The court thus ordered Microsoft to disclose technical information to network/server-based operating systems, finding that "[s]uch assistance is appropriate as it looks toward the new model of the 'platform threat' and seeks to ensure that the ill effects of Microsoft's conduct are not felt in this related area of the industry." *Id.* This Court upheld that "forward-looking" disclosure provision, though non-disclosure "played no role" in liability. *Massachusetts*, 373 F.3d at 1216-18.

Google accepts *Microsoft*'s teaching that remedies can extend to products outside the monopolized market to "restor[e] competition

inside the market[s]." Br.96. But that principle does not apply here, Google says, because the fact pattern here is not identical to *Microsoft*'s. Br.96-97. In Google's telling, *Microsoft* involved middleware that could have helped rival *operating systems* compete, but GenAI products are not "help[ing] other GSEs compete." *Id*. That purported distinction fails for two reasons. First, the court found that GenAI is increasingly being integrated into Google's GSE, JA__(Rem.Op.102), and that GenAI products like Google's Gemini and Microsoft's Copilot "have the potential to provide access points to GSEs," JA__(Rem.Op.46), demonstrating that GenAI *does* have the potential to help "GSEs compete." Second, any difference between GenAI and *Microsoft*'s middleware *strengthens* the case for including GenAI in the remedy, because GenAI products *themselves* are "a potential threat to Google's dominance." JA__(Rem.Op.100).

## CROSS-APPEAL

The court's data-sharing and syndication remedies are important measures that will help thaw the search ecosystem that Google has frozen for over a decade. But despite these significant remedies, the decree does not go far enough to fulfill the court's "duty" to provide

124

complete and effective relief for antitrust violations. *Du Pont*, 366 U.S. at 326-27.

As is, Google can continue leveraging its monopoly profits—which its unlawful conduct enhanced—to secure *future* search-default deals, keeping the ecosystem frozen. In addition, the remedy does nothing to redress the anticompetitive effect of revenue-share payments to Apple found by the court. *See supra* pp.79, 101-03.

The court recognized that a payment ban "could help restore competition," JA__(Rem.Op.126), and that by rejecting a payment ban, it was "leaving in place the very forces that 'effectively [have made] the ecosystem exceptionally resist[ant] to change,'" JA__(Rem.Op.127). The court nevertheless rejected a payment ban because it feared that a ban might harm third parties and cause adverse short-term effects in other markets. JA__(Rem.Op.121-27). That was error.

Courts must order relief that effectively restores competition and let *competition* determine the best outcomes for counterparties and consumers. The court's fears about what might happen in the short term if Google were barred from sharing its monopoly rents were no reason to forgo relief needed to make the monopolized markets

competitive again. The public interest is served by making monopolized markets more competitive—not by letting market participants share monopoly rents.

**The District Court Did Not Follow The Governing Legal Framework When Rejecting A Payment Ban.**

### A. Congress Has Set Forth an Order of Priorities in Government Antitrust Enforcement Actions.

"Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for the Executive to administer the laws and for the courts to enforce them when enforcement is sought." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978). Congress has set forth an order of priorities for antitrust remedies in government enforcement actions that is "deeply rooted in antitrust law":

> 1. The duty of giving complete and efficacious effect to the prohibitions of the statute; 2, the accomplishing of this result with as little injury as possible to the interest of the general public; and, 3, a proper regard for the vast interests of private property . . . .

*Du Pont*, 366 U.S. at 327-28 (quoting *United States v. Am. Tobacco Co.*, 221 U.S. 106, 185 (1911)).[28]

---

[28]    *Du Pont* involved a Clayton Act claim, but the Court's reliance on Sherman Act precedents made clear that its holding applies to all government enforcement actions. 366 U.S. at 318-19, 327 n.8.

