Case Nos. 26-5023, 26-5047, 26-5049

# IN THE UNITED STATES COURT OF APPEALS FOR THE D.C. CIRCUIT

STATE OF COLORADO, et al.,

*Plaintiff – Appellees – Cross-Appellants,*

– v. –

GOOGLE LLC,

*Defendant – Appellant – Cross-Appellee.*

Appeal from the United States District Court
for the District of Columbia
Hon. Amit P. Mehta
Case No. 1:20-cv-03010-APM

## OPENING-ANSWER BRIEF OF THE STATE ATTORNEYS GENERAL

| | |
|---|---|
| PHILIP J. WEISER<br>Attorney General | RUSSELL D. JOHNSON<br>Deputy Solicitor General |
| SHANNON STEVENSON<br>Solicitor General | CONOR MAY<br>Assistant Attorney General |
| JONATHAN SALLET<br>Special Assistant Attorney General<br> *Counsel of Record* | RADHIKA M. KATTULA<br>Assistant Attorney General Fellow |
| | *Attorneys for State of Colorado* |
| Colorado Department of Law<br>1300 Broadway, 10th Floor<br>Denver, Colorado 80203<br>Telephone: 720-508-6000<br>Email: Jon.Sallet@coag.gov | *(Additional counsel on signature page)* |

July 28, 2026

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Appellees'/Cross-Appellants' Colorado et al., certify the following:

### A.    Parties and Amici

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for the United States Plaintiffs and the Plaintiffs' Certificate as to Parties, Rulings, and Related Cases filed on February 23, 2026.

### B.    Rulings Under Review

The references to the rulings at issue in Plaintiffs' Certificate as to Parties, Rulings, and Related Cases filed on February 23, 2026, remain accurate.

### C.    Related Cases

The certification as to related cases in Plaintiffs' Certificate as to Parties, Rulings, and Related Cases filed on February 23, 2026, remains accurate.

/s/ *Jonathan Sallet*
Jonathan Sallet
Special Assistant Attorney General

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES ..................................................................i

    A.    Parties and Amici..............................................................i

    B.    Rulings Under Review ......................................................i

    C.    Related Cases ....................................................................i

TABLE OF AUTHORITIES..........................................................iv

GLOSSARY ..................................................................................vi

INTRODUCTION...........................................................................1

STATEMENT OF JURISDICTION.................................................3

STATEMENT OF THE ISSUES.....................................................3

STATUTES AND REGULATIONS .................................................3

STATEMENT OF THE CASE .........................................................4

STANDARD OF REVIEW.............................................................10

SUMMARY OF THE ARGUMENT ...............................................10

ARGUMENT .................................................................................14

    I.    By allowing Google to continue paying for default placement, the decree fails to create an efficient distribution remedy. ......................15

    II.    Google remains free to buy tomorrow's defaults with the fruits of yesterday's anticompetitive conduct. ...............................................23

    III.    The district court's remedy impermissibly favors Google's out-of-market partners over in-market competition. ...................................28

    IV.    Remand is required to create an efficient and effective distribution remedy. ...........................................................................33

CONCLUSION ................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**

*FTC v. Actavis, Inc.*,
570 U.S. 136 (2013) ................................................................. 31

*FTC v. Meta Platforms, Inc.*,
775 F. Supp. 3d 16 (D.D.C. 2024) ....................................... 29

*Ginsburg v. InBev NV/SA*,
623 F.3d 1229 (8th Cir. 2010) .............................................. 29

*In re McWane, Inc.*,
FTC Docket No. 9351, 2014 WL 556261 (Jan. 30, 2014) ................... 18

*Int'l Salt Co. v. United States*,
332 U.S. 392 (1947) ............................................................... 27

*Massachusetts v. Microsoft Corp.*,
373 F.3d 1199 (D.C. Cir. 2004) ............................... 12, 17, 25

*McWane, Inc. v. FTC*,
783 F.3d 814 (11th Cir. 2015) .............................................. 17

*Nat'l Coll. Athletic Ass'n v. Alston*,
594 U.S. 69 (2021) ................................................................. 33

*New York v. Microsoft Corp.*,
No. 98-1233 (CKK), 2008 WL 254126 (D.D.C. Jan. 29, 2008) ............ 17

*New York v. Microsoft*,
224 F. Supp. 2d 76 (D.D.C. 2002) ....................................... 31

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993) ............................................................... 33

*United States v. Anthem, Inc.*,
236 F. Supp. 3d 171 (D.D.C. 2017) ..................................... 29

*United States v. AT&T Co.*,
552 F. Supp. 131 (D.D.C. 1982) .......................................... 23

*United States v. Dentsply Int'l, Inc.*,
  2006 WL 2612167 (D. Del. Apr. 26, 2006) ........................................... 18

*United States v. Dentsply Int'l, Inc.*,
  399 F.3d 181 (3d Cir. 2005) ........................................................... 18

*United States v. E.I. du Pont de Nemours & Co.*,
  366 U.S. 316 (1961) .................................... 14, 19, 27, 28, 29, 30, 33, 34

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ...................... 10, 12, 13, 14, 24, 27, 30, 34

*United States v. Paramount Pictures, Inc.*,
  334 U.S. 131 (1948) ....................................................................... 26

*United States v. Phila. Nat'l Bank*,
  374 U.S. 321 (1963) ....................................................................... 29

*United States v. United Shoe Mach. Corp.*,
  391 U.S. 244 (1968) ................................................. 18, 24, 25, 27, 34

*Yamaha Motor Co. v. FTC*,
  657 F.2d 971 (8th Cir. 1981) .......................................................... 28

## Other Authorities

IVA Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2025
  Supp.) ...................................................................................... 29

## Rules

Fed. R. App. P. 28(i) ................................................................... 3, 4, 10

# GLOSSARY

GenAI          Generative Artificial Intelligence

GSE            General Search Engine

## INTRODUCTION

The Colorado Plaintiffs join in the U.S. Plaintiffs' Response Brief and Opening Brief on Cross-Appeal for the United States and Co-Plaintiff States ("U.S. Brief") opposing Google's challenges to the district court's liability and remedy decisions, and cross-appealing the court's rejection of a payment-ban remedy. The Colorado Plaintiffs write separately to further explain the court's legal errors in rejecting a payment ban.

To challenge Google, a rival must build a high-quality general search engine ("GSE"). That cannot be done without efficient access to users because user data—the actions people take every day to decide whether to click on one result, click on another, or not to click at all—are the ingredients from which general-search scale and quality are made. And without a critical mass of users, a rival hoping to challenge Google cannot deliver an attractive audience to advertisers.

Defaults are the most effective way to reach users—every other distribution method pales in comparison. Knowing this, Google has paid over $26 billion annually to web browser and device companies to secure exclusionary defaults for its GSE.

