# United States Court of Appeals for the District of Columbia Circuit

## No. 26-5023
## (Consolidated with Nos. 26-5047, 26-5049)

UNITED STATES OF AMERICA, *et al.*,

*Plaintiffs-Appellees/Cross-Appellants,*

*v.*

GOOGLE LLC,

*Defendant-Appellant/Cross-Appellee.*

---

*On Appeal from the United States District Court for the District of Columbia in Nos. 20-cv-3010 and 20-cv-3715, Honorable Amit P. Mehta, U.S.D.J.*

# AMICUS BRIEF OF SERPAPI, LLC IN SUPPORT OF PLAINTIFFS-APPELLEES/CROSS-APPELLANTS URGING AFFIRMANCE

PROSKAUER ROSE LLP
COLIN R. KASS
1001 Pennsylvania Avenue, NW
Suite 600 South
Washington, DC 20004
(202) 416-6800
ckass@proskauer.com

PROSKAUER ROSE LLP
DAVID A. MUNKITTRICK
11 Times Square
New York, New York 10036
(212) 969-3000
dmunkittrick@proskauer.com

*Counsel for Amicus Curiae SerpApi, LLC*

August 4, 2026

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), undersigned counsel for *amicus curiae* SerpApi, LLC ("SerpApi") states that:

**Parties and Amici.** All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Plaintiffs' Certificate as to Parties, Rulings, and Related Cases (App. Dkt. 2160541), except that an amicus brief was also filed in the district court by Public Knowledge, and in this Court, by Brave, Washington Legal Foundation, Mozilla Corporation, Apple Inc., Samsung Electronics Co., Ltd., the Former Antitrust Enforcers, the Law and Economics Scholars, Alden Abbott, Economists and Legal Scholars, Professors Hunt Allcott and Matthew Gentzkow, OpenAI OpCo, DuckDuckGo, Inc., Little Tech Association and Travel Lemming LLC, Microsoft Corporation, American Economic Liberties Project, and SerpApi. SerpApi received the Parties' consent to participate as *amicus curiae* in these proceedings.

**Rulings Under Review.** References to the rulings at issue appear in the Parties' Certificates as to Parties, Rulings, and Related Cases (App. Dkts. 2160428, 2160541).

**Related Cases.** A list of related cases appears in the Parties' Certificates as to Parties, Rulings, and Related Cases (App. Dkts. 2160428, 2160541).

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, counsel for *amicus curiae* SerpApi certifies that SerpApi has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

## STATEMENT REGARDING CONSENT TO FILE, SEPARATE BRIEFING, AND AUTHORITY TO FILE

Pursuant to D.C. Circuit Rule 29(b), the undersigned counsel for *amicus curiae* SerpApi states that all parties have consented to SerpApi's participation as amicus curiae. Pursuant to D.C. Circuit Rule 29(d), the undersigned counsel for amicus curiae SerpApi states that a separate brief is necessary because the perspective the *amicus curiae* brings is distinct from those in the briefing submitted by Plaintiffs-Appellees and those likely to be submitted by other amici curiae. SerpApi is both a nascent search competitor of Google that is developing a Search Index and participates in markets where access to Search data is critical. SerpApi has unique insight into how Google's conduct has affected competition in those relevant markets and how the Final Judgment's remedies can help address those effects.

SerpApi files this amicus brief under Federal Rule of Appellate Procedure 29(a) and D.C. Circuit Rule 29.

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), SerpApi states that:

(i)  no party's counsel authored the brief in whole or in part;

(ii)  no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and

(iii)  no person—other than the *amicus curiae*, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ i

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

STATEMENT REGARDING CONSENT TO FILE, SEPARATE
    BRIEFING, AND AUTHORITY TO FILE ................................................. iii

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS ....... iv

TABLE OF AUTHORITIES ....................................................................... vi

GLOSSARY OF ABBREVIATIONS .................................................... viii

INTRODUCTION & INTEREST OF AMICUS CURIAE ..................................... 1

ARGUMENT ....................................................................................... 4

I.     THE REMEDIES ARE NARROWLY TAILORED TO CORRECT
       THE IMPACT OF GOOGLE'S CONDUCT. .............................................. 4

       A.     The District Court Made Specific Factual Findings Supporting
             Its Data-Sharing and Search Syndication Remedies. ............................ 4

       B.     Sharing a Limited Dataset Through a Closely Regulated and
             Monitored Process Does Not Confiscate Anything from
             Google. ........................................................................ 9

II.    THE DEVELOPMENT OF GENAI PRODUCTS UNDERSCORES
       THE NEED TO ACT NOW. ................................................................. 16

       A.     GenAI Products Provide a Time-Limited Opportunity to Bring
             Competitive Forces to Search. ......................................... 17

       B.     These Remedies Are Essential for Ensuring GenAI Search
             Markets Develop in a Pro-Competitive Environment ......................... 19

III.   CONCLUSION ............................................................................... 21

CERTIFICATE OF COMPLIANCE ........................................................................

