**No. 26-5023**
**(Consolidated with Nos. 26-5047 and 26-5049)**

# United States Court of Appeals for the District of Columbia Circuit

_____

**UNITED STATES OF AMERICA, et al.**,
*Plaintiffs-Appellees - Cross-Appellants*,

v.

**GOOGLE LLC,**
*Defendant-Appellant - Cross-Appellee.*

_____

On Appeal from the United States District Court for the
District of Columbia
(Nos. 1:20-cv-3010 & 1:20-cv-3715, Hon. Amit P. Mehta)

---

**BRIEF OF OPEN MARKETS INSTITUTE AS *AMICUS CURIAE* IN SUPPORT OF UNITED STATES OF AMERICA, et al.**

---

TARA PINCOCK
SANDEEP VAHEESAN
OPEN MARKETS INSTITUTE
655 15th Street NW, Suite 310
Washington, D.C. 20005
*Counsel for Amicus Curiae*

AUGUST 4, 2026

## CORPORATE DISCLOSURE STATEMENT

As required by Federal Rule of Appellate Procedure 26.1, I certify that amicus curiae Open Markets Institute is a nonprofit, non-stock corporation. It has no parent corporations, and no publicly traded corporations have an ownership interest in it.

**TABLE OF CONTENTS**

**CORPORATE DISCLOSURE STATEMENT**......................................................... i

**TABLE OF AUTHORITIES**.................................................................. iii

**INTEREST OF THE *AMICUS CURIAE*** ....................................................1

**INTRODUCTION**.................................................................................1

**ARGUMENT** .......................................................................................5

    **I.   Google's distribution agreements violate the Sherman Act.** .....................5

    **II.  A remedy that allows Google to preserve the exclusivity arrangements is no remedy at all.**.................................................................................8

    **III.  The assumption that digital markets are entitled to special treatment undermines the antitrust laws.** ........................................................12

**CONCLUSION**..................................................................................17

# TABLE OF AUTHORITIES

**Cases**

*Costar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056 (9th Cir. 2025)......7
*Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992) ....7, 16
*Fed. Trade Comm'n v. Shkreli*, 581 F. Supp. 3d. 579 (S.D.N.Y. 2022)...................6
*Ford Motor Co. v. United States*, 405 U.S. 562 (1972) .......................................3, 11
*Int'l Salt Co. v. United States*, 332 U.S. 392 (1947)...................................... 4, 9, 10
*LePage's Inc. v. 3M Co.*, 324 F.3d 141 (3d Cir. 2003) .........................................3, 6
*Loc. 167, Int'l Brotherhood of Teamsters, Chauffeurs, Stablemen & Helpers of Am. v. United States*, 291 U. S. 293 (1934)..........................................................10
*McWane, Inc. v. Fed. Trade Comm'n*, 783 F.3d 814 (11th Cir. 2015) ....................6
*Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141 (2021)..........................12
*Reno v. Am. C.L. Union*, 521 U.S. 844 (1997)........................................................13
*Silver v. New York Stock Exch.*, 373 U.S. 341, 357 (1963)......................................17
*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ........................................1
*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961) ..................................6
*United States v. Am. Tobacco*, 221 U.S. 106 (1911) ................................................9
*United States v. Crescent Amusement Co.*, 323 U.S. 173 (1944) ..............................2
*United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005).................. 7, 8, 16
*United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961) ...... 9, 10, 12
*United States v. Google LLC*, 778 F. Supp. 3d 797 (E.D. Va. 2025) .......................15
*United States v. Grinnell Corp.*, 384 U.S. 563 (1966)...............................................7
*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)............ 3, 6, 7, 8, 13
*United States v. Paramount Pictures*, 334 U.S. 131 (1948) ......................................9
*United States v. Socony-Vacuum Oil Co., Inc.*, 310 U.S. 150 (1940) ..................5, 17
*United States v. United Shoe Mach. Corp.*, 391 U.S. 244 (1968) ..........................4, 9
*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) ..........................6, 16

