No. 26-5023
Consolidated with Nos. 26-5047, 26-5049

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES OF AMERICA, ET AL.,
Plaintiffs-Appellees-Cross-Appellants,

v.

GOOGLE LLC,
Defendant-Appellant-Cross-Appellee.
On Appeal from the United States District Court
for the District of Columbia
Nos. 1:20-cv-3010, 1:20-cv-3715
(Hon. Amit P. Mehta)

**BRIEF OF PUBLIC KNOWLEDGE AS AMICUS CURIAE
IN SUPPORT OF PLAINTIFFS-APPELLEES-CROSS-APPELLANTS
AND AFFIRMANCE IN PART AND VACATUR AND REMAND IN PART**

John Bergmayer
PUBLIC KNOWLEDGE
1818 N Street NW, Suite 410
Washington, DC 20036
(202) 861-0020
john@publicknowledge.org
Counsel for Amicus Curiae Public Knowledge

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), undersigned counsel certifies as follows:

**A. Parties and Amici Curiae.** Except for amici curiae in this Court, all parties, intervenors, and amici appearing before the district court and all parties and intervenors appearing in this Court are listed in the Certificate as to Parties, Rulings, and Related Cases in the Response Brief and Opening Brief on Cross-Appeal for the United States and Co-Plaintiff States, filed July 28, 2026.

**B. Rulings Under Review.** The references to the rulings at issue in Plaintiffs' Certificate as to Parties, Rulings, and Related Cases filed February 23, 2026, remain accurate.

**C. Related Cases.** The certification as to related cases in Plaintiffs' Certificate as to Parties, Rulings, and Related Cases filed February 23, 2026, remains accurate.

i

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Public Knowledge states that it is a nonprofit, non-stock corporation organized under the laws of the District of Columbia. Public Knowledge works to promote freedom of expression, an open Internet, and access to affordable communications tools and creative works. Public Knowledge has no parent corporation, and no publicly held corporation has a 10% or greater ownership interest in it.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES..............i
CORPORATE DISCLOSURE STATEMENT.........................................................ii
TABLE OF AUTHORITIES.............................................................................iv
GLOSSARY...................................................................................................ix
CERTIFICATE REGARDING CONSENT, AUTHORSHIP, AND SEPARATE
BRIEFING.....................................................................................................x
INTEREST OF AMICUS CURIAE..................................................................1
SUMMARY OF ARGUMENT.........................................................................1
ARGUMENT..................................................................................................4

I.    Google's Conduct Was Exclusionary Because It Foreclosed The Most Efficient Search Distribution Channels..............................................4

II.    Google's Market-Definition Argument Mistakes Complementarity For Substitution..................................................................................5

III.    Google's Other Objections Do Not Undermine The District Court's Foreclosure Findings...........................................................................7

IV.    The Apple Agreement Shows How Google's Payments Kept The Strongest Potential Search Challenger Out Of The Market.....................9

V.    The Final Judgment Must Restore The Competition Google Foreclosed..................................................................................... 14

    A.    Effective Relief Must Reopen The Market...................................14
    B.    Relief Must Reach Search Distribution Through AI...................15
    C.    The Decree Should Prohibit Search-Related Distribution Payments, And Chrome Should Be Divested..............................19

VI.    The Public Interest Confirms The Need To Restore Search Competition.................................................................................. 24

CONCLUSION.............................................................................................26
CERTIFICATE OF COMPLIANCE.................................................................28
CERTIFICATE OF SERVICE.........................................................................28

## TABLE OF AUTHORITIES

**Cases**

Brown Shoe Co. v. United States, 370 U.S. 294 (1962)..........................................6

Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451
(1992)..........................................................................................................6

In re EpiPen Mktg., Sales Practices & Antitrust Litig., 44
F.4th 959 (10th Cir. 2022)..........................................................................9

Int'l Salt Co. v. United States, 332 U.S. 392 (1947)..............................................15

Massachusetts v. Microsoft Corp., 373 F.3d 1199 (D.C. Cir.
2004)...........................................................................................................15

Nat'l Soc'y of Pro. Eng'rs v. United States, 435 U.S. 679
(1978)..........................................................................................................15

New York v. Meta Platforms, Inc., 66 F.4th 288 (D.C. Cir.
2023)............................................................................................................9

Rambus Inc. v. FTC, 522 F.3d 456 (D.C. Cir. 2008)..............................................8

Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320 (1961)................................5

United States v. Aluminum Co. of Am., 148 F.2d 416 (2d
Cir. 1945)....................................................................................................4

United States v. Dentsply Int'l, Inc., 399 F.3d 181 (3d Cir.
2005)...................................................................................................5, 7, 14

United States v. Google LLC, 747 F. Supp. 3d 1 (D.D.C.
2024)..................................................4, 5, 6, 7, 9, 10, 13, 14, 24, 25, 26

United States v. Google LLC, 803 F. Supp. 3d 18 (D.D.C.
2025)..................................................15, 16, 17, 19, 20, 21, 25, 26

United States v. Microsoft Corp., 253 F.3d 34 (D.C. Cir.
2001) (en banc)...............................................4, 5, 7, 8, 14, 15, 16

United States v. Paramount Pictures, Inc., 334 U.S. 131
(1948)..........................................................................................................20

United States v. United Shoe Machinery Corp., 391 U.S. 244
(1968)..........................................................................................................24


**Rules**

D.C. Cir. R. 26.1..............................................................................................ii

D.C. Cir. R. 28..................................................................................................i

D.C. Cir. R. 29(d)..............................................................................................x

D.C. Cir. R. 32(e)(1).......................................................................................28

Fed. R. App. P. 26.1..........................................................................................ii

iv

Fed. R. App. P. 29......................................................................................x
Fed. R. App. P. 29(a)(5)...........................................................................28
Fed. R. App. P. 32(a)(5)-(6).....................................................................28
Fed. R. App. P. 32(f)................................................................................28


