**NOT YET SCHEDULED FOR ORAL ARGUMENT**

# United States Court of Appeals
# for the District of Columbia Circuit

### No. 26-5023
### (Consolidated with Nos. 26-5047, 26-5049)

UNITED STATES OF AMERICA, *et al.*,

*Plaintiffs-Appellees/Cross-Appellants,*

*v.*

GOOGLE LLC,

*Defendant-Appellant/Cross-Appellee.*

_____

*On Appeal from the United States District Court for the District of Columbia in Nos. 20-cv-3010 and 20-cv-3715, Honorable Amit P. Mehta, U.S.D.J.*

## BRIEF OF *AMICI CURIAE* BIPARTISAN TECHNOLOGY POLICY EXPERTS IN SUPPORT OF PLAINTIFFS-APPELLEES/CROSS-APPELLANTS URGING AFFIRMANCE

JOEL L. THAYER
  *Counsel of Record*
THAYER, P.L.L.C.
1255 Union Street NE, 7th Floor
Washington, DC 20002
(760) 668-0934
jthayer@thayer.tech
*Attorney for Amici Curiae*

August 4, 2026

COUNSEL PRESS
A ▶ Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (395250)

# CIRCUIT RULE 29(D) STATEMENT

*Amici* certify that they are not aware of any other amicus brief addressing the subject of this brief—in particular, how Google has used its unlawful monopoly to extend its dominance into emerging artificial-intelligence ("AI") markets, and why that dynamic bears on the appropriate remedy. A separate brief is necessary to permit *amici* to offer their unique perspectives on the issues before the Court.

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), amici certify as follows:

**A. Parties and Amici.**

Except for the parties listed below, all parties, intervenors, and amici appearing before the district court and in this Court are listed in Plaintiffs' Certificate as to Parties, Rulings, and Related Cases filed on February 23, 2026. The following parties have filed amicus briefs or notices of intent to file in this Court: Brave Software, Inc.; Washington Legal Foundation; Mozilla Corporation; Apple Inc.; Samsung Electronics Company, Ltd.; Terry Calvani, William Kolasky, Abbott B. Lipsky, Joe Sims; Law & Economics Scholars; Alden Abbott; Gregory J. Werden; Economists and Legal Scholars; Hunt Allcott, Matthew Gentzkow; OpenAI OpCo, LLC.

**B. Orders Under Review.**

The references to the rulings at issue in Plaintiffs' Certificate as to Parties, Rulings, and Related Cases filed on February 23, 2026, remain accurate.

**C. Related Cases.**

To the best of amici's knowledge, the certification as to related cases in Plaintiffs' Certificate as to Parties, Rulings, and Related Cases filed on February 23, 2026, remains accurate.

Dated: August 4, 2026

*s/ Joel Thayer*
Joel Thayer

*Counsel for Amici Curiae Bipartisan Technology Policy Experts*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Amici are appearing in their personal capacities and do not represent any organizations or companies. Even so, amici state that no parent corporations and no publicly-held company own ten percent (10%) or more of any of amici's organizations.

**STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS**

Amici certify that no party or party's counsel authored this brief in whole or in part, that no party or party's counsel provided any money intended to fund the preparation or submission of this brief, and no party or person—other than amici's counsel—contributed money intended to fund the preparation or submission of this brief.

Dated: August 4, 2026

*s/ Joel Thayer*
Joel Thayer

*Counsel for Amici Curiae Bipartisan
Technology Policy Experts*

**TABLE OF CONTENTS**

**Page**

CIRCUIT RULE 29(D) STATEMENT......................................................................i

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW,
    AND RELATED CASES .................................................................................i

CORPORATE DISCLOSURE STATEMENT ...................................................... iii

STATEMENT OF AUTHORSHIP AND FINANCIAL
    CONTRIBUTIONS ......................................................................................iv

TABLE OF AUTHORITIES ...............................................................................vi

IDENTITY OF *AMICI*, INTEREST IN THIS MATTER, AND SOURCE
    OF AUTHORITY TO FILE ........................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................3

ARGUMENT .....................................................................................................4

    I.     Google's Early Monopoly Positions Financed and Seeded its
          AI Position..............................................................................................4

    II.    GenAI is Already a Concentrated Market in which Google is
          Vertically Integrated and Among Market Leaders—Not a
          Competitive Check on Google ............................................................8

    III.   A Monopolist's Entry into an Adjacent Emerging Market
          does not Discipline it in the Monopolized Market, or Act as
          an Excuse for Full Remedy ...............................................................16

CONCLUSION ................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*FTC v. Meta Platforms, Inc.*,
Civil Action No. 1:20-cv-03590 (JEB) (filed Jul. 3, 2025)................................21

*Nat'l Collegiate Athletic Ass'n v. Alston*,
594 U.S. 69, 141 S.Ct. 2141, 210 L.Ed.2d 314 (2021) ......................................19

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
435 U.S. 679 (1978)............................................................................................20

*United States v. E. I. du Pont de Nemours & Co.*,
366 U.S. 316 (1961)............................................................................................20

*United States v. Google LLC*,
747 F. Supp. 3d 1 (D.D.C. 2024).........................................................................3

