**ORAL ARGUMENT NOT YET SCHEDULED**
No. 26-5023
**(Consolidated with Nos. 26-5047 & 26-5049)**

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

UNITED STATES OF AMERICA, *ET AL.*,
*Plaintiffs-Appellees-Cross-Appellants*,

v.

GOOGLE LLC,
*Defendant-Appellant-Cross-Appellee.*

On Appeal from the United States District Court
for the District of Columbia, Nos. 20-cv-3010 & 20-cv-3715
Hon. Amit P. Mehta

**BRIEF OF ECONOMISTS AND LEGAL & TECHNOLOGY SCHOLARS
AS *AMICI CURIAE* IN SUPPORT OF UNITED STATES OF AMERICA, ET
AL., PLAINTIFFS-APPELLEES-CROSS-APPELLANTS**

MEEGAN F. HOLLYWOOD
MATTHEW L. CANTOR
ETHAN E. LITWIN
SHINDER CANTOR LERNER LLP
14 Pennsylvania Plaza, 19th Floor
New York, NY 10122
(646) 960-8601
meegan@scl-llp.com
matthew@scl-llp.com
ethan@scl-llp.com

*Counsel for* Amici Curiae *Economists and Legal & Technology Scholars*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Rule 28(a)(1) of the United States Court of Appeals for the District of Columbia Circuit, *amici curiae*, the economists and legal scholars identified in the Addendum*,* certify as follows:

### A.  Parties and *Amici*

Except for *amici curiae* in this Court, all parties and amici appearing before the district court and all parties appearing before this Court are listed in Google LLC's Certificate as to Parties, Rulings, and Related Cases (Document No. 2160428, filed Feb. 23, 2026) and Plaintiffs 'Certificate as to Parties, Rulings, and Related Cases (Document No. 2160541, filed Feb. 23, 2026).

### B.  Rulings Under Review

References to the rulings at issue appear in Google LLC's Certificate as to Parties, Rulings, and Related Cases (Document No. 2160428, filed Feb. 23, 2026) and Plaintiffs' Certificate as to Parties, Rulings, and Related Cases (Document No. 2160541, filed Feb. 23, 2026).

### C.  Related Cases

This case was previously before this Court in *United States et al. v. Google LLC & Apple Inc.*, No. 25-5016*, available at* 2025 WL 880552 (D.C. Cir. Mar. 21, 2025). *Amici* are not aware of any other related cases.


Dated: August 4, 2026                    Respectfully submitted,

                                         */s/ Meegan F. Hollywood*
                                         Meegan F. Hollywood

## STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING

All parties consent to the filing of this *amici curiae* brief. *See* Fed. R. App. P. 29(a)(2); Cir. R. 29(b). Pursuant to Circuit Rule 29(b), undersigned counsel for *amici curiae* certifies that a separate brief is necessary. *Amici* are economists and scholars in the fields of technology and law who focus on empirical economic analysis, competition economics, antitrust remedies, technological innovation in search, and antitrust policy. *Amici* have served as expert witnesses in antitrust matters, taught at leading universities, served in government agencies, and published dozens of articles on various antitrust topics, including specifically the economic benefits and technological feasibility of the remedies discussed herein. Accordingly, they have a unique perspective to offer on the issues regarding antitrust remedies presented here.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

TABLE OF CONTENTS ................................................................................ iv

TABLE OF AUTHORITIES ...........................................................................v

IDENTITY AND INTEREST OF *AMICI CURIAE* ...................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .....................................2

ARGUMENT ...............................................................................................3

    I.   THE REMEDIES ORDERED BY THE DISTRICT COURT DO NOT CURTAIL GOOGLE'S ANTICOMPETITIVE PAYMENTS AND WILL NOT RESTORE COMPETITION. ..........................................................5

       A.  As the District Court Held, Google's Payments for Placement Were Anticompetitive. ...................................................................5

       B.  The District Court's Remedies Will Not Restore Competition. ..................6

    II. A REMEDY THAT PERMITS GOOGLE TO PAY FOR DEFAULT PLACEMENT ON A LIMITED PORTION OF DEVICES WOULD EFFECTIVELY RESTORE COMPETITION. .................................................10

       A.  The Pay for Half Remedy Would Immediately Open the Market to Competition. ..........................................................................13

