# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

No. 26-5023
(Consolidated with Nos. 26-5047 & 26-5049)

_____

UNITED STATES OF AMERICA, *et al.*,

*Plaintiffs-Appellees/Cross-Appellants*,

v.

GOOGLE LLC,

*Defendant-Appellant/Cross-Appellee.*

_____

On Appeals from the United States District Court for the District of
Columbia, Nos. 20-cv-3010 & 20-cv-3715 (Hon. Amit P. Mehta)

_____

## BRIEF OF AMERICAN ECONOMIC LIBERTIES PROJECT
## AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-
## APPELLEES/CROSS-APPELLANTS

_____

Katherine Van Dyck
KVD STRATEGIES PLLC
1717 N Street NW, Suite 1
Washington, DC 20036
(202) 798-1948
katie@kvdstrategies.com

*Counsel for Amicus Curiae*
*American Economic Liberties Project*

August 4, 2026

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Rule 28(a)(1) of the United States Court of Appeals for the District of Columbia Circuit, *amicus curiae* American Economic Liberties Project certifies as follows:

## A. Parties and Amici

All known parties, intervenors, and amici appearing before the District Court and this Court are accurately identified in the Parties' combined certificates. Washington Legal Foundation; Mozilla Corporation; Brave Software, Inc.; former Federal Trade Commission official Alden Abbott; former Department of Justice official Gregory J. Werden; former antitrust enforcers Terry Calvani, William Kolasky, Abbott B. Lipsky Jr., and Joe Sims; Professors Hunt Allcott and Matthew Gentzkow; and a group of antitrust economists and legal scholars filed amicus briefs on May 28 and 29, 2026. Duck Duck Go, Inc.; Little Tech Association and Travel Lemming LLC; Microsoft Corporation; OpenAI OpCo, LLC; Public Knowledge; and SerpApi, LLC have submitted notices of their intent to participate as amici curiae.

### B. Rulings Under Review

References to the rulings at issue appear in Google LLC's Certificate as to Parties, Rulings, and Related Cases, (Document No. 2160428, filed Feb. 23, 2026), and Plaintiffs' Certificate as to Parties, Rulings, and Related Cases, (Document No. 2160541, filed Feb. 23, 2026).

### C. Related Cases

A list of related cases appears in the Parties' Certificates as to Parties, Rulings, and Related Cases. (App. Dkts. 2160428, 2160541.)

Dated: August 4, 2026

*s/ Katherine Van Dyck*
Katherine Van Dyck

*Counsel for Amicus Curiae American Economic Liberties Project*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, counsel for amicus curiae American Economic Liberties Project certifies that the organization has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

## CERTIFICATE OF COUNSEL REGARDING AUTHORITY TO FILE AND AUTHORSHIP

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all parties have consented to the filing of this brief. Pursuant to D.C. Circuit Rule 29(d), *Amicus* states that a separate amicus brief is needed due to the experience and perspective of the American Economic Liberties Project, as laid out more fully below, that is distinct from those in the briefing submitted by Plaintiffs and those likely to be submitted by other amici curiae. No counsel for a party authored any part of this brief, and no party, party's counsel, or any other person—other than amicus curiae or its counsel—contributed money intended to fund the preparation or submission of this brief. Fed. R. App. P. 29(a)(4)(E).

Dated: August 4, 2026

*s/ Katherine Van Dyck*
Katherine Van Dyck

*Counsel for Amicus Curiae American Economic Liberties Project*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES...............................................................................C-1

CORPORATE DISCLOSURE STATEMENT........................................C-3

CERTIFICATE OF COUNSEL REGARDING AUTHORITY TO FILE AND AUTHORSHIP ...........................................................C-4

TABLE OF AUTHORITIES...................................................................... iii

GLOSSARY ..............................................................................................viii

INTERESTS OF AMICUS CURIAE .........................................................1

SUMMARY OF ARGUMENT ....................................................................2

ARGUMENT ..............................................................................................6

I.    THE DUTIES OF THE DISTRICT AND APPELLATE COURTS ........................................................................................6

II.   THE COURT'S SPECULATIVE GENERATIVE AI FINDINGS ARE CLEAR ERROR ................................................10

    A.   The Fruits of Google's Illegal Monopoly Maintenance are Accelerating its Market Position in GenAI ....................11

        1.   Grounding, and Why Google's Search Index is a GenAI Bottleneck.......................................................11

        2.   Record Evidence of Google's Advantages in Grounding ..................................................................14

        3.   Record Evidence of Google's Replication of Default Payment Practices in GenAI...........................15

4. Post-Judgment Evidence of Google's Dominance in Grounding ...........................18

    a. Consumer-facing GenAI market growth.................19

    b. Other GenAI markets .............................................23

5. Google's GSE Monopoly is Fully Intact .......................25

B. The Refusal to Prohibit Default Payments Based on Hoped-For GenAI Discipline is Fatally Flawed....................27

1. Google is Not Entitled to a Level Playing Field ..........29

2. The Court's Findings and Post-Remedy Developments Demand a Payment Ban ......................30

3. The Court Cannot Wait for Market Correction with Default Payments in Place...................................32

III. THE REMAINING REMEDIES ARE CRITICAL TO COMPETITION..............................................................................36

A. The Data-Sharing and Syndication Protocols are the Bare Minimum ..................................................................36

B. Divestiture is the Final Key to Competition........................39

CONCLUSION .......................................................................................41

CERTIFICATE OF COMPLIANCE .......................................................43

CERTIFICATE OF SERVICE................................................................44

# TABLE OF AUTHORITIES

**Cases**

*Fed. Trade Comm'n v. Whole Foods Mkt.*, 548 F.3d 1028 (D.C. Cir. 2008) ...................................................................................... 9

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972) ................... passim

*Hartford-Empire Co. v. United States*, 324 U.S. 570 (1945) .................... 7

*In re Google Play Store Antitrust Litig.*, 147 F.4th 917 (9th Cir. 2025), *cert. dismissed sub nom. Google LLC v. Epic Games, Inc.*, 146 S. Ct. 1051 (2026) ................................................................. 38

*Int'l Salt Co. v. United States*, 332 U.S. 392 (1947) ............................ 8, 9

*Koon v. United States*, 518 U.S. 81 (1996) .............................................. 9

*Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004) ............................................................................. 29, 30, 38

*N. Pac. Ry. Co. v. United States*, 356 U.S. 1 (1958) ............................... 6

*Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973) ................. 38

*Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642 (1961) ....................................................................................... 41

*United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131 (D.D.C. 1982) ........................................................................................... 35

*United States v. Crescent Amusement Co.*, 323 U.S. 173 (1944) ..... 35, 38

United States v. E. I. du Pont de Nemours & Co., 366 U.S. 316 (1961) ..................................................................................... passim

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ......... 8, 40

*United States v. Paramount Pictures*, 334 U.S. 131 (1948) .................. 40

*United States v. U.S. Gypsum Co.*, 340 U.S. 76 (1950) .................. passim

*United States v. United Shoe Mach. Corp.*, 391 U.S. 244 (1968)... passim

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100 (1969).......... 30

**Treatises and Journal Articles**

Areeda & Hovenkamp, Antitrust Law (5th ed. 2022) ........................... 33

Maurice E. Stucke, *AI, Antitrust, and the Marketplace of Ideas*,
94 Fordham L. Rev. 1677 (2025) ....................................................... 13

Patrick Lewis et al., *Retrieval-Augmented Generation for
Knowledge-Intensive NLP Tasks*, 34th Conf. on Neural
Information Processing Systems (2020) ............................................ 12

