**No. 26-5023**
**(Consolidated with Nos. 26-5047, 26-5049)**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

United States of America, *et al.*,
*Plaintiffs-Appellees-Cross-Appellants*,

v.

Google LLC,
*Defendant-Appellant-Cross-Appellee*,

On appeal from the United States District Court
for the District of Columbia, Nos. 20-cv-3010 & 20-cv-3715

**BRIEF OF *AMICI CURIAE* LITTLE TECH ASSOCIATION AND TRAVEL LEMMING LLC IN SUPPORT OF PLAINTIFFS-APPELLEES AND -CROSS-APPELLANTS AND IN SUPPORT OF AFFIRMANCE WITH RESPECT TO THE APPEAL AND REVERSAL WITH RESPECT TO THE CROSS-APPEAL**

Nicolas A. Stebinger
**SIMONSEN SUSSMAN LLP**
1629 K Street NW, Suite 300
Washington, DC 20006
(202) 384-3130
nicolas@simonsensussman.com

*Counsel for* Amici Curiae *Little Tech Association and Travel Lemming LLC*

Catherine S. Simonsen
Andrew Naravage
**SIMONSEN SUSSMAN LLP**
418 Bamboo Lane, Suite C-18
Los Angeles, California 90012
(917) 747-5196
catherine@simonsensussman.com
andrew.naravage@simonsensussman.com

Shaoul Sussman
**SIMONSEN SUSSMAN LLP**
307 West 38th Street, 16th Floor
New York, NY 10018
(718) 510-5495
shaoul@simonsensussman.com

*On the Brief*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, *Amicus Curiae* Little Tech Association ("LTA") certifies that it is a 501(c)(6) business organization incorporated in Washington, DC. LTA has no parent company and no publicly held corporation owns 10% or more of LTA's stock. *Amicus Curiae* Travel Lemming LLC certifies that it is a Florida limited liability company. Travel Lemming has no parent company and no publicly held corporation owns 10% or more of Travel Lemming's stock.

## STATEMENT OF AUTHORSHIP AND CONSENT

All parties consented to the filing of this brief. No party's counsel authored this brief in whole or in part, no party or their counsel contributed money intended to fund the preparation or submission of this brief, and no person other than *Amici Curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting the brief.

## CERTIFICATE REGARDING SEPARATE BRIEF

Pursuant to D.C. Circuit Rule 29(d), *Amici Curiae* state that this separate brief is necessary because it provides the unique and informed perspective of the Little Tech Association (LTA)—a technology association that champions open systems, open standards, and open infrastructure to foster competitive marketplaces—and Travel Lemming, an online travel publisher. LTA's members

i

include Specialized Vertical Providers ("SVPs") that compete with Google in markets adjacent to the general search engine ("GSE") market. Some of LTA's members and Travel Lemming are also the source of valuable content from whom Google, as a GSE monopolist, extracts and misappropriates value—dampening incentives for innovation and value creation.

LTA's members have seen firsthand how Google uses its monopoly in one market (here, the GSE market) to enter and control adjacent markets (e.g., local search, travel, shopping, GenAI), and how Google uses its unlawfully acquired advantages in these related markets to reinforce its monopoly power in the first market (here, the GSE market). LTA's members and Travel Lemming have also experienced firsthand Google's use of its unlawfully obtained monopoly power in the GSE market to raise prices and worsen terms for GSE consumers and Google Search trading partners—fruits to which Google is not entitled and of which the remedy in this case must deny Google.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

STATEMENT OF AUTHORSHIP AND CONSENT ...................................... i

CERTIFICATE REGARDING SEPARATE BRIEF ................................................ i

IDENTITY AND INTEREST OF *AMICI CURIAE* ........................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................2

ARGUMENT ...................................................................................6

I.   Google's Monopolization Playbook..................................................8

  A.   Mutually Reinforcing Power and Conduct in GSE Products and Other Must-Have Apps ..............................................................8

  B.   Mutually Reinforcing Power and Conduct in the GSE and Local Search Markets ..........................................................10

  C.   Mutually Reinforcing Power and Conduct in the GSE and GenAI Markets 14

  D.   Other Monopoly Playbook Examples .........................................16

II.  The District Court's Remedy Order Appropriately Reaches Beyond the Precise Conduct Found Illegal, But Must Go Further ....................................20

  A.   This Court's Role Is to Ensure that the Remedy Satisfies All Four Required Objectives of an Antitrust Remedy Order ......................................20

  B.   A Payment and Revenue-Sharing Ban for Preferential or Default Treatment of Google's GSE or Preinstallation Is Necessary ........................................23

  C.   Choice Screens for Defaults Are Necessary—for GSEs and GenAI ............24

  D.   Mandatory Syndication and Data Sharing Is Appropriate—In General and As to GenAI Rivals ..............................................25

  E.   Divestiture of Chrome Will Advance the Required Remedial Objectives....26

CONCLUSION ................................................................................28

CERTIFICATE OF COMPLIANCE.................................................................29

**Page(s)**

**Cases**

*Ford Motor Co. v. United States*,
405 U.S. 562 (1972) ................................................................. 23, 26

*Hartford-Empire Co. v. United States*,
323 U.S. 386 (1945) ................................................................. 26, 31

*In re Google Play Store Antitrust Litig.*,
147 F.4th 917 (9th Cir. 2025) .................................... 7, 8, 10, 19, 20

*In re Google Play Store Antitrust Litig.*,
No. 21-md-02981-JD, 2024 U.S. Dist. LEXIS 117988
(N.D. Cal. July 3, 2024) ..................................................................8

