**No. 26-5023**

**(Consolidated with Nos. 26-5047, 26-5049)**

---

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————

UNITED STATES OF AMERICA, ET AL.,
*Plaintiffs-Appellees-Cross-Appellants*,

v.

GOOGLE LLC,
*Defendant-Appellant-Cross-Appellee*.

———————

On Appeal from the United States District Court for the District of Columbia,
Nos. 20-cv-3010 & 20-cv-3715
Hon. Amit P. Mehta

———————

**BRIEF OF THE AMERICAN ANTITRUST INSTITUTE (AAI)
AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES-
CROSS-APPELLANTS SEEKING AFFIRMANCE IN PART AND
REVERSAL IN PART**

———————

RANDY STUTZ
   *Counsel of Record*
KATHLEEN BRADISH
1025 Connecticut Avenue, NW
Suite 1000
Washington, D.C. 20036
(202) 905-5420
rstutz@antitrustinstitute.org

*Counsel for Amicus Curiae*

August 4, 2026

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), amicus curiae certifies as follows:

**A. Parties and Amici Curiae**

Except for the following, all parties, intervenors, and amici appearing before the district court and in this court are identified in the Brief for Plaintiffs-Appellees-Cross-Appellants:

The American Antitrust Institute (AAI)

**B. Rulings Under Review**

References to the rulings at issue appear in the Brief for Plaintiffs-Appellees-Cross-Appellants.

**C. Related Cases**

The cases now pending before this Court were not previously before this Court or any other court. Counsel is not aware of any related case pending before this Court or any court besides those identified in the Brief for Plaintiffs-Appellees-Cross-Appellants.

                                    */s/ Randy Stutz*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Appellate Rule 26.1(a), the American Antitrust Institute states that it is a nonprofit, non-stock corporation. It has no parent corporations, and no publicly traded corporations have an ownership interest in it.

*/s/ Randy Stutz*

ii

**TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ...........i

CORPORATE DISCLOSURE STATEMENT ........................................................ii

TABLE OF CONTENTS ....................................................................................iii

TABLE OF AUTHORITIES ...............................................................................iv

INTEREST OF AMICUS CURIAE ....................................................................1

SUMMARY OF ARGUMENT .......................................................................... 1

ARGUMENT .....................................................................................................5

I.    Google's Proposed Exclusionary-Conduct Standard Is Erroneous............5

      A.    Google's Standard Contravenes Binding Precedent. ......................8

      B.    Google's Standard Contravenes the Consumer-Welfare Purpose
            of the Sherman Act. ....................................................................17

            1.    Google's Standard Warps the Balance of Error Costs.........17

            2.    Google's Standard Applies the Lightest Touch to the Most
                  Entrenched Monopolists......................................................19

            3.    Google's Standard Ignores the Harm of Deterred Entry
                  and Investment...................................................................20

II.   The District Court's Remedy Violates the Cardinal Rule of Antitrust
      Remedies: Effectiveness Must Come First. ...........................................22

      A.    Antitrust Remedial Discretion Is Bounded by Two Distinct
            Requirements ...............................................................................22

      B.    The District Court Erred by Permitting Google's Payment-For-
            Default Mechanism to Persist......................................................24

CONCLUSION ...............................................................................................29

CERTIFICATE REGARDING SEPARATE BRIEF.......................................C-1

CERTIFICATE OF COMPLIANCE..............................................................C-2

CERTIFICATE OF SERVICE.......................................................................C-3

# TABLE OF AUTHORITIES

**Cases**

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988)..........15

*Am. Tobacco Co. v. United States*, 328 U.S. 781 (1946)...................................20

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).........10

*Avins v. White*, 627 F.2d 637 (3d Cir. 1980) ......................................................12

*California Dental Ass'n v. FTC*, 526 U.S. 756 (1999) ......................................13

*Cont'l T.V. v. GTE Sylvania*, 433 U.S. 36 (1977) ....................................2, 23, 26

*Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451 (1992). ..14, 19, 20

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972).....................................22

*FTC v. Actavis, Inc.*, 570 U.S. 136 (2013)...........................................................4

*Int'l Salt Co. v. United States*, 332 U.S. 392 (1947) ...................................22, 23

*Keepseagle v. Perdue*, 856 F.3d 1039 (D.C. Cir. 2017).......................................9

*Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004)..................23

*N. Pac. Ry. Co. v. United States*, 356 U.S. 1 (1958)............................................7

*National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978).....6, 7, 22

*Nynex v. Discon*, 525 U.S. 128 (1998) ....................................................6, 7, 14

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) ................18

*Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008) ......................7, 9, 12, 13, 14

*Schine Chain Theatres, Inc. v. United States*, 334 U.S. 110 (1948)...................23

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993)................................17

*United States v. Aluminum Co. of Am.*, 148 F.2d 416 (2d Cir. 1945) ................20

*United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961).......22, 26

*United States v. Griffith*, 334 U.S. 100 (1948) ..................................................19

*United States v. Grinnell*, 384 U.S. 563 (1966)..................................................10

*United States v. Microsoft*, 253 F.3d 34
 (D.C. Cir. 2001).............................. 8, 11, 16, 19, 21, 22, 23, 25

*United States v. U.S. Gypsum Co.*, 340 U.S. 76 (1950)..............................22, 23

*United States v. United Shoe Mach. Corp.*, 391 U.S. 244 (1968) ..........22, 23, 28

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko*,
 540 U.S. 389 (2004)................................................................14

