**No. 26-5023**
**(Consolidated with Nos. 26-5047, 26-5049)**

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

United States of America, *et al.*,
  *Plaintiffs-Appellees-Cross-Appellants*,

v.

Google LLC,
  *Defendant-Appellant-Cross-Appellee.*

---

On appeal from the United States District Court for the District of Columbia,
No. 20-cv-3010 (APM), No. 20-cv-3715 (APM) (Honorable Amit P. Mehta)

---

### BRIEF OF *AMICI CURIAE* ECONOMICS AND BUSINESS PROFESSORS IN SUPPORT OF PLAINTIFFS-APPELLEES AND CROSS-APPELLANTS AND REVERSAL WITH RESPECT TO THE CROSS-APPEAL

---

Deborah Elman
**GARWIN GERSTEIN & FISHER LLP**
88 Pine Street, 28th Floor
New York, NY 10005
(212) 398-0055
delman@garwingerstein.com

*Counsel for* Amici Curiae *Economics and Business Professors*

Kaitlyn McMillan
**SIMONSEN SUSSMAN LLP**
307 West 38th Street, 16th Floor
New York, NY 10012
(646) 400-6652
kaitlyn.mcmillan@simonsensussman.com

*On the Brief*

## STATEMENT OF AUTHORSHIP, CONSENT, AND SEPARATE BRIEFING

All parties consented to the filing of this brief. No party's counsel authored this brief in whole or in part, no party or their counsel contributed money intended to fund the preparation or submission of this brief, and no person other than *amici curiae* or their counsel contributed money that was intended to fund preparing or submitting the brief. Fed. R. App. P. 29(a)(4)(E).

Pursuant to D.C. Circuit Rule 29(d), this separate amicus brief is necessary because it provides the unique insights of economics and business professors regarding why the District Court's liability findings follow established economic principles, and why core remedy provisions may not adequately address the competitive harm. The arguments presented in this brief are distinct from the arguments presented in the briefs of other *amici curiae*.

# TABLE OF CONTENTS

STATEMENT OF AUTHORSHIP, CONSENT, AND SEPARATE BRIEFING... i

TABLE OF AUTHORITIES.................................................................... iv

IDENTITIES AND INTEREST OF *AMICI CURIAE*.................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................1

I.    Economic Analysis of the Record Supports the District Court's Liability Finding ...........................................................................................................4

    A.    Google's Default Agreements Are Exclusive Contracts That Cover a Large Share of the Market ................................................................................4

    B.    A Monopolist Will Outbid Even a More Efficient Rival to Preserve Its Monopoly......................................................................................................6

    C.    Because Search Is a Market with Substantial Fixed Costs and Scale Economies, the Incumbent Need Not Lock Up All Distribution to Foreclose ..................................................................................................................7

    D.    Because Users Are Also an Input to Produce Quality, Foreclosure Is Self-Reinforcing .................................................................................................9

    E.    Under These Conditions, There Is No Genuine "Competition for the Market"....................................................................................................10

    F.    The Magnitude of Payments Suggests the Contracts Are Intended to Protect Google's Monopoly.......................................................................11

    G.    Contemporaneous Evidence from the Foreclosed Market and Evidence from Unrelated Markets Can Mislead................................................................12

II.   The Remedy Falls Short of Terminating Google's Monopoly or Restoring Competition....................................................................................................14

    A.    An Effective Remedy Must be Comprehensive Enough to Address All the Effects of the Anticompetitive Conduct........................................................14

B.    The Injunction's Data-Sharing and Syndication Provisions May Be Too Limited.................................................................................................16

C.    The Injunction Leaves Google's Distribution Foreclosure Ability Substantially Intact .................................................................................17

D.    Alternative Distribution Remedies Exist to Address the Shortcomings .......19

    1.    Experience Before Choice May Shift Users .........................................20

    2.    A Cap Could Preserve Some Payments While Opening Distribution...20

    3.    Decoupled Payments Separate Compensation from Placement............21

    4.    Resistance to Circumvention Should be Evaluated..............................21

E.    The Remedy Does Not Adequately Address Generative AI Distribution ....22

F.    Remand to Build the Record on Remedies is Appropriate ..........................23

CONCLUSION ........................................................................................................24

CERTIFICATE OF COMPLIANCE .......................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States v. Google LLC*,
    747 F. Supp. 3d 1 (D.D.C. 2024) ......................................... 2, 3, 5, 7, 9-14, 17

*United States v. Google LLC*,
    803 F. Supp. 3d 18 (D.D.C. 2025). ............................. 4, 13, 15, 17-19, 22, 23

**Other Authorities**

Alissa Cooper et al., *Pay for Half: A Better Remedy for Google Search* (Yale U.
    Tobin Ctr. for Econ. Pol'y, Discussion Paper No. 12, 2026) .........................20, 21

