ORAL ARGUMENT NOT CURRENTLY SCHEDULED

No. 26-5023, Consolidated with Nos. 26-5047, 26-5049

In The

# United States Court of Appeals for the D.C. Circuit

UNITED STATES OF AMERICA, ET AL.,

*Plaintiffs-Appellees/Cross-Appellants,*

v.

GOOGLE LLC,

*Defendant-Appellant/Cross-Appellee.*

Appeals from the United States District Court
for the District of Columbia
Nos. 20-cv-3010 & 20-cv-3715 (Hon. Amit P. Mehta)

**SECOND AMICUS BRIEF OF BRAVE SOFTWARE, INC.
IN SUPPORT OF NEITHER PARTY URGING
AFFIRMANCE IN PART AND REVERSAL IN PART**

Gary A. Bornstein
Yonatan Even
Andrew C. Finch
CRAVATH, SWAINE & MOORE LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
gbornstein@cravath.com
(212) 474-1000

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

Pursuant to D.C. Circuit Rule 28(a)(1), undersigned counsel for amicus curiae Brave Software, Inc. ("Brave") states that:

**Parties and Amici.** All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Plaintiffs' Certificates as to Parties, Rulings, and Related Cases (App. Dkt. 2160541, *as supplemented by* App. Dkt. 2185548), except that SerpApi, LLC, the American Economic Liberties Project, Microsoft Corporation, Little Tech Association and Travel Lemming LLC, DuckDuckGo, Inc., Public Knowledge, Economics and Business Professors, and the American Antitrust Institute received the Parties' consent to participate as amici curiae in these proceedings.

**Rulings Under Review.** References to the rulings at issue appear in the parties' Certificates as to Parties, Rulings, and Related Cases (App. Dkts. 2160428, 2160541).

**Related Cases.** A list of related cases appears in the parties' Certificates as to Parties, Rulings, and Related Cases (App. Dkts. 2160428, 2160541).

## STATEMENT REGARDING AUTHORITY AND CONSENT TO FILE AND SEPARATE BRIEFING

Brave files this amicus brief under Federal Rule of Appellate Procedure 29(a) and D.C. Circuit Rule 29.

Pursuant to D.C. Circuit Rule 29(b), the undersigned counsel for amicus curiae Brave states that all parties have consented to Brave's participation as amicus curiae.

Pursuant to D.C. Circuit Rule 29(d), the undersigned counsel for amicus curiae Brave states that a separate brief is necessary because the perspective that Brave brings is distinct from those in the briefing submitted by Plaintiffs and those likely to be submitted by other amici curiae.  As further detailed below, Brave is one of only three general search engines in the United States (alongside Google and Bing) that has developed a commercially viable search index capable of generating all of its own search results.  Brave is also one of the few companies that competes with Google in both relevant antitrust markets found by the district court (the market for general search services and the market for search text ads) *and* in the browser space, which the district court found to be a related market.  Brave therefore has unique insight into how Google's conduct has affected competition in the relevant markets and related markets and how the Final Judgment's remedies would impact those markets.

iii

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), Brave states that:

(i)     no party's counsel authored the brief in whole or in part;

(ii)    no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and

(iii)   no person—other than the amicus curiae, its members or its counsel—contributed money that was intended to fund preparing or submitting the brief.

iv

## TABLE OF CONTENTS

**Page**

GLOSSARY OF ABBREVIATIONS ................................................................... vii

INTRODUCTION & INTEREST OF AMICUS CURIAE .................................... 1

ARGUMENT .................................................................................................... 4

    I.     A Ban on Unconditional Revenue Share Is Not Needed to Remedy Google's Anticompetitive Conduct. ...................................................... 4

         A.     The Record Supports a Ban on Conditional Revenue Share Payments. ...................................................................................... 4

         B.     The Record Does Not Support a Ban on Unconditional Revenue Share Payments. ....................................................................... 8

    II.    The Final Judgment Should Prohibit Google From Using Revenue Share Payments to Discriminate Against Distributors That Do Not Set Google as the Default. ......................................................................... 11

    III.    The District Court Can Consider Brave's Proposed Modification to the Final Judgment. ........................................................................ 12

