ORAL ARGUMENT NOT YET SCHEDULED

No. 26-5023
Consolidated with Nos. 26-5047, 26-5049

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

UNITED STATES OF AMERICA, *ET AL.*,

*Plaintiffs-Appellees-*
*Cross-Appellants*,

v.

GOOGLE LLC,

*Defendant-Appellant-*
*Cross-Appellee*.

On Appeal from the United States District Court
for the District of Columbia
No. 20-cv-3010 (APM), No. 20-cv-3715 (APM) (Honorable Amit P. Mehta)

**BRIEF OF MOZILLA CORPORATION**
**AS *AMICUS CURIAE* IN SUPPORT OF NEITHER PARTY**

JUAN A. ARTEAGA
ROSA M. MORALES
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5300
juan.arteaga@sidley.com
rosa.morales@sidley.com

*Counsel for Amicus Curiae Mozilla Corporation*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), amicus curiae Mozilla Corporation ("Mozilla") certifies as follows:

### A. Parties and Amici Curiae

All parties, intervenors, and amici appearing before the District Court and in this Court are listed in Plaintiffs' Certificate as to Parties, Rulings, and Related Cases (App. Dkt. 2160541), except that an amicus brief was also filed in the District Court by Public Knowledge, and in this Court the following parties have filed amicus briefs or notices of intent to file amicus briefs: Brave Software, Inc.; Washington Legal Foundation; Apple Inc.; Samsung Electronics Co., Ltd.; Terry Calvani, William Kolasky; Abbott B. Lipsky, Joe Sims; Law & Economics Scholars; Alden Abbott; Gregory Werden; Economists and Legal Scholars; Hunt Allcott, Matthew Gentzkow; OpenAI OpCo, LLC; SerpApi, LLC; American Economic Liberties Project; Microsoft Corporation; Little Tech Association, Travel Lemming LLC; DuckDuckGo, Inc.; and Public Knowledge.

### B. Rulings Under Review

The rulings at issue are identified in the Parties' Certificates as to Parties, Rulings, and Related Cases (App. Dkts. 2164028, 2160541).

**C. Related Cases**

A list of related cases appears in the Parties' Certificates as to Parties, Rulings, and Related Cases (App. Dkts. 2164028, 2160541).

/s/ Juan A. Arteaga
Juan A. Arteaga

*Counsel for Amicus Curiae*
*Mozilla Corporation*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, amicus curiae Mozilla certifies that Mozilla is an indirect wholly-owned subsidiary of the Mozilla Foundation. The Mozilla Foundation is not publicly traded and has no parent company. No publicly held corporation owns 10% or more of Mozilla's stock.

/s/ Juan A. Arteaga
Juan A. Arteaga

*Counsel for Amicus Curiae*
*Mozilla Corporation*

## STATEMENT REGARDING CONSENT TO FILE, SEPARATE BRIEFING, AND AUTHORITY TO FILE

Pursuant to D.C. Circuit Rule 29(b), amicus curiae Mozilla states that all parties have consented to Mozilla's participation as amicus curiae, and that this Court's May 26, 2026 Order (App. Dkt. 2175092) authorized Mozilla to file an amicus brief on May 29, 2026 addressing the issues raised in Defendant-Appellant-Cross-Appellee's appeal and the instant brief addressing the issues raised in Plaintiffs-Appellees-Cross-Appellants' cross-appeals provided that both briefs had a combined total of 6,500 words.

Pursuant to D.C. Circuit Rule 29(d), amicus curiae Mozilla states that a separate brief is necessary because Mozilla's views on the issues before this Court are distinct from those set forth in the parties' briefing and those likely to be submitted by other amici curiae.

For instance, as the Independent Browser Developer[1] of the privacy-focused Firefox browser and Gecko browser engine (the only non-Big Tech browser engine available to web and browser developers) and a distributor of search engines and artificial intelligence technology, Mozilla has unique insights into competition, innovation, and consumer welfare in the general search engine market and related browser, browser engine, and artificial intelligence markets that can significantly

[1] The term "Independent Browser Developer" means browser developers that do not own an operating system or desktop/mobile devices.

assist this Court's review of the District Court's liability and remedies rulings. Among other things, Mozilla can detail how Plaintiffs' proposal to bar Google from compensating distributors of Google Search would make it extremely difficult, if not impossible, for Independent Browser Developers to (i) effectively compete with Big Tech browsers, which already enjoy significant distribution advantages through their ownership of operating systems and desktop/mobile devices, and (ii) continue innovating and offering users a more private and secure online experience.[2] Likewise, Plaintiffs' proposed payment ban remedy creates a significant risk that Mozilla will be forced to exit the browser engine market, thereby handing greater control to Apple and Google over web and browser standards.

