Nos. 26-5023, 26-5047, 26-5049

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

UNITED STATES OF AMERICA, ET AL.,

*Plaintiffs-Appellees-Cross-Appellants*,

v.

GOOGLE LLC,

*Defendant-Appellant-Cross-Appellee*.

On appeal from the United States District Court for the District of Columbia,
Nos. 20-cv-3010 & 20-cv-3715
Hon. Amit P. Mehta

# BRIEF OF *AMICI CURIAE* ANTITRUST LAW, ECONOMICS, AND BUSINESS PROFESSORS IN SUPPORT OF PLAINTIFFS-APPELLEES-CROSS-APPELLANTS, URGING AFFIRMANCE IN PART AND REVERSAL IN PART

N. SLADE BOND II (*attorney admission pending*)
**CUNEO GILBERT**
**FLANNERY & LADUCA, LLP**
2445 M Street NW, Suite 740
Washington, D.C. 20037
Tel: (202) 789-3960
sbond@cuneolaw.com

AMANDA G. LEWIS
**CUNEO GILBERT**
**FLANNERY & LADUCA, LLP**
222 Livingston Street, Unit 2
Brooklyn, NY 11201
Tel: (202) 789-3960
alewis@cuneolaw.com

## STATEMENT OF AUTHORSHIP AND CONSENT

All parties consented to the filing of this brief. No party's counsel authored this brief in whole or in part, no party or their counsel contributed money intended to fund the preparation or submission of this brief, and no person other than *Amici Curiae* or their counsel contributed money that was intended to fund preparing or submitting the brief. *Amici* have no financial interests in the outcome of this litigation.

## IDENTITIES AND INTEREST OF *AMICI CURIAE*

*Amici curiae* are dozens of professors of law, economics, and business who have researched and published extensively on antitrust issues.[1] Though our work spans a range of methodologies, we share an interest in ensuring that U.S. antitrust

[1] *Amici* professors include Laura Alexander, Rebecca Haw Allensworth, Ian Ayres, John Manuel Barrios, Christine P. Bartholomew, Elettra Bietti, Timothy F. Bresnahan, Darren Bush, Edward D. Cavanagh, Gregory Day, Stacey Dogan, Javier D. Donna, Erika Douglas, Florian Ederer, Harry First, Eleanor M. Fox, David J. Gerber, Mark Glick, Nikolas Guggenberger, Hiba Hafiz, Jonathan F. Harris, George A. Hay, James R. Kearl, John B. Kirkwood, Mordecai Kurz, John Kwoka, Filippo Lancieri, Robert H. Lande, Christopher Leslie, John M. Newman, Roger Noll, Laura Phillips-Sawyer, Barak D. Richman, Steven C. Salop, Theodosia Stavroulaki, Abbey Stemler, Maurice Stucke, Jennifer E. Sturiale, Zephyr Teachout, Spencer Weber Waller, Samuel N. Weinstein, Lawrence J. White, and Luigi Zingales. For *Amici*'s academic titles and institutional affiliations, see Appendix. *Amici* submit this brief in their individual academic capacities; their institutions take no position on this litigation and are provided solely for identification purposes.

law is coherent and effective in both condemning legal violations and implementing effective remedies.

We write to explain that this case presents an important opportunity for this Court to: (I) affirm that Google's monopoly power and exclusionary conduct gave rise to a quintessential Sherman Act § 2 violation; and (II) reverse and remand the lower court's remedial decision insofar as it declined to terminate Google's exclusionary conduct, a choice that departed from governing precedent and sound antitrust policy.

## TABLE OF CONTENTS

STATEMENT OF AUTHORSHIP AND CONSENT .............................................. i

IDENTITIES AND INTEREST OF *AMICI CURIAE* .............................................. i

TABLE OF AUTHORITIES .......................................................................... iv

INTRODUCTION AND SUMMARY OF ARGUMENT .........................................1

I. THE DISTRICT COURT CORRECTLY HELD THAT GOOGLE VIOLATED SHERMAN ACT § 2 ......................................................................................5

A. The Sherman Act Applies with Full Force to Digital, Zero-Price Markets. ......6

B. Google's Power Meets, and Far Surpasses, the Threshold for Liability. ..........7

C. Google Engaged in a Quintessential Form of Anticompetitive Conduct ..........9

1. Antitrust Law Has Long Held, and Modern Economics Confirms, That Formal and De Facto Exclusivity Arrangements Can Be Anticompetitive.....9

2. Establishing Liability Does Not, and Should Not, Require Perfectly Recreating the World "But For" the Anticompetitive Conduct. ....................12

D. Independent, Objective Analyses Align with the District Court's Findings. ...15

II. THE DISTRICT COURT'S REMEDY ORDER IS LEGALLY ERRONEOUS, LIKELY TO FAIL, AND SHOULD BE REVERSED. .......................................18

A. Precedent Imposes a Duty to Effectively Remedy Illegal Monopolization.....18

1. The Current Remedy Is Legally Erroneous and Likely to Fail. ....................19

2. Preserving Payoffs from Google to Search Distributors Is an Invalid Reason To Permit Anticompetitive Conduct. ...........................................................24

3. Judicial Humility Counsels Against Permitting Anticompetitive Conduct and Public Harm for an Uncertain "Hope" of Future Displacement. ..................25

B. Alternatives Are Available Upon Remand. ....................................................27

CONCLUSION ..........................................................................................29

## TABLE OF AUTHORITIES

**Cases**

*Am. Tobacco Co. v. United States*,
328 U.S. 781 (1946)....8

*Ford Motor Co. v. United States*,
405 U.S. 562 (1972).... 2, 3, 18

*FTC v. Brown Shoe Co.*,
384 U.S. 316 (1966)....9

*FTC v. Surescripts, LLC*,
424 F. Supp. 3d 92 (D.D.C. 2020)....10

*Int'l Boxing Club v. United States*,
358 U.S. 242 (1959)....5

*Lorain J. Co. v. United States*,
342 U.S. 143 (1951)....6, 9

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803)....29

*McWane, Inc. v. FTC*,
783 F.3d 814 (11th Cir. 2015)....9

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447, (1993)....5

*Std. Oil Co. v. United States*,
221 U.S. 1 (1911)....9

*Std. Oil Co. v. United States*,
337 U.S. 293 (1949)....6, 9

*Twin City Sportserv., Inc. v. Charles O. Finley & Co.*,
676 F.2d 1291 (9th Cir. 1982).... 10, 21

*United States v. Alum. Co. of Am.*,
148 F.2d 416 (2d Cir. 1945)....6, 9

*United States v. Bausch & Lomb Optical Co.*,
321 U.S. 707 (1944) .......... 29

*United States v. E. I. du Pont De Nemours & Co.*,
351 U.S. 377 (1956) .......... 6

*United States v. E. I. du Pont De Nemours & Co.*,
366 U.S. 316, (1961) .......... 27

