NOT YET SCHEDULED FOR ORAL ARGUMENT

# United States Court of Appeals for the District of Columbia Circuit

RECEIVED
U.S. COURT OF APPEALS
FOR THE D.C. CIRCUIT
2026 AUG -4 P 10:03
FILING DEPOSITORY

**No. 26-5023**

(Consolidated with Nos. 26-5047 and 26-5049)

UNITED STATES OF AMERICA, *et al.*,

*Plaintiffs-Appellees/Cross-Appellants,*

*v.*

GOOGLE LLC,

*Defendant-Appellant/Cross-Appellee.*

*On Appeals from the United States District Court for the District of Columbia, Nos. 20-cv-3010 & 20-cv-3715, Honorable Amit P. Mehta*

# BRIEF OF *PRO SE AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES/CROSS-APPELLANTS THE UNITED STATES OF AMERICA, *ET AL.*

STEPHEN WESTERMANN
785 Stanford Avenue
Menlo Park, California 94025
(415) 713-1740
stephen.westermann@icloud.com

*Pro Se Amicus Curiae in support of the Plaintiffs-Appellees/ Cross-Appellants The United States of America, et al.*

August 4, 2026

COUNSEL PRESS
A Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (625346)

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

Pursuant to Rule 28(a)(1) of the United States Court of Appeals for the District of Columbia Circuit, Amicus Curiae Stephen Westermann is appearing *pro se* and certifies as follows:

### A. Parties and Amici

Except for Amicus Curiae, to the best of his knowledge, all parties, intervenors, and amici appearing before the District Court and in this Court are listed in the Opening Brief on Cross-Appeal for the United States and Co-Plaintiff States.

### B. Rulings Under Review

References to the rulings at issue in the appeal are listed in the Response Brief and Opening Brief on Cross-Appeal for the United States and Co-Plaintiff States.

### C. Related Cases

The related cases are listed in the Response Brief and Opening Brief on Cross-Appeal for the United States and Co-Plaintiff States.

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iv

STATEMENT OF IDENTITY, INTEREST IN CASE AND AUTHORITY TO APPEAR ........ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........ 3

BACKGROUND ........ 8

A. Publicly Available Data Indicates That Google Possesses Substantial U.S. News Market Share, But Not How Substantial ........ 8

B. The Need to Determine Google's Share of the U.S. News Market ........ 10

ARGUMENT ........ 10

A. Legislative History Indicates That the Paramount Goal of U.S. Antitrust Laws Is to Protect the Nation's Democratic System From Industry Overconcentration ........ 10

B. Amicus Curiae Respectfully Urges the Court and the District Court to Determine Whether Google's Substantial News Market Share Significantly Harms Americans ........ 13

C. Amicus Respectfully Urges the Court to Consider Whether It Has a Duty to Remand This Matter to the District Court ........ 15

D. Discussion of Possible News Market Share Reduction Remedies ........ 17

E. Harm to Americans Caused by Google Search's Substantial News Market Share Is Cognizable Antitrust Harm ........ 19

CONCLUSION ........ 21

CERTIFICATE OF COMPLIANCE ........ 24

CERTIFICATE OF SERVICE ........ 25

## TABLE OF AUTHORITIES

### CASES

*Associated Press v. United States*, 326 U.S. 1 (1945) ....................... 6, 7, 12, 20, 21

**Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021) ........................................ 1, 3, 12

*Maryland v. United States*, 460 U.S. 1001 (1983) ........................................ 16

*Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679 (1978) ........................ 15

*New York Times Co. v. United States*, 403 U.S. 713 (1971) ................................ 12

**Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594 (1953) ........... 7, 12, 21

**United States v. AT&T Co.*, 552 F. Supp. 131 (D.D.C. 1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983) ........................................ 16

**United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1 (D.D.C. 2022) ........................................ 20

**United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024) .................... 1, 3, 6

*United States v. U.S. Gypsum Co.*, 340 U.S. 76 (1950) ........................................ 15

### STATUTES AND RULES

Fed. R. App. P. 29(a)(4)(E) ........................................ ii

Fed. R. App. P. 29(a)(5) ........................................ 23

Fed. R. App. P. 32(a)(5) ........................................ 23, 25

Fed. R. App. P. 32(a)(6) ........................................ 23, 25

Fed. R. App. P. 32(f) ........................................ 23, 25

D.C. Cir. R. 28(a)(1) ........................................ i

D.C. Cir. R. 32(e)(1) ........................................ 23, 25

D.C. Cir. R. 32(e)(3) ........................................ 23, 25

### LEGISLATIVE MATERIALS

21 Cong. Rec. 2460 ........................................ 11

96 Cong. Rec. 11,486 (1949) (statement of Rep. Celler) ........................................ 11

96 Cong. Rec. 16,452 (1950) (statement of Sen. Kefauver)....................................11

H.R. Rep. No. 63-627 (1914)..................................................................................11

