ORAL ARGUMENT NOT YET SCHEDULED

No. 26-5023
Consolidated with Nos. 26-5047 & 26-5049

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

UNITED STATES OF AMERICA, ET AL.,

*Plaintiffs-Appellees/*
*Cross-Appellants,*

v.

GOOGLE LLC,

*Defendant-Appellant-Cross-Appellee.*

On Appeal from the United States District Court for the District of Columbia
Nos. 20-cv-3010-APM, No. 20-cv-3715-APM (Honorable Amit P. Mehta)

# BRIEF FOR MICROSOFT CORPORATION AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES/CROSS-APPELLANTS URGING AFFIRMANCE IN PART AND REVERSAL IN PART

Julia Chapman
Dechert LLP
2929 Arch Street
Philadelphia, PA 19104
215-994-2060
julia.chapman@dechert.com
Counsel for *Amicus Curiae*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to Rule 28(a)(1) of the United States Court of Appeals for the District of Columbia Circuit, *amicus curiae* Microsoft Corporation ("Microsoft") certifies as follows:

A. Parties and *Amici*.

All known parties, intervenors, and *amici* appearing before the District Court and this Court were accurately identified in the Parties' Certificates as to Parties, Rulings, and Related Cases as of filing. Since that time, Apple Inc. and Samsung Electronics Co., Ltd. have been granted leave to file amicus briefs. On May 28 and 29, 2026, Washington Legal Foundation; Law & Economics Scholars; Economists and Legal Scholars; Mozilla Corporation; professors Hunt Allcott and Matthew Gentzkow; Brave Software, Inc.; economist Gregory J. Werden; researcher Alden Abbott; and former antitrust enforcers Terry Calvani, William Kolasky, Abbott B. Lipsky Jr., and Joe Sims filed amicus briefs. On August 4, 2026, SerpApi, LLC, Open Markets Institute, Public Knowledge, Bipartisan Technology Policy Experts, Economists and Legal & Technology Scholars, Duck Duck Go, Inc., American Economic Liberties Project, Mozilla Corporation, Antitrust Law, Economics, and Business Professors, Little Tech Association and Travel Lemming, LLC, American Antitrust Institute (AAI), and Economics and Business Professors filed amicus briefs.

B. Rulings.

References to the rulings at issue appear in the Parties' Certificates as to Parties, Rulings, and Related Cases.

C. Related Cases.

A list of related cases appears in the Parties' Certificates as to Parties, Rulings, and Related Cases.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, *amicus curiae* Microsoft Corporation states that it is a Washington corporation and publicly traded company with no parent corporation. No publicly held corporation owns more than 10% of Microsoft's stock.

Dated: August 4, 2026
Philadelphia, PA

/s/*Julia Chapman*
Julia Chapman
Counsel for *Amicus Curiae*

# TABLE OF CONTENTS


CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ i

CORPORATE DISCLOSURE STATEMENT ................................................... iii

I. STATEMENT OF INTEREST ...........................................................1

II. INTRODUCTION AND SUMMARY OF ARGUMENT.............................2

III. TECHNOLOGY BACKGROUND.........................................................5

IV. ARGUMENT.......................................................................................6

A. The Court Has Broad Discretion to Fashion Forward-Looking Remedies that Eliminate the Consequences of a Monopoly Violation ...........................................................................6

B. Without a Ban on Revenue Share Payments, Google Will Continue to Use the Fruits of Its Unlawful Conduct to Entrench Its Monopolies .......................................................................8

i. Search Access Point Defaults Are the Decisive Competitive Battlefield in General Search .................................9

ii. Google's Default Agreements Give It an Insurmountable Scale Advantage ...........................................................10

iii. Google's Unmatched Revenue Share Payments Are the Fruit of Its Unlawful Monopolies ...........................................12

iv. Banning Exclusivity Without Banning Revenue Share Payments Preserves Google's Monopoly ................................14

v. Without a Payment Ban, the Data Sharing Remedy Is Not Enough .................................................................................16

vi. The Court Should Prohibit Revenue Share Payments Tied to Default Placement..........................................................17

C. A Payment Ban Will Make Default Pricing Competitive and Increase Consumer Welfare..................................................19

i. A Payment Ban Will Introduce Competition to Default Pricing ..................................................................................19

ii. A Payment Ban Will Increase Consumer Welfare ....................21

D. Absent a Distribution Payment Ban, There Is a Substantial Risk that Google Will Expand Its Existing Monopolies into AI Agents and Large Language Models ...........................................................23

i. As the District Court Predicted, AI Agents Are Developing into Important Search Access Points ........................................23

ii. Google Is Deploying the Same Anticompetitive Playbook with AI Agents .........................................................................26

V. CONCLUSION..............................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ford Motor Co. v. United States*,
405 U.S. 562 (1972)....................3, 6

*Massachusetts v. Microsoft Corp.*,
373 F.3d 1199 (D.C. Cir. 2004)....................7

*National Society of Professional Engineers v. United States*,
435 U.S. 679 (1978)....................7, 18

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
20 F.4th 466 (9th Cir. 2021)....................7

*United States v. Google LLC*,
747 F.Supp.3d 1 (D.D.C. 2024)....... 1, 2, 5, 8, 10, 11, 12, 16, 18, 19, 20, 22

*United States v. Google LLC*,
803 F. Supp. 3d 18 (D.D.C. 2025)........ 2, 15, 16, 19, 21, 23, 24, 26, 27, 28

