**ORAL ARGUMENT NOT YET SCHEDULED**
**Nos. 26-5023, 26-5047, 26-5049**

# United States Court of Appeals for the District of Columbia Circuit

UNITED STATES OF AMERICA, et al.,

*Plaintiffs-Appellees-Cross-Appellants*,

v.

GOOGLE LLC,

*Defendant-Appellant-Cross-Appellee.*

On Appeal From the United States District Court for the District of Columbia, Nos. 1:20-cv-3010, 1:20-cv-3715 (Hon. Amit P. Mehta)

## BRIEF FOR APPLE INC. AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT-CROSS-APPELLEE

Sarah M. Ray
Aaron T. Chiu
Sylvia Zhang
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111

Gregory G. Garre
*Counsel of Record*
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

Ben Harris
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

*Counsel for Amicus Curiae Apple Inc.*

August 25, 2026

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel certifies the following:

### A. Parties and *Amici*

Except for the following, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Plaintiffs' Certificate as to Parties, Rulings, and Related Cases filed on February 23, 2026. Since that time, Apple Inc. and Samsung Electronics Co., Ltd. have been granted leave to file amicus briefs. On May 28 and 29, 2026, Washington Legal Foundation; Law & Economics Scholars; Economists and Legal Scholars; Mozilla Corporation; professors Hunt Allcott and Matthew Gentzkow; Brave Software, Inc.; economist Gregory J. Werden; researcher Alden Abbott; and former antitrust enforcers Terry Calvani, William Kolasky, Abbott B. Lipsky Jr., and Joe Sims filed amicus briefs. On August 4, 2026, Microsoft Corp., OpenAI OpCo, LLC, SerpApi, LLC, Open Markets Institute, Public Knowledge, Bipartisan Technology Policy Experts, Economists and Legal & Technology Scholars, Duck Duck Go, Inc., American Economic Liberties Project, Mozilla Corporation, Antitrust Law, Economics, and Business Professors, Little Tech Association and Travel Lemming, LLC, American Antitrust Institute (AAI), and Economics and Business Professors filed amicus briefs. On August 5, 2026, W. Stephen Westermann filed an amicus brief.

**B. Ruling Under Review**

The references to the rulings at issue in Plaintiffs' Certificate as to Parties, Rulings, and Related Cases filed on February 23, 2026, remain accurate.

**C. Related Cases**

The certification as to related cases in Plaintiffs' Certificate as to Parties, Rulings, and Related Cases filed on February 23, 2026, remains accurate.

*/s/ Gregory G. Garre*
Gregory G. Garre
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, counsel for the amicus curiae certifies the following: Apple Inc. ("Apple") states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

## RULE 29 CERTIFICATE

All parties have consented to the filing of this *amicus curiae* brief.

This brief was not authored in whole or in part by a party or its counsel. No party or party's counsel contributed money intended to fund the preparation or filing of this brief; and no person other than *amicus curiae* contributed money intended to fund the preparation or submission of this brief.

Pursuant to Circuit Rule 29(d), *amicus* certifies that a separate brief is necessary to provide the perspective of Apple Inc., which is directly affected by the decision under review. As explained in the Interest of *Amicus Curiae* section, Apple has long contracted with Google LLC to distribute Google Search as the default search engine on Apple's web browser, and the Plaintiffs-Appellees' proposal to ban any search distribution payments would negatively affect both Apple and its users.

*/s/ Gregory G. Garre*
Gregory G. Garre
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

## TABLE OF CONTENTS


Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..... i

CORPORATE DISCLOSURE STATEMENT ..... iii

RULE 29 CERTIFICATE ..... iv

TABLE OF AUTHORITIES ..... vii

GLOSSARY ..... ix

INTEREST OF *AMICUS CURIAE* ..... 1

STATUTES AND REGULATIONS ..... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..... 2

ARGUMENT ..... 5

I. THE DISTRICT COURT ACTED WELL WITHIN ITS DISCRETION IN REFUSING TO IMPOSE AN OUTRIGHT BAN ON SEARCH DISTRIBUTION PAYMENTS ..... 5

A. Courts Must Tailor Antitrust Remedies To Ensure They Are Not More Burdensome Than Necessary ..... 5

B. Google And Apple Have Previously Contracted For Exclusive Search Distribution With Extended Contract Terms ..... 7

C. The District Court's Remedial Decree Meaningfully Changes The Relationship Between Apple And Google And Encourages Competition ..... 9

