**PUBLIC COPY – SEALED MATERIAL DELETED**

ORAL ARGUMENT NOT YET SCHEDULED

No. 26-5023
Consolidated with Nos. 26-5047, 26-5049

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

UNITED STATES OF AMERICA, *ET AL.*,

*Plaintiffs-Appellees-Cross-Appellants*,

v.

GOOGLE LLC,

*Defendant-Appellant-Cross-Appellee*.

On Appeal from the United States District Court
for the District of Columbia
No. 20-cv-3010 (APM), No. 20-cv-3715 (APM) (Honorable Amit P. Mehta)

# BRIEF OF SAMSUNG ELECTRONICS CO., LTD. AS *AMICUS CURIAE* IN SUPPORT OF NEITHER PARTY

JUAN A. ARTEAGA
ROSA M. MORALES
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5300
juan.arteaga@sidley.com
rosa.morales@sidley.com

*Counsel for Amicus Curiae Samsung Electronics Co., Ltd.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), amicus curiae Samsung Electronics Co., Ltd. ("Samsung") certifies as follows:

### A. Parties and Amici Curiae

All parties, intervenors, and amici appearing before the District Court and in this Court are listed in Plaintiffs' Certificate as to Parties, Rulings, and Related Cases (App. Dkt. 2160541), except that an amicus brief was also filed in the District Court by Public Knowledge, and in this Court the following parties have filed amicus briefs or notices of intent to file amicus briefs: Brave Software, Inc.; Washington Legal Foundation; Apple Inc.; Mozilla Corporation; Terry Calvani, William Kolasky; Abbott B. Lipsky, Joe Sims; Law & Economics Scholars; Alden Abbott; Gregory Werden; Economists and Legal Scholars; Hunt Allcott, Matthew Gentzkow; OpenAI OpCo, LLC; SerpApi, LLC; American Economic Liberties Project; Microsoft Corporation; Little Tech Association, Travel Lemming LLC; DuckDuckGo, Inc.; Public Knowledge; American Antitrust Institute; Antitrust Law, Economics, and Business Professors; Bipartisan Technology Policy Experts; Economics and Business Professors; Economics and Legal & Technology Scholars; Open Markets Institute; and W. Stephen Westermann.

**B. Rulings Under Review**

The rulings at issue are identified in the Parties' Certificates as to Parties, Rulings, and Related Cases (App. Dkts. 2164028, 2160541).

**C. Related Cases**

A list of related cases appears in the Parties' Certificates as to Parties, Rulings, and Related Cases (App. Dkts. 2164028, 2160541).

/s/ Juan A. Arteaga
Juan A. Arteaga

*Counsel for Amicus Curiae*
*Samsung Electronics Co., Ltd.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, amicus curiae Samsung certifies that Samsung is a publicly held corporation organized under the laws of the Republic of Korea. Samsung has no parent corporation and no publicly held corporation owns 10% or more of Samsung's stock.

/s/ Juan A. Arteaga
Juan A. Arteaga

*Counsel for Amicus Curiae*
*Samsung Electronics Co., Ltd.*

## STATEMENT REGARDING CONSENT TO FILE, SEPARATE BRIEFING, AND AUTHORITY TO FILE

Pursuant to D.C. Circuit Rule 29(b), amicus curiae Samsung states that all parties have consented to Samsung's participation as amicus curiae and that this Court's May 29, 2026 Order (App. Dkt. 2175743) authorized Samsung to file the instant amicus brief addressing issues raised in Plaintiffs-Appellees-Cross-Appellants' cross-appeals.

Pursuant to D.C. Circuit Rule 29(d), amicus curiae Samsung states that a separate brief is necessary because Samsung's views on the issues before this Court are distinct from those set forth in the parties' briefing and those submitted by other amici curiae.

As the leading manufacturer of mobile devices that utilize the Android Operating System ("OS") and a distributor of search engines, Samsung has unique insights into competition, innovation, and consumer welfare in the general search engine market that can significantly assist this Court's review of the District Court's remedies rulings. Among other things, Samsung can detail how Plaintiffs' proposal to bar Google from compensating distributors of Google Search, Chrome, or its generative artificial intelligence ("GenAI") products would gravely harm search engine, smartphone, browser, and GenAI competition and innovation in the United States, deprive Samsung of the revenue needed to help fund the billions of dollars that it spends annually on research and development ("R&D") in its mobile business

unit, and leave consumers with fewer mobile device options and features while paying higher prices.

Samsung files this amicus brief under Federal Rule of Appellate Procedure 29(a) and D.C. Circuit Rule 29.

/s/ Juan A. Arteaga
Juan A. Arteaga

*Counsel for Amicus Curiae*
*Samsung Electronics Co., Ltd.*

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amicus curiae Samsung states that:

i. no party's counsel authored the brief in whole or in part;

ii. no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and

iii. no person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

/s/ Juan A. Arteaga
Juan A. Arteaga

*Counsel for Amicus Curiae*
*Samsung Electronics Co., Ltd.*

## TABLE OF CONTENTS


INTEREST OF AMICUS CURIAE .......... 1

SUMMARY OF ARGUMENT .......... 2

RELEVANT FACTUAL BACKGROUND .......... 5

A. Samsung's Pro-Competitive Smartphone Business Model .......... 5

B. The Google Partnership Helps Samsung Compete By Providing Access To A Best-In-Class Mobile Operating System And App Store .......... 8

C. Samsung's Search RSA Promotes Smartphone Competition And Innovation .......... 9

D. Samsung's Gemini Contract Promotes Smartphone Competition And Innovation .......... 12

E. Samsung's RSA And Gemini Contract Have Not Prevented It From Preloading And Distributing Non-Google GenAI Tools .......... 15

ARGUMENT .......... 16

I. The District Court Did Not Abuse Its Discretion When Rejecting The Distribution Payment Ban .......... 16

A. The District Court's Comprehensive Remedies Package Rendered A Distribution Payment Ban Unnecessary .......... 18

B. The District Court Correctly Held That The Distribution Payment Ban Would Harm, Rather Than Promote, Search Engine Competition .......... 23

