**NOT YET SCHEDULED FOR ORAL ARGUMENT**

# United States Court of Appeals for the District of Columbia Circuit

**No. 26-5023**

**Consolidated with Nos. 26-5047 & 26-5049**

UNITED STATES OF AMERICA, *et al.*,

*Plaintiffs-Appellees-Cross-Appellants,*

*v.*

GOOGLE LLC,

*Defendant-Appellant-Cross-Appellee.*

*On Appeal from the United States District Court for the District of Columbia, Nos. 1:20-cv-3710, 1:20-cv-3715 (Hon. Amit P. Mehta)*

## BRIEF FOR MOTOROLA MOBILITY LLC AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT-CROSS-APPELLEE

SHAWNNA YASHAR
BRIAN P. QUINN
DANIEL LAUTZENHEISER
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300

*Counsel for Amicus Curiae Motorola Mobility LLC*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel certifies the following:

### A. Parties and *Amici*

Except for the following, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Plaintiffs' Certificate as to Parties, Rulings, and Related Cases filed on February 23, 2026. Since that time, the following parties have filed amicus briefs or notices of intent to file amicus briefs: Brave Software, Inc.; Washington Legal Foundation; Apple Inc.; Samsung Electronics Co., Ltd.; Mozilla Corporation; Terry Calvani, William Kolasky; Abbott B. Lipsky, Joe Sims; Law & Economics Scholars; Alden Abbott; Gregory Werden; Economists and Legal Scholars; Hunt Allcott, Matthew Gentzkow; OpenAI OpCo, LLC; SerpApi, LLC; American Economic Liberties Project; Microsoft Corporation; Little Tech Association, Travel Lemming LLC; DuckDuckGo, Inc.; Public Knowledge; American Antitrust Institute; Antitrust Law, Economics, and Business Professors; Bipartisan Technology Policy Experts; Economics and Business

Professors; Economics and Legal & Technology Scholars; Open Markets Institute; and W. Stephen Westermann.

**B. Ruling Under Review**

The rulings at issue are identified in Parties' Certificates as to Parties, Rulings, and Related Cases filed on February 23, 2026.

**C. Related Cases**

A list of related cases appears in the Parties' Certificates as to Parties, Rulings, and Related Cases filed on February 23, 2026.

*/s/Shawnna Yashar*
Shawnna Yashar
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
syashar@omm.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, counsel for the *amicus curiae* certifies the following: (i) Motorola Mobility LLC is a wholly-owned subsidiary of Lenovo Group Limited; and (ii) Legend Holdings Corporation is the only publicly-held corporation that owns 10% or more of Lenovo Group Limited's stock.

## RULE 29 CERTIFICATE

All parties have consented to the filing of this *amicus curiae* brief.

This brief was not authored in whole or in part by a party or its counsel. No party or party's counsel contributed money intended to fund the preparation or filing of this brief. No person other than *amicus curiae* contributed money intended to fund the preparation or submission of this brief.

Pursuant to Circuit Rule 29(d), *amicus* certifies that a separate brief is necessary to present the unique perspective of Motorola Mobility LLC. Plaintiffs' proposal to ban Google's search distribution payments would arguably impact Motorola more significantly than other non-parties in this litigation. Google's search-distribution payments to Motorola enable Motorola to compete against larger smartphone manufacturers. Eliminating search-related payments to Motorola risks creating a competitive shift in the U.S. smartphone market that would result in less competition, not more.

*/s/Shawnna Yashar*
Shawnna Yashar
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
syashar@omm.com

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICUS CURIAE* ........ 1
INTRODUCTION AND SUMMARY OF ARGUMENT ........ 2
RELEVANT BACKGROUND ........ 5
ARGUMENT ........ 10
I. The District Court Did Not Abuse Its Discretion in Declining to Ban Search Distribution Payments ........ 10
II. A Ban on Search-Distribution Payments Would Harm Smaller Manufacturers Like Motorola and Do Little to Foster Search Competition ........ 16
III. The Market is Already Proving the Wisdom of the District Court's Careful Approach ........ 20
CONCLUSION ........ 22

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*F.T.C. v. Whole Foods Mkt., Inc.*,
548 F.3d 1028 (D.C. Cir. 2008) ........................................................ 10

*Ford Motor Co. v. United States*,
405 U.S. 562 (1972) ........................................................................ 11

