NOT YET SCHEDULED FOR ORAL ARGUMENT

# United States Court of Appeals for the District of Columbia Circuit

**No. 26-5023**

(Consolidated with Nos. 26-5047 and 26-5049)

UNITED STATES OF AMERICA, *et al.*,

*Plaintiffs-Appellees/Cross-Appellants,*

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
SEP 11 2026
RECEIVED

*v.*

GOOGLE LLC,

*Defendant-Appellant/Cross-Appellee.*

*On Appeals from the United States District Court for the District of Columbia, Nos. 20-cv-3010 & 20-cv-3715, Honorable Amit P. Mehta*

**AMENDED BRIEF OF *AMICUS CURIAE* STEPHEN WESTERMANN IN SUPPORT OF PLAINTIFFS-APPELLEES/CROSS-APPELLANTS THE UNITED STATES OF AMERICA, *ET AL.***

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
SEP 11 2026
RECEIVED

STEPHEN WESTERMANN
785 Stanford Avenue
Menlo Park, California 94025
(415) 713-1740
stephen.westermann@icloud.com

*Pro Se Amicus Curiae in support of the Plaintiffs-Appellees/ Cross-Appellants The United States of America, et al.*

September 11, 2026

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

Pursuant to Rule 28(a)(1) of the United States Court of Appeals for the District of Columbia Circuit, Amicus Curiae Stephen Westermann is appearing *pro se* and certifies as follows:

### A. Parties and Amici

Except for Amicus Curiae, to the best of his knowledge, all parties, intervenors, and amici appearing before the District Court and in this Court are listed in the Opening Brief on Cross-Appeal for the United States and Co-Plaintiff States.

### B. Rulings Under Review

References to the rulings at issue in the appeal are listed in the Response Brief and Opening Brief on Cross-Appeal for the United States and Co-Plaintiff States.

### C. Related Cases

The related cases are listed in the Response Brief and Opening Brief on Cross-Appeal for the United States and Co-Plaintiff States.

## TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iii

STATEMENT OF IDENTITY, INTEREST IN CASE AND AUTHORITY TO APPEAR .......... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......... 3

ARGUMENT .......... 7

I. The District Court's Remedial Framework Omitted the Primary Democratic System Harm, Requiring Vacatur and Remand .......... 7

   A. Standard Under *du Pont*, *Gypsum*, and *Nat'l Soc'y of Pro. Eng'rs* .......... 7

   B. Omitting This Harm Means the Decree Does Not "Cure the Ill Effects of the Illegal Conduct," and Constitutes a Material Error of Law .......... 8

   C. The Decree's Timetable and Uncertainty Are Intolerable Measured Against the Democratic System Harm .......... 8

   D. Further Errors of Law .......... 10

   E. Omitting the Primary Democratic System Harm Is Far from Harmless .......... 10

   F. This Court's Duty Is to the Public Interest and the Public Interest Has Never Been Greater .......... 11

   G. Requested Relief .......... 13

II. The Democratic System Harm Is Cognizable Antitrust Harm .......... 14

   A. Based on Legislative History .......... 14

   B. Based on *Associated Press* and Subsequent Cases .......... 14

   C. Based on Standard Antitrust Law for Differentiated Product Markets .......... 16

III. Amicus Curiae Urges This Court to Acknowledge That the District Court Omitted the Main Democratic System Harm, and to Instruct the District Court to Determine Its Magnitude .......... 18

IV. Legislative History Indicates That the Paramount Goal of U.S. Antitrust Laws Is to Protect the Democratic System From Industry Overconcentration ....................21

V. First Amendment-Compliant News Competition Remedies Should Be Available ....................23

CONCLUSION ....................25

APPENDIX I ....................27

CERTIFICATE OF COMPLIANCE ....................29

CERTIFICATE OF SERVICE ....................30

## TABLE OF AUTHORITIES

### CASES

**Associated Press v. United States*, 326 U.S. 1 (1945) ....................6, 14, 15, 16

**Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021) ....................1, 3

**Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ....................22

*Community Publishers, Inc. v. Donrey Corp.*, 892 F. Supp. 1146 (W.D. Ark. 1995) ....................14

**Ford Motor Co. v. United States*, 405 U.S. 562 (1972) ....................7, 11

**FTC v. Indiana Federation of Dentists*, 476 U.S. 447 (1986) ....................17

**Hawaii v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241 (D. Haw. 1999), *aff'd*, 203 F.3d 832 (9th Cir. 1999) ....................14

**Hecht Co. v. Bowles*, 321 U.S. 321 (1944) ....................12

**In re White*, 64 F.4th 302 (D.C. Cir. 2023) ....................8

*Maryland v. United States*, 460 U.S. 1001 (1983) ....................12

*Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004) (en banc) ....................8

**Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ....................23

**Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679 (1978) ....................7, 23, 25

*New York Times Co. v. United States*, 403 U.S. 713 (1971) ....................22

**Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594 (1953) ................14, 22

**United States v. AT&T Co.*, 552 F. Supp. 131 (D.D.C. 1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983) ..........................................12

**United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1 (D.D.C. 2022) ..........................................................................................16

**United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961).....2, 7, 8, 9, 10, 11

**United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024).......................6, 15

**United States v. Google LLC*, 803 F. Supp. 3d 18 (D.D.C. 2025)....6, 9, 10, 11, 12, 15, 20, 27

**United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc).....10, 11

**United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1948).........................24

**United States v. U.S. Gypsum Co.*, 340 U.S. 76 (1950)..................................2, 7, 8

**STATUTES AND RULES**

Fed. R. App. P. 29(a)(4)(E)........................................................................ ii

Fed. R. App. P. 29(a)(5)...............................................................................29

Fed. R. App. P. 32(a)(5)...........................................................................29, 30

Fed. R. App. P. 32(a)(6)...........................................................................29, 30

Fed. R. App. P. 32(f).................................................................................29, 30

D.C. Cir. R. 28(a)(1) .........................................................................................i

D.C. Cir. R. 32(e)(1) ...............................................................................29, 30

