PUBLIC APPENDIX – SEALED MATERIAL IN SEPARATE SUPPLEMENT

**No. 26-5023**
**(Consolidated with Nos. 26-5047, 26-5049)**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

UNITED STATES OF AMERICA, *ET AL.*,
Plaintiffs-Appellees-Cross-Appellants,

v.

GOOGLE LLC,
Defendant-Appellant-Cross-Appellee.

---

On Appeals from the United States District Court
for the District of Columbia, Nos. 20-cv-3010 & 20-cv-3715
Hon. Amit P. Mehta

---

**JOINT APPENDIX VOLUME II OF V**
**(JA0474-0824)**

---


Daniel E. Haar
Nickolai G. Levin
Patrick M. Kuhlmann
Matthew A. Waring
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW, Room 3224
Washington, DC 20530-0001
(202) 532-4186
matthew.waring@usdoj.gov

*Counsel for Plaintiff-Appellee-Cross-Appellant United States of America*

Donald B. Verrilli, Jr.
Ginger D. Anders
Helen E. White
Daniel J. Kane
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW
Suite 500E
Washington, DC 20001
(202) 220-1100
Donald.Verrilli@mto.com

Benjamin J. Horwich
Justin P. Raphael
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000

*Counsel for Appellant-Cross-Appellee Google LLC*

Stanley E. Woodward, Jr.
*Associate Attorney General*
Stephanie A. Greco
*Deputy Assistant Attorney General, Litigation*
Ethan S. Hoffman
*Counsel to the Assistant Attorney General*

Travis R. Chapman
Grant Fergusson
Karl E. Herrmann
Ryan T. Karr
Claire M. Maddox
Michael G. McLellan
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW, Room 3224
Washington, DC 20530-0001

*Counsel for Plaintiff-Appellee-Cross-Appellant United States of America*

John E. Schmidtlein
Graham W. Safty
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
(202) 434-5000

Mark S. Popofsky
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 508-4624

*Counsel for Appellant-Cross-Appellee Google LLC*

Philip J. Weiser
*Attorney General*
Shannon Stevenson
*Solicitor General*
Jonathan Sallet
*Special Assistant Attorney General*
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
Jon.Sallet@coag.gov

Russell D. Johnson
*Deputy Solicitor General*
Conor May
*Assistant Attorney General*
Radhika M. Kattula
*Assistant Attorney General Fellow*

*Counsel for Plaintiff-Appellee-Cross-Appellant State of Colorado*

## TABLE OF CONTENTS

## VOLUME I

Docket Report for United States of America v. Google LLC, No. 20-3010 (D.D.C.) .......... JA0001

Docket Report for State of Colorado v. Google LLC, No. 20-3715 (D.D.C.) .......... JA0213

Order Granting in Part and Denying in Part Plaintiffs' Motion to Consolidate (Jan. 7, 2021) 20-cv-3715 Dkt. 67 .......... JA0227

Order to Bifurcate Proceedings (Dec. 6, 2021) Dkt. 264* .......... JA0229

Order Regarding Production Deadline, Motion to Compel Deadline, and Evidentiary Cut-Off Date (May 25, 2022) Dkt. 357 .......... JA0231

Excerpts from Plaintiffs' Opposition to Defendant's Motion for Summary Judgment (Feb. 16, 2023) Dkt. 506 (Sealed Version at Dkt. 476) .......... JA0235

Excerpts from Plaintiffs' Pre-Trial Brief (Sept. 8, 2023) Dkt. 688 Sealed Version at Dkt. 667) .......... JA0245

Opinion – Summary Judgment (Oct. 6, 2023) Dkt. 728 .......... JA0250

Designated Deposition Testimony of Mitchell Baker (Nov. 3, 2023) Dkt. 757-2 .......... JA0310

Defendant's Proposed Conclusions of Law (Feb. 23, 2024) Dkt. 834 .......... JA0351

Excerpts from Plaintiffs' Post-Trial Brief (Feb. 23, 2024) Dkt. 837 .......... JA0409

Plaintiffs' Proposed Conclusions of Law (Feb. 23, 2024) Dkt. 838 (Sealed Version at Dkt. 821) .......... JA0411

## VOLUME II

Excerpts from Plaintiffs' Proposed Findings of Fact (Apr. 30, 2024) Dkt. 906 .......... JA0474

* Docket entries are from No. 20-3010 unless otherwise specified.

Excerpts from Liability Transcript Dkt. 917 .......... JA0480

Excerpts from Liability Transcript Dkt. 918 .......... JA0510

Excerpts from Liability Transcript Dkt. 936 .......... JA0515

Excerpts from Liability Transcript Dkt. 938 .......... JA0555

Excerpts from Liability Transcript Dkt. 940 .......... JA0559

Excerpts from Liability Transcript Dkt. 941 .......... JA0566

Excerpts from Liability Transcript Dkt. 943 .......... JA0599

Excerpts from Liability Transcript Dkt. 944 .......... JA0608

Excerpts from Liability Transcript Dkt. 945 .......... JA0621

Excerpts from Liability Transcript Dkt. 951 .......... JA0623

Excerpts from Liability Transcript Dkt. 954 .......... JA0631

Excerpts from Liability Transcript Dkt. 965 .......... JA0648

Excerpts from Liability Transcript Dkt. 967 .......... JA0662

Excerpts from Liability Transcript Dkt. 970 .......... JA0667

Excerpts from Liability Transcript Dkt. 971 .......... JA0690

Excerpts from Liability Transcript Dkt. 972 .......... JA0693

Excerpts from Liability Transcript Dkt. 973 .......... JA0710

Excerpts from Liability Transcript Dkt. 974 .......... JA0712

Excerpts from Liability Transcript Dkt. 975 .......... JA0725

Excerpts from Liability Transcript Dkt. 979 .......... JA0727

Excerpts from Liability Transcript Dkt. 982 .......... JA0737

Excerpts from Liability Transcript Dkt. 983 .......... JA0740

Excerpts from Liability Transcript Dkt. 984 .......... JA0746

Excerpts from Liability Transcript Dkt. 985 .......................................... JA0752

Excerpts from Liability Transcript Dkt. 986 .......................................... JA0767

Excerpts from Liability Transcript Dkt. 992 .......................................... JA0770

Excerpts from Liability Transcript Dkt. 1004 .......................................... JA0773

Excerpts from Liability Transcript Dkt. 1006 .......................................... JA0785

Excerpts from Liability Transcript Dkt. 1007 .......................................... JA0791

Excerpts from Liability Transcript Dkt. 1010 .......................................... JA0800

Excerpts from Liability Transcript Dkt. 1012 .......................................... JA0812

Excerpts from Liability Transcript Dkt. 1013 .......................................... JA0820

**VOLUME III**

Opinion – Liability (Aug. 5, 2024) Dkt. 1033
(Sealed Version at Dkt. 1032)........................................................ JA0825

Declaration of Eddy Cue (Dec. 23, 2024) Dkt. 1111-1 .............................. JA1111

Excerpts from Opinion and Order Denying Apple's Motion for Limited
Intervention (Jan. 27, 2025) Dkt. 1153 ................................................ JA1115

Plaintiffs' Revised Proposed Final Judgment (March 7, 2025)
Dkt. 1184-1 ........................................................................ JA1117

Defendant's Proposed Final Judgment (March 7, 2025) Dkt. 1185 .............. JA1167

Declaration of John Giannandrea (May 2, 2025) Dkt. 1239 .......................... JA1179

Excerpts from Deposition of Jay Kim (May 16, 2025) Dkt. 1344-1 ............. JA1184

Excerpts from Redacted Deposition of Francois Laflamme (May 16, 2025)
Dkt. 1350........................................................................... JA1226

Excerpts from Defendant's Proposed Conclusions of Law (May 21, 2025)
Dkt. 1359........................................................................... JA1252

Excerpts from Plaintiffs' Remedies Post-Trial Brief (May 29, 2025)
Dkt. 1369 (Sealed Version at Dkt. 1348)........................................ JA1255

Excerpts from Plaintiffs' Remedies Proposed Findings of Fact
(May 29, 2025) Dkt. 1370 ........ JA1273

## VOLUME IV

Excerpts from Remedies Transcript Dkt. 1393 ........ JA1322

Excerpts from Remedies Transcript Dkt. 1395 ........ JA1326

Excerpts from Remedies Transcript Dkt. 1396 ........ JA1347

Excerpts from Remedies Transcript Dkt. 1397 ........ JA1357

Excerpts from Remedies Transcript Dkt. 1398 ........ JA1360

Excerpts from Remedies Transcript Dkt. 1399 ........ JA1378

Excerpts from Remedies Transcript Dkt. 1402 ........ JA1394

Excerpts from Remedies Transcript Dkt. 1405 ........ JA1398

Excerpts from Remedies Transcript Dkt. 1410 ........ JA1436

Excerpts from Remedies Transcript Dkt. 1411 ........ JA1449

Excerpts from Remedies Transcript Dkt. 1412 ........ JA1477

Excerpts from Remedies Transcript Dkt. 1414 ........ JA1483

Excerpts from Remedies Transcript Dkt. 1416 ........ JA1511

Excerpts from Remedies Transcript Dkt. 1417 ........ JA1528

Excerpts from Remedies Transcript Dkt. 1419 ........ JA1533

Excerpts from Remedies Transcript Dkt. 1420 ........ JA1542

Opinion – Remedies (Sept. 2, 2025) Dkt. 1436
(Sealed Version at Dkt. 1435) ........ JA1560

## VOLUME V

Defendant's Brief in Support of Entry of Its Proposed Final Judgment
(Sept. 17, 2025) Dkt. 1443 ........ JA1790

Excerpts from Final Judgment Hearing Transcript Dkt. 1447 ........................ JA1834

Opinion – Judgment (Dec. 5, 2025) Dkt. 1461 ............................................... JA1839

Judgment (Dec. 5, 2025) Dkt. 1462 ................................................................ JA1934

Motion for Extension of Time to File Notice of Appeal (Dec. 17, 2025) Dkt. 1465 .............................................................................................. JA1969

Order Granting Motion for Extension of Time to File Notice of Appeal (Dec. 18, 2025) Dkt. 1466 ........................................................................... JA1981

Excerpts from Declaration of Jesse Adkins (Jan. 16, 2026) Dkt. 1471-3 ...... JA1982

Notice of Appeal (Jan. 16, 2026) 20-cv-3715 Dkt. 174 ................................. JA1985

Notice of Appeal (Jan. 16, 2026) Dkt. 1472 .................................................. JA1987

Notice of Cross-Appeal (Feb. 3, 2026) Dkt. 1484 .......................................... JA1989

Notice of Cross-Appeal (Feb. 3, 2026) Dkt. 1485 .......................................... JA1997

Technical Committee's Status Report (Feb. 6, 2026) Dkt. 1492 ................... JA2002

Excerpts from Plaintiffs' First Status Report on Defendant's Compliance with the Final Judgment (May 4, 2026) Dkt. 1512 ........................................ JA2033

Order Denying Without Prejudice Defendant's Motion for a Partial Stay Pending Appeal (May 7, 2026) Dkt. 1514 ..................................................... JA2036

Order Granting Plaintiffs' Unopposed Joint Motion for Additional Time to Submit Template License Agreements for Search Syndication and Search Text Ads Syndication (June 26, 2026) Dkt. 1529 ............................... JA2044

Excerpts from Cue 30(b)(6) Deposition (Material Under Seal) ..................... JA2046

Excerpts from Designated Deposition Testimony of Phiroze Parakh (Material Under Seal) ............................................................................................ JA2056

Excerpts from DX0081 (Material Under Seal) .............................................. JA2059

Excerpts from DX0543 (Material Under Seal) .............................................. JA2060

Excerpts from DX0924 (Material Under Seal)............................................JA2064

DX0946 (Material Under Seal)................................................................JA2077

Excerpts from DX0962 (Material Under Seal)............................................JA2097

Excerpts from DX1027 (Material Under Seal)............................................JA2115

DXD06 .......................................................................................................JA2134

Excerpts from DXD29 (Material Under Seal)............................................JA2135

Excerpts from DXD37 (Material Under Seal)............................................JA2138

JX1 (Material Under Seal)........................................................................JA2143

JX24 (Material Under Seal)......................................................................JA2153

JX33 (Material Under Seal)......................................................................JA2157

Excerpts from JX71 (Material Under Seal)................................................JA2177

PXR176 (Material Under Seal)................................................................JA2185

PXR181 (Material Under Seal)................................................................JA2194

Excerpts from PXR571 (Material Under Seal)............................................JA2195

PXR606 (Material Under Seal)................................................................JA2199

PXR607 (Material Under Seal)................................................................JA2201

Excerpts from PXR608 (Material Under Seal)............................................JA2203

PXR609 (Material Under Seal)................................................................JA2214

Excerpts from RDX338 (Material Under Seal)............................................JA2216

Excerpts from RDX340 (Material Under Seal)............................................JA2217

Excerpts from RDX355 (Material Under Seal)............................................JA2221

Excerpts from RDX365 (Material Under Seal)............................................JA2223

Excerpts from RDX366 (Material Under Seal) ........................................... JA2225

Excerpts from RDX367 (Material Under Seal) ........................................... JA2227

RDX368 (Material Under Seal) ..................................................................... JA2228

Excerpts from RDX432 (Material Under Seal) ........................................... JA2236

Excerpts from RDX435 (Material Under Seal) ........................................... JA2247

Excerpts from RDXD025 ............................................................................. JA2250

Excerpts from RDXD33 (Material Under Seal) ......................................... JA2252

UPX0002 (Material Under Seal) .................................................................. JA2254

UPX0123 (Material Under Seal) .................................................................. JA2261

UPX0134 (Material Under Seal) .................................................................. JA2284

UPX0260 (Material Under Seal) .................................................................. JA2294

Excerpts from UPX0334 ............................................................................... JA2298

UPX0339 (Material Under Seal) .................................................................. JA2306

UPX0340 (Material Under Seal) .................................................................. JA2308

Excerpts from UPX0344 (Material Under Seal) ......................................... JA2311

UPX0605 ....................................................................................................... JA2315

UPX0856 (Material Under Seal) .................................................................. JA2325

UPX2051 (Material Under Seal) .................................................................. JA2326

UPX6033 (Material Under Seal) .................................................................. JA2379

UPXD104 (Material Under Seal) ................................................................. JA2384

[redacted]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | [redacted] |
| Defendant. | |
| STATE OF COLORADO, *et al.* | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | [redacted] |
| Defendant. | |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT**

February 9, 2024 [Corrected April 30, 2024]

[redacted]

(§ 2.1) (UCWeb SA (2017)); UPX5211 at -881–82 (§ 2.1) (UCWeb SA (2018)); UPX5212 at -810–11 (§ 2.1) (UCWeb SA (2020)); UPX5213 (UCWeb SA (2020 amend.)); UPX5214 (UCWeb SA (2021 amend.)). The most recent term of the agreement was [redacted]. UPX5212 at -819 (§ 11.1) (UCWeb SA (2020)).

**4. Google's Search Distribution Agreements Are Profitable**

319. Google's search distribution agreements are profitable. Tr. 4773:23–4774:25 (Whinston (Pls. Expert)); Tr. 9785:16–9787:1 (Murphy (Def. Expert)) ("there's a lot of headroom" between what Google pays for defaults and what it would pay).

320. Google refers to the payments that it makes to its search distribution partners to secure defaults as "traffic acquisition costs" or "TAC." Des. Tr. 24:7–10 (Porat (Google) Dep.); *id*. 25:20–22 (agreeing that TAC is "the investment by Google to acquire Search traffic from a partner"); Tr. 1256:24–1257:1 (Dischler (Google)) (agreeing that TAC is "the cost that Google pays its partners in order to receive query traffic").

321. Google determines the profitability of default distribution agreements by measuring the incremental revenue Google would expect to gain from a default relative to the TAC required to secure that default. Tr. 1539:9–1540:9 (Roszak (Google)); Tr. 10049:6–10 (Murphy (Def. Expert)) (when Google offers rev share, it calculates the incremental benefit of defaults to help guide its decision-making); UPX6024 at -437–38 (written 30(b)(6) response: "Prior to entering into these revenue share agreements, Google personnel will often estimate total revenue to be generated from search access points covered by the agreement and the total payments Google expects to make under [the] agreement to the partner."); UPX0551 at -233 (Mr. Pichai stating, "[i]ncremental Searches: This is pretty simple. When we do distribution

[redacted]

deals, the value that is created is if we get ***more searches that we would otherwise have not*** due to the deal.") (emphasis in original).

322. Google has never entered into a default distribution deal where the TAC exceeded the expected incremental revenue. Tr. 1540:19–22 (Roszak (Google)). Ruth Porat, Google's Chief Financial Officer, agrees that "the value of the acquired traffic that Google gets from the TAC payments exceeds [] the cost of the payments that Google makes" and that "[o]therwise [Google] wouldn't make the payments." Des. Tr. 29:19–30:1 (Porat (Google) Dep.); Tr. 10087:12–10088:1 (Murphy (Def. Expert)) (identifying no reason to disagree).

## IV. MARKET DEFINITIONS

### A. General Search Services In The United States Is A Relevant Market

323. General search services are the services GSEs provide to consumers, allowing consumers to find information from across the internet. Tr. 4610:13–22 (Whinston (Pls. Expert)). The services provided by GSEs are significantly differentiated from other methods of searching for and accessing information, such as by using specialized search engines or social media platforms. *Id.* 4611:6–25. Accordingly, general search services is a relevant antitrust product market in the United States. *Id.* 4610:13–4612:13, 4616:5–25.

#### 1. The Characteristics And Uses Of General Search Services Support Finding A General Search Services Market

324. The characteristics and consumer usage patterns of GSEs indicate that general search services constitute a relevant product market.

##### a) General Search Services Are Unique In The Breadth Of Queries They Serve

325. General search services are unique in the breadth of the queries they can serve. GSEs seek to return relevant results to any user query, no matter the topic. Tr. 8266:19–25 (Reid (Google)); Tr. 6511:5–23 (Hurst (Expedia Group)). Dr. Mark Israel, Google's economic expert,

[redacted]

on top drivers across all 4 markets"; showing Google's U.S. performance scores of 24% for both "[r]espects my privacy" and "[k]eeps my personal data secure"); *id.* at .004 ("Security and Privacy are most important drivers of trust in Search. However, we perform poorly on these four attributes across all 4 markets"); UPX1069 at -661–62 (privacy concerns were the biggest contributor to declining user trust in the Google brand).

566. By default, Google retains 18 months of user search history and web activity; Google allows users to change this setting, but only offers 3 months or 36 months of data retention as alternatives. *Infra* ¶¶ 1152–1153. Google set its default data collection at 18 months for no reason other than that 13 months "just felt like a really weird number." Tr. 9012:21–9013:18 (Fitzpatrick (Google)). Similarly, Google considered implementing a "slider" that would allow users to select any duration option within a given range for their personal auto-delete, data-storing preference but decided not to. *Id.* 9012:4–19, 9051:6–9054:16. Instead, if users wish to customize their auto-deletion, they must manually delete their search history. *Id.* 9012:4–19, 9013:19–9014:19. Additionally, changing the 18-month default (to either 3 months or 36 months) requires as many as 10 clicks and involves "considerable choice friction." *Infra* ¶¶ 1153, 1158.

567. Google sets the auto-delete default to 18 months despite its own survey showing that 74% of users would prefer that Google store their data for one year or less. *Infra* ¶ 1153.

**b) Google Captures Significant Surplus From Its Distribution Deals**

568. Google's ability to capture significant surplus from its search distribution deals is evidence of monopoly power in general search services. Tr. 4773:23–4775:13 (Whinston (Pls. Expert)). As Google's chief economist Dr. Varian agreed, large profits are an indicator of monopoly power. Tr. 414:8–10 (Varian (Google)).

[redacted]

569. In Google's search distribution agreements, the remaining sum after Google pays the net revenue share is Google's profit. Tr. 4773:23–4774:25 (Whinston (Pls. Expert)). Google's profit margin for its ISA with Apple is 64%. JX0033 at -797 (§ 4) (Apple ISA (2016 amend.)). Although this revenue share costs Google billions of dollars, the deal is nevertheless "profitable" for Google because it generates "more billions and billions in revenue." Tr. 7780:16–7781:24 (Pichai (Google)). The magnitude of Google's profit is a sign of Google's large market power. Tr. 4773:23–4775:13 (Whinston (Pls. Expert)); *id.* 4775:15–4777:5 ("[W]hen firms have a really, really big advantage, that is very likely to coincide with market power.").

570. Google has been "very insulated" from competitive responsiveness during its negotiations with Apple. *Id.* 4775:15–4777:5. In a competitive market, Apple would be able to play Google against GSE rivals and capture more of the profits by negotiating a higher revenue share. *Id.* 4773:23–4775:13 ("[I]f [Google] had equally capable rivals, it wouldn't be able to make that amount of money. Apple would play them off against each other. So when you see that level of profit, it's telling you that there's a really big gap and they have a lot of market power."); *id.* 10460:22–10462:23 ("[I]f Google faced rivals that were kind of on par with it, Apple would be able to play them off each other and make almost all the profit in this deal."). As Adrian Perica, Apple's head of corporate development, explained, a more competitive Bing—perhaps bolstered by additional traffic from Apple users—would "create incremental negotiating leverage to keep the take rate high from Google, and further our optionality to replace Google down the line." UPX0240 at -506. Instead, Mr. Pichai admitted that Google "didn't pay the [revenue] share Apple wanted" because Google knew that it was Apple's "only viable option." Tr. 7772:12–7773:10 (Pichai (Google)); Tr. 2464:8–2465:7 (Cue (Apple)) (Apple has no "valid

[redacted]

alternative" to Google for Safari's default); Tr. 10460:22–10462:23 (Whinston (Pls. Expert)) (Pichai's testimony demonstrates Google's monopoly power); Tr. 9783:21–9787:1 (Murphy (Def. Expert)) (Google had "a lot of headroom" in Apple revenue share negotiations).

### c) Google Does Not Invest In Quality Improvements

571. Google's failure to invest in quality improvements is direct evidence of its monopoly power in general search services. Google "does not . . . consider whether users will go to other specific search providers (general or otherwise) if it introduces a change to its Search product." UPX6019 at -365–66 (written 30(b)(6) response).

572. When Google has run quality degradation experiments, it has found user substitution was very limited, meaning that there was little cost to Google and reduced incentives to invest in quality improvements. UPX1082 at -294; Tr. 4770:23–4772:24 (Whinston (Pls. Expert)) (explaining UPX1082 at -294). Google has underinvested in search despite significant overall growth in search queries. Despite seeing a 45% increase in total queries between 2014 and 2017, Google decreased spending on search machines during that period. UPX0752 at -017. This "under-invest[ment]" led to corresponding decreases in search quality, including a smaller index, higher latency, and serving errors. Des. Tr. 192:1–196:19 (Porat (Google) Dep.) (discussing UPX0752 at -017); UPX0752 at -017; UPX0223 at -122 (graph of Google's latency increase); Tr. 7443:9–7445:17, 7450:2–7451:4 (Raghavan (Google)) (rejected a proposed investment in more data centers to reduce latency). Google's crawl has also not kept pace with the size of the web: in 2017, Google's index fell by 40% even as queries on its search engine have increased. UPX0722 at -308; UPX0249 at -547 (depicting Google's query growth and index decline on a chart).

573. Google's "R&D" intensity has not been high relative to other firms. Tr. 5857:5–5858:21. (Whinston (Pls. Expert)) (discussing UPXD104 at 79).

