PUBLIC APPENDIX – SEALED MATERIAL IN SEPARATE SUPPLEMENT

**No. 26-5023**
**(Consolidated with Nos. 26-5047, 26-5049)**

---

# UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

UNITED STATES OF AMERICA, *ET AL.*,
Plaintiffs-Appellees-Cross-Appellants,

v.

GOOGLE LLC,
Defendant-Appellant-Cross-Appellee.

---

On Appeals from the United States District Court
for the District of Columbia, Nos. 20-cv-3010 & 20-cv-3715
Hon. Amit P. Mehta

---

## JOINT APPENDIX VOLUME V OF V
## (JA1790-2387)

---


Daniel E. Haar
Nickolai G. Levin
Patrick M. Kuhlmann
Matthew A. Waring
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW, Room 3224
Washington, DC 20530-0001
(202) 532-4186
matthew.waring@usdoj.gov

*Counsel for Plaintiff-Appellee-Cross-Appellant United States of America*

Donald B. Verrilli, Jr.
Ginger D. Anders
Helen E. White
Daniel J. Kane
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW
Suite 500E
Washington, DC 20001
(202) 220-1100
Donald.Verrilli@mto.com

Benjamin J. Horwich
Justin P. Raphael
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000

*Counsel for Appellant-Cross-Appellee Google LLC*

Stanley E. Woodward, Jr.
*Associate Attorney General*
Stephanie A. Greco
*Deputy Assistant Attorney General, Litigation*
Ethan S. Hoffman
*Counsel to the Assistant Attorney General*

Travis R. Chapman
Grant Fergusson
Karl E. Herrmann
Ryan T. Karr
Claire M. Maddox
Michael G. McLellan
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW, Room 3224
Washington, DC 20530-0001

*Counsel for Plaintiff-Appellee-Cross-Appellant United States of America*

John E. Schmidtlein
Graham W. Safty
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
(202) 434-5000

Mark S. Popofsky
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 508-4624

*Counsel for Appellant-Cross-Appellee Google LLC*

Philip J. Weiser
*Attorney General*
Shannon Stevenson
*Solicitor General*
Jonathan Sallet
*Special Assistant Attorney General*
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
Jon.Sallet@coag.gov

Russell D. Johnson
*Deputy Solicitor General*
Conor May
*Assistant Attorney General*
Radhika M. Kattula
*Assistant Attorney General Fellow*

*Counsel for Plaintiff-Appellee-Cross-Appellant State of Colorado*

## TABLE OF CONTENTS

## VOLUME I

Docket Report for United States of America v. Google LLC, No. 20-3010 (D.D.C.) ........ JA0001

Docket Report for State of Colorado v. Google LLC, No. 20-3715 (D.D.C.) ........ JA0213

Order Granting in Part and Denying in Part Plaintiffs' Motion to Consolidate (Jan. 7, 2021) 20-cv-3715 Dkt. 67 ........ JA0227

Order to Bifurcate Proceedings (Dec. 6, 2021) Dkt. 264* ........ JA0229

Order Regarding Production Deadline, Motion to Compel Deadline, and Evidentiary Cut-Off Date (May 25, 2022) Dkt. 357 ........ JA0231

Excerpts from Plaintiffs' Opposition to Defendant's Motion for Summary Judgment (Feb. 16, 2023) Dkt. 506 (Sealed Version at Dkt. 476) ........ JA0235

Excerpts from Plaintiffs' Pre-Trial Brief (Sept. 8, 2023) Dkt. 688 Sealed Version at Dkt. 667) ........ JA0245

Opinion – Summary Judgment (Oct. 6, 2023) Dkt. 728 ........ JA0250

Designated Deposition Testimony of Mitchell Baker (Nov. 3, 2023) Dkt. 757-2 ........ JA0310

Defendant's Proposed Conclusions of Law (Feb. 23, 2024) Dkt. 834 ........ JA0351

Excerpts from Plaintiffs' Post-Trial Brief (Feb. 23, 2024) Dkt. 837 ........ JA0409

Plaintiffs' Proposed Conclusions of Law (Feb. 23, 2024) Dkt. 838 (Sealed Version at Dkt. 821) ........ JA0411

## VOLUME II

Excerpts from Plaintiffs' Proposed Findings of Fact (Apr. 30, 2024) Dkt. 906 ........ JA0474

* Docket entries are from No. 20-3010 unless otherwise specified.

Excerpts from Liability Transcript Dkt. 917 ........................................ JA0480

Excerpts from Liability Transcript Dkt. 918 ........................................ JA0510

Excerpts from Liability Transcript Dkt. 936 ........................................ JA0515

Excerpts from Liability Transcript Dkt. 938 ........................................ JA0555

Excerpts from Liability Transcript Dkt. 940 ........................................ JA0559

Excerpts from Liability Transcript Dkt. 941 ........................................ JA0566

Excerpts from Liability Transcript Dkt. 943 ........................................ JA0599

Excerpts from Liability Transcript Dkt. 944 ........................................ JA0608

Excerpts from Liability Transcript Dkt. 945 ........................................ JA0621

Excerpts from Liability Transcript Dkt. 951 ........................................ JA0623

Excerpts from Liability Transcript Dkt. 954 ........................................ JA0631

Excerpts from Liability Transcript Dkt. 965 ........................................ JA0648

Excerpts from Liability Transcript Dkt. 967 ........................................ JA0662

Excerpts from Liability Transcript Dkt. 970 ........................................ JA0667

Excerpts from Liability Transcript Dkt. 971 ........................................ JA0690

Excerpts from Liability Transcript Dkt. 972 ........................................ JA0693

Excerpts from Liability Transcript Dkt. 973 ........................................ JA0710

Excerpts from Liability Transcript Dkt. 974 ........................................ JA0712

Excerpts from Liability Transcript Dkt. 975 ........................................ JA0725

Excerpts from Liability Transcript Dkt. 979 ........................................ JA0727

Excerpts from Liability Transcript Dkt. 982 ........................................ JA0737

Excerpts from Liability Transcript Dkt. 983 ........................................ JA0740

Excerpts from Liability Transcript Dkt. 984 ........................................ JA0746

Excerpts from Liability Transcript Dkt. 985 ........ JA0752

Excerpts from Liability Transcript Dkt. 986 ........ JA0767

Excerpts from Liability Transcript Dkt. 992 ........ JA0770

Excerpts from Liability Transcript Dkt. 1004 ........ JA0773

Excerpts from Liability Transcript Dkt. 1006 ........ JA0785

Excerpts from Liability Transcript Dkt. 1007 ........ JA0791

Excerpts from Liability Transcript Dkt. 1010 ........ JA0800

Excerpts from Liability Transcript Dkt. 1012 ........ JA0812

Excerpts from Liability Transcript Dkt. 1013 ........ JA0820

**VOLUME III**

Opinion – Liability (Aug. 5, 2024) Dkt. 1033
(Sealed Version at Dkt. 1032)........ JA0825

Declaration of Eddy Cue (Dec. 23, 2024) Dkt. 1111-1 ........ JA1111

Excerpts from Opinion and Order Denying Apple's Motion for Limited Intervention (Jan. 27, 2025) Dkt. 1153 ........ JA1115

Plaintiffs' Revised Proposed Final Judgment (March 7, 2025)
Dkt. 1184-1 ........ JA1117

Defendant's Proposed Final Judgment (March 7, 2025) Dkt. 1185 ........ JA1167

Declaration of John Giannandrea (May 2, 2025) Dkt. 1239 ........ JA1179

Excerpts from Deposition of Jay Kim (May 16, 2025) Dkt. 1344-1 ........ JA1184

Excerpts from Redacted Deposition of Francois Laflamme (May 16, 2025)
Dkt. 1350........ JA1226

Excerpts from Defendant's Proposed Conclusions of Law (May 21, 2025)
Dkt. 1359........ JA1252

Excerpts from Plaintiffs' Remedies Post-Trial Brief (May 29, 2025)
Dkt. 1369 (Sealed Version at Dkt. 1348)........ JA1255

Excerpts from Plaintiffs' Remedies Proposed Findings of Fact (May 29, 2025) Dkt. 1370 .......... JA1273

**VOLUME IV**

Excerpts from Remedies Transcript Dkt. 1393 .......... JA1322

Excerpts from Remedies Transcript Dkt. 1395 .......... JA1326

Excerpts from Remedies Transcript Dkt. 1396 .......... JA1347

Excerpts from Remedies Transcript Dkt. 1397 .......... JA1357

Excerpts from Remedies Transcript Dkt. 1398 .......... JA1360

Excerpts from Remedies Transcript Dkt. 1399 .......... JA1378

Excerpts from Remedies Transcript Dkt. 1402 .......... JA1394

Excerpts from Remedies Transcript Dkt. 1405 .......... JA1398

Excerpts from Remedies Transcript Dkt. 1410 .......... JA1436

Excerpts from Remedies Transcript Dkt. 1411 .......... JA1449

Excerpts from Remedies Transcript Dkt. 1412 .......... JA1477

Excerpts from Remedies Transcript Dkt. 1414 .......... JA1483

Excerpts from Remedies Transcript Dkt. 1416 .......... JA1511

Excerpts from Remedies Transcript Dkt. 1417 .......... JA1528

Excerpts from Remedies Transcript Dkt. 1419 .......... JA1533

Excerpts from Remedies Transcript Dkt. 1420 .......... JA1542

Opinion – Remedies (Sept. 2, 2025) Dkt. 1436 (Sealed Version at Dkt. 1435) .......... JA1560

**VOLUME V**

Defendant's Brief in Support of Entry of Its Proposed Final Judgment (Sept. 17, 2025) Dkt. 1443 .......... JA1790

Excerpts from Final Judgment Hearing Transcript Dkt. 1447 ........................ JA1834

Opinion – Judgment (Dec. 5, 2025) Dkt. 1461............................................... JA1839

Judgment (Dec. 5, 2025) Dkt. 1462................................................................. JA1934

Motion for Extension of Time to File Notice of Appeal (Dec. 17, 2025)
Dkt. 1465......................................................................................................... JA1969

Order Granting Motion for Extension of Time to File Notice of Appeal
(Dec. 18, 2025) Dkt. 1466 ............................................................................ JA1981

Excerpts from Declaration of Jesse Adkins (Jan. 16, 2026) Dkt. 1471-3 ...... JA1982

Notice of Appeal (Jan. 16, 2026) 20-cv-3715 Dkt. 174 ................................. JA1985

Notice of Appeal (Jan. 16, 2026) Dkt. 1472.................................................. JA1987

Notice of Cross-Appeal (Feb. 3, 2026) Dkt. 1484.......................................... JA1989

Notice of Cross-Appeal (Feb. 3, 2026) Dkt. 1485.......................................... JA1997

Technical Committee's Status Report (Feb. 6, 2026) Dkt. 1492 ................... JA2002

Excerpts from Plaintiffs' First Status Report on Defendant's Compliance
with the Final Judgment (May 4, 2026) Dkt. 1512......................................... JA2033

Order Denying Without Prejudice Defendant's Motion for a Partial Stay
Pending Appeal (May 7, 2026) Dkt. 1514..................................................... JA2036

Order Granting Plaintiffs' Unopposed Joint Motion for Additional Time to
Submit Template License Agreements for Search Syndication and
Search Text Ads Syndication (June 26, 2026) Dkt. 1529............................... JA2044

Excerpts from Cue 30(b)(6) Deposition (Material Under Seal)..................... JA2046

Excerpts from Designated Deposition Testimony of Phiroze Parakh
(Material Under Seal)...................................................................................... JA2056

Excerpts from DX0081 (Material Under Seal).............................................. JA2059

Excerpts from DX0543 (Material Under Seal).............................................. JA2060

Excerpts from DX0924 (Material Under Seal) .......... JA2064

DX0946 (Material Under Seal) .......... JA2077

Excerpts from DX0962 (Material Under Seal) .......... JA2097

Excerpts from DX1027 (Material Under Seal) .......... JA2115

DXD06 .......... JA2134

Excerpts from DXD29 (Material Under Seal) .......... JA2135

Excerpts from DXD37 (Material Under Seal) .......... JA2138

JX1 (Material Under Seal) .......... JA2143

JX24 (Material Under Seal) .......... JA2153

JX33 (Material Under Seal) .......... JA2157

Excerpts from JX71 (Material Under Seal) .......... JA2177

PXR176 (Material Under Seal) .......... JA2185

PXR181 (Material Under Seal) .......... JA2194

Excerpts from PXR571 (Material Under Seal) .......... JA2195

PXR606 (Material Under Seal) .......... JA2199

PXR607 (Material Under Seal) .......... JA2201

Excerpts from PXR608 (Material Under Seal) .......... JA2203

PXR609 (Material Under Seal) .......... JA2214

Excerpts from RDX338 (Material Under Seal) .......... JA2216

Excerpts from RDX340 (Material Under Seal) .......... JA2217

Excerpts from RDX355 (Material Under Seal) .......... JA2221

Excerpts from RDX365 (Material Under Seal) .......... JA2223

Excerpts from RDX366 (Material Under Seal) .......... JA2225

Excerpts from RDX367 (Material Under Seal) .......... JA2227

RDX368 (Material Under Seal) .......... JA2228

Excerpts from RDX432 (Material Under Seal) .......... JA2236

Excerpts from RDX435 (Material Under Seal) .......... JA2247

Excerpts from RDXD025 .......... JA2250

Excerpts from RDXD33 (Material Under Seal) .......... JA2252

UPX0002 (Material Under Seal) .......... JA2254

UPX0123 (Material Under Seal) .......... JA2261

UPX0134 (Material Under Seal) .......... JA2284

UPX0260 (Material Under Seal) .......... JA2294

Excerpts from UPX0334 .......... JA2298

UPX0339 (Material Under Seal) .......... JA2306

UPX0340 (Material Under Seal) .......... JA2308

Excerpts from UPX0344 (Material Under Seal) .......... JA2311

UPX0605 .......... JA2315

UPX0856 (Material Under Seal) .......... JA2325

UPX2051 (Material Under Seal) .......... JA2326

UPX6033 (Material Under Seal) .......... JA2379

UPXD104 (Material Under Seal) .......... JA2384

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| United States of America, *et al.*, Plaintiffs, v. Google LLC, Defendant. | Case No. 1:20-cv-03010-APM<br>HON. AMIT P. MEHTA<br>[redacted] |

| | |
|---|---|
| State of Colorado, *et al.*, Plaintiffs, v. Google LLC, Defendant. | Case No. 1:20-cv-03715-APM<br>HON. AMIT P. MEHTA<br>[redacted] |

**DEFENDANT GOOGLE LLC'S BRIEF IN SUPPORT OF ENTRY OF ITS PROPOSED FINAL JUDGMENT**

**TABLE OF CONTENTS**


I. PLAINTIFFS' PROPOSALS REGARDING "GENAI PRODUCTS" ARE VASTLY OVERBROAD. ....2

II. PLAINTIFFS' PROPOSED REWRITE OF THE GOOGLE PROPOSED PROHIBITORY INJUNCTION IS CONTRARY TO THE LAW, THE FACTS, AND THE COURT'S OPINION ....7

A. The Court Should Reject Plaintiffs' Attempt to Overhaul Google's Proposed Injunction. ....7

1. Plaintiffs' PFJ extends to devices and agreements that were not the subject of any claims or findings.... 7

2. Plaintiffs' PFJ encompasses hypothetical conduct that was not the subject of any claims or findings.... 9

3. Plaintiffs' expansion of the "forward-looking" remedies is contrary to precedent and the Court's opinion. .... 10

4. Plaintiffs' proposed limits on the duration of agreements are unreasonable and impermissibly regulate third parties..... 13

5. Plaintiffs' generalized prohibition on "exclusive" contracts is unenforceable. .... 14

B. Google's PFJ Implements the Court's Modifications to the Prohibitory Injunction. ....15

1. Google's PFJ requires annual terminability for OEM and carrier agreements. .... 16

2. Google's PFJ expressly authorizes promotion of Third-Party GenAI Products.... 16

3. Google's PFJ expands the definition of "Gemini Assistant Application."18

III. GOOGLE'S PROPOSED LANGUAGE FOR THE DATA DISCLOSURE AND SYNDICATION PROVISIONS TRACKS THE COURT'S OPINION, WHEREAS PLAINTIFFS' LANGUAGE WOULD STRETCH THE REMEDY BEYOND THE OPINION'S BOUNDS....19

A. Plaintiffs' Definitions Would Expand "Qualified Competitor" Eligibility Far Beyond That Ever Previously Pursued by Plaintiffs. ....19

B. Restrictions Are Necessary to Ensure the Datasets and Syndicated Results and Ads Are Used Only for the Court's Intended Objectives. ....20

1. Permitting Qualified Competitors to sell or share Google's index data and user-side data would undermine the remedy's purpose and violate user privacy and security. .... 20

2. Permitting Qualified Competitors to use syndicated search results and ads for other purposes would likewise undermine the remedy's purpose....... 21

C. Plaintiffs' Rewritten User-Side Data Sharing Proposal Improperly Gives Plaintiffs Unilateral Decision-Making Control over the Privacy and Security Safeguards to Be Applied. ....22

D. The Court Should Reject Syndication Provisions that Would Require a Departure from Google's Ordinary Commercial Terms. ....25

E. The Court Should Enter Google's Proposed Language for the Remaining Disputed Data-Sharing, Syndication, and Auction Provisions. ....29

IV. PLAINTIFFS' TECHNICAL COMMITTEE AND COMPLIANCE PROPOSALS SHOULD BE REJECTED. ....30

A. Plaintiffs' PFJ Impermissibly Delegates Substantive Powers to the TC and Plaintiffs to Define Affirmative Remedy Obligations. ....30

B. Plaintiffs Seek to Expand the TC's Role Beyond the Court's Opinion. ....32

C. Plaintiffs' Proposed "Senior Business Executive" Provision Is Unworkable. ....34

D. Plaintiffs' Document Retention Provisions Are Unnecessary and Overbroad. ....34

E. Plaintiffs' Proposal for Unlimited Compliance Reports, Interrogatories, Interviews, and Document Requests Is Unreasonable. ....35

V. PLAINTIFFS' PROPOSED ENFORCEMENT PROVISIONS ARE CONTRARY TO PRECEDENT. ....36

VI. CONCLUSION ....39

## ABBREVIATIONS

| CITATION | CORRESPONDING FILING OR TRANSCRIPT |
|---|---|
| Google's PFJ | Google's Proposed Final Judgment Dated September 17, 2025. |
| Pls.' PFJ | Plaintiffs' Final Proposed Final Judgment Dated September 17, 2025. |
| Rem. Op. | Memorandum Opinion Regarding Remedies Dated September 2, 2025 (ECF 1435). |
| Tr. | Transcript of the Evidentiary Hearing on Remedies Conducted from April 21 to May 9, 2025 and May 30, 2025. |
| Google's Orig. PFJ | Google's Proposed Final Judgment Dated December 20, 2024 (ECF 1108-1). |
| Pls.' Orig. RPFJ | Plaintiffs' Revised Proposed Final Judgment Dated March 7, 2025 (ECF 1184-1). |
| Pls.' RPFOF | Plaintiffs' Remedies Responsive Proposed Findings of Fact Dated May 23, 2025 (ECF 1364). |
| Google's PFOF | Google's Proposed Findings of Fact Dated May 16, 2025 (ECF 1346). |

Google respectfully requests that the Court enter the attached Proposed Final Judgment (PFJ), which implements the findings and conclusions in the Court's September 2, 2025 opinion, and reject the alternative proposal filed today by Plaintiffs.

First, Google has adopted definitions relating to generative artificial intelligence that conform to the Court's remedies opinion. Plaintiffs' proposal, by contrast, would encompass Google products that have nothing to do with the relevant markets and are unrelated to the evidentiary record and contrary to the Court's findings. Their approach squarely contradicts *Microsoft*'s holdings regarding "forward-looking" remedies.

Second, Google made the specific modifications to the prohibitory injunction (Section III of its PFJ) that the Court directed. Plaintiffs disregarded the Court's conclusions and rewrote the proposed injunction, and their changes find no support in the law or the Court's findings.

Third, Google's PFJ implements the Court's determinations regarding compelled data disclosures and syndication. Plaintiffs' proposals run afoul of the Court's opinion, even on matters as fundamental as whether a Qualified Competitor may sell the data received from Google. And they have backtracked on their own prior representations, including with respect to the Court's ultimate authority to determine crucial issues surrounding user privacy.

Fourth, Google's provisions addressing the Technical Committee and final judgment compliance track the Court's description of the Technical Committee's role and its rejection of several remedies proposed by Plaintiffs. The PFJ submitted by Plaintiffs fails to account for these determinations and is fundamentally unworkable in several respects.

Fifth, Google proposes straightforward enforcement provisions that are consistent with the remedies opinion and precedent. Plaintiffs' additional proposals find no support in the record and reflect misstatements of law.

## I. PLAINTIFFS' PROPOSALS REGARDING "GENAI PRODUCTS" ARE VASTLY OVERBROAD.

Unlike Google's PFJ, which is tethered to the products and issues addressed during the litigation and in the Court's remedies opinion, Plaintiffs' PFJ seeks to regulate countless Google products and services that are unconnected to the liability determination, the evidentiary record from both the liability and remedies trials, and the Court's remedies findings. Plaintiffs seek to accomplish this improper objective primarily through their definition of "GenAI Product," which they define to mean "***any*** application, software, service, feature, tool, functionality, or product ***that involves or makes use of Generative AI capabilities or models***." Pls.' PFJ § IX.J (emphasis added). This definition is far too broad and would reach across Google products having nothing to do with general search services or general search text advertising (or even GenAI products like Google Gemini).

GenAI capabilities and models are "widely used across many industries," from "health care and life sciences" to "travel and hospitality." Tr. 4055:17-4056:17 (Hitt). Google has incorporated GenAI into every product of significance that it offers. Tr. 3329:13-16 (Collins). For instance, GenAI facilitates video and audio generation in YouTube, helps Google Photos users find old pictures, drafts emails in Gmail, and summarizes documents in Google Drive. *Id.* 3321:12-3322:25, 3328:8-3329:12. And these examples barely scratch the surface, as GenAI has played a role in everything from self-driving cars to predicting protein structures. *E.g.*, Tr. 2449:18-2450:13 (Pichai).

Plaintiffs' proposed definition of "GenAI Product" would encompass these technologies and many more "that involve[] or make[] use of Generative AI capabilities or models" in some respect. Pls.' PFJ § IX.J. Because terms incorporating the definition of "GenAI Product" appear throughout Plaintiffs' proposed prohibitory injunction, Plaintiffs' proposal would regulate

Google's distribution of all manner of applications and services unrelated to this case, including but not limited to Google Photos, Messenger, Gmail, Google Drive (Google's cloud storage service), and Google Workspace (Google's suite of office productivity applications like Google Docs, Google Sheets, and Google Slides). *Id.* §§ III.D, G-O.[1] The term also affects the provisions requiring data disclosures and syndication because "GenAI Product" is part of the definition of "Competitor," which in turn appears in "Qualified Competitor." *Id.* §§ IX.E, W; *see id.* §§ IV.A, IV.B, V.A, VI.B. As the Court directed, a "Competitor" includes "any provider of, or potential entrant in the provision of, … a GenAI Product." *Id.* § III.E. But under Plaintiffs' overbroad definition of "GenAI Product," a "Competitor" purportedly could include countless enterprise software companies, e-commerce sites, and social media platforms. All of this is contrary to the facts and the law that informed the Court's liability and remedies opinions.

*First*, the myriad "GenAI Products" that Plaintiffs seek to regulate formed no part of the Court's liability determination, which was limited to the relevant markets for general search services and general search text advertising. "Ordinarily," a court may "conclude rather swiftly that products which fall outside of the relevant market ***are inappropriate for discussion and consideration*** by the Court in conjunction with the crafting of a remedy for illegal monopoly maintenance." *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 104 (D.D.C. 2002) (emphasis added). Nearly all of the "GenAI Products" encompassed by Plaintiffs' definition did not come up at trial because there is no credible argument (then or now) that they are even related to the

[1] The term "GenAI Product" appears in several other defined terms in Plaintiffs' PFJ, including "Google GenAI Product," "Third-Party GenAI Product," and "Google Assistant Application." Pls.' PFJ §§ IX.M, N, FF. These terms are part of Plaintiffs' proposed prohibitory injunction in Section III.

relevant markets or Plaintiffs' theory of liability. The liability opinion thus offers no basis for regulating development or distribution of these applications and services.

*Second*, Plaintiffs did not present any evidence at the remedies hearing that could support regulating "GenAI Products" as they have defined the term. Indeed, most of the products encompassed by that term were ***not even deemed relevant for discovery purposes*** during the remedies phase. For example, Plaintiffs argued that even in the context of their overbroad requests for production, they were "focused on discovery" regarding "generative AI as it relates to Search, Search access points and Search features." Oct. 24, 2024 Hr'g Tr. 13:7-10; *see id.* 14:25-15:1 ("If it doesn't relate to Search, we're not interested in that."). After limiting discovery in this way, Plaintiffs unsurprisingly did not present evidence at the hearing regarding competition among messaging apps, email services, or the plethora of other products that may "involve[] or make[] use of Generative AI capabilities or models." Pls.' PFJ § IX.J. In *Microsoft*, the court rejected the plaintiffs' argument that the remedy should extend to products outside the relevant market—such as web services and handheld devices—***even though*** the plaintiffs offered a "wide array of testimony" to support inclusion of those products in the remedy. *New York*, 224 F. Supp. 2d at 134. It is inconceivable, then, that the judgment could regulate all "GenAI Products" despite Plaintiffs having offered ***no evidence*** regarding the vast majority of products encompassed by the term. *See id.* at 136.

*Third*, the Court made no findings that could support Plaintiffs' definition of "GenAI Products" and the related terms in their PFJ. Although the remedies opinion addresses certain specific applications of GenAI, there are no findings applicable to photo apps, email, videoconferencing tools, or countless other products that may be ensnared by Plaintiffs' proposal. To the limited extent that the opinion alluded to some of these products, it made clear

that they should ***not*** be subject to the final judgment. For instance, the Court observed that "[s]urely, Plaintiffs do not intend for the compliance officer's duties to reach such Alphabet subsidiaries like YouTube, Nest, or Waymo." Rem. Op. at 222. By the same token, the final judgment's prohibitions surely cannot encompass the products offered by YouTube, Nest, and Waymo, even if they "involve[] or make[] use of Generative AI capabilities or models." Pls.' PFJ § IX.J. Yet that is precisely what Plaintiffs seek.

In contrast to Plaintiffs' overbroad proposal, Google's PFJ conforms to the remedies opinion by providing that a product may fall within an applicable definition pertaining to GenAI if, among other things, it "has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information." Google's PFJ §§ IX.L, Y, Z. These definitions implement the Court's conclusion that ***certain kinds of products*** that include GenAI capabilities or models "perform an information-retrieval function that is similar to GSEs" and pose "a potential threat … in the market for general search services." Rem. Op. at 99-100; *see id.* at 22-26 (describing "AI Chatbots" that "perform an information-retrieval function like that performed by GSEs" and "AI Assistants" with "voice- assistant capabilities built into … chatbots"). Consistent with the Court's opinion, Google's proposed definitions encompass "GenAI chatbots, like ChatGPT, Perplexity, and Claude," which the Court found are used by "tens of millions of people … to gather information that they previously sought through internet search." Rem. Op. at 1; *see id.* at 103. And Google's proposals do not include Photos, Gmail, Drive, or the myriad other Google and third-party services that incorporate GenAI functionality but have not been shown to "perform an information-retrieval function that is similar to GSEs," let alone the "potential to become a viable platform substitute for" GSEs. Rem. Op. at 99, 103.

*Fourth*, *Microsoft* precludes Plaintiffs' broader definition of "GenAI Product." In addressing GenAI, this Court relied upon the *Microsoft* court's decision to extend a remedy to aspects of "server/network computing," which posed a "platform threat" to "Microsoft's dominance" in the monopolized market that was "both real and similar" to the platform "threats posed by Navigator and the Java technologies." *New York*, 224 F. Supp. 2d at 128; *see* Rem. Op. at 101-02. Despite affording certain protections to "server/network computing," however, the *Microsoft* court ***rejected*** the plaintiffs' proposal to extend the decree to all "middleware" because "the vast majority of the software technologies identified in Plaintiffs' definitions" of "middleware" were not shown to "have the potential to evolve into platforms … akin or equivalent to … Navigator and Java." *New York*, 224 F. Supp. 2d at 136. Plaintiffs' definition of "GenAI Product" and related terms should be rejected for the same reason: While the Court found that a particular subset of products pose "a potential threat … in the market for general search services" because they "perform an information-retrieval function that is similar to GSEs," Rem. Op. at 99-100, there are no such findings for the vast majority of applications of GenAI potentially encompassed by Plaintiffs' definitions.

As with the remedy directed to server/network computing in *Microsoft*, this Court's rulings regarding GenAI are the "most forward-looking" elements of its decision, and the Court's "discretion [wa]s necessarily less broad." *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1222-24 (D.C. Cir. 2004). Even where the facts and law establish the "appropriateness of a forward-looking remedy, the Court treats every expansion of protection with great caution and makes every attempt to craft a remedy which is no more expansive than necessary." *New York*, 224 F. Supp. 2d at 135; *see Massachusetts*, 373 F.3d at 1224-26. The Court should reject Plaintiffs' attempt to regulate disparate "GenAI Products" that were not even the subject of

remedies findings, let alone liability determinations, and it should instead adopt Google's proposed definitions and corresponding provisions.

## II. PLAINTIFFS' PROPOSED REWRITE OF THE GOOGLE PROPOSED PROHIBITORY INJUNCTION IS CONTRARY TO THE LAW, THE FACTS, AND THE COURT'S OPINION.

The Court "accept[ed], with its modifications, Google's proposed remedies in full." Rem. Op. at 222. But Plaintiffs have ignored the Court's ruling, adding provisions that were never litigated, reintroducing concepts that were rejected, and seeking to inject ambiguity through terms that Plaintiffs cannot explain.

### A. The Court Should Reject Plaintiffs' Attempt to Overhaul Google's Proposed Injunction.

#### 1. Plaintiffs' PFJ extends to devices and agreements that were not the subject of any claims or findings.

Plaintiffs propose a flawed definition of the term "device," which impermissibly expands many of the provisions in Google's proposed final judgment that the Court accepted. *See* Pls.' PFJ § IX.H. Google's PFJ provisions pertaining to Third-Party Browsers have always applied to all applicable form factors (*i.e.*, mobile phones, tablets, laptops, and desktops) because the agreements at issue in this case pertained to browsers available on all such surfaces, while the remaining provisions were expressly directed to agreements with "a mobile device manufacturer or wireless carrier" involving "mobile phones and tablets," as that addressed the at issue Android distribution agreements. *See* Google's Orig. PFJ § III. This approach tracked Plaintiffs' theory of liability and the Court's findings.

Plaintiffs' proposal, by contrast, reaches distribution involving devices never at issue in this litigation. For example, Plaintiffs' proposed decree covers devices running Google's ChromeOS operating system even though Plaintiffs never challenged agreements with companies that manufacture Chromebooks, let alone established that those agreements harm

competition. To paraphrase part of the Court's rationale for rejecting the "self-preferencing" remedy, the Court "made no finding in the liability phase" that agreements pertaining to Chromebooks were "unlawful" even though Plaintiffs could have challenged those agreements because they were "hiding in plain sight." Rem. Op. at 216-17.

If Plaintiffs had challenged agreements pertaining to Google's licensing and distribution of Chromebooks and the Google apps that are included therein, Google would have presented extensive evidence of how the design and distribution of ChromeOS differs from the agreements at issue in this case. For example, the PFJ's restrictions on distributing the Chrome browser cannot reasonably be applied to Chromebooks because "the Chrome browser ***is*** the UI [user interface] for … a ChromeOS device or Chromebook." Tr. 3892:17-20 (Samat) (emphasis added). "In other words, without Chrome, you don't have the user interface, and … you can't even see the [w]indows on your screen" on a Chromebook. Tr. 2611:6-10 (Nieh). In fact, Google employees conducted a years-long project where they "tried to take apart ChromeOS and Chrome and separate them," but they "failed" and "gave up," which is "further evidence that ChromeOS today is deeply integrated with Chrome." *Id.* 2611:11-23. "[R]emedies must be of the 'same type or class' as the violations," *United States v. Microsoft Corp.*, 56 F.3d 1448, 1460 (D.C. Cir. 1995), and an overhaul of the design and licensing of ChromeOS does not meet that standard given that Plaintiffs challenged altogether different agreements in this case. Finally, Chromebooks generate only a small fraction of U.S. general search queries, but they are important to schools and students who depend on low-cost devices, and there is no evidence that expanding the prohibitory injunction would benefit these groups or any other consumers. *See, e.g.*, DXD-37.033 (Murphy); Tr. 2555:15-22 (Nieh).

Plaintiffs' revisions to the PFJ would also extend the provisions currently limited to "mobile phones and tablets" to other types of laptops and desktops, including those that run on the Microsoft Windows operating system. In an effort to compromise this disputed aspect of the competing proposed final judgments, Google offered to extend the applicable prohibitions to laptops and desktops if Plaintiffs would agree to carve out devices that run on ChromeOS and any successor to ChromeOS. Plaintiffs rejected this proposal. Nevertheless, Google has revised its PFJ to conform to its compromise proposal. Among other things, Google has replaced the phrase "mobile phones and tablets" in its PFJ with the defined term "Covered Device," which "means a smartphone, tablet, laptop, or desktop, excluding any device on which the ChromeOS operating system or a successor to the ChromeOS operating system is installed." Google's PFJ § IX.F.

### 2. Plaintiffs' PFJ encompasses hypothetical conduct that was not the subject of any claims or findings.

Plaintiffs also seek to rewrite numerous provisions of Google's PFJ in contravention of the Court's opinion by replacing the straightforward prohibitions on "agreements" with vague prohibitions on "conditions." These changes should be rejected for several reasons.

First, only Google's language corresponds to Plaintiffs' claims and the Court's liability determination. As indicated above, Plaintiffs did not base their theory of liability at issue here on anything other than certain agreements. *See United States v. Google LLC*, 747 F. Supp. 3d 1, 88, 146-52 (D.D.C. 2024); Rem. Op. at 9-10.

Second, the remedies proceedings do not support Plaintiffs' reformulation. Plaintiffs did not establish, and the Court did not find, that Google engaged in any "conditioning" that did not involve an agreement. The findings of fact from the remedies phase, like those from the liability phase, describe ***contracts*** between Google and several sophisticated companies. This is not a

coincidence, as the only conduct at issue involves a commonplace value exchange (such as licensing software or promoting a service) that is the subject of an agreement as a matter of ordinary commercial practice.

Third, Plaintiffs' original RPFJ included a prohibition on "conditional access" that the Court did not adopt or instruct the parties to reconcile with Google's PFJ. Pls.' Orig. RPFJ § IV.D. And for good reason, as Plaintiffs' rehashed proposal presents the same vagueness issues as the "anti-circumvention" proposals that the Court expressly rejected. *E.g.*, Rem. Op. at 208-09. For example, Plaintiffs have not explained whether the act of "condition[ing]" purportedly could reach even a trivial statement by a single Google employee that does not result in an actual agreement. Plaintiffs' proposal creates the kind of needless ambiguity that suppresses rather than enhances competition and has no place in a judicial decree.

### 3. Plaintiffs' expansion of the "forward-looking" remedies is contrary to precedent and the Court's opinion.

Plaintiffs' proposal disregards the evidence and the Court's opinion by removing distinctions between the restrictions applicable to the Google Search Application (GSA) and Chrome, on the one hand, and the "forward-looking" restrictions applicable to products outside the relevant markets (such as the Google Gemini app), on the other hand. These distinctions—which have been part of Google's PFJ since it filed the document—were described by Google in its briefs and arguments and were summarized in the Court's opinion. *See* Rem. Op. at 104-05 (describing provisions applicable to Search and Chrome); *id.* at 106 (describing separate provisions applicable to the Gemini app and Assistant). The Court accepted these provisions, subject to specific modifications, and Plaintiffs' attempt to alter them conflicts with the law and the Court's findings.

For example, the first two sections of Google's prohibitory injunction bar "any agreement with a manufacturer that conditions the licensing of Google Play or any other Google software application on that manufacturer also distributing, preloading, placing, displaying, using, or licensing the Google Search Application" or "the Chrome Browser Application" on "Covered Devices sold in the United States." Google's PFJ §§ III.A, B. These provisions not only eliminate the aspects of MADAs deemed exclusive by the Court, but also enjoin other conduct "of the 'same type or class' as the violations." *Microsoft*, 56 F.3d at 1460. In particular, Sections III.A and B extend to the licensing of "Google Play ***or any other Google software application***," Google's PFJ §§ III.A, B (emphasis added), including numerous applications that are not the subject of any findings by the Court and were never shown to be "a must-have" on Android devices or otherwise deemed analogous to Google Play. *See, e.g.*, *Google*, 747 F. Supp. 3d at 150.

Sections III.C and D of Google's PFJ are narrower prohibitions that do not include the bolded phrase because they are "forward-looking" provisions that regulate the licensing of the Google Assistant Application, the Gemini app, and any future Google GenAI Assistant Application. *See, e.g.*, Rem. Op. at 106. Unlike GSA and Chrome, these services were not part of Plaintiffs' theory of liability or the Court's liability determination. *See, e.g.*, *Google*, 747 F. Supp. 3d at 34, 150-52. The Court's remedies findings confirm that applying the broader restrictions applicable to GSA and Chrome (in Sections III.A and B) to this emerging area would only hinder vigorous competition. For instance, "ChatGPT has proven to be an immensely popular and fast-growing product, with over 100 million daily active users as of the end of 2024." Rem Op. at 39. "OpenAI calculated its share of the U.S. market as of December 2024 to be approximately 85%," with Google's "Gemini at 7%." *Id.* at 42. Under these circumstances,

the Court should not revisit its adoption of Google's PFJ by imposing a six-year prohibition on Google licensing the Gemini app together with "any other Google application," as Plaintiffs propose. Pls.' PFJ § III.D; *see Massachusetts*, 373 F.3d at 1224 (holding that when "adopting a forward-looking provision," the Court's "discretion is necessarily less broad because … it is in danger of imposing restrictions that prevent the defendant from forging new routes to serve consumers").

The same considerations apply to the provisions governing RSAs, where Plaintiffs likewise seek to erase a distinction with respect to access-point-by-access-point licensing that was present in Google's PFJ since December 2024 and both recognized by and not modified by the Court. As the Court observed in paraphrasing recent RSA amendments that conform to Google's PFJ, the salient features of agreements pertaining to GSA and Chrome include "revenue share payments on an access-point-by-access-point and device-by-device basis" and "no restrictions on promoting alternative search services." Rem. Op. at 55-56 (summarizing December 2024 AT&T amendment); *see also id.* at 50 (summarizing April 2025 Samsung RSA); Google's PFJ §§ III.E-I. Under Section III.J of Google's original and current PFJ, agreements pertaining to the Google Assistant and Gemini differ in that they need not be access-point-by-access-point with respect to Assistant or Gemini. The Court's summary of the Gemini Commercial Agreement with Samsung recognizes this distinction in describing the multiple Gemini access points configured pursuant to the agreement. Rem. Op. at 51 (stating that "a new Samsung device must be preinstalled with the Gemini app placed in the App Tray" and "Samsung must set the long-press side key and the 'hot word' to invoke the Gemini app by default"); *see id.* at 53 (explaining that the agreement "does not limit Samsung's ability to work with GenAI services other than Gemini" and "other device entry points remain available to other

GenAI services, including additional side-key buttons, hot words, or placement in the hot seat or on the default home screen"). This agreement complies in all respects with Google's PFJ because, among other things, it is non-exclusive, annually terminable, includes device-by-device optionality, and includes no requirements regarding GSA or Chrome. *See, e.g.*, Rem. Op. at 53, 106; Tr. 254:3-256:4 (Fitzgerald); Google's PFJ §§ III.G, J, K.

Plaintiffs seek to modify the PFJ by porting the access-point-by-access-point requirement applicable to GSA and Chrome to the "forward-looking" provision pertaining to Assistant and the Gemini app. *See* Pls.' PFJ § III.J. Such heavy-handed regulation is unwarranted in a remedy that extends outside the relevant markets and beyond the liability findings. That is all the more apparent here, given the evidence in the remedies trial record that dispels any notion that Google has market power in GenAI products, as well as the Court's findings that "[t]he GenAI space is highly competitive" and "[r]ival GenAI products have had some success in obtaining distribution with OEMs and other companies" even though only a few years ago those GenAI firms were largely unknown or did not even exist. Rem. Op. at 40, 42.

**4. Plaintiffs' proposed limits on the duration of agreements are unreasonable and impermissibly regulate third parties.**

Plaintiffs also rewrote the provisions in Section III of Google's PFJ applicable to Browsers Developers, even where the Court accepted them without modification. Google's PFJ requires that applicable agreements must, among other things, "permit[] the Browser Developer on an annual basis to set a different Default Search Engine in the United States." Google's PFJ § III.L. The Court did not modify this aspect of the PFJ. *See, e.g.*, Rem. Op. at 110 (explaining that "as drafted" Google's PFJ requires applicable agreements to "allow the Browser Developer to annually set a different GSE"). Plaintiffs' proposal, however, provides that an applicable agreement must "terminate[] no more than one year after the date it is entered." Pls.' PFJ § III.L.

The Court should reject Plaintiffs' attempt to prohibit multi-year agreements that the third party can elect to terminate annually, both with respect to Browser Developers in Section III.L and the duration of licenses of applicable Google apps to manufacturers and wireless carriers in Section III.K.

Plaintiffs presented no evidence that an agreement providing annual termination options consistent with Google's PFJ is somehow different from a one-year agreement with no options. Any such evidence would have been unpersuasive because allowing a Browser Developer to enter a multi-year deal with annual options only ***increases*** the number of contracting options available to the Browser Developer (the same Browser Developers could also insist upon one-year agreements if they preferred). Courts have referred interchangeably and without distinction to agreements with annual terminability and one-year agreements. *See, e.g.*, *Google*, 747 F. Supp. 3d at 157 (indicating that "[e]xclusive-dealing contracts terminable in less than a year are presumptively lawful under section 3" (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1984)).[2]

**5. Plaintiffs' generalized prohibition on "exclusive" contracts is unenforceable.**

Plaintiffs propose a new provision that would prohibit "any exclusive contract relating to the distribution of" various products, including "any Google GenAI Product." Pls.' PFJ § III.N. Section III of Google's PFJ already eliminates the terms deemed exclusive by the Court—a point

[2] Plaintiffs' revisions also introduce a new requirement for separate agreements for different Operating System Versions and Privacy Modes. Pls.' PFJ § III.L. For example, under Plaintiffs' proposal, Apple could decide to set Google Search as the default in Safari across all devices, but it would need to enter several separate agreements to accomplish this (*i.e.*, one for iOS, one for iPad OS, and one for mac OS). Plaintiffs' proposal increases administrative burdens for no substantive gains, because the same optionality could be provided in a single agreement rather than several separate instruments.

that Google explained in its Proposed Conclusions of Law and other filings and that Plaintiffs had ample opportunity to address. As the Court stated in adopting Google's PFJ in full, "[s]tripping away the exclusivity of those contracts is a good start to unwind those advantages, so the court will accept those terms." Rem. Op. at 110; *see id.* at 222.

Plaintiffs, however, cannot supplement the descriptions of prohibited conduct in Google's PFJ with a generalized ban on "exclusive" contracts because the law "requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). Plaintiffs have not explained to Google what other type of contract would be deemed "exclusive" if it complies with all provisions of Google's PFJ, and they cannot be allowed to make that determination on an *ad hoc* basis for the duration of the judgment. *See, e.g.*, *id.* at 476 & n.2. Insofar as Plaintiffs envision imposing an obligation to comply with an undefined body of case law concerning exclusive contracting, their proposal is no different than "[b]road, non-specific language that merely enjoins a party to obey the law or comply with an agreement," which "does not give the restrained party fair notice" and therefore cannot be imposed. *Louis W. Epstein Family P'ship v. Kmart Corp.*, 13 F.3d 762, 771 (3d Cir. 1994). And if Plaintiffs view their new proposal as encompassing agreements that they might consider somehow "similar" to the prohibitions in Google's PFJ, then the provision is indistinguishable from the anti-circumvention proposals the Court already rejected. Rem. Op. at 208-09.

### B. Google's PFJ Implements the Court's Modifications to the Prohibitory Injunction.

After "accept[ing]" Google's proposed remedies, the Court "modifie[d] a few aspects of Google's prohibitory injunction." Rem. Op. at 110; *see id.* at 222-23. Google has incorporated each modification.

**1. Google's PFJ requires annual terminability for OEM and carrier agreements.**

First, the Court required a "one-year option as a condition of payments to OEMs and wireless carriers." Rem. Op. at 111. Google incorporated this change in a new provision, which is Section III.K of its revised PFJ. Google's proposal applies not only to GSA and Chrome, but also to the Google Assistant Application and any Google GenAI Assistant Application. And for avoidance of doubt, the provision makes clear that Google cannot charge a termination fee if a partner decides to terminate an agreement after a year.

Plaintiffs' version of Section III.K is flawed in almost every respect described above. For example, it includes Plaintiffs' overbroad definitions of "Google Assistant Application" and "Google GenAI Product"; it sweeps in Chromebooks and other devices beyond the scope of this case; and it limits applicable agreements to one year rather than requiring annual options to terminate.

**2. Google's PFJ expressly authorizes promotion of Third-Party GenAI Products.**

Second, the Court stated that the portion of Google's PFJ "provid[ing] that agreements with Browser Developers shall expressly permit them to 'promote any Third-Party General Search Service' … is underinclusive" because "it excludes GenAI products." Rem. Op. at 111. Google has implemented this change by specifying in Section III.L that an applicable agreement must, among other things, "expressly permit[] the Browser Developer to promote any Third-Party General Search Service or Third-Party GenAI Product in the United States." Google's PFJ § III.L. Google's definition of "Third-Party GenAI Product" encompasses "any application, software, service, feature, tool, functionality, or product not owned by Google or its affiliates that involves or makes use of generative AI capabilities or models and has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad

range of publicly available information." *Id.* § IX.Z.[3] This provision corresponds to the Court's conclusion that certain kinds of products incorporating GenAI should be subject to aspects of the final judgment even though they are outside the relevant markets. *See, e.g.*, Rem. Op. at 100 (concluding that "GenAI chatbots have not eliminated the need for GSEs," but "the capacity 'to fulfill a broad array of informational needs' constitutes a defining feature of both products"); *see also id.* at 22-26, 99-103.

The opinion further provides that "Google's RPFJ shall be modified to make clear that Google is prohibited from entering into an exclusive agreement with Apple to distribute any Google GenAI product either in any Safari mode or on any Apple mobile or desktop device." *Id.* at 111. Google has implemented this requirement in Section III.N of its PFJ, which provides that "Google shall not enter or maintain any agreement requiring Apple to distribute any Google GenAI Assistant Application in any Apple web browser or on any Apple mobile or desktop device in the United States unless the agreement expressly permits Apple to promote any Third-Party General Search Service or Third-Party GenAI Product in the United States."[4]

Plaintiffs' corresponding provision, which is in Section III.M of their PFJ, should be rejected for a host of reasons. To begin, it incorporates an overbroad definition of "GenAI Product." Furthermore, the other restrictions added by Plaintiffs that would apply to their overbroad category of "GenAI Products"—such as annual terminability and optionality based on Operating System Version and Privacy Mode—are not necessary here "to make clear that Google is prohibited from entering into an exclusive agreement." Rem. Op. at 111. This aspect of the decree is purely "forward-looking" in that it applies only to products outside the relevant

---

[3] Consistent with Plaintiffs' characterization of SVPs throughout this case, the definition "does not include specialized vertical search services." Google's PFJ § IX.Z.

[4] The next section addresses the definition of "Google GenAI Assistant Application."

markets. Under the present circumstances, Plaintiffs have not shown that the same restrictions applicable to Google Search are warranted in a "forward-looking remedy," where "the Court treats every expansion of protection with great caution and makes every attempt to craft a remedy which is no more expansive than necessary." *New York*, 224 F. Supp. 2d at 135.

**3. Google's PFJ expands the definition of "Gemini Assistant Application."**

The final modification to Google's prohibitory injunction involves "Google's definition of 'Gemini Assistant Application,'" which the Court found to be "too narrow" because it "does not contemplate the possibility that Google may launch a new GenAI product during the judgment period, whose distribution could raise exclusivity concerns." Rem. Op. at 111. Google has addressed this issue by replacing "Gemini Assistant Application" with the broader term "Google GenAI Assistant Application," which means:

> [T]he stand-alone user-facing mobile software application currently marketed by Google as the "Google Gemini" application (and that application's functionally equivalent successors) and any future user-facing software application owned by Google or its affiliates that makes use of generative AI capabilities or models and has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information, provided, however, that this term shall not include Google Search, the Google Search Application, the Chrome Browser Application, or the Google Assistant Application.

Google's PFJ § IX.L; *see* Google's Orig. PFJ § IX.E.

This new definition uses the language described in Part I above to encompass future apps not already addressed by the PFJ that "could raise exclusivity concerns," Rem. Op. at 111, because they "perform an information-retrieval function that is similar to GSEs" and are "a potential threat … in the market for general search services." *Id.* at 100-01. Plaintiffs do not propose an alternative definition of this term, but instead use the same overbroad definition of "Google GenAI Product" addressed in Part I above. In addition to all of its other flaws, Plaintiffs' definition is not directed in any sense to products "whose distribution could raise

exclusivity concerns." Rem. Op. at 111. Plaintiffs' proposal would prohibit, among many other things, an agreement that conditioned a license to Google Meet on a license to Google Drive because they both "involve[] or make[] use of Generative AI capabilities or models." *See* Pls.' PFJ §§ III.C, D; *id.* §§ IX.J, M, N. That is not an "exclusive" contract, and even if someone tried to characterize it as one, it could not possibly be an appropriate subject for the remedy imposed in this case.

## III. GOOGLE'S PROPOSED LANGUAGE FOR THE DATA DISCLOSURE AND SYNDICATION PROVISIONS TRACKS THE COURT'S OPINION, WHEREAS PLAINTIFFS' LANGUAGE WOULD STRETCH THE REMEDY BEYOND THE OPINION'S BOUNDS.

The parties have reached agreement on certain provisions of Sections IV, V, and VI of the Proposed Final Judgment. Important differences remain, however, and Google addresses the disputed provisions below.

### A. Plaintiffs' Definitions Would Expand "Qualified Competitor" Eligibility Far Beyond That Ever Previously Pursued by Plaintiffs.

Google's definitions of "Competitor" and "General Search Engine" exclude specialized vertical providers ("SVPs"), consistent with the Court's liability opinion. *See* Google's PFJ §§ IX.D, I. Google's "Competitor" definition also includes the more appropriately scoped term "Third-Party GenAI Product," *id.* § IX.D, as opposed to Plaintiffs' term "GenAI Product" that, as discussed above, encompasses a wide array of products that have nothing to do with the relevant markets at issue in this case. *See* Pls.' PFJ § IX.J.

Google's "Qualified Competitor" definition additionally requires that the Qualified Competitors remain in compliance with the applicable criteria, consistent with the purpose of the remedy.[5] *See* Google's PFJ § IX.T. Under Plaintiffs' proposal, a Qualified Competitor could

[5] Google's proposal also includes an express right by Google to report data security or other license violations by Qualified Competitors. Google's PFJ § IX.T. Finally, Google's proposal

make an initial showing of a plan to compete, become qualified, and immediately discontinue all investment while nonetheless receiving years of syndicated search results and ads and multiple user-side data disclosures. Pls.' PFJ § IX.W. Such a result cannot be squared with the purpose of the remedy, *i.e.*, to enable competitors to invest and build their own search engine.

### B. Restrictions Are Necessary to Ensure the Datasets and Syndicated Results and Ads Are Used Only for the Court's Intended Objectives.

#### 1. Permitting Qualified Competitors to sell or share Google's index data and user-side data would undermine the remedy's purpose and violate user privacy and security.

The Court should adopt Google's permitted use provision (Google's PFJ § IV.C.4) to ensure Google's search index and user-side data are only used as intended per the Court's opinion. The proposed license would require that Qualified Competitors agree not to share or sell the datasets, and to use the datasets for the exclusive purpose of serving users located in the United States through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product. Consistent with the Court's opinion, these terms are intended to require Qualified Competitors to use the disclosed data solely to compete in the appropriate markets rather than turn a quick profit in a manner that violates user privacy (including Google's own terms of service).

Without a provision like that proposed by Google, nothing would bar a Qualified Competitor from selling disclosed index and user data to other unknown third parties (or otherwise sharing the data). There is no dispute that these datasets are tremendously valuable and are the product of years of Google hard work and ingenuity. The search index remedy furnishes Qualified Competitors with a proprietary dataset to "quickly build a competitive search

makes clear that the determination as to whether an entity meets the criteria to be a Qualified Competitor is to be made by the Court, not Plaintiffs. *Id.*

index." Rem. Op. at 144. And the user-side datasets will include queries and other user-interaction data, as well as Google's search results. *Id.* at 153-54. Beyond allowing Qualified Competitors to profit from reselling the data, Plaintiffs' proposal vitiates the protective measures intended to secure the disclosed data, including "reasonable data security standards applicable to Qualified Competitors," "data security and privacy audits," and a sufficient showing that recipients "[do] not pose a risk to the national security of the United States." *Id.* at 103, 211. The proposal would also vitiate the limits on who qualifies as a "Qualified Competitor." For instance, under Plaintiffs' proposal, a company that fails to make a sufficient showing "of a plan to invest and compete in or with the GSE and/or Search Text Ads markets," Pls.' PFJ § IX.W, would still be able to acquire the same data by purchasing it from any company that did qualify. Similarly, a company that does not meet the definition of a "Competitor," *id.* § IX.E, and therefore is ineligible to become a "Qualified Competitor," could bypass the process altogether by purchasing the data from any company that did qualify.

**2. Permitting Qualified Competitors to use syndicated search results and ads for other purposes would likewise undermine the remedy's purpose.**

In addition to Google's ordinary course use and display restrictions (*see* Google's PFJ §§ V.B.8 & VI.B.8), Google's PFJ §§ V.B.7 and VI.B.7 implement the Court's direction that the syndication remedy be only a short-term "bridge" for the Qualified Competitor. Rem. Op. at 170-71, 183. Specifically, the sole purpose of the syndication remedy is to enable a Qualified Competitor to display syndicated search results or ads to the end user who submitted the query to the Qualified Competitor, through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product—the Qualified Competitor cannot use syndicated results or ads for any other purpose. *See* Rem. Op. at 178 ("[T]he purpose of this remedy is to provide a short-term

measure for Qualified Competitors to compete as they improve their own search capabilities, not an additional means to facilitate that development.").

For those same reasons, Google's PFJ § V.B.11 (search) and § VI.B.12 (search text ads) further clarify that only queries from human end users are eligible for syndication; Google is under no obligation to serve results in response to machine-generated queries or queries from a syndicator of the Qualified Competitor (*i.e.*, a sub-syndicator). Plaintiffs' rejection of a bar on sub-syndication to other third parties will result in entities that do not meet the requirements of a Qualified Competitor nonetheless getting access to Google data simply by entering into sub-syndication agreements with Qualified Competitors. Allowing Qualified Competitors to sub-syndicate Google's results and ads is entirely divorced from the Court's reasoning that new general search engine entrants should receive syndication from Google for the purpose of improving, and monetizing, ***their own*** SERPs. Rem. Op. at 183; *see also* Tr. 4805:4-6 (Severt) ("[T]hat's our view that the syndication remedy should not be available to people who just want to syndicate."). And because sub-syndication prevents Google from having a direct relationship with the sites that show Google's syndicated content, Google would be unable to monitor compliance and enforce its policies—putting Google's intellectual property at risk and causing harm to Google's advertisers.

### C. Plaintiffs' Rewritten User-Side Data Sharing Proposal Improperly Gives Plaintiffs Unilateral Decision-Making Control over the Privacy and Security Safeguards to Be Applied.

The Court should adopt Google's proposed language regarding the administration of the user-side data sharing provisions. Google's PFJ §§ IV.C.1, VII.A.7. It implements the Court's directive that Google's datasets are to be "anonymiz[ed] and secur[ed]," "while attempting to optimize their usefulness." Rem. Op. at 164; *see* Google's PFJ § IV.C.1. Consistent with the Court's opinion, Google's PFJ further provides that "[t]he TC will have the power to advise

Plaintiffs and the Court about appropriate User-side Data security and privacy safeguards," Google's PFJ § VII.A.7.e, while clarifying that "neither the TC nor Plaintiffs will have the right to make final decisions as to the requirements of this Final Judgment," *id.* § VII.A.7.a. Plaintiffs' proposal, on the other hand, reserves for Plaintiffs the determination of the privacy and security safeguards to be applied. Their proposal is both an improper delegation of authority to Plaintiffs and inconsistent with the representations of DOJ counsel at closing arguments—"in each case, the ultimate authority would rest with the Court, and Google, of course, would be able to object, if we weren't able to reach resolution." Tr. 4772:19-24.

The evidence from the remedies trial made clear that the privacy standard in Plaintiffs' March 7, 2025 RPFJ—which focused exclusively on protecting Personally Identifiable Information (Pls.' Orig. RPFJ § VI.D)—was insufficient to protect user privacy. As the Court found, "[b]oth sides presented privacy experts who agreed that the disclosure of User-side Data without applying adequate anonymization and privacy-enhancing techniques would reveal sensitive user information." Rem. Op. at 163. The Court further found that "anonymizing and securing" the datasets, "while attempting to optimize their usefulness," "no doubt will be challenging." *Id.* at 164. The Court made clear that it would review the recommendations of the Technical Committee in addressing any disputes over Google's proposed data-sharing disclosure process. *Id.*

Plaintiffs' new PFJ fails to recognize the Court's directives regarding the protection of user privacy and the Court's role in that process, instead reserving for themselves the determination of the "privacy and security" safeguards to be applied. Specifically, Plaintiffs' new provision provides: "Plaintiffs, in consultation with the TC, shall promptly determine the appropriate User-side Data privacy and security safeguards to be applied before Google shares

the data specified in Section IV.B with Qualified Competitors." Pls.' PFJ § IV.C.1. Plaintiffs' PFJ cannot be reconciled with the Court's conclusion that it is appropriate for the Court (and the Plaintiffs) to "rely on the Technical Committee to '***facilitate the resolution*** of potentially complex and technologically nuanced disputes between [Google] and others over the practical workings of' the final judgment." Rem. Op. at 164 (emphasis added) (quoting *Massachusetts*, 373 F.3d at 1244).

Google's proposed language, on the other hand, straightforwardly implements the Court's opinion. Google retains the original framework of Plaintiffs' user-side data sharing administration provision and updates the first sentence to reference Google applying "anonymization and privacy-enhancing techniques to ensure the data is anonymized and secured, while attempting to optimize its usefulness," consistent with the Court's opinion. *See* Google's PFJ § IV.C.1. Google maintains the original second sentence (Google's PFJ § IV.C.2) and additionally maintains the third sentence (Google's PFJ § IV.C.3) regarding timing with a correction to resolve what could be read to be circular: "Google will have up to six (6) months from the date that security and privacy safeguards are finally determined to implement the technology and provide any notice necessary to comply with this Section IV.C.2." *Id.* § IV.C.3. Google's Technical Committee provisions further elaborate on the Technical Committee's (and Plaintiffs') power and the Court's ultimate authority. As explained further below, "the TC will have the power to advise Plaintiffs and the Court about appropriate User-side Data security and privacy safeguards," *id.* § VII.A.7.e, and "neither the TC nor Plaintiffs will have the right to make final decisions as to the requirements of this Final Judgment," *id.* § VII.A.7.a.

### D. The Court Should Reject Syndication Provisions that Would Require a Departure from Google's Ordinary Commercial Terms.

Google's PFJ provides for syndication pricing "at market rates consistent with ordinary commercial terms agreed to by other users of Google's search syndication products with respect to queries originating in the United States." Google's PFJ §§ V.B.3, VI.B.2. And with respect to non-pricing terms, Google's PFJ provides for ordinary commercial terms. *Id.* §§ V.B.2, V.B.8, V.B.9, V.B.10, VI.B.1, VI.B.4, VI.B.8, VI.B.9, VI.B.11.

Plaintiffs' PFJ, on the other hand, requires Google to make both search and search text ads syndication licenses available to Qualified Competitors on pricing terms "no worse than those offered to any other user of Google's . . . syndication products." Pls.' PFJ §§ V.A, VI.B.2. For non-pricing terms, Plaintiffs' search syndication provisions require the license be offered "on terms no less favorable than the most favorable terms Google provides" to any other syndication user "as of the date of entry of this Final Judgment." *Id.* §§ V.A, V.B.3, V.B.6, V.B.7, V.B.8, V.B.9. For search ads syndication, Plaintiffs require Google to provide licensing terms made available to "any other user of Google's Search Text Ads syndication products." *Id.* §§ VI.B.1, VI.B.3, VI.B.6, VI.B.12.

Plaintiffs' language could be read to suggest that these requirements would be implemented on a ***term-by-term basis***, without regard to the broader deal terms contained in any given agreement, thereby allowing Qualified Competitors to demand a license with an amalgam of terms cherry-picked from existing contracts across Google's global partners.[6] The result would be compelled syndication on terms that do not align with ***any*** commercial Google

[6] Counsel for Google inquired of counsel for Plaintiffs in a meet-and-confer session whether Plaintiffs intended the language to require the combination of terms from wholly separate agreements with different parties, and counsel for Plaintiffs declined to take a position. Counsel further declined to provide their interpretation of their own PFJ provisions on these issues.

syndication deal, let alone "ordinary commercial terms." Rem. Op. at 173. This outcome is contrary to the Court's opinion in a number of respects.

*First*, permitting pricing terms to be cherry-picked across different global deals would result in pricing that runs headfirst into the same problems that the Court identified with respect to Plaintiffs' "marginal cost" pricing proposal. Rem. Op. at 174-75. For instance, Google offers [redacted] Those ads syndication deals provide that [redacted] To the extent Plaintiffs' proposal requires Google to offer [redacted], the resulting terms would differ dramatically from the standard commercial terms that syndication partners receives. In short, mandating pricing terms unmoored from the remaining terms of broader agreements in which they operate would "interfere with" and "reduce, if not eliminate, competition in the market for syndicated search results." Rem. Op. at 175.

*Second*, and relatedly, Google's search and search text ads syndication pricing terms cannot be considered in isolation from a deal's other terms. To name two examples (there are many more across Google's contracts): [redacted]. That term is part of the overall deal bargain and substantially impacts Google's monetization expectation. [redacted]

[redacted]; Google's PFJ § V.B.5. But then the pricing terms must take that into account, that is, Google should not be required to offer the same revenue share as it would for a deal with different rights and obligations. As a second example, [redacted] Accordingly, Google should not be required to offer [redacted]. In sum, considering pricing terms in isolation from all other terms of a search or search ads syndication deal would be an extraordinary departure from ordinary commercial terms and practices.

Google's proposal makes clear that Google may charge "market rates consistent with ordinary commercial terms agreed to by other users of Google's search syndication products with respect to queries originating in the United States." Google's PFJ § V.B.3. This provision tethers pricing to Google's ordinary commercial terms. With respect to search results syndication, Google's proposal would promote continued competitive conditions in the U.S. "market for syndicated search results" that the Court identified in its opinion. Rem. Op. at 175. And with respect to search text ads syndication, Google's proposal would address the Court's directive to "prevent Google from charging an inflated price to Qualified Competitors," *id.* at 185, while avoiding the unintended consequences that would result were Qualified Competitors permitted to pick and choose individual terms across different deals. As set forth above, [redacted]

[redacted]

*Third*, Google should not be compelled to offer each term of its existing agreements with partners to Qualified Competitors. Pls.' PFJ §§ V.A, V.B.2, V.B.3, V.B.6, V.B.7, V.B.8, V.B.9, VI.B.1, VI.B.3, VI.B.6, VI.B.12. To do so would require exactly the customization that the Court indicated would not be required. Rem. Op. at 180. For example, one of Google's current U.S. partners has a bespoke technical implementation [redacted]. Were Google compelled to build those implementations for Qualified Competitors at their request, [redacted]. This would likely entail months of coordinated effort. [redacted]. Therefore, Google's proposed language in Sections V.B.9 and VI.B.11, requiring that Google apply its ordinary commercial terms, is a more sensible provision. As another example (as above, there are many more), certain partners receive [redacted]. Requiring Google to revert to those historical implementations under Plaintiffs' PFJ Section VI.B.6 would run afoul of ordinary commercial terms.

Google's proposed language solves for each of these problems by specifying the categories of terms that must be offered (in contrast with the "all term" provision of Plaintiffs'

PFJ, § V.B.3), and tethering Google's obligations to ordinary commercial terms, consistent with the Court's instruction that "Qualified Competitors generally will have to follow ordinary commercial terms and therefore will not need to be customized." Rem. Op. at 180.

*Finally*, with respect to which search features are syndicated, implementing Plaintiffs' proposal as written presents technical feasibility issues. Rem. Op. at 173 n.24 ("If there are technical feasibility issues with syndicating only crawled web results, Google shall so advise the Court."). Specifically, extending syndication features currently provided only to Yahoo Japan would require Google to launch serving changes, perform quality assurance for the additional features, and train Google's customer service and tech support teams. Syndicating the Knowledge Panels provided to Yahoo Japan would be particularly technically challenging: the existing implementation cannot be simply mirrored for other partners and would instead require Google to rebuild the underlying data sources to scope out third-party licensed data and other non-crawled data. Additionally, Plaintiffs' proposal would require significant updates to Google's legacy code paths, as well as the untested expansion of highly bespoke, negotiated offerings at unprecedented scale. Google's proposed language solves this problem by requiring Google to syndicate those features that it "provides under current standard search syndication agreements." Google's PFJ § V.A.1-3.

### E. The Court Should Enter Google's Proposed Language for the Remaining Disputed Data-Sharing, Syndication, and Auction Provisions.

For each remaining disputed provision in Sections IV, V, and VI of the parties' PFJs (and the relevant definitions from Section IX), Google attaches an appendix with the parties' respective provisions and a short explanation of why the Court should adopt Google's language.

## IV. PLAINTIFFS' TECHNICAL COMMITTEE AND COMPLIANCE PROPOSALS SHOULD BE REJECTED.

Plaintiffs' revised Technical Committee (TC) and compliance provisions fail to follow the Court's remedies opinion and otherwise add several unworkable requirements. The Court should therefore adopt Google's provisions as they pertain to the TC and compliance in the final judgment in this action.

### A. Plaintiffs' PFJ Impermissibly Delegates Substantive Powers to the TC and Plaintiffs to Define Affirmative Remedy Obligations.

Prior to the remedies trial, Plaintiffs submitted a PFJ that included numerous provisions that would have improperly vested Plaintiffs and the TC with authority to determine affirmative substantive requirements of the final judgment, without court involvement, violating Google's Due Process rights and Article III. Google objected to these provisions in its pre-trial and post-trial briefing. *E.g.*, ECF 1215 at 14-15, ECF 1347 at 72-74. During closing arguments, Plaintiffs assured the Court that they intended that all substantive authority to determine the requirements of the final judgment would remain with the Court:

> [T]he technical committee will help make recommendations, assess, it will help narrow, ripen, and resolve issues before they ever get to the Court. ***But in each case, the ultimate authority would rest with the Court, and Google, of course, would be able to object, if we weren't able to reach resolution.***

Tr. 4772:19-24 (Severt) (emphasis added). The Court's remedies opinion acknowledged Google's concerns, but stated that they were "largely mooted by the court's narrowing of some proposed remedies and its rejection of others." Rem. Op. at 211. The Court further explained that the TC would have only "process responsibilities" and would not substitute for the authority of the Court. *Id.* at 211-12.

Given Plaintiffs' concessions and the Court's opinion, Google's PFJ ensures that Google has the opportunity to be heard on, and that the Court would remain the ultimate decision-maker

for, any substantive disputes on which the parties and the TC cannot reach resolution. Plaintiffs' proposal, by contrast, takes decision-making authority away from the Court. For example, under Plaintiffs' proposal:

- Plaintiffs, in consultation with the TC, unilaterally "determine the appropriate User-side Data privacy and security safeguards to be applied before Google shares the data specified in Section IV.B with Qualified Competitors." Pls.' PFJ § IV.C.1. Plaintiffs' proposal provides no right for Google to object that such safeguards are not sufficient or are otherwise objectionable, and no role for the Court to review the privacy safeguards if the parties disagree. Indeed, under Plaintiffs' proposal, Plaintiffs could reject the recommendation of the TC and make their own determination on privacy with no oversight by the Court.

- Plaintiffs, in consultation with the TC, determine reasonable data security standards applicable to Qualified Competitors. *Id.* § VII.A.7.b. Plaintiffs' proposal provides no right for Google to object to such standards and no role for the Court to review the standards if the parties disagree.

- Plaintiffs, in consultation with the TC, unilaterally decide who is a "Qualified Competitor," including "who makes a sufficient showing to the Plaintiffs, in consultation with the Technical Committee, of a plan to invest and compete in or with the GSE and/or Search Text Ads markets." *Id.* § IX.W. Plaintiffs' proposal provides no right for Google to object to such determination and no role for the Court to review who is a "Qualified Competitor" if the parties disagree.

- Plaintiffs unilaterally can decide that their TC appointee need not meet several of the criteria otherwise required for appointment to the TC. Under Plaintiffs' proposal, Plaintiffs could appoint an individual recently employed by a competitor or even a "consulting or testifying expert" retained by Plaintiffs in this case. *See id.* § VII.A.2 ("unless Plaintiffs specifically consent, no TC member….").

- Plaintiffs unilaterally can remove any TC member (even Google's appointee) that they determine, in their sole judgment, "has failed to act diligently and consistently with the purposes of this Final Judgment." *Id.* § VII.A.5. Under Plaintiffs' proposal, Google has no right to object and the Court has no review of such removal.

- Plaintiffs' proposal grants the TC the power to require Google to provide access to documents, systems, its buildings and its source code and algorithms, to submit reports to the TC, and to conduct employee interviews with no stated limitations. *Id.* § VII.A.7.c, d. Under Plaintiffs' proposal, the Court (and even Plaintiffs) appear to have no role whatsoever in policing such requests, and Google does not appear to have any ability to challenge such requests as unreasonable, unnecessary, or not relevant or proportional to the needs of the TC's duties.

These are just some of the powers reserved to the TC and/or Plaintiffs. For the reasons discussed in Google's post-trial briefing, these proposals would violate Google's Due Process rights and Article III. *E.g.*, ECF 1215 at 14-15, ECF 1347 at 72-74. Google's proposal, on the other hand, includes various provisions that make clear that neither the TC nor Plaintiffs have the right to make final decisions as to the substantive requirements of the final judgment, and that Google will have the right to object to and be heard by the Court on any recommendation from the TC or Plaintiffs as to the interpretations or substantive requirements of the final judgment. Google's PFJ §§ VII.A.2, VII.A.5, VII.A.6.a, VII.A.7.a, VII.A.7.j, VII.A.7.l, VII.A.7.m. Google respectfully requests that the Court enter these provisions.

### B. Plaintiffs Seek to Expand the TC's Role Beyond the Court's Opinion.

In Plaintiffs' March 7, 2025 RPFJ, they proposed giving the TC wide-ranging authority, including providing the TC broad oversight authority over Google's business to address complaints related to Google's compliance with each aspect of the final judgment and with Plaintiffs' proposed (but rejected) anti-circumvention and anti-retaliation provisions. While the Court's opinion adopted a TC, it significantly narrowed the responsibilities from what Plaintiffs requested:

> [The TC] will (1) advise Plaintiffs about potential Qualified Competitors, *id.* § III.U; (2) recommend reasonable data security standards applicable to Qualified Competitors, *id.* § X.A.7.b; (3) advise about an appropriate cap on User-side Data disclosure, *id.* § VI.C; (4) consult with Plaintiffs about appropriate User-side Data security and privacy safeguards, *id.* § VI.D; (5) help formulate a tapering rate for search syndication, *id.* § VII.C.2; (6) audit Qualified Competitors' use of search syndication services, *id.* § VII.C.3; and (7) receive disclosures from Google about Search Text Ads auction changes, *id.* § VIII.D.

Rem. Op. at 211-12. The Court stated that the TC's "proper role" was limited to providing "technical competence." *Id.* at 212.

Google's proposal explicitly enumerates the TC's responsibilities as stated in the Court's ruling. *See* Google's PFJ § VII.A.7. By contrast, Plaintiffs' proposal seeks to grant the TC broad oversight and investigation responsibilities over the entire final judgment. In particular, Plaintiffs seek to include in the TC's powers the ability to receive complaints regarding Google's compliance with ***all aspects*** of the final judgment, including provisions where it otherwise has no role, and for which it has no "technical competence." *See* Pls.' PFJ §§ VII.A.7.e-h, VII.C. For instance, under Plaintiffs' proposal, technical experts chosen based on their expertise in the roles that the Court enumerated (such as data security and privacy) would be charged with investigating and making a recommendation regarding complaints about whether Google's contracts violate the provisions of Section III. Such a role is unnecessary and does not align with the Court's ruling. And it would be particularly improper to grant the TC broad oversight and investigative authority as an end-run around the Court's rejection of the Plaintiffs' anticircumvention and anti-retaliation proposals.[7]

Google's compliance proposal properly places the responsibility for reviewing and investigating complaints with the appointed Compliance Officer. And it grants the TC the ability to make "reasonable and proportional requests" for documents, employee interviews, and other information "necessary to perform its duties."[8] The Court should adopt Google's proposal.

---

[7] Tellingly, despite the Court's anticircumvention ruling, Plaintiffs' PFJ requires the TC to notify the Plaintiffs "when the TC has reason to believe . . . that Google is attempting to circumvent any provision of this Final Judgment or the intended purposes of this Final Judgment." Pls.' PFJ § VII.A.7.g. During the meet and confer, Google raised this language with Plaintiffs, but Plaintiffs have refused to remove it.

[8] Unlike Google's proposal, Plaintiffs in no way limit the scope of the TC's power to seek documents and other information, and provide no ability for Google to challenge unreasonable requests. For instance, Plaintiffs seek a provision to grant the TC "access to . . . any physical facility, building or other premises" and "access to any system or equipment" without limitation. Pls.' PFJ § VII.A.7.c. During meet and confers, Google asked Plaintiffs why such proposals were necessary, and Plaintiffs explained it may be necessary to perform testing regarding

**C. Plaintiffs' Proposed "Senior Business Executive" Provision Is Unworkable.**

Plaintiffs seek a provision appointing "a senior business executive, who has visibility into any Google entity with obligations under this Final Judgment, whom Google shall make available to update the Court on Google's compliance at regular status conferences or as otherwise ordered." Pls.' PFJ § VII.B.5. This provision is overbroad and unworkable. Plaintiffs' proposal appears to be based on a much narrower provision in *Microsoft*. In an amendment to the Microsoft final judgment, the parties agreed that Microsoft would maintain an "executive with direct responsibility for managing the project to rewrite the technical documentation for the Microsoft Communications Protocol Program . . . and shall make [the executive] available to update the Court on the project at Status Conferences or as otherwise ordered." Second Modified Final Judgment, *United States v. Microsoft Corp.*, No. 98-1232, ECF No. 889 (D.D.C. Mar. 22, 2009) at IV.E. This was a much narrower and more workable provision, focused on one aspect of the final judgment. Plaintiffs' provision, by contrast, seeks a senior business executive with an understanding of Google's compliance with the entire final judgment. The Court should reject this unnecessary and unworkable provision.

**D. Plaintiffs' Document Retention Provisions Are Unnecessary and Overbroad.**

Plaintiffs seek to have Google retain an attorney to "collect documents and interview employees and generally review Google's document retention practices and Google's

appropriate User-side Data security and privacy safeguards. Google therefore added a provision that limited the powers in this way. Plaintiffs also seek to grant the TC "access to Google's source code and algorithms," in part to address third-party complaints. *Id.* § VII.A.7.d. During the meet and confer on this provision, Plaintiffs were not able to identify any specific reason why such access would be necessary to the duties the Court delineated for the TC, but stated generally that the TC is tasked with various technical responsibilities that could implicate Google's algorithms.

compliance with its legal discovery obligations under this case and final judgment." Pls.' PFJ § VII.B.6. This provision is unnecessary and overbroad for several reasons.

*First*, Plaintiffs' proposal appears to be another bite at seeking sanctions related to Google's discovery practices in this case. But the Court's liability opinion declined to impose sanctions on Google. Simply put, there is no connection whatsoever between this proposed remedy and the conduct at issue in this case or any valid remedial objective, and no other justification for a remedy related to Google's discovery practices.

*Second*, Google's proposal already requires that Google's Compliance Officer "ensur[e] employees retain all relevant documents and electronically stored information . . . regarding all complaints received . . . and action taken by Google with respect to any such complaint." Google's PFJ § VII.C.4.j. Plaintiffs' proposal similarly places this duty on the Compliance Officer. Pls.' PFJ § VII.B.4.j. There is therefore no need to add an additional person with overlapping responsibilities.

*Third*, Plaintiffs' proposal is vague and overbroad. For one, it is unclear whether Plaintiffs' proposal is limited to document retention practices related to this case or seeks something broader. *See id.* § VII.B.6 (attorney would "generally review Google's document retention practices"). Plaintiffs would also require the Compliance Officer and the retained attorney to ensure Google retains all documents "related to this Final Judgment." *Id.* § VII.B.4.j. That is so vague and overbroad as to be unworkable. The Court should enter Google's provisions, which reasonably limit the scope of document retention to a workable set.

### E. Plaintiffs' Proposal for Unlimited Compliance Reports, Interrogatories, Interviews, and Document Requests Is Unreasonable.

Under Google's proposal, Google would be required to provide an annual compliance report describing its compliance with the final judgment. Plaintiffs would also be able to request

one interim written report per year, and would be able to seek documents and employee interviews sufficient to verify the matters in Google's compliance reports. Google's PFJ § VII.B.2-3. Plaintiffs' proposal goes much further. It would require Google to respond to an unlimited number of requests by Plaintiffs for written reports, interrogatories, employee interviews, and document requests "relating to any matters contained in this Final Judgment." Pls.' PFJ § VII.D.2-3. Such a requirement is overbroad and unnecessary, especially given the Court's rejection of Plaintiffs' anticircumvention provisions and given that the TC will already have the ability to seek documents and interviews for matters within its purview. The Court should enter Google's proposal, which places reasonable limits on the compliance reporting Google must submit.

## V. PLAINTIFFS' PROPOSED ENFORCEMENT PROVISIONS ARE CONTRARY TO PRECEDENT.

Both PFJs propose preserving this Court's jurisdiction to issue further orders as may be necessary or appropriate to carry out or construe the final judgment, to modify or terminate its provisions, and to enforce compliance. Google's PFJ § XI; *see* Pls.' PFJ § XI. The relevant section of Plaintiffs' PFJ, however, would also alter substantive and procedural law in ways that are both unjustified and contrary to precedent.

First, Plaintiffs propose that in a motion to modify the final judgment, they "need not show any change in circumstances, but need only demonstrate that modification is necessary to achieve the intended purposes of this Final Judgment to restore competition in the monopolized markets." Pls.' PFJ § XI.A. The apparent purpose of this provision is to absolve Plaintiffs of the need to comply with Federal Rule of Civil Procedure 60(b)(5), which limits when a court may alter a final judgment. Supreme Court precedent dictates that relief under Rule 60(b)(5) requires the movant to "establish[] that changed circumstances warrant relief." *Horne v. Flores*, 557 U.S.

433, 447 (2009); *see Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992). The Court should reject Plaintiffs' request to rewrite Rule 60(b)(5) because "federal courts have no more discretion to disregard the mandate of a Federal Rule than they do to disregard constitutional or statutory provisions." *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 506 (D.C. Cir. 2016) (cleaned up); *see BLOM Bank SAL v. Honickman*, 145 S. Ct. 1612, 1621 (2025) ("It is Rule 60(b)'s standard—and *only* Rule 60(b)'s standard—that applies when a party seeks relief from final judgment.").[9]

Furthermore, there is also no sound basis for the final judgment to recite various forms of relief Plaintiffs purportedly might pursue, such as "an order to divest [a] Google business" or "a ban on default payments." Pls.' PFJ § XI.A. The Court addressed and rejected those proposed remedies in its opinion, and it should not incorporate language contemplating a second bite at the apple. To the extent the Court indicated that it may revisit those decisions (or an "unconditional" revenue share remedy), there is no ground for departing from Rule 60(b)(5).

Plaintiffs also propose that "[i]n any action to enforce this Final Judgment, Google must show by a preponderance of the evidence that its actions are in compliance with this Final Judgment." Pls.' PFJ § XI.A. The question of who bears the burden of proof and persuasion

---

[9] Google acknowledges that dicta in a D.C. Circuit case suggests that the *Rufo* standard described above—which requires the movant to show "changed circumstances"—does not apply to "request[s] of the party who sought the equitable relief." *United States v. W. Elec. Co.*, 46 F.3d 1198, 1202 (D.C. Cir. 1995). If that is the basis for Plaintiffs' proposal, it is untenable. In the years since *Western Electric*, ample authority confirms that the *Rufo* standard applies to requests by the party that sought equitable relief. *See, e.g.*, *Am. Council of Blind v. Mnuchin*, 977 F.3d 1, 7 (D.C. Cir. 2020) (applying *Horne*); *Pigford v. Veneman*, 292 F.3d 918, 925 (D.C. Cir. 2002) (applying *Rufo* to a request made by the beneficiary of equitable relief). At a minimum, the Court should not resolve this "thorny issue" in the abstract by incorporating a flawed legal principle into a final judgment when it can instead decide the appropriate standard in the future if Plaintiffs request a modification. *New York v. Microsoft Corp.*, 531 F. Supp. 2d 141, 169 (D.D.C. 2008) (describing cases where the D.C. Circuit and "courts in other circuits have … applied *Rufo* to cases in which the beneficiary of a consent decree sought to" modify the decree).

should depend on the issue that arises, not the provision of a final judgment. Plaintiffs' proposal would violate precedent and statutory law by shifting the burden of proof on at least some issues from Plaintiffs to Google. For example, one mechanism to enforce a judgement is a motion for civil contempt. *See* Fed. R. Civ. P. 70(e). But the burden of proof in such a proceeding rests with the party seeking relief, not the party accused of contempt. *See, e.g.*, *U.S. Bank N.A. v. Poblete*, 2017 WL 4736712, at *2 (D.D.C. Oct. 19, 2017). Plaintiffs have neither provided a justification for reallocating the burden of proof to Google nor established that the Court even has the power to enter such an order. *See Winston & Strawn*, 843 F.3d at 506 (holding that a district court may not shift the burden of proof on a summary judgment motion, even where a nonmovant fails to file an opposition).

Similar problems afflict Plaintiffs' proposal that the final judgment "be interpreted to give full effect to the procompetitive purposes of the U.S. antitrust laws and to restore the competition the Court found was harmed by Google's illegal conduct." Pls.' PFJ § XI.C. Plaintiffs have not offered any authority for the proposition that their preferred interpretive principle can or should displace any substantive or procedural law. The provision is also too vague to be enforced. If this principle can be used to interpret the injunction to mean something other than what it actually says, then the judgment does not "describe in reasonable detail … the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C).

Plaintiffs next propose that for four years after expiration of the final judgment, they may bring an "action" against Google for additional relief "if any Plaintiff has evidence that Google violated this Final Judgment before it expired." Pls.' PFJ § XI.D. Again, Plaintiffs have cited no authority authorizing such a provision, which deviates from the background principle that "creating a cause of action is a legislative endeavor," *Egbert v. Boule*, 596 U.S. 482, 491 (2022),

not a judicial one. Moreover, Plaintiffs' proposal lacks foundation, as there is no reason to think that Google will violate the final judgment and therefore no need for a process and remedy directed to such an unfounded hypothetical.

Finally, Plaintiffs seek an order providing for the recovery of attorneys' fees and expert fees "[i]n connection with a successful effort by any Plaintiff to enforce this Final Judgment against Google." Pls.' PFJ § XI.E. The Court should also reject this proposal. "[T]he prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser," and "[f]ederal courts may depart from this rule only when there is express statutory authorization to do so." *Lackey v. Stinnie*, 145 S. Ct. 659, 666 (2025) (cleaned up). Plaintiffs have not provided a statutory authority for one-way fee shifting in this context, and in all events there is no sound basis for including such a provision in the final judgment here.

## VI. CONCLUSION

The Court should adopt Google's PFJ instead of Plaintiffs' PFJ.

Dated: September 17, 2025

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: */s/ John E. Schmidtlein*
John E. Schmidtlein (D.C. Bar No. 441261)
Benjamin M. Greenblum (D.C. Bar No. 979786)
Colette T. Connor (D.C. Bar No. 991533)
680 Maine Avenue, SW
Washington, DC 20024
Tel: 202-434-5000
jschmidtlein@wc.com
bgreenblum@wc.com
cconnor@wc.com

WILSON SONSINI GOODRICH & ROSATI P.C.
Michael Sommer (admitted *pro hac vice)*
Franklin M. Rubinstein (D.C. Bar No. 476674)
1700 K Street, NW
Washington, DC 20006

Tel: 202-973-8800
msommer@wsgr.com
frubinstein@wsgr.com

ROPES & GRAY LLP
Mark S. Popofsky (D.C. Bar No. 454213)
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

Matthew McGinnis (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: 617-951-7703
Matthew.McGinnis@ropesgray.com

*Counsel for Defendant Google LLC*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, ET AL., )
)
Plaintiffs, )
) CV No. 20-3010
vs. ) Washington, D.C.
) October 8, 2025
GOOGLE LLC, ) 10:00 a.m.
)
Defendant. )
______________________________)

TRANSCRIPT OF HEARING ON FINAL JUDGMENT PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

that is, and perhaps I missed it in all of what I've read, but are you all contemplating any regular reporting back to me that does not involve disputes or this will -- I'm not necessarily inviting one, but if -- I didn't see anything in there, and I wanted to make sure I didn't miss it.

MR. GOWER: We wanted to bring only disputes to Your Honor and not occupy your time with anything else.

THE COURT: You know, I like to know what's going on.

All right. That's good to know.

And I just wanted to make sure I didn't miss that.

All right.

MR. DAHLQUIST: At the risk of overstaying my welcome, Your Honor, I have one provision that we didn't get to brief, we didn't know it was going to be an issue until Google's brief, and this is really XI.A. It's the retention of jurisdiction and the enforcement of the final judgment. This is one provision where we have more language than Google has proposed so it flipped it on that way.

I wanted to say two quick things.

One, we want to make sure that the Court, as it always does, has the ability to enforce its judgment but as well as modify its judgment.

And the language that we have added here is specifically from your footnote, really, at, I think,

footnote 114 -- or footnote 14, page 128, where you offer up, "We may need to revisit the payment ban element." We specifically put that into the order. We think it's important to be part of the order.

The second component of it is consistent with *United Shoe*; that the opportunity to revisit this order and to revisit it with Your Honor is if the order is not effective.

Google has argued in their briefing that we would have to be under some Rule 60 requirement of -- show some change circumstances. But, in fact, it's the opposite that is true. It's the -- and I think Your Honor alluded to this or stated directly, the lack of changed circumstances are what may bring us back to Your Honor. If it -- if competition has not improved, has not increased, that is what we'd like the opportunity to come back and revisit with Your Honor, and that is why we've added the additional language in XI.A .

Happy to answer any other questions.

THE COURT: Okay. Thank you.

MR. SCHMIDTLEIN: This is a very, very, very important issue. It has substantial legal consequences. This is not a little footnote for the last minute of the hearing.

If the Court is going to modify the judgment

sua sponte or otherwise, there are strict legal rules and procedures and standards that go with that.

And I'm not going to argue all of the back and forth. You saw some of the case law we cited in our brief on that. I think it would be an error for you to pre-judge that issue inside of this order.

THE COURT: Well, I mean, yes, I think that's -- well, let me say something else.

I recognize the issue. I don't think I need to pre-judge it in terms of what the proper standard is.

I mean, I've read what you both said about it. I think two things. One, it's seemingly clear that I do have the authority to revisit a judgment and amend it if necessary. The question then becomes, what is the standard to apply if a request is made.

MR. SCHMIDTLEIN: Correct.

THE COURT: I can almost assure you there won't be any sua sponte amending of the judgment, especially since you won't give me any reports. So you don't need to worry about that.

But, no, I recognize and it's not something I think we need to tackle right now.

MR. SCHMIDTLEIN: Thank you, Your Honor.

THE COURT: If the plaintiffs come back, we'll deal with that when that happens, if it happens. Okay.

MR. SCHMIDTLEIN: Thank you, Your Honor.

THE COURT: All right. Thank you.

We will, as we've said in the past, get to the business of finalizing all this and get something to you.

We'll obviously -- I think we'll probably need to write something that provides some explanation of why we're doing what we're doing, but we hope to get something back quickly.

And if there's some additional questions that we have in that process, we may call you back in or do something remotely for some discrete issues, okay?

Thank you, all, very much. We'll see you soon.

Don't wait for me, please.

COURTROOM DEPUTY: The Court now is in recess.

(Proceedings concluded at 12:42 p.m.)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**GOOGLE LLC,**<br><br>**Defendant.** | **Case No. 20-cv-3010 (APM)** |
| **STATE OF COLORADO et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**GOOGLE LLC,**<br><br>**Defendant.** | **Case No. 20-cv-3715 (APM)** |

**MEMORANDUM OPINION**

## I. INTRODUCTION

The age-old saying "the devil is in the details" may not have been devised with the drafting of an antitrust remedies judgment in mind, but it sure does fit.

On September 2, 2025, the court issued a Memorandum Opinion ("Remedies Opinion"), ECF No. 1435 [hereinafter Rem. Op.], following its determination that Defendant Google LLC had maintained monopolies in the general search services and general search text advertising markets through exclusive distribution agreements in violation of Section 2 of the Sherman Act. *See United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024). The Remedies Opinion

recounted the case's procedural history; made new findings of fact, particularly with respect to emerging generative AI ("GenAI") products; discussed the legal principles animating the court's decision; and determined the scope of remedies sufficient to "pry open" the markets closed by Google's antitrust violations. The court agreed that Google's proposed prohibitory injunctions were a start. Rem. Op. at 107. But it also held that, to be effective, the remedies should include some of Plaintiffs' proposed behavioral remedies, including disclosure of information about Google's search index, compelled sharing of certain user data, and forced syndication of search results and search text ads, as well as a Technical Committee to assist Plaintiffs with their enforcement efforts. The court rejected more severe proposals, such as the divestiture of Chrome, mandated choice screens, and a complete payment ban, among others. *Id.* at 3–6.

The court then directed the parties to meet and confer and present a joint proposed final judgment consistent with the Remedies Opinion's findings and conclusions. *See id.* at 222–23.

That is when the devil reared its head. As has been true during much of this five-year-long litigation, the parties continued to see eye-to-eye on little, even with the benefit of the Remedies Opinion. They submitted two competing final proposed final judgments reflecting their respective interpretations of the Remedies Opinion with accompanying briefs explaining their positions. *See* Pls.' Br. in Supp. of Pls.' Final Proposed Final J., ECF No. 1442 [hereinafter Pls.' Br.]; Pls.' Br., Pls.' Final Proposed Final J., ECF No. 1442-1 [hereinafter Pls.' FPFJ]; Def. Google LLC's Br. in Supp. of Entry of its Proposed Final J., ECF No. 1441 [hereinafter Google's Br.]; Google's Br., App. to Google's Br., ECF No. 1441-1 [hereinafter Google's App'x]; Google's Br., Def. Google LLC's Proposed Final J., ECF No. 1441-2 [hereinafter Google's FPFJ].

The parties convened before the court on October 8, 2025, for a hearing on those proposed final judgments ("October 8th hearing"). *See* Tr. of Hr'g on Final J. Proceedings, ECF No. 1447

[hereinafter Hr'g Tr.]. A week later, Plaintiffs filed a Notice of Substitute Provisions offering modified versions of certain provisions in their proposed prohibitory injunctions that purported to reflect an updated understanding of the court's Remedies Opinion. *See* Pls.' Notice of Substitute Provisions, ECF No. 1449 [hereinafter Pls.' Suppl.]. Google responded a few days later. *See* Def. Google LLC's Resp. to Pls.' Suppl., ECF No. 1451 [hereinafter Google's Suppl.].

Having now heard hundreds of hours of testimony, reviewed thousands of pages of exhibits and briefing, and considered all the relevant law and authorities across both the liability and remedies phases, the court at long last enters the Final Judgment against Google. While the Remedies Opinion broadly established the court's remedy-specific conclusions of law, the court now explains with more granularity the reasons for adopting, rejecting, or modifying the specific provisions of the parties' most recent proposed final judgments. *See United States v. Microsoft Corp.* (*Microsoft III*), 253 F.3d 34, 103 (D.C. Cir. 2001) (en banc) (holding that the district court must "provide an adequate explanation for the relief . . . ordered" and "explain[] how its remedies decree would accomplish [the] objectives" of antitrust remedies established by the Supreme Court); *cf. Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 (2004) ("No court should impose a duty to deal that it cannot explain or adequately and reasonably supervise." (citation omitted)).

Rather than regurgitate the whole of the Remedies Opinion or scrutinize every word of the parties' proposals, this opinion highlights the parties' major disagreements and explains how the court resolves them in the Final Judgment. For completeness, the court also includes an Appendix identifying the finer differences between the parties' proposals and the language the court ultimately adopts.

## II. GENERAL PRINCIPLES

The court starts with three preliminary points. *First*, in their briefs and at the October 8th hearing, the parties repeatedly offered as a basis for advancing their positions that, by deciding in the Remedies Opinion to impose or modify a certain remedy, the court had "adopted" text from the party's proposed final judgment, or that their proposed provisions "track" the Remedies Opinion while the other's depart. *See, e.g.*, Hr'g Tr. at 21:13-17; *id.* at 41:18–42:10; Pls.' Br. at 11–12, 28–29; Google's Br. at 10, 13, 15. Such arguments rest on an incorrect assumption. As emphasized at the hearing, to the extent the court "adopted" anything offered by a party, it was a proposed remedy as a general concept, not the text offered to define it. Hr'g Tr. at 21:18–22:3. "It is a federal court's judgment, not its opinion, that remedies an injury." *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023). The court exercises its remedial authority in this case through the Final Judgment; the Remedies Opinion and the one at hand merely explain the exercise of this authority. *See Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring); *cf. Trump v. CASA, Inc.*, 606 U.S. 831, 930 n.3 (2025) (Jackson, J., dissenting).

*Second*, the court reiterates the scope of its remedial authority. "The remedy in a Section 2 enforcement action 'must seek' to 'unfetter a market from anticompetitive conduct,' 'deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future.'" Rem. Op. at 58 & n.3 (quoting *Microsoft III*, 253 F.3d at 103). Supreme Court precedent "uphold[s] equity's authority to use drastic measures to achieve freedom from the influence of the unlawful restraint of trade," as long as such measures "reasonably tend[] to dissipate the restraint and prevent evasions." *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 726 (1944). But the "[m]ere existence of an exclusionary act

does not itself justify full feasible relief against the monopolist to create maximum competition." *Microsoft III*, 253 F.3d at 106 (citation omitted); *see also* Rem. Op. at 62–63.

Though these broad principles framed the court's task, the evidence (or lack of it) was the key to deciding whether to adopt or reject a proposed remedy. After all, "[t]here can be no remedy absent a factual basis to support it." Rem. Op. at 119. The court considered and rejected proposed remedies that could not be sufficiently justified by evidence. *See, e.g.*, *id.* at 119–28 (rejecting a payment ban because of anticipated harms to third parties); *id.* at 164–68 (declining to require Ads Data–sharing because Plaintiffs did not offer sufficient evidence as to how it would increase competition in the general search text ads market); *see also id.* at 128 n.14 (declining to consider a partial payment ban because of a lack of evidence). The court continues to be guided by the evidence in fashioning the specific terms of the Final Judgment.

*Finally*, "it is well settled that once the Government has successfully borne the considerable burden of establishing a violation of [antitrust] law, all doubts as to the remedy are to be resolved in its favor." *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 & n.18 (1961) (first citing *Bausch & Lomb*, 321 U.S. at 726; then citing *Loc. 167 of Int'l Bhd. of Teamsters v. United States*, 291 U.S. 293, 299 (1934)). Plaintiffs in this case have successfully borne this burden. *See Google*, 747 F. Supp. 3d at 32. Where any doubts remained after considering the evidence and the parties' positions, the court has deferred to Plaintiffs as to the appropriate remedial terms. *See also* Rem. Op. at 60 (citing 3 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 653f (5th ed. & Supp. 2025) [hereinafter AREEDA & HOVENKAMP] ("[A]ny plausible doubts should be resolved against the monopolist.")); *id.* at 66 n.4 (citing 3 AREEDA & HOVENKAMP ¶ 650a(2)(B) ("[I]t is always appropriate to deprive the defendant of the continuing

benefits of past misbehavior. In devising the 'tailored' remedies for this purpose, reasonable doubts will ordinarily be resolved against the defendant.")).

With this understanding, the court now turns to those terms. The court begins by addressing several definitions that are fundamental to the reach and effect of the Final Judgment. It then turns to the prohibitory injunctions and required data-sharing and syndication remedies. The court concludes by explaining how the Final Judgment will be enforced, in particular the Technical Committee's operations and the court's retention of jurisdiction. The provisions not addressed in this opinion can be found in the Appendix.

## III. DEFINITIONS

### A. GenAI-Related Terms

GenAI plays a significant role in these remedies. As a refresher, between the liability and remedies phases, GenAI burst on to the scene as a formidable nascent threat to general search engines (GSEs). Rem. Op. at 2; *see also id.* at 99 ("[T]here is ample evidence that GenAI chatbots grounded in general search perform an information-retrieval function that is similar to GSEs."). The remedies phase thus became "as much about promoting competition among GSEs as ensuring that Google's dominance in search does not carry over into the GenAI space." *Id.* at 2; *see also id.* at 106–07 ("GenAI products have emerged as a competitive threat to the traditional GSE, and Google cannot be permitted to leverage its dominance in general search to the GenAI product space.").

The court determined that GenAI products and companies should be included in the remedies insofar as GenAI products and GSEs share the capacity to "fulfill a broad array of informational needs." *Id.* at 99–101; *see also id.* at 45–46 ¶ 66. The court rejected Google's insistence that GenAI products should be excluded because they were outside the relevant markets

or untethered to Plaintiffs' theory of liability. *See id.* at 101. Expanding the scope of the remedies to include GenAI, the court held, was both within the court's authority and appropriate to ensure that Google's illegal conduct could not reverberate into that emerging market. *Id.* at 101–02 (citing *New York v. Microsoft Corp.* (*New York I*), 244 F. Supp. 2d 76, 128–29, 193 (D.D.C. 2002)).

Despite this, the parties maintain drastically different understandings of how a GenAI product should be defined for purposes of the Final Judgment. Plaintiffs would have "GenAI Product" mean "any application, software, service, feature, tool, functionality, or product that involves or makes use of Generative AI capabilities or models." Pls.' FPFJ § IX.J. Google offers no similar umbrella definition. Rather, in an effort to narrow the universe of GenAI products swept into the Final Judgment, it offers several different terms referring to discrete GenAI products or categories of products that have among their "principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information." *See* Google's FPFJ § IX.K, L, Y, Z.

The court adopts Plaintiffs' definition of "GenAI Product" with Google's specification that a GenAI Product, for purposes of this decree, have "among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information." *See* Final J., ECF No. 1462 [hereinafter FJ], § IX.J.

Google's discrete terms are too narrow. Taken together, they have the potential to exclude Google GenAI products beyond Google Gemini and Google Assistant or any product that is not strictly "a user-facing mobile software application . . . that makes use of generative AI capabilities or models." *See* Google's FPFJ § IX.K, L; *see also* Pls.' Br. at 28–29.

But Plaintiffs' proposed definition is exceedingly broad. The parties' shared definition of "GenAI" (as opposed to "GenAI Product") is "a type of artificial intelligence that creates new

content including but not limited to text, images, code, classifications, and other media using machine learning models." *See* Pls.' FPFJ § IX.I; Google's FPFJ § IX.H; *see also* Rem. Op. at 17 ¶ 2. Products that "involve[] or make[] use of [such] capabilities or models" encompass a near infinite swath of industries and products having nothing to do with GSEs or the illegal conduct at issue. *See* Google's Br. at 2–5.

GenAI products and companies were expressly included in the Final Judgment because of the growing integration of GenAI into search products. *See* Rem. Op. at 19 ¶ 6. But search and GenAI are not completely interchangeable. *See* Remedies Hr'g Tr., ECF Nos. 1393–1420 [hereinafter Rem. Tr.], at 21:2-5 (Opening Arg.) (Plaintiffs' counsel acknowledging that search and GenAI "are different but overlapping products" and that GenAI "is not a replacement for [s]earch today"); Rem. Op. at 43 ¶ 63. At least for now, GSEs and GenAI products have use cases not shared by the other. *See* Rem. Op. at 44 ¶ 65. Narrowing Plaintiffs' definition to products that have "among [their] principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information" better fits the purpose of including GenAI products within the remedial scheme.

Plaintiffs themselves acknowledge that the court "was clear that the final judgment shall extend to any GenAI Product with the 'capacity to fulfill a broad array of informational needs.'" Pls.' Br. at 28–29 (quoting Rem. Op. at 100). Yet in the same breath, they argue that "Google's attempt to restrict what GenAI Products are covered by the final judgment based on their form or 'principal function' . . . excludes relevant Google GenAI Products from the final judgment [and] ignores any possibility that nascent GenAI competitors may disrupt Google's market dominance through future innovations." *Id.* at 29. Although Plaintiffs stated later that it was "not [their] intention" to sweep in GenAI technologies such as those powering non-information-retrieval

functions in Google products like Photos, Gmail, or Drive, Hr'g Tr. at 114:5–115:9; *see* Google's Br. at 2–3, their proposal unequivocally does so.

For these reasons, the court has adopted the definition of "GenAI Product" described above.[1] *See* FJ § IX.J. The modification makes adopting Plaintiffs' definition of "Third-Party GenAI Product" appropriate. *See* FJ § IX.CC; Pls.' FPFJ § IX.FF. The court also adopts Plaintiffs' definition of "Google GenAI Product." *See* FJ § IX.N; Pls.' § IX.N. Finally, the court adopts Google's definition of "Google Assistant Application," as Plaintiffs' addition of "and . . . any Google GenAI Product" would have swallowed the rest of the definition into a nullity. *See* FJ § IX.M; Pls.' FPFJ § IX.M; Google's FPFJ § IX.K.

**B. "Qualified Competitor" and "Competitor"**

Because the data-sharing and syndication remedies are designed to directly benefit potential competitors in the relevant markets, it is necessary to define which emerging or extant competitors are eligible to enjoy them—that is, to determine who is a "Qualified Competitor."

To start, the court has adopted Plaintiffs' version of "Competitor." *See* FJ § IX.E. The parties' proposed definitions are not so far off, but Google's includes several qualifications. *Compare* Pls.' FPFJ § IX.E, *with* Google's FPFJ § IX.D. Plaintiffs' version is simpler and reflects the court's directive to include GenAI; the court did not intend to broaden the definition of a Competitor to then narrow it again in unnecessary ways. *See* Rem. Op. at 103–04 & n.8.

The parties agree that a Qualified Competitor should meet certain data security standards, agree to regular data security and privacy audits, not pose a risk to the national security of the United States, and make a sufficient showing of a plan to invest and compete in or with the GSE

[1] The court sees no material distinction between the definition of "GenAI Product" it has adopted and Plaintiffs' suggestion that their definition of "GenAI" should be left intact with their definitions of "Google GenAI Product" and "Third-Party GenAI Product" limited only to those products that can "fulfill a broad array of informational needs." Hr'g Tr. at 115:5-20.

and/or Search Text Ads markets.[2] *See* Pls.' FPFJ § IX.W; Google's FPFJ § IX.T. These criteria will ensure that the data-sharing and syndication remedies fulfill their intended purpose of increasing competition in the relevant markets. *See* Rem. Op. at 129–36, 170–71.

The biggest disagreement among the parties concerns Google's proposal that a Qualified Competitor not only be initially certified as one but also annually recertified on those same criteria. *See* Google's FPFJ § IX.T. Google points out that, because Qualified Competitors will be given an enormous quantity of valuable rights and data, "the incentives for mischief . . . will be enormous." Hr'g Tr. at 26:13-18. Google reasons that bad actors that are initially certified as Qualified Competitors could easily abandon a previously demonstrated "plan to invest and compete in or with" the relevant markets and potentially pose privacy and security risks or simply become a white label of Google. *Id.* at 26:13–28:4. In the absence of a recertification requirement, Google contends, the remedies could incentivize harmful or even anti-competitive behavior or allow it to escape detection.

Plaintiffs object to the recertification requirement as "unnecessary red tape." *Id.* at 22:5-7. Although they agree that a Competitor that abandons its plans to compete should be decertified, Plaintiffs argue that obvious, established contenders like Microsoft's Bing should not be subject to a yearly burden to continue to benefit from the remedy. *Id.* at 22:5-8. Putting up annual roadblocks burdening all Qualified Competitors rather than calling out Qualified Competitors on an individual basis "when there's suspicion" is, to Plaintiffs, an example of a "red-tape hoop" that Qualified Competitors must jump through that will delay getting "to a world where there's competition." *Id.* at 25:4-11, 37:6-23.

[2] The court expressly revised the language "plan to invest and compete in" to "plan to invest and compete *in or with*" the relevant markets. *See* Rem. Op. at 103–04 (emphasis added). Google's FPFJ does not reflect this revision. *See* Google's FPFJ § IX.T ("plan to invest and compete with"). The court assumes this was error.

The court agrees with Google that an annual recertification requirement is prudent. The court shares Google's concern about companies initially certified as Qualified Competitors who might abandon their professed intent to compete and improperly take advantage of data releases or other remedies. *See id.* at 23:2–24:12. Some companies that already compete or have maintained their intent to compete in the relevant markets, such as Microsoft, DuckDuckGo, and OpenAI, will face no "red tape" in getting recertified. For new market participants, requiring them to make an annual showing of their continued intent to compete with Google should not prove to be overly burdensome.

Plaintiffs advance an audit procedure as an alternative to a recertification requirement. *Id.* at 25:4-11. But audits are conducted in hindsight, not with foresight. By the time a reason to initiate an audit arises, the mischief has likely already occurred, potentially with enormous consequences not only for Google but for its users whose data may be shared with a Qualified Competitor gone rogue. And Plaintiffs' suggestion that Qualified Competitors warranting decertification will be readily noticeable from their market activities (or lack thereof) suffers from the same infirmity. *See id.* at 24:16-25. By the time mischief's effects are felt in the market, it may be too late. To arrive at a "world where there's competition," the remedies must ensure that their purpose is effected through the entirety of the judgment period. An annual recertification requirement is a relatively simple prophylactic measure to keep bad actors from escaping detection. The court trusts that the Technical Committee and Plaintiffs will establish a recertification process that is neither difficult nor burdensome. *See id.* at 27:10-14.

Finally, Google would put the burden on the court to determine, sometimes in consultation with the Technical Committee, whether a Competitor meets the required data security standards, poses a national security risk to the United States, and has made a sufficient showing of a plan to

compete in or with the relevant markets. *See* Google's FPFJ § IX.T. Though Plaintiffs have hedged on this point, *see infra* Section VIII, the Final Judgment is enforced by Plaintiffs. *See Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1243 (D.C. Cir. 2004) ("[U]ltimately the power to enforce the terms of the decree rests with the government." (quoting *United States v. Microsoft Corp.* (*Microsoft IV*), 231 F. Supp. 2d 144, 198 (D.D.C. 2002))); *see also* Pls.' Br. at 21–24. And the Technical Committee exists to serve Plaintiffs in that effort. *See Massachusetts*, 373 F.3d at 1244; *see also In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 954 (9th Cir. 2025) (establishing a Technical Committee to "provide[] a process to review and resolve inevitable disputes between the parties—ideally without further need for judicial intervention").

As Google often emphasized in its remedies-phase briefs, "courts should never aspire to the role of central planners and must be sensitive to the possibility that the continuing supervision of a highly detailed decree could wind up impairing rather than enhancing competition." Def.'s Proposed Conclusions of L., ECF No. 1347, at 10 (internal quotation marks omitted) (quoting *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 102–03 (2021)). The court therefore adopts Plaintiffs' version, whereby those determinations are made by Plaintiffs, in consultation with the Technical Committee. *See* FJ § IX.V; *see also infra* Section VIII.

**C. "Device"**

Google proposes that a "Device" covered by the Final Judgment exclude devices running on the ChromeOS operating system.[3] Google's FPFJ § IX.F. It points out that "Plaintiffs never challenged agreements with companies that manufacture Chromebooks, let alone established that those agreements harm competition" and that the court rejected Plaintiffs' proposed self-preferencing ban. Google's Br. at 7–8 (citing Rem. Op. at 216–17). Google also contends that

[3] Google adopted the term "Covered Device" while Plaintiffs use "Device." *Compare* Pls.' FPFJ § IX.H, *with* Google's FPFJ § IX.F. The court opts to use "Device." *See* FJ § IX.H.

placing conditions on the distribution of Chrome could not be achieved with respect to devices running on ChromeOS because "the Chrome browser is the UI [user interface] for . . . a ChromeOS device or Chromebook." *Id.* at 8 (quoting Rem. Tr. at 3892:17-20 (Samat) (alteration in original)). In fact, Chrome and ChromeOS are so integrated that Google has not yet been able to separate them. *Id.* (citing Rem. Tr. at 2611:6-23 (Nieh)).

The court finds this reasonable. Plaintiffs insist that allowing Google to exclude ChromeOS-based devices would permit it to enter "nakedly exclusive" agreements with manufacturers of ChromeOS devices. *See* Pls.' Br. at 26–27; Hr'g Tr. at 117:24–118:8. The court does not share Plaintiffs' concern. Exclusive distribution of Chrome by a manufacturer of a ChromeOS device is not the kind of anticompetitive agreement that has been at issue in this case. Unlike distribution on Android or Apple devices or on a third-party browser, Chrome is a necessary component of a ChromeOS device. And although Google Search is the default search engine on Chrome, the court previously rejected a self-preferencing ban in part because Plaintiffs never pursued a theory of liability based on this fact. Rem. Op. at 216–17. Without a factual basis to support restricting exclusive distribution of Chrome on ChromeOS devices, the court cannot order Google be enjoined from entering into such agreements. *Cf. Google*, 747 F. Supp. 3d at 152 ("[E]xclusive agreements are not condemned per se by the antitrust laws, even if they involve a dominant firm."). The court also finds it reasonable to exclude ChromeOS-based devices from the remedies altogether, rather than, as Plaintiffs suggest, identifying individual provisions from which they are carved out. Hr'g Tr. at 117:19–118:8.

"Device" will thus expressly exclude "any device on which the ChromeOS operating system or a successor to the ChromeOS operating system is installed." *See* FJ § IX.H. Plaintiffs' definition is otherwise consistent with the court's interpretation of the part of Google's remedies

that proposed optionality as to the default GSE on a given access point on a device-by-device basis. *See* Pls.' FPFJ § IX.H ("'Device' or 'device' means any single smartphone, tablet, laptop, or desktop. For clarity, any two devices are different devices, even if they are the same make and model (e.g., two Samsung Galaxy S25s are two devices; two Apple iPhone 16 Pros are two devices)."); Rem. Op. at 105. This definition ensures that optionality will exist at the level of the individual device. *See* Pls.' Br. at 27.

**D. "Google"**

Finally, a few words on the definition of "Google." The parties have addressed the court's previous concern about the breadth of Plaintiffs' originally proposed definition, *see* Rem. Op. at 221–22, by cabining it to those people or entities "controlling or overseeing Google Search (including syndicated products), Search Text Ads (including syndicated products), the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any related Google GenAI Product." *See* Pls' FPFJ § IX.L; Google's FPFJ § IX.J.

The court adopts Plaintiffs' final proposed definition, which includes Google's "affiliates, partnerships, and joint ventures" and is written with an eye towards preventing Google from simply moving its anticompetitive conduct to a sister company. *See* Pls' FPFJ § IX.L. To this, the court also adds: "For clarity, the term 'affiliates' includes any Alphabet, Inc.–related entity that controls or oversees the aforementioned products." *See* FJ § IX.L. This definition will capture Alphabet subsidiaries like DeepMind that are separate from Google but work with it to develop Google products relevant for purposes of these remedies. *See* Hr'g Tr. at 123:5-23; *see also* Rem. Tr. at 625:1–626:3 (Hsiao); *id.* at 3341:8-21, 3348:7-22 (Collins). Google should not be able to avoid the terms of the Final Judgment by how Alphabet chooses to organize itself.

## IV. PROHIBITORY INJUNCTIONS

The court previously acknowledged that Google's proposed prohibitory injunctions were a good starting place to remedy its illegal conduct. Rem. Op. at 104. But they did not alone go far enough, either as a class of remedies or as injunctive relief itself.

As injunctive relief, Google's proposals addressed the core of its anticompetitive conduct—its exclusive distribution agreements. *See Google*, 747 F. Supp. 3d at 32–33. The proposed provisions broadly would have offered Google's distribution partners more flexibility to contract with companies other than Google for search and search-related products. Rem. Op. at 105–06. The court agreed that Google should indeed be barred from entering into those exclusive agreements, but also added that (1) like Browser Developers, original equipment manufacturers (OEMs) and wireless carriers should be given the opportunity to set a different GSE at various search access points across different devices on an annual basis; (2) Browser Developers should expressly be permitted to promote any Third-Party General Search Service or Third-Party GenAI Product; and (3) Google should not be permitted to contract with Apple to exclusively distribute any Google GenAI product either in any Safari mode or on any Apple mobile or desktop device. *Id.* at 110–11.

In their final proposed final judgments, the parties presented slightly different versions of Google's originally proposed provisions reflecting different understandings of the court's instructions and holdings. The major disagreements here are whether (1) Google GenAI Products should be subject to lesser restrictions; (2) prohibited conditioning of one Google product on a partner's acceptance of another product is limited to actual agreements; (3) distribution contracts must terminate after one year; and (4) provisions applicable to Browser Developers and Apple should be different from those applicable to Android devices.

**A. Effect of Inclusion of GenAI**

Google appears for the most part to have heeded the court's ruling that GenAI be incorporated into the remedies generally, *see id.* at 99–104, and that it be written into certain provisions specifically, *see, e.g.*, *id.* at 111. *See generally* Google's FPFJ § III. But its proposed text includes a semantic head fake to afford greater flexibility for distributing its GenAI products. For example, Google broadly proposes being barred from conditioning the licensing of "Google Play or *any other Google software application*" on the distributing, preloading, placing, displaying, using, or licensing of the Google Search or Chrome applications. *Id.* § III.A–B (emphasis added). This prohibition would prevent Google from, say, tying distribution of Google Maps to a partner's acceptance of Search or Chrome. But Google proposes dropping the "any other Google software application" language when it comes to distributing its GenAI products. Google would bar itself from conditioning the licensing of only "the Google Search Application, the Chrome Browser Application, or Google Play" on the distributing, preloading, placing, displaying, using, or licensing of its GenAI products, including Gemini and Google Assistant. *Id.* § III.C–D. In other words, under Google's proposal, it could say to a partner, "We'll license Google Maps but only if you also distribute Gemini." Google employs similar methods of relaxing restrictions that would otherwise prevent it from entering exclusive agreements in other provisions about GenAI. *Compare, e.g.*, Google's FPFJ § III.H–I, *with id.* § III.J; *id.* § III.L–M, *with id.* § III.N.

Google defends this subtle yet material distinction by arguing that GenAI was "not part of Plaintiffs' theory of liability or the Court's liability determination" either with respect to Google's conduct or its products. *See* Google's Br. at 11. Provisions that regulate the licensing of Google GenAI products or revenue-share agreements (RSAs) pertaining to such products should be

narrower than parallel provisions for Search or Chrome, Google insists, because the former are "forward-looking provisions" where the court's "discretion is necessarily less broad," and a broader remedy creates the "danger of imposing restrictions that prevent the defendant from forging new routes to serve consumers." *Id.* at 10–12. Accordingly, Google believes it should be able "to retain the right to condition, for example, the Google Maps and YouTube apps on the exclusive distribution of Google GenAI and Google Assistant," because none of these products are "monopoly products." Hr'g Tr. at 59:4–62:18; *see also* Pls.' Br. at 5.

Adopting Google's proposal would be self-defeating. *See* Rem. Op. at 62 ("Antitrust actions would be 'futile exercise[s]' indeed 'if the Government prove[d] a violation but fail[ed] to secure a remedy adequate to redress it." (alterations in original) (quoting *E. I. du Pont*, 366 U.S. at 323)). To repeat once more, Google cannot be permitted to replay its illegal conduct with its GenAI products. Google's arguments have for the most part already been considered and rejected by the court. *See id.* at 99–104.

It is simply not true that the injunctive relief must be so tightly shrink-wrapped around the exact contours of liability. *See Nat'l Soc'y of Pro. Eng'rs v. United States* (*NSPE*), 435 U.S. 679, 698 (1978) (affirming injunctive relief that went "beyond a simple proscription against the precise conduct previously pursued"); *accord* 3 AREEDA & HOVENKAMP ¶ 653f ("[I]njunctive relief must be tailored with sufficient breadth to ensure that a certain 'class' of acts, or acts of a certain type or having a certain effect, not be repeated."). As Google recognizes, *see* Google's Br. at 11, the court can also enjoin "'practices connected with acts actually found to be illegal,' including practices 'which are of the same type or class as unlawful acts,'" Rem. Op. at 60 (first citing *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 89 (1950); then citing *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 132 (1969)). Employing "the same anticompetitive playbook for its

GenAI products that it used for Search," *id.* at 99, would surely be within the same type or class as Google's unlawful exclusionary acts with respect to Search.

At the October 8th hearing, Google contended that it should be permitted to condition its GenAI products in the same way that, for example, Microsoft has been conditioning distribution of its GenAI product, Copilot, on other applications "given the nascent nature of the market and given the level and the degree of competition" and because "Google doesn't have market power in Gemini." Hr'g Tr. at 61:5–64:5; *see also* Google's Br. at 13. The court is unpersuaded.

Besides the representation made by counsel at the hearing, no evidence has been presented that Microsoft in fact conditions distribution of Copilot on other applications, or that any other company does so with their respective GenAI products. *See* Rem. Op. at 217 (finding that Microsoft has integrated Copilot into Edge and Bing, but not that Microsoft bundles Copilot with other applications). Even if they did, the point of these remedies is not to ensure that Google maintains parity with competitors—it is to ensure that others can effectively compete in these markets. *Cf. Massachusetts*, 373 F.3d at 1231 (Section 2 remedies must "restor[e] conditions in which the competitive process is revived."); 3 AREEDA & HOVENKAMP ¶ 650a(2)(D).

Moreover, Google's argument that it should not be prevented from pursuing creative licensing regimes with its GenAI products because of its relative lack of power in that market is unconvincing. Remedies need not be strictly limited to "monopoly products" or even products for which the monopolist has any leverage in the market. The *New York I* court recognized this when it approved the inclusion of new technologies that "ha[d] the capacity to function in a manner similar to that of" the middleware that was the focus of liability in the remedies decree. 224 F. Supp. 2d at 129. And the D.C. Circuit affirmed that decision. *See Massachusetts*, 373 F.3d at 1204. Even Google's own proposed provisions, by their own terms and by Google's

characterization, include products not at issue in liability or for which findings of fact about market power were never established. *See* Google's FPFJ § III.A–B (referring to "Google Play *or any other Google software application*" (emphasis added)); Google's Br. at 11. Google acknowledges that even those products would fall within the court's authority to enjoin other conduct "of the 'same type or class' as the violations." Google's Br. at 11 (citation omitted).

To be certain, the D.C. Circuit has cautioned that when "adopting a forward-looking provision," the court's "discretion is necessarily less broad because . . . it is in danger of imposing restrictions that prevent the defendant from forging new routes to serve consumers." *Massachusetts*, 373 F.3d at 1224. But that discretion is not so constricted that it prohibits the court from imposing remedies to prevent the same unlawful conduct from occurring again in a meaningfully overlapping context. *See id.* at 1233 ("The district court certainly did not abuse its discretion by adopting a remedy that denies Microsoft the ability to take the same or similar actions to limit competition in the future rather than a remedy aimed narrowly at redressing the harm suffered by specific competitors in the past.").

In sum, the court declines to accept the relaxed injunctive relief Google proposes with respect to GenAI products. Those provisions related to such products shall be parallel to the provisions related to non-GenAI Google products in the way that Plaintiffs propose.[4] *See* FJ § III.A–D, H–J, M.

[4] Google also characterizes the court's description of its recent Gemini Commercial Agreement with Samsung as "recogniz[ing] this distinction" between GenAI and non-GenAI products with respect to access-point optionality. *See* Google's Br. at 12–13 (discussing Rem. Op. at 50–56). The court simply described these agreements to demonstrate that the liability decision was already influencing the way Google was contracting with its partners, *see* Rem. Op. at 107, not to define the scope of the Final Judgment when it comes to the distribution of GenAI products.

**B. Scope of Prohibited Conditioning**

The parties appeared to agree throughout the remedies phase about the constraints on Google's ability to condition the distribution of one piece of software on another. *See* Rem. Op. at 106. Apparently, not so.

Google's proposed injunctive relief prevents it from entering or maintaining agreements that contain an express conditioning term. But Plaintiffs' proposals ban conditioning altogether, regardless of whether it has been memorialized in an agreement. *Compare* Google's FPFJ § III.A–J ("Google shall not enter or maintain any agreement . . . that conditions . . . ."), *with* Pls.' FPFJ § III.A–J ("Google shall not condition . . . .").

Plaintiffs urge acceptance of their version to prevent Google from not only entering into agreements that contain an express conditioning term, but also declining to enter agreements that would not. Pls.' Br. at 3. They allege that "[i]n a meeting, Google confirmed that . . . Google intends to reserve the right to conditionally refuse to license the Play Store based on whether the device manufacturers opt to distribute Google Search–related products." *Id.* Google emphatically denies having made this representation, Hr'g Tr. at 54:1–56:10, but still defends its proposed language on the basis that "Plaintiffs did not establish, and the Court did not find, that Google engaged in any 'conditioning' that did not involve an agreement," *see* Google's Br. at 9–10, and that Plaintiffs' proposed language invites potential misinterpretation by partners, *see* Hr'g Tr. at 56:11-16.

The court has already explained that injunctive relief need not be surgically drawn around the exact contours of liability. *See supra* Section IV.A. But more to the point, conditional refusals to deal are as pernicious as conditional deals committed to writing. *Cf. OJ Com., LLC v. KidKraft, Inc.*, 34 F.4th 1232, 1247 (11th Cir. 2022) ("Conditional refusals to deal—i.e., one firm unilaterally

refusing to deal with another firm unless some condition is met—and exclusive dealing [are] synonymous." (cleaned up)); *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520 (5th Cir. 2022) ("[C]onditional refusals to deal are functionally equivalent to exclusive-dealing arrangements." (citing *OJ Com.*, 34 F.4th at 1247)); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 193 (3d Cir. 2005) (analyzing exclusionary business practices as if they were exclusive agreements because such practices were "as effective as those in written contracts"). A prohibition on Google's anticompetitive conduct would be fundamentally flawed if, for example, Google were prohibited from entering into an agreement that expressly conditions the licensing of the Play Store on the distribution of Search but were permitted to decline a request to license Google Play because the partner would not preinstall Search on its devices. *See* Pls.' Br. at 3. After all, this court must "end the illegal conduct and . . . make every effort to protect against conduct of the same type or class." *New York I*, 224 F. Supp. 2d at 189.

Plaintiffs' language is not impermissibly vague, as Google suggests. Google's Br. at 10. It is straightforward: Google shall not condition. Google protests that "Plaintiffs have not explained whether the act of 'condition[ing]' purportedly could reach even a trivial statement by a single Google employee that does not result in an actual agreement," Google's Br. at 10, and that it is at risk of being brought into a contempt proceeding over a potential misunderstanding during negotiations, Hr'g Tr. at 56:9-16. These concerns are overstated. The court is confident that "trivial" statements will not result in contempt proceedings and that if there is a non-trivial allegation of breach, the Final Judgment's enforcement procedures will provide an adequate path to resolution. *See generally* FJ § VII.

Google swears that "there's not going to be any conditioning of the type" and that it is "100 percent certain that [the court] would find that to be a violation of the decree, and that [it]

will not take place." Hr'g Tr. at 57:1-4. Then it should have no problem with a decree that expressly prohibits "any conditioning of the type." The court therefore adopts Plaintiffs' language that "Google shall not condition." *See generally* FJ § III.

**C. Annual Termination**

At the liability phase, the court determined that "[t]he lack of flexibility for partners to exit the distribution agreements reinforces their foreclosure effect." *Google*, 747 F. Supp. 3d at 158. This lack of flexibility came from both the agreements' durations and the fact that they were not easily terminable. *Id.* The court thus approved of provisions giving Browser Developers, OEMs, and wireless carriers an annual opportunity to reset the search product at different access points across different devices. Rem. Op. at 110–11.

Google believes that multi-year agreements with a right to opt out annually without termination fees offer sufficient flexibility. In fact, it argues, a multi-year agreement with annual opt-outs would *increase* the contracting options for partners, including opting out of their agreements after one year, if they wish. Google's Br. at 14; Hr'g Tr. at 74:19–75:5. Google insists that partners want these choices and that providing them will foster greater competition. Hr'g Tr. at 75:6-13.

Plaintiffs see it differently. They urge that an applicable agreement must "terminate[] no more than one year after the date it is entered." Pls.' FPFJ § III.K. Stressing that Google's prior agreements were hard to terminate, Plaintiffs argue that Google's proposal would still permit it to find creative ways to make termination difficult or to discourage opting out, such as by annually increasing RSA payments or imposing other burdens. Pls.' Br. at 7 & n.2.

The court holds that a hard-and-fast termination requirement after one year would best carry out the purpose of the injunctive relief.

Recall, the liability phase "record reflects no meaningful competitive rebidding of the agreements. The more common story is Google's partners renewing the agreements without genuine consideration of an alternative." *Google*, 747 F. Supp. 3d at 158. Requiring contracting parties to reevaluate their positions and renegotiate their agreements each year would create regular opportunities for competitive rebidding. Competitors in the industry would be on regular notice as to when an agreement between a Browser Developer, OEM, or wireless carrier and Google is coming to an end and be able to prepare accordingly to enter a competitive bid when that time comes. *See* Hr'g Tr. at 73:19–74:8. A bright-line, one-year term also will simplify enforcement. *See* Pls.' Br. at 7; Hr'g Tr. at 73:11-18 (Plaintiffs' counsel suggesting that adopting Google's language would in fact be less efficient than Google represents because it may require "mini economic trial[s]" on potential multi-year contracts "to see whether or not the incentives overwhelm what should be the right of termination"); *see also id.* at 67:24–69:6 (Plaintiffs' counsel approving of an omnibus agreement for the required separate agreements for different Operating System versions and privacy modes across different devices as long as each agreement must be renegotiated each year). *But see* Google's Br. at 14 & n.2 (describing Plaintiffs' proposal as increasing administrative burden because the optionality Plaintiffs seek could be achieved in a single agreement).

The court is skeptical of Google's contention that its proposal would give partners *more* flexibility. In theory, partners have always had a choice. But in practice, Google has held all the cards. *Google*, 747 F. Supp. 3d at 158; Hr'g Tr. at 80:1-5. Knowing that contracts will come to

an end annually gives them a bit of the leverage they previously lacked and, importantly, will create frequent opportunities for genuine competition.[5]

Courts have presumed under related antitrust provisions that exclusive contracts ending within a year are reasonable. *Google*, 747 F. Supp. 3d at 157. Given the aggregation of factors contributing to the exclusive agreements' substantial foreclosure of the market, the hard-and-fast yearly termination requirement will help to "pry open" that market. *See* FJ § III.K–M.

### D. Browser Developers and Apple

The parties' proposals with respect to Browser Developers and Apple differed from the start, and they have only diverged further. Plaintiffs originally proposed that Google could "enter or maintain any agreement requiring" either a Browser Developer or Apple to set Google Search (and for Apple, also any Google GenAI Product) as the default search engine or product only if that agreement applies to just one Operating System Version and one Privacy Mode at a time. Pls.' FPFJ § III.L–M. They also clarified that "this provision does not prohibit Google from negotiating multiple such agreements with" a Browser Developer or Apple "as long as no agreement is conditioned on another." *Id.* Google, on the other hand, proposed that it could enter such an agreement as long as the Browser Developer or Apple is permitted "on an annual basis to set a different Default Search Engine in the United States for any Operating System Version and/or Privacy Mode offered by the Browser Developer [or Apple] without foregoing any payments attributable to an Operating System Version or Privacy Mode where Google Search remains set as

[5] Google takes issue with a yearly termination requirement as "impermissibly regulat[ing] third parties." Google's Br. at 13. But antitrust remedies directed at agreements that unlawfully foreclose markets will necessarily affect relevant third parties to some degree. That is unavoidable. *See, e.g.*, *New York I*, 224 F. Supp. 2d at 152–56 (approving restrictions on Microsoft's ability to enter certain agreements with third party OEMs); *cf. E. I. du Pont*, 366 U.S. at 326 ("[C]ourts are authorized, indeed required, to decree relief effective to redress the violations, whatever the adverse effect of such a decree on private interests.").

the Default Search Engine."[6] Google's FPFJ § III.L; *id.* § III.M–N. Plaintiffs maintain that Google's provision would allow it to require Apple to set Google as the default search engine on every instance of Safari on every Apple device at every access point as long as it did so one year at a time. Pls.' Br. at 8–9; Hr'g Tr. at 72:3-15. But Google is adamant that its provision would allow a Browser Developer or Apple on an annual basis to "mix and match" across Operating Systems or Privacy Modes without any impact on their revenue share. Hr'g Tr. at 77:14–78:10. It insists that the only difference between its provisions and Plaintiffs' is the issue of yearly termination and administration. *Id.* at 78:11–79:8.

At the October 8th hearing, Plaintiffs justified their proposal in part by stating that they understood the court "to permit some more exclusive dealing on browsers and Apple." *Id.* at 70:4–16. More specifically, they said, "We read Your Honor's opinion to suggest that you would be okay with more all-or-nothing type agreements, where Google would buy, for example, all iPhones in the United States, the standard Safari mode default, where Apple can't change a single device to a different default. We find that troubling, but if they were going to do that, we want it to be limited to the mode and the operating system." *Id.* at 69:7-13. In response, the court clarified it did not intend for there to be daylight between restrictions on Google's ability to contract with respect to Android devices and those with respect to Browser Developers and Apple. *Id.* at 70:25–71:15. Plaintiffs told the court that this was "welcome news," *id.* at 71:16, and that they would "love to rewrite" those provisions, *id.* at 87:23–88:22.[7]

---

[6] Because the court has already found that applicable restrictions should not be relaxed with respect to GenAI products and that agreements permitted under the prohibitory injunctions must terminate after one year, *see supra* Sections IV.A, C, the court discusses these provisions without addressing those differing elements of the parties' proposals. The court also does not discuss the one element of these provisions that is undisputed—that Browser Developers and Apple are expressly permitted to promote any Third-Party General Search Service and Third-Party GenAI Product. *See* Pls.' FPFJ § III.L–M; Google's FPFJ § III.L–N.

[7] As far as the court can tell, Plaintiffs appear to have understood the court to "permit some more exclusive dealing" with respect to Browser Developers and Apple because it read the court's description of Google's original revised

Following this exchange, Plaintiffs submitted new proposals for its provisions regarding Browser Developers and Apple. *See* Pls.' Suppl. These revised provisions tightened the restrictions to mirror those imposed on Android partners. They would prevent Google from conditioning consideration for (1) setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product on any browser access point (including alternative modes) or any proprietary Apple feature or functionality (such as Safari, Siri, Spotlight, and any Privacy Mode) on a device on (2) setting the same product on any other browser access point or proprietary Apple feature or functionality on that same device or any other device in the United States. *See* Pls.' Suppl. § III.L–M. In other words, Plaintiffs propose that the same access-point-by-access-point and device-by-device optionality it proposes for Android devices apply also to browsers and Apple devices.

The Final Judgment will include, over Google's objection, Plaintiffs' revised provisions regarding Browser Developers and Apple. *See* FJ § III.L–M.

As a threshold matter, the court rejects Google's contention that it cannot consider Plaintiffs' updated provisions because they were presented "after the evidentiary record is closed and after briefing and argument on the parties' [proposed final judgments]." *See* Google's Suppl. at 5. Plaintiffs have not relied on new evidence. And Google has had a fulsome opportunity to respond at both the October 8th hearing and in writing. Furthermore, in crafting the Final Judgment, the court is not beholden to the exact language the parties have proposed at any stage.

---

proposed final judgment and its acknowledgment that "[a]ll of this is a good start" as adopting that description for purposes of the Final Judgment. *See* Rem. Op. at 105–07 ("Under its proposal . . . Google also would be permitted to pay Browser Developers, including Apple, to set Search as the default GSE, so long as the Browser Developer (1) can promote other GSEs and (2) is permitted to set a different GSE on different operating system versions or in a privacy mode and make[] changes, if desired, on an annual basis. . . . And Apple could preload GSEs on a device-by-device basis (i.e., Safari for Mac versus Safari for Windows), and install different GSEs for different search modes, like private browsing."). As previously explained, *see supra* Section II, any "approvals" of a proposed remedy did not signal the court's embrace of the proposal's specific text.

The court makes this determination with the evidentiary record already before it, as well as the benefit of the parties' arguments and submissions.

Google's merits objections to Plaintiffs' updated proposals are largely a reprise of its position that the prohibitory injunctions must be limited to the narrowest reading of the court's liability findings. For example, Google stresses multiple times that Plaintiffs only established that the "purported 'exclusivity' arose from Apple having agreed for the term of the contract not to 'pre-select a different default search engine in Safari's private browsing mode' or 'offer a different default search engine on different Apple devices (e.g., *different defaults on mobile versus desktop devices*).'" *Id.* at 1 (quoting Pls.' Post-Trial Br., ECF No. 896, at 36); *see also id.* at 2–3 (referring to the court's representation at the October 8th hearing that it had understood Plaintiffs' reference to device-level optionality as being relevant to the device type). Maybe so, but the court can fashion a remedy that goes "beyond a simple proscription against the precise conduct previously pursued." *NSPE*, 435 U.S. at 698; *see supra* Section IV.A.

Google also argues that device-by-device and access-point-by-access-point optionality is unnecessary to include in the provision applicable to Apple. Because Apple, too, is an OEM, Google states, all the other provisions in the prohibitory injunction will also apply to Apple. Google's Suppl. at 3. This is only partly true.

The court held at the liability phase that "(1) agreements between Google and browser developers, such as Apple and Mozilla, were exclusive insofar as they established Google as the out-of-the box default search engine; (2) mobile application distribution agreements ("MADAs") between Google and Android [OEMs] were exclusive in practice; and (3) [RSAs] between Google and Android device distributors—both OEMs and wireless carriers—formalized the practical exclusivity of the MADAs." Rem. Op. at 9–10 (citing *Google*, 747 F. Supp. 3d at 146–52).

In doing so, it evaluated separately the Apple Internet Services Agreement (ISA) and Browser Developer agreements on one hand and the Android agreements on the other, because the way Google Search was distributed across those agreements differed. For Apple and Browser Developers, Search is integrated into specific search access points, such as Safari, Siri, and Spotlight on Apple devices, and the search box, navigation or location bar, and search box displayed on the Startpage on Mozilla's Firefox browser. *See Google*, 747 F. Supp. 3d at 44 ¶ 59; *id.* 96 ¶ 334. For Android devices, on the other hand, Search is primarily distributed through individual applications, such as the Google Search Widget and Chrome, and bundled with others like YouTube and Google Maps as part of the MADAs. *Id.* at 97–100 ¶¶ 348–361. Apple does not contract for Google services through applications the way Android partners do. So, while Apple is indeed an OEM, those provisions that prevent Google from conditioning payment or licensing of *applications* on the distribution of one another do not apply to Apple. This objection therefore falls flat.

Finally, Google maintains that "[t]he additional provision applicable to agreements setting Google Search as the Default Search Engine in a Third-Party Browser has always differed in some respects from the provisions directed to certain devices because a browser default is only one search access point on a device. There is no logical basis for distinguishing between individual devices or access points in the context of a browser default, which is why no one even suggested such a concept until Plaintiffs raised it this month." Google's Suppl. at 4 (emphasis omitted). Google overlooks the fact that Browser Developers can also be OEMs—notably, for instance, Samsung. *Google*, 747 F. Supp. 3d at 35–37 ¶¶ 9, 16. Others may emerge in the future. Plaintiffs' proposal ensures that a device manufacturer that also has a proprietary browser could contract for browser placement with different competitors. The court acknowledges that at present firms that

are only Browser Developers (e.g., Mozilla) may not have the ability to select a default search engine on a device-by-device basis. But because express recognition of such optionality would deny Google "the ability to take the same or similar actions to limit competition in the future," *Massachusetts*, 373 F.3d at 1233, the court thinks deference to Plaintiffs is warranted here. *See E. I. du Pont*, 366 U.S. at 334; *supra* Section II.

**E. Other Provisions**

The court addresses two final provisions of the proposed prohibitory injunctive relief, each proposed by Plaintiffs or Google alone. The court adopts neither.

*First*, Plaintiffs propose a provision that reads: "Google shall not enter or maintain any exclusive contract relating to the distribution of Google Search, the Google Search Application, the Chrome Browser Application, the Google Assistant Application, and any Google GenAI Product in the United States." Pls.' FPFJ § III.N. This is far too broad and vague a term.

Federal Rule of Civil Procedure 65(d) requires that every order granting an injunction "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C). Plaintiffs defend the provision essentially as being designed to catch what is "not allowed." Hr'g Tr. at 87:12–88:3; *see also* Pls.' Br. at 12 ("Section III.N prevents any inadvertent gap between the remedies opinion and the final judgment regarding the treatment of exclusive contracts relating to the distribution of Google Search, Chrome, Google Assistant, and the Gemini app."). But that is exactly the kind of ban on unspecified conduct that Rule 65(d) is designed to prevent. *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) ("[Rule 65(d)] requires that those enjoined receive explicit notice of precisely what conduct is outlawed."); *cf. Gulf Oil Corp. v. Brock*, 778 F.2d 834, 843 (D.C. Cir. 1985) (rejecting order that enjoined "substantially similar" conduct without explaining what would be similar). The provision tracks what Plaintiffs describe as "the

Court's directive that . . . the final judgment bar 'any exclusive contract,'" Pls.' Br. at 12 (quoting Rem. Op. at 3), but again, the Final Judgment is what restrains Google, not an opinion. Rule 65(d) requires specificity, not vague language that might fill undefined "gaps." *See United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009) ("[W]e have held injunctions to be too vague when they enjoin all violations of a statute in the abstract without any further specification . . . ." (citing *SEC v. Wash. Inv. Network*, 475 F.3d 392, 407 (D.C. Cir. 2007))).

The court can understand Plaintiffs' desire to include a provision that "helps prevent a recurrence of the unlawful conduct by ensuring that Google cannot adopt novel forms of the exclusive distribution the Court condemned." Pls.' Br. at 12 (citing *Microsoft II*, 253 F.3d at 103). But the court cannot enjoin "all future violations of the antitrust laws." *Zenith Radio*, 395 U.S. at 133. The Final Judgment's enforcement provisions, including the court's retention of jurisdiction, should provide an avenue for addressing any allegation of noncompliance or circumvention.[8]

*Second*, Google proposes a provision that reads: "Nothing in this Final Judgment shall otherwise prohibit Google from providing Consideration to a manufacturer or wireless carrier with respect to any Google product or service in exchange for such entity's distribution, placement on any access point, promotion, or licensing of that Google product or service." Google's FPFJ § III.O. Apparently, Google drafted this provision in response to Plaintiffs' previously proposed payment ban. Pls.' Br. at 13. The court has rejected for now that proposed remedy. Rem. Op. at 119–28. Because this provision otherwise adds nothing of value to the Final Judgment, the court declines to adopt it.

---

[8] Plaintiffs' counsel also stated that "[i]f those provisions [enjoining Google from locking up device or access-point flexibility] were also changed to where everyone, including Apple and browsers, had device-by-device and access-point-by-access-point flexibility, I don't know if I could name a type of exclusive agreement right now that would be captured by III.N." Hr'g Tr. at 88:4-12. Because the court adopts Plaintiffs' modified §§ III.L and III.M, *see supra* Section IV.D, Plaintiffs' concern should be placated.

## V. DATA-SHARING

The chief conflict regarding the data-sharing remedy has to do with Google's proposal that the data be shared subject to a license governing use. *See* Google's FPFJ § IV.C.4.

Required sharing of certain data is justified to "narrow the scale gap created by Google's exclusive distribution agreements and, in turn, the quality gap that followed." Rem. Op. at 130. Google has acquired a massive scale advantage in part because its exclusive distribution agreements have enabled Google to see far more queries than any of its rivals. *Google*, 747 F. Supp. 3d at 49–50 ¶¶ 86–90. Those queries gave Google data that helped improve the quality of Search, which in turn attracted more users and improved monetization, reinforcing the flywheel of network effects that entrenched Google's monopoly. *Id.* at 161–62. Because antitrust remedies must "deny to the defendant the fruits of its statutory violation," *Microsoft III*, 253 F.3d at 103 (citations omitted), and because scale is a significant fruit of Google's exclusive distribution agreements, *see* Rem. Op. at 89, the court held that sharing data—specifically, of Web Search Index[9] Data and User-side Data—"represents a reasonable method of eliminating the consequences of [Google's] illegal conduct," Rem Op. at 130 (quoting *NSPE*, 435 U.S. at 698). The data would give competitors the opportunity to boost quality while they continue to innovate to set themselves apart competitively from Google. *See id.* at 145–46; *see also id.* at 130 (citing *In re Google Play Store*, 147 F.4th at 947 (affirming an information-sharing remedy that would "overcome [Google's] illegally amplified network effects by giving rival stores a fair opportunity to establish themselves" (cleaned up))).

[9] The Final Judgment adopts Google's "Web Search Index" rather than Plaintiffs' "Search Index." *See* FJ § IX.FF; Appendix; Google's App'x at 1. Google's term and definition more closely aligns with the court's prior directive that this definition should exclude data from Google's various other indexes not crawled from the web. *See* Rem. Op. at 141.

Google proposes that any data required to be shared under the Final Judgment be subject to a license governing use. That license would "include a requirement that the Qualified Competitor commit not to share or sell the datasets, and shall use the datasets for the exclusive purpose of serving users located in the United States through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product." Google's FPFJ § IV.C.4. The Final Judgment should forbid Qualified Competitors from selling the data they receive to unknown third parties, Google argues, because the data-sharing remedy is meant to furnish Qualified Competitors tools to compete in the relevant markets, not to give them an easy way to "turn a quick profit in a manner that violates user privacy (including Google's own terms of service)." Google's Br. at 20.

In general, the court agrees that data should be shared subject to a license, but with modifications that incorporate some of Plaintiffs' objections.

### A. Restriction on Sharing or Selling Data

Plaintiffs' main concern raised at the October 8th hearing about the licensing proposal was that restricting Qualified Competitors from selling or sharing data from the jump would "artificially constrain them right now before we even know who they are, what their new product might be, [or] how they might innovate on that." Hr'g Tr. at 47:3–48:1.

As to the restriction on selling data, Plaintiffs argue that any Competitor whose intention is only to sell data rather than earnestly use it to compete would be screened out from the start, as such a firm would not be certified as a Qualified Competitor. *Id.* at 47:3-11. When pressed to offer a scenario in which it would be appropriate for a Qualified Competitor to simply sell the data to a third party, regardless of whether that third party has an interest in developing a GSE, counsel for Plaintiffs could only relay that those specific scenarios are as of now unknown. They noted only that it is possible, for example, that a Qualified Competitor would want to sell a product that

includes the data, and the Final Judgment should not preemptively preclude them from doing so without letting that scenario unfold. *See id.* at 49:5-17.

As to the restriction on sharing data, Plaintiffs worry that such a license would prevent Qualified Competitors from sharing data with a partner in a joint venture, for example "with an AI company to improve search results or innovate new search-oriented products." Pls.' Br. at 15; *see also* Hr'g Tr. at 48:18–49:19. Google does not flatly oppose the possibility of such a joint venture, but it points out that it "would need to understand whether the joint venture partner is actually doing something that is related to the purposes of this remedy." Hr'g Tr. at 53:10-24.

With all this in mind, the court agrees that it is appropriate to subject Qualified Competitors to a license that prohibits them from sharing or selling the data received under the Final Judgment. But those Qualified Competitors will be able to petition the Technical Committee (or the court, if necessary) for relief from that constraint.

The court has serious concerns about allowing Qualified Competitors unbridled use of this valuable data. Even with appropriate privacy safeguards in place, User-side Data is still likely to contain highly sensitive information about individual users. *See* Rem. Op. at 163. And allowing a Qualified Competitor simply to sell the data to make a profit would be inconsistent with the purpose of this remedy. But at the same time, the court also agrees that Qualified Competitors should not be prevented from entering joint ventures or otherwise innovating with this data. After all, data-sharing is meant to give competitors a hand in setting themselves apart from Google. *See id.* at 145–46. Because the real-world effects of the data-sharing remedy have not yet been borne out, there is value in leaving slightly ajar the door to the possibility that some form of sharing or selling the data would be reasonable. *See also* Hr'g Tr. at 52:22–53:3 (Plaintiffs' counsel stating that they are more concerned about the hurdles put up for sharing and would be willing to write

out the sale provision); *id.* at 53:21-24 (Google's counsel stating that a Qualified Competitor and its potential partner getting approval and providing Google with notice and some transparency would be "something that makes sense").

**B. "Exclusive Purpose"**

Next, Plaintiffs take issue with Google's proposed limitation that Qualified Competitors use the data "for the exclusive purpose of serving users . . . through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product." *See* Google's FPFJ § IV.C.4. They read this language as permitting Qualified Competitors to use the data "only for 'serving' users results," but not to improve algorithms or products. Pls.' Br. at 15.

The court does not read the proposed text so narrowly. That provision does not require a Qualified Competitor to only serve users "results." It does not limit how the data is used, whether directly to serve query results or to improve algorithms or products, as long as the *end* purpose of such use is to develop a product in the relevant markets that is competitive in quality.

Google itself maintains that "these terms are intended to require Qualified Competitors to use the disclosed data solely to compete in the appropriate markets rather than turn a quick profit." Google's Br. at 20; *see also* Hr'g Tr. at 42:25–43:20 (Google's counsel agreeing with the court that the intention behind this phrase is not how Plaintiffs characterized it). If it becomes evident during the judgment period that Google does in fact intend to use this language to essentially neutralize the remedy, the court will reconsider it. But for now, the court finds this limitation reasonable.

**C. Burden on Qualified Competitors**

Plaintiffs worry that "Qualified Competitors who currently sell data or search results (for example to GenAI companies) would also be forced, at significant expense, to make the choice of

either maintaining a second copy of their data or systems untouched by the data at issue or shut down that business." Pls.' Br. at 15.

The court is unsure of Plaintiff's concern. Nothing in the Final Judgment would prevent a Qualified Competitor from selling its *own* search results and its *own* search results data, even if such products used Google's proprietary data as an input in some way. And companies like the GenAI companies Plaintiffs refer to that could benefit from the data in a way that is consistent with the purpose of the remedy can themselves seek to be certified as Qualified Competitors. Lastly, if there is some compelling reason a Qualified Competitor must sell the data that is consistent with the purpose of this remedy, it may petition the Technical Committee (or the court) to do so. *See supra* Section V.A.

**D. Location of Users Served**

Google would specify that the consumers served by use of the data be "located in the United States." Google's FPFJ § IV.C.4. Plaintiffs argue that, under Google's provision, a Qualified Competitor that currently serves search results worldwide using one system would be forced to exert considerable effort into building anew or maintaining separate infrastructure to use Google's data for the purpose of only serving users "located in the United States." Pls.' Br. at 15. At the hearing, the court asked counsel for Google how this would be feasible as a practical matter. Hr'g Tr. at 44:3-45:21. Counsel for Google responded that "that may be a [T]echnical [C]ommittee issue that . . . depending on how these competitors operate . . . [the Technical Committee] can resolve," *id.* at 45:14-17, but that ultimately what that phrase attempts to prevent is data getting into the hands of competitors who would use the data to develop products, whether search or unrelated to search, outside of the United States or that do not include the United States because "[t]hat's outside the scope of what this case was about," *id.* 45:2-8. Though the court understands

Google's concern, given the practical difficulties the language may produce, the court believes that excising the phrase would avoid confusion. The court is willing to revisit this issue if necessary, with input from the Technical Committee.

* * *

The provision imposing a license for shared data will thus be as follows: "The data specified in Sections IV.A and B will be shared pursuant to a license governing use. The terms of the license shall include a requirement that the Qualified Competitor commit not to share or sell the datasets unless authorized by the Technical Committee or the Court and shall use the datasets for the exclusive purpose of serving users through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product." FJ § IV.C.3. To be clear, the license requirement is not meant to allow Google to impose further burdens on Qualified Competitors. Nor is it meant to be an "artificial hurdle[]" to Qualified Competitors' ability to innovate. *See* Hr'g Tr. at 52:20-21. As drafted by the court, this provision will simply ensure that execution of this remedy remains moored to its purpose. To facilitate execution of this remedy, the court has also included in the Final Judgment a provision requiring that Plaintiffs and the Technical Committee, with input from Google, create a template for such a license within six months of the effective date of the Final Judgment. *See* FJ § IV.C.3.

## VI. SEARCH SYNDICATION

Because it will take time for Qualified Competitors to develop high-quality competitive GSEs even with the data-sharing remedy, the court found that requiring Google to syndicate its search results would provide a much-needed "bridge" for Qualified Competitors to deliver quality search results that will foster short-term competition with Google. Rem. Op. at 170–71 (quoting Rem. Tr. at 3023:16–3024:14 (J. Adkins) (agreeing that "search syndication can provide a bridge

until a new search engine can become a fully independent search engine”)). But it also determined that the information syndicated would be narrower than what Plaintiffs proposed and that syndication would be subject to a license restricting use, as “the purpose of this remedy is to provide a short-term measure for Qualified Competitors to compete as they improve their own search capabilities, not an additional means to facilitate that development. Other remedies serve that latter purpose.” *Id.* at 178.

Consistent with the Remedies Opinion, the parties’ proposals include some version of a search syndication license. *See* Pls.’ FPFJ § V.A–B; Google’s FPFJ § V.A–B. They differ in substantial ways, however. Mainly, the parties disagree on whether the terms of the search syndication license should (1) be restricted to those “no less favorable” than those in existing licenses or to “ordinary commercial” terms; (2) permit Google to restrict display of search results; (3) permit sub-syndication; and (4) last for a term of five years regardless of whether such term might extend beyond the six-year judgment period.

### A. “No Less Favorable” versus “Ordinary Commercial” Terms

#### *1. License Terms Generally*

Originally, Plaintiffs had proposed an exceedingly broad search syndication remedy. They proposed, among other things, that Google would be required to provide search syndication services only at marginal cost and could not place any conditions or restrictions on how a Qualified Competitor could use or display the syndicated content. Rem. Op. at 168–70. The court narrowed many of these provisions largely because they strayed too far from terms found in licensing agreements in the existing search syndication market. *Id.* at 173–74 (quoting *Bausch & Lomb*, 321 U.S. at 728 (“Congress has been liberal in enacting remedies to enforce the antimonopoly

statues. But in no instance has it indicated an intention to interfere with ordinary commercial practices.”)).

In making this determination, the court used phrases like the following: that a “Qualified Competitor who opts into the syndication remedies shall receive organic results and features on terms *no less favorable than* a current licensee”; “when it comes to a remedy like syndication for which there is an established market and which requires Google to deal with a Qualified Competitor, it is best to hew closely to *ordinary commercial terms*”; and “[p]ricing shall be based on ‘financial terms *no worse than* those offered to any other users of Google’s search syndication products.’” *Id.* at 173–74 (emphases added) (citation omitted). The court’s overarching point was that the terms of a syndication license should not be unmoored from commercial realities already in place.

The parties have picked from this section of the Remedies Opinion the phrases that, they believe, best fit their purposes. Phrases like “no less favorable than,” “no worse than,” and “least restrictive” appear throughout Plaintiffs’ proposal. *See* Pls.’ FPFJ § V.A–B. Google’s, on the other hand, consistently refers to “ordinary commercial” terms. *See* Google’s FPFJ § V.B. The parties have sparred over what these terms mean and whether they track the court’s opinion. *See* Pls.’ Br. at 18–20; Google’s Br. at 25–29.

For the most part, the court is wary of Google’s blanket reliance on “ordinary commercial” terms. First, Google’s use of “ordinary commercial” terms is ambiguous. As Plaintiffs point out, it is unclear what an “ordinary commercial” term with respect to any limitation currently is or how it may change over time. Pls.’ Br. at 19. To be fair, the court used “ordinary commercial terms” in the Remedies Opinion, so Google cannot be faulted for grasping onto that language. But it did

not intend for that phrase to convey an effective veto to Google over the search syndication terms merely because a term or some combination of terms is not deemed "ordinary."

But that is precisely how Google would have the court apply it. If a Qualified Competitor proposes a term that is not "ordinary" or typical to Google's existing syndication agreements, Google wants to be able to reject it. Such an ability would inhibit the innovation this remedy attempts to encourage. For example, potential Qualified Competitor DuckDuckGo operates a GSE that seeks to set itself apart by focusing on user privacy. Br. of Amicus Curiae Duck Duck Go, Inc. in Supp. of Pls.' FPFJ, ECF No. 1446-1 [hereinafter DuckDuckGo Br.], at 4; *Google*, 747 F. Supp. 3d at 36 ¶ 12. In an amicus brief, DuckDuckGo worries that, under Google's proposed provisions, Google would be able to refuse to syndicate search results to privacy-focused GSEs like DuckDuckGo's by saying that a provision ensuring a certain degree of user-data protections is not "ordinary" to Google's existing syndication agreements. DuckDuckGo Br. at 5. Qualified Competitors hoping to compete by offering unique services or features may therefore be forced to either forego the syndication remedy or abandon developing what sets them apart. *Id.* at 5–6.

Save one exception, the court will adopt Plaintiffs' language over Google's use of "ordinary commercial" terms. Because these provisions are many, the court will discuss two areas where these differences were particularly contentious: pricing and display restrictions.

### 2. *Pricing*

The court held that Google would not be required to provide syndication services at "no more than . . . marginal cost." Rem. Op. at 174. Because the availability of marginal-cost syndication from Google would disincentivize new syndication market entrants and potentially harm current providers of search syndication services, the court wrote that "[p]ricing shall be based

on 'financial terms no worse than those offered to any other user of Google's search syndication products.'" *Id.* at 173–74 (citation omitted).

And yet Google took a different tack. It now proposes that "Google will offer these syndication services on a non-discriminatory basis to Qualified Competitors at market rates consistent with ordinary commercial terms agreed to by other users of Google's search syndication products." Google's FPFJ § V.B.3.

Its main objection to the court's language, which Plaintiffs have adopted, is that it would create the same problems the court contemplated would arise from a "marginal cost" provision. A most-favored-nation pricing term, Google protests, would result in syndication licenses with pricing terms cherry-picked from, for instance, discounted organic search syndication pricing offered to partners who also syndicate search text ads, sometimes at prices below marginal cost. Google's Br. at 26. Ordinarily, Google says, such discounted pricing is offered because the discount is offset by the revenue Google expects from the ad syndication. *Id.* Google argues that being required to offer the discounted rate to a Qualified Competitor where Google cannot expect the same revenue to offset it would "'interfere with' and 'reduce, if not eliminate, competition in the market for syndicated search results'" for the same reasons the court determined marginal-cost pricing would. *Id.* (quoting Rem. Op. at 175).

Google's concern is overstated. The court thinks it is unlikely that a Qualified Competitor will syndicate search results from Google but not search text ads. After all, it is through search text ads (and other forms of advertising) that GSEs generate revenue. While it may be possible that a Qualified Competitor will syndicate search results from Google but search text ads from elsewhere or not at all, until such arrangements come to fruition, the court is disinclined to alter

the Final Judgment in a way that permits Google to dictate pricing with Qualified Competitors based on existing commercial terms reached with Google's profit motive in mind.

Similarly, that most-favored-nation pricing would "substantially impact[] Google's monetization expectation," Google's Br. at 26, is of no moment. Google's "monetization expectation" is a fruit of its illegal conduct. *See* Rem. Op. at 95–97. "Those who violate the [Sherman] Act may not reap the benefits of their violations and avoid an undoing of their unlawful project on the plea of hardship or inconvenience." *E. I. du Pont*, 366 U.S. at 326–27. The Final Judgment's pricing provisions may result in syndication agreements that depart from the way Google has historically contracted or made its revenue. *See* Google's Br. at 26–27. But that is an acceptable consequence of remedying Google's illegal conduct. *Microsoft III*, 253 F.3d at 103 (holding that Section 2 remedies must "deny to the defendant the fruits of its statutory violation" (internal citation and quotation marks omitted)).

*3. Restriction on Display of Search Results*

Originally, it was Plaintiffs who sought to enable Qualified Competitors to "effectively replicate how Google delivers its [search engine results pages ("SERPs")]." Rem. Op. at 172 ("How else to explain Plaintiffs' insistence that Google must provide information that is 'the same as if the Qualified Competitor's query had been submitted through Google.com'?" (citation omitted)). Now, Plaintiffs accuse Google of attempting such a result. Hr'g Tr. at 98:15–99:1. And they are right. Google now proposes that it be "permitted to place its ordinary commercial restrictions on the use and display of its syndicated results and content." Google's FPFJ § V.B.8. At the October 8th hearing, Google's counsel explained that its typical syndication-display restrictions include requiring a "Powered by Google" branding insignia, preventing the licensee from changing the order of the syndicated search results, or simply preventing the licensee from

"using the syndicated results in manners other than the way Google . . . presents them." Hr'g Tr. at 106:19–107:10. Google believes it should be able to continue to impose these restrictions under the Final Judgment.

Plaintiffs aver that if Google can limit Qualified Competitors' display of the syndicated search results to, for example, the "10 blue links" in the way they are displayed on Google's own SERPs, a GenAI company like OpenAI would not be able to "repackag[e] it" as they or their consumers would see fit. *Id.* at 98:15–99:1; *see also* Rem. Tr. at 389:17–390:2 (Turley) (OpenAI is "not trying to recreate the type of experience that [a consumer] would find on Google.com where you see ten blue links."); Hr'g Tr. at 98:18-21 ("[Google's] provision says they can put ordinary commercial restrictions on the use and display of syndicated Search results. That is what we worry about would create a world of Google clones."). Because of these concerns, Plaintiffs propose that Google may not impose such restrictions "beyond the least restrictive terms Google provides under any current search syndication agreements." Pls.' FPFJ § V.B.6.

The court agrees with Plaintiffs. Google frames its proposal in part by arguing that oftentimes a Qualified Competitor *wants* to be able to adopt Google's branding "as part of the reason why they're syndicating from Google." Hr'g Tr. at 109:9-18. That may be true for some current licensees. But for a Qualified Competitor—who, to reiterate, can only be certified if it can demonstrate a plan to invest and compete in or with the GSE and/or Search Text Ads markets—becoming a Google clone or marketing itself as one seems an unlikely desire. The syndication remedy is meant to give Qualified Competitors a boost in quality while they develop competitive products, not to pose as Google in the meantime. And at least one potential Qualified Competitor in the GenAI space has explicitly expressed a desire to depart from Google's familiar ten blue

links format. At bottom, allowing Google to require licensees to display results to replicate Google's SERPs would be at odds with what this remedy is designed to achieve.[10]

* * *

In sum, both pricing and non-pricing restrictions or limitations in a search syndication license pursuant to the Final Judgment shall be, for the most part, defined by Plaintiffs' language, on "least restrictive," "no less favorable," or "no worse" terms. The Final Judgment will retain the use of "ordinary commercial" terms to protect against Qualified Competitors using the syndication agreement in a manner than exceeds its intended purpose. *See* Rem. Op. at 184 (citing Rem. Tr. at 2988:9–2989:3, 2990:22–2992:10 (J. Adkins) (discussing Google's ordinary restrictions on scraping, indexing, and crawling in its current syndication agreements)).

A final word on Google's objections: Google contends that Plaintiffs' proposed license restrictions contradict the court's previous assurance that "Qualified Competitors generally will have to follow ordinary commercial terms and therefore will not need to be customized." Google's Br. at 28–29 (quoting Rem. Op. at 180). Google takes this quote out of context. The court made this assurance in response to Google's concern that the syndication remedy would put the court in the role of a "central planner." Rem. Op. at 180 (citation omitted). Google should take the court at its word that it has no intention of becoming a "central planner." Indeed, adopting Plaintiffs' terms will avoid this. Google appears to believe that, unless it alone gets to say what terms are ordinary, each license will be a custom-made patchwork of terms causing Google insurmountable challenges.[11] But there is more certainty in the universe of terms that are the "least restrictive" or

[10] As to use, Google explains Qualified Competitors should not be permitted to use syndicated data to feed into their LLMs for training. Hr'g Tr. at 107:11–108:1. The court agrees the Final Judgment should not permit this. *See id.* at 108:19–109:2. But the court does not believe that is what Plaintiffs seek or that the Final Judgment in fact permits it.

[11] In response to the court's note in the Remedies Opinion that "[i]f there are technical feasibility issues with syndicating only crawled web results, Google shall so advise the court," Rem. Op. at 173 n.24, Google now lists a

that are "no less favorable." In any event, Google cannot "avoid an undoing of [its] unlawful project on the plea of hardship or inconvenience." *See E. I. du Pont*, 366 U.S. at 326–27.

Lastly, for both the search and search text ads syndication remedies, the court will also require that Plaintiffs and the Technical Committee, with input from Google, create a template for such syndication licenses within 60 days of the effective date of the Final Judgment. *See* FJ §§ V.B, VI.B.

**B. Sub-Syndication**

The court agrees with Google that Qualified Competitors should not be able to sub-syndicate the search results they syndicate from Google under the Final Judgment. *See* Google's FPFJ § V.B.11. Plaintiffs object, arguing that sub-syndication is a standard permission in the existing syndication market and that, because it is not apparent yet whether a Qualified Competitor would "need" to sub-syndicate, the Final Judgment should not foreclose them from doing so upfront. Hr'g Tr. at 93:3-16.

But Google has it right: "Allowing Qualified Competitors to sub-syndicate Google's results . . . is entirely divorced from the Court's reasoning that new general search engine entrants should receive syndication from Google for the purpose of improving . . . *their own* SERPs." Google's Br. at 22 (citing Rem. Tr. at 4805:4-6 (Closing Arg.) (Plaintiffs' counsel stating that it's their "view that the syndication remedy should not be available to people who just want to syndicate")). Given that search syndication is meant to provide a Qualified Competitor a way to serve high-quality results while it develops its own products, the court does not see why a Qualified Competitor would "need" to sub-syndicate to accomplish that purpose. *See* Rem. Op. at 170–71.

---

host of "technical feasibility issues." *See* Google's Br. at 29. The court is not at this time convinced that these issues are so burdensome the features subject to syndication must be limited to those that Google "provides under current standard search syndication agreements." *See id.* As explained above, Google overstates how "bespoke" the syndication agreements with Qualified Competitors will be. *See id.*

And that some syndication agreements today, including Google's, permit some level of sub-syndication does not warrant expanding the purpose of the syndication remedy. *See* Pls.' Br. at 20; Hr'g Tr. at 93:19–94:8; *see also id.* at 105:6–106:6 (Google's counsel stating that sub-syndication is not a widespread practice and usually limited to the licensee's affiliate, and that in those agreements where Google does permit sub-syndication, it retains an absolute right to reject it).

**C. Duration**

A syndication license pursuant to the Final Judgment will be for a term of five years, regardless of when Google's syndication service is made available to the Qualified Competitor, for both search and search text ads syndication.

Despite the court's holding to that effect, *see* Rem. Op. at 175–76, Google has added that a syndication license will be for a term of five years, *unless* there are fewer than five years remaining before the end of the judgment period. Googe's FPFJ § V.A. In that case, Google proposes, the license will be for a term lasting the remainder of the judgment period. *Id.* In practice, what that means is that only a Qualified Competitor that comes onto the scene during the first year of the Final Judgment will enjoy a full five-year syndication term.

The court does not dwell on this long. It held that the syndication license would be for five years based on testimony from potential Qualified Competitors that five years would be enough time in which to become independent of Google. Rem. Op. at 175–76 (citing Rem. Tr. at 426:16-25 (Turley)); *id.* at 176 n.25 (citing to article detailing that Brave began delivering search results exclusively from its own search index within about two years). And as DuckDuckGo points out, allowing these syndication licenses to terminate at the end of the judgment period could permit Google to simply run out the clock on license negotiations, especially as the judgment period draws

to a close. DuckDuckGo Br. at 6–7. The syndication remedy as Google would have it would not fulfill its purpose for a Qualified Competitor that becomes certified in year five of the six-year judgment period; the Qualified Competitor would simply not have enough time with the syndicated data to develop a competitive GSE in the meantime. *See* Rem. Op. at 175–76; Hr'g Tr. at 110:10–111:8. What's more, were the court to adopt Google's proposal, the incentive for Qualified Competitors to come forward would diminish over the period remaining on the Final Judgment. Such an outcome would benefit only Google, not competition.

## VII. SEARCH TEXT ADS SYNDICATION

"Because Google has more users, it has more advertisers, and with more advertisers, it has more dollars to improve its GSE and pay for distribution." Rem. Op. at 183. And because Qualified Competitors would be attempting to compete "[i]n the face of such formidable headwinds," the court held that Qualified Competitors should also be able to syndicate search text ads from Google as a "short-term measure designed to 'pry open' the relevant markets." *Id.*

For the same reasons search syndication licenses will be restricted on "no less favorable terms" and other similar language used by Plaintiffs rather than Google's "ordinary commercial" terms, the same will be true, for the most part, for search text ads syndication. *See generally* FJ § VI. The restriction on scraping, indexing, and crawling will remain on ordinary commercial terms. *Id.* § VI.B.6. The provision regarding the duration of such licenses will also be the same.[12] *Id.* § VI.B.

[12] The restriction on display will be slightly different. *See* FJ § VI.B.6. The court previously held that "Google may place ordinary-course restrictions on the use or display of syndicated content." Rem. Op. at 184. Unlike in search syndication, Google presented evidence of the specific ways search text ads syndication without ordinary-course restrictions on display or use could harm advertisers and ad quality. *See id.* (citing Rem. Tr. at 2972:4–2976:3, 2979:5–2984:10 (J. Adkins)). That said, the court does not adopt Plaintiffs' narrow enumeration of permissible justifications for imposing such restrictions. *See* Pls.' FPFJ § VI.B.6.

The search text ads syndication remedy differs in one important way from the search syndication remedy. The court previously contemplated the possibility of new entrants into the ad platform market. *See* Rem. Op. at 183 ("It is also possible that an independent ad platform could emerge to compete with Google and Microsoft, which are the only current suppliers of general search text ads in the United States."). Becoming an independent ad platform in the search text ads market takes a near-insurmountable effort in part due to Google's monopoly. *See* Rem. Tr. at 1794:12–1797:3 (Epstein) (describing "cold start" problems). To be competitive, a potential new entrant would need to be able to offer publishers syndication of high-quality ads. *See id.* at 1798:16–1799:16 (Epstein); *see also* Pls.' Br. at 20. So, while sub-syndication of search results would be inappropriate for Qualified Competitors looking to compete in search for the reasons explained above, *see supra* Section VI.B, sub-syndication of search text ads would be a useful bridge for a Qualified Competitor looking to compete with Google's ad platform. Sub-syndication will thus be permitted for search text ads only if "such Qualified Competitor has been certified as a Competitor to a Google ads platform (e.g., Google Ads)." FJ § VI.B.9.

## VIII. ENFORCEMENT

From the beginning, the provisions related to the Technical Committee have been contentious. The court will not rehash the parties' arguments or go over their final proposals with a fine-tooth comb here. Rather, the court will explain at a high level its approach to the relevant provisions.

The court has been clear that a Technical Committee is an appropriate instrument to assist Plaintiffs in their enforcement efforts, as it "comports with federal courts' long history of utilizing appointed experts and provides a process to review and resolve inevitable disputes between the parties—ideally without further need for judicial intervention." Rem. Op. at 211 (quoting *In re*

*Google Play Store*, 147 F.4th at 954). A Technical Committee that is the "enforcement arm of the government," *Microsoft IV*, 231 F. Supp. 2d at 197, embodies the principle that with the government's broad authority to enforce the antitrust laws comes discretion with how violations should be redressed, *see F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 170–71 (2004) ("A Government plaintiff . . . must seek to obtain the relief necessary to protect the public from further anticompetitive conduct and to redress anticompetitive harm. And a Government plaintiff has legal authority broad enough to allow it to carry out this mission. . . . '[I]t is well settled that once the Government has successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor.'" (quoting *E. I. DuPont*, 366 U.S. at 334)); *see also Ford Motor Co. v. United States*, 405 U.S. 562, 575 (1972).

Throughout the remedies phase, Plaintiffs have vigorously insisted that the court's rulings and the case law make clear that "ultimately the power to enforce the terms of the decree rests with the government." Pls.' Br. at 21 (quoting *Massachusetts*, 373 F.3d at 1243). In their most recent brief, they took issue with Google's attempts at squeezing Plaintiffs out of various enforcement activities and roping the court into resolving disputes instead. *Id.* at 20–21. They also accused Google of attempting to "empower Google to delay or stymie enforcement at every turn simply by objecting." *Id.* at 21. Plaintiffs' FPFJ reflects these objections. *See generally* Pls.' FPFJ § VII.

Yet at the hearing, Plaintiffs appeared to surrender their position. From the jump, they conceded that Google should have full opportunity to object to any detail of the Final Judgment's execution. *See* Hr'g Tr. at 18:24–19:10. And despite the clear textual differences in the parties' FPFJs and briefs, Plaintiffs' counsel effectively agreed that "there is substantively no difference between the language that [Plaintiffs have] proposed, at least with respect to Google's ability to

object and bring things to the Court's attention, and what [Google has] proposed." *Id.* at 20:11–21:2.

Plaintiffs' counsel tried to assure the court that it is "free to delegate any of those elements [of enforcement] entirely to the [T]echnical [C]ommittee, entirely to [P]laintiffs." *Id.* at 34:7-14. But the court is frankly at a loss for how it can square this with their simultaneous position that "there is no such decision that ends with [Plaintiffs] and the [T]echnical [C]ommittee" and that "Google can object to everything and almost anything that would then require [the court's] resolution." *Id.* at 19:20–20:5.

The court is wary of being called in as a referee to the minutiae of the Final Judgment's execution and enforcement. Nevertheless, because the parties agree that Google should have a broad right to object, the court will grant it. *See* FJ § VII.A.7.k. This should put to rest Google's blanket objections to Plaintiffs' alleged attempts at taking decision-making authority from the court. Google's Br. at 30–32. The parties offer the assurance that they will elevate for judicial consideration only the most important conflicts. *See* Hr'g Tr. at 19:24–20:5; 26:7-12. The court is skeptical. Still, it adopts Google's express right to object with cautious optimism that the parties will keep their word.

Although Google will have an express right to object, the court affords some deference to Plaintiffs' provisions in this section of the Final Judgment. *See generally* FJ § VII; *see also* Appendix. Google appears to protest any function carried out by the Technical Committee that goes beyond mere "technical competence," characterizing the broad oversight and investigative functions Plaintiffs propose as "an end-run around the Court's rejection of the Plaintiffs' anticircumvention and anti-retaliation proposals." *See* Google's Br. at 32–33. Yet, the Technical Committee established in *New York I* and affirmed by *Massachusetts* had much of these same

broad functions. *See* Second Modified Final J., *United States v. Microsoft Corp.*, No. 98-cv-1232, ECF No. 889 (D.D.C. Mar. 22, 2009). None of these responsibilities are a "substitute for the enforcement authority of [Plaintiffs]" or the court. Rem. Op. at 212 (citing *Massachusetts*, 373 F.3d at 1244).

Finally, to keep the court updated on the progress of executing the Final Judgment, Plaintiffs, with input from the Technical Committee, shall submit a status report within 90 days of the effective date of the Final Judgment and then on future dates as set by the Court. FJ § VII.E.1.

## IX. RETENTION OF JURISDICTION

Last but not least, the court addresses its retention of jurisdiction. The Supreme Court was explicit in *United States v. United Shoe Machinery Corp.* that, where the government is entitled to relief in a Section 2 case, the "court's power" to order additional relief to remedy an earlier antitrust violation "is clear," even after the judgment period has passed. 391 U.S. 244, 251 (1968); *accord* 2A AREEDA & HOVENKAMP ¶ 325a ("[A] court's involvement is not necessarily ended once its decree is issued."); *id.* ¶ 325c2 ("Antitrust decrees may reserve the court's jurisdiction to order additional or modified relief." (citing *United States v. United Shoe Mach. Corp.*, 110 F. Supp. 295 (D. Mass. 1953), *aff'd per curiam*, 347 U.S. 521 (1954))). Both parties' proposals would preserve this court's jurisdiction accordingly.

Plaintiffs' proposal that it be permitted to file suit against Google for a period of four years after the expiration of the Final Judgment for any violations of the Final Judgment committed during the judgment period is not, as Google argues, the impermissible creation of a cause of action. *See* Google's Br. at 38–39. It is simply a part of the court's retention of its jurisdiction to enable Plaintiffs to enforce the Final Judgment.

That said, the court will not determine now, as Plaintiffs propose, what Plaintiffs must show to alter the judgment and to what standard Google will be held in response. *Compare* FJ § XI.A, *with* Pls.' FPFJ § XI.A. The court will address those specifics if and when the time comes.

## X. CONCLUSION

It bears repeating that "Google is a monopolist, and it has acted as one to maintain its monopoly." *Google*, 747 F. Supp. 3d at 32. In crafting the Final Judgment, the task of this court was to "unfetter a market from anticompetitive conduct, . . . deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future," *Microsoft III*, 253 F.3d at 103 (internal quotation marks and citations omitted), even if the remedies ordered would "entail harsh consequences," *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1033 (D.C. Cir. 2008) (quoting *E. I. du Pont*, 366 U.S. at 327). The terms of the Final Judgment have been designed to do just that consistent with established Section 2 legal principles.

The Final Judgment accompanies this Memorandum Opinion.

Dated: December 5, 2025

Amit P. Mehta
United States District Judge

# APPENDIX

## I. JURISDICTION

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| The Court has jurisdiction over the subject matter of this action and over Google. | This Court has jurisdiction over the subject matter of this action and over Google LLC. | This Court has jurisdiction over the subject matter of this action and over Google LLC. |

## II. APPLICABILITY

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| This Final Judgment applies to Google and to each of its officers, directors, agents, employees, subsidiaries, successors and assigns; and to all other persons in active concert or participation with Google who have received actual notice of this Final Judgment by personal service or otherwise. | This Final Judgment applies to Google and to each of its officers, directors, agents, employees, subsidiaries, successors, and assigns. | This Final Judgment applies to Google and to each of its officers, directors, agents, employees, subsidiaries, successors, and assigns; and to all other persons in active concert or participation with Google who have received actual notice of this Final Judgment by personal service or otherwise. |

## III. PROHIBITORY INJUNCTIONS

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| A. Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of the Google Search Application on any device sold in the United States. | A. Google shall not enter or maintain any agreement with a manufacturer that conditions the licensing of Google Play or any other Google software application on that manufacturer also distributing, preloading, placing, displaying, using, or licensing the Google Search Application on Covered Devices sold in the United States. | A. Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of the Google Search Application on any device sold in the United States. |
| B. Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of the Chrome Browser Application on any device sold in the United States. | B. Google shall not enter or maintain any agreement with a manufacturer that conditions the licensing of Google Play or any other Google software application on that manufacturer also distributing, preloading, placing, displaying, using, or licensing the Chrome Browser Application on Covered Devices sold in the United States. | B. Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use or license of the Chrome Browser Application on any device sold in the United States. |
| C. Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or | C. Google shall not enter or maintain any agreement with a manufacturer that conditions the licensing of the Google Search | C. Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or |

| | | |
|---|---|---|
| license of the Google Assistant Application on any device sold in the United States. | Application, the Chrome Browser Application, or Google Play, on the manufacturer also distributing, preloading, placing, displaying, using, or licensing the Google Assistant Application on Covered Devices sold in the United States. | license of the Google Assistant Application on any device sold in the United States. |
| D. Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of any Google GenAI Product on any device sold in the United States. | D. Google shall not enter or maintain any agreement with a manufacturer that conditions the licensing of the Google Search Application, the Chrome Browser Application, or Google Play, on the manufacturer also distributing, preloading, placing, displaying, using, or licensing Google GenAI Assistant Application on Covered Devices sold in the United States. | D. Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of any Google GenAI Product on any device sold in the United States. |
| E. Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party General Search Service on any device sold in the United States. | E. Google shall not enter or maintain any agreement with a manufacturer or wireless carrier that conditions (i) Consideration or (ii) the license of Google Play or any Google software application, on that manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party General Search Service on Covered Devices sold in the United States. | E. Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party General Search Service on any device sold in the United States. |
| F. Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party Browser on any device sold in the United States. | F. Google shall not enter or maintain any agreement with a manufacturer or wireless carrier that conditions (i) Consideration or (ii) the license of Google Play or any Google software application, on that manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party Browser on Covered Devices sold in the United States. | F. Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party Browser on any device sold in the United States. |
| G. Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or | G. Google shall not enter or maintain any agreement with a manufacturer or wireless carrier that conditions (i) Consideration or (ii) the license of Google Play or any Google software application, on that manufacturer or wireless carrier | G. Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or |

| | | |
|---|---|---|
| licensing any Third-Party GenAI Product on any device sold in the United States. | refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party GenAI Assistive Service on Covered Devices sold in the United States. | licensing any Third-Party GenAI Product on any device sold in the United States. |
| H. Google shall not condition the payment for preload of, placement of, or assignment of an access point for the Google Search Application for one device on any other preload, placement, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States. | H. Google shall not enter or maintain any agreement with a manufacturer or wireless carrier that conditions the payment for preload, placement, or assignment of an access point for the Google Search Application on the preload, placement, or assignment of any other access point to any of Google Search, the Google Search Application, the Chrome Browser Application, the Google Assistant Application, and/or a Google GenAI Assistant Application on Covered Devices sold in the United States. For the avoidance of doubt, Google shall only contract with such partners with respect to such access points on a device by device basis. | H. Google shall not condition the payment for preload, placement, or assignment of an access point for the Google Search Application for one device on any other preload, placement, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States. |
| I. Google shall not condition the payment for preload of, placement of, or assignment of an access point for the Chrome Browser Application for one device on any other preload of, placement of, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States. | I. Google shall not enter or maintain any agreement with a manufacturer or wireless carrier that conditions the payment for preload, placement, or assignment of an access point for the Chrome Browser Application on the preload, placement, or assignment of any other access point to any of the Google Search Application, the Chrome Browser Application, the Google Assistant Application, and/or a Google GenAI Assistant Application on Covered Devices sold in the United States. For the avoidance of doubt, Google shall only contract with such partners with respect to such access points on a device by device basis. | I. Google shall not condition the payment for preload, placement, or assignment of an access point for the Chrome Browser Application for one device on any other preload, placement, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States. |
| J. Google shall not condition the payment for preload of, placement of, or assignment of an access point for the Google Assistant Application or any Google GenAI Product for one device on any other preload, placement, or assignment of an access point for the Google Search Application, the Chrome Browser | J. Google shall not enter or maintain any agreement with a manufacturer or wireless carrier that conditions the payment for preload, placement, or assignment of an access point for the Google Assistant Application or a Google GenAI Assistant Application on the preload, placement, or assignment of any other | J. Google shall not condition the payment for preload, placement, or assignment of an access point for the Google Assistant Application or any Google GenAI Product for one device on any other preload, placement, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the |

| | | |
|---|---|---|
| Application, the Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States. | access point to any of the Google Search Application and/or the Chrome Browser Application on Covered Devices sold in the United States. For the avoidance of doubt, Google shall only contract with such partners with respect to such access points on a device by device basis. | Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States. |
| K. Google shall not enter or maintain any agreement requiring or conditioning Consideration on the distribution of, preload of, placement of, display of, use of, license of, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product in the United States unless the agreement terminates no more than one year after the date it is entered. | K. Google shall not enter or maintain any agreement with a manufacturer or wireless carrier requiring the preload, placement, or assignment of an access point on Covered Devices in the United States to any of the Google Search Application, the Chrome Browser Application, the Google Assistant Application, and/or a Google GenAI Assistant Application for a period of more than one year, unless the agreement allows the manufacturer or wireless carrier to terminate the agreement on an annual basis and does not charge a fee for terminating. | K. Google shall not enter or maintain any agreement requiring or conditioning Consideration on the distribution, preload, placement, display, use, license, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product in the United States unless the agreement terminates no more than one year after the date it is entered. |
| L. Google shall not condition (1) Consideration for a Browser Developer setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product on any browser access point (including alternative modes such as Privacy Mode) on any Device on (2) the Browser Developer setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product on any other browser access point on that same Device or any other Device in the United States. Any agreement containing a default condition permitted by this provision must expire after one year and must expressly permit the Browser Developer to promote any Third-Party General Search Service and Third-Party GenAI Product.[1] | L. Google shall not enter or maintain any agreement requiring a Browser Developer to set Google Search as the Browser Default Search Engine in a Third-Party Browser in the United States unless the agreement (i) permits the Browser Developer on an annual basis to set a different Default Search Engine in the United States for any Operating System Version and/or Privacy Mode offered by the Browser Developer without foregoing any payments attributable to an Operating System Version or Privacy Mode where Google Search remains set as the Default Search Engine; and (ii) expressly permits the Browser Developer to promote any Third-Party General Search Service or Third-Party GenAI Product in the United States. | L. Google shall not condition (1) Consideration for a Browser Developer setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product on any browser access point (including alternative modes such as Privacy Mode) on any Device on (2) the Browser Developer setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product on any other browser access point on that same Device or any other Device in the United States. Any agreement containing a default condition permitted by this provision must expire after one year and must expressly permit the Browser Developer to promote any Third-Party General Search Service and Third-Party GenAI Product. |

[1] Originally: "Google shall not enter or maintain any agreement requiring a Browser Developer to set Google Search as the Browser Default Search Engine in a Third-Party Browser in the United States unless the agreement (i) applies to no more than one Operating System Version and no more than one Privacy Mode, (ii) terminates no more than one year after the date it is entered, and (iii) expressly

| | | |
|---|---|---|
| M. Google shall not condition (1) Consideration for Apple setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product with respect to any proprietary Apple feature or functionality, including Safari, Siri, Spotlight, and any Privacy Mode within those products, on one Device on (2) Apple setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product with respect to any proprietary Apple feature or functionality on that same Device or any other Device in the United States. Any agreement containing a default condition permitted by this provision must expire after one year and must expressly permit Apple to promote any Third-Party General Search Service and Third-Party GenAI Product.[2] | M. Google shall not enter or maintain any agreement requiring Apple, Inc. ("Apple") to set Google Search as the Default Search Engine in the United States with respect to any proprietary Apple feature or functionality, including Siri and Spotlight, unless the agreement complies with Section III.L above.<br><br>N. Google shall not enter or maintain any agreement requiring Apple to distribute any Google GenAI Assistant Application in any Apple web browser or on any Apple mobile or desktop device in the United States unless the agreement expressly permits Apple to promote any Third-Party General Search Service or Third-Party GenAI Product in the United States. | M. Google shall not condition (1) Consideration for Apple setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product with respect to any proprietary Apple feature or functionality, including Safari, Siri, Spotlight, and any Privacy Mode within those products, on one Device on (2) Apple setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product with respect to any proprietary Apple feature or functionality on that same Device or any other Device in the United States. Any agreement containing a default condition permitted by this provision must expire after one year and must expressly permit Apple to promote any Third-Party General Search Service and Third-Party GenAI Product. |
| N. Google shall not enter or maintain any exclusive contract relating to the distribution of Google Search, the Google Search Application, the Chrome Browser Application, the Google Assistant Application, and any Google GenAI Product in the United States. | [No similar provision.] | [No similar provision.] |
| [No similar provision.] | O. Nothing in this Final Judgment shall otherwise prohibit Google from providing Consideration to a manufacturer or wireless carrier with respect to any Google product or service in exchange for such entity's distribution, placement on any access point, promotion, or licensing of that Google product or service. | [No similar provision.] |
| O. Nothing in this Final Judgment shall prohibit Google from | P. Nothing in this Final Judgment shall prohibit Google from | N. Nothing in this Final Judgment shall prohibit Google from |

permits the Browser Developer to promote any Third-Party General Search Service and Third-Party GenAI Product. For clarity, this provision does not prohibit Google from negotiating multiple such agreements with a Browser Developer as long as no agreement is conditioned on another."

[2] Originally: "Google shall not enter or maintain any agreement requiring Apple to set Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product in the United States with respect to any proprietary Apple feature or functionality, including Safari, Siri, and Spotlight, unless the agreement (i) applies to no more than one Operating System Version and no more than one Privacy Mode, (ii) terminates no more than one year after the date it is entered, and (iii) expressly permits Apple to promote any Third-Party General Search Service and Third-Party GenAI Product. For clarity, this provision does not prohibit Google from negotiating multiple such agreements with Apple as long as no agreement is conditioned on another."

| | | |
|---|---|---|
| distributing the Google Search Application, the Google Assistant Application, and any Google GenAI Product through a single Application Programming Kit (APK) as long as the licensee has the option to disable end-user access to any of those applications and services that the licensee declines to license. | distributing the Google Search Application, the Google Assistant Application, and a Google GenAI Assistant Application through a single Application Programming Kit (APK) as long as the licensee has the option to disable end-user access to any of those applications and services that the licensee declines to license. | distributing the Google Search Application, the Google Assistant Application, and any Google GenAI Product through a single Application Programming Kit (APK) as long as the licensee has the option to disable end-user access to any of those applications and services that the licensee declines to license. |

## IV. REQUIRED DISCLOSURES OF DATA

| **Plaintiffs' Proposal** | **Google's Proposal** | **Final Judgment** |
|---|---|---|
| A. Google's Search Index: Within thirty (30) days of a Qualified Competitor's certification pursuant to Section IX.W, Google shall make available to such Qualified Competitor, at marginal cost, to Qualified Competitors the following data related to Google's Search Index:<br>1. for each document in the Google Search Index, a unique identifier (DocID) and another notation sufficient to denote all the documents Google considers duplicates of each other;<br>2. a DocID to URL map; and<br>3. for each DocID, the (A) time that the URL was first seen, (B) time that the URL was last crawled, (C) spam score, and (D) device-type flag.<br>This information shall be provided for all websites in the full Search Index Google uses for searches on Google.com, the Google Search Application, or any other current or future Google general search products. Nothing in Section IV is intended to transfer intellectual property rights of third parties to index users. | A. Google's Web Search Index: For the term of this Final Judgment, Google will make available, at Marginal Cost, to Qualified Competitors the following data related to Google's Web Search Index on a non-discriminatory basis while safeguarding personal privacy and security:<br>1. for each document in the Google Web Search Index a unique identifier (DocID) and another notation sufficient to denote all the documents Google considers duplicates of each other;<br>2. a DocID to URL map; and<br>3. for each DocID the following set of associated data: (A) time that the URL was first seen, (B) time that the URL was last crawled, (C) spam score, and (D) device-type flag.<br>4. This information must be provided for all websites in the Web Search Index Google uses for searches on Google.com, the Google Search App, or future Google general search products.<br>5. Google must make this information available to Qualified Competitors on a one-time basis at or around the time they are so certified as a Qualified Competitor.<br>6. Nothing in this Section IV is intended to transfer intellectual property rights of third parties to index users. | A. Google's Web Search Index: Within thirty (30) days of a Qualified Competitor's certification pursuant to Section IX.V, unless granted additional time, Google shall make available, at marginal cost, to Qualified Competitors the following data related to Google's Web Search Index:<br>1. for each document in the Google Web Search Index, a unique identifier (DocID) and another notation sufficient to denote all the documents Google considers duplicates of each other;<br>2. a DocID to URL map; and<br>3. for each DocID, the (A) time that the URL was first seen, (B) time that the URL was last crawled, (C) spam score, and (D) device-type flag.<br>The information shall be provided for all websites in the full Web Search Index Google uses for searches on Google.com, the Google Search Application, or any future Google general search products. Nothing in Section IV is intended to transfer intellectual property rights of third parties to index users. |

| | | |
|---|---|---|
| B. User-Side Data: For the term of this Final Judgment, Google shall make available, at marginal cost, to Qualified Competitors the following User-side Data on a non-discriminatory basis while safeguarding personal privacy and security:<br>1. User-side Data used to build, create, or operate the GLUE statistical model(s); and<br>2. User-side Data used to train, build, or operate the RankEmbed model(s).<br>Google shall make this data available to Qualified Competitors at least twice, with the exact number and frequency of such disclosures to be determined by the Court after consultation with Plaintiffs and the Technical Committee (TC). Any cap on the number of such disclosures shall be informed, in part, by the utility of the datasets disclosed after appropriate privacy-enhancing techniques have been applied. For clarity, this Section IV.B shall not require disclosure of intellectual property or trade secrets, such as algorithms, ranking signals, or post-trained LLMs. | B. User-Side Data: For the term of this Final Judgment, Google will make available, at Marginal Cost, to Qualified Competitors the following User-side Data on a non-discriminatory basis while safeguarding personal privacy and security:<br>1. User-side Data used to build, create, or operate the GLUE statistical model(s); and<br>2. User-side Data used to train, build, or operate the RankEmbed model(s).<br>3. For the avoidance of doubt, "User-side Data" for purposes of Section IV includes only the underlying data, not the model itself or any ranking signal or score, spam score, information retrieval score, information satisfaction score, query interpretation information, query suggestion information, query-based salient term, or document salient term.<br>4. The number of times a Qualified Competitor may receive a dataset will be capped by the Court after consultation with the Technical Committee. The cap on the number of such disclosures will be informed, in part, by the utility of the datasets disclosed after appropriate privacy-enhancing techniques have been applied. | B. User-Side Data: For the term of this Final Judgment, Google shall make available, at marginal cost, to Qualified Competitors the following User-side Data on a non-discriminatory basis while safeguarding personal privacy and security:<br>1. User-side Data used to build, create, or operate the GLUE statistical model(s); and<br>2. User-side Data used to train, build, or operate the RankEmbed model(s).<br>Google shall make this data available to Qualified Competitors at least twice, with the exact number and frequency of such disclosures to be determined by the Court after consultation with Plaintiffs and the Technical Committee (TC). Any cap on the number of such disclosures shall be informed, in part, by the utility of the datasets disclosed after appropriate privacy-enhancing techniques have been applied. For clarity, this Section IV.B shall not require disclosure of intellectual property or trade secrets, such as algorithms, ranking signals, or post-trained LLMs. |
| C. User-Side Data Sharing Administration: | C. User-Side Data Sharing Administration: These remedies are intended to make this data available in a way that provides suitable security and privacy safeguards for the data the Google must share. | C. User-Side Data Sharing Administration: |
| 1. Plaintiffs, in consultation with the TC, shall promptly determine the appropriate User-side Data privacy and security safeguards to be applied before Google shares the data specified in Section IV.B with Qualified Competitors. Google shall have up to six (6) months from the date that the Plaintiffs, in | 1. Before this data specified in Paragraph IV.B is shared with Qualified Competitors, Google shall apply adequate anonymization and privacy-enhancing techniques to ensure the data is anonymized and secured, while attempting to optimize its usefulness. | 1. Plaintiffs, in consultation with the TC, shall promptly determine the appropriate User-side Data privacy and security safeguards to be applied before Google shares the data specified in Section IV.B with Qualified Competitors. Google shall have up to six (6) months from the date that the Plaintiffs, in |

| | | |
|---|---|---|
| consultation with the TC, determine such privacy and security safeguards to implement the technology and provide any notice necessary to comply with this Section IV, and Google shall be deemed to have implemented the technology once Plaintiffs, in consultation with the TC, determine that the technology, including privacy and security safeguards, is fully functional. | 3. Google will have up to six (6) months from the date that security and privacy safeguards are finally determined to implement the technology and provide any notice necessary to comply with this Section IV.C.2. | consultation with the TC, determine such privacy and security safeguards to implement the technology and provide any notice necessary to comply with this Section IV, and Google shall be deemed to have implemented the technology once Plaintiffs, in consultation with the TC, determine that the technology, including privacy and security safeguards, is fully functional. |
| 2. Google shall provide sufficient information about each dataset such that Qualified Competitors can reasonably understand what it contains, including but not limited to a description of what the dataset contains, any sampling methodology used to create the dataset, and any anonymization or privacy-enhancing technique that was applied. Plaintiffs, in consultation with the TC, may impose restrictions on what information Google shares under this Section IV.C.2 for the purposes of (i) promoting data privacy and security and (ii) ensuring privacy and security safeguards are effectively applied. | 2. Google must provide sufficient information about each dataset such that Qualified Competitors can reasonably understand what it contains, including but not limited to a description of what the dataset contains, any sampling methodology used to create the dataset, and any anonymization or privacy-enhancing technique that was applied. Plaintiffs, in consultation with the Technical Committee, may recommend restrictions on what information Google shares under this Paragraph IV.C.2 for the purposes of (i) promoting data privacy and security and (ii) ensuring privacy and security safeguards are effectively applied. | 2. Google shall provide sufficient information about each dataset such that Qualified Competitors can reasonably understand what it contains, including but not limited to a description of what the dataset contains, any sampling methodology used to create the dataset, and any anonymization or privacy-enhancing technique that was applied. Plaintiffs, in consultation with the TC, may impose restrictions on what information Google shares under this Section IV.C.2 for the purposes of (i) promoting data privacy and security and (ii) ensuring privacy and security safeguards are effectively applied. |
| [No similar provision.] | 4. The data specified in Paragraph IV.A and B will be shared pursuant to a license governing use. The terms of the license shall include a requirement that the Qualified Competitor commit not to share or sell the datasets, and shall use the datasets for the exclusive purpose of serving users located in the United States through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product. | 3. The data specified in Sections IV.A and B will be shared pursuant to a license governing use. The terms of the license shall include a requirement that the Qualified Competitor commit not to share or sell the datasets unless authorized by the Technical Committee or the Court and shall use the datasets for the exclusive purpose of serving users through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product. Within six (6) months of the Effective Date of this Final Judgment, Plaintiffs and the Technical Committee, with input from Google, shall create and submit to the Court a template for such license. |

## V. REQUIRED SYNDICATION OF SEARCH RESULTS

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| A. Search Syndication License: Google shall take steps sufficient to make available to any Qualified Competitor, on financial terms no worse than those offered to any other user of Google's search syndication products, a syndication license whose term will be five (5) years from the date the license is signed, and which shall require Google, via real-time API(s), to make the following information and data available in response to each query issued or submitted by a Qualified Competitor:<br>1. both desktop and mobile versions of the ranked organic web search results obtained from crawling the web;<br>2. the user-facing query-rewriting features that Google provides under any of its current search syndication agreements as of the date of entry of this Final Judgment, including user-facing Search Features that enable query correction, modification, or expansion; and<br>3. the Local, Maps, Video, Images, and Knowledge Panel Search Feature content that Google provides under any of its current search syndication agreements as of the date of the entry of this Final Judgment. | A. Search Syndication: Google must take steps sufficient to make available to any Qualified Competitor a syndication agreement whose term will be five (5) years from the date Google's search syndication service, as set forth in this Final Judgment, is made available to the Qualified Competitor, unless there are fewer than five (5) years remaining before expiration of the term of the Final Judgment, in which case the term will be the remainder of the term of the Final Judgment. Google must make available under the syndication agreement the following information and data in response to each query submitted by a Qualified Competitor:<br>1. Both desktop and mobile versions of the ranked organic web search results obtained from crawling the web (i.e., the ten blue links) that Google provides under current standard search syndication agreements;<br>2. the user-facing query-rewriting features that Google provides under current standard search syndication agreements, including user-facing features that enable query correction, modification, or expansion; and<br>3. the Local, Maps, Video, Images, and Knowledge Panel search feature content that Google provides under current standard search syndication agreements. For the avoidance of doubt, Google is not required to syndicate content in a manner inconsistent with its third-party content license agreements. | A. Search Syndication License: Google shall take steps sufficient to make available to any Qualified Competitor, on financial terms no worse than those offered to any other user of Google's search syndication products, a syndication license whose term will be five (5) years from the date the license is signed, and which shall require Google, via real-time API(s), to make the following information and data available in response to each query issued or submitted by a Qualified Competitor:<br>1. both desktop and mobile versions of the ranked organic web search results obtained from crawling the web;<br>2. the user-facing query-rewriting features that Google provides under any of its current search syndication agreements as of the date of entry of this Final Judgment, including user-facing Search Features that enable query correction, modification, or expansion; and<br>3. the Local, Maps, Video, Images, and Knowledge Panel Search Feature content that Google provides under any of its current search syndication agreements as of the date of entry of this Final Judgment. |
| B. Search Syndication License Terms: The search syndication license specified in Section V.A shall have the following additional features: | B. Search Syndication Agreement Terms: The search syndication agreement must have the following additional features: | B. Search Syndication License Terms: The search syndication license in Section V.A shall have the following additional features: |

| | | |
|---|---|---|
| 1. Google shall make syndicated content available via an API. | 1. Google will make syndicated content available via an API. | 1. Google shall make syndicated content available via an API. |
| 2. Google shall provide responses with latency and reliability functionally equivalent to what any other user of Google's search syndication products would receive as of the date of entry of this Final Judgment. | 2. Google will provide Qualified Competitors with latency and reliability functionally equivalent to what Google ordinarily provides to other users of Google's search syndication products with respect to queries originating in the United States. For the avoidance of doubt, Google's obligations do not extend to latency and reliability differences that result from differences in product implementation, users, or are otherwise outside of Google's syndication products. | 2. Google shall provide Qualified Competitors with latency and reliability functionally equivalent to what any other user of Google's search syndication products would receive as of the date of entry of this Final Judgment. For the avoidance of doubt, Google's obligations do not extend to latency and reliability differences that result from differences in product implementation, users, or are otherwise outside of Google's syndication products. |
| 3. Google shall provide the license on a non-discriminatory basis to any Qualified Competitor on terms no less favorable than the most favorable terms Google provides under any current search syndication agreements as of the date of entry of this Final Judgment. | 3. Google will offer these syndication services on a non-discriminatory basis to Qualified Competitors at market rates consistent with ordinary commercial terms agreed to by other users of Google's search syndication products with respect to queries originating in the United States. | 3. Google shall provide the license on a non-discriminatory basis to any Qualified Competitor on terms no less favorable than the most favorable terms Google provides under any current search syndication agreements as of the date of entry of this Final Judgment. |
| 4. Syndication shall start with significant access to the data required by Section V.A above and decline over the course of five (5) years with an expectation that Qualified Competitors will become independent of Google over time through investment in their own search capabilities. Qualified Competitors' use of Google's search syndication services in the first year of a syndication license available under Section V.A shall be capped at 40% of the Qualified Competitors' annual queries. The scope of allowable syndication beyond the first year of a syndication license available under Section V.A shall be determined by the Plaintiffs in consultation with the TC. | 4. Qualified Competitors' use of Google's syndication services in the first year will be capped at 40% of Qualified Competitors' annual U.S. queries and decline over the course of a 5-year period with an expectation that Qualified Competitors will become independent of Google over time through investment in their own search capabilities. The pace of this tapering, the methods for measuring and determining the percentage, and the application of the percentage will be determined by the Court upon consultation with the Technical Committee in a manner that facilitates competition while incentivizing Qualified Competitors to move promptly to become independent of Google. | 4. Qualified Competitors' use of Google's syndication services in the first year will be capped at 40% of Qualified Competitors' annual U.S. queries and decline over the course of a 5-year period with an expectation that Qualified Competitors will become independent of Google over time through investment in their own search capabilities. The pace of this tapering, the methods for measuring and determining the percentage, and the application of the percentage will be determined by the Court upon consultation with Plaintiffs and the Technical Committee in a manner that facilitates competition while incentivizing Qualified Competitors to move promptly to become independent of Google. |
| 5. Google may not consent to Qualified Competitors exceeding syndication limits set by Plaintiffs, and Qualified Competitors shall | 6. Google may not consent to Qualified Competitors exceeding syndication limits, and Qualified Competitors must submit to the | 5. Google may not consent to Qualified Competitors exceeding syndication limits, and Qualified Competitors shall submit to the TC |

| | | |
|---|---|---|
| submit to their TC audits of syndication frequency and scope. The frequency and content of these audits shall be determined by the Plaintiffs in consultation with the TC. | Technical Committee audits of syndication frequency and scope. The Technical Committee will make recommendations regarding the frequency and content of these audits, and the Court will have final authority over their frequency and scope. | audits of syndication frequency and scope. The frequency and content of these audits shall be determined by the Plaintiffs in consultation with the TC. |
| 6. Google may impose no restrictions or conditions on how a Qualified Competitor uses, displays, or integrates information or services obtained under this Section V beyond the least restrictive terms Google provides under any current search syndication agreements as of the date of entry of this Final Judgment. | 7. The only permitted use of the information and data that Qualified Competitors obtain from Google pursuant to this Section V is to display the search results to the end user who submitted the associated query, for the exclusive purpose of serving users located in the United States through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product. | 6. Google may impose no restrictions or conditions on how a Qualified Competitor uses, displays, or integrates information or services obtained under this Section V beyond the least restrictive terms Google provides under any current search syndication agreements as of the date of entry of this Final Judgment. |
| 7. Qualified Competitors may elect, in their sole discretion, which queries (some or all) for which they will request syndicated results and which syndication components to display or use and may do so in any manner they choose, except that Google may impose restrictions on the display or use of syndication components no less favorable than what it provides under any current search syndication agreements as of the date of entry of this Final Judgment. | 5. Qualified Competitors may elect, in their sole discretion, the queries (of those that are eligible for syndication pursuant to paragraph V.B.4) for which they will request syndicated results and which syndication components to call for.<br><br>8. Google may impose its ordinary commercial terms and policies. For the avoidance of doubt, Google is permitted to place its ordinary commercial restrictions on the use and display of its syndicated results and content. Google is also permitted to place its ordinary commercial restrictions on scraping, indexing, crawling, or otherwise storing or analyzing the syndicated results and content. | 7. Qualified Competitors may elect, in their sole discretion, which queries (some or all) for which they will request syndicated results and which syndication components to display or use and may do so in any manner they choose, except that Google may impose restrictions on the display or use of syndication components no less favorable than what it provides under any current search syndication agreements as of the date of entry of this Final Judgment. Google is also permitted to place its ordinary commercial restrictions on scraping, indexing, or crawling the syndicated results and content. |
| 8. It shall be the Qualified Competitor's sole discretion to determine how much information to share with Google regarding the end-user, except that Google may require a Qualified Competitor to share information with Google regarding the end-user, on terms no less favorable than what any other user of Google's search syndication products would receive as of the date of entry of this Final Judgment, as is | 9. It will be the Qualified Competitor's sole discretion to determine how much information to share with Google regarding the end-user, except that Google may impose its ordinary commercial terms as is necessary for the purposes of (1) search syndication functionality; (2) spam and abuse detection; and (3) legal or regulatory compliance. | 8. It shall be the Qualified Competitor's sole discretion to determine how much information to share with Google regarding the end user except that Google may require a Qualified Competitor to share information with Google regarding the end user, on terms no less favorable than what any other user of Google's search syndication products would receive as of the date of entry of this Final Judgment, as is |

| | | |
|---|---|---|
| necessary for the purposes of (1) basic search syndication functionality; (2) spam and abuse detection; and (3) legal or regulatory compliance. | | necessary for the purposes of (1) basic search syndication functionality; (2) spam and abuse detection; and (3) legal or regulatory compliance. |
| 9. Google may not retain or use (in any way) syndicated queries or other information it obtains under Section V.A for its own products and services beyond the most limited retention and use permitted under any of Google's current search syndication agreements as of the date of entry of this Final Judgment. | 10. Google is permitted to retain or use data collected from Qualified Competitors in provisioning of the service under Section V for Google's own products and services to the same extent Google retains or uses data in the ordinary course from other users of its search syndication service. | 9. Google may not retain or use (in any way) syndicated queries or other information it obtains under Section V.A for its own products and services beyond the most limited retention and use permitted under any of Google's current search syndication agreements as of the date of entry of this Final Judgment. |
| 10. For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States. Synthetic queries are not eligible for syndication under this Final Judgment. | 11. For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States, from human end users of the Qualified Competitor. Queries from a syndicator of the Qualified Competitor and synthetic queries are not eligible for syndication under the Final Judgment. | 10. For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States, from human end users of the Qualified Competitor. Queries from a syndicator of the Qualified Competitor and synthetic queries are not eligible for syndication under the Final Judgment. |
| [No similar provision.] | 12. If Google in good faith believes a Qualified Competitor is in breach of the terms of its agreement, it may exercise its rights under the agreement. Google must also provide simultaneous notice to the Technical Committee of the breach and the actions Google is taking in light of the breach. | 11. If Google in good faith believes a Qualified Competitor is in breach of the terms of its agreement, it may exercise its rights under the agreement. Google must also provide simultaneous notice to the Technical Committee of the breach and the actions Google is taking in light of the breach. |
| [No similar provision.] | [No similar provision.] | Within sixty (60) days of the Effective Date of this Final Judgment, Plaintiffs and the Technical Committee, with input from Google, shall create and submit to the Court a template for such license. |
| C. <u>Existing Syndication Agreements</u>: The provisions of this Section V shall have no effect on any existing Google syndication agreements with third parties or on its ability to enter into syndication agreements with third parties other than Qualified Competitors, except that Google shall permit any entity with an existing syndication agreement who becomes a Qualified Competitor, | C. <u>Existing Syndication Agreements</u>: The provisions of this Section V will have no effect on any existing Google search syndication agreements with third parties or on Google's ability to enter into search syndication contracts with third parties other than Qualified Competitors, except that Google must permit any entity with an existing search syndication agreement who becomes a | C. <u>Existing Syndication Agreements</u>: The provisions of this Section V will have no effect on any existing Google search syndication agreements with third parties or on Google's ability to enter into search syndication agreements with third parties other than Qualified Competitors, except that Google shall permit any entity with an existing search syndication agreement who |

| | | |
|---|---|---|
| at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section V. | Qualified Competitor, at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section V. | becomes a Qualified Competitor, at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section V. |

## VI. SEARCH TEXT AD AUCTION CHANGES AND SEARCH TEXT ADS SYNDICATION

| **Plaintiffs' Proposal** | **Google's Proposal** | **Final Judgment** |
|---|---|---|
| A. Search Text Ads Auction Changes: Within a reasonable period of time after the Technical Committee's appointment, Plaintiffs shall submit a proposal to the Court, informed by the Technical Committee's views, by which Google shall periodically provide the Technical Committee and Plaintiffs a report outlining all changes to its Search Text Ads auction meeting certain parameters and, for each such change, (1) Google's public disclosure of that change or (2) a statement why no public disclosure is necessary. Plaintiffs' proposal shall detail the types of changes that must be disclosed, the frequency of disclosure, the steps to mitigate undue burden on Google, and the steps to ensure any public disclosure of an ad auction change (if not already made by Google) avoids revealing Google's trade secrets, in accord with the Court's instructions in its September 2, 2025, Memorandum Opinion. Plaintiffs have the right to challenge any disclosure they deem inadequate. For the avoidance of doubt, Google need not report on auction experiments, which are generally tested on some fraction of Google's Search Text Ads traffic, but Google shall disclose changes to the Search Text Ads auction that result from any such auction experiments. | A. Search Text Ads Auction Changes: Within a reasonable period of time after the Technical Committee's appointment, Plaintiffs and the Technical Committee shall submit a proposal to the Court, by which Google shall periodically provide the Technical Committee and Plaintiffs a report outlining all changes to its Search Text Ads auction meeting certain parameters and, for each such change, (1) Google's public disclosure of that change or (2) a statement why no public disclosure is necessary. The proposal shall detail the types of changes that must be disclosed, the frequency of disclosure, the steps to mitigate undue burden on Google, and the steps to ensure any public disclosure of an ad auction change (if not already made by Google) avoids revealing Google's trade secrets, in accord with the Court's instructions in its September 2, 2025, Memorandum Opinion. For the avoidance of doubt, Google need not report on auction experiments, which are generally tested on some fraction of Google's Search Text Ads traffic. Should any of these auction experiments result in ad auction launches that fall within the types of changes that must be disclosed under this Section, Google shall disclose such changes to Plaintiffs and the Technical Committee. | A. Search Text Ads Auction Changes: Within a reasonable period of time after the Technical Committee's appointment, Plaintiffs shall submit a proposal to the Court, informed by the Technical Committee's views, by which Google shall periodically provide the Technical Committee and Plaintiffs a report outlining all changes to its Search Text Ads auction meeting certain parameters and, for each change, (1) Google's public disclosure of that change or (2) a statement why no public disclosure is necessary. Plaintiffs' proposal shall detail the types of changes that must be disclosed, the frequency of disclosure, the steps to mitigate undue burden on Google, and the steps to ensure any public disclosure of an ad auction change (if not already made by Google) avoids revealing Google's trade secrets, in accord with the Court's instructions in its September 2, 2025, Memorandum Opinion. Plaintiffs have the right to challenge any disclosure they deem inadequate. For the avoidance of doubt, Google need not report on auction experiments, which are generally tested on some fraction of Google's Search Text Ads traffic, but Google shall disclose changes to the Search Text Ads auction that result from any such auction experiments. |
| B. Search Text Ads Syndication: Google shall take steps sufficient to make available to any Qualified Competitor a Search Ads Syndication License whose term will be five (5) years from the date the license is | B. Search Text Ads Syndication: Google must take steps sufficient to make available to any Qualified Competitor a Search Text Ads syndication agreement whose term will be five (5) years from the date | B. Search Text Ads Syndication: Google shall take steps sufficient to make available to any Qualified Competitor a Search Text Ads Syndication License whose term will be five (5) years from the date the |

| | | |
|---|---|---|
| signed. The Search Text Ads syndication agreement shall have the following additional features: | Google's Search Text Ads syndication service, as set forth in this Final Judgment, is made available to the Qualified Competitor, unless there are fewer than five (5) years remaining before expiration of the term of the Final Judgment, in which case the term will be the remainder of the term of the Final Judgment. The Search Text Ads syndication agreement must have the following additional features: | license is signed. The Search Text Ads syndication agreement shall have the following additional features: |
| 1. Google shall provide latency, reliability, and performance functionally equivalent to what Google provides any other user of Google's Search Text Ads syndication products, e.g., AdSense for Search, or any other current or future products offering syndicated Search Text Ads. Search Text Ads syndication licenses to Qualified Competitors shall include all types of Search Text Ads (including any assets, extensions, or similar Search Text Ad variations) available through its syndication products. For the avoidance of doubt, Google shall only provide syndication for queries that originate in the United States. | 1. Google will provide latency, reliability, and performance functionally equivalent to what Google ordinarily provides to other users of Google's Search Text Ads syndication products, e.g., AdSense for Search, with respect to queries originating in the United States. For the avoidance of doubt, Google's obligations do not extend to latency, reliability, and performance differences that result from differences in product implementation, users, or are otherwise outside of Google's syndication products.<br>3. Google will make available to Qualified Competitors all types of Search Text Ads (including any assets, extensions, or similar Search Text Ad variations) that are available through its Search Text Ads syndication products. | 1. Google shall provide latency, reliability, and performance functionally equivalent to what Google ordinarily provides to other users of Google's Search Text Ads syndication products, e.g., AdSense for Search, or any other current or future products offering syndicated Search Text Ads. Search Text Ads syndication licenses to Qualified Competitors shall include all types of Search Text Ads (including any assets, extensions, or similar Search Text Ad variations) available through its syndication products. For the avoidance of doubt, Google's obligations do not extend to latency, reliability, and performance differences that result from differences in product implementation, users, or are otherwise outside of Google's syndication products. |
| 2. Google shall provide the Search Ads Syndication License to Qualified Competitors on financial terms no worse than those offered to any other user of Google's Search Text Ads syndication products. | 2. Google will offer these syndication services on a non-discriminatory basis to Qualified Competitors at market rates consistent with ordinary commercial terms agreed to by other users of Google's Search Text Ads syndication products, e.g., AdSense for Search, with respect to queries originating in the United States. | 2. Google shall provide the Search Text Ads Syndication License to Qualified Competitors on financial terms no worse than those offered to any other user of Google's Search Text Ads syndication products. |
| 3. Google shall not require Qualified Competitors to share more information with Google regarding the end-user than it requires from any other user of Google's Search Text Ads syndication products. | 11. It will be the Qualified Competitor's sole discretion to determine how much information to share with Google regarding the end-user, except that Google may impose its ordinary commercial terms for the | 3. Google shall not require Qualified Competitors to share more information with Google regarding the end user than it requires from any other user of Google's Search Text Ads syndication products. |

| | | |
|---|---|---|
| | purposes of (1) ad syndication functionality; (2) spam and abuse detection; and/or (3) legal or regulatory compliance. | |
| 4. The only permitted use of the information and data that Qualified Competitors obtain from Google pursuant to this Section VI is to display the ad results to the end user who submitted the associated query, as further detailed in this section. | 7. The only permitted use of the information and data that Qualified Competitors obtain from Google pursuant to this Section VI is to display the ad results to the end user who submitted the associated query, for the exclusive purpose of serving users located in the United States through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product. | 4. The only permitted use of the information and data that Qualified Competitors obtain from Google pursuant to this Section VI is to display the ad results to the end user who submitted the associated query, as further detailed in this section, except as permitted by Section VI.B.9. |
| 5. Google shall (i) make the purchase of ads syndicated under this Section VI.B available to advertisers on a nondiscriminatory basis comparable to, and no more burdensome than, the availability of Google's other Search Text Ads; (ii) include Qualified Competitors in its Search Partner Network; and (iii) provide advertisers the option to appear on each individual Qualified Competitor's sites on a site-by-site basis (i.e., an advertiser can choose to appear as a syndicated result on a Qualified Competitor's site regardless of whether it opts into the Search Partner Network or chooses to appear on any other site, including Google.com) to the same extent advertisers have such choice for any Google Search Text Ads Syndicator as of the date of entry of this Final Judgment. | 4. Google will make the purchase of ads syndicated under this Section VI available to advertisers on a nondiscriminatory basis comparable to, and no more burdensome than, the availability of Google's other Search Text Ads, and must offer advertisers the choice to opt into showing ads on Qualified Competitors' websites, consistent with Google's ordinary commercial terms, policies, and functionality offered to other users of Google's Search Text Ads syndication products. | 5. Google shall (i) make the purchase of ads syndicated under this Section VI.B available to advertisers on a non-discriminatory basis comparable to, and no more burdensome than, the availability of Google's other Search Text Ads and (ii) include Qualified Competitors in its Search Partner Network. |
| 6. Qualified Competitors shall have the same formatting flexibility available to any other user of Google's Search Text Ads syndication products, shall be free to use other providers of syndicated search ads or display their own ads, | 5. Qualified Competitors shall have the same formatting flexibility with respect to the Search Text Ads syndicated pursuant to this Judgment as Google makes available to other users of Google's Search Text Ads syndication products. | 6. Qualified Competitors shall have the same formatting flexibility available to any other user of Google's Search Text Ads syndication products, shall be free to use other providers of syndicated search ads or display their own ads, |

| | | |
|---|---|---|
| and shall not be required to provide Google ads with preferential placement over equivalent ads requested from other sources. Google may place only ordinary-course restrictions on the use or display of syndicated ad content intended to guard against "trick or click" schemes, ensure the proper ordering of ads, guarantee ad quality, protect the advertiser, or prevent ad misuse, and may place restrictions on scraping, indexing, or crawling syndicated results, but such restrictions shall be no more restrictive than those applied to any other user of Google's Search Text Ads syndication products. | 6. Qualified Competitors shall be free to use other providers of syndicated search ads or display their own ads, and Qualified Competitors shall not be required to provide Google ads with preferential placement over equivalent ads requested from other sources.<br>8. Google may impose its ordinary commercial terms and policies. For the avoidance of doubt, Google is permitted to place its ordinary commercial restrictions on the use and display of its syndicated ads. Google is also permitted to place its ordinary commercial restrictions on scraping, indexing, crawling, or otherwise storing or analyzing the syndicated ads. | and shall not be required to provide Google ads with preferential placement over equivalent ads requested from other sources. Google may place only ordinary-course restrictions on the use or display of syndicated ad content, but such restrictions shall be no more restrictive than those applied to any other user of Google's Search Text Ads syndication products. Google is also permitted to place its ordinary commercial restrictions on scraping, indexing, or crawling the syndicated ads. |
| 7. Google may only retain or use (in any way) syndicated queries or other information it obtains under this Section VI.B to "build, improve, and maintain" its ad infrastructure in the same manner it used such information as of the date of entry of this Final Judgment. | 9. Google is permitted to retain or use data collected from Qualified Competitors in provisioning of the service under Section VI for Google's own products and services for the purpose of building, improving, and maintaining its ads infrastructure and shared ads systems. Google's use of Qualified Competitors' data for these purposes will be the same as Google's use of data from other users of its Search Text Ads syndication products. | 7. Google is permitted to retain or use data collected from Qualified Competitors in provisioning of the service under Section VI for Google's own products and services for the purpose of building, improving, and maintaining its ads infrastructure and shared ads systems. Google's use of Qualified Competitors' data for these purposes will be the same as Google's use of data from other users of its Search Text Ads syndication products. |
| 8. Google need not grant Qualified Competitors the right to set a minimum cost per click for syndicated ads unless failing to do so would violate Section VI.B.1. | 10. Google need not grant Qualified Competitors the right to set a minimum cost per click for syndicated ads. | 8. Google need not grant Qualified Competitors the right to set a minimum cost per click for syndicated ads unless failing to do so would violate Section VI.B.1. |
| 9. For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States, from human end users. Synthetic queries are not eligible for syndication under the Final Judgment. | 12. For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States, from human end users of the Qualified Competitor. Queries from a syndicator of the Qualified Competitor and synthetic queries are not eligible for syndication under the Final Judgment. | 9. For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States, from human end users. Synthetic queries are not eligible for syndication under the Final Judgment. Queries from a syndicator of the Qualified Competitor are not eligible for syndication under the Final Judgment, unless such Qualified Competitor has been certified as a |

| | | |
|---|---|---|
| | | Competitor to a Google ads platform (e.g., Google Ads). |
| 10. If Google in good faith believes a Qualified Competitor is in breach of the terms of its agreement under this Section VI, Google may exercise its rights under the agreement. Before exercising such rights, Google shall first provide simultaneous notice to the Technical Committee and the Plaintiffs of the breach and the actions Google is taking in light of the breach. Google shall provide this notice in time such that Plaintiffs have a reasonable period of time to raise objections. If Plaintiffs object and seek a resolution by the Court, Google may not take any action until the later of (i) two weeks after Plaintiffs seek Court intervention, if the Court does not act, or (ii) until further order of the Court, if the Court intervenes. | 13. If Google in good faith believes a Qualified Competitor is in breach of the terms of its agreement, it may exercise its rights under the agreement. Google must also provide simultaneous notice to the Technical Committee of the breach and the actions Google is taking in light of the breach. | 10. If Google in good faith believes a Qualified Competitor is in breach of the terms of its agreement under this Section VI, Google may exercise its rights under the agreement. Before exercising such rights, Google shall first provide simultaneous notice to the Technical Committee and the Plaintiffs of the breach and the actions Google is taking in light of the breach. Google shall provide this notice in time such that Plaintiffs have a reasonable period of time to raise objections. If Plaintiffs object and seek a resolution by the Court, Google may not take any action until the later of (i) two weeks after Plaintiffs seek Court intervention, if the Court does not act, or (ii) until further order of the Court, if the Court intervenes. Google may seek expedited consideration from the Court if the circumstances warrant such treatment. |
| 11. Google shall be entitled to propose additional terms to the Search Text Ad syndication agreements with Qualified Competitors as necessary to guarantee ad quality, protect advertisers, and prevent ad misuse. Qualified Competitors are free to reject these proposed additional terms. Google shall provide simultaneous notice to the Technical Committee and the Plaintiffs of any such term and allow Plaintiffs a reasonable period of time to raise objections. If Plaintiffs object and seek a resolution by the Court, Google may not modify its Search Text Ad syndication agreements under this Section VI until the later of (i) two weeks after Plaintiffs seek Court intervention, if the Court does not act, or (ii) until further order of the Court, if the Court intervenes. | 14. Google will be entitled to propose additional terms to the Search Text Ad syndication agreements with Qualified Competitors as necessary to guarantee ad quality, protect advertisers, and prevent ad misuse. | 11. Google shall be entitled to propose additional terms to the Search Text Ad syndication agreements with Qualified Competitors as necessary to guarantee ad quality, protect advertisers, and prevent ad misuse. Qualified Competitors are free to reject these proposed additional terms. Google shall provide simultaneous notice to the Technical Committee and the Plaintiffs of any such term and allow Plaintiffs a reasonable period of time to raise objections. If Plaintiffs object and seek a resolution by the Court, Google may not modify its Search Text Ad syndication agreements under this Section VI until the later of (i) two weeks after Plaintiffs seek Court intervention, if the Court does not act, or (ii) until further order of the Court, if the Court intervenes. Google may seek expedited |

| | | |
|---|---|---|
| | | consideration from the Court if the circumstances warrant such treatment. |
| 12. Qualified Competitors may elect, in their sole discretion, which queries (some or all) for which they will request syndicated search text ad results and which syndication components to display or use and may do so in any manner they choose, except that Google may impose restrictions on the display or use of syndication components no less favorable than what it provides under current search text ad syndication agreements as of the date of entry of this Final Judgment. | 15. Qualified Competitors may elect, in their sole discretion, the queries for which they will request syndicated ad results. | 12. Qualified Competitors may elect, in their sole discretion, the queries for which they will request syndicated ad results. |
| [No similar provision.] | [No similar provision.] | Within sixty (60) days of the Effective Date of this Final Judgment, Plaintiffs and the Technical Committee, with input from Google, shall create and submit to the Court a template for such license. |
| C. <u>Existing Syndication Agreements</u>: The provisions of this Section VI shall have no effect on any existing Google search text ad syndication agreements with third parties or on its ability to enter into search text ad syndication agreements with third parties other than Qualified Competitors, except that Google shall permit any entity with an existing search text ad syndication agreement who becomes a Qualified Competitor, at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section VI. | C. <u>Existing Syndication Agreements</u>: The provisions of this Section VI will have no effect on any existing Google Search Text Ad syndication agreements with third parties or on Google's ability to enter into Search Text Ad syndication contracts with third parties other than Qualified Competitors, except that Google must permit any entity with an existing Search Text Ad syndication agreement who becomes a Qualified Competitor, at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section VI. | C. <u>Existing Syndication Agreements</u>: The provisions of this Section VI shall have no effect on any existing Google Search Text Ad syndication agreements with third parties or on Google's ability to enter in Search Text Ad syndication agreements with third parties other than Qualified Competitors, except that Google shall permit any entity with an existing Search Text Ad syndication agreement who becomes a Qualified Competitor, at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section VI. |

## VII. COMPLIANCE, ADMINISTRATION, AND ENFORCEMENT PROCEDURES

| **Plaintiffs' Proposal** | **Google's Proposal** | **Final Judgment** |
|---|---|---|
| A. <u>Technical Committee</u>: | A. <u>Technical Committee</u>: | A. <u>Technical Committee:</u> |
| 1. Within sixty (60) days of entry of this Final Judgment, the Court will appoint, pursuant to the procedures below, a five-person Technical Committee ("TC") to assist in | 1. Within sixty (60) days of entry of this Final Judgment, the Court will appoint, pursuant to the procedures below, a five-person Technical Committee ("TC") to | 1. Within sixty (60) days of entry of this Final Judgment, the Court will appoint, pursuant to the procedures below, a five-person Technical Committee to assist in |

| | | |
|---|---|---|
| enforcement of and compliance with this Final Judgment. | assist in enforcement of and compliance with this Final Judgment. | enforcement of and compliance with this Final Judgment. |
| 2. The TC members shall be experts in some combination of software engineering, information retrieval, artificial intelligence, economics, behavioral science, as well as data privacy and data security. No TC member may have a conflict of interest that could prevent them from performing their duties in a fair and unbiased manner. In addition, unless Plaintiffs specifically consent, no TC member: | 2. The TC members must be experts in some combination of software engineering, information retrieval, artificial intelligence, economics, behavioral science, and data privacy and data security. No TC member may have a conflict of interest that could prevent them from performing their duties in a fair and unbiased manner. In addition, unless the Court approves, no TC member: | 2. The TC members shall be experts in some combination of software engineering, information retrieval, artificial intelligence, economics, behavioral science, and data privacy and data security. No TC member may have a conflict of interest that could prevent them from performing their duties in a fair and unbiased manner. In addition, unless the Court so approves, no TC member: |
| a. may have been employed in any capacity by Google or any Competitor to Google within the six-month period directly predating their appointment to the TC; | a. may have been employed in any capacity by Google or any Competitor to Google within the six-month period directly predating their appointment to the TC; | a. may have been employed in any capacity by Google or any Competitor to Google within the six-month period directly predating their appointment to the TC; |
| b. may have been retained by any party as a consulting or testifying expert in this action; or | b. may have been retained as a consulting or testifying expert by any part in this action; or | b. may have been retained by any party as a consulting or testifying expert in this action; or |
| c. may perform any work for Google or any Competitor of Google during the time that they serve on the TC and for one (1) year after ceasing to serve on the TC. | c. may perform any work for Google or any Competitor of Google during the time that they serve on the TC and for one (1) year after ceasing to serve on the TC. | c. may perform any work for Google or any Competitor of Google during the time that they serve on the TC and for one (1) year after ceasing to serve on the TC. |
| 3. Within thirty (30) days of entry of this Final Judgment, Plaintiff United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States, and Google shall each select one member of the TC, and a majority of those three members will then select the remaining two members. Plaintiff United States' appointee shall serve as chair. The selection and approval process shall be as follows: | 3. Within thirty (30) days of entry of this Final Judgment, Plaintiff United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States, and Google will each select one member of the TC, and a majority of those three members will then select the remaining two members. Plaintiff United States' appointee will serve as chair. The selection and approval process will be as follows: | 3. Within thirty (30) days of entry of this Final Judgment, Plaintiff United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States, and Google shall each select one member of the TC, and a majority of those three members will then select the remaining two members. Plaintiff United States' appointee shall serve as chair. The selection and approval process shall be as follows: |
| a. As soon as practicable after submission of this Final Judgment to the Court, the Plaintiffs as a group shall identify to Google the individuals they propose to select as their designees to the TC, and Google shall identify to Plaintiffs | a. As soon as practicable after submission of this Final Judgment to the Court, the Plaintiffs as a group will identify to Google the individuals they propose to select as their designees to the TC, and Google will identify to Plaintiffs | a. As soon as practicable after submission of this Final Judgment to the Court, the Plaintiffs as a group shall identify to Google the individuals they propose to select as their designees to the TC, and Google shall identify to Plaintiffs |

| | | |
|---|---|---|
| the individual it proposes to select as its designees. No party may object to a selection on any ground other than failure to satisfy the requirements of Section VII.A.2 above. Any such objection shall be made within ten (10) business days of receipt of notification of selection. | the individual it proposes to select as its designee. No party may object to a selection on any ground other than failure to satisfy the requirements of Paragraph VII.A.2 above. Any such objection must be made within ten (10) business days of the receipt of notification of selection. | the individual it proposes to select as its designee. No party may object to a selection on any ground other than failure to satisfy the requirements of Section VII.A.2 above. Any such objection shall be made within ten (10) business days of receipt of notification of selection. |
| b. The Plaintiffs shall apply to the Court for appointment of the persons selected pursuant to Section VII.A.3.a) above. Any objections to the eligibility of a selected person that the parties have failed to resolve between themselves will be decided by the Court based solely on the requirements stated in Section VII.A.2 above. | b. The Plaintiffs will apply to the Court for appointment of the persons selected pursuant to Paragraph VII.A.3.a above. Any objections to the eligibility of a selected person that the parties have failed to resolve between themselves will be decided by the Court based solely on the requirements stated in Paragraph VII.A.2 above. | b. The Plaintiffs shall apply to the Court for appointment of the persons selected pursuant to Section VII.A.3.a above. Any objections to the eligibility of a selected person that the parties have failed to resolve between themselves will be decided by the Court based solely on the requirements stated in Section VII.A.2 above. |
| c. As soon as practicable after their appointment by the Court, the three members of the TC selected by the Plaintiffs and Google (the "Standing Committee Members") shall identify to the Plaintiffs and Google the persons that they in turn propose to select as the remaining members of the TC. The Plaintiffs and Google shall not object to these selections on any grounds other than failure to satisfy the requirements of Section VII.A.2 above. Any such objection shall be made within ten (10) business days of receipt of notification of the selection and shall be served on the other party as well as on the Standing Committee Members. | c. As soon as practicable after their appointment by the Court, the three members of the TC selected by the Plaintiffs and Google (the "Standing Committee Members") will identify to the Plaintiffs and Google the persons that they in turn propose to select as the remaining members of the TC. The Plaintiffs and Google must not object to these selections on any grounds other than failure to satisfy the requirements of Paragraph VII.A.2 above. Any such objection must be made within ten (10) business days of the receipt of notification of the selection and must be served on the other party as well as on the Standing Committee Members. | c. As soon as practicable after their appointment by the Court, the three members of the TC selected by the Plaintiffs and Google (the "Standing Committee Members") shall identify to the Plaintiffs and Google the persons that they in turn propose to select as the remaining members of the TC. The Plaintiffs and Google shall not object to these selections on any grounds other than failure to satisfy the requirements of Section VII.A.2 above. Any such objection shall be made within ten (10) business days of receipt of notification of selection and shall be served on the other party as well as on the Standing Committee Members. |
| d. The Plaintiffs shall apply to the Court for appointment of the persons selected by the Standing Committee Members. If the Standing Committee Members cannot agree on the fourth or fifth members of the TC, that member or members shall be appointed by the Court. Any objection by Plaintiffs or Google to the eligibility of the person selected by | d. The Plaintiffs will apply to the Court for appointment of the persons selected by the Standing Committee Members. If the Standing Committee Members cannot agree on the fourth or fifth members of the TC, that member or members will be appointed by the Court. Any objection by Plaintiffs or Google to the eligibility of the person selected by | d. The Plaintiffs shall apply to the Court for appointment of the persons selected by the Standing Committee Members. If the Standing Committee Members cannot agree on the fourth or fifth members of the TC, that member or members shall be appointed by the Court. Any objection by Plaintiffs or Google to the eligibility of the person selected by |

| | | |
|---|---|---|
| the Standing Committee Members which the parties have failed to resolve among themselves shall also be decided by the Court based solely on the requirements stated in Section VII.A.2 above. | the Standing Committee Members which the parties have failed to resolve among themselves will also be decided by the Court based solely on the requirements stated in Paragraph VII.A.2 above. | the Standing Committee Members which the parties have failed to resolve among themselves shall also be decided by the Court based solely on the requirements stated in Section VII.A.2 above. |
| 4. The Standing Committee Members shall serve for an initial term of thirty-six (36) months; the remaining members shall serve for an initial term of thirty (30) months. At the end of a TC member's term, the party that originally selected them may, in its sole discretion, either request re-appointment by the Court to additional terms of the same length, or replace the TC member in the same manner as provided for in Section VII.A.3 above. In the case of the fourth and fifth members of the TC, those members shall be re-appointed or replaced in the manner provided in Section VII.A.3 above. | 4. The Standing Committee Members will serve for an initial term of thirty-six (36) months; the remaining members will serve for an initial term of thirty (30) months. At the end a TC member's term, the party that originally selected them may, in its sole discretion, either request re-appointment by the Court to additional terms of the same length, or replace the TC member in the same manner as provided for in Paragraph VII.A.3 above. In the case of the fourth and fifth members of the TC, those members will be re-appointed or replaced in the manner provided in Paragraph VII.A.3 above. | 4. The Standing Committee Members shall serve for an initial term of thirty-six (36) months; the remaining members shall serve for an initial term of thirty (30) months. At the end of a TC member's term, the party that originally selected them may, in its sole discretion, either request re-appointment by the Court to additional terms of the same length, or replace the TC member in the same manner as provided for in Section VII.A.3 above. In the case of the fourth and fifth members of the TC, those members shall be re-appointed or replaced in the manner provided in Section VII.A.3 above. |
| 5. If Plaintiffs determine that a member of the TC has failed to act diligently and consistently with the purposes of this Final Judgment, or if a member of the TC resigns, or for any other reason ceases to serve in their capacity as a member of the TC, the person or persons that originally selected the TC member shall select a replacement member in the same manner as provided for in Section VII.A.3 above. | 5. If any party determines that a member of the TC has failed to act diligently and consistently with the purposes of this Final Judgment, they may petition the Court for removal of that member. If a member of the TC is removed by the Court, resigns, or for any other reason ceases to serve in their capacity as a member of the TC, the person or persons that originally selected the TC member will select a replacement member in the same manner as provided for in Paragraph VII.A.3 above. | 5. If any party determines that a member of the TC has failed to act diligently and consistently with the purposes of this Final Judgment, they may petition the Court for removal of that member. If a member of the TC is removed by the Court, resigns, or for any other reason ceases to serve in their capacity as a member of the TC, the person or persons that originally selected the TC member shall select a replacement member in the same manner as provided for in Section VII.A.3 above. |
| 6. Promptly after appointment of the TC by the Court, the Plaintiffs shall enter into a Technical Committee Services Agreement ("TC Services Agreement") with each TC member that grants the rights, powers, and authorities necessary to permit the TC to perform its duties under this Final Judgment. Google shall indemnify each TC member and hold them harmless against any losses, claims, | 6. Promptly after appointment of the TC by the Court, the Plaintiffs will enter into a Technical Committee Services Agreement ("TC Services Agreement") with each TC member that grants the rights, powers, and authorities necessary to permit the TC to perform its duties under this Final Judgment. Google must indemnify each TC member and hold them harmless against any losses, claims, | 6. Promptly after appointment of the TC by the Court, the Plaintiffs shall enter into a Technical Committee Services Agreement ("TC Services Agreement") with each TC member that grants the rights, powers, and authorities necessary to permit the TC to perform its duties under this Final Judgment. Google shall indemnify each TC member and hold them harmless against any losses, claims, |

| | | |
|---|---|---|
| damages, liabilities or expenses arising out of, or in connection with, the performance of the TC's duties, except to the extent that such liabilities, losses, damages, claims, or expenses result from misfeasance, gross negligence, willful or wanton acts, or bad faith by the TC member. The TC Services Agreements shall include the following: | damages, liabilities or expenses arising out of, in connection with, the performance of the TC's duties, except to the extent that such liabilities, losses, damages, claims, or expenses result from misfeasance, gross negligence, willful or wanton acts, or bad faith by the TC member. The TC Services Agreement must include the following: | damages, liabilities, or expenses arising out of, or in connection with, the performance of the TC's duties, except to the extent that such liabilities, losses, damages, claims, or expenses result from misfeasance, gross negligence, willful or wanton acts, or bad faith by the TC member. The TC Services Agreements shall include the following: |
| a. The TC members shall serve, without bond or other security, at the cost and expense of Google on such terms and conditions as the Plaintiffs approve, including the payment of reasonable fees and expenses. | a. The TC members will serve, without bond or security, at the cost and expense of Google on such terms and conditions as the parties agree, including the payment of reasonable fees and expenses. To the extent that the parties cannot agree on the terms of a TC Services Agreement, the parties will submit such disagreement to the Court for resolution. | a. The TC members shall serve, without bond or other security, at the cost and expense of Google on such terms and conditions as the parties agree, including payment of reasonable fees and expenses. To the extent that the parties cannot agree on the terms of a TC Services Agreement, the parties will submit such disagreement to the Court for resolution. |
| b. The TC Services Agreement shall provide that each member of the TC must comply with the limitations provided for in Section VII.A.2 above. | b. The TC Services Agreement will provide that each member of the TC must comply with the limitations provided for in Paragraph VII.A.2 above. | b. The TC Services Agreement shall provide that each member of the TC must comply with the limitations provided for in Section VII.A.2 above. |
| 7. The TC shall have the following powers and duties: | 7. The TC has the following powers and duties: | 7. The TC shall have the following powers and duties: |
| a. The TC shall have the power and authority to monitor Google's implementation of and compliance with its obligations under this Final Judgment, in the manner describe further herein. | b. The TC will have the power to advise and make recommendations about the standards to be applied for assessing, and the ultimate determination of whether a third party should qualify as a Qualified Competitor for purposes of this Final Judgment, *see* Paragraph IX.T. | a. The TC shall have the power and authority to monitor Google's implementation of and compliance with its obligations under this Final Judgment, in the manner described further herein. |
| | d. The TC will have the power to advise Plaintiffs and the Court about an appropriate cap on User-side Data disclosures to be made to Qualified Competitors, *see* Paragraph IV.B.4. | |
| | e. The TC will have the power to advise Plaintiffs and the Court about appropriate User-side Data security and privacy safeguards, *see* Paragraph IV.C. | |

| | | |
|---|---|---|
| | f. The TC will have the power to audit Qualified Competitors' use of search and search text ads syndication services, *see* Paragraph IX.T. | |
| | g. The TC will have the power to conduct data security and privacy safeguard audits of Qualified Competitors, *see* Paragraph IX.T. | |
| | h. The TC will have the power to advise Plaintiffs and the Court about an appropriate tapering rate for search syndication, *see* Paragraph V.B.4. | |
| | i. The TC will have the power to develop and propose parameters that inform Google what types of Search Text Ads auction changes must be brought to the attention of Plaintiffs and the Technical Committee, and receive disclosures from Google about Search Text Ads auctions changes, *see* Paragraph VI.A. | |
| b. The TC shall have the power to recommend reasonable data security standards applicable to Qualified Competitors, which shall be approved by the Plaintiffs. | c. The TC will have the power to recommend reasonable data security standards applicable to Qualified Competitors, which will be submitted to the Court for review and determination, *see* Paragraph IX.T. | b. The TC shall have the power to recommend reasonable data security standards applicable to Qualified Competitors, which shall be approved by the Plaintiffs. |
| c. The TC may, on reasonable notice to Google: | j. The TC may make reasonable and proportional requests necessary to perform its duties, on reasonable notice to Google, to: | c. The TC may, on reasonable notice to Google: |
| 1. interview, either informally or on the record, any Google personnel, who may have their individual counsel present; any such interview will be subject to the reasonable convenience of such personnel and without restraint or interference by Google; | 1. interview any Google personnel, who may have counsel present; any such interview will be subject to the reasonable convenience of such personnel and without restraint or interference by Google; | i. interview, either informally or on the record, any Google personnel, who may have their individual counsel present; any such interview will be subject to the reasonable convenience of such personnel and without restraint or interference by Google; |
| 2. inspect and copy any document in the possession, custody, or control of Google personnel; | 2. provide non-privileged documents and records in its possession, custody, or control; | ii. inspect and copy any document in the possession, custody, or control of Google personnel; |

| | | |
|---|---|---|
| 3. obtain reasonable access to any system or equipment to which Google personnel have access; | 3. obtain reasonable access to systems or equipment to the extent necessary to perform testing regarding appropriate User-side Data security and privacy safeguards, *see* Paragraph IV.C; and | iii. obtain reasonable access to any system or equipment to which Google personnel have access; |
| 4. obtain reasonable access to, and inspect, any physical facility, building or other premises to which Google personnel have access; and | 4. obtain reasonable access to any physical facilities, building or other premises to the extent necessary to perform testing regarding appropriate User-side Data security and privacy safeguards, *see* Paragraph IV.C. | iv. obtain reasonable access to, and inspect, any physical facility, building, or other premises to which Google personnel have access; and |
| 5. require Google personnel to provide documents, data and other information, and to submit reports to the TC containing such material, in such form as the TC may reasonably direct. | [No similar provision. | v. require Google personnel to provide documents, data, and other information, and to submit reports to the TC containing such material, in such form as the TC may reasonably direct. |
| [No similar provision.] | 5. To the extent that Google and the TC cannot agree on the reasonable scope of any such request, the parties may submit such disagreement to the Court for resolution. | [No similar provision.] |
| d. The TC shall have access to Google's source code and algorithms, subject to a confidentiality agreement, as approved by the Plaintiffs and to be agreed to by the TC members pursuant to Section VII.A.8 below, and by any staff or consultants who may have access to the source code and algorithms. The TC may study, interrogate and interact with the source code and algorithms in order to perform its functions and duties, including the handling of complaints and other inquiries from third parties. | [No similar provision.] | d. The TC shall have access to Google's source code and algorithms, subject to a confidentiality agreement, as approved by the Plaintiffs and to be agreed to by the TC members pursuant to Section VII.A.8 below, and by any staff or consultants who may have access to the source code and algorithms. The TC may study, interrogate, and interact with the source code and algorithms in order to perform its functions and duties, including the handling of complaints and other inquiries from third parties. |
| e. The TC shall receive complaints from Google's | [No similar provision.] | e. The TC shall receive complaints from Google's |

| | | |
|---|---|---|
| Compliance Officer (as described in Section VII.B below), third parties, or the Plaintiffs and handle them in the manner specified in Section VII.C below. | | Compliance Officer (as described in Section VII.B below), third parties, or the Plaintiffs and handle them in the manner specified in Section VII.C below. |
| f. The TC shall report in writing to the Plaintiffs, initially every three (3) months for three (3) years and thereafter every six (6) months until expiration of this Final Judgment, the actions it has undertaken in performing its duties pursuant to this Final Judgment, including the identification of each business practice reviewed and any recommendations made by the TC. | k. The TC must report in writing to the parties, initially every three (3) months for three (3) years and thereafter every six (6) months until expiration of this Final Judgment, the actions it has undertaken in performing its duties pursuant to this Final Judgment. | f. The TC shall report in writing to the Plaintiffs, initially every three (3) months for three (3) years and thereafter every six (6) months until expiration of this Final Judgment, the actions it has undertaken in performing its duties pursuant to this Final Judgment, including the identification of each business practice reviewed and any recommendations made by the TC. |
| g. Regardless of when reports are due, when the TC has reason to believe that there may have been a failure by Google to comply with any term of this Final Judgment, or that Google is attempting to circumvent any provision of this Final Judgment or the intended purposes of this Final Judgment, the TC shall immediately notify the Plaintiffs in writing setting forth the relevant details. | [No similar provision.] | g. Regardless of when reports are due, when the TC has reason to believe that there may have been a failure by Google to comply with any term of this Final Judgment, or that Google is attempting to circumvent any provision of this Final Judgment or the intended purposes of this Final Judgment, the TC shall immediately notify the Plaintiffs in writing setting forth the relevant details. |
| h. TC members may communicate with third parties about how their complaints or inquiries might be resolved with Google, so long as the confidentiality of information obtained from Google is maintained. | [No similar provision.] | h. TC members may communicate with third parties about how their complaints or inquiries might be resolved with Google, so long as the confidentiality of information obtained from Google is maintained. |
| i. The TC may hire at the cost and expense of Google, with prior notice to Google and subject to approval by the Plaintiffs, such staff or consultants (all of whom must meet the qualifications of Sections VII.A.2.a–c) as are reasonably necessary for the TC to carry out its duties and responsibilities under this Final Judgment. The compensation of any person retained by the TC shall be based on reasonable and | l. The TC may hire at the cost and expense of Google, with prior notice to Google and subject to approval by the parties, such staff or consultants (all of whom must meet the qualifications of Paragraphs VII.A.2.a-c) as are reasonably necessary for the TC to carry out its duties and responsibilities under this Final Judgment. The compensation of any person retained by the TC will be based on reasonable and | i. The TC may hire at the cost and expense of Google, with prior notice to Google and subject to approval by the Plaintiffs, such staff or consultants (all of whom must meet the qualifications of Sections VII.A.2.a–c) as are reasonably necessary for the TC to carry out its duties and responsibilities under this Final Judgment. The compensation of any person retained by the TC shall be based on reasonable and |

| | | |
|---|---|---|
| customary terms commensurate with the individual's experience and responsibilities. | customary terms commensurate with the individual's experience and responsibilities, and subject to approval by the parties. To the extent that the parties cannot agree on such a request, the parties will submit such disagreement to the Court for resolution. | customary terms commensurate with the individual's experience and responsibilities. |
| j. The TC shall account for all reasonable expenses incurred, including agreed upon fees for the TC members' services, subject to the approval of the Plaintiffs. Google's failure to promptly pay the TC's accounted-for costs and expenses, including for agents and consultants, shall constitute a violation of this Final Judgment and may result in sanctions imposed by the Court. Google may, on application to the Court, object to the reasonableness of any such fees or other expenses only if Google has conveyed such objections to the Plaintiffs and the TC within ten (10) calendar days of receiving the invoice for such fees or other expenses. On any such application, (a) Google shall bear the burden to demonstrate unreasonableness; (b) Google shall establish an escrow account into which it deposits the disputed costs and expenses until the dispute is resolved; and (c) the TC members shall be entitled to recover all costs incurred on such application (including reasonable attorneys' fees and costs), regardless of the Court's disposition of such application, unless the Court expressly finds that the TC's opposition to the application was without substantial justification. | m. The TC must account for all reasonable expenses incurred, including agreed upon fees for the TC members' services, subject to the approval of the parties. To the extent that the parties cannot agree on the reasonableness of such expenses, the parties will submit such disagreement to the Court for resolution. | j. The TC shall account for all reasonable expenses incurred, including agreed upon fees for the TC members' services, subject to the approval of the Plaintiffs. Google's failure to promptly pay the TC's accounted-for costs and expenses, including for agents and consultants, shall constitute a violation of this Final Judgment and may result in sanctions imposed by the Court. Google may, on application to the Court, object to the reasonableness of any such fees or other expenses only if Google has conveyed such objections to the Plaintiffs and the TC within ten (10) calendar days of receiving the invoice for such fees or other expenses. On any such application, (a) Google shall bear the burden to demonstrate unreasonableness; (b) Google shall establish an escrow account into which it deposits the disputed costs and expenses until the dispute is resolved; and (c) the TC members shall be entitled to recover all costs incurred on such application (including reasonable attorneys' fees and costs), regardless of the Court's disposition of such application, unless the Court expressly finds that the TC's opposition to the application was without substantial justification. |
| [No similar provision.] | a. For the avoidance of doubt, neither the TC nor Plaintiffs will have the right to make final decisions as to the requirements of this Final Judgment. Google will have the right to object to and be | k. Google may object to and be heard by the Court on any recommendation from the TC or Plaintiffs as to the interpretations or substantive requirements of this Final Judgment. |

| | | |
|---|---|---|
| | heard by the Court on any recommendation from the TC or Plaintiffs as to the interpretations of or substantive requirements of this Final Judgment. | |
| 8. Each TC member, and any consultants or staff hired by the TC, shall sign a confidentiality agreement prohibiting disclosure of any information obtained in the course of performing his or her duties as a member of the TC or as a person assisting the TC, to anyone other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, or the Court. All information gathered by the TC in connection with this Final Judgment and any report and recommendations prepared by the TC shall be treated as Highly Confidential under the Protective Order in this case, and shall not be disclosed to any person other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, and the Court except as allowed by the Protective Order entered in the Action or by further order of this Court. No member of the TC may make any public statements relating to the TC's activities. | 8. Each TC member, and any consultants or staff hired by the TC, must sign a confidentiality agreement prohibiting disclosure of any information obtained in the course of performing his or her duties as a member of the TC or as a person assisting the TC, to anyone other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, or the Court. All information gathered by the TC in connection with this Final Judgment and any report and recommendations prepared by the TC must be treated as Highly Confidential under the Protective Order in this case, and must not be disclosed to any person other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, and the Court except as allowed by the Protective Order entered in the Action or by further order of this Court. No member of the TC may make any public statements relating to the TC's activities. | 8. Each TC member, and any consultants or staff hired by the TC, shall sign a confidentiality agreement prohibiting disclosure of any information obtained in the course of performing his or her duties as a member of the TC or as a person assisting the TC, to anyone other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, or the Court. All information gathered by the TC in connection with this Final Judgment and any report and recommendations prepared by the TC shall be treated as Highly Confidential under the Protective Order in this case, and shall not be disclosed to any person other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, and the Court except as allowed by the Protective Order entered in the Action or by further order of this Court. No member of the TC may make any public statements relating to the TC's activities. |
| B. <u>Internal Compliance Officer</u>: | C. <u>Internal Compliance Officer</u>: | B. <u>Internal Compliance Officer</u>: |
| 1. Google shall designate, within thirty (30) days of entry of this Final Judgment, an employee of Google as the internal Compliance Officer with responsibility for administering Google's antitrust compliance program and helping to ensure compliance with this Final Judgment. | 1. Google shall designate, within 30 days of entry of this Final Judgment, an internal Compliance Officer who shall be an employee of Google with responsibility for administering Google's antitrust compliance program and helping to ensure compliance with this Final Judgment. | 1. Google shall designate, within thirty (30) days of entry of this Final Judgment, an employee of Google as the internal Compliance Officer with responsibility for administering Google's antitrust compliance program and helping to ensure compliance with this Final Judgment. |
| 2. Within seven (7) days of the Compliance Officer's appointment, Google shall identify to the Plaintiffs the Compliance Officer's name, business address, telephone number, and email address. Within fifteen (15) days of a vacancy in the | 2. Within seven (7) days of the Compliance Officer's appointment, Google must identify to the Plaintiffs the Compliance Officer's name, business address, telephone number, and email address. Within fifteen (15) days of a vacancy in the | 2. Within seven (7) days of the Compliance Officer's appointment, Google shall identify to the Plaintiffs the Compliance Officer's name, business address, telephone number, and email address. Within fifteen (15) days of a vacancy in the |

| | | |
|---|---|---|
| Compliance Officer position, Google shall appoint a replacement and identify to the Plaintiffs the replacement Compliance Officer's name, business address, telephone number, and email address. Google's initial or replacement appointment of the Compliance Officer is subject to the approval of the Plaintiffs. | Compliance Officer position, Google must appoint a replacement and identify to the Plaintiffs the replacement Compliance Officer's name, business address, telephone number, and email address. | Compliance Officer position, Google shall appoint a replacement and identify to the Plaintiffs the replacement Compliance Officer's name, business address, telephone number, and email address. Google's initial or replacement appointment of the Compliance Officer is subject to the approval of the Plaintiffs. |
| 3. The Compliance Officer shall supervise the review of Google activities to ensure that they comply with this Final Judgment. The Compliance Officer may be assisted by other employees of Google. | 3. The Compliance Officer shall supervise the review of Google's activities to ensure that they comply with this Final Judgment. The Compliance Officer may be assisted by other employees of Google. | 3. The Compliance Officer shall supervise the review of Google activities to ensure that they comply with this Final Judgment. The Compliance Officer may be assisted by other employees of Google. |
| 4. The Compliance Officer shall be responsible for performing the following activities: | 4. The Compliance Officer shall be responsible for performing the following activities: | 4. The Compliance Officer shall be responsible for performing the following activities: |
| a. within thirty (30) days after entry of this Final Judgment, distributing a copy of the Final Judgment to all officers and directors of Google; | a. within 45 days after entry of this Final Judgment, distributing a copy of the Final Judgment to all officers and directors of Google; | a. within forty-five (45) days after entry of this Final Judgment, distributing a copy of the Final Judgment to all officers and directors of Google; |
| b. distributing a copy of this Final Judgment to any person who succeeds to a position described in Section VII.B.4.a above within thirty (30) days of the date the person starts that position. | b. promptly distributing a copy of this Final Judgment to any person who succeeds to a position described in Paragraph VII.C.4.a; | b. promptly distributing a copy of this Final Judgment to any person who succeeds to a position described in Section VII.B.4.a above; |
| c. ensuring that those persons designated by Section VII.B.4.a above are annually trained on the meaning and requirements of this Final Judgment and the U.S. antitrust laws and advising them that Google's legal advisors are available to confer with them regarding any question concerning compliance with this Final Judgment or the U.S. antitrust laws; | c. ensuring that those persons designated in Paragraph VII.C.4.a are annually briefed on the meaning and requirements of this Final Judgment and the U.S. antitrust laws and advising them that Google's legal advisors are available to confer with them regarding any question concerning compliance with this Final Judgment or the U.S. antitrust law; | c. ensuring that those persons designated by Section VII.B.4.a above are annually briefed on the meaning and requirements of this Final Judgment and the U.S. antitrust laws and advising them that Google's legal advisors are available to confer with them regarding any question concerning compliance with this Final Judgment or the U.S. antitrust laws; |
| d. obtaining from each person designated in Section VII.B.4.a above an annual written certification that he or she: (i) has read and agrees to abide by the terms of this Final Judgment; and (ii) has been advised and understands that his or her failure | d. obtaining from each person designated in Paragraph VII.C.4.a an annual written certification that he or she: (i) has read and agrees to abide by the terms of this Final Judgment; and (ii) has been advised and understands that his or her failure to comply with this | d. obtaining from each person designated in Section VII.B.4.a above an annual written certification that he or she: (i) has read and agrees to abide by the terms of this Final Judgment and (ii) has been advised and understands that his or her failure |

| | | |
|---|---|---|
| to comply with this Final Judgment may result in a finding of contempt of court; | Final Judgment may result in a finding of contempt of court; | to comply with this Final Judgment may result in a finding of contempt of court; |
| e. maintaining a record of all persons to whom a copy of this Final Judgment has been distributed and from whom the certification described in Section VII.B.4.d above has been obtained; | e. maintaining a record of all persons to whom a copy of this Final Judgment has been distributed and from whom the certification described in Paragraph VII.C.4.d has been obtained; | e. maintaining a record of all persons to whom a copy of this Final Judgment has been distributed and from whom the certification described in Section VII.B.4.d above has been obtained; |
| f. annually communicating to all employees that they may disclose to the Compliance Officer, without reprisal for such disclosure, information concerning any violation or potential violation of this Final Judgment or the U.S. antitrust laws by Google, and establishing a confidential avenue for any employee to report potential violations. | [No similar provision.] | [No similar provision.] |
| g. establishing and maintaining the website provided for in Section VII.C.2.a below; | f. establishing and maintaining the website provided for in Paragraph VII.D.2.b; | f. establishing and maintaining the website provided for in Section VII.C.2.a below; |
| [No similar provision.] | g. preparing the Annual Compliance Report described in Paragraph VII.B.2 and any Interim Report requested as described in Paragraph VII.B.3.a; | [No similar provision.] |
| h. receiving complaints from third parties, the TC, and the Plaintiffs concerning Google's compliance with this Final Judgment and following the appropriate procedures set forth in Section VII.C below; | h. receiving complaints from third parties or the Plaintiffs concerning Google's compliance with this Final Judgment and following the appropriate procedures set forth in Paragraph VII.D; | g. receiving complaints from third parties, the TC, and the Plaintiffs concerning Google's compliance with this Final Judgment and following the appropriate procedures set forth in Section VII.C below; |
| i. maintaining a record of all complaints received and action taken by Google with respect to each such complaint; and | i. maintaining a record of all complaints received and action taken by Google with respect to each such complaint; and | h. maintaining a record of all complaints received and action taken by Google with respect to each such complaint; and |
| j. ensuring Google retains all relevant documents and electronically stored information, regardless of medium or form, related to this Final Judgment and all complaints received and or action taken by Google with respect to any complaint. | j. ensuring employees retain all relevant documents and electronically stored information, regardless of medium or form, regarding all complaints received pursuant to Paragraph VII.D.1 and action taken by Google with respect to any such complaint. | i. ensuring Google retains all relevant documents and electronically stored information, regardless of medium or form, related to this Final Judgment and all complaints received and/or action taken by Google with respect to any complaint. |
| 5. Google shall within thirty (30) days further appoint a senior | [No similar provision.] | 5. Google shall within thirty (30) days further appoint a senior |

| | | |
|---|---|---|
| business executive, who has visibility into any Google entity with obligations under this Final Judgment, whom Google shall make available to update the Court on Google's compliance at regular status conferences or as otherwise ordered. | | business executive, who has visibility into any Google entity with obligations under this Final Judgment, whom Google shall make available to update the Court on Google's compliance at regular status conferences or as otherwise ordered. |
| 6. Google shall retain (if it has not already) a licensed attorney in good standing in California to collect documents and interview employees and generally review Google's document retention practices and Google's compliance with its legal discovery obligations under this case and final judgment. This attorney shall be retained for a term no shorter than eighteen (18) months. This attorney (and any team this attorney assembles) shall present to the Audit and Compliance Committee (or any successor Board Committee) on the retention of documents and Google's compliance with its discovery obligations. | [No similar provision.] | [No similar provision.] |
| C. <u>Voluntary Dispute Resolution</u>: | D. <u>Voluntary Dispute Resolution</u>: | C. <u>Voluntary Dispute Resolution</u>: |
| 1. Third parties may submit complaints concerning Google's compliance with this Final Judgment to the Plaintiffs, the TC, or the Compliance Officer. | 1. Third parties may submit complaints concerning Google's compliance with this Final Judgment to the Plaintiffs or the Compliance Officer. | 1. Third parties may submit complaints concerning Google's compliance with this Final Judgment to the Plaintiffs, the TC, or the Compliance Officer. |
| 2. Third parties, the TC, or Plaintiffs in their discretion may submit to the Compliance Officer any complaints concerning Google's compliance with this Final Judgment. Without in any way limiting their authority to take any other action to enforce this Final Judgment, the Plaintiffs may submit complaints to the Compliance Officer whenever doing so would be consistent with the public interest. | 2. Submissions to the Compliance Officer.<br><br>a. Third parties or Plaintiffs in their discretion may submit to the Compliance Officer any complaints concerning Google's compliance with this Final Judgment. Without in any way limiting their authority to take any other action to enforce this Final Judgment, the Plaintiffs may submit complaints related to Google's compliance with this Final Judgment to the Compliance Officer whenever doing so would be consistent with the public interest. | 2. Third parties, the TC, or Plaintiffs in their discretion may submit to the Compliance Officer any complaints concerning Google's compliance with this Final Judgment. Without in any way limiting their authority to take any other action to enforce this Final Judgment, the Plaintiffs may submit complaints to the Compliance Officer whenever doing so would be consistent with the public interest. |

| | | |
|---|---|---|
| a. To facilitate the communication of complaints and inquiries by parties, the Compliance Officer shall place on Google's website, in a manner acceptable to the Plaintiffs, the procedures for submitting complaints. To encourage whenever possible the informal resolution of complaints and inquiries, the website shall provide a mechanism for communicating complaints and inquiries to the Compliance Officer. | b. To facilitate the communication of complaints and inquiries by parties, the Compliance Officer shall place on Google's corporate website, in a manner reasonably acceptable to the Plaintiffs, the procedures for submitting complaints. To encourage whenever possible the informal resolution of complaints and inquiries, the website must provide a mechanism for communicating complaints and inquiries to the Compliance Officer. | a. To facilitate the communication of complaints and inquiries by parties, the Compliance Officer shall place on Google's website, in a manner acceptable to the Plaintiffs, the procedures for submitting complaints. To encourage whenever possible the informal resolution of complaints and inquiries, the website shall provide a mechanism for communicating complaints and inquiries to the Compliance Officer. |
| b. Google has thirty (30) days after receiving a complaint to attempt to resolve or to reject it. | c. Google shall have 30 days after receiving a complaint to attempt to resolve or to reject it. | b. Google has thirty (30) days after receiving a complaint to attempt to resolve or to reject it. |
| c. Within thirty (30) days of receiving a complaint, the Compliance Officer shall advise the TC and Plaintiffs of the nature of the complaint and its disposition. The TC may then propose to the Plaintiffs further actions consistent with this Final Judgment, including consulting with Plaintiffs regarding the complaint. | [No similar provision.] | c. Within thirty (30) days of receiving a complaint, the Compliance Officer shall advise the TC and Plaintiffs of the nature of the complaint and its disposition. The TC may then propose to the Plaintiffs further actions consistent with this Final Judgment, including consulting with Plaintiffs regarding the complaint. |
| 3. The Compliance Officer, third parties, or the Plaintiffs in their discretion may submit to the TC any complaints concerning Google's compliance with this Final Judgment. | [No similar provisions.] | 3. The Compliance Officer, third parties, or the Plaintiffs in their discretion may submit to the TC any complaints concerning Google's compliance with this Final Judgment. |
| a. The TC shall investigate the complaints it receives and shall consult with the Plaintiffs regarding its investigation. At least once during its investigation, and more often when it may help resolve the complaints informally, the TC shall meet with the Compliance Officer to allow Google to respond to the substance of the complaints and to determine whether the complaints can be resolved without further proceedings. | | a. The TC shall investigate the complaints it receives and shall consult with the Plaintiffs regarding its investigation. At least once during its investigation, and more often when it may help resolve the complaints informally, the TC shall meet with the Compliance Officer to allow Google to respond to the substance of the complaints and to determine whether the complaints can be resolved without further proceedings. |

| | | |
|---|---|---|
| b. Following its investigation, the TC shall advise Google and the Plaintiffs of its conclusion and its proposal for cure. | | b. Following its investigation, the TC shall advise Google and the Plaintiffs of its conclusion and its proposal for cure. |
| c. Reports and recommendations from the TC may be received into evidence by the Court in connection with any effort by any Plaintiff to enforce this Final Judgment but shall not be otherwise made available in any other court or tribunal related to any other matter. No member of the TC shall be required to testify by deposition, in court, or before any other tribunal regarding any matter related to this Final Judgment. | | c. Reports and recommendations from the TC may be received into evidence by the Court in connection with any effort by any Plaintiff to enforce this Final Judgment but shall not be otherwise made available in any other court or tribunal related to any other matter. No member of the TC shall be required to testify by deposition, in court, or before any other tribunal regarding any matter related to this Final Judgment. |
| d. The TC may preserve the anonymity of any third-party complainant where it deems it appropriate to do so upon the request of the Plaintiffs or the third party, or in its discretion. | | d. The TC may preserve the anonymity of any third-party complainant where it deems it appropriate to do so upon the request of the Plaintiffs or the third party, or in its discretion. |
| D. <u>Compliance Inspection</u>: | B. <u>Annual Compliance Report and Compliance Inspection</u>: | D. <u>Compliance Inspection</u>: |
| 1. Without in any way limiting the sovereign enforcement authority of each of the Colorado Plaintiff States, the Colorado Plaintiff States shall form a committee to coordinate their enforcement of this Final Judgment. Neither a Co-Plaintiff State nor a Colorado Plaintiff State may take any action to enforce this Final Judgment without first consulting with the United States and with the Colorado Plaintiff States' enforcement committee. | 1. Without limiting the sovereign enforcement authority of each of the Plaintiff States, the Plaintiff States will form a committee to coordinate their enforcement of this Final Judgment ("Plaintiff States' Committee"). No Plaintiff State shall take any action to enforce this Final Judgment without first consulting with the United States and with the Plaintiff States' Committee. | 1. Without in any way limiting the sovereign enforcement authority of each of the Colorado Plaintiff States, the Colorado Plaintiff States shall form a committee to coordinate their enforcement of this Final Judgment. Neither a Co-Plaintiff State nor a Colorado Plaintiff State may take any action to enforce this Final Judgment without first consulting with the United States and with the Colorado Plaintiff States' enforcement committee. |
| [No similar provision.] | 2. Google will prepare and submit, on an annual basis, a written report describing its compliance with this Final Judgment ("Annual Compliance Report"). | [No similar provision.] |
| 2. For the purposes of determining or securing compliance with this Final Judgment or of determining whether this Final Judgment should be modified or vacated, upon written request of an | 3. To determine and enforce compliance with this Final Judgment, upon written request and on reasonable notice to Google and subject to any lawful privilege, a duly authorized representative of the | 2. For the purposes of determining or securing compliance with this Final Judgment or of determining whether this Final Judgment should be modified or vacated, upon written request of an |

| | | |
|---|---|---|
| authorized representative of the Assistant Attorney General for the Antitrust Division (after consultation with the Co-Plaintiff States and the Colorado Plaintiff States' enforcement committee) or of the Attorney General of a Co-Plaintiff State or the Attorney General of a Colorado Plaintiff State (after consultation with the United States and the Colorado Plaintiff States' enforcement committee), as the case may be, and reasonable notice to Google, Google shall permit, from time to time and subject to legally recognized privileges, authorized representatives, including agents retained by any Plaintiff: | United States (after consultation with the Plaintiff States' Committee) or of the Attorney General of a Plaintiff State (after consultation with the United States and the Plaintiff States' Committee), may: | authorized representative of the Assistant Attorney General for the Antitrust Division (after consultation with the Co-Plaintiff States and the Colorado Plaintiff States' enforcement committee) or of the Attorney General of a Co-Plaintiff State or the Attorney General of a Colorado Plaintiff State (after consultation with the United States and the Colorado Plaintiff States' enforcement committee), as the case may be, and reasonable notice to Google, Google shall permit, from time to time and subject to legally recognized privileges, authorized representatives, including agents retained by any Plaintiff: |
| [No similar provision.] | a. request from Google no more than one interim written report per year ("Interim Report"), under oath if requested, regarding Google's compliance with this Final Judgment; | [No similar provision.] |
| a. to have access during Google's office hours to inspect and copy, or at the option of the Plaintiff, to require Google to provide electronic copies of all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Google relating to any matters contained in this Final Judgment; and | b. make reasonable requests to Google for production of non-privileged documents and records in its possession, custody, or control sufficient to verify the matters contained in Google's Annual Compliance Report or Interim Report; and | a. to have access during Google's office hours to inspect and copy, or at the option of the Plaintiff, to require Google to provide electronic copies of all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Google relating to any matters contained in this Final Judgment; and |
| b. to interview, either informally or on the record, Google's officers, employees, or agents, who may have their individual counsel present, relating to any matters contained in this Final Judgment. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Google. | c. subject to the reasonable convenience of Google and without restraint or interference from it, interview officers, employees, or agents of Google, who may have counsel present, sufficient to verify the matters contained in Google's Annual Compliance Report or Interim Report. | b. to interview, either informally or on the record, Google's officers, employees, or agents, who may have their individual counsel present, relating to any matters contained in this Final Judgment. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Google. |
| 3. Upon the written request of an authorized representative of the Assistant Attorney General for the Antitrust Division (after consultation with the Co-Plaintiff States and the | [No similar provision.] | 3. Upon the written request of an authorized representative of the Assistant Attorney General for the Antitrust Division (after consultation with the Co-Plaintiff States and the |

| | | |
|---|---|---|
| Colorado Plaintiff States' enforcement committee) or of the Attorney General of a Co-Plaintiff State or the Attorney General of a Colorado Plaintiff State (after consultation with the United States and the Co-Plaintiff States' enforcement committee), Google shall submit written reports or respond to written interrogatories, under oath if requested, relating to any matters contained in this Final Judgment. | | Colorado Plaintiff States' enforcement committee) or of the Attorney General of a Co-Plaintiff State or the Attorney General of a Colorado Plaintiff State (after consultation with the United States and the Colorado Plaintiff States' enforcement committee), Google shall submit written reports or respond to written interrogatories, under oath if requested, relating to any matters contained in this Final Judgment. |
| [No similar provision.] | 4. No information or documents obtained by the means provided in this section shall be divulged by the United States or the Plaintiff States to any person, except in the course of legal proceedings to which the United States is a party, or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law. | [No similar provision.] |
| [No similar provision.] | 5. If, at the time information or documents are furnished by Google to the United States or the Plaintiff States, Google identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Google marks each pertinent page of such material, "Confidential and Sensitive Commercial Information Subject to Rule 26(c)(1)(G)" then the United States shall give 10 business days' notice prior to divulging such material in any legal proceeding. | 4. If, at the time information or documents are furnished by Google to the Plaintiffs, Google identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Google marks each pertinent page of such material, "Confidential and Sensitive Commercial Information Subject to Rule 26(c)(1)(G)," then the Plaintiffs shall give five (5) business days' notice prior to divulging such material in any legal proceeding, unless good cause is shown for a shorter notice period. |
| [No similar provision.] | 6. Google shall have the right to claim protection from public disclosure, under the Freedom of Information Act, 5 U.S.C. § 552, or any other applicable law or regulation, for any material it submits to the United States or the Plaintiff States under this Final Judgment. After appropriate consideration of such claim of | 5. Google shall have the right to claim protection from public disclosure, under the Freedom of Information Act, 5 U.S.C. § 552, or any other applicable law or regulation, for any material it submits to the Plaintiffs under this Final Judgment. After appropriate consideration of such claim of protection, Plaintiffs, as the case may |

| | | |
|---|---|---|
| | protection, the United States or the Plaintiff States, as the case may be, will either assert that the material is protected from disclosure under law or give Google 10 business days' notice of its intent to disclose the material. | be, will either assert that the material is protected from disclosure under law or give Google ten (10) business days' notice of its intent to disclose the material. |
| [No similar provision.] | [No similar provision.] | E. Status Reports to the Court:<br>1. Plaintiffs, with input from the Technical Committee, shall file a status report within ninety (90) days of the Effective Date of this Final Judgment, and then on future dates as set by the Court, updating the Court as to the enforcement of and Google's compliance with this Final Judgment. |

## VIII. EFFECTIVE DATE AND EXPIRATION

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| The Final Judgment will take effect sixty (60) days after the date on which it is entered (the "Effective Date"), and Plaintiffs shall report the date on which Google has substantially implemented all provisions of this Final Judgment, except for Section VII.A, which shall take effect immediately upon entry. Unless the Court grants an extension or early termination is granted, this Final Judgment will expire six (6) years from the Effective Date. This Final Judgment may be terminated upon notice by the United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States' enforcement committee, and Google that continuation of this Final Judgment is no longer necessary to restore competition in the monopolized markets. | A. Subject to the outcome of any motion to stay this Final Judgment pending appeal, this Final Judgment shall take effect 60 days after the date on which it is entered, except that the portions of Section VII.A that require the parties to take steps toward forming the Technical Committee and that address the start of its work shall take effect immediately.<br>B. Pursuant to Local Rule 54.2, the deadline for any motion under Federal Rule of Civil Procedure 54(d)(2)(B) and the proceedings as to any such motion shall be held in abeyance pending the conclusion of any appeals from this Final Judgment.<br>C. Unless this Court grants an extension, this Final Judgment will expire on the sixth anniversary of the date on which it takes effect. | The Final Judgment will take effect sixty (60) days after the date on which it is entered (the "Effective Date"), and Plaintiffs shall report the date on which Google has substantially implemented all provisions of this Final Judgment, except for Section VII.A, which shall take effect immediately upon entry. Unless the Court grants an extension or early termination is granted, this Final Judgment will expire six (6) years from the Effective Date. This Final Judgment may be terminated upon notice by the United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States' enforcement committee, and Google that continuation of this Final Judgment is no longer necessary to restore competition in the monopolized markets. |

## IX. DEFINITIONS

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| A. "API" or "application programming interface" means a mechanism that allows different | A. "API" or "application programming interface" means a mechanism that allows different | A. "API" or "application programming interface" means a mechanism that allows different |

| | | |
|---|---|---|
| software components to communicate with each other. | software components to communicate with each other. | software components to communicate with each other. |
| B. "Apple" means Apple, Inc., a corporation organized and existing under the laws of the State of California, headquartered in Cupertino, California, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees. | [No similar provision.] | B. "Apple" means Apple Inc., a corporation organized and existing under the laws of the State of California, headquartered in Cupertino, California, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees. |
| C. "Browser Developer" means a developer, owner, or operator of a Third-Party Browser and includes, by way of example, Apple, Mozilla Corp., and Samsung Electronics Co., Ltd. | B. "Browser Developer" means a developer, owner, or operator of a Third-Party Browser and includes, by way of example, Apple, Mozilla Corp., and Samsung Electronics Co., Ltd. | C. "Browser Developer" means a developer, owner, or operator of a Third-Party Browser and includes, by way of example, Apple, Mozilla Corp., and Samsung Electronics Co., Ltd. |
| D. "Chrome Browser Application" means the browser software application currently marketed by Google as "Google Chrome" and its successors. | C. "Chrome Browser Application" means the browser software application currently marketed by Google as "Google Chrome" and its successors. | D. "Chrome Browser Application" means the browser software application currently marketed by Google as "Google Chrome" and its successors. |
| E. "Competitor" means any provider of, or potential entrant in the provision of (i) a General Search Engine (GSE) in the United States, (ii) Search Text Ads in the United States, or (iii) a GenAI Product in the United States. | D. "Competitor" means any provider of, or potential entrant in the provision of (i) a General Search Engine (GSE) in the United States, (ii) Search Text Ads in the United States or (iii) a Third-Party GenAI Product in the United States. For the avoidance of doubt, "Competitor" does not include specialized vertical search providers, whether or not they offer a GenAI product. | E. "Competitor" means any provider of or potential entrant in the provision of (i) a General Search Engine (GSE) in the United States, (ii) Search Text Ads in the United States, or (iii) a GenAI Product in the United States. |
| F. "Consideration" means anything of value, including monetary payment; provision of preferential licensing terms; technical, marketing, and sales support; developer support; or hardware or software certification or approval. | E. "Consideration" means any monetary payment; provision of preferential licensing terms; technical, marketing, and sales support; developer support; or hardware or software certification or approval. | F. "Consideration" means anything of value, including any monetary payment; provision of preferential licensing terms; technical, marketing, and sales support; developer support; or hardware or software certification or approval. |
| G. "Default Search Engine" means a search engine that is set by a Browser Developer to respond to user queries if a user takes no action to select a particular search engine. | G. "Default Search Engine" means a search engine that is set by a Browser Developer to respond to user queries if a user takes no action to select a particular search engine. | G. "Default Search Engine" means a search engine that is set by a Browser Developer to respond to user queries if a user takes no action to select a particular search engine. |
| H. "Device" or "device" means any single smartphone, tablet, laptop, or desktop. For clarity, any two devices are different devices, even if they are the same make and model | F. "Covered Device" means a smartphone, tablet, laptop, or desktop, excluding any device on which the ChromeOS operating system or a | H. "Device" or "device" means any single smartphone, tablet, laptop, or desktop, excluding any device on which the ChromeOS operating system or a successor to the |

| | | |
|---|---|---|
| (e.g., two Samsung Galaxy S25s are two devices; two Apple iPhone 16 Pros are two devices). | successor to the ChromeOS operating system is installed. | ChromeOS operating system is installed. For clarity, any two devices are different devices, even if they are the same make and model (e.g., two Samsung Galaxy S25s are two devices; two Apple iPhone 16 Pros are two devices). |
| I. "GenAI" or "Generative AI" is a type of artificial intelligence that creates new content including but not limited to text, images, code, classifications, and other media using machine learning models. | H. "GenAI" or "Generative AI" is a type of artificial intelligence that creates new content including but not limited to text, images, code, classifications, and other media using machine learning models. | I. "GenAI" or "Generative AI" is a type of artificial intelligence that creates new content including but not limited to text, images, code, classifications, and other media using machine learning models. |
| J. "GenAI Product" means any application, software, service, feature, tool, functionality, or product that involves or makes use of Generative AI capabilities or models. It can include GenAI Search Access Points. | [No similar provision.] | J. "GenAI Product" means any application, software, service, feature, tool, functionality, or product that involves or makes use of Generative AI capabilities or models and has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information. |
| K. "General Search Engine" or "GSE" means software or a service that produces links to websites and other relevant information in response to a user query or prompt. | I. "General Search Engine" or "GSE" means software or a service that produces links to websites and other relevant information in response to a user query or prompt, and that attempts to answer all queries (rather than only regarding particular topics). "General Search Engine" or "GSE" also has the meaning defined and used in the Court's Memorandum Opinion of August 5, 2024, ECF 1032. | K. "General Search Engine" or "GSE" means software or a service that produces links to websites and other relevant information in response to a user query or prompt and that seeks to fulfill a broad array of informational needs. |
| L. "Google" means (1) Defendant Google LLC, a limited liability company organized and existing under the laws of the State of Delaware, headquartered in Mountain View, California; (2) its successors and assigns, subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures controlling or overseeing Google Search (including syndicated products), Search Text Ads (including syndicated products) the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any related Google GenAI Product; and | J. "Google" means Defendant Google LLC, a limited liability company organized and existing under the laws of the State of Delaware, headquartered in Mountain View, California; (2) its successors and assigns, subsidiaries, divisions, and groups controlling or overseeing Google Search (including syndicated products), Search Text Ads (including syndicated products), the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any Google GenAI Assistant Application; and (3) the directors, officers, managers, | L. "Google" means (1) Defendant Google LLC, a limited liability company organized and existing under the laws of the State of Delaware, headquartered in Mountain View, California; (2) its successors and assigns, subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures controlling or overseeing Google Search (including syndicated products), Search Text Ads (including syndicated products), the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any related Google GenAI Product; and |

| | | |
|---|---|---|
| (3) the directors, officers, managers, agents, and employees of such entities specified in this Section IX.L who oversee Google Search (including syndicated products), Search Text Ads (including syndicated products) the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any related Google GenAI Product. | agents, and employees of such entities specified in this Paragraph IX.J who oversee Google Search (including syndicated products), Search Text Ads (including syndicated products), the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any Google GenAI Assistant Application. | (3) the directors, officers, managers, agents, and employees of such entities specified in this Section IX.L who oversee Google Search (including syndicated products), Search Text Ads (including syndicated products), the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any related Google GenAI Product. For clarity, the term "affiliates" includes any Alphabet Inc.–related entity that controls or oversees the aforementioned products. |
| M. "Google Assistant Application" means (1) the user-facing mobile assistive service software application marketed by Google as "Google Assistant" and its successors and (2) any Google GenAI Product. | K. "Google Assistant Application" means the user-facing mobile assistive service software application marketed by Google as "Google Assistant" and its successors. | M. "Google Assistant Application" means the user-facing mobile assistive service software application marketed by Google as "Google Assistant" and its successors. |
| N. "Google GenAI Product" means any GenAI Product offered by Google including by way of example, the stand-alone user-facing mobile software application currently marketed by Google as the "Google Gemini" application (and that application's functionally equivalent successors). | L. "Google GenAI Assistant Application" means the stand-alone user-facing mobile software application currently marketed by Google as the "Google Gemini" application (and that application's functionally equivalent successors) and any future user-facing software application owned by Google or its affiliates that makes use of generative AI capabilities or models and has among its principal functions answering information-seeking prompts across a wide variety or topics using a broad range of publicly available information, provided, however, that this term shall not include Google Search, the Google Search Application, the Chrome Browser Application, or the Google Assistant Application. | N. "Google GenAI Product" means any GenAI Product offered by Google, including by way of example, the stand-alone user-facing mobile software application currently marketed by Google as the "Google Gemini" application (and that application's functionally equivalent successors). |
| O. "Google Play" means the user-facing mobile software application distribution service currently marketed by Google as the "Play Store" and its successors. | M. "Google Play" means the user-facing mobile software application distribution service currently marketed by Google as the "Play Store" and its successors. | O. "Google Play" means the user-facing mobile software application distribution service currently marketed by Google as the "Play Store" and its successors. |
| P. "Google Search" means the web search and search advertising services offered by Google at Google.com. | N. "Google Search" means the web search and search advertising services offered by Google at Google.com. | P. "Google Search" means the web search and search advertising services offered by Google at Google.com. |

| | | |
|---|---|---|
| Q. "Google Search Application" means the user-facing mobile online search software application currently marketed by Google as the "Google app" or the "Google Search app" (and its successors). | O. "Google Search Application" means the user-facing mobile online search software application currently marketed by Google as the "Google app" or the "Google Search app" (and its successors). | Q. "Google Search Application" means the user-facing mobile online search software application currently marketed by Google as the "Google app" or the "Google Search app" (and its successors). |
| R. The terms "include" and "including" should be read as "including but not limited to," and any use of either word is not limited in any way to any examples provided. | [No similar provision.] | R. The terms "include" and "including" should be read as "including but not limited to," and any use of either word is not limited in any way to any examples provided. |
| S. "Marginal Cost" or "marginal cost" means the direct total production cost of producing an additional unit of a good or service, which is determined by calculating the change in direct total production cost resulting from Google providing the additional unit(s) of data or services required under this Final Judgment. | P. "Marginal Cost" means the direct total production cost of producing an additional unit of a good or service, as determined by calculating the change in direct total production cost resulting from providing the additional unit(s) of data or services. | S. "Marginal Cost" or "marginal cost" means the direct total production cost of producing an additional unit of a good or service, which is determined by calculating the change in direct total production cost resulting from Google providing the additional unit(s) of data or services required under this Final Judgment. |
| T. "Operating System Version" means a particular desktop or mobile operating system including, by way of example, Microsoft Windows, Apple iOS, Apple Mac OS, Apple iPad OS, or Android. | Q. "Operating System Version" means a web browser version or a version of any proprietary Apple feature or functionality, including Siri and Spotlight, designed to be installed and used on a particular desktop or mobile operating system including, by way of example, Microsoft Windows, Apple iOS, Apple Mac OS, Apple iPad OS, or Android. | T. "Operating System Version" means a web browser version or a version of any proprietary Apple feature or functionality, including Siri and Spotlight, designed to be installed and used on a particular desktop or mobile operating system including, by way of example, Microsoft Windows, Apple iOS, Apple Mac OS, Apple iPad OS, or Android. |
| U. "Person" or "person" means any natural person, corporate entity, partnership, association, joint venture, government entity, or trust. | [No similar provision.] | [No similar provision.] |
| [No similar provision.] | R. "Plaintiff States" means the States and Commonwealths of Arkansas, California, Georgia, Florida, Indiana, Kentucky, Louisiana, Michigan, Missouri, Mississippi, Montana, South Carolina, Texas, and Wisconsin, Colorado, Nebraska, Arizona, Iowa, New York, North Carolina, Tennessee, Utah, Alaska, Connecticut, Delaware, District of Columbia, Guam, Hawaii, Idaho, Illinois, Kansas, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, | [No similar provision.] |

| | | |
|---|---|---|
| | Puerto Rico, Rhode Island, South Dakota, Vermont, Virginia, Washington, West Virginia, and Wyoming. | |
| V. "Privacy Mode" means a mode within a web browser or an Apple product or service such as Siri or Spotlight that is designed to offer a preconfigured privacy setting and includes, by way of example, Private Browsing in Apple Safari, Private mode in Mozilla Firefox, and Secret mode in Samsung Internet. | S. "Privacy Mode" means a mode within a web browser that is designed to offer a preconfigured privacy setting and includes, by way of example, Private Browsing in Apple Safari, Private mode in Mozilla Firefox, and Secret mode in Samsung Internet. | U. "Privacy Mode" means a mode within a web browser or an Apple product or service such as Siri or Spotlight that is designed to offer a preconfigured privacy setting and includes, by way of example, Private Browsing in Apple Safari, Private mode in Mozilla Firefox, and Secret mode in Samsung Internet. |
| W. "Qualified Competitor" means a Competitor who meets the Plaintiffs' approved data security standards as recommended by the Technical Committee and agrees to regular data security and privacy audits by the Technical Committee, who makes a sufficient showing to the Plaintiffs, in consultation with the Technical Committee, of a plan to invest and compete in or with the GSE and/or Search Text Ads markets, and who does not pose a risk to the national security of the United States. | T. "Qualified Competitor" means a Competitor who applies to be so designated and: (i) meets the data security standards as determined by the Court in consultation with the Technical Committee; (ii) agrees to and satisfactorily passes regular data security and privacy audits by the Technical Committee; (iii) does not pose a risk to the national security of the United States, as determined by the Court; and (iv) makes a sufficient showing of a plan to invest and compete with General Search Engines and/or Search Text Ads providers, as determined by the Court in consultation with the Technical Committee. To remain eligible as a Qualified Competitor, the Competitor must apply for re-certification on an annual basis and establish that it continues to meet the criteria set forth in (i) – (iv). To continue to be in compliance with (iv) for purposes of re-certification, the Qualified Competitor must show that it is making sufficient efforts to invest and compete with General Search Engines and/or Search Text Ads providers. Google will have the right to object to and be heard by the Court on the qualification of, and continuing eligibility of, any proposed Qualified Competitor, including on the basis of noncompliance with data security, privacy, or contractual access or use restrictions. | V. "Qualified Competitor" means a Competitor who meets the Plaintiffs' approved data security standards as recommended by the Technical Committee and agrees to regular data security and privacy audits by the Technical Committee; who makes a sufficient showing to the Plaintiffs, in consultation with the Technical Committee, of a plan to invest and compete in or with the GSE and/or Search Text Ads markets; and who does not pose a risk to the national security of the United States. To remain eligible as a Qualified Competitor, the Competitor must apply for re-certification on an annual basis starting from the date of original certification as a Qualified Competitor and establish that it continues to meet the definition of a Qualified Competitor. The Technical Committee shall establish appropriate procedures for the re-certification process. |

| | | |
|---|---|---|
| X. "Search Access Point" means any software, application, interface, digital product, or service where a user can enter a query or prompt and, in response to at least some user queries or prompts, receive (or be directed to a place to receive) a response that includes information from a GSE, including links to websites. Search Access Points include OS-level Search Access Points, browsers (including Search Access Points within browsers such as browser address bars), search apps, and GenAI Products that can retrieve and display information from a GSE, including links to websites. | [No similar provision.] | W. "Search Access Point" means any software, application, interface, digital product, or service where a user can enter a query or prompt and, in response to at least some user queries or prompts, receive (or be directed to a place to receive) a response that includes information from a GSE, including links to websites. Search Access Points include OS-level Search Access Points, browsers (including Search Access Points within browsers such as browser address bars), search apps, and GenAI Products that can retrieve and display information from a GSE, including links to websites. |
| Y. "Search Feature" in Google Search means any user-facing content on a SERP that is not an organic link. Search Features include images, featured snippets, hotel units, query expansion features like auto-complete, "did you mean" prompts, spelling corrections, and related searches. | [No similar provision.] | X. "Search Feature" in Google Search means any user-facing content on a SERP that is not an organic link. Search Features include images, featured snippets, hotel units, query expansion features like auto-complete, "did you mean" prompts, spelling corrections, and related searches. |
| AA. "Search Text Ad" means a general search text advertisement, which is an ad that resembles an organic link on a SERP. Search Text Ads can include images and often appear at the top of the SERP with a designation indicating that they are paid advertisements. "Search Text Ad" also includes Search Text Ads appearing in or in connection with Google AI Overviews. | U. "Search Text Ad" means a general search text advertisement, which is an ad that resembles an organic text link on a search engine results page. "Search Text Ad" also has the meaning defined and used in the Court's Memorandum Opinion of August 5, 2024, ECF 1032, at 60, and includes Search Text Ads appearing in or in connection with Google AI Overviews. | Y. "Search Text Ad" means a general search text advertisement, which is an ad that resembles an organic link on a SERP. Search Text Ads can include images and often appear at the top of the SERP with a designation indicating that they are paid advertisements. "Search Text Ad" also includes Search Text Ads appearing in or in connection with Google AI Overviews. |
| BB. "SERP" or "Search Engine Results Page" means the results provided by a search engine, in response to a user query, including links and other features and content, including from a broad index of the web. | [No similar provision.] | Z. "SERP" or "Search Engine Results Page" means the results provided by a search engine, in response to a user query, including links and other features and content, drawn from a broad index of the web. |
| [No similar provision.] | V. "Specialized Vertical Provider" means a platform that responds to queries with information centered on a particular subject matter. | [No similar provision.] |
| CC. "Technical Committee" or "TC" means the five-person committee of experts appointed by the Court pursuant to Section VII.A. | W. "Technical Committee" or "TC" means the five-person committee of experts appointed by the Court pursuant to Paragraph VII.A. | AA. "Technical Committee" or "TC" means the five-person committee of experts appointed by the Court pursuant to Section VII.A. |

| | | |
|---|---|---|
| DD. "Third-Party Browser" means any web browser that is not Google Chrome or another proprietary Google web browser and includes, by way of example, Apple Safari, Mozilla Firefox, and Samsung Internet. | X. "Third-Party Browser" means any web browser that is not Google Chrome or another proprietary Google web browser and includes, by way of example, Apple Safari, Mozilla Firefox, and Samsung Internet. | BB. "Third-Party Browser" means any web browser that is not Google Chrome or another proprietary Google web browser and includes, by way of example, Apple Safari, Mozilla Firefox, and Samsung Internet. |
| [No similar provision.] | Y. "Third-Party GenAI Assistive Service" means a user-facing software application not owned by Google or its affiliates that makes use of generative AI capabilities or models and has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information. | [No similar provision.] |
| FF. "Third-Party GenAI Product" means any GenAI Product that is not owned by Google. | Z. "Third-Party GenAI Product" means any application, software, service, feature, tool, functionality, or product not owned by Google or its affiliates that involves or makes use of generative AI capabilities or models and has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information. For clarity, "Third-Party GenAI Product" does not include specialized vertical search services, whether or not they offer a GenAI Product. | CC. "Third-Party GenAI Product" means any GenAI Product that is not owned by Google. |
| EE. "Third-Party General Search Service" means a web search service that can respond to a broad range of search query categories and offers functionality that is substantially similar to Google Search, and is not owned by Google or its affiliates. | AA. "Third-Party General Search Service" means a web search service that can respond to a broad range of search query categories and offers functionality that is substantially similar to Google Search, and is not owned by Google or its affiliates. | DD. "Third-Party General Search Service" means a web search service that can respond to a broad range of search query categories and offers functionality that is substantially similar to Google Search and is not owned by Google or its affiliates. |
| GG. "User-side Data" means all data that can be obtained from users in the United States, directly through a search engine's interaction with the user's Device, including software running on that Device, by automated means. User-side Data includes information Google collects when answering commercial, tail, and local queries. | BB. "User-side Data" means all data that can be obtained from users in the United States, directly through a search engine's interaction with the user's device, including software running on that device, by automated means. User-side Data includes information Google collects when answering commercial, tail, and local queries. | EE. "User-side Data" means all data that can be obtained from users in the United States, directly through a search engine's interaction with the user's Device, including software running on that Device, by automated means. User-side Data includes information Google collects when answering commercial, tail, and local queries. |
| Z. "Search Index" means any databases that store and organize | CC. "Web Search Index" means databases that store and organize | FF. "Web Search Index" means databases that store and organize |

| | | |
|---|---|---|
| information about websites and their content that is crawled from the web. | information about websites and their content that is crawled from the web. For the avoidance of doubt, it does not include Google's vertical indexes or its video, images, or other specialized indexes that contain information not crawled from the web. | information about websites and their content that is crawled from the web. For the avoidance of doubt, it does not include Google's vertical indexes or its video, images, or other specialized indexes that contain information not crawled from the web. |

## X. THIRD-PARTY RIGHTS

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| Nothing in this Final Judgment is intended to confer upon any other persons any rights or remedies of any nature whatsoever or by reason of this Final Judgment other than the right to submit complaints to the Compliance Officer and the TC. | Nothing in this Final Judgment is intended to confer upon any other persons any rights or remedies of any nature. | Nothing in this Final Judgment is intended to confer upon any other persons any rights or remedies of any nature whatsoever or by reason of this Final Judgment other than the right to submit complaints to the Compliance Officer and the TC. |

## XI. RETENTION OF JURISDICTION AND ENFORCEMENT OF FINAL JUDGMENT

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| A. Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders or directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification of any of its provisions (including an order to divest any relevant Google business), for the enforcement of compliance with this Final Judgment, and for the punishment of any violation of this Final Judgment. For example, Plaintiffs may request that the Court revisit its decision on a payment ban, including but not limited to a ban on default payments, if competition is not substantially restored by this Order. In any motion to modify this Final Judgment, Plaintiffs need not show any change in circumstances, but need only demonstrate that modification is necessary to achieve the intended purposes of this Final Judgment to restore competition in the monopolized markets. In any action to | This Court retains jurisdiction for the purpose of enabling any of the parties to this Final Judgment to apply for such further orders or directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify or terminate any of its provisions, and to enforce compliance. | A. Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders or directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification of any of its provisions, for the enforcement of compliance with this Final Judgment, and for the punishment of any violation of this Final Judgment. |

| | | |
|---|---|---|
| enforce this Final Judgment, Google must show by a preponderance of the evidence that its actions are in compliance with this Final Judgment. | | |
| B. The Court may act *sua sponte* to issue orders or directions for the construction or carrying out of this Final Judgment, for the enforcement of compliance, and for the punishment of any violation. | [No similar provision.] | [No similar provision.] |
| C. This Final Judgment should be interpreted to give full effect to the procompetitive purposes of the U.S. antitrust laws and to restore the competition the Court found was harmed by Google's illegal conduct. | [No similar provision.] | [No similar provision.] |
| D. For a period of four (4) years following the expiration of this Final Judgment, if any Plaintiff has evidence that Google violated this Final Judgment before it expired, that Plaintiff may file an action against Google in this Court requesting that the Court order (1) Google to comply with the terms of this Final Judgment for an additional term of at least four (4) years following the filing of the enforcement action; (2) all appropriate contempt remedies; and (3) additional relief needed to ensure Google complies with the terms of this Final Judgment. | [No similar provision.] | B. For a period of four (4) years following the expiration of this Final Judgment, if any Plaintiff has evidence that Google violated this Final Judgment before it expired, that Plaintiff may file an action against Google in this Court requesting that the Court order (1) Google to comply with the terms of this Final Judgment for an additional term of at least four (4) years following the filing of the enforcement action; (2) all appropriate contempt remedies; and (3) additional relief needed to ensure Google complies with the terms of this Final Judgment. |
| E. In connection with a successful effort by any Plaintiff to enforce this Final Judgment against Google, whether litigated or resolved before litigation, Plaintiff may request that the Court order Google to reimburse that Plaintiff for the fees and expenses of its attorneys, as well as all other costs, including experts' fees, incurred in connection with that effort to enforce this Final Judgment, including in the investigation of the potential violation. | [No similar provision.] | [No similar provision.] |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA et al.,**<br>**Plaintiffs,**<br>**v.**<br>**GOOGLE LLC,**<br>**Defendant.** | ) | **Case No. 20-cv-3010 (APM)** |
| **STATE OF COLORADO et al.,**<br>**Plaintiffs,**<br>**v.**<br>**GOOGLE LLC,**<br>**Defendant.** | ) | **Case No. 20-cv-3715 (APM)** |

# FINAL JUDGMENT

WHEREAS, Plaintiffs United States of America, and the States and Commonwealths of Arkansas, California, Georgia, Florida, Indiana, Kentucky, Louisiana, Michigan, Missouri, Mississippi, Montana, South Carolina, Texas, and Wisconsin, by and through their respective Attorneys General ("Co-Plaintiff States"), filed their Complaint on October 20, 2020, and their Amended Complaint on January 15, 2021;

AND WHEREAS, Plaintiffs Colorado, Nebraska, Arizona, Iowa, New York, North Carolina, Tennessee, Utah, Alaska, Connecticut, Delaware, District of Columbia, Guam, Hawaii, Idaho, Illinois, Kansas, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire,

New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Dakota, Vermont, Virginia, Washington, West Virginia, and Wyoming ("Colorado Plaintiff States") filed their Complaint on December 17, 2020;

AND WHEREAS, the Court conducted a trial and entered Findings of Fact and Conclusions of Law in both actions on August 5, 2024;

AND WHEREAS, the Court entered judgment finding Google liable for violating Section 2 of the Sherman Act by unlawfully maintaining its monopolies in the general search services and general search text advertising markets;

AND WHEREAS, the Court conducted a further remedies trial and entered additional Findings of Fact and Conclusions of Law on September 2, 2025;

NOW THEREFORE, upon the record at trial and all prior and subsequent proceedings, it is hereby ORDERED, ADJUDGED, AND DECREED:

## I. JURISDICTION

The Court has jurisdiction over the subject matter of this action and over Google LLC.

## II. APPLICABILITY

The Final Judgment applies to Google and to each of its officers, directors, agents, employees, subsidiaries, successors, and assigns; and to all other persons in active concert or participation with Google who have received actual notice of this Final Judgment by personal service or otherwise.

## III. PROHIBITORY INJUNCTIONS

A. Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of the Google Search Application on any device sold in the United States.

B. Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of the Chrome Browser Application on any device sold in the United States.

C. Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of the Google Assistant Application on any device sold in the United States.

D. Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of any Google GenAI Product on any device sold in the United States.

E. Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party General Search Service on any device sold in the United States.

F. Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party Browser on any device sold in the United States.

G. Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party GenAI Product on any device sold in the United States.

H. Google shall not condition the payment for preload, placement, or assignment of an access point for the Google Search Application for one device on any other preload, placement,

or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States.

I. Google shall not condition the payment for preload, placement, or assignment of an access point for the Chrome Browser Application for one device on any other preload, placement, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States.

J. Google shall not condition the payment for preload, placement, or assignment of an access point for the Google Assistant Application or any Google GenAI Product for one device on any other preload, placement, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States.

K. Google shall not enter or maintain any agreement requiring or conditioning Consideration on the distribution, preload, placement, display, use, license, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product in the United States unless the agreement terminates no more than one year after the date it is entered.

L. Google shall not condition (1) Consideration for a Browser Developer setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product on any browser access point (including alternative modes such as Privacy Mode) on any Device on (2) the Browser Developer setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product on any other browser access point on that same

Device or any other Device in the United States. Any agreement containing a default condition permitted by this provision must expire after one year and must expressly permit the Browser Developer to promote any Third-Party General Search Service and Third-Party GenAI Product.

M. Google shall not condition (1) Consideration for Apple setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product with respect to any proprietary Apple feature or functionality, including Safari, Siri, Spotlight, and any Privacy Mode within those products, on one Device on (2) Apple setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product with respect to any proprietary Apple feature or functionality on that same Device or any other Device in the United States. Any agreement containing a default condition permitted by this provision must expire after one year and must expressly permit Apple to promote any Third-Party General Search Service and Third-Party GenAI Product.

N. Nothing in this Final Judgment shall prohibit Google from distributing the Google Search Application, the Google Assistant Application, and any Google GenAI Product through a single Application Programming Kit (APK) as long as the licensee has the option to disable end-user access to any of those applications and services that the licensee declines to license.

## IV. REQUIRED DISCLOSURES OF DATA

A. Google's Web Search Index: Within thirty (30) days of a Qualified Competitor's certification pursuant to Section IX.V, unless granted additional time, Google shall make available, at marginal cost, to Qualified Competitors the following data related to Google's Web Search Index:

1. for each document in the Google Web Search Index, a unique identifier (DocID) and another notation sufficient to denote all the documents Google considers duplicates of each other;

2. a DocID to URL map; and

3. for each DocID, the (A) time that the URL was first seen, (B) time that the URL was last crawled, (C) spam score, and (D) device-type flag.

This information shall be provided for all websites in the full Web Search Index Google uses for searches on Google.com, the Google Search Application, or any future Google general search products. Nothing in Section IV is intended to transfer intellectual property rights of third parties to index users.

B. User-Side Data: For the term of this Final Judgment, Google shall make available, at marginal cost, to Qualified Competitors the following User-side Data on a non-discriminatory basis while safeguarding personal privacy and security:

1. User-side Data used to build, create, or operate the GLUE statistical model(s); and

2. User-side Data used to train, build, or operate the RankEmbed model(s).

Google shall make this data available to Qualified Competitors at least twice, with the exact number and frequency of such disclosures to be determined by the Court after consultation with Plaintiffs and the Technical Committee (TC). Any cap on the number of such disclosures shall be informed, in part, by the utility of the datasets disclosed after appropriate privacy-enhancing techniques have been applied. For clarity, this Section IV.B shall not require disclosure of intellectual property or trade secrets, such as algorithms, ranking signals, or post-trained LLMs.

C. User-Side Data Sharing Administration:

1. Plaintiffs, in consultation with the TC, shall promptly determine the appropriate User-side Data privacy and security safeguards to be applied before Google shares the data specified in Section IV.B with Qualified Competitors. Google shall have up to six (6) months from the date that the Plaintiffs, in consultation with the TC, determine such privacy and security safeguards to implement the technology and provide any notice necessary to comply with this Section IV, and Google shall be deemed to have implemented the technology once Plaintiffs, in consultation with the TC, determine that the technology, including privacy and security safeguards, is fully functional.

2. Google shall provide sufficient information about each dataset such that Qualified Competitors can reasonably understand what it contains, including but not limited to a description of what the dataset contains, any sampling methodology used to create the dataset, and any anonymization or privacy-enhancing technique that was applied. Plaintiffs, in consultation with the TC, may impose restrictions on what information Google shares under this Section IV.C.2 for the purposes of (i) promoting data privacy and security and (ii) ensuring privacy and security safeguards are effectively applied.

3. The data specified in Sections IV.A and B will be shared pursuant to a license governing use. The terms of the license shall include a requirement that the Qualified Competitor commit not to share or sell the datasets unless authorized by the Technical Committee or the Court and shall use the datasets for the exclusive purpose of serving users through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product. Within six (6) months of the Effective Date of this Final Judgment,

Plaintiffs and the Technical Committee, with input from Google, shall create and submit to the Court a template for such license.

## V. REQUIRED SYNDICATION OF SEARCH RESULTS

A. Search Syndication License: Google shall take steps sufficient to make available to any Qualified Competitor, on financial terms no worse than those offered to any other user of Google's search syndication products, a syndication license whose term will be five (5) years from the date the license is signed, and which shall require Google, via real-time API(s), to make the following information and data available in response to each query issued or submitted by a Qualified Competitor:

1. both desktop and mobile versions of the ranked organic web search results obtained from crawling the web;

2. the user-facing query-rewriting features that Google provides under any of its current search syndication agreements as of the date of entry of this Final Judgment, including user-facing Search Features that enable query correction, modification, or expansion; and

3. the Local, Maps, Video, Images, and Knowledge Panel Search Feature content that Google provides under any of its current search syndication agreements as of the date of entry of this Final Judgment.

B. Search Syndication License Terms: The search syndication license in Section V.A shall have the following additional features:

1. Google shall make syndicated content available via an API.

2. Google shall provide Qualified Competitors with latency and reliability functionally equivalent to what any other user of Google's search syndication products

would receive as of the date of entry of this Final Judgment. For the avoidance of doubt, Google's obligations do not extend to latency and reliability differences that result from differences in product implementation, users, or are otherwise outside of Google's syndication products.

3. Google shall provide the license on a non-discriminatory basis to any Qualified Competitor on terms no less favorable than the most favorable terms Google provides under any current search syndication agreements as of the date of entry of this Final Judgment.

4. Qualified Competitors' use of Google's syndication services in the first year will be capped at 40% of Qualified Competitors' annual U.S. queries and decline over the course of a 5-year period with an expectation that Qualified Competitors will become independent of Google over time through investment in their own search capabilities. The pace of this tapering, the methods for measuring and determining the percentage, and the application of the percentage will be determined by the Court upon consultation with Plaintiffs and the Technical Committee in a manner that facilitates competition while incentivizing Qualified Competitors to move promptly to become independent of Google.

5. Google may not consent to Qualified Competitors exceeding syndication limits, and Qualified Competitors shall submit to the TC audits of syndication frequency and scope. The frequency and content of these audits shall be determined by the Plaintiffs in consultation with the TC.

6. Google may impose no restrictions or conditions on how a Qualified Competitor uses, displays, or integrates information or services obtained under this

Section V beyond the least restrictive terms Google provides under any current search syndication agreements as of the date of entry of this Final Judgment.

7. Qualified Competitors may elect, in their sole discretion, which queries (some or all) for which they will request syndicated results and which syndication components to display or use and may do so in any manner they choose, except that Google may impose restrictions on the display or use of syndication components no less favorable than what it provides under any current search syndication agreements as of the date of entry of this Final Judgment. Google is also permitted to place its ordinary commercial restrictions on scraping, indexing, or crawling the syndicated results and content.

8. It shall be the Qualified Competitor's sole discretion to determine how much information to share with Google regarding the end user except that Google may require a Qualified Competitor to share information with Google regarding the end user, on terms no less favorable than what any other user of Google's search syndication products would receive as of the date of entry of this Final Judgment, as is necessary for the purposes of (1) basic search syndication functionality; (2) spam and abuse detection; and (3) legal or regulatory compliance.

9. Google may not retain or use (in any way) syndicated queries or other information it obtains under Section V.A for its own products and services beyond the most limited retention and use permitted under any of Google's current search syndication agreements as of the date of entry of this Final Judgment.

10. For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States, from human end users

of the Qualified Competitor. Queries from a syndicator of the Qualified Competitor and synthetic queries are not eligible for syndication under the Final Judgment.

11. If Google in good faith believes a Qualified Competitor is in breach of the terms of its agreement, it may exercise its rights under the agreement. Google must also provide simultaneous notice to the Technical Committee of the breach and the actions Google is taking in light of the breach.

Within sixty (60) days of the Effective Date of this Final Judgment, Plaintiffs and the Technical Committee, with input from Google, shall create and submit to the Court a template for such license.

C. Existing Syndication Agreements: The provisions of this Section V shall have no effect on any existing Google search syndication agreements with third parties or on Google's ability to enter into search syndication agreements with third parties other than Qualified Competitors, except that Google shall permit any entity with an existing search syndication agreement who becomes a Qualified Competitor, at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section V.

## VI. SEARCH TEXT AD AUCTION CHANGES AND SEARCH TEXT ADS SYNDICATION

A. Search Text Ads Auction Changes: Within a reasonable period of time after the Technical Committee's appointment, Plaintiffs shall submit a proposal to the Court, informed by the Technical Committee's views, by which Google shall periodically provide the Technical Committee and Plaintiffs a report outlining all changes to its Search Text Ads auction meeting certain parameters and, for each change, (1) Google's public disclosure of that change or (2) a statement why no public disclosure is necessary. Plaintiffs' proposal shall detail the types of changes that must be disclosed, the frequency of disclosure, the steps to mitigate undue burden on

Google, and the steps to ensure any public disclosure of an ad auction change (if not already made by Google) avoids revealing Google's trade secrets, in accord with the Court's instructions in its September 2, 2025, Memorandum Opinion. Plaintiffs have the right to challenge any disclosure they deem inadequate. For the avoidance of doubt, Google need not report on auction experiments, which are generally tested on some fraction of Google's Search Text Ads traffic, but Google shall disclose changes to the Search Text Ads auction that result from any such auction experiments.

B. Search Text Ads Syndication: Google shall take steps sufficient to make available to any Qualified Competitor a Search Text Ads Syndication License whose term will be five (5) years from the date the license is signed. The Search Text Ads syndication agreement shall have the following additional features:

1. Google shall provide Qualified Competitors latency, reliability, and performance functionally equivalent to what Google ordinarily provides to other users of Google's Search Text Ads syndication products, e.g., AdSense for Search, or any other current or future products offering syndicated Search Text Ads. Search Text Ads syndication licenses to Qualified Competitors shall include all types of Search Text Ads (including any assets, extensions, or similar Search Text Ad variations) available through its syndication products. For the avoidance of doubt, Google's obligations do not extend to latency, reliability, and performance differences that result from differences in product implementation, users, or are otherwise outside of Google's syndication products.

2. Google shall provide the Search Text Ads Syndication License to Qualified Competitors on financial terms no worse than those offered to any other user of Google's Search Text Ads syndication products.

3. Google shall not require Qualified Competitors to share more information with Google regarding the end user than it requires from any other user of Google's Search Text Ads syndication products.

4. The only permitted use of the information and data that Qualified Competitors obtain from Google pursuant to this Section VI is to display the ad results to the end user who submitted the associated query, as further detailed in this section, except as permitted by Section VI.B.9.

5. Google shall (i) make the purchase of ads syndicated under this Section VI.B available to advertisers on a non-discriminatory basis comparable to, and no more burdensome than, the availability of Google's other Search Text Ads and (ii) include Qualified Competitors in its Search Partner Network.

6. Qualified Competitors shall have the same formatting flexibility available to any other user of Google's Search Text Ads syndication products, shall be free to use other providers of syndicated search ads or display their own ads, and shall not be required to provide Google ads with preferential placement over equivalent ads requested from other sources. Google may place only ordinary-course restrictions on the use or display of syndicated ad content, but such restrictions shall be no more restrictive than those applied to any other user of Google's Search Text Ads syndication products. Google is also permitted to place its ordinary commercial restrictions on scraping, indexing, or crawling the syndicated ads.

7. Google is permitted to retain or use data collected from Qualified Competitors in provisioning of the service under Section VI for Google's own products and services for the purpose of building, improving, and maintaining its ads infrastructure

and shared ads systems. Google's use of Qualified Competitors' data for these purposes will be the same as Google's use of data from other users of its Search Text Ads syndication products.

8. Google need not grant Qualified Competitors the right to set a minimum cost per click for syndicated ads unless failing to do so would violate Section VI.B.1.

9. For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States, from human end users. Synthetic queries are not eligible for syndication under the Final Judgment. Queries from a syndicator of the Qualified Competitor are not eligible for syndication under the Final Judgment, unless such Qualified Competitor has been certified as a Competitor to a Google ads platform (e.g., Google Ads).

10. If Google in good faith believes a Qualified Competitor is in breach of the terms of its agreement under this Section VI, Google may exercise its rights under the agreement. Before exercising such rights, Google shall first provide simultaneous notice to the Technical Committee and the Plaintiffs of the breach and the actions Google is taking in light of the breach. Google shall provide this notice in time such that Plaintiffs have a reasonable period of time to raise objections. If Plaintiffs object and seek a resolution by the Court, Google may not take any action until the later of (i) two weeks after Plaintiffs seek Court intervention, if the Court does not act, or (ii) until further order of the Court, if the Court intervenes. Google may seek expedited consideration from the Court if the circumstances warrant such treatment.

11. Google shall be entitled to propose additional terms to the Search Text Ad syndication agreements with Qualified Competitors as necessary to guarantee ad quality,

protect advertisers, and prevent ad misuse. Qualified Competitors are free to reject these proposed additional terms. Google shall provide simultaneous notice to the Technical Committee and the Plaintiffs of any such term and allow Plaintiffs a reasonable period of time to raise objections. If Plaintiffs object and seek a resolution by the Court, Google may not modify its Search Text Ad syndication agreements under this Section VI until the later of (i) two weeks after Plaintiffs seek Court intervention, if the Court does not act, or (ii) until further order of the Court, if the Court intervenes. Google may seek expedited consideration from the Court if the circumstances warrant such treatment.

12. Qualified Competitors may elect, in their sole discretion, the queries for which they will request syndicated ad results.

Within sixty (60) days of the Effective Date of this Final Judgment, Plaintiffs and the Technical Committee, with input from Google, shall create and submit to the Court a template for such license.

C. Existing Syndication Agreements: The provisions of this Section VI shall have no effect on any existing Google Search Text Ad syndication agreements with third parties or on Google's ability to enter in Search Text Ad syndication agreements with third parties other than Qualified Competitors, except that Google shall permit any entity with an existing Search Text Ad syndication agreement who becomes a Qualified Competitor, at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section VI.

## VII. COMPLIANCE, ADMINISTRATION, AND ENFORCEMENT PROCEDURES

A. Technical Committee:

1. Within sixty (60) days of entry of this Final Judgment, the Court will appoint, pursuant to the procedures below, a five-person Technical Committee to assist in enforcement of and compliance with this Final Judgment.

2. The TC members shall be experts in some combination of software engineering, information retrieval, artificial intelligence, economics, behavioral science, and data privacy and data security. No TC member may have a conflict of interest that could prevent them from performing their duties in a fair and unbiased manner. In addition, unless the Court so approves, no TC member:

a. may have been employed in any capacity by Google or any Competitor to Google within the six-month period directly predating their appointment to the TC;

b. may have been retained by any party as a consulting or testifying expert in this action; or

c. may perform any work for Google or any Competitor of Google during the time that they serve on the TC and for one (1) year after ceasing to serve on the TC.

3. Within thirty (30) days of entry of this Final Judgment, Plaintiff United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States, and Google shall each select one member of the TC, and a majority of those three members will then select the remaining two members. Plaintiff United States' appointee shall serve as chair. The selection and approval process shall be as follows:

a. As soon as practicable after submission of this Final Judgment to the Court, the Plaintiffs as a group shall identify to Google the individuals they propose to select as their designees to the TC, and Google shall identify to Plaintiffs the individual it proposes to select as its designee. No party may object to a selection on any ground other than failure to satisfy the requirements of Section VII.A.2 above. Any such objection shall be made within ten (10) business days of receipt of notification of selection.

b. The Plaintiffs shall apply to the Court for appointment of the persons selected pursuant to Section VII.A.3.a above. Any objections to the eligibility of a selected person that the parties have failed to resolve between themselves will be decided by the Court based solely on the requirements stated in Section VII.A.2 above.

c. As soon as practicable after their appointment by the Court, the three members of the TC selected by the Plaintiffs and Google (the "Standing Committee Members") shall identify to the Plaintiffs and Google the persons that they in turn propose to select as the remaining members of the TC. The Plaintiffs and Google shall not object to these selections on any grounds other than failure to satisfy the requirements of Section VII.A.2 above. Any such objection shall be made within ten (10) business days of receipt of notification of selection and shall be served on the other party as well as on the Standing Committee Members.

d. The Plaintiffs shall apply to the Court for appointment of the persons selected by the Standing Committee Members. If the Standing Committee Members cannot agree on the fourth or fifth members of the TC, that member or

members shall be appointed by the Court. Any objection by Plaintiffs or Google to the eligibility of the person selected by the Standing Committee Members which the parties have failed to resolve among themselves shall also be decided by the Court based solely on the requirements stated in Section VII.A.2 above.

4. The Standing Committee Members shall serve for an initial term of thirty-six (36) months; the remaining members shall serve for an initial term of thirty (30) months. At the end of a TC member's term, the party that originally selected them may, in its sole discretion, either request re-appointment by the Court to additional terms of the same length, or replace the TC member in the same manner as provided for in Section VII.A.3 above. In the case of the fourth and fifth members of the TC, those members shall be re-appointed or replaced in the manner provided in Section VII.A.3 above.

5. If any party determines that a member of the TC has failed to act diligently and consistently with the purposes of this Final Judgment, they may petition the Court for removal of that member. If a member of the TC is removed by the Court, resigns, or for any other reason ceases to serve in their capacity as a member of the TC, the person or persons that originally selected the TC member shall select a replacement member in the same manner as provided for in Section VII.A.3 above.

6. Promptly after appointment of the TC by the Court, the Plaintiffs shall enter into a Technical Committee Services Agreement ("TC Services Agreement") with each TC member that grants the rights, powers, and authorities necessary to permit the TC to perform its duties under this Final Judgment. Google shall indemnify each TC member and hold them harmless against any losses, claims, damages, liabilities, or expenses arising out of, or in connection with, the performance of the TC's duties, except to the extent that

such liabilities, losses, damages, claims, or expenses result from misfeasance, gross negligence, willful or wanton acts, or bad faith by the TC member. The TC Services Agreements shall include the following:

a. The TC members shall serve, without bond or other security, at the cost and expense of Google on such terms and conditions as the parties agree, including payment of reasonable fees and expenses. To the extent that the parties cannot agree on the terms of a TC Services Agreement, the parties will submit such disagreement to the Court for resolution.

b. The TC Services Agreement shall provide that each member of the TC must comply with the limitations provided for in Section VII.A.2 above.

7. The TC shall have the following powers and duties:

a. The TC shall have the power and authority to monitor Google's implementation of and compliance with its obligations under this Final Judgment, in the manner described further herein.

b. The TC shall have the power to recommend reasonable data security standards applicable to Qualified Competitors, which shall be approved by the Plaintiffs.

c. The TC may, on reasonable notice to Google:

i. interview, either informally or on the record, any Google personnel, who may have their individual counsel present; any such interview will be subject to the reasonable convenience of such personnel and without restraint or interference by Google;

ii. inspect and copy any document in the possession, custody, or control of Google personnel;

iii. obtain reasonable access to any system or equipment to which Google personnel have access;

iv. obtain reasonable access to, and inspect, any physical facility, building, or other premises to which Google personnel have access; and

v. require Google personnel to provide documents, data, and other information, and to submit reports to the TC containing such material, in such form as the TC may reasonably direct.

d. The TC shall have access to Google's source code and algorithms, subject to a confidentiality agreement, as approved by the Plaintiffs and to be agreed to by the TC members pursuant to Section VII.A.8 below, and by any staff or consultants who may have access to the source code and algorithms. The TC may study, interrogate, and interact with the source code and algorithms in order to perform its functions and duties, including the handling of complaints and other inquiries from third parties.

e. The TC shall receive complaints from Google's Compliance Officer (as described in Section VII.B below), third parties, or the Plaintiffs and handle them in the manner specified in Section VII.C below.

f. The TC shall report in writing to the Plaintiffs, initially every three (3) months for three (3) years and thereafter every six (6) months until expiration of this Final Judgment, the actions it has undertaken in performing its

duties pursuant to this Final Judgment, including the identification of each business practice reviewed and any recommendations made by the TC.

g. Regardless of when reports are due, when the TC has reason to believe that there may have been a failure by Google to comply with any term of this Final Judgment, or that Google is attempting to circumvent any provision of this Final Judgment or the intended purposes of this Final Judgment, the TC shall immediately notify the Plaintiffs in writing setting forth the relevant details.

h. TC members may communicate with third parties about how their complaints or inquiries might be resolved with Google, so long as the confidentiality of information obtained from Google is maintained.

i. The TC may hire at the cost and expense of Google, with prior notice to Google and subject to approval by the Plaintiffs, such staff or consultants (all of whom must meet the qualifications of Sections VII.A.2.a–c) as are reasonably necessary for the TC to carry out its duties and responsibilities under this Final Judgment. The compensation of any person retained by the TC shall be based on reasonable and customary terms commensurate with the individual's experience and responsibilities.

j. The TC shall account for all reasonable expenses incurred, including agreed upon fees for the TC members' services, subject to the approval of the Plaintiffs. Google's failure to promptly pay the TC's accounted-for costs and expenses, including for agents and consultants, shall constitute a violation of this Final Judgment and may result in sanctions imposed by the Court. Google may, on application to the Court, object to the reasonableness of any such fees or other

expenses only if Google has conveyed such objections to the Plaintiffs and the TC within ten (10) calendar days of receiving the invoice for such fees or other expenses. On any such application, (a) Google shall bear the burden to demonstrate unreasonableness; (b) Google shall establish an escrow account into which it deposits the disputed costs and expenses until the dispute is resolved; and (c) the TC members shall be entitled to recover all costs incurred on such application (including reasonable attorneys' fees and costs), regardless of the Court's disposition of such application, unless the Court expressly finds that the TC's opposition to the application was without substantial justification.

k. Google may object to and be heard by the Court on any recommendation from the TC or Plaintiffs as to the interpretations or substantive requirements of this Final Judgment.

8. Each TC member, and any consultants or staff hired by the TC, shall sign a confidentiality agreement prohibiting disclosure of any information obtained in the course of performing his or her duties as a member of the TC or as a person assisting the TC, to anyone other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, or the Court. All information gathered by the TC in connection with this Final Judgment and any report and recommendations prepared by the TC shall be treated as Highly Confidential under the Protective Order in this case, and shall not be disclosed to any person other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, and the Court except as allowed by the Protective Order entered in the Action or by further order of this Court. No member of the TC may make any public statements relating to the TC's activities.

B. Internal Compliance Officer:

1. Google shall designate, within thirty (30) days of entry of this Final Judgment, an employee of Google as the internal Compliance Officer with responsibility for administering Google's antitrust compliance program and helping to ensure compliance with this Final Judgment.

2. Within seven (7) days of the Compliance Officer's appointment, Google shall identify to the Plaintiffs the Compliance Officer's name, business address, telephone number, and email address. Within fifteen (15) days of a vacancy in the Compliance Officer position, Google shall appoint a replacement and identify to the Plaintiffs the replacement Compliance Officer's name, business address, telephone number, and email address. Google's initial or replacement appointment of the Compliance Officer is subject to the approval of the Plaintiffs.

3. The Compliance Officer shall supervise the review of Google activities to ensure that they comply with this Final Judgment. The Compliance Officer may be assisted by other employees of Google.

4. The Compliance Officer shall be responsible for performing the following activities:

a. within forty-five (45) days after entry of this Final Judgment, distributing a copy of the Final Judgment to all officers and directors of Google;

b. promptly distributing a copy of this Final Judgment to any person who succeeds to a position described in Section VII.B.4.a above;

c. ensuring that those persons designated in Section VII.B.4.a above are annually briefed on the meaning and requirements of this Final Judgment and

the U.S. antitrust laws and advising them that Google's legal advisors are available to confer with them regarding any question concerning compliance with this Final Judgment or the U.S. antitrust laws;

d. obtaining from each person designated in Section VII.B.4.a above an annual written certification that he or she: (i) has read and agrees to abide by the terms of this Final Judgment and (ii) has been advised and understands that his or her failure to comply with this Final Judgment may result in a finding of contempt of court;

e. maintaining a record of all persons to whom a copy of this Final Judgment has been distributed and from whom the certification described in Section VII.B.4.d above has been obtained;

f. establishing and maintaining the website provided for in Section VII.C.2.a below;

g. receiving complaints from third parties, the TC, and the Plaintiffs concerning Google's compliance with this Final Judgment and following the appropriate procedures set forth in Section VII.C below;

h. maintaining a record of all complaints received and action taken by Google with respect to each such complaint; and

i. ensuring Google retains all relevant documents and electronically stored information, regardless of medium or form, related to this Final Judgment and all complaints received and/or action taken by Google with respect to any complaint.

5. Google shall within thirty (30) days further appoint a senior business executive, who has visibility into any Google entity with obligations under this Final Judgment, whom Google shall make available to update the Court on Google's compliance at regular status conferences or as otherwise ordered.

C. Voluntary Dispute Resolution:

1. Third parties may submit complaints concerning Google's compliance with this Final Judgment to the Plaintiffs, the TC, or the Compliance Officer.

2. Third parties, the TC, or Plaintiffs in their discretion may submit to the Compliance Officer any complaints concerning Google's compliance with this Final Judgment. Without in any way limiting their authority to take any other action to enforce this Final Judgment, the Plaintiffs may submit complaints to the Compliance Officer whenever doing so would be consistent with the public interest.

a. To facilitate the communication of complaints and inquiries by parties, the Compliance Officer shall place on Google's website, in a manner acceptable to the Plaintiffs, the procedures for submitting complaints. To encourage whenever possible the informal resolution of complaints and inquiries, the website shall provide a mechanism for communicating complaints and inquiries to the Compliance Officer.

b. Google has thirty (30) days after receiving a complaint to attempt to resolve or to reject it.

c. Within thirty (30) days of receiving a complaint, the Compliance Officer shall advise the TC and the Plaintiffs of the nature of the complaint and its disposition. The TC may then propose to the Plaintiffs further actions consistent

with this Final Judgment, including consulting with Plaintiffs regarding the complaint.

3. The Compliance Officer, third parties, or the Plaintiffs in their discretion may submit to the TC any complaints concerning Google's compliance with this Final Judgment.

a. The TC shall investigate the complaints it receives and shall consult with the Plaintiffs regarding its investigation. At least once during its investigation, and more often when it may help resolve the complaints informally, the TC shall meet with the Compliance Officer to allow Google to respond to the substance of the complaints and to determine whether the complaints can be resolved without further proceedings.

b. Following its investigation, the TC shall advise Google and the Plaintiffs of its conclusion and its proposal for cure.

c. Reports and recommendations from the TC may be received into evidence by the Court in connection with any effort by any Plaintiff to enforce this Final Judgment but shall not be otherwise made available in any other court or tribunal related to any other matter. No member of the TC shall be required to testify by deposition, in court, or before any other tribunal regarding any matter related to this Final Judgment.

d. The TC may preserve the anonymity of any third-party complainant where it deems it appropriate to do so upon the request of the Plaintiffs or the third party, or in its discretion.

D. Compliance Inspection:

1. Without in any way limiting the sovereign enforcement authority of each of the Colorado Plaintiff States, the Colorado Plaintiff States shall form a committee to coordinate their enforcement of this Final Judgment. Neither a Co-Plaintiff State nor a Colorado Plaintiff State may take any action to enforce this Final Judgment without first consulting with the United States and with the Colorado Plaintiff States' enforcement committee.

2. For the purposes of determining or securing compliance with this Final Judgment or of determining whether this Final Judgment should be modified or vacated, upon written request of an authorized representative of the Assistant Attorney General for the Antitrust Division (after consultation with the Co-Plaintiff States and the Colorado Plaintiff States' enforcement committee) or of the Attorney General of a Co-Plaintiff State or the Attorney General of a Colorado Plaintiff State (after consultation with the United States and the Colorado Plaintiff States' enforcement committee), as the case may be, and reasonable notice to Google, Google shall permit, from time to time and subject to legally recognized privileges, authorized representatives, including agents retained by any Plaintiff:

a. to have access during Google's office hours to inspect and copy, or at the option of the Plaintiff, to require Google to provide electronic copies of all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Google relating to any matters contained in this Final Judgment; and

b. to interview, either informally or on the record, Google's officers, employees, or agents, who may have their individual counsel present, relating to

any matters contained in this Final Judgment. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Google.

3. Upon the written request of an authorized representative of the Assistant Attorney General for the Antitrust Division (after consultation with the Co-Plaintiff States and the Colorado Plaintiff States' enforcement committee) or of the Attorney General of a Co-Plaintiff State or the Attorney General of a Colorado Plaintiff State (after consultation with the United States and the Colorado Plaintiff States' enforcement committee), Google shall submit written reports or respond to written interrogatories, under oath if requested, relating to any matters contained in this Final Judgment.

4. If, at the time information or documents are furnished by Google to the Plaintiffs, Google identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Google marks each pertinent page of such material, "Confidential and Sensitive Commercial Information Subject to Rule 26(c)(1)(G)," then the Plaintiffs shall give five (5) business days' notice prior to divulging such material in any legal proceeding, unless good cause is shown for a shorter notice period.

5. Google shall have the right to claim protection from public disclosure, under the Freedom of Information Act, 5 U.S.C. § 552, or any other applicable law or regulation, for any material it submits to the Plaintiffs under this Final Judgment. After appropriate consideration of such claim of protection, Plaintiffs, as the case may be, will either assert that the material is protected from disclosure under law or give Google ten (10) business days' notice of its intent to disclose the material.

E. Status Reports to the Court:

1. Plaintiffs, with input from the Technical Committee, shall file a status report within ninety (90) days of the Effective Date of this Final Judgment, and then on future dates as set by the Court, updating the Court as to the enforcement of and Google's compliance with this Final Judgment.

## VIII. EFFECTIVE DATE AND EXPIRATION

This Final Judgment will take effect sixty (60) days after the date on which it is entered (the "Effective Date"), and Plaintiffs shall report the date on which Google has substantially implemented all provisions of this Final Judgment, except for Section VII.A, which shall take effect immediately upon entry. Unless the Court grants an extension or early termination is granted, this Final Judgment will expire six (6) years from the Effective Date. This Final Judgment may be terminated upon notice by the United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States' enforcement committee, and Google that continuation of this Final Judgment is no longer necessary to restore competition in the monopolized markets.

## IX. DEFINITIONS

A. "API" or "application programming interface" means a mechanism that allows different software components to communicate with each other.

B. "Apple" means Apple Inc., a corporation organized and existing under the laws of the State of California, headquartered in Cupertino, California, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

C. “Browser Developer” means a developer, owner, or operator of a Third-Party Browser and includes, by way of example, Apple, Mozilla Corp., and Samsung Electronics Co., Ltd.

D. “Chrome Browser Application” means the browser software application currently marketed by Google as “Google Chrome” and its successors.

E. “Competitor” means any provider of or potential entrant in the provision of (i) a General Search Engine (GSE) in the United States, (ii) Search Text Ads in the United States, or (iii) a GenAI Product in the United States.

F. “Consideration” means anything of value, including any monetary payment; provision of preferential licensing terms; technical, marketing, and sales support; developer support; or hardware or software certification or approval.

G. “Default Search Engine” means a search engine that is set by a Browser Developer to respond to user queries if a user takes no action to select a particular search engine.

H. “Device” or “device” means any single smartphone, tablet, laptop, or desktop, excluding any device on which the ChromeOS operating system or a successor to the ChromeOS operating system is installed. For clarity, any two devices are different devices, even if they are the same make and model (e.g., two Samsung Galaxy S25s are two devices; two Apple iPhone 16 Pros are two devices).

I. “GenAI” or “Generative AI” is a type of artificial intelligence that creates new content including but not limited to text, images, code, classifications, and other media using machine learning models.

J. “GenAI Product” means any application, software, service, feature, tool, functionality, or product that involves or makes use of Generative AI capabilities or models and

has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information.

K. "General Search Engine" or "GSE" means software or a service that produces links to websites and other relevant information in response to a user query or prompt and that seeks to fulfill a broad array of informational needs.

L. "Google" means (1) Defendant Google LLC, a limited liability company organized and existing under the laws of the State of Delaware, headquartered in Mountain View, California; (2) its successors and assigns, subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures controlling or overseeing Google Search (including syndicated products), Search Text Ads (including syndicated products), the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any related Google GenAI Product; and (3) the directors, officers, managers, agents, and employees of such entities specified in this Section IX.L who oversee Google Search (including syndicated products), Search Text Ads (including syndicated products), the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any related Google GenAI Product. For clarity, the term "affiliates" includes any Alphabet Inc.–related entity that controls or oversees the aforementioned products.

M. "Google Assistant Application" means the user-facing mobile assistive service software application marketed by Google as "Google Assistant" and its successors.

N. "Google GenAI Product" means any GenAI Product offered by Google, including by way of example, the stand-alone user-facing mobile software application currently marketed by Google as the "Google Gemini" application (and that application's functionally equivalent successors).

O. "Google Play" means the user-facing mobile software application distribution service currently marketed by Google as the "Play Store" and its successors.

P. "Google Search" means the web search and search advertising services offered by Google at Google.com.

Q. "Google Search Application" means the user-facing mobile online search software application currently marketed by Google as the "Google app" or the "Google Search app" (and its successors).

R. The terms "include" and "including" should be read as "including but not limited to," and any use of either word is not limited in any way to any examples provided.

S. "Marginal Cost" or "marginal cost" means the direct total production cost of producing an additional unit of a good or service, which is determined by calculating the change in direct total production cost resulting from Google providing the additional unit(s) of data or services required under this Final Judgment.

T. "Operating System Version" means a web browser version or a version of any proprietary Apple feature or functionality, including Siri and Spotlight, designed to be installed and used on a particular desktop or mobile operating system including, by way of example, Microsoft Windows, Apple iOS, Apple Mac OS, Apple iPad OS, or Android.

U. "Privacy Mode" means a mode within a web browser or an Apple product or service such as Siri or Spotlight that is designed to offer a preconfigured privacy setting and includes, by way of example, Private Browsing in Apple Safari, Private mode in Mozilla Firefox, and Secret mode in Samsung Internet.

V. "Qualified Competitor" means a Competitor who meets the Plaintiffs' approved data security standards as recommended by the Technical Committee and agrees to regular data

security and privacy audits by the Technical Committee; who makes a sufficient showing to the Plaintiffs, in consultation with the Technical Committee, of a plan to invest and compete in or with the GSE and/or Search Text Ads markets; and who does not pose a risk to the national security of the United States. To remain eligible as a Qualified Competitor, the Competitor must apply for re-certification on an annual basis starting from the date of original certification as a Qualified Competitor and establish that it continues to meet the definition of a Qualified Competitor. The Technical Committee shall establish appropriate procedures for the re-certification process.

W. "Search Access Point" means any software, application, interface, digital product, or service where a user can enter a query or prompt and, in response to at least some user queries or prompts, receive (or be directed to a place to receive) a response that includes information from a GSE, including links to websites. Search Access Points include OS-level Search Access Points, browsers (including Search Access Points within browsers such as browser address bars), search apps, and GenAI Products that can retrieve and display information from a GSE, including links to websites.

X. "Search Feature" in Google Search means any user-facing content on a SERP that is not an organic link. Search Features include images, featured snippets, hotel units, query expansion features like auto-complete, "did you mean" prompts, spelling corrections, and related searches.

Y. "Search Text Ad" means a general search text advertisement, which is an ad that resembles an organic link on a SERP. Search Text Ads can include images and often appear at the top of the SERP with a designation indicating that they are paid advertisements. "Search Text Ad" also includes Search Text Ads appearing in or in connection with Google AI Overviews.

Z. "SERP" or "Search Engine Results Page" means the results provided by a search engine, in response to a user query, including links and other features and content, drawn from a broad index of the web.

AA. "Technical Committee" or "TC" means the five-person committee of experts appointed by the Court pursuant to Section VII.A.

BB. "Third-Party Browser" means any web browser that is not Google Chrome or another proprietary Google web browser and includes, by way of example, Apple Safari, Mozilla Firefox, and Samsung Internet.

CC. "Third-Party GenAI Product" means any GenAI Product that is not owned by Google.

DD. "Third-Party General Search Service" means a web search service that can respond to a broad range of search query categories and offers functionality that is substantially similar to Google Search and is not owned by Google or its affiliates.

EE. "User-side Data" means all data that can be obtained from users in the United States, directly through a search engine's interaction with the user's Device, including software running on that Device, by automated means. User-side Data includes information Google collects when answering commercial, tail, and local queries.

FF. "Web Search Index" means databases that store and organize information about websites and their content that is crawled from the web. For the avoidance of doubt, it does not include Google's vertical indexes or its video, images, or other specialized indexes that contain information not crawled from the web.

## X. THIRD-PARTY RIGHTS

Nothing in this Final Judgment is intended to confer upon any other persons any rights or remedies of any nature whatsoever or by reason of this Final Judgment other than the right to submit complaints to the Compliance Officer and the TC.

## XI. RETENTION OF JURISDICTION AND ENFORCEMENT OF FINAL JUDGMENT

A. Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders or directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification of any of its provisions, for the enforcement of compliance with this Final Judgment, and for the punishment of any violation of this Final Judgment.

B. For a period of four (4) years following the expiration of this Final Judgment, if any Plaintiff has evidence that Google violated this Final Judgment before it expired, that Plaintiff may file an action against Google in this Court requesting that the Court order (1) Google to comply with the terms of this Final Judgment for an additional term of at least four (4) years following the filing of the enforcement action; (2) all appropriate contempt remedies; and (3) additional relief needed to ensure Google complies with the terms of this Final Judgment.

Dated: December 5, 2025

Amit P. Mehta
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 1:20-cv-03010-APM<br>HON. AMIT P. MEHTA |
| STATE OF COLORADO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 1:20-cv-03715-APM<br>HON. AMIT P. MEHTA |

## MOTION FOR EXTENSION OF TIME TO FILE NOTICE OF APPEAL

The Colorado Plaintiff States respectfully request that the Court order that the deadline for filing a notice of appeal in *United States v. Google*, 20-cv-03010 and *Colorado v. Google*, 20-cv-03973 be February 3, 2026, 60 days from the entry of the Court's Final Judgment. *See* Fed. R. App. Pro. 26(a)(1).

1. Rule 4 of the Federal Rules of Appellate Procedure dictates that "except as provided in Rules 4(a)(1)(B), 4(a)(4), and 4(c), the notice of appeal … must be filed with the district clerk within 30 days after entry of the judgment or order appealed from." Fed. R. App. Pro. 4(a)(1)(A). Pursuant to Rule 26(a)(1), this would result in a filing deadline of January 5, 2026. However, Rule

4 also specifies that "[t]he notice of appeal may be filed by any party within 60 days after entry of the judgment if one of the parties is: (i) the United States." Fed. R. App. Pro. 4(a)(1)(B). This would result in a filing deadline of February 3, 2026. *See* Fed. R. App. Pro. 26(a)(1). Finally, Rule 4(a)(5)(A) provides that the Court may extend the time to file a notice of appeal if "(i) a party so moves no later than 30 days after the time prescribed by this Rule 4(a) expires; and (ii) regardless of whether its motion is filed before or during the 30 days after the time prescribed by this Rule 4(a) expires, that party shows excusable neglect or good cause." Fed. R. App. Pro. 4(a)(5)(A).

2. Because the United States is a party to *United States v. Google*, Rule 4(a)(1)A) establishes the time to file notice of appeal in that case as 60 days after the entry of final judgment, February 3, 2026. In the event that either party seeks an appeal of the Final Judgment, the questions at issue in that appeal are likely to be substantially the same, if not identical, in *Colorado v. Google* and in *United States v. Google*, Case no. 20-cv-03010-APM. Therefore, the Colorado Plaintiff States believe that judicial efficiency strongly favors the use of a single appellate timeline in both proceedings. The Colorado Plaintiff States further believe that this constitutes good cause for the Court to order, pursuant to Rule 4(a)(5)(A), that the deadline to file notices of appeal in *Colorado v. Google* be 60 days from the entry of Final Judgment.[1]

Accordingly, the Colorado Plaintiff States respectfully request that the Court extend their time to file notices of appeal from the Final Judgment to February 3, 2026.

December 18, 2025 Respectfully submitted,

[1] The D.C. Circuit has historically applied the 60-day time to file notice of appeal to all consolidated cases if the U.S. is a party to any one of those cases, *see Cablevision Sys. Dev. Co. v. Motion Picture Ass'n of Am., Inc.*, 808 F.2d 133, 135 (D.C. Cir. 1987), but recent Supreme Court holdings suggest that consolidated cases may not be subject to the same appellate timelines in every instance. *See Hall v. Hall*, 584 U.S. 59, 66 (2018) (addressing whether a party could file for immediate appeal in a case when other consolidated cases remained pending). For avoidance of doubt, the Colorado Plaintiff States believe an order under Rule 4(a)(5)(A) is warranted.

PHILIP WEISER
Attorney General of Colorado

_/s/ Jonathan B. Sallet_
Jonathan B. Sallet, DC Bar No. 336198
Steven M. Kaufmann
Elizabeth W. Hereford
Conor J. May
Colorado Office of the Attorney General
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
E-Mail: Jon.Sallet@coag.gov
Steve.Kaufmann@coag.gov
Elizabeth.Hereford@coag.gov
Conor.May@coag.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Colorado*

MIKE HILGERS
Attorney General of Nebraska

Justin C. McCully, Assistant Attorney General
Nebraska Department of Justice
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-9305
E-Mail: Justin.mccully@nebraska.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2793
E-Mail: wfcavanaugh@pbwt.com

KRISTIN K. MAYES
Attorney General of Arizona

Robert A. Bernheim, Unit Chief Counsel
Jayme Weber, Senior Litigation Counsel
Arizona Office of the Attorney General
400 West Congress, Ste. S-215
Tucson, Arizona 85701
Telephone: (520) 628-6507
E-Mail: Robert.Bernheim@azag.gov
Jayme.Weber@azag.gov

*Counsel for Plaintiff State of Arizona*

*Counsel for Plaintiff State of Nebraska*

BRENNA BIRD
Attorney General of Iowa

Noah Goerlitz, Assistant Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
Telephone: (515) 725-1018
E-Mail: Noah.goerlitz@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

LETITIA JAMES
Attorney General of New York

Elinor R. Hoffmann
Morgan J. Feder
Michael D. Schwartz
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8513
E-Mail: Elinor.hoffmann@ag.ny.gov
Morgan.feder@ag.ny.gov
Michael.schwartz@ag.ny.gov

*Counsel for Plaintiff State of New York*

JEFF JACKSON
Attorney General of North Carolina

Kunal Janak Choksi
Joshua Daniel Abram
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
Telephone: (919) 716-6000
E-Mail: kchoksi@ncdoj.gov
jabram@ncdoj.gov

*Counsel for Plaintiff State of North Carolina*

JONATHAN SKRMETTI
Attorney General of Tennessee

J. David McDowell
Austin Ostiguy
Tyler Corcoran
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 741-8722
E-Mail: David.McDowell@ag.tn.gov
austin.ostiguy@ag.tn.gov
Tyler.Corcoran@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

DEREK E. BROWN
Attorney General of Utah

Matthew Michaloski, Assistant Attorney General
Marie W.L. Martin, Deputy Division Director
Utah Office of Attorney General
160 E 300 S, 5th Floor
P.O. Box 140811
Salt Lake City, Utah 84114

STEPHEN COX
Attorney General of Alaska

Jeff Pickett
Senior Assistant Attorney General
State of Alaska, Department of Law
Office of the Attorney General
1031 W. Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5275
E-Mail: Jeff.pickett@alaska.gov

Telephone: (801) 440-9825
E-Mail: mmichaloski@agutah.gov
mwmartin@agutah.gov

*Counsel for Plaintiff State of Utah*

*Counsel for Plaintiff State of Alaska*

WILLIAM TONG
Attorney General of Connecticut

Nicole Demers
Office of the Attorney General of Connecticut
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
Telephone: (860) 808-5202
E-Mail: Nicole.demers@ct.gov

*Counsel for Plaintiff State of Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware

Michael Andrew Undorf
Delaware Department of Justice
Fraud and Consumer Protection Division
820 N. French St., 5th Floor
Wilmington, DE 19801
Telephone: (302) 683-8816
E-Mail: Michael.undorf@delaware.gov

*Counsel for Plaintiff State of Delaware*

BRIAN SCHWALB
Attorney General of the District of Columbia

Elizabeth Gentry Arthur
Office of the Attorney General for the District of Columbia
400 6th Street NW
Washington, DC 20001
Telephone: (202) 724-6514
E-Mail: Elizabeth.arthur@dc.gov

*Counsel for Plaintiff District of Columbia*

DOUGLAS MOYLAN
Attorney General of Guam

Fred Nishihira
Office of the Attorney General of Guam
590 S. Marine Corps Drive, Suite 901
Tamuning, Guam 96913
Telephone: (671) 475-3324
E-Mail: fnishihira@oagguam.org

*Counsel for Plaintiff Territory Guam*

ANNE E. LOPEZ
Attorney General of Hawaiʻi

Rodney I. Kimura
Department of the Attorney General, State of Hawaiʻi
425 Queen Street
Honolulu, HI 96813
Telephone (808) 586-1180
E-Mail: Rodney.i.kimura@hawaii.gov

*Counsel for Plaintiff State of Hawaiʻi*

RAÚL LABRADOR
Attorney General of Idaho

John K. Olson
Office of the Idaho Attorney General
Consumer Protection Division
954 W. Jefferson St., 2nd Floor
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 332-3549
E-Mail: John.olson@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

KWAME RAOUL
Attorney General of Illinois

Elizabeth Maxeiner
Brian Yost
Jennifer Coronel
Office of the Attorney General of Illinois
115 S. LaSalle St.
Chicago, IL 60603
Telephone: (773) 590-7935
E-Mail: Elizabeth.maxeiner@ilag.gov
Brian.yost@ilag.gov
Jennifer.coronel@ilag.gov

*Counsel for Plaintiff State of Illinois*

KRIS W. KOBACH
Attorney General of Kansas

Christopher Teters
Kansas Office of the Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612
Telephone: (785) 296-3751
E-Mail: chris.teters@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

AARON M. FREY
Attorney General of Maine

Christina M. Moylan
Office of the Attorney General of Maine
6 State House Station
August, ME 04333
Telephone: (207) 626-8800
E-Mail: Christina.moylan@maine.gov

*Counsel for Plaintiff State of Maine*

ANTHONY G. BROWN
Attorney General of Maryland

Schonette J. Walker
Melissa English
Office of the Attorney General of Maryland
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Telephone: (410) 576-6480
E-Mail: swalker@oag.state.md.us
menglish@oag.state.md.us

*Counsel for Plaintiff State of Maryland*

ANDREA CAMPBELL
Attorney General of Massachusetts

Jennifer E. Greaney
Office of the Attorney General of Massachusetts
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 963-2981
E-Mail: Jennifer, greaney@mass.gov

*Counsel for Plaintiff Commonwealth of Massachusetts*

KEITH ELLISON
Attorney General of Minnesota

Zach Biesanz
Senior Enforcement Counsel
Office of the Minnesota Attorney General
Antitrust Division
445 Minnesota Street, Suite 600
St. Paul, MN 55101
Telephone: (651) 757-1257
E-Mail: Zach.biesanz@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*

AARON D. FORD
Attorney General of Nevada

JOHN FORMELLA
Attorney General of New Hampshire

Michelle C. Badorine
Lucas J. Tucker
Nevada Office of the Attorney General
100 N. Carson Street
Carson City, NV 89701
Telephone: (775) 684-1164
E-Mail: mbadorine@ag.nv.gov
ltucker@ag.nv.gov

*Counsel for Plaintiff State of Nevada*

Brandon Garod
Office of Attorney General of New Hampshire
1 Granite Place South
Concord, NH 03301
Telephone: (603) 271-1217
E-Mail: Brandon.h.garod@doj.nh.gov

*Counsel for Plaintiff State of New Hampshire*

MATTHEW PLATKIN
Attorney General of New Jersey

Yale A. Leber
Abiola G. Miles
Deputy Attorneys General
New Jersey Attorney General's Office
25 Market Street, P.O. Box 106
Trenton, NJ 08625
Telephone: (609) 376-2383
E-Mail: Yale.Leber@law.njoag.gov
Abiola.Miles@law.njoag.gov

*Counsel for Plaintiff State of New Jersey*

RAÚL TORREZ
Attorney General of New Mexico

Judith E. Paquin Cholla Khoury
Assistant Attorney General
New Mexico Office of the Attorney General
408 Galisteo St.
Santa Fe, NM 87504
Telephone: (505) 490-4885
E-Mail: jpaquin@nmag.gov
ckhoury@nmag.gov

*Counsel for Plaintiff State of New Mexico*

DREW WRIGLEY
Attorney General of North Dakota

Elin S. Alm
Assistant Attorney General
Consumer Protection and Antitrust Division
Office of the Attorney General of North Dakota
1720 Burlington Drive, Suite C
Bismarck, ND 58504
Telephone: (701) 328-5570
E-Mail: ealm@nd.gov

*Counsel for Plaintiff State of North Dakota*

DAVID YOST
Attorney General of Ohio

Beth Ann Finnerty, Section Chief, Antitrust
Sarah Mader, Assistant Attorney General, Antitrust
Office of the Attorney General of Ohio
30 E Broad Street, 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
E-Mail: Beth.Finnerty@ohioago.gov
Sarah.Mader@ohioago.gov

*Counsel for Plaintiff State of Ohio*

GENTNER DRUMMOND
Attorney General of Oklahoma

Cameron R. Capps

DAN RAYFIELD
Attorney General of Oregon

Office of the Oklahoma Attorney General
313 NE 21st Street
Oklahoma City, OK 73105
Telephone: (405) 522-0858
E-Mail: Cameron.capps@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*

Cheryl Hiemstra, Special Assistant Attorney General
Gina Ko, Assistant Attorney General
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301
Telephone: (503) 934-4400
E-Mail: Cheryl.Hiemstra@doj.oregon.gov
Gina.Ko@doj.oregon.gov

*Counsel for Plaintiff State of Oregon*

DAVID W. SUNDAY, JR.
Attorney General of Pennsylvania

Tracy W. Wertz
Joseph S. Betsko
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
Telephone: (717) 787-4530
E-Mail: jbetsko@attorneygeneral.gov
twertz@attorneygeneral.gov

*Counsel for Plaintiff Commonwealth of Pennsylvania*

LOURDES L. GÓMEZ TORRES
Secretary of Justice

TANIA L. FERNÁNDEZ-MEDERO
Assistant Secretary of Justice

SAMUEL WISCOVITCH-CORALI
Deputy Undersecretary

Pablo Tufiño-Soto
Senior Attorney
Antitrust Division
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, Puerto Rico 00902-0192
Telephone: (787) 721-2900, Ext. 1205
E-Mail: ptufino@justicia.pr.gov

*Counsel for Plaintiff Territory Puerto Rico*

PETER NERONHA
Attorney General of Rhode Island

Stephen Provazza
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
E-Mail: SProvazza@riag.ri.gov

*Counsel for Plaintiff State of Rhode Island*

MARTIN J. JACKLEY
Attorney General of South Dakota

Yvette K. Lafrentz
Office of the Attorney General of South Dakota
1302 E. Hwy 14, Suite 1
Pierre, SD 57501
Telephone: (605) 773-3215
E-Mail: Yvette.lafrentz@state.sd.us

*Counsel for Plaintiff State of South Dakota*

CHARITY R. CLARK

JASON S. MIYARES

Attorney General of Vermont

Christopher J. Curtis, Assistant Attorney General
Office of the Attorney General of Vermont
109 State St.
Montpelier, VT 05609
Telephone: (802) 828-3170
E-Mail: christopher.curtis@vermont.gov

*Counsel for Plaintiff State of Vermont*

Attorney General of Virginia

Tyler T. Henry
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, VA 23219
Telephone: (804) 692-0485
E-Mail: thenry@oag.state.va.us

*Counsel for Plaintiff State of Virginia*

NICHOLAS W. BROWN
Attorney General of Washington

Amy N.L. Hanson
Senior Managing Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-5419
E-Mail: Amy.hanson@atg.wa.gov

*Counsel for Plaintiff State of Washington*

JOHN B. McCUSKEY
Attorney General of West Virginia

Douglas Lee Davis
Office of the Attorney General, State of West Virginia
1900 Kanawha Boulevard East
Building 6, Suite 401
P.O. Box 1789
Charleston, WV 25305
Telephone: (304) 558-8986
E-Mail: Douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*

KEITH KAUTZ
Attorney General of Wyoming

William T. Young
Wyoming Attorney General's Office
2320 Capitol Avenue
Kendrick Building
Cheyenne, WY 82002
Telephone: (307) 777-7847
E-Mail: William.young@wyo.gov

*Counsel for Plaintiff State of Wyoming*

By: /s/ Lee Istrail
James Uthmeier, Attorney General
R. Scott Palmer, Special Counsel, Complex Enforcement Chief, Antitrust Division

Lee Istrail, Assistant Attorney General
Office of the Attorney General, State of Florida
PL-01 The Capitol

Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com
Scott.Palmer@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

By: /s/ Diamante Smith
Ken Paxton, Attorney General
Brent Webster, First Assistant Attorney General
Ralph Molina, Deputy First Assistant Attorney General
Austin Kinghorn, Deputy Attorney General for Civil Litigation
Thomas York, Division Chief, Antitrust Division
Diamante Smith, Assistant Attorney General, Antitrust Division
Office of the Attorney General, State of Texas
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1162
Diamante.Smith@oag.texas.gov

*Counsel for Plaintiff State of Texas*

By: /s/ Carolyn D. Jeffries
Rob Bonta, Attorney General
Paula Blizzard, Senior Assistant Attorney General
Michael Jorgenson, Supervising Deputy Attorney General
Brian Wang, Deputy Attorney General
Carolyn D. Jeffries, Deputy Attorney General (DC Bar No. 1600843)
Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Cari.Jeffries@doj.ca.gov

*Counsel for Plaintiff State of California*

Amanda J. Wentz
Ark. Bar No. 2021066
Assistant Attorney General
Office of the Arkansas Attorney General
101 West Capitol Avenue
Little Rock, Arkansas 72201
Phone: (501) 682-1178
Fax: (501) 682-8118
Amanda.Wentz@ArkansasAG.gov

*Counsel for Plaintiff State of Arkansas*

Christopher Carr, Attorney General
Logan B. Winkles, Deputy Attorney General
Ronald J. Stay, Jr., Senior Assistant Attorney General
Charles Thimmesch, Senior Assistant Attorney General
Office of the Attorney General, State of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
cthimmesch@law.georgia.gov

*Counsel for Plaintiff State of Georgia*

Theodore Edward Rokita, Attorney General
Scott L. Barnhart, Chief Counsel and Director, Consumer Protection Division
Jesse Moore, Deputy Attorney General
Christi Foust, Deputy Attorney General
Office of the Attorney General, State of Indiana
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Jesse.Moore@atg.in.gov

*Counsel for Plaintiff State of Indiana*

Russell Coleman, Attorney General
J. Christian Lewis, Commissioner of the Office of Consumer Protection
Philip R. Heleringer, Executive Director of the Office of Consumer Protection

Jonathan E. Farmer, Deputy Executive Director of the Office of Consumer Protection
Office of the Attorney General, Commonwealth of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Philip.Heleringer@ky.gov

*Counsel for Plaintiff Commonwealth of Kentucky*

Liz Murrill, Attorney General
Asyl Nachabe, Assistant Attorney General
Office of the Attorney General, State of Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
nachabea@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

Dana Nessel, Attorney General
Scott Mertens, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for Plaintiff State of Michigan*

Alison Esbeck
Missouri Bar No. 58501
Assistant Attorney General
Consumer Protection Section
Missouri Attorney General's Office
815 Olive Street | Suite 200
Saint Louis, Missouri 63101
Alison.esbeck@ago.mo.gov
Phone: 314-340-4977
Fax: 314-340-7981

*Counsel for Plaintiff State of Missouri*

Lynn Fitch, Attorney General
Crystal Utley Secoy, Assistant Attorney General
Lee Morris, Special Assistant Attorney General
Office of the Attorney General, State of Mississippi
P.O. Box 220
Jackson, Mississippi 39205
Crystal.Utley@ago.ms.gov
Lee.Morris@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

Anna Schneider
Special Assistant Attorney General, Senior Counsel
Montana Office of Consumer Protection
P.O. Box 200151
Helena, MT. 59602-0150
Phone: (406) 444-4500
Fax: 406-442-1894
Anna.schneider@mt.gov

*Counsel for Plaintiff State of Montana*

Alan Wilson, Attorney General
W. Jeffrey Young, Chief Deputy Attorney General
C. Havird Jones, Jr., Senior Assistant Deputy Attorney General
Mary Frances Jowers, Assistant Deputy Attorney General
Office of the Attorney General, State of South Carolina
1000 Assembly Street
Rembert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-1549
mfjowers@scag.gov

*Counsel for Plaintiff State of South Carolina*

Joshua L. Kaul, Attorney General
Caitlin M. Madden, Assistant Attorney General
Wisconsin Department of Justice

17 W. Main St.
Madison, Wisconsin 53701
caitlin.madden@wisdoj.gov

*Counsel for Plaintiff State of Wisconsin*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 1:20-cv-03010-APM<br>HON. AMIT P. MEHTA |
| STATE OF COLORADO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 1:20-cv-03715-APM<br>HON. AMIT P. MEHTA |

**ORDER EXTENDING TIME TO FILE NOTICE OF APPEAL**

Upon consideration of the motion of parties the Colorado State Plaintiffs, it is hereby **ORDERED** that the Colorado State Plaintiff Motion for Extension of Time to File Notice of Appeal is **GRANTED**. The time to file notices of appeal shall be extended from the Final Judgment to February 3, 2026.

Amit P Mehta Digitally signed by Amit P Mehta Date: 2025.12.18 07:13:06 -05'00'

December 18, 2025

Date

Hon. Amit P. Mehta
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| United States of America, *et al.*,<br>Plaintiffs,<br>v.<br>Google LLC,<br>Defendant. | Case No. 1:20-cv-03010-APM<br>HON. AMIT P. MEHTA |
| State of Colorado, *et al.*,<br>Plaintiffs,<br>v.<br>Google LLC,<br>Defendant. | Case No. 1:20-cv-03715-APM<br>HON. AMIT P. MEHTA |

**DECLARATION OF JESSE ADKINS**

I, Jesse Adkins, declare as follows:

1. I am currently employed by Google LLC (Google) as a Director of Product Management for Search Syndication and Search Ads Syndication. I have worked for Google since 2013. I submit this declaration in support of Google's Motion to Stay. The facts set forth herein are within my personal knowledge and if called as a witness, I could and would competently testify to them.

2. As Director of Product Management for Search Syndication and Search Ads Syndication, my responsibilities include overseeing the product areas in which Google

these harms will multiply given the sub-syndication provision of the Final Judgment (FJ § VI.B.9).

22. Because syndicating ads can offer a significant source of revenue, Google has exercised careful and measured discretion when evaluating who to partner with, and whether certain practices may come at the expense of Google or its advertisers. The Final Judgment restricts Google's ability to operate its syndication business in the ordinary course, hindering Google from effectively protecting its intellectual property and its business model, thus resulting in irreparable harm absent a stay.

23. The harm to Google's advertisers and Google's competitive standing cannot be undone if the Final Judgment is overturned or modified on appeal, and there would be no way to remedy the harm to Google or its advertisers after appeal.

**Compelled Syndication "on Financial Terms No Worse Than Those Offered to Any Other User" of the Syndication Services Will Irreparably Harm Google**

24. I understand that the Court's Final Judgment requires Google to provide both its syndicated search results and features and its syndicated search text ads to Qualified Competitors on financial terms "no worse than those offered to any other user of Google's search syndication products." FJ §§ V.A, VI.B.2. At this time, the precise contours of the compelled pricing terms are unknown. The Plaintiffs and the Technical Committee, with input from Google, are to prepare a license template. FJ §§ V.B, VI.B. Google has the right to object to licensing terms, but may not "dictate pricing with Qualified Competitors based on existing commercial terms[.]" Dec. Rem. Op. at 41.

25. The existing rates were offered in the context of specific customers with whom Google has long-established partnerships, and for whom Google has a strong understanding of the partner's unique traffic mix, capacity requirements, and technical needs in order to price the

service. Extending these rates to Qualified Competitors forces Google to price its services well below how it would choose to price these services in the market. The Court recognized that "[t]he Final Judgment's pricing provisions may result in syndication agreements that depart from the way Google has historically contracted or made its revenue." Dec. Rem. Op. at 41.

26. Google will suffer financial harm to the extent that the Final Judgment results in the compelled syndication of search results and features and search text ads at rates that do not make economic sense for Google. The financial impact cannot be quantified at this time because it will depend on both the compelled licensing terms and the volume of queries Qualified Competitors choose to syndicate to Google.

27. If the Final Judgment is overturned or modified on appeal, these harms to Google cannot be undone.

* * * *

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 15 day of January 2026, in Pittsburgh PA.

Signed by:
Jesse Adkins
851A9A333316462...

Jesse Adkins

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br>*Plaintiffs*,<br>v.<br>GOOGLE LLC,<br>*Defendant*. | Case No. 1:20-cv-03010<br>Hon. Amit P. Mehta |
| STATE OF COLORADO, et al.,<br>*Plaintiffs*,<br>v.<br>GOOGLE LLC,<br>*Defendant*. | Case No. 1:20-cv-03715<br>Hon. Amit P. Mehta |

**NOTICE OF APPEAL**

Google LLC hereby provides notice of its appeal to the United States Court of Appeals for the District of Columbia Circuit from this Court's final judgment, entered in these actions on December 5, 2025 (Case No. 1:20-cv-03010, ECF No. 1462), and all orders in these actions merged into that final judgment. By order dated December 18, 2025, the district court extended the deadline for any party to file notices of appeal in *State of Colorado v. Google LLC* until February 3, 2026. Case No. 1:20-cv-03715, ECF No. 1466.

Dated: January 16, 2026

Respectfully submitted,

*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue, NW, Suite 500E
Washington, DC 20001
(202) 220-1100
donald.verrilli@mto.com

John E. Schmidtlein
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
(202) 434-5000
jschmidtlein@wc.com

*Counsel for Google LLC*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br>*Plaintiffs*,<br>v.<br>GOOGLE LLC,<br>*Defendant*. | Case No. 1:20-cv-03010<br>Hon. Amit P. Mehta |
| STATE OF COLORADO, et al.,<br>*Plaintiffs*,<br>v.<br>GOOGLE LLC,<br>*Defendant*. | Case No. 1:20-cv-03715<br>Hon. Amit P. Mehta |

**NOTICE OF APPEAL**

Google LLC hereby provides notice of its appeal to the United States Court of Appeals for the District of Columbia Circuit from this Court's final judgment, entered in these actions on December 5, 2025 (Case No. 1:20-cv-03010, ECF No. 1462), and all orders in these actions merged into that final judgment. By order dated December 18, 2025, the district court extended the deadline for any party to file notices of appeal in *State of Colorado v. Google LLC* until February 3, 2026. Case No. 1:20-cv-03715, ECF No. 1466.

Dated: January 16, 2026

Respectfully submitted,

*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue, NW, Suite 500E
Washington, DC 20001
(202) 220-1100
donald.verrilli@mto.com

John E. Schmidtlein
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
(202) 434-5000
jschmidtlein@wc.com

*Counsel for Google LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 1:20-cv-03010-APM<br>HON. AMIT P. MEHTA |
| STATE OF COLORADO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 1:20-cv-03715-APM<br>HON. AMIT P. MEHTA |

**PLAINTIFF STATES' NOTICE OF CROSS-APPEAL**

The Plaintiff States of Colorado, Nebraska, Arizona, Iowa, New York, North Carolina, Tennessee, Utah, Alaska, Connecticut, Delaware, Hawai'i, Idaho, Illinois, Kansas, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Vermont, Virginia, Washington, West Virginia, and Wyoming, the District of Columbia, and the Territories of Guam and Puerto Rico cross-appeal to the United States Court of Appeals for the District of Columbia Circuit from the final judgment entered in the above-referenced consolidated actions on December 5, 2025, (Case No. 1:20-cv-03010, ECF No. 1462) and all orders in these actions merged into that judgment.

Google LLC filed a notice of appeal from that judgment and all orders merged into it on January 16, 2026. Case No. 1:20-cv-03010, ECF No. 1472; Case No. 1:20-cv-03715, ECF No. 174. By order dated December 18, 2025, this Court extended the deadline for any party to file notices of appeal in *State of Colorado v. Google, LLC* until February 3, 2026. Case No. 1:20-cv-03010, ECF No. 1466.

Dated: February 3, 2026

Respectfully submitted,

PHILIP WEISER
Attorney General of Colorado

*/s/ Jonathan B. Sallet*
Jonathan B. Sallet, DC Bar No. 336198
Steven M. Kaufmann
Elizabeth W. Hereford
Conor J. May
Colorado Office of the Attorney General
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
E-Mail: Jon.Sallet@coag.gov
Steve.Kaufmann@coag.gov
Elizabeth.Hereford@coag.gov
Conor.May@coag.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Colorado*

MIKE HILGERS
Attorney General of Nebraska

Justin C. McCully, Assistant Attorney General
Nebraska Department of Justice
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-9305
E-Mail: Justin.mccully@nebraska.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Nebraska*

KRISTIN K. MAYES
Attorney General of Arizona

Robert A. Bernheim, Unit Chief Counsel
Jayme Weber, Senior Litigation Counsel
Arizona Office of the Attorney General
400 West Congress, Ste. S-215
Tucson, Arizona 85701
Telephone: (520) 628-6507
E-Mail: Robert.Bernheim@azag.gov
Jayme.Weber@azag.gov

*Counsel for Plaintiff State of Arizona*

BRENNA BIRD
Attorney General of Iowa

Noah Goerlitz, Assistant Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
Telephone: (515) 725-1018
E-Mail: Noah.goerlitz@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

LETITIA JAMES
Attorney General of New York

Elinor R. Hoffmann
Morgan J. Feder
Michael D. Schwartz
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8513
E-Mail: Elinor.hoffmann@ag.ny.gov
Morgan.feder@ag.ny.gov
Michael.schwartz@ag.ny.gov

*Counsel for Plaintiff State of New York*

JEFF JACKSON
Attorney General of North Carolina

Kunal Janak Choksi
Joshua Daniel Abram
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
Telephone: (919) 716-6000
E-Mail: kchoksi@ncdoj.gov
jabram@ncdoj.gov

*Counsel for Plaintiff State of North Carolina*

JONATHAN SKRMETTI
Attorney General of Tennessee

J. David McDowell
Austin Ostiguy
Tyler Corcoran
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 741-8722
E-Mail: David.McDowell@ag.tn.gov
austin.ostiguy@ag.tn.gov
Tyler.Corcoran@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

DEREK E. BROWN
Attorney General of Utah

Matthew Michaloski, Assistant Attorney General
Marie W.L. Martin, Division Director
Utah Office of Attorney General
160 E 300 S, 5th Floor
P.O. Box 140811
Salt Lake City, Utah 84114
Telephone: (801) 440-9825
E-Mail: mmichaloski@agutah.gov
mwmartin@agutah.gov

*Counsel for Plaintiff State of Utah*

STEPHEN J. COX
Attorney General of Alaska

Jeff Pickett
Senior Assistant Attorney General
State of Alaska, Department of Law
Office of the Attorney General
1031 W. Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5275
E-Mail: Jeff.pickett@alaska.gov

*Counsel for Plaintiff State of Alaska*

WILLIAM TONG
Attorney General of Connecticut

Nicole Demers
Office of the Attorney General of Connecticut
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
Telephone: (860) 808-5202
E-Mail: Nicole.demers@ct.gov

*Counsel for Plaintiff State of Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware

Michael Andrew Undorf
Delaware Department of Justice
Fraud and Consumer Protection Division
820 N. French St., 5th Floor
Wilmington, DE 19801
Telephone: (302) 683-8816
E-Mail: Michael.undorf@delaware.gov

*Counsel for Plaintiff State of Delaware*

BRIAN SCHWALB
Attorney General of the District of Columbia

Elizabeth Gentry Arthur
Office of the Attorney General for the District of Columbia
400 6th Street NW
Washington, DC 20001
Telephone: (202) 724-6514
E-Mail: Elizabeth.arthur@dc.gov

*Counsel for Plaintiff District of Columbia*

DOUGLAS MOYLAN
Attorney General of Guam

Norman Lee Miller, Jr.
Office of the Attorney General of Guam
590 S. Marine Corps Drive, Suite 901
Tamuning, Guam 96913
Telephone: (671) 475-2710
E-Mail: nmillerjr@oagguam.org

*Counsel for Plaintiff Territory Guam*

ANNE E. LOPEZ
Attorney General of Hawai‘i

Rodney I. Kimura
Department of the Attorney General, State of Hawai‘i
425 Queen Street
Honolulu, HI 96813
Telephone (808) 586-1180
E-Mail: Rodney.i.kimura@hawaii.gov

*Counsel for Plaintiff State of Hawai‘i*

RAÚL LABRADOR
Attorney General of Idaho

John K. Olson
Office of the Idaho Attorney General
Consumer Protection Division
954 W. Jefferson St., 2nd Floor
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 332-3549
E-Mail: John.olson@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

KWAME RAOUL
Attorney General of Illinois

Elizabeth Maxeiner
Brian Yost
Jennifer Coronel
Office of the Attorney General of Illinois
115 S. LaSalle St.
Chicago, IL 60603
Telephone: (773) 590-7935
E-Mail: Elizabeth.maxeiner@ilag.gov
Brian.yost@ilag.gov
Jennifer.coronel@ilag.gov

*Counsel for Plaintiff State of Illinois*

KRIS W. KOBACH
Attorney General of Kansas

Christopher Teters
Kansas Office of the Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612
Telephone: (785) 296-3751
E-Mail: chris.teters@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

AARON M. FREY
Attorney General of Maine

Christina M. Moylan
Office of the Attorney General of Maine
6 State House Station
August, ME 04333
Telephone: (207) 626-8800
E-Mail: Christina.moylan@maine.gov

*Counsel for Plaintiff State of Maine*

ANTHONY G. BROWN
Attorney General of Maryland

Schonette J. Walker
Melissa English
Office of the Attorney General of Maryland
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Telephone: (410) 576-6480
E-Mail: swalker@oag.state.md.us
menglish@oag.state.md.us

*Counsel for Plaintiff State of Maryland*

ANDREA CAMPBELL
Attorney General of Massachusetts

Jennifer E. Greaney
Office of the Attorney General of Massachusetts
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 963-2981
E-Mail: Jennifer, greaney@mass.gov

*Counsel for Plaintiff Commonwealth of Massachusetts*

KEITH ELLISON
Attorney General of Minnesota

Zach Biesanz
Senior Enforcement Counsel
Office of the Minnesota Attorney General
Antitrust Division
445 Minnesota Street, Suite 600
St. Paul, MN 55101
Telephone: (651) 757-1257
E-Mail: Zach.biesanz@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*

AARON D. FORD
Attorney General of Nevada

Michelle C. Badorine
Lucas J. Tucker
Nevada Office of the Attorney General
100 N. Carson Street
Carson City, NV 89701
Telephone: (775) 684-1164
E-Mail: mbadorine@ag.nv.gov
ltucker@ag.nv.gov

*Counsel for Plaintiff State of Nevada*

JOHN FORMELLA
Attorney General of New Hampshire

Brandon Garod
Office of Attorney General of New Hampshire
1 Granite Place South
Concord, NH 03301
Telephone: (603) 271-1217
E-Mail: Brandon.h.garod@doj.nh.gov

*Counsel for Plaintiff State of New Hampshire*

JENNIFER DAVENPORT
Acting Attorney General of New Jersey

Yale A. Leber
Abiola G. Miles
Deputy Attorneys General
New Jersey Attorney General's Office
25 Market Street, P.O. Box 106
Trenton, NJ 08625
Telephone: (609) 376-2383
E-Mail: Yale.Leber@law.njoag.gov
Abiola.Miles@law.njoag.gov

*Counsel for Plaintiff State of New Jersey*

RAÚL TORREZ
Attorney General of New Mexico

Judith E. Paquin Cholla Khoury
Assistant Attorney General
New Mexico Office of the Attorney General
408 Galisteo St.
Santa Fe, NM 87504
Telephone: (505) 490-4885
E-Mail: jpaquin@nmag.gov
ckhoury@nmag.gov

*Counsel for Plaintiff State of New Mexico*

DREW WRIGLEY
Attorney General of North Dakota

Elin S. Alm
Assistant Attorney General
Consumer Protection and Antitrust Division
Office of the Attorney General of North Dakota
1720 Burlington Drive, Suite C
Bismarck, ND 58504
Telephone: (701) 328-5570
E-Mail: ealm@nd.gov

*Counsel for Plaintiff State of North Dakota*

DAVID YOST
Attorney General of Ohio

Beth Ann Finnerty, Section Chief, Antitrust
Sarah Mader, Assistant Attorney General, Antitrust
Office of the Attorney General of Ohio
30 E Broad Street, 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
E-Mail: Beth.Finnerty@ohioago.gov
Sarah.Mader@ohioago.gov
*Counsel for Plaintiff State of Ohio*

GENTNER DRUMMOND
Attorney General of Oklahoma

Cameron R. Capps
Office of the Oklahoma Attorney General
313 NE 21st Street
Oklahoma City, OK 73105
Telephone: (405) 522-0858
E-Mail: Cameron.capps@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*

DAN RAYFIELD
Attorney General of Oregon

Gina Ko, Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (503) 934-4400
E-Mail: Gina.Ko@doj.oregon.gov

*Counsel for Plaintiff State of Oregon*

DAVID W. SUNDAY, JR.
Attorney General of Pennsylvania

Tracy W. Wertz
Joseph S. Betsko
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
Telephone: (717) 787-4530
E-Mail: jbetsko@attorneygeneral.gov
twertz@attorneygeneral.gov

*Counsel for Plaintiff Commonwealth of Pennsylvania*

LOURDES L. GÓMEZ TORRES
Secretary of Justice

TANIA L. FERNÁNDEZ-MEDERO
Assistant Secretary of Justice

SAMUEL WISCOVITCH-CORALI
Deputy Undersecretary

Pablo Tufiño-Soto
Senior Attorney
Antitrust Division
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, Puerto Rico 00902-0192
Telephone: (787) 721-2900, Ext. 1205
E-Mail: ptufino@justicia.pr.gov

*Counsel for Plaintiff Territory Puerto Rico*

PETER NERONHA
Attorney General of Rhode Island

Stephen Provazza
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
E-Mail: SProvazza@riag.ri.gov

*Counsel for Plaintiff State of Rhode Island*

MARTIN J. JACKLEY
Attorney General of South Dakota

Yvette K. Lafrentz
Office of the Attorney General of South Dakota
1302 E. Hwy 14, Suite 1
Pierre, SD 57501
Telephone: (605) 773-3215
E-Mail: Yvette.lafrentz@state.sd.us
*Counsel for Plaintiff State of South Dakota*

CHARITY R. CLARK
Attorney General of Vermont

Christopher J. Curtis, Assistant Attorney General
Office of the Attorney General of Vermont
109 State St.
Montpelier, VT 05609
Telephone: (802) 828-3170
E-Mail: christopher.curtis@vermont.gov

*Counsel for Plaintiff State of Vermont*

JAY JONES
Attorney General of Virginia

Tyler T. Henry
Senior Assistant Attorney General
Antitrust Unit
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, VA 23219
Telephone: (804) 692-0485
E-Mail: thenry@oag.state.va.us

*Counsel for Plaintiff Commonwealth of Virginia*

NICHOLAS W. BROWN
Attorney General of Washington

Amy N.L. Hanson
Senior Managing Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-5419
E-Mail: Amy.hanson@atg.wa.gov

*Counsel for Plaintiff State of Washington*

JOHN B. McCUSKEY
Attorney General of West Virginia

Douglas Lee Davis
Office of the Attorney General, State of West Virginia
1900 Kanawha Boulevard East
Building 6, Suite 401
P.O. Box 1789
Charleston, WV 25305
Telephone: (304) 558-8986
E-Mail: Douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*

KEITH KAUTZ
Attorney General of Wyoming

William T. Young
Wyoming Attorney General's Office
2320 Capitol Avenue
Kendrick Building
Cheyenne, WY 82002
Telephone: (307) 777-7847
E-Mail: William.young@wyo.gov

*Counsel for Plaintiff State of Wyoming*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| United States of America, et al.,<br><br>Plaintiffs,<br>v.<br><br>Google LLC,<br><br>Defendant. | Case No. 1:20-cv-03010-APM<br><br>HON. AMIT P. MEHTA |

## NOTICE OF CROSS-APPEAL

Notice is hereby given that the United States of America, the State of Arkansas, the State of California, the State of Florida, the State of Georgia, the State of Indiana, the Commonwealth of Kentucky, the State of Louisiana, the State of Michigan, the State of Missouri, the State of Montana, the State of South Carolina, the State of Texas, and the State of Wisconsin, plaintiffs in the above-named case, hereby cross-appeal to the United States Court of Appeals for the District of Columbia Circuit from the final judgment of this Court entered on December 5, 2025, and all orders in this action merged into that final judgment.

Dated: February 3, 2026

Respectfully submitted,

/s/ Karl E. Herrmann
David E. Dahlquist
Travis R. Chapman (D.C. Bar #90031151)
Danielle Hauck
Karl E. Herrmann (D.C. Bar #1022464)

U.S. Department of Justice
Antitrust Division
Technology & Digital Platforms Section
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 307-6158
David.Dahlquist@usdoj.gov
Travis.Chapman@usdoj.gov

*Counsel for Plaintiff United States of America*

By: /s/ Amanda Wentz
Amanda J. Wentz
Assistant Attorney General
Office of the Arkansas Attorney General
101 West Capitol Avenue
Little Rock, Arkansas 72201
Phone: (501) 682-1178
Amanda.Wentz@ArkansasAG.gov

*Counsel for Plaintiff State of Arkansas*

By: /s/ Carolyn D. Jeffries
Rob Bonta, Attorney General
Paula Blizzard, Senior Assistant Attorney General
Michael Jorgenson, Supervising Deputy Attorney General
Brian Wang, Deputy Attorney General
Carolyn D. Jeffries, Deputy Attorney General (DC Bar No. 1600843)
Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Cari.Jeffries@doj.ca.gov

*Counsel for Plaintiff State of California*

By: /s/ Lee Istrail
James Uthmeier, Attorney General
R. Scott Palmer, Special Counsel, Complex Enforcement Chief, Antitrust Division
Lee Istrail, Assistant Attorney General
Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com
Scott.Palmer@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

By: /s/ Charles Thimmesch
Christopher Carr, Attorney General
Logan B. Winkles, Deputy Attorney General
Ronald J. Stay, Jr., Senior Assistant Attorney General
Charles Thimmesch, Senior Assistant Attorney General
Office of the Attorney General, State of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
cthimmesch@law.georgia.gov

*Counsel for Plaintiff State of Georgia*

By: /s/ Jesse Moore
Theodore Edward Rokita, Attorney General
Scott L. Barnhart, Chief Counsel and Director, Consumer Protection Division
Jesse Moore, Deputy Attorney General
Christi Foust, Deputy Attorney General
Office of the Attorney General, State of Indiana
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Jesse.Moore@atg.in.gov

*Counsel for Plaintiff State of Indiana*

By: /s/ Jonathan E. Farmer
Russell Coleman, Attorney General
J. Christian Lewis, Commissioner of the Office of Consumer Protection
Philip R. Heleringer, Executive Director of the Office of Consumer Protection
Jonathan E. Farmer, Deputy Executive Director of the Office of Consumer Protection
Office of the Attorney General, Commonwealth of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Philip.Heleringer@ky.gov

*Counsel for Plaintiff Commonwealth of Kentucky*

By: /s/ Asyl Nachabe
Liz Murrill, Attorney General
Asyl Nachabe, Assistant Attorney General
Office of the Attorney General, State of Louisiana
Public Protection Division
909 Poydras St. Suite 1850
New Orleans, LA 70112
(225) 326-6435
NachabeA@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

By: /s/ Scott Mertens
Dana Nessel, Attorney General
Scott Mertens, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for Plaintiff State of Michigan*

By: /s/ Alison Esbeck
Alison Esbeck
Assistant Attorney General
Missouri Attorney General's Office
815 Olive Street | Suite 200
Saint Louis, Missouri 63101
Alison.esbeck@ago.mo.gov
Phone: 314-340-4977

*Counsel for Plaintiff State of Missouri*

By: /s/ Anna Schneider
Anna Schneider
Special Assistant Attorney General, Senior Counsel,
Montana Office of Consumer Protection
P.O. Box 200151
Helena, MT 59602-0150
Phone: (406) 444-4500
Anna.schneider@mt.gov

*Counsel for Plaintiff State of Montana*

By: /s/ Mary Frances Jowers
Alan Wilson, Attorney General
W. Jeffrey Young, Chief Deputy Attorney General
C. Havird Jones, Jr., Senior Assistant Deputy Attorney General
Mary Frances Jowers, Assistant Deputy Attorney General
Office of the Attorney General
State of South Carolina
1000 Assembly Street
Rembert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-1549
mfjowers@scag.gov

*Counsel for Plaintiff State of South Carolina*

By: /s/ Diamante Smith
Ken Paxton, Attorney General
Brent Webster, First Assistant Attorney General
Ralph Molina, Deputy First Assistant Attorney General
Austin Kinghorn, Deputy Attorney General for Civil Litigation
Thomas York, Division Chief, Antitrust Division
Diamante Smith, Assistant Attorney General, Antitrust Division
Office of the Attorney General, State of Texas
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1162
Diamante.Smith@oag.texas.gov

*Counsel for Plaintiff State of Texas*

By: /s/ Caitlin M. Madden
Joshua L. Kaul, Attorney General
Caitlin M. Madden, Assistant Attorney General
Wisconsin Department of Justice
17 W. Main St.
Post Office Box 7857
Madison, Wisconsin 53707-7857
caitlin.madden@Wisconsin.gov

*Counsel for Plaintiff State of Wisconsin*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

United States of America, *et al.*,

Plaintiffs,

v.

Google LLC,

Defendant.

Case No. 1:20-cv-03010-APM

HON. AMIT P. MEHTA

[redacted]

State of Colorado, *et al.*,

Plaintiffs,

v.

Google LLC,

Defendant.

Case No. 1:20-cv-03715-APM

HON. AMIT P. MEHTA

[redacted]

**JOINT STATUS REPORT**

Pursuant to the Court's Order, ECF No. 1482, the Parties submit the following Joint Status Report.

## I. Joint Status Update

On January 21, 2026, the Court entered an order appointing the Parties' nominees to the Technical Committee ("TC"), those three individuals composing the Standing Committee Members. Under Section VII.A.6 of the Final Judgment, Plaintiffs are required to enter into a Technical Committee Services Agreement ("TC Services Agreement") with each Technical Committee Member ("TC Member") "[p]romptly after appointment." Under Section VII.A.8, each TC Member must also sign a confidentiality agreement.

The Parties provide the Court with the following joint update on the status of the TC Services Agreement and Confidentiality Agreement and request the Court's assistance with the disputes identified below in the Parties' Position Statements. The Parties respectfully request an expedited hearing on these disputes.

TC Services Agreement Status

Section VII.A.6.a directs the TC Services Agreement to include, among other provisions, that "[t]he TC members shall serve, without bond or other security, at the cost and expense of Google on such terms and conditions as the parties agree, including payment of reasonable fees and expenses."

The Parties have engaged in ongoing meet and confers regarding potential compensation for TC members, beginning on December 16, 2025 and concluding on January 30, 2026, when the Parties reached impasse on the time commitment for TC Members and related points on which compensation would be based.

During and after this same period, the Parties engaged in ongoing negotiations regarding other provisions of the TC Services Agreement. Although the Parties remained at an impasse regarding compensation-related terms, they were able to reach agreement regarding the remainder of the TC Services Agreement.

The Parties respectfully request the Court's guidance on the compensation-related disputes. The Parties include their respective position statements regarding these disputes in Sections II–IV below.

Confidentiality Agreement Status

On January 20, 2026, Plaintiffs sent Google a draft of the Confidentiality Agreement at the same time Plaintiffs sent the draft TC Services Agreement. Google provided redlines to the

draft Confidentiality Agreement on February 4. On February 5, the Parties met and conferred regarding the Confidentiality Agreement and—while an agreement has not been reached—believe that Court intervention is not needed at this time.

## II. United States and Co-Plaintiff States' Position Statement Regarding Compensation-Related Terms

This is a landmark antitrust case to which the Parties and the Court have dedicated a great deal of time and effort. The Final Judgment is the culmination of years of litigation and thorough analysis by the Court, and the remedies are intended to address over a decade's worth of harm caused by Google's conduct in the markets for general search services and search text ads. The TC will play a vital role in implementing those remedies.

To that end, Plaintiffs propose that, at least for each TC Member's initial term,[1] the TC Member role should be (a) considered a full-time position, (b) compensated at a salary that reflects the market and practical realities of similar positions and expectations, and (c) compensated at the same rate for the entirety of the TC Member's initial term. Since the Parties' first meet and confer on December 16, Plaintiffs have emphasized the full-time commitment, which reflects the critical nature of the TC's role to assist in the enforcement of and compliance with the Final Judgment. Plaintiffs' proposal is further informed by the technical committee in the *Microsoft* case, which was compensated on a full-time basis and—as Google has affirmatively argued—had a narrower remit compared to the more complex remedies that the TC will address here.[2] By contrast, Google's proposal that the TC Member role be compensated

[1] Under Section VII.A. 4 of the Final Judgment, "[t]he Standing Committee Members shall serve for an initial term of thirty-six (36) months; the remaining members shall serve for an initial term of thirty (30) months."

[2] *See, e.g.*, Rem. Tr. 4829:1–4830:23 (J. Schmidtlein) ("In *Microsoft*, the details were, you're going to have to disclose those APIs, you're going to have to disclose a certain amount of

as a salary position based on a part-time commitment undermines the TC before its work can even begin, relegating TC Members to part-time, ignoring the vital role of the TC and the primary precedent that exists, and impairing the ability to recruit highly qualified individuals to serve on the TC.

### A. The TC Member Role Is A Full-Time Commitment

Considering the TC Member role as a full-time commitment reflects the importance of the role and that it deserves the TC Members' full attention. As this Court has recognized, the TC "will carry out important functions" and will help Plaintiffs "establish standards and processes[] . . . [t]hat will be part of the 'practical workings' of the final judgment." Rem. Op. 211–12 (citation omitted). Recognizing the significant work that the TC Members will undertake, the Court extended the remedies period by one year based on the "expectation that it will take one year to establish the [TC] and the processes necessary for execution." Rem. Op. 219. Even once those processes are established, however, the TC will continue to have substantial ongoing obligations, including but not limited to evaluating (potential) Qualified Competitors, auditing Qualified Competitors' data security and privacy practices, auditing Qualified Competitors' use of search syndication, receiving disclosures from Google about Search Text Ads auction changes, monitoring Google's implementation of and compliance with its obligations under the Final Judgment, handling complaints received pursuant to the Final Judgment, and submitting regular written reports to Plaintiffs on the TC's activities and recommendations. Rem. Op. 211–12; Final Judg. §§ V.B.5, VI.A, VII.A.7, VII.C.3, VII.E, IX.V.

---

protocols. . . . That's what the technical committee was brought in [*Microsoft*] for, a bunch of computer science and engineering. It was a very narrow remit and a very narrow set of expertise."); Def.'s Prop. Findings of Fact ¶ 1226, ECF No. 1346 ("[Plaintiffs' proposed TC] is different from the role of the Technical Committee in *United States v. Microsoft*, where the Technical Committee was established to assist the plaintiffs with compliance. Here, the TC has substantive input into what the actual proposals require of Google." (internal citation omitted)).

The actual remedies, moreover, are technologically complex—not only in and of themselves, but also when implemented "in these fast-moving times, where GenAI technologies are breaking barriers seemingly at light speed." Rem. Op. 220. For the TC to provide the "technical competence" needed to assist in the enforcement of and compliance with the Final Judgment, TC Members must be able to dedicate their full attention to the remedies. Rem. Op. 212; Final Judg. § VII.A. Google's contention that the TC need only work on a part-time basis conflicts with the fact that the TC will have a much broader role and wider scope of issues to work through than the *Microsoft* technical committee, as Google's own arguments have recognized. *See* Final Judg. Mem. Op. 50 (rejecting Google's argument that the TC's role in this case is improperly broad); Rem. Tr. 4829:1–4830:23 (J. Schmidtlein) (describing the *Microsoft* technical committee as having a "very narrow remit and a very narrow set of expertise").

Plaintiffs expect the Standing Committee Members to be deeply involved in the analyses and decision-making processes of the TC. To be effective and drive the process forward, TC Members need to have a strong executive skillset, including leadership and organizational skills, in addition to a high level of expertise and experience. In making the nominations, Plaintiffs recognized the serious and substantial work to be done. At least two Standing Committee Members have extensive experience in creating and managing the types of organizational structures and cross-technical teams that will be needed to implement the remedies, and given the complexity of the numerous areas of their remit, Plaintiffs anticipate that a high level of commitment will be required by the TC Members to carry out their duties efficiently and effectively, especially in a fast-moving industry. The work of establishing the TC and the required processes will be significant, *see* Rem. Op. 219, especially during the initial term, and even if there is a possibility that the committee *may* at some point be able to transition into more

of a "maintenance" posture, that point would be much further down the line (and indeed never came in *Microsoft*, where the technical committee remained full-time).

Treating the TC Member role as a full-time position is also consistent with *Microsoft*. Plaintiffs understand that the *Microsoft* technical committee member role was at no point part-time and was compensated as a salaried position throughout each member's time on the committee. And as the *Microsoft* court emphasized, the committee's significant work played a critical role in the final judgment's success:

> [T]he TC has truly become one of the most successful aspects of the Final Judgments, because it has been invaluable in facilitating the Plaintiffs' enforcement efforts. . . . [T]he instant case is an 'unusually complex' one, and the TC has provided the Plaintiffs with crucial technical expertise by providing advice and evaluating Microsoft's compliance with the Final Judgments. . . . [The TC] provid[ed] testing, feedback, and critiques that have proved critical to the Plaintiffs' efforts to maximize the full potential of the Final Judgments' remedies.

*New York v. Microsoft Corp.*, 531 F. Supp. 2d 141, 157 (D.D.C. 2008) (internal footnote and citation omitted). The court went on to recognize that "based largely upon the TC's ability to evaluate the technical significance of issues and advise the Plaintiffs and Microsoft as to potential solutions," the parties were able to resolve compliance-related concerns "through cooperation rather than litigation." *Id.* at 158. The court later called the committee "the lynchpin in the successful effort" to implement the remedies and expressing that "without their assistance we would not have been successful." Hr'g Tr. 29:21–30:05, *United States v. Microsoft Corp.*, Case No. 1:98-cv-01232-CKK (D.D.C. June 19, 2012), ECF No. 930.

Google's proposal to treat the TC Member role as a part-time position from the start risks the success of the TC and the Court's Final Judgment. Setting up the TC as part-time would unnecessarily disrupt the TC's ability to perform their obligations and impede implementation of the Court-ordered remedies. The wiser course would be for TC Members to commence their terms prepared for full-time work.

Google's proposal also has significant financial consequences that would also impair the ability to attract and retain talented TC Members. The TC Members are private citizens who have agreed to serve the public by assisting Plaintiffs and the Court in the enforcement of and compliance with the Final Judgment. Two of these individuals are in the process of leaving their current employment and/or foregoing industry opportunities to work on the TC. Although Google has insisted that TC Members can engage in "other opportunities" like consulting if they want a full-time income while serving on the TC, that position falls flat for at least two reasons.

*First*, Google assumes that TC Members who are not already engaged in consulting work can readily do so. That, however, would: (a) effectively require such members to set up a side business that does not already exist; (b) require such members to actively grow a side business while also trying to do the work of the TC; and (c) distract from such members' work on the TC, which must take priority.

*Second*, Google assumes that "other opportunities" would be sufficient to make up for the shortfall in income from the TC Member role being a part-time position. This assumption, however, ignores that TC Members would be locked out of doing a substantial portion of possible consulting work due to the conflict provisions of the Final Judgment, including the one-year cooling-off period at the end of their service on the committee. Final Judg. § VII.A.2.c. These provisions—which Plaintiffs view as important to maintaining the integrity of the committee—would make it difficult for the TC members to easily find other professional opportunities that align with their expertise.

Accordingly, Plaintiffs believe that the TC Member role should be considered a full-time position, at least for each TC Member's initial term, and all TC Members, including the remaining two members to be selected, should be compensated accordingly.[3]

**B. The TC Member Salary Should Reflect The Market And Practical Realities Of Similar Positions And Expectations**

In addition, the TC Member salary should reflect the market and practical realities of positions that are similar to and have similar expectations as the TC Member role. Given their duties and obligations, the TC Member role is most akin to a senior Product Manager role in the technology industry. To meet the Court's remedial goals, the role requires a TC Member to work strategically and cross-functionally to apply leading-edge technical expertise, at a minimum. Moreover, TC Members need to have the experience and expertise to engage with senior executives at Google on highly complex issues. Plaintiffs' proposal therefore aims to compensate TC Members accordingly, to enhance the TC's ability to attract and retain top talent.

Plaintiffs' proposal recognizes that the type of role a TC member would inhabit is akin to, at a minimum, a senior full-time product manager positions in the technology industry and should be paid a salary that reflects the expertise brought to the role, the work to be done, and the expectation that the individual will prioritize that work over other potential professional endeavors.[4]

---

[3] Plaintiffs have advised Google that if a TC Member is unwilling or unable to commit to being full-time, and if both (a) the other TC Members believe that the resulting workload distribution among the TC Members would still be workable, and (b) the TC Members agree that different terms reflecting the reduced commitment is appropriate, then the TC Members may jointly make such a proposal to Plaintiffs for that specific member for Plaintiffs to consider.

[4] How Google compensates its own Product Managers may reflect a competitive salary in the marketplace. During the parties' December 16 meet and confer, Plaintiffs requested that Google provide information on its salary ladders for Plaintiffs to consider. Google declined. Therefore, Plaintiffs looked at publicly available information for Google Product Managers in San

Further, Plaintiffs recognize that serving on the TC represents a significant opportunity cost for TC Members. As noted above, two of the Standing Committee Members are in the process of leaving their current employment and/or foregoing industry opportunities in recognition of the need to focus on the TC on a full-time basis. Moreover, many senior leaders and executives in the technology industry now—particularly more senior employees with experiences comparable to the TC Members' experiences—are compensated at least partially in stock options,[5] the value of which can grow over time, potentially very significantly. Here, however, TC Members will not have the opportunity for stock options and thus will be forgoing such potential future growth.[6]

The opportunity costs that the TC members bear are not limited to their time serving on the TC. Section VII.A.2.c of the Final Judgment prohibits TC Members from "perform[ing] any work for Google or any Competitor of Google during the time that they serve on the TC and for one (1) year after ceasing to serve on the TC." This provision effectively locks each TC Member out of any number of well-paid employment opportunities after their time on the TC ends, and similar restrictions in the private sector typically require additional compensation to account for the lost employment potential.

Francisco at Google's "L10" level, which roughly equates to a Vice President Role, and used that to inform the compensation proposal. Although the Parties disagree as to whether the TC Member role reflects a higher level on Google's ladder, Plaintiffs do not believe that needs to be resolved for purposes of the present dispute.

[5] For example, between 2022 and 2024, the compensation of Google's six executive officers was structured to be less than 3% coming from salary and well over 90% coming from stock awards. Alphabet, Notice of 2025 Annual Meeting of Stockholders and Proxy Statement 49 (Apr. 25, 2025), https://abc.xyz/investor/annual-meeting/.

[6] TC members would also forego typical employment benefits such as health insurance, life insurance, and 401(k) plans.

Based on the factors and information above, Plaintiffs have proposed that the total compensation for each TC Member per year should be [redacted]. This total amount reflects the market and practical realities of the TC Member position and will ensure that the TC is comprised of serious, experienced, and talented members in an industry that is widely known for being highly competitive, particularly at more senior levels.

By contrast, Google appears to propose that the TC Member salary be based in large part on the reported hourly rates of experts in this case, for a total annual compensation of [redacted] per TC Member—an annual salary assuming part-time hours. Google's approach, however, is neither realistic nor appropriate in this context. Moreover, the TC's work is inherently different than what an expert typically does in the litigation context. The TC Members are not merely looking at a discrete set of issues and offering an opinion. Instead, the TC Members will be building an entire organization from scratch, serving as operators and managers, creating cross-functional teams, developing a range of processes, and undertaking ongoing auditing and compliance responsibilities over the full term of the Final Judgment. Such work is far more akin to a typical salaried executive than to a consulting or testifying expert. Further, for the reasons discussed above, the TC Member role is a full-time position, and tying salary for this type of position to a specific number of hours worked does not reflect market or practical realities.

Even accepting, *arguendo*, Google's starting point of the hourly rates of experts in this litigation, such an approach fails to account for the actual compensation those experts received. An expert's hourly rate, as stated in an expert report on a given matter, does not necessarily reflect that expert's actual compensation related to that matter. Many experts, whether working with a firm or independently, also receive other forms of compensation in addition to their hourly

rate on a matter, such as a percentage of the billings for staff working on that matter or a bonus to reward the expert for bringing that work to firm. Google's proposal does not appear to account for any such additional forms of compensation.

Finally, to the extent Google suggests that its proposal is based on the *Microsoft* technical committee, that assertion ignores that the remedies in this case are more complex than in *Microsoft*. Further, the technology industry has grown exponentially since the *Microsoft* technical committee concluded its work, and competitive salaries in the market today are significantly higher.

**C. TC Member Compensation Should Be Set For The Initial Term**

Finally, compensation for TC Members should be set for the initial term. As referenced above, Standing Committee Members and remaining members are to serve for an initial term of 36 months and 30 months, respectively. Final Judg. § VII.A. 4. The TC Services Agreement therefore binds Plaintiffs and TC Members for the same periods.

As a practical matter, the TC Members should have a degree of certainty as to what their compensation will be across their terms. Plaintiffs thus propose that the TC Member total compensation be set at a sum certain for the entire initial term. This balances income certainty with the opportunity to reassess in the event circumstances change and to make an adjustment if the parties agree that is appropriate.

Google's proposal, by contrast, would create an untenable position for the TC and TC Members. Google proposes that total compensation be set at a sum certain for only the first year of each TC Member's term, with compensation for the remainder of the term to be decided at a later, undefined time. Such a structure essentially asks TC Members to decide now to forego other professional opportunities and commit to a three-year term plus a one-year non-compete

provision, with no knowledge of what their compensation would be after just one year.[7] Google's proposal thus prevents the TC Member from having important details needed to make an informed decision on whether to join the TC in the first instance. And the proposal is further inconsistent with the approach used for the *Microsoft* technical committee and with how compensation in professional arrangements is typically structured.

### D. Conclusion

For these reasons, Plaintiffs respectfully request the Court to order that, at least for each TC Member's initial term, the TC Member position be (a) considered a full-time position, (b) compensated at a salary that reflects the market and practical realities of similar full-time positions and expectations, and (c) compensated at a consistent salary for its initial term.

## III. Colorado States' Position Statement Compensation-Related Terms

The Colorado States join in the separate statement of the United States and offer these additional views. The Colorado States' position on compensation reflects our expectation of the extensive commitment that will be required of its members in order for the TC to achieve its goals effectively, both in developing, launching, and maintaining the TC's processes and, especially, in implementing the remedies.

Although the phrasing of "full-time" versus "part-time" can be a helpful shorthand, the fundamental point is this: The work of the TC cannot be calculated merely by counting hours.

In the interview process, the Colorado States consistently emphasized to prospective TC Members that the work of the TC must always come first. And that means, perforce, that the

---

[7] Google's proposal would also disrupt the TC's ability to carry out its duties under the Final Judgment. Under Google's timeline, the TC Members would need to enter salary negotiations less than a year from now, while still doing significant work both to stand up the TC's operations and to assist in the enforcement of and compliance with the Final Judgment. Such a disruption is not necessary and could readily be avoided with Plaintiffs' proposal.

members must be available to ensure the rapid and thoughtful implementation of remedies and that they must be prepared to assume the opportunity costs that this commitment may involve. In other words, achieving remedial goals is not just a matter of the total hours that the members work; it must also recognize the dedicated focus that TC Members will need to devote to these tasks. And that, of course, requires that they not work some defined set of hours but that they be available whenever they are needed and that the work of the TC must take precedence in their professional lives.

The varied and complex tasks assigned to the TC support the need for a full-time commitment. Not only must the TC stand up—and then manage—a new organization comprised of dedicated professionals, it must also help solve critical technical issues needed to implement the Court's remedies and conduct ongoing monitoring and other duties. Some of these tasks include:

- Determining what companies are Qualified Competitors, a task that itself includes determining whether a Competitor under the Final Judgment meets approved data security standards and then whether that company has presented a sufficient plan to invest and compete in or with the GSE and/or Search Text Ads markets. Final Judg. § IX.V.

- Determining the appropriate general Qualified Competitor, and User-side Data-specific, privacy and security safeguards to be applied before Google shares data with Qualified Competitors, as well as helping to determine that the technology for user data-sharing including privacy and security safeguards is fully functional and considering restrictions on the data that Google shares. Final Judg. §§ IV.C., IX.V.

- Continuing to administer data security and privacy audits to Qualified Competitors. Final Judg. § IX.V.

- Consulting with Plaintiffs and the Court regarding the exact number of and frequency of disclosures of User-side Data to Qualified Competitors Final Judg. § IV.B.2.

- Consulting with Plaintiffs regarding the frequency and content of search syndication audits and continuing to administer such audits. Final Judg. § V.B.5.

- Continuing to receive and investigate complaints from Plaintiffs, Google's Compliance Officer, and third parties. Final Judg. §§ VII.A.7e., VII.C.3.

Against this, Google's objections ring hollow.

First, the role of a TC Member is not that of an expert witness, and Google's apparent notion that the Court look to the payment of experts as a guide to the compensation issue is wholly inapt. An expert offers an opinion. A TC Member runs an organization. An expert suggests how facts can be understood. A TC Member's task is to "assist the plaintiffs and the court in enforcing equitable antitrust remedies," Rem. Op. 211–a task that requires analyzing facts and applying multiple disciplines to actionable outcomes. An expert witness would never be described as a decision-maker. But the very first task of the TC is to make a critical decision: whom to propose for the final two slots on the TC.

The importance of experience and knowledge among TC Members cannot be over-emphasized. Google has plentiful knowledge about the operations of general search and general search text ads – software engineering, information retrieval, artificial intelligence, economics, behavioral science and data privacy and data security. Rem. Op. 213. A good bet is that there is no entity in the world more knowledgeable.

Against this, the Plaintiffs must work to enforce the Final Judgment effectively. A huge barrier to success is the vast information asymmetry that exists between the Plaintiffs and Google. In some real sense, a critical task of the TC, with the help of expert staff, is to close that asymmetry just enough to render remedies effective. And to do so in the face of Google's superior knowledge and obvious economic incentives – the same economic incentives that led, after all, to the monopoly maintenance conduct itself. This daunting task demands a TC with sophisticated expertise and laser-like focus.

Second, Google fails (or declines) to recognize what is at stake. This Court has emphasized the importance of speedily implementing the Final Judgement. Hr'g Tr. 32:7–15

(Oct. 08, 2025). Even just considering the two compensation numbers on their face sets up an obvious choice: Risk under-implementation or risk over-compensation. In these circumstances that is no choice at all. Under-implementation would risk the failure of the remedies. Over-compensation, given the specific numbers filed under seal in the separate statement of the United States, would be a rounding error, even less than a rounding error, for Google.

This Court has recognized before the different positions in which the Plaintiffs and Google stand. In rejecting Google's request that it have the right to nominate as many TC Members as the Plaintiffs, the Court said:

> Google seems to believe it deserves an equal seat at the table. Google's Br. at 73. But that misconstrues the Committee's purpose. Its role is "to inform and assist the Government in its enforcement efforts," Massachusetts, 373 F.3d at 1244, not to act as a "neutral arbiter," Google's Br. at 73.

Rem. Op. 212.

Finally, "it is well settled that once the Government has successfully borne the considerable burden of establishing a violation of [antitrust] law, all doubts as to the remedy are to be resolved in its favor." Final Judg. Op. 5. That is why "[w]here any doubts remained after considering the evidence and the parties' positions, the court has deferred to Plaintiffs as to the appropriate remedial terms." *Id.* Given the importance of the work of the Technical Committee, any doubt should be resolved in favor of the Plaintiffs' position, but as demonstrated herein, the Colorado States believe there is no doubt at all.

**IV. Google's Position Statement Regarding Compensation-Related Terms**

Google and Plaintiffs are in agreement that Technical Committee Members ("TC Members") should be fairly compensated for the important role that they will serve in administering the Final Judgment. Plaintiffs' unprecedented compensation proposal, however, assumes unrealistically full-time work ([redacted]) for the first three years, and sets

a fixed [redacted] salary that is to be paid regardless of time actually worked. Google's proposal, by contrast, will more than fairly compensate TC Members based on a more realistic projection of the amount of work they will perform, consistent with the Final Judgment. FJ § VII.A.6.a ("The TC members shall serve . . . at the cost and expense of Google on such terms and conditions as the parties agree including payment of *reasonable* fees and expenses."). Consistent with the Court's "expectation that it will take one year to establish the Technical Committee and the processes necessary for execution," Sept. 2 Op. at 219, Google's proposal also accounts for the Technical Committee's changing duties over time. Google's proposed compensation for the first year [redacted] is based on the assumption that TC Members each devote very substantial time—approximately [redacted] hours—to Technical Committee work over the first year of service. Compensation would then be re-assessed to reflect that the ongoing duties after the first year are significantly less time-intensive than the duties in the first year.

Plaintiffs' principal arguments in support of their proposal are (i) that the Microsoft TC was ultimately paid on a full-time basis, and (ii) that the TC Members should be compensated at a level commensurate with a VP-level role at a major technology company. Neither withstands scrutiny.

First, Plaintiffs' proposal is at odds with the Technical Committee's duties under the Final Judgment. Those duties are most time-intensive at the outset, as the Technical Committee develops standards and processes before reverting to primarily compliance work. Aided by as many staff "as are reasonably necessary" to perform its duties (FJ § VII.A.7.i), the TC Members' immediate tasks entail: (1) recommending Qualified Competitor ("QC") data security standards, advising on certification, and establishing re-certification procedures; (2) advising on the license template for the index and user-side data disclosures; (3) advising on privacy and security

safeguards to be applied to the user-side data and the number and frequency of the user-side data disclosures; (4) advising on the search and ads syndication license templates and search syndication caps; and (5) advising on the search text ads reporting requirement. The timelines provided by the Final Judgment contemplate that all of that work will occur within the first year, and much of it within the first six months.[8] Once these "processes necessary for execution" of the Judgment are in place, Sept. 2 Op. at 219, the TC Members' responsibilities will transition to less time-consuming work, including assessing prospective QCs, auditing and re-certifying QCs, reviewing ads auction disclosures, handling any complaints, and reporting on Google's compliance.[9] Google's proposal accounts for this reduced workload by reassessing compensation after the first year, rather than a fixed salary that does not account for any change in actual hours worked.[10]

Second, Plaintiffs' proposal to presumptively compensate TC Members on a full-time basis—without any requirement that TC Members record their time— is inconsistent with both the Final Judgment ("payment of reasonable fees") and common practice in the context of the consulting and testifying experts retained for litigation, as well as monitors and special masters. Federal courts routinely establish compliance monitors and special masters with hourly compensation frameworks, typically charging their "standard hourly rate" plus costs and expenses. Thomas E. Willging et al., *Special Masters' Incidence and Activity*, Federal Judicial Center, 41-44 (2000); *see also Trout v. Ball*, 705 F. Supp. 705, 708 (D.D.C. 1989) ("The rule in this Circuit is that [special master's] fees are to be determined based upon the prevailing market rate for similar

---

[8] FJ §§ IV.C.1, 3; FJ § V.B; FJ §§ VI.A, B; FJ §§ VII.A.1, 3.c.
[9] FJ § V.B.5; FJ § VI.A; FJ §§ VII.A.7.a, c-h; FJ §§ VII.C, E; FJ § IX.W.
[10] Notably, nothing in the Final Judgment requires that TC Members exclusively work on the Technical Committee. As reflected in Section VII.A.2 of the Final Judgment, TC Members may perform other work throughout their service, subject to the conflict limitations.

work."). While Google's own proposal provides for a fixed salary for the first year (as opposed to an hourly-pay structure) in recognition of the TC Members' commitment to set aside substantial time for their initial work on the Technical Committee, it bears emphasis that a salaried position is itself a departure from the norm.

Third, Plaintiffs point to the *Microsoft* Technical Committee in support of their full-time, fixed salary proposal. But the *Microsoft* Technical Committee prepared original, highly technical documentation required to be usable by licensees across a broad range of implementations—an extraordinarily complex effort that ultimately took more than five years. *New York v. Microsoft Corp.*, 531 F. Supp. 2d 141, 158-64 (D.D.C. 2008); *see also* Joint Status Report, *United States v. Microsoft Corp.*, 2011 WL 2681926 (Apr. 22, 2011 D.D.C.) (Microsoft will be "publishing the documentation prepared by the TC without any substantive changes."). The Microsoft Technical Committee also expanded its involvement over time across multiple implementation plans, taking on work that Microsoft had committed to completing and resolving technical issues itself using Windows source code. *See New York*, 531 F. Supp 2d at 144, 158-64 (recounting the protocol disclosure remedy's "extreme and unforeseen" delays and "tortured history"). Here, there is no reason to believe—and Plaintiffs have not suggested—that the Technical Committee's responsibilities entail a similar, years-long technical endeavor. Nonetheless, Plaintiffs have proposed [redacted] TC Member annual salaries that far exceed those of the *Microsoft* TC members.[11] The Court should instead adopt Google's proposal, which is more than reasonable in both the form and amount of compensation.

---

11 [redacted]

Finally, based on the parties' meet-and-confer discussions, Plaintiffs appear to be contemplating a role for the Technical Committee that is very different from Google's understanding. Google's understanding was that the Technical Committee would be composed of technical experts whose principal role would be to bring their technical expertise to bear on the unresolved issues in the Final Judgment. To that end, Google's compensation proposal is based on the blended average hourly rate of testifying experts retained by either side in the liability and remedies phases of this litigation (28 experts total; average rate just under [redacted], as well as Dr. Abowd's customary hourly rate [redacted] Plaintiffs, by contrast, envision the Technical Committee as principally executive-level product managers, who Plaintiffs believe should be compensated akin to the total compensation package (including stock options) that Vice Presidents at major technology companies receive. Plaintiffs have not explained how the TC Member's role is comparable to that of a VP-level executive, whether in terms of day-to-day responsibilities, time commitment, or otherwise.

The Court should adopt Google's proposal: [redacted] compensation for year 1, with year 2 and thereafter to be reassessed based on anticipated time commitment (among other variables). The Court should further require that TC Members track the number of hours spent per week on Technical Committee-related responsibilities.

---

[redacted]

Dated: February 6, 2026

Respectfully submitted,

/s/ Karl E. Herrmann
David E. Dahlquist
Travis R. Chapman (D.C. Bar #90031151)
Danielle Hauck
Claire M. Maddox (D.C. Bar #498356)
Grant M. Fergusson (D.C. Bar #90004882)
Karl E. Herrmann (D.C. Bar #1022464)

U.S. Department of Justice
Antitrust Division
Technology & Digital Platforms Section
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 307-6158
David.Dahlquist@usdoj.gov
Travis.Chapman@usdoj.gov

*Counsel for Plaintiff United States of America*

By: /s/ Amanda Wentz
Amanda J. Wentz
Assistant Attorney General
Office of the Arkansas Attorney General
101 West Capitol Avenue
Little Rock, Arkansas 72201
Phone: (501) 682-1178
Amanda.Wentz@ArkansasAG.gov

*Counsel for Plaintiff State of Arkansas*

By: /s/ Carolyn D. Jeffries
Rob Bonta, Attorney General
Paula Blizzard, Senior Assistant Attorney General
Michael Jorgenson, Supervising Deputy Attorney General
Brian Wang, Deputy Attorney General
Carolyn D. Jeffries, Deputy Attorney General (DC Bar No. 1600843)
Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Cari.Jeffries@doj.ca.gov

*Counsel for Plaintiff State of California*

By: /s/ Lee Istrail
James Uthmeier, Attorney General
R. Scott Palmer, Special Counsel, Complex Enforcement Chief, Antitrust Division
Lee Istrail, Assistant Attorney General
Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com
Scott.Palmer@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

By: /s/ Charles Thimmesch
Christopher Carr, Attorney General
Logan B. Winkles, Deputy Attorney General
Ronald J. Stay, Jr., Senior Assistant Attorney General
Charles Thimmesch, Senior Assistant Attorney General
Office of the Attorney General, State of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
cthimmesch@law.georgia.gov

*Counsel for Plaintiff State of Georgia*

By: /s/ Jesse Moore
Theodore Edward Rokita, Attorney General
Scott L. Barnhart, Chief Counsel and Director, Consumer Protection Division
Jesse Moore, Deputy Attorney General
Christi Foust, Deputy Attorney General
Office of the Attorney General, State of Indiana
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Jesse.Moore@atg.in.gov

*Counsel for Plaintiff State of Indiana*

By: /s/ Jonathan E. Farmer
Russell Coleman, Attorney General
J. Christian Lewis, Commissioner of the Office of Consumer Protection
Philip R. Heleringer, Executive Director of the Office of Consumer Protection
Jonathan E. Farmer, Deputy Executive Director of the Office of Consumer Protection
Office of the Attorney General, Commonwealth of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Philip.Heleringer@ky.gov

*Counsel for Plaintiff Commonwealth of Kentucky*

By: /s/ Asyl Nachabe
Liz Murrill, Attorney General
Asyl Nachabe, Assistant Attorney General
Office of the Attorney General, State of Louisiana
Public Protection Division
909 Poydras St. Suite 1850
New Orleans, LA 70112
(225) 326-6435
NachabeA@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

By: /s/ Scott Mertens
Dana Nessel, Attorney General
Scott Mertens, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for Plaintiff State of Michigan*

By: /s/ Alison Esbeck
Alison Esbeck
Assistant Attorney General
Missouri Attorney General's Office
815 Olive Street | Suite 200
Saint Louis, Missouri 63101
Alison.esbeck@ago.mo.gov
Phone: 314-340-4977

*Counsel for Plaintiff State of Missouri*

By: /s/ Anna Schneider
Anna Schneider
Special Assistant Attorney General,
Senior Counsel,
Montana Office of Consumer Protection
P.O. Box 200151
Helena, MT 59602-0150
Phone: (406) 444-4500
Anna.schneider@mt.gov

*Counsel for Plaintiff State of Montana*

By: /s/ Mary Frances Jowers
Alan Wilson, Attorney General
W. Jeffrey Young, Chief Deputy Attorney General
C. Havird Jones, Jr., Senior Assistant Deputy Attorney General
Mary Frances Jowers, Assistant Deputy Attorney General
Office of the Attorney General
State of South Carolina
1000 Assembly Street
Rembert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-1549
mfjowers@scag.gov

*Counsel for Plaintiff State of South Carolina*

By: /s/ Diamante Smith
Ken Paxton, Attorney General
Brent Webster, First Assistant Attorney General
Ralph Molina, Deputy First Assistant Attorney General
Austin Kinghorn, Deputy Attorney General for Civil Litigation
Thomas York, Division Chief, Antitrust Division
Diamante Smith, Assistant Attorney General, Antitrust Division
Office of the Attorney General, State of Texas
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1162
Diamante.Smith@oag.texas.gov

*Counsel for Plaintiff State of Texas*

By: /s/ Caitlin M. Madden
Joshua L. Kaul, Attorney General
Caitlin M. Madden, Assistant Attorney General
Wisconsin Department of Justice
17 W. Main St.
Post Office Box 7857
Madison, Wisconsin 53707-7857
caitlin.madden@Wisconsin.gov

*Counsel for Plaintiff State of Wisconsin*

PHILIP WEISER
Attorney General of Colorado

_/s/ Jonathan B. Sallet_
Jonathan B. Sallet, DC Bar No. 336198
Steven M. Kaufmann
Elizabeth W. Hereford
Conor J. May
Colorado Office of the Attorney General
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
E-Mail: Jon.Sallet@coag.gov
Steve.Kaufmann@coag.gov
Elizabeth.Hereford@coag.gov
Conor.May@coag.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Colorado*

MIKE HILGERS
Attorney General of Nebraska

Justin C. McCully, Assistant Attorney
General
Nebraska Department of Justice
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-9305
E-Mail: Justin.mccully@nebraska.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Nebraska*

KRISTIN K. MAYES
Attorney General of Arizona

Robert A. Bernheim, Unit Chief Counsel
Jayme Weber, Senior Litigation Counsel
Arizona Office of the Attorney General
400 West Congress, Ste. S-215
Tucson, Arizona 85701
Telephone: (520) 628-6507
E-Mail: Robert.Bernheim@azag.gov
Jayme.Weber@azag.gov

*Counsel for Plaintiff State of Arizona*

BRENNA BIRD
Attorney General of Iowa

Noah Goerlitz, Assistant Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
Telephone: (515) 725-1018
E-Mail: Noah.goerlitz@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

LETITIA JAMES
Attorney General of New York

Elinor R. Hoffmann
Morgan J. Feder
Michael D. Schwartz
Office of the New York State Attorney
General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8513
E-Mail: Elinor.hoffmann@ag.ny.gov
Morgan.feder@ag.ny.gov
Michael.schwartz@ag.ny.gov

*Counsel for Plaintiff State of New York*

JEFF JACKSON
Attorney General of North Carolina

Kunal Janak Choksi
Joshua Daniel Abram
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
Telephone: (919) 716-6000
E-Mail: kchoksi@ncdoj.gov
jabram@ncdoj.gov

*Counsel for Plaintiff State of North Carolina*

JONATHAN SKRMETTI
Attorney General of Tennessee

J. David McDowell
Austin Ostiguy
Tyler Corcoran
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 741-8722
E-Mail: David.McDowell@ag.tn.gov
austin.ostiguy@ag.tn.gov
Tyler.Corcoran@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

DEREK E. BROWN
Attorney General of Utah

Matthew Michaloski, Assistant Attorney General
Marie W.L. Martin, Division Director
Utah Office of Attorney General
160 E 300 S, 5th Floor
P.O. Box 140811
Salt Lake City, Utah 84114
Telephone: (801) 440-9825
E-Mail: mmichaloski@agutah.gov
mwmartin@agutah.gov

*Counsel for Plaintiff State of Utah*

STEPHEN J. COX
Attorney General of Alaska

Jeff Pickett
Senior Assistant Attorney General
State of Alaska, Department of Law
Office of the Attorney General
1031 W. Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5275
E-Mail: Jeff.pickett@alaska.gov

*Counsel for Plaintiff State of Alaska*

WILLIAM TONG
Attorney General of Connecticut

Nicole Demers
Office of the Attorney General of Connecticut
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
Telephone: (860) 808-5202
E-Mail: Nicole.demers@ct.gov

*Counsel for Plaintiff State of Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware

Michael Andrew Undorf
Delaware Department of Justice
Fraud and Consumer Protection Division
820 N. French St., 5th Floor
Wilmington, DE 19801
Telephone: (302) 683-8816
E-Mail: Michael.undorf@delaware.gov

*Counsel for Plaintiff State of Delaware*

BRIAN SCHWALB
Attorney General of the District of Columbia

Elizabeth Gentry Arthur
Office of the Attorney General for the District of Columbia
400 6th Street NW
Washington, DC 20001
Telephone: (202) 724-6514
E-Mail: Elizabeth.arthur@dc.gov

*Counsel for Plaintiff District of Columbia*

DOUGLAS MOYLAN
Attorney General of Guam

Norman Lee Miller, Jr.
Office of the Attorney General of Guam
590 S. Marine Corps Drive, Suite 901
Tamuning, Guam 96913
Telephone: (671) 475-2710
E-Mail: nmillerjr@oagguam.org

*Counsel for Plaintiff Territory Guam*

ANNE E. LOPEZ
Attorney General of Hawaiʻi

Rodney I. Kimura
Department of the Attorney General, State of Hawaiʻi
425 Queen Street
Honolulu, HI 96813
Telephone (808) 586-1180
E-Mail: Rodney.i.kimura@hawaii.gov

*Counsel for Plaintiff State of Hawaiʻi*

RAÚL LABRADOR
Attorney General of Idaho

John K. Olson
Office of the Idaho Attorney General
Consumer Protection Division
954 W. Jefferson St., 2nd Floor
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 332-3549
E-Mail: John.olson@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

KWAME RAOUL
Attorney General of Illinois

Elizabeth Maxeiner
Brian Yost
Jennifer Coronel
Office of the Attorney General of Illinois
115 S. LaSalle St.
Chicago, IL 60603
Telephone: (773) 590-7935
E-Mail: Elizabeth.maxeiner@ilag.gov
Brian.yost@ilag.gov
Jennifer.coronel@ilag.gov

*Counsel for Plaintiff State of Illinois*

KRIS W. KOBACH
Attorney General of Kansas

Christopher Teters
Kansas Office of the Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612
Telephone: (785) 296-3751
E-Mail: chris.teters@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

AARON M. FREY
Attorney General of Maine

Christina M. Moylan
Office of the Attorney General of Maine
6 State House Station
August, ME 04333
Telephone: (207) 626-8800
E-Mail: Christina.moylan@maine.gov

*Counsel for Plaintiff State of Maine*

ANTHONY G. BROWN
Attorney General of Maryland

Schonette J. Walker
Melissa English
Office of the Attorney General of Maryland
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Telephone: (410) 576-6480
E-Mail: swalker@oag.state.md.us
menglish@oag.state.md.us

*Counsel for Plaintiff State of Maryland*

ANDREA CAMPBELL
Attorney General of Massachusetts

Jennifer E. Greaney
Office of the Attorney General of Massachusetts
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 963-2981
E-Mail: Jennifer, greaney@mass.gov

*Counsel for Plaintiff Commonwealth of Massachusetts*

KEITH ELLISON
Attorney General of Minnesota

Zach Biesanz
Senior Enforcement Counsel
Office of the Minnesota Attorney General
Antitrust Division
445 Minnesota Street, Suite 600
St. Paul, MN 55101
Telephone: (651) 757-1257
E-Mail: Zach.biesanz@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*

AARON D. FORD
Attorney General of Nevada

Michelle C. Badorine
Lucas J. Tucker
Nevada Office of the Attorney General
100 N. Carson Street
Carson City, NV 89701
Telephone: (775) 684-1164
E-Mail: mbadorine@ag.nv.gov
ltucker@ag.nv.gov

*Counsel for Plaintiff State of Nevada*

JOHN FORMELLA
Attorney General of New Hampshire

Brandon Garod
Office of Attorney General of New Hampshire
1 Granite Place South
Concord, NH 03301
Telephone: (603) 271-1217
E-Mail: Brandon.h.garod@doj.nh.gov

*Counsel for Plaintiff State of New Hampshire*

JENNIFER DAVENPORT
Acting Attorney General of New Jersey

Yale A. Leber
Abiola G. Miles
Deputy Attorneys General
New Jersey Attorney General's Office
25 Market Street, P.O. Box 106
Trenton, NJ 08625
Telephone: (609) 376-2383
E-Mail: Yale.Leber@law.njoag.gov
Abiola.Miles@law.njoag.gov

*Counsel for Plaintiff State of New Jersey*

RAÚL TORREZ
Attorney General of New Mexico

Judith E. Paquin Cholla Khoury
Assistant Attorney General
New Mexico Office of the Attorney General
408 Galisteo St.
Santa Fe, NM 87504

Telephone: (505) 490-4885
E-Mail: jpaquin@nmag.gov
ckhoury@nmag.gov

*Counsel for Plaintiff State of New Mexico*

DREW WRIGLEY
Attorney General of North Dakota

Elin S. Alm
Assistant Attorney General
Consumer Protection and Antitrust Division
Office of the Attorney General of North Dakota
1720 Burlington Drive, Suite C
Bismarck, ND 58504
Telephone: (701) 328-5570
E-Mail: ealm@nd.gov

*Counsel for Plaintiff State of North Dakota*

DAVID YOST
Attorney General of Ohio

Beth Ann Finnerty, Section Chief, Antitrust
Sarah Mader, Assistant Attorney General, Antitrust
Office of the Attorney General of Ohio
30 E Broad Street, 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
E-Mail: Beth.Finnerty@ohioago.gov
Sarah.Mader@ohioago.gov

*Counsel for Plaintiff State of Ohio*

GENTNER DRUMMOND
Attorney General of Oklahoma

Cameron R. Capps
Office of the Oklahoma Attorney General
313 NE 21st Street
Oklahoma City, OK 73105
Telephone: (405) 522-0858
E-Mail: Cameron.capps@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*

DAN RAYFIELD
Attorney General of Oregon

Gina Ko, Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (503) 934-4400
E-Mail: Gina.Ko@doj.oregon.gov

*Counsel for Plaintiff State of Oregon*

DAVID W. SUNDAY, JR.
Attorney General of Pennsylvania

Tracy W. Wertz
Joseph S. Betsko
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
Telephone: (717) 787-4530
E-Mail: jbetsko@attorneygeneral.gov
twertz@attorneygeneral.gov

*Counsel for Plaintiff Commonwealth of Pennsylvania*

LOURDES L. GÓMEZ TORRES
Secretary of Justice

TANIA L. FERNÁNDEZ-MEDERO
Assistant Secretary of Justice

SAMUEL WISCOVITCH-CORALI
Deputy Undersecretary

Pablo Tufiño-Soto
Senior Attorney
Antitrust Division
Puerto Rico Department of Justice
P.O. Box 9020192

San Juan, Puerto Rico 00902-0192
Telephone: (787) 721-2900, Ext. 1205
E-Mail: ptufino@justicia.pr.gov

*Counsel for Plaintiff Territory Puerto Rico*

PETER NERONHA
Attorney General of Rhode Island

Stephen Provazza
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
E-Mail: SProvazza@riag.ri.gov

*Counsel for Plaintiff State of Rhode Island*

MARTIN J. JACKLEY
Attorney General of South Dakota

Yvette K. Lafrentz
Office of the Attorney General of South Dakota
1302 E. Hwy 14, Suite 1
Pierre, SD 57501
Telephone: (605) 773-3215
E-Mail: Yvette.lafrentz@state.sd.us

*Counsel for Plaintiff State of South Dakota*

CHARITY R. CLARK
Attorney General of Vermont

Christopher J. Curtis, Assistant Attorney General
Office of the Attorney General of Vermont
109 State St.
Montpelier, VT 05609
Telephone: (802) 828-3170
E-Mail: christopher.curtis@vermont.gov
*Counsel for Plaintiff State of Vermont*

JAY JONES
Attorney General of Virginia

Tyler T. Henry
Senior Assistant Attorney General
Antitrust Unit
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, VA 23219
Telephone: (804) 692-0485
E-Mail: thenry@oag.state.va.us

*Counsel for Plaintiff State of Virginia*

NICHOLAS W. BROWN
Attorney General of Washington

Amy N.L. Hanson
Senior Managing Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-5419
E-Mail: Amy.hanson@atg.wa.gov

*Counsel for Plaintiff State of Washington*

JOHN B. McCUSKEY
Attorney General of West Virginia

Douglas Lee Davis
Office of the Attorney General, State of West Virginia
1900 Kanawha Boulevard East
Building 6, Suite 401
P.O. Box 1789
Charleston, WV 25305
Telephone: (304) 558-8986
E-Mail: Douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*

KEITH KAUTZ
Attorney General of Wyoming

William T. Young
Wyoming Attorney General's Office
2320 Capitol Avenue
Kendrick Building
Cheyenne, WY 82002
Telephone: (307) 777-7847
E-Mail: William.young@wyo.gov

*Counsel for Plaintiff State of Wyoming*

WILLIAMS & CONNOLLY LLP

By: */s/ John E. Schmidtlein*
John E. Schmidtlein (D.C. Bar No. 441261)
Benjamin M. Greenblum (D.C. Bar No. 979786)
Colette T. Connor (D.C. Bar No. 991533)
680 Maine Avenue, SW
Washington, DC 20024
Tel: 202-434-5000
jschmidtlein@wc.com
bgreenblum@wc.com
cconnor@wc.com

WILSON SONSINI GOODRICH & ROSATI P.C.
Michael Sommer (admitted *pro hac vice)*
Franklin M. Rubinstein (D.C. Bar No. 476674)
1700 K Street, NW
Washington, DC 20006
Tel: 202-973-880
msommer@wsgr.com
frubinstein@wsgr.com

ROPES & GRAY LLP
Mark S. Popofsky (D.C. Bar No. 454213)
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

Matthew McGinnis (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: 617-951-7703
Matthew.McGinnis@ropesgray.com

*Counsel for Defendant Google LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| United States of America, *et al.*,<br>Plaintiffs,<br>v.<br>Google LLC,<br>Defendant. | Case No. 1:20-cv-03010-APM<br>HON. AMIT P. MEHTA |
| State of Colorado, *et al.*,<br>Plaintiffs,<br>v.<br>Google LLC,<br>Defendant. | Case No. 1:20-cv-03715-APM<br>HON. AMIT P. MEHTA |

**PLAINTIFFS' FIRST STATUS REPORT ON**
**GOOGLE'S COMPLIANCE WITH THE FINAL JUDGMENT**

Pursuant to Section VII.E of the Final Judgment, ECF No. 1462, Plaintiffs in the above-captioned cases jointly file this Status Report.[1]

## I. INTRODUCTION

Section VII.E requires Plaintiffs, with input from the Technical Committee ("TC"), to file a status report within 90 days of the Effective Date of the Final Judgment to update the Court "as to the enforcement of and Google's compliance with this Final Judgment," with additional status reports due on future dates to be set by the Court.

[1] Unless otherwise stated, all references to "sections" herein are to sections of the Final Judgment.

**B. Qualified Competitors (Section IX.V)**

To benefit from the Court's data sharing and syndication remedies, an entity must become a Qualified Competitor under the Final Judgment.[5] To do that, the entity must: (1) meet Plaintiffs' approved data security standards, as recommended by the TC; (2) agree to regular data security and privacy audits by the TC; (3) make a sufficient showing to Plaintiffs, in consultation with the TC, of a plan to invest and compete in or with the general search engine and/or Search Text Ads markets; and (4) pose no risk to the national security of the United States. *See* Final J. § IX.V. Accordingly, a top priority is establishing the procedures for certifying Qualified Competitors. Such procedures will include, for example, determining the certification criteria, creating the application process, identifying the information that must be provided and how it will be evaluated, and developing processes for managing Qualified Competitor audits.

Even after Qualified Competitors are approved, the TC must still complete many other requirements before the Qualified Competitors can start receiving data and syndication services under the Final Judgment, as discussed herein.

Given the work remaining, Plaintiffs have agreed with the Court that Qualified Competitors would likely begin to receive access to data and syndication services by late fall 2026 or early winter 2027 at the earliest. *See* Hr'g Tr. (Apr. 8, 2026) 5:22–6:22, 7:11–19. Relatedly, potential Qualified Competitors have already expressed interest and made inquiries to Plaintiffs about the application process and timeline. Plaintiffs and the TC intend to provide further information on when and how to become a Qualified Competitor, as well as on when and how to submit complaints to the TC pursuant to Sections VII.A.7.e and VII.C.3, through a TC-

[5] The term "Qualified Competitor" is defined in Section IX.V.

administered website or other publicly available source once the remaining TC Members are appointed and the TC is fully operational.

### C. Data Sharing Remedies (Section IV)

Pursuant to Section IV.B, Google is required to make certain User-side Data available to Qualified Competitors.[6] To that end, Section IV.C.1 requires "Plaintiffs, in consultation with the TC, [to] promptly determine the appropriate User-side Data privacy and security safeguards to be applied before Google shares the data," after which point Google has six months to implement the safeguards. Final J. § IV.C.1. Under Section IV.C.3, within six months of the Effective Date of the Final Judgment (i.e., by August 3, 2026), Plaintiffs and the TC, with input from Google, are required to create and submit to the Court a template license governing the use of data shared pursuant to Section IV.

Plaintiffs have been working to effectuate the data sharing remedies. Since the Standing Committee Members became fully engaged on March 30, Plaintiffs have briefed them regarding these remedies and provided access to materials, so the members can familiarize themselves with the data required to be shared as well as the privacy and security safeguards considered at trial. Plaintiffs anticipate that the TC will seek additional information and data from Google to evaluate potential privacy and security safeguards after the remaining TC Members are appointed and a Protected Information Access and Security Plan is in place.

### D. Search Text Ads Auction Remedy (Section VI.A)

Under Section VI.A, "[w]ithin a reasonable period of time after the [TC]'s appointment, Plaintiffs [must] submit a proposal to the Court, informed by the [TC]'s views, by which Google [must] periodically provide the [TC] and Plaintiffs a report outlining all changes to its Search

[6] The term "User-side Data" is defined in Section IX.EE.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**GOOGLE LLC,**<br><br>**Defendant.** | ) | **Case No. 20-cv-3010 (APM)** |
| **STATE OF COLORADO et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**GOOGLE LLC,**<br><br>**Defendant.** | ) | **Case No. 20-cv-3715 (APM)** |

**ORDER**

**I.**

On December 5, 2025, this court entered the Final Judgment against Defendant Google LLC for unlawfully maintaining a monopoly in the general search services and general search text advertising markets. The Final Judgment (1) prohibits Google from entering into exclusive distribution agreements for its search and search-related products and (2) compels Google to share its search index data and user-side data and to syndicate its search results and search text ads to Qualified Competitors. It also establishes a Technical Committee to assist in Plaintiffs' enforcement efforts and sets a judgment period of six years, among other things.

Google filed a notice of appeal to the D.C. Circuit on January 16, 2026. *See* ECF No. 1472. Plaintiffs then filed notices of cross-appeal on February 3, 2026. *See* ECF Nos. 1484, 1485. The Final Judgment became effective on February 3, 2026.

Now, Google asks the court to partially stay the Final Judgment pending appeal—specifically, those provisions compelling the disclosure of search index and user data and the syndication of search results and search text ads. *See* Def.'s Mot. for a Partial Stay Pending Appeal, ECF No. 1471 [hereinafter Google's Mot.], Mem. of P. & A. in Supp. of Google's Mot., ECF No. 1471-1 [hereinafter Google's Mem.], at 1. Plaintiffs oppose the stay, but only for now, on the basis that compelled data-sharing and syndication are still months away and therefore cannot satisfy the demanding irreparable-harm standard. *See* Pls.' Mem. of P. & A. in Opp'n to Google's Mot., ECF No. 1478 [hereinafter Pls.' Opp'n], at 1–3.

The court agrees with Plaintiffs. Google's Motion for a Partial Stay Pending Appeal, ECF No. 1471, is therefore denied without prejudice.

**II.**

Under "long-standing principles governing stays pending appeal," the court considers four factors: "(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Marin Audubon Soc'y v. FAA*, 129 F.4th 869, 871 (D.C. Cir. 2025); *see Nken v. Holder*, 556 U.S. 418, 427 (2009). The test is "essentially the same" as that for a preliminary injunction. *Al-Anazi v. Bush*, 370 F. Supp. 2d 188, 193 n.5 (D.D.C. 2005) (citing cases); *see also Nken*, 556 U.S. at 434.

Staying a judgment pending its appeal is "extraordinary relief." *Citizens for Resp. & Ethics in Wash. v. FEC*, 904 F.3d 1014, 1017 (D.C. Cir. 2018). Because "[a] stay is an 'intrusion into the ordinary processes of administration and judicial review,'" *Nken*, 556 U.S. at 427, it "is not a matter of right," *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926). Rather, it is "an exercise of judicial discretion," and "[t]he propriety of its issue is dependent upon the circumstances of the particular case." *Nken*, 556 U.S. at 433 (quoting *Virginian Ry.*, 272 U.S. at 672–73). And while a stay pending appeal is "a means of ensuring that appellate courts can responsibly fulfill their role in the judicial process, . . . a reviewing court may not resolve a conflict between considered review and effective relief by reflexively holding a final order in abeyance pending review." *Id.* at 427. The traditional stay factors rather "contemplate individualized judgments in each case." *Hilton v. Braunskill*, 481 U.S. 770, 777 (1987).

**III.**

The court's decision today starts and ends with irreparable harm. A showing of irreparable harm is "a necessary prerequisite for a stay," and the failure to demonstrate such harm is "fatal" to the movant's request, *KalshiEX LLC v. CFTC*, 119 F.4th 58, 64 (D.C. Cir. 2024), "even if the other three factors entering the calculus merit such relief," *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The D.C. Circuit "has set a high standard for irreparable injury." *Id.* Specifically, the movant must establish that they will suffer harm that is "both certain and great, actual and not theoretical, . . . and of such imminence that there is a clear and present need for equitable relief to prevent" it. *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (emphasis omitted) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Relief "will not be granted against something merely feared as liable

to occur at some indefinite time." *Wis. Gas Co.*, 758 F.2d at 674 (quoting *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931)).

Since entry of the Final Judgment, the parties have been working to carry out those parts of the Final Judgment that require immediate action. They have identified and sought court approval for the three members of the Technical Committee's Standing Committee, and they have largely finalized the terms under which the Technical Committee members will operate. *See* Order, ECF No. 1474; Order, ECF No. 1497; Tr. of Status Conference, ECF No. 1495, at 5:18–6:14. The Standing Committee also has started to lay the groundwork for its operations. *See* Pls.' First Status Report on Google's Compliance with the Final J., ECF No. 1512 [hereinafter Pls.' SR], at 4–6. That progress is commendable. But as of the date of this order, the Technical Committee is not yet fully staffed—two members remain unappointed—and so the tasks of developing data-sharing and syndication license templates has not begun. *See* Order, ECF No. 1505; Order, ECF No. 1510. Nor have Qualified Competitors been comprehensively identified or the privacy safeguards as to the sharing of user data been discussed. *See* Tr. of Hr'g on Mot., ECF No. 1507 [hereinafter Hr'g Tr.], at 9:6-11. The parties also continue to work through operational and governing details, some of which have required the court's intervention. *See* Joint Status Report, ECF No. 1491 (Technical Committee's compensation); Joint Status Report, ECF No. 1511 (Google's access to confidential third-party information). All of this has in turn required status hearings and extensions of time, *see, e.g.*, Minute Order, Feb. 11, 2026; Minute Order, May 1, 2026; Order, ECF No. 1505; Order, ECF No. 1510. Plaintiffs estimate that Qualified Competitors may be able to concretely reap the benefits of the Final Judgment, most optimistically, by late fall or early winter of this year. Hr'g Tr. at 6:6–7:19.

Google argues that it will be irreparably harmed absent a partial stay, because the data-sharing and syndication provisions will result in the disclosure of confidential information. Google's Mem. at 26–30. From that, they argue, will flow further harms still, including to its right to appeal, competitive standing and reputation, and the way it does business, particularly as to competitors. *Id.* at 30–35.

As of today, neither the court nor the parties have any concrete point of reference for the harms the data-sharing and syndication provisions may precipitate. The Final Judgment broadly orders that certain search index and user-side data be disclosed and that search results and search text ads be syndicated on ordinary commercial terms. *See* Final J., ECF No. 1462, §§ IV.A–B, V, VI.B–C. But key details such as license terms, security and privacy safeguards, and who the Qualified Competitors will be are far from established. And discussions as to these details will not meaningfully begin until the Technical Committee is not only fully staffed but also internally organized, which will include hiring staff, assigning responsibilities, establishing procedures, and securing an annual budget. *See* Pls.' SR at 7–8; Final J. § VII.A.7. Further, Plaintiffs' rosy estimate of when these remedies will be available to Qualified Competitors likely depends on relatively conflict-free negotiations of licensing terms and certifying competitors, which is far from assured. The time at which any of the potential harms Google asserts will occur is therefore not imminent, *see Wis. Gas Co.*, 758 F.2d at 674, and what those harms will be are yet "speculative," *see Chaplaincy*, 454 F.3d at 298.

Google lodges many objections to this approach. First, it cites a string of examples in which courts have granted a stay even where the harm was to occur many months later. *See* Def.'s Reply in Supp. of Google's Mot., ECF No. 1493 [hereinafter Google's Reply], at 2–4. But those courts did so presumably because they had enough information to effectively weigh the stay

factors, even months before the purported harms were to take effect. Second, Google cautions that Plaintiffs' proposal would "create a procedural morass." *Id.* at 4. It describes the proposal as requiring Google to "file motions on the eve of implementation of each of the four remedies at issue," such that Google will be made to file multiple emergency motions with the D.C. Circuit if this court does not enter a stay. *Id.* To that concern, the court will require Plaintiffs to notify both the court and Google 45 days before the date on which a Qualified Competitor (as certified by Plaintiffs and the Technical Committee) may begin to access a data-sharing or syndication remedy, so that Google can seek a stay at that juncture. By that time, template license terms, procedures, safeguards, and other important details will presumably have been established as to both the data disclosure and syndication remedies. The court also thinks it unlikely that Google will have to seek relief before each remedy comes into effect. The outcome of the first such application may prove dispositive as to others.

Finally, Google contends that its harm is "neither 'speculative' nor 'unrealistic,'" because notwithstanding the nascent stage of their implementation, the remedies expressly and plainly require Google to disclose "its valuable assets and confidential data to competitors." *Id.* at 1–2. The fundamental harm caused by the data-sharing and syndication provisions is the disclosure of confidential information to a competitor, and neither more time nor further details would change that. *Id.* at 5–6. Once that information is disclosed, Google argues, "the cat is out of the bag" and "would irreparably harm Google under *any* circumstance." *Id.* (emphasis added).

But there is no rule in this circuit that *any* disclosure of information is an irreparable harm sufficient to warrant a stay. *See Univ. of Cal. Student Ass'n v. Carter*, 766 F. Supp. 3d 114, 121 (D.D.C. 2025) (explaining that, although "disclosure of information generally cannot be 'undone,' . . . that is not sufficient to show irreparable harm"). Nor is there a per se rule in the antitrust

context that the disclosure of information to competitors is an irreparable harm that warrants an automatic stay. There have certainly been instances where a court found irreparable harm because confidential information was to be disclosed to competitors. *See, e.g.*, *Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010). But "[w]hat [Google] overlooks is that the context of the dissemination matters." *See Carter*, 766 F. Supp. 3d at 121 (whether the harm of the disclosure of confidential information is irreparable depends in part on the recipient and circumstances of the disclosure (citing cases)). Evaluating whether the disclosure of confidential information would be an irreparable harm "requires looking at (1) the type of information disclosed and (2) the breadth of disclosure and the use of the information disclosed." *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Labor*, No. 25-cv-339, 2025 WL 1783899, at *11 (D.D.C. June 27, 2025). Whether there are safeguards protecting the information disclosed can also figure into this determination. *See id.* at *12 (citing cases). The court must therefore account for the contours of the disclosure to assess irreparable harm rather than merely rely on the fact of disclosure itself. *See, e.g.*, *Carter*, 766 F. Supp. 3d at 121; *Am. Fed'n of Lab.*, 2025 WL 1783899, at *11–12; *Ashland Oil, Inc. v. FTC*, 409 F. Supp. 297, 308–09 (D.D.C. 1976); *Kaplan v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 759 F.2d 256, 259–60 (2d Cir. 1985). Specifics as to the "context of the dissemination" in this case, such as the identities of the Qualified Competitors, the ways in which they plan to use the remedies, the security and privacy safeguards, the substance of the license terms, and even the extent to which Google participates in and objects to these decisions, will help inform the irreparable-harm inquiry.

The court thinks it is therefore prudent to let the preparatory work take its course for now. The "circumstances of [this] particular case" warrant seeing the details of these remedies through before deciding whether their execution should be stayed. *See Nken*, 556 U.S. at 433; *id.* at 427

(describing a stay as "an intrusion into the ordinary processes of administration and judicial review"). Plaintiffs also have indicated that they would be "open to talking about how to address this more comprehensively" with Google as the potential harms become more evident. Hr'g Tr. at 8:25–9:4; *see also* Pls.' Opp'n at 1 ("The Plaintiffs . . . offered to work with Google on ways to allow it to raise its stay arguments as to these remedies when they are ripe . . . ."). Giving any harm time to potentially materialize into something "actual and not theoretical, . . . and of such imminence" may bring to light information that could bear on discussions among the parties and the court's evaluation of the stay factors. *See Mexichem*, 787 F.3d 544 at 555. Though the court is loath to kick the proverbial can down the road, it is what the high bar of irreparable harm presently demands.

**IV.**

For the foregoing reasons, Google's Motion for a Partial Stay Pending Appeal, ECF No. 1471, is denied without prejudice. Plaintiffs shall notify Google and the court 45 days before the date on which any Qualified Competitor (as certified by Plaintiffs and the Technical Committee) may begin to access a data-sharing or syndication remedy so that Google can renew its request for a stay, if necessary.

Dated: May 7, 2026

Amit P. Mehta
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| United States of America, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Google LLC,<br><br>Defendant. | Case No. 1:20-cv-03010-APM<br><br>HON. AMIT P. MEHTA |
| State of Colorado, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Google LLC,<br><br>Defendant. | Case No. 1:20-cv-03715-APM<br><br>HON. AMIT P. MEHTA |

**ORDER GRANTING PLAINTIFFS' UNOPPOSED JOINT MOTION FOR ADDITIONAL TIME TO SUBMIT TEMPLATE LICENSE AGREEMENTS FOR SEARCH SYNDICATION AND SEARCH TEXT ADS SYNDICATION**

WHEREAS, on June 26, 2026, Plaintiffs in the above-captioned cases jointly filed an Unopposed Joint Motion for Additional Time to Submit Template License Agreements for Search Syndication and Search Text Ads Syndication;

it is hereby **ORDERED**:

(1) That Plaintiffs' Unopposed Joint Motion for Additional Time to Submit Template License Agreements for Search Syndication and Search Text Ads Syndication is **GRANTED**;

(2) That the Parties shall adopt all proposed terms set forth in Appendix A of Plaintiffs' Unopposed Joint Motion for Additional Time to Submit Template License Agreements for Search Syndication and Search Text Ads Syndication; and

(3) That the deadline for Plaintiffs to submit to the Court templates for a Search Syndication License and a Search Text Ads Syndication License is October 6, 2026.

Dated: June 26, 2026

Amit Mehta Digitally signed by Amit Mehta Date: 2026.06.26 18:06:41 -04'00'

Hon. Amit P. Mehta
United States District Court Judge

**MATERIAL UNDER SEAL DELETED**

**JA2046 - JA2133**

# Changing the Default in Apple's Safari Browser




Google
DXD-06.001

**MATERIAL UNDER SEAL DELETED**

**JA2135 - JA2249**

# Firefox's "This Time Search With" Feature – iOS




Google
RDXD-25.001

# Firefox's "This Time Search With" Feature – Desktop




Google
RDXD-25.002

**MATERIAL UNDER SEAL DELETED**

**JA2252 - JA2297**

# Seven Deadly Sins of Tech

Hal Varian
NYU
Sept 2019

The views in this presentation are those of the author and do not represent the views of his employer or any other party.

Ex. No.
UPX0334
1:20-cv-03010-APM

## The alleged seven deadly sins of tech

1. Concentration
2. Competition
3. Innovation
4. Acquisitions
5. Entry
6. Lock-in
7. Barriers to entry



Concentration

## Concentration

- Autor, et. al. (2017) describe two interpretations of concentration increase
  - "...super-star firms with higher productivity increasingly capture a larger slice of the market,"
  - "...arise from anticompetitive forces whereby dominant firms are able to prevent actual and potential rivals from entering and expanding."
- Their conclusion: industries that became more concentrated were those in which productivity increased the most
- Related findings by Ganapati [2017], Bessen [2017], OECD, and others.

# Competition

## Where's the competition in search? Follow the money.

- General purpose search is a tough business
  - Just ask AOL, Ask Jeeves, Yahoo, Inktomi, Excite, Lycos...
- You build a system to answer 100% of clicks but you only get paid for 6% of clicks.
  - Why? Only 6% of clicks are commercial clicks (ads)
  - Competition is intense for the for the commercial clicks: Amazon, eBay, Yelp, Travelocity, Expedia, Orbitz, Trip Advisor, and thousands of comparison and review sites
- They want users to navigate directly to them rather than come via an ad click

## Why is competition intense for commercial clicks?

- Companies advertise  to attract consumers and provide quality service so users go directly to them in the future.   [Amazon, Netflix, GroupOn] were all huge advertisers at one time..
  - And that brand building pays off...
  - Now 54% of shopping journeys in the US start on Amazon.
- Nowadays, some mobile users use apps rather than web search.
  - Yelp gets 35M monthly unique visitors via its mobile app.
- General purpose search engines model: if we provides great answers for [ancient history], people will (we hope) use Google to get  great answers to [buy frying pan].
  - Which is why we strive to provide good answers for all queries

## Competition

Tech firms compete intensely against each other. That's why prices are low, and innovation is high.

| Product | AMZN | AAPL | GOOG | FB | MSFT |
|---|---|---|---|---|---|
| advertising platforms | ✓ | | ✓ | ✓ | ✓ |
| artificial intelligence | ✓ | ✓ | ✓ | ✓ | ✓ |
| browsers | ✓ | ✓ | ✓ | | ✓ |
| cloud services | ✓ | | ✓ | | ✓ |
| digital assistants | ✓ | ✓ | ✓ | ✓ | ✓ |
| ebooks | ✓ | ✓ | ✓ | | |
| email and messaging | | ✓ | ✓ | ✓ | ✓ |
| games | ✓ | ✓ | ✓ | ✓ | ✓ |
| general purpose search engines | | | ✓ | | ✓ |
| home delivery services | ✓ | | ✓ | | |
| maps | | ✓ | ✓ | | ✓ |
| office tools | | ✓ | ✓ | | ✓ |
| operating systems | ✓ | ✓ | ✓ | | ✓ |
| smartphones | ✓ | ✓ | ✓ | | ✓ |
| social networks | | | ✓ | ✓ | |
| special purpose search engines | ✓ | ✓ | ✓ | ✓ | ✓ |
| streaming video | ✓ | | ✓ | ✓ | |
| video and music distribution | ✓ | ✓ | ✓ | | |
| video conferencing | | ✓ | ✓ | ✓ | ✓ |

**MATERIAL UNDER SEAL DELETED**

**JA2306 - JA2314**

# OC Deal Review

Agenda for June 22, 2009:

1. **Apple - Safari Desktop Search (Jeff Shardell)**
2. Celtic - Corp Dev (David Lawee)

Google

Ex. No.
UPX0605
1:20-cv-03010-APM

OC

June 22, 2009

J. Shardell

CONFIDENTIAL – FOR INTERNAL USE

## Partnership Overview – Apple




- Google is currently Safari browser's default search setting for Mac, Windows and devices
- 50% revenue share, after 10% costs
- Mac/Window deal expires on 7/31/2009
- Device deal expires 7/14/2010
- $490M gross revenue May 08-June 09 on desktop partnership
- Q1 2009 desktop gross revenue = $122M

CONFIDENTIAL – FOR INTERNAL USE

## Summary of Executed Deal Terms

| | |
|---|---|
| Term | Current desktop deal expires 7/31/09 |
| Product | Google Search |
| Pricing | • 50% revenue share, 10% operating costs for Safari default search |
| Exclusivity | • Google set as default search provider on Safari chrome for Mac and Windows |
| Guarantee to Partner | • None |
| Guarantees from Partner | • None |
| Termination/ Other Issues | • The mobile deal expires on July 14, 2010<br>• Mobile revenue share is 50%, after 10% costs |

CONFIDENTIAL – FOR INTERNAL USE

## Renewal summary – Google's offer

- 1 year desktop extension (through 7/31/2010)
- Reduction of desktop revenue share to 30% of net revenue, after 10% operating costs (from 50% / 10%)
  - A change from 45% of gross to 27% of gross

CONFIDENTIAL – FOR INTERNAL USE

## Renewal summary – Apple's counter

- 3 year extension (3 years for desktop and 2 years for devices)
- Existing revenue share unchanged (50% / 10% for both)
- **New Apple Ask:** The option but not the obligation to set Google as the default search provider. Under current terms they get no revenue if we aren't set as default
- **New Apple Ask**: Revenue share when Google is NOT set as the default (see chart below). No rev share under current deal

| | Hardware Pre-loaded | Software only |
|---|---|---|
| Google set as default | 50% after 10% costs | 40% after 10% costs |
| Google NOT set as default | 40% after 10% costs | 30% after 10% costs |

CONFIDENTIAL – FOR INTERNAL USE


Recommendations & Options
Options
●Agree to Apple's terms
○NOT recommended
●Maintain hardware deal "as is"
○50% after 10% costs
○NOT recommended
●Adjust existing deal with reduced revenue share terms
○35% - 40% after 10% costs
●Do not adjust the mobile deal until we get closer to deal expiration
○Recommended
●Are we prepared to walk?
Rationale
●The current desktop deal pays AAPL more than 100% of incremental revenue
○Lower revenue share is justified
●Apple's terms attempt to impose a tax on all Google.com revenue through Safari and their devices
Issues / Risks
●AAPL could decide to work with an alternate provider for the desktop / Safari search solution
CONFIDENTIAL – FOR INTERNAL USE

## Apple Safari – Financial Overview

**3rd Party Browsers – Financial Performance**

| | Revenue ($M) | | | Effective TAC % | |
|---|---|---|---|---|---|
| | 2007 | 2008 | 2008 Y/Y | 2008 | 2009 YTD |
| Mozilla Firefox | $869.0 | $1,412.5 | 63% | 5.4% | 5.4% |
| Apple Safari | $282.8 | $448.2 | 58% | 45.0% | 45.0% |
| Opera | $23.8 | $35.8 | 50% | 41.4% | 56.7% |
| Netscape | $6.1 | $1.3 | -78% | 51.7% | 37.0% |

- Apple Deal Terms
  - 50% Revenue Share after 10% deduction for operating cost across three platforms: Safari for Mac, Safari for Windows, and iPhone/iPod
- Desktop contract is up for renewal in July-09
- Top Countries by Revenue in 2009:
  - United States - 68%
  - United Kingdom – 11%
  - Germany – 4%
  - France – 3%
- Top Countries by Traffic
  - United States - 49%
  - United Kingdom – 8%
  - France – 6%
  - Canada – 5%

CONFIDENTIAL – FOR INTERNAL USE ONLY

## Apple Safari – Historical Desktop and Mobile performance

| | Apple Desktop Partnership ($M) | | | Apple Mobile Partnership ($M) | | |
|---|---|---|---|---|---|---|
| | Total Revenue | Payments | Net Revenue | Total Revenue | Payments | Net Revenue |
| Q308 | $114 | $51 | $62 | $3 | $1 | $2 |
| Q408 | $127 | $57 | $70 | $5 | $2 | $3 |
| Q109 | $122 | $55 | $67 | $8 | $4 | $5 |
| Q209E | $127 | $57 | $70 | $10 | $5 | $6 |
| Last 12 months | $490 | $221 | $270 | $26 | $12 | $14 |
| % of google.com | 3.6% | 29.2% | 2.2% | 14.4% | 19.2% | 13.5% |

- Revenue share terms are 50/10 (45% of gross) for both desktop and mobile
- Desktop estimated Payment/Incremental Revenue[1] > 100%

1 – Payment/Incremental revenue is a measure of the amount Google is paying in relation to an estimate of the new revenue it derives from a partnership; it is a function of search share where CUP data is available (US, UK, EMEA)

# OC Deal Review

Agenda for June 22, 2009:

1. Apple - Safari Desktop Search (Jeff Shardell)
2. **Celtic - Corp Dev (David Lawee)**

Google

**MATERIAL UNDER SEAL DELETED**

**JA2325 - JA2387**