ORAL ARGUMENT NOT YET SCHEDULED

**No. 26-5023**
**(Consolidated with Nos. 26-5047, 26-5049)**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

UNITED STATES OF AMERICA, *ET AL.*,
Plaintiffs-Appellees-Cross-Appellants,

v.

GOOGLE LLC,
Defendant-Appellant-Cross-Appellee.

---

On Appeals from the United States District Court
for the District of Columbia, Nos. 20-cv-3010 & 20-cv-3715
Hon. Amit P. Mehta

---

# APPELLANT'S FINAL COMBINED REPLY AND RESPONSE BRIEF

---

Benjamin J. Horwich
Justin P. Raphael
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000

John E. Schmidtlein
Graham W. Safty
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
(202) 434-5000

Donald B. Verrilli, Jr.
Ginger D. Anders
Daniel J. Kane
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW
Suite 500E
Washington, DC 20001
(202) 220-1100
Donald.Verrilli@mto.com

Mark S. Popofsky
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 508-4624

*Counsel for Appellant-Cross-Appellee Google LLC*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES, AND CORPORATE DISCLOSURE STATEMENT**

I certify that the combined certificate as to parties, rulings, and related cases, and corporate disclosure statement filed on February 23, 2026, Document #2160428, remains accurate, except for the following. Since that time, the following entities and individuals filed amicus briefs in this Court: Alden Abbott, Nikhil Agarwal, Brian C. Albrecht, Laura Alexander, Hunt Allcott, Rebecca Haw Allensworth, American Economic Liberties Project, Apple Inc., Dirk Auer, Ian Ayres, John Manuel Barrios, Christine P. Bartholomew, Elettra Bietti, Donald J. Boudreaux, Brave Software, Inc., Timothy F. Bresnahan, Darren Bush, Luis Cabral, Terry Calvani, Hon. Ronald A. Cass, Edward D. Cavanagh, Guiseppe Colangelo, Christopher T. Conlon, Alissa Cooper, Robert W. Crandall, Gregory Day, Mert Demirer, Stephen Dnes, Stacey Dogan, Javier D. Donna, Erika Douglas, Duck Duck Go, Inc., Florian Ederer, Richard E. Epstein, Chiara Farronato, Harry First, Amelia Fletcher, Eleanor M. Fox, Eric Fruits, Martin Gaynor, Matthew Gentzkow, David J. Gerber, Daniel J. Gilman, David Gindis, Mark Glick, Nikolas Guggenberger, Hiba Hafiz, Jonathan F. Harris, George A. Hay, Paul Heidhues, M. Todd Henderson, Kenneth Hendricks, Jean-Francois Houde, Justin (Gus) Hurwitz, Keith N. Hylton, Gaston Illanes, James R. Kearl, Yunsieg P. Kim, Gene Kimmelman, John B. Kirkwood, Benjamin Klein, William Kolasky, Mordecai Kurz, John Kwoka, Thomas A. Lambert, Filippo Lancieri, Robert H. Lande,

Richard N. Langlois, Christopher Leslie, Abbott (Tad) B. Lipsky Jr., Little Tech Association, Daniel A. Lyons, Geoffrey A. Manne, Scott E. Masten, Microsoft Corporation, Andrew P. Morriss, Fiona Scott Morton, Motorola Mobility LLC, Mozilla Corporation, Murat C. Mungan, Aviv Nevo, John M. Newman, Roger Noll, Open Markets Institute, OpenAI, Laura Phillips-Sawyer, Public Knowledge, Bilal Sayyed, Robert H. Porter, Asad Ramzanali, Marc Remer, Barak D. Richman, Nancy L. Rose, Steven C. Salop, Tobias Salz, Samsung Electronics Co., Ltd., Monika Schnitzer, SerpApi, LLC, Joe Sims, Theodosia Stavroulaki, Abbey Stemler, Maurice Stucke, Jennifer E. Sturiale, Zephyr Teachout, David J. Teece, Joel Thayer, Travel Lemming LLC, Alexander "Sasha" Volokh, Spencer Weber Waller, Washington Legal Foundation, Samuel N. Weinstein, Gregory J. Werden, Stephen Westermann, Lawrence J. White, Ralph Winter, and Luigi Zingales.

Dated: October 23, 2026

*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES, AND CORPORATE DISCLOSURE STATEMENT ....................................i

GLOSSARY OF ABBREVIATIONS ..........................................................ix

REPLY BRIEF ........................................................................................1

INTRODUCTION ....................................................................................1

ARGUMENT ...........................................................................................4

I. The District Court's Liability Determination Reflects Multiple, Independent Errors of Law ........................................................................4

A. Google Engaged in No Conduct that Violated Section 2......................4

1. The District Court Erred in Holding that Google Engaged in Exclusionary Conduct...........................................................4

2. The Browser Agreements Were Not Exclusive Deals in the First Place.........................................................................29

3. Accepting Any of Google's Arguments About the Browser Agreements Ends the Case........................................35

B. The District Court Erred in Concluding that Google Has Monopoly Power ......................................................................37

II. The District Court Abused Its Remedial Discretion by Applying the Wrong Legal Standards ..........................................................................40

A. The District Court Did Not—and Could Not—Make the Findings Legally Necessary to Impose Data-Transfer and Syndication ..........................................................................40

B. The District Court Separately Erred by Extending the Data-Transfer and Syndication Remedies to Companies Offering GenAI Products ......................................................................46

**TABLE OF CONTENTS**
**(continued)**


**Page**

CROSS-APPEAL RESPONSE ........ 49

INTRODUCTION ........ 49

STATEMENT OF THE CASE ........ 50

I. Proceedings ........ 50

II. The District Court's Remedies Decision ........ 53

STANDARD OF REVIEW ........ 59

SUMMARY OF ARGUMENT ........ 60

ARGUMENT ........ 63

I. The District Court Exercised Sound Discretion in Rejecting a Payment Ban Upon Determining that It Was Not Necessary to Restore Competition ........ 65

A. The District Court Found that Its Remedies Would Be Effective ........ 65

B. The District Court Correctly Rejected a Payment Ban Upon Finding that It Would Likely Harm Competition and Consumers ........ 73

1. The District Court Found that a Payment Ban Would Reduce Competition and Consumer Welfare ........ 73

2. Plaintiffs' Arguments for Ignoring the District Court's Findings Lack Merit ........ 78

II. Plaintiffs Identify No Other Sound Basis for the Payment Ban ........ 87

A. The Payment Ban Is Not Necessary to Terminate Google's Supposedly Unlawful Conduct ........ 88

B. The Payment Ban Is Not Necessary to Deprive Google of Any Fruits of Its Supposed Violation ........ 89

III. Even if the Court Agrees with Plaintiffs, Plaintiffs Are Entitled to No More than a Remand for Further Consideration of a Payment Ban ........ 92

CONCLUSION ........ 94

CERTIFICATE OF COMPLIANCE ........ 95

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3D Global Solutions, Inc.* v. *MVM, Inc.*, 754 F.3d 1053 (D.C. Cir. 2014) .............79

*Aerotec International, Inc.* v. *Honeywell International, Inc.*, 836 F.3d 1171 (9th Cir. 2016) .............31, 33

*American Dental Association* v. *Shalala*, 3 F.3d 445 (D.C. Cir. 1993) .............53

* *Barry Wright Corp.* v. *ITT Grinnell Corp.*, 724 F.2d 227 (1st Cir. 1983) .............6, 27

*Board of Trade of City of Chicago* v. *United States*, 246 U.S. 231 (1918).............6

*Brown* v. *Plata*, 563 U.S. 493 (2011) .............59

*Conwood Co., L.P.* v. *United States Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002) .............22

*Eastman Kodak Co.* v. *Image Technical Services, Inc.*, 504 U.S. 451 (1992) .............39

* *Eisai, Inc.* v. *Sanofi Aventis U.S., LLC*, 821 F.3d 394 (3d Cir. 2016).............31

* *In re EpiPen Antitrust Litigation*, 44 F.4th 959 (10th Cir. 2022).............6, 18, 19, 20

*Ford Motor Co.* v. *United States*, 405 U.S. 562 (1972) .............59

*Federal Trade Commission* v. *Actavis, Inc.*, 570 U.S. 136 (2013).............27, 28

*Federal Trade Commission* v. *Motion Picture Advertising Service Co.*, 344 U.S. 392 (1953).............21

*Federal Trade Commission* v. *Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020) .............24

*Geneva Pharmaceuticals Technology Corp.* v. *Barr Laboratories Inc.*, 386 F.3d 485 (2d Cir. 2004) .............37

*Ginsburg* v. *InBev NV/SA*, 623 F.3d 1229 (8th Cir. 2010) .............79

* *Authorities upon which we chiefly rely are marked with asterisks.*

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Indeck Energy Services, Inc.* v. *Consumers Energy Co.*,
250 F.3d 972 (6th Cir. 2000) ....................6

*Keepseagle* v. *Perdue*, 856 F.3d 1039 (D.C. Cir. 2017) ....................73

*Malheur Forest Fairness Coalition* v. *Iron Triangle, LLC*,
164 F.4th 710 (9th Cir. 2026) ....................19

* *Massachusetts* v. *Microsoft Corp.*,
373 F.3d 1199 (D.C. Cir. 2004) .................... 41, 42, 46, 48, 51, 59, 62, 65, 66, 70, 72, 73, 79, 80-82, 87, 91

*Matsushita Electric Industrial Co.* v. *Zenith Radio Corp.*,
475 U.S. 574 (1986) ....................24

* *McWane* v. *Federal Trade Commission*, 783 F.3d 814 (11th Cir. 2015) ....................20, 21

*Menasha Corp.* v. *News America Marketing In-Store, Inc.*,
354 F.3d 661 (7th Cir. 2004) ....................19, 20

*National Collegiate Athletic Association* v. *Alston*,
594 U.S. 69 (2021) ....................24, 49, 58, 78

*National Collegiate Athletic Association* v. *Board of Regents of University of Oklahoma*, 468 U.S. 85 (1984) ....................87

* *NicSand, Inc.* v. *3M Co.*, 507 F.3d 442 (6th Cir. 2007) ....................18

*Novell, Inc.* v. *Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) ....................23

*NYNEX Corp.* v. *Discon, Inc.*, 525 U.S. 128 (1998) ....................7

*Ohio* v. *American Express Co.*, 585 U.S. 529 (2018) ....................39

*Pacific Bell Telephone Co.* v. *linkLine Communications, Inc.*,
555 U.S. 438 (2009) ....................23, 33, 34

*Paddock Publications, Inc. v. Chicago Tribune Co.*,
103 F.3d 42 (7th Cir. 1996) ....................21

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

* *PhantomALERT Inc.* v. *Apple Inc.*, 183 F.4th 790 (D.C. Cir. 2026)....................6, 38

*Race Tires America, Inc.* v. *Hoosier Racing Tire Corp.*,
614 F.3d 57 (3d Cir. 2010) ....................................................................19

* *Rambus Inc. v. Federal Trade Commission*,
522 F.3d 456 (D.C. Cir. 2008)..........................................................16, 17

*Reiter* v. *Sonotone Corp.*, 442 U.S. 330 (1979).............................................86

*Rothery Storage & Van Co.* v. *Atlas Van Lines, Inc.*,
792 F.2d 210 (D.C. Cir. 1986)..................................................................64

*Smith* v. *District of Columbia*,
2022 WL 758070 (D.C. Cir. Mar. 4, 2022) ................................................70

*Spectrum Sports, Inc.* v. *McQuillan*, 506 U.S. 447 (1993)........................................7

*Tampa Electric Co.* v. *Nashville Coal Co.*, 365 U.S. 320 (1961) ...........................30

*United Shoe Machinery Corp.* v. *United States*, 258 U.S. 451 (1922)....................31

*United States* v. *Aluminum Company of America*,
148 F.2d 416 (2d Cir. 1945) ....................................................................19

*United States* v. *American Tobacco Co.*, 221 U.S. 106 (1911).........................79, 82

*United States* v. *Askew*, 529 F.3d 1119 (D.C. Cir. 2008) .......................................70

* *United States* v. *Dentsply International, Inc.*,
399 F.3d 181 (3d Cir. 2005) ....................................................................20

*United States* v. *E. I. du Pont de Nemours & Co.*,
366 U.S. 316 (1961)...................................................................65, 69, 79, 82, 84

*United States* v. *Microsoft Corp.*
* 84 F. Supp. 2d 9 (D.D.C. 1999)..........................................................14, 15, 27
* 253 F.3d 34 (D.C. Cir. 2001)....................................2, 6-7, 12-14, 16, 17, 22, 32,
33, 38, 40, 41, 43, 45, 47, 48
50, 59, 60 64, 73, 83, 89, 91

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**


*United States* v. *Philip Morris USA Inc.*,
801 F.3d 250 (D.C. Cir. 2015)........................................................................73

*United States* v. *Topco Associates*, 405 U.S. 596 (1972) ........................................83

*Verizon Commcations Inc.* v. *Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004).......................................................................................2, 6, 36

*Weyerhaeuser Co.* v. *Ross-Simmons Hardwood Lumber Co.*,
549 U.S. 312 (2007)...............................................................................................7

* *ZF Meritor, LLC* v. *Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) ........................21, 30


**RULE**


Fed. R. Civ. P. 30(b)(6)...........................................................................................12


**OTHER AUTHORITIES**


Hunt Allcott et al., *Sources of Market Power in Web Search: Evidence from a Field Experiment* (Nat'l Bureau of Econ. Rsch., Working Paper No. 33410, 2025), https://www.nber.org/system/files/working_papers/w33410/w33410.pdf ........................................................74, 75

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (updated May 2026) ..........................................................................................................29

## GLOSSARY OF ABBREVIATIONS

The following abbreviated terms are used in this brief:

| | |
|---|---|
| GenAI | Generative Artificial Intelligence |
| GSE | General Search Engine |
| ISV | Independent Software Vendor |
| OEM | Original Equipment Manufacturer |
| SVP | Specialized Vertical Provider |

## REPLY BRIEF

## INTRODUCTION

Antitrust law protects the competitive process because competition pressures firms to satisfy consumer demand for the best quality and price. When a firm offers what consumers prefer, its rivals inevitably lose, but consumers win because they get what they want. For that reason, competition on the merits never violates the antitrust laws. That bedrock principle disposes of this case. Apple and Mozilla chose Google as the default general search engine ("GSE") for all access points because Apple and Mozilla sought to give consumers what they wanted: the best GSE. And Google was in a position to offer the best GSE because it had outpaced its rivals through leading technology, better monetization, top engineering talent, and superior business foresight (as the district court found) years before Plaintiffs claim that Google engaged in any unlawful conduct.

Unable to dispute that fundamental point, Plaintiffs deny that it matters. As Plaintiffs would have it, even though Apple and Mozilla concluded that their consumers would prefer Google as the default on all devices and browsing modes, the antitrust laws prohibited that arrangement because it would disadvantage Google's rivals. That profoundly mistaken view would erase the distinction between lawful competition and unlawful exclusion. Indeed, Plaintiffs do not even try to explain what Google could have done to comply with the law as they see it.

Plaintiffs cite no case holding a monopolist liable under Section 2 for exclusive dealing when distributors independently decide that dealing with one firm will make their consumers better off. *Microsoft* is certainly not that case. Indeed, this Court *reversed* Section 2 liability for Microsoft offering an "attractive deal," which is the "hallmark of competition" and exactly what Google did here. *United States* v. *Microsoft Corp.*, 253 F.3d 34, 68 (D.C. Cir. 2001) (en banc). This Court affirmed Section 2 liability only for exclusive agreements that Microsoft extracted by threatening and bribing companies that preferred to distribute Netscape. Google did no such thing; all evidence is that the challenged browser agreements *reflected*—not *dictated*—Apple's and Mozilla's preferences.

Telegraphing the weakness of their primary trial theory, Plaintiffs now pivot to an alternative—that Google paid Apple not to compete in search. But that backup theory is far afield from the exclusive dealing theory that Plaintiffs pursued at trial and has no basis in the record. Plaintiffs' last-minute shift vividly confirms that their case has always been a result in search of a theory—a demand that Google be cut down to size so that its rivals might fare better. Indulging such abuse of the antitrust laws to "eliminate" Google's advantages rather than "prevent unlawful monopolization" "would be a serious mistake" *Verizon Commc'ns Inc.* v. *Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 (2004) (citation modified).

The district court's remedial order confirms the grave consequences of misusing antitrust law for central planning. Plaintiffs do not explain why—absent Google's supposedly unlawful conduct—Apple or Mozilla would have chosen an inferior GSE for any default position, nor why Google's rivals would have won additional queries. Plaintiffs just complain that it is too difficult to separate the effects of Google's supposedly unlawful conduct from the lawful success of its superior product and business acumen. But that is a beef with this Court's precedent, which requires calibrating the aggressive remedies ordered here to proof that the monopolist's *unlawful* conduct caused it to maintain its market share.