Courts thus have a paramount "duty" to "effectively redress proved violations of the antitrust laws" in government enforcement cases. *Id.* at 323. Courts must first determine what remedies are "effective to restore competition" and to "redress the violations." *Id.* at 326. Courts can then proceed to consider other generally-applicable equitable factors—e.g., third-party hardships and public interests other than law enforcement—but only if "two or more effective remedies" are available. *Id.* at 327, 328 ("Plainly, if the relief is not effective, there is no occasion to consider the third criterion."); *see United States v. Union Pac. R.R. Co.*, 226 U.S. 470, 477 (1913) ("So far as is consistent with [ending antitrust violations] a court of equity . . . should conserve the property interests involved, but never in such wise as to sacrifice the object and purpose of the statute."). "[A]ll doubts as to the remedy are to be resolved in [the Government's] favor." *Du Pont*, 366 U.S. at 334.

Applying these principles, the Supreme Court has repeatedly emphasized trial courts' "duty" to order effective relief in government enforcement actions. *United Shoe*, 391 U.S. at 250 ("The trial court is charged with inescapable responsibility to achieve this objective."); *see Ford*, 405 U.S. at 573 ("The relief in an antitrust case must be 'effective

127

to redress the violations' and 'to restore competition.'" (quoting *du Pont*, 366 U.S. at 326)); *cf.* Areeda ¶325 ("The threshold requirement for any remedy is that it be effective to undo the harm that has been challenged."). And, to be effective, an antitrust decree "must" achieve the four objectives of unfettering the market from anticompetitive conduct, terminating the illegal monopoly, denying the defendant the fruits of the violation, and preventing recurrence. *See supra* pp.110-11.

*Du Pont*'s framework accords with the Supreme Court's approach to equitable relief in government enforcement actions brought in other statutory contexts. When a violation of federal law is shown, courts may choose among means of effectively enforcing the statute in crafting an injunction, but they "cannot, in their discretion, reject the balance that Congress has struck" by refusing effective relief altogether. *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001). Thus, for instance, the Court held in *Oakland Cannabis* that a district court's preliminary injunction enforcing the Controlled Substances Act could not carve out a "medical necessity exception" permitting conduct the Act prohibited. *Id.* at 499; *see also Hill*, 437 U.S. at 194 (affirming permanent injunction enforcing the Endangered Species Act without

balancing equities); *Gilbertville Trucking Co. v. United States*, 371 U.S. 115, 130 (1962) (the Interstate Commerce Commission must order any "necessary element of effective relief" regardless of the "economic hardship" (quoting *du Pont*, 366 U.S. at 326-27)).

## B. The District Court Did Not Ensure Its Decree Effectively Restored Competition.

In rejecting a payment ban, the court departed from these legal principles. The court never determined whether a payment ban was "necessary to assure effective relief," as it was required to do. 366 U.S. at 326. Instead, it wrongly skipped ahead to considerations other than effectiveness. That error of law was an abuse of the court's remedial discretion. *In re White*, 64 F.4th 302, 312 (D.C. Cir. 2023).

### 1. The district court failed to determine whether a payment ban was necessary for effective relief.

The court never answered whether a payment ban was necessary to effectively restore competition—the "key" question before the court. *Du Pont*, 366 U.S. at 326. Three critical determinations are missing from the court's analysis.

First, although the court acknowledged its "duty" to "restore competition," JA__(Rem.Op.58), it never made the overarching

determination whether a remedy without a payment ban would achieve that goal. In fact, the court expressed significant doubt that the permanent injunction would restore competition. The court thought that a payment ban "could bring about a much-needed thaw." JA__(Rem.Op.120). By contrast, the court stated that *without* a payment ban, distributors would have the incentive to retain Google because its monopoly profits and "superior monetization" enable it to "pay more." JA__(Rem.Op.127). The court thus "well recognize[d]" that forgoing a payment ban "could blunt the effectiveness of the remedies imposed." *Id.* Against this problem, the court offered only "hope that Google will not simply outbid competitors for distribution" in the new world of GenAI. JA__(Rem.Op.128).