1

Those exclusive defaults have played a central role in Google's ability to maintain its monopoly because they allow Google to widen the scale and quality gaps between Google and its rivals by blocking rivals' ability to gain scale and improve quality. Google uses the revenues it receives from its current default placements to purchase ones in an unending cycle of network effects protecting Google from competition.

Faced with the artificial distribution barrier Google's defaults have created, the district court failed to impose a payment ban preventing Google from continuing to pay for defaults—even though the court recognized that it was forgoing a remedy that could help restore competition in the general-search and text advertisement markets. JA__(Liab.Op.159, 190). Indeed, the court failed to impose *any* remedy that would give rivals an efficient and effective pathway to users, thus failing to restore competition as the law requires. This was legal error, as was the court's failure to deny the continuing effects of the fruits of Google's violation, most notably monopoly revenue.

The court's justification for its decision—focusing on potential out-of-market impacts on Google's partners in downstream markets—has no basis in the law. That prioritizes Google's default payments to Apple and

2

other third parties to the detriment of future competition and participants in the monopolized markets.

This Court should affirm the district court's liability decision and the remedies the court did impose for the reasons the U.S. Brief articulates in its response to Google's appeal. This Court should also vacate the denial of the payment ban and remand to the district court with directions to apply the correct legal standards to craft a remedy that gives potential competitors access to efficient channels of distribution.

## STATEMENT OF JURISDICTION

Plaintiffs/Cross-Appellants in Case No. 26-5049 (the "Colorado Plaintiffs") adopt the Statement of Jurisdiction in the U.S. Brief. *See* U.S.Br.7; Fed. R. App. P. 28(i).

## STATEMENT OF THE ISSUES

The Colorado Plaintiffs adopt the Statement of the Issues in the U.S. Brief. *See* U.S.Br.8-9; Fed. R. App. P. 28(i).

## STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in the Addendum to the U.S. Brief.

## STATEMENT OF THE CASE

The Colorado Plaintiffs incorporate the U.S. Brief's Statement of the Case in full and emphasize here only the district court's factual findings and conclusions of law most relevant to the Colorado Plaintiffs' cross-appeal. *See* U.S.Br.10-37; Fed. R. App. P. 28(i).

"The most efficient channel of GSE distribution is, by far, placement as the preloaded, out-of-the-box default GSE," JA__(Liab.Op.24), because "many users simply stick to searching with the default." JA__(Liab.Op.2). "Google's near-complete control of [default placement] is a major barrier to entry" in the monopolized general-search results and text advertisements markets. JA__(Liab.Op.159, 190). Google controls the general-search default for all Apple devices, Android mobile devices, Chrome, and other third-party browsers. JA__(Liab.Op.158-59). Chrome excepted, Google's control of general-search distribution is achieved by contract. JA__(Liab.Op.158).

In this world of digital platforms, reaching users is doubly important. First, "[m]ore users mean more advertisers, and more advertisers mean more revenues." JA__(Liab.Op.2). Second, users provide the essential input upon which scale and product quality are

4

built: user data. Every piece of data collected while a user interacts with Google's search products helps Google improve its product, while its defaults stifle competitors' opportunity to obtain user data to improve their products. *See* JA__(Rem.Op.93-94) ("Google incorporates user data into every step of the search process" including constructing its search index, enhancing the freshness of results, and running experiments to develop new features).

Google thus widens scale and quality gaps with every new default contract, further reinforcing Google's advantage. Every spin of the flywheel depicted in the graphic the district court used, copied below, illustrates this self-perpetuating cycle: distribution brings users, users generate data and monopoly revenue, Google widens the scale and quality gaps, and Google can then reinvest that monopoly revenue to secure further distribution.



JA__(Liab.Op.231).

Default agreements also create a cycle of advertising revenues: "(1) Google can serve more ads to users; (2) Google can serve more effective ads to users; and (3) Google can reinvest the revenue generated through (1) and (2) in product development and securing distribution to secure even more users, thereby perpetuating this cycle." JA__(Rem.Op.95).

Rivals suffer the opposite effect. JA__(Rem.Op.95). Google's agreements keep them "stuck in place, or worse, cause[] a downward spiral of scale and revenue." JA__(Rem.Op.95). Foreclosure from the most

6

effective channel of general-search distribution has kept usage of rivals' search products "below the critical levels necessary to pose a threat to Google's monopoly." JA__(Liab.Op.202). Put simply, the money Google paid browser and device companies for default placement "effectively make the ecosystem exceptionally resistant to change" and "basically freeze the ecosystem in place." JA__(Liab.Op.227) (citation modified).

Neeva, an alternative GSE, illustrates the freeze. Although Neeva had "crawled the web, built an index, and developed a ranking model, which relied heavily on artificial intelligence," JA__(Liab.Op.30-31), it "could not gain a foothold in the market in part because it was relegated to less efficient means of distribution, such as app downloads," JA__(Liab.Op.237), and "was unable to be even a default provider on things like the major browsers or operating systems." JA__(Liab.Op.30) (citation modified). Neeva no longer exists. JA__(Liab.Op.11).

There is a reason Google annually pays billions of dollars to secure default placements: Defaults—not simply quality—drive consumer use. *See* JA__(Liab.Op.26) (explaining that "users overwhelming[ly] use Google through preloaded search access points"). JA__(Liab.Op.228). Google itself predicted that losing the Apple default alone would cost it

"between 60–80% of its [Apple mobile] query volume," translating into net revenue losses of $28.2 to $32.7 billion and more than double that in gross revenue losses. JA__(Liab.Op.30).

The court found that the continuing impact of "Google's anticompetitive behavior" results in three fruits of its violation: "(1) freedom from threats; (2) scale; and (3) revenue." JA__(Rem.Op.82). Separately and together, these forces "have allowed [Google] to operate free of any genuine competition for more than 10 years." JA__(Rem.Op.82); *see also* JA__(Liab.Op.237) (noting the lack of successful entrants between 2006 and 2021). Thus, Google's exclusive distribution agreements have enabled it to increase text-ad prices by billions of dollars "without any meaningful competitive constraint." JA__(Liab.Op.88-89, 259). Supracompetitive prices generate the monopoly revenues Google used "to secure the next iteration of exclusive distribution deals, paying out billions of dollars in revenue share each year." JA__(Rem.Op.96).

Plaintiffs proposed barring Google from paying for defaults and other forms of preferential advantage so that rivals have a realistic opportunity to obtain defaults. JA__(Pls.' RPFJ §§ IV.A-B, E; Pls.'