CERTIFICATE OF SERVICE .................................................................................

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Associated Press v. United States*,
326 U.S. 1 (1945) ..............................................................................7, 8

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979) ...................................................................10

*Ford Motor Co. v. United States*,
405 U.S. 562 (1972)................................................................................10

*In re Google Play Store Antitrust Litig.*,
147 F.4th 917 (9th Cir. 2025) ...................................................................7

*Massachusetts v. Microsoft Corp.*,
373 F.3d 1199 (D.C. Cir. 2004)...............................................................13

*Nat'l Society of Prof'l Eng'rs v. United States*,
435 U.S. 679 (1978) .................................................................................8

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
20 F.4th 466 (9th Cir. 2021) ...................................................................10

*Trabert & Hoeffer, Inc. v. Piaget Watch Corp.*,
633 F.2d 477 (7th Cir. 1980) ...............................................................8, 10

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001).................................................................5, 14

*United States v. Paramount Pictures*,
334 U.S. 131 (1948).................................................................................8

*United States v. U.S. Gypsum Co.*,
340 U.S. 76 (1950)...............................................................................9, 10

*United States v. United Shoe Mach. Corp.*,
391 U.S. 244 (1968).................................................................................8

**OTHER AUTHORITIES**

3 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application (5th ed. 2015) ..................................................................................................8

# GLOSSARY OF ABBREVIATIONS

| Abbreviation | Document |
|---|---|
| AI | Artificial intelligence |
| Brave Br. | Amicus Brief of Brave Software, Inc. filed in the remedies proceeding before the district court, D. Ct. Dkt. 1333 |
| CMA | Competition and Markets Authority |
| DocIDs | Document identifiers |
| Final Judgment or Fin. Judg. | Final Judgment (Dec. 5, 2025), D. Ct. Dkt. 1462 |
| Final Judgment Opinion or Fin. Jud. Op. | Memorandum Opinion accompanying Final Judgment (Dec. 5, 2025), D. Ct. Dkt. 1461 |
| GenAI | Generative artificial intelligence |
| Google Br. | Principal Brief of Appellant Google LLC, App. Dkt. 2174652 |
| GSE | General search engine |
| Liability Opinion or L.Op. | Memorandum Opinion (Liability Phase) (Aug. 5, 2024), D. Ct. Dkt. 1033 |
| LLM(s) | Large language model(s) |
| OEM | Original equipment manufacturer |
| Remedies Opinion or R.Op. | Memorandum Opinion (Remedies Phase) (Sep. 2, 2025), D. Ct. Dkt. 1436 |
| Rem. Tr. | Transcript (Remedies Phase Trial), D. Ct. Dkts. 1393-1420 |
| SerpApi | SerpApi, LLC |

## INTRODUCTION & INTEREST OF AMICUS CURIAE

"The general search engine has revolutionized how we live." (L.Op. 31). With the advent of AI-powered search, internet search stands at a critical inflection point. Competition and innovation could flourish, or they could fizzle. The District Court's remedies help ensure it is the former.

For the first time in decades, there are over 20 up-and-comers creating their own Search Indices. SerpApi is one of them, alongside Mojeek, Stract, Brave, Right Dao, Alexandria, Yep, Ecosia, Qwant, and others. SerpApi was founded in 2017 to solve a gap in the market by providing programmatic access to public search results available to anyone using a standard web browser. SerpApi has been described as operating at the "forefront of this new frontier of SEO in the generative AI era."[1] SerpApi offers APIs for several sources of public search data, including Google, Bing, Amazon, Baidu, YouTube, and other search engines.

The genesis of SerpApi came when SerpApi's founder, Julien Khalegy, realized that obtaining structured search data was incredibly challenging.[2] In that

---

[1] *From SEO to AI Search: How SerpApi Became the Developer Bridge to Generative AI*, TechCrunch, https://techcrunch.com/sponsor/serpapi/from-seo-to-ai-search-how-serpapi-became-the-developer-bridge-to-generative-ai/ (last accessed on July 30, 2026).