**Other Authorities**

Jay Sykes, CONG. RSCH. SERV., R46875, Antitrust Reform and Big Tech Firms 23 (2023)...............................................................................................................14
John M. Newman, *Antitrust in Digital Markets,* 72 Vand. L. Rev. 1497 (2019). 4, 5, 13, 15, 17
Martin Watzinger et al., *How Antitrust Can Spur Innovation: Bell Labs and the 1956 Consent Decree*, 12 Am. Econ. J.: Econ. Pol'y 328 (2020) ........................15

Rebecca Haw Allensworth, *Antitrust's High-Tech Exceptionalism*, 130 Yale L.J.F. 588 (2021) ..............................................................................................4, 12

Richard A. Posner, *Antitrust in the New Economy,* 68 Antitrust L.J. 925 (2001).....4, 13, 14

Tim Wu, *Taking Innovation Seriously: Antitrust Enforcement if Innovation Mattered Most*, 78 Antitrust L.J. 313 (2012) ................................................. 15, 16

## INTEREST OF THE *AMICUS CURIAE*

The Open Markets Institute (OMI) is a non-profit organization dedicated to protecting democracy and individual liberties from concentrated economic power and control. OMI does so by promoting fair competition throughout our political economy, a broadly shared prosperity, and innovation that serves the public interest. OMI regularly provides expertise on antitrust law and competition policy to Congress, federal agencies, courts, journalists, and members of the public. It does not accept any funding or donations from for-profit corporations.[1]

## INTRODUCTION

A foundational principle in antitrust law holds that monopolists cannot use unfair exclusionary conduct to maintain their dominant position. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993). Google dominates the general search engine ("GSE") market by a wide margin. Its application, Google Search ("Search"), has been the default out-of-the-box GSE on most internet browsers and mobile devices for years. But it did not achieve this default position by accident. It achieved it through exclusionary distribution agreements with original equipment manufacturers (like Apple), browser developers (like Mozilla), and others, as well as through revenue sharing agreements ("RSA") that amount to billions of dollars

---

[1] All parties consent to the filing of this *amicus* brief. No counsel for any party authored this brief in whole or in part. Apart from *amicus curiae*, no person contributed money intended to fund the brief's preparation and submission.

1

per year. Because default is king, approximately half of all GSE queries in the United States run through Search. Unless Google is banned from continuing its revenue-sharing program, it will continue to dominate the GSE market through the same exclusionary conduct that gave rise to this lawsuit.

In its liability order, the district court correctly held that Google violated Section 2 of the Sherman Act by using exclusionary distribution agreements, including Mobile Application Distribution Agreements (MADAs) and RSAs, as well as revenue-share payments to maintain its dominance. The court understood that default placement is "extremely valuable real estate" that gives Google "a major, largely unseen advantage over its rivals." [Liability Op. at 31]. But when the district court issued its remedial order one year later, it refused to ban the company from making revenue-share payments even though "distributors will be incentivized to stick with Google because it can pay more." [Rem. Op. at 106]. Monopolists should not get a free pass just because they are willing to share their monopoly profits with partners. *United States v. Crescent Amusement Co.*, 323 U.S. 173, 189 (1944).

Despite Google's claims to the contrary, its distribution agreements amount to exclusionary conduct under the antitrust laws. Companies with monopoly power are not permitted to use exclusivity contracts that foreclose rivals from "a substantial percentage of the available opportunities" in the relevant market.

2

*United States v. Microsoft Corp.*, 253 F.3d 34, 70–71 (D.C. Cir. 2001) (en banc). Moreover, a contract may be illegal even if it does not expressly require complete exclusivity. *LePage's Inc. v. 3M Co.*, 324 F.3d 141, 157–58 (3d Cir. 2003) (en banc). While the distribution agreements in this case did not bar distributors from making limited deals with Google's rivals, they operated as exclusive arrangements because they foreclosed approximately 50% of the market. *See Microsoft,* 253 F.3d at 70 (noting that less than 40% foreclosure may be sufficient for a Section 2 violation when a monopolist uses exclusivity contracts).