**Other Authorities**

Alissa Cooper et al., Pay for Half: A Better Remedy for
    Google Search 7-9, 13-17 (Digital Regul. Project Policy
    Discussion Paper No. 121, June 25, 2026),
    https://tobin.yale.edu/research/pay-half-better-remedy-
    google-search...................................................................................20
Anick Jesdanun, Apple Maps, Once a Laughingstock, Now
    Dominates iPhones, Associated Press (Dec. 7, 2015),
    https://www.manufacturing.net/home/news/13103213/app
    le-maps-once-a-laughingstock-now-dominates-iphones...................12
Anthony Chavez, Next Steps for Privacy Sandbox and
    Tracking Protections in Chrome, Privacy Sandbox (Apr.
    22, 2025),
    https://privacysandbox.google.com/blog/privacy-sandbox-
    next-steps.......................................................................................23
Anthony Chavez, Update on Plans for Privacy Sandbox
    Technologies, Privacy Sandbox (Oct. 17, 2025),
    https://privacysandbox.google.com/blog/update-on-plans-
    for-privacy-sandbox-technologies...................................................23
Apple Inc., Apple Delivers a New Redesigned Maps for All
    Users in the United States (Jan. 30, 2020),
    https://www.apple.com/newsroom/2020/01/apple-
    delivers-a-new-redesigned-maps-for-all-users-in-the-
    united-states/...................................................................................12
Apple Inc., Apple Intelligence Brings Powerful AI
    Capabilities into Everyday Experiences (June 8, 2026),
    https://www.apple.com/newsroom/2026/06/apple-
    intelligence-brings-powerful-ai-capabilities-into-
    everyday-experiences/......................................................................18
Apple Security Research, Expanding Private Cloud Compute
    (June 8, 2026), https://security.apple.com/blog/expanding-
    pcc/.................................................................................................18
Athena Chapekis & Anna Lieb, Google Users Are Less
    Likely to Click on Links When an AI Summary Appears

in the Results, Pew Research Center (July 22, 2025), https://www.pewresearch.org/short-reads/2025/07/22/google-users-are-less-likely-to-click-on-links-when-an-ai-summary-appears-in-the-results/.................................................................26

Charles Arthur, Apple Maps: Tim Cook Says He Is 'Extremely Sorry', The Guardian (Sept. 28, 2012), https://www.theguardian.com/technology/2012/sep/28/apple-maps-tim-cook-apology.................................................................10

Charmaine Dsilva, Bringing the Best of Gemini in Chrome to Android, Google (May 12, 2026), https://blog.google/products-and-platforms/products/chrome/bringing-chrome-ai-to-android/.................................................................17

Daniel Graf, Google Maps Is Now Available for iPhone, Google Lat Long Blog (Dec. 12, 2012), https://maps.googleblog.com/2012/12/google-maps-is-now-available-for-iphone.html.................................................................11

Darrell Etherington, Apple Reportedly Ditched Google Maps Over Lack Of Turn-By-Turn Navigation, TechCrunch (Sept. 26, 2012), https://techcrunch.com/2012/09/26/apple-reportedly-ditched-google-maps-over-lack-of-turn-by-turn-navigation/.................................................................10

Elizabeth Reid, A New Era for AI Search, Google (May 19, 2026), https://blog.google/products-and-platforms/products/search/search-io-2026/.................................................................17

Eric Rescorla & Alissa Cooper, The Technical Feasibility of Divesting Google Chrome 2-5, 22-31 (Knight-Georgetown Inst. July 1, 2025), https://kgi.georgetown.edu/wp-content/uploads/2025/06/Technical-Feasibility-of-Divesting-Google-Chrome-07-01-2025-The-Knight-Georgetown-Institute.pdf.................................................................21, 22

Google & Apple, Joint Statement (Jan. 12, 2026), https://blog.google/company-news/inside-google/company-announcements/joint-statement-google-apple/.................................................................18

Google, Cookie Blocking, Privacy Sandbox (last updated Dec. 18, 2025), https://privacysandbox.google.com/cookies/basics/cookie-blocking.................................................................23

Joanna Stern, Google Maps App for iPhone Released With Turn-by-Turn Navigation, Transit Directions and Street View, ABC News (Dec. 12, 2012), https://abcnews.com/Technology/google-maps-app-iphone-released-turn-turn-navigation/story?id=17952434...............................11

John Paczkowski, Apple-Google Maps Talks Crashed Over Voice-Guided Directions, AllThingsD (Sept. 26, 2012), https://allthingsd.com/20120926/apple-google-maps-talks-crashed-over-voice-guided-directions/..............................................10

John Wilander, Full Third-Party Cookie Blocking and More, WebKit Blog (Mar. 24, 2020), https://webkit.org/blog/10218/full-third-party-cookie-blocking-and-more/..................................................................23

Justin Pot, 4 Things Apple Maps Does Better Than Google Maps, Wired (Jan. 21, 2025), https://www.wired.com/story/things-apple-maps-does-better-than-google-maps/.........................................................12

Lena Cohen, Why Privacy Badger Opts You Out of Google's Privacy Sandbox, Electronic Frontier Foundation (July 22, 2024), https://www.eff.org/deeplinks/2024/07/why-privacy-badger-opts-you-out-googles-privacy-sandbox...................................23

Mozilla Foundation, Mozilla Foundation Releases the Highly Anticipated Mozilla Firefox 1.0 Web Browser (Nov. 9, 2004), https://blog.mozilla.org/press/2004/11/mozilla-foundation-releases-the-highly-anticipated-mozilla-firefox-1-0-web-browser/.....................................................22

Mozilla, Firefox Rolls Out Total Cookie Protection by Default to More Users Worldwide (June 14, 2022, updated Aug. 28, 2024), https://blog.mozilla.org/en/mozilla/firefox-rolls-out-total-cookie-protection-by-default-to-all-users-worldwide/......................................23

Mozilla, Mozilla Organizations, https://www.mozilla.org/en-US/about/governance/organizations/ (last visited Aug. 4, 2026).................................................................................21

Nathan Olivarez-Giles, Hallelujah! Google Maps Returns to Apple's iPhone, Wired (Dec. 13, 2012), https://www.wired.com/2012/12/google-maps-apple-ios-iphone-ipad/..................................................................11

OpenAI, Brief of Amicus Curiae in Support of Plaintiffs' Proposed Final Judgment at i, United States v. Google