*United States v. Google LLC*,
803 F. Supp. 3d 18 (D.D.C. 2025).............................................................3, 19, 20

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001)..............................................................................20

**Statutes and Other Authorities:**

Fed. R. App. P. 29(a) ...............................................................................................1

Alphabet Inc., *Alphabet Announces First Quarter 2026 Results*
(Apr. 29, 2026), https://s206.q4cdn.com/479360582/files/doc_
financials/2026/q1/2026q1-alphabet-earnings-release.pdf................................10

Cade Metz, *Genius Makers: The Mavericks Who Brought AI to Google,
Facebook, and the World* 80–91 (2021) ......................................................5, 6, 7

Catherine Perloff & Phoebe Liu, *Behind Google's TPU Ground War to
Lure Nvidia's Most Loyal Customers*, *The Information* (July 13, 2026),
https://www.theinformation.com/newsletters/ai-infrastructure/behind-
googles-tpu-ground-war-lure-nvidias-loyal-customers......................................10

Cedric Sam et al., *A Guide to the Circular Deals Underpinning the AI
Boom*, *Bloomberg* (updated July 28, 2026), https://www.bloomberg.
com/graphics/2026-ai-circular-deals/ ...............................................................15

Charles Duhigg, *The Case Against Google*, *N.Y. Times Mag*. (Feb. 20, 2018), https://www.nytimes.com/2018/02/20/magazine/the-case-against-google.html ...................................................................22, 23

Competition and Markets Authority (U.K.), *AI Foundation Models: Update Paper* (2024), https://assets.publishing.service.gov.uk/media/661941a6c1d297c6ad1dfeed/Update_Paper__1_.pdf .............................12

Dara Kerr, *United States Takes on Google in Biggest Tech Monopoly Trial of 21ˢᵗ Century*, *NPR* (Sep. 12, 2023), https://www.npr.org/2023/09/12/1198558372/doj-google-monopoly-antitrust-trial-search-engine ......................17

Ernesto Falcon, *What the AT&T Breakup Teaches Us About a Big Tech Breakup*, Electronic Frontier Foundation (Mar. 1, 2021), https://www.eff.org/deeplinks/2021/02/what-att-breakup-teaches-us-about-big-tech-breakup ....................................................................17

Harsh Chauhan, *Meet the Biggest Threat to Nvidia in AI Chips. It's Not AMD, Intel, or Broadcom.*, *The Motley Fool* (Apr. 25, 2026), https://www.fool.com/investing/2026/04/25/meet-biggest-threat-nvidia-ai-chips-its-not-amd/ .................................................................9

Joint Statement from Apple and Google, (Jan. 12, 2026), https://blog.google/company-news/inside-google/company-announcements/joint-statement-google-apple/ ....................................18

Laurie Naspe & Sam Sheridan, *The 2026 Generative AI Landscape*, Similarweb (July 2026), https://www.similarweb.com/corp/the-2026-generative-ai-landscape/ ........................................................... 12-13

Mark Tyson, *Latest GPU Market Analysis Shows Nvidia Losing Ground to AMD — and Intel Cracks the 1% Share Milestone for the First Time*, *Tom's Hardware* (Dec. 2, 2025), https://www.tomshardware.com/pc-components/gpus/latest-gpu-market-analysis-shows-nvidia-losing-ground-to-amd-and-intel-cracks-the-1-percent-share-milestone-for-the-first-time........................................................................9

*Q2 Cloud Market Passes $143 Billion; Highest Growth Rate in Eight Years*, Synergy Rsch. Grp. (2026), https://www.srgresearch.com/articles/q2-cloud-market-passes-143-billion-highest-growth-rate-in-eight-years....................................................................10

Robert McMillan, *Inside the Artificial Brain That's Remaking the Google Empire*, *Wired* (July 16, 2014), https://www.wired.com/2014/07/google-brain/ ...............................................................................6

Shriya Srikanth, *The Antitrust Case Against AI Overviews*, *Harv. J.L. & Tech. Digest* (2025), https://jolt.law.harvard.edu/digest/the-antitrust-case-against-ai-overviews.................................................................16

*State of CVC Q1'25 Report*, CB Insights (Apr. 29, 2025), https://www.cbinsights.com/research/report/corporate-venture-capital-trends-q1-2025/ ..................................................................15

Stephanie Palazzolo & Erin Woo, *OpenAI CEO Declares 'Code Red' to Combat Threats to ChatGPT, Delays Ads Effort*, *The Information* (Dec. 1, 2025), https://www.theinformation.com/articles/openai-ceo-declares-code-red-combat-threats-chatgpt-delays-ads-effort ...............................8

Steven Levy, *8 Google Employees Invented Modern AI. Here's the Inside Story*, *Wired* (Mar. 20, 2024), https://www.wired.com/story/eight-google-employees-invented-modern-ai-transformers-paper/ ...............................7

Tejas N. Narechania & Ganesh Sitaraman, *An Antimonopoly Approach to Governing Artificial Intelligence*, 43 *Yale L. & Pol'y Rev*. 95 (2024)...................................................................8

Tejas N. Narechania, *Machine Learning as Natural Monopoly*, 107 *Iowa L. Rev.* 1543 (2022) ................................................................11