       B.  The "Pay for Half" Remedy Can Be Implemented and Measured Effectively. ...........................................................................15

CONCLUSION ...........................................................................................17

ADDENDUM: LIST OF *AMICI CURIAE* ............................................................ I

CERTIFICATE OF COMPLIANCE .................................................................. II

CERTIFICATE OF SERVICE ......................................................................... III

# TABLE OF AUTHORITIES

Jonathan B. Baker, *Beyond Schumpeter v. Arrow*, 74 Antitrust L.J. 575, 576 (2007) ..................................................................................................................................8

Alissa Cooper, Jacques Crémer, Amelia Fletcher, Paul Heidhues, Nick Jacobson, Gene Kimmelman, Margaret O'Grady, Fiona Scott Morton, *Pay for Half: A Better Remedy for Google Search* (June 26, 2026) Tobin Center for Economic Policy ................................................................................................................... *passim*

Richard J. Gilbert & A. Douglas Melamed, *Innovation Under Section 2 of the Sherman Act*, 84 Antitrust L.J. 1 (2021) ...................................................................8

Richard J. Gilbert & David M.G. Newbery, *Preemptive Patenting and the Persistence of Monopoly*, 72 Am. Econ. Rev. 514 (1982) ....................................7, 8

Filippo Lancieri & Caio Mario S. Pereira Neto, *Designing Remedies for Digital Markets: The Interplay Between Antitrust and Regulation*, 18 J. Competition L. & Econ. (2022).......................................................................................................10

Fiona Scott Morton and David Dinielli, *Roadmap for a Monopolization Case Against Google Regarding the Search Market* (June 2020)......................................8

Paul Heidhues, Fiona Scott Morton, et al., *More Competitive Search Through Regulation*, Yale J. on Reg., 40:3, 915 (2023)...........................................................9

Steven C. Salop, *The Raising Rivals 'Cost Foreclosure Paradigm, Conditional Pricing Practices, and the Flawed Incremental Price-Cost Test*, 81 Antitrust L.J. 371 (2017) ...............................................................................................................8

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001).............................5

*United States, et al. v. Google LLC*, 747 F. Supp. 3d (D.D.C. 2024) (liability) ................................................................................................................... *passim*

*United States, et al. v. Google LLC*, 803 F. Supp. 3d (D.D.C. 2025) (remedies) ................................................................................................................... *passim*

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

*Amici* are scholars in the fields of economics, technology, and law who are experts in empirical economic analysis, competition economics, antitrust remedies, innovation and competition in search, and antitrust policy. *Amici* have served as expert witnesses in antitrust matters, served in government agencies, taught at leading universities, and published dozens of articles on various antitrust topics, including specifically the economic benefits and technological feasibility of the proposed remedies adopted by the District Court and discussed further herein. A full list of *amici* appears in the Addendum.

*Amici* submit this brief in support of the United States, et al., Plaintiffs Appellees-Cross-Appellants. *Amici* explain that, although the District Court correctly found that Google engaged in illegal monopolistic conduct, it erred by failing to award remedies that would curtail that conduct and restore competition in the general search market. *United States, et al. v. Google LLC*, No. 20-cv-3010; 20-cv-3715, 747 F. Supp. 3d 1 (D.D.C. Aug. 5, 2024) (liability); *United States v. Google LLC*, 803 F. Supp. 3d 18, 73 (D.D.C. 2025) (remedies).

---

[1] This brief is filed pursuant to Federal Rule of Appellate Procedure 29(a)(2) and Rule 29(b) of the United States Court of Appeals for the District of Columbia Circuit. *Amici* state that no party or counsel for a party authored this brief in whole or in part, and no one other than *amici* and their counsel have made a monetary contribution to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

As the District Court found, Google has maintained a monopoly in general search by paying tens of billions of dollars per year for exclusive placement, foreclosing any significant potential (or actual) competitor in the market. However, in its remedies decision, the District Court decided to allow Google to continue to make such payments. An effective remedy must make it possible for search competitors to enter the market and expand. Economic analysis demonstrates that the remedies ordered by the District Court are insufficient to achieve this goal and should be reconsidered.

Google is a monopolist. It can use its monopoly profit—which, according to bedrock economic principles, is always larger than competitive profit—to pay distribution partners for pre-installation and default status. Given this, no entering competitor will pay more than the monopolist Google to obtain distribution.