Saharsh Agarwal & Ananya Sen, *The Impact of Google AI
Overviews on Publisher Traffic and User Experience:
Evidence from a Field Experiment*, SSRN (July 8, 2026),
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=651305
9 .................................................................................................... 22

**Other Authorities**

Alphabet Investor Relations, *2026 Q1 Earnings Call* (last
visited July 29, 2026), https://abc.xyz/investor/events/event-
details/2026/2026-Q1-Earnings-Call-2026-
nW8kCrBAKS/default.aspx .............................................................. 24

Alphabet Investor Relations, *2026 Q2 Earnings Call* (last
visited Aug. 1, 2026), https://abc.xyz/investor/events/event-
details/2026/2026-Q2-Earnings-Call-2026-
GgTAq7Is0z/default.aspx ...................................................... 21, 23, 24

Asa Fitch, *OpenAI's Less-Flashy Rival Might Have a Better
Business Model,* Wall Street Journal (Oct. 26, 2025),
https://www.wsj.com/tech/ai/anthropic-business-model-ai-
9e26b4ef?eafs_enabled=false........................................................... 20

Cade Metz, Nico Grant, & David McCabe, *Inside Google's Investment in the A.I. Start-Up Anthropic*, New York Times (Mar. 11, 2025), https://www.nytimes.com/2025/03/11/technology/google-investment-anthropic.html?eafs_enabled=false ................................23

Google Cloud, *Introducing Gemini Enterprise* (Oct. 9, 2025), https://cloud.google.com/blog/products/ai-machine-learning/introducing-gemini-enterprise ............................................24

Google, *A new era for AI Search* (last visited Aug. 2, 2026), https://blog.google/products-and-platforms/products/search/search-io-2026/ .......................................22

Google, *Generative AI in Search: Let Google do the searching for you* (last visited July 29, 2026), https://blog.google/products-and-platforms/products/search/generative-ai-google-search-may-2024/ ....................................................................................21

Google, *Joint statement from Google and Apple* (last visited July 29, 2026), https://blog.google/company-news/inside-google/company-announcements/joint-statement-google-apple/ ....................................................................................19

Grounding overview, *Gemini Enterprise Agent Platform Docs* (last visited Aug. 1, 2026), https://docs.cloud.google.com/gemini-enterprise-agent-platform/models/grounding/overview ...............................................12

Hannah Murphy & Stephen Morris, *Google caps Meta's Gemini use as AI demand strains capacity*, Financial Times (June 28, 2026), https://www.ft.com/content/c5d52f72-71ef-40bc-bad3-61afdba8b378?syn-25a6b1a6=1 ...............................................19

Ivan Mehta, *ChatGPT's market share slips below 50% for first time*, TechCrunch (June 16, 2026), https://techcrunch.com/2026/06/16/chatgpts-market-share-slips-below-50-for-first-time/ ........................................................20

Ivan Mehta, *Google's Gemini nears billion-user milestone*, TechCrunch (July 23, 2026), https://techcrunch.com/2026/07/23/google-closes-in-on-another-billion-user-product-with-gemini/ ...................................20, 27

Kate Conger, *Google Is Building an A.I. Fence Around the Internet It Once Championed*, New York Times (July 20, 2026), https://www.nytimes.com/2026/07/20/technology/google-ai-open-web.html ...................................22

Lydia Giannini, *The Google Search Remedies Are Already Failing: How Weak Antitrust Relief Handed Google an AI Advantage*, Public Knowledge (Apr. 2, 2026), https://publicknowledge.org/the-google-search-remedies-are-already-failing-how-weak-antitrust-relief-handed-google-an-ai-advantage/ ...................................19

Sri Muppidi, Erin Woo, & Amir Efrati, *Anthropic Commits to Spending $200 Billion on Google's Cloud and Chips*, The Information (May 5, 2026), https://www.theinformation.com/articles/anthropic-commits-spending-200-billion-googles-cloud-chips ...................................23

StatCounter GlobalStats, *Frequently Asked Questions* (last visited Aug. 1, 2026), https://gs.statcounter.com/faq#search-engine-referrals ...................................25

StatCounter GlobalStats, *Google vs ChatGPT Market Share United States of America, June 2025–June 2026* (last visited July 31, 2026), https://gs.statcounter.com/google-vs-chatgpt-market-share/all/united-states-of-america ...................................26

StatCounter GlobalStats, *Search Engine Market Share United States of America, June 2025–July 2026* (last visited Aug. 1, 2026), https://gs.statcounter.com/search-engine-market-share/all/united-states-of-america ...................................25

Tripp Mickle, *Google Commits to Invest Up to $40 Billion in Anthropic*, New York Times (Apr. 24, 2026), https://www.nytimes.com/2026/04/24/technology/google-anthropic-investment-artificial-intelligence.html ........................ 22, 23

Vahid Karaahmetovic, *Google's Gemini continues to gain market share among AI models, new analysis shows*, Yahoo! Finance (Apr. 16, 2026), https://uk.finance.yahoo.com/news/google-gemini-continues-gain-market-133218052.html .......................................................... 20

# GLOSSARY

| | |
|---|---|
| Col.Ans.Br. | Opening-Answer Brief of the State Attorneys General (July 29, 2026), Doc. No. 2185710 |
| Des.Rem.Tr. | Plaintiffs' Remedies Designated Testimony |
| F.J. | Final Judgment (Dec. 5, 2025), D. Ct. Dkt. 1462 |
| GenAI | Generative artificial intelligence |
| Google.Pr.Br. | Appellant-Cross-Appellee's Initial Principal Brief (May 22, 2026), Doc. No. 2174652 |
| GSE | General search engine |
| Liab.Op. | Memorandum Opinion (Liability Phase) (Aug. 5, 2024), D. Ct. Dkt. 1033 |
| OpenAI.Br. | Amicus Curiae OpenAI's Brief in Support of Plaintiffs' Proposed Final Judgment (Oct. 31, 2025), D. Ct. Dkt. 1452-1 |
| Pls'.1st.Status.Rep. | Plaintiffs' First Status Report on Google's Compliance with the Final Judgment (May 4, 2026), D. Ct. Dkt. 1512 |
| Pls'.PFOF. | Plaintiffs' Remedies Proposed Findings of Fact (May 29, 2025), D. Ct. Dkt. 1370 |
| Pls'.Rem.Br. | Plaintiffs' Remedies Post-Trial Brief (May 29, 2025), D. Ct. Dkt. 1369 |
| Rem.Op. | Memorandum Opinion (Remedies Phase) (Sept. 2, 2025), D. Ct. Dkt. 1436 |
| Rem.Tr. | Transcript (Remedies Phase Trial), D. Ct. Dkts. 1393–1420 |
| Sec.Rem.Op. | Memorandum Opinion (Final Judgment) (Dec. 5, 2025), D. Ct. Dkt. 1461 |

## INTERESTS OF AMICUS CURIAE

American Economic Liberties Project ("AELP") is a nonpartisan, nonprofit research and advocacy organization that supports fair and consistent enforcement of the antitrust laws. It was founded to translate developments in antitrust law and policy to the broader public, while ensuring that lawmakers, agency officials, enforcement personnel, and courts apply the rich history of antitrust law to contemporary market realities. AELP's interest in this appeal stems from its expertise in big tech monopolies and its studious observation of the instant case.

AELP has studied this case from its inception. Its writers attended every day of the liability and remedies phases of this case and published near-daily trial updates for public consumption. AELP's inquiry into the broader circumstances of the case has taken the form of technological research, publication of white papers, participation in relevant legal and academic forums, and submission of an amicus brief in the district court related to proper remedies. AELP submits this brief to share its expertise on how the remedies ordered by the Court have permitted Google to use the fruits of its unlawful conduct to capture the GenAI markets that have

1

emerged in the two years between the district court's liability ruling on August 5, 2024 and today.