*International Boxing Club of N.Y., Inc. v. United States*,
358 U.S. 242 (1959) ............................................................. 26, 27, 31

*National Society of Professional Engineers v. United States*,
435 U.S. 679 (1978) ......................................................................24

*Schine Chain Theatres, Inc. v. United States*,
334 U.S. 110 (1948) ......................................................................25

*Trabert & Hoeffer, Inc. v. Piaget Watch Co.*,
633 F.2d 477 (7th Cir. 1980) ........................................................32

*United States v. E. I. du Pont de Nemours & Co.*,
366 U.S. 316 (1961) ................................................................... 6, 24

*United States v. Google LLC*,
747 F. Supp. 3d 1 (D.D.C. 2024) ............................... 4, 5, 7, 9, 15, 23, 27, 29, 31

*United States v. Google LLC*,
778 F. Supp. 3d 797 (E.D. Va. 2025) ................................... 7, 8, 21, 22

*United States v. Google LLC*,
803 F. Supp. 3d 18 (D.D.C. 2025) ................................ 10, 13, 16, 17, 18, 27, 29

*United States v. Google LLC*,
    No. 20-cv-3010 (APM), 2025 U.S. Dist. LEXIS 251831
     (D.D.C. Dec. 5, 2025) ................................................................. 28, 29, 31

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ...................................................................................24

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ............................................ 6, 16, 23, 30

*United States v. United Shoe Mach. Corp.*,
    391 U.S. 244 (1968) .......................................................... 6, 24, 25, 26

*Warner-Lambert Co. v. FTC*,
    562 F.2d 749 (D.C. Cir. 1977), *cert. denied*, 435 U.S. 950 (1978) ......................24

## Other Authorities

Davey Alba & Julia Love, *Google AI Search Shift Leaves Website Makers Feeling 'Betrayed,'* Bloomberg (April 7, 2025),
    https://www.bloomberg.com/news/articles/2025-04-07/google-ai-search-shift-leaves-website-makers-feeling-betrayed .............................................................13

EverCore ISI, *Alphabet, Inc. GOOGL Earnings Report* (Apr. 29, 2026). ..............16

Danny Goodwin, *Google Zero-Click Searches Hit 68% in Early 2026: Study*,
    Search Engine Land (June 9, 2026), https://tinyurl.com/2p9ns4zc .....................13

Thomas Germain, *Is Google About to Destroy the Web?*, BBC (June 13, 2025),
    https://www.bbc.com/future/article/20250611-ai-mode-is-google-about-to-change-the-internet-forever ...........................................................................13

**IDENTITY AND INTEREST OF *AMICI CURIAE***

*Amici Curiae* the Little Tech Association ("LTA") and Travel Lemming LLC occupy a unique vantage point in this case. Many of LTA's members and Travel Lemming are sources of content or data on which Google's GSE and GenAI products depend. Many of LTA's members also sit at the intersection of Google's general search engine ("GSE") monopoly and the adjacent markets it distorts. Together, *Amici* have experienced multiple facets of Google's monopolization playbook, as described herein—the rent extraction, the monopoly leveraging, and the monopoly reinforcement—in ways no party to this proceeding can describe.

*Amicus Curiae* Travel Lemming publishes travel guides written by human creators with first-hand experience visiting or living in each destination. Travel Lemming invests significant resources and effort into creating, curating, and updating Travel Lemming's library of travel guides. *Amicus Curiae* LTA represents over 200 companies across the tech industry, including those engaged in various GSE-adjacent markets such as local search, travel, and GenAI.

LTA's member companies as well as Travel Lemming serve as the de facto source of substantial valuable data for Google's GSE and GenAI products. Content or links appearing in search results and GenAI responses stem from their hard work and investments. Google would lack GSE results and GenAI answers without this content for which they, and millions of other sources, are responsible.

1

Yet, due to its unlawfully maintained GSE monopoly, Google avoids compensating these companies for this value. Instead, they are forced to pay Google enormous sums or allow Google to scrape their content just to show up in search results. Recently, with GenAI, "AI Overviews," and "AI Mode," Google bypasses these sources of information entirely by effectively stealing content to train GenAI features, republishing it in Google's GenAI products, and foreclosing click-through possibilities. This misappropriation by Google is enabled by its unlawfully maintained GSE monopoly and, if left unchecked, will destroy incentives to produce or source content, leaving little of value for search and GenAI products to return.

Further ill-gotten fruits of Google's GSE monopoly consist of the unfair advantages Google has created for itself by leveraging its GSE monopoly to distort competition in adjacent markets—against the likes of SVPs in local search and in travel, for example. These unfair advantages in adjacent markets are not just ill-gotten fruits. They also reinforce Google's GSE monopoly, and therefore must be eradicated as part of preventing conduct likely to perpetuate the unlawful GSE monopoly.

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Amici Curiae* submit this brief to illustrate the interplay between Google's illegally maintained GSE monopoly and its conduct in related markets,

demonstrating why an effective remedy must extend beyond the GSE market. Google follows a playbook across markets—from GSEs and local search to GenAI, programmatic ad servers, and app stores—using the interactive nature of these markets to reinforce power in each. In so doing, it reaps illegal gains not only from consumers and trading partners in the GSE market, but also from competitors in adjacent markets. Effective relief from this conduct's crushing effects on innovation, quality, and price, and disgorgement of Google's ill-gotten fruits, requires strong, far-reaching relief.