## Other Authorities

3 Phillip Areeda & Donald F. Turner, *Antitrust Law* (1978) ..............................10

Erik Hovenkamp & A. Douglas Melamed, *Antitrust Analysis of Search Engine
 Defaults*, Antitrust L.J. (forthcoming) (manuscript at 46), *available at*
 https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5717762...15, 20, 21

Jonathan B. Baker, *Taking the Error Out of "Error Cost" Analysis: What's
 Wrong with Antitrust's Right*, 80 Antitrust L.J. 1 (2015)....................18, 19

Richard A. Posner, *Antitrust Law: An Economic Perspective* (1976) ..................6

Richard A. Posner, *Antitrust Policy and the Supreme Court: An Analysis of the
 Restricted Distribution, Horizontal Merger and Potential Competition
 Decisions*, 75 Colum. L. Rev. 282 (1975)...................................................3

Richard J. Gilbert & David M.G. Newbery, *Preemptive Patenting and the
 Persistence of Monopoly*, 72 Am. Econ. Rev. 514 (1982). ......................21

Robert L. Steiner, *Vertical Competition, Horizontal Competition, and Market
 Power*, 53 Antitrust Bull. 251 (2008)........................................................2

Stigler Comm. on Digital Platforms, *Final Report* (2019),
 https://www.chicagobooth.edu/-/media/research/stigler/pdfs/digital-
 platforms---committee-report---stigler-center.pdf ...................................18

Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion:
 Raising Rivals' Costs to Achieve Power over Price,* 96 Yale L.J. 209
 (1986).........................................................................................................21

## INTEREST OF AMICUS CURIAE[1]

The American Antitrust Institute ("AAI") is an independent nonprofit organization devoted to promoting competition that protects consumers, businesses, and society. It serves the public through research, education, and advocacy on the benefits of competition and the use of antitrust enforcement as a vital component of national and international competition policy. AAI enjoys the input of an Advisory Board that consists of over 130 prominent antitrust lawyers, law professors, economists, and business leaders. See http://www.antitrustinstitute.org.[2]

## SUMMARY OF ARGUMENT

This landmark antitrust case presents recurring questions about the meaning of exclusionary conduct under Section 2 of the Sherman Act and what courts should do about it. After a nine-week bench trial, the district court found that Google entered exclusive revenue sharing arrangements with partner firms that distribute search services to users. The court found further that the arrangements, which conditioned revenue sharing on exclusive status as the distributor's default search engine, foreclosed a substantial share of the market,

---

[1] All parties have consented to the filing of this amicus brief. No counsel for a party has authored this brief in whole or in part, and no party, party's counsel, or any other person—other than amicus curiae or its counsel—has contributed money that was intended to fund preparing or submitting this brief.
[2] Individual views of members of AAI's Board of Directors or Advisory Board may differ from AAI's positions.

1

prevented rivals from gaining scale, and diminished rivals' incentives to invest and innovate. After finding Google liable for exclusionary conduct that unlawfully maintained its monopoly, the court entered equitable relief that, among other things, allows Google to continue sharing revenue in exchange for default status.

Google claims its conduct is not exclusionary but rather competition on the merits. In its own words, Apple and Mozilla "chose Google because it gave their users the best experience *and* they stood to earn the most by sharing in Google's advertising revenues. That is what competition on the merits looks like." Google.Br.2 (emphasis added). Google says that by purchasing exclusive default status across nearly every search access point, it "just prevailed in the marketplace fair and square." *Id*.

But Google's own description defeats its claim. The fact that distributors "stood to earn the most" by doing business with a monopolist is a concession, not a defense. Google's reward for a monopoly achieved by offering users "the best experience" should have been the ability and incentive to pay distributors the *least. Cont'l T.V. v. GTE Sylvania*, 433 U.S. 36, 56 n.24 (1977) (Ordinarily a manufacturer "would prefer to minimize" its "cost of distribution."); *see* Robert L. Steiner, *Vertical Competition, Horizontal Competition, and Market Power*, 53 Antitrust Bull. 251, 265 (2008) ("[T]he monopolist manufacturer will use the enhanced vertical bargaining power from his increased sales to further depress the margins of his retailers and suppliers thereby raising his profits.");

Richard A. Posner, *Antitrust Policy and the Supreme Court: An Analysis of the Restricted Distribution, Horizontal Merger and Potential Competition Decisions*, 75 Colum. L. Rev. 282, 283 (1975) ("[A]ny seller (even a monopolist) wants to minimize his costs.").

Google thus begs the key question here: Why did a firm with over 80% market share and a superior product pay distributors more than they could earn from other search engines—including an estimated $20 billion to Apple alone in 2022—instead of paying the monopoly price? JA__(Liab.Op.241). The district court found that it did so to prevent competition.

That conclusion is sensible. Google is not a charitable organization. Voluntarily giving away excess sums through revenue sharing is economically irrational for a profit-driven business, unless it serves some ulterior purpose. Here, on an extensive trial record, the district court found no procompetitive justifications for Google's conduct. JA__(Liab.Op.257). The facts showed that Google shared monopoly profits to make allies of the firms positioned to promote entry and competitive opportunity for rival search engines that might erode or at least apply pressure to Google's monopoly. Because Apple, Mozilla, and device makers shared in Google's monopoly profits, they were not customers choosing Google's product on the merits; Google made them partners by giving them a direct financial stake in preserving the monopoly that funds them. A partner paid out of monopoly profits has every reason to keep the monopoly intact, and none to promote entry or expansion that might compete

away its share. Payments to block entry or expansion are not a form of competition on the merits. They suppress the rivalry and choice on which competition depends.