B. Douglas Bernheim & Michael D. Whinston, *Exclusive Dealing*, 106 J. Pol.
    Econ. 64 (1998) ................................................................................................8

Eric Rasmusen, J. Mark Ramseyer, & John S. Wiley Jr., *Naked Exclusion*, 81
    Am. Econ. Rev. 1137 (1991)..............................................................................8

Erik Hovenkamp, *The Competitive Effects of Search Engine Defaults*, J.L. and
    Econ. (forthcoming 2027) ...........................................................................22, 23

Erik Hovenkamp & A. Douglas Melamed, *Antitrust Analysis of Search Engine
    Defaults*, Antitrust L.J. (forthcoming) ...............................................................22

Hunt Allcott et al., *Sources of Market Power in Web Search: Evidence from a
    Field Experiment* (Nat'l Bureau of Econ. Rsch., Working Paper No. 33410,
    2026)....... ..................................................................................................16, 20

Ilya R. Segal & Michael D. Whinston, *Naked Exclusion: Comment*, 90 Am. Econ.
    Rev. 296 (2000)..................................................................................................8

Richard J. Gilbert & David M. Newbery, *Preemptive Patenting and the
    Persistence of Monopoly,* 72 Am. Econ. Rev. 514 (1982) ...................................7

# TABLE OF AUTHORITIES (CONTINUED)

**Page(s)**

Steven Salop, *A Simple and Effective Repair for the Google Search Remedy*, ProMarket (June 3, 2026), https://www.promarket.org/2026/06/03/a-simple-and-effective-repair-for-the-google-search-remedy/ ............................................21

Steven Salop, *Market Structure, Competitive Effects, and Remedies*, *in* Modern Economic Analysis and Antitrust Law: A Guide 9-43 (2026) ............................21

Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion*: *Raising Rivals' Costs to Achieve Power over Price*, 96 Yale L.J. 209 (1986)..................14

Tobias J. Klein et al., *How Important Are User-Generated Data for Search Result Quality? Experimental Evidence*, 68 J.L. and Econ. 499 (2025) ........................16

**IDENTITIES AND INTEREST OF *AMICI CURIAE***

*Amici curiae* are economics and business professors with expertise in industrial organization, competition economics, and antitrust. Institutional affiliations, listed for identification only, appear in Appendix A. *Amici* share an interest in applying sound economic reasoning to allegations of antitrust harm, particularly the monopoly maintenance and remedy questions this appeal presents. They submit this brief to explain why the District Court's liability findings follow established economic principles, and why core remedy provisions may not adequately address the competitive harm.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

*Amici* offer an economic framework to assess key elements of the record. First, Google's default agreements are exclusive contracts covering a large market share. For tens of billions of dollars annually, Apple, Mozilla, and Android makers and carriers set Google as their default search engine and agree not to give rivals comparable placement. A default, especially one a partner cannot displace, is de facto exclusive.

Second, a monopolist can outbid even a more efficient rival for an exclusive preserving its monopoly. Because competition reduces total market profits, monopoly profits exceed the combined profits two firms earn splitting the market. Thus, the incumbent gains more by completely excluding a rival than the rival

1

gains by competing.

Third, search is a market with substantial fixed costs and scale economies, and a search engine requires a minimum number of users to be competitive. In such markets, a monopolist can exclude a rival by foreclosing just enough distribution to hold it below viable scale. Google's agreements were found to "effectively block Google's rivals from the most effective channels of search distribution." *United States v. Google LLC*, 747 F. Supp. 3d 1, 142 (D.D.C. 2024).

Fourth, because users are also an "input" that directly contributes to the production of quality products in this market, foreclosure is self-reinforcing. Denying a rival distribution not only keeps it small but also limits its quality and blunts its incentive to invest. This dynamic creates the very quality gap Google offers as the benign source for its dominance.

Fifth, under these conditions, there is no genuine "competition for the market." An auction for exclusivity will not necessarily select the higher quality firm when Google is able to use its monopoly profits to outbid competitors on enough distribution contracts to keep rivals sub-scale. Scale economics allow the monopolist to keep rivals below the scale at which they could compete effectively. The District Court's finding of "no genuine 'competition for the contract'" is consistent with basic economics as well as the factual record. *Id.* at 144.

Sixth, the magnitude of payments at issue also suggests the contracts are

intended to protect Google's monopoly. Google's revenue-share payments to distribution partners totaled $26.3 billion in 2021. *Id.* at 88. Google claims that it wins on quality alone, but it is hard to understand why Google would need to offer such large amounts to outbid a rival it claims is inferior.

Finally, contemporaneous evidence from the foreclosed market and evidence from unrelated markets can mislead. In other words, behavior of market participants today, in a search market Google has monopolized for years, does not necessarily shed light on what a competitive market would look like.