CONCLUSION ............................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bruce v. United States*,
    379 F.2d 113 (D.C. Cir. 1967)..................................................................13

*FTC v. Actavis, Inc.*,
    570 U.S. 136 (2013)..............................................................................10

*Hecht Co. v. Bowles*,
    321 U.S. 321 (1944)..............................................................................13

*In re Google Play Store Antitrust Litig.*,
    147 F.4th 917 (9th Cir. 2025) .................................................................13

*Morgan v. Garris*,
    307 F.2d 179 (D.C. Cir. 1962)................................................................13

*Nat'l Soc. of Pro. Eng'rs v. United States*,
    435 U.S. 679 (1978)..............................................................................13

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    20 F.4th 466 (9th Cir. 2021) ..................................................................13

*United States v. E.I. du Pont de Nemours & Co.*,
    366 U.S. 316 (1961)..........................................................................4, 13

**Other Authorities**

*How do I set my default search engine?*, Brave (last visited Aug. 2,
    2026), https://support.brave.app/hc/en-us/articles/360017479752-
    How-do-I-set-my-default-search-engine ...............................................5

*Privacy-Preserving Brave Search Replaces Google as the Default
    Search Engine in the Brave Browser*, Brave (Oct. 19, 2021),
    https://brave.com/blog/search-and-web-discovery/................................9

## GLOSSARY OF ABBREVIATIONS

| Abbreviation | Document |
|---|---|
| Brave Br. | First Amicus Brief of Brave Software, Inc., App. Dkt. 2175899 |
| Final Judgment or FJ | Final Judgment (Dec. 5, 2025), D. Ct. Dkt. 1462 |
| GSE | General search engine |
| Liability Opinion or Liab. Op. | Liability Opinion (August 5, 2024), D. Ct. Dkt. 1033 |
| Liab. Tr. | Transcript (Liability Phase Trial), D. Ct. Dkts. 914-1015 |
| Pls.' RPFJ | Plaintiffs' Revised Proposed Final Judgment (March 7, 2025), D. Ct. Dkt. 1184-1 |
| Remedies Opinion or Rem. Op. | Memorandum Opinion (Remedies Phase) (Sept. 2, 2025), D. Ct. Dkt. 1436 |
| Rem. Tr. | Transcript (Remedies Phase Trial), D. Ct. Dkts. 1393-1420 |
| States Br. | Opening-Answer Brief of the State Attorneys General, App. Dkt. 2185549 |
| U.S. Br. | Response Brief and Opening Brief on Cross-Appeal for the United States and Co-Plaintiff States, App. Dkt. 2185548 |

## INTRODUCTION & INTEREST OF AMICUS CURIAE

Brave operates a web browser and a GSE.  Its interest as amicus curiae is described further in its first amicus brief filed in this matter.  (*See* Brave Br. 1-2.)

The Department of Justice and several States (together, "Plaintiffs") challenge the district court's denial of their requested "payment ban," which would have prohibited Google from making any search-related payments to any distributors during the remedies term.  (*See* U.S. Br. 144; States Br. 10.)  The Plaintiffs argue that such a ban is necessary to redress the violations at issue, and that the district court erred by giving too much weight to the negative effects on third parties of a payment ban.  (U.S. Br. 126-29; States Br. 15-17.)

Brave agrees with the Plaintiffs' diagnosis but not with their proposed cure.  The Plaintiffs are correct that the Final Judgment, as written, would not effectively redress Google's anticompetitive conduct.  For years, Google has used its monopoly profits to lock up default placement for Google Search, foreclosing its GSE competitors from effective channels of distribution.  (Liab. Op. 222.)  The Final Judgment lets Google continue doing just that.  Google may continue to pay for, or condition payments on, default placement—as long as it renegotiates those agreements annually, and separately for each access point a distributor operates.  (*See* FJ § III.K; Rem. Op. 121.)  Thus, under the Final Judgment, Google can use

1

its unlawfully obtained monopoly profits to outbid other GSEs for default status and continue foreclosing competitors.  Brave agrees with the Plaintiffs that a ban on Google buying *default* placement is necessary to provide GSEs a meaningful opportunity to compete for distribution.  (*See* **Section I.A**.)