Furthermore, as the subsidiary of a non-profit organization whose mission is to promote an open and healthy internet ecosystem, Mozilla is uniquely positioned to assist this Court's assessment of whether the District Court's liability and remedies rulings further the policy and societal goals of the antitrust laws. Other market participants submitting amicus briefs are unlikely to offer similar perspectives because, as profit-driven entities, they do not have a public-oriented mission like Mozilla.

---

[2] For additional details regarding the procompetitive impact that Mozilla has had in the search engine and related markets, see Mozilla's opening amicus brief at pages 6-15.

Mozilla files this amicus brief under Federal Rule of Appellate Procedure 29(a) and D.C. Circuit Rule 29.

/s/ Juan A. Arteaga
Juan A. Arteaga

*Counsel for Amicus Curiae*
*Mozilla Corporation*

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), Mozilla states that:

i. no party's counsel authored the brief in whole or in part;

ii. no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and

iii. no person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

/s/ Juan A. Arteaga
Juan A. Arteaga

*Counsel for Amicus Curiae*
*Mozilla Corporation*

## TABLE OF CONTENTS


INTEREST OF AMICUS CURIAE ....... 1

ARGUMENT ....... 1

I. The District Court Did Not Abuse Its Discretion When Rejecting The Distribution Payment Ban ....... 1

A. The District Court Understood And Fulfilled Its Remedial Duties ....... 2

B. The District Court Correctly Held That The Distribution Payment Ban Would Harm Competition And Consumers In The General Search Engine Market ....... 5

C. The District Court Appropriately Considered The Distribution Payment Ban's Likely Competitive Harm To Search Engine Distributors ....... 7

CONCLUSION ....... 10

CERTIFICATE OF COMPLIANCE ....... 11

CERTIFICATE OF SERVICE ....... 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ford Motor Co. v. United States*,
405 U.S. 562 (1972)....................1

*Massachusetts v. Microsoft Corp.*,
373 F.3d 1199 (D.C. Cir. 2004)....................1

*NCAA v. Alston*,
594 U.S. 69 (2021)....................10

*United States v. E.I. du Pont de Nemours & Co.*,
366 U.S. 316 (1961)....................7, 10

*United States v. Google LLC*,
803 F. Supp.3d 18 (D.D.C. 2025)....................2, 3, 4, 5, 6, 7, 8

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001)....................1, 5

## INTEREST OF AMICUS CURIAE

Mozilla submits this amicus brief to assist this Court's review of the District Court's decision rejecting Plaintiffs' proposal to bar Google from compensating distributors of Google Search ("Distribution Payment Ban"). Mozilla has a strong interest in the adjudication of this issue because the Distribution Payment Ban, if adopted, could force Mozilla (and other Independent Browser Developers) to exit the browser and browser engine markets, thereby eliminating a key distributor in the general search engine market, depriving users of a high-quality browser that offers market-leading privacy and security protections, and granting greater power over the internet to Big Tech companies.

## ARGUMENT

### I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN REJECTING THE DISTRIBUTION PAYMENT BAN

It is well-settled that district courts are "clothed with 'large discretion'" when crafting antitrust remedies. *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) (citation omitted); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 105 (D.C. Cir. 2001) ("[A] district court is afforded broad discretion to enter that relief it calculates will best remedy the conduct it found to be unlawful."). Consequently, this Court "review[s] the district court's decision whether to grant [antitrust remedies] only for abuse of discretion." *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1207 (D.C. Cir. 2004).

Here, the District Court properly exercised its discretion when rejecting the Distribution Payment Ban for several reasons. *First*, the District Court crafted a comprehensive remedies package that rendered the Distribution Payment Ban unnecessary to effectively redress the conduct deemed anticompetitive. *Second*, the District Court correctly held that the Distribution Payment Ban would harm competition and consumers in the general search engine market. *Third*, the District Court appropriately considered the competitive harm that the Distribution Payment Ban would likely cause in the browser and mobile device markets, which serve as important distribution channels for search engine developers.

### A. The District Court Understood And Fulfilled Its Remedial Duties

After holding that Google violated the antitrust laws, the District Court expressly recognized its "duty" to "redress the violation and restore competition" by crafting remedies that "'unfetter [the general search engine] market from anticompetitive conduct,'" "'deny [Google] the fruits of its [antitrust] violation, and ensure that there remain no practices likely to result in monopolization in the future.'" *United States v. Google LLC* ("Rem.Op."), 803 F. Supp. 3d 18, 67 (D.D.C. 2025) (citation omitted).

In a 223-page opinion, the District Court closely adhered to these well-settled principles by crafting a comprehensive remedies package that "'restor[es] conditions in which the competitive process is revived,'" and is "'tailored to fit the wrong

creating the occasion for the remedy.'" Rem.Op._68 (citations omitted). *First*, the District Court enjoined the contracting practices found to have enabled Google to monopolize the general search engine market, and extended this injunctive relief to cover Google's browser, voice assistant, app store, and GenAI products. Rem.Op._93-98. By prohibiting Google from entering exclusive distribution contracts for its search and other related products, the District Court "grant[ed] GSE distributors far more freedom to partner with firms other than Google." Rem.Op._93-98.