*United States v. Google LLC*,
747 F. Supp. 3d 1 (D.D.C. 2024) .......... 1, 8, 11, 12, 13, 17, 20, 23, 24, 26

*United States v. Google LLC*,
803 F. Supp. 3d 18 (D.D.C. 2025) .......... 3, 21, 22, 24, 25, 27, 28

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966) .......... 1, 5, 8

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) .......... 2, 6, 7, 10, 12, 13, 14, 17, 18, 21, 26

*United States v. Topco Assocs., Inc.*,
405 U.S. 596 (1972) .......... 5

*United States v. U.S. Gypsum Co.*,
340 U.S. 76 (1950) .......... 2

*United States v. United Shoe Mach. Corp.*,
391 U.S. 244 (1968) .......... 2, 3, 9, 18, 19, 22, 29

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012) .......... 10

**Statutes**

15 U.S.C. § 1 .......... 9

15 U.S.C. § 14 .......... 9

15 U.S.C. § 2 .......... 1, 5, 9, 18, 25

15 U.S.C. § 45 .......... 9

**Other Authorities**


Austl. Competition & Consumer Comm'n, Digital Platforms Inquiry: Final Report (2019) ........ 15

B. Douglas Bernheim & Michael D. Whinston, *Exclusive Dealing*, 106 J. Pol. Econ. 64 (1998) ........ 11

Carl Shapiro, Microsoft*: A Remedial Failure*, 75 Antitrust L.J. 739 (2009) ........ 19

Case C-48/22 P, *Google LLC v. Comm'n*, ECLI:EU:C:2024:726 (Sept. 10, 2024) ........ 15

Doha Mekki, *Antitrust and Economic Liberty*, 94 Fordham L. Rev. 1765 (2026) ........ 6

Einer Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 Harv. L. Rev. 397 (2009) ........ 11

Erik Hovenkamp & Douglas Melamed, *Appraising the Google Search Antitrust Remedies*, ProMarket (Sept. 23, 2025) https://bit.ly/4fzR5B9. ........ 21

Eur. Comm'n, *Case AT.40099 –Google Android*, Comm'n Decision C(2018) 4761 final, art. 1 (July 18, 2018) ........ 15

Eur. Directorate-Gen. for Competition, *Case AT.39740 – Google Shopping*, Comm'n Decision, C(2017) 4444 final (June 27, 2017) ........ 15

Filippo Lancieri & Caio Mario S. Pereira Neto, *Designing Remedies for Digital Markets: The Interplay Between Antitrust and Regulation*, 18 J. Competition L. & Econ. 613 (2022) ........ 3, 24, 26

Filippo Lancieri & Patricia Morita Sakowski, *Competition in Digital Markets: A Review of Expert Reports*, 26 Stan. J.L. Bus. & Fin. 65 (2021) ........ 15, 16

Fiona M. Scott Morton & David C. Dinielli, *Roadmap for a Monopolization Case Against Google Regarding the Search Market* (Omidyar Network 2020) ........ 16

Hugh Langley, *Google's Gemini App Nips at ChatGPT's Heels as It Nears 1 Billion Users*, Bus. Insider (July 22, 2026) ........ 27

Jack B. Kirkwood, *Antitrust and Two-Sided Platforms*, 41 Cardozo L. Rev. 1805 (2020).....24

Jacques Crémer, Yves-Alexandre de Montjoye & Heike Schweitzer, Eur. Comm'n, Competition Policy for the Digital Era (2019).....15

Jason Furman et al., Digital Competition Expert Panel, Unlocking Digital Competition: Report of the Digital Competition Expert Panel (2019).....15

John B. Kirkwood, *Market Power and Antitrust Enforcement*, 98 B.U. L. Rev. 1169 (2018).....7

John M. Newman, *Antitrust in Digital Markets*, 72 Vand. L. Rev. 1497 (2019).....8

John M. Newman, *Antitrust in Zero-Price Markets: Foundations*, 164 U. Pa. L. Rev. 149 (2015).....6, 24

John M. Newman, *Procompetitive Justifications in Antitrust Law*, 94 Ind. L.J. 501 (2019).....24

Jonathan B. Baker, *Beyond Schumpeter vs. Arrow*, 74 Antitrust L.J. 575 (2007).....23

Jonathan B. Baker, *Exclusion as a Core Competition Concern*, 78 Antitrust L.J. 527 (2013).....11

Kate Conger, *Google Is Building an A.I. Fence Around the Internet It Once Championed*, N.Y. Times (July 20, 2026).....26

Madhavi Singh & Fiona M. Scott Morton, *A Roadmap for a Monopolization Case Against Google: Monopsony Power and AI Overviews*, 175 U. Pa. L. Rev. (forthcoming 2026).....27

Marissa Beck & Fiona Scott Morton, *Evaluating the Evidence on Vertical Mergers*, 59 Rev. Indus. Org. 273 (2021).....11

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (5th ed. & Supp. 2025).....14

Richard J. Gilbert & A. Douglas Melamed, *Innovation Under Section 2 of the Sherman Act*, 84 Antitrust L.J. 1 (2021).....23

Richard J. Gilbert & David M.G. Newbery, *Preemptive Patenting and the Persistence of Monopoly*, 72 Am. Econ. Rev. 514 (1982) ..................... 4, 12, 26

Robert H. Bork, The Antitrust Paradox 288 (1978) ................................................11

Roger P. Alford, *The Bipartisan Consensus on Big Tech*, 71 Emory L.J. 893 (2022) ...............................................................................................7

Steven C. Salop, Modern Economic Analysis and Antitrust Law (2026) .........................................................................1, 7, 11, 28

Steven C. Salop, *The Raising Rivals' Cost Foreclosure Paradigm, Conditional Pricing Practices, and the Flawed Incremental Price-Cost Test*, 81 Antitrust L.J. 371 (2017) .......................................................4, 12

Steven Salop, *Unconditional Revenue-Sharing By Google Would Still Be Anticompetitive Monopolization*, ProMarket (Dec. 23, 2024), https://bit.ly/4yDJgDr. ................................................................ 22, 24

Stigler Comm. on Digital Platforms, Stigler Ctr. at Univ. of Chi. Booth Final Report (2019) .........................................................................15

Thomas G. Krattenmaker & Steven C. Salop, *Competition and Cooperation in the Market for Exclusionary Rights*, 76 Am. Econ. Rev. 109 (1986) ..............................................................................10

U.K. Competition & Mkts. Auth., Online Platforms and Digital Advertising: Market Study Final Report (2020) ........................................ 15, 16

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case presents two important antitrust issues that merit clear resolution. As to liability, it offers a vehicle for affirming that the Sherman Act applies with equal force to digital, zero-price markets as it does to offline, brick-and-mortar industries. And as to remedy, it offers the chance to correct a deviation from longstanding antitrust principles, a deviation that would otherwise perpetuate significant harm in a particularly important sector of the economy.