**COURT DOCUMENTS**

Pls.' Post-Trial Br. [Redacted], *United States v. Google LLC*, No. 1:20-cv-03010-APM (D.D.C. Feb. 9, 2024), ECF No. 837 ...........................1, 3, 5, 7, 13

**OTHER AUTHORITIES**

Daron Acemoglu et al., *Democracy Does Cause Growth*, 127 J. Pol. Econ. 47 (2019)..............................................................................................15

Andrew Bosworth, *Lord of the Rings, 2020 and Stuffed Oreos: Read the Andrew Bosworth Memo*, N.Y. Times (Jan. 7, 2020)........................................4

Alice Brooker, *AI Overviews Cutting Publisher Clickthrough Rates by 50%, New Report Finds*, Press Gazette (July 30, 2025) ............................................18

Daniel A. Crane, *Antitrust as an Instrument of Democracy*, 72 Duke L.J. Online 21 (2022)..........................................................................................5, 12

Daniel A. Crane, *Fascism and Monopoly*, 118 Mich. L. Rev. 1315 (2020) ..........11

Decartelization Branch, Off. of Mil. Gov't for Ger. (U.S.), *German Economic Decentralization: An Analysis of the German Cartel and Combine Problem* (Mar. 1, 1947) (unpublished report)..................................11

Francis Fukuyama et al., *How to Save Democracy from Technology: Ending Big Tech's Information Monopoly*, Foreign Affairs (Nov. 24, 2020)...........5, 12

Keach Hagey, *News Publishers See Google's AI Search Tool as a Traffic-Destroying Nightmare*, Wall St. J. (Mar. 24, 2025) ........................................18

Lina M. Khan, *The Ideological Roots of America's Market Power Problem*, 127 Yale L.J. 960 (2018) ...........................................................................11

William E. Lee, *Antitrust Enforcement, Freedom of the Press, and the "Open Market": The Supreme Court on the Structure and Conduct of Mass Media*, 32 Vand. L. Rev. 1249 (1979)...............................................7, 20, 21

Paul Liu, *Our Experiment on the Value of News Content*, Google (Mar. 25, 2025) ..............................................................................................................19

Wendy Max et al., *Valuing Human Life: Estimating the Present Value of Lifetime Earnings, 2000* (Univ. of Cal. S.F. Inst. for Health & Aging 2004) ....................14

Megan Morrone, *Publishers Race Against Google Zero Doomsday Clock*, Axios (July 23, 2025)....................18

Nic Newman et al., Reuters Inst. for the Study of Journalism, *Reuters Institute Digital News Report 2026* (2026)....................8, 9

Pew Rsch. Ctr., *News Media Tracker* (June 10, 2025)....................9

Pew Rsch. Ctr., *News Platform Fact Sheet* (Sept. 25, 2025)....................8

Pew Rsch. Ctr., *Social Media and News Fact Sheet* (Sept. 25, 2025) ....................8, 9

Robert Pitofsky, *The Political Content of Antitrust*, 127 U. Pa. L. Rev. 1051 (1979)....................10

*Search Engine Market Share United States*, Statcounter (July 2026)....................16

Charlotte Tobitt, *Global Publisher Google Traffic Dropped by a Third in 2025*, Press Gazette (Jan. 12, 2026)....................9

U.S. Bureau of Lab. Stat., *Consumer Price Index Summary—June 2026*....................14

U.S. Census Bureau, Population Div., *Annual Estimates of the Resident Population by Sex and Single Year of Age for the United States: April 1, 2020 to July 1, 2025*, tbl. NC-EST2025-AGESEX-RES ....................14

U.S. Census Bureau, *U.S. and World Population Clock*....................15

U.S. Dep't of Just. & Fed. Trade Comm'n, *Merger Guidelines* (2023)....................19

W. Stephen Westermann, *A Republic If You Enforce Your Antitrust Laws Against the Dominant Digital Platform News Publishers*, SSRN (Aug. 11, 2025) ....................1

Tim Wu, *The Curse of Bigness: Antitrust in the New Gilded Age* (2018) ....5, 11, 12

## STATEMENT OF IDENTITY, INTEREST IN CASE AND AUTHORITY TO APPEAR

Stephen Westermann attended University of Chicago School of Law and is admitted to the bar of the Supreme Court of Illinois (inactive status). He has published law scholarship articles on SSRN that have been cited in numerous law review articles. The articles deal with antitrust and legal entitlement theory. His most recent article in 2025 is *A Republic If You Enforce Your Antitrust Laws Against the Dominant Digital Platform News Publishers*.[1] This article addresses, among other topics, the novel profound risks to the nation's democracy posed by what Justice Clarence Thomas characterized as the "unprecedented … concentrated control of so much speech in the hands of a few [digital platforms]," *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1221 (2021) (Thomas, J., concurring), and how the antitrust laws may be applied to mitigate these risks.