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001)....................2

**Other Authorities**

Fed. R. App. P. 29(a) ....................1

Fed. R. App. P. 29(a)(4)(E)....................1

Fed. R. App. P. 29(a)(5)....................31

Fed. R. App. P. 32(a)(7)....................31

Fed. R. App. P. 32(a)(5)....................31

Fed. R. App. P. 32(a)(6)....................31

Fed. R. App. P. 32(f)....................31

Michael Gennaro & Greg Andrews, *Apple's Google AI Deal to Test Tenor of Antitrust Enforcement Under Trump*, Law.com (Jan. 29, 2026) ....................28

Berber Jin, *How OpenAI Lost Its AI Crown—and the Fight to Win It Back*, Wall Street Journal (July 31, 2026) ....................29

Hyunjoo Jin, *Samsung to double AI mobile devices to 800 million units this year*, Reuters (Jan. 5, 2025) ....................27

Louis Juricic, *Alphabet's Gemini app surges to 900M users amid $84.75 billion raise*, Yahoo Finance (June 3, 2026) ....................4, 29

Zaheer Kachwala & Aditya Soni, *Apple, Google strike Gemini deal for revamped Siri in major win for Alphabet*, Reuters (Jan. 13, 2026) ....................28

Ivan Mehta, *Google's Gemini nears billion user milestone,* TechCrunch (July 23, 2026) ....................29

Madhavi Singh, *Google–Apple Gemini Deal Underscores Tech's Antitrust Catch-22*, Bloomberg Law (Jan. 26, 2026) ....................29

Beth Stackpole, *Agentic AI, explained*, MIT (Feb. 18, 2026) ....................6, 25

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| AI | Artificial Intelligence |
| API | Application Program Interface |
| GenAI | Generative Artificial Intelligence |
| GSE | General Search Engine |
| Liab. Op. | *United States v. Google LLC*, 747 F.Supp.3d 1 (D.D.C. Aug. 5, 2024) |
| Liab. Tr. | Transcript of Liability Bench Trial in *United States v. Google LLC*, Sep. 12–Nov. 16, 2023 |
| LLM | Large Language Model |
| *NSPE* | *National Society of Professional Engineers v. United States*, 435 U.S. 679 (1978) |
| Rem. Op. | *United States v. Google LLC*, 803 F. Supp. 3d 18 (D.D.C. 2025) |
| Rem. Tr. | Transcript of Remedies Bench Trial in *United States v. Google LLC*, Apr. 22–May 9, 2025 |
| RSA | Revenue Share Agreement |
| SAP | Search Access Point |

## I. STATEMENT OF INTEREST

Microsoft is a global technology company that develops, licenses, and supports a wide range of software, services, and devices. Relevant here, it operates Bing, which competes in the general search and general search text advertising markets. Microsoft has also developed Copilot, an artificial intelligence ("AI") assistant that incorporates large language models developed by Microsoft and third parties into Bing, productivity software, cloud services, and other consumer and enterprise products. Microsoft has also launched Azure AI Agents, a platform that enables developers to build and operate AI-powered applications capable of reasoning, retrieving information, and executing tasks through connected tools and data sources, including general search functionality.[1]

Microsoft has a significant interest in the issues before the Court. Microsoft is one of Google's main competitors in general search, "the only rival that crawls the web and generates its own search results." *United States v. Google LLC*, 747 F.Supp.3d 1, 38 (D.D.C. Aug. 5, 2024) ("Liab. Op."). Therefore, Microsoft has

---

[1] Microsoft files this brief pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure and all parties to the appeal have consented to the filing of this brief. In accordance with Federal Rule of Appellate Procedure 29(a)(4)(E), Microsoft states that its counsel authored the brief in whole. No party or their counsel, or any third party, contributed money with the intention of funding the preparation or submission of the brief. A separate brief is necessary given Microsoft's unique perspective and expertise as a developer of general search and AI tools.

firsthand experience with the harmful effects of Google's exclusive and anticompetitive distribution agreements. Microsoft has also observed how Google is deploying similar distribution strategies with respect to AI—a technology the District Court recognized as an emerging potential search access point, and which has become even more so in the eleven months since the District Court's Remedies Opinion.

Microsoft also brings a unique, historical perspective as the defendant in *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001), a case on which the District Court relied extensively. That case also involved allegations of monopolization in fast-evolving technology markets. That experience gives Microsoft a distinct understanding of how antitrust enforcement can balance the twin goals of preserving competition and fostering innovation.

Accordingly, Microsoft submits this brief to assist the Court in evaluating the District Court's August 5, 2024, and September 2, 2025, Memorandum Opinions and the parties' arguments on appeal.

## II. INTRODUCTION AND SUMMARY OF ARGUMENT

The District Court correctly found, based on overwhelming evidence, that Google unlawfully maintained its monopoly in general search. Liab. Op. 119. Google also "controls the most efficient and effective channels of distribution for GSEs," serving as "the exclusive preloaded GSE on all Apple and Android mobile

devices, all Apple desktop devices, and most third-party browsers." *Id.* at 120. Even when these default placements are not exclusive in name, they are exclusive in operation because although users are free to switch to a different general search provider, "they rarely do." *Id.* at 149. The District Court properly concluded that: "Google is a monopolist, and it has acted as one to maintain its monopoly." *Id.* at 32.

The District Court erred, however, in failing to impose remedies that will be sufficient to "pry open to competition a market that has been closed." *Ford Motor Co. v. United States*, 405 U.S. 562, 577–78 (1972) (quotation omitted). The District Court's central error was its failure to prohibit Google's unlawful revenue share payments for securing default placement at search access points. These payments allowed Google to maintain unrivaled scale—the user data that allows Google to refine its search results and target advertising with a precision no competitor can replicate. And because Google's scale advantage is the result of its anticompetitive conduct, it generates supracompetitive advertising revenues that Google uses to fund revenue share payments no rival can match. So long as Google can share its illegally maintained monopoly rents with distribution partners in return for exclusive defaults, it will continue to reinforce the scale barrier protecting its monopolies. In short, no distributor will have an economic reason to choose a competitor.