II. AN OUTRIGHT BAN ON SEARCH DISTRIBUTION PAYMENTS IS UNTENABLE AND WOULD BACKFIRE ..... 12

A. Prohibiting All Search Distribution Payments Would Benefit Google And Harm Competition ..... 13

**Page**

B. A Payment Ban Would Harm Apple's Users And Apple Itself ........ 17

C. Plaintiffs-Appellees Provide No Justification For Their Punitive Payment Ban Remedy ........ 18

D. A Ban On Search Distribution Payments Would Exceed The Scope Of The Liability Ruling ........ 24

CONCLUSION ........ 26

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

* *Califano v. Yamasaki*,
442 U.S. 682 (1979)....................5, 25

*Ford Motor Co. v. United States*,
405 U.S. 562 (1972)....................6

*FTC v. Whole Foods Market, Inc.*,
548 F.3d 1028 (D.C. Cir. 2008)....................6

*Gulf Oil Corp. v. Brock*,
778 F.2d 834 (D.C. Cir. 1985)....................24

*Hecht Co. v. Bowles*,
321 U.S. 321 (1944)....................5

*International Salt Co. v. United States*,
332 U.S. 392 (1947)....................6

*NCAA v. Alston*,
594 U.S. 69 (2021)....................5

*New York v. Microsoft Corp.*,
224 F. Supp. 2d 76 (D.D.C. 2002), *aff'd sub nom. Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004)....................5

* *Population Institute v. McPherson*,
797 F.2d 1062 (D.C. Cir. 1986)....................6, 18

*Rebel Oil Co. v. Atlantic Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995)....................16

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993)....................6

*Systemation, Inc. v. Engel Industries, Inc.*,
194 F.3d 1331 (Fed. Cir. Mar. 10, 1999)....................6

* Authorities upon which *amicus* chiefly relies are marked with asterisks.

**Page(s)**

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)....5

*United States v. Brown University*,
5 F.3d 658 (3d Cir. 1993) ....16

*United States v. Crescent Amusement Co.*,
323 U.S. 173 (1944)....6

*United States v. E.I. du Pont de Nemours & Co.*,
366 U.S. 316 (1961)....23

* *United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001)....5, 11, 15

**OTHER AUTHORITIES**

Hunt Allcott et al., *Sources of Market Power in Web Search: Evidence from a Field Experiment* (Nat'l Bureau of Econ. Rsch., Working Paper No. 33410, rev. Feb. 2026), https://www.nber.org/system/files/working_papers/w33410/w33410.pdf ....16

## GLOSSARY

| | |
|---|---|
| Giannandrea Decl. | Declaration of John Giannandrea on Behalf of Amicus Curiae Apple Inc. (May 2, 2025), Dkt. 1239 |
| Liab.Op. | Memorandum Opinion (Liability Phase) (Aug. 5, 2024), Dkt. 1033 |
| Rem.Op. | Memorandum Opinion (Remedies Phase) (Sept. 2, 2025), Dkt. 1436 |
| Rem.Tr. | Transcript (Remedies Phase Trial), Dkts. 1393-1420 |

## INTEREST OF *AMICUS CURIAE*

*Amicus curiae* Apple Inc. ("Apple") is a global technology company based in Cupertino, California. Apple has created numerous Internet-connected products, including the iPhone, and it has developed a browser that allows its users to access the web, called Safari. Apple has contracted with Google LLC ("Google") to distribute Google Search as the default search engine on Safari, in exchange for which Google makes search distribution payments. As a result, Apple and its users have a strong interest in the resolution of this appeal, which concerns in part whether Google may continue to compensate Apple for distributing Google Search on Apple's devices. Given that interest, the district court took the unusual step of allowing Apple to "participate as *amicus curiae* and file post-hearing submissions to ensure consideration of Apple's views when crafting the remedial decree" in this case. Dkt. 1153 at 2.[1] Plaintiffs-Appellees repeatedly single out Apple by name in their briefs in this Court, and Apple files this brief to offer its perspective that the district court properly rejected a ban on Google's search distribution payments.

## STATUTES AND REGULATIONS

The relevant statutes and regulations are reproduced in the Brief for the United States.

[1] "Dkt." refers to documents filed in *United States v. Google LLC*, No. 20-cv-3010 (D.D.C.).

## INTRODUCTION AND SUMMARY OF ARGUMENT

After a multi-week evidentiary hearing concerning the proper relief to redress Google's violation of the Sherman Act, the district court ordered a series of significant remedies, including data-sharing and syndication, and changes to the kinds of contracts Google can enter related to search distribution with third parties like Apple. But the district court correctly declined to order an outright ban on Google's agreements to share revenue with its search distribution partners after finding that such a ban would "harm consumer welfare." JA___(Rem.Op.126) (Dkt. 1436). Apple files this amicus brief to explain why the district court got it right. Because Google remains the best search engine today and Apple is committed to providing the best possible user experience, Apple would likely continue presetting Google as the default search engine on Apple devices, at least in the near term, no matter whether Google can pay for search distribution. As a result, a payment ban would only *benefit* Google at the expense of third parties and consumers. The district court recognized, therefore, that a payment ban would not appropriately redress Google's violation of Section 2. There is no reason for this Court to disturb that well-reasoned conclusion, much less find that it was an abuse of discretion.