C. The District Court Appropriately Avoided The "Crippling" Harm That The Distribution Payment Ban Would Inflict On Search Engine Distributors .......... 25

D. Google's Search And AI Competitors Can Secure Distribution Without A Payment Ban .......... 27

CONCLUSION .......... 31

CERTIFICATE OF COMPLIANCE .......... 32

CERTIFICATE OF SERVICE .......... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices & Antitrust Litig.*,
44 F.4th 959 (10th Cir. 2022) ....................20

*Ford Motor Co. v. United States*,
405 U.S. 562 (1972) ....................16

*Int'l Salt Co. v. United States*,
332 U.S. 392 (1947) ....................16

*Massachusetts v. Microsoft Corp.*,
373 F.3d 1199 (D.C. Cir. 2004) ....................3, 5, 17

*Md. & Va. Milk Producers Ass'n, Inc. v. United States*,
362 U.S. 458 (1960) ....................16

*NCAA v. Alston*,
594 U.S. 69 (2021) ....................5, 17

*United States v. E.I. du Pont de Nemours & Co.*,
366 U.S. 316 (1961) ....................4, 17, 27

*United States v. Google LLC*,
747 F. Supp. 3d 1 (D.D.C. 2024) ....................9, 11, 13, 14

*United States v. Google LLC*,
803 F. Supp. 3d 18 (D.D.C. 2025) ....................2, 4, 11, 17-20, 23, 25, 28

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ....................3, 22

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012) ....................20

# GLOSSARY

| | |
|---|---|
| Apps | Software applications |
| Distribution Payment Ban | Plaintiffs' proposal to bar Google from compensating distributors of Google Search, Chrome, and its GenAI products |
| GenAI | Generative Artificial Intelligence |
| GSE | General Search Engine |
| OS | Operating System |
| R&D | Research and Development |
| RSA | Revenue Share Agreement |

## INTEREST OF AMICUS CURIAE

Samsung is a multinational company that designs, develops, manufactures, and sells cutting-edge consumer electronics, such as its Galaxy S smartphones, and innovative software and services, such as the Galaxy Store, Samsung Browser, and Bixby Assistant. Samsung is also the leading manufacturer of mobile devices that utilize the Android OS in the United States and abroad.

Moreover, Samsung has emerged as a leader in bringing GenAI technology to mobile devices through its Galaxy AI service and its partnerships with multiple leading GenAI developers.

Samsung submits this brief to assist this Court's review of the District Court's decision rejecting Plaintiffs' proposal to bar Google from compensating distributors of Google Search, Chrome, or its GenAI products ("Distribution Payment Ban"). Samsung has a strong interest in this issue because the ban, if adopted, would significantly harm Samsung's customers and its ability to compete in U.S. smartphone markets by offering the best products and services on its devices; prevent Samsung from offering users the best out-of-the-box search engine experience; deprive Samsung of the revenue needed to continue developing and launching innovative mobile devices with market-leading features and privacy/security protections; and force Samsung to reduce its mobile device offerings, increase consumer prices, or both.

## SUMMARY OF ARGUMENT

Immediately after the District Court's remedies decision, Plaintiffs proclaimed they "won significant remedies in their monopolization case against Google" that "will pry open the market for general search services" and "'restore competition for millions of Americans[.]'"[1] Yet, in their cross-appeal, Plaintiffs now accuse the District Court of breaching its duty to order effective remedies because it rejected the Distribution Payment Ban. None of Plaintiffs' arguments support their new position, let alone satisfy their heavy burden to show that the District Court abused its discretion.

Plaintiffs' cross-appeal primarily rests on the assertion that the District Court erred by failing to "determine[] whether a payment ban was needed for complete and effective relief." DOJBr_6. This assertion lacks merit. In its remedies decision, the District Court expressly considered the Distribution Payment Ban's potential competitive benefits but ultimately concluded that this remedy "would not promote competition and in fact would likely advantage Google, at least in the short term." *United States v. Google LLC ("Google II")*, 803 F. Supp. 3d 18, 103 (D.D.C. 2025). Specifically, the District Court concluded that the ban would permit Google to "continue to receive a disproportionate volume of search queries for a fraction of the

---

[1] *Department of Justice Wins Significant Remedies Against Google*, U.S. Dep't of Just. Press Release (Sept. 2, 2025), https://www.justice.gov/opa/pr/department-justice-wins-significant-remedies-against-google.

cost" because distributors seeking to offer the best user experience would likely retain Google as the out-of-the-box search default even without compensation. *Id.* "Freed of having to pay billions in revenue share, Google's profits would *increase*" and "Google then could use those profits to improve its products and monetization, further propagating the network effects flywheel that has proven so difficult to disrupt." *Id.* at 103-04.

The District Court further concluded that the Distribution Payment Ban would harm consumer welfare and reduce price competition in the general search engine market—a direct harm to competition in the market at issue in this case based on factual findings made by the District Court not challenged by Plaintiffs on appeal. *Id.* at 104-06.

A district court clearly does not abuse its discretion by rejecting a remedy that it finds would preserve the challenged monopoly, harm consumer welfare, and reduce rivals' incentives to compete. *United States v. Microsoft Corp.* ("*Microsoft I*"), 253 F.3d 34, 103 (D.C. Cir. 2001) (Section 2 remedies must "unfetter a market from anticompetitive conduct"); *Massachusetts v. Microsoft Corp.* ("*Microsoft II*"), 373 F.3d 1199, 1209-13, 1219, 1226-27 (D.C. Cir. 2004) (rejecting various remedies that would have harmed consumers and reduced rivals' incentives to innovate).