*New York v. Microsoft Corp.*,
224 F. Supp. 2d 76 (D.D.C. 2002) .................................................... 11

*Spectrum Sports v. McQuillan*,
506 U.S. 447 (1993) ........................................................................ 11

*United States v. E. I. du Pont de Nemours & Co.*,
366 U.S. 316 (1961) ........................................................................ 15

*United States v. Google LLC*,
803 F. Supp. 3d 18 (D.D.C. 2025) ............................................. passim

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ...................................................... 11, 13

*United States v. Microsoft Corp.*,
97 F. Supp. 2d 59 (D.D.C. 2000) ...................................................... 15

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012)............................................................... 13

## Other Authorities

*Announcing Our Global Partnership with Motorola*, Perplexity
(Apr. 24, 2025), https://tinyurl.com/3kupbrb5 .................................... 22

*Cell Phone Development*, Motorola Solutions,
https://tinyurl.com/ymhknbn9 .......................................................... 17

Counterpoint Research, *US Smartphone Market Share: Quarterly*,
https://tinyurl.com/2py9zxn4 (Q2 2026 statistics, last accessed
August 31, 2026)................................................................................. 6

Matt Swider, *Moto Z3 Is the World's First 5G-upgradable
Smartphone, Say Motorola and Verizon*, TechRadar (Aug. 2,
2018), https://tinyurl.com/ypvpbm98.................................................. 17

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Suzanne Bearne, *AI Challenges the Dominance of Google Search*, BBC (Sept. 15, 2025), https://tinyurl.com/5846pu4c............................21

# GLOSSARY

| | |
|---|---|
| Deposition Transcript of Francois Laflamme, *United States v. Google LLC*, Case No. 1:20-cv-03010 (D.D.C. May 13, 2025), Dkt. No. 1350 | Laflamme Dep. |
| Generative Artificial Intelligence | GenAI |
| Original Equipment Manufacturer | OEM |
| Revenue Share Agreement | RSA |
| Opening-Answer Brief of the State Attorneys General, *State of Colorado, et al. v. Google LLC*, Case Nos. 26-5023, 26-5047, 26-5049 (D.C. Cir. July 29, 2026), Dkt. No. 2185710 | AG Br. |
| Response Brief and Opening Brief on Cross-Appeal for the United States and Co-Plaintiff States, *United States, et al. v. Google LLC*, Case Nos. 26-5023, 26-5047, 26-5049 (D.C. Cir. July 28, 2026), Dkt. No. 2185548 | DOJ Br. |

## INTEREST OF *AMICUS CURIAE*

*Amicus curiae* Motorola Mobility LLC ("Motorola") is a consumer electronics and telecommunications company and smartphone manufacturer. Motorola is a party to multiple contracts with Google through which Motorola receives search-distribution payments and licenses to proprietary mobile applications for the Android operating system. Motorola is uniquely positioned, as it is both a competitor and customer of Google's. In its role as a customer, Motorola receives payments from Google to distribute Google's search functionality. Those payments are vital to Motorola's ability to continue to fully fund manufacturing, research and development ("R&D") in the United States, and marketing, as set forward in the February 20, 2025 testimony of Motorola's Global Chief Strategy & Marketing Officer, Francois Laflamme, and documents produced by Motorola in this case. Motorola also uses those payments to reduce prices for the smartphones that it sells to U.S. consumers and businesses.

Motorola is a David in an industry of smartphone Goliaths. Other U.S. smartphone manufacturers' sales dwarf Motorola's, particularly in premium segments. But Motorola plays an essential role in keeping the

industry competitive, particularly in mass-market and budget segments. Motorola respectfully submits this *amicus* brief to present the full picture of the potential unintended consequences to the U.S. smartphone market of Plaintiffs' proposed ban on Google's search-distribution payments.

## INTRODUCTION AND SUMMARY OF ARGUMENT

After thoroughly considering the massive factual record from the liability and remedies phases of this landmark antitrust case, the district court got it right. Its remedies package will pass the Goldilocks test: it will redress the competitive harm that the district court identified, without trampling on the interests of third parties, consumers, or competition in the relevant markets and adjacent ones. The district court leveraged a multi-faceted approach to accomplish that goal—prohibiting exclusivity in agreements between Google and smartphone OEMs, imposing a one-year term limit on revenue-share agreements, and creating the conditions for search distributors to simultaneously carry Google's and its competitors' products.