D.C. Cir. R. 32(e)(3) ...............................................................................29, 30

**LEGISLATIVE MATERIALS**

21 Cong. Rec. 2460 (1890)...........................................................................21

96 Cong. Rec. 11,486 (1950) (statement of Rep. Celler) ....................................22

96 Cong. Rec. 16,452 (1950) (statement of Sen. Kefauver)...................................21

H.R. Rep. No. 63-627 (1914).........................................................................21

## COURT DOCUMENTS

Br. of Amicus Curiae Am. Econ. Liberties Project in Supp. of Pls., *United States v. Google LLC*, No. 1:20-cv-03010-APM (D.D.C. May 9, 2025) .......... 11

Br. of Antitrust Law, Economics, and Business Professors as *Amici Curiae* Supporting Plaintiffs-Appellees .......... 9

Pls.' Liability Post-Trial Br. [Redacted], *United States v. Google LLC*, No. 1:20-cv-03010-APM (D.D.C. Feb. 9, 2024), ECF No. 837 .......... 3

Pls.' Remedies Post-Trial Br., *United States v. Google LLC*, No. 1:20-cv-03010-APM (D.D.C.) .......... 3

Response Br. and Opening Br. on Cross-Appeal for the United States and Co-Plaintiff States .......... 10

## OTHER AUTHORITIES

Daron Acemoglu et al., *Democracy Does Cause Growth*, 127 J. Pol. Econ. 47 (2019) .......... 20

Andrew Bosworth, *Lord of the Rings, 2020 and Stuffed Oreos: Read the Andrew Bosworth Memo*, N.Y. Times (Jan. 7, 2020) .......... 5

Daniel A. Crane, *Antitrust as an Instrument of Democracy*, 72 Duke L.J. Online 21 (2022) .......... 19, 22

Daniel A. Crane, *Fascism and Monopoly*, 118 Mich. L. Rev. 1315 (2020) .......... 21

Decartelization Branch, Off. of Mil. Gov't for Ger. (U.S.), *German Economic Decentralization: An Analysis of the German Cartel and Combine Problem* (Mar. 1, 1947) (unpublished report) .......... 22

Francis Fukuyama & Barak Richman, *How to Quiet the Megaphones of Facebook, Google and Twitter*, Wall St. J. (Feb. 12, 2021) .......... 1, 4, 26

Francis Fukuyama et al., *How to Save Democracy from Technology: Ending Big Tech's Information Monopoly*, Foreign Affairs (Nov. 24, 2020) .. 1, 3, 19, 22

Keach Hagey, *News Publishers See Google's AI Search Tool as a Traffic-Destroying Nightmare*, Wall St. J. (Mar. 24, 2025) .......... 25

Paul Liu, *Our Experiment on the Value of News Content*, Google (Mar. 25, 2025) .......... 24

Wendy Max et al., *Valuing Human Life: Estimating the Present Value of Lifetime Earnings, 2000* (UCSF Inst. for Health & Aging 2004) .......... 20

Nic Newman et al., *Reuters Institute Digital News Report 2026* (2026) ................27

*Online Platforms and Market Power, Part 1: The Free and Diverse Press: Hearing Before the Subcomm. on Antitrust, Com., and Admin. L. of the H. Comm. on the Judiciary*, 116th Cong. (2019) ..............................................4

Pew Rsch. Ctr., *Americans' Views of and Experiences With the News* (2025) .......17

Pew Rsch. Ctr., *Most Americans Think Social Media Sites Censor Political Viewpoints* (Aug. 19, 2020) ..........................................................................19

Pew Rsch. Ctr., *News Media Tracker* (June 10, 2025).............................................27

Pew Rsch. Ctr., *News Platform Fact Sheet* (Sept. 25, 2025)............................15, 27

Pew Rsch. Ctr., *Social Media and News Fact Sheet* (Sept. 25, 2025).....................27

Robert Pitofsky, *The Political Content of Antitrust*, 127 U. Pa. L. Rev. 1051 (1979) ..................................................................................................21

Stigler Ctr. on Dig. Platforms, *Committee on Digital Platforms: Final Report* (2019)...........................................................................................4, 5, 18

U.S. Bureau of Lab. Stat., *Consumer Price Index Summary—June 2026* ..............20

U.S. Census Bureau, *Annual Estimates of the Resident Population by Sex and Single Year of Age*, tbl. NC-EST2025-AGESEX-RES ....................................20

U.S. Dep't of Just. & Fed. Trade Comm'n, *Merger Guidelines* (2023)...................17

W. Stephen Westermann, *A Republic If You Enforce Your Antitrust Laws Against the Dominant Digital Platform News Publishers*, SSRN (Aug. 11, 2025) .................................................................................................1

Tim Wu, *The Curse of Bigness: Antitrust in the New Gilded Age* (2018) ..........4, 21

* Authorities upon which Amicus Curiae chiefly relies are marked with asterisks.

## STATEMENT OF IDENTITY, INTEREST IN CASE AND AUTHORITY TO APPEAR

Stephen Westermann received his J.D. from the University of Chicago Law School. His scholarship has been cited in numerous law review articles. His most recent article in 2025—*A Republic If You Enforce Your Antitrust Laws Against the Dominant Digital Platform News Publishers*[1]—addresses the risks to the nation's democracy posed by what Justice Clarence Thomas characterized as the "unprecedented … concentrated control of so much speech in the hands of a few [digital platforms]," *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1221 (2021) (Thomas, J., concurring), and how the antitrust laws may be applied to mitigate them.

Professors Francis Fukuyama and Barak Richman have explained "[t]he real danger [of digital platforms] is not that they distort markets; it is that they threaten democracy,"[2] because their "ability to amplify or silence speech has reached a scale large enough to potentially sway elections."[3] Based on such analysis, the greatest

---

[1] W. Stephen Westermann, *A Republic If You Enforce Your Antitrust Laws Against the Dominant Digital Platform News Publishers*, SSRN (Aug. 11, 2025), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5366540.