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
United States of America,     )
et al.,                       )
                              )
              Plaintiffs,     )
                              ) CV No. 20-3010
                     vs.      ) Washington, D.C.
                              ) September 13, 2023
Google LLC,                   ) 1:35 p.m.
                              )
              Defendant.      )
______________________________)
```

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For DOJ Plaintiffs: **Kenneth M. Dintzer**
**Joshua Hafenbrack**
U.S. DEPARTMENT OF JUSTICE
1100 L Street, NW
Washington, D.C.
(202) 307-0340
Email: Kenneth.dintzer2@usdoj.gov
Email: Joshua.hafenbrack@usdoj.gov

For Plaintiff State of Colorado: **Jonathan Bruce Sallet**
COLORADO DEPARTMENT OF LAW
Consumer Protection Section
Ralph L. Carr Colorado Judicial Center
1300 Broadway, Seventh Floor
Denver, CO 80203
(720) 508-6000
Email: Jon.sallet@coag.gov

For Defendant Google: **John E. Schmidtlein**
**Kenneth Smurzynski**
WILLIAMS & CONNOLLY LLP
725 12th St., NW
Washington, D.C. 20005
(202) 434-5000
Email: Jschmidtlein@wc.com
Email: Ksmurzynski@wc.com

Court Reporter: Janice E. Dickman, RMR, CRR, CRC
Email: Janice_e_dickman@dcd.uscourts.gov

* * *

Finally, there are a number of market events that I encounter in which a default has either been added or removed or is different between two similar devices that allow us to ask what data is specific to consumer search, what happens when a default is changed. And, again, I use that to validate the behavioral analysis and to compare it with the evidence from the case materials.

Q. Did you submit reports in this matter?
A. I did. I submitted three reports and a summary report.
Q. Did you personally draft those reports?
A. The reports, Your Honor, are drafted by me, with one exception: That your world has a very unique way of writing footnotes on references, and I needed help with that.
Q. And what conclusions did you reach, Professor Rangel?
A. Your Honor, here are my conclusions at a very high level. I list them in three rows, one conclusion associated with each assignment. My first conclusion is that search engine defaults generate a sizeable and robust bias in consumer search.

My second conclusion is that this default affects, these biases, are stronger in mobile than in personal computers.

And, finally, at a high level, that the existence of defaults in search and defaults in privacy affect, also, consumers' privacy choices.

Q. With respect to your first conclusion, Professor Rangel, I

want to ask you about the terms you used there, "a sizeable and robust bias."

What does "bias" mean in behavioral economics?

A. Bias, Your Honor, is fundamental -- fundamental concept in behavioral economics. A changing in a variable in the environment -- changing default, changing an interface, changing the music in the background in a store -- creates a bias in a decision -- in a consumer decision when it affects the decision of the consumer without changing the fundamentals of the problem.

What are the goods being offered to the consumer? What are the costs and the benefits? What is information that the consumer has? Direct impact modulated with other fundamentals being changed.

Q. And what does it mean for a default bias to be sizeable and robust?

A. By "sizeable," I mean that it's large. That it is of a magnitude that the participants in the market care about. And in the particular case of search, that, you know, it affects millions of consumers, and it's of sufficient magnitude that these companies are willing to invest billions of dollars to influence them.

And by "robust," I mean that a consumer who encounters these product without default is likely to be influenced by them with high probability.

habit in consumer search?
A. My opinion, Your Honor, is that the vast majority of individual searches, or queries, are carried out in habit, and this is why: Consumers search with high frequency. And they tend to search with a familiar device, the phone and the application that they tend to use. And critically, they get feedback immediately. The query works or the query doesn't work. Habits develop very strongly in those situations of high repetition and immediate feedback.
Q. And how, if at all, does being the default search engine affect the formation of habits?
A. In my opinion, being the default search engine is favored, is advantageous, to the point of view of these habits. And this is why: When a consumer encounters their devices for the first time and they start searching, they start searching with the default search engine, which for many of them is the case, likely. If that search engine that is the default generates adequate experiences, the consumer will get habitized to that.
THE COURT: Just -- I'll ask a question. I take it that an experiment could be constructed to evaluate if a -- what number of consumers and under what conditions a consumer would switch from a default search engine.
Are you aware of any such studies or experiments being conducted?
THE WITNESS: I am aware of experimental work -- and

I discuss it in my reports, Your Honor -- that has switched default search engines. So, for example, there is something called the Waldo Firefox experiment in which they took 1 percent of the users, allocated half as a control, they kept the Google default, and half they switched the default though them. They let it run and they see what happened. In my opinion, they found a substantial default effect. I cannot mention the numbers for confidentiality reasons.

I want to emphasize one thing, Your Honor. That is not exactly the experiment that you're asking for because this is not an experiment where you start with a situation where there is no default and somehow all of the options from the point of view of the choice architecture are on an equal basis, and then you have the default. This is a situation where you start with a default and then you impose on the consumer a change to another thing.

It's not quite the same, and there are reasons to worry about that as a precise answer to your question. But there is data that is qualitatively consistent.

THE COURT: In other words, in that study, when there was a different -- the default search engine was Google, but then it was changed to some other search engine --

THE WITNESS: To Bing.

THE COURT: -- to Bing in half the users. And for those that were changed to Bing, what was the -- and you don't

need to give me numbers, but what was the impact of having Bing as the default?

THE WITNESS: So I cannot mention the number, but a majority of the users in the treatment that had their default switched from Google to Bing did not switch their default back.

THE COURT: And were they advised that the default had changed?

THE WITNESS: No, they were not. Yeah, they were not. And there was also multi-fault, many, many times increase in Bing's searcher as the result of that.

BY MR. HAFENBRACK:

Q. Professor Rangel, did you see any case documents on how habits affect the way consumers search?

A. I have seen a number of case documents from Google that explicitly mention the role of defaults -- so, I apologize -- the role of habits on consumer decisions for tech products. And this table, Your Honor, is organized for the Court in a very similar way, just to save a mental effort on your part.

Again, they span a large number of years. Each row is a document by either -- by Google, or Google Neeva in the last stage, and it emphasizes how important is our habits. Let me highlight, for example, the first row, which is from this memo that has been discussed during Hal Varian's testimony. It says: Recommendation. Get users addicted to our interface and tools.

The word "addicted" is, in behavioral economics parlance, an extreme habit. The same way of saying the same thing.

But, they recognize throughout documents that if you can get users to develop a habit to use that product, the consumer will use that product.

MR. HAFENBRACK: And for the record, the UPX numbers on this slide are UPX151, UPX757, UPX1049.

BY MR. HAFENBRACK:

Q. Professor Rangel, if a user is searching in habit mode, are they sitting down to consider the pros and cons of their search engine choice?

A. No.

Q. And did you see evidence consistent with the view that for the vast majority of individual searches, users aren't doing that, considering those pros and cons?

A. There are some documents, in particular the one I'm going to show Your Honor, that are consistent with that view. Let me give you the context of this document, Your Honor. This is a letter in 2005 that Google sends to Microsoft, and the context is the following:

At that time Microsoft has implemented an upgrade of their operating system that involves new version of Internet Explorer, which is the predecessor of the Bing browser -- I apologize, of the Edge browser -- and Apple is complaining that

the way this has been implemented is problematic because Microsoft is importing the search engine defaults from the old version of Internet Explorer to the new one. If it was your original default, that; if the users change it, that. Whatever was the default at the time of the system upgrade.

And Google is complaining in the document that because users mostly don't change the defaults, that's, basically, a problem because they will stick with Internet Explorer's defaults. And, in fact -- this is not quoted here in this document -- choice is -- Google is urging Microsoft to use a choice screen in Internet Explorer.

They are also, in the last part of the quote, Your Honor, emphasizing that users -- a small fraction of users that are not in this habitual mode and will try to change the default will get frustrated and stop the process.

THE COURT: Let me ask a different question.

You used the example of walking into a coffee shop, and a consumer, over the course of time, may try a number of different drinks and then ultimately settles on the drink that matters.

Do you view a search engine first-time use differently than the person who is walking into the coffee shop the first time? In other words, what you've just described as a person walks in the coffee shop the first time actually is actively making a choice before the habit kicks in.

Do you see a different pattern with respect to the first time use -- or, user of a search engine -- or, search access point, I should say, to be more precise.

THE WITNESS: I do, Your Honor. And let me give you an example. The analogy of your beautiful example for the coffeehouse on the Google defaults would be, the first time you walk into Starbucks, or enter your first coffeehouse, they hand you a coffee, and that's the one you use. And if it's good -- if it's good enough, you just keep using it. You may explore and you may change when you see a friend, et cetera, but that initial consumption experience is determined by the default.

I think for most users that encounter these devices for the first time -- though it's getting harder because kids are learning them earlier and earlier -- but the default is where you to start. And then you start thinking about switching more if the experience is unsatisfactory, or if, for example, imagine that you go to a friend's house and you encounter -- you have to search in their computer, and you have, over years, developed a very strong preference for a brand, and you know that for your particular search that works well. But that may be a situation in which, because you have a very strong preference brand, your friend is different, you notice, you do change.

But the evidence that I have seen, Your Honor, in the case documents -- which, of course, there is variation among

consumers -- but many of them are confused. They don't know that there is a default. They don't know what the default search engine is. They don't know they can be changed.

THE COURT: That was going to be my question because you suggest that, at least, over time, that there may be conditions that arise that might cause people to want to change. And I guess the question is: Is it possible to quantify, or have there been experiments that would provide some understanding of what circumstances might cause a person to even consider switching from the default?

THE WITNESS: Yes. The data -- the data that a tech company has or a search engine has, especially with the ability to run the types of A/B testing that many of these companies do that involve changing settings or offering two different versions of the product and see what happens, tracking the consumer over time, yes. You can definitely study those things with their resources, yes.

THE COURT: Have you seen any study or experiment like that?

THE WITNESS: I mentioned --

THE COURT: Other than the one you mentioned.

THE WITNESS: There are a handful of experiments that I have seen that are related to this. Let me mention another. It's not exactly what you want, or at least with the data I have access to, Your Honor, I'm limited to the documents I see.

steps back and now considers more, What are the options? What are the custom and benefits? Thinks and makes a decision. It's slower. It requires substantial more mental effort.

And in my opinion, to finish the answer to your question, Counsel, individual searches, individual queries, are largely carried out with habits. When the consumer, infrequently, at some point, steps back and thinks about changing their default search engine, they do that on explicit mode.

THE COURT: They do what?

THE WITNESS: Explicit or deliberative mode, when they step back.

THE COURT: I see. Okay.

BY MR. HAFENBRACK:

Q. And did you, Professor Rangel, analyze what factors -- what behavioral factors might affect a consumer who is explicitly considering her choice of search engine?

A. I did.

Q. And what did you conclude?

A. So, Your Honor, in my opinion, as you can see in the slide, for a consumer to complete the process of switching the default in this explicit or deliberative mode, four things needs to happen. First, the consumer needs to be aware that there is a default. And that may sound trivial to the more sophisticated parts of the population, maybe to the younger parts of the

population, but that is not the case for everyone. And there are case documents that I have encountered multiple times that show that many people are not aware of this, and people are confused, even about what's the default search engine that they have.

Second, once they are aware that there is a default and that they could potentially change it, people don't walk around with a map of the alternatives and the pros and benefits. They have to discover them. This involves some research, some conversations, some Google searches, some reading, and that requires more mental effort. After they have somehow reached a consensus in their heads that maybe there is something else that they want to try, they need to figure out how to implement that change.

So, for example, if a consumer wants to change a default, let's say in an Android phone or in Safari -- the Safari browser, they need to research it again. These are not individuals like a very, very narrow class of Google engineers in the back of their heads with the steps to help do these things. They have to search them. And then maybe at that point they do it and they print out what are the steps, old-school, they put them next to their device. And at that point, they need to implement the steps. All of these things need to be completed successfully before a default change is successfully complete.

Q. And are the four factors that you've listed on this slide examples of what you would consider choice friction?
A. In my view, yes.
Q. And what is choice friction?
A. Your Honor, another fundamental concept in behavioral economics that applies to search engine defaults, the idea of choice friction is that you can have the same decision situation, same options, same items, same benefits and costs, but implementing the decision, the actions, can be more or less difficult.
For example, I could show you the font so small that you barely read, and screen your eyes and increase the screen, or I may ask you to leave application a couple of times, or scroll, scroll, scroll. The more effort is required -- and a lot of this effort is not the calories you spend moving the fingers, it's mental effort, the more choice friction there is.
Q. Does the degree of choice friction affect the impact, or the stickiness, of a particular default?
A. The conclusion from behavioral economics, Your Honor, is that the more choice friction it takes to change the defaults, the sticker the defaults are.
Q. And, Professor Rangel, did you see evidence from Google consistent with that opinion?
A. Yes.
Q. What did you see?

A. So, Your Honor, here is a slide from 2021, from the behavioral economics team, in which they are given -- and I've seen a version of this material multiple times -- in which they are trying to educate others at Google about behavioral economics and how it matters for the products. And here, talking about reducing friction. And I emphasize. I read the yellow part with you.

Seemingly small friction points -- small friction points, low choice friction -- in user experiences can have a dramatically disproportionate effect on whether people drop or stick -- in the context of defaults, of whether people drop in the process of changing a default or stick and complete the change.

Q. Any other evidence in a similar vein?

A. Yes. It's a related document. Your Honor, this is a document by the other behavioral economics group that had been collaborating with Google, Irrational Labs, that I mentioned before. And it's emphasizing a similar point, which is that -- I'm not going to read it to save the Court's time, but it's emphasizing how this mental efforts, this thinking costs can be ten times larger than what you think it is. The seemingly trivial mental efforts really matter.

MR. HAFENBRACK: And the last two exhibits were UPX103, UPX848, for the record.

BY MR. HAFENBRACK:

Q. Professor Rangel, does Google monitor the choice friction associated with its search defaults?
A. The case documents suggest that the answer is yes.
Q. What case documents did you see in that regard?
A. Well, seen a number of things. Generally, I've seen a number of memos, presentations, Your Honor, in which Google tracks the number of clicks, or steps, that it takes to change the default in different application devices. And to put it in context, Your Honor, I mention four things that need to happen, four choices of choice friction that refers about tracking the last step, the number of clicks.
Q. Do Google's contracts with Android manufacturers have provisions that, in your view, create choice friction?
A. Yes.
Q. And how so?
A. So, Your Honor, this is a highly redacted slide, but you can see the material on your page. And let me explain the context and the key idea that you can read highlighted in yellow.
So, Google has assigned these modified MADAs with a number of the Android manufacturers. This is an example from one with Samsung, but my understanding is that that has happened with other Android manufacturers. And as you can see in the box in the middle, they are requiring -- or, they're asking in the agreement, that consumers not be provided with

too much information, or with information about alternatives, about how to change them, et cetera.

And in my view, this introduces choice friction. Remember, again, the four steps of choice friction that I mentioned. This is about the degree of choice friction for the first steps: Awareness of the existence of default. Awareness of options. Reminders of that.

MR. HAFENBRACK: And for the record, that was UPX5511.

BY MR. HAFENBRACK:

Q. Professor Rangel, are you familiar with the Samsung S browser?

A. I am.

Q. And what is that the S browser?

A. It's a browser that comes pre-installed in Android Samsung devices.

Q. And do Google's contracts with Samsung create choice friction with respect to the S browser?

A. Yes, in my opinion.

Q. What did you see in that regard?

A. Your Honor, this is another highly redacted piece, but here is the context.

So, at some point around the day of the document -- the date of the document, Samsung had implemented a change in the interface for the S browser that facilitated -- reduced the

choice friction -- in the language of behavioral economics, the process of changing the default in this browser. And in this document -- and my understanding is I cannot specify the details -- Google is sending a complaint to Samsung, telling them that that reduction in the choice friction is in violation of the contract.

Q. And --

A. As a result of this -- let me finish, Counsel.

Q. Sure.

A. As a result of this, in the next iteration of the operating system -- or of the software, apologies, that interface was reverted, basically.

Q. And, Professor Rangel, why did you consider that episode significant?

A. I think it's consistent -- and, again, I'm not testifying for Google's motives, I have no expertise on that. It's consistent with the idea that this degree of choice friction is being monitored and enforced according to the contracts.

MR. HAFENBRACK: And that was UPX149.

BY MR. HAFENBRACK:

Q. Professor Rangel, did you analyze the manual steps, the Number 4 on your list of choice friction from earlier, required to change Google's search defaults?

A. I did.

Q. What search defaults did you analyze on a step-by-step

basis?
A. I did a number of them in my devices -- I apologize. In my reports. I talk about changing defaults in iPhones, in Safaris. I talk about changing defaults in Chrome. I talk about changing the search widget in Android devices. But I have, of course, investigated more options.
Q. Are you familiar with the Android search widget?
A. I am.
Q. And what's the Android search widget?
A. The Android search widget, Your Honor, is a search bar that appears in the home screen of Android devices of the box that allows consumers to type a search there without having to open a browser; a search app and, by default, searches with Google.
Q. And did you test out the steps that are required to change the default in the search widget on a particular type of Android device?
A. Yes. I am -- Your Honor, I have been a iPhone user since I was inspired in 2006 by Steve Jobs, in the initial launch. But for the purpose of this case, I purchased a Galaxy S22 phone out of the box and went through the experience that a new user of that interface and application should have, and spent considerable time familiarizing myself with that.
Q. And did you prepare a short demonstration for the Court of the steps required to change the search widget in a Samsung Android phone?

A. I have.
Q. Could you walk through that for the Court, please?
A. Yes, of course. So, Your Honor, before I start a demonstration, let me just put it in context so it makes sense.
So, what I want to give is a sense of a very specific subcomponent of the choice friction. This is a sub -- I'm trying to get a sense of what is the experience of an Android consumer who is aware that the defaults are there, has already spent the effort to understand another option, or set of options, and made a choice, and has already done the research about how to do this, and literally has the printout next to them. So I'm isolating that component, not everything. I just want to give you a sense of this.
So, imagine that you are a consumer and you are searching with a search widget. And you are a very enlightened consumer, so you want to learn about behavioral economics. So you type behavioral economics and you press search and you get the results. And at that point, you see the interface, and you see that the results were generated by Google. And for some reason -- I'm not testifying about Google's quality or saying anything about why -- the consumer just wants -- remembers that they had one -- they had this piece of paper with instructions and wanted to switch the default to Bing in the bar.
What would they have to do? Now the demonstration really starts.

So they would have to leave the application and go to the home page, press Play Store, and then go to the top and type Bing. They don't have to type exactly Bing search application. They have to type something that is sufficiently similar. But not anything will generate Bing. It has to be sufficiently close. They press install, and then they go back to the home, leave the application, and then they have to do a different kind of touch, it's a long kind of touch, and the widgets appear and they can click on it -- at least of widgets that are available, click. You're clicking one of them.

And then there are multiple flavors. You select one of them with a rather long touch, then you press @, and now the bar is there. Now you want to change it, you're going to take out the Google one, you do a long press there, up, remove, and now you have completed a change. You had a Google search box, now you have a Bing one.

Now, imagine the consumer types, again, behavioral economics, just to test that everything has worked. Press search. And now, as you can see, you get a search generated by Bing.

And by the way, not intentionally, just casually, the Bing returned a picture of famous behavioral economist. Not me. The third one from the left is someone called Dan Ariely, who is the head of Irrational Labs that works with Google. Factoid.

Q. And what is your opinion of the degree of choice friction associated with the steps you just demonstrated?
A. Again, let me emphasize, this only the final part. But if you only think about that final part, I think this is considerable choice friction. And this is why, Your Honor:
To put it in context, compare what I just show you with the tipping interface or the Google market, for example. It's in your face. It is one click. That's it. This, much more complicated. So it's not surprising to a behavioral economist that as in the document I showed you earlier, some consumers would try to complete the process.
Q. If a -- take an Android user, a user of this type of Samsung phone. If they are able to complete the steps you just demonstrated for changing the defaults in the search widget, does that change the Google Search default for other search access points?
A. Not in Android.
Q. Would the user have to complete a separate series of steps to, for example, change the default in the Chrome browser?
A. That is correct.
Q. You analyzed the degree of choice friction associated with changing the default in Apple's Safari browser; is that right?
A. Yes.
Q. What's your opinion about the choice friction associated with Safari?

A. I am not ready to provide, literally, ranking of the degrees of choice friction of all of those interfaces. This is something that I cannot do. But, I think it's substantial.

And, again, especially when you compare it to the examples of the interface of the software prescription, you know, that I have shown you that we know have much lower interfaces, is very far apart, and they already generate sizeable default.

Q. Did you listen to opening statements yesterday?

A. I did.

Q. Did you hear a comment by Google's counsel that if a user wants to change a Google Search default, they can easily do so at zero cost?

A. Yes.

Q. Do you agree with that?

A. No.

Q. Why not?

A. Every action that we take, Your Honor, every action, every thought requires mental effort. You can argue about how much, but it requires mental effort. And one key lesson of behavioral economics that I just showed you is shared by behavioral economics team at Google, when we talk about friction, is that everything, every one of these steps matters a lot more than you think. It really affects consumer behavior.

Q. Did you -- switching gears slightly.

Did you analyze market evidence on the effect that search defaults have on consumer choice?

A. I have.

Q. And what market evidence did you analyze, Professor Rangel?

A. Your Honor, I have analyzed a number of market events, both for mobile devices and personal computers. Again, these are market events in which a default has been switched. And for the purpose of facilitating the discussion, let me talk first about these three in mobile devices.

Q. Okay. Let's take the first one first.

What is your understanding of the Apple Maps default switch?

A. Before 2012, Your Honor, Google Maps, map software for finding direction and other things, is the default in iPhones, in Apple phones. In 2012, Apple Maps is introduced by Apple and made the default in Apple devices.

Q. And what did the data associated with that default switch from Google Maps to Apple Maps show?

A. So, Your Honor, this is the result of that event. I wait for you to find it because there are -- takes a while. It's slide 40, if it helps, Your Honor.

THE COURT: That does help. Thank you.

THE WITNESS: So while maintaining confidentiality, of course, with what that graph is plotting is the share of map

searches in the iPhones that are going through Google, to Google Maps. And what you can see there, in green, is that the share for Android after the default is changed in Apple doesn't -- the trend doesn't change. Things keep changing at the same rate. There's no effect, basically.

But the impact for iPhones is immediate, very sizeable, and last quite a while, at least for the period covered in that graph. That's a large default effect.

MR. HAFENBRACK: And that was UPX97.

BY MR. HAFENBRACK:

Q. Professor Rangel, are there any other aspects of the Apple Maps default switch that you considered relevant to your analysis?

A. Yes, there are.

Q. What are those?

A. So, Your Honor, there's some that are -- there are a couple of things that are interesting about this. The first one is that when Apple Maps is initially introduced, the software is very boggy. It has a lot of problems and there are a lot of complaints, to the point that you see Apple's CEO publicly come and apologize. Something you don't see every day. And as an economist, this is interesting because it shows it's another example of how defaults can be powerful enough to produce these effects, even when the default is assigned to an inferior product. And this is a quote from Google making the same

thing.

THE COURT: And just to be clear, when you say the maps became the defaults, what you mean by that is that it was the Apple Maps app that was on the home screen when it was taken out of the box, and no longer the Google map set, correct?

THE WITNESS: My understanding is that and something else, Your Honor, which is that -- you may have experienced this in the use of your own devices. Sometime, in a website, you encounter an address and you tap it and an application opens with a map or in an email. That will be the app that will open with that.

THE COURT: Right. Okay.

THE WITNESS: The second part, just to complete the -- sorry, Your Honor.

THE COURT: No, no. Please, go ahead.

THE WITNESS: You asked me to discuss these two things, Counsel.

BY MR. HAFENBRACK:

Q. Yes.

A. To remind the Court, earlier we talked about this event called Code Red in which -- and I'm going to get it right this time -- Google worries about losing the Apple default, and there are discussions internally about the implications and what to do.

One of the things that you see on the slides, on the decks, in the discussions is Google trying to estimate how much search, how much revenue they're going to lose from that. And, of course, they need to do that based on the data. And the documents show that this Google Maps event is used to construct those estimates for mobile devices.

Q. Could you provide an example of a piece of evidence you saw in which Google uses the Google Maps data to project what might happen if it lost the search default on Apple devices?

A. Absolutely. So, Your Honor, this is another redacted slide, but let me highlight a couple of parts of the document while maintaining confidentiality.

So, in the table that you see on the left-hand side, on the upper left, they are providing estimates in the left column of what they call the recovery assumptions. If Apple were to change the default to something else, how much of the traffic they will get back. In the top row for mobile, in the bottom for PCs. Now, that's how much they would get back.

What they would lose is 100 percent minus that number. The loss is 100 percent minus the recovery, which is what is listed there.

And please notice that the number that is listed there, it's very substantial, and it's justified by the slide about the Google Maps that I just showed you.

MR. HAFENBRACK: And that was UPX148.

THE COURT: Counsel, just to let you know, it's about 5 of 5. I'm not sure where you are in your examination.

MR. HAFENBRACK: Your Honor, I've got, you know, half -- 20 minutes to half an hour more, probably.

THE COURT: Okay. All right. Why don't we go to 5. I've got a plea hearing at 5 o'clock, so we'll just continue with the testimony in the morning.

MR. HAFENBRACK: Okay. That sounds great.

So go for five more minutes?

THE COURT: Yes.

BY MR. HAFENBRACK:

Q. Professor Rangel, did you analyze search usage on tablet devices in the United States?

A. I have.

Q. And what tablets in particular did you look at?

A. I compare, Your Honor, iPads and Amazon Fire tablets.

Q. Could you describe for the Court the default browser and search engine configuration on those two types of tablet devices?

A. And I will put it here, also, for the Court.

In iPad, Your Honor, Safari is the default browser, and it has Google as the search engine default. And in Fire, Silk is the default browser, and comes with Bing as the default.

Q. And what market evidence did you observe with respect to

these tablet devices?

A. What you compare -- this is a comparison, Your Honor, between two devices of the same general category, similar screens, similar user interfaces, that come with different defaults. And we can get a sense of the magnitude of these defaults by comparing the shares of the two default engines, Google and Bing. And as you can see, again, maintaining confidentiality, these numbers are very big.

For example, look at the impact for Bing. Their share when they are the default in Amazon Fire tablets is many, many times what it is in the iPad.

MR. HAFENBRACK: And this was -- the one document on this slide is UPX945.

BY MR. HAFENBRACK:

Q. Professor Rangel, understanding you can't discuss the figures in open court, but can you give us a qualitative sense of the size, the magnitude of the default effect you're observing here?

A. If you take those numbers as the estimate of the default size, this is an enormous effect, compared to the defaults -- the body of defaults research.

Q. And how did the size of the default effects you observe here on tablet devices compare to the Code Red projections you just discussed?

A. I mean, these are larger default effects than the Code Red

projections.

Q. Professor Rangel, are you familiar with the introduction of a search engine choice screen in Russia?

A. I am.

Q. And first, in matter of terminology, what is a choice screen?

A. Yes. Your Honor, a choice screen is a procedure, an interface, in which a user is asked explicitly to make a choice about a setting of a device or other software before they can continue using it.

In the context of defaults, instead of having that default given by you, you choose. You have to make a choice.

THE COURT: And this is a choice screen given the first time the product is used?

THE WITNESS: In this particular case, Your Honor, it's -- let me -- the answer depends. And what happens here, Your Honor, is that in 2017, the Russian Federation antitrust authorities asked Google to start releasing a choice screen starting on that date. Now, the release is different for new devices than for people who are continued using their old phone. There's some differences about how this is done.

BY MR. HAFENBRACK:

Q. Both --

A. One other thing, sorry, I wanted to say for the Court that may be useful.

Q. Of course.
A. The release for existing users, Your Honor, the choice of screen is encountered after a software release. So there's a software update that fits that. And as you can imagine, this happens for different users at different times. So as a behavioral economist, the way I think about Russian choice screen is that it doesn't phase in as a particular date. Instead, it takes about two years to fully face it because different consumers take actions at the choice of screen at different times.
THE COURT: Why don't we take a pause now and --
MR. HAFENBRACK: Of course.
THE COURT: -- we'll stop for the day.
So, Dr. Rangel, we'll ask you to return tomorrow. We'll start tomorrow at 9:30. I'll just ask you not to discuss your testimony with anyone overnight. And we'll see you tomorrow.
THE WITNESS: Of course, your Honor. Thank you, sir.
THE COURT: Thank you.
THE COURTROOM DEPUTY: All rise.
THE COURT: Dr. Rangel, why don't you just step down and let me just talk to counsel for a moment.
Everybody else, you can have a seat or...
So did I understand, if I remember, you said that some portion of Dr. Rangel's testimony you want to do in a

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CV No. 20-3010 |
| vs. | ) | Washington, D.C. |
| | ) | September 14, 2023 |
| GOOGLE LLC, | ) | 9:30 a.m. |
| | ) | |
| Defendant. | ) | Day 3 |
| ______________________________ | ) | Morning Session |

TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

quality.

If that were the case, you should see default effects similar here in PCs and iPhones, and you do not. They are specific, specific to Android where the choice screen was introduced and the default removed.

Q And from the last -- the three examples we discussed, we discussed the Google Maps example and tablets in the United States yesterday afternoon, we discussed the Russian choice screen here this morning, do you draw any conclusions about the power of search engine defaults on mobile devices?

A I think the body of market evidence, together with the case documents that I have been discussing, together with Google's own estimates about what would happen in Code Red if they were to lose the Apple default, suggests that they -- Google search engine defaults in mobile devices are quite sizable.

Q Are there particular behavioral factors that affect whether consumers are willing or able to explicitly decide to switch a search engine default?

A Yes, there are.

Q And could you discuss a couple of those.

A Your Honor, yesterday we made this distinction about the automaticity to have it driven mode of control for individual searches, and the explicit mode of

decision-making when a consumer sits back and considers changing the default or search engine and what steps need to happen.

At that stage of explicitly considering, there are additional biases that behavioral economists have identified that come into play and exacerbate the power of defaults.

One of them that we have been discussing throughout is the roll of mental effort, of cognitive cost. You have to do research, you have to think. People don't like this. It's emphasized in the documents that I show you from the Google behavioral economics teams. This affects our large, ten times larger than you think.

Then there are two others that I thought would be useful for the Court to be aware of that have been discovered by behavioral economists.

One of them is status quo bias, the other one is loss aversion.

And to orient Your Honor to the slide, on the right, I am mentioning, for each one of these mechanisms, quotes from Google documents that address the specific role that that mechanism, that I will describe for Your Honor in a second, plays on defaults, on the power of defaults.

Q How does status quo bias apply to Google search defaults?

A Your Honor, when consumers are in a situation in

which there is some status quo option, something that they get to consume, they don't do something else. A default is a part of typical example of this.

When they explicitly consider changing, if they are not sure, if they are confused, if they are uncertain, they are biased, they tend to order, things being equal, to retain the status quo.

And as a result, since the default is the status quo, that benefits the default.

Q And how does the concept of loss aversion apply to Google search defaults?

A Yes.

So loss aversion is another one of those very fundamental concepts in behavioral economics about human behavior, Your Honor.

If a perfectly Russian consumer, fully Russian, were to sit down and consider changing from the Google default to something else, they -- the computations, the calculations that they will make would look roughly as follows:

One of the benefits from changing, what do I gain, what do I lose, what are the costs. You take the benefits, you subtract the costs, if the number is positive, I switch; otherwise, I don't.

In other words, you count benefits and losses

exactly the same.

This is not how people, how human beings tend to make these calculations. What people tend to do is they overweight, they overcount their losses. So they take benefits minus the losses blown up, amplified, and then they change if the result is positive.

But because the losses are overblown, you only switch if the benefits are sufficiently larger than the costs. And as a result, again, since the default is the status quo, is the current option, you would only switch if you have loss aversion, which a lot of consumers do, if the benefits are sufficiently larger than the losses.

THE COURT: And in a case like this where someone is considering making a switch, what would the losses be?

THE WITNESS: That's an excellent question, Your Honor.

When consumers are deciding between products, and the product in this case will be different search engine, these products have different features. So, for example, when you query a search, there are many features that describe the product. You have the quality of the text, the quality of the advertisements, the quality of the images, the quality of the underlying index that is going to affect the quality of the results, how good it is for the particular type of searches that you tend to do.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CV No. 20-3010 |
| vs. | ) | Washington, D.C. |
| | ) | September 21, 2023 |
| GOOGLE LLC, | ) | 9:45 a.m. |
| | ) | |
| Defendant. | ) | Day 8 |
| ______________________________________ | ) | Morning Session |

TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

A I work at DuckDuckGo.
Q And what is your role at DuckDuckGo?
A I am the CEO, and I founded the company too.
Q And in what year did you found DuckDuckGo?
A 2008.
Q And where are DuckDuckGo's headquarters?
A Paoli, Pennsylvania.
Q And can you tell the Court what DuckDuckGo is?
A Sure.

So DuckDuckGo is the leading Internet privacy company.

We're most well-known for our private search engine.

Over the last several years, we have expanded the product vision to be more the easy button for privacy is what we call it. Our flagship kind of product experience is our free browser, which is a replacement for Chrome. It has the private search engine built in, along with about 12 other privacy protections that also protect your browsing, email, other online activity.

Q And how many people --

THE COURT: I'm sorry to interrupt you.

I may have missed it. What's the name of the browser?

THE WITNESS: DuckDuckGo. Same name.

But in addition, I'd say we get it from Bing with the ads. So in addition to links to monetize a search engine, you need ads. The ads itself have a very strong network effect which is coalesced into two search ad feeds.

And then we kind of get the result -- get those link results with the ads which is kind of further incentive not to invest in that when we can invest in search modules.

Additionally we invest in other privacy technology as well to make this privacy easy button that I was mentioning earlier.

Q And who does DuckDuckGo consider to be its search engine competitors?

A Really most of our users switch from Google. So like far and away, we consider Google just our competitor.

Other search engines that compete with us are Bing, Yahoo!, Ecosia, and Brave are probably the main ones in the U.S.

Q Does DuckDuckGo consider vertical search engines such as Amazon to be competitors that users are likely to switch to or from?

A No, not really.

Q And today, what is DuckDuckGo's percentage share of the overall U.S. search market?

A We're about two and a half percent in the U.S.

Q And which search engine has the largest percentage

of the U.S. search market?
A Google.
Q And does DuckDuckGo try to distinguish its search engine from Google's search engine in any way?
A Yeah.
I mean, in a word, it's privacy.
You want me to expand on that?
Q Go ahead, please.
A Sure.
I mean, so when you go online today, if you don't do anything to protect yourself, it's as if someone is, you know following you around everywhere you go, everything you do and recording that, really, every second.
All this information is then added together into, you know, what I would think of as a huge dossier about you or what we would call an online profile.
So if you use Google, that is, you know, your search history and most of your browsing history based on what you click on, and from their other products, location history, purchase history as well. So these profiles can basically be directly used to cause you harm.
So, for example, the ad targeting that is enabled by them have been tied to discrimination for just access to essential goods and services like jobs, housing, education, healthcare, even financial products.

Additionally, it can be used to charge you different prices as based on your profiles.

And then for Search in particular, I mean, there are many of these harms but relating to Search, as I mentioned earlier from Bing, you know, results may differ based on your profile. So your results may be manipulated, from our perspective at least, based on your user profile without you knowing about it which can bias your kind of conclusions from your search results.

So generally we find that a large percentage of Americans would like to avoid these harms. And so to distinguish that on DuckDuckGo, we don't do any profiling at all. In fact, we don't have any individual user, browser, or search histories. A way to think about it is every time you search on DuckDuckGo, it's like it's your first time or sometimes we say, you know, if 100 people search for cat pictures today, we don't really know whether it's like one person or 100 different people.

And then I would say also besides harms, just privacy gives you benefits. A lot of people from some research we do, do not like ads that follow them around the Internet all the time. And so if you use our browser and search engine, you effectively avoid what we call these kind of creepy ads, and that's just a more pleasant experience overall.

Q And do any of DuckDuckGo's search engine competitors offer by default the level of privacy that DuckDuckGo's search engine offers?

A No, I don't believe so.

I mean, there are some other private search engines to varying degrees, like Brave offers some privacy, Ecosia offers some privacy, but we don't think to the level that we do.

Q And does Google offer by default the level of privacy that DuckDuckGo's search engine offers?

A No.

Q Does Google offer, even if a user selects the most secure privacy options, the level of privacy that DuckDuckGo offers its users by default?

A I don't believe so, no.

Q And why is that?

A Because we've done several studies over the years, for example, this notion of changing results around when, based on your user profile, which we would call the filter bubble, because it kind of puts you in a bubble based on your profile and other results are filtered out -- we did two pretty deep studies of that in 2012 and 2018, and in that study we looked at people who were signed out, in incognito mode on Chrome, and found still individual results they were getting were very similar to the signed-in mode

relative to other people right around them that were not. And so we controlled for things like location, time of day, missing -- all variables we could think of and that was the only thing remaining.

Q So you described some studies that DuckDuckGo has done.

Has DuckDuckGo conducted any studies to evaluate search engine users' level of concern about Internet privacy?

A Yeah.

I mean, when we started, there really wasn't a lot of consumer privacy research. So I'd say just in the last, probably since around 2016 when we got really serious about working on this easy button, we've probably done over 50 large scale surveys of the American population.

Q And before you go on and tell us at a high level what those studies have found, can I ask you to describe how DuckDuckGo performs those studies?

A Sure.

We generally commission them with a survey panel company who then demographically adjusts them for the American population. We don't conduct them ourselves.

And, you know, we have our own user insights team who -- kind of professional survey people. And then sometimes we've also commissioned the entire survey from an

external research firm.

Q Okay.

And now back to the question. At a high level, what have these studies shown?

A So at a high level, it shows about 30 to 40 percent of Americans have a strong preference for search privacy. To give you some color to that, we often ask a question, if a new search engine were to come along, pick the top factor that would motivate you to switch search engines. And if you've already switched before, what was that factor.

So factors include, there's a little more precise language than this in the question, but they're essentially better results; better privacy; fewer ads; better connection to the social values of the company, like climate change; better design; better customization options; and an other category. So you might expect that better results would be the number one thing that people pick. That is not what we find.

Consistently, we find better privacy as the pick, the number one factor, about 40 percent of the time. Better results comes in at number two at about 25 percent. Fewer ads is at 15 percent. And then all the rest of the categories, so that ads up to 80, are about 20. So that's one data point.

The second one that I would give you would be -- because people -- often what we hear from that is, like, what people say or people do online may be different. So we also try to ask very specifically, like, what people are doing and recite back behaviors to us. So we ask things like, do they regularly clear cookies, do they -- have they ever downloaded a privacy app or extension. Have they ever subscribed to, like, a privacy app or service. And we have a number of these.

If people say they've done several of them, we put them in what we consider more our target market which is the care and act on privacy group, so they not only have expressed concern, but they've expressly taken actions that show that concern.

That comes out about right now at least around a third of Americans and it's been steadily climbing since we started doing this about ten years ago. So both of those triangulate around the same, I'd say between 30 to 40 percent of Americans showing a pretty strong privacy preference for search engines.

Q And has DuckDuckGo --

THE COURT: Counsel, I'm sorry, can I help interrupt?

We're a little bit past 11:00, so we're going to take our morning break. It's 11:00 -- a little after 11:05,

And so since then, the coverage has been way wider as to what data is out there, how does it get leaked, how does it line up in other places, that kind of thing.

Q So we've talked about the level of privacy the different search engines provide. Let's talk now about the level of privacy that Internet browsers provide.

In your experience, Mr. Weinberg, do leading Internet browsers generally have privacy modes?

A I would say, yeah, most major browsers have a privacy mode. I don't necessarily believe it provides much privacy protection, but they have a mode.

Q And can you explain why you don't believe that most privacy modes offer privacy protection?

A Yeah.

I mean, historically when they started -- this is kind of another -- things were different a long time ago, right?

So when the private mode first kicked off, there wasn't as much online tracking going on. And so the mode was more about wiping your local history. And so if you used the private browsing mode and then closed the window, that history would be wiped such that, you know, your spouse or someone in your household couldn't see your browsing history.

But over time, the real privacy threats were more

online and websites tracking you behind the scenes. The privacy modes did nothing to prevent any of this tracking.

I'd say after many years of complaining about this and at least one class-action lawsuit, major browsers have started to put some privacy protection in privacy mode but definitely not enough to stop the privacy harms I was talking about earlier, and generally no search privacy in the mode.

Q And just for reference, do you know the name that Apple gives the privacy mode in its Safari browser?

A I think they just call it private mode.

Q Okay.

And the same question for Google's Chrome browser?

A Google calls it incognito mode.

Q And do you know the name that Mozilla's Firefox browser uses?

A I'm not sure if they have a name for it. I think it's just like new private tab, new private window.

Q Okay.

And you said earlier that DuckDuckGo also operates a browser. Does DuckDuckGo's browser have a privacy mode?

A Our goal is to offer privacy by default. So all our privacy protections are available in all of our windows.

Q Okay.

And when you say privacy by default, what does

that mean?

A I mean, when you install the product, you don't have to go into a privacy mode or mess around with settings to make the browser private, it just starts with the privacy protections on by default.

Q Now, Mr. Weinberg, is it possible that even if a browser is set to privacy mode, that a search engine could still track a user's private information?

A Yes.

I mean, oftentimes the browser and the search engine are different companies, and so they're not even coordinating. It just -- generally when you go into a private mode, the browsers aren't stopping online tracking. And so they wouldn't be stopping the search engine that you visit, which could be any search engine, from doing anything on their website.

Q And are there ramifications for the privacy of a consumer who pairs a browser set to privacy mode with a search engine that tracks personal information?

A Yes.

I mean, all the harms I was talking about earlier, a lot of them stem from searching and search privacy. So, you know, if you search for something in private mode, it could follow you around. Like we were talking about with ads, it could -- those ads could be discriminatory. Things

could still be added to your profile that could be used for changing your search results, like I was talking about, incognito mode. All of those, tracking could still be happening.

Q Earlier you described some studies that DuckDuckGo has commissioned. Has DuckDuckGo commissioned studies regarding consumer misconceptions about privacy protections offered by browsers set to a privacy mode?

A Yes.

Specifically we went pretty deep into this issue in 2016, and put out a detailed white paper in 2017, that was based on a number of surveys.

In general, we found that usage of these modes was very high. I recall something like 45 percent of people saying they used them at some point.

There was wide misconceptions about what they do. So we kind of asked people to check off what it did, and the majority of people could not identify what it actually did.

A primary misconception was this search privacy issue you're asking about where people thought their searches would be anonymous in private browsing mode, when they're not.

We then went on to ask people -- to tell people what it actually did and then ask people how they felt about it and to identify kind of from a range of emotions, and

people generally, again, the majority, felt kind of a range of negative emotions, confused, misled, that kind of thing.

Q And did DuckDuckGo study whether informed consumers would prefer to pair a browser in privacy mode with a search engine that does not track private information?

A Yes.

I mean, generally -- and that was part of the reason why we're doing this study in particular was, we had a hunch that that was the case. And, you know, we were trying to make the case to browsers to use us in private mode, and so that is what we found.

Q And for a consumer who prefers pairing a browser in privacy mode with a privacy-focused search engine, is it easy for them to switch device defaults to a search engine like DuckDuckGo?

A No. I mean, it's generally impossible. There's no -- there's generally no separate setting for a search engine in private mode versus regular mode.

Q All right. Well, let's talk about potential methods of extending the reach of DuckDuckGo's search engine.

Has DuckDuckGo sought to have its search engine included as an option on any choice screen menus?

A Yes, in Europe.

Q And what happened there?