There was no such proof here. If Apple or Mozilla wanted a different GSE for any default, they would have said so in the courtroom and their internal documents. But there is no evidence—none—that Apple or Mozilla would have made different choices for any access point had they not entered into the agreements here. Thus, forcing Google to aid rivals would not right a wrong; it would unfairly punish Google and distort the marketplace. Nowhere is that overreach more evident than in the order requiring Google to hand over its innovations and investments to GenAI firms not building a GSE, whose products could not have been affected by anything Google did.

The judgment should be reversed.

# ARGUMENT

## I. The District Court's Liability Determination Reflects Multiple, Independent Errors of Law

### A. Google Engaged in No Conduct that Violated Section 2

#### 1. The District Court Erred in Holding that Google Engaged in Exclusionary Conduct

**a. The parties' central disagreement is over where this Court should focus in determining whether Google's conduct violated Section 2.** Google contends that the inquiry must focus on how the browser agreements came to be—the competition among Google and its rivals to be chosen for the default GSE position that Apple and Mozilla designed into their browsers. Apple and Mozilla designed their products with a single GSE for browser defaults across all their browsers to best serve their customers. *See, e.g.*, JA0610-0611 (Cue) ("[B]uilding the Safari browser to have a single default search engine out-of-the-box" was a "product design decision that Apple carefully considered"); *infra*, pp. 8-9. They chose Google because they "value its quality, and they continue to select Google as the default because its search engine provides the best bet for monetizing queries." JA1027*. Commercial success won by offering the best product at the best price is exactly what the antitrust laws exist to foster.

Plaintiffs, in contrast, track the district court in focusing on *what happened after* Apple and Mozilla chose Google rather than on the *reasons* they chose

Google. As Plaintiffs see it, the legally dispositive fact is that Google's placement by Apple and Mozilla as the sole default GSE made consumers likely to use Google Search, not a rival GSE, for the search queries through those access points. DOJ.Br.78 (browser agreements "denied rivals" both "distribution" and "scale"). That is what they characterize as the unlawful "anticompetitive effect"—*i.e.*, an effect produced by something other than competition on the merits. JA1054*. As the court put it, Google supposedly employed "means other than competition on the merits" because its agreements reduced "consumer use of rival GSEs" and thus "significantly contributed to Google's ability to maintain its highly durable monopoly." JA1030*.

Plaintiffs' principal defense of the district court's liability ruling therefore comes down to the proposition that because (in their erroneous view) Google has monopoly power, the antitrust laws categorically forbid Google from entering into promotion and distribution contracts that are reasonably capable of maintaining its market share—even if Apple and Mozilla *wanted* those contracts to best serve their customers.

Google's understanding of the law is correct, and Plaintiffs' is deeply misguided (regardless of whether the Apple and Mozilla agreements are classified as "exclusive," *but see* Google.Br.66-71; *infra*, pp. 29-35). That conclusion follows from fundamental antitrust principles. *First*, and most importantly, "[a]

firm whose product or service dominates a market because it offers better value than any potential substitute product or service does not monopolize unlawfully." *PhantomALERT Inc.* v. *Apple Inc.*, 183 F.4th 790, 796 (D.C. Cir. 2026).

*Second*, for more than a century, "the history of the restraint" has been among the "relevant facts" for assessing a Sherman Act violation, *Bd. of Trade of City of Chicago* v. *United States*, 246 U.S. 231, 238 (1918), and "[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue," *Trinko*, 540 U.S. at 411.

*Third*, "any selection of a competitor in the marketplace will cause some economic harm to the entities not chosen." *Indeck Energy Servs., Inc.* v. *Consumers Energy Co.*, 250 F.3d 972, 978 (6th Cir. 2000); *see Barry Wright Corp.* v. *ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir. 1983) (Breyer, J.). But that selection alone cannot prove a Section 2 violation because "harm to one or more *competitors* will not suffice" to prove exclusionary conduct. *Microsoft*, 253 F.3d at 58.

And *fourth*, harm to competition cannot be inferred from the bare existence of exclusive deals, because they "pose very little threat to competition even when utilized by a monopolist." *In re EpiPen Antitrust Litigation*, 44 F.4th 959, 983 (10th Cir. 2022). To establish exclusionary conduct, a good deal more is required. The "more" could include the monopolist coercing a distributor into exclusivity,

bribing a customer to cut off rivals, or thrusting an all-or-none ultimatum on its counterparty. *See infra*, pp. 13-16 (discussing such aspects of *Microsoft*); pp. 17-21 (discussing such aspects in other Circuits' cases). Certainly, no list can be exhaustive.[1] But liability must hinge on the monopolist doing *something* to "extract[]," *Microsoft*, 253 F.3d at 74, a commitment that goes against its counterparty's preference for a rival. *Cf. NYNEX Corp.* v. *Discon, Inc.*, 525 U.S. 128, 137 (1998) ("[F]reedom to switch suppliers lies close to the heart of the competitive process that the antitrust laws seek to encourage.").

Those principles make clear that a competitor—even a monopolist—that wins on the merits by offering the best product at the best price cannot be subject to antitrust liability merely because the resulting agreement harms rivals that lost the competition. Google's browser agreements can be condemned as exclusionary only if they "harm the competitive *process* and thereby harm consumers." *Microsoft*, 253 F.3d at 58; *see Spectrum Sports, Inc.* v. *McQuillan*, 506 U.S. 447, 458 (1993) (Sherman Act does not "protect businesses from the working of the market").

---

[1] A *predatory*—*i.e.*, unprofitable—payment also can violate Section 2 even though it temporarily benefits consumers. *See Weyerhaeuser Co.* v. *Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 324-35 (2007). That caveat has no application here: Google's agreements were profitable. *See* Google.Br.36 n.5. This undisputed fact renders inapt amici's theorizing that it was exclusionary for Google to "outbid," Econ.and.Bus.Profs.Amicus.Br.6, or "outspend rivals," Antitrust.Law.Econ.and.Bus.Profs.Br.12.

Competition on the merits is precisely what the district court's findings establish here. Apple and Mozilla offered GSEs the opportunity to win the default placement across access points. *See infra*, pp. 8-11. Google won that competition because it offered the best product at the best price, not because it extracted a promise from browser-makers to give up a product they and their consumers liked better. *See infra*, pp. 24-27 (addressing Plaintiffs' misconceived claims of Google's "insistence"). Rivals doubtless confronted difficulty in gaining share when Google was the default. But that outcome was a *competitive* effect, not an *anticompetitive* effect—the consequence of Google winning the competition that mattered. To condemn Google's success because rivals suffered is to confuse harm to competitors with harm to competition—a cardinal antitrust sin.

**b. The trial evidence conclusively showed that the genesis of the browser agreements was Apple's and Mozilla's choices and Google's competition on the merits.** Consider every material element of the contracts:

***Single-default design.*** The record is unequivocal that Apple and Mozilla *chose* to design their browsers to have a *single* out-of-the-box default GSE because they believed that design would best serve their customers. That choice was good business, not something that Google extracted. As the district court found, there is a "longstanding industry practice of preloading a browser with" a single default GSE. JA1076*. "Indeed, all browsers in the United States are so designed,"

JA1076-1077*, including those that do *not* use Google (such as Microsoft's Edge). As Apple executive Eddy Cue testified, "building the Safari browser to have a single default search engine out-of-the-box" was a "product design decision that Apple carefully considered." JA0610-0611 (Cue). Apple did so to "provide the best experience across all of our devices" rather than (for example) "an inferior experience on a Mac versus a phone." JA0572-0575 (Cue).

***Choosing Google to be the default.*** Apple and Mozilla chose Google because Google made the best offer and delivered the best customer experience—full stop. The district court found that "Google's partners value its quality, and they continue to select Google as the default *because* its search engine provides the best bet for monetizing queries." JA1027* (emphasis added). Mozilla came to this conclusion twice: when it initially set Google as a default, and a second time after it switched universally to Yahoo!, saw how its customers responded, and then switched back to Google. *See* Google.Br.17.

Apple described selecting Google as a "no brainer" because it was "a sure thing. They have the best search engine, they know how to advertise, and they're monetizing really well." JA0941* (quoting JA0595/Liab.Tr.2528 (Cue)). As Apple's executive stated, "we make Google be the default search engine because we've always thought it was the best engine." JA0572-0573 (Cue); *see* JA2055 (Cue 30(b)(6)). And as the district court found, "Google is widely recognized as

the best GSE available in the United States," JA0874*, and "Apple benefits and sells more iPhones by having their brand associated with the quality...[of] Google Search," JA0876* (citation omitted). By contrast, "Bing's inferior quality" made choosing Microsoft a "business risk." JA0941* (quoting JA0586 (Cue)).[2]

Plaintiffs do not dispute that it is lawful for a monopolist to compete using lawfully-won scale advantages (Google.Br.47-49), but that is what Plaintiffs are complaining about here. Google had made itself the best and most popular GSE long before the challenged agreements, Google.Br.8-9, and that—not exclusionary conduct—is why Apple and Mozilla chose Google. Because Google initially won the default by offering the best product, Google earned any revenue or scale generated by default placement fair and square by outcompeting its rivals. And deploying those advantages to continue to improve its GSE was just more competition on the merits, not an "exclusionary cycle." *Contra* DOJ.Br.4.

***Revenue sharing.*** Meeting consumer demand for the best GSE would generate enormous value and profits for those involved. When business

---

[2] Plaintiffs do not assert that any browser-maker wanted DuckDuckGo or Neeva as the out-of-the-box default. Plaintiffs say that "DuckDuckGo discussed with developers being the default in privacy mode." DOJ.Br.88. But what matters is that "Apple executives never genuinely considered using [DuckDuckGo] as the default in Safari's private browsing mode." JA0943*. And Neeva did not even seek default placement—doubtless because Apple did not want to give its consumers a search engine they would need to pay to use. *See* JA0858-0859*.

collaborators jointly create value, antitrust law does not dictate how much each firm should keep. Here, the revenue-sharing agreements between Google and browser-makers reflected that both parties' contributions created value—Google by providing Search and browser-makers through promotion. Apple, for example, had ample bargaining power to demand payment because of its "sizeable and valuable user base, for which Apple controls distribution." JA0929* (citation omitted). Apple "felt like 50/50 seemed like the right and the fair [split]." JA2050 (Cue 30(b)(6)). Google's superior product and monetization gave it some ability to push back, *see* JA2047-2048 (Cue 30(b)(6)), but Google could not avoid Apple's demand for payment altogether, and Apple's executives were shrewd enough not to tell Google that Apple might well send traffic to Google for free.

***Duration.*** Firms normally enter written contracts that reflect their preferred exchange of value and give themselves predictability. As just explained, Google and Apple both wanted the deal they entered, but it was Apple—not Google—that wanted a long-term contract. Apple "wanted a 10-year deal," which "Google pushed back on," seeking a shorter agreement. JA0600-0601 (Cue). Google compromised, yet still acceded to Apple's demand for "the right to extend the deal to a longer term, if they choose to do so." JA0756 (Pichai); *see* JA0929-0930*;

JA2059 (email from Cue to Pichai of Google: "If we are going to get this done, your side has to give on the 5 to 7 [years] just as I have given from 10 to 7").[3]

Thus, if the analysis of the browser agreements focuses where it should—on their origins—Google could not possibly be found to have engaged in exclusionary conduct. Apple and Mozilla chose Google for the single defaults they designed because they found Google to be the most competitively attractive option.

The district court erroneously brushed all that aside. It never undertook the inquiry that Section 2 requires into the browser agreements' origins, and therefore had no basis to conclude that the effects of default placement on Google's rivals were anticompetitive, rather than a competitive outcome of Apple's and Mozilla's preferences for Google's superior product. *See Microsoft*, 253 F.3d at 58-59. The court's mistake doubtless traces to its misidentification of the "key question" as whether the browser agreements "reasonably appear capable of significantly contributing to maintaining Google's monopoly"—collapsing the analytically

---

[3] That overwhelming evidence about Apple—*all of it*—was ratified by Apple's sworn Rule 30(b)(6) testimony from an Apple witness testifying to Apple's official position. Given that record, it is baffling for counsel to suggest in Apple's amicus that Apple thinks consumers may be better served by the "flexibility" provided by the district court's remedial order. *See* Apple.Amicus.Br.8. Perhaps, because of the rapid emergence of GenAI services, Apple has recalibrated its business interests. Or perhaps Apple seeks to curry favor with regulators. Whatever the explanation, this case must be decided on the trial record and the findings below—not Apple's post hoc machinations.

distinct exclusionary-conduct and causation inquiries. *See* Google.Br.38-42. Plaintiffs make no real effort to defend that reasoning, which focuses entirely on how default placement advantaged Google rather than how Google competed for that advantage in the first place. And plaintiffs offer no alternative justification for the court's obviously incorrect assumption that the only legally relevant question was the extent to which Google being the default disadvantaged Google's rivals. That error simply cannot be explained away, and it requires reversal.

**c. A faithful application of *Microsoft* requires judgment for Google.**

Unlike the district court here, the *Microsoft* court focused on the competitive process, not the outcomes of that process. This Court was emphatic that "offering a customer an attractive deal" is "the hallmark of competition." 253 F.3d at 68. And the Court reversed the district court's liability findings to the extent they were based on Microsoft "offering its product at an attractive price" and "developing an attractive product." *Id*.

Ignoring all that, Plaintiffs insist that *Microsoft* held that exclusive dealing arrangements Microsoft had with distributors were unlawful based on the bare fact that those deals foreclosed Microsoft's competitors from a substantial percentage of the market. *See* DOJ.Br.68-70, 76-79. But Plaintiffs divorce statements in *Microsoft* from the context that gives them meaning. The liability determinations were all predicated on express findings that Microsoft abused its monopoly power

by "extracting," 253 F.3d at 74, commitments from distributors to make Internet Explorer the dominant browser even though distributors wanted to offer Netscape's Navigator browser because their consumers preferred it.

This Court emphasized throughout its opinion that Microsoft had used its power to "impose[]" "restrictions" on distributors that prevented them from offering services and products they preferred to offer. 253 F.3d at 60; *id*. at 62. For example, the *Microsoft* district court found that Microsoft "threatened to cancel" Mac Office, which was key to "Apple's survival," unless "Apple compromised" on reducing distribution of Navigator. *United States* v. *Microsoft Corp.*, 84 F. Supp. 2d 9, 95 (D.D.C. 1999). "Apple increased its distribution and promotion of Internet Explorer not because of a conviction that the quality of Microsoft's product was superior to Navigator's, or that consumer demand for it was greater, but rather because of the in terrorem effect of the prospect of the loss of Mac Office." *Id.* at 97.

Microsoft similarly "impose[d]" restrictions," 253 F.3d at 62, that, as the district court found, "forced" computer "OEMs either to ignore consumer preferences for Navigator or to give them a Hobson's choice of both browser products at the cost of increased confusion, degraded system performance, and restricted memory," 84 F. Supp. 2d at 111. "Gateway, Hewlett-Packard, and IBM communicated their opposition forcefully and urged Microsoft to lift the

restrictions." *Id.* at 61. But "[e]ven in the face of such strident opposition from its OEM customers, Microsoft refused to relent." *Id.*

"AOL executives" likewise "saw Navigator as enjoying better brand recognition and demonstrated success," *id.* at 79, so they "would have preferred to make an AOL-configured version of Navigator readily available," *id.* at 82. But Microsoft's CEO wanted "to be sure that we don't allow [AOL] to promote Netscape," so Microsoft conditioned favorable treatment to AOL on AOL's agreement to "exclusively promote" Internet Explorer. *Id.* at 79, 81. AOL gave up "its natural inclination to respond to consumer demand in order to obtain" benefits from Microsoft. *Id.* at 82. Microsoft achieved that "coup" at "considerable deprivation of consumers' freedom of choice." *Id.* at 85.

Microsoft also "extract[ed]" from Independent Software Vendors ("ISVs") "commitments to make their Web-centric applications reliant on technology specific to Internet Explorer." *Id.* at 93. ISVs were "highly dependent on Microsoft's cooperation," and by conditioning that cooperation on ISVs distributing only Windows-compatible products, "Microsoft induced dozens of important ISVs to make their Java applications reliant on Windows-specific technologies and to refrain from distributing" applications compatible only with Internet Explorer. *Id.* at 93, 109.

These factual findings obliterate Plaintiffs' reading of *Microsoft*. Microsoft did not merely "[r]equest[]" exclusivity, as Plaintiffs euphemistically assert (DOJ.Br.71)—it bludgeoned and bribed distributors into acceding to exclusivity. On appeal, Microsoft *did not even try* to defend most of its actions as competition on the merits. Rather, Microsoft principally contended that procompetitive justifications for its conduct outweighed any anticompetitive harm. *See, e.g.*, 253 F.3d at 65. And with respect to specific conduct that Microsoft *did* defend as competition on the merits, this Court *agreed* and held that Microsoft could not be liable for "offering its product at an attractive price" and "developing an attractive product." *Id.* at 68. Microsoft's conduct was exclusionary only where Microsoft extracted commitments from distributors to eliminate or limit distribution of products *they considered more attractive*.