Second, although the court acknowledged that "[t]he ordinary starting point is an injunction terminating the anticompetitive conduct," JA__(Rem.Op.59), it did not explain how the decree fixed all the anticompetitive harm it found at the liability stage. In particular, the court expressly found that Google's revenue-share payments to Apple were anticompetitive because, in addition to conferring exclusivity, they disincentivized Apple from entering the general-

search-services market. *See* JA__(Liab.Op.241-43). In the prior intervention appeal, this Court expressly recognized that, "[g]iven the district court's discussion" of Apple's disincentive to compete in the liability opinion, "it was quite likely that plaintiffs would pursue an order enjoining revenue sharing between Google and Apple (and not just such payments as they were tied to the ISA provisions protecting Google's default placement)." *Google*, 2025 WL 880552, at *3. Yet the court did not prohibit Google from paying Apple revenue share or explain how its decree otherwise addresses the anticompetitive effect stemming from Apple's incentives.

Third, although the court acknowledged that a remedy "must" deny the fruits of the violation, JA__(Rem.Op.58), it never found that a permanent injunction without a payment ban would effectively deny one of the specific fruits that it found at the liability stage. That fruit is increased "revenue pouring into [Google's] coffers" and Google's ability to "reinvest th[at] revenue" in "securing distribution to secure even more users." JA__(Rem.Op.95). The court agreed that a payment ban "would be one way" of denying that fruit, JA__(Rem.Op.121), but did not

131

ultimately address that fruit through a payment ban or any other remedy.

To the contrary, the court appeared to concede that this fruit would likely persist, noting that Google would maintain its "massive financial advantage" over rivals. JA__(Rem.Op.127). The court never explained how allowing Google to retain the ill-gotten gains of its unlawful conduct in this way was consistent with an effective remedy. *Cf. Liu v. SEC*, 591 U.S. 71, 79-80 (2020) (noting the "foundational principle" that "[i]t would be inequitable that [a wrongdoer] should make a profit out of his own wrong").

### 2. The district court improperly elevated other considerations above effective relief.

Instead of assessing whether a payment ban was needed for effective relief, the court identified two concerns it deemed "reason enough not to proceed with the remedy." JA__(Rem.Op.125). Neither consideration justified forgoing an effectiveness determination.

a. The court first suggested that a payment ban could cause third-party distributors to "earn less than they do now." JA__(Rem.Op.122). "[I]n equity," the court reasoned, a court "must consider the harms that might befall other market actors, even if that

means, as here, forgoing a remedy that could help restore competition." JA__(Rem.Op.126).

Not so. "[I]f the relief [was] not effective," the court had "no occasion" to elevate its own policy concerns for third-party distributors over Congress's command to restore competition. *Du Pont*, 366 U.S. at 328. And if the court had any doubt as to whether a payment ban were needed for effective relief, "all doubts as to the remedy [we]re to be resolved in [the Government's] favor." *Id.* at 334.

*Du Pont* illustrates the point. There, the government proposed a divestiture to remedy du Pont's unlawful acquisition of stock. 366 U.S. at 319. But the district court denied the divestiture because it "would have very serious adverse consequences" for "innocent stockholders." *United States v. E. I. du Pont De Nemours & Co.*, 177 F. Supp. 1, 42 (N.D. Ill. 1959), *vacated*, 366 U.S. 316 (1961). The court instead chose the milder remedy of pass-through of du Pont's voting rights. 366 U.S. at 321.

The Supreme Court vacated that remedy. It explained that "the adverse tax and market consequences which the District Court found would be concomitants of complete divestiture cannot save the [pass-

through] remedy" if pass-through was "not an effective remedy," which it was not. *Du Pont,* 366 U.S. at 328. Thus, divestiture was required.