8

Remedies Post-Trial Br.23). As the court found, other ways for GSEs to reach users, such as by encouraging users to download their search apps, do not come close to matching the efficiency and effectiveness of defaults. JA__(Liab.Op.24; Rem.Op.82-87). That is particularly true on mobile devices where smaller screens make switching less likely. JA__(Liab.Op.28).

The court recognized the logic of a payment ban: because Google's "revenue share payments shape the market for general search services in Google's favor," "[t]he rationale for a payment ban is straightforward": "It would pry open the market to competition" and "could bring about a much-needed thaw" by "stimulating competition among Google's rivals to secure default distribution." JA__(Rem.Op.120).

Even though it acknowledged that "the bases for a payment ban are sound," JA__(Rem.Op.121), the court chose to "forgo[] a remedy that could help restore competition" by focusing on asserted impacts in other, non-general-search markets. JA__(Rem.Op.126). The court particularly focused on browser developers, such as Apple, and smartphone manufacturers, such as Samsung. JA__(Rem.Op.123-25)

Consistent with those concerns, the court's decree permits Google to buy future defaults. JA__(FJ §§ IV-IX; Rem.Op.126-28). The court expressed "hope," however, that a rival would out-bid Google for default placement. JA__(Rem.Op.128).

## STANDARD OF REVIEW

The Colorado Plaintiffs adopt the Standard of Review in the U.S. Brief. *See* U.S.Br.37-38; Fed. R. App. P. 28(i).

## SUMMARY OF THE ARGUMENT[1]

The Plaintiffs' cross-appeals challenge the decree's failure to adopt the proposed payment ban that would have provided rivals with efficient and effective channels of distribution through which they can reach users. The district court's rejection of the payment ban rested on three legal errors, any of which would support a remand and all of which should be addressed by this Court so that the district court on remand applies the appropriate standards as it constructs an efficient distribution remedy. *See United States v. Microsoft Corp.*, 253 F.3d 34, 105 (D.C. Cir. 2001) ("*Microsoft*") (noting "a desire to advance the ultimate resolution of

---

[1] As noted above, *see supra* p.1, the Colorado Plaintiffs join in the U.S. Brief opposing Google's challenges to the district court's liability and remedy decisions.

this important controversy," this Court offered "some further guidance" for the drafting of the remedies decree).

*First*, where a violation is based on locking up the most efficient channel of distribution, efficient distribution opportunities must be established to restore competition, as the law requires. Here, the decree erroneously leaves rivals without effective access to default distribution, the only truly efficient distribution method. In the monopolized markets, that error leaves in place a fundamental barrier to competition because distribution channels are not just a way to connect users and advertisers; they are the most important way to obtain the user data needed to generate higher-quality general-search results and text advertisements.

Google's unlawful default agreements denied rivals the only distribution channel the court found meaningfully capable of reaching users at scale, which meant that rival GSEs had "been kept below the critical levels necessary to pose a threat to Google's monopoly." JA__(Rem.Op.88) (citation omitted). Although the court's data-sharing and syndication remedies improve quality, they are limited in time and scope, do not create a path to users, and are designed only to be a "bridge" to sustainable competition. JA__(Rem.Op.171) (Google executive

11

testimony that "search syndication can provide a bridge until a new search engine can become a fully independent search engine." (citation omitted)). Sustainable competition requires effective access to users.

Without a payment ban, however, Google remains free to pay Apple and other third parties billions of dollars for defaults. Plaintiffs proposed prohibiting Google's payments, but the court rejected that remedy without requiring any efficient distribution channel. Under both *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004) ("*Massachusetts*"), and *Microsoft*, that was legal error: a decree that leaves rivals (whether other GSEs or GenAI firms) without effective access to the distribution channels needed to challenge Google cannot satisfy the duty to restore competition.

*Second*, the decree fails to restore competition because Google remains free to use monopoly revenues generated by its past exclusive distribution agreements to outbid rivals for future defaults. That flywheel effect delivers still more users, data, monopoly revenue, and scale, while rivals remain stuck, bidding with a much smaller revenue base to try to gain the very defaults they need to close the scale and quality gaps. This is the chicken-and-egg dilemma at the heart of this

Court's *Microsoft* decision: without an efficient pathway to users, there can be no quality improvement; without quality improvements, rivals will struggle to attract enough users to build a successful advertising business.

The district court declined to issue a payment ban despite recognizing that Google's use of its monopoly revenues is itself a fruit and continuing consequence of the antitrust violation. JA__(Rem.Op.82). "A payment ban would be one way to deny Google the fruits of its statutory violation." JA__(Rem.Op.121). Having found that Google used monopoly profits to secure the next generation of default agreements, the court could not satisfy its duty to deny Google the fruits of its violation through a remedial decree that leaves Google free to keep using its monopoly profits to secure more defaults.

*Third*, the court's failure to issue the payment ban impermissibly rested on its protection of a continuing stream of monopoly revenues to Apple and the third parties in the downstream browser and mobile device markets—payments that are funded by overcharging advertisers in the monopolized markets, that harm competition, and that deprive GSE users of innovation. Under *United States v. E.I. du Pont de Nemours &*

*Co.*, 366 U.S. 316 (1961) ("*du Pont*"), the prospect of such impact on third parties cannot justify ignoring the need for efficient distribution channels in the harmed market. In *Microsoft*, this Court recognized that out-of-market conduct could have in-market effects. Here, the court improperly relied on supposed out-of-market effects to avoid remedying in-market harm. In both circumstances, the restoration of competition in the monopolized markets is paramount.

## ARGUMENT

The Colorado Plaintiffs adopt and incorporate by reference the U.S. Brief regarding why Google's appeal should be denied and why the district court reversibly erred in rejecting the Plaintiffs' payment ban. U.S.Br.49-144. The Colorado Plaintiffs write separately to further explain three legal errors the court committed in its rejection of the payment ban: (1) failing to open the market to competition by allowing Google to continue paying for default placement; (2) failing to prevent Google from using its monopoly profits to purchase defaults; and (3) prioritizing asserted out-of-market impacts over in-market harms before crafting an effective remedy.

I.    **By allowing Google to continue paying for default placement, the decree fails to create an efficient distribution remedy.**

Where, as here, unlawful conduct preserved a defendant's monopoly power by foreclosing efficient distribution, effective relief must address that distribution barrier. The decree neither provides rivals a realistic chance to reach the "critical level" necessary to challenge Google nor prevents the revised contracts from being used to effectively obtain exclusivity through Google's "massive financial advantage." JA__(Rem.Op.127).