[2] *See The Birth of SerpApi*, SerpApi (July 27, 2021), https://serpapi.com/blog/the-birth-of-serpapi/ (last accessed July 29, 2026).

vein of innovation, SerpApi has also begun developing its own Search Index.[3]  In doing so, SerpApi has experienced entry barriers around the General Search Services market.  These barriers stem in part from Google's dominant scale, built and maintained through its antitrust violations.  Google is now the gatekeeper of the General Search Services market landscape.

Google's scale provides it with significant network and feedback advantages. Google's search index "covers hundreds of billions of webpages and is well over 100,000,000 gigabytes in size."[4]  It is so large it is almost impossible to replicate. The volume of user queries processed by Google enables it to refine and improve search quality at a scale unavailable to smaller or emerging rivals.  Even a former Google executive stated "Scale is the key. [Google] just ha[s] so much scale in terms of the data [Google] can bring to bear."[5]  These data advantages create self-reinforcing network effects.  Greater query volume enables Google to improve search quality and relevance, which in turn attracts additional users and generates

---

[3] *Search Index*, SerpApi, https://serpapi.com/search-index-api (last accessed on July 22, 2026).

[4]  Google   Search,   *How   Google   Search   Organizes   Information*, https://www.google.com/intl/en_us/search/howsearchworks/how-search-works/organizing-information/ (last accessed May 22, 2026); *see also* Complaint, *United States v. Google LLC*, No. 20-cv-03010 (D.D.C. Oct. 20, 2020), ¶ 22.

[5] Complaint, *United States v. Google LLC*, No. 20-cv-03010 (D.D.C. Oct. 20, 2020), ¶ 8.

additional query data.  Google's anticompetitive conduct has effectively locked the market for General Search Services, limiting entrance and progression for upstarts like SerpApi.

The District Court's data sharing remedies directly address this structural defect.  The Court described their purpose as "narrow[ing] the scale gap created by Google's exclusive distribution agreements and, in turn, the quality gap that followed."  (Fin. Jud. Op. 16).  Google attempts to refashion the legal standard for antitrust remedies to suit its interests, but this Court's *Microsoft* ruling confirms the District Court's remedies are well founded.  The District Court found that Google's unlawful distribution agreements helped buttress its scale that keeps rivals from effectively competing.  As the Court found, "Plaintiffs' data-sharing remedies are directly tied to the theory of liability in this case." (R.Op. 110).  The remedies are narrowly tailored to correct a market stalled by Google's conduct.

There is also no basis for Google's argument that the remedies should not extend to GenAI markets.  GenAI products are poised to reshape the search landscape, giving new competitors a chance to rival Google.  But their development depends on the search data Google has been uniquely able to compile due in large part to its anticompetitive conduct.  Extension of these remedies to GenAI markets will promote healthy, competitive ecosystems.

**ARGUMENT**

I.  **THE REMEDIES ARE NARROWLY TAILORED TO CORRECT THE IMPACT OF GOOGLE'S CONDUCT.**

Google asks this Court to overturn the District Court's data sharing and syndication remedies. (Google Br. 85).  Google's main argument is that the District Court "never found what effect (if any) Google's conduct had on the market." (*Id*. at 88).  SerpApi disagrees.

   ***A.  The District Court Made Specific Factual Findings Supporting Its Data-Sharing and Search Syndication Remedies.***

Google's argument centers on causation. (Google Br. 94).  But the District Court's factual findings were more than sufficient, and they identify the structural defect that blocks nascent competitors like SerpApi.

The District Court rightly found that "the distribution agreements allowed Google to lock in its sizeable scale advantage over its rivals." (R.Op. 108).  Scale is not an abstract concept; it is a structural barrier that shuts emerging rivals out of the market.  The District Court linked scale to "user queries" and described how "[s]cale is the essential raw material for building, improving, and sustaining a GSE," and, without scale, "new entrants cannot hope to achieve a scale that would allow them to compete with Google." (L.Op. 159).  This is the core structural barrier at the heart of this case:  Google's unlawful conduct created and maintained a scale advantage so large that nascent competitors cannot overcome it through innovation and investment alone.  The District Court referenced, in its Findings of Fact, Google's

4

own acknowledgment of the value that its default placement in the distribution agreements provided in terms of user query volume, with one Google document noting "most of the knowledge that powers Google, that makes it magical, ORIGINATES in the minds of Google users." (*Id*. at 49).