The district court's selected remedies are insufficient and fall short of what the law demands, however. Because the district court refused to ban Google's revenue-sharing program, the remedial order failed to effectively rectify the antitrust violations. As a result of Google's existing dominant market position and its vast financial resources, Google will remain at the top of the GSE mountain well into the future if this Court allows it to pay for default placement. This portion of the district court's decree failed to "unfetter" the GSE market from Google's illegal conduct, *Ford Motor Co. v. United States*, 405 U.S. 562, 577–78 (1972) (citing *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947)), "terminate [its] illegal monopoly," deny Google the "fruits of its statutory violation," and "ensure that there remain no practices likely to result in monopolization in the future." *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968).

3

The district court's insufficient remedies reflect a broader problem. For far too long, corporations that operated in the online and computer technology markets ("digital markets") have been given special dispensation under the antitrust laws. In the 1990s and early 2000s, scholars and the media argued that digital markets, which they called the "new economy," were entitled to a defendant-friendly, hands-off approach because antitrust enforcement created a high risk of chilling innovation. *See* Richard A. Posner, *Antitrust in the New Economy,* 68 Antitrust L.J. 925, 925–26 (2001). Their reasoning was adopted by the courts, and since then, there has been almost no antitrust enforcement in these markets. John M. Newman, *Antitrust in Digital Markets,* 72 Vand. L. Rev. 1497, 1500 (2019). At the same time, the largest big tech companies "used this blank check to entrench their market power and keep start-ups from becoming what they themselves once were: the next big thing." Rebecca Haw Allensworth, *Antitrust's High-Tech Exceptionalism*, 130 Yale L.J.F. 588, 588 (2021).

The district court's overly cautious approach and fear of "jolt[ing] the system" can be traced back to the dangerous and flawed "new economy" consensus. [Rem. Op. at 107]. If a monopolist violates the antitrust laws, the remedies must be designed to fix the problem regardless of the industry in which it operates. *See United States v. Socony-Vacuum Oil Co., Inc.*, 310 U.S. 150, 222 (1940) (stating that the Sherman Act "establishes one uniform rule applicable to all

4

industries alike."). Courts need to stop applying the "unusually laissez-faire" approach that has dominated since the turn of this century and hold all monopolists who maintain their position through illicit to account. Newman, *supra*, at 1497, 1502.

## ARGUMENT

### I.    Google's distribution agreements violate the Sherman Act.

The district court correctly concluded that Google engaged in unlawful exclusionary conduct through the deployment of exclusive dealing agreements. It held that the distribution agreements between Google and distributors were exclusive because they "significantly contribut[ed] to maintaining Google's monopoly power in the" GSE market. [Liability Op. at 153]. The district court further held that the distribution agreements were unlawful because they (1) foreclosed the market, (2) stopped rivals for reaching scale, and (3) "diminish[ed] the incentives of rivals to invest and innovate in general search." *Id.* Because Google's conduct unfairly perpetuated its monopoly in the GSE market, it violated Section 2 of the Sherman Act.

Exclusive dealing is a business practice that allows a monopolistic firm to maintain its dominant position. Through exclusive dealing, monopolists can cut off essential distribution channels or inputs to rivals and unfairly foreclose them from the market. *United States v. Microsoft Corp.*, 253 F.3d 34, 70–71 (D.C. Cir. 2001)

(en banc). *See also McWane, Inc. v. Fed. Trade Comm'n*, 783 F.3d 814, 839–40 (11th Cir. 2015); *Fed. Trade Comm'n v. Shkreli*, 581 F. Supp. 3d. 579, 634–36 (S.D.N.Y. 2022). Exclusive arrangements unfairly marginalize rivals and thus violate Section 2 of the Sherman Act if the defendant (1) possesses monopoly power and (2) foreclosed rivals from "a substantial percentage of the available opportunities" in the relevant market. *Microsoft*, 253 F.3d at 70–71. As the Third Circuit wrote, "[I]f the defendant occupies a dominant position in the market, its exclusive dealing arrangements invariably have the power to exclude rivals." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284 (3d Cir. 2012).