LLC, No. 1:20-cv-03010 (D.D.C. Oct. 31, 2025), ECF No.
1452-1,
https://storage.courtlistener.com/recap/gov.uscourts.dcd.2
23205/gov.uscourts.dcd.223205.1452.1_2.pdf...................................................16
OpenAI, ChatGPT Search, OpenAI Help Center,
https://help.openai.com/en/articles/9237897-chatgpt-
search (last visited Aug. 4, 2026).......................................................................17
Plaintiffs' First Status Report on Google's Compliance with
the Final Judgment at 9, United States v. Google LLC, No.
1:20-cv-03010 (D.D.C. May 4, 2026), ECF No. 1512,
https://www.justice.gov/atr/media/1439461/dl?inline=....................................18
Plaintiffs' Revised Proposed Final Judgment § V.A, ECF No.
1184-1 (Mar. 7, 2025),
https://www.justice.gov/atr/media/1392601/dl...................................................21
World Wide Web Consortium Technical Architecture Group,
Web User Agents §§ 2-3 (Group Note Draft July 15,
2026), https://www.w3.org/TR/2026/DNOTE-web-user-
agents-20260715/.................................................................................................22
World Wide Web Consortium, Architecture of the World
Wide Web, Volume One § 1 (Dec. 15, 2004),
https://www.w3.org/TR/webarch/.........................................................................22
Yohan Beugin et al., Cookies, 2024 Web Almanac (2024),
https://almanac.httparchive.org/en/2024/cookies...............................................23

# GLOSSARY

| | |
|---|---|
| **AI** | artificial intelligence |
| **AP** | Associated Press |
| **CM/ECF** | Case Management/Electronic Case Files system |
| **ECF** | Electronic Case Files |
| **EFF** | Electronic Frontier Foundation |
| **Google Br.** | Appellant-Cross-Appellee's Initial Principal Brief |
| **GSE** | general search engine |
| **HTML** | Hypertext Markup Language |
| **iOS** | Apple's mobile operating system |
| **ISA** | Internet Services Agreement |
| **Liability Op.** | *United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024) |
| **Remedy Op.** | *United States v. Google LLC*, 803 F. Supp. 3d 18 (D.D.C. 2025) |
| **State Pls. Br.** | Opening-Answer Brief of the State Attorneys General |
| **SVP** | specialized vertical provider |
| **U.S. Pls. Br.** | Response Brief and Opening Brief on Cross-Appeal for the United States and Co-Plaintiff States |
| **W3C** | World Wide Web Consortium |

## CERTIFICATE REGARDING CONSENT, AUTHORSHIP, AND SEPARATE BRIEFING

All parties have consented to the filing of this brief.

No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund the preparation or submission of this brief. No person other than amicus curiae or its counsel contributed money intended to fund the preparation or submission of this brief. See Fed. R. App. P. 29(a)(4)(E).

Pursuant to D.C. Circuit Rule 29(d), counsel certifies that a separate brief is necessary because Public Knowledge addresses the effects on the public of the foreclosure of search, and how this relates to new search technologies.

x

**INTEREST OF AMICUS CURIAE**

Public Knowledge is a nonprofit organization that promotes freedom of expression, an open Internet, and access to affordable communications tools and creative works. For a quarter of a century, Public Knowledge has participated in proceedings before Congress, federal agencies, and the courts on competition policy in technology markets.

**SUMMARY OF ARGUMENT**

Consumers benefit when search engines have to compete for users. Competition can produce better privacy choices and new ways for people to find information online. Publishers, advertisers, app developers, device makers, and all Internet users benefit when search access is open to competitive pressure. Effective relief should reopen every important distribution channel to that pressure.

The district court found that Google used monopoly profits to secure the most important search defaults. Being set as the default ensures usage, which generates both the data and revenue needed to compete in search. By buying control over those access points, Google cut off the path rivals needed to grow.

Google's market-definition argument is contradicted by its own evidence. Specialized vertical providers are not substitutes for a general search engine; Google's research showed that users use them as complements. While a specialized service may answer one kind of query, it cannot replace the general

1

search engine that directs users across the web. At the same time, the district court found credible evidence that new AI services are, in fact, beginning to compete with traditional search engines for general, non-specialized queries.

Apple is the most important example of how Google's exclusionary conduct has harmed competition. Apple controlled Safari's default and had invested in search technology. It also had the resources to build or sponsor a competing general search engine and the ability to acquire significant usage by setting it as the default. Google understood Apple's competitive threat and projected significant losses if Apple entered the general search market. Its billions in revenue-sharing payments gave Apple a lucrative reason not to take that step. Apple's own history with Apple Maps shows how default placement can give a new product the users and time it needs to improve while forcing the incumbent to compete.

Google's challenges to the relief already entered should be rejected. Its distribution provisions and requirements governing access to data and syndication respond directly to the conditions Google's conduct created. The decree also properly reaches AI-assisted search. AI services increasingly receive general search queries through a number of access points, and Google has already integrated Gemini into Android, Search, and Chrome. Proper relief must keep those access points open before Google's distribution advantages become as entrenched in AI as they have in search.

Both sets of Plaintiffs ask this Court to vacate and remand the denial of a prohibition on search-related distribution payments under the correct legal framework. U.S. Pls. Br. 136–44; State Pls. Br. 33–35. The record supports a categorical prohibition on remand. Google also owns Chrome, a major search access point that accounts for roughly 20 percent of U.S. searches. Chrome should be divested. Independent ownership would open the distribution channel Google controls and allow Chrome to serve browser users when it makes privacy decisions and determines how to integrate search and AI. Plaintiffs do not cross-appeal the denial of Chrome divestiture, but the Court should not foreclose the district court from ordering that relief through its retained jurisdiction if the decree fails to restore competition.

The public interest benefits from effective relief that remediates the harms of Google's exclusionary conduct. Defaults influence what users see and whether investors will finance new search products. Google's monopoly also harms publishers whose traffic is reduced by first-party and AI search features and advertisers who face prices set without meaningful competitive constraint. Restoring competition will benefit Internet users and the businesses that depend on search to reach them.

**ARGUMENT**

**I.    Google's Conduct Was Exclusionary Because It Foreclosed The Most Efficient Search Distribution Channels.**

Section 2 does not condemn a firm for building a good product or winning customers. The "successful competitor, having been urged to compete, must not be turned upon when he wins." *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945). But that principle does not address a monopolist that maintains monopoly power by excluding rivals from the channels they need to become real competitive threats.

In *Microsoft*, the D.C. Circuit found that Microsoft's exclusive distribution agreements were unlawful because they excluded Navigator from a usage share needed to threaten Microsoft's operating-system monopoly. 253 F.3d at 70-71. Search defaults play the same role here. The district court found that defaults are the most efficient channels for distributing search engines, that users disproportionately stick with defaults, and that scale is critical to improving search quality and monetization. *United States v. Google LLC*, 747 F. Supp. 3d 1, 44-50, 144-45, 158-62 (D.D.C. 2024) ("Liability Op.").