Tim Tully et al., *2025: The State of Generative AI in the Enterprise*, Menlo Ventures (Dec. 9, 2025), https://menlovc.com/perspective/2025-the-state-of-generative-ai-in-the-enterprise/ .........................................................11

*Top Websites Ranking - Most Visited Websites In The World*, Similarweb (July 1, 2026), https://www.similarweb.com/top-websites/ ...............................12

## IDENTITY OF *AMICI*, INTEREST IN THIS MATTER, AND SOURCE OF AUTHORITY TO FILE

Pursuant to Fed. R. App. P. 29(a), all parties have consented to the filing of this brief. Amicus Joel Thayer is President of the Digital Progress Institute, a Senior Fellow for AI and Emerging Technology Policy at the America First Policy Institute, a Senior Fellow at the Vanderbilt Policy Accelerator for Political Economy and Regulation ("VPA"), and a tech and telecom attorney. Mr. Thayer previously was an associate at Phillips Lytle LLP. Before that, he served as Policy Counsel for ACT | The App Association, where he advised on legal and policy issues related to antitrust, telecommunications, privacy, cybersecurity, and intellectual property. His experience also includes working as a legal clerk for FCC Chairman Ajit Pai and FTC Commissioner Maureen Ohlhausen and as a congressional staffer for the Hon. Lee Terry and the Hon. Mary Bono. He has testified before both the Senate Judiciary Committee on advancing a national privacy framework and the House Energy and Commerce Committee on protecting children online. His works have been featured in the *American University Intellectual Property Brief, Harvard Journal of Law and Public Policy*, *Yale Journal on Regulation, Stanford Technology Law Review, the Journal of American Affairs, The Wall Street Journal, Newsweek*, *The Hill*, *The National Review*, and *The Federalist Society*.

Amicus Asad Ramzanali is the Director of Artificial Intelligence and Technology Policy at the Vanderbilt Policy Accelerator, a policy research center at Vanderbilt University. Mr. Ramzanali has technology and technology policy experience across government, nonprofit, and industry. Most recently, he served as the Chief of Staff and Deputy Director for Strategy at the White House Office of Science and Technology Policy ("OSTP"), with the designation of Special Assistant to the President. He joined OSTP after four years as a congressional staffer to the Hon. Anna Eshoo and the Hon. Brian Schatz. Before entering public service, Mr. Ramzanali worked on the corporate strategy team at Intuit Inc. and managed an impact investing program backed by JPMorgan Chase at the nonprofit Center for Financial Services Innovation (now Financial Health Network). He has testified at hearings about AI before the House Energy and Commerce Committee and the Senate Commerce, Science, and Transportation Committee. His work has been published in *The Atlantic*, *Time*, *Politico*, *MIT Technology Review*, *Tech Policy Press*, and the National Academy of Sciences' *Issues in Science and Technology*; by the Brookings Institution and RAND Corporation. He and his work have been quoted in *The New York Times, The Financial Times, The Los Angeles Times, The Hill, The Verge, Washington Monthly, Axios, Puck, NBC News,* and other press outlets.

Amici approach policy questions from different points on the political spectrum but share the view that fair, competitive markets depend on rigorous enforcement of antitrust laws.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

"Google is a monopolist, and it has acted as one to maintain its monopoly," U.S. Federal District Judge Amit Mehta wrote in an antitrust opinion of seismic proportions against monopolist Google, the general-search monopolist. *United States v. Google LLC*, 747 F. Supp. 3d 1, 32 (D.D.C. 2024). The opinion's impact is on par with major antitrust cases of the 20th century. When crafting his opinion, Judge Mehta dedicates a great deal of time explaining that the Department of Justice ("DOJ") fully demonstrated Google's liability under our current antitrust laws. For instance, he says the DOJ proved that exclusive default agreements—such as Google's agreement with Apple—"allowed Google to persistently widen the data moat, ensuring that rivals could not achieve a degree of quality that would pose a threat to Google." *United States v. Google LLC*, 803 F. Supp. 3d 18, 79 (D.D.C. 2025). Judge Mehta even says that they "also discouraged investment by existing market actors and new entrants." *Id.*

Even still, Judge Mehta failed to provide adequate remedy to quell the conduct. The reason, as Judge Mehta provides, is that market shifts from generative AI ("GenAI") may discipline the general-search market. As we

describe, this logic ignores several key realities. *First*, Google's illegal monopoly in general search services allowed it to invest in and gain a foothold in AI. *Second*, GenAI is already a concentrated market and Google is vertically integrated in underappreciated ways. *Third*, GenAI will not discipline its monopolization in general search services. The humblest judicial posture is to apply the law to determine a remedy to correct Google's monopolization of the market in which it has an illegal monopoly, not to apply a judicial forecast of how AI may advance or relate to other markets. This Court could reverse that course. If it does, the Court can thwart the monopolist's ability to continue its demonstrated anticompetitive conduct not only in the general-search market, but in emerging markets, too. In this brief, amici proffer a straightforward argument: siding with the DOJ will do much to prevent Google—and other firms—from employing similar tactics in other emerging markets, such as AI.