The scheme that Google developed to create and exploit its monopoly power was left largely unchanged by the District Court and, today, it keeps Google safe from competitive challenge. *Amici* write to explain that, without limiting Google's payments to channel partners,[2] there is little hope for any new entrants in

---

[2] A "channel partner" is a party that contracts with GSE(s) for privileged status on search access points that it controls. Device manufacturers have the most control over the settings of a device, including defaults and preinstallations/configurations. *See* Alissa Cooper, Jacques Crémer, Amelia Fletcher, Paul Heidhues, Nick Jacobson, Gene Kimmelman, Margaret O'Grady, Fiona Scott Morton, *Pay for*

search and little chance that Google's monopoly position will erode.

This outcome is not inevitable, and this Court now has the opportunity to correct it by reversing the District Court's remedy decision on the grounds that the District Court must structure a remedy that restores competition in the general search engine (GSE) market. The complete payment ban advocated for by government enforcers would accomplish this. But there are likely a number of such remedies that would also do so. *Amici* describe and explain one such reasonable remedy below. Under our proposed remedy, Google would not be permitted to pay for default status on all consumer devices, but only on a fraction of them, thereby leaving space in the market for entrants to compete for positions on the remaining non-Google devices. "Pay for Half," as *amici* call the proposal, explicitly creates the conditions for new competitors (including AI companies) to enter the market for search.

## ARGUMENT

In August 2024, the District Court found Google liable for illegally maintaining its monopoly in the GSE market by, among other things, paying billions of dollars for exclusive placement on mobile devices and desktop

---

*Half: A Better Remedy for Google Search* (June 26, 2026) Tobin Center for Economic Policy, *available at* https://tobin.yale.edu/sites/default/files/2026-06/Pay%20for%20Half_A%20Better%20Remedy%20for%20Google%20Search_June%202026.pdf.

browsers. Nearly one year later, in September 2025, the District Court issued its remedies opinion, which included data sharing and syndication remedies and a removal of the exclusivity requirements from Google's contracts. *United States v. Google LLC*, 803 F. Supp. 3d 18, 37-38 (D.D.C. 2025) (remedies). However, the District Court decided to allow Google to continue to pay distributors billions of dollars for default placement on both Android and Apple handsets. And, because Google is a monopolist, it can pay a higher price than potential entrants to secure default search status, meaning that the existing default payments will continue to block competitors from entry. In order to compete with Google (and benefit from the data sharing and syndication remedies ordered by the court), new entrants must have access to consumers through those consumers' devices. But the District Court's remedies allow Google to continue to block that access.

This Court should hold that any injunction should comport with the District Court's findings, analysis, and rulings. The remedy should open a new path for entrants, including AI companies, which are still unable to compete for default placement in the GSE market because of Google's monopoly.

*Amici* offer one such remedy, called "Pay for Half," that would meet these goals. Our proposed remedy effectively targets the mechanism supporting Google's monopolistic conduct and would open the market to competition, while also addressing some of the District Court's concerns about the potential impact on

channel partners (Apple, Samsung, Mozilla, etc.) if they receive less money from Google.

**I.    THE REMEDIES ORDERED BY THE DISTRICT COURT DO NOT CURTAIL GOOGLE'S ANTICOMPETITIVE PAYMENTS AND WILL NOT RESTORE COMPETITION.**

Section 2 of the Sherman Act requires remedies to address the violations of the statute. Specifically, the remedies should "unfetter a market from anticompetitive conduct, [...] terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future." *United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001). Central to the District Court's liability finding is the way in which the network and magnitude of Google's exclusive agreements "froze[ ]" the market for search. *Google*, 747 F. Supp. 3d at 206 (liability); *Google*, 803 F. Supp. 3d at 81 (remedies). Thus, at a minimum, any injunction aimed at remedying the harm that Google caused must give competitors a viable pathway to enter the market and compete. The District Court's remedies fail to do so.

**A.  As the District Court Held, Google's Payments for Placement Were Anticompetitive.**

The District Court found that Google's exclusive contracts caused the lack of competition in the markets for search services and search text advertising. The District Court held that Google's default distribution agreements with Apple,

Mozilla, and Android were "exclusive and have anticompetitive effects" and lacked procompetitive justifications. *Google*, 747 F. Supp. 3d at 4 (liability). It also held that Google's payments caused a "market stasis" by preventing other GSEs from entering the market and eliminating the incentives for firms to attempt to develop their own GSEs. *Id.* at 153.