## SUMMARY OF ARGUMENT

"Google has no true competitor," and its "monopoly in general search has been remarkably durable." JA__(Liab.Op.200.) Today, exactly two years after the district court made that finding—and over eleven months after issuance of a remedies order—Google maintains an undiminished monopoly over the GSE market. And, as detailed below, it is rapidly gaining share in related but distinct GenAI markets. This failure of the court's remedy results from multiple legal errors, and a conceptual one. The district court erroneously interpreted a technological change as a competitive threat, instead of realizing that this inflection point heightened the urgency to restore competition.

Google illegally maintained its GSE monopoly in part through exclusive distribution agreements and the payments that secured them. These agreements made Google's search engine the default at nearly every access point in the GSE market, including browser search bars, Android home-screen search widgets, and voice assistants such as Siri. JA__(Liab.Op.24.) The scale those agreements produced is "the essential

2

raw material for building, improving, and sustaining a GSE," and Google's rivals "cannot match" it. JA__(Liab.Op.226.) The district court had a "duty" under the Sherman Act to craft remedies that would restore competition in the GSE market and prevent new monopolies from forming.[1] *See infra* Sec. I. This Court has its own duty to ensure that ineffective decrees are transformed into effective ones. *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 88–89 (1950); *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 251 (1968).

Plaintiffs correctly challenge the district court's refusal to prohibit Google's payments for default placement as a breach of its duty to restore competition, for the reasons set forth in their briefing as well as those detailed below. Google incorrectly challenges the data-sharing and syndication remedies. (Google.Pr.Br.85–98.) Those provisions are properly aimed at curing "Google's massive scale advantage," JA__(Rem.Op.129), which the district court found in its liability ruling to be "a key reason why Google is effectively the only genuine choice as a default GSE," JA__(Liab.Op.233).

---

[1] This brief does not separately discuss Google's illegal maintenance of its search text ads monopoly, but the same legal principles govern remedies for that market.

The remedies Plaintiffs seek and those challenged by Google are, as the district court acknowledged, interrelated. JA__(Rem.Op.132.) In fact, as the district court also acknowledged, the data-sharing and syndication provisions are "blunt[ed]" by the district court's decision not to adopt a payment ban. JA__(Rem.Op.127.) As the Colorado Plaintiffs explain, the former set of provisions "improve quality," but they "do not create a path to users." JA__(Col.Ans.Br.11.) The payment ban would open up that path through default placement. JA__(Col.Ans.Br.11.) Thus, the district court's refusal to prohibit default payments cannot be reconciled with its findings about how such payments create incentives that foreclose markets, JA__(Liab.Op.226; Rem.Op.120), or its finding that "[t]he rationale for a payment ban is straightforward: It would pry open the market to competition," JA__(Rem.Op.120, 128).

The district court reasoned that capital is now flowing into GenAI technologies at an "astonishing" rate and opined that these "new realities g[ave] the district court hope that Google w[ould] not simply outbid competitors for distribution if superior products emerge." JA__(Rem.Op.127–28.) As explained below, this speculative hope was unfounded and legal error. Developments in various GenAI markets in

the months since the district court's remedies opinion underscore the urgent imperative for a payment ban, and possibly more. *See infra* Sec. II.A.4.

*Amicus* AELP explains below how Google has wielded its scale and revenue—among the fruits of its unlawful conduct—to foreclose competition, impair rivals' opportunities, and rapidly expand its position in GenAI markets, while preserving its dominance in the GSE market. This is precisely the result antitrust remedies are supposed to prevent. Indeed, the "hope" about GenAI that the district court deployed as "caution" in allowing default payments to continue is the very doubt it was required to resolve in Plaintiffs' favor. *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 (1961); *Ford Motor Co. v. United States*, 405 U.S. 562, 575 (1972).

After finding the GSE market to have been frozen for over a decade, the court identified an apparent sudden warming—marked by the arrival of GenAI—and identified threats that might jeopardize that thaw: Google's default payments along with scale and revenue advantages no rival could duplicate. JA__(Rem.Op.107, 127.) The payments were a principal tool used by Google to maintain its monopoly, and the data and

revenue acquired through default are among the fruits. JA__(Rem.Op.89–97.) Yet after identifying these market conditions, the district court failed to correct them. It found the GenAI market to be competitive, left the payments intact, and ordered the barest data-sharing and syndication remedies in its arsenal. Google is now using that payment machinery, and grounding its GenAI products in its search index, to entrench itself in the market the district court hoped would discipline it. These errors demand  remand to the district court with instructions to institute a payment ban, keep and consider strengthening the data-sharing and syndication remedies, and revisit Chrome divestiture and any other remedies that would pry open competition in the GSE market and protect competition in GenAI.

## ARGUMENT

### I.   THE DUTIES OF THE DISTRICT AND APPELLATE COURTS

The Sherman Act is "a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958). Relief in a monopolization case exists to vindicate that charter. It is "of great public importance" and "crucial" to ensuring "[t]he proper disposition of the

case." *du Pont*, 366 U.S. at 323–24. Thus, the Supreme Court has emphasized that "it is unthinkable that Congress has entrusted the enforcement of a statute of such far-reaching importance to the judgment of a single judge, without review of the relief granted or denied by him." *Hartford-Empire Co. v. United States*, 324 U.S. 570, 571 (1945); *du Pont*, 366 U.S. at 324–25.

Where a district court's decree is inadequate, the reviewing court has a "duty" to "modify the decree so as to assure the complete extirpation of the illegal monopoly." *United Shoe*, 391 U.S. at 251; *see also du Pont*, 366 U.S. at 323 (describing the Supreme Court's "duty ourselves to be sure that a decree is fashioned which will effectively redress proved violations of the antitrust laws"); *Hartford-Empire*, 324 U.S. at 571 & n.1 (collecting cases and discussing reviewing court's prerogative to modify remedies).

Because this Court has a duty to ensure that the unique remedial goals embedded into the Sherman Act are satisfied, *United Shoe*, 391 U.S. at 251, the standard for reviewing antitrust remedies on appeal is notably distinct from the standards for reviewing equitable remedies in non-antitrust matters. It is *not* simply "one of discretion, subject only to

reversal for gross abuse." *Gypsum*, 340 U.S. at 88–89. Instead, the district court's discretion is cabined by its duty "to prescribe relief which will terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future." *United Shoe*, 391 U.S. at 250; *United States v. Microsoft Corp.* ("*Microsoft*"), 253 F.3d 34, 103 (D.C. Cir. 2001).

Each court's obligation is affirmative. Upon finding a Section 2 violation, each "has the duty to compel action … that will, so far as practicable, cure the ill effects of the illegal conduct, and assure the public freedom from its continuance." *Gypsum*, 340 U.S. at 88. The crafted remedy must "unfetter a market from anticompetitive conduct" and "pry open to competition a market that has been closed by defendants' illegal restraints." *Ford*, 405 U.S. at 577–78 (quoting *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947)). The district court is "not limited to prohibition of the proven means by which the evil was accomplished." *Gypsum*, 340 U.S. at 88–89. "[A]cts entirely proper when viewed alone may be prohibited," because violators "should, so far as practicable, be denied future benefits from their forbidden conduct." *Id.* at 89. "If this

decree accomplishes less than that, the Government has won a lawsuit and lost a cause." *Int'l Salt*, 332 U.S. at 401.