Google's playbook is consistent: it uses its unlawfully maintained GSE monopoly to enrich itself at the expense of its trading partners in the GSE market and gain unfair advantages in adjacent markets (i.e., ill-gotten fruits) and then harvests those advantages to further entrench its GSE monopoly. Each turn of this cycle compounds harm to competitors, trading partners, content creators, and consumers alike. An effective remedy, then, must ensure that Google cannot create or maintain such self-reinforcing monopolies in adjacent markets. Only then can we deny Google its ill-gotten gains and prevent it from leveraging outside positions to reinforce its GSE dominance.

This brief provides unique, real-world illustrations of Google's self-reinforcing monopolization conduct, including from Yelp, a founder and member company of LTA, and Travel Lemming, an online travel publisher. Through these

3

illustrations, *Amici* show why the District Court's remedy is necessary but also woefully insufficient to unfetter the GSE market from Google's monopoly, terminate the monopoly, deny Google the fruits of its antitrust violations, and ensure no practices likely to result in future monopolization remain.

The stakes are existential. As discussed *infra*, Section I.C, in the first four months of 2026, 68% of U.S. Google searches ended without a single click to an external website—up from 60% in 2024—with AI Overviews reducing click-through rates by nearly 60% when they appear. Google's playbook is not theoretical; it is actively destroying the economic viability of the content creators and SVPs whose work Google surfaces.

*Amici* submit that the District Court erred in refusing to prohibit a core category of conduct that the court found to have contributed to Google's GSE monopoly—the payment of "huge sums," on the order of tens of billions of dollars, every year to OEMs and browser manufacturers to make Google Search the default and only preloaded GSE. *United States v. Google LLC*, 747 F. Supp. 3d 1, 32 (D.D.C. 2024) (hereinafter, "*Search Liability*"). Those payments keep competing GSEs on the sidelines. The District Court improperly elevated the interests of third parties receiving those payments over every other third party suffering from Google's abuse of monopoly power. If Google's payments-to-exclude continue, the lifeblood of the Internet—those responsible for the content Google surfaces—may

not. The District Court erred by preferencing the short-term financial interests of third parties who are effectively complicit in the unlawful conduct, over the Supreme Court's mandated antitrust remedial objectives.

For similar reasons, although Plaintiffs have not appealed this aspect of the court's remedy order, *Amici* submit the District Court erred by not requiring choice screens. Consumers have grown accustomed to using whatever browser and search engine comes with their device; Google would not have paid so much for default placement were this not the market reality. *See id.* at 160. The court was required to go beyond prohibiting exclusive dealing and default payments. To unfetter the market from years of monopoly conditioning, an effective remedy must un-condition consumers by making the default a choice.

As for the forced data sharing and search index syndication the court ordered, it was well grounded in factual findings of unlawful monopoly maintenance and properly extends to GenAI providers. Indeed, Google itself concedes that a remedy extending outside the relevant market is proper if "aiding [providers] *outside* of the [relevant] market would help create conditions in which rival [GSE providers] could compete with [Google] *inside* that market." Google Br. 96 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 59-60 (D.C. Cir. 2001)). This is precisely the kind of remedy that is necessary to address Google's use of

monopoly power in one market to create unfair advantages in adjacent markets, which reinforce its monopoly in the first market.

Finally, while recognizing that Plaintiffs have also not appealed this aspect of the remedy ordered below, *Amici* respectfully submit the Court dispensed with the Government's requested divestiture of Chrome too hastily and superficially. Structural relief—"immediate dissolution or divestiture," *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 251 (1968)—is the presumptive and "most important" remedy, for the simple reason that it is "simple, relatively easy to administer, and sure." *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 331 (1961). Here, the divestiture of Chrome is simple and straightforward— there is nothing to monitor or revisit—and its predicted results are clear and undisputable: the owner of one of the most popular browsers in the market will have no temptation to self-preference Google's own GSE. Paired with bans on payments for default placement and exclusivity agreements and mandatory choice screens, a Chrome divestiture would almost instantaneously and drastically improve the competitiveness of the GSE market.

## ARGUMENT

"Google is a monopolist." *Search Liability*, 747 F. Supp. 3d at 32. Courts have found, over and over, that Google has monopolized numerous relevant markets in which it competes. *See id.* (Google monopolized GSE and search text

ads markets); *United States v. Google LLC*, 778 F. Supp. 3d 797, 810 (E.D. Va. 2025) (hereinafter, "*AdTech*") (publisher ad server and open-web display ad exchange markets); *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 930 (9th Cir. 2025) (hereinafter, "*Play Store Appeal*") (Android app distribution and Android in-app billing services markets).

Courts have also found—over and over, including in this case—that Google monopolizes markets by using its market or monopoly power in one market to create market power or unlawful advantages for itself in one or more related markets. Google then uses the unlawfully acquired power in the related market to maintain or expand its dominance in the first market. *See, e.g.*, *AdTech*, 778 F. Supp. 3d at 825-26 (Google leveraged its ad server monopoly to distort competition in the ad exchange market and used the "singularly powerful source of digital advertising demand" flowing through its ad exchange product to illegally maintain its ad server monopoly); *Play Store Appeal*, 147 F.4th at 932, and *In re Google Play Store Antitrust Litig.*, No. 21-md-02981-JD, 2024 U.S. Dist. LEXIS 117988, at *101, *107 (N.D. Cal. July 3, 2024) (Google unlawfully obtained Google Play Store monopoly in Android app distribution market and then used that app distribution monopoly to monopolize the Android in-app billing services market, yielding monopoly rents it used to reinforce its Play Store monopoly).