The Supreme Court has already held that a monopolist who shares profits to insulate itself from competition is not beyond antitrust law's reach. In *FTC v. Actavis*, the Court held that a firm cannot pay to preserve "the full … monopoly return while dividing that return" if "the basic reason is a desire to maintain and to share … monopoly profits." 570 U.S. 136, 154, 158 (2013). When such a payment is large and "otherwise unexplained," the Court held, it "likely seeks to prevent the risk of competition. And, as we have said, that consequence constitutes the relevant anticompetitive harm." *Id*. at 157.

Google's proposed exclusionary-conduct standard would invert that principle, recasting large, otherwise-unexplained payments that foreclose rivals as a badge of honor. The Court should decline Google's invitation to immunize such exclusionary conduct. Sharing monopoly profits to foreclose rivals is not winning on the merits; it is precisely the conduct antitrust law is designed to prevent.

Although the district court correctly found liability, it failed to heed legal rules that set a floor for acceptable equitable relief in Section 2 cases. Remedial discretion, although broad, has two bounds: relief must remain tethered to the violation and must reach the whole of it. The decree's data and syndication remedies meet the standard and should be affirmed, but the court erred by

permitting Google to continue sharing monopoly profits for default placement, which violates the second requirement by preserving the bargain that created liability. The court relied on a rule that limits excessive relief, but the rule against overreach does not license underreach.

## ARGUMENT

Google's payments to browser makers and OEMs were not competition on the merits. They were an exercise of monopoly power to maintain monopoly. Google used the profits its search monopoly generated to buy exclusivity that its product alone could not guarantee. That rival search engines might have lost the contest for default placement says nothing about whether Google harmed the competitive process. As a matter of law and statutory policy, winning with a check drawn on monopoly profits is not the same as winning with a better product or superior acumen. Google's anticompetitive conduct violates Section 2 and must be remedied by a decree that reaches the mechanism of the violation.

## I.    Google's Proposed Exclusionary-Conduct Standard Is Erroneous.

Google offers only one explanation for its conduct: that sharing monopoly profits "won [it] the uniform default position." Google.Br.46. That is not an innocent explanation; it is an anticompetitive one. Sharing monopoly search revenues is Google's mechanism of foreclosure. A monopolist's payment to firms positioned to promote entry and competition, made to keep them from doing so, is the definition of exclusionary conduct used in economics textbooks.

*See, e.g.*, Richard A. Posner, *Antitrust Law: An Economic Perspective* 28 (1976) (defining an exclusionary practice as "a method by which a firm . . . trades a part of its monopoly profits, at least temporarily, for a larger market share, by making it unprofitable for other sellers to compete with it.").

Google maintains that all conduct is competition on the merits absent proof that a rival would have won in a counterfactual world where the conduct did not occur. Google.Br.41–68. That counterintuitive definition of competition redefines exclusion, emptying it of its content.

Google's but-for-world standard hinges on proof of the counterfactual market outcome had the search market been competitive during its reign. Google.Br.55 ("The court did not find that browser-makers would have chosen another GSE"); *id*. at 61 ("there was no proof that a better GSE would nonetheless lose to Google Search"). But because "[t]he heart of our national economic policy long has been faith in the value of competition," the Sherman Act's "legislative judgment" that "competition is the best method of allocating resources" is an "assumption." *National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978).

As Google's brief repeatedly acknowledges but its consequentialist standard paradoxically rejects, the plaintiff's burden is to allege and prove "harm … to the competitive *process*, *i.e.*, to competition itself," not that such competition would have yielded a different market outcome. *Nynex v. Discon*, 525 U.S. 128, 135 (1998); *see* Google.Br.1, 3, 29, 37, 38, 39, 48, 68. "The

6

statutory policy precludes inquiry" into "exceptions to the presumed consequences of competition." *Prof'l Eng'rs*, 435 U.S. at 695; *see N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958).

Google accepts that, "[i]n the competitive process, consumers 'select among alternative offers,' and firms vie" to be selected, Google.Br.38 (quoting *Prof'l Eng'rs*, 435 U.S. at 695), but it fails to heed its own admonition that the process itself is protected. The hypothetical outcome of that vying and selecting in a but-for world says nothing about whether conduct "distorts or disables" the process. Google.Br.4. *Cf. Nynex*, 525 U.S. at 137 (holding that consumer outcomes are not dispositive of harm to the competitive process and that "it is wrong" to use "*per se* reasoning" to categorically condemn or excuse conduct on that basis) (internal quotation and citation); *Rambus Inc. v. FTC*, 522 F.3d 456, 464 (D.C. Cir. 2008) (holding same and defining harm to the competitive process as conduct that "impair[s] rivals in a manner tending to bring about or protect a defendant's monopoly power").

Google's consequentialist definitions of competition and exclusion would defeat the purpose of Section 2. It sets a liability standard that never asks why a monopolist with a superior product and over 80% market share would inflate its own distribution costs instead of paying the monopoly price. It thus tips the scales decisively toward the monopolist.

### A.    Google's Standard Contravenes Binding Precedent.

In reducing exclusion to the single question of whether a rival would have obtained the default absent Google's payments, Google does what it accuses the district court of doing. Google argues that the district court used *Microsoft*'s causation standard to decide whether the conduct was exclusionary, pointing out that *Microsoft* treated "Anticompetitive Conduct" and "Causation" as separate inquiries, reaching causation only after finding exclusionary conduct. Google.Br.40–44; *but see* DOJ.Br.88–90.