As for the injunction, economic analysis suggests the District Court's remedy order is unlikely to prevent Google's ongoing monopolization or undo harm from its past conduct. An effective remedy must address and cure both customer foreclosure (distribution) and input foreclosure (user quality data). The two are interdependent; relief aimed at one is likely to fail if the other is left intact. On the present record, the injunction's data-sharing and syndication provisions appear too limited—too narrow in scope, currency, and duration to bridge the scale advantages Google was found to possess during the liability phase. The injunction leaves substantially intact Google's ability to foreclose access to customers. By allowing Google to pay for default placement with minimal restrictions, the decree preserves Google's ability to maintain its monopoly.

Additionally, the remedy does not adequately address Generative AI

(GenAI) distribution. The District Court declined to order stronger relief in part on the hope that GenAI assistants will enter the fray and provide competitive discipline where search rivals could not, and "that Google will not simply outbid competitors for distribution." *United States v. Google LLC*, 803 F. Supp. 3d 18, 107 (D.D.C. 2025). But a decree that leaves Google largely unfettered in paying for GenAI distribution permits Google to shift its foreclosure to the emerging field of search through GenAI.

A remand to the District Court to build a sufficient record on alternative remedies and address the present shortcomings would be an appropriate response for this Court.

## I. ECONOMIC ANALYSIS OF THE RECORD SUPPORTS THE DISTRICT COURT'S LIABILITY FINDING

### A. Google's Default Agreements Are Exclusive Contracts That Cover a Large Share of the Market

Google's default contracts are, by definition, exclusive: only one search engine can be the default for a given user. And the record shows these default contracts have real exclusionary bite. The District Court credited extensive evidence that users rarely switch search engines, and many users do not know a default exists or that it can be changed, so that, as a practical matter, whoever holds the default holds the users. Transcript of Liability Hearing Proceedings ("Tr."), *United States v. Google LLC*, Case No. 20-cv-3010 (APM) (D.D.C. Sept. 2, 2025),

at 547:6-7, 549:1-3, 615:1-9 (ECF Nos. 917-18) (Direct Examination of Antonio Rangel).

Google's contracts secure that default position. In exchange for a share of search-advertising revenue, Google's partners make it the out-of-the-box default and agree not to preload a rival. The result is that "most devices in the United States come preloaded exclusively with Google." 747 F. Supp. 3d at 32. The court held these agreements are "exclusive," *id.*, expressly so on Android, where they "prohibit[] Google's Android partners from preloading rival search engines," *id.* at 151, and in effect on Apple devices, where contractual terms and Apple's actions mean "Google will be the only [general search engine] preloaded." *Id.* at 148. This exclusivity is enforced by Google: when Apple, Verizon, and others asked for flexibility to offer their users a choice, Google insisted on exclusivity as the price of revenue share. *Id.* at 93, 102, 173.

The District Court correctly found that this exclusivity was anything but ordinary, procompetitive distribution. An arrangement under which a distributor agrees to set the incumbent monopolist's product as the automatic choice and withhold equivalent treatment from every competitor is the classic form of an exclusive-dealing contract. Labeling it a "default" and a "revenue share" changes the vocabulary, not its economic effect. And a rival cannot answer an exclusive with a partial offer, because there is no partial default to win: "if Google is offering

5

just an exclusive, there's nothing for Microsoft to do but compete for an exclusive . . . it's all or nothing." Tr. at 6145:10-13 (ECF No. 973) (Cross-Examination of Michael D. Whinston). These exclusive contracts are *exclusionary*—that is, anticompetitive—not competition on the merits.

### B. A Monopolist Will Outbid Even a More Efficient Rival to Preserve Its Monopoly

Google counters that it secured these defaults in fair competition by offering a better option than rivals. In theory, where winning a single contract hands the winner the entire market, that inference may hold: a more efficient challenger, expecting monopoly rents, can outbid the incumbent.

But with multiple distributors, an incumbent defending its monopoly and a rival seeking to compete do not bid for the same prize. A rival winning exclusivity with one distributor earns only shared market profits, not monopoly rents. Because competition dissipates profits, monopoly profits exceed the combined profits of firms splitting a market. This gives an incumbent monopolist the incentive and ability to outbid an equally or more efficient rival for exclusivity on every contract needed to maintain its monopoly and supracompetitive profits. Richard Gilbert & David M. Newbery, *Preemptive Patenting and the Persistence of Monopoly,* 72 Am. Econ. Rev. 514 (1982); Tr. at 6100:1-9 (ECF No. 972) (Whinston) ("[T]he dominant firm is protecting monopoly profits if it wins. . . . The dominant firm will win," because it "has the protection of those monopoly profits and will spend them

if it needs to to win.").