However, the Plaintiffs' proposed *total* payment ban, which would prohibit Google from "making nearly all search-related payments to distributors," is not the solution.  (Rem. Op. 119 (citing Pls.' RPFJ § IV.A-B, E).)  That proposed remedy wrongly lumps together two kinds of search-traffic payments:  conditional payments (*i.e.*, those conditioned on the distributor setting Google Search as the default) and unconditional payments (*i.e.*, those for search traffic generated by a search access point regardless of whether Google Search is the default—essentially payment for inclusion as one search option available to users).  The record below demonstrated the need to ban Google from conditioning revenue share payments on default placement, which resulted in *de facto* exclusivity; it did *not* support a ban on unconditional revenue share payments.  Extending the payment ban to include unconditional revenue share payments—as Plaintiffs urge—would serve only to enrich Google, not benefit competition.  (*See* **Section I.B**.)

Brave recognizes the inherent risk that Google may misuse unconditional revenue share payments to skirt a prohibition on default distribution agreements by directing money exclusively to distributors that *do* have Google as

the default, even if their revenue sharing agreements do not expressly require it. Such agreements would be "unconditional" in name only. But the solution to this risk is not to ban revenue share altogether. Instead, Google can be prohibited from discriminating against distributors that do not have Google Search as their default. In other words, if Google wants to pay revenue share to distributors that generate search traffic for Google Search, it must pay revenue share on equal terms to all distributors that do so, irrespective of whether that distributor gives Google Search default or preferential placement. That will ensure that distributors do not face the "Hobson's choice" between revenue from Google and the ability to promote another GSE over Google Search. (*See* **Section II**.)

The district court can consider Brave's proposal notwithstanding the Plaintiffs' failure to propose it. Courts have wide latitude to craft the remedies needed to correct the distortion caused by antitrust violations, and non-discriminatory unconditional revenue share is one such remedy. (*See* **Section III**.)

Brave therefore respectfully requests that this Court remand to the district court with an instruction to consider a remedy that prohibits Google from paying for default placement but permits Google to make unconditional revenue share payments on a non-discriminatory basis, without distinguishing between distributors that do or do not preference Google Search.

# ARGUMENT

## I.    A BAN ON UNCONDITIONAL REVENUE SHARE IS NOT NEEDED TO REMEDY GOOGLE'S ANTICOMPETITIVE CONDUCT.

An antitrust remedy must "effectively redress proved violations of the antitrust laws." *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 323 (1961).  Here, the district court found that Google's distribution agreements were anticompetitive because they required—either explicitly, or implicitly through the threat of lost revenue share—that the distributor set Google Search as the default GSE.  (Liab. Op. 216.)  These arrangements allowed Google to "lock up" default distribution, depriving its rivals of the scale needed to compete.  (*Id.* at 230-34.)

The Plaintiffs argue that a ban on search-related payments is necessary to effectively redress the harm caused by these agreements and deny Google the "fruits of [its] violation."  (U.S. Br. 130-32.)  Brave agrees, but only in part.  The record below supports the need to prohibit Google from conditioning payment to distributors on default placement of Google Search.  (Section I.A, below.)  But there is no basis to prohibit search-related payments that are not conditioned on default placement.  (Section I.B, below.)

### A.    The Record Supports a Ban on Conditional Revenue Share Payments.

Two types of revenue share payments were discussed during the district court proceedings:  revenue share payments that are conditioned on default or preferential placement, and revenue share payments that are not.  The latter,

4

referred to as "unconditional" revenue share payments, are paid to the distributor

for search traffic generated by a given search access point, regardless of whether

the GSE is the default on that search access point.  Unconditional revenue share

agreements incentivize the distributor to include a GSE as at least *an option* on a

search access point, even if not the *default* option.  For example, the omnibox

search bar on Mozilla's Firefox browser has a default GSE (Google Search); but it

also has a feature ("This time, search with") that allows users to temporarily

override that default and switch the search provider for a given query.  (*See* Liab.

Op. 25.)  Other distributors, like Brave's browser, offer a menu of pre-selected

search engines to choose from when the user seeks to change the default GSE in

their settings.[1]  Unconditional revenue share payments would reward distributors

for including a GSE on these types of menus, which makes it easier for users to

search via that GSE and, if they so choose, make it their default GSE.