*Second*, the District Court opened Google's agreements for the out-of-the-box default search position—which Plaintiffs describe as the "most efficient [distribution] channel" (DOJBr._13)—to annual competition by limiting these agreements to one-year terms and requiring any agreement with browser developers, including Apple, to permit them to "annually set a different GSE at various search access points across different devices." Rem.Op._94-98.

*Third*, the District Court ordered Google to share with competitors certain search index and user-interaction data as a means of "narrow[ing] the scale gap created by Google's exclusive distribution agreements and, in turn, the quality gap that followed." Rem.Op._108-30. In doing so, the District Court concluded that these remedies were "tied directly to a key liability finding" and would "deny Google a key fruit of its anticompetitive conduct[.]" Rem.Op._107-08. Notably, the District

Court determined that these remedies would help offset any advantage that Google could gain by continuing to compensate distributors because they would provide the "scale" search competitors need to "innovat[e] and differentiat[e] their search services from Google's." Rem.Op._109.

*Fourth*, the District Court required Google to syndicate search results and other content from its search engine results page to enable rivals to "compete in the short term" while they "build [their] own search index and the capacity to deliver high-quality search results." Rem.Op._131. This remedy, the District Court reasoned, was a "'reasonable method' of addressing the effects of Google's anticompetitive acts." Rem.Op._132.

*Fifth*, the District Court required Google to syndicate search text advertisements because this remedy would permit rivals to immediately "serv[e] high-quality ads that [they] can monetize" to generate "revenue [that] can be reinvested to improve search quality, gain distribution, and perhaps build a proprietary ad platform." Rem.Op._138. This remedy, the District Court determined, would address a "key component in the flywheel that has made [Google's] monopoly so durable." *Id.*

*Sixth*, to ensure competitors have sufficient time to "develop the capacity to compete with Google," the District Court required Google to comply with the Final

Judgment for five years, which is "consistent with the five-year term adopted in *Microsoft*." Rem.Op._159-60.

*Finally*, like the *Microsoft* court, the District Court "establish[ed] a Technical Committee to facilitate enforcement of and compliance with the final judgment." Rem.Op._154.

Tellingly, while spending numerous pages wrongly criticizing the District Court's rejection of the Distribution Payment Ban, Plaintiffs ultimately acknowledge the obvious: "the District Court imposed significant remedies for Google's monopolization" that "alleviate Google's ill-gotten scale and revenue advantages so rivals can compete effectively with Google." DOJBr._2, 29 (bold and capitalization omitted).

### B. The District Court Correctly Held That The Distribution Payment Ban Would Harm Competition And Consumers In The General Search Engine Market

Plaintiffs incorrectly contend that the District Court committed legal error by "never answer[ing] whether a payment ban was necessary to effectively restore competition" and instead "skipp[ing] ahead to considerations" about competitive harms outside the general search engine market. DOJBr._129.

After acknowledging that "[a] payment ban in theory" could have procompetitive benefits and detailing those benefits, the District Court declined to adopt this remedy because in actuality it "would not promote competition and in fact

would likely advantage Google, at least in the short term." Rem.Op._102-03. Specifically, the District Court concluded that the Distribution Payment Ban would permit Google to "continue to receive a disproportionate volume of search queries for a fraction of the cost" because distributors, seeking to offer the best user experience, would likely keep Google as their out-of-the-box search default even without compensation. Rem.Op._103. "Freed of having to pay billions in revenue share, Google's profits would *increase*" and "Google then could use those profits to improve its products and monetization, further propagating the network effects flywheel that has proven so difficult to disrupt." Rem.Op._103-04.

Citing Plaintiffs' own expert and proffered studies, the District Court also concluded that the Distribution Payment Ban would harm consumers because they would receive lower quality default search engines if distributors opted to sacrifice the user experience to secure search revenue from Google's rivals. Rem.Op._103-06.

Moreover, the District Court concluded that the Distribution Payment Ban would reduce price competition among search engine developers because, as Plaintiffs' expert acknowledged, Google's "rivals would pay less" to "secure default or preferential placement" with "Google sidelined from competition[.]" Rem.Op._104.

Finally, Plaintiffs' assertion that the absence of a Distribution Payment Ban permits Google to use its "monopoly profits" to simply outbid competitors for the out-of-the-box search default position ignores that Google's current and likely search rivals are multi-trillion-dollar Big Tech companies and GenAI developers that have raised hundreds of billions in funding. As the District Court noted, Google is unlikely to be able to "simply outbid competitors for distribution if superior products emerge" because "[t]oday, established technology companies are making, and start-ups are receiving, hundreds of billions of dollars in capital to develop GenAI products that pose a threat to the primacy of traditional internet search." Rem.Op._107.