Google's conduct meets, and far surpasses, the thresholds for violating Sherman Act § 2's prohibition on "monopoliz[ing] . . . any part" of the U.S. economy. 15 U.S.C. § 2. The two elements of § 2 liability—monopoly power and exclusionary conduct, *see, e.g.*, *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)—are easily met on these facts. Both direct and structural evidence make clear that Google has had monopoly power over general search services for decades.[2] Google wielded that power to engage in a well-recognized form of exclusionary conduct. This is, quite literally, a textbook antitrust violation. Steven C. Salop, Modern Economic Analysis and Antitrust Law: A Guide ch.10 (2026) (using this case as an illustrative example of monopolistic behavior).

[2] The District Court found Google liable for monopolizing both the general search services and general search text advertising markets. *United States v. Google LLC*, 747 F. Supp. 3d 1, 187 (D.D.C. 2024) [hereinafter *Google Liability*]. For simplicity's sake we generally focus on the former.

Having found liability, the District Court was under a nonoptional "duty to prescribe relief which will" terminate all of Google's illegal conduct, restore competition and thereby eradicate Google's illegal monopoly, deny Google the fruits of its violation, and prevent practices that are likely to result in monopolization going forward. *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001) (en banc). "The trial court is charged with inescapable responsibility to achieve this objective . . . ." *United Shoe*, 391 U.S. at 250.

The remedy selected by the District Court will likely fail to achieve any of these mandatory ends, and will certainly fail to achieve all of them. The current remedy leaves Google largely free to continue paying distributors billions of dollars for favored placement over rivals. That is the very conduct the District Court found to have harmfully entrenched Google's dominance for more than a decade (and counting). Permitting it to continue was reversible error. *See, e.g.*, *Ford Motor Co. v. United States*, 405 U.S. 562, 575 (1972) ("The relief ordered should 'cure the ill effects of the illegal conduct, and assure the public freedom from its continuance . . . ." (quoting *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 88 (1950)).

Monopolized markets are structurally resistant to self-correction. Monopoly profit streams provide defendants with strong incentives and resources to maintain

the status quo by creating barriers to entry and expansion. This is particularly true in markets characterized by strong network effects and scale economies. These markets require especially robust remedial intervention to dislodge an illegally maintained monopoly. *See* Filippo Lancieri & Caio Mario S. Pereira Neto, *Designing Remedies for Digital Markets: The Interplay Between Antitrust and Regulation*, 18 J. Competition L. & Econ. 613, 613-616 (2022) (explaining that many antitrust remedies in digital markets failed to achieve their stated goals).

Instead, the current remedy order, which permits an incumbent monopolist to continue engaging in exclusionary conduct, is unusually and impermissibly weak. It will fail to achieve even the most basic of the trial court's mandatory duties: to halt all of the monopolist's illegal conduct and prevent the monopolist from engaging in similar conduct going forward. *See Ford Motor*, 405 U.S. at 575; *United Shoe*, 391 U.S. at 250 ("[I]t is the duty of the court to prescribe relief which will . . . ensure that there remain no practices likely to result in monopolization in the future.").

The court below based its unusually narrow approach on the "hope that Google will not simply outbid competitors for distribution." *United States v. Google LLC*, 803 F. Supp. 3d 18, 107 (D.D.C. 2025) [hereinafter *Google Remedies*]. Allowing immediate, certain harm to occur based on an uncertain hope that things may someday improve is unsound as a matter of both antitrust law and

policy. As we explain below, it disregards the well-accepted economic principle that entrenched monopolies generally have strong incentives and resources to outbid competitors by sharing monopoly rents with distributors. *See* Richard J. Gilbert & David M.G. Newbery, *Preemptive Patenting and the Persistence of Monopoly*, 72 Am. Econ. Rev. 514 (1982) (providing the basic insight); Steven C. Salop, *The Raising Rivals' Cost Foreclosure Paradigm, Conditional Pricing Practices, and the Flawed Incremental Price-Cost Test*, 81 Antitrust L.J. 371, 377 (2017) (extending the analysis to monopolists bidding for distribution).

The current remedy opinion expressly acknowledges the risky nature of its choice, then justifies it by reference to general principles of judicial humility. But judicial humility here requires following both precedent and sound economic learning, not departing from it to gamble on a low-probability outcome that might or might not occur at some indeterminate time in an uncertain future.

*Amici* therefore respectfully urge this Court to reverse in part the District Court's remedial order and remand for reconsideration of more effective alternatives. As we explain, alternatives are available, beginning with a straightforward ban on Google splitting its monopoly rents with distributors. Or, should this Court decide to forego that route, on remand, the District Court could consider other available mechanisms, like prohibiting conditional revenue-sharing

payments while also requiring Google to make payments to distributors that do not hinge on which general search service is used.

For more than a century, the Sherman Act has stood as a bulwark against the abuse of monopoly power. Today, its role is—or should be—as vital as ever. Yet the Sherman Act cannot continue to serve as our "Magna Carta of free enterprise," *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972), if it applies with less force to modern, digital markets than traditional, brick-and-mortar industries. When proven, decades-long violations lead only to weak, ineffective remedies, the American public has "won the battle but lost the war." *Int'l Boxing Club v. United States*, 358 U.S. 242 (1959). *Amici* therefore respectfully urge this Court to affirm the lower court's liability holding, and to reverse its decision to let Google continue engaging in exclusionary conduct.

* * *

## I. THE DISTRICT COURT CORRECTLY HELD THAT GOOGLE VIOLATED SHERMAN ACT § 2

A violation of Sherman Act § 2 consists of two elements. First, the defendant possessed monopoly power, the power to "control" an important aspect of competition.[3] *Grinnell Corp.*, 384 U.S. at 570–71 (quoting *United States v. E. I.*

[3] For attempted monopolization cases, all that is required is a "dangerous probability" of attaining such power. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

*du Pont De Nemours & Co.*, 351 U.S. 377, 391 (1956) (internal quotation marks omitted)). Second, the defendant engaged in exclusionary behavior: conduct that appears "reasonably capable of contributing significantly" to its power by impairing rivals' ability or incentive to compete fully and freely on the merits. *Microsoft Corp.*, 253 F.3d at 79.

### A. The Sherman Act Applies with Full Force to Digital, Zero-Price Markets.

This case presents a textbook antitrust violation. The only apparent distinction from longstanding precedent it raises is the setting: a zero-price, digital market instead of brick-and-mortar industries like oil, print newspapers, or aluminum. *See, e.g.*, *Lorain J. Co. v. United States*, 342 U.S. 143 (1951); *Std. Oil Co. v. United States*, 337 U.S. 293 (1949); *United States v. Alum. Co. of Am.*, 148 F.2d 416 (2d Cir. 1945). But this is a distinction without a difference.