After the District Court determined that certain conduct by Google had contravened the Sherman Act, *United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024), Plaintiffs identified how harm to Americans from Google's substantial information market share was a main antitrust harm that needed be remedied: "The Court's intervention [in ordering remedies] is required to redress the

[1] W. Stephen Westermann, *A Republic If You Enforce Your Antitrust Laws Against the Dominant Digital Platform News Publishers*, SSRN (Aug. 11, 2025), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5366540.

consequences of Google's monopolies and ensure Americans regain access to vibrant, open information markets." Pls.' Post-Trial Br. [Redacted] at 2, *United States v. Google LLC*, No. 1:20-cv-03010-APM (D.D.C. Feb. 9, 2024), ECF No. 837. However, amid the complexities of this case, Plaintiffs and the District Court may not have contemplated the possible existence of remedies designed specifically to reduce the news market share of Google Search that may be able with greater certainty more promptly mitigate harm from Google's substantial news market share independently of when, or if, the other antitrust remedies successfully restore robust general search market competition. Amicus Curiae's very specific interest is respectfully to urge the Court to consider remanding the matter to the District Court with instructions 1. to determine the magnitude of harm to Americans from Googles' substantial news market share; and 2. if the District Court determines that the magnitude of such harm is substantial, consider whether there exist viable remedies that could mitigate such harm both rapidly and with high certainty independently of when, or if, the other antitrust remedies successfully restore robust general search market competition. Finally, Amicus Curiae respectfully urges the Court to recognize that in this case democracy itself conceivably may be at stake, which may make this case in retrospect one of the most consequential antitrust cases in the nation's history.

All parties—the Department of Justice and Co-Plaintiff States, the Colorado-led Plaintiff States, and Google LLC—have consented to submission of this brief. No party's counsel authored any part of the brief and no one contributed money intended to fund the brief's preparation and submission. Fed. R. App. P. 29(a)(4)(E).

## INTRODUCTION AND SUMMARY OF ARGUMENT

In a 2021 case, Justice Clarence Thomas observed that the "unprecedented … concentrated control of so much speech in the hands of a few [digital platforms]" means "we will soon have no choice but to address how our legal doctrines apply to [them]." *Knight First Amend. Inst.*, 141 S. Ct. at 1221. After the District Court determined that certain conduct by Google had contravened the Sherman Act, *see Google*, 747 F. Supp. 3d 1, Plaintiffs identified how harm to Americans from Google's substantial information market share was a main antitrust harm that needed be remedied: "The Court's intervention [in ordering remedies] is required to redress the consequences of Google's monopolies and ensure Americans regain access to vibrant, open information markets." Pls.' Post-Trial Br. at 2.

For Americans, one of the most important information markets is the market for news information that informs their voting decisions. One way Google's substantial share of the U.S. news market possibly may impose substantial harm on Americans is that Google's substantial news market may give it the power, if it chose

to use it, to influence presidential and other election outcomes by manipulating what news to promote or suppress. Meta also possesses substantial news market share. In 2020, Meta's now CTO expressed his belief that one candidate's superior use of Facebook advertising may have helped decide the 2016 presidential election, and that Facebook possibly could significantly influence the 2020 presidential election if it tried to do so (while advocating strongly that it should not do so).[2]

Amicus Curiae knows of no basis to believe Google has ever has tried to influence election outcomes, or, moreover, to believe that it will try to do so in the future. Nevertheless, Google's substantial news market share may undermine some Americans' perception of the legitimacy of elections because it is difficult for them to know whether Google is trying to or not. The Court should contemplate that a conceivable worst-case scenario would be if the common interest in protecting their market shares led Google and other large digital platform companies that also publish news to support one of the political parties if such party in the future adopted a policy of lenient antitrust law enforcement against these companies. Amicus Curiae is unable to assess the plausibility of such a scenario. However, such a conceivable scenario may lend credence to antitrust scholar Daniel Crane's

---

[2] *See* Andrew Bosworth, *Lord of the Rings, 2020 and Stuffed Oreos: Read the Andrew Bosworth Memo*, N.Y. Times (Jan. 7, 2020), https://www.nytimes.com/2020/01/07/technology/facebook-andrew-bosworth-memo.html.

observation that "this is not to say that the monopolization of information channels could not contribute to the literal demise of democratic government."[3] Other scholars share this concern.[4]

Amid the complexities of this case, Plaintiffs and the District Court may have failed to consider that there may exist remedies that would reduce Google Search's news market share that could in a very short period mitigate harm to Americans from Google's substantial news market share independently of when, or if, the other antitrust remedies successfully restore robust general search market competition. The limited purpose of this brief is respectfully to urge the Court to consider remanding this matter to the District Court with instructions to consider seeking expert advice regarding whether Google Search's news market share substantially harms Americans, and also with instructions to consider whether there exist remedies that would give effect to Plaintiffs' request that the District Court intervene

---

[3] Daniel A. Crane, *Antitrust as an Instrument of Democracy*, 72 Duke L.J. Online 21, 29 (2022).