The threat extends beyond general search and into the newest iteration of search access points, AI agents. AI agents generate predictive responses to queries using large language models supplemented by, in many instances, general search results. Google is already deploying the same playbook that it used in general search to control these search access points by paying device manufacturers to make Gemini, Google's AI assistant, the default on their platforms. Google's strategy has more than doubled Gemini's user base to nearly one billion monthly users in just 14 months and threatens to hobble competition for both AI agents and the underlying large language models that help power them. *See* Louis Juricic, *Alphabet's Gemini app surges to 900M users amid $84.75 billion raise*, Yahoo Finance (June 3, 2026), https://finance.yahoo.com/sectors/technology/articles/alphabet-gemini-app-surges-900m-143645067.html. Left unchecked, Google stands to monopolize these new technologies, just as it has general search, for years to come.

To prevent both outcomes, Microsoft urges this Court to remand with instructions to prohibit revenue share payments (or similar financial consideration) tied to default placement for Google Search, Google's Gemini AI assistant, and successor technologies. Without that prohibition, the remedies will neither restore competition in general search nor prevent Google from extending its existing monopolies into evolving AI technologies.

## III. TECHNOLOGY BACKGROUND

The issues discussed in this amicus brief involve four layers of technology:

***General search engines*** ("GSEs") are software designed to answer user queries by crawling the web, indexing it, and returning a list of websites responsive to the query. Liab. Op. 38. Examples include Google, Yahoo Search, and Bing.

***Search access points*** ("SAPs") are the channels through which companies distribute, and users access, general search engines. *Id.* at 44. They include search bars and bookmarks integrated into browsers, search widgets on mobile phones, search applications, and web searches. *Id.*

***Large language models*** ("LLMs") are a type of generative AI that takes text or other types of data as inputs and uses that information to generate predictive responses to user prompts. *United States v. Google LLC*, 803 F. Supp. 3d 18, 44 (D.D.C. 2025) ("Rem. Op."). They are trained on vast quantities of data, and the amount of input data generally determines the quality of the response. *Id.* at 45.

***AI agents*****—**such as Google's Gemini AI assistant, Microsoft's Copilot assistant, and OpenAI's ChatGPT**—**which sometimes are referred to as AI chatbots or AI assistants, are the interface through which users access large language models to not merely answer questions, but perform complex, multi-step tasks. *Id.* at 50. Similar to browsers, which provide important non-search functions, AI agents provide an onramp to general search. At the time of the Remedies Opinion, for

example, AI agents relied on general search when a user query involved events that postdated the underlying models' training or posed a question not recognized by the model. *Id.* at 53–54. Since that opinion, their reliance on general search has continued to grow to include when AI agents need to analyze and act upon information maintained on a particular website or create their own general search queries when performing multi-step workflows. Beth Stackpole, *Agentic AI, explained*, MIT (Feb. 18, 2026), https://mitsloan.mit.edu/ideas-made-to-matter/agentic-ai-explained. As a result, AI agents have evolved into an important search access point today.

## IV. ARGUMENT

### A. The Court Has Broad Discretion to Fashion Forward-Looking Remedies that Eliminate the Consequences of a Monopoly Violation

The goal of any antitrust remedy is to "unfetter a market from anticompetitive conduct" and "pry open to competition a market that has been closed by defendants' illegal restraints." *Ford Motor Co.*, 405 U.S. at 577–78 (quotation omitted). Courts possess "large discretion" to "fit the decree to the special needs of the individual case," *id*. at 573 (quotation and citations omitted), including the power to "fashion appropriate restraints on [] future activities both to avoid a recurrence of the violation and to eliminate its consequences." *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 697 (1978) ("*NSPE*") (citations omitted).

That discretion allows the court to fashion remedies that go beyond the specific conduct that establishes liability. In *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004), for example, this Court upheld "forward-looking" remedial provisions requiring Microsoft to disclose its proprietary application program interfaces ("APIs") and communication protocols to competitors—even though non-disclosure of that information "played no role" in the liability finding. *Id.* at 1215–16. The Court approved the remedy because it fostered interoperation with Windows, giving rivals in other markets the tools they needed to challenge Microsoft's then-monopoly in personal computer operating systems. *Id.* at 1215, 1221; *see also Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 486 (9th Cir. 2021) (upholding mandatory dealing remedy even though refusal-to-deal claim was dismissed to "avoid a recurrence of the [antitrust] violation and to eliminate its consequences" (alteration in original) (quotation omitted)).

The District Court recognized these principles. And it made numerous findings that compel a payment ban. For example, the District Court found that Google's revenue share payments "freeze the [general search] ecosystem in place," that declining to prohibit them would "leav[e] in place "the very forces that effectively have made the ecosystem exceptionally resistant to change," and that allowing such payments to continue "could also blunt the effectiveness of the remedies imposed." Rem. Op 102, 106 (cleaned up) (quotation omitted). But the

District Court stopped short of imposing the prohibition based on its "hope" others might compete for distribution in the future and concern on the potential impact on parties that shared in Google's illegally maintained monopoly rents. *Id.* at 103, 107. That was error.