Apple and Google have long contracted for Google to distribute its general search engine on Apple devices. Google, after all, is unparalleled in search, and Apple's priority has always been giving its users the best possible experience. Apple

users can select whichever search engine they would like to use on their device, but Apple presets Google as the default search engine, meaning that when users type a search inquiry into the URL box on Apple's Safari web browser, the browser defaults to Google if a user has not set a different default. This arrangement is of immense value to Google given Apple's enormous user base and the service Apple provides by distributing Google Search on Apple devices. As compensation for the benefits and services Apple provides, Google pays Apple a portion of the revenue it generates through search.

The district court's remedial order makes important changes to the distribution agreement between Apple and Google that are likely to improve competition. Rather than allow Google to contract for exclusive default status on all the access points where users might use a search engine, the remedial decree now expressly orders that Apple be allowed to choose a different default search engine for other access points and devices. And rather than permit a five-year distribution contract, the remedial decree mandates that Google and Apple's revenue sharing agreement last no more than one year, meaning that Apple can assess annually whether to alter its search distribution strategy and work with competitors. These tailored and significant changes solve the core issue the district court identified: the exclusive nature of Google's distribution contracts.

Plaintiffs-Appellees now ask this Court—on a cold record—to impose a far more drastic remedy. They ask this Court to vacate the district court's remedial order and instead take the extreme step of banning Google from making any search distribution payments whatsoever. That misguided proposal rests on an unsupported justification that exceeds the bounds of the district court's liability decision. As the district court recognized, Apple's day-one incentive is to continue distributing Google, and a payment ban would simply grant Google an enormous, multi-billion-dollar windfall because, under such a ban, Google would continue to capture searches from Apple's user base while being relieved of any contractual obligation to share revenue generated by those users. That perverse outcome would *inflate* Google's profits, as the district court correctly found.

Plaintiffs-Appellees provide no justification for such a backward remedy, except for their vague factual claim that Apple would develop its own competing search engine. That is incorrect: Apple has no plans to build a search engine and is invested in other products and services that are far more likely to improve the user experience. As the district court found, a payment ban thus would advantage Google, harm consumers, and further harm third-party distributors, like Apple, which use the search distribution revenue to develop new and innovative products. The district court was well within its discretion to craft a tailored remedy based on

the extensive record developed in the remedial phase of this case, and this Court should not disturb its conclusion that an outright payment ban is wholly unjustified.

## ARGUMENT

### I. THE DISTRICT COURT ACTED WELL WITHIN ITS DISCRETION IN REFUSING TO IMPOSE AN OUTRIGHT BAN ON SEARCH DISTRIBUTION PAYMENTS

#### A. Courts Must Tailor Antitrust Remedies To Ensure They Are Not More Burdensome Than Necessary

Courts fashioning equitable remedies must ensure that "injunctive relief" is "no more burdensome . . . than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025) (same). That is because injunctive relief should "deter," and not "punish." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944).

When it comes to antitrust remedies, the Supreme Court has admonished that "caution is key." *NCAA v. Alston*, 594 U.S. 69, 106 (2021). "Equitable relief in an antitrust case should not 'embody harsh measures when less severe ones will do.'" *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 100 (D.D.C. 2002) (citation omitted), *aff'd sub nom*. *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004). And the "relief" in antitrust cases "should be tailored to fit the wrong creating the occasion for the remedy." *United States v. Microsoft Corp.*, 253 F.3d 34, 107 (D.C. Cir. 2001) (per curiam).

The ultimate goal of any antitrust remedy is to ensure that relief protects consumer welfare. The "purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993). So, courts must avoid applying the Sherman Act so as to "chill competition, rather than to foster it." *Id.* Courts must likewise ensure that injunctions do not cause "third parties" to "suffer undue harm." *Population Inst. v. McPherson*, 797 F.2d 1062, 1067 (D.C. Cir. 1986); *see also Systemation, Inc. v. Engel Indus., Inc.*, 194 F.3d 1331, at *2 (Fed. Cir. Mar. 10, 1999) (similar).

In crafting "[t]he relief in an antitrust case, . . . [t]he District Court is clothed with 'large discretion' to fit the decree to the special needs of the individual case." *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) (quoting *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947)). As the Supreme Court long ago explained, "there is a wide range of discretion in the District Court to mould the decree to the exigencies of the particular case; and where the findings of violations are sustained, we will not direct a recasting of the decree except upon a showing of abuse of discretion." *United States v. Crescent Amusement Co.*, 323 U.S. 173, 185 (1944). This Court has echoed those same fundamental equitable principles. *See FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1033 (D.C. Cir. 2008) (citing *Ford* and noting the "large discretion" afforded to district courts).