Plaintiffs also assert that the District Court wrongly considered the "potential harm to Google's business partners and, in turn, the possibility of 'downstream

effects' in other markets" when rejecting the Distribution Payment Ban. DOJBr_6-7. Controlling precedent refutes that argument: the Supreme Court has long instructed district courts to craft remedies that effectively redress an antitrust violation while causing "'as little injury as possible to the interest of the general public'" and showing "'proper regard for the vast interests of private property[.]'" *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 327-28 (1961) (citation omitted). That is precisely what the District Court did.

As detailed below, the District Court crafted a comprehensive remedies package that redressed the competitive effects of Google's conduct and positioned rivals to compete on the merits. In doing so, the District Court considered whether the Distribution Payment Ban would help promote search engine competition and concluded it would not. The District Court also considered the ban's likely impact on consumer welfare. On that point, the District Court correctly concluded that the ban would significantly harm consumer welfare because it would likely result in lower quality default search engines, "[l]ost competition and innovation from small browser developers," "[f]ewer products and less product innovation from Apple," "[l]ess investment in the U.S. market by Android OEMs, which would reduce competition in the U.S. mobile phone market with Apple," and "[h]igher mobile phone prices and less innovative phone features." *Google II*, 803 F. Supp. 3d at 104-05.

The District Court rightly avoided these unnecessary harms—which Plaintiffs "acknowledge[d]" could occur, *id.*—because it is well-settled that courts "must be sensitive to" remedies that "could wind up impairing rather than enhancing competition" by, for example, "unintentionally suppress[ing] innovation" or "harm[ing] consumers." *NCAA v. Alston*, 594 U.S. 69, 102 (2021); *Microsoft II*, 373 F.3d at 1209-13, 1219, 1226-27.

Finally, any suggestion that the absence of the Distribution Payment Ban would prevent Google's search and GenAI rivals from securing distribution on Samsung mobile devices is demonstrably false. After the remedies decision, Samsung entered a multifaceted partnership with Perplexity, which resulted in Samsung (i) preloading and deeply integrating Perplexity's AI assistant on its most recently launched smartphone series (Galaxy S26) and enabling users to easily launch this assistant with an audio prompt ("Hey, Plex") or side-button long press; and (ii) integrating Perplexity's AI technology into multiple search functions in the Samsung Browser and Bixby Assistant.

## RELEVANT FACTUAL BACKGROUND

### A. Samsung's Pro-Competitive Smartphone Business Model

"Guided by the value of open collaboration, Samsung joined forces with [Google's] Android [OS in the late 2000s] to push the frontier of mobile

technology[.]"[2] In 2010, this partnership resulted in the launch of Samsung's first Galaxy S series device, which was "[p]acked with best-in-class technology" and "created the blueprint for a mobile experience that enriches and simplifies everyday life."[3] Since then, Samsung has "cement[ed] [its] status as a pioneer in the smartphone industry" by creating new device categories (*e.g.,* foldables; Galaxy Note with S Pen), introducing ultra-slim hardware designs with larger, brighter, and curved screen displays, and being the first manufacturer to offer face recognition, 5G connectivity, water resistance, and a health software app.[4] More recently, Samsung has led the efforts to "fully unlock the benefits of AI technology" on smartphones through its Galaxy AI service—"Samsung's cutting-edge artificial intelligence" feature "designed to make [users'] interactions with Samsung devices more intuitive, efficient, and personalized."[5]

---

[2] *A Journey of Mobile Innovation*, Samsung Newsroom (Jan. 11, 2019), https://news.samsung.com/global/a-journey-of-mobile-innovation.

[3] *Id.*

[4] *Id.*; *How Samsung Galaxy Has Rewritten Smartphone History in 10 Innovative Technologies*, Samsung Press Release (Feb. 9, 2022), https://news.samsung.com/global/how-samsung-galaxy-has-rewritten-smartphone-history-in-10-innovative-technologies.

[5] *Samsung Solidifies its Mobile AI Leadership at MWC 2025: From Galaxy AI to Software-Centric Networks*, Samsung Press Release (Mar. 2, 2025), https://www.samsungmobilepress.com/press-releases/samsung-solidifies-its-mobile-ai-leadership-at-mwc-2025-from-galaxy-ai-to-software-centric-networks; *What is Galaxy AI*, Samsung Website (last visited Aug. 28, 2026), https://www.samsung.com/uk/mobile-phone-buying-guide/what-is-galaxy-ai/.

To achieve these and other innovative breakthroughs, Samsung has invested billions of dollars and millions of engineering hours in R&D. In 2025 alone, Samsung invested [redacted] into R&D for its mobile business.

In addition to being an innovation leader, Samsung has broadened the pricing and product options for consumers. Unlike Apple, which focuses exclusively on "a more expensive [premium] segment of the [] smartphone market,"[6] Samsung offers consumers a broad array of devices ranging from entry-level smartphones costing about $150 to premium, business/enterprise-focused devices costing nearly $2,000. KimDep_24:8-23.

This consumer-friendly business model, however, has resulted in Samsung having higher production costs than Apple because Samsung must purchase a "[v]ariety of chipsets and components" tailored to each device line's unique design and capabilities. KimDep_24:24-25:8, 214:5-23.[7] Coupled with Samsung's lower prices, these higher production costs have contributed to Samsung's "very thin" device margins. KimDep_24:24-25:8, 214:5-23. For example, Samsung's device margins are [redacted] whereas Apple's device margins are "more than

---

[6] First Am. Compl. ¶ 22, *United States et al. v. Apple Inc.*, No. 2:24-cv-04055, ECF #51 (D.N.J.) ("DOJAppleCompl.").

[7] KimDep_214:5-13 ("[W]e're playing at the premium segment, and Apple is all premium segment, and that's where the U.S. market is mainly residing. But we also . . . play in a lower [margin] segment to provide options for the U.S. customers . . . [which] increases the cost for us.").