Plaintiffs insist that the remedies package isn't good enough. They pay lip service to the "significant remedies" the district court ordered,

but assert that the district court should have ordered a complete prohibition on Google's search-related payments to distributors, like revenue-share agreements or payments for default placement. DOJ Br. 124. In Plaintiffs' eyes, the district court "impermissibly" acted to protect "a continuing stream of monopoly rents to Apple and other third parties in the 'downstream' browser and mobile device markets." AG Br. 28. Plaintiffs appear to suggest that the district court should have adopted a payment ban—regardless of its impact on others—because banning payments is the only way to break Google's hold on the relevant markets. *Id.*

Not only did the district court conclude that a payment ban would "pose a substantial risk of harm to OEMs, carriers, and browser developers," *United States v. Google LLC*, 803 F. Supp. 3d 18, 103 (D.D.C. 2025), but it also concluded that a payment ban wouldn't solve the competition problem in the relevant markets. *Id.* Indeed, it found that a payment ban "would not promote competition" in those markets "and in fact would likely *advantage Google*, at least in the short term." *Id.* The district court did not err in declining to adopt a blunt remedy

that has little likelihood of achieving its purpose but a high likelihood of prejudicing third parties and consumers.

In this appeal, Plaintiffs once again take up the payment-ban banner. But for at least the following reasons, this Court should reject Plaintiffs' flawed proposal and affirm the remedies package that the district court crafted.

*First*, the district court acted well within its discretion in refusing to outright ban search-distribution payments. It considered a payment ban and declined to enter that remedy after finding that it "would not promote competition." *Google*, 803 F. Supp. 3d at 103. That approach accords with governing law and past practice.

*Second*, the district court reached the right result on the merits. A payment ban would disproportionately harm smaller OEMs like Motorola, threatening their ability to compete and potentially further consolidating the U.S. smartphone market. Paradoxically, a ban would also benefit Google by handing it a multi-billion dollar windfall—its search engine would remain a de facto default, while it would be freed of any obligation to pay for distribution of that technology.

*Finally*, recent market developments demonstrate that the district court's approach will work. Google's competitors can and will secure meaningful distribution on devices without a payment ban, especially with the rise of generative artificial intelligence (GenAI) products.

## RELEVANT BACKGROUND

Motorola offers a variety of smartphones catering to different consumers' needs and preferences. It manufactures flagship smartphones—high-end devices with advanced features and specifications. But Motorola also makes mid-range smartphones, which balance performance and price and offer standard features suitable for most users; budget or affordable smartphones with mainstream specifications for cost-conscious consumers; specialty smartphones, with unique functionality and features; and entry-level or low-end smartphones designed for customers who seek essential features at very low cost. Among other models, Motorola manufactures the Razr, Edge, and Moto smartphones.

Despite its diverse product mix, Motorola has a significantly smaller presence in the U.S. smartphone market than the top two manufacturers. Its market share stands at around 11 percent based on

recent shipment estimates. Counterpoint Research, *US Smartphone Market Share: Quarterly*, https://tinyurl.com/2py9zxn4 (Q2 2026 statistics, last accessed August 31, 2026). Industry leaders Apple and Samsung account for 54 percent and 30 percent, respectively, whereas the rest of the market (including Google's Pixel brand) comprises 6 percent. *Id.* Motorola vigorously competes with these U.S. smartphone suppliers, including with Google in the mid-range and budget segments.

To compete effectively, Motorola has relied on its U.S.-based engineering teams to deliver high-quality smartphones at affordable prices. To help finance those efforts, Motorola entered into multiple contracts with Google through which Motorola (1) receives compensation from Google in exchange for distributing Google's search services on its devices and (2) licenses Google's proprietary mobile applications for the Android operating system. *See* Deposition Transcript of Francois Laflamme ("Laflamme Dep.") 33:15-34:16, 41:2-45:4, 64:5-9, 168:3-170:15 (Feb. 20, 2025), *United States v. Google LLC*, Case No. 1:20-cv-03010 (D.D.C. May 13, 2025), Dkt. No. 1350 (discussing Revenue Share Agreement and go-to-market agreements).

Capitalizing on Android's open-source nature, Motorola implements a "pure" Android system for its smartphones. That means that Motorola's smartphones do not come preinstalled with "bloatware" that may slow down Android's performance. Motorola also pre-installs Google services (e.g., Search, Maps, and the Play Store) on its devices. This arrangement benefits Motorola's consumers, who enjoy out-of-the-box access to valuable Google tools; Motorola, by enabling it to dedicate U.S. R&D and investment to hardware rather than software; and Google, by driving user engagement with Google's services.