[2] Francis Fukuyama, Ashish Goel, Barak Richman, *How to Save Democracy from Technology: Ending Big Tech's Information Monopoly*, Foreign Affairs (Nov. 24, 2020), https://www.foreignaffairs.com/articles/united-states/2020-11-24/fukuyama-how-save-democracy-technology.

[3] Francis Fukuyama & Barak Richman, *How to Quiet the Megaphones of Facebook, Google and Twitter*, Wall St. J. (Feb. 12, 2021, 5:09 PM),

antitrust harm from Google's monopolization of general search and resultant domination of the search news information channel is the harm to Americans from impairment of and increased risk of destruction of the democratic system (the "Democratic System Harm"). **Amicus Curiae's main interest is to bring to the Court's attention, since no other party does, that since the District Court did not consider the Democratic System Harm, the remedies below do not "cure" the main "ill effects of the illegal conduct," as they must.** *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 88 (1950). Therefore, Amicus will urge the Court to exercise its duty under *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 323 (1961) to remand the case with instructions to the District Court to fashion a decree that will redress the Democratic System Harm.

Google LLC and the Colorado-led Plaintiff States consented to submission of this amended brief, and the Department of Justice and Co-Plaintiff States took no position. No party's counsel authored any part of the brief and no one contributed money intended to fund the brief's preparation and submission. Fed. R. App. P. 29(a)(4)(E).

---

https://www.wsj.com/tech/how-to-quiet-the-megaphones-of-facebook-google-and-twitter-11613068856.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In a 2021 case, Justice Clarence Thomas observed that the "unprecedented ... concentrated control of so much speech in the hands of a few [digital platforms]" means "we will soon have no choice but to address how our legal doctrines apply to [them]." *Biden*, 141 S. Ct. at 1221. At the Liability stage, Plaintiffs identified how harm from Google's concentrated control of so much information was a main source of antitrust harm: "The Court's intervention is required to redress the consequences of Google's monopolies and ensure Americans regain access to vibrant, open information markets." Pls.' Liability Post-Trial Br. at 2. At the remedial stage, Plaintiffs explained how "Google, through its stranglehold on the ecosystem," has become "the gateway for how Americans retrieve information on the internet," and invoked the breakup of AT&T's control over an information channel "crucial ... in providing information to citizenry." Pls.' Remedies Post-Trial Br. at 1–2.

For Americans, one of the most important information markets is the news information market that informs their voting decisions. Professors Francis Fukuyama (Stanford), Ashish Goel (Stanford), and Barak Richman (George Washington University Law School) explained in a 2020 *Foreign Affairs* article: "The real danger [of digital platforms] is not that they distort markets; it is that they

threaten democracy."[4] In a subsequent article, Professors Fukuyama and Richman explained that this threat derives from their unprecedented control of the news voters receive:

> **[Digital platforms'] ability to amplify or silence speech has reached a scale large enough to potentially sway elections and shape policy outcomes. It constitutes a form of concentrated political power similar to leaving a loaded gun on the table.** We may believe that the person sitting opposite us today will not pick up the gun and shoot us with it, but trusting the good intentions of individual actors is not a sustainable approach for any democracy.[5]

Other scholars, lawmakers, and commentators share this concern, especially with respect to Google and Meta.[6] Based on this analysis, for the first time the federal judiciary confronts a case in which the main antitrust harm is impairment of and increased risk of destruction of the nation's democracy (collectively, the

---

[4] *See* Fukuyama et al., *supra* note 2.

[5] *See* Fukuyama & Richman, *supra* note 3 (emphasis added).

[6] *See, e.g.*, *Online Platforms and Market Power, Part 1: The Free and Diverse Press: Hearing Before the Subcomm. on Antitrust, Com., and Admin. L. of the H. Comm. on the Judiciary, 116th Cong. 10* (2019) (statement of Rep. Jerrold Nadler, Chairman) (observing that "[Google and Facebook] have immense control over how Americans access their news sources"); Stigler Ctr. on Dig. Platforms, Committee on Digital Platforms: Final Report 15 (2019) ("This concentration of economic, media, data, and political power is potentially dangerous for our democracies."), https://research.chicagobooth.edu/-/media/research/stigler/pdfs/digital-platforms---committee-report---stigler-center.pdf; Tim Wu, *The Curse of Bigness: Antitrust in the New Gilded Age* 32 (2018) (observing the "clear dangers to democracy" from "concentration of so much power over speech" by Facebook).

"Democratic System Harm"). As discussed in Section II, on three different bases the Democratic System Harm is cognizable antitrust harm.

Supporting the assertions by Professors Fukuyama and Richman, in 2020 Meta's current CTO expressed his belief that one candidate's superior use of Facebook advertising may have decided the 2016 presidential election, and that Facebook alone could significantly influence the 2020 presidential election if it tried to do so (while advocating strongly it should not).[7] Surveys indicate Google possesses substantially greater news market share than second-place Meta (Facebook, Instagram and WhatsApp), and much greater share than any individual news publisher.[8] Separately, Google's substantial news market share impairs the ongoing operation of democracy, including by undermining many Americans' perception of the legitimacy of elections because it is impossible for them to know whether Google is trying to manipulate news.[9]

Amid the complexities of this case, Plaintiffs and the District Court failed to consider remedies ("News Competition Remedies") that would reduce Google Search's news market share, which could rapidly mitigate the Democratic System

---

[7] *See* Andrew Bosworth, *Lord of the Rings, 2020 and Stuffed Oreos: Read the Andrew Bosworth Memo*, N.Y. Times (Jan. 7, 2020), https://www.nytimes.com/2020/01/07/technology/facebook-andrew-bosworth-memo.html.

[8] *See* Appendix I.

[9] *See, e.g.*, Stigler Ctr., *supra* note 6, at 15.

Harm independent of when, or if, the other antitrust remedies restore general search market competition. If one newspaper company stole printing presses from a competitor, it would not violate the First Amendment to require the first newspaper to reduce its news market share by returning those printing presses. Likewise, as discussed in Section V, there likely exist First Amendment-compliant News Competition Remedies pursuant to which Google Search would forego news market share it obtained or maintained in part through adjudicated illegal conduct, *United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024) ["*Google Liability*"]. The Supreme Court made this principle clear in *Associated Press v. United States*: "Freedom to publish is guaranteed by the Constitution, but freedom to combine to keep others from publishing is not." 326 U.S. 1, 20 (1945).