A There was an antitrust case in 2018, and Google put forth their own remedy of a choice screen, which we -- we have no formal role in this process. We weren't kind of asked about it. The EC Commission didn't really include us in the negotiations. So from our point of view, it was kind of immediately flawed.
The first version, they wanted to charge us money to participate way more than the profits we make per user.
So that and many other things, issues with it, we've been complaining about.
The only thing that's really changed is it became free, but we think it's still not designed very well. But we participate now because it's free.
Q Okay.
Is DuckDuckGo a non-default search option in any browser?
A Yes.
Q And how effective is it for gaining traffic to be a non-default search engine in a browser?
A In general, just being made the option we found not very helpful because users find -- we can't very well instruct people to go to those settings.
There's one exception to that, which is there are browsers where -- and iOS is one of these -- where it is

impossible to set the search engine unless you're an option. And so that gives us some boost because otherwise, it was completely impossible.

But generally, we find just being an option doesn't give us that much.

Q Do you find any roadblocks that consumers have in resetting defaults?

A Yeah.

I mean, I -- so I'd say broadly, the search defaults are kind of the primary barrier for people expressing their search privacy.

They're -- like -- as I was just saying, they're extremely powerful. We find it empirically hard to get people to switch.

Q And could you expand on why it's difficult to get people to switch defaults?

A Sure.

So I think there's a few nuances to this.

First, it just -- as a practical matter, there's too many steps to get a full substitution of DuckDuckGo to Google.

This is because -- Google to DuckDuckGo.

This is because there's just so many devices and search defaults.

So if you think about it, a typical user is going

to have multiple devices they interact with across home, work, family, phone, tablet, desktop, laptop, somewhere between three to seven devices, I would say routinely.

Each one of these devices has multiple search defaults on it, the browser defaults and the operating system defaults, some people use multiple browsers, et cetera, sometimes there's multiple search results per device.

And so if you just switch one default, say, like, the Android widget, that's just a small fraction of the users' queries, that's not a full substitution of Google to DuckDuckGo, because they're still using and interacting with all their other browser and search defaults.

So to really get them to have a real substitution, a real substitute of products, you'd have to switch all the search defaults that they regularly interact with. That's now on the order of like 30 to 50 steps, not like three to five. And it's just too many steps. So, like, that's what we're seeing empirically.

We have survey data, we don't have any user data, but we do these surveys of the American population again -- we do a lot of surveys because we don't have any user data to see what usage DuckDuckGo gets and, like, how people are using it. We can segment those surveys by our most avid users. So these are users who love our search results, they

are recommending us multiple times a month to friends and family. This is like the top end of the range.

These people still aren't switching all their search defaults. They are routinely reporting to us that they're full-time on, say, mobile but not Desktop or they're full-time on one browser but not another. And so that's why I say kind of empirically, it just is not happening.

Two other nuances that might be worth mentioning is -- that we run into is, I think you just said, you know, it resets sometimes. So that definitely happens. So like on browser and operating system updates, the default can reset. Search functionality can also change which is kind of like a de facto reset. There's a new access point added or it's a little different, and so there's a justification to kind of reset it.

What this means essentially is, if you switch some of these defaults, eventually you're going to be forced back on to Google if you do nothing.

And then finally I'd say, it's all just way harder than it needs to be. So on Android, we find it takes currently 15 plus steps, there's more taps if you count all the taps, just to switch everything you can and not everything is switchable like the assistant, for example.

But it could be easy. So it could be the case. Imagine for a second that you had an operating system

setting that switched all the search defaults across the device in actually one step, and now imagine that if you downloaded our app or website, we could take you -- or you downloaded our app or went to our website, we could take you to that setting in one click. That's how easy it could be, but it just doesn't work that way.

Q Is that your choice that it doesn't work that way?

A No.

Q Is there any browser where DuckDuckGo is the default option today?

A I believe we're the default in the Tor browser, which is a privacy focused browser.

THE COURT: I'm sorry, can you spell that browser?

THE WITNESS: T-o-r.

BY MR. HOFFMAN:

Q And what percentage of the U.S. browser market does Tor have today?

A Some immeasurable small amount. I don't know if it's measurable.

Q Well, what have you found to be the most successful method of distributing DuckDuckGo's search engine?

A When we've been the default for brief periods in different times, that's been the best method.

Like in this Tor example, even, we weren't the

MR. CONRAD: Good morning, Your Honor. Joseph Conrad for the State of Nebraska and for the plaintiff States.

THE COURT: Good morning.

BY MR. CONRAD:

Q Good morning, Mr. Weinberg.

First, if you could just satisfy my curiosity, I've been sitting there just curious.

What prompted you to name the company DuckDuckGo?

A Oh.

Unfortunately it was not a great story.

The mascot -- the idea for a mascot came before the name, wanted a cute mascot, tried to think of a name that would go with the cute mascot.

Q Got it. Thank you.

So you talked with my colleague, I think, about what you referred to as search modules. And could you explain where you get the content that fit into those modules?

A Sure.

I mean, as I was saying, there really are many dozens of distinct types of search modules, and each one has its own index, so if you want to get really complicated, set of indexes sometimes.

And so because of their vertical nature they're

going to come, each one is going to be pretty different as to what the content is going to be.

I referenced Apple for maps. You know, we partnered with Tripadvisor, some of them, like, FAQs -- some of them, like, Calculator, we'll just make ourselves. Something like info about people and places, we generally get from Wikipedia but that's from indexing ourselves, not from them directly.

Q And what motivated DuckDuckGo to first develop these features, or excuse me, those modules?

A Well, I actually started myself. The whole reason for starting the company myself was to improve my own Google results initially. And part of the initial motivation was actually going to Wikipedia a lot. So the first code that I ended up writing was crawling and indexing Wikipedia and making search models for Wikipedia and putting them on top of the search results.

Q And how did that strategy develop over time?

A We -- I thought it was the future.

We ended up really making that a core strategy of the company early on from, like, 2000 maybe -- let me get the dates wrong, '11 to '14 maybe. And we actually created a whole open source platform where developers could code all sorts of different search modules for us and the idea was to get pretty niche modules. We ended up with basically

thousands of these in the end.

All sorts of things, like, if you were into a certain programming language, you might have the programming language for that -- modules for that programming language documentation. Or if you were really into Pokémon cards or something, we could have a Pokémon directed search module.

It ended up not being as attractive a way to get people to switch search engines as I would have liked so we stopped focusing on it as much but that was kind of the strategy at that time.

Q And does DuckDuckGo continue to develop these modules?

A Yeah.

We -- I had mentioned earlier there's about 20 that I think are essential so we now focus our efforts on those essential ones and we continue to develop them.

Q And does DuckDuckGo do any testing or experimentation with regards to these modules?

A Yes.

Q And can you just explain for the Court what this testing or experimentation looks like?

A Sure.

I mean, there's not just one type of experimentation or test. We will -- I think the most common would be like an AB test or what they call a split test

where you have two versions of something going on at once and you're looking at what people are clicking on or engaging with on both versions and seeing which one is better by whatever endpoint you want.

We also will do other things, though. We'll do a qualitative test by having people walk through things and tell us what they're thinking or seeing. We'll do survey tests, like I was -- like, surveys like I was talking about before. There's a wide range of methodologies you could use.

Q And does the number of users that DuckDuckGo impact the quality of the testing or experimentation it conducts?

A Yeah.

I mean, we are very limited in the amount of on-site experimentation we can do, which is partly why we use all these other methodologies to try to be a proxy for what we could get if we could run more AB tests live on the site.

Q Thank you. Those are my questions.

THE COURT: Can I ask one question, one additional question, which is -- and you may have answered this, I apologize.

In terms of search quality and the quality of results, what does DuckDuckGo do with the data it receives

[redacted] [redacted]
[redacted] [redacted]
[redacted]
[redacted] [redacted]
[redacted] [redacted]
[redacted]
[redacted]
[redacted] [redacted]
[redacted]
[redacted] [redacted]
[redacted]
[redacted] [redacted]
[redacted]
[redacted] [redacted]
[redacted] [redacted]
[redacted]
[redacted] [redacted]
[redacted]
[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, et al.,
Plaintiffs,

vs.

GOOGLE, LLC,

Defendant.

Civil Action No. 1:20-cv-3010

Washington, DC
September 21, 2023
1:36 p.m.

Day 8
Afternoon Session

**SEALED PROCEEDINGS**

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For DOJ Plaintiffs: **KENNETH DINTZER**
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005

**IAN HOFFMAN**
**JOSHUA HAFENBRACK**
U.S. Department of Justice
450 Fifth Street, NW
Washington, DC 20001

**DAVID DAHLQUIST**
U.S Department of Justice
209 South LaSalle Street, Suite 600
Chicago, IL 60604

For Plaintiff State of Colorado: **WILLIAM CAVANAUGH, JR.**
Patterson, Belknap, Webb & Tyler, LLP
1133 Avenue of the Americas #2200
Suite 2200
New York, NY 10036

[redacted]

Q. When you say it listed the default right there, what do you mean?

A. I mean they sent us a version of a search contract that specifically said if we're the default, then the revenue share would be [redacted]

Q. When you said if we are the default, when you say we, you refer to whom?

A. DuckDuckGo.

Q. And why was DuckDuckGo prepared to [redacted] if they were to become the default in Safari?

A. Well, we were already paying it up to that point, but [redacted] But if we were the default in private browsing mode, our market share, by our calculations at the time, would increase multiple times over. We would be getting exposure for our brand every time someone opened up private browsing mode. So that's -- you know, most Americans over time would start to be aware of kind of who we are, and so for those reasons, it seemed worth it.

**A.** And then we stopped it.

**MR. HOFFMAN:** Okay, thank you. Your Honor, I have no further questions for the witness. I'd pass him to the states.

**THE COURT:** Can I ask another question. Under what was contemplated, if you had gotten a greater exposure on the privacy mode -- whether default or not, the search results that would have come back to you -- well, let me ask you this: What data would you have collected from that position that would have, in your opinion, improved your search engine?

**THE WITNESS:** So we run experiments on the site all the time. Like we'll say a question of should a map go on this search or not, as one example. It would enable us to run many, many more experiments, because those are limited by the volume of search queries we have.

**THE COURT:** I see. So am I understanding correctly that the primary way in which DuckDuckGo attempts to improve its user's experience is through experimentation because you're not collecting user data?

**THE WITNESS:** So I'd say we developed methodologies that enable us to experiment on the site anonymously. We can still survey users outside of the site, but it's so less effective because it's not a great proxy for what actually happens on the site.

**THE COURT:** And maybe I should be more specific. Does DuckDuckGo collect sort of click data, for example?

**THE WITNESS:** Yes, just anonymous.

**THE COURT:** It's anonymous?

**THE WITNESS:** Yes. So we have no way -- we don't have any user sessions so that we can't say it's the same user doing different actions. But we can say -- on average, say you had two layouts, we could say this one is getting interacted more and better than this one just anonymously.

**THE COURT:** I see, okay. Thank you, I appreciate that clarification. Counsel.

**DIRECT EXAMINATION OF GABRIEL WEINBERG**

**BY MR. CONRAD:**

**Q.** Mr. Weinberg, I just want to follow up from my colleague and continue on the theme of DuckDuckGo and Apple's business dealings. So I think you testified earlier that DuckDuckGo integrates the Apple Maps into the search results that DuckDuckGo provides; is that right?

**A.** That's correct.

**Q.** And can you just generally explain how this works, what would appear in response to a local query?

**A.** Yeah, so local's a pretty big category, so it actually is a bunch of different search modules. When you think about local, there's maps, directions, it's kind of different. There's business listings of like if you want to search for hotels near me or a particular hotel and get the -- get like the phone number, all those are going to have different

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America, et al., Plaintiffs,
vs.
Google LLC, Defendant.

[redacted]
Civil Action No. 20-cv-3010
Washington, D.C.
September 22, 2023
9:30 a.m.
PUBLIC

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For DoJ Plaintiffs:

**Kenneth M. Dintzer**
U.S. DEPARTMENT OF JUSTICE
1100 L Street, NW
Washington, DC
(202) 307-0340
Email: Kenneth.dintzer2@usdoj.gov

**David E. Dahlquist**
U.S. Department of Justice
209 South LaSalle Street
Suite 600
Chicago, IL 60604
(202) 805-8563
Email: David.dahlquist@usdoj.gov

For Plaintiff State of Colorado:

**William J. Cavanaugh, Jr.**
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
Suite 2200
New York, NY 10036
(212) 335-2793
Email: Wfcavanaugh@pbwt.com

size of the Apple bot crawl.

Q. At the time of your deposition, you told us that Apple had crawled [redacted] pages; is that right?

A. That sounds likely, yes.

Q. How about today, what are we at now?

A. I actually don't know that number, but it's probably slightly higher.

Q. Now, Apple crawls the web for a number of reasons. Apple has several products that depends on having knowledge of the web; is that right?

A. That's correct.

Q. And what are those products?

A. There's quite a few. Obviously, Spotlight is one, Safari Search is another. But we use the web crawl for many different things, including improving how your keyboard suggestions work on an iPhone.

Q. And unfortunately, Apple uses a lot of S words to describe its bot. So I'm just going write them here, just so we keep them straight. Spotlight is on device, Safari is the browser. And you mentioned Suggestions. What's Suggestions?

A. Suggestions in Safari. So those two are related, yeah.

Q. I'll use that as a dash then, as a sub to Safari.

Is Suggestions the thing when I start typing, it pops up with a suggestion of the website I might want to go to?

A. Yeah. In a modern web browser, people can do the searches

in the URL bar, the bar at the top of the browser. And when you start typing there, character by character, most modern browsers give you suggestions. And those might be websites or they could be queries that are popular.

Q. And Safari and Spotlight depend on Apple's having a knowledge of the web?

A. Yes.

Q. What's a natural language model, in one sentence --

THE COURT: Sorry to interrupt.

Can I just ask a clarification? The suggestions that pop up, are they popping up as a result of the search engine or the browser? Or maybe it's both?

THE WITNESS: It's a combination. So the suggestions that pop up in Safari are coming from Apple, and they're interleaved with suggestions coming from Google.

THE COURT: They're -- I'm sorry --

THE WITNESS: Interleaved with suggestions coming from Google.

THE COURT: I see.

THE WITNESS: So it's a fairly complicated process, but we are trying to guess what you might be looking for.

THE COURT: Gotcha. Okay.

MR. DINTZER: And in a couple minutes, Your Honor, we'll have a demonstrative to help show this.

THE COURT: Okay.

yes.
Q. Okay. And how is user data used in the indexing process?
A. In a few ways, but it's not as important as how the indexing is implemented.
Q. Does the user data help in knowing whether to index things so that they can be obtained quickly, as opposed to maybe take a little bit longer?
A. By "user data," do you mean the usage of the subsequent search engine?
Q. Click data. The -- we should probably agree on a term, sir. A term to describe the signal from user clicking on the web page, is there a term that you prefer to use?
A. Well, the click signal is not particularly important for indexing, but the number of queries are.
Q. Okay. How so?
A. Because you would want to make sure that you had covered queries that you see frequently.
Q. And Google index is the stuff that it crawls; is that right?
A. Yes, of course.
Q. Google has a massive index; is that correct?
A. It last a pretty big index, yes.
Q. And to run a modern search engine, the index needs billions of web pages?
A. Could you restate the question?

Q. Of course.
To run a modern general search engine, the index needs billions of web pages.
A. Yes. More web pages in your index is better.
Q. We're talking about tera -- I may not have the right -- terabytes of information; is that right?
A. Probably not in the serving index, but in the crawl, for sure.
Q. And Apple maintains an index of the web; is that right?
A. We do.
Q. And I think I got this right: Apple has [redacted] pages served on its index; is that right?
A. Yeah, in recent years we've grown our index size to be about [redacted] pages.
Q. In fact, more recently it's been growing [redacted].
A. We've been investing in it, yes.
Q. And that's based on your recommendation that Apple invest?
A. Yes. Because if something is not in the index, then it's not going to surface it in a web search.
Q. That's been a [redacted] for Apple, correct?
A. I would say so, yes.
Q. Very briefly, very briefly, because I know this could go on, what is machine learning?

quality search engine?
A. I think clearly less important.
Q. And have the development and use of AI technologies made click and query data more or less important in building a high quality search engine?
A. I would say neither. I think if you have that data you will use it in building your machine learning algorithms.
Q. In other words, the training or the -- strike that.
The large language models that are being used today, are those being trained on click and query data or other, sort of, publicly available data?
A. My understanding would be both. I would think you would use everything available to you.
Q. What implications do these improvements in natural language learning have on the ability to build a high quality search engine?
A. Well, I think, as you can see from both Bing and Google racing to put these things in their products, they think it's very important.
Q. Based on your experience at Google, does search query scale guarantee that a search engine will be commercially successful?
A. Guarantee, no.
Q. Now, when you were at Google and you were involved in Search, did you view or did Google view vertical search providers like an Amazon or a Yelp or a Trip Adviser to be

completing with Google for search queries?

A. Not for general search queries, but for overall information intents, yes.

Q. And did Google view specialized vertical search providers like an Amazon or a Yelp or an Expedia, for example, in many cases to be more significant competitors to them then, let's says, a Bing or a DuckDuckGo?

A. For the queries that they specialized in, like travel queries or commerce queries, yes, more attention was paid to those vertical search providers than to DuckDuckGo.

Q. Did Google, during your years there, did Google make significant investments and innovations to allow Google to compete more effectively against those specialized vertical search providers?

A. Yes, very much so. Particularly in shopping and travel.

MR. SCHMIDTLEIN: I have no further questions, Your Honor.

THE COURT: Okay. Redirect in closed session?

MR. DINTZER: Your Honor, I'm going to be covering basically -- I'm going to be walking through some of what counsel has walked through. So I think it's no more openable than what he just covered.

THE COURT: I'm not following. I'm sorry.

MR. DINTZER: I think we need to stay where we are, Your Honor, just because I'm going to be covering the same

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CV No. 20-3010 |
| vs. | ) | Washington, D.C. |
| | ) | September 26, 2023 |
| GOOGLE LLC, | ) | 9:29 a.m. |
| | ) | |
| Defendant. | ) | Day 10 |
| _________________________________ | ) | Morning Session |

TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

A I don't -- I mean, there's --
THE COURT: Be more specific, Counsel.
THE WITNESS: Yeah.
BY MS. BELLSHAW:
Q Does Apple make -- do Apple users make some choices to set up their phones right out of the box?
A Oh, they do.
MS. BELLSHAW: I'd like to pass out a demonstrative.
May we approach, Your Honor?
THE WITNESS: Thank you.
BY MS. BELLSHAW:
Q I think it should also be on your screen, Mr. Cue.
A It is now.
Q I've handed you what has been marked as UPXD009. This is the United States Demonstrative 9.
A It's very bad resolution on the screen. We need a Mac.
THE COURT: If Apple would like to make contributions to the judiciary, we'd welcome it.
BY MS. BELLSHAW:
Q Mr. Cue, I will represent that we took these images from various support pages on Apple's website.
When you start at the left looking at the image on UPXD009, when setting up a new iPhone out of the box, are

users presented with a choice about the appearance of their iPhone?

A Yeah, that's correct.

When you take a device out of the box, if you think about it, our customers are very excited about getting their phone and getting it up and running and working fast, right. You just spent a significant amount of money, it's a device you use every day. And so we try to get them up and running as quickly as possible. And so the more choices or the more options that you get, it frustrates customers. So we've spent a great deal of time and effort to minimize the number of questions that we ask. And we look at those by what do we think are the most critical things that a customer really needs to know at that point in time.

And we thought appearance being whether you want to be in a -- what we call the size of the text in the phone, because obviously some people wear glasses, others don't, it's something that we get a lot of requests for people when they're setting up their phones, they want their fonts to be bigger. And so we provide this capability when you're setting up your phone.

Q So Apple presents users with options and then asks them to select the text size and appearance of the icons on their phones; is that fair?

A That's correct.

Q And then if you would look at the middle image on UPXD009, the first time a user opens the maps app, are they given a choice about whether to allow maps to use their location?

A Yes, but I don't think what you're seeing in the second one is a choice screen around it. We provide choices at the beginning. What I see here in the middle, and certainly the next one, are all about privacy decisions that a customer has to make. And so they're appropriate to ask at the time that they're using those applications. They're not appropriate to ask at another time.

Q The first time that a user opens up the maps app, Apple presents them with a screen that has three choices on it, right?

A Yes. Again, I -- you started this by the word "choice," and I just want to make clear, yes, we provide the option for the customer to pick what level of privacy they want in maps, that is correct.

Q Right.

The user is offered, they can allow maps to use their location once, they can use it while -- maps can use their location while using the app, or they can choose not to allow location tracking in apps -- maps; is that correct?

A That's correct.

Q And then if you look at the image all the way on

the right in UPXD009, do you recognize that image?

A I do.

Q Is this the -- are you familiar with app tracking transparency?

A I am.

Q And what is app tracking transparency?

A We wanted to make sure that if an application was using the customer's data to be tracked across multiple applications or websites, that the customer was made aware of them and the customer had a choice of whether to allow that or not allow that.

Q Do you believe that the privacy control afforded by the app tracking transparency is in an Apple user's best interests?

A I do.

Q And am I correct the way that it works is that some applications ask to track users?

A Well, it's, again, the app -- any application that does this is required to prompt the user for this. If the application doesn't do that, then they're not required to prompt.

Q Can so if a user downloads a new app that is asked to track them, they're presented with this screen on the right in UPXD009 asking -- giving them the choice of whether or not they'd like the app to track them; is that correct?

A Yeah, I think that's fair.
Q And this screen appears for every new app the user downloads that has asked to track the user the first time they -- the user opens up the application; is that right?
A That's not the only time. It can be anytime that an application makes a change, for example. So it could be an existing application that you already have on your phone.
Q So when it's important, Apple does offer users choices, not just right out of the box but as they use their iPhone?
A Look, if you're comparing this with picking search engines for browsers, I think these are two very different things, completely different things. I think the appearance one is how to set up a phone, the other one is around privacy, which is a really important component to customers, and we want customers to be aware of what those applications are doing.
When we're picking search engines, we pick the best one and we let the customer easily change them. So I have no problem with that. I think we're doing the right thing by customers.
Q And, Mr. Cue, I'm simply asking that when Apple thinks it's important, it does allow the user a choice, such as the choice screens that we see in UPXD009?
A We certainly make decisions on when to show these

options that you show here.

Q And the ISA does not permit a choice screen for Apple users to set their default search engine out of the box, correct?

A That's correct, it's not something we've ever wanted. We didn't ask for it in 2002, and it's not something we wanted. We think it's a mistake to ask the customer something like that.

In both of these cases that you show here, it's very clear to the customer what the choice is. Do you want maps to know your location? Every customer in the world understands that.

Being tracked, every customer pretty much in the world understands that.

When you're picking a search engine, we have choices in there that customers have never heard of. DuckDuckGo is a very small one.

We have another one called Sconcierge, or something like that.

They are -- and so you present a user with a choice for something they don't even know. We know what happens. Customers, they don't understand, they're afraid of making the wrong choice.

So what we do is we make Google be the default search engine because we've always thought it was the best

engine. And then we make it really easy for customers to switch if they'd like to switch. And so that's worked extremely well for our customers and we certainly believe we've done the right thing for our customers.

Q And, Mr. Cue, would you agree that the choice of a search engine can affect a user's privacy?

A Yes, to some level, it could, yes.

Q Is the ISA limited to the United States or is it a global agreement?

A It's a global agreement.

Q Under the ISA, can Apple set Google as the default search engine internationally while using a different default search provider in the United States?

A Again, we -- in the agreements, over time, there were certain countries where we found that either Google wasn't the best one or there was another one that we thought was very competitive, and so we carved those out in the agreement. I believe China was one of those, for example, where we thought the Google search engine was not the best one, and so we carved out the ability of us setting the default there.

In the other countries, we felt very comfortable that Google was by far the best one. So there's no carve-out for any other country other than, I think it's the -- I believe it's China, Russia, and South Korea, if I'm

correct.

Q And there's no carve-out for the United States?

A There was no need to.

Q So under the ISA, Apple can't set Google as the search provider internationally and a different search provider in the United States, right?

A Again, yes, but it's not something we thought about or needed.

Q You mentioned earlier some of the different device types that Apple sells, including Mac computers. Under the ISA, could Apple decide to send search queries from a Mac computer to one search engine that is not Google, while sending, you know, all search queries from iPhone to Google?

A Again, just to be very clear, when we were doing the deal with Google, we wanted the capabilities to provide the best -- the best service, the best application, the best thing for customers. Google was the best one. So when we chose and did the deal, we picked it around the world.

We don't treat our customers differently around the world. We want them all to have the best experience. And so in the countries where Google was providing the best experience, we did that. In the countries where they were not, we did not do that.

Q And it also applies to all devices, right?

A Sure, because, I mean, from an Apple perspective,

why would we give an inferior experience on a Mac versus a phone. So we want to provide the best experience across all of our devices.

Q Mr. Cue, I'd like to direct your attention to UPX790 in your binder.

Is UPX790 an email that you sent to Apple's CEO, Tim Cook, on January 10th, 2013?

A It is.

MS. BELLSHAW: And, Your Honor, we would move to admit UPX790.

THE COURT: All right. 790 will be admitted.

MR. SCHMIDTLEIN: No objection.

THE COURT: No objection? All right. Thank you. 790 is admitted.

MS. BELLSHAW: Thank you, Your Honor.

(Plaintiffs' Exhibit UPX790 received into evidence.)

BY MS. BELLSHAW:

Q The attachment to UPX790 is a slide deck on privacy that you sent to Mr. Cook.

Do you see that?

A I do.

Q If you would please turn to page 2 of UPX790, it ends in Bates number 3668.

There's a presentation titled "Competing on Privacy."

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]
[redacted]
[redacted]
[redacted]
[redacted] [redacted]
[redacted] [redacted]
[redacted]
[redacted] [redacted]
[redacted]
[redacted] [redacted]
[redacted]
[redacted]
[redacted]
[redacted] [redacted]
[redacted] [redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted] [redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
et al.,
Plaintiffs,

vs.

GOOGLE, LLC,

Defendant.
_______________________________/

Civil Action
No. 1:20-cv-3010

Washington, DC
September 26, 2023
1:49 p.m.

Day 10
Afternoon Session

**[redacted] PROCEEDINGS**

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For DOJ Plaintiffs:

**KENNETH DINTZER**
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005

**MEAGAN BELLSHAW**
**DIANA AGUILAR**
U.S. Department of Justice
450 Fifth Street, NW
Washington, DC 20001

**DAVID DAHLQUIST**
U.S Department of Justice
209 South LaSalle Street, Suite 600
Chicago, IL 60604

For Plaintiffs
State of Colorado &
State of Nebraska:

**WILLIAM CAVANAUGH, JR.**
Patterson, Belknap, Webb & Tyler, LLP
1133 Avenue of the Americas #2200
Suite 2200
New York, NY 10036

[redacted]

Q. And then I think the third thing you testified to as a

goal was the term of the deal, that you wanted a long-term deal; is that right?

**A.** Those were the big things, that's correct.

**Q.** And you wanted a [redacted] deal?

**A.** I did.

**Q.** And Google pushed back on that; is that right?

**A.** That's also correct, they didn't wanted to do a long-term deal.

**Q.** And did the parties end up compromising on that term as well?

**A.** I believe so.

**Q.** Does Apple today have agreements with other search providers to be promoted in Safari?

**A.** We do.

**Q.** And who does Apple have agreements with today?

**A.** We have agreements with Bing, with Yahoo!, with DuckDuckGo and a few others.

**Q.** And has Apple had those agreements for a number of years?

**A.** We've had since -- for a long time.

**Q.** Why does Apple have agreements with other search providers that are not the default search engine in Safari?

**A.** Again, everyone gets a benefit, because it's easy to switch. And so we give customers the ability to easily switch to one of those search providers, and then they would get the

traffic and the advertising and the other things and they would share that with us. And so it's all about the fact that we make our customers and our software be integrated with those search engines to make it really easy for customers to use.

**Q.** And do those search engines pay a revenue share to Apple pursuant to those agreements?

**A.** They do.

**Q.** And if Apple believed that those other search engines were superior to Google and users preferred them, would Apple switch the default at the conclusion of a Google agreement?

**A.** We would.

**Q.** Now, you talked a little bit earlier this morning about some geographic carve-outs that were included in the Google-Safari agreement. Do you recall that?

**A.** I do.

**Q.** And did Apple seek those carve-outs from Google?

**A.** We did.

**Q.** And did Apple ever seek a carve-out for the United States?

**A.** No, there was no reason to. We picked carve-outs for countries where there was either somebody who was -- we thought already was better than Google at providing search results, or there was an area where it was a little bit of a question and we weren't sure, but it was clear that there was somebody who was close. And so we wanted to have the ability to switch.

**Q.** Did Google retaliate against Apple when Apple demanded the carve-outs for particular foreign countries?

**A.** I'm not aware of anything.

**Q.** Now, you also talked about some discussions that took place between Apple and Google -- excuse me, some discussions that took place between Apple and Microsoft in 2018. Do you recall that?

**A.** That's correct.

**Q.** And in 2018, did Microsoft approach Apple and offer to engage and to do some sort of either joint venture or acquisition or partnership?

**A.** Microsoft, over the years, has continued to approach us: They approached us in 2018, they've approached us later. And so that's correct, they approached us in 2018, again, saying that their search engine had improved even further from 2015-2016, from the last time, and that they had gotten better and we should do a deal together.

**Q.** Were you involved in those 2018 discussions?

**A.** I was, not as much as the last time, honestly, because I knew they weren't good enough. And we had had JG, who was an expert in search, that had started, and he was going to do an evaluation. And so I knew he would do the evaluation, and so I didn't want to have a lot of discussions with Microsoft about promises or whatever else they had. But I had discussions with Tim around it, and once I saw the evaluation and the results,

enough. And so from a customer point of view, even if you're interested in it, when you give it a try -- and maybe the privacy thing causes you to have some interest in it, you'll try it and you won't like it, and you'll default back or switch back -- or you won't even switch, which is generally the case. But to a small minority of customers that may like that, it's, again, very easy to switch and they can do that.

**MR. SCHMIDTLEIN:** Your Honor, I can do the rest of mine, I think, in open session.

**THE COURT:** Okay, terrific. I did have a couple of follow up questions for Mr. Cue relating to a closed matter. [redacted]

[redacted] [redacted]

**THE COURT:** [redacted] Why has Apple not invested incrementally more to develop its own search engine so that it could monetize the ad revenue that could be generated from that search engine?

**THE WITNESS:** That's a great question. I think it goes back to the comment I made: Doing a general search engine is a huge amount of work, and so it's not an insignificant amount of work. It's hard, it's difficult. I think we could do it, certainly Apple can do a lot of things if it sets its mind to. But if we do that, we can't do other things. So you have to

make choices in life: If you have limited engineers and resources, do you want to put all of your energies there. And our viewpoint was Google's doing a great job at general search. We have the capability in our agreement -- and this is something we haven't talked about. [redacted] And so our goal was there's things where they're not general search, the customer's just looking for a specific answer, and we'd like to give them that answer and not have it go to Google or anybody else. And so we think that's an area that we can invest in that makes a great experience for our customers.

But building a general search engine, our viewpoint around it is Google does a great job in it. Okay, we can be as good, maybe we can be even better from that standpoint. [redacted] These are all engineers, and so you have -- ultimately we have to pick where we invest our resources, and so that just didn't make a lot of sense for us.

**THE COURT:** And in your consideration of that issue, did the potential loss of Google revenue share, even in the short term, did that play a role in thinking about that issue?

and, again, that periodically if something better came along that we could switch to, I thought it was a win for us.

**THE COURT:** Any follow up, Mr. Schmidtlein, on those questions?

**BY MR. SCHMIDTLEIN:**

**Q.** Yeah, just a quick follow up. [redacted]

[redacted]

**Q.** And does Apple today have any capabilities -- or I should say technologies or development of search advertising technology in the way that Google has search advertising technology?

**A.** No, we don't.

**Q.** And is one of the issues that Apple would have to confront, if it ever decided to build its own general search engine, would be how would Apple begin to either develop or implement search advertising technology?

**A.** Yeah, you're just making the -- which is exactly the point I was trying to make, the work to build what Google has done over a more than 20-year period with some incredible engineers is not an insignificant amount of work to recreate.

And so, sure, it's all of the search capabilities, all of that knowledge, all of the advertising capabilities and all of that knowledge. So it is not -- it is a huge, huge project to do. But we shouldn't -- you know, because we need to be careful here. As I said, our number one goal here is to provide the best results for our customers.

And so our work in Siri, and our work in Spotlight, and even our work in Safari -- for example, if you type in NY in Safari, and you are an existing Safari customer, we know based on your search history -- and that's within the device, not Apple, the device knows that you go to the New York Times, for example, every day. And so we'll autofill the New York Times there, and you can just click and go, and it doesn't go to Google at all. So we're just trying to make the best experience for our customers irrespective of whether it goes to Google or with Google. Now, when it goes to Google, we would like to have the best experience there as well.

But let's not mistake the point that our number one objective and goal is to make sure we give the best answers to customers, and the best experience when they're using Safari, using Siri or using Spotlight. And if that means answering the question or giving them a different result than Google, we do that -- and we do that every day. We've done that since the beginning, and we continue to do that today, which is let's give the customers exactly what they want, if we know that. We

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, et al.,
Plaintiffs,

vs.

GOOGLE, LLC,

Defendant.

Civil Action No. 1:20-cv-3010

Washington, DC
September 26, 2023
2:37 p.m.

Day 10
Afternoon Session

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For DOJ Plaintiffs: **KENNETH DINTZER**
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005

**MEAGAN BELLSHAW**
**DIANA AGUILAR**
U.S. Department of Justice
450 Fifth Street, NW
Washington, DC 20001

**DAVID DAHLQUIST**
U.S Department of Justice
209 South LaSalle Street, Suite 600
Chicago, IL 60604

For Plaintiffs State of Colorado & State of Nebraska: **WILLIAM CAVANAUGH, JR.**
Patterson, Belknap, Webb & Tyler, LLP
1133 Avenue of the Americas #2200
Suite 2200
New York, NY 10036

**A.** It's in the single digits. As I said earlier, Microsoft was always the biggest player by far.

**Q.** If you'll turn in your binder to DX270. Just take a moment as we put that up. And this is also in evidence, Your Honor.

Do you recognize this document, Mr. Cue?

**A.** I do. This was the announcement of the iPhone.

**Q.** And this -- at this time, did Apple also launch a version of the Safari browser specifically for the iPhone?

**A.** Yes. As I stated earlier, prior to this, when you bought a mobile phone, it came with a quote, unquote mobile browser. Think of that as a browser that was a subset or neutered compared to a full browser that you got on Windows or Mac. One of the innovations that we wanted to bring to phones was to get a full browser so that you would get the same experience that you would get on Windows or on a Mac, for example, on a browser on the phone. And so this was part of that announcement.

**Q.** And if you look on page three -- and we'll blow it up on the computer screen in front of you, one of the features that's being touted at the release of the iPhone is this new version of Safari. And specifically, there's a reference to: "iPhone's Safari web browser also includes built-in Google search and Yahoo! search so users can instantly search for information on their phone, just like they do on their

computer."

Why was Apple promoting both Google and Yahoo! as part of this announcement of the new Safari browser on iPhones?

**A.** Though at the time we thought Google was the best search engine, Yahoo! was still kind of a close second and was popular. So we -- as we've done since then, we built it in so that customers could easily switch. And so we wanted to make sure that people knew that if they bought an iPhone and they were using Safari, they could also use Yahoo!. And so we made it easy, again, for customers to switch.

**Q.** Has Apple over the years put a great deal of thought into how it designs the Safari browser?

**A.** I mean, sorry if it comes off as -- I think we do -- we spend a great deal of time on everything that we do. From a design point of view, I think it's part of our culture and what makes us unique.

**Q.** Was designing the Safari browser to have an integrated search box so you could either type in a search query or a URL one of those design decisions?

**A.** Yes, absolutely.

**Q.** And --

**A.** I think everybody's copied it since then, so it was a great idea.

**Q.** Was building the Safari browser to have a single default search engine out-of-the-box another product design

decision that Apple carefully considered?

**A.** Sure. When you bring up Safari for the first time and you type something in and you get the search results, it works -- some people would call it magically. Again, we've gotten used to all of this. But at this time, when we're innovating and doing this for the first time, it was incredible. People were blown away with the fact that you could just type in there and you'd get search results. That had never been seen before.

**Q.** Did you or others at Apple understand that some consumers don't distinguish between a browser and a default search engine?

**A.** Yeah, again, I think from our point of view, our concern -- again, we're trying to address all of our customers. So -- and when you're trying to address all your customers, you have to make decisions on how you do things. And so when we looked at it, we said, look, we want customers to have an experience that doesn't force them to understand all these different search engines that potentially are there. Secondly, to pick the best search engine that there is out there for it so that when you do this it just works. If at some point later on you decide that you prefer a different search engine or there's a different one that you want to use, then it's fine, you can switch it over.

And again, we don't -- we didn't do anything to prevent

those search engines from working. In other words, if you do that, it works exactly the same way: You type in the URL field, and it works for Yahoo! or it works for somebody else. So we were giving the customer the choice and the experience. But it's critical for customers -- with our products, at least. As I said, we don't like bloatware, we don't like a lot of things that others do. We like our products to come out-of-the-box and work where it feels like magic. And I think the ability of searching in Safari and doing that with Google, it does feel like magic, it works really well.

**Q.** If a user has a poor experience with a browser because of the quality of the default search engine, will users potentially switch browsers?

**A.** Again, we have an App Store, it's very easy to download applications, it is not difficult. As a matter of fact, we highly encourage it. Most customers have downloaded tens, if not hundreds, of apps at this point. So it's quite easy to go download another browser or download any another application from that stance. So sure, look, if we're not -- I go back to the same thing. In my view, in the environment that we're in, if we don't have the best product, the best product ultimately wins. Because there's no lock and key here in any way, and so customers can choose a different browser, customers can choose a different search engine, customers can choose a different product. We compete -- as I said, we're not the

you get better results. Again, you become a little bit more popular.

**Q.** Okay. If I may, you mentioned a concept of a feedback loop earlier, and you said there are many feedback loops in search. Did I hear you correctly?

**A.** Correct.

**Q.** And what's the role of traffic in a feedback loop?

**A.** Traffic participates in several feedback loops, but there is absolute value of traffic. As I said, that tends to be a little bit less important, but still important. For example, it provides ability to experiment. If I have enough absolute -- an absolute way to -- enough traffic, I can quicker understand whether my changes are good or not or run more experiments at the same time.

Relative traffic, if I have more traffic than my competitors, that participates in multiple feedback loops driving quality and driving index completeness, which in effect is driving quality. And not unimportant, it is very impactful for revenue. Revenue in search -- in advertising in general is nonlinear: If you're twice as big as your opponent, you will make four times as much money. Not exactly these numbers, but I'm just trying to illustrate the concept of nonlinearity.

**Q.** Okay. Mr. Parakhin, why don't we take a look at a document. Mr. Parakhin, I'm showing you what has been marked as UPX270. Do you see that at the bottom, at the front page on

the yellow sticker?

**A.** On the front, yes.

**Q.** And at the first page of the exhibit, there's a cover e-mail from Mr. Sachin -- and excuse me if I don't say that right, Malhotra?

**A.** Yes.

**Q.** Yes, okay. And who is Mr. Sachin Malhotra?

**A.** Sachin is our product manager on ads team.

**Q.** And he works for you?

**A.** He works in our organization, yes.

**Q.** And attached to the e-mail there's a PowerPoint presentation. Do you see that?

**A.** Uh-huh.

**Q.** Do you recognize the presentation?

**A.** I think I saw it before.

**Q.** At a high level, what is the presentation?

**A.** I think it is an explanation on roughly the feedback mechanisms that I just tried to describe.

**Q.** And was this presentation prepared in the ordinary course?

**A.** I believe so.

**MS. AGUILAR:** Your Honor, at this point, I'd like to move to admit UPX270.

**MR. SMURZYNSKI:** No objection, Your Honor.

**THE COURT:** 270 will be admitted.

(Exhibit UPX270 admitted into evidence)

**BY MS. AGUILAR:**

**Q.** Thank you. Mr. Parakhin, will you please turn to page three of the document in front of you. It has a Bates number ending in 70.001.

**A.** Yep.

**Q.** And the title of the slide is Successful Search Businesses Require Scale with Users and Advertisers. Do you see that?

**A.** Yes.

**Q.** And there's a graphic on the right hand side of the document. Do you see that?

**A.** Yes.

**Q.** And at a high level, is that image consistent with your understanding of the search feedback loop?

**A.** I think it is very consistent. It's trying to -- in simplified form, to show all those feedback loops, yes.

**Q.** I'd like to walk through each of those steps, starting with at the top, do you see where it says more users?

**A.** Yes.

**Q.** And that transitions into more advertisers. Do you see that?

**A.** Yes.

**Q.** And can you please explain to the Court briefly why more users would lead to more advertisers?

**A.** Advertisers need to optimize their systems for each ad network, each provider of advertising technology. The more users you have, the more your advertising network, your advertising solution is interesting for advertisers. They have to spend the same amount of work than, say, for somebody with smaller number of users, but they would get more conversions, more ads results. So usually the larger -- the more users you have, the more impressions or clicks or final conversions you can deliver, the more advertisers are interested in being on your platform.

**Q.** Earlier, I think you mentioned the term form factor. What did you mean by that?

**A.** Well, roughly usually we identify main two form factors --

**THE COURT:** Did you say form factor?

**THE WITNESS:** Form factor, device form factor, Your Honor. The most distinct sort of basic ones is desktop and mobile, and then there are smaller subgroups. There could be tablets, there could be smart TVs or other special devices which are -- which tend to be smaller as part of the market.

**BY MS. AGUILAR:**

**Q.** And does the form factor a user is using affect which advertisers a search engine can attract?

**A.** Usually, yes.

**Q.** And why is that?

so which is why from the very beginning I said it's important for us to look at more geographic area, language and market, and the form factor, because there's very significant difference in query distribution. So since there is this difference, you cannot easily sort of leverage data in one form factor to easily improve quality in another.

**Q.** Mr. Parakhin, I'd like to pivot a little bit to talk about non scale attributes of search quality. Do you know what I mean by non scale attributes of search quality?

**A.** Quality of algorithms, I assume.

**Q.** Well, based on your experience, are there other ways to improve search quality without increasing scale?

**A.** There are -- quality is an aggregate term. It, of course, requires certain components that are scale-dependent, and, of course, also requires certain components that are not scale-dependent like basic machine learning algorithms, the quality of engineering, the investment in just number of servers to serve, and so on and so forth.

**Q.** You mentioned the quality of engineers as a method of improving search -- as a non scale method of improving search quality. Did I hear you right?

**A.** Quality of engineering, yeah. Basic algorithms often can be improved, even in the -- you know, even for a small-scale or a no-scale situation. If I may, I would like to point out that sometimes it's not obvious how scale is

affecting certain things like, for example, the speed of serving results. You would say latency should not be dependent on scale, but in fact it does very significantly. For example, because the higher the scale you have, the more likely it is that query was issued that isn't in cache. And so in the cache somewhere closer to the user, you will have higher density of end points. So even latency can be affected by scale. So I'm trying to say it's not always obvious which facets are affected by scale and which are not. But certainly there are facets that are not affected by scale, including basic machine learning algorithms and engineering.

**Q.** Well, in terms of engineering, as sort of maybe increasing headcount as a method of improving search quality, how does that compare to improving search quality through increasing scale?

**A.** It's important up to a point, it hits diminishing returns. Empirically, if you look at successful companies worldwide, after about, I want to say -- and this is rough, my estimate. After about two to 3,000 engineers, core engineers on search, the next implement will be very incremental which is probably why if you look at companies like Yandex, never in Korea -- successful Korean search company or Bing all have roughly the same sized teams.

**Q.** You mentioned machine learning or improving machine learning as a method of improving search quality. Can you tell

me how that compares to improving search quality to increasing scale?

**A.** If you don't have scale, you can to a certain degree try to mitigate it by trying to be smarter and running more sophisticated machine learning algorithms. It will give you some way forward, which is why Bing very quickly embraced machine learning and was fully machine learning-based even in early -- or late 2000s. It's not a substitution or a solution, it can be mitigation. But empirically, even significant improvement in algorithms does not tend to outweigh importance of scale.

**Q.** And how about growing the index, is that a method of improving search quality?

**A.** The bigger the index the better. It is important to have a large index. There are -- again, there is a little bit of optimal size after which improvements become incremental. It's more important to have a higher quality index -- meaning higher quality results in that database than just pure sites, where our discussion of making sure that all the websites allow you to crawl is very, very relevant.

**Q.** And how do you compare improving search quality through growing the index to improving search quality through additional scale?

**A.** Well, you can -- if you don't have scale, you cannot have high quality index. I can show example from my past

career at Yandex. We really tried to expand into Turkey and invested a lot of effort. However, local -- you know, we were sub scale in Turkey. And a local, very important commerce site, kind of an Amazon of Turkey, Sahibinden, they prohibited Yandex from crawling. And then like no matter what you do, you're not going to have most important commercial site in the country in your index, and that makes the results very uncompetitive, right. So I would say scale is an enabling factor that has to be there. Of course, if you don't have engineering, it's not a panacea. But without scale, even the best engineering has proven, at least empirically, to be virtually powerless.