This Court's decision in *Rambus Inc.* v. *FTC*, 522 F.3d 456 (D.C. Cir. 2008), confirms that *Microsoft* precludes liability where there are no findings that the defendant's product was chosen for any reason besides being the preferred one. *Rambus* "adhere[d]" to "antitrust principles that guided…*Microsoft*" about "exclusionary conduct." *Id.* at 463. Applying those principles, this Court held that the FTC "failed to demonstrate that Rambus's conduct was exclusionary" because it failed to prove that Rambus induced JEDEC to abandon a preference to standardize the technology of one of Rambus's rivals: "[I]f JEDEC, in the world

that would have existed but for Rambus's deception, would have standardized the very same technologies, Rambus's alleged deception cannot be said to have had an effect on competition in violation of the antitrust laws." *Id.* at 466-67.

If *Microsoft*'s principles required judgment for Rambus, then they certainly require judgment for Google, which is not accused of anything like the fraud asserted in *Rambus*. Whereas the FTC failed to prove that Rambus's allegedly unlawful "behavior caused JEDEC's choice," *id.* at 466, here, the district court affirmatively found that Apple and Mozilla *preferred* Google's "attractive product" and "attractive price." *Microsoft*, 253 F.3d at 34. That "does not violate the Sherman Act." *Id.*

**d. Properly understood, *Microsoft* aligns precisely with uniform caselaw that distinguishes lawful from unlawful exclusive dealing.** The courts of appeals uniformly recognize that antitrust analysis must account for the *origin* of an allegedly exclusive deal. When a firm prefers a single supplier in order to best serve its consumers, a monopolist supplier does not violate Section 2 by making an offer that best meets the firm's preferences, even when doing so limits sales by the monopolist's rivals. That is this case. By contrast, when a firm prefers to do business with a monopolist's rivals because consumers prefer their products, the monopolist can violate Section 2 by extracting exclusivity that interferes with the firm's ability to deliver what consumers demand. That was *Microsoft*.

*NicSand, Inc.* v. *3M Co.*, 507 F.3d 442 (6th Cir. 2007) (en banc) (Sutton, J.) illustrates the distinction. In *NicSand*, "five of the six large retailers sold just one brand of" automotive sandpaper, "meaning they permitted NicSand or 3M, but not both, to sell its products at the stores." *Id.* at 447. The Sixth Circuit rejected the plaintiff's argument that "the exclusivity of the agreements establishes the requisite injury" to competition, stressing that courts "cannot ignore the demands of the marketplace in which these agreements arose." *Id.* at 454. In offering "greater discounts" to be the sole supplier, 3M "did nothing more than compete on terms that the market already required." *Id.* at 452-53.

The same was true in *EpiPen*. There, Mylan paid rebates to pharmacy benefit managers ("PBMs") that selected Mylan's EpiPen as the only treatment covered by insurance plans on their formularies. Such "exclusive rebate agreements were a normal competitive tool" and "PBMs often instigated exclusivity to stimulate price competition" that would lower consumers' premiums. 44 F.4th at 989. "The widespread use of exclusive rebate agreements" did "not suggest Mylan acted anticompetitively" but instead "demonstrates the market was functioning properly." *Id.* Noting that no PBM witness "testified that they felt compelled to enter into exclusive agreements with Mylan despite unfavorable terms," the Tenth Circuit held that "the district court properly considered the absence of coercion as a factor in the exclusive dealing analysis."

*Id.* at 997, 999. Echoing Judge Hand's admonition (*see* Google.Br.1), the court warned that "Mylan's legitimate competition *for* the formulary must not now expose it to liability." *Id.* at 1006 (citing *United States* v. *Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945)).

The Third Circuit took the same approach in *Race Tires Am., Inc.* v. *Hoosier Racing Tire Corp.*, 614 F.3d 57 (2010). There, motorsports sanctioning bodies adopted rules requiring participants to use Hoosier tires. The court found that "the major sanctioning bodies…generally prefer the single tire and, at least sometimes, desire a Hoosier-only rule." *Id.* at 78. Where the body "remains free to pick the supplier that it believes will provide the best deal," it was "no more an act of coercion, collusion, or improper interference for Hoosier, [Hoosier's rival], or any one else to offer more money to the sanctioning body." *Id.* at 79; *see Malheur Forest Fairness Coalition* v. *Iron Triangle, LLC*, 164 F.4th 710, 721, 726 (9th Cir. 2026) (defendant did not "exclude competition" by winning 100% share of market for services where government agency sought an exclusive service provider on a "best-value" basis, which was "necessarily an exclusive contract").

The rule to be taken from these cases is clear: Exclusive dealing—even by a monopolist—does not violate Section 2 when distributors prefer exclusivity because it makes their consumers better off, even if it makes rivals worse off. *Cf. Menasha Corp.* v. *News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir.

2004) (Easterbrook, J.) ("That retailers and manufacturers like exclusive deals implies that they serve the interests of…consumers.").

In contrast, courts of appeals have found exclusive dealing unlawful (absent predatory overpayment, *see supra*, note 1) only when distributors preferred to appeal to consumers by dealing with multiple suppliers, but the monopolist extracted exclusivity despite those preferences. "*Dentsply* is a good example." *EpiPen*, 44 F.4th at 996. There the distributors' "current and potential customers requested" rivals' products, so the distributors were "dissatisfied" with Dentsply's demand for exclusivity, but they nevertheless "dropped" competing lines "after Dentsply threatened to stop supplying its product." *United States* v. *Dentsply Int'l, Inc*., 399 F.3d 181, 185, 194 (3d Cir. 2005).

"The presence of coercion also explains" other Section 2 decisions. *EpiPen*, 44 F.4th at 997. In *McWane* v. *FTC*, the Eleventh Circuit held that McWane violated Section 2 by "*requiring* exclusivity from distributors." 783 F.3d 814, 819 (11th Cir. 2015) (emphasis added). McWane "unilaterally imposed" exclusivity, *id.*at 834, "announc[ing]" that distributors that did not purchase "all of their" product needs "from McWane…would lose their rebates and be cut off from purchases for 12 weeks," *id.* at 819. Despite being "interested in purchasing" from McWane's rivals, distributors "refused to purchase" from rivals "despite a promise

of lower prices." *Id.* at 837-38. They did so "to avoid the devastating result of being cut off" from McWane's supply. *Id.* at 821.

The same was true in *ZF Meritor, LLC* v. *Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012). Eaton "*coerce[d]*" customers into giving up their ability to distribute rival truck transmissions and "effectively force[d]" exclusivity on them. *Id.* at 285 (emphasis added). One customer "felt that Eaton was holding it 'hostage'" because its agreements "were preventing" the customer "from promoting a competitive product...which was being demanded by truck buyers." *Id.* at 277.

To be sure, exclusionary conduct can take forms other than coercion, but it is no answer to make that point (DOJ.Br.98-99) without also saying what was exclusionary about Google's conduct here. The common thread in the caselaw is that the monopolist does something to *prevent* a buyer from following its preference for a rival or induce it to *give up* that preference. Plaintiffs cite no case imposing Section 2 liability for an exclusive deal that *served* the monopolist's counterparty's express, well-considered preferences as the deals here did.[4] The

[4] *FTC* v. *Motion Picture Advertising Service Co.*, cited at DOJ.Br.98, is not such a case. There, the FTC found that one-year exclusive agreements did not violate the FTC Act because, like uniform defaults, they "had become a standard practice." 344 U.S. 392, 396 (1953). The Court held that it was "for the Commission, not the courts, to determine" that longer exclusive contracts that customers preferred "should be restricted in the public interest" under the FTC Act. *Id.* at 396. That decision has no bearing here, where *this Court* must determine whether Google's browser agreements violated the Sherman Act. *See also Paddock Publ'ns, Inc.* v. *Chi. Trib. Co.*, 103 F.3d 42, 46 (7th Cir. 1996).

only fact patterns Plaintiffs can conjure—"destroying [] competitors' servers and kidnapping their best engineers," DOJ.Br.84, by analogy to *Conwood Co.* v. *U.S. Tobacco Co.*, 290 F.3d 768, 788 (6th Cir. 2002)—are independently unlawful and light-years away from anything Plaintiffs alleged here.

Also beside the point is Plaintiffs' assertion that liability cannot "hing[e]" on "a plaintiff's ability or inability to reconstruct the hypothetical marketplace," DOJ.Br.93-94 (quoting *Microsoft*, 253 F.3d at 79). Asking what a counterparty *actually* preferred requires no hypothesizing. Counterparty preferences are historical facts, provable by their testimony and documents, as in *Microsoft*, *Dentsply*, and *McWane*. Here, *no* evidence exists that Apple and Mozilla contracted with Google despite preferring Google's rivals. *See infra*, pp. 24-27 (discussing Plaintiffs' unfounded claims of "insistence" by Google).

**e. The district court did what antitrust law consistently warns against—protecting competitors at the expense of competition that ultimately benefits consumers.** Accepting Plaintiffs' argument—that a monopolist winning a certain portion of sales for itself rather than its rivals is inherently exclusionary—would sow widespread confusion because a company in Google's position could not know what to do. Apple's and Mozilla's demands—which reflected *their* product design decisions—made it inevitable that whichever GSE they chose would occupy the default position across their browsers. Was Google forbidden to

compete at all for that universal default because winning would leave no default placement for rivals? Should Google have told Apple and Mozilla that they must redesign their products to set aside some default access points for other GSEs? How many? Which ones? Should Google have cut its revenue share offer, to give Microsoft and others more of a chance to outbid Google for the default placement? To what level?

Plaintiffs have no good answers because there are none. *See Novell, Inc.* v. *Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) (Gorsuch, J.) ("Forcing monopolists to hold[] an umbrella over inefficient competitors might make rivals happy but it usually leaves consumers paying more for less." (citation modified)). The Supreme Court has rejected antitrust rules that would require "the defendant [to] leave its rivals a 'fair' or 'adequate' margin" because such indeterminate standards would give firms "no safe harbor" for presumptively lawful conduct. *Pac. Bell Tel. Co.* v. *linkLine Commc'ns, Inc.*, 555 U.S. 438, 453-54 (2009). To say that "it depends" is a recipe for disaster because "skilled lawyer[s]" will "have little difficulty imagining possible" offers that would have been better for rivals yet worse for consumers. *NCAA* v. *Alston*, 594 U.S. 69, 98 (2021) (citation omitted).

At bottom, the district court did not apply—and Plaintiffs do not advance—a coherent, administrable exclusionary conduct standard that "screens out conduct

that is solely competition on the merits," DOJ.Br.77. Rather, under the district court's approach, firms with market power would pull their competitive punches out of fear that continued success will engender "mistaken inferences," thereby "chill[ing] the very conduct the antitrust laws are designed to protect." *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 594 (1986).

**f. There was no record evidence that Google extracted default positions.** Recognizing the vulnerability of a legal theory that attaches no significance to the browser agreements' genesis, Plaintiffs now suggest that it was Google's "insistence," and not Apple's and Mozilla's free choices, that produced the distribution agreements condemned as exclusionary. *See* DOJ.Br.99-102. But that claim cannot be sustained on the trial evidence.

"Because Google was by far the best search engine," Apple did not even seek "the option to select a different default search engine in" the U.S. JA2052 (Cue 30(b)(6)). Mozilla actually switched default GSEs—twice!—during the 2010s, learning from consumers' reactions. *See* Google.Br.17-18; *cf. FTC* v. *Qualcomm Inc.*, 969 F.3d 974, 1004 (9th Cir. 2020) (allegedly exclusive agreements did not harm competition where monopolist had no "viable competitor"). If Apple or Mozilla wanted the flexibility to have different GSE defaults for their browsers on different devices, then evidence of their unhappiness

about a contract that provides for a single default GSE would exist—but the evidence is 100% to the contrary. *See supra*, pp. 8-12.

Google did not, for example, threaten to take Google Search off iPhones if Apple made another GSE the default on Macs (or vice-versa). Nor did Google refuse to pay *any* search revenue unless it received *all* default positions. Such topics never entered the conversation because, from the get-go, browser-makers *wanted* the same default GSE on all versions of their browsers in the U.S. And Apple freely chose other GSEs as defaults in countries where Apple believed other GSEs "provid[ed] the best experience." JA0574 (Cue). Plaintiffs' observation that this was outside the U.S. market (DOJ.Br.102) misses the point: In the very negotiation Plaintiffs rely on, Apple actively sought the best GSE for consumers outside the U.S., and Google did nothing to stop Apple. *See* Google.Br.60.

Plaintiffs try to make something of the district court's stray reference to Google's "insistence." DOJ.Br.99-102. But that cannot rescue their case. For one thing, the conduct that the court used the word "insistence" to describe occurred in 2009 and 2012—years before the agreements at issue and years before the period in which Plaintiffs claimed anticompetitive effects. *See* Google.Br.8 n.3, 61.

Regardless, Plaintiffs miscast the evidence, which shows no "insistence." Plaintiffs assert that a Google witness testified about the 2009 negotiations that "[i]f they wanted to receive revenue share, Apple had to maintain Google as the

*exclusive* Safari default." DOJ.Br.101 (citation modified; emphasis added). That is false; the cited testimony says nothing about exclusivity. It simply says that if Apple wanted to earn a share of Google's revenue from Search, then it had to promote Google Search. *See* Google.Br.61-65. Plaintiffs ignore the same witness's explanation that Google did not want to pay Apple a "tax on any Google traffic on the platform" regardless of whether Apple helped generate the traffic by promoting Google. JA0661 (Braddi). The single document cited by the district court corroborates that testimony: "Apple's terms attempt to impose a tax on all Google.com revenue." JA2321.

In short, Apple wanted to be paid for *doing nothing*. Resistance to such an absurd deal cannot be evidence of "insistence" that Apple either use Google for everything or Google would walk away. Context extinguishes all doubt: The deal being negotiated was for only a *single* access point—Safari on desktop—not for all access points on Macs, iPhones, and iPads. *See* JA0659-0660 (Braddi) (explaining that UPX605.270 addressed "ongoing conversation about a renewal of…the Safari desktop" default in 2009, when Google had "separate terms for its deal with iPhone and iPad"); JA2321 (referring to "desktop deal"). Google was obviously not pressuring Apple into an unwanted all-or-nothing deal. Indeed, the suggestion is downright implausible. Riding high on the success of the iPhone, it was *Apple* seeking to extract a "tax" from *Google*—Apple was not a firm that Google "could

likely bully into accepting a contract that might foreclose new competition," *Barry Wright*, 724 F.2d at 237.

The contrast with *Microsoft* could hardly be starker. "Insistence" is an internal memo to Microsoft's CEO that the "threat to cancel Mac Office 97 is certainly the strongest bargaining point we have, as doing so will do a great deal of harm to Apple immediately." 84 F. Supp. 2d at 95. "Insistence" is what AOL executives reported in a memo: "Microsoft has made it clear that they will not continue to include us in Windows if we don't agree to continue our 'virtual exclusivity' provisions." *Id.* at 84. "Insistence" is what a Hewlett-Packard manager complained about to Microsoft's CEO: "If we had a choice of another supplier, based on your actions in this area, I assure you [that you] would not be our supplier of choice." *Id.* at 62. Nothing like that happened here.

**g. The liability judgment cannot be sustained on a shared-monopoly theory.** Recognizing the infirmity of the exclusive dealing theory they pressed at trial, Plaintiffs (and some amici) now try to swap in an entirely different basis for liability: that Google and Apple colluded to generate and share monopoly profits like the defendants in *FTC* v. *Actavis, Inc.*, 570 U.S. 136 (2013). But Plaintiffs never even cited *Actavis* below, and it bears no resemblance to this case.

*Actavis* involved a settlement of patent infringement litigation by a plaintiff brand-name drug manufacturer against generic manufacturers, accompanied by

agreements for the brand to pay the generics for services. The settlement agreements prohibited the generics from selling their products, and the complaint alleged that payments nominally earmarked for services were, in fact, made "in return for staying out of the market." *Id.* at 154. *Actavis* held that allegations that the payments were "large and unjustified" stated a claim of a conspiracy to keep generic competition off the market and split the resulting monopoly profits. *Id.* at 158.

Google's agreement with Apple was completely different. The agreement did not prohibit Apple from launching a search engine. Apple chose Google to benefit consumers. Plaintiffs conceded that, unlike the alleged business deals in *Actavis*, Google's payments to Apple made business sense because Google would earn more from the traffic than it paid. *See* Google.Br.36 n.5. And Apple designed its browser with a single default and chose Google for the legitimate reason that "Apple benefits and sells more iPhones by having their brand associated with the quality…[of] Google Search." JA0876* (citation omitted).