Just as financial hardship for stockholders could not bar effective relief in *du Pont*, financial hardships to third-party distributors should not prevent effective relief here. That is true even if, as the court hypothesized, losing Google's payouts could hamper distributors in "creating new products and new capabilities." JA__(Rem.Op.124). A monopolist's payments to forestall competition often yield financial benefits for counterparties, but those benefits are not procompetitive. *Cf. Law v. NCAA,* 134 F.3d 1010, 1023 (10th Cir. 1998) ("cost savings" were not a valid procompetitive rationale for a rule capping coaches' salaries).

Moreover, any effect on distributors' innovation from a payment ban would occur in separate markets for browsers and smartphones. JA__(Rem.Op.123-25). But *du Pont* required the court to prioritize the monopolized markets. The anticompetitive consequences of Google's conduct occurred in those markets, and an effective remedy thus needed to address those consequences and "pry open to competition [the] market[s] that ha[ve] been closed." *Du Pont,* 366 U.S. at 323 (quoting

*Int'l Salt*, 332 U.S. at 401).[29] The court had no power to "sacrifice competition in [the relevant markets] for greater competition" in the browser and smartphone markets. *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 611 (1972). Such tradeoffs "must be made by Congress and not by private forces or by the courts." *Id.*

b.     The court also rejected a payment ban because of the "possibility" of short-term "adverse market effects." JA__(Rem.Op.125-26). In particular, the court feared that if distributors lost revenue, that "might" affect prices and quality in browser and smartphone markets "in the short term." *See* JA__(Rem.Op.126). The court also pointed to a study suggesting that, although a payment ban "would lead to Google's market share falling significantly" by helping to restore competition, this shift would cause "a *large reduction* in consumer surplus" because most users currently prefer Google. JA__(Rem.Op.127). But that study did not attempt to quantify the long-run consumer benefits of restoring

---

[29]     If the court determined that multiple remedies—e.g., both a partial and a complete payment ban—would be effective in achieving the remedial goals, it could *then* have proceeded to consider whether one would cause less third-party harm than the other.

competition in search, JA__(Rem.Tr.2191:16-18), which are precisely what *du Pont* required the court to prioritize.

Antitrust remedies will often have short-term effects on prices and quality. Those consequences—whether temporarily beneficial or harmful to consumers—do not displace the court's duty to "'redress the violations' and 'to restore competition'" in the relevant market. *Ford*, 405 U.S. at 573 (quoting *du Pont*, 366 U.S. at 326). The long-term benefits of greater competition, Congress determined, outweigh any short-term harms.

Otherwise, the most successful monopolists could often be subject to the weakest remedies—contrary to law and policy. The more entrenched a monopolist, the more inertia a remedy must overcome to restore genuine competition to the market. As here, the monopolist's product may be superior due in part to its exclusionary conduct, making a shift to rival products seem harmful from the standpoint of short-term "consumer surplus." And as here, the ecosystem may have become dependent on the monopolist's sharing its rents, such that weaning counterparties off those rents requires an adjustment in how those counterparties do business.

The court invoked the correct goal—protecting "consumer welfare." JA__(Rem.Op.126); *see, e.g.*, *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979) ("Congress designed the Sherman Act as a 'consumer welfare prescription.'"). But the court departed from the particular means Congress chose for protecting consumers—restoring competition.

That is, the Sherman Act does not direct courts to design the perfect market outcome for consumers. *See, e.g.*, *Alston*, 594 U.S. at 102 ("Judges must be wary, too, of the temptation to specify 'the proper price, quantity, and other terms of dealing.'" (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLC*, 540 U.S. 398, 408 (2004))). Rather, the Act "safeguard[s] consumers by protecting the competitive process." *Geneva Pharms.*, 386 F.3d at 489. The Act "rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958). Thus, at both the liability and remedies stages, "Congress tasked courts with enforcing a policy of competition," *Alston*, 594 U.S. at 73, based on "a legislative judgment that ultimately competition will produce not only lower prices, but also

better goods and services," *Pro. Eng'rs*, 435 U.S. at 695. By "*restor[ing]*

*competition*," *Ford*, 405 U.S. at 573 (emphasis added), antitrust

remedies benefit consumers in the long run, *see Alston*, 594 U.S. at 73

("market forces 'yield the best allocation' of the Nation's resources");

*Fishman v. Est. of Wirtz*, 807 F.2d 520, 536 (7th Cir. 1987) ("A healthy

and unimpaired competitive process is presumed to be in the consumer

interest."); Areeda ¶100a ("[T]he principal objective of antitrust policy is

to maximize consumer welfare by encouraging firms to behave

competitively.").