The creation of an efficient path to competitive independence required the court's intervention. Google's default payments keep distributors dependent on the flow of revenues that have maintained Google's monopolies. JA__(Rem.Op.96-97) (explaining that Google's partners face strong financial incentives to stick with Google). Potential rivals have no chance to compete with Google because the bidding is asymmetric: Google bids to protect monopoly profits, while rivals bid (from a smaller revenue base) to enter a market where successful competition would tend to reduce profits. Thus, general-search markets

15

are "exceptionally resistant to change." JA__(Rem.Op.81) (citation omitted).

The stark reality of the record is this: When a single GSE controls the default, it will get to users. Microsoft's ability to achieve enough scale to match Google's quality on desktop is premised on its control of its proprietary Bing default. JA__(Liab.Op.229). But where Google controls access on mobile through its ownership of Android and arrangements with Apple and others, rivals do not have anything near "the critical levels necessary to pose a threat to Google's monopoly." JA__(Liab.Op.202, 234) ("No current rival or nascent competitor can hope to compete against Google in the wider marketplace without access to meaningful scale, especially on mobile.").

Indeed, it is notable that in the liability phase the court rejected the notion that other potential avenues of distribution, such as the ability to download general-search-engine apps or to reach a Google rival through a browser bookmark, were adequate substitutes for default contracts. JA__(Liab.Op.31-34). Rivals are therefore left without the one thing rivals need most: "efficient and effective" access to default distribution. JA__(Rem.Op.82) (citation modified).

16

Cases from this Court and others demonstrate the importance of requiring efficient distribution where efficient distribution has been blocked. In *Massachusetts*, Microsoft improperly limited the ability of middleware providers, most notably the Netscape browser, to reach users and thereby raised a critical barrier to competitive entry. This Court recognized both that (i) the resulting freedom from competition was a fruit of the violation and (ii) "[t]he district court properly focused, therefore, upon opening the channels of distribution to such rivals." *Massachusetts*, 373 F.3d at 1229, 1243. That was accomplished, *inter alia*, by prohibiting Microsoft from securing for itself a distribution advantage over middleware providers. *New York v. Microsoft Corp.*, No. 98-1233 (CKK), 2008 WL 254126, at *6 (D.D.C. Jan. 29, 2008).

The same remedial logic appears in modern distribution-foreclosure cases. In *McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015), the monopolist's conduct "deprived its rivals . . . of distribution sufficient to achieve efficient scale, thereby raising costs and slowing or preventing effective entry." *Id.* at 838 (citation omitted). To remedy this violation, the FTC's order both prohibited formal exclusivity and barred retroactive

17

incentives that effectively created exclusivity. *In re McWane, Inc.*, FTC Docket No. 9351, 2014 WL 556261, at *40 (Jan. 30, 2014).

Similarly, in *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005), the monopolist's dealer policy kept rival sales "below the critical level necessary for any rival to pose a real threat to Dentsply's market share." *Id.* at 191. The final judgment therefore barred Dentsply from imposing *de facto* exclusivity requirements. *United States v. Dentsply Int'l, Inc.*, 2006 WL 2612167, at *1 (D. Del. Apr. 26, 2006). These cases demonstrate that, where efficient distribution has been blocked, an efficient distribution remedy is necessary to redress the violation and restore competition. *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968) (requiring that there "remain no practices likely to result in monopolization in the future").

The court's reasons for finding the payment-ban remedy unnecessary here are erroneous. *First*, the court "hope[d]" that recent developments in GenAI would themselves thaw the frozen landscape Google's payments for defaults had created. JA__(Rem.Op.128). But nothing in the record supports the "hope" that Google will allow itself to be outbid by any companies, including the GenAI companies, for default

18

placement when its enormous monopoly profits are at stake. JA__(Liab.Op.4, 237) (noting Google's "monopoly" and "outsized" profits).

Moreover, the experience of GenAI firms further shows that the court's faith in the effect of GenAI on competition was misplaced. Google has already entered "distribution and promotion agreements for the Gemini app," JA__(Rem.Op.43), while GenAI firms have had only "some success in obtaining distribution," JA__(Rem.Op.42), and certainly nothing coming close to matching the power of access to Apple. JA__(Liab.Op.103) (Safari defaults accounted for 28% of all general-search queries in the United States). No GenAI firm has obtained a default on a major distribution channel. *See* JA__(Liab.Op.206) (explaining importance of access to "major channels of distribution.")

*Du Pont* establishes that remedial decrees must rest on more than "hope"—they must be designed to actually restore competitive conditions. *Compare du Pont*, 366 U.S. at 332 (rejecting a remedy where "common sense" demonstrates that a "special relationship" between firms "might well" continue anticompetitive effects), *with* JA__(Rem.Op.127) (declining to adopt a payment ban despite the continuing business

19

relationships that would likely preserve the forces that have made the ecosystem "exceptionally resist[ant] to change.")

Here, the practical effects of permitted default placements mirror the effects of the past exclusive defaults. The court recognized, for example, that merely "excising the exclusive provisions from Google's distribution agreements [would] not unleash competition" because the revised contracts would "do nothing to eliminate the consequences of its exclusionary acts" nor the advantages derived "in part from its decade-long vice grip on default distribution." JA__(Rem.Op.108); *id.* at 82-88 (describing the various ways that the distribution contracts freed Google from competitive threats). The defaults "have helped to entrench Google." JA__(Rem.Op.82); *see* JA__(Liab.Op.233) ("The truth is, no new entrant could hope to compete with Google for the default on Firefox or any other browser.").

In addition, the habitual nature of "default bias" makes user switching unlikely, especially on mobile. JA__(Rem.Op.83). And Google's ability to buy defaults itself freezes the marketplace, leaving distributors "incentivized to stick with Google" in the face of Google's "massive financial advantage" and "superior monetization," and preserving the

20

forces that made the ecosystem "exceptionally resist[ant] to change." JA__(Rem.Op.127).

*Second*, and separately, the court opined that at the beginning of the remedial period distributors would conclude they had "no real alternative" to Google because of Google's existing search quality advantage. JA__(Rem.Op.121). The court failed to realize that it had already addressed that issue: The very purpose of syndication remedies is to avoid a situation where "poor results from the start" doom potential rivals before they even get started. JA__(Rem.Op.170).[2]

Syndication provides "a Qualified Competitor a way to serve high-quality results while it develops its own products." JA__(FJ.Op.44), which means that "Qualified Competitors will be able to deliver high-quality web results for five years while they build their own search index and search stack." JA__(Rem.Op.180). Syndication improves competitors' ability to answer queries where Google's scale and quality gaps are greatest (i.e., uncommon, "long-tail queries" or queries often made on

---

[2] The court termed this a "day one" problem. JA__(Rem.Op.121). But that day may never even come. The syndication licenses are now scheduled to be completed in October 2026. Order, *Colorado v. Google LLC*, No. 20-cv-03715 (D.D.C. June 26, 2026), Dkt. No. 1529. Thus, the syndicated remedies could be available to rivals before a payment ban were in place.

mobile devices, such as for local business hours). JA__(Rem.Op.90-95, 131, 171). A Google executive agreed: "A search engine can use other search services in its early days while it's building its own search engine to augment their own results and to improve." JA__(Rem.Op.171) (citation omitted). And syndication of text advertisements will "provide a new entrant a means of serving high-quality ads that it can monetize from the start," improving the rivals' ability to compete against Google from the get-go.  JA__(Rem.Op.183).