The District Court's analysis was thorough; it drew the causal line from Google's unlawful conduct to its scale. Even if some of Google's scale is lawful, that does not negate the contribution of Google's unlawful conduct. This Court previously held in *Microsoft* that courts may "infer 'causation'" when the unlawful conduct "reasonably appear[s] capable of making a significant contribution to ... maintaining monopoly power." *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001). This Court also held that "[w]e may infer causation when exclusionary conduct is aimed at producers of nascent competitive technologies as well as when it is aimed at producers of established substitutes." *Id.*[6] This is exactly what the District Court did. Google aimed its exclusionary distribution agreements at protecting its scale, and in doing so, impeded entry from nascent competitors building independent search indices like SerpApi. On appeal, Google continues to

---

[6] This Court was also clear that it could find no case "standing for the proposition that, as to § 2 *liability* in an equitable enforcement action, plaintiffs must present direct proof that a defendant's continued monopoly power is precisely attributable to its anticompetitive conduct." *Id.* Google's suggestion that the District Court must link its monopoly precisely to the distribution agreements is inconsistent with this Court's prior ruling.

"contort[] the [*Microsoft*] decisions to tease out its desired standard." (R.Op. 74).

As the District Court explained, "[m]erely excising the exclusive provisions from Google's distribution agreements will not unleash competition" because Google "simply retains too many advantages that are derived in part from its decade-long vice grip on default distribution, including its quality, data volume, and capacity to monetize search queries." (*Id*. at 95-96).  This is the structural defect the remedies are designed to correct:  a market so locked in Google's favor that nascent competitors cannot break through.

The District Court found that Google's conduct produced a structural defect— a disabled competitive process—not merely a one-off injury to a single rival.  The Court documented Google's self-reinforcing scale loop in detail: default placement drives query volume; query volume yields user data (scale); scale improves search quality; better quality attracts more users; and more users attract more advertisers, generating the monopoly revenue Google uses to secure the next round of exclusive defaults. (*Id*. at 85-88).  Each turn of this flywheel widens the competitive gap.

Testimony confirmed this dynamic. Microsoft CEO Satya Nadella described Google's distribution advantage as creating a "vicious cycle that [Microsoft is] trapped in" because the "defaults get reinforced." (L.Op. 159).  Neeva founder Dr. Sridhar Ramaswamy testified that Google's high revenue share payments "effectively make the ecosystem exceptionally resist[ant] to change" and their "net

effect ... [is to] basically freeze the ecosystem in place." (*Id*. at 145). Neeva withdrew from the market for lack of scale (*Id*. at 164). Google's distribution agreements thus "allowed [it] to persistently widen the data moat, ensuring that rivals could not achieve a degree of quality that would pose a threat to Google." (R.Op. 79). Google was "not entitled to maintain and magnify the relevant network effects by entrenching its dominance through anticompetitive conduct." (*Id.* at 78) (quoting *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 949 (9th Cir. 2025)). What Google characterizes as "lawfully achieved" market position was "unlawfully amplified" through exclusionary conduct. The ordered remedies are designed to restore the competitive process.

As commentators have noted, "even if you had that capital, you wouldn't have Google's query volume and so you wouldn't have Google's quality."[7] Simply enjoining the distribution agreements would not by itself restore competition. The structural defect persists even after the unlawful conduct stops. The District Court's answer was the data-sharing and search syndication remedies. Such "fashioning of a decree in an Antitrust case ... to prevent future violations and eradicate existing evils, is ... the court's discretion." *Associated Press v. United States*, 326 U.S. 1,

---

[7] *Competing in Search*, Benedict Evans (Aug. 18, 2024), https://www.ben-evans.com/benedictevans/2024/8/19/competing-in-search (last accessed July 29, 2026).

22-23 (1945).[8]  The "existing evil" here is not merely Google's past conduct.  It is the entrenched barrier to entry that conduct created.

Nor is linking data-sharing to scale novel.  The Competition and Markets Authority in the UK, after conducting an extensive study, concluded "[a]n intervention requiring third party access to search data could provide rival search engines with helpful insights into the information that users are looking for online, including many of the uncommon or 'tail' queries that only Google has access to."[9]

---

[8]  *See also Nat'l Society of Prof'l  Eng'rs v. United States*, 435 U.S. 679, 697-98 (1978) (antitrust remedies can exist to "avoid a recurrence of the violation" and to "eliminate its consequences."); *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968) (the antitrust remedy should leave it such that "there remain no practices likely to result in monopolization in the future."); *Trabert & Hoeffer, Inc. v. Piaget Watch Corp.*, 633 F.2d 477, 485 (7th Cir. 1980) (the antitrust remedy ordered must be able to "cure the ill effects of the illegal conduct, and assure the public freedom from its continuance.") (collecting cases); *United States v. Paramount Pictures*, 334 U.S. 131, 171 (1948) ("Hence the problem of the District Court does not end with enjoining continuance of the unlawful restraints nor with dissolving the combination which launched the conspiracy. Its function includes undoing what the conspiracy achieved."); 3 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 653f (5th ed. 2015) ("[E]quitable relief properly goes beyond merely 'undoing the act'; the proper relief is eradicating all the consequences of the act and providing deterrence against repetition; and any plausible doubts should be resolved against the monopolist.").