A contract does not need to expressly require exclusivity to be illegal. The Third Circuit ruled that even though an agreement did not include an "express exclusivity requirement," it was still exclusive because it "effectively foreclosed the business of competitors . . . ." *LePage's Inc. v. 3M Co.*, 324 F.3d 141,157–58 (3d Cir. 2003) (en banc); *see also Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326 (1961) (focusing on "practical effect" of arrangements that barred a firm's customers from doing business with rivals). This approach is consistent with the Supreme Court's directive that judges must consider "actual market realities," and not be distracted by "formalistic distinctions." *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 466–467 (1992).

6

Further, total foreclosure is not necessary to violate the law. As a sister circuit stated: "The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit." *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005). Partial exclusivity violates the law if the practical effect of the contract forecloses a considerable portion of the market. *Costar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1073 (9th Cir. 2025). The *Microsoft* court made it clear that "a monopolist's use of exclusive contracts ... may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation." *Microsoft,* 253 F.3d at 70.

Here, Google's possesses monopoly power in the GSE market. Rather than compete and maintain its monopoly through a "superior product," *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966), it used its dominant position to foreclose rivals from "a substantial percentage of the available opportunities" in the market by paying distributors billions of dollars per year in revenue share on the condition that Search received default placement at key search access points. *See Microsoft,* 253 F.3d at 70–71. Notwithstanding the availability of other means of distribution, Google tied up the most efficient channel—default installation of its search tools on devices—and severely hobbled rivals. *See Dentsply*, 399 F.3d at 193 (concluding that direct sales of artificial teeth to dental laboratories were not a

competitive threat to sales made through dealers). As a result, approximately half of all queries in the United States flow through an access point that defaults to Google. [Liability Op. at 153]. This level of foreclosure is more than sufficient to violate the Sherman Act's prohibition on monopolization and easily clears the threshold set out by this Court. *Microsoft,* 253 F.3d at 70.

Despite the fact that Google's distribution agreements do not explicitly require exclusivity, they operate as exclusive arrangements in practice. It does not matter if distributors are free to contract with Google's rivals or if users can change the default settings after purchase because it makes no economic sense for a distributor to refuse to install Search as the out-of-the-box default GSE on its product. Refusing to do so would entail a significant financial sacrifice. In 2021, for example, Google paid its partners $26 billion for default placement. [Liability Op. at 88–89]. Even the largest and most well-funded companies such as Apple and Samsung would have a hard time saying no to such sums—and they would have a harder time justifying such a decision to their shareholders.

**II.    A remedy that allows Google to preserve the exclusivity arrangements is no remedy at all.**

If a district court finds that a corporation is liable for violating the antitrust laws, it has a duty to craft effective remedies. The remedies must cure the current harms at issue as well as prevent potential harm that may arise in the future. District courts are obligated to fashion relief that will "effective[ly]…redress the

violations" and may not be swayed by the "adverse effect" it will have on "private interests." *United States v. E. I. du Pont de Nemours & Co.* (*du Pont*), 366 U.S. 316, 326 (1961). This duty "does not end with enjoining continuance of the unlawful restraints nor with dissolving the combination which launched the conspiracy," but rather, the court's responsibility "includes undoing what the conspiracy achieved." *United States v. Paramount Pictures*, 334 U.S. 131, 171 (1948); *United States v. Am. Tobacco*, 221 U.S. 106, 185–86 (1911) (when fashioning remedies, courts have a "duty to destroy" the "ingredients" that resulted in the unlawful conduct).