Google's payments to make itself the exclusive default on Safari (the default browser on Macs, iPads, and iPhones), Firefox, and Android access points, id. at 143-64, excluded competitors from the data and revenue they would need to

4

become durable search competitors. This, in turn, made continued dependence on Google the rational path for the distributors.

Google replies that Apple and Mozilla remained free to distribute rival search engines by other means. Google Br. 68-74. But *Microsoft* rejected this defense. Other distribution channels existed there too; the problem was that Microsoft closed the channels "leading most efficiently to the acquisition of browser usage share." 253 F.3d at 70. *Dentsply* likewise rejected the notion that rivals survive an exclusive-dealing claim simply because they can sell through less effective channels. "The test is not total foreclosure," but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit. *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005); see also *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326, 329 (1961).

Google also attacks a position Apple took during the parties' 2009 and 2012 contract negotiations. Apple sought a share of revenue from Google queries without agreeing to make Google the default. Google calls this "money for nothing." Google Br. 63-64. Google says Apple would have had "no promotional or other obligations" when users reached Google themselves, such as by entering google.com. Id. Elsewhere, Google relies on Apple's other nondefault placements to argue that its agreements did not restrain rivals from obtaining distribution. It calls included Safari bookmarks "promotional placement," and cites agreements

where Apple promoted Bing and Yahoo through them. Id. at 13, 18, 62, 70. But these positions obviously conflict. Pre-loaded bookmarks have the same promotional value whether they send a user to Bing, Yahoo, or Google. The fact that Google was not willing to pay unless the default shows by Google's deeds rather than its words that it does not consider anything short of default placement to be a meaningful method of distribution or promotion.

Google argues that it should be free to compete for defaults on the same terms as its rivals. Google Br. 50-51. While it is true that a company without monopoly power generally may contract for default placement or other advantages, "behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist." *Dentsply*, 399 F.3d at 187. Section 2 has always required courts to look at the competitive effect of the conduct in light of the specific defendant's market power.

## II. Google's Market-Definition Argument Mistakes Complementarity For Substitution.

Google's fallback is to define away its monopoly power by putting specialized vertical providers, such as Amazon, Yelp, Booking.com, and Expedia, in the same market as general search engines. Google Br. 76-85. That argument is not consistent with market-definition law, the district court's findings, or Google's own empirical research.

Product markets are not defined by abstract theorizing about whether two products can sometimes be used for a similar purpose. *Brown Shoe* looks to "reasonable interchangeability of use or the cross-elasticity of demand" and to practical indicia of market reality. 370 U.S. at 325. *Kodak* warns against "formalistic distinctions" that depart from "actual market realities." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466-67 (1992). Applying this framework, the district court found that SVPs are not GSEs and could not substitute for a GSE as a default search engine. Liability Op. at 58-59. They respond to narrower categories of queries, often within a closed commercial environment. Id. at 58-60. A user searching for "UFOs" on Google would see general web results, while on Amazon, the results are products. On Expedia or HomeAdvisor, there may be no results at all. Id. at 59.

More importantly, the district court found that even where GSEs and SVPs overlap, they often function as complements. Id. at 60. A user may begin with Google, click through to an SVP, compare options, and return to Google for a different part of the same task. Google's own empirical research showed that SVP use was "complementary, rather than cannibalistic," with no evidence that increased SVP use reduced use of Google or other GSEs. Id. at 61. SVPs also depend heavily on GSEs for traffic, with 33 to 88 percent of online traffic in some verticals flowing through GSEs via organic links or advertisements. Id. at 60-61. In

7

other words, the fact that people regularly use GSEs and SVPs together is evidence of complementarity, not substitution.

### III. Google's Other Objections Do Not Undermine The District Court's Foreclosure Findings.

Google says the district court improperly treated "reasonably appears capable," a phrase from *Microsoft*'s causation analysis, as a threshold test for exclusionary conduct. Google Br. 40-44. But the district court's analysis does not depend on that phrase. The court found conventional foreclosure: Google paid for de facto exclusive default status in the most important search access points. Liability Op. at 203-26. Those defaults drove search query volume, and those searches supplied the data and revenue rivals needed to improve their products and compete. Id. at 144-64, 230-34. That is exclusionary conduct under *Microsoft* and *Dentsply*.

Relying on *Rambus*, Google also makes an "alternate world" argument. It argues that Plaintiffs had to show that browser makers would have chosen another GSE "in a world without the browser agreements." Google Br. 54-56. Because Apple and Mozilla preferred Google's quality and revenue share, Google argues that the same defaults would have prevailed and the agreements therefore had no anticompetitive effect. *Id.* at 55-56. But *Rambus* does not support that conclusion. In that case, the question was whether, absent *Rambus*'s deception, the standard-setting body would have selected a rival technology or selected *Rambus*'s

technology on different licensing terms. If the same technology would have been selected, the deception may have affected royalties without affecting competition. 522 F.3d at 466-67. But as the district court found, Google's exclusionary acts directly affected the competitive process—not merely licensing fees. Further, *Microsoft* rejected any requirement that the government prove "that a defendant's continued monopoly power is precisely attributable to its anticompetitive conduct." 253 F.3d at 79. Once exclusionary conduct has been shown, a court may infer causation where the conduct "reasonably appear[s] capable of making a significant contribution to . . . maintaining monopoly power." *Id.* Google cannot lock up the market's most efficient distribution channels and then demand certainty about the competitive path its agreements helped close.

Google also relies on *EpiPen*, but that case is inapposite. There, pharmacy benefit managers used short, easily terminable rebate agreements to bargain down drug prices for the plans and patients they served. The Tenth Circuit viewed this as ordinary price competition, not the locking up of a distribution channel or denying competitors necessary inputs. *In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, 44 F.4th 959, 966-67, 988-89 (10th Cir. 2022). Apple, by contrast, was not acting as a buyer of search services for users, much less bargaining for lower search prices users would pay. It was a gatekeeper and potential search entrant receiving billions in search-advertising revenue for maintaining Google as the

default. *Meta* is distinguishable for another reason: it involved a complaint that failed to allege that the channel was important or that foreclosure was substantial. *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 304 (D.C. Cir. 2023). Here, after trial, the district court found that defaults were critical distribution channels, foreclosure was substantial, and the Apple payments helped preserve Google's scale advantage. Liability Op. at 203-34, 239-42.

## IV.    The Apple Agreement Shows How Google's Payments Kept The Strongest Potential Search Challenger Out Of The Market.