## ARGUMENT

### I. Google's Early Monopoly Positions Financed and Seeded its AI Position

Google's monopoly in general search services did more than entrench its position in one market—it generated the cash, computational capacity ("compute"), and data that enabled Google to build an early and durable lead in AI. By the early 2000s Google had become the world's dominant general search engine ("GSE"), a position it has since maintained. That dominance produced the

revenues, the proprietary infrastructure, and unparalleled data that would later become the essential inputs to modern AI: cash, compute, and data.

Years before GenAI was its own product category, Google invested significant sums in AI research to improve its GSE, ads, and related products. In 2011, Google launched an internal research team, codenamed Project Marvin, to use deep learning to build neural networks, an emerging domain of academic research in AI that required costly amounts of compute and data. Google had both. By the end of 2012, the team had grown to 10 people in a unit called Google Brain, and Google invested millions of dollars in compute for the team to enable it to use thousands of chips. In addition to cash and compute, neural networks need data, which Google had unparalleled amounts of from the billions of daily searches conducted on its platform, along with data across many other internet products the company had acquired or launched by that year. Cade Metz, *Genius Makers: The Mavericks Who Brought AI to Google, Facebook, and the World* 80–91 (2021).

In the coming years, Google would use its cash, compute, and data advantage to deepen its AI advantage. In 2012, a team of researchers at the University of Toronto published "one of the most influential papers in the history of computer science," describing AlexNet, an AI system they built that performed markedly better than all prior entrants to an academic AI competition in part by showing for the first time that graphics processing unit (GPU) chips are more

effective for training AI systems than the more common and classical central processing unit (CPU) chips. In 2013, Google acquired an academic spinout based on that research, DNNresearch (for deep neural networks), for $44 million, though it was apparently ready to spend more. The three researchers Google would employ as part of the acquisition were Geoffrey Hinton (widely considered a "godfather of AI"), Ilya Sutskever (who later cofounded OpenAI), and Alex Krizhevsky (namesake of AlexNet). *Id.* at 1–12, 91–98.  It was around this point that Google's head of engineering "was intent on cornering the worldwide market for deep learning researchers—or at least coming close," and he was given "free rein to secure any and all of the leading researchers" in the field by Google co-founder Larry Page, according to a history of the field of AI. *Id.* at 99. As a 2014 magazine article describes it, soon after seeing some early research successes, "the company began snatching up every deep learning expert it could find." Robert McMillan, *Inside the Artificial Brain That's Remaking the Google Empire*, *Wired* (July 16, 2014), https://www.wired.com/2014/07/google-brain/. For example, in 2014, Google hired leading researcher Ian Goodfellow, who had recently published a paper introducing a key technical advancement in AI called generative adversarial networks. Metz, *supra*, at 205. This goal of cornering the market for the nascent AI field was what directly led to Google acquiring DeepMind, which was

an independent AI research company based in the U.K., in 2014 for $650 million. *Id.* at 99–116.

These talent and research investments soon translated into direct commercial applications inside Google's GSE. Among the earliest applications of AI research at Google with direct business effects was in 2015 when the company started using AI-based RankBrain to order results for Google Search, soon sorting results for 15 percent of queries. *Id.* at 139.

In 2017, eight Google employees authored a technical paper entitled, "Attention Is All You Need," which introduced the transformer architecture for AI systems. Transformers quickly became a seminal technical development and the architecture still undergirds modern AI systems (the T in ChatGPT stands for transformer). Steven Levy, *8 Google Employees Invented Modern AI. Here's the Inside Story*, *Wired* (Mar. 20, 2024), https://www.wired.com/story/eight-google-employees-invented-modern-ai-transformers-paper/. When OpenAI launched ChatGPT in November 2022, Google declared a "code red" internally, feeling the pressure on its general search business. Google's response included developing an improved version of its existing foundation model to rival the quality of OpenAI's offerings, as would be expected in competitive markets, but it also used various tactics that built on its vertical integration across the AI tech stack, including by more fully integrating AI into GSE results, which prompted OpenAI to later

declare its own "code red." Stephanie Palazzolo & Erin Woo, *OpenAI CEO Declares 'Code Red' to Combat Threats to ChatGPT, Delays Ads Effort*, *The Information* (Dec. 1, 2025), https://www.theinformation.com/articles/openai-ceo-declares-code-red-combat-threats-chatgpt-delays-ads-effort.

Google's AI efforts were not a typical example of a business expanding into a new market; the company's general search services monopoly financed and seeded Google's ability to establish the field of GenAI and thrive in it. The cash, compute, and data that entrenched Google in the general-search market became the essential inputs to its AI position. A remedy that leaves the general search monopoly position largely untouched ignores the fact that Google's AI position is a direct result of its illegal monopoly in general search services, from which it directly benefited.