Google's monopoly in search services and search advertising became further entrenched due to the market's default bias and network effects. *Google*, 803 F. Supp. 3d at 81 (remedies). Indeed, the District Court identified default positions as the critical mechanism that Google used to dominate and harm competition: it held that Google default positions allowed it to both capture crucial user access points to general search and to monopolize control over the inputs that allow search engines to compete: user data and advertising revenue. *Id. at 81-82. It also held* that, by securing default positions on browsers, Google entrenched its ability to receive monopoly profits from its advertisements. *Id.* at 83-84. And it held that Google's default positions granted it crucial and unique access to user data, which further cemented the company's search engine dominance and raised the barriers to entry for potential competitors even higher. *Id.* at 84.

**B.  The District Court's Remedies Will Not Restore Competition.**

The remedies as ordered by the District Court will not stop Google from excluding rivals from the market, including new AI entrants. Instead, the remedies

allow Google to continue the same conduct that "substantially contributed" to producing the "antithesis of a competitive market." Google, 747 F. Supp. 3d at 145, 153, 163 (liability).

*First*, the District Court barred Google from entering or maintaining exclusive contracts that condition the licensing of any Google application on the distribution of Google Search, Chrome, Google Assistant, and Gemini. *Id.* at 7. But the District Court declined to restrict Google's payments to distribution partners for the default placement of Google's applications. *Id* at 119-128. Expressing concern for the loss of revenue to the original equipment manufacturers (OEMs), carriers, and browser developers on the receiving end of Google's default distribution payments, the District Court rejected plaintiffs' proposal to ban Google's default payments. *Id*. *Second*, the District Court ordered Google to make available certain search index and user-interaction data as well as search and search text ads syndication services to facilitate competition. To implement and enforce these remedies, the District Court also established a Technical Committee. *Id.* at 37-38.

Under the District Court's remedies, Google may still pay for default placement on all of a channel partner's devices, which it is uniquely able to do given its monopoly status. *Id*. at 107-08; 132. Because a monopolist is willing to pay more than entrants, economic theory predicts that Google will successfully

obtain 100% of default positions, allowing its monopoly in search to persist.[3] There

is no functional difference between allowing Google to continue its exclusive

contracts and allowing it to pay for default status: the market is foreclosed either

way. New entrants may try to enter the market by bidding for a default position,

but their entry will continue to be stymied by the same mechanism that Google has

used to monopolize the market in the first place: scale generates lower costs and

higher value which in turn generate the ability to pay more to keep that scale.[4]

Google's exclusive agreements leave any potential competitors "[w]ithout an

efficient means of reaching users, and thus no real prospect of acquiring scale." *Id.*

at 84. A decade of entrenchment subsequent to the illegal conduct has only

widened the scale gap between Google and entrants, regardless of the

innovativeness or quality of a potential entrant's search engine.[5] Limited data

---

[3] *See, e.g.,* Richard J. Gilbert & David M.G. Newbery, *Preemptive Patenting and the Persistence of Monopoly*, 72 Am. Econ. Rev. 514 (1982).

[4] *See* Richard J. Gilbert & David M.G. Newbery, *Preemptive Patenting and the Persistence of Monopoly*, 72 Am. Econ. Rev. 514 (1982); *see also* Steven C. Salop, *The Raising Rivals 'Cost Foreclosure Paradigm, Conditional Pricing Practices, and the Flawed Incremental Price-Cost Test*, 81 Antitrust L.J. 371 (2017).

[5] *See* Fiona Scott Morton and David Dinielli, *Roadmap for a Monopolization Case Against Google Regarding the Search Market* (June 2020), *available at* https://omidyar.com/wp-content/uploads/2025/03/Roadmap-for-a-Monopolization-Case-Against-Google-Regarding-the-Search-Market.pdf; *see also* Richard J. Gilbert & A. Douglas Melamed, *Innovation Under Section 2 of the Sherman Act*,

sharing and syndication sold at market (e.g. monopoly) prices cannot significantly erode this advantage.