Two rules follow that govern this appeal. *First*, doubts must be resolved in favor of the public: "[O]nce the Government has successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor." *du Pont*, 366 U.S. at 334; *Ford*, 405 U.S. at 575. *Second*, effectiveness trumps private equities: "Economic hardship can influence choice only as among two or more effective remedies. If the remedy chosen is not effective, it will not be saved because an effective remedy would entail harsh consequences." *du Pont*, 366 U.S. at 327. Or as this Court phrased it more recently, "[e]ven remedies which 'entail harsh consequences' would be appropriate to ameliorate the harm to competition from an antitrust violation." *Fed. Trade Comm'n v. Whole Foods Mkt.*, 548 F.3d 1028, 1033 (D.C. Cir. 2008) (citation omitted). The district court's remedy, as explained below, is legal error and abuse of its discretion because it fails to adhere to these rules. *Koon v. United States*, 518 U.S. 81, 100 (1996). It is this Court's duty to remand, to ensure that the goals of the Sherman Act and the mandates of *Microsoft* are realized.

## II. THE COURT'S SPECULATIVE GENERATIVE AI FINDINGS ARE CLEAR ERROR

The emergence of GenAI after the liability phase of this case presented a new frontier for the district court to consider in crafting remedies, and the district court properly included GenAI technologies and companies in the exclusive dealing, data-sharing, and syndication remedies to prevent Google from replicating its anticompetitive playbook for its own GenAI products. JA__(Rem.Op.99–100); *see infra* Sec. III.A. But it drew back when it came time to consider default payments, based on an erroneous conclusion that GenAI posed "a nascent competitive threat" to Google's monopolies. JA__(Rem.Op.1–2.)

The district court mistook the emergence of a new technology as an escape valve for its duty to terminate an existing monopoly. As such, the district court failed to appreciate how allowing Google to use default payments for its GenAI products would allow it to use the fruits of its monopoly—including its scale and revenue—to rapidly capture new GenAI markets. Instead, the district court resolved substantially all of its doubts in favor of Google, and it let concerns about economic hardship, rather than effectiveness, drive its decision. A review of the record below, and GenAI market developments since entry of final judgment, reveals

the folly of this decision and the need for remand to properly apply the law to these facts.

A. The Fruits of Google's Illegal Monopoly Maintenance are Accelerating its Market Position in GenAI

This Court does not need a crystal ball to see how Google would use the fruits of its unlawful conduct in adjacent GenAI markets. It has a rearview mirror, and the reflection is clear. Google is replicating the practices by which it maintained its GSE monopoly, this time to gain control of GenAI markets, particularly consumer-facing ones. The remedies phase was, in the district court's words, "as much about promoting competition among GSEs as ensuring that Google's dominance in search does not carry over into the GenAI space." JA__(Rem.Op.2.) The key reason is grounding.

1. *Grounding, and Why Google's Search Index is a GenAI Bottleneck*

Grounding is defined as "any method, including via API, by which foundation model output or a GenAI product can connect, call, access, retrieve, or display links or information from a [search engine]."

JA__(Pls'.PFOF.19.) It "is the ability to connect model output to verifiable sources of information."[2]

Grounding is critical to the accuracy of GenAI. JA__(Rem.Op.139.) A GenAI model's learned parameters are frozen as of its last training run. JA__(Rem.Op.139.) To answer current questions or reliably cite its sources, it must be grounded, at the moment a query is asked, to external sources of information. JA__(Rem.Op.33.) This is usually accomplished through a live index of the web, JA__(Rem.Op.34), a technique known as retrieval-augmented generation.[3] The district court found that GenAI chatbots "grounded in general search perform an information-retrieval function that is similar to GSEs." JA__(Rem.Op.99.) The quality of a grounded answer therefore rises and falls with the quality and freshness of the underlying index.

The district court made the point directly: "[S]earch index quality is critically important not only for traditional search engines, but also for

---

[2] Grounding overview, *Gemini Enterprise Agent Platform Docs* (last visited Aug. 1, 2026), https://docs.cloud.google.com/gemini-enterprise-agent-platform/models/grounding/overview.

[3] Patrick Lewis et al., *Retrieval-Augmented Generation for Knowledge-Intensive NLP Tasks*, 34th Conf. on Neural Information Processing Systems (2020).

emerging GenAI products." JA__(Rem.Op.139.) That is why Apple executive Eddy Cue, who the district court said "perhaps explained it best (this time advertently)," identified growing "their search index" as "the only thing" keeping GenAI rivals from displacing Google. JA__(Rem.Op.140.) Or as a Google witness conceded, a "lack of good search APIs is an innovation killer." JA__(Pls'.PFOF.21–22 (citing Des.Rem.Tr.183:14–184:13) (cleaned up).) In short, Google's control of the highest-quality index available for grounding is a bottleneck for GenAI competition, not merely an advantage in the GSE market.[4]

Google can use its control of an irreplicable index—the world's largest—to give Gemini superior grounding, degrade rivals' grounding, charge rivals more for access, or refuse to deal altogether.[5] And because the district court has allowed Google to continue paying for default positions, the quality of its index will continue to grow and outpace its rivals', reinforcing the existing GSE monopoly while it builds a new one in GenAI.

---

[4] Maurice E. Stucke, *AI, Antitrust, and the Marketplace of Ideas*, 94 Fordham L. Rev. 1677, 1685 (2025).

[5] *Id.*

In short, Google continues to control the search infrastructure that is becoming a critical element of GenAI development. Indeed, it increasingly appears that grounding may become its own market in which Google would be unquestionably dominant.

### 2. *Record Evidence of Google's Advantages in Grounding*

Even without peeking at current developments, it is clear from the record evidence that the district court's speculative assumptions about GenAI's likely impacts on Google were unfounded. Google's scale advantage is astronomical. It "is a cornerstone of Google's success" and a direct fruit of "Google's exclusive distribution arrangements." JA__(Rem.Op.89–95.) That scale advantage is the source of Google's superior grounding capabilities and the engine of Google's GenAI products.

The district court described in detail how Google is already using its scale to advantage itself in GenAI. "The size of Google's index gives it a key competitive advantage over existing small GSEs, like DuckDuckGo, and emerging companies in the GenAI space, like ChatGPT." JA__(Rem.Op.139.) Google reserves the best grounding data for itself. JA__(Rem.Op.36); JA__(Pls'.PFOF.46). It does not make FastSearch

ranked results or its Knowledge Graph available to third parties.[6] JA__(Rem.Op.35–36.) Vertex, Google's cloud-based grounding product, only provides customers with "the information from those results." JA__(Rem.Op.35.) And Google refused OpenAI's request to partner on ChatGPT grounding. JA__(Rem.Op.38–39.)

The development and ongoing improvement of Gemini is also irretrievably rooted in Google's vast data-holding fruits. Gemini products are pre-trained on the Google Common Corpus, JA__(Rem.Op.29, 34), and Gemini products kick back to Search for commercial queries post-training, JA__(Rem.Op.46). Finally, Google uses the scale advantage baked into Gemini, along with the revenue that is also a fruit of its unlawful conduct, to replicate its default-and-payment practices in the grounded LLM market.

### 3. Record Evidence of Google's Replication of Default Payment Practices in GenAI

Google's grip on defaults has already had a fatal impact on nascent competition. Evidence at trial revealed that, even though venture-backed

---

[6] FastSearch's "primary use case is grounding for GenAI products." JA__(Rem.Op.179.) Knowledge Graph is an "enormous" database "containing useful information about people, places, and things along with what connects them together." JA__(Rem.Op.149.)