The remedy in this case must take account of this playbook, in which Google monopolizes a market, leverages that monopoly to distort competition to its own advantage in a second market, and then uses its artificial advantages in the second market to reinforce its unlawful monopoly in the first market.

## I.     Google's Monopolization Playbook

Google deploys its playbook across multiple markets, as the following examples illustrate.

### A.     Mutually Reinforcing Power and Conduct in GSE Products and Other Must-Have Apps

As the District Court in this case found, Google secured its GSE monopoly in part by requiring Android OEMs—if they wanted to distribute essential Google apps and the Google Play Store—to distribute Google Search and Chrome and make them the default and in some cases non-deletable apps. *See Search Liability*, 747 F. Supp. 3d at 98, 150. As Judge Mehta explained, these Mobile Application Distribution Agreements ("MADAs") "resulted in . . . all Android devices featuring the Google Search Widget and Chrome on the home screen to the exclusion of rivals as a practical matter. . . . These prized placements are extremely effective at driving searches to Google." *Id.* at 150. In turn, Google requires those same OEMs for whom Chrome and Google Search have become must-have, to distribute Google's other mobile apps and the Play Store. *Id.*

Google's MADAs create a self-reinforcing monopolization feedback loop between Google's GSE monopoly and its dominance in these essential apps. Through this conduct, Google leapfrogs from dominance in one market to monopoly in another, and back again. As Judge Mehta put it, "Google . . . used illegal restraints to maintain its monopoly. It was 'not entitled to maintain and magnify' the relevant network effects by entrenching its dominance through anticompetitive conduct.'" *United States v. Google LLC*, 803 F. Supp. 3d 18, 78 (D.D.C. 2025) (hereinafter, "*Search Remedy*") (quoting *Play Store Appeal*, 147 F.4th at 949).

Google implicitly recognized the two-way, mutually reinforcing effects of its conduct within and outside of the GSE market when it proposed that the District Court's remedy "bar conditioning the licensing of Search, Chrome, or Google Play on an OEM also preloading or distributing the Google Assistant Application or the Gemini app." *Id.* at 94. The conduct the court found unlawful was Google's conditioning distribution of Google Play and other software on Search and Chrome distribution—not the other way around. But Google recognizes that its GSE monopoly can reinforce monopolies in adjacent markets which in turn reinforce Google's GSE dominance. Because of these dynamics, a ban on conditioning distribution of Google's GSE products on distribution of related products prevents further entrenchment of its GSE monopoly.

**B.** **Mutually Reinforcing Power and Conduct in the GSE and Local Search Markets**

Google uses this same playbook with respect to its GSE monopoly and local search. As LTA's SVP members have experienced, Google ties its local search product to its GSE via policy, practice, and contract, distorting local search competition—despite historically lagging quality. Google then uses its advantages derived from its distortion of local search competition to reinforce its GSE monopoly. By hoarding traffic and advertising dollars, Google's conduct benefits its GSE enterprises and increases its monopoly power.

Google's GSE operates alongside SVPs—platforms users seek out for answers within specific subject areas. SVPs return focused, helpful results using proprietary, structured data unavailable elsewhere and made possible through sustained investment. On SVPs such as Yelp, for example, consumers share and learn from varied local content, including detailed reviews and photos of local business offerings. In turn, local businesses providing exceptional service can establish and promote themselves, including by advertising. These advertising revenues allow SVPs to invest in their platforms.

As early as 2005, Google felt threatened by SVPs providing specialized search results and proprietary data that attract traffic away from Google. To address this threat, Google leveraged its GSE dominance to keep users within its confines—hoarding traffic and advertising dollars, suppressing competition,

appropriating SVPs' content, and limiting outbound clicks from its product ecosystem.

For example, Google tied its local search product to its GSE—coercing consumers of Google's GSE to consume Google's local search product, to the exclusion of Google's local search competitors. Google also started (surreptitiously) "scraping" data from various sources, populating its Google Places pages for local businesses with ratings and reviews lifted directly from those other sites. SVPs complained about Google's scraping, but Google offered a Hobson's choice: allow content to be included in Google's properties and products, or be excluded from the Google search engine results page ("SERP") altogether. Some SVPs, for example Yelp, were eventually successful in lobbying to remain in Google's organic search results despite not consenting to Google using their content without a license. But by then, Google had already directed enough users to its own local search product using stolen content and its GSE monopoly, effectively anointing itself with the virtually singular entitlement to monetize its products online.

Recently, Google has taken its misappropriation of content and diversion of traffic from SVPs to an unprecedented next level. As discussed further *infra*, Section I.C, in May 2024, Google launched "AI Overviews" in the United States. AI-generated summaries now appear at the top of the SERP for many local queries

(e.g., "best pizza in San Jose"). These often pull from Google's own review data, maps, and profiles—cutting traffic to SVPs (and other sources of valuable content) even further. *See Search Remedy*, 803 F. Supp. 3d at 47.

More recently still, Google "integrated a new GenAI feature in Search called 'AI Mode.'" *Id.* at 47:



In AI Mode, Google returns a GenAI chatbot interface with an "answer" to the search query. Paid and organic search results are hidden and can only be accessed by clicking a small, greyed-out "All" text box.