But Google too uses a causation standard to decide whether conduct is exclusionary; it just uses a different (and incorrect) causation standard. Instead of asking whether a defendant has engaged in anticompetitive conduct that reasonably appears capable of making a significant contribution to maintaining monopoly power, as *Microsoft* does, it would ask whether conduct "prevents a defendant's rivals from winning even if they have a better product or make a better offer." Google.Br.30; *see United States v. Microsoft*, 253 F.3d 34, 79 (D.C. Cir. 2001). That is a causation standard. It does not ask whether Google's exclusive default arrangements harm the competitive process; it asks whether the maintenance of Google's monopoly flows from the harm. *Microsoft*, 253 F.3d at 78 (defining "causal link" in "Causation" section of the opinion as the link between "Microsoft's anticompetitive conduct, in particular its foreclosure" and "the maintenance of Microsoft's … monopoly").

8

Google argued its but-for-world test as a causation standard below but has changed its legal theory on appeal, forfeiting it. *Keepseagle v. Perdue*, 856 F.3d 1039, 1053 (D.C. Cir. 2017) ("legal theories" not asserted "ordinarily will not be heard on appeal."). Google repeatedly cited a sentence from *Rambus* finding that "deception cannot be said to have *had* an effect on competition" if rivals' opportunities would not be impaired in the but-for world, 522 F.3d at 466–67 (emphasis added), and it argued that "assessing anticompetitive effects *that flow from* an exclusive agreement should be measured against a valid but-for world where the agreements do not exist." Google.Post-Trial.Br.43 (emphasis added).

The district court ruled on the argument Google presented, rightly holding that "causation does not require but-for proof" and that a plaintiff, while permitted to try, "is not required to show that but for the defendant's exclusionary conduct the anticompetitive effects would not have followed." JA__(Liab.Op.216); *see id.* at 215. Having failed to hitch its but-for-world test to causation, Google now moves the goalposts: it asks this Court to tether the same sentence in *Rambus* to the definition of exclusionary conduct instead. Google did not preserve this argument below, and it is, if anything, more extraordinary than the one on which it lost and has now abandoned.

Google's proposed definition of exclusionary conduct has no basis in Supreme Court precedent. The Supreme Court in *Grinnell* identified two elements of a monopolization offense: monopoly power and exclusionary

9

conduct, defining the latter as "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell*, 384 U.S. 563, 570–71 (1966). Google focuses myopically on the "superior product" terminology, but *Grinnell*'s test poses a question about what produced or maintained the monopoly, with the implicit causation question embedded ("as a consequence of"). Nowhere does it instruct courts to inquire which product would have prevailed. Because the purpose of Section 2 is to prevent conduct that harms the competitive process—the lesson that Google repeatedly both recites and contradicts—the Court requires an inquiry into the means of the growth, development or maintenance of the monopoly, not an inquiry into the ends.

Google's definition of exclusionary conduct departs even more obviously from *Aspen Skiing*. There the Court defined the conduct element as "'behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way.'" *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985) (quoting 3 Phillip Areeda & Donald F. Turner, *Antitrust Law* 78 (1978)). Google collapses *Aspen Skiing*'s two-part conduct inquiry into a single outcome inquiry, distorting both parts.

First, Google misreads "tends to impair the opportunities of rivals" by maintaining that "[c]onduct cannot cross the line into illegality unless it

10

prevents a defendant's rivals from winning." Google.Br.30. This changes "tends to impair the opportunities" into "did impair wins," converting language that is process-oriented into language that is consequentialist.

Google then adds to its first mistake by deleting "unnecessarily restrictive way" from *Aspen Skiing*'s second prong entirely: it ignores that conduct that furthers competition on the merits can still be, on balance, exclusionary. Google frames its large, unexplained payments to its partners as an unremarkable example of an intermediary paying for an input. Google.Br.53. But its test leaves no room to consider whether *exclusive* defaults were unnecessarily restrictive.

Google fares no better looking to this Circuit. It cites the governing *Microsoft* test, which balances procompetitive and anticompetitive effects. Google.Br.29, 40–41. But lacking procompetitive effects, Google seeks to escape the test's results. The *Microsoft* Court declined to condition exclusionary conduct on a finding that Microsoft would have lost the operating-system monopoly to rivals but for its conduct. 253 F.3d at 106–07. Instead, the Court emphasized that "it would be inimical to the purpose of the Sherman Act to allow monopolists free reign to squash nascent, albeit unproven, competitors at will." *Id.* at 79.

To circumvent *Microsoft*, Google transforms *Rambus* into a definitional case on exclusionary conduct. Google.Br.55 ("*Rambus* is dispositive"). Google claims *Rambus* reinvented the meaning of exclusionary conduct by requiring a

11

"finding … that Google's customers would have chosen a rival." Google.Br.3 (citing *Rambus*, 522 F.3d at 466–67). As the district court correctly recognized, it does not.

Google relies on a sentence from *Rambus* that is not located in the part of the opinion that defines conduct "condemned as exclusionary." 522 F.3d at 463. There, the Court adhered to "the antitrust principles that guided us in *Microsoft*." *Id*. The sentence appears nearly four pages later, in an explanation of why the FTC's claim failed. *Id*. at 466–67.