### C. Because Search Is a Market with Substantial Fixed Costs and Scale Economies, the Incumbent Need Not Lock Up All Distribution to Foreclose

A search engine requires a minimum number of users to compete effectively. Building and running a search engine is "an extremely capital- and human-resource intensive endeavor," 747 F. Supp. 3d at 42, and without a large, continuous flow of queries a rival cannot cover those costs or sustain the service. Critically, search engine users not only generate revenue (through ad consumption, for example) but also are an essential input that gives the search engine an advantage over rivals. Each new query and click provides data about useful results, so an engine that is used more learns and improves faster, drawing still more users and more searches—the "essential raw material for building, improving, and sustaining" a search engine, in a self-reinforcing loop. *Id.* at 159, 161-62. This "flywheel" effect of compounding benefits of scale economies and network effects is illustrated by a Microsoft graphic referenced by the court. *Id.* at 162.



Economists have long understood that where viability depends on scale, a monopolist can exclude an equally or more efficient rival without buying up all distribution. It need only foreclose enough to hold its rival below the scale at which it could become an effective competitor, leaving the rest of the market formally open but too small to sustain a viable challenger. *See* B. Douglas Bernheim & Michael D. Whinston, *Exclusive Dealing*, 106 J. Pol. Econ. 64 (1998); Eric Rasmusen, J. Mark Ramseyer, & John S. Wiley Jr., *Naked Exclusion*, 81 Am. Econ. Rev. 1137 (1991); Ilya R. Segal & Michael D. Whinston, *Naked Exclusion: Comment*, 90 Am. Econ. Rev. 296 (2000). Thus, a rival cannot succeed by winning a contract here and there; below the viability threshold, partial success is no

success at all.

Google's default contracts route roughly half of all U.S. queries to Google through the covered access points, 747 F. Supp. 3d at 157, and a further fifth run through Google's own Chrome browser. *Id.* at 160. Foreclosing enough distribution to deny a rival viable scale is the strategy, not a gap in it. The result: Google's ranking systems have "locked out small players from the ranking game." Tr. at 5793:13 (ECF No. 970) (Whinston).

### D. Because Users Are Also an Input to Produce Quality, Foreclosure Is Self-Reinforcing

The role of user scale in determining search quality compounds the monopoly advantage for Google. Foreclosing distribution denies rivals access to both customers and inputs. Keeping a rival small depresses its quality and weakens it as a competitor. A rival denied queries cannot see enough searches to close the quality gap, however able its engineers. *See* Tr. at 5781:22-23 (ECF No. 970) (Whinston) ("[R]educed scale directly weakens rivals as competitors."). Mobile search further exemplifies this dynamic: "Microsoft has never achieved the mobile distribution that it needs to improve on that platform. This perpetual scale and quality deficit means that Microsoft has no genuine hope of displacing Google." 747 F. Supp. 3d at 162 (internal citations omitted).

Foreclosure also blunts the rival's incentive to invest. It shrinks the reward to any improvement, because even a much-improved rival still cannot reach the

users locked behind defaults. And this foreclosure raises the cost of improving, because the data that would fuel the improvement is exactly what the foreclosure withholds. Tr. at 5837:24-38:3 (ECF No. 971) (Whinston).

Two consequences follow. First, exclusion becomes cheaper: the incumbent needs to foreclose less to keep a rival non-threatening. Second, the advantage is self-perpetuating: fewer users yield lower quality, producing the consumer preference Google offers to explain its dominance. Google's argument that it has the better search engine stems partly from foreclosure: Google is better in part because it has users, and it has users partly because contracts denied them to others. To say Google won because it is better, without asking why, confuses a consequence of conduct for a justification.

### E. Under These Conditions, There Is No Genuine "Competition for the Market"

The conditions described above explain why "competition for the market" is a mirage. In this market, the incumbent can outbid rivals for the exclusive that preserves its monopoly. Scale economies let it foreclose enough distribution to prevent a rival from becoming an effective competitor. And because scale produces quality, foreclosure keeps rivals small, lower quality, and unable to invest their way to success. In fact, when Microsoft offered Apple a 100% revenue share, Apple would not switch, 747 F. Supp. 3d at 173, and Google's own internal analysis found that Microsoft would have to pay Apple 122% of Bing's revenue

merely to match Google's offer, concluding it "will not be possible for [Microsoft] to match our payments profitably." *Id.* at 95.

In short, defaults, rather than competition between products, decide who serves the market. "Competition for the market" cannot discipline a monopoly when the monopolist's contracts settle the contest before the merits are tested. Both economic theory and the factual record support the District Court's finding of "no genuine 'competition for the contract.'" *Id.* at 144.

### F.  The Magnitude of Payments Suggests the Contracts Are Intended to Protect Google's Monopoly

An additional piece of economic evidence comes from Google's own conduct: the amount of money it pays to secure its exclusive contracts. In 2021, Google's revenue-share payments to distribution partners totaled $26.3 billion, *id.* at 88: "nearly four times more than all of Google's other search-specific costs combined," *id.*; the payment to Apple alone was an estimated $20 billion in 2022. *Id.* at 90. These payments are approximately a third of the advertising revenue generated by the searches. *Id.* at 95.