The challenged distribution agreements in this case involved

*conditional* revenue share payments.  That is, Google paid revenue share only if

Google Search was the distributor's default GSE.  (Liab. Op. 101, 118.)  The

Plaintiffs did not challenge, and the district court did not analyze, agreements

---

[1] *How do I set my default search engine?*, Brave (last visited Aug. 2, 2026),
https://support.brave.app/hc/en-us/articles/360017479752-How-do-I-set-my-default-search-engine.

involving unconditional revenue share, because there were no such agreements in the record.  (Liab. Tr. 10621:12-19 (Whinston) (Plaintiffs' economic expert agreeing that there was no evidence "of any search provider ever agreeing to an unconditional revenue share agreement").)

The district court found that Google's conditioning of revenue share payments on default placement enabled Google to "lock up" access to the "extremely valuable real estate" that is default placement.  (Liab. Op. 230-34; *id.* at 214-36.)  "Due to Google's massive financial advantage and its superior monetization," no other GSE can afford to pay distributors the revenue share that Google, the market monopolist, offers.  (Rem. Op. 127.)  Because Google's conditional revenue share arrangements condition receipt of *any* revenue share on Google Search being the default, distributors may not make another GSE the default without forgoing millions or even billions of dollars annually.  With no other GSE capable of matching Google's revenue share, distributors have an overwhelming incentive to make Google Search the default.

To make matters worse, allowing Google to pay for default placement will undercut the remedies that the district court did order, because Google will be able to disincentivize distributors from trying to enter or invest in the general search services market.  Browser developers, for example, are particularly well-suited to create a GSE because they have ready-made distribution platforms and

audiences.  If Google can condition payments on default status, however, browser developers and other distributors interested in developing a GSE will have to choose between promoting their own nascent product through default placement and receiving revenue share from Google.  Many will choose to stay out of the market.  (*See, e.g.*, Liab. Op. 241 ("The prospect of losing tens of billions in guaranteed revenue from Google . . . disincentivizes Apple from launching its own search engine when it otherwise has built the capacity to do so.").)

Brave therefore agrees with the Plaintiffs that, to effectively redress the anticompetitive harms of Google's conduct, Google must be prohibited from conditioning revenue share on default placement.  (*See, e.g.*, States Br. 2-3, 11-12.)  The Final Judgment does not accomplish this.  It permits Google to condition revenue share on default placement, provided it renegotiates the agreements annually and on an access-point-by-access-point basis.  (FJ § III.L.)  But these caveats do not cure the all-or-nothing problem faced by distributors.  Under the Final Judgment, a distributor that chooses another GSE as the default for a particular search access point still forfeits *any* revenue share for the traffic that search access point generates for Google.  Thus, even under access-point-by-access-point negotiations, distributors that are unwilling (or unable) to forfeit revenue share will remain incentivized to set Google as the default for each search access point—and to do so every year.  The only effective solution is to completely

7

prohibit Google from conditioning payments on default distribution.  The district court's refusal to adopt such a ban was erroneous.

**B.    The Record Does Not Support a Ban on Unconditional Revenue Share Payments.**

Unconditional revenue share is different.  Unconditional revenue share does not foreclose distribution the way that conditional revenue share does.  As the Plaintiffs' expert explained, unconditional revenue share removes the "all or nothing" threat:  a distributor can choose any GSE as its default without fear of forfeiting Google's payments altogether.  (Liab. Tr. 10525:6-21 (Whinston).)

Indeed, banning unconditional revenue share would undermine—not advance—the Plaintiffs' stated goal of depriving Google of the fruits of its monopoly.  (U.S. Br. 131-32; States Br. 23-27.)  As the district court recognized, Google's monopolization of the general search market has created staying power with users, who have been conditioned to return time and again to Google for search.  (*See* Rem. Op. 84 ("[P]eople tend to stick with the status quo because it represents the path of least resistance.").)  Brave's own experience reflects the stickiness of Google's search dominance.  Prior to launching Brave Search in 2021, Google Search was the default GSE on the Brave browser.  Post-launch, Brave

8

changed its default to Brave Search.[2]  Yet, today—five years after Brave Search

replaced Google in that default spot—billions of queries originating from the

Brave browser every month still go to Google, which then monetizes those queries

for itself.  This is in part a consequence of Google's unlawful monopolization of

general search, which makes it difficult for distributors to convince users to switch

away from Google, even when Google Search is not the default GSE.  (*See, e.g.*,

Liab. Op. 27.)