### C. The District Court Appropriately Considered The Distribution Payment Ban's Likely Competitive Harm To Search Engine Distributors

The Supreme Court has made clear that district courts should craft remedies that effectively redress an antitrust violation while causing "'as little injury as possible to the interest of the general public'" and showing "'proper regard for the vast interests of private property[.]'" *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 327-28 (1961) (citation omitted). This is exactly what the District Court did here.

As detailed above, the District Court's comprehensive remedies package effectively redressed the competitive effects of Google's conduct and positioned

rivals to compete with Google on the merits. As part of this process, the District Court considered whether the Distribution Payment Ban would enhance the Final Judgment's efficacy and concluded it would fail to do so because this remedy "would not promote [search engine] competition and in fact would likely advantage Google" while "harm[ing] consumer welfare." Rem.Op._103-06.

To bolster its rejection of the Distribution Payment Ban, the District Court cited record evidence showing that this remedy would "impose substantial—in some cases crippling—downstream harms to distribution partners, related markets, and consumers[.]" Rem.Op._37, 103-06. With respect to the browser market, the District Court concluded that these competitive harms would likely include "[l]ost competition and innovation from small developers in the browser market" because eliminating Google's payments "'could at the end of the day put [independent browsers like] Firefox out of business.'" Rem.Op._104-05 (citation omitted). Such an outcome would cause direct harm in the general search engine market by eliminating multiple distributors while simultaneously reducing the options available to privacy and security conscious browser users.

The District Court's determination that the Distribution Payment Ban could have "dire" effects on search engine distributors like Mozilla, RemOp._104, is fully supported by the five-month analysis that Mozilla conducted after the liability decision. This analysis assessed the potential impact on Mozilla's revenue if the

remedies in this case required it to set Bing as the out-of-the-box search default in Firefox. Consistent with earlier experiments conducted by Mozilla (*see* Mozilla's initial amicus brief at pp. 19-20), this analysis found that Mozilla's search revenue would decline dramatically because a "[s]ignificant number of users [would] change [their] search [default] away from Bing," while users who remained on Bing would have far lower usage and monetization rates. RDX340_at_769, 771.

Importantly, this analysis also concluded that setting Bing as Firefox's search default would severely "**challenge [Mozilla's] ability to maintain [the] Gecko [browser engine]**," which, in turn, would further harm Firefox's competitiveness by resulting in "meaningful loss of user share & revenue" given that many users choose Firefox precisely because "[i]t isn't built on Chromium[.]" RDX340_at_769, 784. The analysis further concluded that Mozilla's exit from the browser engine market would (i) remove its ability to prevent web "standards that are bad for users, especially with privacy," and (ii) "[h]and[] control of implementation of web standards to only Google and Apple[.]" RDX340_at_784. In addition, Mozilla's inability to maintain Gecko would leave web and browser developers with only Big Tech controlled browser engines, which could also harm AI competition given the important role that browsers and browser engines are playing in the development and distribution of this technology.

The District Court's decision to avoid inflicting competitive harm in the

browser market (as well as the mobile device market) without sacrificing the efficacy of its remedies decree was neither legally erroneous nor an abuse of discretion. *See Du Pont*, 366 U.S. at 327-28 (courts should accomplish the goal of crafting effective remedies "with as little injury as possible to the interest of the general public" and "proper regard for the vast interests of private property"); *NCAA v. Alston*, 594 U.S. 69, 102 (2021) (courts "must be sensitive to" entering remedies that "could wind up impairing rather than enhancing competition" and "innovation").

In sum, the District Court's rejection of the Distribution Payment Ban avoided competitive harm in the general search engine market and important search engine distribution channels.

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's rejection of Plaintiffs' proposed Distribution Payment Ban.

Dated: August 4, 2026

Respectfully submitted,

/s/ Juan A. Arteaga
Juan A. Arteaga
Rosa M. Morales
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5300
juan.arteaga@sidley.com
rosa.morales@sidley.com

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

This brief complies with the word-count limitation of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B)(i). This brief contains 2,000 words, not counting the parts excluded by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1). The total word count for both of Mozilla's amicus briefs is 6,498, which complies with the word count limit set forth in this Court's May 26, 2026 Order granting Mozilla leave to file separate briefs in the parties' respective appeals.

/s/ Juan A. Arteaga
Juan A. Arteaga

*Counsel for Amicus Curiae Mozilla Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 4, 2026, I caused the foregoing document to be electronically filed through this Court's CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Juan A. Arteaga
Juan A. Arteaga

*Counsel for Amicus Curiae*
*Mozilla Corporation*