Some early academic commentators confused a lack of positive prices for the absence of market activity. *See* John M. Newman, *Antitrust in Zero-Price Markets: Foundations*, 164 U. Pa. L. Rev. 149, 161–62 (2015) (collecting examples). Today, there is widespread consensus that U.S. antitrust laws do—and should—apply with full force to digital markets like general search services. *See, e.g.*, Doha Mekki, *Antitrust and Economic Liberty*, 94 Fordham L. Rev. 1765, 1778 (2026); Roger P. Alford, *The Bipartisan Consensus on Big Tech*, 71 Emory

L.J. 893, 925–26 (2022). We urge this Court to clearly affirm that principle, in a case that involves an especially strong and clear set of facts.

### B. Google's Power Meets, and Far Surpasses, the Threshold for Liability.

Modern antitrust law recognizes two distinct paths to analyzing whether a defendant has monopoly power: (1) direct evidence and (2) structural evidence. *E.g.*, *Microsoft*, 253 F.3d at 51. Both are abundantly present in this case. The District Court, as well as a wide range of independent academic experts, policymakers, and competition authorities around the world, have all reached the same conclusion: Google has substantial, durable monopoly power, protected by very high barriers to entry and expansion by competitors, including the barriers that result from Google's exclusionary conduct.

***Direct evidence.*** In a competitive market, no single firm can capture an outsized share of profits and surplus, because no single firm can impose worse terms on trading partners without losing business to its rivals. Evidence of a defendant operating without the constraint of competitive pressure is therefore direct evidence of monopoly power. *See* Salop, Modern Economic Analysis, *supra*, at § 2.15; John B. Kirkwood, *Market Power and Antitrust Enforcement*, 98 B.U. L. Rev. 1169 (2018).

In this case, the District Court found that Google is "indifferen[t]" to the possibility that it might lose users to rivals if it lowers the quality of its online

search product. *Google Liability*, 747 F. Supp. 3d at 118. And Google, unlike a competitive market participant, can capture "immense revenues and large profit margins" and "significant surplus." *Id.*

***Structural evidence.*** The relevant markets in this case are very highly concentrated, with Google capturing an "over-80% share since at least 2009." *Id.* at 119. Its share of online general search has only grown over time, reaching nearly 90% across all devices, and 95% on mobile devices, by 2020. *Id.* at 31. Durable market shares in this range evidence not just monopoly, but "*substantial* monopoly." *Grinnell Corp.*, 384 U.S. at 571 (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946) (internal quotation marks omitted) (emphasis added)). And the markets here are protected by extraordinarily high barriers: multibillion-dollar sunk costs, scale and scope economies, incumbent brand recognition, and—last but not least—Google's exclusionary conduct. *Google Liability*, 747 F. Supp. 3d at 120–22; *see also* John M. Newman, *Antitrust in Digital Markets*, 72 Vand. L. Rev. 1497, 1503–19 (2019) (explaining that monopoly power can be more durable in digital markets than early commentators believed).

### C. Google Engaged in a Quintessential Form of Anticompetitive Conduct.

Google's conduct—a series of exclusive and de facto exclusive dealing arrangements—has long been familiar to antitrust law and economics. It is a quintessential example of anticompetitive strategic behavior by a dominant firm.

#### 1. Antitrust Law Has Long Held, and Modern Economics Confirms, That Formal and De Facto Exclusivity Arrangements Can Be Anticompetitive.

U.S. antitrust law has long recognized that exclusivity and de facto exclusivity requirements imposed by a powerful firm can be anticompetitive. *See, e.g.*, *Lorain J. Co.*, 342 U.S. 143; *United Shoe Mach. Corp. v. United States*, 258 U.S. 451 (1922); *Alum. Co. of Am.*, 148 F.2d 416. Such requirements can violate not only Sherman Act § 2, but also Sherman Act § 1, Clayton Act § 3, and FTC Act § 5. *See, e.g.*, *FTC v. Brown Shoe Co.*, 384 U.S. 316 (1966); *Std. Oil Co. v. United States*, 337 U.S. 293 (1949); *Std. Oil Co. v. United States*, 221 U.S. 1, 32–33, 81–82 (1911).

These arrangements need not formally require total exclusivity to violate the antitrust laws. They can take the form of preferential discounts and rebates, bundled pricing strategies, soft requirements, and a variety of other incentive structures that tend to cause market foreclosure and raise rivals' costs. *Std. Oil Co.*, 221 U.S. at 32–33; *McWane, Inc. v. FTC*, 783 F.3d 814, 820–21 (11th Cir. 2015);

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 265 (3d Cir. 2012); *FTC v. Surescripts, LLC*, 424 F. Supp. 3d 92, 102 (D.D.C. 2020).

Nor do the restraints in question need to blanket the entire relevant market to constitute a violation. Exclusivity arrangements that affect an important distribution channel for the product can be the basis for liability. *See, e.g.*, *Microsoft Corp.*, 253 F.3d at 70–71 (condemning de facto exclusivity arrangements affecting "one of the two major channels" for browser distribution). And exclusive dealings that cover significantly less than 100% of the market can violate the Sherman Act. *See id.* at 70; *Twin City Sportserv., Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1301 (9th Cir. 1982) (arrangements affected 24% of market).

Google's argument that the lack of "express exclusivity provision[s] . . . should have ended . . . Plaintiffs' case," Def. Br. at *31, is incorrect as a matter of law.

It is also incorrect on economic grounds. Modern economics supports applying U.S. antitrust laws so as to prohibit anticompetitive exclusivity requirements whatever their form. Foreclosing rivals from important distribution channels, inputs, or customers can raise rivals' costs, impairing their ability and/or incentive to enter and expand in the affected market(s). Thomas G. Krattenmaker & Steven C. Salop, *Competition and Cooperation in the Market for Exclusionary Rights*, 76 Am. Econ. Rev. 109 (1986); *see also* B. Douglas Bernheim & Michael

D. Whinston, *Exclusive Dealing*, 106 J. Pol. Econ. 64 (1998). Such foreclosure can maintain, entrench, or increase an already dominant firm's power. Bernheim & Whinston, *supra*; *see also* Salop, Modern Economic Analysis ch.10, *supra*.

To be sure, exclusivity arrangements, especially when adopted by firms in competitive markets, can sometimes be benign. Historically, some scholars theorized that contracting practices between a supplier and a distributor are *never* harmful and should therefore be *per se* legal. *E.g.*, Robert H. Bork, The Antitrust Paradox 288 (1978) ("[E]very vertical restraint should be completely lawful."). But subsequent advances in economic theory and empirics have shown that vertical restraints in general, and exclusivity arrangements in particular, can be anticompetitive. *See, e.g.*, Jonathan B. Baker, *Exclusion as a Core Competition Concern*, 78 Antitrust L.J. 527 (2013); Einer Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 Harv. L. Rev. 397, 403–19 (2009); *see also* Marissa Beck & Fiona Scott Morton, *Evaluating the Evidence on Vertical Mergers*, 59 Rev. Indus. Org. 273 (2021) (explaining that vertical mergers can be harmful). Today, all serious antitrust scholars agree that such restraints can be harmful and should be subject to careful antitrust scrutiny.