[4] *See, e.g.*, Francis Fukuyama et al., *How to Save Democracy from Technology: Ending Big Tech's Information Monopoly*, Foreign Affairs (Nov. 24, 2020), https://www.foreignaffairs.com/articles/united-states/2020-11-24/fukuyama-how-save-democracy-technology; Tim Wu, *The Curse of Bigness: Antitrust in the New Gilded Age* 32 (2018) ("And we have not even touched upon the non-economic concerns, such as the concentration of so much power over speech into a single platform, and the clear dangers to democracy that stem from manipulation of the Facebook conglomerate.").

to "to ensure Americans regain access to vibrant, open information markets" Pls.' Post-Trial Br. at 2, particularly with respect to the U.S. news market.

If designed properly, there may exist such remedies that advance the goal of the First Amendment that ensure there are "diverse and antagonistic [news] sources" without contravening that Amendment. *Associated Press v. United States*, 326 U.S. 1, 20 (1945). As will be discussed, if one newspaper company stole printing presses from a competing newspaper company, it would not violate the First Amendment to require the first newspaper to reduce its news market share by returning the printing presses it stole. Likewise, there may exist properly designed news market share reduction remedies that do not contravene the First Amendment pursuant to which Google Search would forego news market share it arguably obtained from its search competitors in part through conduct the District Court determined contravened the Sherman Act. *See Google*, 747 F. Supp. 3d 1.

The Supreme Court made this principle clear in the landmark *Associated Press* antitrust case: "Freedom to publish is guaranteed by the Constitution, but freedom to combine to keep others from publishing [in context meaning any unlawful conduct under the antitrust laws that impairs the speech volume of others] is not." *Associated Press*, 326 U.S. at 20. In *Associated Press*, the Supreme Court established that in the very small subset of antitrust cases where the illegal conduct stifles diversity of news sources federal courts have a special duty to mitigate this

consequence by imposing remedies that restore as much as possible the First Amendment goal of "the widest possible dissemination of information from diverse and antagonistic sources." *Id.*[5] This is because "[t]ruth and understanding are not wares like peanuts or potatoes." *Associated Press*, 326 U.S. at 28 (Frankfurter, J., concurring). As the Supreme Court further explained in *Times-Picayune*, a "vigorous and dauntless press" is "essential to the effective functioning of our [democratic] political system … [because it] is a chief source feeding the flow of democratic expression and controversy which maintains the institutions of a free society." *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 602 (1953) (internal citations omitted). Amicus Curiae respectfully urges the Court to consider whether this means it has a duty to remand this matter to the District Court. Americans would benefit greatly from certain and immediate restored "access to vibrant, open information markets" Pls.' Post-Trial Br. at 2, especially with respect to news information markets.

[5] *See also, e.g.*, William E. Lee, *Antitrust Enforcement, Freedom of the Press, and the "Open Market": The Supreme Court on the Structure and Conduct of Mass Media*, 32 Vand. L. Rev. 1249, 1267 (1979) ("[The Court] explained that the government has an affirmative obligation to protect first amendment freedoms, and that the Sherman Act was an appropriate method of doing so. Central to the majority opinion … is the concept that of a market which is free from constraints which either destroy competition or the initiative which brings newcomers into the field.").

## BACKGROUND

### A. Publicly Available Data Indicates That Google Possesses Substantial U.S. News Market Share, But Not How Substantial

The 2025 Pew Research Center surveys and the 2026 Reuters Institute Digital News Report survey indicate that Google possesses substantial U.S. news market share, but it is impossible to determine how substantial from these surveys. According to the 2025 Pew Research Center Social Media and News Fact Sheet survey, 35% of U.S. adults reported they regularly got news from YouTube;[6] according to the 2025 Pew Research Center News Platform Worksheet survey,16.2% and 37.4% of U.S. adults reported getting news from Google Search "Often" or "Sometimes," respectively (assuming that Google Search has 85% share of Pew's overall search engine category);[7] and according to the 2026 Reuters Institute Digital News Report survey, 22% and 12% of U.S. adults reported getting news from Google Discover and Google News in the past week, respectively.[8] In

---

[6] Pew Rsch. Ctr., *Social Media and News Fact Sheet* (Sept. 25, 2025), https://www.pewresearch.org/journalism/fact-sheet/social-media-and-news-fact-sheet/.

[7] Pew Rsch. Ctr., *News Platform Fact Sheet* (Sept. 25, 2025), https://www.pewresearch.org/journalism/fact-sheet/news-platform-fact-sheet/.