### B. Without a Ban on Revenue Share Payments, Google Will Continue to Use the Fruits of Its Unlawful Conduct to Entrench Its Monopolies

As the District Court found, banning revenue share payments for default placement would "deny Google the fruits of its statutory violation." *Id.* at 103. Revenue share agreements ("RSAs") are the engine of Google's general search and general search text advertising monopolies. Google uses these agreements to pay distributors a percentage of advertising revenues for default placement of Google Search. Liab. Op. 100–01. In return, defaults deliver Google query volume, query volume builds scale, and scale generates the revenues that fund revenue share payments—a self-reinforcing cycle that the District Court found "basically freeze[s] the ecosystem in place." *Id.* at 159–61 (quotation omitted). An exclusivity ban that leaves these payments in place is insufficient: so long as Google can outbid every competitor for defaults based on its supracompetitive revenues, the competitive landscape will remain frozen.

#### i. Search Access Point Defaults Are the Decisive Competitive Battlefield in General Search

Google maintains its dominant position in general search by paying for exclusive default placement at critical search access points, especially on mobile devices. *Id.* at 159–61. The scale of those payments is staggering: in 2021 alone, Google spent $26.3 billion in shared revenue to secure default placements—nearly four times more than all its other general search-related costs combined. *Id.* at 88.

Google made these investments because default placement is "by far" the "most efficient channel of GSE distribution." *Id.* at 44. Roughly 50% of all general search queries in the United States flow through the default search access points covered by Google's challenged contracts, and an additional 20% flow through Chrome, which also defaults to Google. *Id*. at 44–45. And once a user is habituated to a default, the default sticks: it "remains the primary search access point" due to "user habit, Google's brand, and choice friction." *Id*. at 44, 160. Indeed, as Microsoft CEO Satya Nadella testified, defaults are "[t]he only thing that matter in terms of changing search behavior." Transcript of Bench Trial Sep. 12–Nov. 16, 2023 ("Liab. Tr.") at 3497:23–24 (Nadella); *id.* at 5283:18–24 (former Google executive Arjan Dijk testifying that "it was clearly understood that being the default is almost everything, because when you're the default 95 percent of people will stick with the default").

### ii. Google's Default Agreements Give It an Insurmountable Scale Advantage

Control of key search access points through default placement has "given Google access to scale that its rivals cannot match." Liab. Op. 159. By locking up defaults, Google has amassed enormous volumes of "click data," which shows the general search results users click on, hover on, and scroll through, and "query data," which identifies the information that users are looking for. *Id.* at 50, 161. Indeed, Google receives nine times more general search queries each day than its rivals combined, and 19 times more on mobile. *Id.* at 49–50. And the volume of click and query data that Google acquires in just 13 months through its defaults would take Microsoft ***17.5 years*** to accumulate. *Id.* at 161.

Google's exclusive default placement has made it impossible both for established competitors and new entrants to close this scale gap. Microsoft's experience is illustrative. Bing is the default general search engine on Microsoft Edge, the default browser on most Windows PCs. *Id.* at 48. Even accounting for users who switch back to Google due to its incumbency and brand recognition, Bing retains approximately 30% of U.S. desktop general search queries. *See* Transcript of Bench Trial Apr. 22–May 9, 2025 ("Rem. Tr.") 1015:9–13 (Schechter). Thus, despite Google's continued dominance on general searches performed on desktop PCs, Bing's quality on desktop is broadly on par with Google for most queries. Liab. Op. 160. In contrast, in the mobile space where Google's dominance is reinforced

by default placement, the picture is reversed: Google's exclusive agreements with Apple and Android manufacturers lock Bing out of mobile defaults, leaving it with just 1.3% of mobile queries.[2] Liab. Op. 38; Rem. Tr. 1015:15–17 (Schechter).

Microsoft's significant investments in general search (including for mobile) cannot move the needle. Microsoft has invested approximately $100 billion in general search since 2005, dedicates more per capita to general search than any competitor to Google, and considers general search its "largest software category out there by far." Liab. Op. 36, 166; Liab. Tr. 3488:11–12 (Nadella). Yet from 2009 to 2020, Google's share of general search queries grew from 80% to 89.2%, while Bing's market share has never risen above 12%. Liab. Op. 38. As Microsoft's former CEO of Advertising and Web Services Mikhail Parakhin explained, the reason is simple: without the defaults that drive scale, "it is almost meaningless to invest in the area." *Id.* at 2643:21–23 (Parakhin); *see also* Liab. Op. 166; Liab. Tr. 3510:13–15 (Nadella) ("Can we invest more? Of course . . . . And in order to invest more, please give me some mobile share and I'll invest more.").

Engineering improvements also cannot substitute for scale. As Parakhin testified, "[i]f you don't have scale, you can to a certain degree try to mitigate it by trying to be smarter and running more sophisticated machine learning

---

[2] This result is made possible in part because default effects are weaker in desktop than in mobile, due to the larger desktop interface that gives users more screen real estate to notice and change the default. Liab. Op. 46.

algorithms. . . . But empirically, even significant improvement in algorithms does not tend to outweigh [the] importance of scale." Liab. Tr. 2666:3–11 (Parakhin). The reason is straightforward: "search is really dependent on data to improve its overall services," and Bing's inability to acquire general search defaults on mobile "leads to a vicious cycle." Rem. Tr. 1015:24–1016:4 (Schechter).

Nor can new entrants make a dent. Google tried to prove that barriers to entry were low by citing the example of DuckDuckGo and Neeva, the "only two notable market entrants in the last 15 years," but their experience showed the opposite. Liab. Op. 165. While they "entered the market notwithstanding Google's dominance," Google's stranglehold on scale made it impossible for them to take "significant business" from Google or pose any "meaningful threat to its market power"—and Neeva ultimately shut down its operations. *Id.* at 36–37, 122, 165 (internal quotations omitted). It is no wonder that general search has long been considered the "biggest no-fly zone" for startups—a market where new entry is virtually impossible. Liab. Tr. 3512:5–7 (Nadella).