### B. Google And Apple Have Previously Contracted For Exclusive Search Distribution With Extended Contract Terms

For years, Apple and Google have maintained an agreement for Apple to distribute Google Search, which Apple has long seen as the "highest quality general search engine" it can provide its users. JA___(Rem.Tr.3818:13-19) (Cue) (Dkt. 1414). In 2002, Apple licensed Google Search to allow Apple's users to access Google Search directly from the "search box" in Apple's web browser. JA___(Liab.Op.108) (Dkt. 1033). Apple licensed Google because Google provided the highest quality search results, and Apple has always been committed to providing its users a quality experience. Pursuant to Apple's agreement with Google, when a user types a query into the search box, the browser automatically searches the web based on that query—a process that simplifies the user experience by making it easy and fast to search for anything on the Internet.

Apple and Google's initial agreement for Apple to distribute Google Search did not include a revenue share provision or a provision for a default preset. But in 2005, Apple and Google renegotiated their search distribution agreement to provide that Google would pay a lump sum and a percentage of the advertising revenue generated from Apple's users, and in exchange, Apple would preset Google as the default search engine on its Safari browser. JA___(Liab.Op.109). Users can select alternative search engines from the settings menu on Apple devices, but Google is the out-of-the-box default. Apple and Google subsequently amended their

agreement in 2007 after the iPhone launched, providing that Google would serve as the default in Apple's Safari browser across the iPhone, iPod, and Safari for Windows. *Id.*

As the district court carefully recounted in its liability opinion, Apple has in the past sought more flexibility in its contractual agreement with Google. Apple has sought such flexibility to ensure that it can constantly evaluate competition in search and maintain its ability to provide Apple users the best possible options. Specifically, in 2009 Apple sought to continue to receive compensation for distributing Google Search but hoped to negotiate a deal by which Apple would not be obligated to preset Google as the default search engine on Apple devices. JA___(Liab.Op.110) (noting that "Apple sought '[t]he option but not the obligation to set Google as the default search provider' and still receive revenue share" (alteration in original) (citation omitted)). But "Google rejected those terms," because such a deal would allow Apple to contract with alternative general search engine providers for some of its search access points, leaving "Google as the default for some, but not all, locations or product lines/versions." *Id.* Apple "again sought . . . flexibility" three years later in 2012, but Google again "stood firm" that "Apple had to maintain Google as the exclusive Safari default" across relevant search access points. *Id.*

In 2016, Apple and Google entered the version of their agreement that governed until this lawsuit—an agreement that made Google the exclusive default search engine on Apple devices for multiple years. Under the agreement, "Google pays Apple a share of its search ads revenue" and Apple preloads Google "as the exclusive, out-of-the-box default [general search engine] on its mobile and desktop browser, Safari." JA___(Liab.Op.101). The agreement required "Apple to set Google as the default search engine on Safari for all its devices." JA___(Liab.Op.102). As for the length of the contract, the 2016 agreement lasted for five years, and in 2021 Apple and Google extended the agreement for an additional five years until 2026. JA___(Liab.Op.101). "Neither party ha[d] the right to unilaterally terminate" the agreement before its expiration date. JA___(Liab.Op.102). The district court thus found that the agreement guarantees Google exclusive default status across all access points; the most recent iteration of the agreement does so for five-year terms. JA___-___(Liab.Op.110-11), JA___(Liab.Op.224).

### C. The District Court's Remedial Decree Meaningfully Changes The Relationship Between Apple And Google And Encourages Competition

The district court's remedial decree alters several of the critical terms governing the search distribution agreement between Apple and Google. Google is now prohibited, among other things, from "maintaining any exclusive contract

relating to the distribution" of its search applications, including its general search engine (Google Search), its browser (Chrome), its virtual assistant software (Google Assistant), and its generative artificial intelligence application (Gemini). JA___(Rem.Op.3). Any contract providing revenue share payments for the distribution of these applications cannot run more than "one year." JA___(Rem.Op.4). And Google must allow its distribution partners, like Apple, to preload other default search applications on other search access points, meaning that search distribution contracts must allow distributors to preload a different general search engine in, for instance, private browsing mode. JA___-___(Rem.Op.3-4), JA___-___(Rem.Op.105-06).

By altering critical terms governing Google's search distribution contracts, the district court's remedy institutes the kind of contractual flexibility that Apple previously sought in 2009 and 2012. For the past decade, as explained above, the agreement between Apple and Google has made Google the exclusive out-of-the-box default search engine across Apple's search access points, and the agreement imposed five-year terms, preventing the parties from reaching alternative search distribution deals for extended periods of time. Now, under the district court's remedial decree, Apple has the flexibility it previously sought. Apple can contract with different search engines for different access points on Apple devices, and the parties can no longer bind themselves for half a decade at a time, thereby

instituting contractual flexibility and fostering annual competition for search distribution on Apple devices. When Apple's Senior Vice President of Services and Health, Eddy Cue, was asked whether Google's proposed final judgment—which likewise provided an annual right to consider different defaults—would "give Apple the flexibility and the ability to change the default on Safari," his testimony was clear. JA___(Rem.Tr.3842:6-10). He explained to the district court that "[t]here's no question" that a remedy affording Apple and Google an annual right to reconsider the terms of their contract would be "better than the current agreement" Apple has with Google. *Id.* (Rem.Tr.3842:6-12) (Cue). That is precisely what the district court ordered.