30 percent," which is "more than double those of others in the industry." KimDep_44:7-8; DOJAppleCompl. ¶¶ 5, 20. Because Samsung's device margins are "very thin," the revenue that it receives from mobile partnerships has become increasingly important to its ability to compete and innovate. KimDep_24:24-25:8.[8]

### B. The Google Partnership Helps Samsung Compete By Providing Access To A Best-In-Class Mobile Operating System And App Store

"The most important software component [in] a smartphone[] [is the] [OS]," which serves as "the foundational software that manages both the hardware and other software programs on the device." DOJAppleCompl. ¶ 158. For example, mobile software applications ("apps") "depend on a smartphone's [OS]" to perform requested tasks and "access various hardware components on the phone, such as the camera, microphone, and speaker." *Id.*

Through its Google partnership, Samsung receives access to the Android OS, which enables Samsung devices to seamlessly deploy cutting-edge technology while offering consumers market-leading security features. Importantly, Samsung does not have to pay a licensing fee to build its smartphones on the Android OS, which keeps Samsung's production costs down, permitting Samsung to offer consumers

---

[8] *Samsung Electronics Announces Second Quarter 2026 Results*, Samsung Press Release (July 30, 2026) (mobile business had approximately $506 million operating loss in Q2 2026 "due to elevated cost pressures across the industry"), https://news.samsung.com/global/samsung-electronics-announces-second-quarter-2026-results.

lower prices and greater device features, and to make greater investments in R&D.

Samsung's Google partnership also provides access to the Play Store, which is "essential to the Android customer experience" because it "support[s] the functionality of all Android [apps]" and "'allow[s] customers to [easily] access the apps that they want to have [o]n their device[.]'" *United States v. Google LLC* ("*Google I*"), 747 F. Supp. 3d 1, 98, 150 (D.D.C. 2024) (quotation marks and citation omitted).[9] [redacted]

**C. Samsung's Search RSA Promotes Smartphone Competition And Innovation**

Since launching its first smartphone in 2010, Samsung has selected Google as the default for search access points on its Android devices because "Google has the best service" in the United States and abroad. KimDep_30:13-14, 41:9-12. As

[9] *Google I*, 747 F. Supp. 3d at 98 ("The Play Store . . . contributes significantly to the user experience."); *id.* at 150 ("[W]ithout the Play Store, the 'phone is a brick.'" (citation omitted)).

[redacted]

Samsung's Corporate Executive Vice President and Head of the Products and Experiences Office, Jay Kim, testified, Samsung must provide users the best out-of-the-box search experience because "one of the things that [consumers] do most [on their smartphones] is searching [the internet]." KimDep_30:3-19.

Over the years, Samsung has considered setting Bing as the default for Android device search access points but has concluded each time that consumers view "Google Search [as] . . . a better product." KimDep_32:8-11. This conclusion has been supported by the fact that all Samsung personal computers built on Microsoft's Windows OS have "Bing and Edge [set] as [the] default service," as required by Microsoft's Jumpstart program, but many "[consumers] still use Google Search as their primary search engine." KimDep_32:12-33:2.

In 2023, Samsung again considered a search partnership with Microsoft, which was promoting an AI-enhanced "New Bing." Samsung ultimately determined that "New Bing" was not "a compelling product . . . to bring to Samsung users" because Microsoft could not clearly explain whether "New Bing" would function as an AI-powered search engine competing with Google Search or as an AI tool competing with ChatGPT. KimDep_36:3-37:10, 39:23-40:16.

In addition to product quality, Samsung has selected Google as the default for Android device search access points because Google, as "the best search engine," "provides the best bet for monetizing [search] queries," *Google I*, 747 F. Supp. 3d

at 144, which is critically important to Samsung's ability to compete in smartphone markets. As Mr. Kim testified, Samsung uses its search revenue to help fund the billions of dollars that Samsung invests each year in R&D and marketing "to keep up with the competition." KimDep_21:23-22:19, 42:16-43:22. As Mr. Kim also testified, Samsung's search revenue plays a critical role in its ability to offer consumers the lowest prices possible and cover the higher costs associated with producing a broad array of devices with different functionalities. KimDep_23:22-25:13, 214:5-23.[11]

Moreover, Samsung's Google partnership has enabled it to develop innovative search functionalities for Samsung devices. For example, Samsung engineers worked with Google engineers to create "Circle to Search" for the Galaxy S24 series, which enables users to conduct searches by circling an image without needing to type any text. KimDep_93:11-21, 149:13-20. This search service has gained widespread usage on Samsung devices designed with this functionality. KimDep_223:13-22.

While recognizing Google's product superiority, Samsung has preserved its freedom to work with other search engine providers by consistently securing the contractual right to select different providers on a device-by-device basis.

[11] Under its Google partnership, Samsung receives payments that help cover the marketing costs associated with seeking to convert iPhone users to Android users. RDX0435_343-45.

JX0071_399; PXR0608_046. Moreover, in recent revenue share agreements ("RSA"), Samsung expanded this freedom by securing express non-exclusivity provisions and the right to select different search providers for different access points on the same device. PXR0608_049, 061-69.

### D. Samsung's Gemini Contract Promotes Smartphone Competition And Innovation

Consistent with its longstanding commitment to open collaboration, Samsung adopted a "philosophical approach [of] openness" when it began considering integrating GenAI technology on its mobile devices. KimDep_58:8-61:5.[12] Samsung concluded that such an open approach offers the best user experience and enhances the competitiveness of Samsung devices. KimDep_58:8-61:5, 78:6-83:1. Consequently, Samsung has invested significant financial and engineering resources to ensure its devices can deeply integrate multiple GenAI services and thereafter allow for their maximum deployment when selected by users. KimDep_48:12-49:15, 58:8-64:19, 69:19-70:13.

In addition, Samsung has actively pursued partnerships with multiple leading GenAI providers. For instance, before entering its Gemini deal with Google in November 2024, Samsung discussed potential preload agreements with OpenAI and

[12] RDX0365_091 ("[W]ith respect to AI, it is necessary to take three approaches. 1. Cooperation with various partners such as Google/MS etc. Need to open all possibilities[.]").