In exchange for distributing Google's services, Motorola receives (1) revenue share payments from Google under a Revenue Share Agreement ("RSA") and Mobile Incentive Agreement ("MIA"); and (2) go-to-market funds under a general Go-To-Market Marketing Agreement ("Marketing Agreement"). Motorola is also eligible to receive go-to-market funds specifically related to the promotion of Google's artificial intelligence assistant Gemini under a separate Gemini Go-To-Market Agreement ("Gemini Marketing Agreement").

Through the RSA, Motorola shares in Google Search revenue in exchange for certain placement requirements. Specifically, Motorola

receives fixed dollar amounts based on how many Motorola devices enroll in the premier tier monthly incentive program, with Motorola receiving the highest amount of revenue share when 95% or more of its devices enroll. Currently, "the RSA payment is a fixed amount, and is based on number of devices more than the actual revenue associated with a consumer accessing Google properties." Laflamme Dep. 62:18-63:13. The RSA largely does not restrict the ways in which Motorola can use these payments, which affords Motorola much-needed flexibility.

Motorola broadly uses the RSA payments to fund manufacturing, U.S.-based R&D, and other costs, which in turn enables it to reduce the price of the smartphones it sells to U.S. carriers and consumers. *See, e.g.*, *id.* at 49:11-50:22 ("The way we used those specific dollars, the financial benefits would be dollars that we would generally pay out of our own A&P that we were then using those dollars to pay, instead."). The RSA payments are critical to Motorola's continuing viability as a U.S. competitor to smartphone industry heavyweights, and they allow for R&D efforts to continue in the United States in Chicago, Illinois—as Motorola has done since 1928. *See, e.g.*, *id.* at 100:19-101:6 (discussing Project Marble). Losing access to those payments would require a

fundamental change to Motorola's longstanding business model that has served U.S. consumers well for decades. *See, e.g.*, *id.* at 77:4-78:19 (discussing "significant financial burdens" that would result from losing funds associated with Google RSA payments).

The go-to-market funds are different. While these funds can be used for a range of purposes essential to Motorola's business, Motorola must nevertheless use the go-to-market funds according to Google's instructions. *See id.* at 45:5-46:20. For example, the most recent Marketing Agreement includes a list of products eligible for marketing dollars and specifies that a Google committee will approve Motorola's marketing plans for those products. And the Gemini Marketing Agreement limits the use of funds to promoting Gemini apps and services. While these go-to-market funds are important, they cannot replace the RSA payments given the limits on their use. *See id.* at 41:2-22 (discussing "go-to-market funds . . . as a bridge-gap to what we perceived to be a portion . . . of the gap in RSA dollars"); *see also id.* at 79:14-80:21 ("The spirit of go-to-market, in my view, is additional dollars to be spent very specifically to amplify the message of what

[Motorola is] doing jointly and/or whatever platform that Google or other partners would want to amplify.”).

## ARGUMENT

This Court should reject Plaintiffs’ arguments on cross-appeal for a payment ban. The district court considered but declined to adopt that blanket remedy. Plaintiffs clearly disagree with that decision, but their attempts to paint it as legally infirm are unavailing. The district court struck the right balance in limiting but not outlawing Google’s payment arrangements with OEMs. This Court should affirm that decision. A payment ban would harm smaller OEMs like Motorola while doing little to curb Google’s dominant search position. And the market is already developing in ways that validate the district court’s tailored approach, particularly in the burgeoning GenAI ecosystem.

### I. The District Court Did Not Abuse Its Discretion in Declining to Ban Search Distribution Payments.

In crafting the remedy here, the district court steered well within the broad guardrails that defined its discretion. District courts are “clothed with large discretion to create remedies effective to redress antitrust violations and to restore competition.” *F.T.C. v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1033 (D.C. Cir. 2008) (quoting *Ford Motor Co.*

*v. United States*, 405 U.S. 562, 573 (1972)) (alterations omitted). Antitrust remedies should be "tailored to fit the wrong creating the occasion for the remedy" and eschew "unacceptable and unjustified burden[s]" on lawful competition. *United States v. Microsoft Corp.*, 253 F.3d 34, 70, 107 (D.C. Cir. 2001); *see also New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 136 (D.D.C. 2002) (courts "must be 'careful to avoid constructions of § 2 which might chill competition, rather than foster it'") (citing *Spectrum Sports v. McQuillan*, 506 U.S. 447, 458 (1993)); *id.* at 177 (if the court finds there "is sufficient harm which flows from the [proposed remedies] which is not countermanded by competitive benefit," then "it is best not to require" the parties to implement them).