The largest component of the Democratic System Harm is incremental risk of democratic system failure caused by Google's incidentally acquired substantial news market share. Though such harm is not primarily monetary, the monetary component of the harm could be immense. Based on the analysis in Section III, a 1% or 5% increased risk of democratic system failure would impose estimated expected harm of $680 billion or $3.4 trillion, respectively, just from foregone earnings.[10] Democratic System Harm on this order far exceeds the commercial harms the District Court weighed in its remedies opinion, like supracompetitive advertising

[10] *See infra* notes 20 and 21 and accompanying text.

rates and diminished search engine choice. *United States v. Google LLC*, 803 F. Supp. 3d 18, 79, 142 (D.D.C. 2025) ["*Google Remedies*"]. **Amicus Curiae urges the Court to consider that the Democratic System Harm is the main antitrust harm in this case and may be the greatest harm in any antitrust case in U.S. history; but the District Court did not consider this harm when determining remedies.** As a result, the remedies do not "cure" the main "ill effects of the illegal conduct," as they must. *Gypsum*, 340 U.S. at 88. Therefore, Amicus Curiae urges the Court to exercise its duty under *du Pont*, 366 U.S. at 323, to remand the case with instructions to the District Court to fashion a decree that will redress the Democratic System Harm rapidly and with high certainty.

## ARGUMENT

### I. The District Court's Remedial Framework Omitted the Primary Democratic System Harm, Requiring Vacatur and Remand

#### A. Standard Under *du Pont*, *Gypsum*, and *Nat'l Soc'y of Pro. Eng'rs*

Under *du Pont*, the duty of the reviewing court "is to examine the District Court's action closely to satisfy [itself] that the relief is effective to redress the antitrust violation proved," because "[t]he proper disposition of antitrust cases is obviously *of great public importance* and their remedial phase, more often than not, is crucial." 366 U.S. at 323 (emphasis added). A decree must "cure the ill effects of the illegal conduct" and "*assure the public* freedom from its continuance," *Ford*

*Motor Co. v. United States*, 405 U.S. 562, 575 (1972) (quoting *U.S. Gypsum*, 340 U.S. at 88 (emphasis added)), and must "eliminat[e] the consequences of the illegal conduct." *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 698 (1978). A remedial decree is reviewed for abuse of discretion. *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1207 (D.C. Cir. 2004) (en banc).

### B. Omitting This Harm Means the Decree Does Not "Cure the Ill Effects of the Illegal Conduct," and Constitutes a Material Error of Law

In *du Pont*, the Court determined the district court erred because it had not addressed the "crucial question," which was whether "complete divestiture [was] necessary to assure effective relief" of the antitrust violation. *Id.* at 326. Here, the error is greater, since nothing in the record indicates the District Court considered the primary Democratic System Harm at all in determining remedies, and no remedy in the decree directly addresses this harm. Amicus submits that as in *du Pont* this Court should conclude that "the remedy decreed leaves the public interest . . . inadequately protected," and that it "should be derelict in [its] duty if [it] did not correct the error." *Id.* at 326. Because the court omitted the main Democratic System Harm, the decree is not "effective to redress the antitrust violation proved," *id.* at 326, and does not "cure the ill effects of the illegal conduct," *Gypsum*, 340 U.S. at 88. Omitting the main harm from the remedial framework constitutes a material error of law, as did the resultant failure of the decree to cure the Democratic System Harm

ill effects. "A material error of law is always an abuse of discretion." *In re White*, 64 F.4th 302, 312 (D.C. Cir. 2023).

### C. The Decree's Timetable and Uncertainty Are Intolerable Measured Against the Democratic System Harm

Currently, mitigation of the Democratic System Harm currently depends entirely on the remedies designed to restore general search competition. The District Court set a six-year term—one year to establish the Technical Committee and the data-sharing infrastructure, and as much as five more years before rivals might "develop the capacity to compete with Google"—while observing that five years of European intervention "have not moved the needle." *Google Remedies*, 803 F. Supp. 3d at 159. Other amici submit the decree is very unlikely to restore competition. Br. of Antitrust Law, Economics, and Business Professors as *Amici Curiae* Supporting Plaintiffs-Appellees at 2. Neither this protracted timetable nor this uncertainty is tolerable where the antitrust harm is impairment of and increased risk of destruction of the democratic system. In *du Pont*, the Supreme Court held that "the public interest should not . . . be required to depend upon the often cumbersome and time-consuming injunctive remedy," 366 U.S. at 333–34. That principle applies here with much greater force.

### D. Further Errors of Law

Plaintiffs argue correctly that the District Court made a material error of law by "never determin[ing] whether a payment ban was necessary to assure effective relief, as it was required to do, instead ... wrongly skipp[ing] ahead to considerations other than effectiveness." Response Br. and Opening Br. on Cross-Appeal for the United States and Co-Plaintiff States 129 ("U.S. Br.") (citing *du Pont*, 366 U.S. at 326). This defect, though, applies to the entire decree: the court made a material error of law never to determine whether the *combination of remedies* it ordered will redress the harms caused by the illegal conduct, which it was required to do under *du Pont*. 366 U.S. at 326. This is a separate error of law, the magnitude of which is multiplied after the Democratic System Harm is included in the remedial framework.

### E. Omitting the Primary Democratic System Harm Is Far from Harmless

The omission is far from harmless because it is reasonable to expect that the District Court would have ordered different and more extensive remedies had it included the Democratic System Harm. For example, one reason the court rejected the Chrome remedy was it found the record did not establish the *Microsoft III* "clearer indication of a significant causal connection" standard for structural relief. *Google Remedies*, 803 F. Supp. 3d at 69 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 106 (D.C. Cir. 2001) (en banc) ["*Microsoft III*"]). But the court would not have reached this standard had it determined the only way to restore competition

with sufficient speed and certainty to redress the Democratic System Harm was to order Chrome divestiture. As *du Pont* instructs, "[e]conomic hardship can influence choice only as among two or more effective remedies." 366 U.S. at 326–27. The *Microsoft III* standard (to the extent not legally incorrect dicta[11]) comes into play only in choice among different effective remedies.