**Q.** Mr. Parakhin, I'd like to pivot to talk about Bing chat. Are you familiar with Bing Chat?

**A.** Very much. My little baby.

**Q.** And what is Bing Chat?

**A.** Bing Chat is our system where we use the most powerful language models that were developed in collaboration with OpenAI -- or by OpenAI, our partner. And we combine it with ability to query index and search index, and so provide results in a more natural human form.

**Q.** And you mentioned a large language model. At a very high level for the nontechnical audience, what is a large language model?

**A.** A large language model is the closest that humanity

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, ET AL., )
)
Plaintiffs, )
) CV No. 20-3010
vs. ) Washington, D.C.
) September 27, 2023
GOOGLE LLC, ) 9:39 a.m.
)
Defendant. ) Day 11
______________________________) Morning Session

TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

has huge impact on latency, I mean it's a factor of five maybe. So once you get results from the cache, it is much, much faster.

So it's not ignorable. You know, all of those contribute.

Q In the United States, is it your view that Microsoft's latency is better, worse, or the same as Google Search?

A It depends on whether we're talking about desktop or mobile in United States.

I would say on desktop, we are roughly on par, give or take, maybe slightly worse.

On mobile, we are significantly worse.

Q Today, if a Microsoft user is using the Edge browser, Microsoft's browser, and they have opted in to allow for optional data collection, Microsoft will collect what that user sees on the page and what they do next, correct?

A In certain situations, specified in terms of service.

Q So, for example, if someone is in the Edge browser and they navigate to Google.com -- and, by the way, is Google.com the single largest search query issued on Bing?

A It used to be at some point. I don't know if it is right now, but it's one of the largest.

BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, et al., . Case Number 20-cv-3010

Plaintiffs,

vs.

GOOGLE LLC,

Defendant.

Washington, D.C.
September 28, 2023
1:00 p.m.

PUBLIC TRANSCRIPT OF BENCH TRIAL, DAY 12
(AFTERNOON SESSION)
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For DOJ Plaintiffs: KENNETH DINTZER, ESQ.
United States Department of Justice
1100 L Street Northwest
Washington, D.C. 20005

MEAGAN BELLSHAW, ESQ.
United States Department of Justice
450 Fifth Street Northwest
Washington, D.C. 20001

For Plaintiff State of Colorado: JONATHAN SALLET, ESQ.
Colorado Department of Law
Consumer Protection Section
Antitrust Unit
1300 Broadway
Seventh Floor
Denver, Colorado 80203

-- continued --

device today you have Chrome with Google and you have Samsung Internet with Google. And so even if was Chrome and Edge or Chrome and Samsung Internet and Edge, all of those devices would have had Google. So I think even as we were talking about this, we were talking about a compromise that would have had Edge basically with Google on it.

Q. Okay. I'd like to ask you one more set of questions about your discussions with Apple. Earlier, you talked about discussions that you had with Apple about Bing's international search quality.

Do you recall that?

A. Yeah.

Q. Did Microsoft provide Apple with an investment strategy to improve Bing's international quality over the course of its discussions?

A. So one of the -- and I think we talked about this a little bit this morning. The frequent conversations, topics of conversation that came up in discussions with Apple was Bing's quality, is Bing good enough to put on our phones.

And I think, you know, there was some acknowledged product gaps, and I think in particular when you went to mobile and in particular when you went to international there were real acknowledged product gaps.

And one of our beliefs always was that a major contributor to the quality gap was the lack of scale. Right? Again, we

talked about that dynamic a little bit this morning.

So what we would argue to Apple was, A, if we had access to your query volume, we could then use that scale to rapidly improve the quality of Bing and ship a quality product.

You then get into a little bit of a chicken and egg problem, which is, we need the scale in order to improve, they don't really want to make the switch until you improve. Right?

And that's the -- one of the tension points that we were trying to resolve. And we kicked around a bunch of different ideas. One thing I think we said, hey, could you give us an offline data dump of all the queries, so could we see all the queries, and could we then use the access to that scale to improve the search engine before you make the switch.

And I think ultimately, there was a combination of they didn't have access to all of the queries, there were privacy and data handling, so we said that wasn't working. But that's just one example of things we were brainstorming.

What we did believe was we had a playbook that once we had the scale, we knew what investments we needed to make, we knew what engineering work we needed to do that we could improve relatively quickly. And so one of the arguments -- you know, one of the arguments we had with them is, we said, hey, look, you all have experience in your own mapping product of shipping a product that initially wasn't great, but as soon as you started getting usage and taking advantage of scale, you pretty

rapidly improved it, and then you ultimately, you know, ended up with a decent solid product.

So we could repeat your experience here. Yes, Bing may be less than optimal in France out of the gate, but Apple Maps was less than optimal in France out of the gate. And you'll have the same basic dynamic; people continue to use the defaults.

So that was one of the arguments we were making to them.

The other arguments we were making to them is, we said, look, there's going to be a decently long lead time. Right? And I think we were talking about, you know, from the time we signed a deal until the deal got announced, it could be 12 months, from the time we signed a deal until devices with the new Bing/Apple search experience were in market could have been be another 18 -- could have been 18 months.

There was time when we said there are things that we will start doing during that intermittent period of time, like go license more local data in France so, you know, you will have a better quality with local search results. So those were the things we can do.

And we tried to put that -- we kind of called it a playbook, like a product quality improvement playbook was the way we described it internally. And so yeah, we did put that in front of Apple on multiple occasions and say, hey, yeah, this is what we're going to go do.

It was all around trying to get them confident that they

could make the switch, and even if there was a short-term dip after they make the switch, we would be able to close the gap fast enough.

Q. If you would please turn to UPX797.

And again, this is a document we're not going to put on the screen.

Do you recognize UPX797?

A. Yeah.

Q. Is UPX797 a part of this strategic playbook or strategic investment plan that Microsoft provided to Apple during the course of the discussions in the time period reflected in the e-mail on UPX797?

A. Yeah. So what this e-mail was was we had had a meeting with several executives at Apple. They had asked several questions around what would you do, how would we -- you know, what investment would you need to make, you have our scale, what are you going to do with this, how much money are you going to have to spend. So this was sharing our view of the playbook with them.

To understand part of what this is is we brought the -- the discussions we had with Apple in 2018 were a little bit different in tone and tenor than the discussions that we had had with Apple previously. And part of it was the CEOs had had a meeting in mid-2018 where they said, hey, let's go look at search again. And they said as a mental framework, before we

get into detailed negotiations around dividing the pie, let's get a common understanding of what the pie looks like and how big it was. And so we actually were going through an exercise with Apple that says if you thought about Bing and the Apple search business as a single business, what would that look like, how much revenue would it have, what was the cost structure associated with it.

And so one of the questions in there was, you know, to take advantage -- you couldn't just get the scale and then just magically fix. You get the scale, and now that you had the scale, you would have to make engineering investments to take advantage of the scale. And so that gets reflected in this shared P&L, and, you know, so this was our saying, hey, look, here's the amount of engineering we would need to spend, here's what these people would do, all in the spirit of how do you then take advantage of the scale.

Q. And in your view, are the -- is the investment plan that's reflected in UPX797, would it make sense for Microsoft to undertake that level of investment in international search quality absent the increase in scaled query volume from a deal with someone like Apple?

A. No. So -- because again, you have to understand, there's a couple of things going on here. So for example, one of the reasons why scale matters, right, is a lot of search is experimentation. Right? I try tweaking the algorithm. I try

tweaking the page treatment. So you do little experiments. You look at user reactions to the experiments, and those experiments allow you in an iterative way to improve quality.

The great thing about improved scale is you have the capability now to run more simultaneous experiments. If the minimum size of an experiment is 2 and you have 100, then you can run 50 experiments. If the minimum size of an experiment is 2 and you have 1,000, then you can run 500 experiments. Right?

And so one of the reasons we were so excited about getting access to query volume at Apple's scale was you could run more simultaneous experiments. You still need engineers to write the code, build the experiments, generate the experiments, and realize them and use them to improve the product.

So, of course, it doesn't make sense to hire those engineers if you don't have the query volume to run the experiments on. Right? So in a lot of cases, like, there would have been nothing for these people to do, because what they were doing was working on the advanced scale.

The second thing I will say is there were some things here that just -- that just made no financial success -- I'm sorry, financial sense, right, which is, you know, in a world where your business in an individual country is sort of size X, at some point in time investing Y where Y is significantly higher than X sort of ceases to make sense.

We invested ginormous amounts of money in Bing over the

years. I think you've seen kind of the cumulative loss was in the 10s of billions of dollars. The actual cumulative investment was a multiple of that, because those cumulative losses don't even include the investments that get offset by revenue.

But even there, there were some things that, just given the size of the business in France, the size of the business in Germany, it didn't make sense to do a lot of very country-specific work.

But if you had access to the scale from Apple, all of a sudden you had a meaningful-sized business. You could amortize the investment costs over a larger business, and it made more financial sense.

MS. BELLSHAW: Your Honor, at this time, we've completed the questions for the open session. I have just two documents I would like to cover in the closed session that do involve financial numbers and revenue projections.

THE COURT: Okay. So it sounds like this will be 15 minutes, 20 minutes?

MS. BELLSHAW: I think probably 10 minutes or so.

THE COURT: And then we will have cross.

All right. So we're going to go into closed session for, it seems like, maybe a half hour or so at most. So if you're not associated with the parties or with Microsoft, I will ask you to please leave the courtroom, and then we will let you back

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ET AL., Plaintiffs, | CV No. 20-3010 |
| vs. | Washington, D.C. |
| | October 2, 2023 |
| GOOGLE LLC, | 9:15 a.m. |
| Defendant. | Day 14 |
| | Morning Session |

TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

CEO, did you have responsibilities for Bing?

A No, I didn't.

Q Okay.

And just, sir, at a high level, can you describe how Bing fits into Microsoft's overall strategy?

A You know, Microsoft has been always focused on, as a software company, to look at software categories that we want to participate in, both because we think that we can bring innovation to it, and also the categories' attractive.

So when I think about Bing from a Microsoft perspective, I sort of see search or Internet search as the largest software category out there by far. There's nothing even close. I used to think Windows and Office were sort of attractive businesses until Internet search. And so once that became clear, we were very committed to making progress in that category.

So, yes, we're a very, very low-share player, we're grounded in that, but we continue to persist in it because we think of this as a software category that we can contribute innovation to, and it's a very attractive market.

Q In what sense is Internet search the largest software category? What do you mean by that?

A Just by share, revenue, margins. Whichever way you look at it today, you know, it's dominated by one player, so therefore it's got high margins.

But even if you sort of take that in aggregate, the market is the largest software category.

Q And just sort of talking -- looking at sort of Bing in particular, what's the Bing strategy within Microsoft?

A Within Microsoft is more about being able to make progress in what is the largest software market.

And then do so by picking a strategy that allows us to continually invest. One of the things I did, you know, when I became CEO was to make sure that the business became profitable so that we can keep investing in it on a continual basis, knowing that this is a large, attractive market, and then if a window opens up for us, then that'll be something that Microsoft can benefit from.

Q So is Bing profitable today?

A Yes, it is.

Q And you said you're waiting for a window. What do you mean by that?

A You know, when I think about any software market, digital market, there are sort of two sets of things that were. One is that there is an opportunity for us to see either some paradigm shift or, quite frankly, some intervention in the market.

When I think about sort of what Microsoft itself had to go through was both an antitrust intervention, plus

It's kind of also an interesting market, which is it's a multisided market. It's -- you can't bring traditional price competition because the price on one side is zero, and the other side, in fact, the prices keep going up.

And so that even creates even harder, like, how does one even bring price competition is one of the fundamental challenges of these multisided markets.

Q And what have you done to try to combat this, as you call it, vicious cycle?

THE COURT: Counsel, can I interrupt?

Mr. Nadella, can I just ask you to clarify your response.

You said one side of the equation, there's zero price, I understand that, the consumer. You said the other side of the equation, the price is going up. What did you mean by that?

THE WITNESS: So on search, in simple terms, there's advertisers bidding in an auction to get placement in order to reach consumers, and so the consumers obviously get a free service.

But the advertisers, you know, supply-constrained market, which when there's one dominant supplier, every advertiser needs to go into that one auction.

And so if the density of the auction goes up, the

prices go up.

And so, for example, the empirical evidence is anywhere there's a marketing campaign or an advertising campaign moves from Google to Bing, the first thing they notice is they get better ROI because the prices go down for them. But there isn't enough traffic in Bing to justify sometimes having the same intensity of auction, if you will.

THE COURT: Thank you.

BY MR. SEVERT:

Q And just to follow-up on the Court's question, has Bing had difficulties in increasing advertiser participation in the Bing auctions?

A Oh, yeah.

I mean, it starts with, quite frankly the share, because advertisers go where there is high share. So it sort of -- that's the first barrier.

And then the second barrier is there is things, you know, that, like SA360 and some structural issues and how campaigns can be moved over in a friction-free way and, you know, obviously we've not been able to break through on that with Google in terms of making it such that an advertiser can have the same campaign across multiple search engines and so on.

Q And you mentioned, just to sort of go back, you mentioned the vicious or virtuous cycle depending on what's

your perspective. What have you done to try to combat or overcome that?

A I think the predominant thing that we've achieved some modicum of success, which sort of even helps us continue down this path, is desktop search.

I mean, the one inherent advantage Microsoft has is we get to set defaults on Windows and create incentives for our OEMs for those defaults and what have you.

And so therefore in that context, as I said, I think, you know, on desktop search, we're being able to grow share, we've become more competitive with our browser.

And so that's sort of perhaps the most successful strategy we've had. And, of course, one of the other things that we've been trying very, very hard is to get additional distribution.

Q And you mentioned you have more share on desktop. About what share do you think you have on desktop?

A It depends.

If you use third party, things like Comscore, probably in the teens.

Q How about in mobile?

A Mobile would be low, low single digits, if that.

Q So what's the rationale for investing in the area where you're already -- at least relatively more strong, versus the area where you're relatively more weak?

before you even get the first query.

But then after that, it quickly becomes how do you get enough queries to continuously improve search quality and enough advertisers to get enough advertising in order to sustain not just the business model but, as I say, advertising itself is content.

And so that's kind of where we have focused on really making sure that we do our best job on both those fixed costs, as well as the dynamic data acquisition, if you will, on desktop.

And then, you know, continuing to try to get distribution in mobile.

Q Sure.

And you've mentioned distribution a few times.

When you say distribution, do you mean defaults?

A Defaults.

Q And why is that the type of distribution that you've been focused on?

A It's the only -- I mean, it's the mechanism that fundamentally can change.

This entire notion that users have choice and they go from one website to one website or one search into one search and it's complete bogus. There's defaults. The only thing that matter in terms of changing search behavior.

And at this point, in fact, it's even more true,

right. I mean, there's -- you get up in the morning, you brush your teeth and you search on Google. And so therefore, with that such level of habit forming, the only way to change is by changing defaults.

Q And is there a difference between defaults on desktop versus mobile?

A The desktop, it ironically turns out that Windows is the most open platform today, because anyone can distribute anything on Windows, they don't need to go to Microsoft.

And so, yes, we do have defaults of ours, but it doesn't require any inter -- or -- any coordination with Microsoft to distribute a complete alternate player which includes the browser as well. So changing defaults today is easiest on Windows, toughest on mobile platforms because they're all locked up; they're locked up on the browser that is allowed, they're locked up with app store access. So there are many, many sort of friction points on mobile operating systems.

Q And you made a statement that Windows is the most open platform today. What did you mean by that?

A I mean, here's the thought experiment.

To ask ourselves today and say, would Google even exist if Windows had iOS-like restrictions on how things get distributed? And so, it just -- that's what I mean.

then there's the capital investment, and maybe the third one is the investments in the go-to-market, including distribution. So all three are always in contention at any given time.

And the one way to think about it is in a market where there is more competition, we are growing share, that means as a percentage of our revenue, we'll invest back more, because, after all, we're a, you know, contender, and so that's kind of how we would look at it.

Q And are there any constraints on Microsoft in terms of, you know, what it can invest in just by it being a public company?

A Sure.

I mean, in any -- at the end of the day, I'm subject to sort of the same laws of gravity that anybody is as a public company, which is it has to be in the long-term interest of our shareholders.

So I always have to sort of argue the case internally and externally by showing real progress that, Hey, we picked the right markets to participate in, we are making progress in those markets, and, yes, that, you know, if we continue to make the progress, then we get more permission from our shareholders to be able to invest.

Q And this may come as no surprise to you, but Google has argued that Microsoft is under-invested in Bing.

Do you agree with that?

A You know, I would say as someone who has -- let me put it this way. As per capita to our revenue we've made, we've invested a lot, more so than Google has invested, in search. And so, therefore, I would say, you know, we're the only player other than Google that has continued to invest in search.

And, quite frankly, the investments Microsoft has made in search has even kept all the other search players who contend for it, like a DuckDuckGo, even going, because they use our search index. And so I kind of look -- I -- I don't subscribe to that view that we've not invested.

Can we invest more? Of course, any day, you know, everybody wants to invest more. And in order to invest more, please give me some mobile share and I'll invest more.

Q And how much money Microsoft has invested in Bing over the years?

A You know, if you take sort of our latest numbers and you say the vast majority of it is search revenue and -- and we drive today profit, but over the last 20 years, maybe close to $100 billion.

Q And is that net of revenue?

A No, this is total investment.

THE COURT: While counsel is paused, can I ask you a slightly different question, which is, you mentioned

DuckDuckGo, for example.

Is it conceivable to you that there could be a nascent search company that could be built from the ground up, given the barriers of entry and the costs to invest in a truly first-class search engine?

THE WITNESS: There is no existence proof of that, that's what I'd say.

It's sort of -- it's very -- sort of hard to say that, you know, in tech, at least, we love to sort of talk about how anything is possible, because that's the dream, at least, we try to keep alive.

But this is just a hard one, the fixed cost. That's why, the reason I brought up DuckDuckGo is DuckDuckGo had an angle, they wanted to be, you know, in fact, a privacy-first type of search engine.

But then they piggybacked off of a bunch of the investment we made, and we were happy to give them that because we wanted search competition, you know. It would -- in fact, it would be very similar to me if DuckDuckGo was able to make a lot of progress; it would be no different than Apple default for me.

And so, yes, so we're always looking for if somebody else has a better idea, or even recently, you know, Neeva was one of the other competitors, we were happy to give them our search index.

But it's just -- you know, because of all the reasons why we have struggled as Microsoft, for all sort of the strengths we have, including our own distribution in Windows, it's very hard for a startup.

In fact, you go to Silicon Valley, they have these things called the no-fly zones and you have to go ask them, Which is a biggest no-fly zone, it will be Internet search.

THE COURT: And we've heard about how AI has now been integrated into Bing search. To what extent do you think, if at all, AI can make up the delta in -- between Google and Bing in terms of search quality?

THE WITNESS: So that's a -- there are two sets of things, right, which is, the age of these large language models creates, I'll call it, a new baseline for what both, now at some level, Bing and Google and anybody else who wants to compete in search has to do for core search ranking and be republic with this, which is -- some of the largest sort of core ranking gains we had was when we started using these large language models.

But it fundamentally doesn't address all the other challenges, right, which is the user habit comes from search defaults, settings, so the distribution advantage Google has today doesn't go away.

In fact, if anything, I worry a lot -- even in spite of my enthusiasm that there is a new angle with AI,

I worry a lot that, in fact, this vicious cycle that I'm trapped in can even become even more vicious because the defaults get reinforced.

The publisher content can get locked in. And so if there are exclusive content deals which are happening right as we speak, which is scary because what that does is not only lock all that content today, at least, that's crawlable by everyone and usable by large model training, could become exclusive.

THE COURT: When you say "lock in deals," you mean locked-in deals for the AI crawling in terms of --

THE WITNESS: So you can parlay high share today. Think about -- you have the largest sort of economic sort of surplus. So you can use that economic surplus to essentially buy off publishers of all kinds.

And it's -- in the case of obviously Alphabet Google, you know, they're super strong, not only in Google Search but also in YouTube. So you can see how they could use both of those as places where that content will be exclusively used by them to train their models and serve their models.

And it will not be viable. So right now I'm struggling to get a default distribution, and I'll have to now contend with an additional thing called -- now you're to pay up, to every publishers, the rates Google can pay,

because Google can pay using that economic rent they collect today, which we don't collect.

So I think this is going to become even harder in the AI age to compete with someone who has that core share advantage and economic advantage.

THE COURT: So say you were Tim Cook. Why would Apple ever have want to switch to Bing?

And what I mean by that is, given the lag in what I think we've all heard is less user quality or less quality of Bing search results on mobile, we understand what the reasons are, what would be their incentive to change and what circumstances could you ever see them changing?

THE WITNESS: Yeah.

So I don't think anybody would want to switch to any product that's inferior in the long run.

We had proven to them that with the access to their query stream and their share position, that we can absolutely bridge the quality gap, whether it's in local search, international search, all of the various considerations. So we know how to do that, it's a set of investments that need to be made. More importantly than the investments, it's the data that needs to be there.

Then your question of why would Apple ever want to do this. It would want to do this if they felt that economically in the long run for them having competition in

Q And you mentioned something called SwiftKey. What is that?

A It's a software keyboard on mobile phones, so we bought a company a while ago, which actually had significant OEM distributions, because OEMs liked SwiftKey. In fact, they paid SwiftKey to include a good software key. And then, of course, we wanted to continue that. And once it became part of Microsoft, I think Google rewrote some of their terms on what is allowed and not allowed in terms of third-party keys, keyboards.

Q What the connection between the SwiftKey keyboard and search?

A Because you can -- I mean, keyboard could be, could be, an alternate entry point because you could have a search box on a keyboard.

So if there was a default keyboard then which had an entry search box, that could act as an another type of entry point other than the search default on the browser.

Q And what happened to SwiftKey after it was acquired by Microsoft?

A As I said, I think there were changes in some of the agreements, and some of the agreements they had with OEMs, that is SwiftKey had with OEMs, just became harder to maintain because all the economics on that changed.

Q And I think when you were talking about scale

earlier; you mentioned that you need enough queries to continually improve search quality.

What do you mean by that?

A The search is a product in which what you see today informs quality. So it's not just what you saw all in history, but there would be always new novel things that are being queried for the first time because there's new content that is being generated for the first time, being indexed for the first time, new things are coming out.

And so unless and until you are in that river of sort of seeing what people are searching for all the time and have the diversity, right -- so you're seeing stuff in mobile, you're seeing stuff in desktop, you're seeing it internationally, all of that matters.

So dynamic data is sort of really part of search quality. There may be other software categories like that, but this one is much more, you know, if you're not a high -- in some sense, the share and scale is quality on two fronts. One is because of the search quality of organic results; and advertisers are going to be more intense on your platform and so, therefore, advertising is also content. And so between the two, you need to get to high share in order to have a high quality product long term.

Q And is there some time element to the -- to having scale? Does it sort of build upon itself over time?

A Yeah.

I mean, like if one -- one of the -- the dreams, at least, I have is that, hey, at what level does it start getting -- like on desktop, I think there's some empirical evidence that there is, you know, 20 points of share or what -- you can have a very competitive market, right, between Google and Microsoft and some of it is also because we can get to defend our defaults.

So my hope is, hey, what would the world look like if we, or somebody else, had 20 points of mobile search share. You know, would there be more competition on -- and rather, will there be stability on search quality gains.

Q And I want to talk for just a couple minutes about Microsoft syndication deal with Yahoo!. Are you familiar with that?

A Absolutely.

Q And what is Microsoft providing to Yahoo! in terms of search?

A Again, it's very similar to what we do with DuckDuckGo, what have you. We provide them all of our search, essentially white labeled, so that it's Yahoo!'s search for people who go to Yahoo!

Q And how long has that relationship existed?

A It's existed now for a long time, and I think we renewed it even recently again. So it's 10 plus years.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, et al.,
Plaintiffs,

vs.

GOOGLE, LLC,

Defendant.

Civil Action No. 1:20-cv-3010

Washington, DC
October 10, 2023
1:35 p.m.

Day 19
Afternoon Session

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For DOJ Plaintiffs:

**KENNETH DINTZER**
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005

**ADAM SEVERT**
**RICHARD GOWER**
**MEAGAN BELLSHAW**
U.S. Department of Justice
450 Fifth Street, NW
Washington, DC 20001

**DAVID DAHLQUIST**
U.S Department of Justice
209 South LaSalle Street, Suite 600
Chicago, IL 60604

For Plaintiffs State of Colorado & State of Nebraska:

**WILLIAM CAVANAUGH, JR.**
Patterson, Belknap, Webb & Tyler, LLP
1133 Avenue of the Americas #2200
Suite 2200
New York, NY 10036

**THE COURT:** It will be admitted.

(Exhibit UPX672 admitted into evidence)

**BY MR. SEVERT:**

**Q.** And Apple ultimately abandoned the idea of putting up a Yahoo! home page and search box as the default home screen; is that right?

**A.** On Safari. There's lots of home screens on the iPhone. There's a startup screen, there's a home screen that's not within Safari. They can do whatever they want there. But in Safari.

**Q.** So as to Mr. Pichai's concerns, he could breathe a sigh of relief?

**MR. SCHMIDTLEIN:** Objection.

**THE COURT:** Sustained.

**BY MR. SEVERT:**

**Q.** Let's jump ahead to 2009. We can take down UPX672. In 2009, Google and Apple were negotiating an ISA extension; is that right?

**A.** I believe so.

**Q.** And you were involved in those discussions?

**A.** I believe so.

**Q.** Let's take a look at UPX605. UPX605 is an OC deal review presentation. Do you see that?

**A.** I see that.

**Q.** And what is OC?

**A.** I think it took the place of EMG.

**Q.** And is this the kind of document that would be presented at a meeting to review the deal?

**A.** At times. It changes formats.

**Q.** And this is -- and you, in fact, attended this meeting to discuss this particular deal with Apple?

**A.** Unsure if I was there, no.

**Q.** Well, let me see if I can refresh your recollection. Ms. Braddi, I've handed you a document bearing Bates number GOOG-DOJ-04263030. I'd ask you to take a look at the OC -- this appears to be an agenda and notes from an OC deal review from June 22nd, 2009 with a list of attendees with your name listed there. Take a look at that.

**A.** And I saw my name.

**Q.** You can put it aside. Ms. Braddi, does this refresh your recollection as to whether you were in attendance at this June 22nd --

**A.** If it says I was, I was there.

**MR. SEVERT:** Okay, thank you. And, Your Honor, I'd move to admit UPX605.

**MR. SCHMIDTLEIN:** No objection.

**THE COURT:** It will be admitted.

(Exhibit UPX605 admitted into evidence)

**BY MR. SEVERT:**

**Q.** Looking at just the cover of UPX605, you see there's

an agenda on the first page?

**A.** Yes.

**Q.** And the first item is: "Apple-Safari desktop search." Do you see that?

**A.** Yes.

**Q.** And the presenter listed here is, again, Mr. Shardell?

**A.** Yes.

**Q.** And he was still reporting to you in 2009?

**A.** Yes.

**Q.** Let's go to page three, Bates ending in 266. I'll just flag for you, Ms. Braddi, pieces of this are redacted, so I'm going -- I'm not going to say the numbers, and I'm going to ask you not to either.

**A.** Okay.

**Q.** At the top we see it says: "Partnership overview - Apple," right?

**A.** Uh-huh.

**Q.** And the first point is: "Google is currently Safari browser's default search setting for Mac, Windows and devices," right?

**A.** Correct.

**Q.** So that was sort of the status quo, right?

**A.** Yes.

**Q.** Let's go to page five, Bates ending in 268. And here we see that Google -- and I won't get into the details, but

Google had made an offer to extend the ISA?

**A.** Based on -- they wanted to extend the ISA.

**Q.** And this is just a summary of the terms Google was offering at this time?

**A.** Yes.

**Q.** Let's go to the next page, Bates ending in 269. We see the title is Apple's counter, right?

**A.** Yes.

**Q.** And that's its counter to Google's offer, right?

**A.** Correct.

**Q.** The bullet in the middle of the page says: "New Apple ask." Do you see that?

**A.** Yes.

**Q.** The second one -- sorry, the first one: "New Apple ask," the third line. It says: "The option, but not the obligation, to set Google as the default search provider." Do you see that?

**A.** Yes.

**Q.** And then I won't read it, but there's a reference to the current terms and a relationship to the -- to how the default works under the current terms. Do you see that?

**A.** Yes.

**Q.** So here, Apple's ask is it wanted flexibility, right?

**A.** Well, they got flexibility in the very first agreement where they didn't have to set us anywhere and just point to us,

and no money was shared. But now they wanted that same flexibility, but they wanted to be paid either way.

**Q.** And in particular, what Apple wanted was the ability to set different defaults, perhaps by different locations, right?

**A.** They weren't clear.

**Q.** And Apple asked to be able to set different defaults by different product lines or versions; is that right?

**A.** That wasn't clear either.

**Q.** Well, let's take a look. Ms. Braddi, I've handed you Exhibits UPX615 and UPX675. And starting with UPX615, that's an e-mail from Mr. Shardell to Mr. Eustace with you on the CC line; is that right?

**A.** Correct.

**Q.** And this is a -- and we can see further down the page this is a red line that Apple had sent to Google as part of a contract back and forth; is that right?

**A.** Correct.

**Q.** And then if we go to 675, we see the actual red line, that's the attachment. Do you see that?

**A.** Correct, yes.

**MR. SEVERT:** Your Honor, I'd move to admit UPX615 and UPX675.

**MR. SCHMIDTLEIN:** No objection.

**THE COURT:** They'll be admitted.

(Exhibits UPX615 and UPX675 admitted into evidence)

**BY MR. SEVERT:**

**Q.** Let's take a quick look at the red line. And I'm going to be very careful here, because I know the precise terms are under seal. But let's turn to page two, paragraph three of Apple's red line.

Are you there, Ms. Braddi?

**A.** I'm here.

**Q.** And if we -- do you see the last sentence, it starts with the word --

**THE COURT:** Sorry, can you blow this up on the screen? It looks like at least a portion of it is not redacted.

**MR. SEVERT:** I think that part is cleared; is that right? We're cleared on that.

**MR. SCHMIDTLEIN:** That portion's okay.

**THE COURT:** Okay.

**BY MR. SEVERT:**

**Q.** That's the only portion we need.

So Ms. Braddi, I'd just direct your attention to the last sentence of paragraph three that starts "if." Do you see that?

**A.** I do.

**Q.** And that sentence: "Apple contemplates setting someone other than Google as the search default on some devices;" is that right?

**A.** On some devices or --

**Q.** And then there's a parenthetical --

**A.** -- versions or locations, yes.

**Q.** And what Apple identified, after the e.g. or location, product lines or versions; is that right?

**A.** Yes.

**Q.** And Apple did not get this flexibility; is that right?

**A.** No, but they could remove the product line that they didn't want to set Google as default. They're the ones who adds the product that they want to use Google on. That's purely their discretion.

**Q.** And we can put aside UPX615 and 675.

**THE COURT:** I'm sorry, Ms. Braddi, can you repeat what you said? I didn't hear you.

**THE WITNESS:** So Apple adds products that they want to use our services with their browser. They don't have to add all their products. They could keep some aside and do something different with them or -- but it's their election of whether or not they want to add those products for our services to be used.

**THE COURT:** Okay. But this last line, did that remain in the final agreement or did that get dropped out?

**THE WITNESS:** I believe it got dropped out.

**BY MR. SEVERT:**

**Q.** And Ms. Braddi, in 2012, Apple came back again and asked again for more flexibility; is that right?

**A.** In the JCA, the wish list for the JCA?

**Q.** Yes.

**A.** Yes.

**Q.** And Apple, again, tried to remove its obligation to make Google the default search provider in Safari, right?

**A.** They tried to remove all their obligations.

**Q.** Sure. Let's take a look at UPX570. And UPX570 is an e-mail to you and others from Mr. Bruce Sewell at Apple; is that right?

**A.** Correct.

**Q.** And Mr. Sewell, at the time, he was Apple's general counsel?

**A.** Correct.

**Q.** And the subject line is draft term sheet?

**A.** Yes.

**Q.** And I think, as we said, this is kind of before the ISA or JCA discussions really began in earnest; is that right?

**A.** Yes.

**Q.** And then let's take a look at the next page, Bates ending in 721. And we can see that what follows is indeed a term sheet, right?

**A.** Yes.

**MR. SEVERT:** Your Honor, I'd move to admit UPX570.

**MR. SCHMIDTLEIN:** No objection.

**THE COURT:** It will be admitted.

(Exhibit UPX570 admitted into evidence)

**BY MR. SEVERT:**

**Q.** Let's take a look at the last page of this exhibit. And there's --

**A.** Page four of the --

**Q.** Page, yes, 724. And there's a section that says search. Do you see that?

**A.** Yes.

**Q.** And then the second heading under search says default. Do you see that section?

**A.** Yes.

**Q.** And it reads: "No obligation to use Google search services or to make Google the default."

Do you see that?

**A.** I do.

**Q.** And that's what Apple asked for, no default obligation at all, right?

**A.** Just like in their very first agreement.

**Q.** And without the obligation, Apple could have had the freedom to implement a choice screen, right?

**A.** Without an agreement, yes, they could do whatever they wanted.

**Q.** And Apple could have made, for example, DuckDuckGo the default in private browsing mode, couldn't they?

**A.** Yes, they certainly can.

**Q.** And without any obligation, Apple could decide query by query what search engine to use, right?

**A.** Yes, if they didn't have any agreement with us, they could do whatever they'd like.

**Q.** And in fact, this kind of freedom would give Apple the freedom to invent whatever solution it thought best, right?

**A.** Of course.

**Q.** But, ultimately, Apple's obligation to make Google the default in Safari, that remained in place, right?

**A.** If they wanted to receive revenue share, yes, benefit of the bargain.

**Q.** We can put aside UPX570. Ms. Braddi, I'd like to show you what's been marked as UPXD007. It's the very last page of your binder. Your Honor, this is the same demonstrative that Mr. Giannandrea used during his testimony, just for continuity.

Ms. Braddi, do you recall that Apple introduced a suggestions product in around 2013?

**A.** Yes.

**Q.** And is what's depicted in UPXD007 look like an implementation of suggestions?

**A.** It's not theirs, no.

**Q.** Huh?

**A.** It's not their suggestions, no.

**Q.** I'm sorry, what do you mean it's not their suggestions?

Windows user in 2007, what would have been the method by which I would have been able to acquire Safari as a browser, if I wanted to do that?

**THE WITNESS:** You'd probably have to go to the Safari site -- the Apple site and download Safari for Windows, just like you would do for Chrome.

**BY MR. SCHMIDTLEIN:**

**Q.** If you'll turn --

**THE COURT:** Sorry, one more question. Do you have an understanding of why Safari for Windows was not successful?

**THE WITNESS:** I have an opinion.

**THE COURT:** I mean, I know it's not your product, but I'm just curious.

**THE WITNESS:** I have an opinion, and it's similar to Apple's opinion on why some of their services aren't popular on other platforms. It's probably because Windows users are really into Windows. I don't know how much they optimized their product for Windows, so on and so forth -- or how much effort they put into it.

**THE COURT:** Okay, thank you.

**BY MR. SCHMIDTLEIN:**

**Q.** If you will turn to UPX605. And if you'll look at I guess the page that is numbered -- you were asked some questions about I think pages 269 and 270. And, again, this is in the 2009 timeframe. Do you recall around 2009 there was

another ongoing conversation about a renewal of -- it looks like here, the Safari desktop search?

**A.** Uh-huh.

**Q.** And can you explain to the Court what the significance of the reference to desktop search there is?

**A.** Because it contained both Microsoft and -- Windows and Mac.

**Q.** And at this point in time, did Google have sort of separate terms for its deal with iPhone and iPad?

**A.** Yes.

**Q.** And if you -- again, focusing on this page, you were asked some questions about a new Apple ask about having the option, but not the obligation, to set Google as the default search provider; and an Apple ask for revenue share, even if Google is not set as the default search provider.

If you'll look at the page that is numbered 270, and there's a bullet there under rationale at the top. Do you see that?

**A.** Yes.

**Q.** And it says: "Apple's terms attempt to impose a tax on all Google.com revenue through Safari and their devices."

Do you see that?

**A.** I do.

**Q.** And can you explain what that means?

**A.** Well, it seems that no matter how a user gets to

Google on their platform, they wanted Google to pay --

**Q.** And --

**A.** -- without them having any obligation to do anything.

**Q.** And did Google feel -- has Google always felt strongly, sort of regardless of the platform, that it wanted to avoid entering into agreements that essentially allowed the partner to impose a tax on any Google traffic on the platform?

**A.** Yes.

**Q.** And was that one of the motivations for why Google refused to go along with a deal that would involve paying a rev share, but no obligation to be set as the default?

**A.** Correct.

**Q.** Can you take a look at UPX570. This is a fast forward to -- a couple more years to November of 2012. And I believe you testified --

**THE COURT:** I'm sorry, what was the exhibit again?

**BY MR. SCHMIDTLEIN:**

**Q.** 570. And I believe you testified that this was sort of -- when it talks about a draft heads of agreement, Google and Apple, that this was sort of in the early stages of what eventually turned into the joint cooperation agreement?

**A.** Yes, it was like a 17-month negotiation.

**Q.** Was there something unique about that agreement as opposed to other versions of agreements between Google and Apple that touched on the Safari agreement?

BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, et al., . Case Number 20-cv-3010

Plaintiffs,

vs.

GOOGLE LLC, . Washington, D.C. October 11, 2023 1:33 p.m.

Defendant.

- - - - - - - - - - - - - - - - -

TRANSCRIPT OF BENCH TRIAL, DAY 20
(AFTERNOON SESSION)
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For DOJ Plaintiffs: KENNETH DINTZER, ESQ.
United States Department of Justice
1100 L Street Northwest
Washington, D.C. 20005

KERRIE FREEBORN, ESQ.
CLAIRE MADDOX, ESQ.
United States Department of Justice
450 Fifth Street Northwest
Washington, D.C. 20001

For Plaintiff State of Colorado: JONATHAN SALLET, ESQ.
STEVEN KAUFMANN, ESQ.
Colorado Department of Law
Consumer Protection Section
Antitrust Unit
1300 Broadway
Seventh Floor
Denver, Colorado 80203

-- continued --

TikTok and Facebook, television advertising. But reality is, this is all in the low-intent and medium-intent space. So it means that it's very difficult to attribute a booking to showing a baseball ad on television. So that's kind of really, really difficult.

So we have tried, and one of my key tasks clearly as the chief marketing officer is to make that work hard, and it almost pains me to say that I haven't been very effective yet with my team.

Q. And does that effort to reduce reliance on Google involve attempting to try completely different marketing channels? You talked about innovative marketing channels earlier.

A. Well, when you really start looking to get to high-intent consumers across the world, we, the travel industry and any company, is completely reliant on Google to open the door to the courtyard.

So if you allow me to draw an analogy, if you picture companies having market stalls on a courtyard, there are several doors into a courtyard. Every door of that courtyard is kind of directly controlled, partially controlled by Google. So it means that Google really decides, oh, shall we open a door or not.

Then on top of that, Google will cherry-pick. So they cherry-pick industries where they feel they can make more money. What they do, they put a travel stall in front of one of the

doors. So it means suddenly that people say, ah, yeah, oh, yeah, I was interested in travel, let me start with Google.

So it's a double whammy, if you understand what I mean. And I'm describing Google Hotel Ads to you.

Q. Okay. And when you say in specific industries, Google then puts in additional barriers for you to reach consumers through hotel ads?

A. Yes. So Google will cherry-pick the industries where they can monetize. For example, if you ask the time in San Francisco, this is clearly a noncommercial search query, very difficult to --

THE COURT: Sorry. What was the query?

THE WITNESS: Time in San Francisco.

THE COURT: Time in San Francisco.

THE WITNESS: Yeah, or your favorite hip-hop band. I won't make the joke again, but, you know, very difficult to monetize that. But especially industries like travel in certain areas and industry like financial services, e-commercial ping are very well positioned for Google to monetize.

BY MR. KAUFMANN:

Q. Is Booking.com able to look to other general search firms such as Bing as viable marketing alternatives to Google?

A. I would say no.

Q. And why is that?

A. Because the scale is kind of too small. So even if Bing

would be far cheaper, it would really not work for us, because we really don't get the scale that we need.

So to go back to the courtyard analogy, there are four big gates that Google controls, and there's a little door that Bing controls. So you kind of put a lot of people through that. So that's the reality.

Q. Are text ads that Booking.com purchases on Bing generally less expensive than on Google?

A. Very difficult to say. It depends very much on the keywords and the searches. But as I told to you, it doesn't really matter. I would gladly spend far more with Bing, but I'm constrained because the demand is clearly not there.

Q. Okay. Has Booking.com's general business migrated more to mobile phones than desktop in recent years?

A. Yes.

Q. And how would you describe that in terms of magnitude generally?

A. That's an enormous change. Clearly, ten years ago, people were not comfortable buying on a mobile phone. We see now that more than 50 percent of our bookings go through the mobile app. So it's a very important channel.

Q. What is Bing's presence on mobile devices as compared to Google?

A. I would call it zero or approaching zero.

Q. Do you have an understanding as to why Bing's presence on

mobile is so much lower than Google's?

A. Yeah, because it's almost impossible to really break in to the conditioned consumer. So when you're on your iPhone, you go to Safari.

MR. SOMMER: Objection, Your Honor; speculation, no foundation.

THE COURT: It's overruled. He can answer to the extent of his understanding based upon his industry knowledge and his time at Google.

Go ahead.

THE WITNESS: When you open your Safari browser, you know, you type in your search term. The default setting is Google. So people don't really realize that, you know. So that's on the iPhone side.

On the Android side, Google completely controls the ecosystem. The Android's ecosystem, people have preinstalled apps. The search bar, again, is default Google.

Maybe if you allow me, Mr. Kaufmann, the importance of default settings is really, really key. In my days at Google -- I worked there 11 years -- it was clearly understood that being the default is almost everything, because when you're the default 95 percent of people will stick with the default. Maybe 5 percent of people will opt out. And that kind of realization was very clear.

BY MR. KAUFMANN:

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, et al.,
Plaintiffs,

vs.

GOOGLE, LLC,

Defendant.
_______________________________/

Civil Action No. 1:20-cv-3010

Washington, DC
October 16, 2023
9:33 a.m.

Day 22
Morning Session

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For DOJ Plaintiffs: **KENNETH DINTZER**
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005

**ADAM SEVERT**
**MEAGAN BELLSHAW**
U.S. Department of Justice
450 Fifth Street, NW
Washington, DC 20001

**DAVID DAHLQUIST**
U.S Department of Justice
209 South LaSalle Street, Suite 600
Chicago, IL 60604

For Plaintiffs State of Colorado & State of Nebraska: **WILLIAM CAVANAUGH, JR.**
Patterson, Belknap, Webb & Tyler, LLP
1133 Avenue of the Americas #2200
Suite 2200
New York, NY 10036

**A.** I did.

**Q.** What were those?

**A.** So if you bring up slide three, you'll see there are three opinions related to those two assignments. They're numbered -- I had two opinions last time. So these are numbered continuing that numbering. So opinion three was that Google search distribution contracts give it exclusive defaults, which are a large driver of search traffic.

Opinion four is that Google search distribution contracts foreclose rivals from a substantial share of each relevant market. And opinion five is that Google search distribution contracts have harmed competition to the likely detriment of consumers and advertisers.

**Q.** And how do these three opinions fit into your overall analysis in this case?

**A.** Sure. So, Your Honor, I guess I regard what we did last time as sort of the predicate, setting the stage for really -- now for looking at -- now looking at Google's conduct. And in particular, looking at the effects Google's conduct ultimately has on competition and consumers and advertisers.

**Q.** Professor, let's go to slide four. And we have opinion three that you just described. What conduct did you investigate in this case?

**A.** So the conduct that I investigated was Google's

exclusionary distribution contracts, and in particular, the ISA with Apple, the MADA and RSAs with Android OEMs and carriers. And also the RSAs with third-party browsers.

**Q.** And what conclusion did you reach?

**A.** My conclusion is that they are anti-competitive and harm competition, and to the likely detriment of both consumers and advertisers.

**Q.** And your opinion says that Google's contracts give it exclusive defaults. Let's start with Apple. How does Google's contract with Apple give it exclusive defaults?

**A.** So if you bring up slide five. There are really three ways. First, most prominently, Apple must set Google as the default on all instances of Safari. Second, Apple has to ensure that its Safari suggest feature remains, quote, substantially similar to the way it operated in 2016. And third, Google has a right of first refusal should Apple decide to run ads on Siri or Spotlight.

**Q.** And practically, what do these provisions prevent Apple from doing?

**A.** If you bring up slide six, you'll see a variety of things that it restricts Apple from doing. So Apple cannot offer a search choice screen that gives consumers a choice of their default in Safari upon, say, device activation. They can't offer a different default in Safari's private browsing mode. Apple can't offer different defaults by device. Apple

can't offer different defaults in the U.S. versus the rest of the world. Apple can't substantially increase its suggestions for users. And Apple also can't run ads on Siri or Spotlight without giving Google the option to run.

**Q.** Now, Professor, doesn't the ISA allow, for example, Bing and Yahoo! to have bookmarks in Safari and users can change the default; isn't that right?

**A.** It does, but the Safari default is responsible for the lion share of queries on Apple devices. Your Honor, I think you heard testimony about this. And so it's -- you know, I take account of the fact in my analysis that there are these other ways for users to access alternative search engines. But nonetheless, the Safari default really is where the vast majority of queries are being entered.

**Q.** And let's move to Android. How do the Android contracts give Google exclusive defaults?

**A.** So if you turn to slide seven, you'll see here, Your Honor, the -- just a list of the provisions of the MADAs and the RSAs. I know you've probably heard more than you want to hear at this point about them, so I'll just be very brief.

So the MADA is requiring that the Google search widget be on the home screen. It's requiring Chrome and GSA to be undeletable and be in a Google folder on the home screen. And it's also prohibiting distributors from implementing launchers or otherwise encouraging or helping users change the

out-of-the-box defaults.

The RSAs, they're going further. They -- and they're signed by both OEMs -- I should say, the MADA's signed by OEMs. The RSAs are signed by both OEMs and carriers. And to maximize the revenue share that one of these distributors earns, it has to set the -- Google as the default on all search access points and not pre-install any alternative search service -- where, by alternative search service, the meaning really is general search engines.

One thing -- I know you're familiar with this, but one thing I think to -- is worth highlighting is the redundancy in these agreements. So in particular, around the Google search widget, the requirement is -- on the Google search widget appears both in the MADA and in the RSAs. So in the case of carrier ID phones, no one party can get out of it. So if a carrier decided it wanted to just completely ditch Google, it can't because the OEM has agreed to the MADA.