Plaintiffs also repeat the district court's throwaway line that Google's payments "reduced the incentive" for Apple to launch its own GSE. DOJ.Br.80 (quoting JA1064*); *see* DOJ.Br.104-06 (proposing a framework in which choices to buy rather than make are presumptively unlawful until firms show they are procompetitive). But by definition, any value that Apple can get from a third-party

GSE is an opportunity cost of launching and using its own GSE. Plaintiffs fail to identify *any* distribution deal that Apple could have made—with Google or anyone else, whether "exclusive" or not—that would not have affected its incentive to self-supply. If Apple's choice to use Google's GSE rather than develop its own sufficed to trigger antitrust liability, then every decision by a customer to buy rather than make an input could be recast as an agreement not to compete. *See* Google.Br.51. That cannot be the law.

### 2. The Browser Agreements Were Not Exclusive Deals in the First Place

The district court's liability determination should be reversed even if the antitrust analysis (wrongly) focuses only on the browser agreements themselves, rather than the competitive process that generated them. As a matter of law, those agreements were not exclusive deals because they did not prevent Apple and Mozilla from dealing with Google's rivals or restrain their ability to meet consumer demand for rival GSEs. That should end the case because Plaintiffs "framed this case" solely as "about exclusive dealing." JA1031*.

**a. The browser agreements were not exclusive deals.** Exclusive dealing entails "a contract…that forbids the buyer from purchasing the contracted good from any other seller." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1800a (updated May 2026). Even Plaintiffs concede that, to be "exclusive," an agreement must "'prevent[] lessees or purchasers from using or dealing in the

goods, etc., of a competitor.'" DOJ.Br.68 (quoting *Tampa Elec. Co.* v. *Nashville Coal Co.*, 365 U.S. 320, 327 (1961)).

Google's browser agreements do not satisfy that standard. They did not prevent browser-makers from promoting rival GSEs to any and all users, and browser-makers in fact promoted Bing, Yahoo!, and other GSEs. Nor (unlike the contractual cap on AOL in *Microsoft*) did the agreements preclude browser-makers from providing a rival's GSE to every user who requested one, which the browser-makers also did. The agreements contained "no express exclusivity provision," so "Google's browser partners can contract with its rivals." JA1033, JA1035*. Because nothing was "exclusive" about the browser agreements, they should not have been condemned. *See* Google.Br.67-68.

**b. The browser agreements cannot be condemned as "de facto" exclusive deals.** The district court nevertheless held, and Plaintiffs contend, that the agreements should be treated *as though they were* exclusive deals because they created "de facto" or "practical" exclusivity. Some courts have used those terms to describe arrangements with the same "practical effect" as contractually enforceable exclusivity. *See, e.g.*, *ZF Meritor*, 696 F.3d at 282. In such cases, notwithstanding the lack of an enforceable contract term, "the defendant threatened to refuse to continue dealing with customers if customers purchased rival's products," and the "threat to cut off supply ultimately provided customers with no choice but to

continue purchasing from the defendants." *Eisai, Inc.* v. *Sanofi Aventis U.S., LLC*, 821 F.3d 394, 406 (3d Cir. 2016); *see United Shoe Machinery Corp.* v. *United States*, 258 U.S. 451, 457 (1922) (under the defendant's policies, using a competitor's products created an intolerable "risk of forfeiting the right to use the [essential] machines furnished by the [defendant]").

Accordingly, "de facto" exclusive dealing occurs when the defendant threatens to withhold performance (say, supplying important inputs) if a customer deals with rivals as the customer would prefer, thereby forcing the customer to abandon its preference—just as if a contract had expressly so required. But Plaintiffs cite *no* case finding exclusive dealing where neither the contract's terms nor the attendant circumstances put a customer to such a choice. *See Aerotec Int'l, Inc.* v. *Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182 (9th Cir. 2016) (rejecting "de facto exclusive dealing theory" on this basis).

As a matter of law, Google's actions are not "de facto" exclusive dealing. Google did not condition access to Google Search on browser-makers agreeing not to promote or meet consumer demand for rivals. To the contrary, when browser-makers preferred *not* to set Google as the default (*viz.*, Mozilla opting for Yahoo! and Apple carving out certain geographies), Google reacted by…simply going along. *See* JA0603 (Cue). Plaintiffs' "practical" exclusivity theory thus is not about threats of supply cutoffs or similar conduct that in practice restricts

distributors' freedom to supply the products that ultimate consumers want. Rather, Plaintiffs' theory is that a promotional agreement should be treated as de facto exclusive dealing whenever most consumers, in fact, end up using the promoted product. That approach would indiscriminately expand "exclusive dealing" to encompass a wide range of consumer-influencing commercial arrangements never thought to raise any antitrust problem.

**c. The contrast between the browser agreements and the exclusive deals found unlawful by this Court in *Microsoft* underscores the district court's error.** The agreements held exclusive in *Microsoft* are different from the browser agreements in a dispositive respect: The *Microsoft* agreements prevented Microsoft's counterparties from promoting and meeting consumer demand for rivals' products. Contractually, AOL could "*not promote* any non-Microsoft browser, nor provide software using any non-Microsoft browser except at the customer's request, and even then AOL will *not supply* more than 15% of its subscribers with a browser other than [Microsoft's] IE." 253 F.3d at 68 (emphasis added). The agreement's terms thus *prohibited* AOL from meeting consumer demand for rivals' products.

Similarly, the antitrust problem with Microsoft's First Wave Agreements "with the ISVs" was that they "*conditioned* receipt of Windows technical information upon the ISVs' agreement to *promote Microsoft's JVM exclusively*."

*Id.* at 75 (emphasis added). "Microsoft induced dozens of important ISVs to make their Java applications reliant on Windows-specific technologies and to *refrain from distributing* to Windows users JVMs that complied with [rival] standards." *Id.* (quoting Findings of Fact) (emphasis added). The agreements were "exclusive as a practical matter" because counterparties could not distribute rival products, lest they lose access to Microsoft's must-have services. *Id.* at 76. The browser agreements here are entirely different. *See* Google.Br.67-68.

**d. The district court's ruling can survive only under a definition of exclusive dealing that lacks principled, administrable limits.** Plaintiffs suggest that the agreements should be treated as exclusive because "'[m]any users do not know that there is a default' or 'that it can be changed.'" DOJ.Br.74 (quoting JA0855*). But courts "look at the actual terms of the agreements" (or the parties' course of dealing)—not to what is inside consumer's heads—to determine whether there is "an agreement to deal exclusively," *Aerotec* 836 F.3d at 1181 (citation omitted). That is the only way to draw principled lines that firms can understand and to which they can conform their conduct. *See linkLine*, 555 U.S. at 453 ("[A]ntitrust rules must be clear enough for lawyers to explain them to clients." (citation modified)).

Under the district court's approach, in contrast, antitrust liability would be triggered based on a *retrospective* assessment of how consumers responded to

product promotion. Even with the benefit of hindsight, years of discovery, expert analysis, and a nine-week trial, the decision below offers no estimate of how many consumers would have stayed with Google had Google engaged in different conduct. So surely Google could not have reliably gauged that supposedly liability-determining fact *in advance*. The default is plainly not determinative for *all* consumers—Firefox users switched to Google when Yahoo! became the default, Google.Br.17-18—but Plaintiffs provide no standard for how sticky the default must be to render its sale "de facto exclusive" dealing. If 50% of users would stick with the default, could Google sign a contract for half of the defaults? What about a contract for a quarter of defaults that are 75% sticky? Plaintiffs do not say how a court should decide, again flouting the "importance of clear rules in antitrust law," *linkLine*, 555 U.S. at 452.

The district court's own findings show that its approach would perversely discourage firms like Apple and Mozilla from making their customers' preferred GSE the easiest to access. The court recognized that "default effects are weaker when the product is of poor quality or is unknown to users" and "stronger when the user is satisfied with the product." JA0856*. For example, whereas users typically stick with Google when it is the default, "when Mozilla changed the Firefox default from Google to Yahoo in 2014, most users 'switched back' to Google." JA1056-1057*. In other words, the court found that the default's effect—the effect

that supposedly makes it "de facto" exclusive—is not fixed at all, but instead varies enormously based on user choice and the default product's quality.

Thus, the natural inference from what users do—run the vast majority of their queries on Google—is that users overwhelmingly prefer Google Search, not that browser-makers and users have been dragooned into distributing and using a GSE they dislike. Yet neither the district court's ruling nor Plaintiffs' defense of it takes that possibility seriously. Having advanced no basis for rejecting the most obvious inference from consumer behavior, Plaintiffs cannot plausibly defend the court's "de facto" exclusivity finding.

#### 3. Accepting Any of Google's Arguments About the Browser Agreements Ends the Case

There is no merit to Plaintiffs' suggestions that their case can survive even if Google's arguments about the browser agreements are correct.

The notion that the browser agreements can give rise to liability "[e]ven if the[y]…were not exclusive," DOJ.Br.106, is not only incorrect but also forfeited. Plaintiffs never contend with the district court's rejection of their "dramatic post-trial shift" away from exclusive-dealing. JA1031*; *see* Google.Br.66.

Nor is it plausible that even if "the browser agreements are lawful," "liability could rest on the Android agreements alone," DOJ.Br.107-08. Plaintiffs concede

that those agreements at most "foreclosed 19.4% of the market." DOJ.Br.108.[5] In response to Google's authorities (*see* Google.Br.72-73), Plaintiffs identify *no decision* holding that 19% foreclosure establishes Sherman Act liability. Moreover, coverage is merely the beginning of identifying substantial foreclosure, and Plaintiffs have no theory (let alone evidence) for why anything close to *all* Android queries would have shifted to Google's rivals absent the contested terms in the Android agreements. *See* Google.Br.73.

Nor could the scope of liability found by the district court—let alone the vast remedies it imposed—be affirmed on the basis of the advertising market alone. *See* DOJ.Br.109. Indeed, it is unclear how *any* liability finding could rest on the advertising market when there was no exclusionary conduct directed to that market. "[T]he possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." *Trinko*, 540 U.S. at 407; *see* Google.Br.72 n.10.

---

[5] Plaintiffs' convoluted theory for inflating that figure based on queries that flowed through Chrome (DOJ.Br.108 (citing JA1045*)) is as flawed as it is desperate. That theory would fault Google for the success of "user-downloaded Chrome," JA1045*, unrelated to any challenged conduct. And it ignores the district court's foreclosure finding regarding the Android agreements. JA0853, JA1045, JA1052*.

### B. The District Court Erred in Concluding that Google Has Monopoly Power

Regardless of whether Google has monopoly power, Google's conduct was lawful. But that conduct should not have been subject to Section 2 scrutiny in the first place because the district court's factual findings establish that Google faces competitive constraints that prevent it from exercising monopoly power. The hallmark of monopoly power is the ability to charge customers more or give them less because they lack other choices. But Google cannot do that because consumers can choose SVPs for commercial queries—the source of Google's revenues. To earn revenue, Google must give users more value to attract them to use Google Search, not SVPs, for commercial queries.[6]

**1.** The "goal in defining the relevant market" is "identify[ing] the market participants and competitive pressures that restrain" a firm from reducing the value it provides to consumers. *Geneva Pharms. Tech. Corp.* v. *Barr Lab'ys Inc.*, 386 F.3d 485, 496 (2d Cir. 2004). Courts identify competitive constraints by looking to "interchangeability of use" and "commercial realities." DOJ.Br.51, 59 (citation omitted). Plaintiffs acknowledge that "'an SVP may be reasonably interchangeable with a GSE for a discrete purpose'—i.e., an individual query,"

---

[6] Google did not forfeit this argument. In the very filing Plaintiffs cite, DOJ.Br.61 (citing Dkt.834.2, which appears at JA0359), Google elaborated on why SVPs such as Amazon are in the relevant market, JA0362.

DOJ.Br.64 (quoting JA0976*), such as "shop[ping] for a blender," JA0975*. Nor do Plaintiffs dispute that "intense" competition with SVPs for commercial queries led Google to improve Google Search. *See* JA0881, 0975*; Google.Br.76-77.

Those undisputed facts establish that SVPs act as competitive constraints on GSEs in attracting queries and thus belong in the same market. Two "products compete" in the same market if "quality decreases" in one product would lead consumers to switch to the other. *PhantomALERT*, 183 F.4th at 800. That is exactly what the Google "study" that Plaintiffs cite, *see* DOJ.Br.63, actually found: Google would lose up to 1% of "global search revenue" if it reduced search quality by 1%—*i.e.*, by "1 IS point" out of 100. JA0876*; *see* JA0719-0720 (Nayak). According to the witness whose testimony the court cited, the "big takeaway" was that search quality "matters." JA0722-0723 (Nayak). That competitive pressure from SVPs is why Google improved Google Search across the board.

**2.** Plaintiffs wrongly dismiss all that on the theory that only GSEs "answer[] *all* queries." DOJ.Br.62.

*First*, binding precedent establishes that products used for the same purposes can compete in the same market even if they cannot be used for *all* of the same purposes. *See* Google.Br.77-80. *Microsoft* respects that rule: There, "middleware [was] *not*…interchangeable with Windows," and consumers bought appliances other than PCs "as a *supplement to* their PCs." 253 F.3d at 54, 52 (emphasis

added). But here, SVPs *are* interchangeable with GSEs for commercial queries that generate revenue, as Plaintiffs concede. DOJ.Br.64; *see* JA0971*. The related contention that only GSEs compete for default placement (DOJ.Br.54-55), ignores that market definition is conducted from the *user's* perspective.

*Second*, Plaintiffs never explain why GSEs' ability to answer noncommercial queries would insulate them from the "commercial realit[y]" of SVP competition. *See Eastman Kodak Co.* v. *Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992). To the contrary, they admit that Google "us[es] noncommercial queries as a loss-leader to attract commercial queries." DOJ.Br.62.

*Third*, Plaintiffs never justify focusing the market-definition inquiry on a firm's *non*-revenue-generating activity. They observe (DOJ.Br.61) that GSEs do not earn revenue in the same way as the credit card platforms in *Ohio* v. *American Express Co.*, 585 U.S. 529 (2018). But *Amex*'s larger point is that how firms earn revenue matters for market definition. This is not to assert that "only competition for commercial queries...matters." *Contra* DOJ.Br.60. Rather, the district court erred by attaching dispositive significance to noncommercial queries when GSEs answer them to better compete for revenue-generating commercial queries.

**3.** Echoing the district court, Plaintiffs point to other factual differences between GSEs and SVPs (DOJ.Br.53-54) but never explain why those differences matter *to competition*. Plaintiffs do not explain, for example, why an SVP cannot

pressure Google to deliver more value merely because that SVP also advertises on Google Search, or merely because some consumers use both SVPs and GSEs—confirming that rote application of the *Brown Shoe* factors, without regard to competitive constraints, is legal error. *See* Google.Br.79-81.

**4.** Plaintiffs' halfhearted arguments regarding the market for search text advertising are meritless. Plaintiffs agree that because "the text-ads market is 'derivative' of the [user] market," they must rise or "fall together." DOJ.Br.65. Google lacks monopoly power over user queries, so the advertising market must fall too. And there was no exclusionary conduct directed to the advertising market. *See supra*, p. 36.

## II. The District Court Abused Its Remedial Discretion by Applying the Wrong Legal Standards

Even if the liability decision stands, significant aspects of the remedies must be reversed.

### A. The District Court Did Not—and Could Not—Make the Findings Legally Necessary to Impose Data-Transfer and Syndication

Plaintiffs do not dispute that remedies that go beyond enjoining the unlawful conduct require "a sufficient causal connection between [the defendant's] anticompetitive conduct and its dominant position in the [relevant] market." *Microsoft*, 253 F.3d at 106; DOJ.Br.115-16. Nor do Plaintiffs dispute that those standards govern the data-transfer and syndication remedies. *See* DOJ.Br.115-16;

*Massachusetts* v. *Microsoft Corp*., 373 F.3d 1199, 1228 (D.C. Cir. 2004) (en banc) (remedies requiring sharing of advantages require a "sufficient causal connection"). The parties' dispute comes down to whether the district court made the findings required to tailor its remedies to addressing the effects—*if any*—that Google's browser agreements (as opposed to its superior product quality) had on maintaining its market position. No such findings exist, which is fatal to the data-transfer and syndication remedies.

**1.** The district court found "ample evidence that *lawful* conduct played an important role in Google's maintenance of its monopoly." JA1678* (emphasis added); *see, e.g.*, JA1642* ("[Google's] scale advantage cannot be fully explained by exclusive search distribution."). Those uncontested findings obligated the court to fashion a remedy that distinguished the effects of Google's lawful investment in search and its superior quality from the effects of any unlawful conduct. Any remedies designed to aid rivals must be calibrated to findings about what greater success (if any) rivals would have enjoyed absent any unlawful aspects of Google's agreements. *See Microsoft*, 253 F.3d at 107; *Massachusetts*, 373 F.3d at 1226 (where a "barrier to entry arose only in part because of [the monopolist's] unlawful practices," "[i]f the court is not to risk harming consumers, then the remedy must address" the "barrier to entry in a manner traceable to" the unlawful conduct).