Indeed, *Ford* upheld a ten-year prohibition on Ford's manufacture

of spark plugs although it "remove[d] a potential competitor from the

marketplace" because the prohibition was "a step toward the

restoration of the status quo ante." 405 U.S. at 575 n.10. That remedy

threatened to harm consumers in the near term by removing a viable

supplier, but it was necessary for effective relief. Likewise, in *American

Tobacco*, the Court observed that two possible remedies might inflict

public injury but nevertheless instructed the lower court to order one of

them if it could not identify another way to "give effect to the

requirements of the statute." 221 U.S. at 187-88.

Finally, barring only Google from paying revenue share is proper. A monopolist normally may not take certain actions smaller firms can. *Supra* pp.81-82. And "those caught violating the Act must expect some fencing in" through remedies. *Otter Tail*, 410 U.S. at 381; *see United States v. Crescent Amusement Co.*, 323 U.S. 173, 189 (1944) ("Those who violate the Act may not reap the benefits of their violations and avoid an undoing of their unlawful project on the plea of hardship and inconvenience.").

### 3. The district court misapplied case law in failing to comply with *du Pont*.

As support for its decision to reject a payment ban, the court relied on *Ginsburg v. InBev NV/SA*, 623 F.3d 1229 (8th Cir. 2010), and *American Tobacco*. But these cases merely underscore the court's failure to follow *du Pont*.

First, the court erred in reading *Ginsburg* to require that it "balance the benefit to competition against the hardship or competitive disadvantage the remedy may cause" in a government enforcement action. JA__(Rem.Op.121). *Ginsburg* was a private merger challenge where the government had already obtained a divestiture in a consent decree. 623 F.3d at 1231-32. Plaintiffs sought a broader divestiture. *Id.*

The court of appeals held that divestiture was "barred as a matter of law," *id.* at 1236, noting that the district court had found that "Plaintiffs' § 7 potential competition claims were 'purely speculative,'" and concluding that "any antitrust injury Plaintiffs could prove would be both speculative and localized," which was outweighed by the potential hardship from the additional relief, *id.* at 1235.

Private cases like *Ginsburg* do not speak to the appropriate relief in government enforcement actions like this one. "A Government plaintiff, unlike a private plaintiff, must seek to obtain the relief necessary to protect the public from further anticompetitive conduct and to redress anticompetitive harm. And a Government plaintiff has legal authority broad enough to allow it to carry out this mission." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 170 (2004). Indeed, *Ginsburg* itself recognized that the proper scope of relief is generally broader "[w]hen the federal government sues to enforce [the antitrust laws] in the public interest."[30] 623 F.3d at 1234; *see California v. Am. Stores Co.*, 495 U.S. 271, 295 (1990) (noting that "[i]n a

---

[30]     *Ginsburg* did not address equitable relief in cases brought by state enforcers, who may also bring enforcement actions to protect the public interest.

Government case the proof of the violation of law may itself establish sufficient public injury to warrant relief," without a balancing of equities). Private plaintiffs can only seek equitable relief to redress their own "*threatened loss or damage* by a violation of the antitrust laws," 15 U.S.C. § 26 (emphasis added), whereas the United States has broad authority to obtain a permanent injunction that fully "*prevent[s] and restrain[s]* such violations," 15 U.S.C. § 4 (emphasis added), by effectively redressing the violation. Here, then, "the cost of correcting the market failure"—i.e., the cost of remedying Google's illegal monopolies—was *not* a legitimate basis for denying the government effective relief for "the anticompetitive injury visited on consumers"— i.e., the ongoing harms from Google's anticompetitive conduct. *See* JA__(Rem.Op.126) (quoting *Ginsburg*, 623 F.3d at 1235 n.4).