By providing "an immediate solution that would give rivals the ability to more rapidly create consumer-facing products," JA__(Rem.Op.175) (quoting Dr. Chipty), syndication directly addresses the scale and quality gaps. The court's failure to account for the immediate effects of the syndication remedies further undercuts its rationale for rejecting the critical payment ban plaintiffs proposed.

At the same time, the limits of syndication and data-sharing remedies must be recognized: they are time- and scope-limited and no substitute for the direct access to users and the necessary user data provided by efficient channels of distribution. Without an efficient path to users and user data, rivals may succeed in building only pop-up

22

Potemkin villages while remaining effectively blocked from constructing sturdy structures of their own.

As useful as syndication and data-sharing are, they only complement an efficient channel of distribution. They are not substitutes. *Cf. United States v. AT&T Co.*, 552 F. Supp. 131, 187, 196 (D.D.C. 1982) (prohibition on Bell entry in long-distance works alongside requirement that Bell companies not discriminate against AT&T long-distance competitors). In sum, the failure to provide an efficient and effective pathway to distribution is a fatal legal error in the court's remedies decree.

## II. Google remains free to buy tomorrow's defaults with the fruits of yesterday's anticompetitive conduct.

Monopoly revenues spin Google's exclusionary flywheel and defaults keep it spinning. As the court explained, anticompetitive conduct yielded revenues boosting Google's ability to generate more and improved advertisements. JA__(Rem.Op.82, 95). Those advertisement sales produce yet more revenue, allowing Google to "secur[e] distribution to secure even more users, thereby perpetuating this cycle." JA__(Rem.Op.95). The resulting revenues are a fruit of the unlawful conduct, as the district court correctly found. *Id.* Accordingly, the use of

those revenues to disadvantage competition through the purchase of defaults must be denied; the court said itself that "[a] payment ban would be one way to deny Google the fruits of its statutory violation." JA__(Rem.Op.82, 95, 121); *United Shoe*, 391 U.S. at 250 (holding an effective remedy must "deny to the defendant the fruits of its statutory violation").

"[D]efault placements directly drive revenue—in Google's case, to the tune of tens of billions of dollars each year." JA__(Rem.Op.86). Google's unlawful exclusive distribution agreements enabled it to increase text-ad prices "without any meaningful competitive constraint" and to the tune of billions of dollars. JA__(Liab.Op.88-89, 259).

The importance of halting the use of these monopoly-revenue fruits is amplified by powerful network and scale effects embodied in the flywheel. Advertisers want to be in front of many users—a dynamic that creates the same "chicken and egg" problem described in *Microsoft*. 253 F.3d at 56. Neither the app developers in *Microsoft* nor advertisers here will much patronize a digital platform with relatively few users. Without a way to get in front of users to demonstrate and improve the quality of their products, Google's rivals cannot hope to build an attractive

24

audience. *See Massachusetts*, 373 F.3d at 1212 (finding that Microsoft's monopoly was "due not only to the exclusionary practices we found unlawful in *Microsoft* but also to positive network effects" (citation modified)).

Against that background, the question for the district court was whether the monopoly-driven revenue-generating cycle must be broken to eliminate the fruit of Google's unlawful conduct. The answer is "Yes." *Id.* at 1232. Equitable antitrust relief must "deny to the defendant the fruits of its statutory violation" and "ensure that there remain no practices likely to result in monopolization in the future." *United Shoe*, 391 U.S. at 250.

To deny the fruits of the violation means, at minimum, to adopt a remedy that halts the fruits' continued adverse impact on competition and prevents their reuse through the purchase of defaults. That principle applies to each fruit the court identified, including Google's revenue gain—which drives the self-perpetuating anticompetitive cycle here— and its elimination of competitive threats and ability to gain scale. None of these fruits will be effectively addressed, despite the one-year time limit the district court placed on Google's default placement contracts,

25

when monopoly revenue can continue to entrench Google by securing the next generation of defaults. In other words, the freedom from competitive threats that Google gains through the defaults permits monopoly pricing while scale reinforces the quality advantage and monetization. The resulting revenues finance future default agreements.

*Paramount* illustrates the remedial principle. There, the "fruits of monopolistic practices" could not be left to continue producing anticompetitive effects, and the Court required structural and behavioral relief to neutralize them. *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 152 (1948). Here too, the remedy must prevent the fruits of Google's misconduct from continuing to fuel the mechanism by which Google maintains its monopolies.

Ensuring that there remain no practices likely to result in continued closure of the general-search markets requires a remedy to open efficient distribution, which the Plaintiffs' payment ban would accomplish. The court rejected that remedy even though revenue-share payments "effectively make the ecosystem exceptionally resist[ant] to change" and "basically freeze the ecosystem." JA__(Rem.Op.120) (quoting Plaintiffs' witness Dr. Ramaswamy). That common-sense reality cannot

be ignored. *du Pont*, 366 U.S. at 332 (rejecting a remedy where "common sense" demonstrates that a "special relationship" between firms "might well" continue "anticompetitive effects").

Having found that Google's exclusive agreements denied rivals the distribution, scale, and data needed to compete, the court could not meet its remedial responsibilities by leaving Google free to use monopoly revenues to lock down the default access that rivals need to close the scale and quality gaps. *See* JA__(Rem.Op.95) (describing "the opposite effect for rivals": Google's agreements keep them "stuck in place" or cause "a downward spiral of scale and revenue").

Indeed, without a payment ban, the decree perpetuates the same effects the remedy was required to end. Without a remedy that will "deny to the defendant the fruits of its statutory violation" and prevent recurrence of the same effects, *Microsoft*, 253 F.3d at 103, Plaintiffs have "won a lawsuit and lost a cause." *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947); *see also United Shoe*, 391 U.S. at 250.

### III. The district court's remedy impermissibly favors Google's out-of-market partners over in-market competition.

The court's decision not to implement the payment ban also impermissibly rested on its protection of a continuing stream of monopoly rents to Apple and other third parties in the "downstream" browser and mobile device markets. JA__(Rem.Op.123-25) (discussing "downstream" effects in "the browser market" and "the U.S. mobile phone market"). This result is at the expense of restoring competition and innovation that benefits users and advertisers in the general-search markets. This trade-off is both misguided as a matter of antitrust policy and legally impermissible.