[9] Online platforms and digital advertising market study, Final Report Appendix V: assessment of pro-competition interventions in general search, Competition and Markets Authority (Jul. 1, 2020), https://assets.publishing.service.gov.uk/media/5fe36a18d3bf7f08a02c87f6/Appendix_V__-__assessment_of_procompetition_interventions_in_ general_search_1.7.20.pdf (last accessed July 29, 2026).

Likewise, the District Court noted that "[f]or GSEs with little scale, even a small amount of data can result in meaningful improvements." (L.Op. 52). Google's attempt to raise the causation bar would protect its unlawful conduct and keep would-be rivals like SerpApi from achieving the scale necessary to meaningfully compete.

### B. Sharing a Limited Dataset Through a Closely Regulated and Monitored Process Does Not Confiscate Anything from Google.

Google implies that the data-sharing and syndication remedies amount to "affirmatively aiding rivals" and would "hobbl[e] Google." (Google Br. 24). Neither is true. As Judge Mehta noted, the data does not automatically create Google rivals because they still "have to build the crawlers, crawl the web pages, extract the web page information, and process the data to create a competitive search index." (R.Op. 117). By requiring Google to share limited data under limited circumstances, Google is not handing over the keys to its kingdom. Rather, Google would be taking the corrective steps necessary to "eradicate the existing evils" caused by its unlawful conduct, reopening the market so that nascent competitors have a realistic path to build independent search indices.

It is settled law that district courts are empowered to order antitrust remedies that go beyond the conduct found to be unlawful. *See United States v. U.S. Gypsum Co.*, 340 U.S. 76, 90 (1950) ("relief, to be effective, must go beyond the narrow

limits of the proven violation").[10]  Testimony at the remedies hearing confirmed that data sharing accelerates, but does not substitute, the independent investment required to build a competitive search index.  Apple's Senior Vice President Eddy Cue explained that GenAI rivals "have to get better at the search index part" because "[t]hey're very good at their LLMs" but what they need is "a product that gives better results." (R.Op. 114 (quoting Rem. Tr. at 3846:3-10 (Cue))).  Cue testified that if there were "a way to accelerate [GenAI products'] ability to having bigger search indexes," they could emerge as a competitive threat to Google. (*Id.* (quoting Rem. Tr. at 3848:16-18 (Cue))).  OpenAI's Nick Turley similarly testified that "access to the data that underlies Google's index ... would accelerate the development of [OpenAI's] own index" and "would allow us to build a better product faster." (*Id.* at 114-17 (quoting Rem. Tr. at 409:11-410:22 (Turley))).  DuckDuckGo's Gabriel Weinberg likewise predicted that disclosure of search index information would

---

[10] *See also Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) (noting that district courts are "clothed with 'large discretion' to fit the [remedy] to the special needs of the individual case.") (citing cases); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 293 (2d Cir. 1979) ("an injunction need not be limited to prohibiting repetition of past misconduct"); *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 486 (9th Cir. 2021) ("[A] district court may order an injunction beyond a simple proscription against the precise conduct previously pursued.") (internal citation and quotation omitted); *Trabert*, 633 F.2d at 485 (describing how antitrust remedies are not limited to "prohibition of the proven means by which the evil was accomplished, but may range broadly through practices connected with acts actually found to be illegal.") (collecting cases).

"jump start building ... indexes at scale." (*Id.* (quoting Rem. Tr. at 840:22-842:13 (Weinberg))).

The data Google is required to share under the Final Judgment is critical for nascent competitors to compete but is also limited in scope. For example, for Search Index data, Google is only required to share a "one-time snapshot." (R.Op. 117-118). And Google is not obligated to share all the data it has; for example, Knowledge Graph data[11], only that which is necessary to restore competition and a fair playing field. For syndication, the Court imposed a cap limiting syndication to only 40% of a competitor's queries in year one (tapering down thereafter), reflecting the understanding that the remedy would provide incremental assistance rather than fundamentally shift market dynamics. (*Id.* at 134). The Court reiterated its "expectation that Qualified Competitors will become independent of Google over time through investment in their own search capabilities." (Fin. Judg. 9).

The Court tailored its data-sharing and search syndication remedies by addressing specific market distortions flowing from Google's anticompetitive conduct. First, Search Index data addresses the crawl/discovery/freshness gap, providing competitors DocIDs, URL maps, crawl timing, and spam scores so they can "more quickly build a competitive search index, one that is robust in volume,

---

[11] *See* R.Op. at 119.