In carrying out their duty to craft an effective remedy, district courts have flexibility over the means of doing so. They "are invested with large discretion to model their judgement to fit the exigencies of the particular case." *Int'l Salt Co. v. United States*, 332 U.S. 392, 400–01 (1947), *abrogated by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). They can fashion a decree featuring behavioral prohibitions and mandates, structural remedies, or some combination of the two. *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968). Nevertheless, this discretion is limited by the overriding principle that antitrust remedies must "pry open to competition" the relevant market which "has been closed by defendants' illegal restraints. If [the] decree accomplishes less than that, the Government has won a lawsuit and lost a cause." *Int'l Salt*, 332 U.S. at 401.

9

With this in mind, it has long been understood that if courts err in one direction, it should be "in favor of the Government and against the conspirators." *Loc. 167, Int'l Brotherhood of Teamsters, Chauffeurs, Stablemen & Helpers of Am. v. United States*, 291 U. S. 293, 299 (1934); *du Pont*, 366 U.S. at 334 (same).

District courts should also presume that the offending parties will only do what they are strictly ordered to do. As the Supreme Court explained:

> The District Court is not obliged to assume, contrary to common experience, that a violator of the antitrust laws will relinquish the fruits of his violation more completely than the court requires him to do. And advantages already in hand may be held by methods more subtle and informed, and more difficult to prove, than those which, in the first place, win a market. When the purpose to restrain trade appears from a clear violation of law, it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed.

*Int'l Salt*, 332 U.S. at 400.

Accordingly, courts are required to fashion a decree that will achieve the following goals: (1) "unfetter a market from anticompetitive conduct," (2) "terminate the illegal monopoly," (3) "deny to the defendant the fruits of its statutory violation," and (4) "ensure that there remain no practices likely to result in monopolization in the future." *Ford Motor Co. v. United States*, 405 U.S. 562, 577–78 (1972).

Here, the district court's remedy order failed to achieve these goals. The remedy neither destroyed the fruits of Google's unlawful restraints nor pried open the doors to future competition. Despite ruling that Google achieved exclusivity

10

through conduct that included its revenue-sharing program, the district court declined to prohibit Google from paying for default placement in the future out of fear that it would "jolt the system." [Rem. Op. at 107]. Consequently, Google is free to continue paying distributors billions of dollars a year for default placement. These payments will ensure that the status quo remains intact because distributors are highly unlikely to decline Google's payments or refuse to continue making Search the default at key access points unless the court intervenes.

Most importantly, the future of the search market will look exactly like it does today and Google's monopolistic position will be left whole. Because Google is able to continue paying for placement, the market for online search will remain burdened by the same unfair exclusionary conduct that instigated the lawsuit in the first place. As one of the most profitable companies in the world, Google's pockets are as deep as the Mariana Trench. Because current or future competitors are highly unlikely to be able to match Google's revenue share payments, they will almost certainly be outbid by monopolistic Google every single time.

The district court raised a few concerns regarding the downstream effects of a payment ban, including that prices for mobile devices could increase if Google's partners no longer get to share in its monopoly profits. [Remedies Op. at 104–05]. But while prices may increase for a short time, prices could also decrease and innovation could increase as more companies are able to compete in this space.

11

Further, the court improperly elevated the protection of "private interests" of Google's trading partners over its duty to craft effective remedies and protect the public. *Du Pont*, 366 U.S. at 326.

**III.    The assumption that digital markets are entitled to special treatment undermines the antitrust laws.**

Since the turn of the century, courts have granted companies that operate in digital markets special dispensation from the antitrust laws. Rebecca Haw Allensworth, *Antitrust's High-Tech Exceptionalism*, 130 Yale L.J.F. 588, 592 (2021); *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2159 (2021) ("[This] Court has regularly refused [to allow] special dispensations from the Sherman Act[.]"). As a result, these companies "have used this blank check to entrench their market power and keep start-ups from becoming what they themselves once were: the next big thing." Allensworth, *supra,* at 588. The district court's inadequate remedies in this case show that the judicial preference for a hands-off approach and effective carveout for dominant digital corporations remains firmly intact.