Apple was the most important distribution partner in the case, and the most important potential source of direct competition. The district court found that Apple had the ability to develop or acquire a competing general search engine; that Apple had hired John Giannandrea, the former head of Google Search; that Apple had invested substantially in search; and that Apple had built core pieces of a general search engine. Liability Op. at 90-92, 167-68. Apple even maintained an index of billions of websites. Id. at 39. Given this background, the district court found that both Google and Apple understood Apple could develop its own general search engine to replace Google as the Safari default. Id. at 167-68. Google projected enormous losses if Apple did so. Id. at 90. And Google knew that Apple's control over the Safari default gave Apple a unique ability to enter the search market in a significant way.

The story of Apple Maps is instructive here. Google supplied the original iPhone Maps backend. When Apple wanted voice-guided turn-by-turn navigation for iOS, Google treated that feature as an Android advantage and resisted giving Apple the necessary data except on terms Apple would not accept. Reporting at the time said Google wanted a larger role in the iOS product, including in-app branding and increased data collection (e.g., by integrating its location-sharing service Google Latitude). Apple declined those requests; sources also cited Apple's concern that Google was already gathering too much user data through the app.[1]

Apple's replacement for Google Maps was famously rocky. Tim Cook apologized publicly and pointed users to rival mapping services while Apple improved the product.[2] But Apple had the default on iPhones, just as Google had default search placement in major browsers. Default placement gave Apple a large user base while it fixed errors and kept investing.

Google did not just sit idly by when this happened, but began to compete for iPhone users, rather than relying on a contract with Apple to reach them. Within

_____

[1] John Paczkowski, Apple-Google Maps Talks Crashed Over Voice-Guided Directions, AllThingsD (Sept. 26, 2012), https://allthingsd.com/20120926/apple-google-maps-talks-crashed-over-voice-guided-directions/; Darrell Etherington, Apple Reportedly Ditched Google Maps Over Lack Of Turn-By-Turn Navigation, TechCrunch (Sept. 26, 2012), https://techcrunch.com/2012/09/26/apple-reportedly-ditched-google-maps-over-lack-of-turn-by-turn-navigation/.
[2] Charles Arthur, Apple Maps: Tim Cook Says He Is 'Extremely Sorry', The Guardian (Sept. 28, 2012), https://www.theguardian.com/technology/2012/sep/28/apple-maps-tim-cook-apology.

months, Google released a standalone iOS Maps app with voice-guided turn-by-turn navigation and other features that users had wanted on the iPhone. Google also released an iOS software development kit so developers could build Google Maps back into their own apps.[3] Apple's default placement of Apple Maps helped it survive a rough launch, and Google's response was to improve its offering. U.S. Pls. Br. 85 n.16.

Apple's turnaround showed how easily a platform owner can steer users to its own service. Defaults matter. Many people used Apple Maps because it came with the phone, and may not have been aware of alternatives. Additionally, other iPhone services such as Siri and Mail routed users there.[4] By 2020, Apple said Maps served hundreds of millions of users in more than 200 countries and territories, with privacy marketed as a differentiator from Google.[5]

---

[3] Daniel Graf, Google Maps Is Now Available for iPhone, Google Lat Long Blog (Dec. 12, 2012), https://maps.googleblog.com/2012/12/google-maps-is-now-available-for-iphone.html; Nathan Olivarez-Giles, Hallelujah! Google Maps Returns to Apple's iPhone, Wired (Dec. 13, 2012), https://www.wired.com/2012/12/google-maps-apple-ios-iphone-ipad/; Joanna Stern, Google Maps App for iPhone Released With Turn-by-Turn Navigation, Transit Directions and Street View, ABC News (Dec. 12, 2012), https://abcnews.com/Technology/google-maps-app-iphone-released-turn-turn-navigation/story?id=17952434.

[4] Anick Jesdanun, Apple Maps, Once a Laughingstock, Now Dominates iPhones, Associated Press (Dec. 7, 2015), https://www.manufacturing.net/home/news/13103213/apple-maps-once-a-laughingstock-now-dominates-iphones.

[5] Apple Inc., Apple Delivers a New Redesigned Maps for All Users in the United States (Jan. 30, 2020), https://www.apple.com/newsroom/2020/01/apple-delivers-a-new-redesigned-maps-for-all-users-in-the-united-states/.

This experience supports the district court's view of Apple as a serious search threat. As was the case with Apple Maps, a new Apple search product likely would have started below Google in quality. But defaults can give a merely adequate product the users and time it needs to improve. A changed Safari default would also have forced Google to compete for iPhone search users on the merits, just as Google competed for iPhone Maps users after Apple changed the maps default. The market as a whole would have benefited from that contest. Some users would have returned to Google. Others might have stayed with Apple if the product became good enough for ordinary use. Eventually, some users might even have preferred Apple's approach, as has happened with Maps.[6]

The ISA addressed that perceived threat. The first Google-Apple ISA, signed in 2002, licensed Google Search for Apple's web browser but was nonexclusive and included no revenue share. Liability Op. at 92. Around 2005, after Google worried that Yahoo might replace it, Google proposed and Apple accepted a revenue share for default exclusivity. Id. at 92-93. In 2007, the arrangement was extended to the iPhone and other Apple platforms. Id. at 93. The current ISA was entered in 2016 and extended in 2021, and it requires Apple to set Google as the default search engine on Safari. Id. at 88-90. By 2022, Google paid

---

[6] Justin Pot, 4 Things Apple Maps Does Better Than Google Maps, Wired (Jan. 21, 2025), https://www.wired.com/story/things-apple-maps-does-better-than-google-maps/.

Apple an estimated $20 billion for worldwide queries. Id. at 90. That was nearly double the 2020 payment, which was then 17.5 percent of Apple's operating profit, and more than Google paid all other revenue-share partners combined. Id. The district court found that the revenue share was "an important factor in Apple's calculus" and that the payments "unquestionably" contributed to keeping Apple out of search. Id. at 167-68.

Google treats Apple's willingness to accept those payments as if it proves that Apple and other search providers were not "excluded" from the market. But it is undoubtedly easier to get paid by the market leader to avoid competing than to enter the market, and the firms that control important distribution channels may also prefer the arrangement. Deals like this deprive the public of the benefits of competition and may still be unlawful. In *Dentsply*, dealers had "a strong economic incentive" to keep carrying Dentsply's teeth; the arrangement still violated Section 2 because it denied rivals access to the key distribution channel. 399 F.3d at 194. In *Microsoft*, Internet access providers accepted Microsoft's inducements; the D.C. Circuit still condemned the exclusive terms because they helped keep Navigator below the level needed to threaten Microsoft's monopoly. 253 F.3d at 70-71. A boxer's willingness to fix a fight does not excuse the behavior.