## II. GenAI is Already a Concentrated Market in which Google is Vertically Integrated and Among Market Leaders—Not a Competitive Check on Google

Today's GenAI ecosystem is commonly described as a technical stack of layers of technology—software and hardware—that build on each other. See, e.g., Tejas N. Narechania & Ganesh Sitaraman, *An Antimonopoly Approach to Governing Artificial Intelligence*, 43 *Yale L. & Pol'y Rev*. 95, 108–128 (2024). Consider a simplified AI tech stack of four layers: End users interact with (1) applications that access (2) AI foundation models, which are built (i.e., training)

and accessed (i.e., inference) using (3) cloud computing infrastructure, that relies on (4) chips (i.e., semiconductors). Analyzing GenAI this way helps illuminate distinct policy questions in each market. The bottom three layers—chips, cloud computing, and AI foundation models—are highly concentrated markets where between one and three providers account for a majority of market share. Google is one of a few players leading in today's AI markets, and it draws major advantages from being the most vertically integrated actor across all layers of the stack.

First, consider concentration. The bottom two layers are often collectively called compute. The market for AI chips is dominated by Nvidia, with recent estimates putting the company's market share of AI chips at between 80% and above 90%. Mark Tyson, *Latest GPU Market Analysis Shows Nvidia Losing Ground to AMD — and Intel Cracks the 1% Share Milestone for the First Time*, *Tom's Hardware* (Dec. 2, 2025), https://www.tomshardware.com/pc-components/gpus/latest-gpu-market-analysis-shows-nvidia-losing-ground-to-amd-and-intel-cracks-the-1-percent-share-milestone-for-the-first-time; Harsh Chauhan, *Meet the Biggest Threat to Nvidia in AI Chips. It's Not AMD, Intel, or Broadcom.*, *The Motley Fool* (Apr. 25, 2026), https://www.fool.com/investing/2026/04/25/meet-biggest-threat-nvidia-ai-chips-its-not-amd/. Recently, Google has started selling its tensor processing unit (TPU) chip, which it previously used only in its own Google Cloud infrastructure,

marketed explicitly for specializing in handling AI workloads. Amir Efrati, Catherine Perloff & Phoebe Liu, *Behind Google's TPU Ground War to Lure Nvidia's Most Loyal Customers*, *The Information* (July 13, 2026), https://www.theinformation.com/newsletters/ai-infrastructure/behind-googles-tpu-ground-war-lure-nvidias-loyal-customers. At the cloud layer, three companies— Amazon, Microsoft, and Google—comprise approximately two-thirds of the market by global revenues, with Google itself commanding 15% of the market. *Q2 Cloud Market Passes $143 Billion; Highest Growth Rate in Eight Years*, Synergy Rsch. Grp. (2026), https://www.srgresearch.com/articles/q2-cloud-market-passes-143-billion-highest-growth-rate-in-eight-years. In the press release announcing its most recent quarterly earnings, Google's parent company Alphabet highlighted as a financial strength that its cloud business grew 63% from a year prior to $20 billion in quarterly revenues, largely driven by the growth in AI. Alphabet Inc., *Alphabet Announces First Quarter 2026 Results* (Apr. 29, 2026), https://s206.q4cdn.com/479360582/files/doc_financials/2026/q1/2026q1-alphabet-earnings-release.pdf.

Next, consider AI tech stack layers of AI foundation models and applications. While common GenAI products like ChatGPT are often described as "models," they are better understood as two vertically integrated technologies: a chatbot application (e.g., OpenAI's Chat, as it is commonly called) and an AI

foundation model (e.g., OpenAI's GPT-family of foundation models). Anthropic, Google, and xAI each offer a similar vertically integrated application-foundation model pair, like to OpenAI's ChatGPT (Claude, Gemini, and Grok, respectively). While it may seem an artificial move to separate these products, each company offers third-party developers access to their AI foundation models via an application programming interface (API), and myriad startups are building applications (sometimes called "wrappers") that sit between users and those companies' AI foundation models. When analyzing the AI foundation model market by API revenues, one estimate finds that three companies—Anthropic, OpenAI, and Google—comprised 88% of API revenues, with Google alone commanding 21%, as of the end of December 2025. Tim Tully et al., *2025: The State of Generative AI in the Enterprise*, Menlo Ventures (Dec. 9, 2025), https://menlovc.com/perspective/2025-the-state-of-generative-ai-in-the-enterprise/.

While the compute layers are commonly considered AI infrastructure, AI foundation models exhibit similar dynamics to infrastructure markets. These are markets that are dominated by a few providers that command real market power. In 2022, before the release of ChatGPT, one scholar compared AI models to natural monopolies, in part due to the high cost of entry, which has only gotten more significant since GenAI became popular. Tejas N. Narechania, *Machine Learning as Natural Monopoly*, 107 *Iowa L. Rev.* 1543 (2022). In researching the foundation

model market, the United Kingdom's Competition & Markets Authority concluded the following:

> We are concerned that the FM sector is developing in ways that risk negative market outcomes…In particular, the growing presence across the FM value chain of a small number of incumbent technology firms, which already hold positions of market power in many of today's most important digital markets, could profoundly shape FM-related markets to the detriment of fair, open and effective competition, ultimately harming businesses and consumers, for example by reducing choice and quality, and by raising prices. Competition and Markets Authority (U.K.), *AI Foundation Models: Update Paper* (2024), https://assets.publishing.service.gov.uk/media/661941a6c1d297c6ad1dfeed/Update_Paper__1_.pdf.