*Amici* are not alone in their concern about the insufficiency of the proposed remedies concerning the default payments. The District Court, in fact, acknowledged the likelihood that its remedy may not eliminate the harm to competition that Google caused:

> The court well recognizes what eschewing a payment ban may mean for competition. Due to Google's massive financial advantage and its superior monetization, distributors will be incentivized to stick with Google because it can pay more, thus leaving in place the very forces that "effectively [have made] the ecosystem exceptionally resist[ant] to change." *Id.* at 127.

The District Court's concern is well-founded. Without meaningful intervention, the market will remain frozen, and Google will continue to reap monopoly profits from it.

Even though it imposed no meaningful restrictions on Google's illegal conduct, the District Court expressed an amorphous "hope" that generative AI products would fix the market. *Id.* at 107, 127. But the District Court did not explain (because it could not) how the emergence of AI technology would make the barriers to entry Google has constructed any less restrictive. AI entrants seeking to compete in the market for general search will need the same access

---

84 Antitrust L.J. 1, 2 (2021); Jonathan B. Baker, *Beyond Schumpeter v. Arrow*, 74 Antitrust L.J. 575, 576 (2007).

points to customers that Google's payments have foreclosed to every other competitor: defaults, browser placement, and preinstallation.[6] Meanwhile, Google remains free to offer payment for default placement of its Gemini service, as well as including AI results within its core search offering, giving its own AI a competitive advantage over rivals. Unlike the District Court's remedies, the "Pay for Half" framework would provide competitors, including AI companies, with this necessary access.

## II.    A REMEDY THAT PERMITS GOOGLE TO PAY FOR DEFAULT PLACEMENT ON A LIMITED PORTION OF DEVICES WOULD EFFECTIVELY RESTORE COMPETITION.

The payment ban advocated for by enforcers would help restore competition. It is also possible, however, to order a remedy that comports with the District Court's liability finding while addressing the concerns about disruption that might arise from banning Google's ability to pay channel partners.[7] The "Pay for Half" framework could increase competition in search by ensuring that some default positions are open to new entrants.[8]

---

[6] *See* Paul Heidhues, Fiona Scott Morton, et al., *More Competitive Search Through Regulation*, Yale J. on Reg., 40:3, 915 (2023), *available at* https://www.yalejreg.com/print/more-competitive-search-through-regulation/.

[7] *See* Filippo Lancieri & Caio Mario S. Pereira Neto, *Designing Remedies for Digital Markets: The Interplay Between Antitrust and Regulation*, 18 J. Competition L. & Econ. (2022).

The framework is called "Pay for Half" because, under it, Google would be permitted to continue to pay a channel partner search revenue on at most half of its devices.[9] This cap on payments from Google provides a strong incentive to channel partners to attract and select another search engine from which they can earn money on their remaining devices. When channel partners realize that Google cannot buy a significant part of their traffic, they will be incentivized to find a rival to pay for that traffic, and this will create a place for entry by rivals, thus restoring competition to the market.

The Pay for Half remedy framework provides space for one additional entrant at similar scale to Google. It would be entirely reasonable for a court to set a lower market share cap on Google's payments in order to allow for multiple entrants of the same size as Google, or a variety of entrants of different sizes. This raises the question of the likely market structure in the "but for" world in the absence of Google's conduct. The tools of economics are not capable of predicting particular outcomes such as the identity of entrants, the date they enter, or the

---

[8] For more detail, *see Pay for Half: A Better Remedy for Google Search, supra* note 2.

[9] A 50% cap would allow at least one other competitor to obtain default status on a share of devices. This is a conservative framework; the District Court could decide to order that Google is permitted to pay for default status on a smaller portion of devices (25%, for example), thereby allowing a greater number of competitors to enter the market.

market shares they obtain. Any such tool would need to predict specific outcomes robustly enough to be used in legal proceedings, which makes the hurdle even higher. However, economic analysis based on decades of theoretical and empirical research *can* reliably determine and use a firm's incentive and ability to predict its general direction and goals. Broad-based economic analysis of firms' strategies permits robust predictions of the types of changes that would occur in the but for world. For example, removing entry barriers and restoring the ability to achieve scale will increase the incentive and ability to enter and yield more entry.