GSE startup Neeva built its own index and AI-based ranking model, its foreclosure from major browsers and operating systems ultimately led it to exit the GSE market. JA__(Liab.Op.11, 30–31.) Google's foreclosure tactics continued for years. Before the remedies phase of the proceedings below was over, Google secured an agreement with Samsung that made the Gemini App the device default on Samsung phones. JA__(Pls'.PFOF.40 (citing Rem.Tr.635:14–20; PXR0571 at -363).) It also has revenue-sharing agreements pinned to default positions for Gemini with Motorola and Lenovo. JA__(Rem.Op.43.) Google pays for that placement through the same practices it used in the GSE market—fixed payments, per-device bounties, and revenue sharing tied to a partner's "implementation of a certain Gemini experience." JA__(Rem.Op.51.) The default position is just as important with Gemini as it is with Google Search because, "in a market where queries are currency," a Gemini default "drive[s] significant traffic" to Google Search. JA__(Rem.Op.86.)

The economics of this default arrangement are such that a rival like Microsoft would "need to bring large [dollars] to make up for … lost revenue from Google" to secure default positions for its GenAI products. JA__(Pls'.PFOF.68.) Google maintained revenue-share provisions in

16

agreements with AT&T and Verizon and mobile incentive agreements with Motorola and LG, all predicated on default placement of Google's search engine, that blocked rivals' AI assistants up until the week before the remedies hearing. JA__(Pls'.PFOF.75–76 (citing Rem.Tr.369:3–10; PXR0606; PXR0607; PXR0609).) Perplexity's witness described the choice Google's defaults leave a rival with as "hav[ing] a gun to your head." JA__(Pls'.PFOF.98–99 (citing Rem.Tr.727).)

The district court held that this evidence "did not establish that Google's scale advantage in Search translates into a quality advantage in GenAI search-assisted responses." JA__(Rem.Op.156.) But the data-sharing and syndication remedies are based on the scale and index advantages that Google's distribution payments allowed it to achieve, JA__(Rem.Op.89, 130). And those advantages are the same ones on which GenAI grounding depends. Google's inroads into GenAI markets since the entry of final judgment demonstrate the district court's error in finding the GenAI markets competitive and in refusing to bar Google's distribution payments.

### 4. *Post-Judgment Evidence of Google's Dominance in Grounding*

There is no need to speculate about whether the prohibitory relief granted by the district court will, on its own, pry open these markets. We know it has not, and it never will. None of the remedies in this case have been stayed. The prohibitory injunctions—the remedies that have taken full effect—became binding in early February 2026. JA__(F.J.29.) They have restricted Google's ability to condition distribution on or coerce uptake of its search and GenAI products on exclusivity ever since. The data-sharing and syndication remedies are in the process of being implemented,[7] but because there is no stay, competitors and investors have been free to factor the entire decree—and their expectations about it—into their business decisions for the more than eleven months since the remedies opinion was entered. The results so far are one-sided, in Google's favor.

---

[7] In May 2026, Plaintiffs anticipated that "Qualified Competitors would likely begin to receive access to data and syndication services by late fall 2026 or early winter 2027 at the earliest." JA__(Pls'.1st.Status.Rep.9.)

### a. Consumer-facing GenAI market growth

Google has made aggressive moves to expand its share of consumer-facing GenAI markets. In January 2026, Apple and Google announced that Apple would use Gemini to power Siri.[8] "Although Apple is paying Google for the use of its AI capabilities, the net outcome is that Apple receives $19 billion in profit from Google each year, instead of $20 billion."[9] Similarly, Meta, which the district court deemed a rival to Google in GenAI, JA__(Rem.Op.42), is now an intensive user of Gemini products.[10] And Anthropic, another erstwhile competitor, is almost entirely focused on the enterprise market and not consumer-focused GenAI products.[11]

---

[8] Google, *Joint statement from Google and Apple* (last visited July 29, 2026), https://blog.google/company-news/inside-google/company-announcements/joint-statement-google-apple/.

[9] Lydia Giannini, *The Google Search Remedies Are Already Failing: How Weak Antitrust Relief Handed Google an AI Advantage*, Public Knowledge (Apr. 2, 2026), https://publicknowledge.org/the-google-search-remedies-are-already-failing-how-weak-antitrust-relief-handed-google-an-ai-advantage/.

[10] Hannah Murphy & Stephen Morris, *Google caps Meta's Gemini use as AI demand strains capacity*, Financial Times (June 28, 2026), https://www.ft.com/content/c5d52f72-71ef-40bc-bad3-61afdba8b378?syn-25a6b1a6=1.

[11] Asa Fitch, *OpenAI's Less-Flashy Rival Might Have a Better Business Model,* Wall Street Journal (Oct. 26, 2025),

Meanwhile, the figures Google invokes have gone stale. The district court recorded OpenAI's own calculation of the U.S. market as of December 2024: 85% for ChatGPT, 7% for Gemini, 3% for Claude. JA__(Rem.Op.42.) Google still leans on that 85% to challenge the data-sharing and syndication remedies. (Google.Pr.Br.96.) But by May 2026, ChatGPT's share was estimated to be below 50% of AI-assistant usage for the first time, with Gemini at nearly 30%.[12] By Google's own account, the Gemini app now has 950 million monthly active users, approaching the 1 billion monthly active users reported by ChatGPT in June.[13] And its share of unique visitors rose from 13.8% in August 2025 to 27% in March 2026, "with ChatGPT as the primary share donor."[14] As Google

---

https://www.wsj.com/tech/ai/anthropic-business-model-ai-9e26b4ef?eafs_enabled=false.

[12] Ivan Mehta, *ChatGPT's market share slips below 50% for first time*, TechCrunch (June 16, 2026), https://techcrunch.com/2026/06/16/chatgpts-market-share-slips-below-50-for-first-time/.

[13] Ivan Mehta, *Google's Gemini nears billion-user milestone*, TechCrunch (July 23, 2026), https://techcrunch.com/2026/07/23/google-closes-in-on-another-billion-user-product-with-gemini/.

[14] Vahid Karaahmetovic, *Google's Gemini continues to gain market share among AI models, new analysis shows*, Yahoo! Finance (Apr. 16, 2026), https://uk.finance.yahoo.com/news/google-gemini-continues-gain-market-133218052.html.

said during its second quarter 2026 earnings call, "Gemini continues to be a key driver of growth."[15] It powers Google's ambitions in enterprise and consumer GenAI markets.

Google also recognizes that many consumers use GenAI as a search tool, a fact that the company is leveraging to keep more people from leaving the Google platform. In May 2024, Google introduced AI Overviews, a Gemini-generated summary of top search results.[16] OpenAI stated in an amicus brief submitted during the remedies phase that AI Overviews were likely to allow "Google to secure a competitive advantage for its own AI products" by making traditional search result displays "obsolete or outdated." JA__(OpenAI.Br.4.) In a randomized experiment, the presence of AI Overviews reduced organic clicks on internet publishers' content by nearly 40%, while zero-click searches increased by 34.5%.[17] In May 2026, Google announced changes to the search bar,

---

[15] Alphabet Investor Relations, *2026 Q2 Earnings Call* (last visited Aug. 1, 2026), https://abc.xyz/investor/events/event-details/2026/2026-Q2-Earnings-Call-2026-GgTAq7Is0z/default.aspx.

[16] Google, *Generative AI in Search: Let Google do the searching for you* (last visited July 29, 2026), https://blog.google/products-and-platforms/products/search/generative-ai-google-search-may-2024/.