Recent research shows that these latest, GenAI incarnations of Google's playbook are further threatening the viability of SVPs—as well as publishers like Travel Lemming—who must have click-throughs to support their innovations and contributions to the Internet. For example, in the first four months of 2026, U.S. Google searches ended without a click 68.01% of the time, up from 60.45% in

12

2024.[1] The study designer "believes AI Overviews are likely contributing to the increase in zero-click searches," based on a finding that when AI Overviews appear on Google searches, "click-through rates drop by nearly 60%."[2] By stealing content from businesses responsible for that content, promoting that content as its own, and de-promoting links to SVPs' and publishers' properties, Google in one fell swoop hoards traffic and advertising dollars benefitting its GSE monopoly, disincentivizes investment and innovation, and prevents SVPs from scaling. Consumers are harmed by reduced competitive investment and lower-quality search results—and eventually, less valuable content online.[3]

In short, Google's conduct with respect to SVPs in adjacent markets exemplifies its monopolize-leverage-reinforce playbook. *See Search Liability*, 747 F. Supp. 3d at 31-32. The unfair advantages Google begets in local search are the fruit of its continuing monopoly maintenance in the GSE market—plucked from

---

[1] *See* Danny Goodwin, *Google Zero-Click Searches Hit 68% in Early 2026: Study*, Search Engine Land (June 9, 2026), https://tinyurl.com/2p9ns4zc.
[2] *Id.*
[3] *See* Davey Alba & Julia Love, *Google AI Search Shift Leaves Website Makers Feeling 'Betrayed,'* Bloomberg (April 7, 2025), https://www.bloomberg.com/news/articles/2025-04-07/google-ai-search-shift-leaves-website-makers-feeling-betrayed (publishers "have to either shut down or reinvent their distribution strategy, a cycle experts say could eventually degrade the quality of information" online"); Thomas Germain, *Is Google About to Destroy the Web?*, BBC (June 13, 2025), https://www.bbc.com/future/article/20250611-ai-mode-is-google-about-to-change-the-internet-forever (AI Mode "will severely cut into the main source of revenue for most publishers and it will disincentivise content creators.").

the hands of SVPs—and a means by which Google continues to maintain its GSE monopoly.

### C. Mutually Reinforcing Power and Conduct in the GSE and GenAI Markets

True to its monopolize-leverage-reinforce playbook, Google weaponizes its GSE monopoly to stifle independent AI innovation—and then uses its resulting, emerging GenAI dominance to funnel users back through Google Search and Google's other products, compounding its advantages at every node.

Crucially, this Court need not take a position on the precise market relationship between GSEs and GenAI products in order to bless remedies that extend to GenAI. Regardless of whether GenAI is considered in the same or an adjacent market as GSEs, Google uses its GSE dominance to advantage and artificially favor its own GenAI products, which further reinforces Google's GSE monopoly. A remedy that addresses Google's emerging dominance in GenAI, then, fits precisely with the required remedial objectives with respect to the GSE market. *See Microsoft*, 253 F.3d at 103.

Google leverages its massive GSE monopoly to make Google's GenAI products, like AI Overview, the default for Google Search users. *See Search Remedy*, 803 F. Supp. 3d at 92. As Google steers more consumers to its own GenAI products, it amasses even more data from those GenAI queries, which it can use to further advantage not only its GenAI products but also its *GSE*. As the

14

District Court explained, "[g]reater query volume . . . yields greater user data, or 'scale.' . . . This interplay . . . creates a positive feedback loop." *Id.* at 84; *see id.* at 86-87. The District Court explicitly found—consistent with *Amici Curiae*'s experience—that "AI Overviews has potentially strengthened Google's position in the GSE market." *Id.* at 59. This is at least in part because AI Overviews and AI Mode allow Google to keep users within its ecosystem—preventing click-throughs to the original sources of the content—which further compounds Google's data advantage.

Indeed, Google gains an immense GenAI product advantage over its competitors by leveraging its GSE monopoly to force publishers like Travel Lemming to provide content for Google's AI products. As discussed, Google presents publishers with a Hobson's choice: allow Google to scrape your content to feed Google's GenAI products, or disappear from Google search results. *See Search Remedy*, 803 F. Supp. 3d at 150-51. Thus, while publishers like Travel Lemming block other GenAI products like ChatGPT, Claude, and Perplexity from grounding in their content, they are forced to allow Google's GenAI products to do so. In this way, Google leverages its GSE monopoly to gain an advantage over its GenAI rivals, which feeds back into Google's GSE monopoly via scale and exclusive access to data.

Moreover, Google can use its GenAI products to steer users to Google "Search with respect to commercial queries to monetize on the ads served on Search." *Id.* at 60. Indeed, a recent financial analyst report observed that Google's "Search Revenue grew 19% Y[ear] [over] Y[ear] (highest in at least 4 years) to $60.4B, with m[ana]g[e]m[e]t[] emphasizing that AI is proving expansionary rather than cannibalizing the franchise. Queries are at an all-time high, with AI Overviews and AI Mode driving incremental usage."[4] Critically, when AI Mode kicks users back to Google Search for commercial queries, it can monetize Internet users in a way that no other GenAI company can, hoarding dollars, data, and scale that just compound its GSE dominance. Through this kicking-to-Google-Search, Google also funnels users directly into Google products, rather than allowing SVPs to compete. This self-preferencing loop compounds Google's advantages at every node. SVPs like Yelp, which historically competed for these commercial queries, are bypassed entirely, leaving consumers with only Google's historically inferior, self-serving content rather than the independent, expert-curated content SVPs provide. The pattern is the same: monopolize, leverage, reinforce.

### D. Other Monopoly Playbook Examples

Other examples of Google's self-reinforcing monopoly playbook abound.