In *Rambus*, unlike here, the plaintiff chose to proffer counterfactuals as evidence supporting its claim. The FTC alleged that Rambus avoided one of two possible outcomes by deceiving a standard-setting organization (JEDEC), but without specifying which. *Id*. at 463–64. Because "a general verdict may [not] rest on either of two claims—one supported by the evidence and the other not," the Court had to determine whether each outcome alone was capable of causing the requisite anticompetitive effect, which it defined as "impair[ing] rivals in a manner tending to bring about or protect a defendant's monopoly power." *Id*. at 464 (quoting *Avins v. White*, 627 F.2d 637, 646 (3d Cir. 1980)) (alteration added).

The Court ruled for Rambus because one of the two outcomes did not tend to impair rivals, not because of who would have won. The FTC alleged that, absent Rambus's deception, JEDEC would have either (1) denied Rambus's standards application, or (2) awarded the standard anyway, albeit

with an accompanying RAND obligation. The Court held that the second possibility could not have harmed the competitive process, because if the same technology would have been standardized regardless, "Rambus's alleged deception cannot be said to have had an effect on competition." *Id*. at 466–67.

Google grabs hold of this sentence with both hands, but the Court's only point was in the preceding sentence: "an otherwise lawful monopolist's end-run around price constraints, even when deceptive or fraudulent, does not alone present a harm to competition in the monopolized market." *Id*. at 466. Read without selectively omitting the conjunctive adverb "thus," as Google does, the sentence is clearly explanatory, not doctrinal. The Court was elucidating why the FTC failed to prove one of its two counterfactual theories. Namely, the Court found that deceiving a standard-setting organization only tends to impair rivals' opportunities if it could impair their ability to compete for the standard. Once the standard is awarded, rivals are equally impaired with or without a RAND obligation.

Google dismisses the district court's treatment of *Rambus* by asserting that the "only reason" it offered for "disregarding *Rambus*" was that it "involved deception to a standard-setting organization." Google.Br.56. But the district court owes no apology for considering the "circumstances, details, and logic" of *Rambus*. *California Dental Ass'n v. FTC*, 526 U.S. 756, 781 (1999). Accounting for the type (monopoly acquisition), nature (deception), and context (standard setting) of conduct is not only advisable but required. *Verizon*

*Commc'ns, Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 389, 411 (2004) ("Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue."); *see also Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 467 (1992).

It would have been enough to observe that the FTC's own choice to allege but-for counterfactuals does not imply such counterfactuals are required, but the district court went further in explaining why but-for reasoning made sense in *Rambus* and not here: (1) SSO deception is "particularly susceptible to a finding of materiality," and (2) extending a but-for rationale beyond that context "would be contrary to *Microsoft*," an *en banc* case that *Rambus* never questioned. JA__(Liab.Op.219). The district court was correct. Monopoly acquisition by deception in the standard-setting context is very different from monopoly maintenance by foreclosure in a network industry.

The nature of the claim in *Rambus* is instructive because deception, like the fraud in *Nynex*, sometimes constitutes a mere business tort, not an antitrust violation. *Rambus*, 522 F.3d at 464. Google's conduct has no tort-law analogue: it foreclosed a substantial share of the market and diminished rivals' ability and incentive to enter and innovate. Unlike the defendants in *Nynex* and *Rambus*, Google does not dispute that its conduct "lies close to the heart of the competitive process." *Nynex*, 525 U.S. at 137. It argues its conduct "*is* competition." Google.Br.38.

14

The type and context of the claim are also instructive. *Rambus* was a monopoly acquisition case involving a one-time standard-setting exercise, not a monopoly maintenance case involving foreclosure spanning "well over a decade." JA__(Liab.Op.1). The setting of a standard is a "particular, discrete event" that creates a new monopoly by fiat, proving the district court's materiality point. Erik Hovenkamp & A. Douglas Melamed, *Antitrust Analysis of Search Engine Defaults*, Antitrust L.J. (forthcoming) (manuscript at 46), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5717762. The Court in *Rambus* could see that JEDEC made a one-time choice between two known alternatives at a fixed point in time, so it could easily reconstruct the FTC's alleged counterfactuals before and after the new monopoly. Moreover, a standard-setting exercise is fundamentally different from a market transaction in that, there, impairing rivals' opportunities to create monopoly can be procompetitive. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 506–07 (1988) ("[S]tandard-setting … is permitted at all under the antitrust laws only on the understanding that it will be conducted in a nonpartisan manner offering procompetitive benefits").

Monopoly maintenance claims, by contrast, begin from the opposite premise: both the actual and the but-for world are already monopolized, so there is no isolatable, past decision-point to analyze. Here, by creating "market stasis" for well over a decade, Google's exclusionary conduct prevented competitive pressure from emerging that entire time. JA__(Liab.Op.200). And because it

deprived rivals of scale and reduced their investment and innovation incentives in a network industry, nobody can know what the competitive process would have yielded or who would have won. The type and context of the claim (monopoly maintenance in the search industry) thus give special weight to *Microsoft*'s statement—in a similar monopoly maintenance case that also involved a dynamic technology industry subject to network effects—that "'neither plaintiffs nor the court can confidently reconstruct . . . a world absent the defendant's exclusionary conduct.'" 253 F.3d at 79.

Read properly, *Rambus* is an application of *Microsoft*'s exclusionary conduct standard that follows the *en banc* Court's holding, not a ground-breaking re-definition of exclusion. Google's reading—which implies that a three-judge panel rejected the *en banc* Court's exclusion standard—is implausible, especially given *Rambus*'s explicit endorsement of *Microsoft*. The district court rightly read the two decisions harmoniously by holding that while anticompetitive effects may be "'ideally' examined against a but-for world, the law does not require it." JA__(Liab.Op.218) (quoting Dr. Whinston). The court applied the *Microsoft* framework, relied on extensive record evidence, and made the finding that *Rambus* and *Microsoft* both require: Google "impair[ed] rivals' opportunities" without procompetitive justification. JA__(Liab.Op.226).