Google argues that "there is no . . . evidence . . . that Google's customers would have chosen a rival, even in the absence of the challenged agreements," Google Br., ECF No. 2174652, at 3, that "users preferred for [sic] Google's higher-quality GSE," *id.* at 46, and that "browser-makers would have chosen Google regardless," *id.* at 94. If that were true, it is difficult to see why Google would offer

such large amounts to outbid rivals it claims are inferior.

There are two possible explanations for these enormous payments. Either the contracts are valuable because they exclude actual or potential competitors, or Google is acting as an irrational economic actor that is paying tens of billions of dollars for little benefit. The record repudiates the second explanation. Google "recognizes that losing defaults would dramatically impact its bottom line," 747 F. Supp. 3d at 160, and guards them accordingly. A former Google advertising executive testified that the payments "provide an incredibly strong incentive for the ecosystem to not do anything" and "basically freeze the ecosystem in place." *Id.* at 145. Apple's Eddy Cue put it plainly: "I don't believe there's a price in the world that Microsoft could offer us. They offered to give us Bing for free. They could give us the whole company." *Id.* at 95.

The conclusion is the same whether one relies on basic economic principles or the observed payments: a scale-protected monopolist will outbid rivals to maintain its monopoly, and Google did exactly that. These contracts are not the fruit of competition on the merits; they are the anticompetitive mechanism by which competition on the merits is prevented.

### G. Contemporaneous Evidence from the Foreclosed Market and Evidence from Unrelated Markets Can Mislead

The way users interact with search engines today does not necessarily tell us what they would do in a competitive market. Recurring arguments point to present

behavior, such as: even when users are provided with a different default (as in Mozilla's Yahoo experiment), they often return to Google, *id.* at 160; or European choice screens shifted few users. 803 F. Supp. 3d at 142. But such isolated and partial observations are made *inside* the equilibrium the default contracts created. The rivals that users decline to use today are rivals that were denied the ability to reach scale through competitive distribution. Whether users prefer Google to a rival that was never allowed to reach scale says nothing about whether they would prefer Google to a rival that had achieved scale. As the government's expert explained, low switching "can be true at the current qualities, but not true if rivals were . . . invested and became better." Tr. at 5726:15-17 (ECF No. 970) (Whinston). Contemporary evidence that shows Google is the best search engine *today* does not explain *why* that is the case, which is the question at the heart of the case.

For the same reason, arguing that Google's quality advantage dates to 2009, Google Br. 8, is no defense: because quality is produced from the ongoing flow of data through usage of the search engine, an advantage that must be continually renewed, these default contracts are the instrument of its renewal. Had Google's supremacy been permanently secured by 2009, it would have had no reason to pay such large and ever-increasing amounts of money to secure exclusivity thereafter. But it did pursue those exclusives, and its market share increased from 80% in

2009 to nearly 90% by 2020. 747 F. Supp. 3d at 38.

Similarly, observations from other industries do not necessarily transfer to search. Exclusive contracts and loyalty payments may be benign in markets lacking search's economic conditions. Where scale economies are slight, and quality does not increase with use, rivals can win customers one at a time. If buyers are attentive, defaults matter less. General search has none of these features: viability and quality depend on scale, defaults are all-or-nothing rather than user-by-user competition, and default choice is one most users never revisit.

The economics bears on two central questions: whether there was genuine "competition for the contract," which there was not—as an application of economic principles as well as fact; and whether the conduct excluded rivals "on some basis other than efficiency," which it did—contracts that hold rivals below the scale from which viability and quality are produced exclude them on a basis prior to efficiency, keeping them from *becoming* efficient. *See* Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion*: *Raising Rivals' Costs to Achieve Power over Price*, 96 Yale L.J. 209, 224 (1986). The District Court's liability findings are consistent with economics and the factual record.

## II.   THE REMEDY FALLS SHORT OF TERMINATING GOOGLE'S MONOPOLY OR RESTORING COMPETITION

### A. An Effective Remedy Must be Comprehensive Enough to Address All the Effects of the Anticompetitive Conduct

Two mutually reinforcing anticompetitive mechanisms were established in the liability analysis: defaults capture users and their queries, and query volume produces the quality and monetization that in turn win distribution. *See supra* I.C.-D. Google's agreements did not merely divert a fixed number of queries; they limited rivals' opportunities to reach users, learn from their searches, improve their products, and earn the revenue needed to compete for future distribution. An effective remedy needs to address both mechanisms. The District Court found that "[m]erely excising the exclusive provisions from Google's distribution agreements will not unleash competition," 803 F. Supp. 3d at 95, and therefore ordered data sharing and syndication to reduce the advantages Google obtained from scale. However, it also allowed Google to continue conditioning substantial payments on default placement, even after concluding that those payments may preserve the distribution equilibrium that entrenched Google's monopoly. *Id.* at 107.