  That stickiness will not disappear overnight.  Even with the Final

Judgment remedies, many users will continue using Google Search in the near

term.  (Rem. Op. 122 ("[E]ven if distributors were, at some point, to select a

different GSE . . . a sizeable number of users would switch back to Google.").)

The Plaintiffs' proposed total payment ban would not stop Google from earning

revenue on those queries—it would just prevent Google from sharing that revenue

with distributors.  As the district court observed, with a total payment ban, Google

"would continue to receive a disproportionate volume of search queries for a

---

[2] *Privacy-Preserving Brave Search Replaces Google as the Default Search Engine in the Brave Browser*, Brave (Oct. 19, 2021), https://brave.com/blog/search-and-web-discovery/.

fraction of the cost," increasing its profits, at least in the near term.  (Rem.

Op. 122.)  That would help Google, not competition.[3]

As long as Google's revenue share payments are unconditional—*i.e.*, are for making Google Search a non-exclusive option, not for requiring it to be the default—they do not implicate the Plaintiffs' concerns about the sharing of monopoly profits with third parties to exclude competitors.  (States Br. 31 (citing *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013)); *see also* U.S. Br. 102-03 (same).)  The Supreme Court in *Actavis* recognized the dangers of monopolists making "large, unjustified" payments intended "to maintain and to share . . . monopoly profits" that would otherwise not exist in a competitive market.  *Actavis*, 570 U.S. at 158.  But that is an issue only when those payments are conditioned on exclusivity.  If a distributor may select a GSE other than Google Search as its default without losing all revenue share payments from Google, then those payments do not pose

---

[3] Google's expert testified that Google would have no incentive to pay revenue share if it could not use it to secure default placement (Liab. Tr. 9791:20-9792:8 (Murphy)), because many distributors, like Apple, have stated that they will keep Google as an option even without payment to do so (Rem. Tr. 3829:12-3830:10 (Cue)).  But Apple had strong reason—in the form of $20 billion annually—to oppose a ban on default payments.  Once the remedies in the Final Judgment go into effect, a different set of incentives should take hold.  For example, when rival GSEs get the benefits of syndication and the other remedies, those rivals could compete for default or other preferential placement.  Google will then have an incentive to pay Apple and other distributors an unconditional revenue share to continue receiving traffic.

competitive concerns. Divorcing the search-traffic payment from a default requirement, as Brave suggests, takes any exclusionary sting out of the revenue share.

In sum, given the extent to which Google's unlawful conduct has cemented its dominance, Google will continue to receive extensive search traffic (and search revenue) from distributors regardless of whether the Final Judgment prohibits compensation for that traffic. Banning all search-related payments would only keep those fruits in Google's hands, with no material benefit to competition. (Rem. Op. 122.)

## II. THE FINAL JUDGMENT SHOULD PROHIBIT GOOGLE FROM USING REVENUE SHARE PAYMENTS TO DISCRIMINATE AGAINST DISTRIBUTORS THAT DO NOT SET GOOGLE AS THE DEFAULT.

A ban on default payments will be effective only if Google cannot achieve the same result another way. Allowing Google to enter unconditional revenue share agreements without adequate guardrails would risk letting Google circumvent the ban by selectively paying only those distributors that set Google Search as the default—even if the agreements do not expressly require default placement.

The Plaintiffs' proposed solution to that risk is to forbid all revenue share payments. That is a sledgehammer, not a scalpel. Brave proposes instead that the Final Judgment include a provision requiring Google to make any revenue

share payments on a non-discriminatory basis, unrelated to whether a distributor has set Google Search as the default on any search access point. If Google chooses to pay unconditional revenue share to any distributors, it must pay for traffic, on the same terms, to all distributors that offer Google Search as an option, regardless of whether Google Search is the *default* option. This will prevent Google from using revenue share payments as a reward for *de facto* default status and ensure distributors do not fear that changing the default away from Google Search will be punished by a loss of all revenue share from Google.