On the facts present in this case, *Amici* concur with the District Court's extensive analysis—and ultimate rejection—of Google's claimed justifications. *Google Liability*, 747 F. Supp. 3d at 171–76. The economic mechanism underlying

Google's exclusionary conduct is well understood: Gilbert and Newbery famously demonstrated that a monopolist tends to have a powerful incentive to outspend rivals to keep accruing economic rents. *See* Gilbert & Newbery, *supra*. Monopoly profits accrue continuously and generally exceed duopoly profits, because more competition usually leads to lower prices and higher investments in quality and innovation. *See, e.g.*, Salop, *Raising Rivals' Cost*, *supra*, at 377. Those profits provide the ability and incentive to outbid rivals and thereby foreclose competition.

As the District Court held, Google's payments to foreclose search distribution "created an ecosystem that has a 'strong incentive' to do 'nothing', is 'resist[ant] to change,' and is 'basically [frozen] in place.'" *Google Liability*, 747 F. Supp. 3d at 201–02. This is exactly the monopoly-maintenance mechanism predicted by Gilbert and Newbery's now-standard economic model.

### 2. Establishing Liability Does Not, and Should Not, Require Perfectly Recreating the World "But For" the Anticompetitive Conduct.

The Sherman Act does not require enforcers or courts to reconstruct with certainty what would have happened in an alternate universe absent the defendant's illegal conduct. This Court has put it well: "To require that § 2 liability turn on a plaintiff's ability or inability to reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct would only encourage monopolists to take more and earlier anticompetitive action." *Microsoft Corp.*, 253 F.3d at 79.

The facts of both *Microsoft* and this case underscore why courts have not adopted such a rule. One of Microsoft's exclusionary tactics was not including its own web browser in the Windows "Add/Remove Programs" utility. *Id.* at 66–67. Doing so made it relatively easier for users to uninstall rival browsers, and relatively harder for them to uninstall Microsoft's browser. Basic logic and experience, informed by precedent, dictate that such conduct by an incumbent monopoly was reasonably capable of having an exclusionary effect. Both the *Microsoft* district court and this Court held as much—and did so without insisting on separate proof of exactly how many users had switched to or kept using Microsoft's browser because of this particular aspect of Microsoft's illegal conduct. *Id.*

Google's series of exclusionary arrangements began decades ago and has extended across multiple relevant markets, distribution channels, and counterparties. *See Google Liability*, 747 F. Supp. at 88, 93. Here, as in *Microsoft*, logic, precedent, and experience dictate that such conduct likely had exclusionary effects. *See id.* at 153, 168 (summarizing findings that Google's conduct tended to foreclose competition, prevent rivals from achieving scale, and diminish rivals incentives' to enter, for example by "contributing to keeping Apple on the sidelines of search").

Google and certain *amici* urge this Court to change long-established law and impose a new requirement of reconstructing what would have happened in an alternate universe free from Google's illegal conduct. *See* Appellant-Cross-Appellee's Initial Principal Br. at *50; Br. of Law & Economics Scholars as *Amici Curiae* in Support of Defendant-Appellant-Cross-Appellee Google LLC, at *3–4, *7, *9, *13, *35–36. Requiring precise reconstruction of the world the monopolist's conduct foreclosed would be a massive, error-prone diversion that would force courts to abandon precedent, logic, and reason at the door. That is why this Court upheld the liability decision in *Microsoft* without also insisting on clear proof that Netscape or Java would in fact have disrupted Windows in a hypothetical world reconstructed "but for" Microsoft's exclusionary conduct.

Adopting Google's new rule would also shift the risk of harm onto the American public, rather than a monopolist that chose to engage in exclusionary conduct. As such, it would not only be bad law, but also bad policy. As this Court has observed, "[t]o some degree, 'the defendant is made to suffer the uncertain consequences of its own undesirable conduct.'" *Microsoft Corp.*, 253 F.3d at 79 (quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* 78 (5th ed. & Supp. 2025).

### D. Independent, Objective Analyses Align with the District Court's Findings.

Multiple independent analyses by academic researchers, policymakers, and competition authorities in the United States and abroad have reached conclusions similar to those of the District Court regarding general search services and Google's conduct. For analyses specific to general search services, see U.K. Competition & Mkts. Auth., Online Platforms and Digital Advertising: Market Study Final Report (2020); Austl. Competition & Consumer Comm'n, Digital Platforms Inquiry: Final Report (2019); Eur. Directorate-Gen. for Competition, *Case AT.39740 – Google Shopping*, Comm'n Decision, C(2017) 4444 final (June 27, 2017), *aff'd by* Case C-48/22 P, *Google LLC v. Comm'n*, ECLI:EU:C:2024:726 (Sept. 10, 2024); Eur. Comm'n, *Case AT.40099 –Google Android*, Comm'n Decision C(2018) 4761 final, art. 1 (July 18, 2018). For more general analyses of the competitive dynamics of online markets, including general search, see Stigler Comm. on Digital Platforms, Stigler Ctr. at Univ. of Chi. Booth Final Report (2019); Jason Furman et al., Digital Competition Expert Panel, Unlocking Digital Competition: Report of the Digital Competition Expert Panel (2019); Jacques Crémer, Yves-Alexandre de Montjoye & Heike Schweitzer, Eur. Comm'n, Competition Policy for the Digital Era (2019); *see also* Filippo Lancieri & Patricia Morita Sakowski, *Competition in Digital Markets: A Review of Expert Reports*, 26 Stan. J.L. Bus. & Fin. 65 (2021) (collecting and summarizing), Fiona M. Scott

Morton & David C. Dinielli, *Roadmap for a Monopolization Case Against Google Regarding the Search Market* (Omidyar Network 2020) (building on these and other studies).

One of the most comprehensive, in-depth analyses of general search services was conducted by the U.K. Competition and Markets Authority ("CMA"). Published in July 2020, the main report runs some 437 pages in length, with twenty-seven technical appendices totaling thousands of additional pages. Like the District Court, the CMA concluded that general search is a relevant product market, and that Google controls a commanding share of ~90%. CMA, Online Platforms, *supra*, at 77–81, P6, P11; Lancieri & Sakowski, *supra*, at 126–27. Also like the District Court, the CMA concluded that Google's return on capital was well above competitive benchmarks and consistent with substantial market power. CMA, Online Platforms, *supra*, at 8, 67. Like the District Court, the CMA identified the critical importance of the ability to gain scale in online search, *id*. at 89, and that that Google's "extensive default positions act as a significant barrier to expansion for rival search engines," *id*. at 113 ¶ 3.149.[4]

[4] The CMA used compulsory process to obtain real-world, user-based, click-and-query data from both Google and Microsoft. This was, to the best of our knowledge, the only available study that could match different datasets from different companies. It also independently found that data plays an important role for competition in search markets. *Id.* at App'x I, I14-I16.