[8] Nic Newman et al., Reuters Inst. for the Study of Journalism, *Reuters Institute Digital News Report 2026*, at 11 (2026), https://reutersinstitute.politics.ox.ac.uk/sites/default/files/2026-06/DNR%202026%20FINAL_2.pdf.

comparison Meta, according to the 2025 Pew Research Center Social Media and News Fact Sheet survey, 38%, 20% and 5% of U.S. adults reported they regularly get news from Facebook, Instagram and WhatsApp, respectively.[9] It should be noted that these survey results are not directly comparable because the survey questions vary. Also for comparison, according to the 2025 Pew Research Center News Media Tracker, 36% and 19% of U.S. adults reported getting news regularly from ABC News and *The New York Times*, respectively, for example.[10]

According to Chartbeat, in November 2025 globally Google Discover (13%) and Google Search (7.3%) were the leading providers of referrals to news publisher web sites which together provided significantly more referrals than third-ranked Facebook (3.3%).[11] Separately, according to the 2026 Reuters Institute Digital News Report survey, more Americans reported using Swipe right on Android or Google App (Google Discover) (22%) and Google News (12%) to get news in the past week than all other news aggregators Reuters included in the survey combined—Swipe right on Apple or Apple News app (10%), NewsBreak (8%), Ground News (3%), SmartNews (3%), and Snapchat Discover (2%).[12]

---

[9] Pew Rsch. Ctr., *Social Media and News Fact Sheet*, *supra* note 7.

[10] Pew Rsch. Ctr., *News Media Tracker* (June 10, 2025), https://www.pewresearch.org/journalism/feature/news-media-tracker/.

[11] Charlotte Tobitt, *Global Publisher Google Traffic Dropped by a Third in 2025*, Press Gazette (Jan. 12, 2026), https://pressgazette.co.uk/media-audience-and-business-data/google-traffic-down-2025-trends-report-2026/.

[12] Newman et al., *supra* note 8, at 11.

### B. The Need to Determine Google's Share of the U.S. News Market

In order for the Court and the District Court to understand the magnitude of harm to Americans caused by Google's substantial U.S. news market share, it is necessary for them to obtain accurate estimates of the U.S. news market shares of Google Search, of the different modalities that comprise Google Search, of YouTube, of Facebook, of Instagram, and of all the other news sources commonly used by Americans. Unfortunately, no public survey nor any public data enables reasonably precise estimation of such market shares.

## ARGUMENT

### A. Legislative History Indicates That the Paramount Goal of U.S. Antitrust Laws Is to Protect the Nation's Democratic System From Industry Overconcentration

Legislative history indicates that the paramount legislative goal of U.S. antitrust laws is to prevent concentration in private industries from impairing or causing the destruction of the nation's democratic system.[13] In his floor statement

---

[13] *See, e.g.*, Robert Pitofsky, *The Political Content of Antitrust*, 127 U. Pa. L. Rev. 1051, 1053–54 (1979) ("Congress has in its antitrust enactments—most clearly when it amended section 7 of the Clayton Act in 1950—exhibited a clear concern that an economic order dominated by a few corporate giants could, during a time of domestic stress or disorder, facilitate the overthrow of democratic institutions and the installation of a totalitarian regime.").

sponsoring the Sherman Act, Senator Sherman warned Congress that if it did not curb the "power and grasp of these [business] combinations" it must "be ready for the socialist, the communist, and the nihilist."[14] Likewise, Senator Kefauver, co-sponsor of the Celler-Kefauver Act, warned that when "concentration and monopoly gain too much power, [t]he taking over by the public through its government always has one or two political results[:] … a fascist state or the nationalization of industries and thereafter a socialist or communist state."[15] His co-sponsor Representative Celler expressed the same concerns.[16] As support for his warning, Senator Kefauver referred to the U.S. Army's analysis following World War II that concluded

---

[14] *See* 21 Cong. Rec. 2460 (emphasis added).

[15] 96 Cong. Rec. 16,452 (1950) (statement of Sen. Kefauver); *see also, e.g.*, H.R. Rep. No. 63-627, at 19 (1914) ("[T]he concentration of wealth, money, and property in the United States under the control and in the hands of a few individuals or great corporations has grown to such an enormous extent … [that it] threaten[s] the perpetuity of our institutions."); Lina M. Khan, *The Ideological Roots of America's Market Power Problem*, 127 Yale L.J. 960 (2018) ("The Celler-Kefauver Act, a supplementary antitrust law, was passed in 1950 due to fears that excessive consolidation could deliver fascism."); Wu, *supra* note 4, at 82 (the Celler-Kefauver Act "was explicitly styled as a reaction to the German and Soviet examples."); Daniel A. Crane, *Fascism and Monopoly*, 118 Mich. L. Rev. 1315, 1324 (2020) ("Celler and Kefauver's floor speeches reflected a broader concern of the U.S. Congress and other national institutions that industrial concentration facilitated the incubation of totalitarianism and threatened democracy.").