#### iii. Google's Unmatched Revenue Share Payments Are the Fruit of Its Unlawful Monopolies

Google's ability to pay outsized revenue share payments to distributors is not a product of superior innovation; it flows directly from its antitrust violations. Google pays for default placement through revenue share agreements that give distributors a percentage of Google's general search advertising revenue. Liab. Op.

89–90. Those payments are only as large as the advertising revenue behind them, and Google's advertising revenue is far larger than any rival's because Google's illegally maintained scale allows it to target ads with precision no competitor can replicate. That in turn leads to the feedback loop identified by the District Court:

> (1) More user data allows a GSE to improve search quality, (2) better search quality attracts more users and improves monetization, (3) more users and better monetization attract more advertisers, (4) more advertisers mean higher ad revenue, and (5) more ad revenue enables a GSE to expend more resources on traffic acquisition costs (i.e., revenue share payments) and investments, which enable the continued acquisition of scale.

*Id.* at 161.

The result is a self-reinforcing advantage for Google. Because its revenue share agreements preserve its monopoly power, Google can "profitably charge supracompetitive prices for text advertisements," generating "high and remarkably stable operating profits." *Id.* at 177–78 (cleaned up) (citations omitted). Google then channels a portion of those monopoly profits back to securing additional exclusive distribution deals, effectively paying distributors to allow it to maintain its unlawful monopolies. *Id.* at 178. Because those payments are funded by monopoly profits that flow from Google's unrivaled scale, no competitor can ever match them. *Id.* at 180–81 (Google's revenue sharing agreements have "capped" rivals' advertising revenue, leaving them "in no position" to compete).

Google's own internal "Alice in Wonderland" study—which referred to Microsoft as "Alice"—confirms that no rival can match Google's monopoly-funded

revenue payments. *Id.* at 95. Google found that Microsoft would need to pay Apple 122% of Bing's revenue just to equal Google's then-33.75% revenue share, and concluded that "it will not be possible for Alice [i.e. Microsoft] to match our payments profitably." *Id.* (quotation omitted). The math is straightforward: because Google's unlawful monopolies enable it to command far more general search traffic, its ad auctions attract denser advertiser participation and higher per-query bids at supracompetitive prices, generating revenue per user a non-monopolist cannot replicate. Liab. Tr. 2646:20–22 (Parakhin). So long as Google's monopoly-scale revenues dwarf its competitors', no rival can offer distributors comparable financial incentives—and no distributor will forgo those payments.[3]

#### iv. Banning Exclusivity Without Banning Revenue Share Payments Preserves Google's Monopoly

Prohibiting Google's exclusive agreements while permitting its revenue share payments thus will not restore competition. Until competitors gain the distribution needed to build scale, their advertising conversion rates will remain lower than Google's, making it economically impossible to match Google's payments. As Nadella testified, advertisers who shift campaigns from Google to Bing see better returns because prices drop—but "there isn't enough traffic in Bing to justify . . . the

[3] It is therefore unsurprising that several of Google's distribution partners have filed amicus briefs in this appeal opposing a payment ban. Those partners share directly in Google's monopoly rents, and they have a financial stake in preserving the very payments the remedy would eliminate.

same intensity of auction." Liab. Tr. 3494:2–6 (Nadella). Advertisers confirmed as much: Booking.com's Chief Marketing Officer testified that although Bing may be cheaper and he "would gladly spend far more with Bing" if it had sufficient scale, he cannot shift spending because "the demand is clearly not there." Liab. Tr. 5281:21–5282:5 (Dijk). No distributor will select a competitor as the default while Google can offer outsized revenue shares. Permitting continued revenue share payments not only fails to "eliminate [the] consequences" of Google's conduct; it entrenches them.

The District Court's analysis confirms that an exclusivity ban alone will not dislodge Google's dominance. Even after Google voluntarily stripped exclusivity provisions from its revenue share agreements, the court found that "distributors still are likely to select Google as its primary, if not only, default GSE" because Google remains the best-quality general search engine and distributors "cannot afford to go elsewhere." Rem. Op. 95–96. The court further acknowledged that "[a]llowing Google to continue making payments . . . could blunt the effectiveness of the remedies imposed" and maintain the "status quo" even when coupled with an exclusivity ban. *Id.* at 106–107. So long as Google retains the ability to outbid every rival for default placement, the exclusivity ban is a prohibition in name only.

#### v. Without a Payment Ban, the Data Sharing Remedy Is Not Enough

The data sharing remedy crafted by the District Court cannot break Google's dominance. *See* SAG Br. at 15–23; USA Br. at 129–32. This is because it cannot address the root cause of the scale disparity—the monopoly revenues Google leverages to secure default status and to outbid competitors for default placement. Even if rivals improve quality using the shared data, they cannot compete on price given Google's entrenched advantage. *See* Liab. Op. 159–61. Google's buying power arising from scale creates "an incredibly strong incentive for the ecosystem to not do anything," making it "exceptionally resist[ant] to change." *Id.* at 145 (quoting Liab. Tr. 3796:8–3798:22 (Ramaswamy)). Google will simply leverage its "massive financial advantage" and "superior monetization" to "pay more," giving distributors no incentive to switch to a less recognized competitor offering equivalent quality at best. Rem. Op. 106.