The district court acted well within its broad discretion to craft a decree "tailored to fit the wrong" identified in its liability opinion. *Microsoft*, 253 F.3d at 107. By preventing Google from contracting for exclusive default status across all search access points and ensuring annual flexibility, the district court has pried open competition and ensured that Apple will have the ability to continually reassess its search distribution strategy and consider, every year and on every access point, whether other search partners would be appropriate.

What is more, Apple has already explored—and contracted with—other search partners to offer its users high-quality search experiences on Apple devices. Apple is innovating and improving its on-device search options by working with

artificial intelligence companies to offer new and evolving options in addition to traditional general search. *See, e.g.*, JA___(Rem.Tr.3853:8-22) (Cue). This work reflects a competitive landscape for the next generation of search tools on Apple devices. Apple will continue to evaluate what kinds of integrations will best serve its users as these technologies continue to progress. And the district court's remedial decree offers needed and valuable flexibility to ensure open and active competition among search and artificial intelligence tools as Apple continues to explore partnerships and build products that connect its users to the best technologies available.

In short, the district court made real and material changes to Apple's relationship with Google in its remedial order. Those changes will have real-world effects on Apple's ability to evaluate competitors, and they offer Apple the benefit of flexibility in pursuing the best tools for its users.

## II. AN OUTRIGHT BAN ON SEARCH DISTRIBUTION PAYMENTS IS UNTENABLE AND WOULD BACKFIRE

The district court issued a tailored and meaningful remedial decree designed to open the competitive landscape, while protecting against unnecessary collateral harm to third parties. But Plaintiffs-Appellees now ask this Court to order a far more sweeping remedy: a total ban on Google's ability to share revenue with distributors, like Apple, who distribute Google Search to their users. This Court should reject that request. A payment ban would mean Apple would either distribute Google at

no cost, affording Google a massive windfall, or Apple would cease offering its users the highest quality product on the market, thereby harming consumer welfare and Apple's brand reputation. And the only justification for a payment ban would be that Apple would ostensibly develop its own search engine, but—as the record developed below established—Apple is invested elsewhere and has no plans to dedicate the substantial resources that would be required to compete in the general search market. The district court exercised its considered discretion to correctly reject a payment ban as unrealistic, short-sighted, and unnecessary. This Court should not disturb that finding.

### A. Prohibiting All Search Distribution Payments Would Benefit Google And Harm Competition

An outright ban on search distribution payments would leave Apple with two bad options, each of which would harm consumer welfare, Apple's users, and Apple itself.

*First*, faced with a ban on search distribution payments, Apple could continue to set Google as the default search engine on Apple's devices, but it would be required to grant Google the enormous benefit of distributing Google Search to Apple's user base—for free. The district court recognized that Apple's "day one" incentive is "to maintain Google . . . as the default, regardless of whether the payments are going to be made, because [Apple] want[s] to deliver the best search engine experience to [its] customers." JA___-___(Rem.Tr.2144:16-17,

2144:23-2145:3) (Dkt. 1405). As Eddy Cue testified in the remedial proceeding, Google remains "the best" search engine on the market, and Apple's "number one priority" is to put its users first. JA___(Rem.Tr.3819:1-4), JA___(Rem.Tr.3829:16-17). The result is that Apple would likely continue to make Google the out-of-the-box default even if "there was a remedy that prevented Google from paying Apple." *See id.* (Rem.Tr.3829:7-19). Even Plaintiffs-Appellees' expert witness agreed that Apple is incentivized "to keep Google because Google is better" and Apple "may not want to disrupt" the "user experience." JA___(Rem.Tr.2145:20-23).

As the district court correctly recognized, imposing a remedy banning search distribution payments would "likely advantage Google" because "distributors will have no real alternative." JA___(Rem.Op.121). "[B]ecause Google is the best search provider," distributors like Apple "will maintain it as the default [general search engine], if for no other reason than to avoid alienating their customers." *Id.* The result of a payment ban, therefore, would mean that Google "would continue to receive a disproportionate volume of search queries for a fraction of the cost." JA___(Rem.Op.122). And "[f]reed from having to pay billions in revenue share, Google's profits would *increase*." *Id.* As the district court recognized, "[n]ot paying Apple alone would result in a windfall worth tens of billions of dollars," and "Google

then could use those profits to improve its products and monetization, further propagating the network effects flywheel that has proven so difficult to disrupt." *Id.*