Microsoft for the then-forthcoming Galaxy S25 series and subsequent series. KimDep_61:17-63:7. During these discussions, Samsung made clear that its Google partnership was not an obstacle. Thus, when "OpenAI initially thought that collaborating with Samsung [mobile] seemed unlikely due to its relationship with Google," "Samsung clarified that collaboration is possible" and that it was "targeting 2025" for a partnership. RDX0366_291, 293. Samsung likewise told Microsoft that it was pursuing "Multi-AI on Galaxy" and "[o]ther AI assistants can ***co-exist with Gemini*** thru Samsung's own access points such as side-key long-press, keyboard etc." RDX0367_173. Samsung told every potential partner, including Google, that there would be absolutely "[n]o [AI] exclusivity." *Id.*

To kickstart contract negotiations, Samsung provided term sheets to OpenAI and Microsoft, which left open for future discussion key financial terms. KimDep_93:25-95:19, 98:9-99:15, 105:25-107:3; RDX0368_170-75. [redacted]

[redacted]

Samsung ultimately selected Gemini as the promoted GenAI service for its S25 series because it was the "best" product that met Samsung's product specifications and timing requirements as it sought to respond to Apple's earlier integration of ChatGPT on iPhones. KimDep_57:13-23, 83:2-19.

However, to ensure it could pursue its announced multi-AI partner strategy, Samsung secured an express non-exclusivity provision, device-by-device and access-point-by-access-point election provisions, and an early termination for convenience provision. RDX0432_368, 371, 375.[14] Furthermore, Samsung ensured that its RSA would play no role in its GenAI partnership decisions by securing a provision that prevented the reduction of its search revenue based on its decision to partner with a Google GenAI rival. *Id.*

---

[redacted]

[14] KimDep_70:22-25 ("[Under this non-exclusivity provision], Samsung has [the] option to work with any other [GenAI] companies for our devices[.]"); KimDep_68:12-21 (Samsung has "option" to not preload Gemini on any device line).

### E. Samsung's RSA And Gemini Contract Have Not Prevented It From Preloading And Distributing Non-Google GenAI Tools

After entering the Gemini contract, Samsung continued exploring partnerships with various other GenAI providers, including OpenAI and Microsoft. KimDep_60:24-61:5. Those discussions led to a multifaceted partnership with Perplexity after the District Court rejected the Distribution Payment Ban.

Under this partnership, Samsung deeply integrated Perplexity's AI assistant at the OS-level (alongside Google's Gemini assistant) in its latest smartphone series (Galaxy S26), which launched in February 2026. In doing so, Samsung preloaded Perplexity's AI assistant and designed the S26 series to enable users to easily launch this assistant through an audio prompt ("Hey, Plex") or side-button long press.[15]

In addition, Samsung actively promoted the use of Perplexity's AI assistant through a yearlong free Pro tier subscription for smartphone, tablet, and television customers.[16] Moreover, Samsung "upgraded" its Bixby Assistant "to operate as a conversational device agent" that utilizes Perplexity's AI technology to conduct "real-time web search[es]" that provide users with immediate "access [to] live and

---

[15] *How to use Perplexity on the Samsung Galaxy S26 Series*, Samsung website (last visited Aug. 28, 2026), https://www.samsung.com/levant/support/mobile-devices/how-to-use-perplexity-on-the-samsung-galaxy-s26-series/.

[16] Janhoi McGregor, *Galaxy S26 Ultra Release Date: Samsung's Free Offer Now Makes Sense*, Forbes (Dec. 30, 2025), https://www.forbes.com/sites/jaymcgregor/2025/12/30/samsung-galaxy-phone-bixby-perplexity-integration-galaxy-s26/.

up-to-date information[.]"[17] Similarly, Samsung upgraded the Samsung Browser to include a new AI-powered assistant through Perplexity which provides users "**[a] faster, smarter way to Search**" the internet.[18]

The revenue that Samsung receives from its GenAI partnerships helps cover the significant investments that Samsung is making into integrating GenAI technology into its mobile devices.

## ARGUMENT

### I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN REJECTING THE DISTRIBUTION PAYMENT BAN

The Supreme Court has long held that district courts are "clothed with 'large discretion'" when crafting antitrust remedies. *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) (citation omitted).[19] Consequently, this Court "review[s] the

[17] *Samsung introduces the New Bixby in One UI 8.5*, Samsung Press Release (Feb. 20, 2026), https://www.samsungmobilepress.com/articles/bixby-one-ui-8-5-conversational-device-agent.

[18] *Samsung Takes Its Browser Beyond Mobile, Extending Agentic AI Across Devices*, Samsung Press Release (Mar. 26, 2026), https://news.samsung.com/global/samsung-takes-its-browser-beyond-mobile-extending-agentic-ai-across-devices.

[19] *Md. & Va. Milk Producers Ass'n, Inc. v. United States*, 362 U.S. 458, 473 (1960) ("The formulation of [antitrust] decrees is largely left to the discretion of the trial court[.]"); *Int'l Salt Co. v. United States*, 332 U.S. 392, 400-01 (1947) ("The framing of [antitrust] decrees should take place in the District rather than in Appellate Courts. They are invested with large discretion to model their judgments to fit the exigencies of the particular case.").

district court's decision whether to grant [antitrust remedies] only for abuse of discretion." *Microsoft II*, 373 F.3d at 1207.

As detailed below, the District Court properly exercised its discretion when rejecting the Distribution Payment Ban because:

(i) the court crafted a comprehensive remedies package that rendered the ban unnecessary to "effective[ly] [] redress the [antitrust] violation[]" and "restore competition" to the general search engine market, *Du Pont*, 366 U.S. at 326;

(ii) the court correctly held that the ban would harm, rather than promote, competition and consumer welfare in the general search engine market; and

(iii) the court appropriately sought to avoid "impos[ing] substantial—in some cases, crippling—[] harms" to smartphone manufacturers and browser developers, which serve as critical distribution channels for search engine developers and deliver countless benefits to consumers and society, *Google II*, 803 F. Supp. 3d at 37.