The remedies ordered here meet all of those criteria. In its liability opinion, the district court found that Google's distribution agreements with browser developers, wireless carriers, and OEMs effectively "froze" the search ecosystem by making Google the default search engine at key access points. *See Google*, 803 F. Supp. 3d at 36. But that finding hinged on specific aspects of those agreements, not on the mere fact of payment from Google to distributors.

For example, the parties and the district court extensively analyzed the *exclusive* nature of some of the agreements. The court held that Google "violated Section 2 of the Sherman Act by maintaining its monopoly in the general search services market through *exclusive* distribution agreements." *Id.* at 41 (emphasis added). Plaintiffs agree that it was the "exclusive defaults [that] played a central role in Google's ability to maintain its monopoly." AG Br. 2. So the remedy package targeted exclusivity rather than banning Google from entering into agreements with (and making payments to) distributors. *See Google*, 803 F. Supp. 3d at 37. The court prohibited exclusivity not only for agreements on Google Search, but for other Google products including Chrome, Google Assistant, and Gemini. *Id.* And it went even further, opening the door for third parties like Motorola and other distributors "to preload, distribute, and feature non-Google products that was largely unavailable under the[ir] prior agreements" with Google. *Id.* at 95. This expanded flexibility for the OEMs addresses the competition problem in a narrowly tailored way.

The court adopted a similarly nuanced approach to remedying the harm associated with the *length* of Google's distribution agreements. It

made a liability finding that "rivals [could not] presently access default channels of distribution without convincing Google's partners to break existing agreements, *all of which* [we]re binding for a term of years." *Id.* at 97 (alterations omitted, emphasis in original). And so the court limited Google's distribution agreements to a one-year term. This limit ensures that rivals can compete annually for default placement with Google's current distribution partners. Courts recognize that short-term distribution contracts "present little threat to competition." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 286 (3d Cir. 2012) (collecting cases).

As other *amici* have noted, Plaintiffs' proposed payment ban does not attack Google's agreements for being exclusive or unduly long; rather, it targets *any* kind of search-distribution agreement between Google and a distributor. *See, e.g.*, Br. for Apple Inc. as *Amicus Curiae* in Support of Defendant-Appellant-Cross-Appellee (Aug. 25, 2026), App. Dkt. 2189889, at 24-25. But distribution agreements, writ large, were not a "harm" that the district court identified during the liability phase. Instead, the district court fashioned a remedies package that is "tailored to fit the wrong" while avoiding collateral damage. *Microsoft*, 253 F.3d at 107; *see Google*, 803 F. Supp. 3d at 37 (explaining that

adopting a payment ban would "almost certainly … impose substantial—in some cases, crippling—downstream harms to distribution partners, related markets, and consumers").

Plaintiffs do not seriously contend otherwise. Rather, they selectively quote from portions of the remedies order to construct and then knock down a strawman. For example, Plaintiffs argue that—in declining to adopt a payments ban—the district court sided with "the interests of third parties" instead of "restor[ing] competition" no matter the downstream effects. *See* DOJ Br. 48. Not so.

The court weighed the competitive implications of the proposed payment ban in depth. *Google*, 803 F. Supp. 3d at 102-07. It ultimately concluded that the ban "would not promote competition" in the relevant markets and could actually entrench Google, at least in the short term. *Id.* at 103. It also catalogued the potentially "dire" downstream effects attendant to a payment ban. *Id.* at 104-05. And it noted material developments in the year since its liability finding, including the meteoric growth of GenAI that "threat[ened] the primacy of traditional internet search," and by extension Google's hold on the market. *Id.* at 107. Nothing about that analysis gave rise to a legal error.

To the contrary, the district court's approach adheres to precedent, including *United States v. Microsoft*. The final judgment in that case did not prohibit Microsoft from offering discounts or incentives to OEMs for promoting or distributing its Internet Explorer browser, yet it still addressed and remedied specific anticompetitive practices. 97 F. Supp. 2d 59, 66 (D.D.C. 2000). For example, the final judgment required that Microsoft "not take or threaten any action adversely affecting any OEM" based on the OEM's decision to "use, distribute, promote, license, develop, produce or sell any product or service that competes with any Microsoft product or service." *Id.* The remedy order here strikes the same balance.