If the court reaches balancing assessments on remand, these would be materially altered by including the Democratic System Harm. For example, the District Court withheld the payment ban based on downstream risks to distributors that it could "not predict to any degree of certainty." *Google Remedies*, 803 F. Supp. 3d at 105. Had the court weighed risks to distributors against this remedy's contribution to mitigating the graver risk to the democratic system, it may have ruled otherwise.

### F. This Court's Duty Is to the Public Interest, and the Public Interest Has Never Been Greater

The District Court's responsibility is to "assure the public" that the "ill effects of the illegal conduct" will not continue," *Ford*, 405 U.S. at 575; and this Court's duty to assure the decree does so is also owed to the "public interest." *du Pont*, 366 U.S. at 333-34. In *du Pont*, the Supreme Court found the public interest in effective

[11] *See* Br. of Amicus Curiae Am. Econ. Liberties Project in Supp. of Pls., *United States v. Google LLC*, No. 1:20-cv-03010-APM (D.D.C. May 9, 2025) (arguing that *Microsoft III*'s "significant causal connection" discussion is legally incorrect dicta drawn from a treatise passage advancing the authors' personal policy views).

antitrust relief compelled it to reject the decree below and direct the court to order complete divestiture—in a case where the stakes were *automobile fabrics and finishes*. 366 U.S. at 326, 334. Here the public interest is of an entirely different order. Amicus respectfully submits that the public interest in mitigation of the Democratic System Harm is so great that it requires that this Court assure that the decree redresses this main antitrust harm.

Because its duty is to the public interest, the District Court is empowered to fashion remedies to redress the primary Democratic System Harm that Plaintiffs did not specifically request. *See Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944) (equity courts mold decrees "to the necessities of the particular case," with "[f]lexibility rather than rigidity"). For example, in this case the District Court on its own initiative broadened Plaintiffs' definition of "Qualified Competitor" to include genAI competitors like OpenAI. *Google Remedies*, 803 F. Supp. 3d at 93. In *United States v. AT&T Co.*, Judge Greene barred AT&T from electronic publishing for seven years because he determined AT&T could injure the democratic system by leveraging its dominance in national data transmission to become a dominant news publisher. 552 F. Supp. 131, 183–86 (D.D.C. 1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983). In that case, AT&T *had not even entered electronic publishing*, whereas Google already dominates the general search news channel with around 90% of the general search market. *Google Remedies,* 803 F. Supp. 3d at 95.

### G. Requested Relief

The District Court's omission of the main Democratic System Harm affects the entire decree. Therefore, Amicus Curiae respectfully urges this Court to vacate the denial of a payment ban, as Plaintiffs request, and to remand with instructions that the District Court include the Democratic System Harm in its remedial framework and determine what remedies are required to mitigate the Democratic System Harm both rapidly and with high certainty, including (1) determining viable News Competition Remedies; (2) reconsidering the payment ban, the structural and other remedies originally proposed by Plaintiffs that would make restoration of general search competition more rapid and certain (the "Search Competition Remedies"); and (3) taking such further evidence as these determinations require. A framework instruction reaches every remedy the District Court fashions on remand, including those Plaintiffs have not challenged.

If effective News Competition Remedies were ordered, they might relieve some time pressure for the Search Competition Remedies. If, contrary to the analysis in Section V, the District Court determines News Competition Remedies are unavailable, mitigation of the Democratic System Harm will depend entirely on the Search Competition Remedies, which then must operate much faster and with much greater certainty than the decree below provides.

## II. The Democratic System Harm Is Cognizable Antitrust Harm

### A. Based on Legislative History

The Democratic System Harm is cognizable antitrust harm based on the legislative history that indicates the paramount goal of the antitrust laws is to protect Americans from democratic system failure that could be precipitated by industry overconcentration. *See infra* Section IV.

### B. Based on *Associated Press* and Subsequent Cases

In *Associated Press*, the Court held that harm to Americans from threatened loss of newspaper diversity in many regional markets caused by a trade restraint was cognizable antitrust harm because "the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." 326 U.S. at 20. Eight years later, the Court further explained that the reason the dissemination of news "from as many different sources ... as is possible" is important is that "[a] vigorous and dauntless press is a chief source feeding the flow of democratic expression and controversy which maintains the institutions of a free society." *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 602–03 (1953) (citations omitted).[12] Likewise, in this case the harm to the public caused by reduced

[12] *See also, e.g.*, *Hawaii v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241, 1253–55 (D. Haw. 1999), aff'd, 203 F.3d 832 (9th Cir. 1999) (enjoining the closure of a competing newspaper under Clayton Act § 16 after finding "no monetary amount will be able to compensate for the loss of [its] editorial and reportorial voice, . . . the elimination of an important source of democratic expression"); *Community*

diversity of news sources in the general search news channel is cognizable antitrust harm because today general search is a main way Americans get news like newspapers were in the 1950s. According to a 2025 Pew survey, today 63% of U.S. adults get news from search engines "often" or "sometimes;"[13] and, roughly nine of every ten times an American gets news using general search, Google decides what appears and in what order (based on Google Search's general search market share of about 90%, *Google Remedies,* 803 F. Supp. 3d at 95).

In *Associated Press*, the Court found the trade restraint at issue unlawful because it "can have most serious effects on the publication of competitive newspapers, both those presently published and those which, but for these restrictions, might be published in the future." 326 U.S. at 13. Like rival newspapers, Google's competitors each have their own distinct editorial policies and algorithms for curating news. The District Court found that Google's unlawful conduct "kept [rivals'] usage ... below the critical levels necessary to pose a threat to Google's monopoly," *Google Liability*, 747 F. Supp. 3d at 145—leaving Bing (5.5%), Yahoo! (2.2%), and DuckDuckGo (2.1%) with very small general search market shares, *id.*

---

*Publishers, Inc. v. Donrey Corp.*, 892 F. Supp. 1146, 1177 (W.D. Ark. 1995) (ordering rescission of the acquisition of a competing newspaper after concluding "the public interest is injured each day that competition is prevented under this arrangement").