**Q.** And Professor, what about third-party browsers?

**A.** So third-party browsers, the restrictions are similar. It has to be the default for the -- out-of-the-box default for the third-party browser, out-of-the-box in a figurative sense.

**Q.** And when you say similar, similar to what?

**A.** Well, say, to the Safari default.

**Q.** So we talked about exclusive defaults, but if the users can change the default, why do they matter?

**A.** So, again, I think -- Your Honor, you've heard testimony from Professor Rangel and many others about the power of defaults. I think one thing Google has liked to say over the years is competition is just a click away. It's definitely not a click away in terms of how users behave. And if you bring up slide eight, you'll just see a range of testimony that you've heard about this.

**Q.** And Professor, what evidence did you look at about the importance of defaults?

**A.** So in my analysis, I looked at two different kinds of evidence. If you bring up slide nine, you'll see that. One, the internal projections and business decisions of Google, Microsoft and Apple. And two, analyzing the behavior of search users.

**Q.** Let's talk about the first category, and go to slide 11, the ordinary course business documents. Why is that evidence informative?

**A.** Right. So these -- just to be clear, these internal projections and business decisions, I'm looking at two sorts of things. One is ordinary course documents, which you've highlighted here from Google, Microsoft and Apple, that estimate the impact of Google losing search defaults. And then second, Google's payments to these search distribution partners. So, I'm sorry, Mr. Severt, could you just repeat your question?

They -- they might have preferred the non-default search engine. Some people will go and make the change and others won't. And we're going to talk, I think, soon, when we talk about foreclosure measures, we're going to talk about this fact and what it implies for thinking about foreclosure measures. But that's how I think about it.

**THE COURT:** I guess the question then, though, is to what extent -- if there are some consumers that view the cost of switching as negligible and they do switch, isn't Google's response, well, the reason they're making the switch is because they're switching to a better product? And so options like a choice screen, for example, would not really alter the alternate mix of search engines if it were offered?

**THE WITNESS:** Yeah, great question. I think a really, really important thing to keep in mind is that that can be true at the current qualities, but not true if rivals were at, say, invested and became better. So just what's happening when you see right now that what consumers are doing doesn't tell you in some sense -- ultimately, we're going to talk about competitive effects and but-for worlds and the like -- doesn't tell you what these defaults are doing to say rivals incentives for investment.

Because when rivals are thinking about investment, they're thinking, well, what if I get much better. And we're going to talk about -- I mean, your question -- you kind of did this

last time. Your question's kind of leading into a lot of other things.

**THE COURT:** Fair enough.

**BY MR. SEVERT:**

**Q.** Okay. Professor, on slide 18, you have a bullet about Google's payments to search distribution partners. What do the size of the payments tell you about defaults?

**A.** So if you bring up slide 19. So the thing -- Your Honor, this is a figure just showing what the -- Google's payments are to different groups, Apple, Android M&Os and OEMs and third-party browsers, of what in total Google paid for -- in revenue share in the U.S.

And the thing is, just to -- I think I should have said -- probably said this first because it was really what your question was, Mr. Severt. Is when you see Google paying billions and billions and billions of dollars, there's got to be a reason. There has to be a reason it's worth doing it. As an economist, you know, that's what is kind of the first thing that slaps me in the face.

So here, you're seeing, yes, Your Honor, they are paying many billions of dollars. And I should say, I know you've probably -- Your Honor, you've probably seen numbers for what revenue share payments are. And these are smaller, because the numbers -- sometimes, perhaps because the numbers you've seen perhaps are worldwide while these are just for the U.S., okay.

**A.** So I looked at the EU and Russia choice screens because they are one of the very -- other than the Mozilla Firefox change, they're one of the very -- really, the only other cases where we see an actual default switch from one search provider to a different way of the defaults. You know, different default situation.

It's important to recognize this is not -- the previous things we looked at, Your Honor, were switches of a default where a default switched from Google to a rival. And here, it's different, it's a switch from a Google default to a choice screen. As I think Professor Rangel touched -- showed you some things about this, the choice screens were a little different in the way they worked in Russia and the EU. But in both cases, it was to a choice screen.

**Q.** And what would you expect to see with the choice screen that would be different where there's an exclusive default?

**A.** So the thing about a choice screen is you're seeing users -- at least if it's a well defined -- I'm sorry, a well designed choice screen, you're going to see users preferences over search engines. They're going to choose.

**Q.** A few minutes ago in response to the Court's question, you talked about the quality or strength of rivals. How does the ability to overcome an exclusive default depend upon the strength of rivals and applies to choice screens also?

A. Right. So it does apply to choice screens, and in a very strong way. So if everyone -- if Google is much, much stronger than its rivals, okay, then you may not see very much shift from a Google default to the choice screen in terms of shares because Google is much stronger than rivals, and at that moment, what you're seeing in the choice screen is what user -- consumers preferences are at the time the choice screen was instituted. And so that may hide the power of defaults.

Q. Can you give the Court an example to illustrate the point?

A. Yes. So, Your Honor, this -- and I think this point touches on exactly the question you were asking me 10, 15 minutes ago. So like, imagine, for example, that we had -- just to take an extreme hypothetical. Imagine that we had a default that was perfectly powerful, nobody ever leaves the default when it exists. So the power of the default there, a hundred percent, infinite, just nobody can leave the default.

And imagine, as well, that we have a search engine, say Google, that has the default to start with, and then we move to a choice screen. And that that search engine, say Google, suppose it's preferred by 99 -- at that moment, preferred by 99 percent of the population, okay.

What will you see in the choice screen? You'll see a 1 percent shift, from a hundred percent of everybody picking Google to 99. But we have a completely powerful default by

hypothesis, right. Nobody would ever leave that default. And in particular, if rivals got better -- suppose someone invested and got to the point where 30 percent of the population preferred the rival -- you know, instead of 99 percent preferring Google, only 70 percent preferred Google.

Now if you ran -- if you did the choice screen, you'd go from a hundred percent to 70. And so you would -- in the case where the rival had improved, you would see the power of the default, but you just don't see it when Google is preferred by everyone.

And why is that going to matter? It's going to matter because of the way it impacts investment incentives. When a rival is thinking, gee, should I spend a ton of money to get better, and it's thinking, what can I get -- how much traffic will I attract if I do that, when we get to competitive effects, the fact that the power of the default is there, if it got better, like that would have a big impact on traffic if it got better, will be really important.

**THE COURT:** So these numbers are not -- I take it the numbers on the right column -- oh, I guess I'm a page ahead of you.

Can you flip to the next page, please.

So the number on the right column is a market share number; is that right?

**THE WITNESS:** Yeah, I haven't explained it.

exclusive defaults, if you use those estimates -- which are also in the case of Google confirmed by -- Google on PCs, confirmed by what I looked at in Mozilla, if you use those estimates, what do you get for the overall shift in U.S. queries?

**BY MR. SEVERT:**

**Q.** And Professor, when you did your estimate, did you -- and switching Google's exclusive defaults, did that include switching the Google default on Windows Chrome?

**A.** No, no.

**Q.** Let's go to slide 32. I think this is your fourth opinion. Can you restate what your fourth opinion was in this case?

**A.** Yeah, this is my fourth opinion. So what is my fourth opinion? It's that Google's search distribution contracts foreclose rivals from a substantial share of each relevant market.

**Q.** And how did you go about reaching this opinion?

**A.** So, Your Honor, I know that in your summary judgment opinion, the measurement of foreclosure was something that you regarded as very important. So what I did here -- if you'd turn to slide 33. What I did here was -- and showing you is how -- is the Areeda and Hovenkamp definition of measuring foreclosure, which is that foreclosure is measured by looking at the percentage of the market that's tied up by the

contracts. So that's what I have tried to do as a measurement.

**Q.** And does this Areeda definition of foreclosure make sense to you as an economist?

**A.** It does, because what it's doing is it's identifying kind of the fundamental force that these contracts are having. When I get to competitive effects, I'm going to use these estimates to inform my analysis of competitive effects. But what this measurement is doing is it's kind of at a first level asking, well, what do these contracts do if they're in place.

**Q.** And were you able to identify a specific percentage of the market that's foreclosed by Google's contracts?

**A.** Not exactly. Your Honor, this comes back, again, to this discussion in your questions. So there's a question of what "tied up" means. And in particular, we talked about how consumers have some variation in how affected they are by defaults. And so when you're thinking about how tied up the contracts make things, as we've already -- kind of the conversation we've been having, it depends on the strength of rivals.

And so what I've tried to do here -- and, you know, at some level, it's not an economic decision in terms of this. It's what you think is kind of the right measure. So what I've tried to do is -- and I'm going to show you is a range, and I'm going to explain how that range is related to strength of rivals, where you can then think about what you think is the

right definition.

In the end, when I get to competitive effects, I'm going to use all that information. But in terms of what -- for legal purposes you find the right thing, I'm just trying to provide you with the information for you to think about that.

**THE COURT:** To make sure I understand. So at the most general level, what the foreclosure rate is in your thinking, it's here's the full market for search, say it's a hundred searches a year -- obviously, that's not right, but a hundred searches. The tied-up portion, at least at the most general level, is the percentage of that hundred that is attributed to those contracts in which Google is the default, the paid default, correct?

**THE WITNESS:** So I'm going to show you a range. It depends what you mean by attributed to. If you mean coverage, that's going to be one end of this range. I'm going to show you something else, too. But we're going to -- the way you started describing that in terms of the whole market, that's exactly what I'm going to show you.

**THE COURT:** Okay. And your range is not the coverage range because -- maybe I'm jumping ahead. You're assuming that some number of people are going to stick with Google no matter what?

**THE WITNESS:** So let me go two or three slides and I think it will help.

**THE COURT:** Fine, go ahead.

**THE WITNESS:** Totally fine. I'm just trying to do it in the most helpful way.

**BY MR. SEVERT:**

**Q.** What's the range that you identified?

**A.** So the range, if you look at slide 34, at the high end, it would be 50 percent. That 50 percent is -- where do I get it? It's the share of U.S. queries that are, quote, covered by Google's exclusive defaults. They're the queries that are going through the defaults that are affected by exclusionary provisions.

At the low end, kind of a lower bound is 33 percent -- and this is percentages of all U.S. queries, Your Honor. And what is that doing? It's the share of U.S. queries that Google's exclusive defaults make unavailable even to a much stronger rival. So the -- anyway, let me pause there, and you can --

**Q.** What do you mean by much stronger rival?

**A.** So by much stronger rival, Your Honor -- and let me first just say, a way to think about the first number -- and we're going to come back to that -- is the ones that are going through the exclusionary defaults are ones that are affected to some degree by the presence of a default. That is, it's not just all of those queries. It's not just Google's quality that matters. But also there is a default in place, and that can matter. So that's what the 50 percent is going to be.

The 33 percent is to think about an exercise where -- imagine rivals became like almost unimaginably better, where -- the thing I like to think about you're sitting at a restaurant with your friends, and a question comes up, like, nobody knows the answer. And everyone immediately says let's DuckDuckGo that. Nobody's talking about Googling things anymore. DuckDuckGo has become so good that everyone -- that that's what everyone uses as the verb, okay. Or it could be another rival, I'm just picking DuckDuckGo. But some rival has improved that much that it's gotten -- you know, which is almost unimaginable, but imagine that they did.

What do I mean by that? The exact thing I mean by it is they've gotten as much better than Google as Google now is better than them. That's what it's going to be when I think about that. I'll use a fanciful shorthand, because that's a mouthful. The rival has become Super Duck, okay. It's just a fantastic search engine that is that much stronger than Google.

So that's the -- where the 33 percent's going to come from, is asking what share of queries in the U.S. -- from these covered queries, what share of them would a rival be able to access when it got that good, and what share would nonetheless stick with Google -- which is now not nearly as good as the Super Duck, but would stick with Google just because it's the default. That's the way I'm thinking about this other extreme. So that's the range that I'm kind of trying to show you.

**Q.** And if we were looking just at mobile, what -- how would that impact the range?

**A.** So the range on both of these, if we looked at mobile, would be bigger numbers. I don't mean the range would be bigger, I mean the high end would be bigger on mobile, the share of covered queries is higher, and as well the lower bound would be higher. I'm not going to go further into talking about mobile. I'm going to stick with the overall estimate. but just to state that.

**THE COURT:** So the 50 percent number, let's just start there. So that's share of U.S. queries covered by Google's exclusive defaults. And by that, do you mean that half of all U.S. queries input into a search engine are subject to either an RSA or the Apple agreement?

**THE WITNESS:** Yes, with -- except that I've done it kind of conservatively. So I'm not counting, for example, queries coming through the bookmark in Safari -- on an iPhone, because arguably somebody might say, oh, the bookmarks, Yahoo! and Bing and Google are all there. So when I give a coverage number, I'll show you, it's not going to have those in it. It's not going to have queries where an individual went to the Google search app on an iPhone.

**THE COURT:** Right, or anything through Chrome.

**THE WITNESS:** Correct.

**THE COURT:** Which is probably the biggest number of the

remaining 50.

**THE WITNESS:** Exactly. So it's not going to be counting those things. I'm kind of trying to do it conservatively, where we're looking at things that really are affected by the exclusionary provisions.

**THE COURT:** And then the 33 percent, is that a third of 50 or is that a third of a hundred?

**THE WITNESS:** Good question. It's a third of a hundred. So the 50 is 50 percent of all U.S. queries. The 33 is 33 percent of all U.S. queries.

**BY MR. SEVERT:**

**Q.** Let's take a look at your slide 35 --

**THE COURT:** Counsel, why don't we actually take a break before Professor Whinston sort of provides more detail about his conclusions.

So it's a little bit before 11:00. We'll resume at 11:15. See you all shortly. Oh, one thing I did forget to add -- I can tell you after the break, it's not important. Thank you.

(Recess taken at 10:59 a.m.)

(Back on the record at 11:17 a.m.)

**THE COURT:** Before we get started, Counsel, I wanted to make sure -- I only saw it myself a couple minutes ago, that both sides -- or all sides had seen the memorandum the New York Times filed this morning. I assume you all received a heads up, since it reflects some meet and confer prior to that.

measure.

So it's easy, at least for me, to start that distinction -- which really comes in in this case, and I think it's important, like I think it's really helpful to break that out when you're thinking about this case and have that foreclosure measure. But it's not something that we normally do in an academic paper.

**Q.** Okay. Professor, let's turn to the issue of effects on competition. Do Google's distribution contracts harm competition?

**A.** They do.

**Q.** And why do they lead to reduced competition?

**A.** So if you go to slide 42, you'll see two things here. So, Your Honor, the way I think about this, there are kind of two distinct ways in which competition is harmed, two mechanisms. The first mechanism is kind of a direct mechanism coming from reduced scale. I think you've heard testimony about scale mattering for quality. We will, I think, talk about that shortly. But because, you know, reduced scale can direct -- you know, if rivals have reduced scale, that can directly reduce the quality of their search services and their ad as well. So they -- basically, reduced scale directly weakens rivals as competitors. So that's one way in which harm occurs from these contracts.

The second way is distinct. It's about incentives. I've

kind of alluded to this a little bit already, which is: The contracts reduce the incentives for rivals to compete on quality and price -- price in the case of the ad markets. It does that for Google. It does that for current search engine rivals. It does that for potential entrants. And it also does it for potential distributors. So I think that's how I -- you know, when I'm thinking about the competitive impact here, I'm thinking about those two kinds of mechanisms.

**Q.** And I think you mentioned you list Google in your second mechanism. Why is Google listed there?

**A.** So let me -- maybe I'll -- it helps maybe to first -- if you don't mind, to say something about current search engine rivals and entrants. And we're going to come to this. But if you think about that Super Duck example, DuckDuckGo, if it's thinking about how much to invest in improving its quality, takes account of how much it can possibly get as a benefit. And to the extent that these contracts are in place and tie up the market, there's less that DuckDuckGo can foresee as a benefit of investing. So that's how DuckDuckGo's incentives or other rivals of Google see their incentives reduced. Same thing for potential entrants, same story.

Mr. Severt, your question was about Google: So why would Google's incentives be reduced. Google's incentives are reduced for two reasons. One is for the same reason that the contracts -- the same point that the contracts tie up the

Again, this is something that you've seen before when Hal Varian testified. You know, the whole back and forth around the -- whether scale mattered around the time of the Yahoo!-Microsoft deal in 2009, and how strongly Marissa Mayer and Udi Manber felt about the importance of scale.

**Q.** In addition to the documentary evidence, did you review any testimony during this trial about scale and its impact on quality?

**A.** I did. So if you bring up slide 47. Your Honor, you've seen all of these. This is just an excerpt of trial testimony from Mr. Parakhin, trial testimony from Dr. Lehman and e-mail in the record from John -- from Mr. Giannandrea, all of which are about how scale matters because seeing user clicks and user behavior.

**Q.** Professor, have you reviewed any evidence that Google's algorithm makes use of a significant amount of user data?

**A.** I have. So if you go to slide 48. So this, Your Honor, is talking about navboost. I think you've heard of navboost, which is not only one of the components of Google's ranking system, but to this day still considered the most powerful. And how much -- you know, how navboost is using user clicks.

What it does is it uses that information to help determine ranking, what should be at the top of -- what organic results

should be at the top of the SERP, of the results page. So at the top are two -- on the left, a document that Eric Lehman authored, just describing what navboost is in essence and that it's still the most potent. That's from 2016. On the right, trial testimony about what navboost does.

And importantly, on the right, let me just say something about how much data it uses, so how many months of data Google is using as an input into training navboost. And at the bottom, back when Amit Singhal, who was putting in for a Founder's Award nomination -- or was put in, in 2006 his team came up -- I think either him personally or his team came up with navboost. And the way he described it is: Navboost has locked out small players from the ranking game.

And the reason he described it that way is because he's using user data and a lot of user data. And one way to put the impact of this, Your Honor, is if you go back to the comment of Eric Lehman about how many months of data -- the question about how many months of data navboost is using, and you asked yourself how many -- how long would it take Microsoft -- how much data would Microsoft at its current share have to use to use -- get the same amount of data. It's basically like 16 or 17 years of data. And, obviously, the 16-year-old data is not going to be very useful when we start looking at that.

**Q.** Is it just algorithm training where scale matters for search services quality?

**A.** No. If you bring up the next slide, slide 49. So really important thing, Your Honor, is that it's not -- and again, I think you've heard some of this. It's not just training the current algorithms. It's also developing the current algorithms. And a key thing that they used to develop these algorithms and approve them are live-traffic experiments where they'll take some actual queries and they have some idea for an improvement in the algorithm, and they'll use the new algorithm and see how good the outcome is.

And so the thing is that when you don't have a lot of scale, you can't do a lot of these experiments. And moreover, the experiments that you do will tend to have smaller samples. So it's either going to be less precise, if you let the experiment go for the same amount of time, or it's going to have to go a lot longer. That's just a basic property of statistics: The bigger the sample, the more precise the results. And so -- and you can see here testimony to that effect from Jon Tinter -- Mr. Tinter, from Mr. Parakhin and Mr. Weinberg about what impact it has on experimentation.

Actually, one thing, I was here during Hal Varian's testimony, as I've mentioned before. You know, he had this thing that he would say that, like, it's not the ingredients, it's the recipe. I'm paraphrasing. By that, what he meant is -- he was trying to argue it's not the data, the ingredients, it's that we've learned how to use the data. It's

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America, )
et al., )
) DAY 22
Plaintiffs, )
) CV No. 20-3010
vs. ) Washington, D.C.
) October 16, 2023
Google LLC, ) 1:30 p.m.
)
Defendant. )
______________________________)

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For DoJ Plaintiffs:
**Kenneth M. Dintzer**
U.S. Department of Justice
1100 L Street, NW
Washington, D.C.
(202) 307-0340
Email: Kenneth.dintzer2@usdoj.gov
**David E. Dahlquist**
U.S. Department of Justice
209 South LaSalle Street
Suite 600
Chicago, IL 60604
(202) 805-8563
Email: David.dahlquist@usdoj.gov
**Adam T. Severt**
U.S. Department of Justice
450 Fifth Street, NW, Suite 7100
Washington, DC 20530
202-307-6158
Email: Adam.severt@usdoj.gov

For Plaintiff States:
**William J. Cavanaugh, Jr.**
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
Suite 2200
New York, NY 10036
(212) 335-2793
Email: Wfcavanaugh@pbwt.com

Compete on Quality and Price."

Are you there?

A. I am.

Q. How are market participants' incentives for investment affected by Google's contracts?

A. So, Your Honor, this brings us back to things we were talking about before lunch. And the way in which -- first, foreclosure, because of these contracts tying up demand or queries, ends up meaning that rivals and potential entrants don't have access, if they do improve their quality, to the -- as much traffic as they would absent the contract.

And so -- sorry, let me just say that again. So what we -- you know, this morning we were about how much is tied up. And with the -- what I meant to say is with the contracts in place, we talked about how much -- what a DuckDuckGo who became Super Duck could possibly get. And that affects their investment incentives because they're thinking, like, oh, if I invest, what's the benefit? And, of course, they're -- when they think about that, they're comparing it to the cost, the difficulty of investing.

And what these contracts are doing are two things. One, because of the tying up of queries, the contracts are reducing the benefits of investing. You're going to get less traffic if you become Super Duck. They're also, for the reason that we just talked about a couple of minutes ago, making it

more costly for you to increase your quality, more difficult because now it's harder for you to experiment, it's harder for you to figure out how to get quality to be higher.

So we may have -- you know, we don't have the data. Maybe we're going to have to hire more engineers. Maybe we're going to have to do something else -- sorry -- something else to get our quality to become Super Duck. So it's both benefits getting smaller and costs getting higher of improving quality, and that -- that's the -- you know, basic kind of benefit versus cost analysis, like, investment -- you know, that's the basic model of what determines investment in economics. It's benefits and costs.

Q. Professor, have you seen evidence that Google thinks about investments using the benefit-cost framework you described?

A. I have. So, if you bring up slide 61.

Your Honor, Google is a company that kind of prides itself, you know, from what I can tell in looking at documents, at employing exactly this kind of benefit-cost reasoning. And so here, this is a document where, you know, basically about an engineer proposing some improvement to search and part of the pitch to get the funds to do it is what's the benefit going to be? And, you know, what do they do? They say, well, the key -- you know, the callout here is highlighting exactly how they're using things that I've talked about here to figure that out.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, et al.,
Plaintiffs,

vs.

GOOGLE, LLC,

Defendant.

Civil Action No. 1:20-cv-3010

Washington, DC
October 17, 2023
9:32 a.m.

Day 23
Morning Session

# TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For DOJ Plaintiffs:

**KENNETH DINTZER**
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005

**ADAM SEVERT**
**MEAGAN BELLSHAW**
U.S. Department of Justice
450 Fifth Street, NW
Washington, DC 20001

**DAVID DAHLQUIST**
U.S Department of Justice
209 South LaSalle Street, Suite 600
Chicago, IL 60604

For Plaintiffs State of Colorado & State of Nebraska:

**WILLIAM CAVANAUGH, JR.**
Patterson, Belknap, Webb & Tyler, LLP
1133 Avenue of the Americas #2200
Suite 2200
New York, NY 10036

monopoly. Do you recall that?

**A.** I do.

**Q.** And Mr. Dintzer explained or claimed that the DOJ plaintiffs' contention in this case, that Google was a monopolist at least as early as 2010. Do you recall that?

**A.** I do.

**Q.** Now, you were given an assignment in this case by counsel for the DOJ, right?

**A.** I was.

**Q.** And for purposes of your analysis in this case, your assignment, if you will, both with respect to the market power issues and relevant market issues we've been talking about -- and as well as the conduct issues we're going to be talking about, you were asked by the DOJ to look at the time period beginning in 2014, correct?

**A.** That's correct.

**Q.** You were not asked to go back and look at the period and offer opinions from 2010, right?

**A.** Correct.

**Q.** And you have not offered any opinion in your reports in this case as to when Google supposedly first achieved monopoly power or substantial market power, to use your terms, in any search or search ads market, right?

**A.** That's correct.

**Q.** You've not offered any opinions in your reports that

Google created or acquired substantial market power in any relevant market through anti-competitive conduct, correct?

**A.** That's correct.

**Q.** You've not offered any opinion in your reports comparing the distribution agreements that Google entered into during the period prior to it supposedly achieving substantial market power and the period after it supposedly achieved substantial market power, correct?

**A.** Could you just repeat the question again, please?

**Q.** You've not offered any opinions in your reports comparing the distribution agreements that Google entered into during the period prior to achieving monopoly power with the agreements after monopoly power?

**A.** That's correct.

**Q.** And you have not offered any opinions in this case that Google would have lost its allegedly substantial market power in any market in the absence of the allegedly anti-competitive agreements, correct?

**A.** You know, your question is a question asking me whether I expressed the opinion that it would -- I think your question -- definitely lost, like I don't -- I'm not sure I understand your question.

**Q.** You have not offered any opinions in your expert reports in this case that Google would have lost its allegedly substantial market power in any market in the absence of the

alleged anti-competitive agreements, correct?

**A.** I've not offered any opinion that Google would have definitely lost its market power.

**Q.** All right. For purposes of your opinions regarding Google's conduct, again, you looked only at 2014 to the present, right?

**A.** Yes.

**Q.** And you're not offering any opinion that any Google search agreement -- distribution agreement that was entered into prior to 2014 was anti-competitive?

**A.** So, I guess to the extent that there were agreements that were in existence and continued to be in existence, those would be things that were within the period.

**Q.** Fair enough. Agreements that did not have any overlap or effect, 2014 to the present, you haven't offered an opinion as to those?

**A.** If they didn't overlap into 2014 or later, then no.

**Q.** In the case of Apple, is it fair to say that your opinions in this case focus on the 2016 agreement between Google and Apple?

**A.** Well, I mean, Apple had an agreement prior to that, so -- and the document, Your Honor, that we looked at looking at that spread, for example, was talking about profits under that -- you know, gains under that 2014 agreement. So that's something that I did look at.

**Q.** Have you attempted to estimate what percentage of U.S. search consumers prefer Bing or Yahoo! or DuckDuckGo to Google?

**A.** Not -- in some sense, the analysis I did of the EU choice screen and then projecting what that would imply had the same choice screen been in the U.S. was seeking to do that.

**Q.** Okay, and that's a fair point. I wanted to get to that, because I was going to ask you whether you viewed that as a proxy, if you will, for trying to get at the question of whether there were people who actually preferred a non-Google search engine. And you think the choice screen analysis is the closest thing you've seen to that?

**A.** I think the choice screen analysis tells you something about -- well, what does it tell you? It tells you if you've instituted a choice screen with the current quality of rivals, what share of choices would be for rivals.

**Q.** And your choice screen analysis demonstrated that over 90 percent of U.S. consumers would select Google if presented with the choice screen, right?

**A.** Yeah, I think it was 90.55, but yes.

**Q.** And that percentage of users that you just identified, the 90 percent-plus, that's actually larger than the market share number that you provided to the Court for purposes of your relevant market analysis, right?

**A.** It's larger, but it's for a different thing.

**Q.** Understood.

**Q.** This reflects the people who switched back to Google on Firefox?

**A.** I think what you're referring to, just so I understand, is we're looking at essentially a daily level of the shares on Mozilla. And the switching back would be the fact that we see -- like I testified yesterday, we see within three days a dramatic shift in shares. And then we see some bounce back for Google up to -- if you look at this, up until mid-2016, and then actually Google starts declining again. And then when Google -- when they switch back to Google, you see a big jump back up.

**Q.** But what I'm saying here is this just captures searching being done on Firefox, right?

**A.** No, that's true.

**Q.** This doesn't capture all of the search volume that previously was on Firefox but has departed to go to another browser to search with Google, correct?

**A.** This doesn't. That's why I'm telling you about the other analysis that I did.

**Q.** Now, in your expert reports in this case, you've not offered an opinion that Google's MADA agreements constitute anti-competitive tying, correct?

**A.** I haven't expressed that opinion.

**Q.** Instead, you've opined that the MADAs are anti-competitive exclusive dealing arrangements, correct?

**A.** In essence, yes.

**Q.** And you understand that exclusive dealing arrangements can be pro-competitive, correct?

**A.** I've written about that, yes.

**Q.** And you understand that for an exclusive dealing agreement to harm competition, it must foreclose a substantial share of the market, correct?

**A.** That's the anti-competitive driver.

**Q.** And you would agree that the likely competitive effects of Google's behavior, locking up search access points through the challenge agreements, is ideally examined relative to a but-for world?

**A.** Competitive -- just for -- so I'm sure I'm answering your question, can you just repeat the question?

**Q.** The likely competitive effects of Google's behavior, locking up search access points through the challenged agreements, is ideally examined relative to a but-for world?

**A.** Yes. Your question asked about competitive effects, and I agree with that.

**Q.** And you would agree that calculating the percentage of search queries covered by a MADA or an RSA does not inform the Court about the amount of search traffic that is actually foreclosed by any agreement, correct?

**A.** No, I don't agree with that. Sorry, do you want me -- you sometimes tell me to just say yes or no. So if you want to

ask something else, I can explain.

**Q.** Let me read you some language to see if it sounds familiar to you: "In the present case, however, one can reasonably argue that Google securing these contracts does not make unavailable to rivals all of the search traffic that the contracts cover, because Google would have served some of the search traffic, even without the contracts. To the extent that this is the point that Professor Murphy is making when he states that Plaintiffs appear to equate foreclosure with the coverage of Google's arrangements, but the queries that those arrangements cover is not an economically sensible measure of foreclosure, I agree with him."

You wrote those words, correct?

**A.** I did. Actually, can you repeat that? Because there was just so much that you've said, I just want to make sure I take back in that paragraph. Obviously, yes, I did write it.

**Q.** You've not offered any opinions in your reports in this case about what the but-for world would look like, correct?

**A.** I don't agree with that either.

**Q.** You did -- you believe you've offered an opinion in this case as to what the but-for world would look like absent the alleged agreements?

**A.** Yes.

**Q.** And where is that in your expert report?

**A.** So, as I said, I consider -- I think about unconditional revenue share payments. I think about --

**Q.** Did you offer those in your initial report?

**A.** I talked about -- you know, so --

**Q.** The word "unconditional revenue share payment" doesn't appear anywhere in the opening report you issued in this case, correct?

**A.** I'd have to go back and look, but it's certainly what -- things I was thinking about about the overall effect.

**Q.** You've never offered the opinion in your report that in the but-for world, absent the agreements, that anybody would have entered into an unconditional revenue share agreement?

**A.** Oh, I don't know if -- as I said yesterday, I mean, it's very hard to know exactly what the form -- you know, absent these agreements, it's very hard to know exactly what the agreements would have been, what Google would have done to start with.

**Q.** You've not offered any opinion in this case that in the but-for world, Apple would have selected anyone other than Google to be the default search engine for Safari, correct?

**A.** So repeat the question one more time.

**Q.** You have not offered any opinion in your expert reports in this case that in a but-for world, Apple would have selected another search engine provider other than Google to be the default for Safari?

**A.** So I don't know that with certainty. But what I do know is that the incentives for rivals and their scale would have been larger in less restrictive alternatives. That's a major change in what the likely quality of rivals would be. So --

**Q.** We'll get to the likely -- we'll get to that. The two things you modeled in your report were a world in which every single search distribution agreement that you looked at, the default was flipped from Google to a rival. That was one of your scenarios, correct?

**A.** No. I was really, really clear about this. So what I've said is that that thought exercise was designed, Your Honor, like I said yesterday, to show what the overall effect of defaults is. It was not a but-for analysis.

**Q.** Right.

**A.** It was not competitive effects, but it was something to show the power of defaults. And that ultimately leads you to -- as we talked about at length yesterday, leads you to a measure of foreclosure of the amount of the market that's tied up by these contracts.

**Q.** Right. We'll talk a little bit about each of your measures. But you offer opinions in this case about moving all the defaults from Google to somebody else, and then you also look at a world in which all of the agreements involve a choice screen, correct?

**A.** They're not worlds, they're --

**Q.** What are they? What are they? If they're not but-for worlds, what are they? Why did you put them in your reports?

**A.** I put them in my reports to show the power -- as a measure of the power of defaults. I've said that very explicitly.

**Q.** So when you calculated the Android agreements -- let's talk about the Android agreements, and you were calculating the power of the default for the Android agreements, and you compared the actual world to a world where every Android agreement in the United States involved a choice screen. Are you with me?

**A.** I'm with you except for the use of the word world, which is trying to kind of make things sound like it's a but-for world, and that that was what I was thinking of when I did competitive effects. It was not. I mean, I was thinking about that as an input to competitive effects, because I was thinking about how -- what do defaults do. But it wasn't the competitive effects analysis.

**Q.** So whether you want to call it a but-for world, whatever word you want to try to now put on it, okay, when you compared search market share with the Android agreements compared with search -- Google search market share in a world where -- in a scenario where every Android agreement had a choice screen, the shift in market share from Google to a

search rival was less than 1 percent of U.S. market share, correct?

**A.** So yes. But, Your Honor, there are two things in that question. One is Android is just a fraction of the market. Two is the same thing -- something I really was trying to emphasize yesterday, is it's at today's quality levels for the rivals. And so when we're thinking about but-for analysis, we're thinking about how the world would be if -- you know, how incentives would change, how rivals would potentially change their investments.

And so there are a lot of -- you know, a lot of what Google points to is what happened in the choice screen, you know, with the current level of rivals: Did distributors with the current level of rivals -- of quality want to use the rivals. But the whole point -- you know, what I tried to emphasize yesterday, first with the hypothetical about how -- you know, if you had a really powerful default but rivals are weak, you might not see it at all, even though the default is super powerful and would affect things if rivals' quality went up.

And second, how that would affect rivals. You know, when we talked about foreclosure and the horrible Super Duck name, you know, how that would affect rivals' incentives. So when we're doing competitive effects analysis, we can't just look at what's the evidence given the rivals are really weak, because a

significant contributor to why the rivals are really weak are the contracts.

**THE COURT:** Can I ask you to square the following -- and maybe I'm not following. As I understand it, you did an exercise in which all of defaults covered by Android agreements would be switched to a rival, right? And in that thought experiment, your conclusion was that there would be a less than 1 percent overall switch in traffic?

**THE WITNESS:** So that's a number that Google has talked about. So what I had evidence about was in the choice screen, what the share of choices would be. The projection was, in the U.S., 10 percent of choices would have been, you know, in an Android choice screen with the current level of quality that rivals had in the U.S. And I should say, with the same choice screen that was used in Europe, the projection would be that 10 percent of people would choose rivals.

**THE COURT:** I see.

**BY MR. SCHMIDTLEIN:**

**Q.** And that translates into less than 1 percent of U.S. market share, correct? Just answer the question, sir.

**A.** Yes, and for the reasons that I just said.

**Q.** Sir, have you studied in this case -- have you gone back and tried to evaluate the delta in search quality between Google and rivals during --

**A.** And can I just say --

ourselves here, you're focused on -- the 50 percent covered queries, queries covered by Google agreements, correct?
**A.** By the exclusionary provisions.
**Q.** Yes. And then what you're saying here is that if during the course, in the middle of an agreement -- and let's say on day one what you've described as Super Duck occurs, somebody invents a search engine that has a quality that is higher than Google's, of the same magnitude that Google's quality is higher than rivals' today, correct?
**A.** That's what I'm thinking about, yes.
**Q.** All right. So on day one, you're saying that search engine, on day one, would be able to get what percent of queries in the market?
**A.** I'm sorry, I'm not sure what you're asking exactly.
**Q.** You're saying that on that day one, that new and improved search engine would only be -- would be foreclosed from winning 33 percent of queries, correct?
**A.** So I don't quite understand the day one point. I mean, the --
**Q.** On day one -- in other words, we're in the midst of agreements, we're at a time period when the agreements are in place. And you say: When I introduce that new search engine that is so much better, because of the existing agreements, 33 percent of the queries I can't get; is that right?
**A.** So if you go back to what it was based on -- for

example, Your Honor, that Google's estimates of what it would lose if it lost the default, that's where all of this came from, those kind of recovery and shared estimates. Those estimates didn't have a thing about day one or day five or anything else. Google was just saying if we lost the default, how much -- what share of default revenue would we lose.

So that's why I'm having trouble with your day one thing, because like -- you know, all of this is based on those -- you know, Google's and Microsoft's estimates of recovery -- of how powerful defaults are. And they weren't talking about day one versus day five versus day seven.

**Q.** Well, the next time the Apple agreement comes up for negotiation, Super Duck's going to win the agreement, right?

**A.** So the foreclosure measure -- I mean --

**Q.** Can you answer my question, sir?

**A.** It may or may not.

**MR. SEVERT:** Objection, argumentative.

**THE COURT:** So it's argumentative.

Go ahead. Objection's overruled.

**THE WITNESS:** It may or may not. And the reason is -- and I think we'll get to -- I'm sure at some point either next -- next time or whenever about talking about competition for contracts. And there is a fundamental asymmetry when you're competing for these exclusive contracts between the dominant firm that has market power and rivals. And the asymmetry is

that the dominant -- Your Honor, the dominant firm is protecting monopoly profits if it wins. The rival is bringing competition and it's destroying profits.

And so there's this asymmetry that if they're equal, for example -- this is kind of a standard result in industrial organization in thinking about these things. The dominant firm will win. Because the dominant firm will deploy -- you know, has the protection of those monopoly profits and will spend them if it needs to to win. And it's a fundamental asymmetry between those who bring competition versus those who are trying to protect it in competing for these contracts.

You saw that -- actually, when I was reading Mr. Nadella's testimony, actually I was really struck because he says something kind of just like that about, you know, if we bring competition where -- you know, we're bringing competition, Google's protecting against it. And that makes it hard to win.

And so that's why the answer -- you know, it's not clear even whether DuckDuckGo would. But just to make also clear, the foreclosure measures, as I said last time, Your Honor, they're a very circumscribed exercise. They're really asking with the contracts in place, what's the effect. They're not getting at your question, which is what would happen when, you know, ultimately there is competition.

And I should say, in the case of Apple, it's a fairly long-term contract, and so it's not like every week we're doing

competition for the Apple agreement. So anyway, I hope I've responded.

**BY MR. SCHMIDTLEIN:**

**Q.** You have not answered the question of when that Apple contract next comes up for renewal, if Super Duck's quality is that much better than Google's, Super Duck will win the contract, correct?

**A.** I did answer that. I said it's not clear for the reasons I said.

**Q.** Not clear, okay. And similarly, Super Duck can compete for Android contracts, correct?

**A.** Super Duck can compete for Android contracts, yes.

**Q.** And if they have superior search quality, you would expect them to win traffic on Android agreements, too, correct?

**A.** I mean, the answer's the same. I think just to say one other thing about, like, foreshadowing this whole discussion about competition for the contracts. Your Honor, competition --

**MR. SCHMIDTLEIN:** Your Honor, if I may, I don't know what he's talking about when he says foreshadowing discussions about competition for the contracts at some later date.

**THE COURT:** Let's move on.

**BY MR. SCHMIDTLEIN:**

**Q.** Why don't we stick with what we're talking about today, because if you wanted to talk about competition for the

BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, et al., . Case Number 20-cv-3010
Plaintiffs,
vs.
GOOGLE LLC, . Washington, D.C. October 17, 2023 1:31 p.m.
Defendant.

PUBLIC TRANSCRIPT OF BENCH TRIAL, DAY 23
(AFTERNOON SESSION)
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For DOJ Plaintiffs:

KENNETH DINTZER, ESQ.
United States Department of Justice
1100 L Street Northwest
Washington, D.C. 20005

DAVID DAHLQUIST, ESQ.
United States Department of Justice
209 South LaSalle Street
Suite 600
Chicago, Illinois 60604

ADAM SEVERT, ESQ.
CAMERON GOWER, ESQ.
MEAGAN BELLSHAW, ESQ.
United States Department of Justice
450 Fifth Street Northwest
Washington, D.C. 20001

-- continued --

A. Correct.
Q. And you made reference to in your testimony the share -- the increased share of Bing search traffic coming from IE and Edge; correct?
A. By "increased," you mean what the share is on Edge and IE compared to the other four?
Q. Correct.
A. Yeah, it's in this figure.
Q. And did you do any analysis in this case to evaluate how many people were trying to avoid or switch search engines on IE and Edge by switching to a different browser that defaulted to Google?
A. I don't know that, no.
Q. You're aware that IE and Edge have been preloaded almost exclusively on Windows PCs; right?
A. Yes.
Q. And you know that the overall search engine share on Windows PCs is predominantly Google; correct?
A. Yes.
Q. And so you know just by doing the math that a significant percentage of the people who were on Windows PCs and having IE and Edge available to them decided not to search on these browsers with Bing as the default; correct?
A. Yeah, a lot of them searched on Chrome.
Q. If you will turn to slide 44 in your binder. And I just

BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, et al., Plaintiffs,
vs.
GOOGLE LLC, Defendant.

Case Number 20-cv-3010
Washington, D.C.
October 18, 2023
9:32 a.m.

TRANSCRIPT OF BENCH TRIAL, DAY 24
(MORNING SESSION)
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For DOJ Plaintiffs: KENNETH DINTZER, ESQ.
United States Department of Justice
1100 L Street Northwest
Washington, D.C. 20005

DAVID DAHLQUIST, ESQ.
United States Department of Justice
209 South LaSalle Street
Suite 600
Chicago, Illinois 60604

For Plaintiff State of Colorado: STEVEN KAUFMANN, ESQ.
Colorado Department of Law
Consumer Protection Section
Antitrust Unit
1300 Broadway
Seventh Floor
Denver, Colorado 80203

-- continued --

that web.
Q. And the next circle in the demonstrative in yellow is information index. How does Google go about creating an index?
A. Yeah, so the index is a core piece of the search, of the search system, and an index is just like an index at the back of a book. There's a word and all the pages that it occurs on. So you need a clear index of the web.
Like I said, trillions of pages is a lot of pages. So it's a little difficult to get an index of the whole web. It's not even clear you want an index of the whole web, because the web has a lot of spam in it. So you want an index of sort of the useful parts of the web that would help users.
And so we go out using a process of crawling the web and other mechanisms for acquiring the content, and we create an index of hundreds of billions of documents that we hope is comprehensive in terms of the kinds of queries and questions that users come to us with.
Q. What is the implication for search of a document being either in the index or not in the index?
A. It has a very significant implication, which is if it's not in the index, we can't serve it to users. It's as simple as that. So making sure that when users come to us with queries, we want to make sure that we've indexed enough of the web so we can serve those queries. And so that's why the index is such a crucial piece of the puzzle.

compromised the quality of Google's search?

A. No. At an aggregate level, it does not compromise the quality of search.

Q. Does Google from time to time compare its index to that of Microsoft?

A. Yes, we do that every so often, yes.

Q. Dr. Nayak, you have a binder in front of you that has a white cover. And I would like to direct your attention to UPX268A, which is an evidence. And the A just simply reflects that it's a native version.

And, Your Honor, there are pieces of this that are confidential. So we will be following along.

First, what is this document in front of you?

A. It looks like a document that talks about various competitive facts.

Q. Okay. And if I could ask you to please turn to the document that ends in .033.

A. Yes.

Q. What is being shown -- and I ask you to be careful not to identify any particular numbers. But what is being shown on this page?

A. So this is an attempt to measure the relative coverage of the Google index against the Bing index.

Q. And what is shown by the blue line on that page in front of you, .033?

A. So the strategy that was adopted to do this measurement was as follows: We started with a large sample of queries that were representative of the query stream. And for those queries, we looked at what results Bing returned for those queries. And then we looked to see what fraction of those results were in our index. All right? So that's the blue line.

And you can see over time most of the results that were in the Bing results were in the Google index. You can ignore that little sharp line that goes down. That's just a data error at that point, and that can be ignored. But you can see that the blue line suggests that most of the results that were in the Bing results were in the Google index.

The red line is the opposite of that. So we looked at all the results that were showing up for Google, and we asked ourselves which of these results were in the Bing index. And as you can see, there's sort of a meaningful gap in the index coverage there.

Q. Does that gap in coverage have any implications for the differences in quality between Google and Bing?

A. I think in general, it goes back to the point that if it's not in the index, you can't serve it. And so if you have useful results that are not in the index, as is the case here, then that has a direct impact on quality.

Q. Let's turn to the next page, 034, which is also redacted. What are we seeing here?

A. Here, we have two charts that are created in the same way as that -- the top-level chart that we talked about in the past. The top chart here is on a subset of queries that are identified as long-tail queries. So these are queries that occur quite infrequently in the query stream. And you can see that the gap between the Google line and the Bing line is actually larger here. The bottom line is on popular queries. These are more common queries that occur more frequently, and you can see that the gap is smaller here.

So this suggests that the index coverage is poorer, or the index coverage gap is larger in long-tail queries.

Q. Dr. Nayak, what are the implications for the differences in search quality between Bing and Google on popular and long-tail queries with respect to this chart?

A. So what the charts would suggest is that the quality gap between Google and Bing is larger on long-tail queries than on popular queries.

Q. What, if anything, does that have to do with the index?

A. The thing with long-tail queries is that this is where you really need to have a more comprehensive index, because the user is asking for something very specific. It's not a very common document. And if you don't have that document in the index, you can't serve that long-tail intent that the user came to you with.

So it's the index -- comprehensiveness of the index is

crucial to being able to serve long-tail queries like this.

Q. I would like to turn now to the topics of mobile and desktop.

THE COURT: Sorry. If I could just follow up with a question.

Dr. Nayak, to what -- let me back up.

Can you just share with me what -- in your estimation, what are the most important variables in creating a quality index?