But the district court never articulated a record-based "causal connection" between any allegedly unlawful terms of Google's agreements and its success in the marketplace. Instead, the court *assumed* that the agreements *must have* contributed to Google's advantages to some unspecified degree based on (1) a professed "confidence" in liability-stage findings that concededly did not address those issues (*see* Google.Br.86-87), and (2) the belief that any other conclusion would "blink reality," JA1642*. Such subjectivity, circularity, and hand-waving are legally infirm. As Google previously pointed out, how can Google contest—or this Court review—the district court's supposed "findings" of unarticulated causal connections to unspecified effects? Google.Br.90-91. Plaintiffs' feeble response to this reviewability conundrum (DOJ.Br.117) is to say this Court was able to review the findings in a *different* case—*Massachusetts*—in which the defendant did not even appeal.

**2.** "Plaintiffs are not challenging the concept of a search default or that distributors may recommend a search engine, set a search default, or preinstall search access points." JA1077*. Plaintiffs' theory is entirely about supposedly "exclusive" agreements that denied rivals any out-of-the-box default GSE distribution. Thus, the very first step in the causation analysis requires asking who would have won the defaults under agreements that were ***not*** exclusive. Would rivals have displaced Google for default distribution on some devices or browsing

modes, or would Google's distribution partners have instead continued to set Google as the universal out-of-the-box default (albeit under separate short-term contracts for different devices and browsing modes)?

The district court made no finding that rivals would have had success at that very first step. Indeed, it suggested the *opposite*. *See, e.g.*, Google.Br.87 (quoting JA1639*); JA0942* ("Apple has never seriously considered Bing as an option."); JA0943* (Apple "never genuinely considered using DDG as the default in Safari's private browsing mode"). The record here thus stands in total contrast to *Microsoft*, where the plaintiffs carried their burden of showing that competitive threats like Netscape Navigator and Sun's Java could have thrived absent the unlawful conduct—because those rivals *had been succeeding*, until Microsoft's unlawful conduct squashed them. *See Microsoft*, 253 F.3d at 47 ("Netscape Navigator [w]as the preeminent internet browser."); *id.* at 74 ("Netscape agreed with Sun to distribute a copy of the Java runtime environment with every copy of Navigator….").

Notably, Plaintiffs never assert that rivals would have won more default placements. They gesture generally (DOJ.Br.117) at the district court's "five pages" of purported causation findings (JA1637-1645*), but those pages contain no finding about rivals winning more default placements. Plaintiffs simply assume the existence of this critical predicate, and move on to the *next* step in the causal

chain, asserting that "*any switch in defaults* would have shifted substantial queries to rivals." DOJ.Br.118 (emphasis added). But if Apple and Mozilla would not have switched defaults, then there would not have been any substantial shift in queries to rivals, no matter how powerful defaults might be.

Plaintiffs demur that there is no way to know what might have happened. DOJ.Br.119-22. Not so: Apple's executive testified on that exact issue. *See, e.g.*, Google.Br.15-16; JA2050 (Cue 30(b)(6)) (Apple was "[n]ot really" "considering any other search engines to partner with" because "Google was by far the best search provider"); JA2052 (similar); JA2053 (similar). Plaintiffs point out that, privately, "Google was concerned about losing defaults." DOJ.Br.118. But the trial record shows what Google didn't know when it was negotiating: Although Apple investigated other potential default deals, in the end it "never" wanted to promote a different GSE. *See* Google.Br.15-16, 44-45; JA0942*; JA0943*. And when Mozilla switched its default to Yahoo!, users reacted unfavorably, prompting Mozilla's return to Google. *See* Google.Br.17-18. That is compelling evidence that when Google's distribution partners freely shopped around—even before the time when Plaintiffs claim Google was acting unlawfully—they chose Google because of its superior quality and monetization.

Plaintiffs also say Google "does not explain" why it would pay for default placement "if rivals had no chance of winning [such placement] anyway."

DOJ.Br.118. Google has answered this, starting on the second page of its opening brief: Google's ability to monetize queries—which redounds to distributors' benefit only if Google shares revenue—is part of what made Google their preferred choice. There is nothing unusual about Apple (or anyone else) seeking to be paid for valuable promotional placement, and nothing unlawful about Google (or any other GSE) paying for profitable distribution. *See* Google.Br.36 n.5; *supra*, pp. 10-11. The district court did not hold that paying for default placement is unlawful, and Plaintiffs do not dispute that *any* GSE would have paid (and indeed, did pay) for promotional placement—"default," "exclusive," or otherwise.

All that remains is Plaintiffs' speculation that things might have turned out differently. That is the antithesis of proving a "causal connection."

**3.** Plaintiffs object (DOJ.Br.119-22) that Google urges an impossible-to-satisfy causation standard. But really they are objecting to having to make any causation showing at all. "Counterfactual analysis is not an exotic technique; it is the bread and butter of empirical economics," and is "fundamental to designing remedies that go beyond simple injunctive relief and are designed to restore lost competition." Econ.and.Legal.Scholars.Amicus.Br.2, 5. No one contends here that Plaintiffs' failure was an inability to "confidently reconstruct a [rival] product's hypothetical technological development," DOJ.Br.119 (quoting *Microsoft*, 253 F.3d at 79). The point is that, to justify affirmative remedies,

Plaintiffs had to show *something*: "[T]he fruits of a violation must be identified before they may be denied." *Massachusetts*, 373 F.3d at 1232. Identifying the "fruits" of any unlawful conduct must begin with identifying whether anything would have been different without the conduct—*i.e.*, whether any rival would have secured additional default distribution. As explained above, the district court did not make findings that support finding *any* chain of causation connecting the unlawful conduct to *any* such real-world effects.

### B. The District Court Separately Erred by Extending the Data-Transfer and Syndication Remedies to Companies Offering GenAI Products

The district court also erred in forcing Google to transfer data and syndicate results to companies offering GenAI products but not a GSE. *See* Google.Br.91-94. Plaintiffs' and amici's scattershot defenses of the court's provision of special assistance to GenAI companies lack merit.

**1.** Plaintiffs do not dispute that GenAI products could not have been harmed by Google's allegedly unlawful conduct because they did not exist during the time period at issue. By the same token, nobody asserts that, absent Google's agreements, GenAI companies not building GSEs would have obtained the data and ability to serve long-tail queries for which the data-transfer and syndication remedies aim to substitute. To the contrary, Plaintiffs agree that the capacity to serve long-tail queries comes distinctively from being a GSE. *See* DOJ.Br.12, 18-

19, 79-80. Accordingly, handing out data and syndication results to GenAI companies to use for non-GSE purposes is not "tailored to fit the wrong creating the occasion for the remedy." *Microsoft*, 253 F.3d at 107.

**2.** Plaintiffs and their amici nonetheless offer three rationales for giving special treatment to out-of-market, unharmed, and wildly successful GenAI firms. *See, e.g.*, DOJ.Br.125-26; LTA.Amicus.Br.25-26; OpenAI.Amicus.Br.9-20; SerpApi.Amicus.Br.9-15. All are unpersuasive.

*First*, Plaintiffs suggest that GenAI products might themselves compete with GSEs. *See* DOJ.Br.125-26. But the district court refused to put GenAI products in the same market as GSEs. Nor did the court find that GenAI companies are building GSEs to compete with Google Search in the market defined by the court. As for OpenAI's hypothetical of a GenAI firm that seeks to "partner[]with third-party search providers," OpenAI.Amicus.Br.12, the court *rejected* a similar partnership theory as too speculative, *cf.* JA0293-0302* (granting Google summary judgment on Colorado Plaintiffs' theory about "partnerships between Google's rivals and SVPs"). The proper approach is to ask whether a hypothetical partner intends to compete in the GSE market, not to indiscriminately dole out Google's advantages to every GenAI firm.

*Second*, Plaintiffs and amici assert that aiding GenAI firms may spur innovations in GSEs or ultimately replace GSEs. *See, e.g.*, DOJ.Br.125-26;

OpenAI.Amicus.Br.6-9; SerpApi.Amicus.Br.17-19. That justification, premised on GenAI competition *with* (as opposed to in) the GSE market, is unsound. In "technologically dynamic markets," "firms compete through innovation for temporary market dominance, from which they may be displaced by the next wave of product advancements." *Microsoft*, 253 F.3d at 49 (citation omitted). But the relationship between that organic dynamism and the accused conduct here is fundamentally different from that in *Microsoft*. Microsoft aimed to undermine middleware that threatened to disrupt the operating systems in the allegedly monopolized market. *See* 253 F.3d at 61, 67, 76. Google did not direct its conduct against GenAI competitors that threatened GSEs. Aiding "competitors that were not the target of [the defendant's] unlawful efforts to maintain its monopoly" risks "put[ting] the remedy in opposition to the purpose of the antitrust laws," which "protect competition, not competitors." *Massachusetts*, 373 F.3d at 1229-30 (citation modified). Aiding GenAI products would simply be "market engineering aimed at benefitting a specific competitor." *Id.* at 1232 (citation modified).[7]

[7] Certainly, after holding Google liable for its contracts addressing GSE distribution, the district court could prophylactically enjoin Google from entering into the *same* kind of contracts with respect to Google's own GenAI offerings. *See* JA1253-1254 (Google acknowledging this). But Plaintiffs draw the wrong lesson from that acknowledgment. *See* DOJ.Br.124-25. It does not follow that Google should *also* be required to affirmatively aid other GenAI companies in ways that have no relationship to Google's supposed wrongdoing.

*Third*, the suggestion that extending affirmative relief to GenAI companies so that their GenAI products can better compete with Google's GenAI offerings confirms that Plaintiffs' and amici's true aim is cutting Google down to size and pursuing naked commercial advantage, not fidelity to antitrust principles. *See* DOJ.Br.125-26; SerpApi.Amicus.Br.19-21; OpenAI.Amicus.Br.9-14; LTA.Amicus.Br.26; AELP.Amicus.Br.36-39. This case has never been about competition among GenAI products. This is no forum for engineering competition among them, much less imposing a novel regulatory regime to govern their development.

As the district court recognized, these are exceptionally "fast-moving times, where GenAI technologies are breaking barriers seemingly at light speed." JA1783*. By nevertheless directing Google to give a boost to GenAI firms that have been massively successful on their own, the court needlessly inserted itself into a dynamic and consequential competitive landscape—creating an intolerable risk of "impairing rather than enhancing competition," *Alston*, 594 U.S. at 102.

## CROSS-APPEAL RESPONSE

## INTRODUCTION

This Court should not reach Plaintiffs' cross-appeal challenging the district court's decision not to impose a payment ban. The district court erred in holding Google liable. And it erred again in imposing the heightened remedies of data-

transfer and syndication despite failing to determine what effects of Google's conduct required remediation. *See supra*, pp. 40-46. Either of those points is an independently sound and complete basis for summarily rejecting Plaintiffs' cross-appeal: Either Google is not liable at all, or Plaintiffs failed to establish the predicate for *any* "remed[y beyond] an injunction against continuation of [the unlawful] conduct," *Microsoft*, 253 F.3d at 106 (citation modified).

But if this Court were to affirm the data-transfer and syndication remedies, then consistency would demand that the Court affirm the district court's exercise of remedial discretion to reject a payment ban. Plaintiffs contend that, absent a ban on Google's ability to make payments related to the promotion and distribution of Google Search, the district court's package of remedies is inadequate to restore competition. That claim is doubly mistaken: The district court found not only that its remedies would be effective, but also that a payment ban would likely *harm* competition and consumers. Plaintiffs' argument thus reduces to a disagreement with the court's factual findings—a claim that the court misjudged the costs and benefits of a payment ban. That claim cannot survive abuse-of-discretion review.

## STATEMENT OF THE CASE

### I. Proceedings

In post-liability proceedings, the parties proposed a long list of remedies. Taking the district court's liability findings as a given, Google principally

recommended that the court bar Google from entering into the same or similar kinds of contracts that the court had deemed exclusive. JA1578-1579*. Under Google's proposal, for example, the company would not be allowed to bundle Google Search products with other applications in OEM agreements, prevent partners from promoting alternative GSEs, or condition payments on the installation of Google Search on more than one search access point or device. JA1578*. Google's proposal also would have required Google's agreements to allow browser defaults to be changed every year. JA1578-1579*. And although GenAI products were not a part of the liability case, Google proposed, as a prophylactic, extending the contractual remedies to prohibit distribution of its GenAI products using agreements with terms "the same or similar," *Massachusetts* v. *Microsoft Corp.*, 373 F.3d 1199, 1233 (D.C. Cir. 2004) (en banc), to those held unlawful with respect to Search. JA1578-1579*.

Plaintiffs proposed a vast range of aggressive additional remedies. JA1576-1578*. They sought immediate forced divestiture of Google's Chrome web browser (which had no role in Google's supposed wrongful conduct) and a contingent divestiture of Google's Android mobile operating system. JA1576*. Plaintiffs further sought a judgment requiring Google to give them advance notice of its acquisitions and investments; to allow website publishers to opt out of Google accessing their websites; to provide advertisers with enhanced data,

additional features, and disclosures; to offer choice screens on Google's own mobile devices that would let users select the GSE they wish to use; and to launch and fund a nationwide public education campaign. JA1576-1577*.

Plaintiffs also asked the court to order Google to aid its GSE rivals through forced sharing remedies. JA1577*. Plaintiffs requested that Google disclose to competitors its proprietary search index (*i.e.*, its database of web pages); its data on how users interact with search results (*i.e.*, "the raw material that Google uses to improve search services"); and its data on how it selects, ranks, and places search text advertisements. JA1577, JA1699-1700, JA1715, JA1727*; *see* JA1131-1133. Plaintiffs also requested that the court compel Google to syndicate its search results to other GSEs so that rivals could immediately provide Google's own high-quality search results as though they were their own. JA1731-1732*; JA1134-1135. And Plaintiffs further requested that Google syndicate its search text advertisements so that rivals could monetize those results more effectively than their own technology could. JA1743-1744*; *see* JA1140.

Finally, Plaintiffs asked the Court to bar Google from paying for search distribution. JA1682*. That proposal was categorical: Apart from a narrow exception for advertisements in app stores and a time-limited carveout for payments to Android distributors that display a choice screen on search access points, Plaintiffs sought a complete prohibition on payments to distributors,

including revenue sharing. *See* JA1682*; JA1123-1125. Plaintiffs did not propose any narrower limitations on payments, such as "allowing Google to make payments for distribution but not for default distribution." JA1691*.[8]

## II. The District Court's Remedies Decision

From among those proposals, the district court selected a package of remedies that it thought would best redress Google's violation and "restore competition." JA1621-1622*; *see* JA1565* (citing goals of restoring competition, denying Google any fruits of its violation, and ensuring that anticompetitive behavior would not recur). The court endeavored not to "hobble Google's competitiveness," but to improve rivals' competitiveness, principally by enhancing the "quality and attractiveness" of their products. JA1668, 1680, 1694, 1780*; *see* JA1625-1626*.

**A.** The district court first imposed modified versions of Google's contracting remedies. JA1667-1674*; *see* JA1935-1938*. Those remedies, the court explained, would ensure that distributors could "preload, distribute, and feature non-Google products." JA1669-1670*. The court reasoned that those

[8] Some of Plaintiffs' amici suggest other, more exotic or finely drawn prohibitions, *see* Econ.and.Tech.Scholars.Amicus.Br.10-17; Brave.Amicus.Br.4-14; Antitrust.Profs.Amicus.Br.27-29; Econ.and.Bus.Profs.Amicus.Br.27-29, but none of those proposals was litigated below. They are therefore not properly before this Court. *See, e.g.*, *Am. Dental Ass'n* v. *Shalala*, 3 F.3d 445, 448 (D.C. Cir. 1993) (declining to address "separate contentions" raised by amicus "beyond the scope of the issues raised below by the appellants").

contracting remedies would improve rivals' access to distribution and begin to "unwind" Google's quality, data volume, and monetization advantages. JA1673*.

The court believed more was justified to restore competition and deny Google the fruits of its violation.[9] JA1670-1671*. As the court saw it, even if Google's rivals had access to distribution channels, distributors would likely continue to select Google as a default GSE due to Google's superior quality. JA1671*. And although the advent of GenAI was a significant development, the court concluded that GenAI had "not yet fundamentally altered market dynamics." JA1673*.

**B.** Accordingly, the district court imposed a set of remedies requiring Google to aid other GSEs to improve their quality and ability to monetize queries. JA1691-1749*. In particular, the court found that forcing Google to disclose its search index and user data would "narrow the scale gap created by Google's exclusive distribution agreements and, in turn, the quality gap that followed."

---

[9] As explained above, the district court did not make adequate findings to support the imposition of any heightened remedies (*i.e.*, those beyond the contracting remedies). *See supra*, pp. 40-46. Google incorporates those arguments (and its arguments from it opening brief, Google.Br.82-91) for purposes of the cross-appeal; if this Court agrees, then Plaintiffs' cross-appeal fails just as the district court's heightened remedies fail. *See infra*, pp. 90-91. In responding to Plaintiffs' cross-appeal, Google otherwise focuses on why, even assuming that the district court's remedial findings somehow sufficed for the imposition of heightened remedies, the court exercised sound discretion in rejecting the particular heightened remedy of a payment ban.