Second, *American Tobacco* does not support the decision. On the contrary, *du Pont* relied on *American Tobacco* for the very framework the court here failed to apply. *American Tobacco* established that the court in a Sherman Act enforcement suit has "[t]he duty of giving complete and efficacious effect to the prohibitions of the statute." 221 U.S. at 185. The Court held that lower courts should "accomplish[ ] *this*

141

*result*"—an effective remedy—"with as little injury as possible to the interest of the general public," *id.* (emphasis added), making clear the priority given to effective relief. Indeed, *du Pont* cited *American Tobacco* for its holding that "[i]f the remedy chosen is not effective, it will not be saved because an effective remedy would entail harsh consequences." 366 U.S. at 327.

## C. The Error Requires Immediate Correction.

It is not sufficient that the court might "revisit a payment ban" later under a yet-undecided standard.[31] JA__(Rem.Op.128). *Du Pont* requires relief that *currently* "promise[s] elimination of the violation" and restores competition. 366 U.S. at 332. Indeed, the district court there promised to revisit its remedy if necessary, *du Pont*, 177 F. Supp. at 42, 52, but the Supreme Court vacated the remedy and ordered divestiture, 366 U.S. at 334-35.

---

[31] Google argued that modifying the Final Judgment requires "changed circumstances." *See* Dkt.1443.36. Plaintiffs explained this was incorrect and that the judgment can be modified if necessary to achieve its intended objective of restoring competition, JA__(Dkt.1447.125:9-18) (citing *United Shoe*, 391 U.S. at 251), but the court left the issue open, JA__(F.J.Op.51).

As is, the decree is unlikely to provide complete and effective relief for Google's violations. An effective remedy must unfetter the monopolized markets from Google's having "lock[ed] up 'the most efficient and effective channels of distribution.'" JA__(Rem.Op.82). Yet even if Google cannot require exclusivity, the decree permits revenue-share payments preserving Google's vise-grip on distribution. The court also did not unfetter the markets from Google's anticompetitive payoffs to Apple. *See supra* pp.130-31. And the remedy leaves Google in possession of the fruits of its monopolization. *See supra* pp.131-32. Consumers thus stand to suffer continuing harm—harm that will not be undone even if the court orders a payment ban later.

Indeed, without a payment ban, it is likely that the syndication and data-sharing remedies will not fulfill their potential, as allowing Google to keep buying defaults will likely ensure that Google continues locking up those defaults, reinforcing the very scale and quality gaps the data-sharing and syndication remedies were crafted to address. JA__(Rem.Op.129) (noting that "additional query volume" from "default placements" led to Google's "insurmountable quality and monetization advantage"). And without efficient distribution, even improved rival

products will likely be unable to compete effectively, as Microsoft's and Neeva's inability to "compete without greater distribution" shows. JA__(Rem.Op.110).

Moreover, without a payment ban, any benefit to competition will take longer to arrive. The court predicted that it will take "years" for the data-sharing remedies to significantly affect competition. *See* JA__(Rem.Op.220). A payment ban would have a swifter impact, since it would immediately force distributors "to look to other GSEs to earn revenue share." *See* JA__(Rem.Op.120).

Finally, a window of opportunity may well close if a payment ban is delayed. Gen AI products "are shifting the competitive landscape" and pose "a potential threat to Google's dominance." JA__(Rem.Op.100-01). Yet GenAI products will not realize their potential in search if Google can "use the same anticompetitive playbook" against them. JA__(Rem.Op.99).

## CONCLUSION

This Court should vacate and remand the denial of a payment ban to apply the correct legal framework but otherwise affirm the judgment below.