Under *du Pont*, an antitrust remedy may not leave "a substantial likelihood" that harm will remain uncured because of potential impact on third parties. 366 U.S. at 326-27, 331-33 ("Economic hardship can influence choice only as among two or more effective remedies. If the remedy chosen is not effective, it will not be saved because an effective remedy would entail harsh consequences."); *see Yamaha Motor Co. v. FTC*, 657 F.2d 971, 983 (8th Cir. 1981) (explaining that economic

hardship was addressed only after the Commission determined that complete rescission was the sole effective remedy).

Protection of a continuing stream of Google payments to its partners is particularly suspect where a court is looking to the impact on companies operating downstream in other markets. *See* IVA Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 972a, at 1 (2025 Supp.) ("As a general proposition, antitrust rejects" the idea that "possible injuries to competition in one market are offset by efficiency benefits in a different market"), *cited with approval by FTC v. Meta Platforms, Inc.*, 775 F. Supp. 3d 16, 69 (D.D.C. 2024); *see also United States v. Phila. Nat'l Bank*, 374 U.S. 321, 371 (1963) (rejecting consideration of effects in a separate investment-banking market); *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 252 (D.D.C. 2017) (similar).[3]

In *du Pont*, the district court had favored the private interests of stockholders that were not "in any way actors or participants in the wrongs," but the Supreme Court required that in-market harm to

---

[3] *Ginsburg v. InBev NV/SA*, 623 F.3d 1229 (8th Cir. 2010) addressed merger relief in the relevant market. *See id.* at 1236-37; JA__(Rem.Op.121). Here, by contrast, the court looked to potential impacts in downstream markets and, in any event, never assessed such impact against continued harm to in-market competition.

competition be cured before turning to the interests of third parties. 366 U.S. at 328 (citation modified). Here, the court erroneously protected the interests of third parties that were beneficiaries of Google's wrongs because of potential effects in downstream markets.

Failure to create any efficient distribution channel advantages Google's partners, which received billions in payments from the illegal contracts, over the interests of Google's victims, including users and advertisers that paid too much due to lack of competition. Google was able to fund its purchase of future exclusive defaults by raising text-advertisement prices "substantially above the competitive level." JA__(Liab.Op.191). Advertisers that purchase general search text advertisements—including trial witnesses such as Home Depot and J.P. Morgan—were effectively over-charged for the benefit of Apple and other third parties and even now face the continuing presence of the "supracompetitive" pricing that allows Google to "maintain high and remarkably stable operating profits." JA__(Liab.Op.79-80, 259, 260) (quoting *Microsoft*, 253 F.3d at 50, to the effect that high-profit margins can "represent exploitation of customer lock-in and monopoly power when viewed through the lens of network economics").

30

There is no valid reason, and the court gave none, to privilege the interests of Apple and other third parties over the harm to in-market advertisers. *See New York v. Microsoft*, 224 F. Supp. 2d 76, 189 (D.D.C. 2002) ("[F]avoritism of one market participant over another in a remedy provision places the Court in the improper position of exerting too much control over the market."). Google's users also suffer, deprived of the competitive innovation Google thwarted. JA__(Liab.Op.236-37). Indeed, advertisers may have passed along some portion of the overcharge to their customers—a normal commercial practice.

The public interest is served by pushing the market to competitive outcomes, not by letting Google share monopoly rents with Apple and other third parties. *FTC v. Actavis, Inc.*, 570 U.S. 136, 154 (2013) (forbidding "large and unjustified" payments that share "monopoly profits that would otherwise be lost in the competitive market.").

Apple tells the tale. Apple garnered more than $20 billion annually through the Safari defaults that accounted for 28% of all general-search queries in the United States. JA__(Liab.Op.103). Apple could create its own general search engine and challenge Google Search directly. JA__(Liab.Op.22, 104). And a payment ban could encourage Apple to do

31

so. JA__(Rem.Op.120). Instead, absent a payment ban, Apple can do nothing and continue to receive billions from Google while Google's rivals remain without efficient access to distribution.

Nor did the court's references to consumers cure the defect. The court's concern that consumers might face higher prices or fewer innovative product choices in the downstream markets for smartphones or mobile apps derives from its concern that browsers, OEMs, and carriers would face a loss or reduction of Google's payments. JA__(Rem.Op.123-25). Antitrust law does not protect any claimed reliance by Apple and other third parties on revenue from arrangements that impede competition or its restoration.

In-market relief also cannot be withheld because Apple and the third parties "likely would earn less than they do now." JA__(Rem.Op.122-25) (suggesting that even just a "reduction" of payments to Apple should be avoided). Competitive markets do not guarantee that a company will receive tomorrow the same revenue it received yesterday, and the purpose of the Sherman Act "is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S.

447, 458 (1993). Indeed, competitive markets might well lead to increased payments. *See Nat'l Coll. Athletic Ass'n v. Alston*, 594 U.S. 69, 96 (2021) ("[T]he Sherman Act . . . is predicated on one assumption alone—'competition is the best method of allocating resources' in the Nation's economy.").

Allowing Google to preserve the default-payment mechanism because its partners rely on those payments would give Apple and other third parties a protected interest in the continuing proceeds of Google's anticompetitive conduct. Under this approach, the old AT&T would have been able to continue its monopolistic tactics by simply sharing some monopoly profits with worthy causes. In sum, the court could not bypass the need for efficient distribution in markets "exceptionally resistant to change." JA__(Rem.Op.81) (citation omitted), because of asserted downstream impacts on Google's distribution partners (which had already received billions of dollars for many years through illegal contracts). Nothing in the Sherman Act permits such an approach.

## IV. Remand is required to create an efficient and effective distribution remedy.

Under *du Pont*, an antitrust remedy is inadequate as a matter of law when there is "a substantial likelihood" that it will not cure the

33

harms caused by the unlawful conduct. 366 U.S. at 331-32. The remedy here is plainly inadequate under that standard because the court imposed no remedy capable of addressing the distribution problem its own findings identified and recognized would be expected to continue. *See United Shoe*, 391 U.S. at 250-51. The court also erred in its treatment of the fruits of Google's violation and of potential consequences in other markets.

Only a remedy that addresses the distribution problem central to its antitrust violation can "deny [Google] the fruits of its statutory violation" and "ensure that there remain no practices likely to result in monopolization in the future." *United Shoe*, 391 U.S. at 250.