11

freshness, and utility." (R.Op. 116). Second, User-Side Data (GLUE and RankEmbed) addresses the ranking-quality gap, particularly for long-tail queries where Google's scale advantage is most pronounced. As the Court observed, this data is "the bread and butter of Google's scale advantage," which it amassed through "unlawfully amplified network effects." (*Id.* at 123-124). Rivals struggle to answer long-tail queries without access to click-and-query data at comparable scale. (*Id.* at 88). Third, search syndication addresses the interim competitive-viability gap— enabling Qualified Competitors to "deliver high-quality web results" while they build their own search index and infrastructure, rather than "doom[ing] the enterprise before it gets off the ground." (*Id.* at 131-136). Critically, the Court priced syndication at "financial terms no worse than those offered to any other user of Google's search syndication products," rather than marginal cost. (*Id.* at 133-134). The Court adopted this pricing structure based on Brave's amicus brief, which warned that marginal-cost syndication would create "perverse incentives" encouraging "white label" GSEs that "could exist for years at nominal cost" without incentive "to differentiate and invest for the long term." (*Id.* at 133 (discussing Brave Br.)). The remedy thus restores competition in the marketplace without displacing Google from its monopoly.

In the liability opinion, the District Court noted in its findings of fact that "[a]t every stage of the search process, user data is a critical input that directly improves

quality." (L.Op. 50). The Court further noted that scale is "***needed*** to effectively compete." (*Id.* at 159). Google has engaged in unlawful conduct that has significantly contributed to its dominant scale. Now, remedies are necessary to give upstarts like SerpApi a chance to survive, innovate, and thrive.

Notably absent from Google's brief is this Court's previous endorsement of disclosing "proprietary information" to "bolster" the ability of rivals to give them the "potential" to compete with the monopolist. *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1221 (D.C. Cir. 2004). The Final Judgment requires Google to disclose limited sets of data to Qualified Competitors—Google's "rivals"—merely to give them a chance to compete with Google.

The District Court has not opened the gates to Google's spoils for all to take. The data from Google would go only to "Qualified Competitors," not just anyone who asks. One cannot become a Qualified Competitor without meeting "approved data security standards" and undertaking a rigorous approval process by the Technical Committee appointed by the parties. (Fin. Judg. 32-33). Thus, only those who can and plan to compete with Google will get the input they need to survive.

Nor would any gains from the data-sharing and search syndication last forever. The District Court framed the syndication remedy explicitly as a short-term "bridge" that would help competitors "compete in the short term as they work towards developing a GSE that can independently compete against Google." (R.Op.

13

131). The District Court went on to explain that, with the remedies ordered, smaller search engines would "not only get better, but ... keep getting better at a faster and faster rate up to some point at which diminishing returns set in." (*Id.* at 109) (internal citation and quotation omitted).

Nor do the remedies confiscate what Google "lawfully achieved." The District Court's approach follows the established three-part standard for antitrust remedies: (1) unfetter the market from anticompetitive conduct; (2) deny the defendant the fruits of its violation; and (3) ensure that anticompetitive behavior will not recur. (R.Op. 67, citing *United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001)). Maligning these remedies as "confiscatory" or "punitive" misconstrues this longstanding framework. The District Court's remedy does not simply punish Google; it restores competitive conditions to the General Search Services Market and denies Google the ongoing benefits of its unlawful conduct.

Indeed, what the District Court *declined* to order demonstrates real tailoring discipline. The Court rejected the Plaintiffs' proposed ban on all search-related payments to distributors, recognizing that such a ban "would pose a substantial risk of harm to OEMs, carriers, and browser developers" and could produce adverse downstream effects including higher phone prices, less innovation, and reduced competition from small browser developers (R.Op. 103-105). The Court also declined to order divestiture of Google's Chrome browser, finding that "complete

divestiture of Chrome is a poor fit for this case" because the record did not support the clearer indication of a significant causal connection required for structural remedies, and because divestiture would extend beyond the conduct creating liability—Google's control of Chrome defaults, not its ownership of Chrome itself (*Id.* at 99-101). Similarly, the Court rejected Plaintiff States' proposed public education campaign on the ground that the remedy was not tailored to fit the wrong and lacked evidentiary connection to Google's distribution agreements and public perceptions of alternative search engines (*Id.* at 149).