In the 1990s and early 2000s, digital markets appeared novel and exciting. *See, e.g., Reno v. Am. C.L. Union*, 521 U.S. 844, 853 (1997). They seemed to move at the speed of light, enjoyed constant evolution, and sported a never-ending stream of new companies, new technologies, and new ideas. The "new economy," as it was called by antitrust scholars and the media at the time, was nothing like "the

industries in which modern antitrust doctrine emerged, and particularly from industries that manufacture traditional physical goods, such as steel, automobiles, pipe, wire, aluminum, railroad cars, roadbuilding materials, and cigarettes." Richard A. Posner, *Antitrust in the New Economy,* 68 Antitrust L.J. 925, 925–26 (2001).

Fear that antitrust enforcement would chill innovation was a popular argument in the "new economy" crowd. Digital markets were purportedly special, and the risk of erroneous findings of liability, or false positives, threatened the industry's ceaseless innovation. Accordingly, enforcers and courts decided that digital markets were entitled to a "hands-off approach" and "unusually defendant-friendly treatment." John M. Newman, *Antitrust in Digital Markets,* 72 Vand. L. Rev. 1497, 1497, 1499, 1502 (2019); *see also* Posner, *supra*, at 943 ("[T]he byword of a prudent enforcement agency and a sensible court will be: caution.").

The "new economy" consensus that dominated the era was adopted in dicta by courts. *See Microsoft*, 253 F.3d at 70 ("And the court must be sensitive to remedies that risk substantially stifling technological innovation . . . ."). Since the *Microsoft* decision was issued in 2001, "the United States has experienced a near-total lack of antitrust enforcement in digital markets." Newman, *supra*, at 1500. This lack of enforcement and the non-binding refusal by courts to hold tech monopolists accountable for violating the antitrust laws is one of the primary

13

causes of the overwhelming concentration of power that we see in digital markets today.

With hindsight, many of the arguments that justified this non-interventionist approach have proven false. For example, proponents of the new antitrust regime argued that these markets were characterized by "quick and frequent entry and exit." Posner, *supra*, at 925–26. This characterization may have been accurate in the early 2000s, but it is anything but true today considering that the digital markets are now dominated by a few mega-corporations. Jay Sykes, CONG. RSCH. SERV., R46875, Antitrust Reform and Big Tech Firms 23 (2023) (illustrating that the combined market capitalization of Meta, Alphabet, Amazon, and Apple is more than $6.6 trillion and exceeds all other markets but the nation's largest equity markets).

Fear that antitrust enforcement would chill innovation was another popular argument of the "new economy" crowd. Contrary to their arguments, the last 25 years has shown that the opposite is true. Innovation in digital markets has actually been chilled by lack of enforcement because it has allowed big tech monopolists to exclude and smother any company that threatened their dominance. In fact, "empirical work indicates that after Google vertically integrates into the market for

14

an app that runs on its Android mobile OS, the developers of existing apps in that market reduce their own efforts to continue innovating." Newman, *supra*, at 1515.[2]

While both internal and external innovation are important, external innovation has more value because it "is more likely to be of a disruptive nature." Tim Wu, *Taking Innovation Seriously: Antitrust Enforcement if Innovation Mattered Most*, 78 Antitrust L.J. 313, 318 (2012) (quotes removed); *see also United States v. Google LLC*, 778 F. Supp. 3d 797, 871-872 (E.D. Va. 2025) (holding that product redesign is anticompetitive if it effectively coerces customers to only use their product and excludes competition). In other words, it is more likely to radically improve or fundamentally change the system. Evidence shows that external innovation also has a better chance of taking "a giant leap forward," while innovation from a monopolist "is most likely to follow the path it has already blazed, lest it lose the value of its existing investments" (*i.e.*, horse-drawn carriages being replaced with automobiles as opposed to merely designing a better horse whip). *Id.*