**V.     The Final Judgment Must Restore The Competition Google Foreclosed.**

**A.     Effective Relief Must Reopen The Market.**

The purpose of antitrust remedies is to "pry open to competition a market that has been closed" by unlawful restraints. *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947). They need not merely prohibit the exact words that appeared in the old contracts, but should eliminate the consequences of the unlawful conduct and restore competitive conditions. *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 698 (1978); *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1216-18 (D.C. Cir. 2004). This is the approach the district court followed. It found that Google's agreements preserved three related advantages: freedom from threats, scale, and revenue. *United States v. Google LLC*, 803 F. Supp. 3d 18 (D.D.C. 2025), slip op. at 82-98. Its remedies were intended to restore competition. A remedy limited to deleting exclusivity language from future contracts would not restore competition after years in which rivals were foreclosed.

Plaintiffs' cross-appeals place the district court's refusal to prohibit search-related payments before this Court. The district court correctly ordered relief designed to remedy the uncompetitive conditions Google's conduct created. That relief is incomplete because it leaves Google free to use monopoly rents to continue securing preferential distribution. Public Knowledge therefore supports the prohibition on search-related distribution payments that both sets of Plaintiffs

seek. The need for this relief is especially great as web search access spreads into new AI products.

Google objects that some remedies benefit firms that could not prove they would have won in a "but-for world" absent Google's unlawful competitive constraints. Google Br. 86-97; see supra Part III. But *Microsoft* rejected the idea that equitable relief requires proof that each lost competitive opportunity would have succeeded. 253 F.3d at 79. A monopolist cannot insist on an impossible reconstruction of every path competition could have taken, but for its unlawful acts.

## B.    Relief Must Reach Search Distribution Through AI.

AI-assisted services are becoming search access points. These products directly integrate web search, and users increasingly use them as general search tools. Remedy Op., slip op. at 1–2, 32–35, 43, 46–47. Search quality therefore affects answer quality. Id. at 35. Gemini uses Google's proprietary FastSearch and RankEmbed systems and receives portions of the Knowledge Graph that Google does not make available to third parties. Id. at 35-36. Those findings show how the decree's AI provisions are directly tied to Google's search monopoly.

Google calls the AI relief "pure prospective regulatory policymaking." Google Br. 95. But under the final judgment, a Qualified Competitor must show a plan to invest and compete "in or with" the GSE or Search Text Ads markets. Final

Judgment § IX.V. Shared data may be used only to serve users through a GSE, Search Text Ads, or a third-party AI product. Id. § IV.C.3. The decree reaches an AI product to the extent that AI provides a new competitive path into search. *Microsoft* treated middleware the same way, because a new product category could erode the barrier protecting Microsoft's operating system monopoly. 253 F.3d at 53-54. Indeed, OpenAI has already described itself as a prospective Qualified Competitor that intends to compete with Google in general search services.[7]

Recent developments illustrate the continuing connection between AI and search. Google says AI Mode has surpassed one billion monthly users and describes an AI-powered Search box as Search's biggest change in more than twenty-five years, and has been integrating Gemini into Chrome, as it long has with Google Search. OpenAI lets users make ChatGPT Search the Chrome default and submit queries from the address bar.[8]

---

[7] Br. of Amicus Curiae OpenAI in Supp. of Pls.' Proposed Final J. at i, *United States v. Google LLC*, No. 1:20-cv-03010 (D.D.C. Oct. 31, 2025), ECF No. 1452-1, https://storage.courtlistener.com/recap/gov.uscourts.dcd.223205/gov.uscourts.dcd.223205.1452.1_2.pdf.

[8] Elizabeth Reid, *A New Era for AI Search*, Google (May 19, 2026), https://blog.google/products-and-platforms/products/search/search-io-2026/; Charmaine Dsilva, *Bringing the Best of Gemini in Chrome to Android*, Google (May 12, 2026), https://blog.google/products-and-platforms/products/chrome/bringing-chrome-ai-to-android/; OpenAI, *ChatGPT Search*, OpenAI Help Center, https://help.openai.com/en/articles/9237897-chatgpt-search (last visited Aug. 4, 2026).

The district court relied on investment in AI as one reason to permit continued search-related payments. Remedy Op., slip op. at 127-28. But investment in a model does not secure distribution. The same opinion describes agreements under which Google paid for Gemini to be the default AI assistant on Samsung devices. Id. at 42, 49-52. Continued payments allow Google to use search-monopoly revenue to shape AI distribution and cut off potential competitors before they can achieve sufficient scale and control over relevant user access points.

Apple's current AI arrangements show how an established search distributor can become an AI search access point. After the district court entered its final judgment, Apple and Google announced a multi-year collaboration under which Apple Foundation Models would be based on Google's Gemini models and cloud technology and would help power Siri.[9] Apple later said those models were "custom-built in collaboration with Google and its Gemini models"[10] and described a collaboration with Google and NVIDIA to run some Apple Intelligence workloads on Google Cloud.[11] Thus, Siri will rely in part on Google technology

_____

[9] Google & Apple, Joint Statement (Jan. 12, 2026), https://blog.google/company-news/inside-google/company-announcements/joint-statement-google-apple/.

[10] Apple Inc., Apple Intelligence Brings Powerful AI Capabilities into Everyday Experiences (June 8, 2026), https://www.apple.com/newsroom/2026/06/apple-intelligence-brings-powerful-ai-capabilities-into-everyday-experiences/.

[11] Apple Security Research, Expanding Private Cloud Compute (June 8, 2026), https://security.apple.com/blog/expanding-pcc/.

when answering user requests. To prevent Google's search monopoly from being extended yet further, the decree should prevent Google from obtaining this kind of preferred access.

Technical remedies such as data-sharing of this kind will take time to be effective. Plaintiffs reported that Qualified Competitors likely would not begin receiving data or syndication until late fall 2026 or early winter 2027 at the earliest.[12] By contrast, a payment prohibition can operate immediately, which is important as Google is at this moment integrating AI into Search and Chrome, and new user habits are forming.