While a few companies compete in the AI foundation model market, Google has distinct advantages in the application layer because of its access to unparalleled distribution, which provides long-term advantages in the AI foundation model market as well. Google's distribution advantages are based on it owning several popular websites where it has started integrating features (which are applications, in the context of the AI tech stack) based on its Gemini model. Consider google.com, which was the most visited web address in the world as of July 1, 2026. *Top Websites Ranking - Most Visited Websites In The World*, Similarweb (July 1, 2026), https://www.similarweb.com/top-websites/. In 2024, Google started including "AI Overviews" atop its GSE results, which rely on the company's Gemini foundation model. According to one analysis, as of May 2026, 43.1% of Google searches included AI Overviews. Laurie Naspe & Sam Sheridan, *The 2026*

12

*Generative AI Landscape*, Similarweb (July 2026),

https://www.similarweb.com/corp/the-2026-generative-ai-landscape/. This means

that over four of 10 Google Search queries see a response that is the start of

engaging with Google's AI product suite. Google.com also now prominently

features a tab for "AI Mode," where results are compiled by default. AI Mode is

also a chat-like interface, powered by Google's Gemini foundation models. To the

user, both AI Overviews and AI Mode appear similar to ChatGPT, but Google's

products integrate Google Search results directly into responses, which is one way

Google's monopoly in general search services enables its success in GenAI. In

May 2026, AI Mode experienced an estimated 279 million visits. *Id.* The data

created by user interactions on AI Overviews and AI Mode establishes additional

material that provides Google with an even greater data-advantage than exists in

general search services alone. Similar dynamics are evolving for other Google

digital properties—e.g., the web's second most visited address is youtube.com,

which now has an "Ask YouTube" feature powered by Gemini.

　　*Finally*, returning to the AI tech stack as a whole, consider Google's vertical

integration. An end user could access applications—e.g., AI Overviews, AI

Mode—that are powered by Google's Gemini foundation models, which are built

and accessed using Google Cloud infrastructure that includes Google TPU chips.

But this is the simplified version of the stack. Here's a less simplified AI tech stack

across Google products: Google products and services across the dozens of categories enable a user to use AI: An end user might access AI Overviews or AI Mode in Google's GSE, or similar GenAI features in Gmail, Maps, YouTube, Google Drive, or other products, accessed via Chrome installed via the Play Store on a Pixel Smartphone or Pixel Tablet running Android's operating system or preinstalled on a Chromebook running ChromeOS, or via a Fitbit or one of many Google Home devices that transmits via local or wide-area networks (e.g., Bluetooth, Wi-Fi, cellular) to a cellular network accessed via Google Fi or a Nest router connected via networks—including networks operated by GFiber (last mile) and Google-operated private backbone networks, including subsea cables and backbone infrastructure, infrastructure supporting core internet protocols (e.g., Google Public DNS)—that support connecting to network-accessible endpoints accessing a Gemini model that is hosted and accessed (and separately, trained) using Google Cloud and related infrastructure (e.g., Cloud CDN), physically located in Google Data Centers powered by electricity procured via Google Energy, and full of Google Servers containing TPU chips. The user might use a Pixel device in a Waymo car or their own car running Android Auto. The parts of the stack not owned by Google might be financed via GV or CapitalG, the company's venture capital and private equity subsidiaries.

To the last point, vertical integration via financing is notable because it itself can create anticompetitive dynamics that benefit Google's AI offerings, through distributional advantages, and can create win-win scenarios for Google as a company. Consider that Google is among the largest investors in, *and* suppliers of compute to, Anthropic. More recently, OpenAI has also started using Google Cloud, among other providers, for its AI compute needs. This blunts the competitive market pressures that might discipline Google because it is not just competing for the GenAI market. Cedric Sam et al., *A Guide to the Circular Deals Underpinning the AI Boom*, *Bloomberg* (updated July 28, 2026), https://www.bloomberg.com/graphics/2026-ai-circular-deals/. If Google's Gemini becomes the market winner, perhaps based on its advantage in reaching consumers via its GSE, Google benefits; if Anthropic or OpenAI end up winning the market, Google still benefits from their need for cash and compute. The dynamic reaches much further than just Google's interlocking relationships with two other market leaders. Google is among the most active corporate venture capital firms and it invests heavily in AI specifically. *State of CVC Q1'25 Report*, CB Insights (Apr. 29, 2025), https://www.cbinsights.com/research/report/corporate-venture-capital-trends-q1-2025/. Because GenAI is generally not seen as profitable yet, these investments are also the fruits of revenues accruing in large part from Google's illegal general search monopoly.

Without more clarity from this Court on Google's liability—matched with a stronger remedy, the same monopolist may well achieve a similar market power in other emerging markets using precisely the same tactics. Indeed, some scholars have already argued that Google is "leveraging [its] illegally maintained monopoly position to gain a foothold in and monopolize the market for AI-powered answer engines too…[and] such acts of leveraging constitute an antitrust violation." Shriya Srikanth, *The Antitrust Case Against AI Overviews*, *Harv. J.L. & Tech. Digest* (2025), https://jolt.law.harvard.edu/digest/the-antitrust-case-against-ai-overviews.