This reasoning, combined with a conservative starting point, generates the Pay for Half base assumption: absent Google's exclusionary conduct, at least one additional competitor would have entered the market. And given the importance of scale, network effects, and data economies, a successful competitor would need a similar scale to Google. But, while we know that there would have been more entry, whether there would have been five entrants or two is impossible to know for sure. The District Court heard from several competitors, any or all of which could have been successful in the market in the absence of Google's illegal conduct. This evidence would justify a cap below 50%. Importantly, the impossibility of determining the specific details of the competition Google would have faced should not prevent the court from imposing a remedy using the most conservative assumption.

Once in effect, the Pay for Half proposal envisions an injunction that could not be evaded by Google. The proposal limits the percentage revenue share paid out so that Google does not simply double its current payment (e.g. move from 36% to 72%) on half of devices in exchange for an implicit agreement that the channel partner will pre-install Google on its remaining devices despite earning zero payment on this second half.[10] In addition, to prevent Google from managing to be the default on the half of devices that earn the most advertising revenue, the proposal requires that OEMs assign device defaults randomly.

Pay for Half would open the market for entrants, a necessary step to end Google's monopoly. Different OEMs can partner, and earn from, different search and AI entrants according to their strategies, technologies, and customer needs. Those entrants would have diverse paths and channel partners they can employ to reach end consumers.

### A. The Pay for Half Remedy Would Immediately Open the Market to Competition.

While *amici* posit that a full ban on Google revenue sharing could be an appropriate remedy because it creates the incentive and opportunity for rival search

---

[10] *Amici* suggest a 40% payment cap. The Technical Committee created via the injunction can adjust this figure if necessary. To the extent that the parties pay on some other basis than a share of search revenue, the dollar amounts involved will be converted to render them comparable so the Technical Committee can assess compliance. *See Pay for Half: A Better Remedy for Google Search, supra* note 2.

engine entry, we recognize that such a ban would end the flow of monopoly profit

that Google has been sharing with distribution partners, such as independent

browsers. *Google*, 803 F. Supp. 3d at 127 (remedies). Independent browsers are

exempted under the Pay for Half framework. And for OEMs, Pay for Half, unlike a

complete payment ban, creates a natural transition. The Pay for Half framework

allows some Google payments to continue to serve as income for channel partners

but also restricts the type and size of payments to induce rapid entry and an

increase in competition in search. Channel partners would have to seek out new

search or AI partners, which will incentivize investment in those businesses.

Access to distribution would enable entrants to develop and distribute products that

would be able to compete quickly with Google head-on, increasing benefits to

channel partners and consumers. Notably, the District Court identified AI entrants

as promising challengers to Google's monopoly (*Google,* 803 F. Supp. 3d at 107

(remedies)), but a year after the remedy decision, Google retains a monopoly share

of the search market.[11]

---

[11] Since this case was first filed in 2020, new technologies including consumer-facing large language models have emerged around general search. *Amici* refer to this market as the search market throughout, recognizing that technological changes have created at least some opportunity for new players to enter and compete in the market if Google's monopolization is halted. Meanwhile, Google appears to be using its dominant position in search to exert control over AI as well. *See, e.g.,* Kate Conger, *Google Is Building an A.I. Fence Around the Internet It Once Championed*, N.Y. Times, July 20, 2026, available at *https://www.nytimes.com/2026/07/20/technology/google-ai-open-web.html*.

As the District Court recognized, "Google's unlawful agreements allowed it to capitalize on two powerful forces within the general search services market: default bias and network effects." *Id.* at 83. The Pay for Half remedy solves both of these problems: at least half of devices will be opened to the option of a different search default, and the entrants who contract for privileged status on these devices will build their own network effects.

### B. The "Pay for Half" Remedy Can Be Implemented and Measured Effectively.

The Pay for Half framework provides Google's competitors the space to enter and compete and grow their businesses so that there is more competition in search going forward. By promoting entry, this solution is aligned with the key principles of remedy design: restoring competition, eliminating practices that are likely to result in future monopolization, and preventing the monopolist from continuing to benefit from the fruits of its exclusionary conduct. *Id.* at 67.

To support effective implementation of the Pay for Half remedy, the Technical Committee, which is responsible for monitoring efficacy and reporting to the court (*id.* at 154-155), would need access to documents and data that Google creates in the ordinary course of running its business. The main documents required are the contracts between Google and its channel partners, which should describe the privileged status being afforded to Google (if any), the mechanisms of randomization, how channel partners handle privileged status on open devices

15

(those that are not subject to Google contract), and agreed payment terms.