[17] Saharsh Agarwal & Ananya Sen, *The Impact of Google AI Overviews on Publisher Traffic and User Experience: Evidence from a Field*

replacing the traditional box with a Gemini chatbot and embedded agents.[18] One study found that in about 75% of searches, users never leave AI Mode[19]—meaning their data never leaves Google. As the district court noted, AI Overviews has potentially strengthened Google's position in the GSE market. Since its introduction, Google Search queries in the United States increased by 1.5 to 2%. JA__(Rem.Op.44.) So while GenAI is not a complete replacement for GSE functionality, there is clear overlap, and Google is exploiting it.

Google's consumer-focused GenAI footprint is not limited to its own products. Google has committed to investing up to $40 billion in Anthropic, taking a silent equity stake of up to roughly 15%.[20] Google's

---

*Experiment*, SSRN (July 8, 2026), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=6513059.

[18] Google, *A new era for AI Search* (last visited Aug. 2, 2026), https://blog.google/products-and-platforms/products/search/search-io-2026/.

[19] Kate Conger, *Google Is Building an A.I. Fence Around the Internet It Once Championed*, New York Times (July 20, 2026), https://www.nytimes.com/2026/07/20/technology/google-ai-open-web.html.

[20] Tripp Mickle, *Google Commits to Invest Up to $40 Billion in Anthropic*, New York Times (Apr. 24, 2026), https://www.nytimes.com/2026/04/24/technology/google-anthropic-investment-artificial-intelligence.html. Google holds a non-voting stake in Anthropic capped at 15%, with no board seats or observer rights.

Cloud segment grew 82% in Q2 2026, to nearly $25 billion, and its cloud backlog reached $514 billion, against which Anthropic alone has reportedly committed approximately $200 billion in spending.[21] Google's growing position in GenAI is reflected not only in Gemini's share of the consumer and cloud markets but also, indirectly, in the growth of a would-be rival that runs on Google's infrastructure and has chosen not to compete in the consumer-focused GenAI market.

### b. Other GenAI markets

Google is not limiting itself to consumer-facing GenAI. It is also folding GenAI into its advertising engine and enterprise business. On its Q2 2026 earnings call, executives described accelerating "the deployment of Gemini across our entire ads infrastructure," explaining that "Gemini

---

Cade Metz, Nico Grant, & David McCabe, *Inside Google's Investment in the A.I. Start-Up Anthropic*, New York Times (Mar. 11, 2025), https://www.nytimes.com/2025/03/11/technology/google-investment-anthropic.html?eafs_enabled=false.

[21] 2026 Q2 Earnings Call, *supra* note 15. Anthropic has reportedly committed to spending approximately $200 billion over five years on Google's cloud services and chips beginning in 2027. Sri Muppidi, Erin Woo, & Amir Efrati, *Anthropic Commits to Spending $200 Billion on Google's Cloud and Chips*, The Information (May 5, 2026), https://www.theinformation.com/articles/anthropic-commits-spending-200-billion-googles-cloud-chips.

improves query understanding, allowing [Google] to find relevant ads for longer searches, previously difficult to monetize."[22] Its search-advertising revenue, into which it has folded AI Overviews and AI Mode revenue, rose by 17% to $63.3 billion in Q2 2026.[23]

On the corporate side, Google announced Gemini Enterprise—a suite of large-scale business software, tools, and platforms that rely on grounding from Google's GSE monopoly—just one month after the district court issued its remedies opinion.[24] By July 2026, nearly 90% of Fortune 100 companies were using the suite of tools.[25] Google's enterprise AI services grew 800% from the first quarter of 2025 to the first quarter of 2026.[26]

---

[22] 2026 Q2 Earnings Call, *supra* note 15..

[23] *Id.*

[24] Google Cloud, *Introducing Gemini Enterprise* (Oct. 9, 2025), https://cloud.google.com/blog/products/ai-machine-learning/introducing-gemini-enterprise.

[25] 2026 Q2 Earnings Call, *supra* note 15.

[26] Alphabet Investor Relations, *2026 Q1 Earnings Call* (last visited July 29, 2026), https://abc.xyz/investor/events/event-details/2026/2026-Q1-Earnings-Call-2026-nW8kCrBAKS/default.aspx.

### 5.    *Google's GSE Monopoly is Fully Intact*

Meanwhile, Google's share of the United States general-search market has not budged. By one publicly available measure (search results click-throughs), Google's GSE market share is higher now than it was a year ago:[27]



---

[27] StatCounter GlobalStats, *Search Engine Market Share United States of America, June 2025–July 2026* (last visited Aug. 1, 2026), https://gs.statcounter.com/search-engine-market-share/all/united-states-of-america. These metrics are based on "search engine referrals, not the number of searches performed." StatCounter GlobalStats, *Frequently Asked Questions* (last visited Aug. 1, 2026), https://gs.statcounter.com/faq#search-engine-referrals. A search engine referral is recorded when someone searches, clicks a result, and lands on a site with StatCounter code installed—it counts click-throughs from search results. *Id.*

In a head-to-head comparison with ChatGPT, Google likewise increased its lead in the post-remedies period (from 99.67% to 99.71%):[28]



Putting all of this together, the conceptual error of mistaking technological progress for market discipline is on display. The district court viewed Google's small market share, when GenAI was in its infancy, as static, without accounting for the distributional power and likely growth Google would achieve with its existing scale and revenue. By refusing to limit that distributional power and declaring GenAI

---

[28] StatCounter GlobalStats, *Google vs ChatGPT Market Share United States of America, June 2025–June 2026* (last visited July 31, 2026), https://gs.statcounter.com/google-vs-chatgpt-market-share/all/united-states-of-america.

competitive, the district court's failed remedy set the stage for Google's growing market share in GenAI, at nearly a billion users for Gemini.[29]

## B. The Refusal to Prohibit Default Payments Based on Hoped-For GenAI Discipline is Fatally Flawed

These market realities belie the district court's hopeful narrative of nascent competitors poised to disrupt Google's dominance. The GenAI products the district court treated as sources of competitive discipline are themselves often downstream consumers of search infrastructure given their need for grounding, and the strongest such infrastructure belongs to Google. Thus, Google has an opportunity, within the confines of the ordered remedies, to extend its GSE monopoly into the market that the district court hoped would threaten it.

Google's scale produces superior AI grounding, superior grounding produces better GenAI products, better GenAI products attract distribution partners, distribution produces queries, queries produce data, and the entire cycle is funded by advertising revenue that the district court found Google inflated through monopoly pricing. The district court itself described the search-side version of this dynamic:

---

[29] Mehta, *supra* note 13.

(1) More user data allows a GSE to improve search quality, (2) better search quality attracts more users and improves monetization, (3) more users and better monetization attract more advertisers, (4) more advertisers mean higher ad revenue, and (5) more ad revenue enables a GSE to expend more resources on traffic acquisition costs (i.e., revenue share payments) and investments, which enable the continued acquisition of scale.

JA__(Rem.Op.87–88). What the district court did not reckon with is that the same flywheel now powers Google's AI products. The absence of a payment ban allows Google to secure default positions for its GSE *and* GenAI products, attracting more users and better monetization and bringing in more advertising revenue. "[W]hat for Google manifests as a dazzling flywheel of queries and quality has the opposite effect for rivals: it keeps them stuck in place, or worse, causes a downward spiral of scale and revenue," in GSE and GenAI alike. JA__(Rem.Op.95.)

A standalone competitor must break into every link of this chain simultaneously, a feat no rival has accomplished in the decade the GSE market has been, as the district court found, "frozen." JA__(Liab.Op.202.) It must build or license an index (scale), win placement on devices (distribution and revenue), secure crawling access (content), fund training runs (infrastructure), and stand up an advertising business (monetization), all while competing against a firm that already controls

28

each input and deploys them in combination. A decree that allows Google to pay for default positions leaves every link of the flywheel intact and all but guarantees that the monopolist will continue to reap "future benefits from [its] forbidden conduct." *Gypsum*, 340 U.S. at 89.