---

[4] EverCore ISI, *Alphabet, Inc. GOOGL Earnings Report* at 2 (Apr. 29, 2026).

***Google Play Store.*** Google's systematic leveraging is illustrated by the Android mobile ecosystem, where a jury found and court of appeals affirmed that Google utilized its ownership of the Android operating system to entrench the Google Play Store and monopolize in-app payment transactions. Specifically, Google used its MADA to compel OEMs to preinstall the Play Store on the default home screen. *Play Store Appeal*, 147 F.4th at 931. Google also entered into exclusive revenue-sharing agreements ("RSAs") with manufacturers and game developers, paying them to refrain from distributing or launching on rival app stores, or from entering the app store market themselves. *Id.* at 932. Google also engineered the Android operating system to implement artificial technical hurdles to users accessing apps from outside the Google Play Store. *Id.* at 931. Through this layered leveraging of software and contracts, Google insulated the Play Store from competitive forces, capturing 95% of all domestic Android app downloads by 2020. *Id.* at 932.

Once Google successfully cemented its monopoly in app distribution, it leveraged that dominance into the market of Android in-app billing services. *Id.* Google forced developers to utilize Google Play Billing exclusively, pocketing a 30% commission on transactions. This arrangement capitalized on the two-sided network effects Google cultivated, resulting in a 71% operating profit for the Play Store by 2021. *Id.*

The Ninth Circuit affirmed the jury's verdict that this conduct constituted monopolization of the Android app distribution and in-app payment services markets and upheld the district court's three-year permanent injunction to curtail these activities. *Id.* at 958; *see id.* at 947. Critically, the Ninth Circuit affirmed a prohibition preventing "Google from sharing Play Store revenue with actual or prospective entrants in the Android app-distribution market, just as Google earlier sought to compensate Samsung . . . to '[p]revent unnecessary competition between the Samsung Galaxy Store and Play Store.'" *Id.* at 945. In other words, the remedy appropriately prohibited Google from deploying the monopoly rents it collected through its in-app payment services to further reinforce its Play Store monopoly.

***Ad Tech.*** Google has deployed the same playbook in connection with programmatic advertising technology, which matches publisher inventory with advertisers seeking to place advertisements:



Last year, a district court found that Google used its monopoly power in the market for publisher ad servers—the technology that runs auctions in which ad exchanges

compete to fill ad space on a publisher's website and that displays or "serves" the winning ad—to harm competition and maintain its illegal dominance in the market for ad exchanges. In turn, Google used its unlawfully acquired dominance in the market for ad exchanges—which run precursor auctions among ad networks and demand-side platforms ("DSPs") and then compete against other ad exchanges to win the final auction run by the publisher ad server—to further entrench its ad server monopoly. *See AdTech*, 778 F. Supp. 3d at 826.

This web of conduct, in at least two separate but related markets, created immediate harm in each market that reverberated in the other. Google implemented "restrictions that prohibited publishers from receiving real-time bids from AdX [Google's ad exchange] (the tying product) unless they also used DFP [Google's ad server] (the tied product)." *Id.* at 860. This entrenched Google's ad server as "the dominant publisher ad server for open-web display advertising." *Id.* Google then used its market power in the ad server market to "artificially advantag[e] AdX [Google's ad exchange product]," cementing Google's dominance in the ad exchange market. *Id.* at 864. Once again: monopolize, leverage, reinforce.

As in this case, Google's playbook was successful in ad tech in part because it gave Google a data advantage. *Id.* at 827. For example, by using its ad server monopoly to self-preference or artificially advantage its ad exchange product, Google "'made it difficult' for other exchanges 'to compete on a level playing field

19

with AdX,'" which both "provid[ed] a revenue advantage" to Google and "gave Google a data advantage that helped the [Google ad exchange] team train its auction bidding models more effectively." *Id.*; *see id.* at 832. This is analogous to the massive data advantage Google obtained in the GSE market through its unlawful conduct—a data advantage Google can use as it pleases, whether to entrench its GSE monopoly, to prop up its GenAI products, or to charge advertisers higher rents so as to make even larger payments to OEMs and browsers for default placement. *Search Liability*, 747 F. Supp. 3d at 49-52.

## II.     The District Court's Remedy Order Appropriately Reaches Beyond the Precise Conduct Found Illegal, But Must Go Further

The foregoing examples of Google's demonstrated pattern of cross-market leveraging serve as a cautionary tale when evaluating whether the remedy ordered by the District Court meets all four required objectives.

### A.     This Court's Role Is to Ensure that the Remedy Satisfies All Four Required Objectives of an Antitrust Remedy Order

"The Supreme Court has explained that a remedies decree in an antitrust case must seek to [1] 'unfetter a market from anticompetitive conduct,' . . . to [2] 'terminate the illegal monopoly, [3] deny to the defendant the fruits of its statutory violation, and [4] ensure that there remain no practices likely to result in monopolization in the future.'" *Microsoft*, 253 F.3d at 103 (quoting *Ford Motor Co. v. United States*, 405 U.S. 562, 577 (1972), and *United Shoe*, 391 U.S. at 250

20

(1968), and citing *United States v. Grinnell Corp.*, 384 U.S. 563, 577 (1966)). The appellate role is "to be *sure* that a decree is fashioned which will *effectively redress* proved violations of the antitrust laws." *E. I. du Pont*, 366 U.S. at 323 (emphases added). An effective remedy cannot be confined to a mere cessation of the unlawful conduct. *See Warner-Lambert Co. v. FTC*, 562 F.2d 749, 761 n.60 (D.C. Cir. 1977), *cert. denied*, 435 U.S. 950 (1978).