### B.   Google's Standard Contravenes the Consumer-Welfare Purpose of the Sherman Act.

Google's proposed exclusionary-conduct standard defeats the purpose of the antitrust laws. Section 2 of the Sherman Act safeguards the competitive process ultimately for the benefit of consumers, not for the benefit of particular firms. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993). Google's standard inverts that goal. Rather than ask whether conduct harmed the competitive process, it asks plaintiffs to reconstruct a counterfactual to protect whichever rival would have prevailed. This is the competitor-focused inquiry the consumer-welfare standard rejects. Worse, it invites evasion by the monopolists most capable of harming consumers: those dominant enough that no rival's fate can be isolated from the advantages entrenched monopoly confers.

### 1.   Google's Standard Warps the Balance of Error Costs.

Antitrust law is inherently probabilistic. Even in the clearest case, no court can know the ultimate effects of challenged conduct beyond doubt. Because certainty is impossible, every exclusionary-conduct standard allocates risk between two errors: mistakenly condemning procompetitive conduct (a false positive) and mistakenly excusing conduct that harms the competitive process (a false negative). That allocation is a policy choice.

No case holds that one error is categorically worse than the other. *See* Jonathan B. Baker, *Taking the Error Out of "Error Cost" Analysis:*

*What's Wrong with Antitrust's Right*, 80 Antitrust L.J. 1, 8-23 (2015) (challenging the premise that false positives are systematically more costly than false negatives). If anything, Section 2's consumer-welfare goal suggests false negatives are the greater concern. Google's standard goes to the opposite extreme. Treating conduct as competition on the merits unless plaintiffs can affirmatively show a rival would have won is a rule of almost zero tolerance for false positives and systematic disregard for false negatives.

That warped balancing of error costs assumes, without evidence, that entry will "prove capable of policing market power with a sufficient frequency, to a sufficient extent, and with sufficient speed to make false positives systematically less costly than false negatives." *Id.* at 9. History does not bear that out, least of all in markets like this one, defined by network effects and scale-driven entry barriers. *See* Stigler Comm. on Digital Platforms, *Final Report* 81 (2019), https://www.chicagobooth.edu/-/media/research/stigler/pdfs/digital-platforms---committee-report---stigler-center.pdf (finding self-correction unlikely, and welfare harms substantial, in markets dominated by large digital platforms).

Google cites no binding precedent supporting its lopsided allocation of risk, because there is none. "[T]he importance of clear rules in antitrust law," Google.Br.43 (quoting *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 452 (2009)), gets it nowhere, because the preference for clarity does not confer license to discount false negatives altogether. A clear rule that

18

systematically under-detects exclusionary conduct is no less of a policy failure than an unclear one. Google's standard nullifies the balancing of anticompetitive effect against procompetitive benefit by curtailing the inquiry at the threshold. That is "inimical" to the policy choice the Sherman Act makes. *Microsoft*, 253 F.3d at 79.

### 2.     Google's Standard Applies the Lightest Touch to the Most Entrenched Monopolists.

Because a dominant firm charged with monopoly maintenance has by definition erased any but-for world without monopoly, Google's threshold requirement also rewards the most thoroughgoing monopolists. Section 2 draws no such asymmetry. "[H]owever lawfully acquired," monopoly power may not be used "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Kodak*, 504 U.S. at 482–83 (quoting *United States v. Griffith*, 334 U.S. 100, 107 (1948)); *Microsoft*, 253 F.3d at 79 (This Court's "immediate concern" was the effect of the defendant's conduct "in preserving its monopoly.").

Monopoly-maintenance claims are among the most welfare-enhancing, because they introduce the promise of competition into markets where entry has demonstrably failed to police the exercise market power. *See* Baker at 8–12. By making such claims the hardest to prove, if not categorically unprovable, Google's rule optimizes for deadweight loss over consumer welfare—the opposite of sound competition policy.

19

Google's rule also does the most damage in markets like this one. Network effects and data-scale advantages make a dominant platform's counterfactual harder to reconstruct the longer it holds its position—not despite those dynamics, but because of them. *See* Hovenkamp & Melamed at 36, 48. Here, Google's threshold test asks plaintiffs to prove something that the market's structure, and Google's own conduct, have made unprovable: what would have happened if rivals could compete for scale in a network environment in an era of rapid technological advancement spanning more than a decade? That is a thinly-veiled request for a conclusive presumption of legality, but "[l]egal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law." JA__(Sum.J.34) (quoting *Kodak*, 504 U.S. at 466–67).

### 3.    Google's Standard Ignores the Harm of Deterred Entry and Investment.

Google's test also misses that competition disciplines a monopolist even when no rival unseats it. "[I]mmunity from competition is a narcotic, and rivalry is a stimulant, to industrial progress." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 813–14 (1946) (quoting *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 427 (2d Cir. 1945) (Hand, J.)). Google's standard is blind to the injury exclusion inflicts when rivals never attempt to compete. Exclusion harms the competitive process when it suppresses the incentive to invest or enter at all, which the district court found here. JA__(Liab.Op.236–38). That harm extends

exclusionary effect beyond any particular rival and even beyond the class of existing competitors. Hovenkamp & Melamed at 36, 39, 48; Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power over Price*, 96 Yale L.J. 209, 263 (1986) (Exclusion's success depends not just on whether consumers *do* switch but on "the ability and willingness of consumers to switch to other unexcluded firms (including entrants) and on the incentives of the purchasers of exclusionary rights and other unexcluded firms to continue to compete."). *See also* Richard J. Gilbert & David M.G. Newbery, *Preemptive Patenting and the Persistence of Monopoly*, 72 Am. Econ. Rev. 514 (1982).