Neglecting distribution foreclosure will likely render the remedy ineffective. Because these mechanisms are dynamically interdependent, relief aimed at only one—either data sharing or distribution—is unlikely to restore competition. Limiting data and syndication relief may leave rivals too weak to compete, while continued default payments keep distributors from shifting users to stronger rivals (were they to be enabled by the remedy) due to profit risks from increased competition. As constructed, the remedy risks leaving intact the uncompetitive

landscape and Google's monopoly profits.

### B. The Injunction's Data-Sharing and Syndication Provisions May Be Too Limited

The data-sharing and syndication provisions are directed at the scale Google acquired through the challenged agreements. Academic research has found that additional user data can improve result quality, particularly for rare queries. *See, e.g.*, Tobias J. Klein et al., *How Important Are User-Generated Data for Search Result Quality? Experimental Evidence*, 68 J.L. and Econ. 499, 513 (2025). Despite this research, there is considerable empirical uncertainty about the precise way in which greater data access translates to the competitive viability of rivals. For example, Hunt Allcott, et al. estimate positive but modest returns to additional click-and-query data at Bing's existing desktop scale. *See* Hunt Allcott et al., *Sources of Market Power in Web Search: Evidence from a Field Experiment* 37-38 (Nat'l Bureau of Econ. Rsch., Working Paper No. 33410, 2026). However, this research does not quantify the value of running more experiments, the effect of scale on advertising and monetization, or potentially larger gains on mobile. Additional discovery may contain evidence of the impact of these dynamics on quality and competition that may warrant more extensive and comprehensive data-sharing and syndication to ensure the competitiveness of Google's rivals.

The data-sharing ordered by the District Court was quite limited, ostensibly due to concerns of free-riding, privacy, and incentives to innovate. As part of the

ordered remedy, a qualified competitor receives a one-time snapshot of specified Search Index information; Glue and RankEmbed training data are to be disclosed at least twice, subject to a cap informed by the Technical Committee; and first-year search syndication is capped at 40% of queries, 803 F. Supp. 3d at 117-18, 124-25, 134, with annual reductions from that percentage also directed by the Technical Committee. *Id.* at 135. While those limitations respond to potentially legitimate concerns, they may not provide rivals access that is current or continuous enough to materially narrow the scale advantages identified at liability.

## C. The Injunction Leaves Google's Distribution Foreclosure Ability Substantially Intact

The remedy allows a distributor to choose a different default without losing the right to distribute other Google products. *Id.* at 37. But Google may still pay for default or preferred placement, subject to the decree's limits. *Id.* at 107. Economic theory and the factual record show why permission to choose need not produce a competitive choice: no rival could match Google's offer for a default, *see supra* sections I.E.-F.; 747 F. Supp. 3d at 95, and nothing in the decree changes that asymmetry, which reflects both Google's superior product and its stronger monetization, each of which benefited from years of Google's monopoly maintenance.

The omission of this specific remedy in the injunction was driven in large part by the District Court's concern about the outcome of a complete payment ban.

17

803 F. Supp. 3d at 106-07. For example, on "day one," distributors might retain Google as the default because users presently prefer it, giving Google a large windfall without changing distribution. *Id.* at 103. Alternatively, distributors might replace Google and lose substantial revenue, because rivals monetize queries less effectively, and some users would return to Google. *Id.* at 104. The court credited evidence that lower payments could reduce investment by browsers, device makers, and carriers; raise device prices; and weaken competition in adjacent markets, *id.* at 104-05, while leaving Google as the default. The District Court apparently feared—but we have no factual findings—that the risk of consumer harm outside the relevant market because of lower payments to distributors outweighed the potential competitive benefit of a payment ban within the relevant market. *Id.* at 106-07.

The District Court expected Google to remain "the primary, if not only, default G[eneral] S[earch] E[ngine]" because of its quality, data volume, and monetization capacity. *Id.* at 96. The court acknowledged that distributors would be induced to stay with Google because Google can pay more and that continued payments could blunt the decree's other provisions. *Id.* at 106-07. Thus, the District Court apparently concedes the inevitability of a distribution monopoly. The concern is not that every distributor necessarily will select Google, or that no user will ever encounter a rival; it is that the decree preserves Google's ability to

18

keep most high-value distribution and thereby also weakens the practical effect of the data-sharing and syndication remedies.