Brave's proposed non-discrimination provision can be adequately enforced through the Final Judgment's existing compliance scheme. Section VII.C of the Final Judgment already contains procedures to monitor Google's compliance with other non-discrimination provisions through complaints submitted to the Technical Committee. This existing framework for enforcing Google's compliance with non-discrimination provisions of this nature can be used for an order requiring non-discrimination in unconditional revenue share.

## III. THE DISTRICT COURT CAN CONSIDER BRAVE'S PROPOSED MODIFICATION TO THE FINAL JUDGMENT.

The district court recognized that unconditional revenue share was "[o]ne possibility" for how to structure a partial payment ban. (Rem. Op. 128 n.14.) However, the court declined to consider it because the Plaintiffs had not expressly advocated for that remedy and because the court did not have detailed

12

expert testimony about its effects.  (*See id.*)  Neither reason precludes consideration of Brave's proposed remedy on remand.

District courts have a duty to devise effective remedies, *Du Pont*, 366 U.S. at 316, and wide discretion and "flexibility" to craft them, especially in the antitrust context, even if a particular remedy was not raised by the parties, *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944); *see also Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 486 (9th Cir. 2021) ( "[T]he available injunctive relief [in antitrust cases] is broad."); *see, e.g.*, *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 954-55 (9th Cir. 2025) (upholding injunction provision not requested by either party).  Moreover, this Court may "remand a case . . . with directions to decide" an issue not previously presented.  *Morgan v. Garris*, 307 F.2d 179, 181 (D.C. Cir. 1962); *see also Bruce v. United States*, 379 F.2d 113, 122 (D.C. Cir. 1967) ("In some cases it may better serve the interest of justice to remand for consideration of points not presented to the District Court.").

Nor does the district court need more comprehensive expert testimony or modeling on the proposed remedy.  An antitrust remedy is judged on "whether the relief represents a reasonable method of eliminating the consequences of the illegal conduct."  *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 698 (1978).  The district court had (and this Court has on review) sufficient information to conclude that Brave's proposed remedy is such a "reasonable method."  Both

13

parties elicited expert testimony on the differences between conditional and unconditional revenue share at the liability and remedies phases.  (*See, e.g.*, Liab. Tr. 9791:20-9796:9 (Murphy); *id.* 10529:18-10535:9 (Whinston); Rem. Tr. 2148:22-2150:18 (Chipty); *id.* 4368:15-4371:16 (Murphy).)  The Plaintiffs' expert even assumed in her market share-shift calculations under the Plaintiffs' requested remedies that Google could still pay for "non-default promotion."  (Rem. Tr. 2148:20-2149:25 (Chipty).)  This evidence, combined with the district court's discretion and flexibility to craft a remedy, is more than sufficient.

## CONCLUSION

Brave respectfully submits that this Court should remand with an instruction to the district court to add a ban on payments for default placement (including conditional revenue share payments) and to consider whether to include a provision ensuring that any search-traffic payments are not made in a discriminatory manner.

14

Dated:  August 4, 2026

Respectfully submitted,

By:  /s/ *Gary A. Bornstein*

**CRAVATH, SWAINE & MOORE LLP**

Gary A. Bornstein
Yonatan Even
Andrew C. Finch
Two Manhattan West
375 Ninth Avenue
New York, New York 10001
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700
gbornstein@cravath.com
yeven@cravath.com
afinch@cravath.com

*Counsel for Brave Software, Inc.*

15

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned certifies:

1.   This document complies with the word limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), this document contains 3,098 words. (*See* App. Dkt. 2174144 (allowing Brave to file two amicus briefs not to exceed 6,500 words in the aggregate); Brave Br. Certificate of Compliance (certifying first amicus brief contains 3,379 words).)

2.   This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  August 4, 2026

/s/ *Gary A. Bornstein*
Gary A. Bornstein

*Counsel for Brave Software, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2026, I electronically filed the foregoing document using the CM/ECF system.  I further certify that all participants in this case are registered CM/ECF users and will be served through the CM/ECF system.


Dated:  August 4, 2026                    /s/ *Gary A. Bornstein*
                                          Gary A. Bornstein

                                          *Counsel for Brave Software, Inc.*