Again, this is just one example of a sophisticated, well-resourced, and independent body reaching factual conclusions similar to those of the District Court in this case. Google has been held liable for violating competition laws or agreed to antitrust remedies in every habitable continent on the planet. The presence of so many internationally respected observers making similar findings tends to confirm that the District Court reached the correct conclusion as to liability: Google has monopoly power, and it has used that power to exclude competition.

* * *

As it was in the influential *Microsoft* litigation at the turn of the last century, the factual record here is particularly clear. If anything, this case presents an even clearer violation than *Microsoft*, inasmuch as Google's strategic behavior targets direct rivals rather than nonrivals that may commoditize the market.

The result is, as one impacted rival testified in the proceedings below, a "vicious cycle." *Google Liability*, 747 F. Supp. 3d at 159 (quoting Satya Nadella, Chief Executive Officer of Microsoft). Paying for default status helps Google maintain its monopoly position by foreclosing competition, and its monopoly position helps Google pay for default status to foreclose competition. In light of the factual record, applicable precedent, and sound economic learning, *Amici* submit that this is a straightforward case for finding liability.

## II. THE DISTRICT COURT'S REMEDY ORDER IS LEGALLY ERRONEOUS, LIKELY TO FAIL, AND SHOULD BE REVERSED.

Permitting Google to continue engaging in its exclusionary conduct is reversible error, and both past experience and economic analysis indicate that the current remedy order is virtually certain to fail. But failure is not inevitable. More effective alternatives are available. In the discussion that follows, we explain the fundamental flaws of the current remedy and offer some illustrative alternatives.[5]

### A. Precedent Imposes a Duty to Effectively Remedy Illegal Monopolization.

To be effective, antitrust remedies in monopolization cases must achieve a set of well-accepted end goals. As this Court and the Supreme Court have explained, a remedy must (i) terminate all of the illegal conduct; (ii) restore competition and thereby eradicate the illegal monopoly; (iii) deny the monopolist the fruits of its conduct; and (iv) prevent practices that are likely to result in monopolization going forward. *Microsoft Corp.*, 253 F.3d at 103 (quoting *United Shoe*, 391 U.S. at 250); *see also Ford Motor*, 405 U.S. at 575.

Achieving these is not optional. The Supreme Court has instructed that once a Sherman Act § 2 violation is found, "it is the duty of the court to prescribe relief

[5] These are not meant to serve as replacements for any other aspects of the District Court's remedy order. They are intended solely to illustrate the availability of alternatives to the remedy's current treatment of Google's payments to distributors.

which will" accomplish these goals. *United Shoe*, 391 U.S. at 250. "The trial court is charged with inescapable responsibility to achieve this objective . . . ." *Id.*

The District Court's remedy will likely fail to achieve any of these end goals, and will certainly fail to achieve all of them. The current remedy order does not effectively terminate all of Google's exclusionary conduct or prevent functionally identical conduct going forward. It leaves largely intact both Google's incentives and ability to continue foreclosing rivals. As a result, it does not include adequate provisions to restore competition and prevent future monopolization.

The decision to permit Google's monopolistic conduct to persist is reversible error. It departs from both governing precedent and modern economic principles. As a policy matter, it is unduly risky, harmful, and unsound.

### 1. The Current Remedy Is Legally Erroneous and Likely to Fail.

One of the most basic requirements for an effective remedy is halting all of the monopolist's illegal conduct and preventing the monopolist from engaging in similar conduct going forward. A court's duty to do so is mandatory. *See, e.g.*, *United Shoe*, 391 U.S. at 250 ("[I]t is the duty of the court to prescribe relief which will . . . ensure that there remain no practices likely to result in monopolization in the future."); *see also*, *e.g.*, Carl Shapiro, Microsoft*: A Remedial Failure*, 75 Antitrust L.J. 739, 748 (2009) ("There is no question that a remedy should prevent

the monopolist from continuing to engage in the illegal practices or their close cousins.”).

The District Court’s remedy, however, allows Google to continue paying distributors billions of dollars for default or favored status across substantial portions of the relevant market. Google would be left free to continue engaging in much of the same conduct that “substantially contributed” to producing the “antithesis of a competitive market.” *Google Liability*, 747 F. Supp. 3d at 159, 163. As the District Court correctly observed in its liability opinion, “[e]xclusivity need be neither express nor complete,” and “[*d*]*e facto* and partial exclusivity may suffice to violate the Sherman Act. *Id.* at 146. The resulting liability findings were not limited to agreements that expressly required exclusive default status on every aspect of the covered distributor’s platform. *See id.* at 149 (agreements that permitted Apple’s browser to include Bing as a default bookmark); *id.* at 150 (agreements that permitted smartphone OEMs to preload, on home screen, non-Google browsers with non-Google default search providers); *id.* (agreements that permitted smartphone OEMs to preload Google products on “some or all” of their devices); *id.* at 151 (agreements that permitted Verizon and Samsung to preinstall other general search engines); *id.* at 152 (“[S]ome of the RSAs do not present a literal ‘all-or-nothing choice,’ as a partner can on a device-by-device basis earn

*some* revenue share on a non-exclusive deal, but that distinction is not dispositive.").

Under the current remedy, while Google cannot purchase across-the-board exclusive default status from a given search distributor, it can still purchase default or favored status across a broad array of search access points in ways that will predictably continue to foreclose competition. Google may, for example, be able to "pay[] Apple to be the default option for, say, 95% of Safari users, even though this would differ only trivially from an 'exclusive' default." Erik Hovenkamp & Douglas Melamed, *Appraising the Google Search Antitrust Remedies*, ProMarket (Sept. 23, 2025), https://bit.ly/4fzR5B9. The current remedy thereby leaves intact much of Google's incentive and its ability to continue paying to secure default or favored status. Yet a monopolist's agreements do not need to cover all, or even half, of a market to be illegal. *See Microsoft*, 253 F.3d at 70 (less than 40% may suffice); *Twin City*, 676 F.2d at 1301 (24% sufficient).

Even absent any contractual default-status requirements, letting Google make revenue-sharing payments for Google search-query volume would predictably permit Google to maintain monopoly power—as the District Court itself recognized. *Google Remedies*, 803 F. Supp. 3d at 102 ("The revenue share payments shape the market for general search services in Google's favor."); Steven

Salop, *Unconditional Revenue-Sharing By Google Would Still Be Anticompetitive Monopolization*, ProMarket (Dec. 23, 2024), https://bit.ly/4yDJgDr.

Competitive counter-bidding for searches under such conditions will tend to fail going forward for the same reasons as it has in the past: again, Google's incremental value of maintaining *monopoly* profits will continue to exceed the rival's potential value of earning (lower) *duopoly* profits. In fact, the District Court itself explained as follows: "Due to Google's massive financial advantage and its superior monetization, distributors will be incentivized to stick with Google because it can pay more, thus leaving in place the very forces that effectively have made the ecosystem exceptionally resistant to change." *Google Remedies*, 803 F. Supp. 3d at at 106 (cleaned up).