[16] 96 Cong. Rec. 11,486 (1949) (statement of Rep. Celler) ("The monopolies soon got control of Germany, brought Hitler to power and forced virtually the whole world into war.").

concurrent monopolization of important industries in Germany had helped facilitate the Nazi Party's overthrow of German democracy.[17]

As the Supreme Court and lower federal courts have repeatedly recognized, though, only the news industry "is essential to the effective functioning of our [democratic] political system." *Times-Picayune*, 345 U.S. at 602. Thus, it is widely recognized overconcentration in the news industry can directly impair the democratic system or directly contribute to its catastrophic failure. *Id.*; *see generally Knight First Amend. Inst.*, 141 S. Ct. at 1221 (Thomas, J., concurring).[18] As the Supreme Court recognized in *Associated Press*, the news industry is unique because it is "essential to the welfare of the public" for that industry to be comprised of many "diverse and antagonistic [news] sources." *Times-Picayune*, 345 U.S. at 602; *see also, e.g.*, *New York Times Co. v. United States*, 403 U.S. 713, 717 (1971) ("In the First Amendment, the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy."). Thus, arguably the paramount

---

[17] Decartelization Branch, Off. of Mil. Gov't for Ger. (U.S.), *German Economic Decentralization: An Analysis of the German Cartel and Combine Problem* I-1 (Mar. 1, 1947) (unpublished report) (on file with the Bentley Historical Library, University of Michigan, Creighton R. Coleman Papers Collection).

[18] *See also* Crane, *Antitrust as an Instrument of Democracy*, *supra* note 3, at 29 ("This is not to say that the monopolization of information channels could not contribute to the literal demise of democratic government."); Fukuyama et al., *supra* note 4; Wu, *supra* note 4, at 132 ("And we have not even touched upon the non-economic concerns, such as the concentration of so much power over speech into a single platform, and the clear dangers to democracy that stem from manipulation of the Facebook conglomerate.").

duty of the federal courts in enforcing the antitrust laws is to prevent news industry overconcentration from impairing the democratic system or contributing to its demise. This duty usually become relevant only in antitrust cases that involve news markets.

### B. Amicus Curiae Respectfully Urges the Court and the District Court to Determine Whether Google's Substantial News Market Share Significantly Harms Americans

Plaintiffs asserted that harm from Google's substantial information market share is main harm caused by Google's dominant general search market share when it told the Court that its "intervention [in ordering remedies] is required to redress the consequences of Google's monopolies and ensure Americans regain access to vibrant, open information markets." Pls.' Post-Trial Br. at 2. However, without knowing more, there currently is no way for the Court to estimate the magnitude of such harm. Amicus Curiae knows of no basis to think Google ever tried to manipulate elections, or, moreover, that it is likely to do so in the future. Nevertheless, Google Search's substantial news market share may undermine some Americans' perception of the legitimacy of elections because they cannot know whether Google is trying to or not.

A conceivable novel threat to the nation's democratic system is if the common interest in protecting their market shares led Google and other large digital platform news publishing companies to support one of the political parties if such party in the

future adopted a policy of lenient antitrust law enforcement against these companies. The collective editorial power of these digital platforms may be great enough in such scenario that these platforms possibly could be able to assure that such political party would win successive elections, which in the very worst case conceivably might contribute to the end of legitimate democracy. Amicus Curiae is unable to assess the plausibility of such scenario. However, Amicus Curiae respectfully suggests that the Court and the District Court should seek expert assessment of the plausibility of this scenario.

It is important for the Court to understand that even a 1% incremental risk of democratic system failure would be very costly to Americans. Purely as an illustration, the present value of the collective monetary cost to Americans from the expected harm from a 1% increase in the risk of democratic system failure may be very roughly estimated to be on the order of more than $680 billion based on the following very simplified assumptions: 1. the estimated present value of an average American's lifetime earnings is $1 million based on the methodology in the footnote;[19] 2. democratic system failure may be estimated to reduce this present

---

[19] Present value of lifetime earnings ("PVLE") for the U.S. population were calculated using age- and sex-specific PVLE values from Wendy Max et al., *Valuing Human Life: Estimating the Present Value of Lifetime Earnings, 2000*, tbl.2 (Univ. of Cal. S.F. Inst. for Health & Aging 2004), https://escholarship.org/uc/item/82d0550k; corresponding 2024 populations from U.S. Census Bureau, Population Div., *Annual Estimates of the Resident Population by Sex and Single Year of Age for the United States: April 1, 2020 to July 1, 2025*,

value by 20%, or $200,000, due to reduced economic growth based on the cited study;[20] and 3. the American population is 340 million.[21]

### C. Amicus Respectfully Urges the Court to Consider Whether It Has a Duty to Remand This Matter to the District Court

After a trial court has determined liability under the Sherman Act, it "has the duty to" to impose remedies that "will, so far as practicable, cure the ill effects of the illegal conduct, and assure the public freedom from its continuance." *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 88 (1950). The objective of the remedies is to "eliminat[e] the consequences of the illegal conduct." *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 698 (1978). The possible substantial harm to Americans from Google's substantial news market share is reason alone for this Court to act. In numerous antitrust cases federal courts have crafted remedies that were not specifically requested by the Government to eliminate antitrust harm. A

---

tbl. NC-EST2025-AGESEX-RES, https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-detail.html (last visited Aug. 3, 2026); and CPI figures to express the values in 2026 dollars from U.S. Bureau of Lab. Stat., *Consumer Price Index Summary—June 2026*, https://www.bls.gov/news.release/cpi.nr0.htm.