The data sharing remedy's design limitations compound the problem. The District Court acknowledged that "privacy-enhancing techniques" would need to accompany any data sharing—particularly for rare or unique "long-tail" queries where particularized context may reveal the user's identity even from anonymized data. Rem. Op. 126–27. Yet because this information is highly user-specific, long-tail queries are the most critical part of the general search dataset. *See id.* at 109 ("[U]nless you're sharing tail queries, the information is not terribly useful for

a search engine to improve its own product and bridge the scale-gap." (quoting Smutny Rem. Dep. at 51:17–22)). Privacy restrictions stand to exclude this critical data. Indeed, restrictions that Google claimed protected privacy resulted in the exclusion of 99% of queries during Google's disclosure under the European Digital Markets Act. *See id.* at 126 (citing Rem. Tr. 1154:2–1160:20 (Evans)).

The Allcott Study that the District Court relied upon also suggests that data sharing will be a less effective remedy than actual distribution and natural growth. The study's authors estimated that for Bing on desktop, the quality bump from having Google's data would produce a mere 1% shift in market share. *See id.* at 109 n.15. The record shows that distribution is the best method of building scale. *See id.* at 102–03 (citing Rem. Tr. 2140:21–2142:19 (Chipty); Rem. Tr. 792:24–793:8 (Shevelenko) (describing "true freedom" as distributors being able to pick the best GenAI product without "fearing lost revenue or lower rev-share rates")).

In declining to impose a payment ban, the District Court acknowledged that the data sharing remedy would need to do the heavy lifting in restoring competition. *See id.* at 109. But the data sharing remedy cannot alone achieve this goal.

#### vi. The Court Should Prohibit Revenue Share Payments Tied to Default Placement

The proper remedy is therefore a temporary prohibition on Google's revenue share payments tied to default placement—long enough to allow other general search engines to develop competitive scale. This in turn will foster a market in

which multiple competitors offer high-quality general search engines, increasing both innovation incentives and consumer welfare.

Bing's desktop performance already demonstrates that this outcome is achievable: with just a 30% share, Bing delivers general search quality broadly on par with Google for most queries. Liab. Op. 56; Rem. Tr. 1015:9–13 (Schechter). This is consistent with Nadella's testimony that once a general search engine obtains 20% query share, the quality gap relative to Google largely disappears. *See* Liab. Tr. 3520:2–8 (Nadella). With restored competition and greater scale, such quality levels will be within reach for other Google rivals as well.

A payment ban falls squarely within the Court's broad discretion to fashion remedies that "avoid a recurrence of the violation and [] eliminate its consequences." *NSPE*, 435 U.S. at 697 (citations omitted). The Court should therefore remand with instructions to prohibit Google from making revenue share payments for including Google Search, Google Gemini AI assistant, and successor technologies as a default or in a prominent placement on any device or browser.[4]

[4] As noted in the United States' Cross-Appeal briefing, even Google proposed to the District Court that the distribution remedies should apply to its Gemini AI assistant. *See* USA Br. at 122–23.

### C. A Payment Ban Will Make Default Pricing Competitive and Increase Consumer Welfare

#### i. A Payment Ban Will Introduce Competition to Default Pricing

In declining to institute a payment ban, the District Court expressed concern that doing so would allow Google's rivals to win defaults at bargain prices from distributors. Rem. Op. 104. That concern was misplaced.

##### a. Banning Google's Default Payments Will Prevent Google from Using Its Monopoly Rents to Shut Out Rivals

The District Court's concern rests on an incorrect premise: that Google's default payments reflect competitive market rates, and that a payment ban would therefore disrupt a healthy market rather than correct a distorted one. The District Court's own findings refute that premise. Google's illegally maintained scale produced the advertising monetization advantages—and, in turn, the monopoly rents—that funded those payments. *See* Liab. Op. 159–63; *supra* § 4(B)(iii).

The District Court's related concern that a payment ban would harm distributors is equally misplaced, because it assumes something the record refutes: that distributors are neutral third parties whose losses cut against the remedy. They are not. Those distributors were Google's counterparties and beneficiaries of its monopolies who repeatedly renewed the illegal agreements. Any short-term

reduction in revenue is thus not a neutral third-party injury, but the loss of a share of monopoly rents generated by the very violation being remedied.[5]

### b. A Payment Ban Will Encourage Competition

Further, a payment ban will encourage other companies to compete for defaults. This includes both general search providers and developers of AI agents, both of which have powerful incentives to secure defaults to develop the scale they need to increase quality and ad revenue. Indeed, competitors need reach only 20% query share to eliminate the quality gap with Google. *See* Liab. Tr. 3520:2–8 (Nadella). Accordingly, banning Google's supracompetitive payments for defaults would encourage multiple categories of bidders, who know they can never outbid Google today, to compete aggressively for these crucial default placements at search access points.

This is for good reason. General search providers and developers of AI agents know that if they don't provide distributors competitive rates for default placement, distributors will be incentivized to vertically integrate to provide similar functionality. For example, Apple has the resources and strategic interest to build or acquire its own general search capability if third-party general search engines fail to offer competitive rates. *See* Liab. Op. 167. While it has declined to build a general

[5] Additionally, because any such reduction would apply uniformly across distributors, no distributor would be disadvantaged relative to their competitors.

search engine due to Google's revenue share payments, *id*, banning Google's billions in payments would encourage Apple—and similarly situated companies—to do so. Apple need not build its own general search engine for that option to matter: the mere credible threat that it could sets a floor on what any bidder must offer and keeps distributors from being lowballed.

Additionally, as described in the State Attorneys General's Cross-Appeal briefing, over the long term, the competitive markets that would develop as a result of a payment ban could lead to ***higher*** revenue share payments to distributors than they receive today. *See* SAG Br. at 33. Once the scale gap is closed, multiple companies could compete for default placement. That resulting competition could result in numerically greater revenue sharing percentages than Google pays today.