Apple agrees that instituting a remedy that would compel distribution of Google Search for free would only harm consumer welfare and exacerbate, rather than cure, the anticompetitive effects the district court identified in holding Google liable under Section 2 of the Sherman Act. Google currently pays Apple for distributing Google Search because Apple expends enormous resources developing and maintaining a successful platform connecting users with search engines. Google's search distribution payments "compensate[]" Apple, in short, "for the services that [it] render[s]." JA___(Rem.Tr.3824:17-20) (Cue). If Google were prohibited from making any search distribution payments—and if Apple were to continue setting Google as the default because that is in the best interests of Apple's users—the only consequence would be Google's receipt of a multi-billion-dollar windfall in the form of free search distribution. That result cannot be squared with this Court's instruction that antitrust remedies "must seek to '*unfetter* a market from anticompetitive conduct'" and "'deny to the defendant the fruits of its statutory violation.'" *Microsoft*, 253 F.3d at 103 (emphasis added) (citations omitted).

*Second*, faced with a payment ban, Apple could—at least in theory—cease distributing Google, which is the highest quality product in the marketplace. But that is no meaningful alternative at all: "At the end of the day, the customer will pick

where they want to search" and "most customers would pick Google because it is the best search engine." JA___(Rem.Tr.3826:16-19) (Cue). The district court explained that "Google is widely recognized as the best [general search engine] available in the United States." JA___(Liab.Op.46). And Apple prides itself on offering its users the very highest quality experiences available, including products that "are very simple," "clean," and that "work very, very well." JA___(Rem.Tr.3841:4-6) (Cue). Apple would not offer its users an inferior product by declining to distribute Google Search—it would "certainly be a bad thing for Apple to make a choice of not providing customers what the best choice is." JA___(Rem.Tr.3829:22-24).

The district court rightly declined to impose a remedy that would "harm consumer welfare." JA___(Rem.Op.126). Forcing the distribution of an inferior product to consumers would harm the market: "Consumer welfare is maximized when . . . consumers are assured competitive price *and quality*." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) (emphasis added); *see also United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993) (recognizing that "deterioration in quality of goods or services" is an "actual anticompetitive effect[]"). It would not bolster consumer welfare to limit access to the highest quality product in the marketplace. *See, e.g.*, Hunt Allcott et al., *Sources of Market Power in Web Search: Evidence from a Field Experiment* 4 (Nat'l Bureau of Econ.

Rsch., Working Paper No. 33410, rev. Feb. 2026), https://www.nber.org/system/files/working_papers/w33410/w33410.pdf (distributing Microsoft Bing as the default search engine instead of Google would "decrease [consumer surplus] by $73 per consumer per year").

**B. A Payment Ban Would Harm Apple's Users And Apple Itself**

Beyond the benefits to Google and harms to consumer welfare that would flow from a payment ban, such a remedy would also harm Apple's users and Apple itself. As the district court recognized, "even if distributors were, at some point, to select a different [general search engine] or [generative artificial intelligence] product to provide search functionality, without Google in the mix, they likely would earn less than they do now." JA___(Rem.Op.122). That is because "a sizeable number of users would switch back to Google, thereby reducing the revenue share a distributor could earn from the new provider" and also because "rivals would pay less than Google did to secure default or preferential placement." *Id.*

Apple and its users would face meaningful harms from an outright payment ban. Apple receives "a significant amount of money" from Google's search distribution payments. JA___(Rem.Tr.3831:3-6) (Cue). Apple uses that revenue to develop "new products and new capabilities" that serve Apple's users. *Id.* (Rem.Tr.3831:7-9). If Google is banned from providing Apple any compensation for distributing Google Search, that loss of revenue means that Apple will be able to

"do less." *Id.* (Rem.Tr.3831:19). Compensation for search distribution provides a stable revenue stream enabling Apple to have patience and confidence to invest in innovative and disruptive technologies, *see id.* (Rem.Tr.3831:3-9), such as artificial intelligence technologies to enable users to more seamlessly access their personal data, *see* Giannandrea Decl. ¶¶ 3-8 (Dkt. 1239). As the district court put it, a payment ban would mean "[f]ewer products and less product innovation from Apple." JA___(Rem.Op.124).

The district court properly crafted a remedy that avoids unleashing downstream harms on third-party distributors, like Apple, which use revenue from Google's search distribution payments to fund innovation that enhances consumer welfare. Courts crafting equitable remedies should consider whether a particular remedy would cause "third parties" to "suffer undue harm." *McPherson*, 797 F.2d at 1067. Here, the district court was able to craft a tailored remedy to pry open competition while avoiding the kind of drastic and uncertain effects that could stem from affording Google an enormous financial windfall at the expense of third parties. That approach hews to the typical limits on injunctive relief and respects this Court's guidance concerning the proper reach and scope of antitrust remedies.

### C. Plaintiffs-Appellees Provide No Justification For Their Punitive Payment Ban Remedy

Plaintiffs-Appellees repeatedly target Apple in their briefing before this Court, harping on Google's search distribution payments to Apple in particular.