The District Court's rejection of the Distribution Payment Ban is supported by binding precedent holding that courts should avoid adopting antitrust remedies that "could wind up impairing rather than enhancing competition," "unintentionally suppress[ing][] innovation," and/or "harm[ing] consumers." *Alston*, 594 U.S. at 102; *Microsoft II*, 373 F.3d at 1211, 1219. Likewise, the District Court's rejection of the Distribution Payment Ban is consistent with well-settled antitrust enforcement principles recognizing that remedies should "'do no harm'" because, "if the antitrust

laws are intended to advance consumer welfare, then any remedy should, at the least, not harm such welfare."[20]

### A. The District Court's Comprehensive Remedies Package Rendered A Distribution Payment Ban Unnecessary

After finding Google violated the antitrust laws, the District Court expressly recognized its "duty" to "redress the violation and restore competition" by crafting remedies that "'unfetter [the general search engine] market from anticompetitive conduct,'" "'deny [Google] the fruits of its [] violation, and ensure that there remain no practices likely to result in monopolization in the future.'" *Google II*, 803 F. Supp. 3d at 67 (citation omitted).

In a 223-page opinion, the District Court fulfilled that duty by crafting a comprehensive remedies package that "'restor[es] conditions in which the competitive process is revived'" and is "'tailored to fit the wrong creating the occasion for the remedy.'" *Id.* at 68 (citations omitted). Indeed, Plaintiffs acknowledge that "the District Court imposed significant remedies for Google's monopolization" that "alleviate Google's ill-gotten scale and revenue advantages so rivals can compete effectively with Google." DOJBr_2, 29 (bold and capitalization omitted). Google's competitors similarly acknowledge that the District Court's

---

[20] Assistant Att'y Gen. Thomas Barnett, U.S. Dep't of Just., Antitrust Div., *Section 2 Remedies: A Necessary Challenge* 4 (Sept. 28, 2007), https://www.justice.gov/archives/atr/file/519221/dl?inline=.

remedies "are squarely aimed at the fruits of [Google's] statutory violation" and "will thereby benefit competition." OpenAIAmicusBr_3, 17.

*Broad Prohibition on Google Contracting Practices*. The District Court enjoined the contracting practices that it found enabled Google to monopolize the general search engine market and extended this injunctive relief to cover Google's browser, voice assistant, app store, and GenAI products. *Google II*, 803 F. Supp. 3d at 93-98. By broadly prohibiting Google from entering exclusive distribution contracts,[21] the District Court "afford[ed] distributors the choice to pre-load, distribute, and feature non-Google products that was largely unavailable under the prior agreements." *Id.* at 95.

*One-Year Limit on Google Distribution Agreements*. After concluding that enjoining the challenged practices "will not alone restore competition[,]" the District Court limited Google's distribution agreements to one-year terms because it found that longer agreements had foreclosed Google's rivals from important distribution channels for significant periods. *Id.* at 97. The District Court also required Google to permit browser developers to "set a different GSE on different [OS] versions or in a privacy mode . . . if desired, on an annual basis." *Id.* at 94.

---

[21] Samsung disagrees with the District Court's finding that Google's distribution agreements were exclusive.

By imposing this strict one-year term limit, the District Court minimized any potential foreclosure effect of Google's default distribution agreements[22] and ensured that Google's rivals could compete annually for out-of-the-box default positions—which Plaintiffs describe as the "most efficient [distribution] channel" (DOJBr_13)—with every Google partner.

*Wide-Ranging Data-Sharing with Rivals*. The District Court ordered Google to share certain search index and user-interaction data with competitors after finding that disclosure of such data would "deny Google a key fruit of its anticompetitive conduct—scale—and [] help rivals overcome that deficit." *Google II*, 803 F. Supp. 3d at 107. Specifically, the District Court found that search index and user-side data disclosures would "enable rivals to overcome the scale gap by allowing them to more quickly build a competitive search index—one that is robust in volume, freshness, and utility." *Id.* at 116, 123.

This finding is consistent with Plaintiffs' argument that data-sharing "will provide Google's rivals and new entrants 'the necessary ingredients to not only improve the quality of their existing [search] services but also create new search features and other innovations in the medium to long term.'" *Id.* at 107 (citation

---

[22] *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, 44 F.4th 959, 988 (10th Cir. 2022) (short contracts "are of little antitrust concern"); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 286 (3d Cir. 2012) (same).

omitted). The District Court further found that the data sharing remedies would help search providers compete effectively with Google without a payment ban by providing the "scale" needed to "innovat[e] and differentiat[e] their search services from Google's." *Id.* at 109.

*Extensive Search Syndication Services for Rivals*. Based on its conclusion that "[i]t will take time for a [competitor] to build its own search index and the capacity to deliver high-quality search results," the District Court ordered Google to "syndicat[e] search results" to help rivals "compete in the short term." *Id.* at 131. The District Court deemed that remedy a "'reasonable method' of addressing the effects of Google's anticompetitive acts" because it would allow competitors to immediately offer high-quality search results. *Id.* at 131-32.

*Search Text Ads Syndication Services for Rivals*. The District Court required Google to syndicate search text advertisement services to rivals so they could immediately generate advertising revenue that could be "reinvested to improve search quality, gain distribution, and perhaps build a proprietary ad platform." *Id.* at 138. By permitting competitors to "serv[e] high-quality ads that [they] can monetize from the start," this remedy, as the District Court reasoned, would "'pry open' the relevant markets" by addressing "a key component in the flywheel that has made [Google's] monopoly so durable." *Id.*

*Five-Year Remedies Term.* To give competitors sufficient time to "develop the capacity to compete with Google," the District Court required Google to comply with the ordered remedies for five years, which is "consistent with the five-year term adopted in *Microsoft*." *Id.* at 159-60.