* * *

In some antitrust cases, "an effective remedy [may] entail harsh consequences[.]" *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 327 (1961). But here—where third parties stand to bear the brunt of the damage, not Google—it is far from clear that the "harsh" remedy of a payment ban would be an effective one. Taking a more nuanced view, the district court opted for a targeted remedy to redress the harm but minimize the collateral damage to third parties. Not only

was that decision well within the district court's broad discretion, it was the right one on the merits.

## II. A Ban on Search-Distribution Payments Would Harm Smaller Manufacturers Like Motorola and Do Little to Foster Search Competition.

There appears to be little dispute between Plaintiffs, Google, the district court, and *amici* that the payment ban would harm Motorola and other smaller distributors, perhaps severely. Plaintiffs contend that the damage to Motorola is simply the price of an effective remedy, DOJ Br. 6-7, 132-35, or alternatively a long-deferred but well-deserved comeuppance for entering into distribution agreements with Google, AG Br. 31. Unlike the district court, Plaintiffs never follow those arguments to their logical conclusion.

1. Start with the harm. The district court found that the payment-ban "remedy would pose a substantial risk of harm to OEMs, carriers, and browser developers." *Google*, 803 F. Supp. 3d at 103. Motorola agrees, and can attest to the direct harm that a payment ban would inflict on its U.S. operations.

Motorola uses Google's payments to retain its U.S. employees, contribute directly toward payroll and real estate, and fund R&D,

specifically in the United States. *See, e.g.*, Laflamme Dep. 77:4-78:19. Google's payments helped Motorola to underwrite the innovation that culminated in the world's first 5G-upgradable phone.[1] The payments enable Motorola to hold down its prices, particularly in the budget and mass-market tiers. *See, e.g.*, Laflamme Dep. 77:4-78:19 ("If we were not to receive these funds, it would have significant financial burdens on our business."). They support Motorola in experimenting with new products and taking innovative risks, as it has done throughout its storied history to the benefit of U.S. consumers and the world at large. Ever since Motorola unveiled the first commercially available handheld cellular phone in 1983,[2] it has been an industry leader in cellular communications.

Large-scale manufacturers often simply produce products using shared or standardized technologies but fail to move the needle forward on true innovation. Motorola is different. And while it was historically able to underwrite most of its own U.S. R&D efforts through American

[1] *See* Matt Swider, *Moto Z3 is the world's first 5G-upgradable smartphone, say Motorola and Verizon*, TechRadar (Aug. 2, 2018), https://tinyurl.com/ypvpbm98.

[2] *Cell Phone Development*, Motorola Solutions, https://tinyurl.com/ymhknbn9.

ingenuity from 1928 through the early 2000s, global economies change and require adaptation. U.S.-based consumer electronics innovation is still very much going strong, but it requires additional support to sustain. Google's RSA payments help fund Motorola's U.S. R&D efforts and eliminating them would knock out a key support that keeps Motorola alive and well in the U.S. economy. *See, e.g.*, Laflamme Dep. 49:11-50:22 (discussing "RSA plus go-to-market dollars" as "dollars to get us to a higher level . . . closer to where we believe we should be, but not where we believe we should be").

The harm from a payment ban would also manifest in less direct ways as well. By impairing Motorola's and other smaller OEMs' ability to vigorously compete or survive in the smartphone market, a payment ban could drive up prices and injure competition in that market, particularly in budget and mass-market segments in which Motorola plays an important role. *See id.* at 39:12-40:4, 77:6-85:6 (discussing the impact on Motorola if Google stopped making its RSA payments to the company). Ironically, a payment ban could redound to Google's benefit insofar as it caused smaller firms to exit the smartphone market and to abandon certain segments to Google and other large manufacturers.

2. Plaintiffs' assumption that a payment ban would deliver strong but effective medicine is also misplaced. Imposing a payment ban would force an "untenable" choice on distributors like Motorola. *Google*, 803 F. Supp. 3d at 103. On the one hand, recognizing consumer preference for Google's superior search product, Motorola could "continue to place Google in default and preferred positions without receiving any revenue." *Id.* In that case, Google would reap a windfall: it would continue to receive search revenue but without having to share billions of dollars in revenue with its distributors, including what it provides to Motorola. *Id.* Rather than fostering a level playing field, the remedy would effectively reward Google by increasing its financial advantage over smartphone OEMs, starving them of the resources they need to more thoroughly compete with Google's smartphones and bolstering Google's war chest in the markets for general search, general search advertising, and smartphones.