[13] Pew Rsch. Ctr., *News Platform Fact Sheet* (Sept. 25, 2025), https://www.pewresearch.org/journalism/fact-sheet/news-platform-fact-sheet/.

at 38—and deterred new entry, *id. at 165*. This has suppressed rivals' news reach and editorial influence in the general search news channel to similarly negligible levels, and silenced the voices of foreclosed entrants.

This principle is not confined to news. Recently, a court in this district found that harm to the public from reduced "variety in the marketplace of ideas" caused by foreseeable loss of book diversity is cognizable antitrust harm. *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 56 (D.D.C. 2022).

*Associated Press* imparts a separate duty to this Court to enforce the Sherman Act to preserve news industry diversity. In this landmark case, the Supreme Court condemned a restraint on trade that would have been acceptable in other industries because, as Justice Frankfurter explained, "[t]ruth and understanding are not wares like peanuts or potatoes." 326 U.S. at 28 (Frankfurter, J., concurring). The Court found that the First Amendment provides "powerful reasons" to apply the Sherman Act to preserve news industry diversity. *Id.* at 20. In his dissent, Justice Murphy supported this interpretation in protesting that the Court would have required more evidence of violation in a suit "against those who sell food, steel or furniture." *Id.* at 53 (Murphy, J., dissenting).

### C. Based on Standard Antitrust Law for Differentiated Product Markets

The Democratic System Harm is cognizable antitrust harm based on standard antitrust law for differentiated product markets that recognizes that in such markets

citizens may enjoy very significant non-price-related welfare when the market offers a variety of products with differentiated product features.[14] For example, in *FTC v. Indiana Federation of Dentists*, a unanimous Supreme Court condemned an agreement among dentists to withhold x-rays from insurers because denying customers "a particular service that they desire" was cognizable antitrust harm, 476 U.S. 447, 459 (1986), even though that information service was peripheral to provision of dental care.

Here the product benefit at issue—better information for voting—is a central reason Americans consume news. According to a 2025 Pew survey, 78% of Americans say news "helps them make voting decisions," including 40% who say it "helps a lot"—compared, for example, to 5% who say it "helps a lot" to do their jobs.[15] Moreover, 80% say Americans "have a responsibility to be informed about the news when they vote," and 64% say it is "extremely" or "very important" to get news from multiple sources. *Id.* And news publishers intend their reporting to make Americans better-informed voters, thereby improving democratic system functioning. A salient example is *The Washington Post*'s masthead slogan "Democracy dies in darkness."

---

[14] U.S. Dep't of Just. & Fed. Trade Comm'n, *Merger Guidelines* § 4.2.E (2023).
[15] Pew Rsch. Ctr., *Americans' Views of and Experiences With the News* (2025), https://www.pewresearch.org/journalism/.

Moreover, in antitrust analysis there is no basis for distinguishing between the benefit to an individual from getting more diverse news to inform voting and the benefit from improved democratic system functioning. Both are intended product benefits. This is also the case with vaccines: a vaccine directly protects the individual who receives it, and protects them additionally by protecting the community. If monopolization of the pandemic vaccine industry increased the risk of deadly pandemics by reducing diversity of vaccine design approaches, that would be antitrust harm—the same way increased risk of democratic system destruction caused by suppression of news diversity in the general search information channel is. In both cases, the harm relates to a main intended benefit of the product.

## III. Amicus Curiae Urges This Court to Acknowledge That the District Court Omitted the Main Democratic System Harm, and to Instruct the District Court to Determine Its Magnitude

The Democratic System Harm has two components: impairment of and increased risk of destruction of the democratic system. Amicus Curiae knows of no basis to think Google has ever tried to manipulate elections. Nevertheless, Google Search's substantial news market share undermines many Americans' perception of the legitimacy of elections because they cannot know whether Google is trying to manipulate news.[16] Supporting this concern, according to a 2020 Pew Research Center ("Pew") survey, 73% of U.S. adults said it is very (37%) or somewhat (36%)

[16] Stigler Ctr., *supra* note 6, at 15.

likely that social media sites intentionally censor political viewpoints they find objectionable.[17] Google Search is not a social media site, but it performs the same kind of black-box curatorial function when ranking news search results.

As discussed in the Introduction, Professors Fukuyama, Goel, and Richman have explained that "[t]he real danger [of digital platforms] is not that they distort markets; it is that they threaten democracy."[18] This is the greater component of the Democratic System Harm. Amicus urges the Court to consider that a novel threat to the nation's democracy is if the common interest in protecting their market shares led Google and other large digital platform news publishing companies to support one of the political parties if such party in the future adopted a policy of lenient antitrust law enforcement against these companies. The collective editorial power of these digital platforms may be great enough that they could assure that such political party would win successive elections, which might contribute to the end of legitimate democracy. Antitrust scholar Daniel Crane has observed that "the monopolization of information channels could … contribute to the literal demise of democratic government."[19] This scenario illustrates one way it could do so. Amicus

---

[17] Pew Rsch. Ctr., *Most Americans Think Social Media Sites Censor Political Viewpoints* (Aug. 19, 2020), https://www.pewresearch.org/internet/2020/08/19/most-americans-think-social-media-sites-censor-political-viewpoints/.
[18] *See* Fukuyama et al., *supra* note 2.
[19] Daniel A. Crane, *Antitrust as an Instrument of Democracy*, 72 Duke L.J. Online 21, 29 (2022).

submits that on remand the District Court should take evidence to determine the likelihood of this scenario.