THE WITNESS: I think the first thing you need to create a quality index is to know which parts of the web to crawl. All right? So you have to make sure that you don't fill your index with spam or low-quality content like that. You need to know where the high-quality pages are that people will find useful. So that's a big part of it.

You need to invest enough in the infrastructure for crawling, and that's another important part.

There's another sort of a subtler point here, which is when you crawl the web, you actually use resources of the website, because you're actually, you know, issuing requests to the website to serve this thing. So a really important part of your crawling system is to make sure you don't overwhelm those websites. You need to be very respectful of websites when you do this. So there's a lot of subtle, careful algorithms that are built to allow you to do this in a way that allows you to keep things fresh, while not overwhelming these websites in this

key elements of great search results, and information satisfaction and page quality are the two metrics we use to track that.

And so we set ourselves goals every year for improving IS and PQ, and that's what this was capturing.

Q. It's hard to read, but within the IS portion under "key goals," there's a reference to "NBU goal."

What does NBU mean?

A. NBU stands for next billion users, and it represents various emerging markets where we operate, things like India, Indonesia, Brazil, Nigeria. We seek to serve users all over the world. So it's important for us to have search quality improvements everywhere. And so one of the key things we had called out there was to set ourselves a goal of improving search in these NBU markets.

Q. Now, this document we just reviewed was for 2021. Are there similar documents and goals for other years at Google?

A. Yeah. This is a part of our annual planning. Every year, we set ourselves goals that -- OKRs, you may have heard of those, objectives and key results. And we set up objectives along these lines.

In search quality, we always have an objective like this one here to improve search quality according to the metrics that we measure here. And we do this every year, yes.

Q. Dr. Nayak, does Google only seek to make improvements in

its quality when it senses some competition?
A. No, not at all. This is something we do all the time. This is -- this goes to the core of serving the mission that we have, is to constantly improve search quality.
Q. Does Google conduct any measurements of its quality in the ordinary course of its search engine?
A. Yes, we do.
Q. And why does it do that?
A. Well, there's a saying which is sometimes attributed to Lord Kelvin, maybe misattributed. It says you can't improve what you don't measure. And even if the attribution isn't accurate, it makes an important point. If we are seeking to improve search quality, then we better have a way of measuring whether it actually is making improvements or not.
Q. What metrics does Google use to measure its search quality?
A. So we use a number of different things of course, but there is one measure that is sort of, I think, the most important, and that is the information satisfaction measure that we touched upon briefly.
Q. Are there any subcomponents of that IS score that you've mentioned?
A. So the IS score is meant to capture what makes great search results. And really, there are, as I mentioned, really two elements to that: Are other search results relevant, and are they from reliable sources or not?

And so those are sort of the two major pieces of the IS metric. And we get raters to help us make these judgments that then get put together into this metric.

Q. On what scale is that aggregate metric portrayed on?

A. The aggregate metric is on a 0 to 100 scale.

Q. And can you please give the Court some sense of what one IS point or some portion of an IS point means in terms of quality.

A. So not surprisingly, it's a little tricky to give a very clear definition of what one IS point would mean. So we came up with the following way of thinking about it: Wikipedia is a really important source on the web, lots of great information. People like it a lot. If we took Wikipedia out of our index, completely out of our index, then that would lead to an IS loss of roughly about a half point.

So that gives you a sense for what a point of IS is. A half point is a pretty significant difference if it represents the whole Wikipedia wealth of information there.

So that's how we've been thinking about it.

Q. And how does Google go about scoring -- or generating the data to create these IS scores?

A. So we have a whole system of evaluation to produce these IS scores. The core of it is we have a whole lot of raters. These are people that are hired from all over the world. We have about 16,000 or more of them around the world. And we essentially ask them to take a look at a sample of queries and

whenever we improve page quality, what we've noticed is that our live experiments come out not so great. So they move in sort of opposite directions.

And I think part of it is things that I mentioned around things like click bait and variations thereof. If we demote the click bait, users may still seek it out, and that looks like a loss on the live experiment when really it's actually a good thing to do that.

Q. All right. We can take that demonstrative down, and let's turn to a document in your binder, UPX1082.

Your Honor, this was on the government's exhibit list. I believe we at one point posed an objection, but we're obviously withdrawing that objection at this point.

THE COURT: Okay.

BY MR. SMURZYNSKI:

Q. Dr. Nayak, what is UPX1082?

A. This is -- I believe this is a deck that describes some experiments that we did to connect improvements in search quality to growth in search usage.

Q. And why did Google perform a study such as this?

A. So for the longest time, we have believed that improving metrics like IS -- in the past, we have had other variations of IS. They were called different things. But it was the same basic idea.

We have long believed almost as an article of faith that

improving metrics like that leads to a more helpful search for users. And some years ago, actually a little before when this deck was done, we decided well, let's make sure it's not just an article of faith, it really is the case that we are building a more helpful Google.

And the way we wanted to say that we're being more helpful is to see if users would use search more. We used growth essentially or usage of search as a proxy for helpfulness, the idea being that if users find it helpful, they're going to use it more. They're going to use it more frequently. They're going to use it for more tasks that they're looking for, but in general just using it more.

And so we were trying to sort of connect these two things. And so we wanted to see whether making improvements in IS was actually correlated with greater usage of search, so that it wasn't just an article of faith but we could say we've got data that shows this. And that's what this deck was describing.

Q. All right. And this deck describes a degradation of one IS point. We've redacted the actual effect from that, but what conclusions did you draw from the change in user behavior with a one IS point degradation?

A. I mean, the conclusion I draw is I find the study to be remarkable in a sense, that we make these changes in search quality which nobody really notices obviously, you know. You're changing the web results around. No one knows you launched

anything. No one knows you made an improvement. And yet, users subliminally notice that search got better. And they feel like they need to use search more. I think it's just a remarkable thing that this shows.

And to me, that was the big takeaway, that it matters what we do in improving search quality. People notice it, even if subliminally.

Q. If you could turn to the fifth page of that document, under "caveats." And in the bottom paragraph there, there's a statement about the relationship between IS and growth and conclusions one can draw for different or not draw for different IS points.

What is being conveyed there?

A. So the document itself or the studies that they did seemed to imply that there was a linear relationship between IS and growth. Okay? So that was -- these were sort of good data scientists who did it, and they wanted to make sure that we understood the limitations of the study.

And what they were pointing out is they did these experiments in a certain range of IS changes where there was this linear relationship that they observed, and they wanted to point out that if you made much larger IS changes, the relationship might not stay linear. It might become nonlinear. There might be inflection points where if you make search much worse, for example, you might actually lose a lot more traffic

than one might imagine with this.

So this was just a caveat, that it might not be linear outside because we had not investigated that.

MR. SMURZYNSKI: Your Honor, I'm about to change topics. If this is a convenient time for our morning break, it would be useful in the course of this exam.

THE COURT: Sure. All right. It's a little bit before 11:00. We will resume at 11:15.

Dr. Nayak, I will ask you not to discuss your testimony during the break. Thank you, sir.

THE WITNESS: Thank you.

(Recess taken from 10:56 a.m. to 11:15 a.m.)

(Call to order of the court.)

THE COURT: Please be seated. Thank you, everyone.

Counsel, whenever you're ready.

MR. SMURZYNSKI: Thank you, Your Honor.

If we could put up the demonstrative again.

BY MR. SMURZYNSKI:

Q. Dr. Nayak, is the quality of Google's search engine determined by the volume of user interaction data it has?

A. There's actually a lot that goes into the quality of search results at Google. User interaction is one piece of it, but by no means the only piece. There's many, many other important pieces in there.

Q. Using this demonstrative, could you start to explain that?

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, et al.,
Plaintiffs,

vs.

GOOGLE, LLC,

Defendant.

Civil Action No. 1:20-cv-3010

Washington, DC
October 18, 2023
1:32 p.m.

Day 24
Afternoon Session

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For DOJ Plaintiffs: **KENNETH DINTZER**
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005

**MEAGAN BELLSHAW**
U.S. Department of Justice
450 Fifth Street, NW
Washington, DC 20001

**DAVID DAHLQUIST**
U.S Department of Justice
209 South LaSalle Street, Suite 600
Chicago, IL 60604

For Plaintiffs State of Colorado & State of Nebraska: **WILLIAM CAVANAUGH, JR.**
Patterson, Belknap, Webb & Tyler, LLP
1133 Avenue of the Americas #2200
Suite 2200
New York, NY 10036

**A.** Yes.

**Q.** And then we go to the next page, X1721, and there's a heading that says: "Top intents of mobile dominant queries."

Do you see that?

**A.** Yes.

**Q.** And what does "top intents" mean there, sir, just that term?

**A.** I think they're looking at -- for queries that are mobile-dominant, what kind of intents do users have. Not for mobile queries at large, but queries that are mobile-dominant that is usually -- that the occurrence on mobile is meaningfully higher than on desktop.

**Q.** Okay. And so the -- so we combined some things here. I just want to break them down. Is it the fact that they occur more on mobile or is it the fact that their being on mobile means something different than if they had been issued by a desktop?

**A.** No, the mobile-dominant part says they occur more frequently on mobile. That's the table further up there.

**Q.** And the top intent is that I have some sort of mobile intent when I put it in?

**A.** So then the question is for those mobile-dominant queries, the question is what was the intent on those queries.

**Q.** Okay. And then to the next page, we have the heading "Top intents of desktop-dominant queries."

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America, )
et al., )
) DAY 26
Plaintiffs, )
) CV No. 20-3010
vs. ) Washington, D.C.
) October 24, 2023
Google LLC, ) 1:35 p.m.
)
Defendant. )
_____________________________)

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For DoJ Plaintiffs: **Kenneth M. Dintzer**
U.S. DEPARTMENT OF JUSTICE
1100 L Street, NW
Washington, D.C.
(202) 307-0340
Email: Kenneth.dintzer2@usdoj.gov
**David E. Dahlquist**
U.S. Department of Justice
209 South LaSalle Street
Suite 600
Chicago, IL 60604
(202) 805-8563
Email: David.dahlquist@usdoj.gov
**Veronica Onyema**
**Richard Cameron Gower**
U.S. Department of Justice
450 Fifth Street, NW, Suite 7100
Washington, DC 20530
202-549-7155
Email: Veronica.onyema@usdoj.gov
Email: Richard.gower@usdoj.gov

For Plaintiff
State of Colorado: **Jonathan Bruce Sallet**
COLORADO DEPARTMENT OF LAW
Consumer Protection Section,
Antitrust Unit
Ralph L. Carr
Colorado Judicial Center

THE COURT: All right. So the Court will recognize Professor Amaldoss as an expert in digital marketing.

BY MR. CAVANAUGH:

Q. Before we get into the substance of your opinions, have you prepared a slide deck to assist you in presenting your testimony?

A. Yeah.

Q. You have to speak audibly.

A. Yeah.

Q. Have you prepared a slide deck?

A. Yes, I have.

Q. Thank you.

A. Yes.

Q. What was your assignment in this case?

A. My assignment was threefold. First, I was asked to address the issue of how advertisers decide which online ad to buy. The second task was to examine how advertisers have been affected by Google's changes to its search engines results page. The third question I was asked to look at was how advertisers have been impacted by Google's operation of SA360.

Q. At a high level, what opinions have you reached on these three topics?

A. Yeah. If you can move to the next slide, I can lay my three opinions.

First, general search ads serve a very distinct

purpose because they help advertisers reach consumers with a higher probability of purchase.

With reference to your second question, my opinion is Google has reduced the visibility of certain SVP advertisers on SERP. This conduct has increased the costs of maintaining prominence on the Google SERP for those SVPs.

And the third opinion is Google's failure to support auction-time bidding and other Microsoft ad tools has decreased the efficiency of advertisers' spend.

Q. Let's start with your first opinion. When you use the term "general search ads," what are you referring to?

A. When I use the term general search ads, what I'm referring to is when a consumer enters a query in the search box, a page is -- a search engine results page is served, and along with that some ads are also presented. I'm speaking of general search ads, all ads which are displayed on the search engine's results page -- which are featured in the search engine results page.

Q. What type of search engines?

A. General search engine.

Q. Again, at a high level, do general search ads serve a distinct purpose for advertisers, in your view?

A. Yes.

Q. What is that?

A. General search ads help to reach consumers with a higher

purchase probability, and general search ads also help those advertisers to be very visible on the search engine's results page because these consumers are looking for some information, and they want to be very visible so that they can do business with them.

Q. Have you been reading the trial testimony in this case?

A. Yes.

Q. Have you seen evidence in this case that illustrates the distinctive nature of general search ads?

A. General search ads, as I mentioned, the search engine results page is a small real estate. And general search ads help advertisers to be very visible because the real estate is very small.

Q. You're looking at testimony from Mr. Booth.

A. Yes.

Q. What relevance does that have to your views?

A. This one is particularly important because there, what he's speaking of is they could introduce both PLA and search ads, and the question was how good it is? And he says: If I use both, it doubles the impact.

That's what he's stating.

Q. Can we go to slide 5, please.

Is this the point you were just making?

A. Yes. To illustrate the point, take a look at the next slide. And there you can see, here is Home Depot getting both

the search ad -- I mean, two types of general search ads. One is a general search text ad and, also, a product listing add. Together, it raises the visibility of Home Depot, and hopefully they would click one of those links and they may have some transaction with them.
Q. Have you seen any indication from Google's own documents that it views general search ads this way?
A. Yes. Google is well aware of this point. And if you look in this slide, what they are speaking of is text plus PLA is -- works wonderfully. In particular, it helps the advertise on the search engine's results page. It is the whole point of improving visibility and being effective in the SERP.
Q. Are you familiar with ads on what we refer to as SVPs?
A. Yes.
Q. All right. Can you give the Court an example? When you've used -- when we use the term "SVPs," what are we referring to?
A. When I'm speaking of SVPs, I'm referring to specialized vertical providers. These are firms which are trying to connect consumers to a service provider. An example of that would be Expedia, Travelocity, and Amazon, and so forth. And on those -- that's SVP. And there could also be ads on those sites. Those are called SVP ads.
Q. In your view, do you distinguish between ads that are on special vertical providers and on general search ads -- on general search?

A. Yes.
Q. How so?
A. In some product categories we have SVPs, but not in all product categories. Where the option of an SVP exists, we see in those SVPs consumers with a higher purchase of probability, people go to Amazon thinking they are going to buy something or when they are almost close to the time of purchase. That's why the purchase probability is much higher.
General search ads for categories where an SVP exists, it also can happen to consumers with a higher purchase probability compared to display advertising, but it could be a little lower than an ad in a SVP.
THE COURT: Sorry. What could be a little lower?
THE WITNESS: The probability of purchase of a consumer in a general search engine would be a little lower compared to in an SVP site where an SVP exists. But in many product categories, SVPs don't exist. In those categories, consumers with highest purchase intent can be tapped at the general search engine.
BY MR. CAVANAUGH:
Q. In response to my question, when you refer to "ads on SVPs," are those ads in response to a search query?
A. Yes. That's the focus.
Q. If we could turn to slide 8, please.
How does Mr. Lowcock's testimony relate to the point you

were just making?
A. The point I just made is what he's also speaking. So if a user goes to a retailer website, they got a higher probability and intent to buy. On a general search engine you could be doing research into the products, so you are trying to learn. I think this is the point which I just made. In cases where an SVP exists, when they're very close to the purchase position, they're more likely to be at the SVP rather than in the general search engine, but SVPs don't exist in all product categories.
Q. What is it about the difference in -- in this difference of intent? Why is that meaningful?
A. Because if you look at the next slide -- you go further on slide 10. Okay. All right. You can go show that slide. I'll explain it.
Q. Okay.
A. So you can see both, one, a search for refrigerator in a general search engine and a search for a refrigerator in a SVP. In a general search engine, we see even a firm which is -- for example, any consumer can possibly learn about the product in the text ad and they can use the PLA and go to Home Depot and buy it.
Whereas if you go to an SVP, everybody cannot advertise there. Only those who are selling a product can advertise there. And if a customer clicks it, the transaction will happen in that website itself. Therefore, this is a click

in, and whereas in the general search engine, it's a click out.

Those are some structural differences, but there are some qualifications. Only a vendor who is selling products in a SVP can advertise, which is not true for general search engine; anybody can. In a general search engine for general search text ads, anybody can buy an ad.

Q. And can a consumer make a purchase on a general search engine?

A. In a general search engine, they have to click out, go to the advertiser's website, and close the transaction. But as in a SVP, like Amazon, you click in and the transaction and everything is closed at the SVP itself.

Q. How is that relevant to indicating a consumer's likely intent?

A. Yeah, the fact that they're going to the website and closing the transaction says that they are very, very close to the moment of purchase; therefore, those consumers' eyeballs are very valuable.

THE COURT: I'm curious. What you say has an intuitive quality to it. The question I have is: Have there been any efforts to actually measure this? I mean, to test the hypothesis that searches done on SVPs attract consumers who are closer to the purchase decision versus someone who goes to a search engine or who goes to social, is there any sort of hard statistics, data experiments that would actually back this up?

THE WITNESS: Yeah. I think it would be based on the conversion probability, what it would be; one is that. The other is: How much are people willing to bid for their eyeballs. Those would be the two matrix, but I have not done any survey to present that information.

THE COURT: Is there anything in the academic literature, to your knowledge?

THE WITNESS: People have explored this issue, but we do not have hard facts about -- from the firm to quantify precisely.

BY MR. CAVANAUGH:

Q. Does Google acknowledge in its documents distinction between the mindset of consumers on an SVP, like Amazon, compared to consumers on Google Search?

A. Yeah. I think this also addresses the point which you raised, Your Honor. You can see in the next slide, Google is where people research. 69 percent of people start with Google when going to retail. And then --

THE COURT: I'm sorry. What was the number?

THE WITNESS: Sorry, sorry. I skipped a slide.

BY MR. CAVANAUGH:

Q. You skipped one.

A. Because I was going by my charts and I flipped two of them. Sorry.

So Google, in -- in its own documents it's presented,

Amazon owns the lower purchase funnel and is often the last point before buying, with ROI that is immediate. And then Google says Google is focused on building a strong shopping ecosystem by helping advertisers reach users across the purchase funnel.

And what is across the purchase funnel? If you go to the next slide --

THE COURT: Just to be clear -- I'm sorry -- this slide that you just showed, is that -- that's an excerpt from an actual Google document?

MR. CAVANAUGH: It's from PSX302, Your Honor, which is in evidence.

THE COURT: All right. Thank you.

A. Which one could see in the footnote.

And the next one is: So is it across the purchase funnel?

I later explain the purchase funnel concept also.

Google is where people research. 69 percent of people start with Google. So in its eyes, it's where people research.

And then the next point is -- it further clarifies: Category searches are a massive opportunity to reach consumers before they have settled on a brand or product.

So that's how they, themselves, perceive the general search engine.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America, )
et al., ) DAY 28
)
Plaintiffs, )
) CV No. 20-3010
vs. ) Washington, D.C.
) October 26, 2023
Google LLC, ) 9:30 a.m.
)
Defendant. )
_______________________________)

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:
For DOJ Plaintiffs: **Kenneth M. Dintzer**
U.S. DEPARTMENT OF JUSTICE
1100 L Street, NW
Washington, D.C.
(202) 307-0340
Email: Kenneth.dintzer2@usdoj.gov

**David E. Dahlquist**
U.S. Department of Justice
209 South LaSalle Street
Suite 600
Chicago, IL 60604
(202) 805-8563
Email: David.dahlquist@usdoj.gov

**Joshua Hafenbrack**
U.S. DEPARTMENT OF JUSTICE
455 5th Street NW
Washington, DC 20530
(202) 603-0857
Email: Joshua.hafenbrack@usdoj.gov

For Plaintiff
States: **William J. Cavanaugh, Jr.**
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
Suite 2200
New York, NY 10036
(212) 335-2793
Email: Wfcavanaugh@pbwt.com

would be different and that it wouldn't be harmful to competition for Google to do that.

Q. I see. So you're imagining a world where over some period of time rivals win a lot of market share, Google's market share goes down, and then at some unbeknownst, undefined time period Google could come back in and compete for an exclusive agreement, is that what you're saying?

A. That's one possibility. I'm not saying -- I'm not saying that would be what would happen. I'm saying that --

Q. At what point --

A. -- I'm saying that the world without this conduct could evolve in different ways, with different firms having different shares and different -- and different ability to compete and making different investments and, you know, different --

Q. Sir, let me just ask you this: So is it your testimony that in the but-for world here, when Apple goes out and holds a competition for the default search engine for the Safari browser, at least during the time period you examined, Google's response to that request should be: I'm sorry, I'm not allowed to be the default search engine?

A. I didn't say that. I just said that it was possible that at some time -- that the but-for world could be very different from the current world.

Q. You've only looked at 2016 to the present, right?

A. That's what I said. I said Google harm began at least

2016.
Q. Right. And there was an Apple agreement that was negotiated and entered into and up for competition in 2016, right?
A. That's correct.
Q. And are you testifying that as in your view, when Apple put that contract out for bid for competition in 2016, Google's response had to be: I'm sorry, we can't bid or compete to be the default search engine for this agreement?
A. That's not what I said.
Q. So what -- what could Google have done in 2016 during that competition?
A. The -- my view is -- I'm describing what a -- what the but-for world would have looked like without the conduct that harmed competition in the actual world. I'm using that and explaining that in that world, we would have more competitive outcomes and, as a result, we would have, you know, higher searches of quality and lower ad prices, or at least more likely to have them, than in the current world. I'm not --
Q. But you haven't said --
A. May I finish please? I didn't take a view as to what Google should have done when. I'm just setting that world up as the way of under -- of the conceptual experiment to understand the competitive effects of Google's conduct.
Q. And if I asked you what Google should have done in 2017

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
et al.,
Plaintiffs,

vs.

GOOGLE, LLC,

Defendant.
_______________________________/

Civil Action
No. 1:20-cv-3010

Washington, DC
October 26, 2023
1:30 p.m.

Day 28
Afternoon Session

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For DOJ Plaintiffs: **KENNETH DINTZER**
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005

**JOSHUA HAFENBRACK**
**MEAGAN BELLSHAW**
**RICHARD GOWER**
U.S. Department of Justice
450 Fifth Street, NW
Washington, DC 20001

**DAVID DAHLQUIST**
U.S Department of Justice
209 South LaSalle Street, Suite 600
Chicago, IL 60604

For Plaintiffs
State of Colorado &
State of Nebraska: **WILLIAM CAVANAUGH, JR.**
Patterson, Belknap, Webb & Tyler, LLP
1133 Avenue of the Americas #2200
Suite 2200
New York, NY 10036

privacy enhancement for Google Search, you would consider whether Google is losing queries to any rival on the basis of privacy, correct?

**A.** So just to make sure I understood the complete question, is one of the considerations how well users are responding to other search engines? Yes.

**Q.** The question is --

**A.** Please.

**Q.** -- in considering whether to sign off on a potential privacy enhancement for search, you would consider whether Google is losing queries to any rival, correct?

**A.** If it is relevant to the privacy proposal, yes.

**Q.** You discussed with your counsel the discussions that were going on in and around June 2019 about privacy messaging by DuckDuckGo, and whether Google should respond to that?

**A.** Yes.

**Q.** Let's take a look at UPX500. Dr. Raghavan, Mr. Sommer showed you a different fork of this e-mail, which was UPX501. This one has the same first e-mail from Cory Ondrejka, so I'm going to ask you a few questions about this one, and then I'm going to ask you a few questions about 501, okay?

**A.** Is there a paper form of this I can look at?

**Q.** Yes, there is, it should be in your binder there.

**A.** One moment, please.

**Q.** This 500's in evidence, Your Honor.

This is an e-mail exchange between you and Cory Ondrejka. Do you see that?

**A.** Yes. One moment, please.

**Q.** Sure, take your time.

**A.** Okay.

**Q.** E-mail chain between you and Cory Ondrejka, correct?

**A.** Correct.

**Q.** And Mr. Ondrejka was a VP at Google?

**A.** Yes.

**Q.** And you see, if you look in sort of the first couple of paragraphs of Mr. Ondrejka's e-mail to you, he mentions that -- he talks about the DuckDuckGo discussions.

That's what you discussed on your direct testimony, right?

**A.** Correct.

**Q.** And he says: "DuckDuckGo is having a successful marketing moment." Do you see that?

**A.** I do.

**Q.** And that was around attacking Google on privacy in the public, right?

**A.** They were insinuating that we weren't private enough.

**Q.** And you see Mr. Ondrejka -- we'll zoom down to his proposed action items, which is just below. And he references a Kathy, and that's Kathy Edwards, right?

A. Kathy Edwards.
Q. And she was -- Ms. Edwards was one of the employees at Google working on privacy and trust issues around this time, right?
A. At that time, yes.
Q. And Your Honor, we have designated deposition testimony from Ms. Edwards.
And you see, Dr. Raghavan, the first action item there from Mr. Ondrejka is about gathering data around users switching between Google and DuckDuckGo. Do you see that?
A. Yes.
Q. And you see he asks whether users are migrating to DuckDuckGo, and whether there's data you can leverage to better understand that, right?
A. Correct.
Q. Let's look at your e-mail at the top of the string back to Mr. Ondrejka. I want to ask you in particular about your point number two.
A. Okay.
Q. And you asked for a study analogous to what impact is DuckDuckGo having on our search volume. Do you see that?
A. I have asked for that.
Q. You saw that. And the very detailed longitudinal study you mentioned there refers to the Project Charlotte analysis we discussed earlier on, right?

**A.** I expect it does.

**Q.** And what you were suggesting here was that before Google enacted any response to DuckDuckGo in response to this messaging campaign, you wanted to see data on whether Google was actually losing queries to DuckDuckGo, right?

**A.** I wanted to see data.

**Q.** And you wanted to see data on whether Google was losing queries to DuckDuckGo, right?

**A.** I wanted to see data, correct.

**Q.** You wanted to know if it was just a PR problem or if it was actually a query loss problem, right?

**A.** Correct.

**Q.** Let's look at 501, the one that your counsel showed you. This, again, has the same sort of base e-mail from Mr. Ondrejka, and there's a different fork above it. I want to direct your attention to the Ben Gomes e-mail.

**A.** The e-mail from Ben?

**Q.** Exactly, from Mr. Gomes.

**A.** Okay.

**Q.** Your Honor, I think we'll be hearing from Mr. Gomes next week.

Mr. Gomes was a senior vice president or a vice president in search at this time; is that right?

**A.** That's correct.

**Q.** Do you know which it was?

**Q.** But that's a separate question, people caring about privacy, from whether Google needed to enact a product change to prevent query loss to DuckDuckGo, right?

**A.** That one had to make a product change in light of all of the above.

**Q.** You can put this one -- take this one down. Subsequent to this e-mail exchange in 2019, Dr. Raghavan, Google has not run any studies or surveys, to your knowledge, on whether -- to follow up on whether Google is losing queries to DuckDuckGo, correct?

**A.** I don't recall any.

**Q.** You don't recall any such studies?

**A.** I don't recall.

**Q.** And as head of Google Search, you could ask for such a study or survey, correct?

**A.** I could ask for such a study.

**Q.** And you haven't done that, correct?

**A.** No.

**Q.** Dr. Raghavan, you have referred to DuckDuckGo search engines that attack Google on privacy as, quote, ankle biters, unquote, correct?

**A.** I may have used that unfortunate term.

**Q.** Okay. That's a yes?

**A.** Yes.

**Q.** The Court has heard testimony from a couple witnesses

BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, et al., . Case Number 20-cv-3010

Plaintiffs, .

vs. .

GOOGLE LLC, . Washington, D.C. October 27, 2023 9:33 a.m.

Defendant. .

- - - - - - - - - - - - - - - - -

TRANSCRIPT OF BENCH TRIAL, DAY 29
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For DOJ Plaintiffs:

KENNETH DINTZER, ESQ.
United States Department of Justice
1100 L Street Northwest
Washington, D.C. 20005

JOSHUA HAFENBRACK, ESQ.
United States Department of Justice
450 Fifth Street Northwest
Washington, D.C. 20001

For Plaintiff State of Colorado:

STEVEN KAUFMANN, ESQ.
Colorado Department of Law
Consumer Protection Section
Antitrust Unit
1300 Broadway
Seventh Floor
Denver, Colorado 80203

-- continued --

sort of near the back of the binder.

THE WITNESS: I can look through the whole thing. Is there a particular --

BY MR. HAFENBRACK:

Q. No, that's okay. I'm going to ask you a few general questions first, and then I will point you to a few specific slides.

This is a update on something called Project Cinnamon that was addressed to you; correct?

A. Yes.

Q. And this is a slide deck from 2020. And at a general level, Project Cinnamon was about Google's search strategy on Apple iOS devices, including iPhones; right?

A. At a general level.

MR. HAFENBRACK: Your Honor, we will offer UPX2051.

MR. SOMMER: No objection.

THE COURT: It will be admitted.

(Exhibit UPX2051 received into evidence.)

BY MR. HAFENBRACK:

Q. Dr. Raghavan, one of the goals of Project Cinnamon was to move the search habit for existing Safari users from Safari into the Google Search application; is that right?

A. IGA, as we call it.

Q. IGA meaning the Google Search application; correct?

A. yes, iOS Google app.

Q. Okay. Great. And Project Cinnamon was a topic of interest in the latter half of 2020 because Google's distribution agreement with Apple was coming up for a renewal point in 2021; is that right?
A. That's not the consideration that was presented to me. The Cinnamon team came and presented this as something they had been working on prior to my arrival in search. And so they were showing me their work.
Q. Okay. So you didn't see it as related to sort of considering the strategic landscape on Apple ahead of the contract renewal?
A. To me, the contract renewal was not the reason to think about the iOS Google app.
Q. Okay. That's fair. This might have been before your time as head of search, Dr. Raghavan, but are you familiar with a Project Soy that came before Project Cinnamon?
A. The name rings a vague, very vague bell, but I'm not familiar with this project.
Q. Okay. And if you recall, did Project Soy have a similar sort of goal of thinking about how to get users out of Safari and into the Google Search application?
A. I have no idea.
Q. Okay. Let's take a look at slide 8, which we will put up on the screen. It's also Bates 519. And a bit of this slide has been marked confidential, as you can see on your screen, but

I'm going to work around that in my questions.

And you see, Dr. Raghavan, the title of the slide asks the question, "How do users reach Google on iOS?" Do you see that?

A. I do.

Q. And the answer in red is "through Safari"; right?

A. Yes.

Q. And then the percentages -- there's a line graph there, and the percentages are redacted. So I won't ask you about the specific numbers. But this line graph is showing that as of 2020, the strong majority of Google's iOS searches were coming through Safari; correct?

A. The strong majority, yes.

Q. And there's lines there for the Google Search application in Chrome.

Do you see that?

A. I do.

Q. The Google Search application's in blue, and the Chrome is in yellow; right?

A. I think that's the yellow line, yeah.

Q. Chrome is yellow; right?

A. I think so.

Q. Okay. And that's showing that much lower percentages relative to Safari of Google Search traffic coming through the search app. in Chrome; right?

A. Yes.

Q. And you see here the percentages of traffic coming through these three different access points, very stable over the period of time depicted on this chart; right?
A. Yes.
Q. And you see this chart is saying the current slope, meaning the growth rate in usage of the Google Search application, was 0 percent; right?
A. The chart does say that.
Q. And you're aware that by this time in 2020, Google had been making a concerted effort for years to try to get users to use the search application instead of Safari; correct?
A. I wouldn't say I'm aware of what had happened before that.
Q. Okay.
A. I can speak to anything you want to know about after this point.
Q. So you don't know one way or the other whether in the years leading up to 2020 Google had done that?
A. I do not.
Q. Okay. That's fair. Let's take a look at the next slide, slide 9. And the question here, the headline question is, "Is serving our users primarily through Safari a risk for us?"
Do you see that?
A. Yes.
Q. And "us" meaning Google; correct?
A. Correct.

Q. And the answer is, "Yes, in Safari, users often unaware they're using Google."
Do you see that?
A. I do.
Q. And then this chart on this slide is showing the results of some user research that Google had done; correct?
A. I believe so, yes.
Q. And that user research showed that the majority of Safari users, when they're searching through the Safari bar, were unaware that they were actually searching through Google; correct?
A. Yes.
Q. You can put that one aside. Dr. Raghavan, you've been the head of Google Search since 2020; is that correct?
A. Since June of 2020.
Q. Do you know to the nearest $1 billion how much Google paid Apple under the ISA in 2022?
A. I do not.
Q. Can you tell me to the nearest $2 billion?
A. I don't want to speculate. I'm told there's an agreement, and I stay out of it. I've been consciously focusing on the product, not the agreement.
Q. And you have no knowledge of the amount of money, top line amount of money that Google pays to Apple; is that right?
A. Not a good estimate, I do not.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, et al.,
Plaintiffs,

vs.

GOOGLE, LLC,

Defendant.

Civil Action No. 1:20-cv-3010

Washington, DC
October 30, 2023
9:31 a.m.

Day 30
Morning Session

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For DOJ Plaintiffs: KENNETH DINTZER
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005

MEAGAN BELLSHAW
U.S. Department of Justice
450 Fifth Street, NW
Washington, DC 20001

DAVID DAHLQUIST
U.S Department of Justice
209 South LaSalle Street, Suite 600
Chicago, IL 60604

For Plaintiffs State of Colorado & State of Nebraska: WILLIAM CAVANAUGH, JR.
Patterson, Belknap, Webb & Tyler, LLP
1133 Avenue of the Americas #2200
Suite 2200
New York, NY 10036

have short-term pressures and long-term pressures, and they are also incented to sell devices. They are competing with other OEMs. So we've found over time more effort goes into developing the next version. And updates are costly, you know, it's costly. And so sometimes they make trade-offs, and we are adding an incentive. You're right that they have an incentive. We are making sure we are working to add to that incentive.

We've found that the compliance wasn't fully there as what you would expect compared to Apple, that simply they just have to update their own products. So we noticed that by adding these incentives, we've been able to improve the rate of compliance for these security updates.

**THE COURT:** Thank you.

**BY MR. SCHMIDTLEIN:**

**Q.** Sir, were you involved -- have you been involved in the negotiation of the Apple Safari agreement that led to a renewal of that agreement in 2016?

**A.** I was extensively involved. The agreement long predates -- it's been a long-standing agreement. But in 2016, I was directly involved in negotiating that agreement.

**Q.** Okay. And who was your negotiating counterpart at Apple?

**A.** Mr. Eddy Cue.

**Q.** And what was your goal for those negotiations?

**A.** Going in, there was a clear understanding that this

had been -- there had been precedent, the deal had been around for a while. From the time of the deal, Apple had grown tremendously, so we saw great usage growth from the deal. The Google experience on iOS was very valuable. The user feedback was very positive, it was working well. Our queries from iPhones had also been growing significantly since the start of the deal. So it was both increasing usage, creating financial value for our shareholders, and so I thought it was a valuable deal and wanted to continue that deal.

Mr. Cue had indicated that it was a very competitive deal dynamic. And there was some precedent -- you know, he had acknowledged in our first meeting that there was tension in the relationship, primarily due to the fact that the revenue share had decreased from the amount it was there previously. One of his main objectives was to increase the revenue share from the deal. I obviously wanted to get the deal done at the best revenue share that's possible for Google.

Added to that, I definitely felt uncertainty. Given Apple designs then to an experience, it wasn't fully clear how they would change the experience if the financial incentive wasn't there. And it was clear to us that the current implementation was leading to increased usage of search, and it was a deal which was working well for both parties. But there was a lot of uncertainty about what would happen if the deal didn't exist. So those were all of the context going into the deal.

**Q.** If users can switch the default on Safari, why does Google pay so much money for the default?

**A.** Well, we've known from -- we want to, first of all, make it very, very seamless and easy for users to use our service. That's how we've approached all the way from developing Google Toolbar to everything we've done, so we want to provide easy access. We do know people are looking to use Google. By making it the default, we know it would lead to increased usage of our products and services, particularly Google Search in this case. So there's clear value in that, and that's what we were looking to do.

**Q.** Now, during the course of the negotiations, you made reference to the fact that Mr. Cue indicated that one of the goals he had was to get the revenue share percentage back up to levels that it had previously been to.

Were there other goals or things that Mr. Cue indicated were important to Apple as part of that agreement?

**A.** I think I felt the overwhelming concern from his side was to get the revenue share higher. He had indicated it was a very comparative deal dynamic. He said they preferred Google because Google was the best product for their users, and that's the sense they had. My sense was both of us felt -- I think we valued our product working well with Apple brands and users. I think they valued the fact that Google being there helped improve the iPhone experience, and increased the perception of

iPhones. But it was definitely, you know, the revenue share was a big topic.

**Q.** Was the term of the agreement an issue that was an important part of the discussions back and forth between the parties?

**A.** In addition to increased rev share, Mr. Eddy Cue had indicated one of the more important aspects of it was to get as long a term as possible. Apple was very interested in a long-term deal.

**Q.** And did you push back on that?

**A.** Yes, I did. Yes, I did. You know, the longer the timeframe, there can be uncertainties. But we eventually ended up doing it in a way in which Apple has the right to extend the deal to a longer term, if they choose to do so.

**Q.** Is it fair to say that at the end of the negotiations, both parties had sort of compromised their positions?

**A.** Yes, on pretty much everything. It was an intense back and forth, we didn't agree on everything, but I think we tried to find common ground to make progress.

**Q.** Did Google agree to increase the revenue share percentage to the amount that Mr. Cue was originally asking for?

**A.** No, we did not.

**Q.** Did Google agree to a compromised revenue share provision?

**A.** That's correct.

**Q.** Now, was the 2016 agreement subsequently extended?

**A.** Yes, that's correct, in 2021.

**Q.** And did Apple approach Google to request an extension?

**A.** That's my understanding, yes.

**Q.** And during the course of the 2016 agreement negotiations, did Google ask Apple to include language requiring Apple to continue implementing the Safari default in a substantially similar manner as it had done to date?

**A.** Yes. This wasn't a major part of the negotiation for most of the time, but towards the end. Internally, our deal teams had been concerned that -- we were obviously doing the deal for default placement. And so we wanted to make sure, as we contemplate a longer term deal, that the notion of default was reasonably preserved in a similar way, particularly with respect to Apple being able to send queries to rival providers. And so we contemplated that and worked through that.

**Q.** Was there a concern internally within Google that Apple could divert queries to third-party vertical providers?

**A.** Yeah, that was precisely the concern, you know, concern maybe where they would take some queries, for example, and just send it to Amazon for shopping queries and do additional deals. And it's perfectly within Apple's right to do. But for us, the rev share and how we structured the current deal didn't take that into account, so we wanted to

**Q.** Do you see the last line in the first paragraphs of the summary discussion, Mr. Sharma argued that: "Focusing on home page market share is one of the most effective things we can do to make gains in search market share"?

**A.** That's right, that's what Mr. Sharma is arguing.

**Q.** So Mr. Sharma's thesis was that defaults would help Google gain market share, right?

**A.** That's correct.

**Q.** Gaining search market share through defaults was an important topic for Google's search team in 2007, right?

**A.** I would say increasing usage of search, you know, was a lot of what we were thinking about. And some of it would be because we gain market share. Some of it is because you're taking existing users, and by giving them more convenient access points, you're making them search more. So both of them could be contributing to it.

**Q.** And one of the methods that was a topic of conversation to increase search in 2007 was the use of defaults, right?

**A.** It was the context of -- I mean, this is talking about we were trying to actually build a product called iGoogle which was a browser home page to compete with Yahoo!, which was a popular home page at the time -- or AOL, people had many different home pages. So this is both trying to understand the importance of building it -- Google didn't have a home page

product, and Ms. Sieving, who worked for me at that time, was leading in developing this home page product. So both the importance of what would the value be to have a home page product, and then having that as the default. So those were the kinds of things we were thinking through.

**Q.** It was both having a home page product, but also the value of having that home page product set as the default?

**A.** Yes, both.

**Q.** And this idea that defaults were important, that wasn't a new concept for you, even in 2007, right?

**A.** Yeah, I don't think so.

**Q.** You understood before Mr. Sharma's presentation in 2007 that defaults were important?

**A.** Again, the word default can mean so many things, so it depends on what you're trying to do in what context; whether what you're trying to do is aligned with what a user would want, right. And there are cases where defaults haven't mattered, because that's not what the user is looking to do. So with that caveat, yes. Done correctly, and if you're putting a product out in front of users which users like and want to use, yes, defaults can make a difference.

**Q.** And one example of setting a default that aligns with typical user preferences would be a default search engine in a browser, right?

**A.** That's correct, yeah.

**Q.** Or setting the default home page to Google when a user opens their browser for the first time?

**A.** Assuming we have a good home page product experience, otherwise they would just switch it to whatever they like to use.

**Q.** You thought Mr. Sharma's analysis on the importance of Google being set as the default home page for market -- to increase market share was important enough to share with Google's top management in the EMG, right?

**A.** That's right. Google was a much smaller company at that time, so definitely this was. I think the Google product strategy meetings, these were forums designed to cover topics like this, actually go deep and look at product topics across the company. They would have separate EMG meetings to discuss management topics. These were product strategy meetings.

**Q.** Mr. Pichai, I think you mentioned earlier, but you worked on the Google Toolbar when you first joined Google, right?

**A.** That's right.

**Q.** And you mentioned that in -- when you first started, I think one reason Google developed the toolbar was so that users could download a browser extension and install a search engine in their browser, right?

**A.** That's correct.

**Q.** Because back then, users weren't able to type a search

approaching 11:00, so why don't we take our morning break, if you're switching topics. We will break until 11:15.

Mr. Pichai, I'll just ask you please not to discuss your testimony with anyone during the break, all right?

**THE WITNESS:** Thank you.

**THE COURT:** Thank you, everyone.

(Recess taken at 10:59 a.m.)

(Back on the record at 11:16 a.m.)

**THE COURT:** Ms. Bellshaw, whenever you're ready.

**BY MS. BELLSHAW:**

**Q.** Thank you, Your Honor.

Mr. Pichai, for years, Google has been concerned that Apple might start its own search engine, right?

**A.** I've thought about competition from everyone, so no different. So Apple was one of the possible competitors, yes.

**Q.** Google has discussed the possibility of Apple starting its own search engine internally?

**A.** We had seen, I think it was maybe a few years ago, some reports of Apple -- there were press reports about Apple crawling the web and developing an index. So that moment was the moment we internally had conversations that they may be possibly building a search engine.

**Q.** And Apple has at least some search capabilities, right?

**A.** Yes. I mean, search is such a broadly defined word.

Can you clarify what you mean by search capabilities?

**Q.** Sure. So, for example, Apple can use its Suggestions product to answer some Safari queries on its own rather than sending them to Google?

**A.** That's correct, yeah.

**Q.** And I think you just referenced, but you're aware that Apple has built a web index?

**A.** I'm not aware. I read press reports speculating or reporting that Apple may be possibly building an index.

**Q.** You're aware of public reports that Apple built a web index?

**A.** Yes.

**Q.** And you have been concerned about Google Search employees leaving for Apple, right?

**A.** I mean, I'm concerned about -- search is where we have our best -- in general, I feel our search and artificial intelligence teams have some of the best talent at Google, so I would be concerned about those employees leaving to any companies, including Apple.

**Q.** You've had specific concerns about Google Search employees leaving for Apple, right?

**A.** Not in an unusual way, no.

**Q.** Mr. Pichai, I'd like to direct your attention to UPX1092. And Your Honor, UPX1092 is in evidence.

Mr. Pichai, UPX1092 is an e-mail from you to some of your

colleagues at Google with the subject: Ben G. and Search. Do you see that?

**A.** Yes.

**Q.** And at the e-mail at the bottom -- so the first e-mail in the chain of UPX1092, is an e-mail from you dated April 16th, 2019?

**A.** That's correct.

**Q.** So the -- in the first sentence of your e-mail you write: "Loss of talent."

You were referring to loss of search talent?

**A.** I'm summarizing Ben Gomes, Mr. Ben Gomes, who headed search at that time, had come to meet me. So I'm sending a note back to people operations summarizing what his concerns were.

**Q.** And Mr. Pichai, just for the record, there are some redacted statements on UPX1092 that involve sort of more personnel, so I'm not going to ask you about any of those statements. You're obviously welcome to refer to them if it's relevant to your response, but I won't be asking you about those specifically.

**A.** Thank you.

**Q.** Focusing on the bottom e-mail, your e-mail in UPX1092, there's a dash line and it says: "JG now recruiting." Do you see that?

**A.** That's correct.

**Q.** And that refers to Google's former head of search, Mr. Giannandrea?
**A.** That's correct.
**Q.** And Mr. Giannandrea left Google for Apple, right?
**A.** That's correct.
**Q.** And after leaving Google for Apple, Mr. Giannandrea was recruiting Google search employees, correct?
**A.** That's what Mr. Ben Gomes was telling me.
**Q.** Looking at the bottom paragraph of your e-mail in UPX1092, you wrote: "I need monthly reports of all losses to key competitors on an ongoing basis."
Do you see that?
**A.** Yes.
**Q.** So you were asking for monthly reports for Google employees who left to go to key competitors, correct?
**A.** That's correct.
**Q.** And then in your sentence, you go on: "If anyone from search to Apple, please e-mail me directly on every individual case."
Do you see that?
**A.** Yes.
**Q.** So when employees left for other competitors, you were receiving monthly reports, right?
**A.** I'm not sure I received those reports, but that's what I'm seeing in the e-mail.

**Q.** But you gave specific instructions to be notified directly for each individual search employee who left Google for Apple, correct?

**A.** That's right. And here, search refers to Ben Gomes' team who was heading the search and a few other teams, yeah. So this is Ben Gomes coming -- Mr. Ben Gomes, expressed to me concern, and he has called out specific people. One of them was at Apple, but others I don't think are. He was bit concerned about loss of talent, and wanted my help in helping retain people. I've always -- I definitely consider it as part of my job to help retain our most valuable employees. And so, yeah, that's the context of this.

**Q.** So Mr. Gomes was head of search at this time in 2019?

**A.** That's correct.

**Q.** And Mr. Gomes was concerned about Google search employees leaving for Apple, right?

**A.** No, no, overall. Gabe and Shashi -- Gabe didn't leave for Apple. I don't know where Shashi left. I don't think -- Shashi left his team internally to some other team at Google, now that I recall. He was just concerned about a loss of talent, because I think he had just recently come into this new role after JG had left. So it was a new role, he was concerned about loss of employees, and so he asked for my help, I offered to help.

**Q.** And one of the ways that you offered to help was you

asked to be notified directly about every individual Google employee who left from search to go to Apple, right?

**A.** That's what I'm saying in this e-mail, that's right, yeah.

**Q.** I think you said earlier that Google has 180,000 employees; is that right?

**A.** That's correct.

**Q.** You don't get a notice when each of those 180,000 employees leaves Google, right?

**A.** No, and neither did I after this e-mail on anybody who left to Apple.

**Q.** We can set that one aside. Switching topics but staying with Apple, you referenced Safari Suggestions earlier.

Do you recall that?

**A.** Yes.

**Q.** What is Safari Suggestions?

**A.** It's their product, but the way I understand it is as users type in Safari's box, they offer suggestions -- Apple offers suggestions of what the users could complete or could navigate to.

**Q.** And you've discussed Safari Suggestions with your staff at Google, right?

**A.** Yes, I'm sure.

**Q.** And who is Tim Cook, just for the record?

**A.** I've heard of him. Mr. Tim Cook is CEO of Apple.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
United States of America,      )
et al.,                        )
                               ) DAY 30
               Plaintiffs,     )
                               ) CV No. 20-3010
                       vs.     ) Washington, D.C.
                               ) October 30, 2023
Google, LLC                    ) 1:30 p.m.
                               )
               Defendant.      )
_______________________________)
```