JA1693*. These disclosures, in the court's view, would "enhance other companies' ability to compete with Google in the monopolized markets by enabling them to improve their quality and monetization and thereby take advantage of the network effects phenomenon that has been pivotal to Google's success." JA1696*; *see* JA1700* (search index "critical to returning high-quality search results"). Disclosing user data would be particularly helpful to rivals, the court stated, in responding to uncommon or unique queries, which Google is "more adept at answering." JA1694*; *see* JA1718-1719* (transferring user data would lead to "[h]igher quality query responses, especially to long-tail queries," and thus "put rivals in a better position to compete with Google").

The district court similarly found that forced syndication of search results would improve the quality of competitors' GSEs. JA1733-1734*. The court believed that the data-transfer remedies would help competitors "create new search features and other innovations in the medium to long term," JA1691* (citation omitted), and that syndication would allow competitors "to compete in the short term as they work towards developing a GSE that can independently compete against Google," JA1734*; *accord* JA1743* (syndication will allow competitors "to deliver high-quality web results for five years while they build their own search index and search stack"). Again, the court ordered syndication on the premise that

it would improve the quality of competitors' responses to uncommon or unique queries. JA1734*.

On the advertising side, the court ordered Google to syndicate search text ads, so that competitors could "serv[e] high-quality ads that [they] can monetize from the start," creating revenue that could be used to "improve search quality, gain distribution, and perhaps build a proprietary ad platform." JA1746*.

**C.** Finally, the district court rejected Plaintiffs' proposed payment ban. JA1682-1691*. It acknowledged that a payment ban "in theory could" aid Google's rivals, as competitors could outbid Google for default distribution. JA1683*. But the court found that the payment ban would harm GSE users, undermining competition and consumer welfare. JA1684-1691*.

The district court recognized that a payment ban would lead to one of two results, neither of which would be an efficacious or desirable way to foster competition. First—and more likely—distributors would "continue to place Google in default and preferred positions without receiving any revenue," at least in the short term. JA1684*. Once the court entered judgment, "because Google is the best search provider," distributors "likely w[ould] maintain it as the default GSE, if for no other reason than to avoid alienating their customers." JA1684*. Indeed, an Apple executive testified to exactly that point, and Plaintiffs' expert effectively conceded it. *See* JA1683, JA1684-1685*. "Google thus would

continue to receive a disproportionate volume of search queries for a fraction of the cost," and the payment ban would accomplish nothing. JA1685*.

Alternatively, distributors might replace Google with a competitor as the default GSE. JA1685-1686*. But in that case, "a sizeable number of users would switch back to Google," which again would give Google volume at a lower cost. JA1685*. And to the extent users stuck with an alternative default (likely Microsoft's Bing), the result would be a "large reduction in consumer surplus," as users—including those with "strong preferences for Google"—were defaulted to a lower-quality GSE. JA1690*.

To make matters worse, under a payment ban, distributors would receive far less revenue. JA1685*. Among GSEs, Google is the most effective at monetizing searches, and with Google sidelined by a payment ban, Microsoft would face little competition in bidding for default positioning. JA1685-1686*. Substantially reduced payments to distributors, in turn, would result in other "significant," "possibly dire" harms to consumers and other market actors. JA1686-1689*. For example, reduced payments could put smaller browsers like Firefox out of business. JA1686*; *see* JA1456-1459 (Muhlheim). Stripped of critical revenue, OEMs and wireless carriers would pare back, resulting in reduced competition in the U.S. mobile phone market. JA1687-1688*. Because OEMs and carriers use revenue share to subsidize their devices, reduced revenue for those distributors

would mean "higher prices" for the consumers who access GSEs through those distribution channels. JA1688-1689*. And those same OEMs would cut back on "innovation," providing consumers with fewer features and degraded quality. JA1689*.

Those risks, in the district court's view, were "reason enough" to reject a payment ban. JA1688*. But the court saw still another reason for exercising "'caution' before disadvantaging Google": By the time of the remedies proceedings, GenAI presented a "threat to the primacy of traditional internet search." JA1690-1691* (quoting *NCAA* v. *Alston*, 594 U.S. 69, 106 (2021)). Because "established technology companies [were] making, and start-ups [were] receiving, hundreds of billions of dollars in capital to develop GenAI products," those products were "in a better position, both financially and technologically, to compete with Google than any traditional search company ha[d] been in decades (except perhaps Microsoft)." JA1690-1691*. The court therefore anticipated that "superior products" might emerge, preventing Google from "simply outbid[ding] competitors for distribution." JA1691*. Rather than "jolt the system" with a payment ban at a dynamic moment, the court determined to let "market forces," aided by the court's other remedies, dictate the future of competition. JA1691*.

Finally, the district court stated that if the remedies it adopted proved insufficient to "substantially restore[]" competition, the court was "prepared to revisit a payment ban (or a lesser remedy)" at a later date. JA1691*.

## STANDARD OF REVIEW

This Court reviews "the district court's decision whether to grant equitable relief only for abuse of discretion." *Massachusetts*, 373 F.3d at 1207. The district court enjoys "broad discretion" to "enter that relief it calculates will best remedy the conduct it has found to be unlawful." *Id.* at 1233 (citation omitted). And it has correspondingly "broad discretionary power to withhold equitable relief as it reasonably sees fit." *Id.* at 1214. The court is thus "clothed with 'large discretion' to fit the decree to the special needs of the individual case." *Ford Motor Co.* v. *United States*, 405 U.S. 562, 573 (1972) (citation omitted).

This Court reviews legal questions *de novo*, but it "defer[s]" to the district court's findings of fact, "setting them aside only if clearly erroneous." *Microsoft*, 253 F.3d at 50. And because district courts' "predictive judgments regarding the likely effects of [their] orders" are "factual questions," this Court defers to those judgments unless clearly erroneous. *Brown* v. *Plata*, 563 U.S. 493, 513, 535 (2011); *see Microsoft*, 253 F.3d at 102 ("[A] prediction about future events is not, as a prediction, any less a factual issue.").

## SUMMARY OF ARGUMENT

Although the district court erred at the liability and remedies stages for reasons discussed in Google's appeal, if this Court affirms the liability determination and the data-transfer and syndication remedies, then it should also affirm the district court's exercise of discretion in rejecting Plaintiffs' proposed payment ban.[10]

**I.** The district court exercised sound discretion in finding that the payment ban was not necessary to ensure an effective remedy. That finding rested on two subsidiary findings, each of which independently supports affirmance.

*First*, the court found that remedies other than the payment ban would be effective in restoring competition. As the court saw it, contracting remedies would free distributors to feature rival GSEs, and data-transfer and syndication remedies would narrow the quality, scale, and monetization gaps that made rivals inferior and unable to win distribution. Plaintiffs do not challenge those findings as clearly erroneous. Instead, Plaintiffs chiefly—and wrongly—assert that the court never made them. And although Plaintiffs insist that the court failed to create an

[10] If this Court reverses on liability, then the cross-appeal is moot. If the Court reverses the data-transfer and syndication remedies because the district court failed to find the causal connection that *Microsoft* requires before imposing heightened remedies, then the Court should reject the cross-appeal because that failure likewise makes the heightened remedy of a payment ban unfounded.

"efficient distribution remedy," Colorado.Br.15-23, that argument simply quarrels with the court's findings without showing they were clearly erroneous.

*Second*, the district court correctly found that the payment ban would likely reduce competition and harm consumers. With a payment ban in place, distributors would either keep Google as the default (but receive no compensation), or select lower-quality GSEs to keep some lesser payments flowing. As the court explained, neither option promotes competition: The first would serve only to increase Google's profits, while the second would offer consumers an inferior and undesired product. The second option would also starve distributors of revenue, which in turn would reduce distribution channels, thus harming competition and consumers in the GSE market. Moreover, the court doubted the payment ban's claimed benefits, including Plaintiffs' predicted shift in market share, and it found that burgeoning competition in the GenAI market counseled caution.

Again, Plaintiffs do not challenge those findings as clearly erroneous, and their legal objections lack merit. Below, Plaintiffs agreed that the court should weigh the competitive benefits of the payment ban against the harms it would cause, inviting the balancing they now criticize. And once the court found that its remedies would be effective, it was not only permitted but *required* to minimize harm to consumers. *Massachusetts* confirms the point, as this Court repeatedly affirmed the rejection of remedies based on "extensive findings both about the

potential harm" and "dubious benefits" of those remedies. 373 F.3d at 1212. Plaintiffs identify no contrary authority. And although Plaintiffs argue that the district court erred by considering harms to distributors outside the GSE market, the court found that the payment ban would create *in*-market harms.

**II.** Plaintiffs offer no other sound justification for the payment ban. They correctly refrain from arguing that it is necessary to terminate unlawful conduct; the district court did not hold that search-related payments were unlawful. Instead, Plaintiffs attempt to justify the ban as necessary to deny Google revenue as a "fruit" of its violation. But the court found that the payment ban would likely *increase* Google's profits. And any theory that the ban would *eventually* cost Google revenue, if and when rivals build higher-quality GSEs and obtain default positions, just restates what the existing injunction is designed to accomplish, without a payment ban. In all events, the record lacks a basis for tailoring a revenue-denial remedy to the violation, because Plaintiffs did not attempt to prove—and the court declined to determine—whether Google received any additional revenue (let alone how much) as a result of that violation. *See supra*, pp. 40-46.

**III.** Even if this Court were to accept Plaintiffs' arguments in the cross-appeal, they at most justify a remand for the district court to reconsider its findings (as Plaintiffs concede). Inasmuch as the arguments Plaintiffs propose to make on

remand are largely inconsistent with the district court's factual findings, the court would be within its discretion to again reject a payment ban.

## ARGUMENT

The district court erred at both the liability and remedies stages, but Google assumes for purposes of Plaintiffs' cross-appeal that the liability determination is correct and that the court made the findings necessary to support the imposition of remedies beyond those that Google proposed. Under those circumstances, the court did not abuse its discretion in rejecting a payment ban while ordering a set of remedies that bar Google from entering into exclusionary contracts and force Google to hand over its advantages to rivals. The court found, first, that the remedies it imposed would be effective in restoring whatever competition it had deemed lost. And the court found, second, that the remedy Plaintiffs seek to revive on appeal—a near-total payment ban—would likely undermine competition and harm consumers. Those findings are not clearly erroneous and affirming either of them is sufficient to resolve the cross-appeal.

The first finding directly refutes Plaintiffs' core argument that the district court never determined whether its remedies would be effective in restoring competition. DOJ.Br.131-32. Plaintiffs simply ignore the court's finding that its remedies would do just that. Plaintiffs also offer a handful of reasons why they think the injunction will prove ineffective—namely, that the court failed to "create

an efficient distribution remedy," Colorado.Br.15-23, alter potential rivals' "incentives," DOJ.Br.132-33, or prevent Google from "locking up" future defaults, DOJ.Br.145; *see* Colorado.Br.27. But Plaintiffs never argue that the court clearly erred in finding otherwise, and it did not.

The second finding—that the proposed payment ban would likely harm competition and consumers—undermines any potential justification for that remedy. Contrary to Plaintiffs' arguments, *see* DOJ.Br.134-41; Colorado.Br.28-33, having found that its remedies would restore competition, the court properly assessed whether any potential benefits of the payment ban could be justified given the countervailing harms to competition and consumers that the ban would likely entail. That analysis was not only permitted but required by precedent, which recognizes the "promotion of consumer welfare" as "the purpose of the antitrust laws." *Rothery Storage & Van Co.* v. *Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986).

There is no other sound basis for the payment ban. Unlawful conduct "should be remedied by an injunction against continuation of that conduct." *Microsoft*, 253 F.3d at 106 (citation modified). But that principle cannot justify a payment ban because Plaintiffs did not allege (and the district court did not find) that paying for default placement was unlawful. And contrary to Plaintiffs' suggestion, *see* DOJ.Br.133-34; Colorado.Br.23-27, a payment ban would be an

utterly illogical way to *deprive* Google of revenue it supposedly obtained as a fruit of its purported violation, when the district court's uncontested finding was that such a ban would likely *increase* Google's profits.

## I. The District Court Exercised Sound Discretion in Rejecting a Payment Ban Upon Determining that It Was Not Necessary to Restore Competition

The district court found that its remedies would be effective in addressing whatever harm it found, and that Plaintiffs' proposed payment ban would likely reduce competition and harm consumers. Plaintiffs do not argue that those findings were clearly erroneous. Instead, Plaintiffs ignore the first finding, insist that the court's remedies will not restore competition, and assert that the second finding betrayed excessive concern with harms to third parties and consumers. Plaintiffs are wrong on each score. The injunction is fully consistent with *United States* v. *E. I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961), and *Massachusetts* v. *Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004) (en banc), which both require courts, in fashioning effective relief, to account for the very sort of risks that the district court identified.

### A. The District Court Found that Its Remedies Would Be Effective

**1.** The district court expressly found that its remedies would be effective in restoring competition: It "determined the scope of remedies sufficient to 'pry open' the markets closed by Google's antitrust violations." JA1840*. And the

court specified that, "to be effective, the remedies should include" not only "Google's proposed prohibitory injunctions" but also "some of Plaintiffs' proposed behavioral remedies, including disclosure of information about Google's search index, compelled sharing of certain user data, and forced syndication of search results and search text ads, as well as a Technical Committee to assist Plaintiffs with their enforcement efforts." JA1840*. The court thus understood itself to have made the critical finding that Plaintiffs claim that it omitted: "the overarching determination" that its remedies would restore competition. DOJ.Br.131.

The remedies opinion cannot fairly be read otherwise. The district court recognized that "[a]n appropriate remedy 'restor[es] conditions in which the competitive process is revived.'" JA1622* (quoting *Massachusetts*, 373 F.3d at 1231). Accordingly, in assessing whether to impose various remedies, the court consistently analyzed whether those remedies would be necessary or sufficient to "restore competition in the monopolized markets." JA1667*.[11] And in declining

---

[11] *See, e.g.*, JA1677* ("Plaintiffs have not shown that their behavioral remedies will be ineffective without the immediate divestiture of Chrome."); JA1681-1682* ("[Plaintiffs] have not explained how a future sale of Android would promote competition in those markets."); JA1729* ("Nor have Plaintiffs come forward with sufficient evidence showing how Ads Data-sharing will increase competition in the general search text ads market."); JA1753* ("[C]hoice screens are not likely to change the competitive landscape under current or even near-term market conditions."); JA1757* ("Nor have Plaintiffs convincingly shown that added data disclosure will stimulate competition."); JA1761* ("The court will not order Google to make a product change absent some persuasive evidence of competitive benefit.").

to impose a payment ban, the court stated its expectation that competition would be "substantially restored through the remedies the court does impose." JA1691*.

**2.** The district court found that its remedies would be effective in combination. First, the court adopted Google's proposed contractual remedies, which, in the court's view, would "afford distributors the choice to preload, distribute, and feature non-Google products that was largely unavailable under the prior agreements." JA1669*. Those remedies, the court found, were "an important step towards restoring competition to the relevant markets." JA1669* But the court also found that "[m]erely excising the exclusive provisions from Google's distribution agreements [would] not unleash competition" as the district court understood it because Google would retain "too many advantages," including "quality, data volume, and capacity to monetize search queries," such that distributors would likely continue to choose Google as their "primary, if not only, default GSE." JA1671*. Thus, although the district court considered the contractual remedies a "good start" toward unwinding Google's advantages, the court believed that they would not do so entirely and thus, in the court's view, would "not alone restore competition." JA1673*.

The district court therefore ordered Google to hand over its advantages to rivals so that they, too, could offer high-quality GSEs. To that end, the court first required Google to transfer its search index and user data with competitors, finding

that doing so would allow competitors to improve their GSEs and thus narrow the "quality gap" between their products and Google's. JA1693*; *see* JA1723* ("Helping competitors improve their search engines is precisely what [the data-transfer] remedy is designed to accomplish."). That remedy was a way of "improving [rivals'] product quality and attractiveness to new users," by shrinking the gap between Google and rivals in answering uncommon queries. JA1694*. The court was closely attentive to the relationship between this remedy and the proposed payment ban, finding that a data-transfer approach was particularly appropriate because the court was not adopting a payment ban. *See* JA1695*.

Whereas data-transfer would help competitors create their own high-quality products in the "medium to long term," JA1691* (citation omitted), the district court found that syndication of search results and advertising would give rivals immediate access to quality results and advertisements, allowing them "to compete in the short term as they work towards developing a GSE that can independently compete against Google," JA1734*. In particular, the court found that syndication would provide rivals with better answers to "long-tail and local queries," as well as "a means of serving high-quality ads that [they] can monetize from the start." JA1734, JA1746*; *see* JA1746* (finding syndication of search text ads "essential to facilitating competition"); JA1748* (finding "most-favored-nation" pricing for text ads license "pro-competitive").