Dated: July 28, 2026

Respectfully submitted,

s/ *Matthew A. Waring*

STANLEY E. WOODWARD, JR.
  *Associate Attorney General*

STEPHANIE A. GRECO
  *Deputy Assistant Attorney General, Litigation*

ETHAN S. HOFFMAN
  *Counsel to the Assistant Attorney General*

TRAVIS R. CHAPMAN
GRANT FERGUSSON
KARL E. HERRMANN
RYAN T. KARR
CLAIRE M. MADDOX
MICHAEL G. MCLELLAN
  *Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION

DANIEL E. HAAR
NICKOLAI G. LEVIN
PATRICK M. KUHLMANN
MATTHEW A. WARING
  *Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave., N.W.
Room 3224
Washington, D.C. 20530-0001
(202) 532-4186
matthew.waring@usdoj.gov

*Counsel for the United States*

*/s/ Lee Istrail*
James Uthmeier, Attorney General
Lee Istrail, Assistant Attorney General
R. Scott Palmer, Special Counsel, Complex Enforcement Chief
Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com

*Counsel for the State of Florida*

*/s/ Diamante Smith*
Ken Paxton, Attorney General
Brent Webster, First Assistant Attorney General
Ralph Molina, Deputy First Assistant Attorney General
Austin Kinghorn, Deputy Attorney General for Civil Litigation
Thomas York, Division Chief, Antitrust Division
Diamante Smith, Assistant Attorney General, Antitrust Division
Office of the Attorney General, State of Texas
P.O. Box 12548
Austin, Texas 78711-2548
Diamante.Smith@oag.texas.gov

*Counsel for the State of Texas*

*/s/ Carolyn D. Jeffries*
Rob Bonta, Attorney General
Paula L. Blizzard, Senior Assistant Attorney General
Michael W. Jorgenson, Supervising Deputy Attorney General
Brian D. Wang, Deputy Attorney General
Carolyn D. Jeffries, Deputy Attorney General
Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Cari.Jeffries@doj.ca.gov

*Counsel for the State of California*

*/s/ Amanda J. Wentz*
Amanda J. Wentz
Assistant Attorney General
Office of the Arkansas Attorney General
101 West Capitol Avenue
Little Rock, Arkansas 72201
Amanda.Wentz@ArkansasAG.gov

*Counsel for the State of Arkansas*

/s/ Logan Winkles
Chris Carr, Attorney General
Logan Winkles, Deputy Attorney
General
40 Capitol Square SW
Atlanta, GA 30334
lwinkles@law.ga.gov

*Counsel for the State of Georgia*

/s/ Scott L. Barnhart
Theodore Edward Rokita, Attorney
General
Scott L. Barnhart, Chief Counsel
and Director, Consumer Protection
Division
Office of the Attorney General,
State of Indiana
Indiana Government Center South,
Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Scott.Barnhart@atg.in.gov
Jacob.Patterson@atg.in.gov

*Counsel for the State of Indiana*

/s/ Jonathan E. Farmer
Jonathan E. Farmer
Deputy Executive Director of
Consumer Protection
Office of the Attorney General of
Kentucky
1024 Capital Center Drive, Suite
200
Frankfort, KY 40601
Jonathan.Farmer@ky.gov

*Counsel for the Commonwealth of
Kentucky*

/s/ Asyl Nachabe
Liz Murrill, Attorney General
Asyl Nachabe, Assistant Attorney
General
Office of the Attorney General
State of Louisiana
Public Protection Division
909 Poydras St. Suite 1850
New Orleans, LA 70112
NachabeA@ag.louisiana.gov

*Counsel for the State of Louisiana*

/s/ Scott Mertens
Dana Nessel, Attorney General
Scott Mertens, Assistant
Attorney General
Michigan Department of
Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for the State of Michigan*

/s/ Christian B. Corrigan
Christian B. Corrigan
Solicitor General, State of
Montana
Anna K. Schneider
Bureau Chief, Montana Office of
Consumer Protection
P.O. Box 200151
Helena, MT. 59602-0150
Christian.Corrigan@mt.gov