This Court does not need to reach each of the three legal errors to justify a remand; any one of them would be sufficient. In *Microsoft*, however, this Court provided guidance on the manner in which remedies should be addressed by the district court on remand even as to issues that it had not decided. 253 F.3d at 105. Here, given the importance of moving quickly to restore competition, this Court should remand with instructions that the district court craft an efficient distribution-focused remedy free of the legal errors the Colorado Plaintiffs have identified. In

34

that event, the Colorado Plaintiffs will present both the payment ban as well as their assessment of alternative distribution remedies.

## CONCLUSION

For the foregoing reasons, this Court should affirm those portions of the district court's decision Google challenges for the reasons described in the United States' brief, vacate the court's rejection of the payment ban, and remand with instructions that the court impose an efficient and effective distribution-focused remedy giving potential competitors a realistic opportunity to challenge Google's monopolies.

Dated: July 28, 2026

<div style="margin-left:40%">

Respectfully Submitted,

PHILIP WEISER
Attorney General of Colorado

*/s/ Jonathan B. Sallet*
Jonathan B. Sallet, DC Bar No. 336198*
Russell D. Johnson
Conor J. May
Bryn A. Williams
Radhika Kattula
Colorado Office of the Attorney General
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
E-Mail: jon.sallet@coag.gov

</div>

russell.johnson@coag.gov
bryn.williams@coag.gov
conor.may@coag.gov
radhika.kattula@coag.gov
*Counsel of record
*Counsel for Plaintiff State of Colorado*

MIKE HILGERS
Attorney General of Nebraska

Justin C. McCully, Assistant Attorney
General
Nebraska Department of Justice
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-9305
E-Mail: justin.mccully@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

KRISTIN K. MAYES
Attorney General of Arizona

Jayme Weber, Senior Litigation
Counsel
Arizona Office of the Attorney General
400 West Congress, Ste. S-215
Tucson, Arizona 85701
Telephone: (520) 628-6609
E-Mail: jayme.weber@azag.gov

*Counsel for Plaintiff State of Arizona*

36

BRENNA BIRD
Attorney General of Iowa

Noah Goerlitz, Assistant Attorney
General
Office of the Attorney General of Iowa
1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
Telephone: (515) 725-1018
E-Mail: noah.goerlitz@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

LETITIA JAMES
Attorney General of New York

Barbara D. Underwood
Judith N. Vale
Philip J. Levitz
Office of the New York State Attorney
General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-6325
E-Mail: philip.levitz@ag.ny.gov

*Counsel for Plaintiff State of New York*

JEFF JACKSON
Attorney General of North Carolina

James Wellner Doggett
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
Telephone: (919) 716-6400
E-Mail: jdoggett@ncdoj.gov

37

*Counsel for Plaintiff State of North Carolina*

JONATHAN SKRMETTI
Attorney General of Tennessee

J. David McDowell
Austin C. Ostiguy
Tyler T. Corcoran
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 741-1671
E-Mail: david.mcdowell@ag.tn.gov
austin.ostiguy@ag.tn.gov
tyler.corcoran@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

DEREK E. BROWN
Attorney General of Utah

Marie W.L. Martin
Utah Office of Attorney General
160 E 300 S, 5th Floor
P.O. Box 140811
Salt Lake City, Utah 84114
Telephone: (801) 440-9825
E-Mail: mwmartin@agutah.gov

*Counsel for Plaintiff State of Utah*

STEPHEN J. COX
Attorney General of Alaska

Jeff Pickett
Senior Assistant Attorney General

38

State of Alaska, Department of Law
Office of the Attorney General
1031 W. Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5275
E-Mail: jeff.pickett@alaska.gov

*Counsel for Plaintiff State of Alaska*

WILLIAM TONG
Attorney General of Connecticut

Nicole Demers
Office of the Attorney General of
Connecticut
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
Telephone: (860) 808-5202
E-Mail: nicole.demers@ct.gov

*Counsel for Plaintiff State of
Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware

Michael A. Undorf
Delaware Department of Justice
Fraud and Consumer Protection
Division
820 N. French St., 5th Floor
Wilmington, DE 19801
Telephone: (302) 683-8816
E-Mail: michael.undorf@delaware.gov

*Counsel for Plaintiff State of Delaware*

39

BRIAN L. SCHWALB
Attorney General of the District of
Columbia

Caroline S. Van Zile
Ashwin P. Phatak
Tessa Gellerson
Office of the Attorney General for the
District of Columbia
400 6th Street NW
Washington, DC 20001
Telephone: (202) 724-6609
E-Mail: caroline.vanzile@dc.gov
ashwin.phatak@dc.gov
tessa.gellerson@dc.gov

*Counsel for Plaintiff District of
Columbia*

DOUGLAS MOYLAN
Attorney General of Guam

Fred Nishihira
Office of the Attorney General of Guam
590 S. Marine Corps Drive, Suite 901
Tamuning, Guam 96913
Telephone: (671) 475-3324
E-Mail: fnishihira@oagguam.org

*Counsel for Plaintiff Territory Guam*

ANNE E. LOPEZ
Attorney General of Hawaiʻi

Rodney I. Kimura
Department of the Attorney General,
State of Hawaiʻi
425 Queen Street

40

Honolulu, HI 96813
Telephone (808) 586-1180
E-Mail: rodney.i.kimura@hawaii.gov

*Counsel for Plaintiff State of Hawai'i*

RAÚL LABRADOR
Attorney General of Idaho

John K. Olson
Office of the Idaho Attorney General
Consumer Protection Division
954 W. Jefferson St., 2nd Floor
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 332-3549
E-Mail: john.olson@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

KWAME RAOUL
Attorney General of Illinois

Sarah A. Hunger
Office of the Attorney General of
Illinois
115 S. LaSalle St.
Chicago, IL 60603
Telephone: (312) 771-3885
E-Mail: sarah.hunger@ilag.gov

*Counsel for Plaintiff State of Illinois*

KRIS W. KOBACH
Attorney General of Kansas

Christopher Teters
Kansas Office of the Attorney General

41

120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612
Telephone: (785) 368-8429
E-Mail: chris.teters@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

AARON M. FREY
Attorney General of Maine

Christina M. Moylan
Office of the Attorney General of
Maine
6 State House Station
August, ME 04333
Telephone: (207) 626-8838
E-Mail: christina.moylan@maine.gov

*Counsel for Plaintiff State of Maine*

ANTHONY G. BROWN
Attorney General of Maryland

Schonette J. Walker
Office of the Attorney General of
Maryland
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Telephone: (410) 576-6473
E-Mail: swalker@oag.maryland.gov

*Counsel for Plaintiff State of Maryland*

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

Jennifer E. Greaney

42

Office of the Attorney General of Massachusetts
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 963-2981
E-Mail: jennifer.greaney@mass.gov