The remedies ordered, data sharing and syndication, are measured responses to specific competitive harms. The data-sharing remedy addresses the scale gap that Google's exclusionary conduct created and maintained; the syndication remedy provides a short-term bridge for competitors to deliver quality results while they develop independent capabilities. Both are designed to deny to the defendant the fruits of its statutory violation while leaving Google's core business, products, and billions of dollars in annual search revenue intact (*Id.* at 67). As the District Court emphasized, the harshness of a remedy "is not reason alone to reject it," but here the Court nonetheless exercised judicial humility by adopting remedies that restore competitive conditions without dismantling Google's enterprise (*Id.* at 69-70).

Time is not neutral in a market shaped by network effects. The Final Judgment's six-year term, the one-time nature of the Search Index snapshot, and the

tapering syndication cap are all calibrated to a timeline that assumes prompt implementation. Delay does not merely preserve the scale gap—it compounds it, narrowing the window of opportunity for nascent competitors.

The District Court found that Google's network effects operate as a "dazzling flywheel" (R.Op. 88). Every month this flywheel continues to spin unchecked, Google widens its lead and the remedies' value erodes—making it harder for startups building independent search indices to catch up. The Search Index snapshot reflects the state of Google's index at a fixed point in time; as the web evolves and Google's index grows, a delayed snapshot captures less of the gap it was meant to close. The syndication cap assumes competitors will use the remedial period to build independent capabilities. The time for competition is now, and every day of delay makes the structural defect harder to correct.

## II. THE DEVELOPMENT OF GENAI PRODUCTS UNDERSCORES THE NEED TO ACT NOW.

Google takes issue with the lower court's extension of data-sharing and search syndication remedies to Generative AI ("GenAI") companies that it contends do not offer General Search Engine ("GSE") services. (Google Br. 95). Google's argument is misplaced. Google harmed competition in the GSE market, which is now being transformed by GenAI products. *See* Elizabeth Reid, *A New Era for AI Search*, GOOGLE: THE KEYWORD (May 19, 2026), https://blog.google/products-and-platforms/products/search/search-io-2026/#powerful-ai (last accessed July 2, 2026).

This is no surprise to Google. As an early entrant into the AI development space, Google is well aware of the technology's transformative potential. Catherine Shu, *Google Acquires Artificial Intelligence Startup DeepMind for More Than $500M*, TECHCRUNCH (Jan. 26, 2014), techcrunch.com/2014/01/26/google-deepmind/ (last accessed July 2, 2026) (DeepMind's purpose was to "try[] to build a system that thinks. This was the original dream of AI").

### A. GenAI Products Provide a Time-Limited Opportunity to Bring Competitive Forces to Search.

"GenAI chatbots grounded in general search perform an information-retrieval function that is similar to GSEs." (R.Op. 91). Judge Mehta is not alone in recognizing how GenAI chatbots overlap with traditional search engines. A simple search will turn up countless articles discussing the GenAI future of internet search.[12]

---

[12] *E.g.,* Elizabeth Silliman, et al., *New Front Door to the Internet: Winning in the Age of AI Search*, McKinsey & Co. (Oct. 16, 2025), www.mckinsey.com/capabilities/growth-marketing-and-sales/our-insights/new-front-door-to-the-internet-winning-in-the-age-of-ai-search (last accessed July 2, 2026) (finding "Half of consumers use AI-powered search" and Gen AI "stands to impact $750 billion in revenue by 2028"); Reza Moaiandin, *What OpenAI's Research Reveals About the Future of AI Search*, Search Engine J. (Sept. 30, 2025), https://www.searchenginejournal.com/what-openai-research-reveals-about-future-of-search/556725/ (last accessed July 2, 2026) (reporting "[n]ew OpenAI research shows AI search has become ChatGPT's primary use case, with mass adoption projected for mid-2026"); Reece Rogers, *Google Search Goes Agentic-and Doesn't Need You Anymore*, WIRED (May 19, 2026), https://www.wired.com/story/google-search-goes-agentic-and-doesnt-need-you-anymore/ (last accessed July 2, 2026); Andrew Hagemann*, Is Generative Engine Optimization (GE) the New SEO?*, BUILTIN (Aug. 13, 2025), https://builtin.com/articles/generative-engine-optimization-new-seo (last accessed July 2, 2026).