While dominant firms are capable of major innovation, it is usually only if their hands are forced by competitors. Oftentimes when a dominant firm takes a giant leap forward it is because they are responding to an external threat or the

---

[2] Empirical work also shows that antitrust enforcement can bolster innovation. Martin Watzinger et al., *How Antitrust Can Spur Innovation: Bell Labs and the 1956 Consent Decree*, 12 Am. Econ. J.: Econ. Pol'y 328 (2020).

innovation is tied to self-preservation rather than true disruption. *Id.* But once external threats have been eliminated, the dominant firms have little to no incentive to engage in the kind of innovative conduct that disrupts the status quo.

Monopolistic firms across industries—including in digital markets—are not entitled to lenient treatment but are actually subject to stricter scrutiny. As Justice Scalia wrote, "Behavior that might otherwise not be of concern to the antitrust laws – or that might even be viewed as procompetitive – can take on exclusionary connotations when practiced by a monopolist." *Eastman Kodak Co. v. Image Technical Services*, 504 U.S. 451, 488 (1992) (Scalia, J., dissenting).[3] This Court should stress that, in accordance with Congress's directive and statutory construction, digital markets are subject to the same antitrust rules and remedies that apply to every other industry and state unequivocally that no monopolist is entitled to a defendant-friendly approach, regardless of the industry in which it operates**.** The Supreme Court made this point clear in *United States v. Socony-Vacuum Oil Co., Inc.* when it said, "[w]hatever may be its peculiar problems and characteristics, the Sherman Act . . . establishes one uniform rule applicable to all industries alike." 310 U.S. 150, 222 (1940). *See also Silver v. New York Stock Exch.*, 373 U.S. 341, 357, 360 (1963) (discussing implied repeal of the antitrust

---

[3] *ZF Meritor*, 696 F.3d at 271 ("Exclusive dealing arrangements are of special concern when imposed by a monopolist.") (citing *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005)).

laws and stating that denying antitrust applicability "would defeat the congressional policy" of "insuring competitive freedom").

This Court should reject the failed and dangerous assumptions regarding digital markets that dominated the last quarter of a century. Time and experience have thoroughly disproven the logic and conjectures of the scholars of yesterday. Challenging the common view that courts should be cautious when imposing antitrust liability on dominant digital firms, Professor Newman stated in the abstract to his law review article:

> [T]his pro-defendant position is deeply—and dangerously—flawed. Economic theory, empirical research, and extant judicial and regulatory authority all contradict the prevailing views regarding power, conduct, and efficiencies in digital markets. Far from being self-correcting, digital markets facilitate the creation and maintenance of uniquely durable market power. . . . Digital markets do require a different approach, but it must be uniquely interventionist, not unusually laissez-faire.

Newman, *supra*, at 1497.

## CONCLUSION

For the reasons stated above, the district court's holding that the distribution agreements are exclusionary contracts that violate Section 2 of the Sherman Act should be upheld. The Court should also vacate and remand the district court's payment ban denial and instruct it to apply a legal framework that will effectively restore competition to the GSE market.

Dated: August 4, 2026

Respectfully submitted,

*/s/ Tara Pincock*
Tara Pincock
Sandeep Vaheesan
Open Markets Institute
655 15th Street NW, Suite 310
Washington, D.C. 2000

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the word limit of Fed. R. App. P. 29(1)(5) because, excluding the parts exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1), this brief contains 4074 words.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in Microsoft Word for Microsoft 365 using 14-point Times New Roman font, a proportionally spaced typeface.

*/s/ Tara Pincock*
Tara Pincock
*Counsel for Amicus Curiae Open Markets Institute*

16

**CERTIFICATE OF SERVICE**

I certify that on August 4, 2026, I caused the foregoing to be filed through this Court's CM/ECF system, which will serve a notice of electronic filing on all registered users.

/s/ Tara Pincock
Tara Pincock
*Counsel for Amicus Curiae Open Markets Institute*

17