### C.    The Decree Should Prohibit Search-Related Distribution Payments, And Chrome Should Be Divested.

The decree bars exclusive agreements but permits Google to provide consideration for nonexclusive default or preferential placement. Remedy Op., slip op. at 119–28; Final Judgment §§ III.K–M. Google can therefore use monopoly search revenue to secure the same access points, provided the contract formally allows another search engine to appear somewhere or lets users change the setting. Both sets of Plaintiffs ask this Court to vacate the refusal to prohibit search-related distribution payments and remand for the district court to apply the proper remedial framework. U.S. Pls. Br. 136–44; State Pls. Br. 33–35.

---

[12] Plaintiffs' First Status Report on Google's Compliance with the Final Judgment at 9, *United States v. Google LLC*, No. 1:20-cv-03010 (D.D.C. May 4, 2026), ECF No. 1512, https://www.justice.gov/atr/media/1439461/dl?inline=.

Public Knowledge supports that request. The record warrants a categorical prohibition on payments or other consideration for default or preferential placement of Google Search or a Google AI Product at a Search Access Point.[13]

Chrome should also be divested. The district court correctly recognized that an asset may be divested even if it was lawfully acquired or developed when it has been used as part of an anticompetitive scheme. Remedy Op., slip op. at 113 (citing *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 152 (1948)). Chrome is itself a major search distribution channel. Its default accounts for roughly 20 percent of U.S. searches, and Google's control of Chrome "significantly narrows the available channels of distribution and thus disincentivizes the emergence of new competition." Id. at 112 (quoting Liability Op. at 120). The agreements shut out third-party browser access points, as well as those on Android devices by third parties such as Samsung. Chrome continues to

---

[13] An alternative is the "Pay for Half" proposal, under which Google could pay for default placement on no more than half of each device line. That approach may be appropriate for Mozilla Corporation, which is wholly owned by the nonprofit Mozilla Foundation and uses search-distribution revenue to fund its operations, including development of the Firefox browser. The district court found that an abrupt cutoff could cause Mozilla's U.S. revenue to "drop precipitously" and put at risk the Firefox browser, which unlike some competitive browsers like Microsoft Edge, does not depend on Google technology and therefore brings needed diversity to the web ecosystem. See Br. of Mozilla Corp. as Amicus Curiae in Supp. of Neither Party and Reversal at C-2, 1-2, *United States v. Google LLC*, No. 26-5023 (D.C. Cir. May 29, 2026), Doc. No. 2175888; Remedy Op., slip op. at 123-24; Alissa Cooper et al., *Pay for Half: A Better Remedy for Google Search* 7-9, 13-17 (Digital Regul. Project Policy Discussion Paper No. 121, June 25, 2026), https://tobin.yale.edu/research/pay-half-better-remedy-google-search.

give Google direct control over another major channel. Divestiture would make that channel independent and help restore search competition.

Understanding how divestiture could work requires distinguishing Chrome from related technologies. Blink is a browser engine—the component of a browser that turns the HTML and other code on a webpage into something a user can view. Chromium is a complete open-source browser project that uses Blink. Chrome is Google's branded browser built on this underlying technology. Search distribution occurs through Chrome, the browser application users directly interact with, and where Google Search is the default. A divestiture could transfer the user-facing Chrome product without requiring the divestiture of Blink or ending Google's participation in Chromium.[14]

Eric Rescorla and Alissa Cooper explain how that separation could work in a report published by the Knight-Georgetown Institute, concluding that Chrome could operate independently after divestiture. A court-supervised divestiture could provide for licensing or replacing Google-owned components and transferring

---

[14] Divestiture need not transfer Chrome to another commercial firm; an independently funded nonprofit or nonprofit-controlled public-benefit corporation could operate it. Mozilla, *Mozilla Organizations*, https://www.mozilla.org/en-US/about/governance/organizations/ (last visited Aug. 4, 2026). The nonprofit Mozilla Foundation wholly owns Mozilla Corporation, which develops Firefox. Plaintiffs' Revised Proposed Final Judgment § V.A, ECF No. 1184-1 (Mar. 7, 2025), https://www.justice.gov/atr/media/1392601/dl, required a divestiture trustee to evaluate a prospective recipient's business and investment plans, treatment of Chromium, and protection of user data; it did not require transfer to a commercial entity.

services that currently depend on Google. Other Chromium-based browsers (such as Brave, Opera, and Microsoft Edge) already operate without Google's proprietary services, and the report proposes independent governance for Chromium under which Google engineers could continue contributing to technical projects without affecting search competition. This answers the district court's concern that divestiture could diminish Chrome or harm the open-source browser ecosystem. See Remedy Op., slip op. at 116-17. It shows that no technical obstacle prevents separating the user-facing Chrome product from Google.[15]

Google's ownership of Chrome creates a conflict between the browser's role as the user's agent and Google's advertising and other businesses. Web standards commonly call a browser a "user agent" because it interacts with websites—which may not have the user's best interests in mind—on the user's behalf. The W3C Technical Architecture Group describes the duty this way: "[e]ach user agent serves its user," including by limiting tracking and by serving "its user's interests over its implementer's interests."[16] Google's ownership of both a browser and

---

[15] Eric Rescorla & Alissa Cooper, *The Technical Feasibility of Divesting Google Chrome* 2-5, 22-31 (Knight-Georgetown Inst. July 1, 2025), https://kgi.georgetown.edu/wp-content/uploads/2025/06/Technical-Feasibility-of-Divesting-Google-Chrome-07-01-2025-The-Knight-Georgetown-Institute.pdf.

[16] World Wide Web Consortium, *Architecture of the World Wide Web, Volume One* § 1 (Dec. 15, 2004), https://www.w3.org/TR/webarch/; World Wide Web Consortium Technical Architecture Group, *Web User Agents* §§ 2-3 (Group Note Draft July 15, 2026), https://www.w3.org/TR/2026/DNOTE-web-user-agents-20260715/. Pop-up blocking was an early example of this principle: Firefox 1.0's integrated blocker let users, rather than websites, decide when pop-up

several very popular web services creates an inherent conflict of interest. Most

obviously, Google is not going to replace Google Search with another service even

if the other service would better serve its users' needs.