Because every layer of the AI tech stack is concentrated, and Google is vertically integrated across all of them, GenAI cannot serve as the competitive check the district court assumed. The logic of the district court's lighter remedy is fundamentally flawed.

III.   **A Monopolist's Entry into an Adjacent Emerging Market does not Discipline it in the Monopolized Market, or Act as an Excuse for Full Remedy**

DOJ called for strong remedies that would have introduced significant market discipline to the general-search market and would have made significant strides to quell the concerns that Google would abuse its monopoly in general search to monopolize the market for GenAI.  DOJ asked the Court to force Google to divest Chrome and potentially even Android; share search data with competitors to help them scale up; enact measures to prevent self-preferencing; and

16

stop paying Apple for default status on its Safari browser—the second-largest mobile browser, after Google Chrome. *U.S., et al. v. Google LLC*, Case 1:20-cv-03010-APM, Document 1184-1, Plaintiffs' Revised Proposed Final Judgment (Mar. 7, 2025).

Judge Mehta's September 2, 2025 follow-up decision provided many observers with hope that "the case could change how tech giants are able to do business and, in effect, how the internet is run." Dara Kerr, *United States Takes on Google in Biggest Tech Monopoly Trial of 21st Century*, *NPR* (Sep. 12, 2023), https://www.npr.org/2023/09/12/1198558372/doj-google-monopoly-antitrust-trial-search-engine. Others made grand comparisons to the U.S. breaking up AT&T in the 1980s. Several outlets and pundits claimed the outcome of this case would "break up" Google. Ernesto Falcon, *What the AT&T Breakup Teaches Us About a Big Tech Breakup*, Electronic Frontier Foundation (Mar. 1, 2021), https://www.eff.org/deeplinks/2021/02/what-att-breakup-teaches-us-about-big-tech-breakup.

Instead, Judge Mehta opted for relatively modest remedies. The judge's ruling, in essence, only requires Google to share some of its data with competitors in a narrow set of circumstances and imposed some restrictions on its exclusive dealings. Even though this ruling represents

an incremental step toward a more competitive, contestable market for general search, these measures are too moderate when compared to the full breadth of harms to competition and consumers that Google's monopolization has caused.

Worse, the court made clear that Google can continue paying $20 billion a year to Apple to make Google the default GSE in Safari so long as it is not totally exclusive. That requirement is easily met. In fact, Google has finalized its deal with Apple to have Gemini power Siri to rival OpenAI's ChatGPT and Perplexity AI. Joint Statement from Apple and Google, (Jan. 12, 2026), https://blog.google/company-news/inside-google/company-announcements/joint-statement-google-apple/. The arrangement enables Google, with Apple's partnership, to aim for dominance in the AI market by using one of the same tactics it did to dominate the general-search market. The outcome of this tactic, which the lower court failed to prevent, is likely to enable Google to establish a hard-to-replicate distribution advantage in AI by using one of the same tactics with the same partner that allowed it to establish an illegal monopoly in general search services.

Thus, not only did Google walk away with a weak remedy, Judge Mehta may have inadvertently blessed repeating the tactic in the AI market while also propping up another monopolist, Apple, that the DOJ is also suing. *United States v. Apple, Inc.,* No. 2:24-cv-04055 (D.N.J. filed Mar. 21, 2024).

This Court can correct that error.

To be very clear, Judge Mehta made clear that his decision had nothing to do with the men and women at the DOJ failing to prove their case. *United States v. Google LLC*, 803 F.Supp.3d 18, 36-37 (D.D.C. 2025). In fact, he said the opposite. Throughout the remedies opinion, Judge Mehta goes out of his way to state that the agency fully demonstrated Google's liability under U.S. antitrust laws. *Id.* For instance, Judge Mehta says that DOJ proved that exclusive default agreements—such as Google's agreement with Apple— "allowed Google to persistently widen the data moat, ensuring that rivals could not achieve a degree of quality that would pose a threat to Google." *Id.* at 79. Judge Mehta even says that they "also discouraged investment by existing market actors and new entrants." *Id.*

But, if that is in fact the case, why not prohibit the practice altogether? Also, why issue a remedy that does not ameliorate the concerns that the judge agrees exist—or, worse, a remedy that allows Google to replicate in AI the tactics of illegal monopolization in general search?

The answer according to Judge Mehta was "a healthy dose of judicial humility." *Id.* at 70 (citing *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 106–07, 141 S.Ct. 2141, 210 L.Ed.2d 314 (2021)). So, Judge Mehta is either unable to go further as a matter of law or is unwilling to under the hope that the

market for GenAI might solve the core problem. Amici posit that the Court is not just *able* to grant the remedy sought by DOJ, the facts of the case, along with the facts of the emerging GenAI market, demand that it pose a limitation on Google from "us[ing] the same anticompetitive playbook for its GenAI products that it used for Search." *Google LLC*, 803 F. Supp. 3d at 90. *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961); *see also*, *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 698 (1978). The caselaw clearly allows the Court to go further than what Judge Mehta held, if it deems appropriate. *United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001) (en banc).