In addition to these documents, the Technical Committee would require periodic data that is also tracked as part of ordinary course operations. First, it would require data on actual usage: how many users have Google search as a default and how many are using Google Search on their devices (including a breakdown of which devices are covered by revenue sharing agreements—and with what parties—and which are not), pathways showing a user's process for switching GSEs, and the actual payments between Google and channel partners in whatever form they take. These data would be collected from Google (and Google can collect, as necessary, this same information from OEMs, browsers, and carriers with whom it contracts). Second, the committee will require information on Google's promotional activities, including how Google prompts users to switch applications. This information would be important to the understanding of whether Google is attempting to induce users into switching to Google, by exploiting consumer biases or downgrading the consumer search experience when using a rival, in order to avoid effective competition with its rivals.

The structure and procedures to gather this information are already in place, as the Technical Committee has already been established, and its work is underway. *See e.g.,* Technical Committee's Status Report, *United States v. Google LLC*, No. 1:20-cv-03010-APM (D.D.C. Feb. 6, 2026), ECF No. 1492. Finally, a

16

key advantage of the Pay for Half framework is that its efficacy is easy to observe: the level of entry in the market by non-Google GSEs securing privileged status on devices can be measured.

## CONCLUSION

Effective antitrust remedies must stop the anticompetitive conduct and restore the lost competition. The current remedies ordered by the District Court do neither. Ineffectual remedies are not a foregone conclusion, however. *Amici* have relied on their expertise in economics, law, and technology to demonstrate that a remedy that could actually address the conduct that the District Court determined was the basis for the liability ruling. This Court should not let the opportunity to correct this grave mistake pass it by. A broken, stagnant search market is not inevitable; Pay for Half shows how.

Dated: August 4, 2026                     Respectfully submitted,

                                          */s/ Meegan F. Hollywood*
                                          MEEGAN F. HOLLYWOOD
                                          MATTHEW L. CANTOR
                                          ETHAN E. LITWIN
                                          SHINDER CANTOR LERNER LLP
                                          14 Pennsylvania Plaza, 19th Floor
                                          New York, NY 10122
                                          (646) 960-8601
                                          meegan@scl-llp.com
                                          matthew@scl-llp.com
                                          ethan@scl-llp.com

17

**ADDENDUM**
**LIST OF AMICI CURIAE**

**Alissa Cooper**, Executive Director, Knight-Georgetown Institute, Georgetown University.

**Amelia Fletcher**, Professor of Competition Policy at NBS and Deputy Director at the Centre for Competition Policy, East Anglia University, Norwich.

**Martin Gaynor**, Emeritus University Professor of Economics and Public Policy at Carnegie Mellon University.

**Paul Heidhues**, Professor of Behavioral and Competition Economics, Düsseldorf Institute for Competition Economics (DICE), Heinrich-Heine University of Düsseldorf.

**Gaston Illanes**, Assistant Professor of Economics, Northwestern University.

**Gene Kimmelman**, Senior Policy Fellow, Tobin Center for Economic Policy at Yale University and Research Fellow, Mossavar-Rahmani Center for Business & Government at the John F. Kennedy School of Government at Harvard University.

**Fiona Scott Morton**, Theodore Nierenberg Professor of Economics at the Yale University School of Management; Director of the Thurman Arnold Project.

**Monika Schnitzer**, Professor of Economics and Chair for Comparative Economics at the Ludwig-Maximilians-University of Munich; chairwoman of the German Council of Economic Experts.

I

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 29(a)(5) because it contains 4,142 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Rule 32(e)(1) of the United States Court of Appeals for the District of Columbia Circuit. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: August 4, 2026                              */s/ Meegan F. Hollywood*
                                                                   Meegan F. Hollywood

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 4, 2026, I electronically filed the foregoing *Brief of Economists and Legal & Technology Scholars as Amici Curiae in Support of United States of America, et al., Plaintiffs-Appellees-Cross-Appellants* with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the Court's CM/ECF system, and served copies of the foregoing via the Court's CM/ECF system on all ECF-registered counsel.


Dated: August 4, 2026                    */s/ Meegan F. Hollywood*
                                          Meegan F. Hollywood

III