It is no surprise then that the prohibitory injunctions in force, along with the data-sharing and syndication remedies in process, have not sufficed either to pry open the GSE market or to forestall the re-emergence of monopolizing dynamics in GenAI. In other words, GenAI has not and will never fully discipline Google's GSE monopoly. Google's GSE monopoly disciplines GenAI.

### 1. *Google is Not Entitled to a Level Playing Field*

Because Google unlawfully maintained a monopoly, its conduct is subject to a different order of scrutiny than that of competitors attempting to disrupt the market it monopolized. As the district court correctly noted, "the point of these remedies is not to ensure that Google maintains parity with competitors—it is to ensure that others can effectively compete in these markets." JA__(Sec.Rem.Op.18) (citing, *inter alia*, *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1231 (D.C. Cir. 2004)). The district court's duty was to ensure that Google could not use

the fruits of the adjudicated violation to build a new monopoly in an adjacent market. *United Shoe*, 391 U.S. at 250; *Massachusetts*, 373 F.3d at 1215–16 (sustaining relief addressing the consequences of a violation even where the conduct remedied was not itself unlawful); *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 132 (1969).

The district court's own remedial findings foreclose the premise on which it denied Plaintiffs' requested relief. "GenAI products have not eliminated the need for GSEs." JA__(Rem.Op.43.) Commercial queries—the bulk of Google's advertising revenue—"are not, at present, a common use case for GenAI applications." JA__(Rem.Op.44–45.) And "AI Overviews has potentially strengthened Google's position in the GSE market," with Google Search queries in the United States rising 1.5 to 2% since its introduction. JA__(Rem.Op.44.)

### 2. The Court's Findings and Post-Remedy Developments Demand a Payment Ban

The district court found the rationale for a payment ban "straightforward: It would pry open the market to competition." JA__(Rem.Op.120.) It credited testimony, from a witness it called "particularly compelling," that Google's payments "provide an incredibly strong incentive for the ecosystem to not do anything," "effectively make

the ecosystem exceptionally resist[ant] to change," and "basically freeze the ecosystem in place." JA__(Liab.Op.201–02.) It found that Google's partners "cannot afford to go elsewhere." JA__(Liab.Op.201.) And it acknowledged that, absent a ban, distributors would remain "incentivized to stick with Google," preserving "the very forces that 'effectively [have made] the ecosystem exceptionally resist[ant] to change.'" JA__(Rem.Op.127.)

Having made those findings, the district court declined to order the remedy whose rationale it had just endorsed, based on hope of disruption and fear of economic hardship. JA__(Rem.Op.127–28.) That reasoning is internally contradictory. A district court cannot find as fact that Google's financial advantage will induce distributors to stay and simultaneously rest its decree on the hope that it will not. Google's explosion into GenAI since—by using its existing scale and revenue to foreclose channels of distribution and impair rivals' opportunities—confirms the district court's fallacy. *See supra* Sec. II.A.4.

The district court's first legal error was resolving its doubt in favor of the proven monopolist. Whether GenAI entrants will discipline Google is, according to the district court, unknowable. It felt it was being "asked

31

to gaze into a crystal ball and look to the future," which is "[n]ot exactly a judge's forte." JA__(Rem.Op.2.) That candor has legal consequences. When the remedial question turns on an acknowledged uncertainty about the future, Supreme Court precedent mandates that it be resolved in favor of the Government. *Ford*, 405 U.S. at 575; *du Pont*, 366 U.S. at 334. The district court resolved it in favor of Google.

The district court's second legal error was denying a payment ban to prevent economic hardship. Nothing in the antitrust laws entitles the beneficiaries of an unlawful scheme to its continuation, simply so they can continue collecting billions in monopoly rents. *See Gypsum*, 340 U.S. at 89. The district court acknowledged that continuing default payments "could blunt the effectiveness of the remedies imposed." JA__(Rem.Op.127.) And so the effective remedy should have prevailed, despite any short-term economic hardship it might have brought. *du Pont*, 366 U.S. at 327.

### 3. The Court Cannot Wait for Market Correction with Default Payments in Place

The district court left the door open to revision in these circumstances, stating that it was "prepared to revisit a payment ban (or a lesser remedy) if competition is not substantially restored through the

remedies the district court does impose." JA__(Rem.Op.128.) That reservation is a concession that the district court-ordered remedies' effectiveness is in doubt. A court that must hold open the possibility of revisiting a remedy has concluded that the remedy may not work, despite clear instruction from the Supreme Court that doubts must be resolved in favor of the Government. *du Pont*, 366 U.S. at 334; *Ford*, 405 U.S. at 575. The district court's resolution to the contrary means the costs of its remedies experiment fall not on Google but on the rivals who must survive it, in a market the district court found to be frozen for over a decade. JA__(Rem.Op.107.)

Plaintiffs' proposed payment ban, on the other hand, would prohibit Google from making search-related payments to distribution partners, with a few very limited exceptions. JA__(Pls'.PFOF. § V.C–H.) That remedy aligns with the treatise on which the district court relied: Antitrust policy "should not differentiate between the manufacturer of widgets that explicitly imposes exclusive dealing on its dealers and the manufacturer that gives such dealers a discount or rebate for dealing exclusively." JA__(Liab.Op.213 (quoting Areeda & Hovenkamp, Antitrust Law ¶ 1807b (5th ed. 2022)).) Both "have the 'practical effect'

of inducing exclusive dealing." JA__(Liab.Op.213 (quoting Areeda & Hovenkamp ¶ 1807b).) It creates an "all-or-nothing" choice when the producer is a dominant firm. JA__(Liab.Op.214.) These are the conditions the district court found in the GSE market: "Merely excising the exclusive provisions from Google's distribution agreements will not unleash competition." JA__(Rem.Op.108.) Those are also the conditions in GenAI. *See supra* Sec. II.A.

A default payments ban would cut off this key source of Google's monopoly power. Distributors could select search and GenAI products on quality rather than subsidy, restoring the contestable access points that Google's scale and access to revenue have eliminated. *Ford*, 405 U.S. at 577–78. And the flywheel described above—scale, quality, distribution, and revenue tied to a partner's implementation of "a certain Gemini experience"—would be foreclosed at the outset. That is the effective remedy, not the one that leaves competitors waiting "years … for a competitor to develop the capacity to compete with Google" (or longer when Plaintiffs are forced to challenge a new Google monopoly in GenAI). JA__(Rem.Op.220.)

The *United Shoe* remedy was reversed after a decade of behavioral remedies failed to dissolve an adjudicated monopoly. 391 U.S. at 252. The Supreme Court said it was duty bound "to modify the decree so as to assure the complete extirpation of the illegal monopoly." *Id.* AT&T was forced to divest its Bell Operating Companies in 1982 when a district court found prior remedies in a 1956 consent decree "patently inadequate." *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 170 (D.D.C. 1982) (subsequent history omitted). Google has illegally maintained its monopoly for over a decade. That "is enough," *United Shoe*, 391 U.S. at 252, and this Court should not force multiple markets to endure another decade before prohibiting the conduct that the district court found unlawful. "Civil suits under the Sherman Act would indeed be idle gestures if the injunction did not run against the continuance or resumption of the unlawful practice." *United States v. Crescent Amusement Co.*, 323 U.S. 173, 188 (1944).