First, the remedy must clear away barriers to entry and facilitate access for competitors. For example, in *National Society of Professional Engineers v. United States*, the Supreme Court upheld an injunction that went beyond enjoining the specific anticompetitive conduct and banned the defendant from adopting any ethical rule or policy statement restricting competitive bidding. 435 U.S. 679, 696-97 (1978).

Second, where a persistent monopoly structure cannot be dismantled by behavioral prohibitions alone, courts must deploy structural remedies. This principle was applied in *United Shoe*, where the Supreme Court held that behavioral restrictions previously ordered had failed to erode the defendant's monopoly, requiring modification of the decree to order structural relief. 391 U.S. at 250-52.

Third, the remedy must strip the monopolist of the benefits and advantages it gained through its illegal conduct to prevent it from retaining an enduring edge

over rivals—and here again, a structural remedy can be appropriate to adequately achieve this mandatory objective. "[T]o require divestiture . . . is not to add to the penalties that Congress has provided in the antitrust laws. Like restitution it merely deprives a defendant of the gains from his wrongful conduct." *Schine Chain Theatres, Inc. v. United States*, 334 U.S. 110, 128 (1948).

Finally, the court must craft the decree to "ensure that there remain no practices likely to result in monopolization in the future." *United Shoe*, 391 U.S. at 250. In appropriate circumstances, this means the court must order behavioral remedies beyond enjoining the precise conduct found to have violated the law, to prevent perpetuation of the monopoly. *See Hartford-Empire Co. v. United States*, 323 U.S. 386, 409 (1945); *Ford Motor*, 405 U.S. at 576.

For example, in *International Boxing Club of N.Y., Inc. v. United States*, the Supreme Court affirmed a decree requiring the defendants to divest their ownership interests in Madison Square Garden, even though "the stock . . . was not acquired pursuant to the conspiracy, was not the fruit of illegal activity and was not proven to be the lever by which Madison Square Garden was persuaded to join the conspiracy." 358 U.S. 242, 255-56 (1959).  It was sufficient to justify the divestiture order that the defendants had, and may have otherwise continued to, "utilize[]" Madison Square Garden "to effect [their ends]" to monopolize the relevant markets.  *Id.* at 256. Although the district court's restrictions "went beyond

the 'relevant market,'" the Court nonetheless upheld the decree, reasoning that "until the effects of the conspiracy are fully dissipated," the district court can deploy "broader" relief to ensure that the defendant cannot continue to use its "decided advantage" against "the independent [competitor]." *Id.* at 262.

While the remedies ordered by the District Court were necessary, they were not at all sufficient to meet these required remedial objectives.

## B. A Payment and Revenue-Sharing Ban for Preferential or Default Treatment of Google's GSE or Preinstallation Is Necessary

The District Court erred in declining to enjoin Google from paying partners for setting Google as the default GSE or for preferential placement and preinstallation of Google's apps. After all, this was core conduct the Court found to have illegally cemented Google's GSE monopoly. *Search Liability*, 747 F. Supp. 3d at 159; *see also Search Remedy*, 803 F. Supp. 3d at 103. The District Court rested its decision almost entirely on its concern for third parties receiving these payments, including Apple—one of the largest multinational corporations in the world. *Search Remedy*, 803 F. Supp. 3d at 102-07; *see United States v. Google LLC*, No. 20-cv-3010 (APM), 2025 U.S. Dist. LEXIS 251831, at *33 (D.D.C. Dec. 5, 2025). Respectfully, the Court erred by prioritizing these third parties above millions of customers, sources of valuable content such as SVPs and publishers, and sidelined GSEs. While considering third-party impacts in crafting remedies is

proper, the court must remain faithful to the four remedial objectives, not subjugate them to special interests.

The court cannot unfetter the market and ensure no unlawful practices remain without, at a minimum, stopping the conduct that violated the Sherman Act. Only then will Google cease overcharging search advertisers; stealing original content from SVPs and creators, including members of LTA and Travel Lemming, and pawning it off as its own; denying them the click-throughs needed to fund investments, thereby destroying their ability and incentive to create; and leveraging its GSE monopoly to distort adjacent markets like local search and GenAI— distortions that only reinforce Google's GSE monopoly.

C.     **Choice Screens for Defaults Are Necessary—for GSEs and GenAI**

Choice screens are also required for any remedy to be effective, which will help reduce consumer bias in favor of Google acquired through its years of unlawful monopolization. *Search Liability*, 747 F. Supp. 3d at 45-46; *Search Remedy*, 803 F. Supp. 3d at 141. Choice screens, properly designed without a default option, will serve all of the required remedial objectives. For example, SVPs could compete to provide services such as local search or travel search, allowing consumers to elect to use search services more tailored to their specific search activity, and enabling SVPs to gain scale. After years in which defaults were the default, it is imperative that *choice* now be made the default.

**D.    Mandatory Syndication and Data Sharing Is Appropriate—In General and As to GenAI Rivals**

Data sharing and syndication are also well-supported by the record below. As the District Court found, Google acquired a massive scale advantage in part because its exclusive distribution agreements enable it to see far more queries than any of its rivals. *Search Liability*, 747 F. Supp. 3d at 49-50. "Those queries gave Google data that helped improve the quality of Search, which in turn attracted more users and improved monetization, reinforcing the flywheel of network effects that entrenched Google's monopoly." *United States v. Google LLC*, No. 20-cv-3010 (APM), 2025 U.S. Dist. LEXIS 251831, at *73-74 (D.D.C. Dec. 5, 2025). The scale of Google's acquired data is a fruit of its unlawful monopoly and thus it was proper for the District Court to eliminate the competitive benefits Google enjoys as a result of this scale.