The gap is not just a blind spot; it incentivizes monopolists to stamp out rivals prophylactically. This Court has already warned that demanding reconstruction of the but-for world "would only encourage monopolists to take more and earlier anticompetitive action." *Microsoft*, 253 F.3d at 79. A rule that rewards the monopolist whose conduct worked early and thoroughly enough to foreclose reconstruction of the counterfactual invites that result. This Court should reaffirm *Microsoft* and reject Google's unsupportable standard for what counts as exclusionary conduct.

**II.    The District Court's Remedy Violates the Cardinal Rule of Antitrust Remedies: Effectiveness Must Come First.**

**A.    Antitrust Remedial Discretion Is Bounded by Two Distinct Requirements**

The district court assessed liability correctly but did not adhere to binding remedial standards. A court finding a violation must redress it. *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 88 (1950); *Ford Motor Co. v. United States*, 405 U.S. 562 (1972). The decree "must seek" to "unfetter a market from anticompetitive conduct," to "deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future." *Microsoft*, 253 F.3d at 103 (quoting *United States v. United Shoe Mach. Corp.*, 391 U.S. 244 (1968)).

Those principles impose two requirements. The first is that relief must remain tethered to the violation: a decree must be "tailored to fit the wrong creating the occasion for the remedy," *id.* at 107, and must "fit the exigencies of the particular case," *Ford*, 405 U.S. at 575 (quoting *Int'l Salt Co. v. United States*, 332 U.S. 392 (1947)). The second is that relief must reach the whole of the violation: the decree must be "a reasonable method of eliminating the consequences of the illegal conduct." *Prof'l Eng'rs*, 435 U.S. at 698; *see United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 323 (1961) (an antitrust suit is "a futile exercise" without a remedy adequate to redress the violation). While the first requirement is a matter of degree and discretion, the second is non-negotiable.

The district court's remedy satisfies the first requirement: it identified the fruits of the violation and imposed data and syndication remedies reaching them. JA__(Rem.Op.129–31). Those remedies should be affirmed. But whether those remedies go far enough is a different question.

The effectiveness requirement sets a floor below which a court may not go. "[T]o be effective," a decree must sometimes "go beyond the narrow limits of the proven violation." *Gypsum*, 340 U.S. at 90. It need not confine itself to "end[ing] specific illegal practices," *Int'l Salt*, 332 U.S. at 401, need not be limited to "return the market to the *status quo ante*," *Ford*, 405 U.S. at 573 n.8, and may impose "forward-looking" obligations reaching conduct that "played no role" in the liability holding, *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1215 (D.C. Cir. 2004). Such permissions exist because otherwise those who had "unlawfully built their empires could preserve them intact." *Schine Chain Theatres, Inc. v. United States*, 334 U.S. 110, 128 (1948).

A court cannot stop short of ending the violation. The discretion to reach further is not a license to do less. A court that finds a violation has "the duty to compel action ... that will, so far as practicable, cure the ill effects of the illegal conduct, and assure the public freedom from its continuance." *Gypsum*, 340 U.S. at 88. Relief must at a minimum "terminate the illegal monopoly." *Microsoft*, 253 F.3d at 103 (quoting *United Shoe*, 391 U.S. at 250).

The causal relationship between violation and remedy operates *within* this framework. "Causation plays an important role in calibrating the scope of a

23

remedial decree," because it tests whether relief has remained tethered to the violation. JA__(Rem.Op.106). It is *not* a threshold that must be crossed for a court's fix to go beyond a bare prohibition. *See id*.

### B. The District Court Erred by Permitting Google's Payment-For-Default Mechanism to Persist.

The district court condemned a specific bargain. Reviewing Google's Android revenue-share agreements, the court explained that "the basic barter is revenue share in exchange for default exclusivity." JA__(Liab.Op.212). *See also* JA__(Liab.Op.204) (describing Apple's revenue share). The payment was consideration that bought the exclusivity.

The court rejected the argument that leaving distributors a choice made the arrangement something less than exclusive dealing. Antitrust policy, it explained, does not distinguish between imposing exclusive dealing outright and paying a rebate for dealing exclusively, because both have the "practical effect" of exclusion. JA__(Liab.Op.213) (citations omitted). A payment that induces exclusive dealing therefore is not a lawful component of an unlawful agreement. It is the operative term.

The record shows the same structure on both sides of the distribution system. Under the T-Mobile agreement, exclusive default placement was a precondition of payment. JA__(Liab.Op.127, 214). Apple sought revenue share without a default obligation twice, in 2009 and 2012, and Google refused both times. JA__(Liab.Op.110–11).

The district court identified the severable alternative but did not adopt it. Payments for distribution, it observed, could be permitted without payments for *default* distribution: "unconditional revenue share." JA__(Rem.Op.128.n.14). That is the lawful remainder. But the decree permits Google to "pay distributors for default placement," JA__(Rem.Op.128), the same conditionality the liability holding condemned.