Recognizing this deficiency, the court retained authority to revisit a payment ban or lesser remedy if competition is not substantially restored. *Id.* at 107. But waiting is not without cost in a market characterized by feedback effects: rivals' opportunity to use syndication is limited in duration, distributors continue to make default decisions, and each period of foregone queries further reduces subsequent quality and monetization. Nor does the court identify a benchmark or timetable for that assessment. *See id.* Judicial humility should account for error in both directions. An overbroad remedy may risk disrupting consumers and adjacent markets in the short-term, but an underinclusive remedy can allow an adjudicated monopoly to remain entrenched and lead to long-term sustained consumer harm in the form of less innovation, product stagnation or degradation, and higher advertising rates.

### D. Alternative Distribution Remedies Exist to Address the Shortcomings

To illustrate that the District Court's choice need not be between a complete payment ban and largely unconstrained Google payments to preserve the status quo, this brief describes three alternatives. These alternatives are neither recommendations nor an exhaustive list of solutions, but rather an illustration that potentially effective alternatives exist.

### 1. Experience Before Choice May Shift Users

A remedy that provides users with exposure to alternatives before asking them to choose a default may disrupt the monopoly while preserving consumer welfare. For example, in one academic study, Bing is introduced as the default for two weeks followed by a single active choice, allowing users to learn about Bing while limiting the risk that inattentive users remain with a search engine they dislike. The study estimates a 15-percentage-point reduction in Google's market share while leaving average consumer surplus roughly constant. Allcott et al., *supra*, at 36. Although such studies do not prescribe implementation details, they suggest that exposure, like the one introduced in the study, or a variant like paying users to try a non-Google search engine for some period, can promote competition.

### 2. A Cap Could Preserve Some Payments While Opening Distribution

The "Pay for Half" proposal, proposed by Cooper at al., would allow Google to pay a channel partner for placement on no more than half of the devices in a product line, with eligible devices randomly assigned. *See* Alissa Cooper, et al., *Pay for Half: A Better Remedy for Google Search* 9 (Yale U. Tobin Ctr. for Econ. Pol'y, Discussion Paper No. 12, 2026). A separate payment cap, equivalent to a 40% revenue share, would prevent Google from concentrating a larger payment on the covered half. *Id.* The central mechanism of Pay for Half is the coverage limit: a distributor could continue receiving material Google revenue while gaining an

incentive to find and promote a second provider for devices on which Google cannot pay. *Id.* at 12. This directly addresses the windfall concerns identified by the District Court, which it associated with a complete ban on payments, while also guaranteeing an opportunity for rival distribution.

### 3. Decoupled Payments Separate Compensation from Placement

Another alternative would be to prohibit payments conditioned on default or promotional status while requiring Google to compensate distributors according to total search volume, regardless of which search engine users employ. *See* Steven Salop, *A Simple and Effective Repair for the Google Search Remedy*, ProMarket (June 3, 2026), https://www.promarket.org/2026/06/03/a-simple-and-effective-repair-for-the-google-search-remedy/. The per-search amount could be based on Google's pre-judgment payments to each distributor, and a court could consider a temporary premium for non-Google searches. Steven Salop, *Market Structure, Competitive Effects, and Remedies*, *in* Modern Economic Analysis and Antitrust Law: A Guide 9-43 (2026). The attraction of such a remedy is its conceptual separation: distributor compensation would no longer turn on selecting or promoting Google. This type of remedy would require additional evidence, which could be sought in a remanded remedies hearing.

### 4. Resistance to Circumvention Should be Evaluated

Any proposal should prevent Google and its counterparties from merely

complying with the formal prohibition while reproducing the same incentive through a differently labeled contract term or payment. It is therefore important to ask what conduct is measured, who supplies and audits the data, what prevents the payment incentive from re-emerging in a different form, what happens when products or access points change, and when the restriction ends. The same concern extends across channels, not only contract forms.

### E. The Remedy Does Not Adequately Address Generative AI Distribution

The District Court declined stronger relief in part on the hope that rapidly expanding GenAI will supply the competitive discipline that search rivals could not, 803 F. Supp. 3d at 107, and "that Google will not simply outbid competitors for distribution if superior products emerge." *Id.* That hope rests on a premise that the liability record refutes. Distribution is as essential to a GenAI assistant as it is to a search engine: an assistant reaches users through similar defaults, preloads, and placements. *See id.* at 158. And a scale-protected monopolist is likely to outbid a GenAI rival for that distribution for the same reason it outbid search rivals—it is defending a monopoly worth more than a rival can earn by sharing the market. *See supra* part I.B. Scholars have concluded that the default agreements "raise barriers to entry and thus reduce the likelihood of search innovation even with AI." Erik Hovenkamp & A. Douglas Melamed, *Antitrust Analysis of Search Engine Defaults* 54, Antitrust L.J. (forthcoming) (manuscript); *see also* Erik Hovenkamp, *The*

22

*Competitive Effects of Search Engine Defaults*, J.L. and Econ. (forthcoming 2027).