Now that Google has illegally entrenched its monopoly power, the only difference between paying for contractual "exclusive" default status and paying for search traffic is the mechanism—explicit versus unspoken—for achieving default status. Either way, foreclosure predictably arises from the monopolist's unique incentive to maintain monopoly power and distributors' interest in getting a share of the resulting monopoly rents. Permitting this cycle to continue is legal error. *United Shoe*, 391 U.S. at 250 ("[I]t is the duty of the court to prescribe relief which will . . . ensure that there remain no practices likely to result in monopolization in the future."). It is also economic error: it will predictably result in persistent harm.

Google's "distribution agreements have . . . reduced the incentive to invest and innovate in search." *Google Liability*, 747 F. Supp. 3d at 165. During the course of Google's illegal conduct, innovative new general-search entrants have been vanishingly rare, and the few that emerged have struggled mightily or exited. *Id.* Thus, Google's long-running exclusionary course of conduct has caused a particularly concerning type of harm: lessened innovation and dynamic competition. *See* Richard J. Gilbert & A. Douglas Melamed, *Innovation Under Section 2 of the Sherman Act*, 84 Antitrust L.J. 1, 2 (2021); Jonathan B. Baker, *Beyond Schumpeter vs. Arrow*, 74 Antitrust L.J. 575, 576 (2007).

The relevant markets in this case exhibit features—network effects, scale and scope economies—that have amplified the exclusionary effects of Google's anticompetitive conduct. *Google Liability*, 747 F. Supp. 3d at 157. For well over a decade (and counting), Google has artificially stunted the competitive landscape, yielding what the District Court called "the antithesis of a competitive market." *Id.* at 159; *see also* Gilbert & Melamed, *supra*, at 7 ("High entry barriers and network effects can insulate firms in today's high-tech economy from competition for decades.").

When an incumbent monopoly in markets like these uses illegal conduct to entrench itself over a significant time period, a particularly robust remedy is essential to jump-start the restoration process. Lancieri & Pereira Neto, *supra*, at

646-47. A weak remedy—like the District Court's current remedy—will predictably fail to do so.

### 2. Preserving Payoffs from Google to Search Distributors Is an Invalid Reason to Permit Anticompetitive Conduct.

In an attempt to justify its unorthodox choice, the District Court invoked the concern that ordering Google to cease revenue-sharing with distributors might cause them to receive less revenue. *Google Remedies*, 803 F. Supp. 3d at 104 (citing "possibl[e]" effects on Apple, Samsung, Mozilla, and others).

Distributors who receive monopoly-based payoffs from Google naturally enjoy the arrangement. But that does not make these arrangements procompetitive for antitrust purposes. *See* John M. Newman, *Procompetitive Justifications in Antitrust Law*, 94 Ind. L.J. 501, 540–41 (2019) (describing the modern test). Nor is there any guarantee that these split-the-rents payoffs will somehow make their way back to the advertising customers, over whom Google wields monopoly power, or actually be passed on to search distributors' users. *See Google Liability*, 747 F. Supp. 3d at 176; Salop, *Unconditional Revenue Sharing*, *supra*.

There is no "Robin Hood" defense in antitrust law. *See* Jack B. Kirkwood, *Antitrust and Two-Sided Platforms*, 41 Cardozo L. Rev. 1805, 1812, 1823 (2020); Newman, *Foundations*, *supra*, at 81. Nor should there be. Google has merely shared some of the monopoly rents it extracted from one group (advertising customers) with members of another (search distributors). A remedy that lets

monopolistic conduct continue merely because it involves payoffs to distributors would create a clear roadmap for future monopolists to break the law. Section 2 of the Sherman Act would be rendered toothless against a common form of exclusion.

#### 3. Judicial Humility Counsels Against Permitting Anticompetitive Conduct and Public Harm for an Uncertain "Hope" of Future Displacement.

Judicial humility is an admirable quality, as the court below recognized. *Google Remedies*, 803 F. Supp. 3d at 36–37. Here, judicial humility counsels in favor of applying precedent and sound economic principles to issue a robust remedy that is designed to succeed. And it further counsels toward erring, if at all, on the side of protecting the American public, not out of solicitude for the adjudicated monopolist.

Instead, the District Court crafted a remedy virtually certain to fail, with the resulting harms to be borne by the very public that our antitrust laws are supposed to protect. The current remedy will not achieve even the basic requirement of terminating all of the monopolist's anticompetitive conduct, a remedial choice based on the lower court's "hope that Google will not simply outbid competitors for distribution if superior products emerge," as well as concern about "disadvantaging Google" in an undefined, different, AI-based market. *Google Remedies*, 803 F. Supp. 3d at 107.

The District Court's "hope" was that disruptive AI-based products might effectively supplant Google's monopoly positions. *Id.* at 107. But a defendant monopolist's predictions about rapidly losing its power should be taken with a large grain of salt. That is particularly so where, as here, an entrenched monopolist controls multiple, interrelated markets that exhibit strong network effects, scale economies, and other barriers to entry. *Google Liability*, 747 F. Supp. 3d at 157.

And the lower court's optimistic vision assumes that Google would sit back and passively let others dislodge its power. Past experience and sound economics counsel otherwise. *See Microsoft Corp.*, 253 F.3d at 55–56, 58–76 (affirming that Microsoft had actively engaged in several types of exclusionary conduct to stave off innovative threats); Lancieri & Pereira Neto, *supra*; *see generally* Gilbert & Newbery (modeling incumbent monopolies' incentives). By approving the persistence of illegally created entry barriers, the remedy also assumes would-be disruptors will be willing and able to raise tens of billions of dollars just to match Google's monopoly-based payoffs for preferential distribution. Predictably, Google is already using its position in general search services to expand into AI-based product markets, and using AI to increase users' time spent on Google Search. Kate Conger, *Google Is Building an A.I. Fence Around the Internet It Once Championed*, N.Y. Times (July 20, 2026), https://bit.ly/4h0iVZQ; Hugh Langley, *Google's Gemini App Nips at ChatGPT's Heels as It Nears 1 Billion*

*Users*, Bus. Insider (July 22, 2026), https://bit.ly/4fGqnac; *see also* Madhavi Singh & Fiona M. Scott Morton, *A Roadmap for a Monopolization Case Against Google: Monopsony Power and AI Overviews*, 175 U. Pa. L. Rev. (forthcoming 2026).

Even if mere "hope" were enough to justify permitting monopolistic conduct to continue, that hope was misguided. Permitting Google to continue engaging in harmful, anticompetitive conduct poses an unacceptably high risk of harm to hundreds of millions of American individuals and businesses. A proper remedy for illegal monopolization should, at minimum, avoid that risk. The current remedy puts that risk on Google's victims and society at large.

The overriding concern for the court below was not over those whom antitrust law is supposed to protect. Instead, it was potentially "disadvantaging Google." *Google Remedies*, 803 F. Supp. 3d at 107. The Supreme Court has instructed otherwise: "Those who violate the [Sherman] Act may not reap the benefits of their violations and avoid an undoing of their unlawful project on the plea of hardship or inconvenience." *United States v. E. I. du Pont De Nemours & Co.*, 366 U.S. 316, 326–27 (1961).