[20] Daron Acemoglu et al., *Democracy Does Cause Growth*, 127 J. Pol. Econ. 47, 48 (2019) ("Our estimates imply that a country that transitions from nondemocracy to democracy achieves about 20 percent higher GDP per capita in the next 25 years than [nondemocracies].").

[21] U.S. Census Bureau, *U.S. and World Population Clock*, U.S. Dep't of Commerce, https://census.gov/polclock/ (last visited Aug. 3, 2026).

salient example is in the AT&T case when D.C. District Court Judge Harold Greene insisted in the consent decree that AT&T agree not to enter online publishing for seven years because he perceived that AT&T potentially could harm Americans by injuring the democratic system if it leveraged its dominance in long-distance data transmission to become a dominant online news publisher. *United States v. AT&T Co.*, 552 F. Supp. 131, 183–86 (D.D.C. 1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983). Judge Greene insisted on this prohibition even though AT&T had not entered online publishing, whereas Google already reportedly has obtained around 85% of the general search market.[22]

That Plaintiffs and the District Court may not have previously contemplated that there may exist remedies that could provide Americans with near immediate and more certain relief from harm imposed by Google's substantial market share should not itself be a reason for this Court and the District Court not to consider whether there are viable remedies that could reduce this harm with more certainty and greater speed. Amicus respectfully urges the Court to consider whether it has a duty to the American people to remand this case to the District Court to consider whether such remedies are available both 1. to cure one of "ill effects of [Google's] illegal conduct" that was identified by Plaintiffs, and 2. to give effect to legislative intent

---

[22] *Search Engine Market Share United States,* Statcounter (July 2026), https://gs.statcounter.com/search-engine-market-share/all/united-states-of-america.

that the paramount goal of the Sherman Act and other antitrust laws is to protect the democratic system, a goal which frequently becomes operative in news industry cases.

## D. Discussion of Possible News Market Share Reduction Remedies

The purpose of this brief is not to attempt to specify how Google Search news market share reduction remedies might be designed. Some discussion of this topic might be warranted, though. One possible remedy if the District Court thought such remedy were viable is a market share cap set to the level that the District Court determined would mitigate as much as possible harm caused by Google Search's substantial news market share. There are some complexities that the District Court would need to address if it decided to consider a market share cap remedy. Any news market share reduction remedy would need to be designed to try to avoid reducing Google Search referral traffic to news publishers. One possible way to do this might be to stipulate that during a transition period Google be required to reduce news market share without reducing referral traffic. This is something Google might be able to accomplish by designing its modality interfaces to encourage more click-throughs to news publishers as these interfaces did previously. Any news market share reduction remedy would need be designed so as not in any way to regulate the content of Google's speech.

Two reasons news market share reduction remedies could possibly work to help remedy Google Search's substantial market share are that Google Search does not produce the scarce product which is original news reporting content, and Google reportedly is sending less and less referrals to news publishers.[23] Original news reporting is produced by news publishers like *The New York Times*, Fox News, and CNN. Google Search takes some of such original news reporting and reformats it to publish as content on its different modalities (such as in content headlines and snippets, AI Overviews, and "People also ask" questions and answers) which a user either 1. consumes without clicking through to the news publisher's website; or 2. consumes before clicking a link that takes the user to the news publisher's web site.[24] Reportedly, as Google Search increasingly responds to news-related searches with AI Overviews and due to other changes, it has been sending increasingly less referral traffic to news publishers.[25] Some news publishers reportedly have said since early 2025 they are preparing for the time when Google Search referrals fall

---

[23] *See, e.g.*, Keach Hagey, *News Publishers See Google's AI Search Tool as a Traffic-Destroying Nightmare*, Wall St. J. (Mar. 24, 2025), https://www.wsj.com/tech/ai/news-publishers-see-googles-ai-search-tool-as-a-traffic-destroying-nightmare-52154074.

[24] *See, e.g.*, Alice Brooker, *AI Overviews Cutting Publisher Clickthrough Rates by 50%, New Report Finds*, Press Gazette (July 30, 2025), https://pressgazette.co.uk/media-audience-and-business-data/google-ai-overviews-publishers-report-clickthroughs-authoritas-report/.

[25] *See, e.g.*, Hagey, *supra* note 23.

significantly.[26] As discussed above, it may be possible to stipulate as part of any news market share reduction remedies that Google reduce news market share without reducing referral traffic. If possible, this would help assure that the news market share reduction remedies would not reduce the quantity of original news reporting. Also, Google Search has previously asserted that news is not a very important part of its business.[27]

### E. Harm to Americans Caused by Google Search's Substantial News Market Share Is Cognizable Antitrust Harm

Harm to Americans caused by Google Search's substantial news market share is cognizable antitrust harm. First, it is cognizable antitrust harm based on the legislative history that indicates the paramount goal of the antitrust laws is to protect Americans from democratic system failure that could be precipitated by industry

---

[26] *See, e.g.*, Megan Morrone, *Publishers Race Against Google Zero Doomsday Clock*, Axios (July 23, 2025), https://www.axios.com/2025/07/23/publishers-google-zero.