A payment ban for distribution provides the framework for competitive alternatives—exactly what Google's illegally maintained monopolies have foreclosed until now.

#### ii. A Payment Ban Will Increase Consumer Welfare

The District Court also expressed concern that a payment ban might result in lower general search quality. *See* Rem. Op. 103–06. While that concern is well-intentioned, it is overstated.

***First,*** the District Court's reasoning would reward Google for its illegal conduct. While the District Court treated Google's quality advantage as a

pre-existing state that a payment ban would unfairly disrupt, its own findings establish that Google's advantage was maintained by its illegal distribution agreements that blocked rivals from achieving equivalent quality through normal competition. Declining a payment ban to preserve short-term consumer welfare only guarantees that the competitive conditions needed to serve those consumers will never materialize, preserving Google's monopoly.

***Second***, any quality gap would be short-lived. The District Court found that scale drives quality through query volume, and that the illegal distribution agreements denied rivals the default placements that generate that volume. By giving rivals access to mobile defaults, a payment ban would allow them to quickly accumulate the query volume—and, through it, the training data—needed to close the gap.

***Third***, a temporary transition cost cannot justify declining to remedy a decade-long violation: that reasoning would reward the monopolist causing greater harm with greater protection from relief, a result irreconcilable with the remedial objectives of the antitrust laws.

***Finally***, consumers are not captive to any given default. If quality between the new default and Google is roughly similar, users will not switch—the condition that will eventually prevail as rivals accumulate scale. But if users perceive quality is materially worse, they will simply switch back to Google. Liab. Op. 148. A

payment ban does not determine whether consumers can access quality general search results; it simply changes who receives the benefit of inertia.

### D. Absent a Distribution Payment Ban, There Is a Substantial Risk that Google Will Expand Its Existing Monopolies into AI Agents and Large Language Models

The brief on behalf of the United States concludes by noting "GenAI products will not realize their potential in search if Google can 'use the same anticompetitive playbook' against them." USA Br. at 144 (quoting Rem. Op. 99). That concern is not theoretical. Indeed, Google is already using the same distribution strategy it used to monopolize general search to secure preferential placement for its Gemini AI assistant on major device platforms.

#### i. As the District Court Predicted, AI Agents Are Developing into Important Search Access Points

Eleven months ago, the District Court recognized that AI agents have the potential to become another search access point. Rem. Op. at 60–61; *see also* Rem. Tr. at 3818:20–3819:4, 3827:23–3828:11, 3846:24–3847:3 (Cue) (Apple executive Eddy Cue testifying that the volume of Google Search queries in Apple's Safari web browser had declined for the first time in 22 years likely due to the emergence of GenAI chatbots). But rather than AI agents using large language models to ***replace general search engines***, AI agents are ***relying on general search engines*** to improve the performance of their underlying models.

AI agents depend on general search in various ways. The most obvious example, which the District Court recognized, is providing access to information that postdates the underlying models' training data. *See* Rem. Op. 54. The District Court also found that if the underlying model requires additional context to better understand the intent of a query, AI agents route those queries to a search index, retrieve the most relevant results, and feed those results into the language model to generate an informed, accurate response. *Id.* at 53–54. But since that opinion, AI agents are increasingly retrieving general search results for other purposes. General search engines also help AI agents by serving as a discovery layer to locate relevant webpages and other general information that the agent can analyze and act upon. *See generally* Stackpole, *supra* at 6. And AI agents routinely generate their own unique queries that they submit to general search engines as an interim measure in completing a multi-step workflow. *Id.*

In each of these circumstances, the perceived quality of AI agents depends directly on the volume and breadth of the underlying search engine they rely upon—the larger and more comprehensive the index, the more accurate the general search-assisted responses AI agents can support. *See id.* at 113. As a result, Google's illegally-maintained search index continues to offer it a "key competitive advantage" over its AI agent rivals. *Id.* at 113; *see also id.* at 115 (Cue testifying that the "only

thing that's keeping" GenAI competitors from providing genuine competition is "*growing their search index*" (quoting Rem. Tr. 3846:3–10 (Cue))).

Microsoft's experience with Copilot illustrates how Google's advantage in general search benefits its Gemini AI assistant. Because Google's anticompetitive agreements deny Bing the user data it needs to compete, Copilot's general search-assisted results suffer across every category of query that depends on scale. Rem. Tr. 1016:14–1020:3 (Schechter). No language model can fill that gap: a model "can't possibly know what news event is coming up" or "if a restaurant is open or not." *Id*. at 1033:20–24 (Schechter). When Bing's general search results are "incorrect, or poor quality," Copilot "won't know the difference and it will generate a response based on that poor quality response." *Id.* at 1023:2–5 (Schechter). The resulting errors are "essentially extinction events" that cause users to distrust and stop using the product altogether. *Id.* at 1034:23–1035:8 (Schechter). AI, in short, doesn't fix the scale problems — it replicates them.

For that reason, AI agents have continued to evolve since the Remedies Opinion into critical search access points. And Google has every reason to approach AI agents the same way it did with the general search apps, widgets, and browser bars that preceded them. As AI agents and their underlying models mature, users increasingly expect accurate, cited, real-time answers—the kind that require a search index with substantial scale. The longer Google's scale advantage persists, the wider

the gap becomes, and the harder it will be for any rival to close it. Indeed, as Nadella warned, the "vicious cycle" in general search could become "even more vicious" in the AI age because "it is going to become even harder in the AI age to compete with someone who has that core share advantage and economic advantage." *Id.* at 3513:1–3, 3514:3–5 (Nadella).