*E.g.*, DOJ Br. 130-31; States' Br. 31-32. Plaintiffs-Appellees are fixated on Apple for a simple reason: As they have maintained throughout this litigation, they believe a payment ban is warranted because cutting off payments will incentivize "Apple [to] enter[] the general-search-services market" by creating its own search engine. DOJ Br. 130-31. But the record refutes the mistaken belief that absent search distribution payments, Apple would develop its own search engine. And Plaintiffs-Appellees offer no other justification for their proposal to target Apple with a sweeping remedy that would *benefit* Google, the only adjudicated monopolist in this case.

As Apple explained to the district court, Plaintiffs-Appellees have not always been clear about their reason for instituting a ban on Google's payments for search distribution. For instance, in attempting to defeat Apple's appeal in this Court of the district court's order denying Apple's motion to intervene, Plaintiffs-Appellees claimed that their proposed remedies did not seek "to force Apple to do anything," and they further stated that "[w]hether Apple enters the search market is Apple's business and does not affect the 'success'" of the remedy Plaintiffs-Appellees proposed. Pls.' Resp. Br. 63, *United States v. Google LLC*, No. 25-5016 (D.C. Cir. Feb. 26, 2025). But Plaintiffs-Appellees have no other explanation for their proposal to ban search distribution payments altogether, and their briefing in this appeal expressly targets Apple by repeatedly emphasizing Apple's incentives in light of

Google's search distribution payments. What is more, Plaintiffs-Appellees' expert confirmed that the payment ban remedy is designed to "increase the chance of entry into general search, especially by Apple." JA___(Rem.Tr.2141:13-15); *see also* JA___(Rem.Tr.2188:12-14). In short, the only explanation for Plaintiffs-Appellees' focus on banning Google from paying for search distribution whatsoever is that Apple will respond by building its own search engine.

That justification is wholly unsupported by the record and does not accord with Apple's priorities or market realities. The uncontroverted testimony at trial—and a declaration Apple submitted by John Giannandrea, Apple's former Senior Vice President of Machine Learning and AI Strategy—confirm that Apple has no plan to build a general search engine. As Mr. Cue testified, Apple "understand[s]" that the district court viewed Google's search distribution payments as a disincentive for Apple to build its own general search engine. JA___(Rem.Tr.3825:15-20) (Cue). But Apple and Google have contracted for search distribution for over two decades, and even when Google paid just a small fraction of what it pays for distribution of Google Search, Apple has "never" been "interested in doing a search engine." *Id.* (Rem.Tr.3825:21-25). That is for a simple reason: "Google does an amazing job." JA___(Rem.Tr.3826:9-10). And Google has developed a "skill set" and core "competency" in this area that Apple has not. *Id.* (Rem.Tr.3826:10-12).

Moreover, it is extremely expensive and resource-intensive to build a search engine. "Developing just the technical infrastructure alone requires billions of dollars," and more billions are required to "maintain[] a fully-integrated [search engine]." JA___(Liab.Op.22). Apple would need to make "considerable investments in an expansion of Apple's data acquisition, engineering, and advertising efforts" to build and run a search engine. Giannandrea Decl. ¶ 10 (Dkt. 1239). And "building the kind of advertising business necessary to monetize a general search engine would be an enormous, years-long undertaking." *Id.*; *see also* Declaration of Eddy Cue in Support of Apple Inc.'s Motion to Intervene ¶¶ 7-8 (Dkt. 1111-1).

Now is not the time for Apple to make the kinds of extensive investments required to build a competing search engine. As the district court correctly recognized, "[t]oday, established technology companies are making, and start-ups are receiving, hundreds of billions of dollars of capital to develop GenAI products that pose a threat to the primacy of traditional internet search." JA___(Rem.Op.127). These new companies "already are in a better position, both financially and technologically, to compete with Google than any traditional search company has been in decades." JA___(Rem.Op.128). There has never been an opportune time for Apple to develop a general search engine given its competing priorities elsewhere, but that is especially true today given the new slate of

companies seeking to revolutionize search by developing new artificial intelligence products. As Mr. Cue testified, "for the first time" in many decades, Apple is seeing users turn to new, potentially "formidable competitors" as the number of searches in Safari is dropping. JA___-___(Rem.Tr.3818:20-3819:4). Regardless of whether it ever made sense for Apple to consider investing in general search, it certainly does not make sense today.

Apple, in any event, is invested elsewhere, and is creating new products to help users access their personal data through artificial intelligence tools. *See* Giannandrea Decl. ¶¶ 3-8 (Dkt. 1239). These products take "time" and "energy," JA___(Rem.Tr.3833:4-6) (Cue), and diverting billions of dollars to now create a general search engine would consume "valuable human resources . . . in pursuit of a general search engine product" that would offer only "minimal incremental value to users," Giannandrea Decl. ¶ 9 (Dkt. 1239). Other companies with resources similar to Apple, like Microsoft, have tried to "out-Google Google" for decades without much success. *See* JA___(Rem.Tr.3869:21-22). Apple is not planning to divert valuable resources to pursue building a general search engine when search is rapidly changing.