*Monitoring Google's Compliance.* As in *Microsoft*, the District Court established a Technical Committee to "assist the plaintiffs and the court in enforcing [the ordered] remedies[.]" *Id.* at 154. To allow the Technical Committee to function effectively, the District Court extended the Final Judgment's term to six years because it expected that it would take a year "to establish the Technical Committee and the processes necessary for execution." *Id.* at 159.

* * * *

Given the breadth and focus of the District Court's comprehensive remedies package, it is not surprising that Plaintiffs previously declared they "won significant remedies in their monopolization case against Google" that "will pry open the market for general search services" and "'restore competition for millions of Americans[.]'"[23]

[23] *Supra* n.1.

### B. The District Court Correctly Held That The Distribution Payment Ban Would Harm, Rather Than Promote, Search Engine Competition

Plaintiffs contend the District Court committed legal error by "never answer[ing] whether a payment ban was necessary to effectively restore competition" and instead "skipp[ing] ahead to considerations" about competitive harms outside the general search engine market. DOJBr_129. Not true.

In assessing whether to adopt the Distribution Payment Ban, the District Court held that, although the ban had "sound" justifications, it "would not promote competition and in fact would likely advantage Google, at least in the short term." *Google II*, 803 F. Supp. 3d at 103. Specifically, the District Court found that the ban could entrench Google's monopoly because Google would likely retain the out-of-the-box search default position due to its product superiority while saving billions in revenue that it could use to further solidify its product-quality and monetization advantages:

> On "day one" post-judgment, distributors will have no real alternative: because Google is the best search provider, they likely will maintain it as the default GSE, if for no other reason than to avoid alienating their customers. Google thus would continue to receive a disproportionate volume of search queries for a fraction of the cost. Freed of having to pay billions in revenue share, Google's profits would *increase*. Not paying Apple alone would result in a windfall worth tens of billions of dollars. Google then could use those profits to improve its products and monetization, further propagating the network effects flywheel that has proven so difficult to disrupt.

*Id.* at 103-04 (citations omitted).

Certain Google search competitors agree with the District Court:

> [M]any users will continue using Google Search in the near term. The Plaintiffs' proposed total payment ban would not stop Google from earning revenue on those queries—it would just prevent Google from sharing that revenue with distributors. As the district court observed, with a total payment ban, Google "would continue to receive a disproportionate volume of search queries for a fraction of the cost," increasing its profits, at least in the near term. That would help Google, not competition.

BraveAmicusBr_8-9 (citation omitted).

Relying on Plaintiffs' own expert and proffered studies, the District Court also held that the Distribution Payment Ban could harm consumers by leaving them with inferior out-of-the-box default search engines if distributors sacrificed the user experience to secure search revenue from Google's rivals. *Google II,* 803 F. Supp. 3d at 106.

The District Court further held that the Distribution Payment Ban would reduce price competition among search engine developers because, as Plaintiffs' expert acknowledged, Google's "rivals would pay less" to "secure default or preferential placement" with "Google sidelined from competition[.]" *Id.* at 104. As the District Court noted, this competitive harm would be compounded by the fact that "a sizeable number of users would switch back to Google, thereby reducing the revenue share a distributor could earn from the new provider." *Id.*

### C. The District Court Appropriately Avoided The "Crippling" Harm That The Distribution Payment Ban Would Inflict On Search Engine Distributors

Plaintiffs argue that the District Court was required to "first determine what remedies are 'effective to restore competition' and to 'redress the violations,'" and "then proceed to consider other generally-applicable factors—e.g., third-party hardships and public interests other than law enforcement[.]" DOJBr_127 (citation omitted). That is exactly what the District Court did.

As detailed above, the District Court crafted a comprehensive remedies package that Plaintiffs acknowledge "imposed significant remedies for Google's monopolization" and "alleviate Google's ill-gotten scale and revenue advantages so rivals can compete effectively with Google." DOJBr_2, 29 (bold and capitalization omitted). In doing so, the District Court considered whether the Distribution Payment Ban would enhance the remedies package's efficacy and concluded it would not. *Google II*, 803 F. Supp. 3d at 103-06.

As part of its analysis, the District Court also considered the ban's likely effect on smartphone manufacturers and browser developers—key distribution channels in the general search engine market. Based on the evidentiary record, the District Court correctly concluded that "[t]he complete loss or reduction of payments to distributors is likely" to "impose substantial—in some cases crippling—downstream harms" which would lead to "[l]ost competition and innovation from small browser

developers," "[f]ewer products and less product innovation from Apple," "[l]ess investment in the U.S. market by Android OEMs, which would reduce competition in the U.S. mobile phone market with Apple," and "[h]igher mobile phone prices and less innovative phone features." *Id.* at 105. These harms would be directly felt in the general search engine market because, as the District Court noted, they could lessen the distribution channels available to search engine developers. *Id.* at 103-06.

Importantly, the District Court concluded that these harms to search engine distributors would "harm consumer welfare" through inferior default search engines, "higher prices, less innovation, and less competition." *Id.* at 106. Plaintiffs never contested that these harms were likely to occur. *Id.* at 105-07.

Testimony from industry executives fully supports the District Court's determination that the Distribution Payment Ban would likely cause significant competitive harms. For example, Mr. Kim unequivocally testified that the ban could force Samsung—the leading manufacturer of Android devices—to exit U.S. smartphone markets:

> [W]e're making a lot of investment to make the latest technology come to our devices. And the revenue share that we [get] from Google is . . . a very . . . important part of . . . sustaining our business to reinvest and manage . . . the price point[s] that we're covering . . . and the customization we do for our customers[.]
>
> And if we're not getting paid from Google in the revenue share that we're getting currently, I think it will probably make our position

> much weaker to innovate and provide . . . the latest technology and better services to our customer. . . .[W]e might face [] a very difficult situation to continue our [U.S.] business.