On the other hand, Motorola could try to enter into a distribution agreement with another search provider. *Google*, 803 F. Supp. 3d at 103. But because a large number of consumers would switch back to Google as their preferred search engine, at least in the near term, this

strategy would reduce any revenue Motorola would receive from the new search provider. *See id.* And with Google banned from making its own deals, the competing provider would face less competition for default placement and therefore pay Motorola less for that privilege. *Id.* The market reality is that Google sets the "baseline" for other competitors; preventing Google from paying revenue shares removes that baseline and the competition it provides. *See* Laflamme Dep. 82:13-85:5 (discussing impact of Google ceasing to make RSA payments to Motorola).

Plaintiffs' solution ignores commercial realities. If implemented, the ban would significantly reduce Motorola's income in the United States and threaten its ability to remain competitive. It would likely do the same for other distributors. And for its high price, the payment ban promises strikingly little in the way of competitive rebalancing in the relevant markets.

## III. The Market is Already Proving the Wisdom of the District Court's Careful Approach.

The district court did not write on a static slate. Instead, it had to make a prediction about the direction of competition for search in the midst of a generational period of technological upheaval and innovation.

GenAI applications are growing by leaps and bounds, and as they add hundreds of millions of active users, they are changing the way that consumers search for information. *See* Suzanne Bearne, *AI Challenges the Dominance of Google Search*, BBC (Sept. 15, 2025), https://tinyurl.com/5846pu4c ("A top Apple executive said that the number of Google searches on Apple devices, via its browser Safari, fell for the first time in more than 20 years."). Today, "established technology companies are making, and start-ups are receiving, hundreds of billions of dollars in capital to develop GenAI products that pose a threat to the primacy of traditional internet search." *Google*, 803 F. Supp. 3d at 107.

These rival GenAI products have already had success "in obtaining distribution with OEMs and other companies." *Google*, 803 F. Supp. 3d at 58-59. That includes Motorola. *See id.* Motorola has pursued partnerships with GenAI providers other than Google, including Perplexity, which comes "pre-installed on millions of smartphones worldwide."[3] Motorola also recently launched a new

[3] *See Announcing our global partnership with Motorola*, Perplexity (Apr. 24, 2025), https://tinyurl.com/3kupbrb5.

product line with multiple AI search engines included, and its amended RSA with Google explicitly permits Motorola to contract with other parties for GenAI and assistive services. Motorola is not alone. *See, e.g.*, *Google*, 803 F. Supp. 3d at 59 (collecting examples).

These developments are proof of concept for the district court's remedies package. The remedy order's limitations on the exclusivity and length of Google's contracts will enable instead of curtail challengers to gain the critical foothold they need to introduce more competition into the relevant markets. There is every prospect that innovative and well-capitalized competitors will secure meaningful distribution through ordinary commercial negotiations, without the collateral damage that a payment ban would inflict on Motorola and other distributors.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's decision to reject a ban on search-distribution payments.

Dated: September 4, 2026

Respectfully submitted,

*<u>/s/Shawnna Yashar</u>*
Shawnna Yashar (D.C. Bar No. 976460)
Brian P. Quinn (D.C. Bar No. 1048323)
Daniel Lautzenheiser (D.C. Bar No. 1724896)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4061
Telephone: (202) 383-5300
Facsimile: (202) 383-5414
syashar@omm.com
bquinn@omm.com
dlautzenheiser@omm.com

Attorneys for *Amicus Curiae* Motorola Mobility LLC

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limitation of the Federal Rules of Appellate Procedure and the D.C. Circuit Rules. The document contains 4,045 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1).

This document complies with the typeface and type style requirements of the Federal Rules. The document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

*/s/Shawnna Yashar*
Shawnna Yashar

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2026, I caused the foregoing document to be electronically filed through this Court's CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Respectfully submitted,

*/s/Shawnna Yashar*

Shawnna Yashar
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4061
Telephone: (202) 383-5300
Facsimile: (202) 383-5414
syashar@omm.com

Attorney for *Amicus Curiae* Motorola Mobility LLC