Even small incremental risk of democratic system failure would be very costly to Americans. As an illustration, the present value of the collective monetary cost to Americans from the expected harm from a 1% increase in the risk of democratic system failure may be roughly estimated to be on the order of more than $680 billion, and from a 5% increase on the order of $3.4 trillion, based on simplified assumptions that 1. the estimated present value of an average American's lifetime earnings is $1 million based on the methodology in the footnote;[20] and 2. democratic system failure may be estimated to reduce this present value by 20%, or $200,000.[21] These estimates exclude the immense non-financial harm Americans would experience from living under some form of authoritarianism. Harm of this order far exceeds the commercial harms the District Court weighed in its remedies opinion, such as

[20] Present value of lifetime earnings ("PVLE") for the U.S. population were calculated using age- and sex-specific PVLE values from Wendy Max et al., *Valuing Human Life: Estimating the Present Value of Lifetime Earnings, 2000*, tbl.2 (UCSF Inst. for Health & Aging 2004), https://escholarship.org/uc/item/82d0550k; weighted by 2024 populations by age and sex, U.S. Census Bureau, tbl. NC-EST2025-AGESEX-RES, https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-detail.html, and estimated 340 million population, U.S. Census Bureau, *U.S. and World Population Clock*, https://census.gov/polclock/; expressed in 2026 dollars using U.S. Bureau of Lab. Stat., *Consumer Price Index Summary—June 2026*, https://www.bls.gov/news.release/cpi.nr0.htm (sources last visited Aug. 3, 2026).
[21] Daron Acemoglu et al., *Democracy Does Cause Growth*, 127 J. Pol. Econ. 47, 48 (2019).

supracompetitive advertising rates and diminished search engine choice. *Google Remedies*, 803 F. Supp. 3d at 79, 142. It is readily appreciable that the magnitude of the Democratic System harm is substantial. Amicus submits that on remand the District Court should take evidence from democracy scholars and economists to determine how great.

## IV. Legislative History Indicates That the Paramount Goal of U.S. Antitrust Laws Is to Protect the Democratic System From Industry Overconcentration

Legislative history indicates that the paramount legislative goal of U.S. antitrust laws is to prevent concentration in private industries from impairing or causing the destruction of the nation's democratic system.[22] In his floor statement sponsoring the Sherman Act, Senator Sherman warned Congress that if it did not curb the "power and grasp of these [business] combinations" it must "be ready for the socialist, the communist, and the nihilist."[23] Likewise, Senator Kefauver, co-sponsor of the Celler-Kefauver Act, warned that when "concentration and monopoly gain too much power, [t]he taking over by the public through its government always has one or two political results[:] ... a fascist state or the nationalization of industries and thereafter a socialist or communist state."[24] His co-sponsor Representative

[22] *See, e.g.*, Robert Pitofsky, *The Political Content of Antitrust*, 127 U. Pa. L. Rev. 1051, 1053–54 (1979).
[23] *See* 21 Cong. Rec. 2460 (1890) (emphasis added).
[24] 96 Cong. Rec. 16,452 (1950) (statement of Sen. Kefauver); *see also, e.g.*, H.R. Rep. No. 63-627, at 19 (1914) ("[T]he concentration of wealth, money, and

Celler expressed the same concerns.[25] Construing the Celler-Kefauver Act, the Supreme Court found that "[t]hroughout the recorded discussion may be found examples of Congress' fear not only of accelerated concentration of economic power on economic grounds, but also of the threat to other values a trend toward concentration was thought to pose." *Brown Shoe Co. v. United States*, 370 U.S. 294, 316 (1962).

But it is the news industry that "is essential to the effective functioning of our political system," *Times-Picayune*, 345 U.S. at 602, as the Supreme Court has repeatedly recognized. *See also, e.g.*, *New York Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring) ("In the First Amendment, the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy."). For this reason, it is widely recognized that it is only overconcentration in the news industry that can *directly* impair the democratic

---

property ... in the hands of a few individuals or great corporations has grown to such an enormous extent ... [that it] threaten[s] the perpetuity of our institutions."); Wu, *supra* note 6, at 82; Daniel A. Crane, *Fascism and Monopoly*, 118 Mich. L. Rev. 1315, 1324 (2020).

[25] 96 Cong. Rec. 11,486 (1950) (statement of Rep. Celler) ("The monopolies soon got control of Germany, brought Hitler to power and forced virtually the whole world into war."); *see, e.g.*, Decartelization Branch, Off. of Mil. Gov't for Ger. (U.S.), *German Economic Decentralization: An Analysis of the German Cartel and Combine Problem* I-1 (Mar. 1, 1947) (on file with the Bentley Historical Library, University of Michigan) (concluding concurrent monopolization of important industries in Germany helped facilitate the overthrow of German democracy).

system, or *directly* contribute to its catastrophic failure.[26] It follows, then, that a paramount duty of the federal courts in enforcing the antitrust laws is to prevent news industry overconcentration from impairing the democratic system or contributing to its demise.

## V. First Amendment-Compliant News Competition Remedies Should Be Available

Upon remand, the District Court should be able to fashion effective News Competition Remedies because it has significant latitude to do so. In *Nat'l Soc'y of Pro. Eng'rs*, the Supreme Court rejected a First Amendment challenge to a Sherman Act decree that "restrict[ed] the Society's range of expression," holding that "[t]he standard against which the order must be judged is whether the relief represents a reasonable method of eliminating the consequences of the illegal conduct." 435 U.S. at 697–98. Recently, in *Moody v. NetChoice, LLC*, the Supreme Court explained that because "it is critically important to have a well-functioning sphere of expression, in which citizens have access to information from many sources"—which "is the whole project of the First Amendment"—"the government can take varied measures, *like enforcing competition laws*, to protect that access," where such measures do not involve "coercing speakers to provide more of some views or less of others." 603 U.S. 707, 732–33 (2024) (emphasis added).

---

[26] *See, e.g.*, Crane, *Antitrust as an Instrument*, *supra* note 19, at 29; Fukuyama et al., *supra* note 2.