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For DoJ Plaintiffs:

**Kenneth M. Dintzer**
U.S. DEPARTMENT OF JUSTICE
1100 L Street, NW
Washington, D.C.
(202) 307-0340
Email: Kenneth.dintzer2@usdoj.gov

**David E. Dahlquist**
U.S. DEPARTMENT of JUSTICE
209 South LaSalle Street
Suite 600
Chicago, IL 60604
(202) 805-8563
Email: David.dahlquist@usdoj.gov

**Meagan Bellshaw**
**Richard Cameron Gower**
U.S. DEPARTMENT of JUSTICE
450 Fifth Street, NW, Suite 7100
Washington, DC 20530
202-549-7155
Email: Meagan.bellshw@usdoj.gov
Email: Richard.gower@usdoj.gov

A. -- percent is the same, and we are making more money. The amount we pay them will also increase. That's a good deal.
Q. And we've had testimony in this case recently that the traffic acquisition costs were roughly 26 billion in 2021. Apple made up a substantial percentage of that, correct?
A. I think I answered that earlier. So, yes.
Q. Now, again, in 2021, did you propose to your team negotiating with Apple utilizing a choice screen where Google would pay a much lower revenue share percentage?
A. Again, this was not within the scope of -- Apple had an implementation and, so, for us, the choice was whether to participate in that construct or not, and that's what we were thinking through.
Q. So you never proposed a choice screen, correct?
A. In 2021, I wasn't negotiating the agreement, so --
Q. Did you propose that to the team, have you considered a choice screen?
A. No, because it's not their -- it's -- Apple has a construct and, I mean, we knew that's what we were competing for.
Q. Would your view in 2021 have been that if there was going to be a choice screen, no revenue share payments to Apple?
A. So, you're saying if Apple came and proposed a choice screen implementation?
Q. Yes.
A. Well, we wouldn't have applied our current revshare

payments to that Apple implementation.
Q. So Google preferred an all-or-nothing arrangement, correct?
A. Can you define "all or nothing"?
Q. All or nothing: Default, you get money; choice screen, you get nothing.
A. In the current way of doing distribution deals, yes, we pay for either default or some way of clearly enhanced promotion of our services.
Q. As you testified earlier, Google and Apple compete against each other in several markets, correct?
A. That's correct.
Q. All right. And all these products, like maps and browsers, mobile operating systems, they're all vertically integrated with either Android or Apple, correct?
A. So, I don't understand. Can you clarify what you mean --
Q. Let me break it down. I was trying to do it too fast.
Google competes against Apple in the mobile software market?
A. Mobile software, yes.
Q. And Google and Apple are the two major providers of mobile operating systems, correct?
A. That's correct.
Q. Would you agree it's, essentially, a duopoly?
MR. SCHMIDTLEIN: Objection to form.
THE COURT: Sustained.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America, et al., Plaintiffs,

vs.

Google LLC, Defendant.

DAY 33

CV No. 20-3010
Washington, D.C.
November 2, 2023
9:30 a.m.

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For DoJ Plaintiffs: **Kenneth M. Dintzer**
U.S. DEPARTMENT OF JUSTICE
1100 L Street, NW
Washington, D.C.
(202) 307-0340
Email: Kenneth.dintzer2@usdoj.gov

**David E. Dahlquist**
U.S. Department of Justice
209 South LaSalle Street
Suite 600
Chicago, IL 60604
(202) 805-8563
Email: David.dahlquist@usdoj.gov

For Plaintiff State of Colorado: **Jonathan Bruce Sallet**
COLORADO DEPARTMENT OF LAW
Consumer Protection Section, Antitrust Unit
Ralph L. Carr
Colorado Judicial Center
1300 Broadway
Seventh Floor
Denver, CO 80203
(720) 508-6000
Email: Jon.sallet@coag.gov

Q. All right. We were moving away to shopping just to one other example that you present.
A. So I have -- the one other vertical where I had data, where the data were subpoenaed, was to have data from Yelp so you can look in local. Local queries are -- they are things like dentists near me. They're things that you tend to be looking for something near your house or near where you are.
Here, you'll see, even if you take Google's top 25 local queries, Yelp gets more. Google gets 11.4 million of those. Yelp actually gets 12.5 million. Bing only gets 200,000. So, Yelp and Amazon, obviously, are applying very strong competition. You know, much stronger competition than Bing, as things stand.
Q. I want to ask you about something Professor Baker testified to, and that was that a query overlap could just show that the search engines are complements, such as if a user goes to Google, enters a query, clicks through to Amazon and enters the same query there. Do you agree with that?
A. I don't understand that to be complements in the sense I would use it as an economist. It means you're using both, but that's why my partial substitution matters. I agree that you could enter some queries in Google for a while and then go over to Amazon and enter some more; but it remains true that every query that you get over at Amazon is a query that didn't go to Google, and they can't monetize.

And really, I think you can think of a lot of the competition here as Amazon trying to get more and more of the queries from the start, and Google trying to get more and more of the queries that go to Amazon. But they're still fighting over which of those queries go where and where that division is. So, using both, to me, doesn't mean complements. It means they're fighting over the extent to which they use either.

Q. Let me ask you about one thing Professor Whinston testified about, and that was that SVPs only appear to be strong competitors because Google's conduct has weakened other general search engines.

Do you agree with that critique?

A. This is the cellophane one we talked about earlier, and, no, I don't. I have a slide here, if we want to go to it.

So, this is the question about is the substitution we're seeing or the query answering we're seeing on Amazon or Yelp, is that fully a substitution? Or are we only seeing that because of Google's conduct? And I say no to that, for several reasons. And, again, for cellophane, I think a lot of this you have to go to the basic evidence and commonsense, frankly.

You know, Amazon is very, very good at shopping, Expedia is very, very good at travel, and they're strong competitors that Google is actively reacting to in its documents. So I just don't see that as in any which analogous to the cellophane cases. These really are extreme cases in

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CV No. 20-3010 |
| vs. | ) | Washington, D.C. |
| | ) | November 13, 2023 |
| GOOGLE LLC, | ) | 9:30 a.m. |
| | ) | |
| Defendant. | ) | Day 39 |
| | ) | Morning Session |

TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

and I'll talk about one of them later.

The first thing, I want to talk about how these default agreements actually enhance the competitive process by actually allowing even weaker rivals to put significant pressure on the stronger producer, in this case, Google. Remember, you know, I think it's -- everybody agrees, Google has higher quality and also the lower costs.

So the fact that Google wins a lot of the business isn't surprising from an economic point of view. If you have higher quality at lower cost, you're probably going to want to win a lot of business. But part of the competitive process, even weaker rivals put a constraint on stronger rivals.

And browsers -- I mean, sorry, default agreements, because they enable partners, platform providers like Apple, browser providers like Mozilla, to switch to the -- the threat of switching to the rival, and remember, this gets back to your question, Your Honor; you said, Well, what about the fact that a lot of people follow the default?

Well, the fact that a lot of people follow the default actually allows the partner to create a lot of price competition between Google and its rivals by threatening to switch to the rivals.

Now, the rivals may not win; in fact, they probably won't win. Why? Because in a competitive

But remember before, I talked earlier that under a default, there's two kinds of competition? You have competition for the default but you also have competition given the default.

And so incentives are driven by both, you can do both. And, you know, unlike an exclusive where you'd have competition for the exclusive, but once you have the exclusive, you're done. Here, really, the default is adding another dimension on competition without eliminating the other one. So you're still going to have incentives to compete against the default, and Google is going to have incentives to compete against those competing against the default.

And if a better rival with a better concept comes along, they're going to do what Google did years ago, which is compete aggressively, build themselves up, and eventually win the default or win in some other way. So this doesn't prevent the better rival from winning at the end of the day, but it allows for competition even in a case where rivals are weaker.

BY MR. SCHMIDTLEIN:

Q I believe you anticipated one of our questions.

Do default browser agreements exclude competitors from the competitive process?

A Yes.

And a couple of questions, a couple of things here.

I'm going to take a step back and talk about some evidence that I haven't talked about yet, but I'm sure is -- I know for a fact has come up in court, so I'm going to talk about two things.

If two pieces of evidence that you might not quite figure out how to put together, one is if you look at switching from the defaults that we have today, the Google defaults to a choice screen, very little effect, and I'll show you some evidence that says it's extremely small, whatever effect.

That sort of says, you know, if you measure, like, the impact that these agreements, relative to a world without these agreements, the impact on rivals' success is actually quite small, right, because you can use a choice screen of saying, what would the world look like today if we didn't have defaults, right, you know, because -- you know, again, stepping back, the fundamental claim in this case is that these agreements prevent consumers from accessing rivals.

And if that were really the issue, you would think switching to a choice screen, where they clearly have direct access to the rivals, would make a substantial difference.

And what we see is it really doesn't. We're going

to see a bunch of other evidence that says, doesn't seem to be access is really the question.

So that's the message you take away from the choice screens, it's really no evidence of lack of access, and we have a bunch of other evidence along that line as well.

But then at the same time, you have to juxtapose that with switching who has the default, not switching from default to choice screen, but switching from default to default has a much bigger effect. And the plaintiffs and I agree on that, that a switch, like you said earlier, changing who has the default makes a big difference; moving to a choice screen, very little difference.

But the thing I would say, if you're thinking about impact on rivals, you should think about the choice screen, because that's relative to a world without defaults. If you think about generating competition, that's default versus default. So these agreements create a lot of competition, but at the end of the day, relative to a world without defaults, have a relatively small impact on rivals.

It also tells us that what Google pays is not what they're paying for the ability to exclude rivals, but really it's a product of that competition, right?

Why does Google pay so much? Not because, relative to a choice screen, they would get a lot of extra

business but because the browser partner can threaten to switch to the rival, and so those large payments we see are an effect of competition, they indicate the competition created by the default, okay.

So that's really the message of those two pieces of evidence. Seeming contradictory evidence, but they fit together very well once you understand how defaults work and how you think about competition.

Q Professor Murphy, let's turn to your next -- the subpoint for your first opinion, which is "Google has won competitions for browser defaults based on quality and price."

What does that mean from an economic perspective?

A You know, we've talked about this a lot so I'm not going to go too in-depth in it.

Really, competition is fundamentally in marketplace about quality and price. When you go to decide which car to buy or which television set to buy or, you know, any other decisions you make in your life, you think about how good is the product, how much does it cost me.

And through this price competition, we have Google and others competing for customers, both directly, mostly there on quality, right.

Most of the competition I make, they have a consumer choose me versus the other guy since I'm not paying

definition of unconditional rev share. The other one, what he considers is offers conditional on parity.

So I'll make an offer, I'll pay you this rev share, as long as you give me at least as good a placement as you give somebody else. Kind of an MFN-type view of the world, but not an MFN on dollars but an MFN on --

THE COURT: Placement.

THE WITNESS: -- placement, yeah.

Okay. Those are the two that I understand he's putting forward.

And so when I think about the parity one, there's all kinds of definitions one could use what parity means. I'm not even quite sure how to define it in some cases, but I'm going to think about it like a choice screen. I'm going to bid to be on a choice screen because a choice screen is some notion of parity, okay?

BY MR. SCHMIDTLEIN:

Q Okay.

Have you considered the economic feasibility of Google agreeing to an unconditional revenue share payment?

A Yes.

And basically the biggest problem I see with unconditional revenue share payments is really at odds with basic economics, particularly for a firm like Google.

Because if they make an unconditional rev share offer, Apple could decide or the partner could decide to not give them any promotion, in which case Google gets the business they would have gotten anyway, right. They didn't get anything for it. They got what -- the business they might have gotten anyway. And if they're not getting -- or then Google is being paid for nothing. They're not going to do that.

But even more importantly and more fundamentally, you know, when I sell stuff to the grocery store, I might just give them a discount to sell more stuff because I know one of the ways I'm going to sell more stuff is I'm going to get a lower price on the shelf and more consumers are going to buy it.

But remember, there's none of that kind of analysis here, right, because the rev share payment -- the rev share payment is to get performance, get them to do something, give me a bookmark, put me in a default. In his hypothetical, give me a choice screen, right. So you're going to condition it on receiving it.

I sort of think of it like a billboard. I want to get a billboard at the baseball stadium. Well, I'm not going to go to the billboard provider and say, Here, I'll give you a 10 percent rev share in my sales in Washington, D.C. in exchange for putting -- and then if you want to, put

up a billboard on the outfield, I'm going to say, No, I'll pay you to put up the billboard. Maybe I'll pay you with a rev share. But I'm going to make you -- the contract is going to be to put up the billboard.

THE COURT: You're not going to pay for something that you may or may not get?

THE WITNESS: Exactly. That's why I don't like the unconditional.

And that's particularly true for somebody like Google, who you're going to make a lot of payments even if he doesn't do anything because you're -- you're -- you've got a lot of customers in you. A lot of people would choose you.

Even if it makes the other guy the default, a lot of people are going to choose you. And you're still going to pay? You know, he kind of did everything he could to move stuff away from you, but you're still paying him.

And the other key observation is, if you look at this industry, and this is blanked out, I'm looking at other providers, and they don't have this problem nearly as much as you, Google, does, because they don't have as many organic customers that would have used them anyway.

But even they specify what they're going to get. They say, Hey, we'll pay you. We'll pay you to give us promotion, but we're going to get the X, Y, or Z that we're

going to get in return. So conditionals is kind of the right story.

You know, when you look at contracting as happens in the world and all kinds of other industries, you know, kind of an unconditional payment, like say I run a store and I've got a worker and my store closes at 10:00, and I want him to stay till 10:00, right, because if he leaves early, I'm in trouble. And I don't try to find a wage rate that'll make him want to stay till 10:00, right. I don't say, Okay, $15 an hour, he'll stay till 10:00 and I'll get what I want.