**3.** Those findings refute Plaintiffs' central arguments. Most notably, the district court made the "overarching determination" that its remedies would restore competition. DOJ.Br.131. The court did not ignore its "paramount 'duty' to 'effectively redress proved violations of the antitrust laws'" or "skip[] ahead to considerations other than effectiveness." DOJ.Br.128, 131 (quoting *du Pont*, 366 U.S. at 323). The court fully recognized that it was "required" to order "relief effective to redress the violations, whatever the adverse effect of such a decree on private interests." JA1862 n.5* (quoting *du Pont*, 366 U.S. at 326). And so the court explained at length how the contractual, forced-disclosure, and syndication remedies would redress the "anticompetitive harm" it (erroneously) believed existed and restore the competition it apparently believed (but never found) had been lost—even "without a payment ban," DOJ.Br.131-32. *See, e.g.*, JA1669* (contractual remedies would "free[] up firms to make substitute choices" (citation omitted)); JA1693-1694, JA1703* (data-transfer remedies would incentivize competitors); JA1695* (data-transfer remedies would restore competition even without a payment ban); JA1734* (syndication remedies would promote competition).

Those findings also answer Plaintiffs' assertion that the court did not create an "efficient distribution remedy." Colorado.Br.15-23; *see* DOJ.Br.145 (asserting that the injunction is "unlikely to provide complete and effective relief" because

Google retains its "vise-grip on distribution"). The court found that its remedies would allow rivals to compete for efficient distribution, first because the contractual remedies would ensure that distribution channels were available, JA1669*, and second because the data-transfer and syndication remedies would give rivals a quality boost to help them vie for distribution, *see* JA1695, JA1734*. Having made those findings, the court was under no obligation to impose "the maximum feasible relief." *Massachusetts*, 373 F.3d at 1233 (citation modified).

**4.** Plaintiffs have not challenged those findings as clearly erroneous. And as Plaintiffs recognize, "[i]f a party does not challenge the district court's findings as clearly erroneous, the Court must accept them." DOJ.Br.38 (citing *Smith* v. *Dist. of Columbia*, 2022 WL 758070, at *4 (D.C. Cir. Mar. 4, 2022)); *see United States* v. *Askew*, 529 F.3d 1119, 1123 (D.C. Cir. 2008) (en banc).

Regardless, the district court did not err in finding that quality plays a critical role in distributors' decisions about distribution. The record consistently showed that Google's advantage in the GSE market generally (and in distribution in particular) was its superior quality. From the beginning, Google "achieved market dominance" because it "hired thousands of highly skilled engineers, innovated consistently, and made shrewd business decisions," resulting in "the industry's highest quality search engine." JA0830*. That "best-in-class search quality" had made Google the obvious choice for the default GSE. JA1678*; *see*

*supra*, pp. 9-10. Apple, for example, chose Google based on "what's best for the customer," both to enhance the customer experience and because, "[a]t the end of the day, the customer will pick where they want to search." JA1488, JA1491 (Cue). And Apple's customers—like almost everyone else over the "last 20 years"—chose Google, "because it is the best search engine." JA1488 (Cue); *see* Google.Br.15-16.

The same was true for Mozilla, which likewise chose Google because it was "way ahead" of the competition. JA0315-0316 (M. Baker); *see* Google.Br.17-18; Mozilla.Br.10-13. And when Mozilla placed Yahoo! in the default position for several years, users "made it clear that they look for and want and expect Google," JA0323 (M. Baker), including by switching to different GSEs, JA1463 (Muhlheim), which in turn led Mozilla to choose to revert to Google, *see* JA0944*. Since that time, Mozilla has continued to assess whether users would tolerate an alternate GSE, and it has consistently found that the answer is no. JA0945-0946*.

Given its finding that quality is what drove Google's own success, *see e.g.*, JA1658*, the district court naturally found that improving rivals' "quality" would improve their prospects to "attract[] more users and improve[] monetization," which in turn would create greater access to distribution. JA1869*. As explained above, Google's purportedly unlawful agreements did not create or widen any quality gap with rivals, because there was no finding that any rival would have

displaced Google as a browser default. *See supra*, pp. 42-45. But assuming those agreements did have an effect on quality, then "ensuring that rivals could…achieve a degree of quality that would pose a threat to Google" was a logical remedial goal. JA1642*.

Plaintiffs posit that, "[a]s useful as syndication and data-sharing are, they only complement an efficient channel of distribution," because "[s]ustainable competition requires effective access to users." Colorado.Br.12, 23. But baked into the district court's own reasoning is that the best path is allowing rivals to compete for that "effective access to users" *on the basis of quality and ability to monetize*. The court therefore barred Google from entering into the kinds of agreements it deemed exclusionary and ordered Google to give rivals "scale-dependent data" that would "enabl[e] them to improve their quality and monetization and thereby take advantage of the network effects phenomenon that has been pivotal to Google's success," JA1696*.

The district court thus did exactly what Plaintiffs' cases suggest: It "focused" on "opening the channels of distribution to" rivals. Colorado.Br.17 (quoting *Massachusetts*, 373 F.3d at 1229). Plaintiffs' quarrel reduces to a disagreement with the court's chosen method and its prediction of how its remedies would serve that end—both of which are determinations on which this

Court defers to the district court. *See Microsoft*, 253 F.3d at 50, 102; *Massachusetts*, 373 F.3d at 1207.

### B. The District Court Correctly Rejected a Payment Ban Upon Finding that It Would Likely Harm Competition and Consumers

Irrespective of the sufficiency of the remedies that were adopted, the cross-appeal is about a particular remedy that was *rejected*, and the district court had good grounds for that rejection, finding that a payment ban would likely *undermine* competition and harm consumers, including in the GSE market itself. That finding was correct and is an independent basis for rejecting Plaintiffs' cross-appeal.[12]

#### 1. The District Court Found that a Payment Ban Would Reduce Competition and Consumer Welfare

The district court explained at length why the net effect of Plaintiffs' proposed payment ban would be a *reduction* in competition and consumer welfare. JA1682-1691*. If a payment ban were imposed, then distributors would face two options: "either (1) continue to place Google in default and preferred positions

[12] At the end of their brief, the Colorado Plaintiffs ask for a remand to "present both the payment ban" and unspecified "alternative distribution remedies." Colorado.Br.34-35. That grossly belated and undeveloped request should be rejected. In the district court, Plaintiffs did not propose any alternatives to their payment ban. *See* JA1576, JA1682*. Indeed, they declined to propose a narrower ban on payments for default distribution. *See* JA1691 n.14*. Having failed to raise alternatives to the payment ban below, and having declined to elaborate on any hypothetical alternatives on appeal, they have doubly forfeited any claim to such a remedy on remand. *See Keepseagle* v. *Perdue*, 856 F.3d 1039, 1053-54 (D.C. Cir. 2017); *United States* v. *Philip Morris USA Inc.*, 801 F.3d 250, 257-58, 261 (D.C. Cir. 2015).

without receiving any revenue or (2) enter distribution agreements with lesser-quality GSEs to ensure that some payments continue." JA1684*. Both options, the court found, "entail[ed] serious risk of harm." JA1684*. And any benefits were speculative.

**a.** The first option would not change the market conditions that the district court identified in its liability opinion. If distributors stuck with Google due to consumer demand for the highest-quality GSE (as the evidence suggested they "likely" would), but Google paid them nothing, then Google would "continue to receive a disproportionate volume of search queries for a fraction of the cost." JA1684-1685*. Google's profits would therefore "*increase*." JA1685*. Google "then could use those profits" to further improve its products and monetization, leaving rivals even further behind. JA1685*.

**b.** The second option for distributors—setting an inferior GSE (likely Microsoft's Bing) as the out-of-the-box default—would reduce Google's share only by harming GSE users and other market participants. JA1685, JA1689-1690*. The district court explained that Google's market share would fall only "at 'the cost of a *large reduction* in consumer surplus,' 'as permanently inattentive users, including users with strong preferences for Google, are defaulted into a less-preferred option.'" JA1690* (quoting Hunt Allcott et al., *Sources of Market Power in Web Search: Evidence from a Field Experiment* 36 (Nat'l Bureau of

Econ. Rsch., Working Paper No. 33410, 2025), https://www.nber.org/system/files/working_papers/w33410/w33410.pdf). In other words, Plaintiffs sought a remedy that would force on consumers a lower-quality search experience that they do not want. And worse, if Bing were the only viable replacement, *see* JA1689-1690*, Microsoft would have little incentive to improve its product, potentially creating a new duopoly, *see* JA1404-1405 (Chipty) (Plaintiffs' expert agreeing with district court that, at least in the "near term," a payment ban would "creat[e] conditions for duopoly" between Google and Microsoft).

On top of that, search distributors' revenues would drop precipitously. JA1685-1686*. Many users would "switch back to Google," as they did when Yahoo! replaced Google as Firefox's default GSE, but Google would be prohibited from making any payments based on those users' activity. JA1685*; *see* JA0944*. And "with Google sidelined from competition, rivals would pay less than Google did to secure default or preferential placement," in a sort of junior-varsity competition among rivals that cannot monetize traffic as effectively as Google. JA1685-1686*; *see* JA1557-1558 (DOJ counsel conceding that, "in the immediate term," payments would be lower due to absence of competition against Microsoft); JA1458-1459 (Muhlheim) (Mozilla CFO testifying that if a payment ban were implemented, revenue share from Microsoft would decline with "no alternative party to bid for that traffic").

As the district court found, the "complete loss or reduction of payments to distributors" would have "significant," "possibly dire" consequences for competition and consumers alike. JA1686*. Competition between browsers would suffer, as smaller developers like Mozilla that depend on revenue-sharing payments could be forced out of business. JA1686-1687*. Phone manufacturers like Apple and Android OEMs, similarly deprived of revenue, would create fewer, less innovative products. JA1687-1688*. And consumers—particularly in the United States—would be offered more expensive mobile phones with fewer features. JA1688*. The payment ban thus would weaken the most popular GSE distribution channels (including mobile devices), limiting the accessibility of GSEs and reducing query output in the GSE market.

**c.** Against those harms, the district court found the touted benefits of a payment ban unlikely to materialize. Although a payment ban would spur distributors to "look to other GSEs to earn revenue share," which in theory "could" channel revenue to rivals, JA1683-1684*; *see* JA1690*, the court was skeptical that a payment ban would bring about a significant shift in traffic. Rather, the court found it "likely" that distributors would retain Google as the default GSE, "if for no other reason than to avoid alienating their customers." JA1684*. The court therefore *rejected* Plaintiffs' predicted 31% shift in query share because it rested

on an unrealistic assumption that distributors "would switch to a default GSE other than Google to earn some revenue share." JA1683 n.11*.

Nor was there any realistic likelihood that the payment ban would actually cause Apple to build its own GSE. The district court acknowledged this "could" happen, and Plaintiffs' expert asserted that a payment ban "'would increase the chance of entry.'" JA1683* (quoting JA1400/Remedies.Tr.2141:4-15 (Chipty)). But an "increase[d]…chance" that Apple "could" build a GSE is not a record-based prediction about what will actually occur, especially when Apple's executive testified repeatedly that Apple had neither the "competency" nor "intention" to do so. JA1487-1488 (Cue) ("we were never interested in doing a search engine" because "Google does an amazing job" and "that's not the competency we had, and we chose to do other things"); JA1503-1504 (Cue) (agreeing that "Apple has no intention of building a search engine"). Indeed, Plaintiffs never even *proposed* a finding that Apple would enter the GSE market. *See* JA1309, JA1321 (proposing that the court find only that a payment ban would "incentivize[]" Apple to build a GSE). Accordingly, the court made no affirmative finding about Apple's likelihood of building a GSE.

The district court further found that the advent of "highly competitive" GenAI technology had shrunk whatever marginal remedial value a payment ban might have had. JA1690-1691*. Wholly without judicial intervention, well-

capitalized GenAI firms had become "a threat to the primacy of traditional internet search." JA1690*. "[A]stonishing" investment had put GenAI companies "in a better position, both financially and technologically, to compete with Google than any traditional search company has been in decades (except perhaps Microsoft)." JA1691*. And those firms were already "moving towards monetizing on commercial queries"—*i.e.*, directly competing with GSEs for the only queries that earn revenue. JA1691*. In truth, those developments severely undermine the court's liability-phase determination that Google was a monopolist whose agreements had erected insurmountable barriers to competition. But at the very least, the torrent of money flowing into GenAI "weigh[ed] in favor of 'caution' before disadvantaging Google" by prohibiting payments from Google alone. JA1691* (quoting *Alston*, 594 U.S. at 106).

Considering the weighty harms and dubious competitive benefits of a payment ban, the district court properly decided "not to jolt the system" with immediate action on Plaintiffs' seismic proposal, and instead to "allow market forces to do the work." JA1691*.

### 2. Plaintiffs' Arguments for Ignoring the District Court's Findings Lack Merit

Plaintiffs challenge none of those findings as clearly erroneous. Instead, they argue that those findings—including findings that a payment ban would harm consumer welfare—are irrelevant. Those arguments lack merit.

**a.** Plaintiffs first assert that the district court could not consider harms to distributors and consumers without first ensuring effective relief. DOJ.Br.134-36; Colorado.Br.28-29. But below, Plaintiffs *agreed* that the court should "balance the benefit to competition against the hardship [or] competitive disadvantage the remedy may cause." JA1546 (quoting *Ginsburg* v. *InBev NV/SA*, 623 F.3d 1229 (8th Cir. 2010)). Plaintiffs cannot now claim that the court erred by doing exactly that. *Contra* DOJ.Br.141; *see 3D Global Sols., Inc.* v. *MVM, Inc.*, 754 F.3d 1053, 1055 (D.C. Cir. 2014) (invited error).

In any event, the court *did* find that its package of remedies would be effective in restoring competition, regardless of any harm to distributors or consumers. *See supra*, pp. 65-70. Having made that finding, the court was not only permitted but *required* to redress the violation "with as little injury as possible to the interest of the general public." *du Pont*, 366 U.S. at 327-38 (quoting *United States* v. *Am. Tobacco Co.*, 221 U.S. 106, 185 (1911)).

In heeding that directive, the district court's payment-ban analysis tracked the analysis that this Court affirmed in *Massachusetts*, where the district court had likewise rejected remedial proposals that threatened harm to third parties and consumers. For example, in remedying Microsoft's unlawful code-level integration of its browser and operating system, the district court had declined to order Microsoft to remove any code, and instead directed Microsoft to allow

OEMs to limit users' access to the browser. *Massachusetts*, 373 F.3d at 1208. On appeal, the plaintiff (Massachusetts) and its amici raised several arguments much like Plaintiffs' here, including that a code-level remedy was necessary to remove an entry barrier and restore competition. *See id.* at 1210-11. But this Court affirmed, explaining that the district court had properly rejected Massachusetts' proposal based on "extensive findings both about the potential harm to consumers from" that proposal and its "dubious benefits." *Id.* at 1212. Indeed, this Court even accepted that Massachusetts' preferred remedy would have posed a greater "threat" to Microsoft's dominance, but it nevertheless held that the lesser remedy was appropriate because it "would not have the same deleterious effect upon consumers." *Id.* at 1211-12; *see id.* at 1211 ("[A]ddressing the applications barrier to entry in a manner likely to harm consumers is not self-evidently an appropriate way to remedy an antitrust violation.").

Similarly, Massachusetts and its amici argued that a remedy requiring Microsoft to disclose some (but not all) application programming interfaces was too narrow to restore competition, and that the district court "made no finding" that the disclosures were broad enough to achieve their procompetitive goal. *Id.* at 1216, 1218. But this Court held that Massachusetts "simply ignore[d] the district court's findings with respect to the economic and technological effects of disclosure," including that Massachusetts' broader proposal could "undermine

Microsoft's incentive to innovate" and "enable competitors to 'clone' Windows." *Id.* at 1218-19. "[N]ot even the broad remedial discretion enjoyed by the district court," this Court concluded, "extends to the adoption of provisions so likely to harm consumers." *Id.* at 1219.

To take one more example from *Massachusetts*, this Court affirmed the district court's decision not to extend a remedy to "Web services," a new technology in an area of "rapid innovation." *Id.* at 1225. This Court explained that "it does not follow that, because a proposed requirement could reduce [a] barrier to entry, it must be adopted." *Id.* at 1226. Rather, where the "barrier to entry arose only in part because of [the monopolist's] unlawful practices," "[i]f the court is not to risk harming consumers, then the remedy must address" the "barrier to entry in a manner traceable to" the liability determination. *Id.*[13]

---

[13] *Massachusetts* in many other places likewise affirms the district court's exercise of remedial discretion in gauging—and then balancing—the benefits and risks of particular remedies. *See* 373 F.3d at 1218 ("Such expanded but not unlimited disclosure represents a reasonable method of facilitating the entry of competitors into a market from which Microsoft's unlawful conduct previously excluded them, particularly in view of the inherently uncertain nature of this forward-looking provision." (citation modified)); *id.* at 1222 ("In light of the forward-looking nature of the API disclosure provision, the court reasonably balanced its goal of enhanced interoperability with the need to avoid requiring overly broad disclosure, which it determined could have adverse economic and technological effects, including the cloning of Microsoft's software."); *id.* at 1227 ("[T]he district court did not abuse its discretion by refusing to prohibit, rather than placing protective conditions upon, Microsoft's offer of discounts."); *id.* at 1229-30 (where "[t]here is more than one way to redress" the violation, "it was certainly within the district court's discretion to address [the violation] by restoring the conditions in which rival[s]…may freely compete").