*Counsel for the State of Montana*

/s/ Gabe Johnson-Karp
Joshua L. Kaul, Attorney General
Gabe Johnson-Karp, Assistant
Attorney General
Wisconsin Department of Justice
17 W. Main St.
Post Office Box 7857
Madison, Wisconsin 53707-7857
Gabe.Johnson-Karp@wisdoj.gov

*Counsel for the State of Wisconsin*

/s/ Alison Esbeck
Alison Esbeck
Assistant Attorney General
Missouri Attorney General's Office
815 Olive Street | Suite 200
Saint Louis, Missouri 63101
Alison.Esbeck@ago.mo.gov

*Counsel for the State of Missouri*

/s/ Mary Frances G. Jowers
Alan Wilson, Attorney General
Mary Frances G. Jowers, Assistant
Deputy Attorney General
Office of the Attorney General,
State of South Carolina
1000 Assembly Street
Rembert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-
1549
mfjowers@scag.gov

*Counsel for the State of South
Carolina*

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limit of this Court's order dated April 30, 2026, because, excluding the parts exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1), this brief contains 25,745 words and the principal brief for the Colorado Plaintiffs contains 6,157 words.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in Microsoft Word for Microsoft 365 using 14-point Century Schoolbook font, a proportionally spaced typeface.

s/ *Matthew A. Waring*
Matthew A. Waring
*Counsel for the United States*

# CERTIFICATE OF SERVICE

I certify that on July 28, 2026, I caused the foregoing to be filed

through this Court's CM/ECF system, which will serve a notice of

electronic filing on all registered users.

s/ <em>Matthew A. Waring</em><br>Matthew A. Waring<br><em>Counsel for the United States</em>

# STATUTORY ADDENDUM

## TABLE OF CONTENTS

15 U.S.C. § 2 ...................................................................................................2

15 U.S.C. § 4 ...................................................................................................3

15 U.S.C. § 26 ...................................................................................................4

## § 2. Monopolizing trade a felony; penalty

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

**CREDIT(S)**

(July 2, 1890, c. 647, § 2, 26 Stat. 209; July 7, 1955, c. 281, 69 Stat. 282; Pub.L. 93-528, § 3, Dec. 21, 1974, 88 Stat. 1708; Pub.L. 101-588, § 4(b), Nov. 16, 1990, 104 Stat. 2880; Pub.L. 108-237, Title II, § 215(b), June 22, 2004, 118 Stat. 668.)

## § 4. Jurisdiction of courts; duty of United States attorneys; procedure

The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of sections 1 to 7 of this title; and it shall be the duty of the several United States attorneys, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations. Such proceedings may be by way of petition setting forth the case and praying that such violation shall be enjoined or otherwise prohibited. When the parties complained of shall have been duly notified of such petition the court shall proceed, as soon as may be, to the hearing and determination of the case; and pending such petition and before final decree, the court may at any time make such temporary restraining order or prohibition as shall be deemed just in the premises.

**CREDIT(S)**

(July 2, 1890, c. 647, § 4, 26 Stat. 209; Mar. 3, 1911, c. 231, § 291, 36 Stat. 1167; June 25, 1948, c. 646, § 1, 62 Stat. 909.)

# § 26. Injunctive relief for private parties; exception; costs

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue: *Provided,* That nothing herein contained shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit for injunctive relief against any common carrier subject to the jurisdiction of the Surface Transportation Board under subtitle IV of Title 49. In any action under this section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such plaintiff.

## CREDIT(S)

(Oct. 15, 1914, c. 323, § 16, 38 Stat. 737; Pub.L. 94-435, Title III, § 302(3), Sept. 30, 1976, 90 Stat. 1396; Pub.L. 104-88, Title III, § 318(3), Dec. 29, 1995, 109 Stat. 949.)