*Counsel for Plaintiff Commonwealth of Massachusetts*

KEITH ELLISON
Attorney General of Minnesota

Zach Biesanz
Senior Enforcement Counsel
Office of the Minnesota Attorney General
Antitrust Division
445 Minnesota Street, Suite 600
St. Paul, MN 55101
Telephone: (651) 757-1257
E-Mail: zach.biesanz@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*

AARON D. FORD
Attorney General of Nevada

Michelle C. Badorine
Nevada Office of the Attorney General
100 N. Carson Street
Carson City, NV 89701
Telephone: (775) 684-1164
E-Mail: mbadorine@ag.nv.gov

*Counsel for Plaintiff State of Nevada*

43

JOHN FORMELLA
Attorney General of New Hampshire

Brandon Garod
Office of Attorney General of New
Hampshire
1 Granite Place South
Concord, NH 03301
Telephone: (603) 271-1217
E-Mail: brandon.h.garod@doj.nh.gov

*Counsel for Plaintiff State of New
Hampshire*

JENNIFER DAVENPORT
Attorney General of New Jersey

Abiola G. Miles
Deputy Attorneys General
New Jersey Attorney General's Office
25 Market Street, P.O. Box 106
Trenton, NJ 08625
Telephone: (862) 381-4159
E-Mail: abiola.miles@law.njoag.gov

*Counsel for Plaintiff State of New
Jersey*

RAÚL TORREZ
Attorney General of New Mexico

Anthony R. Juzaitis
Assistant Attorney General
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87504
Telephone: (505) 651-7565
E-Mail: ajuziatis@nmdoj.gov

44

*Counsel for Plaintiff State of New Mexico*

DREW WRIGLEY
Attorney General of North Dakota

Elin S. Alm
Assistant Attorney General
Consumer Protection and Antitrust
Division
Office of the Attorney General of North
Dakota
1720 Burlington Drive, Suite C
Bismarck, ND 58504
Telephone: (701) 328-5570
E-Mail: ealm@nd.gov

*Counsel for Plaintiff State of North Dakota*

DAVE YOST
Attorney General of Ohio

Sarah Mader, Assistant Attorney
General, Antitrust
Jennifer L. Pratt
Office of the Ohio Attorney General
30 E Broad Street, 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
E-Mail: sarah.mader@ohioago.gov
jennifer.pratt@ohioago.gov

*Counsel for Plaintiff State of Ohio*

45

GENTNER DRUMMOND
Attorney General of Oklahoma

Sylvia Lanfair
Assistant Attorney General
Office of the Oklahoma Attorney
General
313 NE 21st Street
Oklahoma City, OK 73105
Telephone: (405) 522-8159
E-Mail: sylvia.lanfair@oag.ok.gov

*Counsel for Plaintiff State of
Oklahoma*

DAN RAYFIELD
Attorney General of Oregon

Robert A. Koch, Attorney-in-Charge of
Civil & Administrative Appeals
Oregon Department of Justice
1162 Court St NE
Salem, OR 97301
Telephone: (503) 378-4402
E-Mail: robert.a.koch@oregon.gov

*Counsel for Plaintiff State of Oregon*

DAVID W. SUNDAY, JR.
Attorney General of Pennsylvania

Tracy W. Wertz
Daniel B. Mullen
Pennsylvania Office of Attorney
General Strawberry Square
Harrisburg, PA 17120
Telephone: (717) 787-4530

46

E-Mail: twertz@attorneygeneral.gov
dmullen@attorneygeneral.gov

*Counsel for Plaintiff Commonwealth of Pennsylvania*

LOURDES L. GÓMEZ TORRES
Secretary of Justice

TANIA L. FERNÁNDEZ-MEDERO
Assistant Secretary of Justice

SAMUEL WISCOVITCH-CORALI
Deputy Undersecretary

Pablo Tufiño-Soto
Senior Attorney
Diana Jordán-González
Office of Monopolistic Affairs
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, Puerto Rico 00902-0192
Telephone: (787) 721-2900, Ext. 1205
E-Mail: ptufino@justicia.pr.gov
diana.jordan@justicia.pr.gov

*Counsel for Plaintiff Territory Puerto Rico*

PETER NERONHA
Attorney General of Rhode Island

Nicholas M. Vaz
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400

47

E-Mail: nvaz@riag.ri.gov

*Counsel for Plaintiff State of Rhode Island*

MARTY J. JACKLEY
Attorney General of South Dakota

Amanda Miiller
Office of the Attorney General of South Dakota
1302 E. South Dakota Hwy 1889, Suite 1
Pierre, SD 57501
Telephone: (605) 773-3215
E-Mail: amanda.miiller@state.sd.us

*Counsel for Plaintiff State of South Dakota*

CHARITY R. CLARK
Attorney General of Vermont

Christopher J. Curtis, Assistant Attorney General
Office of the Attorney General of Vermont
109 State St.
Montpelier, VT 05609
Telephone: (802) 828-3171
E-Mail:
christopher.curtis@vermont.gov

*Counsel for Plaintiff State of Vermont*

48

JAY JONES
Attorney General of Virginia

Tyler T. Henry
Senior Assistant Attorney General
Antitrust Unit
Office of the Attorney General of
Virginia
202 N. 9th Street
Richmond, VA 23219
Telephone: (804) 692-0485
E-Mail: thenry@oag.state.va.us

*Counsel for Plaintiff State of Virginia*

NICHOLAS W. BROWN
Attorney General of Washington

Amy N.L. Hanson
Senior Managing Assistant Attorney
General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-5419
E-Mail: amy.hanson@atg.wa.gov

*Counsel for Plaintiff State of
Washington*

JOHN B. McCUSKEY
Attorney General of West Virginia

Douglas Lee Davis
Office of the Attorney General, State of
West Virginia
1900 Kanawha Boulevard East
Building 6, Suite 401
P.O. Box 1789

49

Charleston, WV 25326
Telephone: (304) 558-8986
E-Mail: douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*

KEITH KAUTZ
Attorney General of Wyoming

Michael Kahler
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Telephone: (307) 777-7196
E-Mail: mike.kahler@wyo.gov

*Counsel for Plaintiff State of Wyoming*

50

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of this Court's order dated April 30, 2026, because, excluding the parts exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), this brief contains 6,157 words and the principal brief for the United States Plaintiffs contains 25,745 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). Because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook type.

This document has been submitted in compliance with the court's ECF requirements.

/s/ *Jonathan Sallet*
Jonathan Sallet
Special Assistant Attorney General

52

# CERTIFICATE OF SERVICE

I certify that I served the foregoing Opening-Answer Brief on all parties herein by e-filing with the CM/ECF system maintained by the Court, this 28th day of July, 2026.

/s/ *Jonathan Sallet*
Jonathan Sallet
Special Assistant Attorney General

52