This burst of GenAI development underscores the need to reinvigorate competition in search. GenAI-driven search requires massive amounts of data. The scale of data required to ensure that answers to user questions are relevant, comprehensive, and up to date remains a high barrier to entry. Google's dominance in search gives it an illicitly earned but critical advantage. As the United Kingdom's Competition & Markets Authority (CMA) explained, "when firms control key inputs for developing F[oundational] M[odel]s, such as compute, data, or expertise, they could restrict access to them" to "prevent other firms from building" their own models or "protect their position in related markets."[13] That paper similarly pronounced an access principle meant to "reflect[] the fact that the market is more likely to flourish if there is ongoing ready access to data, compute[,] and expertise, without undue restriction."[14]

Google's integration of Gemini into its general search product proves the point. Since integrating Gemini, Google's market share in the GenAI chatbot market has more than quintupled. Rishabh Mishra, *Google's Gemini Eating ChatGPT's Lunch: Market Share Gain from 5% to 18% is 'Clearest Signal' that Alphabet is*

---

[13] *AI Foundation Models: Update Paper* ¶ 31, UNITED KINGDOM COMPETITION & MARKETS AUTHORITY (Apr. 11, 2024), https://assets.publishing.service.gov.uk/media/661941a6c1d297c6ad1dfeed/Update _Paper__1_.pdf (last accessed July 29, 2026).

[14] *Id.* ¶ 33.

*Winning AI War*, YAHOO!FINANCE (Dec. 27, 2025) (Google Gemini market share 5% in December 2025), https://finance.yahoo.com/news/googles-gemini-eating-chatgpts-lunch-163103026.html (last accessed May 22, 2026); Vahid Karaahmetovic, *Google's Gemini Continues to Gain Market Share Among AI Models, New Analysis Shows*, YAHOO!FINANCE (Apr. 16, 2026) (Google Gemini Market share 27% in April 2026), https://uk.finance.yahoo.com/news/google-gemini-continues-gain-market-133218052.html (last accessed May 22, 2026).

### B. These Remedies Are Essential for Ensuring GenAI Search Markets Develop in a Pro-Competitive Environment.

SerpApi sits at the intersection of search and GenAI, giving it unique insight into the lower court's remedial boost to competition. SerpApi is both a developer of an independent search index and a provider of programmatic access to public search results from established search engines, including Google. SerpApi's customers include GenAI product developers seeking access to public search data. Though SerpApi offers public search results from numerous search engines, requests for Google results far outpace, by an exponential margin, any of the others.

The data access remedies will enhance competitors' ability to overcome Google's anticompetitive data moat and develop indices that can power competition in this new stage of search before Google can fully leverage the legacy effects of its past conduct.

Competition in GenAI depends on access to high-quality data, including

large-scale datasets used for model training, fine-tuning, retrieval, evaluation, grounding, and response improvement. *See* Richard May, *Artificial Intelligence, Data, and Competition: OECD Artificial Intelligence Papers No. 18*, ORG. ECON. COOPERATION AND DEVELOPMENT (May 2024), https://www.oecd.org/content/dam/oecd/en/publications/reports/2024/05/artificial-intelligence-data-and-competition_9d0ac766/e7e88884-en.pdf (last accessed July 29, 2026) (finding that while "[c]osts to enter vary at different stages, [] access to sufficient quality data and computing power appear vital" to competition in GenAI); Thoppilan et al., *LaMDA: Language Models for Dialog Applications*, Google (Feb. 10, 2022), https://arxiv.org/pdf/2201.08239 (last accessed July 2, 2026) (explaining technical data needs for GenAI chatbots). Search-derived data and query-response information generated through Google Search are uniquely valuable inputs for GenAI because it reflects current, organized, relevance-ranked information about how users seek and access information across the internet.

Rival indices such as SerpApi's provide alternative data and search sources for the developers of GenAI search products that would compete with Google's traditional search products and its GenAI Gemini product. But the rapid adoption of GenAI tools, Google's search incumbency, and the legacy tilt from Google's anticompetitive conduct make remedial intervention critical. Without the adoption of the lower court's remedies, Google's control of information flows on the internet

will be unduly leveraged into this next evolutionary phase of search.

Today is the day to preserve the search markets of tomorrow.

## III.   CONCLUSION.

SerpApi respectfully submits that the Court affirm the search syndication and data-sharing remedies.  SerpApi further submits that the Court affirm the extension of those remedies into GenAI markets.

Dated: August 4, 2026

Respectfully submitted,

/s/ Colin R. Kass
Colin R. Kass
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 416-6890
ckass@proskauer.com

David A. Munkittrick
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000
dmunkittrick@proskauer.com

*Counsel for Amicus Curiae
SerpApi, LLC*

# <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned certifies:

1.  This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), this document contains 4,709 words.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: August 4, 2026

*/s/ Colin R. Kass*
Colin R. Kass
*Counsel for SerpApi, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2026, I caused the foregoing document to be electronically filed using the CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and will be served through the CM/ECF system.


Dated: August 4, 2026

*/s/ Colin R. Kass*
Colin R. Kass
*Counsel for SerpApi, LLC*