Chrome's treatment of third-party cookies illustrates the same conflict in an

area other than search. Safari and Firefox block third-party cookies by default.[17]

Google introduced Privacy Sandbox to limit cross-site tracking while preserving an

advertising-supported web.[18] EFF criticized the project for shifting tracking into

Chrome and strengthening Google's control over online advertising.[19] In April

2025, Google announced that Chrome would retain its existing user-choice settings

rather than disabling third-party cookies. Six months later, Google discontinued

most of the Privacy Sandbox. Chrome's documentation now says users must

---

windows would appear. Mozilla Foundation, *Mozilla Foundation Releases the Highly Anticipated Mozilla Firefox 1.0 Web Browser* (Nov. 9, 2004), https://blog.mozilla.org/press/2004/11/mozilla-foundation-releases-the-highly-anticipated-mozilla-firefox-1-0-web-browser/.

[17] John Wilander, *Full Third-Party Cookie Blocking and More*, WebKit Blog (Mar. 24, 2020), https://webkit.org/blog/10218/full-third-party-cookie-blocking-and-more/; Mozilla, *Firefox Rolls Out Total Cookie Protection by Default to More Users Worldwide* (June 14, 2022, updated Aug. 28, 2024), https://blog.mozilla.org/en/mozilla/firefox-rolls-out-total-cookie-protection-by-default-to-all-users-worldwide/; Yohan Beugin et al., *Cookies, 2024 Web Almanac* (2024), https://almanac.httparchive.org/en/2024/cookies.

[18] Anthony Chavez, *Next Steps for Privacy Sandbox and Tracking Protections in Chrome*, Privacy Sandbox (Apr. 22, 2025), https://privacysandbox.google.com/blog/privacy-sandbox-next-steps.

[19] Lena Cohen, *Why Privacy Badger Opts You Out of Google's "Privacy Sandbox"*, Electronic Frontier Foundation (July 22, 2024), https://www.eff.org/deeplinks/2024/07/why-privacy-badger-opts-you-out-googles-privacy-sandbox.

23

change Chrome's settings to block third-party cookies. Google is in the position of both deciding Chrome's tracking rules while running the advertising business affected by them.[20] An independent Chrome could make those decisions on behalf of users alone. The same principle applies to search and AI features.

Chrome divestiture is a proper structural remedy to open the search access point Google owns to competition. Plaintiffs sought that relief below but do not cross-appeal its denial. U.S. Pls. Br. 34 n.5. Public Knowledge therefore asks this Court to grant the strongest relief presently before it: vacatur of the district court's refusal to prohibit search-related payments and remand under the correct framework. Chrome divestiture is warranted and should remain available through the district court's retained authority if the decree does not restore competition. Final Judgment § XI.A. When a Section 2 decree fails to achieve adequate relief, the court has a duty to modify it "so as to assure the complete extirpation of the illegal monopoly." *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 251–52 (1968).

---

[20] See supra notes 18–19; Anthony Chavez, *Update on Plans for Privacy Sandbox Technologies*, Privacy Sandbox (Oct. 17, 2025), https://privacysandbox.google.com/blog/update-on-plans-for-privacy-sandbox-technologies; Google, Cookie Blocking, Privacy Sandbox (last updated Dec. 18, 2025), https://privacysandbox.google.com/cookies/basics/cookie-blocking.

**VI.    The Public Interest Confirms The Need To Restore Search Competition.**

This case matters to Internet users, who stand to benefit from a more competitive search market, more than any individual search competitor. Search is a primary way people find information, discover businesses, and navigate the Internet. The district court found that defaults directly drive usage where users initiate searches: 65 percent of searches on Apple devices flow through Safari's default access point, and Google receives almost 95 percent of all general search queries on iPhones. Liability Op. at 89.

These competitive conditions cannot be cured merely by allowing users to change their defaults. The district court credited evidence that many users do not know a default search engine exists, much less how to change it, and that choice friction keeps users from switching. Liability Op. at 45-47. The remedies opinion made the same point: users need experience with alternative search engines to judge their quality, and Google's default position keeps many users from getting that experience. Remedy Op., slip op. at 84-85. The lesson again is that defaults matter.

The interest of the public and of Internet users is not confined to a count of how many competitors are in the market. The lack of competition has led to a degradation of quality relative to what it could have been. For example, the district court credited Google's own internal study showing that Google could

substantially degrade results for approximately three months, by an amount equivalent to removing twice the information contained in all of Wikipedia, without losing substantial revenue. Liability Op. at 57. The same control of defaults also keeps users from encountering other approaches to search, including DuckDuckGo's privacy-focused service. Id. at 54-55, 165. And it has distorted investment incentives: the district court found that Silicon Valley venture capital treated search as a "no fly zone." Id. at 165.

The consequences extend to the web and to advertisers. The remedies opinion cited evidence that Google's AI Overviews have reduced user interactions with organic web results. Remedy Op., slip op. at 21-22. Pew found that users clicked a result in eight percent of searches that contained an AI summary, compared with fifteen percent when no summary appeared.[21] The district court also found that Google used its monopoly power to raise ad prices and to reduce advertisers' control. Liability Op. at 178-81; Remedy Op., slip op. at 95-96. Unless these harms are remedied, it is unclear whether the next generation of search can develop in a competitive market.

Chrome demonstrates a related concern. A browser controls a user's interaction with the web, and determines how websites may access and use their

---

[21] Athena Chapekis & Anna Lieb, *Google Users Are Less Likely to Click on Links When an AI Summary Appears in the Results*, Pew Research Center (July 22, 2025), https://www.pewresearch.org/short-reads/2025/07/22/google-users-are-less-likely-to-click-on-links-when-an-ai-summary-appears-in-the-results/.

data. Divestiture would place those decisions with an institution whose success

depends on serving browser users primarily. It would also open an important

search access point to competition. See supra Part V.C.

**CONCLUSION**

Google's appeal should be rejected. The Court should affirm the liability

judgment and reject Google's challenges to the relief already ordered. On

Plaintiffs' cross-appeals, it should vacate the remedial judgment insofar as it

permits search-related payments to distributors and remand to the district court for

renewed consideration under the correct remedial framework. The record supports

a categorical prohibition on payments or other consideration for default or

preferential placement at Search Access Points. Chrome divestiture is warranted

and should remain available to the district court through its retained jurisdiction if

the decree does not restore competition.

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ John Bergmayer
John Bergmayer
PUBLIC KNOWLEDGE
1818 N Street NW, Suite 410
Washington, DC 20036
(202) 861-0020
john@publicknowledge.org
Counsel for Amicus Curiae Public
Knowledge

</div>

August 4, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,086 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1).

This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Mac in 14-point Times New Roman.

/s/ John Bergmayer
John Bergmayer

## CERTIFICATE OF SERVICE

I certify that, on August 4, 2026, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ John Bergmayer
John Bergmayer