Judge Mehta's invocation of "humility" in this case inaccurately describes the humblest judicial posture for a judge, which is to apply and follow the law, not to forecast AI's technological trajectory. To support his version of humility, Judge Mehta highlights how "artificial intelligence technologies, particularly generative AI ('GenAI'), may yet prove to be game changers." *Google LLC*, 803 F. Supp. 3d at 36. And he highlights how "tens of millions of people use GenAI chatbots, like ChatGPT, Perplexity, and Claude, to gather information that they previously sought through internet search." *Id.* This approach transforms a judge into a market predictor and policymaker, which is neither the proper role of the judiciary nor the function of the law. The more restrained course is to enforce the law, develop remedies that address the underlying conduct, allow the market to operate, and defer

to legislatures for policy objectives. Judicial humility recognizes that judges cannot predict the future but are well equipped to remedy unlawful conduct. To be sure, while judicial "humility" is reasonable when unknown and unforeseeable forces weigh on a decision, it also cannot be a blindfold to how markets are unfolding and how they might foreseeably continue unfolding, as this brief has shown with AI.

Additionally, our antitrust laws have never found that a monopolist entering a distinct, emerging market, where that firm has not yet achieved the same market power, absolves that firm's liability in the market where it does. The contradiction in this logic is best described by analogy proffered by the Federal Trade Commission's brief in a separate case against Meta. In it, the Commission states:

> [I]f the only supermarket in a town starts selling pet food, the supermarket would find itself in newfound competition with Petco and PetSmart. But those competitors would not alter the supermarket's dominance, because consumers cannot patron pet-store retailers to accomplish the purpose of buying groceries for the week. That conclusion holds even if the supermarket's pet food became popular and made up an increasing share of shoppers' grocery baskets. And it holds even if the same consumers purchase pet food alongside their other groceries.
> *FTC v. Meta Platforms, Inc.*, Civil Action No. 1:20-cv-03590 (JEB), Doc. N. 624 *p.3 (filed Jul. 3, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/624%202025.07.03%20 FTC%27s%20Post-Trial%20Memorandum_PUBLIC.pdf.

The Commission is correct, and this Court has the opportunity to correct the record to ensure the monopolists cannot lodge such a defense in the future. To do this, the Court must deny Judge Mehta's underlying logic and reaffirm that this is

not the law. The Court may even consider stronger remedies to better ensure Google cannot engage in this conduct moving forward in the general-search market, AI market, or otherwise.

Amici hope the Court does so; otherwise, Google is likely to harm competition and innovation in GenAI as it did in the general-search market. For instance, Google's monopoly here delayed the deployment of more effective search engines. Take the case of Adam and Shivaun Raff. They developed a search engine that—they hoped—would rival Google. Charles Duhigg, *The Case Against Google*, *N.Y. Times Mag.* (Feb. 20, 2018), https://www.nytimes.com/2018/02/20/magazine/the-case-against-google.html. The *New York Times* reported that the Raffs' search engine was so precise that it could "figure out which websites charged hidden shipping fees and which offered truly good deals." *Id.* Their searches were able to achieve this level of accuracy because they leveraged vertical search algorithms while Google exclusively relied on horizontal search methods. *Id.* However, the Raffs required Google's services to promote their product on Google's GSE as it "account[ed] for an estimated 87 percent of online searches worldwide. It processes trillions of queries each year, which works out to at least 5.5 billion a day, 63,000 a second." *Id.* The other issue is that once Google identified the Raffs' technology as a competitive threat, Google digitally buried their product by placing it as far as 170 pages down from

22

the first page irrespective of how many people directly searched for their product—even if one were to search the exact name of the Raffs' company (i.e., Foundem.com). *Id.* By contrast, other GSEs (e.g., MSN Search and Yahoo) ranked Foundem highly. *Id.*

If the Court accepts Judge Mehta's logic, similar conduct will become common in AI, denying consumers access to smaller innovators' technology just as Google denied them access to Foundem.

A monopolist's entry into an adjacent, not-yet-monopolized market is no legal defense, and it cannot be an excuse for full remedy for the harm in the monopolized market. This aspect of the district court's premise was a legal error, and the remedy should be vacated.

## CONCLUSION

For the foregoing reasons, amici respectfully urge the Court to reject the premise that the emerging market of GenAI might create competitive pressures that diminish Google's monopolization of general search services and the notion that this premise should limit the judiciary granting a full remedy to Google's unlawful monopolization. The Court should reaffirm that a monopolist's expansion into an adjacent, not-yet-monopolized market is no defense, and should ensure the remedy is strong enough to prevent Google from deploying the same anticompetitive playbook it used in Search to dominate AI.

Respectfully submitted,

/s/ Joel L. Thayer

Joel L. Thayer
Counsel of Record
Thayer, PLLC
1255 Union Street NE, Seventh Floor
Washington, DC 20002
(760) 668-0934
jthayer@thayer.tech
Attorney for Amici Curiae

24

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

   x   The brief contains  5,183   words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

      The brief uses a monospaced typeface and contains       lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

   x   The brief has been prepared in a proportionally spaced typeface using MS Word 2007 in a 14 point Times New Roman font or

      The brief has been prepared in a monospaced typeface using MS Word 2002 in a ___ characters per inch_____ font.

08/04/2026_____                 /s/ Joel Thayer
Date                               Joel Thayer