## III. THE REMAINING REMEDIES ARE CRITICAL TO COMPETITION

### A. The Data-Sharing and Syndication Protocols are the Bare Minimum

Google asks this Court to strike the data-sharing and syndication provisions as overreach. But the data-sharing and syndication remedies Google challenges are, at best, the floor for what is required to start closing the scale and quality gap between Google's search engine and grounded GenAI products and its competitors, a gap that Google is widening through the fruits of its illegal conduct. Absent these parts of the final judgment, Google could accelerate the ongoing conversion of its unlawful advantages in data and distribution into a durable position in GenAI before any rival can fully establish itself, deploying the same tactics used to maintain its monopoly in the GSE market.

The district court ordered these behavioral remedies because Google's agreements had denied rivals "scale," which it identified as "the essential raw material for building, improving, and sustaining a GSE," JA__(Liab.Op.226), and because the resulting data assets are fruits of the violation, JA__(Rem.Op.89–95). It ordered them, expressly, because it had declined the payment ban. JA__(Rem.Op.132.)

The data-sharing and syndication provisions run narrower than the findings supporting them and expressly require Google to be compensated for them. JA__(Rem.Op.148, 174, 185.) The district court found "freshness" to be "an important factor in search quality," JA__(Liab.Op.35), and found Google's advantage to lie partly in recrawling the web continuously to "ensure the index contains the freshest web content," JA__(Rem.Op.138). But the district court ordered a single, one-time disclosure, reasoning that a snapshot would supply "the kick start [competitors] need to compete." JA__(Rem.Op.146.) Because an index is not a reference work but instead a continuously maintained pipeline of information, a snapshot begins decaying on delivery.

As to user-interaction data, the district court required disclosure "at least twice" across six years, recognizing that "a more than one-time disclosure is reasonable given the importance of updating training data with fresh information." JA__(Rem.Op.158.) Yet Navboost draws only on the most recent thirteen months. JA__(Liab.Op.230.) The district court further excluded FastSearch, the Knowledge Graph, advertising data, the layer that converts raw data into results, the store that grounds

Gemini's answers, and the layer that lets a rival convert quality into revenue. JA__(Rem.Op.136–38, 148–51, 164–67.) A competitor receiving data once every three years would spend most of each interval working from inputs older than anything in Google's live system.

Google's objection that these narrow provisions compel disclosure of lawfully developed assets is foreclosed by its past unlawful conduct. "[A]cts entirely proper when viewed alone may be prohibited" in an antitrust decree. *Gypsum*, 340 U.S. at 89. Compelled sharing of related assets is also widely accepted relief. *Massachusetts*, 373 F.3d at 1215–16; *Otter Tail Power Co. v. United States*, 410 U.S. 366, 380–82 (1973); *see also In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 947–48 (9th Cir. 2025), *cert. dismissed sub nom. Google LLC v. Epic Games, Inc.*, 146 S. Ct. 1051 (2026) (affirming data sharing to "ameliorate consequences 'intertwined with the network effects' that Google has enjoyed as a monopolist"). And the objection that compliance is burdensome is not a defense. *du Pont*, 366 U.S. at 326–27; *see also Crescent Amusement*, 323 U.S. at 189 ("Those who violate the Act may not reap the benefits of their violations and avoid an undoing of their unlawful project on the plea of hardship and inconvenience.").

Vacating these provisions would leave a decree restricting exclusivity and nothing more. Market conditions would be the status quo, and Google's market power—in the GSE market it monopolized and newly emerging ones in GenAI—would only become more entrenched.

## B.    Divestiture is the Final Key to Competition

Google acknowledges that its agreements with wireless carriers and device makers include requirements to preload and promote its Chrome browser. (Google.Pr.Br.20–21.) There is a reason Google does that—to ensure that these defaults continue driving 70% of all U.S. search queries to Google's GSE monopoly. JA__(Rem.Op.86.) Twenty percent of queries "flow through Google on user-downloaded Chrome, which further narrows the portion of the market available to rivals." JA__(Rem.Op.107.) That is why the prohibitory injunctions address conditions tied to Chrome. JA__(Rem.Op.3, 105–07.) However, these injunctions—which have been in effect for months—are not sufficient and do not cure Google's incentives to self-preference its search engine through Chrome. Only divestiture can accomplish that with certainty.[30]

---

[30] AELP also agrees with the additional reasoning in support of Chrome divestiture set forth in the amicus brief submitted separately by the Little Tech Association.

Supreme Court precedent is clear that lawfully acquired (or developed) assets can be divested if they were used as instruments of illegal conduct. *United States v. Paramount Pictures*, 334 U.S. 131, 152 (1948). Record evidence confirms that divesting Chrome is technically feasible, that Chrome would be viable as a standalone product, and that a Chrome auction would attract multiple bidders, including leading GenAI companies. JA__(Pls'.Rem.Br.37–40.) Moreover, the record demonstrates Google's intention to use Chrome to extend its dominance into GenAI. At the time of the remedies hearing, Gemini was the only preloaded GenAI application in Chrome, and Google planned to limit the ability of rivals to integrate with Chrome, reserving full integration only for Gemini. JA__(Pls'.Rem.Br.34.) Plaintiffs' expert estimated that Google would still hold more than half of U.S. search queries after divesting Chrome. JA__(Pls'.Rem.Br.31.) So to the extent private equities are a legitimate concern in the context of divestiture, the consequences would not be existential for Google. And the "significant causal connection" applied to structural remedies is readily apparent. *Microsoft*, 253 F.3d at 80. The district court would be well within its supervisory powers to reconsider its divestiture on remand. *See Sys. Fed'n No. 91, Ry.*

*Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961) ("an injunction often requires continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief"); *United Shoe*, 391 U.S. at 251 (affirming a district court's power *and duty* "to modify the decree so as to assure the complete extirpation of the illegal monopoly").

## CONCLUSION

The district court identified the right legal principles and then drew back from what they required. It found the ecosystem frozen, found Google's scale and revenue to be fruits of its unlawful conduct, found that prohibitory relief alone would not restore competition, and recognized that a network monopoly "may have to be forced open by more aggressive means." JA__(Rem.Op.109 (quotation omitted).) Then it refused to enter a payment ban despite clear evidence that Google is using the fruits of its unlawful conduct—the scale and revenue it amassed as it maintained its GSE monopoly—to acquire a new monopoly in GenAI. The rulings permitting Google to continue paying for default placement and denying divestiture of Chrome should be vacated and the case remanded for entry of a revised judgment consistent with *Microsoft* and the Supreme Court

41

decisions before it. The data-sharing and syndication provisions, on the other hand, should be affirmed as the floor of adequate relief rather than its ceiling, with any remand this Court may deem appropriate to ensure and strengthen the effectiveness of these remedies.

Dated: August 4, 2026

Respectfully submitted,

s/ Katherine Van Dyck
Katherine Van Dyck
KVD STRATEGIES PLLC
1717 N Street NW, Suite 1
Washington, DC 20036
(202) 798-1948
katie@kvdstrategies.com

Counsel for Amicus Curiae
American Economic Liberties Project

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), this document complies with the type-volume limit of Rules 28.1(e)(2)(B) and 29(a)(5) because, excluding the parts exempted by Rule 32(f) and D.C. Circuit Rule 32(e)(1), it contains 7,593 words. This document complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century, 14-point font.

Dated: August 4, 2026        *s/ Katherine Van Dyck*
Katherine Van Dyck

*Counsel for Amicus Curiae American Economic Liberties Project*

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the Court's CM/ECF system on August 4, 2026, which will send notice of such filing to all counsel who are CM/ECF registered users.

Dated: August 4, 2026
*s/ Katherine Van Dyck*
Katherine Van Dyck

*Counsel for Amicus Curiae American Economic Liberties Project*