Although Google maintains that the District Court's extension of its data-sharing and forced syndication remedy to GenAI providers was improper, it is forced to admit that a remedy extending outside the relevant market is proper if "aiding [providers] *outside* of the [relevant] market would help create conditions in which rival [GSEs] could compete with [Google] *inside* that market." Google Br. 96 (quoting *Microsoft*, 253 F.3d at 59-60). As *Amici Curiae* have explained, there is a clear "link" here between the remedy as extended to GenAI, and "restoring competition inside the market that [Google] ha[s] monopolized." *Id.* Already,

Google is using its unlawful GSE monopoly to advantage its GenAI products, begetting further data advantages and scale that reinforce Google's GSE monopoly. *See supra* Section I.C. Enabling competitive conditions for GenAI is essential to unfettering the GSE market from Google's monopolistic grip.

Moreover, Google's emerging dominance in GenAI is the fruit of its unlawful GSE monopoly maintenance. *See supra* Section I.C. For that independent reason, syndication of the GSE index and user-side data to GenAI rivals was justified.

### E. Divestiture of Chrome Will Advance the Required Remedial Objectives

The failure of the District Court's remedy order to satisfy the objectives mandated by the Supreme Court further results from its rejection of the proposed divestiture of Chrome. True, Google did not unlawfully acquire Chrome. But the relevant question is how Google uses Chrome to perpetuate its monopoly. As with the interests ordered divested in *International Boxing Club* and *Hartford-Empire*, Chrome was an essential instrument in Google's monopolization scheme. *See Search Liability*, 747 F. Supp. 3d at 150, 160.

Moreover, Chrome is the centerpiece of Google's scheme to leverage its massive GSE monopoly to effectively make Google's GenAI products the default for users of Google Search. Gemini is the only preloaded GenAI application in Chrome. *See United States v. Google LLC*, No. 20-cv-3010 (APM), ECF No. 1402

26

(Rem. Tr.), at 1645:1-1647:10 (Apr. 25, 2025). Just as with search defaults, users can manually set other options, but the process is cumbersome. *Id.* Retaining Chrome will allow Google to continue to leverage its unlawful GSE monopoly to drive engagement with Gemini, which in turn will provide valuable data Google will use to further entrench its GSE monopoly.

Chrome's divestiture will open the market for other GSE competitors to be the default on Chrome, sparking a new opportunity for GSE competitors, while also preventing Google from misusing its ownership of Chrome to circumvent the District Court's Final Judgment. *See Trabert & Hoeffer, Inc. v. Piaget Watch Co.*, 633 F.2d 477, 485 (7th Cir. 1980) (without divestiture, ability and incentive to use the asset to "covertly achieve their unlawful purposes" will remain).

An effective remedy will create robust competition with Google's GSE from multiple GSEs. With no single dominant GSE, providers will compete to secure the best data by offering market-rate commercial terms for the right to use that content. Google will be forced by market dynamics to match those competitive terms. In other words, prying open the GSE market to competition will ensure that publishers and SVPs will be heavily incentivized to innovate and create superior web content because they will finally be fairly compensated for their investments. This is the true promise of an effective remedy in this case—an Internet filled with valuable content for Google's products to index and surface for users.

**CONCLUSION**

Google's monopolize-leverage-reinforce playbook has enabled it to hoard ill-gotten gains belonging in no small part to publishers and SVPs who are responsible for actually sourcing or creating the valuable content that Google synthesizes and surfaces. This interplay between Google's power and conduct in the GSE market and adjacent markets dictates an assertive remedy that corrects for years of network effects, self-reinforcing monopolization, and user conditioning. Only then will the conditions exist to restore the Internet to its original promise, for the benefit of competition, access to information, and society at large.

Dated: August 4, 2026

Catherine S. Simonsen
Andrew Naravage
**SIMONSEN SUSSMAN LLP**
418 Bamboo Lane, Suite C-18
Los Angeles, California 90012
(917) 747-5196
catherine@simonsensussman.com
andrew.naravage@simonsensussman.com

Shaoul Sussman
**SIMONSEN SUSSMAN LLP**
307 West 38th Street, 16th Floor
New York, NY 10018
(718) 510-5495
shaoul@simonsensussman.com

*On the Brief*

/s/ Nicolas A. Stebinger
Nicolas A. Stebinger
**SIMONSEN SUSSMAN LLP**
1629 K Street NW, Suite 300
Washington, DC 20006
(202) 384-3130
nicolas@simonsensussman.com

*Counsel for* Amici Curiae *Little Tech Association and Travel Lemming LLC*

# CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief contains 6,474 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman. I certify that this brief is an *amicus* brief and complies with the word limit of Fed. R. App. P. 29(a)(5).

Dated: August 4, 2026

/s/ Nicolas A. Stebinger
Nicolas A. Stebinger

**CERTIFICATE OF SERVICE**

I, Nicolas A. Stebinger, certify that on August 4, 2026, the foregoing

document was filed with the Clerk of the Court for the United States Court of

Appeals for the D.C. Circuit and served on all parties or their counsel of record

through the CM/ECF system.


Dated: August 4, 2026

/s/ Nicolas A. Stebinger<br>Nicolas A. Stebinger