Permitting that mechanism was legal error. The district court declined a ban on paying for default placement because a ban might harm Google's distribution partners. JA__(Rem.Op.121–23). It reasoned that, "[a]cting in equity . . . the court cannot be so myopic"; it must weigh the harms to other market actors "even if that means, as here, forgoing a remedy that could help restore competition." JA__(Rem.Op.126). The authority it cited was *Microsoft*'s statement that the "[m]ere existence of an exclusionary act does not itself justify full feasible relief against the monopolist to create maximum competition." *Id.* (quoting 253 F.3d at 106).

That is the "excessive relief" requirement doing the "effectiveness" requirement's work. *Microsoft* limits how far a remedy may extend beyond the violation to ensure relief does not come unmoored from the violation. It says nothing, however, about relief that stops short of redressing it. The court acknowledged as much when it determined that its duty was "to redress the violation and restore competition." *Id.* at 58.

25

The point is not that the remedy should have gone further—that determination is committed to the district court's discretion. It is that the court was obligated to reach the mechanism of the violation. The court's own starting point was "an injunction terminating the anticompetitive conduct," *id.* at 59, and the payment-for-default mechanism is that conduct. A decree permitting that mechanism to continue cannot "ensure that there remain no practices likely to result in monopolization in the future." *Microsoft*, 253 F.3d at 103.

The district court's concern about ancillary injuries to Google's distribution partners. implicates a rule that governs the choice among multiple remedies that would each effectively restore competition. *E.I. du Pont de Nemours & Co.*, 366 U.S. at 327. It cannot justify a remedy that fails to do so. The district court used a consideration that bears on *how* a violation is ended to answer the question of *whether* it would be. That was an error of law.

Moreover, the district court failed to consider that Google's distribution partners were counterparties to the unlawful agreements, meaning they stand to lose a payment stream that came at advertisers' expense. That an effective antitrust remedy disappoints firms who profited from the violation is not a sound reason to leave the conduct in place. The district court wrongly prioritized the interests of the unlawful conduct's beneficiaries over its victims.

The district court "well recognize[d] what eschewing a payment ban may mean for competition": because of Google's "massive financial advantage and its superior monetization, distributors will be incentivized to stick with Google

26

because it can pay more, thus leaving in place the very forces that … made the ecosystem exceptionally resistant to change." JA__(Rem.Op.127) (citation modified). Continuing payments, the court added, "could blunt the effectiveness of the remedies imposed." *Id.* The court accepted that cost because a ban would enrich Google. Not paying Apple alone "would result in a windfall worth tens of billions of dollars," JA__(Rem.Op.122), which Google could then use "to improve its products and monetization, further propagating the network effects flywheel." *Id*.

That reasoning proves too much. Since every remedy that ends a payment-for-exclusion scheme saves the violator the payments, and the calculus worsens as the spending grows, it would mean that a monopolist that buys exclusion dearly enough can make its scheme unreachable. The redeployment concern also cuts both ways: If Google would spend the savings improving its products, that would be competition on the merits, which the Sherman Act encourages.

The district court also failed to account for administrability. Permitting payment for default placement leaves the court to police which payments are permitted, a line the parties will litigate for as long as the decree runs. Effective relief is designed to avoid that supervision, not to invite it.

The district court expressed a "hope" that, "if superior products emerge," the GenAI industry will prevent Google from simply outbidding competitors for distribution. JA__(Rem.Op.128). But the court's fact findings do not sustain its

27

hope. It found, for example, that scale barriers "remain today, notwithstanding the emergence of GenAI technology." *See, e.g.*, JA__(Rem.Op.130). The payments the decree leaves in place will sustain the barrier the court found still operative.

The court's reservation to "revisit a payment ban . . . if competition is not substantially restored" does not cure the error either. JA__(Rem.Op.128). It runs the ratchet backwards, permitting the conduct now against a promise to tighten later. The second remedial requirement calls for prohibiting the conduct now and relaxing the prohibition only if the market reveals that the relief has proven unnecessary.

*United Shoe* shows the costs of the district court's approach. The Court accepted weak conduct restrictions in place of stronger measures, and workable competition failed to emerge a decade later. The Court eventually reversed with instructions to consider "other, and if necessary more definitive" measures. 391 U.S. at 252. The district court's reservation embraces that failure instead of learning from it.

## CONCLUSION

For the foregoing reasons, the district court's liability opinion should be affirmed and its remedial order should be remanded with instructions to strengthen the remedy.

Respectfully submitted,

/s/ Randy Stutz

RANDY STUTZ
    Counsel of Record
KATHLEEN BRADISH
AMERICAN ANTITRUST INSTITUTE
1025 Connecticut Avenue, NW
Suite 1000
Washington, D.C. 20036
(202) 905-5420
rstutz@antitrustinstitute.org

Counsel for Amicus Curiae

Dated: August 4, 2026

## CERTIFICATE REGARDING SEPARATE BRIEF

Pursuant to D.C. Circuit Rule 29(d), I certify that this separate amicus brief is necessary because it provides unique insights regarding the application of antitrust and competition principles from the perspective of a non-profit consumer antitrust organization and because to my knowledge no other amici address the same principles.

/s/ Randy Stutz
Randy Stutz

*Counsel for Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts exempted by Fed. R. App. P. 32(f), the brief contains 6,489 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(b) because the brief has been prepared in Microsoft Word, using 14-point Times New Roman font, a proportionally spaced typeface.

*/s/ Randy Stutz*
Randy Stutz

## CERTIFICATE OF SERVICE

I certify that on August 4, 2026, I caused the foregoing Brief of Amicus Curiae to be filed through this Court's CM/ECF system, which will serve a notice of electronic filing on all counsel for the parties.


<u>/s/ Randy Stutz</u>
Randy Stutz

C-3