The District Court recognized the risk in principle. These proceedings were "as much about . . . ensuring that Google's dominance in search does not carry over into the GenAI space," 803 F. Supp. 3d at 36; *see id.* at 95. But a decree that leaves Google with few constraints in purchasing search distribution, and largely unfettered in purchasing GenAI distribution, *see id.* at 37, 158, reopens in the adjacent market the foreclosure the remedy sought to curtail in general search. Preventing the adjudicated conduct from simply reappearing in the new GenAI access points protects the search remedy; it is not regulation of a new market, and it does not depend on how the GenAI market is ultimately defined.

### F.  Remand to Build the Record on Remedies is Appropriate

The decree's well-supported data and syndication provisions target advantages tied to Google's unlawfully protected scale. But the adequacy of those input provisions cannot simply be assumed in the abstract. There are substantial reasons to expect their scope, frequency, and duration may be too limited to materially reduce those advantages. Even effective input relief will not restore competition if Google can continue to pay for distribution to preserve its monopoly over users.

This Court need not simply affirm current remedies nor prescribe specific alternatives. It should remand for a focused evidentiary remedies hearing on (1)

whether data and syndication requirements sufficiently reduce the scale advantages identified at liability, and (2) how distribution payments can be restricted or decoupled to change default selection incentives while preserving any substantial, well-documented downstream benefits. The District Court heavily weighted uncertainty about restoring competition as a reason for modest remedies. In a market with scale feedback dynamics, that weighting should run the other way. Restoring competition requires addressing both mutually reinforcing mechanisms identified at liability. As the court observed, if behavioral remedies prove insufficient, structural or quasi-structural relief may be appropriate. A focused remand lets the District Court build the necessary record and choose a well-reasoned remedy, rather than leaving economic questions unresolved and an adjudicated monopoly intact.

## CONCLUSION

Search market economics strongly support the District Court's liability findings, the predictable result of exclusive distribution where scale is both a quality input and an entry barrier. Those findings should be affirmed.

On remedy, the same economics shows the decree's adequacy cannot be assumed. In a market with scale feedback dynamics, error costs are asymmetric. An underinclusive remedy lets an adjudicated monopoly maintain or extend entrenchment and erodes future deterrence—compounding hard-to-reverse

24

harms—while broader remedy costs are comparatively bounded and observable. Given this asymmetry, genuine doubt about efficacy should be resolved toward restoring competition rather than preserving incumbent advantages. Remand for a focused evidentiary hearing on whether the decree or a measured alternative will restore competition is therefore warranted.

Dated: August 4, 2026                    Respectfully Submitted,

/s/ Deborah Elman
Deborah Elman
**GARWIN GERSTEIN & FISHER LLP**
88 Pine Street, 28th Floor
New York, NY 10005
(212) 398-0055

*Counsel for* Amici Curiae *Economics and Business Professors*

Kaitlyn McMillan
**SIMONSEN SUSSMAN LLP**
307 West 38th Street, 16th Floor
New York, NY 10012
(646) 400-6652
kaitlyn.mcmillan@simonsensussman.com

*On the Brief*

25

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief contains 5,418 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman. I certify that this brief is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5).

Dated:  August 4, 2026

*/s/   Deborah Elman*
Deborah Elman

# APPENDIX A

## List of *Amici Curiae* Economics and Business Professors

Nikhil Agarwal
Paul A. Samuelson Professor
MIT Department of Economics

Christopher T. Conlon
Associate Professor of Economics
NYU Stern School of Business

Mert Demirer
Ford Foundation International Career Development Associate Professor
MIT Sloan School of Management

Chiara Farronato
Glenn and Mary Jane Creamer Associate Professor of Business Administration
Harvard Business School

Kenneth Hendricks
Laurits R. Christensen Distinguished Chair
University of Wisconsin

Jean-Francois Houde
David Edwin and Lucille Hartmann Davies Chair in Economics
University of Wisconsin

Aviv Nevo
George A. Weiss and Lydia Bravo Weiss PIK Professor
University of Pennsylvania Wharton School and Department of Economics

Robert H. Porter
William R. Kenan, Jr. Professor of Economics
Northwestern University

Marc Remer
Associate Professor
Swarthmore College Department of Economics

Nancy L. Rose
Charles P. Kindleberger Professor of Applied Economics
MIT Department of Economics
Visiting Scholar
Harvard Kennedy School Mossavar-Rahmani Center for Business and Government

Tobias Salz
Associate Professor
MIT Department of Economics

Ralph Winter
Professor Emeritus of Strategy and Business Economics
University of British Columbia

**CERTIFICATE OF SERVICE**

I, Deborah Elman, certify that on August 4, 2026, the foregoing document was filed with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit and served on all parties or their counsel of record through the CM/ECF system.


Dated:  August 4, 2026


/s/  Deborah Elman
Deborah Elman