**B. Alternatives Are Available Upon Remand.**

Such a weak remedy was not inevitable. Alternatives exist. A remedy could have prohibited Google from making any search-related payments to distributors for a specified period of time. As the District Court itself explained, "The rationale

for a payment ban is straightforward: It would pry open the market to competition." *Google Remedies*, 803 F. Supp. 3d at 102.

The District Court was under a duty to terminate all of Google's illegal conduct and ensure that no similar practices would occur going forward. A straightforward payment ban comports far better with that mandate than permitting Google to continue foreclosing competition.

We urge this Court to remand this aspect of the current remedy for reconsideration of a straightforward payment ban, to be imposed over a specified period of time. This ban might be limited to payments for default or favored placement, or it might cover all conditional and unconditional search-related payments.

Alternatively, this aspect of the remedy might require Google to continue making payments to distributors, and require those payments to be unrelated to Google's relative search volume on the distributor's platform. The payments could, for example, be based on the total number of queries across all search providers that occur on a given distributor, but not on how many search queries Google captured relative to its rivals via that distributor. A remedy along these lines could deliver revenues to distributors for a time while reducing their financial incentive to support Google's monopoly power by steering users toward Google Search. *See* Salop, Modern Economic Analysis, supra, 9-40 to 9-43.

Any of these alternatives would be legally permissible under the broad equity power of the courts. *See, e.g.*, *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 726 (1944); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* 653f (5th ed. & Supp. 2025) ("[E]quitable relief properly goes beyond merely 'undoing the act'; the proper relief is eradicating all the consequences of the act and providing deterrence against repetition; and any plausible doubts should be resolved against the monopolist."). Indeed, making such changes is more than permissible—it is a requisite part of the trial court's "inescapable responsibility," *United Shoe*, 391 at 250, to effectively remedy a proven violation.

## CONCLUSION

*Amici* urge this Court to affirm that U.S. antitrust laws apply with equal force to digital markets as to their offline counterparts, and to affirm that Google's power and conduct meet—and easily surpass—the thresholds for Sherman Act liability.

Yet it is a foundational rule-of-law principle that a law without teeth is no law at all. "The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803). *Amici* therefore respectfully urge this Court to reverse in part the current remedial order and

remand for reconsideration of more effective alternatives, with instructions to issue a remedy that comports with precedent, experience, factual realities, and sound economics.

## APPENDIX

## *AMICI CURIAE* ACADEMIC TITLES AND INSTITUTIONAL AFFILIATIONS

**Laura Alexander**
Assistant Professor of Law
The Ohio State University Moritz College of Law

**Rebecca Haw Allensworth**
David Daniels Allen Distinguished Chair in Law
Vanderbilt Law School

**Ian Ayres**
Oscar M. Ruebhausen Professor of Law
Yale Law School

**John Manuel Barrios**
Associate Professor of Accounting
Yale School of Management

**Christine P. Bartholomew**
Professor; William J. Magavern Faculty Scholar
University at Buffalo School of Law

**Elettra Bietti**
Associate Professor of Law and Computer Science
Northeastern University School of Law

**Timothy F. Bresnahan**
Landau Professor in Technology and the Economy, Emeritus
Stanford University

**Darren Bush**
Leonard B. Rosenberg Professor of Law
University of Houston Law Center

**Edward D. Cavanagh**
Professor of Law
St. John's University School of Law

**Gregory Day**
Associate Professor
University of Georgia Terry College of Business

**Stacey Dogan**
Professor & Law Alumni Scholar
Boston University School of Law

**Javier D. Donna**
Associate Professor of Economics
University of Miami Herbert Business School

**Erika Douglas**
Associate Professor of Law
Santa Clara University School of Law

**Florian Ederer**
Allen and Kelli Questrom Professor in Markets, Public Policy & Law
Boston University Questrom School of Business

**Harry First**
Charles L. Denison Professor of Law Emeritus
NYU School of Law

**Eleanor M. Fox**
Walter J. Derenberg Professor of Trade Regulation Emerita
NYU School of Law

**David J. Gerber**
University Distinguished Professor Emeritus; Professor of Law Emeritus
Chicago-Kent College of Law

**Mark Glick**
Professor of Public Policy and Adjunct Professor of Law,
University of Utah School of Public Affairs

**Nikolas Guggenberger**
Assistant Professor of Law
University of Houston Law Center

**Hiba Hafiz**
Professor of Law
Boston College Law School

**Jonathan F. Harris**
Associate Professor of Law
Temple University Beasley School of Law

**George A. Hay**
Charles Frank Reavis Sr. Professor of Law; Professor of Economics
Cornell Law School

**James R. Kearl**
A. O. Smoot Professor of Economics
Brigham Young University Department of Economics

**John B. Kirkwood**
William C. Oltman Professor of Teaching Excellence
Seattle University School of Law

**Mordecai Kurz**
Joan Kenney Professor of Economics, Emeritus
Stanford University Department of Economics

**John Kwoka**
Neal F. Finnegan Distinguished Professor of Economics
Northeastern University Department of Economics

**Filippo Lancieri**
Associate Professor of Law
Georgetown Law

**Robert H. Lande**
Venable Professor of Law Emeritus
University of Baltimore School of Law

**Christopher Leslie**
Chancellor's Professor of Law
University of California, Irvine School of Law

**John M. Newman**
Herff Chair of Excellence in Law
University of Memphis Cecil C. Humphreys School of Law

**Roger Noll**
Professor of Economics, Emeritus
Stanford University Department of Economics

**Laura Phillips-Sawyer**
Jane W. Wilson Associate Professor in Business Law
University of Georgia School of Law

**Barak D. Richman**
Alexander Hamilton Professor of Business Law
The George Washington University Law School

**Steven C. Salop**
Professor of Law Emeritus
Georgetown Law

**Theodosia Stavroulaki**
Assistant Professor of Law
Saint Louis University School of Law

**Abbey Stemler**
Associate Professor of Business Law and Ethics; Weimer Faculty Fellow
Indiana University Kelley School of Business

**Maurice Stucke**
Lindsay Young Distinguished Professor of Law
University of Tennessee Winston College of Law

**Jennifer E. Sturiale**
Associate Professor of Law
Widener University Delaware Law School

**Zephyr Teachout**
Professor of Law
Fordham University School of Law

**Spencer Weber Waller**
Justice John Paul Stevens Chair in Competition Law; Professor of Law
Loyola University Chicago School of Law

**Samuel N. Weinstein**
Professor of Law
Benjamin N. Cardozo School of Law

**Lawrence J. White**
Robert Kavesh Professor of Economics
NYU Stern School of Business

**Luigi Zingales**
McCormack Distinguished Service Professor of Entrepreneurship and Finance
University of Chicago Booth School of Business