[27] *See* Paul Liu, *Our Experiment on the Value of News Content*, Google (Mar. 25, 2025), https://blog.google/around-the-globe/google-europe/our-experiment-on-the-value-of-european-news-content/ ("The study showed that when we removed this content, there was no change to Search ad revenue and a <1% (0.8%) drop in usage, which indicates that any lost usage was from queries that generated minimal or no revenue. Beyond this, the study found that combined ad revenue across Google properties, including our ad network, also remained flat. From finding a florist, to getting the weather forecast, to booking a flight, people come to Google for many different reasons. This study showed that people still come to Google for these many other tasks, even when Google is less useful for news.").

overconcentration. Second, such harm is cognizable antitrust harm based on standard antitrust law for markets for differentiated product markets that is recognized in the Merger Guidelines.[28] Such antitrust law recognizes that in differentiated product markets citizens may enjoy very significant non-price-related welfare when the market offers a variety of products with differentiated product features.

As discussed, the Supreme Court understood this in *Associated Press* when it based its holding on its determination that Americans were harmed by threatened reduction of newspaper publisher diversity caused by the restraint of trade at issue in the case, not on the basis such trade restraint might increase newspaper prices. *Associated Press*, 326 U.S. at 13.[29] Likewise, in *United States v. Bertelsmann*, the district court blocked a merger of two leading book publishers because it determined the merger would have harmed Americans by reducing the diversity of books published which would have resulted in "less variety in the marketplace of ideas, and an inevitable loss of intellectual and creative output." *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 23 (D.D.C. 2022).

Google's substantial shares of the general search and general search news markets arguably have reduced diversity of editorial perspectives in the general search news markets by suppressing the speech volumes of competitors like Bing,

---

[28] U.S. Dep't of Just. & Fed. Trade Comm'n, *Merger Guidelines* § 4.2.E (2023).

[29] *See also, e.g.*, Lee, *supra* note 5, at 1267.

Yahoo! and DuckDuckGo, and arguably prevented the speech of otherwise new entrants, each with their own distinct editorial policies and algorithms for presenting news content. Moreover, improvement of the operation of the nation's democratic system is a direct intended benefit of news reporting, not an incidental benefit. Many if not most news publishers intend that the news they publish benefit Americans by improving democratic system functioning by making them more informed voters. A salient example is that the *The Washington Post*'s masthead slogan is "Democracy dies in darkness." And also for many if not most Americans a primary reason they consume and purchase news is to make more informed voting decisions.

## CONCLUSION

In *Associated Press*, the Supreme Court established that in the small subset of antitrust cases where conduct that contravenes the antitrust laws stifles diversity of news sources in a news market, federal courts have a special duty to try to mitigate this consequence by imposing remedies designed to restore news source diversity. *See Associated Press*, 326 U.S. at 20.[30] This, the Court explained in *Associated Press*, is because such news market diversity is "a condition of a free society," *id.*, and, as the Supreme Court further explained in *Times-Picayune*, it is "essential to

[30] *See also, e.g.*, Lee, *supra* note 5, at 1267.

the effective functioning of our [democratic] political system." *Times-Picayune*, 345 U.S. at 602.

Harm to Americans caused by Google's substantial news market share may be greater than other harms to Americans from Google's dominant shares of the general search and general search news markets. Currently, the magnitude of harm to Americans from Google's substantial news market share is unknown. To determine whether or not such harm is substantial, the District Court would need to obtain expert advice on this matter including obtaining accurate estimates of Google's news market share. Therefore, Amicus Curiae respectfully urges the Court to consider remanding this matter to the District court with instructions 1. to determine the magnitude of harm to Americans from Googles' substantial news market share; and 2. if the District Court determines that the magnitude of such harm is substantial, consider whether there exist viable remedies that could, as Plaintiffs requested, "ensure Americans regain access to vibrant, open information markets" Pls.' Post-Trial Br. at 2, especially with respect to news information markets, both rapidly and with high certainty independently of when, or if, the other antitrust remedies successfully restore robust general search market competition. Finally, Amicus Curiae respectfully urges the Court to recognize that in this case democracy itself conceivably may be at stake, which may make this case in retrospect one of the most consequential antitrust cases in the nation's history.

Dated: August 4, 2026

Respectfully submitted,

/s/ Stephen Westermann
Amicus Curiae appearing pro se

785 Stanford Avenue
Menlo Park, CA 94025
(415) 713-1740
stephen.westermann@icloud.com

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and D.C. Cir. R. 32(e)(3) because it contains 5340 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: August 4, 2026 /s/ Steve Westermann

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2026, I hand filed this Amicus Curiae Brief via the Late Night Dropbox.

A copy of the Amicus Brief will be served on all ecf users once the Court dockets the brief via ECF Stystem.

Dated: August 4, 2026 /s/ Steve Westermann

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

AUG - 5 2026

RECEIVED