**ii. Google Is Deploying the Same Anticompetitive Playbook with AI Agents**

Google's distribution agreements confirm that it is repeating its general search playbook with AI agents. Just as Google once paid for exclusive default placement of Google Search, it now pursues the same distribution strategy by securing prominent placement of its Gemini AI assistant:

***Samsung*.** Google agreed to make revenue share payments in exchange for Samsung implementing "a certain Gemini Experience on its Android phones and tablets" only on "Gemini Qualified Devices" which have "preinstallation, placement, default, and usage requirements"—including a "long-press side key" and "hot word" that "invoke the Gemini App by default." Rem. Op. 63–64 (quotations omitted). And, just four months after the Remedies Opinion was issued, Samsung and Google announced plans to expand Gemini-powered "Galaxy AI" capabilities across 800 million devices by the end of 2026. *See* Hyunjoo Jin, *Samsung to double AI mobile devices to 800 million units this year*, Reuters (Jan. 5, 2025),

https://www.reuters.com/world/china/samsung-double-mobile-devices-powered-by-googles-gemini-800-mln-units-this-year-2026-01-05/.

***Motorola.*** Google's June 2024 agreement with Motorola expressly restricted Motorola from using those funds to market non-Google assistive services, including other AI agents, for the duration of the agreement. Rem. Op. 65. Google and Motorola also entered into a separate agreement requiring Motorola to preinstall the Gemini app and Google One on the default home screen of four devices, with Google paying Motorola a bounty for Gemini app subscriptions. *Id.* at 65.

***Apple.*** In January 2026, Google and Apple entered into an agreement where Apple will use Gemini models to power Siri, providing Gemini access to a user base in the billions. *See* Zaheer Kachwala & Aditya Soni, *Apple, Google strike Gemini deal for revamped Siri in major win for Alphabet*, Reuters (Jan. 13, 2026), https://www.reuters.com/business/google-apple-enter-into-multi-year-ai-deal-gemini-models-2026-01-12/. In the words of former FTC chairman Bill Kovacic, this agreement represents "a major step in the direction of entrenching Google's solution as the preeminent solution." Michael Gennaro & Greg Andrews, *Apple's Google AI Deal to Test Tenor of Antitrust Enforcement Under Trump*, Law.com (Jan. 29, 2026), https://www.law.com/corpcounsel/2026/01/29/apples-google-ai-deal-to-test-tenor-of-antitrust-enforcement-under-trump/. Others similarly have characterized the Gemini-Siri deal: "***We have seen this movie before, and we know***

***how it ends***." Madhavi Singh, *Google–Apple Gemini Deal Underscores Tech's Antitrust Catch-22*, Bloomberg Law (Jan. 26, 2026), https://news.bloomberglaw.com/legal-exchange-insights-and-commentary/google-apple-gemini-deal-underscores-techs-antitrust-catch-22 (emphasis added).

The results speak for themselves: Gemini has grown from zero to more than 950 million monthly users in less than two and a half years, with more than 500 million added in just the last fourteen months. *See* Ivan Mehta, *Google's Gemini nears billion-user milestone*, TechCrunch (July 23, 2026), https://techcrunch.com/2026/07/23/google-closes-in-on-another-billion-user-product-with-gemini/; Juricic, *supra* at 4. With Google's default placement agreements—and without any remedy to dilute Google's illegally-obtained scale in general search—its distribution will only expand. Indeed, ChatGPT's rate of growth has decreased since the Remedies Opinion. *See* Berber Jin, *How OpenAI Lost Its AI Crown—and the Fight to Win It Back*, Wall Street Journal (July 31, 2026), https://www.wsj.com/tech/ai/how-openai-lost-its-ai-crownand-the-fight-to-win-it-back-7d069695.

The District Court's "hope" that AI competitors could alter Google's illegally maintained monopolies has not been borne out. Rem. Op. 107. ***In the eleven months since the District Court issued its Remedies Opinion, no AI competitor has displaced Google by obtaining any search access point default.*** Indeed, Gemini's

rapid expansion has only added urgency. Google's distribution agreements validate Plaintiffs' concerns that Google is actively deploying the same anti-competitive playbook in AI that clinched its dominance in general search. Not only will securing AI agent defaults for Gemini ensure that Google Search will be used to power general search-assisted AI agent results, it runs the risk that Google will illegally monopolize AI agents and the underlying models that power them.

This is a critical moment. There is a substantial risk that the District Court's hope that AI competitors may someday compete with Google on equal terms may be lost forever in the absence of a payment ban for distribution.

## V. CONCLUSION

Microsoft respectfully requests that this Court remand with instructions to impose a remedy prohibiting Google from making revenue share payments for including Google Search, its Gemini AI assistant, and successor technologies as a default or in a prominent placement on any device or browser.

Dated: August 4, 2026
Philadelphia, PA

Respectfully submitted,

/s/ *Julia Chapman*

Julia Chapman
Dechert LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104
215-994-2060
julia.chapman@dechert.com

Counsel for *Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) and 32(a)(7) because the brief contains 6,498 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Version 2606 in 14-point Times New Roman.

Dated: August 4, 2026
Philadelphia, PA

/s/ *Julia Chapman*
Julia Chapman
Counsel for *Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of August, 2026, I electronically filed the foregoing Brief for Microsoft Corporation as *Amicus Curiae* in Support of Plaintiffs-Appellees/Cross-Appellants Urging Affirmance in Part and Reversal in Part with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system, and served copies of the foregoing via the Court's CM/ECF system on all ECF-registered counsel.

Dated: August 4, 2026
Philadelphia, PA

/s/ *Julia Chapman*
Julia Chapman
Counsel for *Amicus Curiae*