Plaintiffs-Appellees do not respond to these arguments, which Apple advanced in the district court and which make clear that their proposed payment ban remedy would not accomplish its desired end. They merely assert that Apple would

enter search if a payment ban were instituted. But the reality is that Apple distributes Google because it best serves Apple's users, and Apple is invested in other revolutionary products that are far more likely to materially improve the user experience than yet another search engine.

Nor are Plaintiffs-Appellees right to contend that the district court somehow shirked its responsibility under the Supreme Court's decision in *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961). As Plaintiffs-Appellees see it, the district court "never answered whether a payment ban was necessary to effectively restore competition—the 'key' question before the court." Plaintiffs-Appellees' Br. 129 (citing *du Pont*). But the district court repeatedly invoked *du Pont*, acknowledging that the "harshness of a remedy is not reason alone to reject it." JA___(Rem.Op.62) (citing *du Pont*, 366 U.S. at 327). After carefully parsing potential remedies and the record, the court concluded that other remedies—such as data syndication and the contractual limitations on distribution agreements—were appropriate to restore competition in response to Google's violation of Section 2. *See supra* at 2, 9-12. And the district court concluded that a payment ban was far from "necessary to effectively restore competition" because such a ban would *benefit* Google. *See* JA___(Rem.Op.122). Nothing about the district court's careful analysis of the particular circumstances here offends *du Pont*.

### D. A Ban On Search Distribution Payments Would Exceed The Scope Of The Liability Ruling

Plaintiffs-Appellees' proposal to institute a total ban on search distribution payments also cannot be squared with the district court's liability findings. Plaintiffs-Appellees based their case around Google's use of *exclusive* arrangements in distributing Google Search, alleging "that Google had violated Section 2 of the Sherman Act by unlawfully maintaining its monopoly . . . by entering into exclusive agreements to secure default distribution on nearly all desktop and mobile devices in the United States." JA___(Liab.Op.5). The district court focused on the exclusive nature of Google's distribution agreements, too, recognizing that "Google pays Apple a share of its search ads revenue in exchange for Apple preloading Google as the exclusive, out-of-the-box default [general search engine] on its mobile and desktop browser, Safari." JA___(Liab.Op.101). And the district court concluded that Google violated Section 2 "by maintaining its monopoly in two product markets in the United States—general search services and general text advertising—through its *exclusive* distribution agreements." JA___(Liab.Op.276) (emphasis added).

The district court's remedial decree is tailored to the violation it identified: Google's use of *exclusive* dealing arrangements. By prohibiting Google from contracting for exclusive default status and imposing a one-year limitation on its search distribution contracts, the district court "tailored" the "remedy" to "the harm shown." *Gulf Oil Corp. v. Brock*, 778 F.2d 834, 842 (D.C. Cir. 1985). Any broader

remedy would impose relief that is "more burdensome . . . than necessary." *Califano*, 442 U.S. at 702. An outright ban on search distribution payments does not attack Google's agreements for being *exclusive*—it attacks any kind of search distribution agreement with Google. The district court properly tailored its remedy to focus on the exclusive nature of Google's agreements. That remedy is consistent with injunctive relief principles and well-supported by the record in this case.

* * *

The district court crafted a careful, tailored, and appropriate remedy to address Google's violation of Section 2. That remedy will encourage more competition and loosen Google's grip on search distribution contracts. By contrast, Plaintiffs-Appellees' extreme proposal to institute an outright ban on search distribution payments is deeply misguided and likely to backfire by benefiting Google at the expense of third parties. The only conceivable justification for such a remedy—that Apple will build a search engine—is wholly unsupported by the

record evidence. The district court properly declined to impose an outright ban on distribution payments. There is no basis for this Court to set aside that finding.

## CONCLUSION

To the extent the Court affirms the district court's liability ruling, the Court should affirm the district court's remedies decision insofar as the district court rejected a ban on search distribution payments.

August 25, 2026

Respectfully submitted,

*/s/ Gregory G. Garre*

Gregory G. Garre
*Counsel of Record*
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

Ben Harris
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

Sarah M. Ray
Aaron T. Chiu
Sylvia Zhang
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111

*Counsel for Amicus Curiae Apple Inc.*

**CERTIFICATE OF COMPLIANCE WITH RULE 32**

1. This document complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) and Circuit Rule 28(c) because this document contains 5,696 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman Font.

*/s/ Gregory G. Garre*
Gregory G. Garre

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2026, I caused the foregoing brief to be filed electronically with the Clerk of Court using the CM/ECF system, which will send a notification to the attorneys of record in this matter who are registered with the Court's CM/ECF system.

*/s/ Gregory G. Garre*
Gregory G. Garre