KimDep_43:5-22. Mr. Kim also detailed the consumer harm likely to result from the Distribution Payment Ban:

> Q. If Samsung had to cover more of the costs without revenue share from Google on Search, could that impact the price of smartphones to end users?
>
> A. We can't sell a product in minus profit. So, basically, you know, some of [our] product[s] could end up increasing [in] prices or [we may need to] defeature our product[s] to manage the profit, which will make our position [even] weaker in the [U.S.] market. Then . . . we'll be [further] structurally disadvantaged against Apple and . . . it will be a purely 100 percent Apple market eventually.

KimDep_44:9-19.

In short, the District Court clearly followed the Supreme Court's instruction that trial courts craft antitrust remedies that effectively redress the violation while causing "'as little injury as possible to the interest of the general public'" and showing "'proper regard for the vast interests of private property[.]'" *Du Pont*, 366 U.S. at 327-28 (citation omitted).

### D. Google's Search And AI Competitors Can Secure Distribution Without A Payment Ban

Plaintiffs contend that the absence of the Distribution Payment Ban will permit Google to use its "monopoly profits" to maintain its search monopoly and "squelch" the competitive threat from emerging GenAI products. DOJBr_7, 125, 142-44. Certain Google competitors likewise contend that they cannot secure

distribution of their search or GenAI products on Samsung devices without the ban. OpenAIAmicusBr_27-28; MicrosoftAmicusBr_26-27.

Those contentions conveniently ignore that Google's current and potential search and GenAI rivals are multitrillion-dollar Big Tech companies and GenAI developers that have raised hundreds of billions of dollars in funding. Thus, the District Court correctly noted that Google is unlikely to "simply outbid competitors for distribution if superior products emerge" because "[t]oday, established technology companies are making, and start-ups are receiving, hundreds of billions of dollars in capital to develop GenAI products that pose a threat to the primacy of traditional internet search." *Google II*, 803 F. Supp. 3d at 107.

More fundamentally, Samsung's recent agreement with Perplexity demonstrates that these contentions lack merit. After the District Court rejected the Distribution Payment Ban, Samsung entered a multifaceted partnership with Perplexity whereby:

- Samsung preloaded and deeply integrated Perplexity's AI assistant at the OS-level in the recently launched Galaxy S26 smartphone series and enabled users to easily deploy this assistant through an audio prompt ("Hey, Plex") or side-button long press.[24]
- Samsung "upgraded" its Bixby Assistant "to operate as a conversational device agent" that uses Perplexity's AI technology to conduct "real-time

[24] *Supra* n.15.

web search[es]" that provide users with immediate "access [to] live and up-to-date information[.]"[25]

- Samsung upgraded the Samsung Browser to include a new Perplexity-powered AI assistant that provides users "**[a] faster, smarter way to Search**" the internet.[26]
- Samsung actively promoted Perplexity's AI assistant by offering a yearlong free Pro tier subscription for smartphone, tablet, and television customers.[27]

Perplexity's Chief Business Officer, Dmitry Shevelenko, has touted the procompetitive benefits of Samsung's multi-AI partner strategy and decision to deeply integrate Perplexity's AI technology into the Galaxy S26 smartphone series and other Samsung products and software:

- "The transformational Perplexity and Samsung Electronics partnership will bring Perplexity technology to 800M devices this year, including deep integration into every Galaxy S26 phone, the Samsung Browser, and the Bixby assistant. It has been inspiring witnessing the . . . Samsung team in executing on the Multi-AI strategy. Let's keep building."[28]
- "'The first step toward an agentic mobile ecosystem is the user getting to choose whatever agent they want. I think this is where Samsung is taking a big, big leap forward.'"[29]

---

[25] *Supra* n.17.

[26] *Supra* n.18.

[27] *Supra* n.16.

[28] Dmitry Shevelenko, Perplexity Chief Business Officer, LinkedIn Post (Feb. 2026), https://www.linkedin.com/posts/dmitryshevelenko_perplexity-apis-deliver-powerful-ai-to-the-activity-7432846455515725824-LNzH/.

[29] Patrick Holland, *Turns Out Perplexity Might Be the Sleeper Feature on Samsung's Galaxy S26*, CNET (Feb. 25, 2026), https://www.cnet.com/tech/mobile/turns-out-perplexity-might-be-the-sleeper-feature-on-samsungs-galaxy-s26/.

- "'It's a real paradigm shift for Samsung to be going into a multi-AI direction, where they are giving their users choice. And I think they see this as a strategic differentiator.'"[30]

Industry observers have likewise described Samsung's partnership with Perplexity as pivotal because it "put[s] Perplexity shoulder-to-shoulder with Google's Gemini AI assistant" on smartphones made by "the world's largest manufacturer[.]"[31]

The Perplexity partnership confirms the District Court's predictive judgment: With exclusive distribution agreements prohibited and default positions contestable on an annual basis under the remedies package, innovative and well-funded search and GenAI rivals can—and do—secure premium, OS-level distribution on Samsung devices through ordinary commercial negotiations, without any court-imposed payment ban that risks grave competitive harms.

To the extent other Google competitors have not entered similar partnerships with Samsung, the reason lies in their chosen negotiating approaches, product readiness, and differing visions for a partnership—not Samsung's RSA or Gemini contract with Google or any supposed demand by Samsung for high revenue share payments.

---

[30] *Id.*

[31] *Id.*

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's rejection of the Distribution Payment Ban.

Dated: August 25, 2026

Respectfully submitted,

*/s/ Juan A. Arteaga*
Juan A. Arteaga
Rosa M. Morales
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5300
juan.arteaga@sidley.com
rosa.morales@sidley.com

*Counsel for Amicus Curiae*
*Samsung Electronics Co., Ltd.*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

This brief complies with the word-count limitation of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B)(i). This brief contains 6,462 words, not counting the parts excluded by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

/s/ Juan A. Arteaga
Juan A. Arteaga

*Counsel for Amicus Curiae*
*Samsung Electronics Co., Ltd.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2026, I caused the foregoing document to be electronically filed through this Court's CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Juan A. Arteaga
Juan A. Arteaga

*Counsel for Amicus Curiae*
*Samsung Electronics Co., Ltd.*