It is important to recognize that any effective Search Competition Remedies will inherently reduce Google Search's overall speech volume and news market share without contravening the First Amendment. The specific question raised with respect to any News Competition Remedy is whether it contravenes the First Amendment because, unlike Search Competition Remedies, it targets the specific component of speech concentration—news—that causes the principal antitrust harm. Even a straightforward cap on Google Search's news market share should meet the "reasonable method of eliminating the consequences of the illegal conduct" standard because (1) it is necessary to mitigate the main antitrust harm with the speed and certainty required, (2) it can be structured to be temporary, and (3) for Google, news is one small component of content that it monetizes with ad revenue, no different to it from searches for restaurants or refrigerators—so small that Google Search demonstrated in a 2025 study that news is not important to its business.[27]

Since it assigns low commercial value to news, Google may prefer a News Competition Remedy that mitigates the principal component of antitrust harm over a less effective Search Competition Remedy that is more costly to it. As a result, if

[27] *See* Paul Liu, *Our Experiment on the Value of News Content*, Google (Mar. 25, 2025), https://blog.google/around-the-globe/google-europe/our-experiment-on-the-value-of-european-news-content/ ("The study showed that when we removed this [news] content, there was no change to Search ad revenue and a <1% (0.8%) drop in usage. … Beyond this, the study found that combined ad revenue across Google properties, including our ad network, also remained flat.").

the District Court had concerns about a particular News Competition Remedy, it could structure remedies so that Google could petition the court to accept such remedy in place of a specified Search Competition Remedy. Such substitution provisions are common in antitrust decrees. *See, e.g.*, *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 151, 153 (1948) (decree that required divestiture of jointly owned theaters permitted defendant later to seek court approval to acquire the joint interest by showing it would not unduly restrain competition); *Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. at 698–99 (permitting defendant later to "move the district court for modification of the decree" to obtain narrower relief).

One reason News Competition Remedies are viable is that Google Search does not produce the scarce product which is original news reporting. Another is that Google has been referring less traffic to news publishers as it increasingly answers news-related queries with AI Overviews.[28] As a result, it should be possible to stipulate as part of any News Competition Remedies that Google reduce news market share without reducing referral traffic, which Google should be able to accomplish by designing its modality interfaces to encourage more referrals as they

---

[28] *See, e.g.*, Keach Hagey, *News Publishers See Google's AI Search Tool as a Traffic-Destroying Nightmare*, Wall St. J. (Mar. 24, 2025), https://www.wsj.com/tech/ai/news-publishers-see-googles-ai-search-tool-as-a-traffic-destroying-nightmare-52154074.

did previously. This would assure that News Competition Remedies do not reduce the quantity of original news reporting.

## CONCLUSION

The main antitrust harm caused by Google's monopolization of general search is the Democratic System Harm. If this Court does not remand with instructions to mitigate it, Google's concentrated control over much of the news information Americans receive—what Professors Fukuyama and Richman describe as "leaving a loaded gun on the table"[29]—will remain. For the foregoing reasons, Amicus Curiae respectfully urges this Court to vacate the denial of a payment ban and to remand with instructions that the District Court include the Democratic System Harm in its remedial framework and determine remedies that will redress this harm rapidly and with high certainty.

Dated: September 11, 2026

Respectfully submitted,

/s/ Stephen Westermann
Amicus Curiae appearing pro se

785 Stanford Avenue
Menlo Park, CA 94025
(415) 713-1740
stephen.westermann@icloud.com

---

[29] *See* Fukuyama & Richman, *supra* note 3.

## APPENDIX I

### Public Survey Data on U.S. News Market Shares

According to 2025 Pew surveys, 35% of U.S. adults reported they regularly got news from YouTube;[30] and 17.1% and 39.6% reported getting news from Google Search "Often" or "Sometimes" (assigning Google Search 90% of Pew's search-engine category, based on the District Court's finding that Google holds about 90% of the general search market, *Google Remedies*, 803 F. Supp. 3d at 95).[31] According to a 2026 Reuters Institute survey, 22% and 12% of U.S. adults reported getting news from Google Discover and Google News in the past week.[32] In comparison, according to a 2025 Pew survey, 38%, 20% and 5% of U.S. adults reported they regularly get news from Meta platforms Facebook, Instagram and WhatsApp.[33] Also for comparison, according to a 2025 Pew survey, 36% and 19% of U.S. adults reported getting news regularly from ABC News and *The New York Times*.[34]

---

[30] Pew Rsch. Ctr., *Social Media and News Fact Sheet* (Sept. 25, 2025), https://www.pewresearch.org/journalism/fact-sheet/social-media-and-news-fact-sheet/.
[31] *News Platform Fact Sheet*, *supra* note 13.
[32] Nic Newman et al., *Reuters Institute Digital News Report 2026*, at 11 (2026), https://reutersinstitute.politics.ox.ac.uk/sites/default/files/2026-06/DNR%202026%20FINAL_2.pdf.
[33] *Social Media and News Fact Sheet*, *supra* note 30.
[34] Pew Rsch. Ctr., *News Media Tracker* (June 10, 2025), https://www.pewresearch.org/journalism/feature/news-media-tracker/.

These survey results are not directly comparable because the survey questions vary. Nevertheless, rough comparisons are possible using the assumptions that the percentage of adults who get news "regularly" from a source is equivalent to (1) the percentage who got news from a source "in the last week," and (2) the percentage who get news from a source "often" + 0.5 times the percentage who get news "sometimes." (Reach percentages sum to more than 100% because people use multiple sources.) Using this methodology, the aggregate reach of the Google Search modalities (Search, Discover, Google News) (71%) and YouTube (35%) is 106%—substantially greater than Meta's at 63%, and much greater than leading publishers of original news reporting like ABC (36%) and *The New York Times* (19%). Amicus submits that as part of determining the magnitude of the Democratic System Harm the District Court should obtain more precise news market share estimates.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and D.C. Cir. R. 32(e)(3) because it contains 6499 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: September 11, 2026 /s/ Stephen Westermann

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2026, I hand filed this Amicus Curiae Brief via the Clerks office.

A copy of the Amicus Brief will be served on all ecf users once the Court dockets the brief via ECF System.

Dated: September 11, 2026 /s/ Stephen Westermann