THE COURT: Pay him till 11:00.

THE WITNESS: Yeah, or I'm going to tell him, Stay to 10:00 and I'll pay you $15 an hour.

That's all I'm saying is these kinds of things where you're trying to get them to do specific things, you're -- you're going to find it in your interest to specify the actions. Unconditional payment's a very poor way to do.

And even if you get something, it's a problem, right? Let's assume I would make 100 sales without promotion, and that sale would go to 40 -- 140, and I say, I'm willing to pay you 20 percent rev share for that, 20 percent rev share to get to 140, okay?

So now he doesn't do all the stuff you wanted. He does some, you get 110. Now you're paying 20 percent of 110

to get 10 sales. The problem is you're paying on all of them, you're not just paying on the incremental sales you're getting.

And one answer would be to try to estimate the incremental sales and pay only on those, but that's not an easy contract to write because it's hard to figure out what your incremental sales are, just like it's hard to figure out what it takes to get the guy to stay until 10:00.

THE COURT: That's what I was going to ask, which is that if you assume that -- given Google's position in the market, that under any of these browser agreements, it's going to retain some percentage, could you foresee a world in which Google's only paying for the incremental searches that arise as a result of a rev share agreement?

THE WITNESS: I think it's hard.

I mean, that's the problem, is it's kind of like the classic contracting problem.

In a particular case -- in a case where there are lots of things you're trying to get somebody to do, these kind of price-based systems work pretty well.

But when you have specific things, like, I want you to give me a default, I want you to give me a bookmark, I want you to do this, that -- I even want you to put me on a trade, whatever it is, specifying it just makes a whole lot of sense, because, again, it's not like the wholesale

retail world where you say, Oh, I'll give you a discount. Even if you don't give me any promotion, that's going to give me sales because customers are going to get a lower price, they're going to buy more.

Here you're really contracting for specific elements of promotion. And to me, it just makes a lot of sense to say, the efficient contract in that world is to put that in the contract. Trying to find a price that makes it work is hard.

THE COURT: Right.

Even if that contract price is far greater than what you would pay just for incremental sales? Or incremental -- in this case, incremental users?

THE WITNESS: I'm not sure Google does pay more than what they get. I mean, they get -- remember, why do they get incremental sales? Because the guy could switch the default to somebody else.

THE COURT: Right.

THE WITNESS: So if that competitive dynamic means that Google gets a fair amount of incremental sales from winning the default, relative to a choice screen, they might not be getting more -- many incremental sales, but that's not the world they live in, right.

They live in a world in which the guy could give the default to the other guy, and, therefore, there's a lot

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ET AL., Plaintiffs, | ) |
| vs. | ) CV No. 20-3010<br>Washington, D.C.<br>November 14, 2023<br>9:30 a.m. |
| GOOGLE LLC, Defendant. | ) Day 40<br>Morning Session |

TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

because that's a concern of theirs, right?

A There are.

And there's concerns on both sides.

In the final agreement -- this is a great example of if you just look at all the pieces, you understand the economics. But if you look at some of the pieces, you're not.

Q Now, you're not offering, in your not but-for world, what percentage of the market rivals would get if they had exclusivity on iOS devices, right?

A I don't believe -- yes, because I don't believe that would happen in the but-for world for the reasons I've already articulated.

Q You believe that what percentage Google's rivals would hold if they had the default on iOS would depend on what Apple does, right?

A Yes, that would.

THE COURT: Sorry, can you repeat the question?

MR. DINTZER: Sure.

BY MR. DINTZER:

Q What percentage of Google's rivals would hold if they had the default on iOS would depend on what Apple does?

A I would agree.

Q Given Apple's ability to control its environment, a rival securing defaults on Safari would likely get more

than 20 percent?

A Assuming that Apple wanted to go in that direction. I think they -- Apple has a fair amount of control over their platforms so if they wanted to make a more restrictive default, they -- they presumably would have the ability to do that.

THE COURT: I'm sorry. When you say more than 20 percent, more than 20 percent relative to what?

MR. DINTZER: More than 20 percent of the market share.

THE COURT: Oh, of market share.

MR. DINTZER: So -- no, that's fair. Let me re-ask.

THE WITNESS: There's a context for the 20 percent.

THE COURT: Well, hang on. Let him clarify the question in light of mine, and then we can move forward.

MR. DINTZER: No. I appreciate that, Your Honor. Let me just make sure I've sharpened it to a point.

BY MR. DINTZER:

Q So given Apple's ability to control its environment, a rival securing defaults on Safari would likely get more than 20 percent of the search done on Safari; is that right?

A I think that -- I think that's probably right

based on what we know, assuming the default is designed similar to current defaults. This is what we think of the share shift on the covered queries that would happen if you shift defaults.

I think the market evidence would say, on Apple, probably more than 20.

Q Did you read Mr. Parakhin's testimony?

A Mr. Parakhin is his name or --

THE COURT: Parakhin.

MR. DINTZER: I believe it's Parakhin.

THE WITNESS: Parakhin, sorry.

BY MR. DINTZER:

Q Did you read his testimony?

A I did. Not in its entirety.

Q Okay.

So we're going to put up a part of his testimony. This is UPXD270, and we'll put it up on the screen.

And what he said was, he was asked:

"Question: It is the case that Microsoft told Apple that it could invest more in mobile search but it would not do so unless Apple gave it further distribution in mobile?

"Answer: It is uneconomical for Microsoft right now to invest more in mobile because even -- any -- like, it's our belief that no amount of investment without

securing some way to do distribution in mobile will result in any share gain. And so it is correct that unless Microsoft gets a more significant or a firmer guarantee of distribution, then it makes it uneconomical for Microsoft to invest in mobile quality and in mobile search mode."

Do you see that?

A I do.

Q And you don't have any reason to doubt that?

A Well, I would say I'm not sure the market evidence supports that, but if that's what he believes, I don't have any doubt that he believes it.

Q Okay.

If Google didn't have the exclusivity provisions that are being challenged, Microsoft would have a greater incentive to invest in its search engine?

A That's not so clear.

Q You haven't modeled that?

A Well, I talked about that in my direct.

And first off, if you stay focused on Apple, which is what we're talking about here, for example, or mobile, there's a lot of volume that doesn't flow through the default. So they can compete for that already.

Q You're not answering my question.

My question is: If the challenged terms were not in the agreements, Microsoft would have an incentive to

increase its investment?
A Not necessarily.
Q Okay.
And you haven't modeled that? There's nowhere, if I asked you -- if your report's in front of you, if I asked you to point where you've done a regression analysis, some sort of statistical analysis of Microsoft's investment in the absence of these terms, you haven't done it?
A Well, I looked at -- I looked at Desktop, where they have all the access and -- you could possibly have, and they haven't made the investment there, which -- and I think is very telling that it's not the lack of access that's limiting their investment.
I mean, you can't argue they don't have access on Desktop where they have all the preinstallation.
Q Sir --
A So under your theory of the world, they would find an incentive to invest heavily in Desktop.
Q Sir, you understand that there's been testimony, significant testimony, that almost all of the growth in search over the past decade and longer has been in mobile, right?
A Yeah, but Microsoft could go enormously on Desktop just by taking share from Google.
Q And so Microsoft's investment in mobile would

BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, et al., . Case Number 20-cv-3010

Plaintiffs,

vs.

GOOGLE LLC, . Washington, D.C. November 14, 2023 1:37 p.m.

Defendant.

- - - - - - - - - - - - - - - - -

TRANSCRIPT OF BENCH TRIAL, DAY 40
(AFTERNOON SESSION)
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For DOJ Plaintiffs:

KENNETH DINTZER, ESQ.
United States Department of Justice
1100 L Street Northwest
Washington, D.C. 20005

MEAGAN BELLSHAW, ESQ.
CAMERON GOWER, ESQ.
United States Department of Justice
450 Fifth Street Northwest
Washington, D.C. 20001

VERONICA ONYEMA, ESQ.
United States Department of Justice
450 E Street Northwest
Suite 8714
Washington, D.C. 20530

-- continued --

P R O C E E D I N G S

(Call to order of the court.)

THE COURT: All right, Mr. Dintzer.

MR. DINTZER: May I continue, Your Honor?

THE COURT: You may.

MR. DINTZER: Thank you, Your Honor.

CROSS-EXAMINATION (Continued)

BY MR. DINTZER:

Q. So we were talking about the -- whether the distribution contracts were intensely and the defaults were intensely contested.

Do you recall that?

A. I do.

Q. Okay. And on Apple, is it your position that the Apple default on Safari was intensely competed?

A. I think that's a fair general statement.

Q. Okay. Now, it's true that Bing made a proposal, is that right, to Apple?

A. Well, it depends on when you're looking at. I mean, Bing wasn't even around before 2009.

Q. I'm talking about 2016.

A. I had no way of knowing that from your question.

Q. No, that's fair. So let me rephrase.

Is it your position that in 2016, that the default -- that the Safari default was intensely competed?

A. I would think that's a fair characterization.
Q. Okay. And Bing tried to -- or made an offer to try to get the Safari default; right?
A. That's my recollection, yes.
Q. Bing tried offering everything it could and still couldn't match Google; is that right?
A. Well, I don't know if that's everything it could under the plaintiffs' theory that they would gain immensely in terms of additional data and things. You assume they would value that beyond just the current cash flows.

So if they believed that, I assume they would have been willing to bid more to get that highly valuable data; right?

MR. DINTZER: May I approach, Your Honor?

BY MR. DINTZER:

Q. Sir, we're passing this one out instead of putting it on the screen because there's a portion of it that is redacted, and we're not supposed to say it out loud. Oh, we're going to have a redacted one up on the screen, but I want you to be able to see the whole thing.

THE COURT: Hang on for a second. It looks like only -- is the second iteration of that number --

THE WITNESS: Whoops.

MR. DINTZER: No, I think we're allowed to do -- we're not going to put it up.

THE COURT: Okay.

BY MR. DINTZER:

Q. So do you see the slide, sir?

A. I do.

Q. Okay. And Mr. Cue is asked this question, and I'm going to leave out -- I see; I see. I'm going to leave out both of the redactions.

"Question: And did Microsoft later increase its offer to X percent of revenue share?

"Answer: As they got more desperate, they increased their offer to X percent. They offered to have us invest in Bing, and at one point, they offered to us to buy Bing and then ultimately offered to basically give us Bing."

Do you see that?

A. I do.

Q. And Mr. Cue testified that there was no valid alternative to Google; is that right?

A. I don't remember those precise words. I remember he said that they viewed Google as the best choice.

Q. Okay. Let's put -- this one, we can put on the screen, UPXD241. And he was asked:

"Question: And if you weren't able to reach a deal on the economic terms, you were willing to walk away from the ISA; right?

"Answer: I've been fairly clear that I didn't think at the time, nor today, that there's anybody out there who's anywhere

near as good as Google at searching. And so certainly, there wasn't a valid alternative that we could have gone to at that time."

Do you see that?

A. I do.

Q. And even though Bing had tried to offer the X percent that we had looked at in the previous slide.

Do you understand that?

A. I do.

Q. Okay. Mr. Cue also testified that he had no choice in which search engine to pick for the Safari default.

Do you recall that?

A. I don't recall those words. I know he talked about how much he valued going with Google.

Q. Okay. Let's go to UPXD220. He was asked this question:

"Question: If you were unable to reach a deal with Google in 2016, what would Apple have done?

"Answer: Ultimately -- I don't know the answer, but I'm going to speculate a little bit, and that is, it wasn't a choice to pick any of the existing search engines."

Do you see that?

"We probably would have been left with no other choice than to potentially building our own."

So as far as Apple was concerned, there was no other choice of existing search engines?

A. I think that mischaracterizes what he says when he's talking about speculating. So --

MR. DINTZER: May I approach, Your Honor?

THE COURT: Sure.

BY MR. DINTZER:

Q. Sir, this one has a box on it, so I'm handing it up. There are parts of it that I can't read out loud.

And I'm going to draw your attention to -- you're welcome to read the whole thing, of course -- to the answer as to what Mr. Cue indicated was the place where they would deal with Microsoft.

Do you see that?

A. I do.

Q. Okay. And given that testimony, Apple did not view Microsoft's -- Apple, not you, Apple did not view Microsoft's competition with Google as intense?

A. If you take that testimony at face value, I would say that's what he believed, but for competition, it's more important what Google believed. Right? Because -- I will tell you why I know that. I bet he didn't tell that to Google.

Q. Android -- so moving from Apple to Android, Android OEMs don't put their defaults out for bids when their contracts come up.

A. Well, I don't think they have a formal bid, but if somebody approached them, I assume they would be interested.

rattled off a list of a number of different benefits.

Do you recall whether or not a benefit that was available under the RSAs was revenue share payment for placement of Chrome in the hotseat?

A. Yes, that's a part of the RSA, and that would be a part of what generates presumably incremental volume.

Q. And does having Chrome in the hotseat impact Android device quality and competition with the iPhone, in your view?

MR. DINTZER: Objection, Your Honor; leading.

THE COURT: It's overruled. You can answer that.

THE WITNESS: It would depend on what the alternative was, but given Chrome is the -- I think the evidence would say it's the highest quality browser, it would improve the quality in -- putting Chrome in the hotseat.

BY MR. SCHMIDTLEIN:

Q. Would you expect putting Chrome in the hotseat would increase overall search usage?

A. Again, given that the market evidence would suggest that it's the best browser on Android, I would assume it would increase usage, yes.

Q. Now, you were asked some questions about Apple and questions around Apple's potential for entering the search market.

Are you familiar with the term or the concept of "make or buy"?

A. Yes. I talk about it frequently.
Q. Okay. And is the concept or the notion of make or buy a very, very prevalent thing in the economy?
THE COURT: Just rephrase the question.
BY MR. SCHMIDTLEIN:
Q. Describe what make or buy is.
A. Make or buy is when you have the option between doing something for yourself or having somebody else do it for you. Basic idea in economics is, it's going to come down to which you think is -- gives you the best deal.
Effectively, the way -- the most common way I would teach my students is if you can do it at lower costs than the guy who is supplying you, you're probably going to want to do it for yourself. If your costs are higher than his, the best thing to have happen is you negotiate him down to at or -- let's say I can do it for a hundred and he can do it for 80. Well, I'm not going to pay more than a hundred, because I can do it myself for a hundred. He can do it for me for 80; I'm going to negotiate something between 80 and a hundred. He's happy because he'd get the business and it's profitable, and I'm happy because I'd get it for less than it would take me to do myself.
That's the basic lesson on make or buy.
Q. If there is -- a large customer in the market also has the potential to make or buy the input that it's looking to purchase, would you expect that to generate more or less

competition in the sale of that input?
A. Well, certainly, I would expect that person to be able to get a better deal, and that could, depending on the market structure, generate better deals for everybody else. It would just depend on how it works.
MR. SCHMIDTLEIN: All right. No further questions, Your Honor.
THE COURT: Okay.
MR. DINTZER: I failed to move in a document, if I may.
THE COURT: Sure. Well, why don't we excuse Professor Murphy and wish him well.
Professor Murphy, thank you for all your work, and safe travels home.
THE WITNESS: Thank you so much. I appreciate it.
MR. DINTZER: Your Honor, UPX2086, I failed to move it in.
THE COURT: Why don't we do this. We've got a few things to talk about, and I want to give our court reporter a break. So if you would just take a look at that exhibit, and you can let me know if there's an objection after the break.
We will come back at 3:15. Thank you, everyone.
(Recess taken from 3:00 p.m. to 3:15 p.m.)
(Call to order of the court.)
THE COURT: Mr. Schmidtlein?

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, ET AL., )
)
Plaintiffs, )
) CV No. 20-3010
vs. ) Washington, D.C.
) November 16, 2023
GOOGLE LLC, ) 9:30 a.m.
)
Defendant. ) Day 42
_________________________________) Morning Session

TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

BY MR. SEVERT:

Q And this is turning to your third bullet here, your final bullet.

Why does competition for exclusives, when there is a dominant firm, advantage the dominant firm?

A Okay.

So the last bullet point, Your Honor, the last thing I wanted to talk about, is how competition for -- another way that competition for exclusives that a dominant firm is advantaged when competition takes the form of competition for exclusives.

And a secondary consequence of that which is that that competition -- because the dominant firm is advantaged, the competition for those contracts can be less intense. So it will be kind of a two part thing.

So why is competition for exclusives advantage the dominant firm? It's because competition for exclusives is all or nothing.

And if you think about a dominant firm, the document firm -- when competition is all or nothing, the dominant firm -- to beat the rival, the dominant firm kind of has to be better on average for all the different uses and consumers compared to the rival.

If a rival is good for just some part of traffic, you know take DuckDuckGo for privacy or something, it still

can't compete for something that is an all or nothing deal.

And so, as a result, you know, if -- I should say, if instead it wasn't competition for exclusives, it was not all or nothing, then, you know, DuckDuckGo would be bringing competition because Google would have to beat in the thing that DuckDuckGo is best at, okay? And that difference, you know, can end up softening competition.

So actually -- I know you asked the other day -- I think you brought up grocery store question, ketchup, maybe. There was something about ketchup.

And so -- and it was interesting to me because I think -- when Mr. Severt was asking about my qualifications, I talked about the -- this antitrust -- this book of antitrust lectures that I wrote in 2006 and '7. One of them was on exclusive dealing.

And one of them -- and in that exclusive dealing chapter, by the way -- actually, it was written, I think, very much, hoping people like you would read it. And I know you're going to have a vacation coming up on Thanksgiving so it's a page turner.

Anyway, more seriously, it had an example which I think also kind of illustrates this idea.

So, you know, imagine that you have a -- the example was potato chips so I'll do potato chips and stick with it because that's what I'm used to.

But imagine that there's a dominant potato chip manufacturer and there's also a different potato chip that has -- is really good for one -- its manufacturer, but it doesn't have like the general, you know, attractiveness, but it is really good, say, at, you know, light potato chips or salt-free potato chips. Let's do salt-free potato chips.

And think about the difference if the dominant manufacturer wants to keep that smaller firm -- salt-free firm out of the grocery store think about two different situations. One where the dominant firm is just trying to buy shelf space, okay?

And the other, where it's -- you know, say it offers the grocery store, I'll pay you a certain amount for each foot of good shelf space, and the other where it's competing for an exclusive -- it says, no, a grocery store, I want to be -- I'm going to only offer you to be the exclusive potato chip in your store.

In the first case, it's hard -- it's much harder to keep the special, you know, the salt-free manufacturer out of the store, because like if there's some people who want that salt-free thing, you know, the grocery store is going to find some place on the shelf to it put.

In the case where it's all or nothing, it's -- you know, the salt-free manufacturers, they're going to lose. They're just not going to be able to compete against the

dominant potato chip manufacturer to be the one in the store.

And so, you know, that just kind of, I guess in a different setting, kind of illustrates this idea of all or nothing.

And I think one of the things that's really telling, if you go back to Professor Murphy's testimony, is how many times he used the word "win."

Win is happening -- you know, the fact that it's win or lose is happening because it's exclusive contracts, it's all or nothing.

And if you're instead, say, and we'll talk about, you know, I talked about last time, competing, say, with unconditional revenue shares, which are kind of like bidding for shelf space, then it's not win or lose. Like it's how much is each going to get and what special -- and, you could imagine, you know, if there -- there might be a search engine like DuckDuckGo that's good for privacy and another search engine, maybe Microsoft is good in the U.S. on PCs and et cetera that there might be competition in this way that pressures Google and makes Google compete harder.

THE COURT: So how does your thinking about this marry up with the DuckDuckGo example on Apple or privacy mode? In other words, this is an example it seems to me of wanting to -- or DuckDuckGo attempting to compete in what

Q And what are some examples of less restrictive alternatives under which there would be greater competition in today?

A So the two I talked about last time that I thought about -- and, again, Your Honor, just to remind you, like when I started thinking about but-for worlds and competitive effects, it was challenging because like exactly what Google would do, rolling back the clock, what would be legally permissible, what Google's counsel would find legally permissible.

So what I did is I focused on what I regarded as a couple of less restrictive alternatives.

One was Google using kind of -- what you might think of as most favored supplier contracts, where it shouldn't be treated worse than anyone else. That, you know, for example, could lead -- allow a choice screen -- for a distributor to do a choice screen.

Another were unconditional revenue share payments. That was the other thing that I talked about.

Q And what do you mean by an "unconditional revenue share payment"?

A So unconditional -- I know Professor Murphy commented, he wasn't sure exactly what I meant.

I mean, I think there actually are a range of things that it could be.

So one possibility is I offer -- you know, Google offers a distributor a revenue share for any traffic coming from the device.

Another possibility is it offers revenue share for any traffic coming from the search access point. So, for example -- sorry about that.

For example, to offer Apple -- like whenever we are -- whenever we are -- you put us as the default in Safari, maybe you put us for non-private search or whatever it is, whenever you make us the default, we'll share revenue with you.

Now, the thing about that, of course, is -- and this comes back to the point about defaults versus exclusives, Apple is perfectly free to, you know, make Google a default all the time then if it wants to. But isn't obligated to, it's not restricted by the exclusion -- by the exclusivity term.

Q And Professor Murphy testified that Google wouldn't pay for any of these kinds arrangements. Do you agree with that?

A I don't.

Q Why not?

A Well, I think, you know, first of all, take the case of unconditional revenue share payments. I just said that what the literature actually seems to suggest and

indicate is that Google would pay more than it's paying now if it was unconditional. So that would be one thing to look at.

As well, you know, in a choice screen, you know, one -- if, like, this most favorite supplier contract, I think Professor Murphy was like, well, we know we're going to be in the choice screen anyway so we're not going to pay.

But if rivals are offering revenue share payments, say, suppose rivals are offering unconditional revenue share payments, it may be tempting for the distributor to make the rival, you know, have the default all the time and turn down the offer from Google, and that's going to make Google pay. So that, you know, that is why I say that.

Q Are unconditional revenue share payments used -- revenue share agreements used in the real world?

A They are.

Q Can you give the Court an example?

MR. SCHMIDTLEIN: Objection, Your Honor.

This -- all this testimony, none of it was disclosed in his expert reports. The words "unconditional revenue share payments" did not appear in his first report, and he provides no examples of any real-world examples of unconditional revenue shares anywhere in his reports.

THE COURT: All right. I'll overrule the objection. I mean, Professor Murphy did spend some time

yesterday speaking about -- or it was the day before -- about unconditional revenue share, and so I think this is an appropriate rebuttal testimony.

Go ahead.

BY MR. SEVERT:

Q Can you give the Court an example of an unconditional revenue share?

A Sure.

So, you know, the default change menu, for example, on a browser, like, it's just kind of what I said, that you ought -- these -- a rival -- firms offer revenue share payments that say, you know, we're in that menu, and if put us in the -- if -- sorry -- if a consumer chooses to switch to us, we'll pay you revenue share then.

Another example would be the second -- you know, I described to you how there were different iterations of the choice screen in Europe. The second one, not the one that I looked at for the data that I showed you, Google designed an auction for firms to be in the choice screen, and firms were bidding to be in the choice screen and paying Google.

BY MR. SEVERT:

Q And going back --

THE COURT: Sorry, what does that mean, to be in the choice screen?

THE WITNESS: So consumers -- the second version

of the choice screen, consumers were faced with a choice of search providers. Once a quarter, the firm -- search engines would -- and it had to be general search engines like I described to you -- would say how much they were willing to pay for each time they were chosen by a consumer.

And so the one -- base -- it was constructed, kind of like the ad auction, as a second price -- as a generalized second-price auction, you know, there were five slots, just like there are ad slots on a SERP, on a search-results page, there were a certain number of slots in this chose screen menu for consumers, and so advertisers -- advertisers, sorry -- general search engines would bid --

THE COURT: To be -- as to where they would be ranked?

THE WITNESS: Well, what they --

THE COURT: Well, not ranked, but placed, I should say.

THE WITNESS: I'm just trying to think back to what I remember about it.

So I don't -- I think -- so there's two issues. One is, they would bid to be in and the highest bidder would pay, you know, the amount that would be better than the second highest bidder; second highest bidder, the amount, the third.

So they were paying, and each time a consumer

chose them, they would pay that amount, just like each time a consumer clicks on an ad, the advertiser pays.

The one thing I'm not 100 percent sure of is whether the order in the choice screen was determined by how much you paid --

THE COURT: I'm trying to --

THE WITNESS: -- or whether it was randomized. And I'm not sure about that, to be honest. I know I knew it, I just don't remember it sitting here now.

THE COURT: Because I'm just trying to understand why -- what the bidding is for.

THE WITNESS: The bidding is to be in it, as opposed to not be in it.

Now, what I can't remember is, is it also the case that you might be bidding higher so you would be in a higher position on the list, and I'm just not remembering that.

BY MR. SEVERT:

Q Just outside of the search context, are unconditional revenue shares used?

A Sure.

I mean, unconditional revenue share payments are used all the time. You know, Your Honor, like contingency fees for lawyers. Like, what a party in a lawsuit cares about, say, maybe it's a negligence case or something, is what recovery -- how many dollars are they going to get in

recovery. And they pay the lawyer a share of that in a contingency fee.

And, you know, the thing -- you know, what they're doing is paying for the thing they care about, right?

Just like in a revenue share, in an unconditional revenue share payment, what you're paying for is revenue. You're paying a share of revenue, and revenue is what you care about when you're a search engine, like...

So it's very analogous in that sense.

BY MR. SEVERT:

Q All right, Professor Whinston, just going back to what will happen under lesser alternatives. Let's just now assume, as Professor Murphy argues, that payments of distributors would fall?

THE COURT: I'm sorry, what?

BY MR. SEVERT:

Q That payments of distributors would go down?

A We're assuming that.

Q Just assume that's --

A Contrary to what I said but, yes, okay, I got it.

Q Did Professor Murphy present any reliable evidence that this would harm consumers by leading to more expensive devices because of passthrough?

A I see.

So you're asking me about passthrough issues.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, ET AL., )
)
Plaintiffs, )
) CV No. 20-3010
vs. ) Washington, D.C.
) May 2, 2024
GOOGLE LLC, ) 9:00 a.m.
)
Defendant. ) Day 1
__________________________________) Morning Session

TRANSCRIPT OF
BENCH TRIAL CLOSING ARGUMENT PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For DOJ Plaintiffs: Kenneth M. Dintzer
U.S. DEPARTMENT OF JUSTICE
1100 L Street, NW
Washington, D.C.
(202) 307-0340
Email:
kenneth.dintzer2@usdoj.gov

impacted their ability to compete against Google.

The evidence will also -- in this case is, they had a dispute with Yelp over the manner in which Microsoft was using their data, and that data terminated because they couldn't reach terms. That couldn't be harming their ability to compete against Google because Google doesn't have a deal with Yelp either.

So the notion that somehow Microsoft has failed to compete because it can't get access to data, the record is absolutely -- it doesn't support that claim at all, and Microsoft has more than enough money to go out and acquire data.

Your Honor, I think, made a question: Google spends money to acquire data as well. There's lots of third-party data sources that they have to acquire, depends on the nature of the data, it depends on the nature of the trade, but there's no evidence in this case that a reduction in deals with SVPs has hindered Microsoft at all.

I want to now skip over and talk a little bit about the prima facia case and talk a little bit about the framework and the questions and some of these Your Honor touched on.

I think Your Honor at summary judgment framed this as looking at, do the agreements harm the competitive process and thereby harm consumers as opposed to simply

harming a competitor, and you were quoting ***U.S. v Microsoft*** and sort of discussing that concept.

And I think there are -- as part of that conversation, there's a couple of different inquiries, and, again, you've touched on some of them.

One is, is the agreement actually -- are we dealing with an exclusive agreement here? And that obviously has its own legal test.

I will confess, and we'll get to it in a little bit, I was shocked at how much Mr. Dintzer, when you pressed him on this foreclosure and these questions about what's the test, he began talking about the 2016 Apple ISA and the substantially foreclosed -- the substantially similar product language.

Your Honor, I know we made this argument but it is worth repeating: That claim, that allegation was never, ever referenced in the complaint in this case, in the contention interrogatories in this case. And you may remember when Professor Whinston tried to give some very conclusory testimony about it, I asked him on cross-examination: Did you reference this anywhere in your expert reports? And his answer was: No.

It's not because they didn't have the agreement, Your Honor. They've had the agreement since well before the lawsuit was filed. No expert evidence, no analysis

whatsoever of that clause and its actual effect on the market. They asked witnesses at trial about it, and all of them said, it had nothing to do with limiting Apple's ability to answer its own queries.

You'll see there's a provision in there that allows Apple to make changes to improve its own product, and Mr. Giannandrea testified, and I believe Ms. Braddi testified, I may have this wrong, that we observed, they, in fact, did increase the volume of queries Apple was actually answering in response to Suggestions. So the notion that that is the anti-competitive effect that could somehow save their case is absurd. It was never pled. It was made up at trial.

So let's talk a little bit about the browser agreements, because I think you were absolutely right as you did in summary judgment, I think we have to look at these separately, and I think you do have to look at the provisions separately, because these other subsidiary provisions have nothing to do with exclusive dealing.

So as to the browser agreements, I want to talk a little bit -- I want to sort of go back and talk a little bit, because there was a conversation, I think you had before, about coercion and, you know, how does that factor into the analysis here. And the reason why it's relevant, Your Honor, is it goes to this question of, does the conduct

harm the competitive process or does it just harm a competitor?

Because Google winning agreements because it has a better product is not a harm to the competitive process. Even if it gives its scale to improve its product, even if it gives it other advantages, merely getting advantages by winning on quality, that may have an effect on a rival, but the question is, does it have an anti-competitive effect?

Because there are all sorts of things that happen in the marketplace. Every time one company wins, you know, a competition over another, does it affect the other company? Absolutely it does. Might it affect their ability to compete more effectively in the future? Sure. Is it an anti-competitive effect? Absolutely not. That doesn't answer the question.

And what the plaintiffs in this case -- they want you to just to skip to the result which is, oh, well, this has some effect. Google's won these contracts; they've had an effect. That's not the question; that's not the test in ***Microsoft***.

Microsoft used a couple -- and I'll talk about a couple of the different types of agreements, but they used the Windows operating system monopoly to coerce the OEMs into giving them all of the advantages. And what the Court agreed was effective preload exclusivity, because, for

various reasons that existed with respect to PCs back in the 1990s, it just wasn't -- it wasn't feasible for the OEMs to preload a rival once they had chosen Internet Explorer.

They won the browser competition and harmed the competitive process not because they had a better browser but because they had the Windows monopoly. They didn't win that, they harm the competitive process.

And how do we know that? Well, the Court made extensive findings of fact. Netscape Navigator was the number one browser before that. It was the highest quality. It was distributed by the OEMs. It was preferred by consumers.

And all of these things -- they flipped the market. They completely coerced the OEMs to engage in conduct that they previously had not engaged in.

And these prohibitions and restrictions that they placed on them, the Court found, had a substantial effect. And the reason why it had a substantial effect was, it actually reduced the level of Navigator usage.

So this wasn't just a hypothetical effect. We talked a little bit -- and this kind of bleeds a little bit into what we're going to get to on the but-for world question. Let's make no doubt, ***Microsoft*** court found but-for effects.

Mr. Dintzer tries to say, oh, well, that talked

about causation at the end, it wouldn't make sense to talk about that, but then require it earlier in the case. That's absolutely wrong.

What the Court found in the case was there was a substantial effect on Navigator, a real-world, but-for world, whatever you want to call it, effect. And we know this again from various -- from various provisions and various findings of fact in the case.

Before 1996, Navigator enjoyed a substantial and growing presence on desktops of new PCs. Over the next two years, however, they forced the number of copies of Navigator distributed through the OEM channel to an exegesis fraction of what it had been. That is but-for actual real-world effects.

What Microsoft later argued was, well, yeah, maybe you found an actual effect on browsers, but you didn't prove that absent these -- the browsers actually -- the middleware threat actually would have come to fruition.

And that's where the Court said, no, that's -- they don't need to go that far, because what they did show was this conduct had the anti-competitive effect of increasing the, you know, applications barrier to entry by making this distribution of cross-platform middleware much reduced.

So there is an actual effect that they found on

the OEM deals. And they also had the exact same conclusion with respect to the Internet access provider deals, and that's where AOL comes into the discussion.

THE COURT: But I thought, maybe I'm misrecollecting, I mean, I think your point is that there was -- in ***Microsoft***, there was real-world evidence of competitive harm in the browser market, right. Navigator's distribution went down and you can plot it, but ultimately the question still remains, was there anti-competitive effect in the operating system market.

And I thought it was as to that issue, that question, that the ***Microsoft*** Court said, you don't need to reconstruct a but-for world; that you don't have to show what the world would have looked like in this market, in the iOS -- excuse me, in the operating system market in order to make out your Section 2 case.

MR. SCHMIDTLEIN: The analogous argument in this case, which we are not making, Your Honor, is if we were in here arguing absent the agreements, even under their world -- let's just assume their relevant market because we're really -- we're talking about the exclusionary conduct, we're not talking about relevant market in this phase, we're not talking about a monopoly power.

If you assume Google has a monopoly in general search engines, if I was in here arguing, Judge, they

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America, et al., Plaintiffs, vs. Google LLC, Defendant.

Civil Action No. 20-3010
CLOSING ARGUMENTS
Washington, D.C.
Day 1 - Afternoon
Date: May 2, 2024
Time: 2:00 p.m.

---

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For DOJ Plaintiffs: **Kenneth M. Dintzer**
U.S. DEPARTMENT OF JUSTICE
1100 L Street, NW
Washington, D.C.
(202) 307-0340
Email: Kenneth.dintzer2@usdoj.gov
**David E. Dahlquist**
U.S. Department of Justice
209 South LaSalle Street
Suite 600
Chicago, IL 60604
(202) 805-8563
Email: David.dahlquist@usdoj.gov

For Plaintiff State of Colorado: **Jonathan Bruce Sallet**
COLORADO DEPARTMENT OF LAW
Consumer Protection Section, Antitrust Unit
Ralph L. Carr
Colorado Judicial Center
1300 Broadway
Seventh Floor
Denver, CO 80203
(720) 508-6000
Email: Jon.sallet@coag.gov

It would be reversible for you to suggest, oh, I didn't see a contemporaneous Google document that ties every single revenue payment to all of these other knock-on effects. That's absolutely not the law and I would commend you to our brief, our responsive proposed conclusions of law, page 26, where we point out, "For example, in *Microsoft*, the D.C. Circuit credited *Microsoft's* copyright based justification for preventing OEMs from automatically substituting a different interface after initial boot-up, even though the District Court condemned that restriction based on contemporaneous documents indicating it was indicated to serve Microsoft's own goals."

So in other words, the lower court said I'm discrediting that because I actually read your documents as saying you did this for anticompetitive reasons. The Court of Appeals said, no, they had a copyright-based legitimate justification for doing so. That actually trumps and that carries the day here. That was a legitimate procompetitive justification.

So I offer those for the Court's consideration on those points.

If we can go to Slide 43. And our -- this is in our second binder, Your Honor.

And I want to go back and talk just a little bit about foreclosure because it ties a little bit into this question of scale that we've been -- we've been talking about.

I thought Your Honor -- you raised a really interesting question earlier, which is when you pointed out to Mr. Dintzer, I believe, you know, on these Apple devices 40 percent of the search queries are not -- are not actually covered by the default. Why isn't that enough for them to compete to get the scale they need?

And I've -- I've heard over and over and over today discussions of mobile search. Oh, but they've got this share of mobile search, they don't have enough scale in mobile search. There's no relevant market for mobile search pled in this case, Your Honor.

They never pled a relevant market of mobile search. Had they done so, we would have had some very other interesting academic debates and some economic debates, but they never did so. They want to have their cake and eat it too on that and they can't. It's not -- it's not permissible.

But here's what -- here's what the evidence in the case said, because if we're going to talk about foreclosure and we're going to talk about, well, how much more volume would they actually get? And Professor Murphy did an analysis of this using some of the choice screen data because, you know, that's the -- that's the alternative world that they seem to be suggesting. It's not a but-for world in Professor Whinston's world, but it's his thought experiment and it's -- it's the less restrictive -- one of the less-restrictive alternatives

they keep telling us should exist.

If all the browser agreements in this case were flipped from Google as the default to a choice screen and we -- we take the data and we take the learning that we have, what's the incremental share shift? .9 percent is the answer.

Now, you'll also recall -- and we're not -- we're not going to reargue -- try to reargue the *Daubert* motion on Professor Fox here today. But you understand the discussion here, you understand the analysis he did. It's very interesting; scale, scale, scale. Where was the computer science expert on scale? They didn't offer one in their affirmative case.

Where -- where was the evidence and the testimony? I've examined the industry and here is what the minimum viable scale is that you need. I've -- I've done the analysis, I've looked over time, I've broken out, you know, the various different factors. Where is the computer science expert to offer that testimony?

We brought in an expert who tried to do an analysis, who tried to untangle this and offered an opinion. They don't like it, but they never offered an expert. They offered an expert to say our expert's opinion, you know, has these flaws to it. There's nobody on their side. They brought in -- they offer some breezy testimony by Mr. Parakhin based on nothing. He just -- he just, in very breezy fashion, says, well, you

know, you probably need 70 percent -- or, 30 percent to compete. Based on what? He never says.

So we have this continued reliance on scale as the linchpin of this case and there is a total failure of proof on it in terms of how much scale do you need? Because your question is right on the money. Well, how much foreclosure might tell me whether the scale thing is even in play? And they've offered no evidence on that at all. This is the evidence on browsers --

THE COURT: Can I go back to this for a moment and what -- I think what the response is going to be is that it's not a terribly useful number in the sense that the shift -- this shift reflects the last decade and a half. In other words, this is -- if things were to change tomorrow, what would be baked into the reaction -- I mean, to the response is everything that's happened in the last 15 years, which they will say is a function of monopolistic and exclusionary conduct.

So we really can't look at what tomorrow would look like as the sort of, you know, weathervane for determining foreclosure.

MR. SCHMIDTLEIN: Google's -- Google's share was large before they claim the conduct occurred and it's large after they claim the conduct occurred.

Again, this goes back to where were they? What's the