Here, too, the district court made extensive findings about the serious risks and dubious benefits of a payment ban. JA1684-1690*. Those harms included harms to other market actors and to consumers. JA1685-1690]*. And those harms were "reason enough" to reject the ban, whether or not it would remove a barrier to entry. JA1688*.

Strikingly, DOJ's cross-appeal brief does not even cite *Massachusetts*—this Court's key precedent reviewing the rejection of remedies in a Section 2 case. Rather, DOJ relies principally on cases involving mergers and acquisitions. *See* DOJ.Br.135-37, 140-41 (citing *du Pont*, *American Tobacco*, and *Ford*). But those cases do not suggest that a district court may ignore the impacts of its remedies on consumers; indeed, they *demand* attention to that issue. *See Am. Tobacco*, 221 U.S. at 188 (requiring avoidance of "unnecessary injury to the public"); *du Pont*, 366 U.S. at 327-28 (same). Moreover, remedial lessons from merger cases do not translate readily to a monopolization case. Whereas divestiture may be "simple, relatively easy to administer, and sure," *du Pont*, 366 U.S. at 331, far more complex choices and tradeoffs arise in undertaking forward-looking judicial intervention in a technologically dynamic market to remedy monopolization by a firm that also enjoys considerable lawfully obtained commercial advantages. *Massachusetts* is the case about that complexity and those tradeoffs, and it holds

that harms to third parties and consumers, including degraded product quality, are critical considerations in selecting an appropriate remedy.

**b.** Plaintiffs next argue that harms to distributors were legally irrelevant because they "would occur in separate markets for browsers and smartphones." DOJ.Br.136-37; *see* Colorado.Br.29-33.

Plaintiffs cite no case holding that a district court abuses its discretion by rejecting an antitrust *remedy* due to concerns about harm to actors in related markets. Plaintiffs' starting premise is that, as to antitrust *liability*, a defendant cannot justify unlawful conduct in one market by pointing to offsetting benefits in another market. DOJ.Br.137 (citing *United States* v. *Topco Assocs.*, 405 U.S. 596, 611 (1972)). In such a case, the default antitrust remedy—"an injunction against continuation of [the unlawful] conduct," *Microsoft*, 253 F.3d at 106 (citation omitted)—might indirectly "harm" those who had previously received those offsetting benefits, when *private actors* adjust their behavior in response to the injunction. But even if Plaintiffs' premise about liability analysis were correct—which this Court need not decide—the harms of concern here are categorically different. Here, where a court contemplates affirmative *judicial intervention*, and must choose among effective equitable remedies, nothing says the court must blind itself to harms to the public and consumers that *its own interventions* might create.

*du Pont* is not to the contrary—it squarely supports the district court's approach. *See* DOJ.Br.135-36; Colorado.Br.29-30. There, the district court had eschewed the only effective remedy on offer (a divestiture)—and not out of concern for the general public, but only for the tax consequences that might befall the defendant's own shareholders. *du Pont*, 366 U.S. at 320-21, 328. The Supreme Court thus reversed because the alternative remedy was not effective and the "harms" to be avoided were not equitably salient. Neither is true here, where the district court adopted a package of remedies that it believed would restore competition *and* avoid harms to the public and consumers. Moreover, *du Pont*'s broad concern for ensuring "as little injury as possible to the interest of the general public," *id.* at 327-28 (citation omitted), cannot be understood as limited to Plaintiffs' conception of narrow, in-market harms.

This Court need not mark the outer limits of what harms are relevant at the remedies stage, however, because the district court here found that a payment ban would create *in*-market harms. Under such a ban, distributors would face a choice: continue setting Google as the out-of-the-box default or switch to a lower-quality GSE. JA1684*. In the first, more likely scenario, Google would receive a "windfall" and use its profits to further outpace its rivals *in the GSE market*. JA1684-1685*. Alternatively, in the second scenario, consumers would either navigate around the new default (in which case Google would again receive the

same windfall profits) or use the new default (in which case consumer experience *in the GSE market* would be degraded, at least in the short term, and Microsoft would likely emerge as a new duopolist *in the GSE market*). *See supra*, pp. 73-76. Thus, the district court found that the payment ban would harm rivals in the GSE market, consumers in the GSE market, competition in the GSE market—or all three.

Plaintiffs focus instead on the district court's findings regarding lost revenue for distributors. *See* DOJ.Br.136-37; Colorado.Br.29-33. But even if the court's analysis began with the wellbeing of distributors, its ultimate concern was that artificially reducing revenues for distributors of GSEs (*i.e.*, browser-makers, mobile carriers, and Android OEMs) would harm the GSE market through reduced output and quality. *See* JA1686-1688*. For example, if consumers reduced consumption of smartphones due to "[h]igher mobile phone prices," those consumers would also reduce consumption of GSEs, thus reducing output in the GSE market. JA1688*. More generally, reduced revenue opportunities for GSE access points means less investment in new and higher-quality GSE access points, in turn reducing output in the GSE market. *See* JA1687-1688*; *see also* JA0857* ("giving [users] more convenient access points" "mak[es] them search more") (quoting JA0758 (Pichai)). In short, the district court understood that a payment ban would harm the distribution channels for the very GSE market it sought to aid.

Such concerns are categorically more legitimate than the *du Pont* district court's solicitude for the tax liabilities of the defendant corporation's shareholders, which had no effect at all on competition in the relevant market.

**c.** Finally, Plaintiffs offer glancing arguments that the district court should have chosen to harm consumers, at least in the short term, to remedy Google's violation. *See, e.g.*, DOJ.Br.139-40. But the Sherman Act is a "consumer welfare prescription." *Reiter* v. *Sonotone Corp.*, 442 U.S. 330, 343 (1979) (citation omitted). An antitrust case that demands a remedy that harms consumers seems misconceived from the start, brought under the false dogma that the government knows GSE users' interests better than they do.

DOJ acknowledges that protecting consumers is an appropriate goal but argues that the district court improperly focused on "short-term" harm to consumers, rather than the "long-term benefits of greater competition." DOJ.Br.137-39. But that argument begs the question by assuming that the remedy the district court actually selected was ineffective. As explained above, the court found otherwise. *See supra*, pp. 65-70. Having made that finding, the court properly looked to avoid consumer harm.

The Colorado Plaintiffs, on the other hand, argue that the district court should not have been concerned about consumer welfare because its concerns "derive[d] from its concern that browsers, OEMs, and carriers would face a loss or

reduction of Google's payments." Colorado.Br.32. That account plainly mischaracterizes the court's reasoning: The court found that consumers would be harmed by being defaulted to a lower-quality product. *See* JA1689-1690*. In any event, it would have been appropriate for the court to focus on harms to consumers flowing from harms to distributors. In *Massachusetts*, for example, this Court held that the district court properly rejected one of the plaintiffs' proposed remedies because it would reduce the quality of independent software vendors' products, which in turn would harm consumers. *See Massachusetts*, 373 F.3d at 1208, 1212. And that consumer-focused inquiry should not be surprising: If the "fundamental goal of antitrust law" is the protection of consumers, *NCAA* v. *Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 107 (1984), then Plaintiffs are wrong to demand that district courts ignore severe and immediate harms to consumer welfare.

## II. Plaintiffs Identify No Other Sound Basis for the Payment Ban

Aside from their arguments related to effectiveness, Plaintiffs make few arguments to justify a payment ban. They correctly refrain from arguing that the payment ban is needed to terminate Google's unlawful conduct; the district court did not find that Google's violation was *paying* for promotion and distribution of its GSE. Plaintiffs' only other justification for a payment ban is denying Google revenue—one "fruit" of its purportedly unlawful conduct. DOJ.Br.133-34;

Colorado.Br.23-27. But that argument is backwards, given the district court's finding that the payment ban would likely *increase* Google's profit.

### A. The Payment Ban Is Not Necessary to Terminate Google's Supposedly Unlawful Conduct

Plaintiffs have never argued that paying for a default is unlawful. Below, they did not challenge "the concept of a search default or that distributors may recommend a search engine, set a search default, or preinstall search access points." JA1077* (quoting Dkt.907.38). And they did not argue that Google's payments for defaults were unprofitable or predatory. *See* Google.Br.36 n.5. Instead, Plaintiffs challenged Google's agreements on the theory that those agreements "require[d] counterparties to set Google as the *exclusive* search default." JA1077* (emphasis added) (quoting Dkt.907.38). Similarly, the district court held Google liable for what it viewed as "exclusive distribution agreements." JA1030*.

On appeal, therefore, Plaintiffs do not attempt to justify the payment ban as necessary to terminate unlawful conduct. Nor could they. The payment ban would bar Google from making virtually any search-related payments, but the district court did not hold that any search-related payments were unlawful. And any such holding would be indefensible, when payment for promotion and distribution of a service—including for default placement—is lawful, procompetitive, and

ubiquitous. *See* JA1432 (Chipty) (Plaintiffs' expert conceding that paying for distribution is not inherently anticompetitive).[14]

### B. The Payment Ban Is Not Necessary to Deprive Google of Any Fruits of Its Supposed Violation

Plaintiffs do argue that the payment ban is necessary to deny Google revenue. DOJ.Br.133-34; Colorado.Br.23-27. They contend that because the district court found that Google's distribution agreements yielded large revenues, *see* JA1658-1660*, and because effective remedies must deny defendants the fruits of their violations, *see Microsoft*, 253 F.3d at 103, the district court was required to impose the payment ban.

That argument is backwards. The district court found that the payment ban would likely "*increase*" Google's profits by preventing revenue sharing, not deny

[14] Google does not understand Plaintiffs to argue otherwise in making the passing (and imprecise) observation that the district court "found that Google's revenue-share payments to Apple were anticompetitive because, in addition to conferring exclusivity, they disincentivized Apple from entering the general-search-services market." DOJ.Br.132 (citing JA1069-1071*). *Any* meaningful payment by Google for *any* kind of promotion or distribution of Google Search (or any other service for Google Search) could "disincentivize[]" the recipient from building its own GSE. *See supra*, pp. 28-29 (discussing the opportunity costs in any make-or-buy decision). But markets function because of incentives; a "disincentiv[e]" is not a sufficient warrant to condemn such a payment. And Plaintiffs never argued, as a matter of liability or remedies, that Google must cease all meaningful dealings with Apple relating to Search—and with good reason, because doing so would harm competition and consumers in all the ways the district court recognized (and more). *See supra*, pp. 73-78 (discussing district court's finding of harmful effects from payment ban).

Google revenue. JA1684-1685*. The court found that if it were to impose the ban, distributors would "likely" retain Google as their default GSE, which in turn would "likely advantage Google, at least in the short term," because Google "would continue to receive a disproportionate volume of search queries for a fraction of the cost." JA1684-1685*. Indeed, even if distributors later chose "a different GSE," a "sizeable number of users would switch back to Google," meaning that Google still would obtain considerable traffic without paying "billions in revenue share." JA1685*.

Perhaps Plaintiffs' theory is that, in time, a payment ban would cost Google revenue as rivals eventually build higher-quality GSEs and obtain default positions for which Google cannot bid. *Cf.* Colorado.Br.25 (arguing that the payment ban is necessary because it would promote rivals' distribution and break the "revenue-generating cycle"). But as explained above, that is precisely what the district court found that its injunction would do, *without* a payment ban: "neutralize" Google's supposedly unlawful advantages and prevent future "anticompetitive effects," Colorado.Br.26; *see supra*, pp. 65-70. Plaintiffs' argument for the necessity of a payment ban thus collapses back into their disagreement with the district court's factual findings, predictive judgment, and exercise of discretion.

Plaintiffs' argument that a payment ban would deny Google "fruits" of its conduct suffers from still another fundamental flaw that Plaintiffs nowhere

address: "[T]he fruits of a violation must be identified before they may be denied." *Massachusetts*, 373 F.3d at 1232. The district court declined to determine "how much additional scale or revenue Google received as a result of the exclusive agreements." JA1661*; *see* Google.Br.85-91; *supra*, pp. 40-45. Despite seeking a near-absolute payment ban, Plaintiffs do not (and could not) argue that Google must be denied *all* revenue associated with Google Search, when the district court found "ample evidence that lawful conduct played an important role in Google's maintenance of its monopoly," JA1678*; *see* JA0830* (Google's "market dominance" arose from hiring skilled engineers, innovating constantly, and making shrewd business decisions in building the "industry's highest quality search engine"). Indeed, Plaintiffs did not try below (and do not try in this Court) to identify what revenue Google must be denied. They have, in short, defaulted on their burden to show how a remedy aimed at denying Google revenue could be "tailored to fit the wrong creating the occasion for the remedy," *Microsoft*, 253 F.3d at 107.[15]

---

[15] Nor is it sound to argue that Google must be denied the ability to generate or use search-related revenue because Google could "reinvest" that revenue to "secure further distribution." Colorado.Br.5; *see id.* at 23-25. Like most businesses in our market economy, Google reinvests some of its revenue in continuing to improve and promote its products. *See* JA1027* (recognizing that Google "has continued to innovate in search"). By Plaintiffs' logic, Google should be barred from investing not only in promotion and distribution, but in *anything* that might contribute to consumer satisfaction and the success of Google Search. Yet even Plaintiffs do not propose that annihilative remedy, presumably because it would highlight the fundamentally anticompetitive logic of the payment ban.

## III. Even if the Court Agrees with Plaintiffs, Plaintiffs Are Entitled to No More than a Remand for Further Consideration of a Payment Ban

There was no factual or legal basis for the payment ban, and for that reason this Court should reject the cross-appeal. But even if the district court erred in its evaluation of the payment ban, Plaintiffs themselves concede that the proper result would be a remand from this Court for the district court to reconsider its remedies in light of this Court's decision. *See* DOJ.Br.147.

Importantly, on such a remand, the district court could quite rightly again refuse Plaintiffs' remedial proposals. Most of Plaintiffs' arguments for an additional remedy on remand (DOJ.Br.144-46) are simply at war with the district court's findings. They principally assert that a payment ban is needed because the district court's remedies will be ineffective in restoring competition. DOJ.Br.145-46. Again—assuming there was something in need of remediation—that argument cannot be reconciled with the district court's finding that its remedies would be effective. *See supra*, pp. 65-70. Plaintiffs add that the payment ban would have "a swifter impact" than the remedies that the court imposed. DOJ.Br.146. Here again, the court assessed the "impact" of the payment ban and found that, on balance, it would harm competition and consumers. *See supra*, pp. 73-78.

Plaintiffs also urge a payment ban on the theory that Google may stifle GenAI products. DOJ.Br.146. But Plaintiffs' liability case had nothing to do with GenAI. Google is plainly not a monopolist in GenAI; rival GenAI providers

thrived even before the contract remedies were imposed in this case. And the record lacks a basis for judging how a payment ban would affect innovation and competition among GenAI providers. Moreover, the district court found that the contracting remedies it adopted would prevent Google from "us[ing] the same anticompetitive playbook for its GenAI products," JA1662*; *contra* DOJ.Br.146. Plaintiffs' GenAI-based theories for a payment ban are thus not arguments directed to the court's remedial discretion, but rather an undeveloped regulatory proposal. Indeed, as explained, the injunction is *overly* solicitous toward GenAI companies, and nothing would justify adding another heightened remedy that would distort the development of a distinct and rapidly changing market. *See supra*, pp. 46-49.[16]

In short, even if Plaintiffs had shown an error in the district court's framework for evaluating the payment ban, they would still need to offer grounds on remand to justify a payment ban in the face of the district court's many reasons for rejecting it—and they have done neither.

[16] For the same reasons, irrespective of how this Court disposes of the cross-appeal, none of the heightened remedies—the payment ban, data transfer, and syndication—should apply to GenAI-only companies.

## CONCLUSION

The district court's judgment should be reversed.

October 23, 2026

Respectfully submitted,

*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
Ginger D. Anders
Daniel J. Kane
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW
Suite 500E
Washington, DC 20001
(202) 220-1100
Donald.Verrilli@mto.com

Mark S. Popofsky
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 508-4624

Benjamin J. Horwich
Justin P. Raphael
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000

John E. Schmidtlein
Graham W. Safty
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
(202) 434-5000

*Counsel for Appellant-Cross-Appellee Google LLC*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of this Court's order of April 30, 2026. As measured by the word-processing system used to prepare this brief, there are 21,299 words in the brief excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Cir. Rule 32(e)(1).

Dated: October 23, 2026

*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.