ORAL ARGUMENT NOT YET SCHEDULED

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 26-5023
(Consolidated with Nos. 26-5047 & 26-5049)

UNITED STATES OF AMERICA, *et al.*,

*Plaintiffs-Appellees/Cross-Appellants*,

v.

GOOGLE LLC,

*Defendant-Appellant/Cross-Appellee*.

On Appeals from the United States District Court for the District of Columbia, Nos. 20-cv-3010 & 20-cv-3715 (Hon. Amit P. Mehta)

**FINAL BRIEF OF OPENAI AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES/CROSS-APPELLANTS**

AARON M. PANNER
ALEX A. PARKINSON
GEOFFREY J.H. BLOCK
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
aparkinson@kellogghansen.com
gblock@kellogghansen.com

*Counsel for Amicus Curiae OpenAI*

October 27, 2026

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), counsel for *amicus curiae* OpenAI certifies as follows:

### A. Parties and *Amici*

Except for *amici curiae* in this Court, all parties and *amici* appearing before the district court and all parties appearing before this Court are listed in Google LLC's Certificate as to Parties, Rulings, and Related Cases (Document No. 2160428, filed Feb. 23, 2026) and in Plaintiffs' Certificate as to Parties, Rulings, and Related Cases (Document No. 2160541, filed Feb. 23, 2026).

### B. Rulings Under Review

References to the rulings at issue appear in Google LLC's Certificate as to Parties, Rulings, and Related Cases (Document No. 2160428, filed Feb. 23, 2026) and in Plaintiffs' Certificate as to Parties, Rulings, and Related Cases (Document No. 2160541, filed Feb. 23, 2026).

### C. Related Cases

References to related cases appear in Plaintiffs' Certificate as to Parties, Rulings, and Related Cases (Document No. 2160541, filed Feb. 23, 2026).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, *amicus curiae* OpenAI OpCo, LLC states that it is a subsidiary of OpenAI Global, LLC and that Microsoft Corporation is a publicly held corporation that has a financial interest of 10% or more in OpenAI Global, LLC.

## TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..... i

CORPORATE DISCLOSURE STATEMENT ..... ii

TABLE OF AUTHORITIES ..... iv

GLOSSARY ..... vi

INTEREST OF *AMICUS CURIAE* ..... 1

INTRODUCTION ..... 2

ARGUMENT ..... 6

I. THE DISTRICT COURT'S SYNDICATION AND DATA-SHARING REMEDIES ARE FULLY JUSTIFIED, INCLUDING AS APPLIED TO GENAI COMPETITORS ..... 6

A. GenAI Products Compete with GSEs ..... 6

B. GenAI Companies Need Access to GSE Capabilities and Data To Compete Effectively ..... 9

C. The Remedy Appropriately Addresses the Fruits of Google's Unlawful Monopolization ..... 14

D. The District Court Correctly Included GenAI Companies Among "Qualified Competitors" ..... 17

II. GOOGLE'S UNRESTRAINED DEFAULT PAYMENTS WILL LIKELY ALLOW GOOGLE TO MAINTAIN ITS MONOPOLY POSITION ..... 20

CONCLUSION ..... 28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Page

### CASES

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) .......................................................5

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001).........................2, 17

*United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963) ..............................5

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100 (1969) .....................4, 17

### RULES

Fed. R. App. P. 29(a)(4)(E)..........................................................................1

### OTHER MATERIALS

Samuel Axon, *Google Is About To Make Gemini a Core Part of Workspaces—with Price Changes*, Ars Technica (Jan. 16, 2025, 3:15 PM), https://arstechnica.com/ai/2025/01/google-increases-workspace-plan-base-prices-while-adding-gemini-features/.........................................................................................25

European Comm'n, *Commission provides guidance to Google for AI interoperability on Android and sharing of Google Search data under the Digital Markets Act* (July 16, 2026), https://digital-markets-act.ec.europa.eu/commission-provides-guidance-google-ai-interoperability-android-and-sharing-google-search-data-under-2026-07-16_en .................................................26

Sarah Perez, *If You Use Google, You're Training Its AI. Here's How To Opt Out*, TechCrunch (July 6, 2026, 10:04 AM PDT), https://techcrunch.com/2026/07/06/if-you-use-google-youre-training-its-ai-heres-how-to-opt-out.......................................................25, 26

Press Release, Google, *Joint Statement from Google and Apple* (Jan. 12, 2026), https://blog.google/company-news/inside-google/company-announcements/joint-statement-google-apple/ ........ 24

Elizabeth Reid, *A new era for AI Search*, Google (May 19, 2026), https://blog.google/products-and-platforms/products/search/search-io-2026/ ........ 8

Elias Virtanen, *WWDC 2026: Siri AI Runs on Google's $1B Gemini Deal*, Tech Insider (June 9, 2026), https://tech-insider.org/wwdc-2026-siri-ai-gemini-deal/ ........ 24

Jess Weatherbed, *Chrome's AI Features May Be Hogging 4GB of Your Computer Storage*, The Verge (May 6, 2026 6:13 AM EDT), https://www.theverge.com/tech/924933/google-chrome-4gb-gemini-nano-ai-features ........ 26

## GLOSSARY

| | |
|---|---|
| GenAI | generative artificial intelligence |
| GSE | general search engine |
| JA | Joint Appendix |
| LLM | large language model |
| OEM | original equipment manufacturer |

## INTEREST OF *AMICUS CURIAE*[1]

OpenAI is an American artificial intelligence research and deployment company and a leader in generative artificial intelligence ("GenAI") technologies. Its mission is to ensure that artificial general intelligence benefits all of humanity. It develops its own foundation models that are used in a consumer AI service named ChatGPT, an enterprise service named ChatGPT Enterprise, and a developer API that lets others build applications using OpenAI's models. The 2022 launch of ChatGPT was a revolutionary innovation, ushering in a new era in which GenAI is widely and generally available. GenAI competition today is intense. But Google is now using its scale advantage and monopoly profits from search to entrench its search monopoly and extend that dominance into GenAI. Search is an essential input and distribution channel for GenAI. An effective remedy here can strengthen GenAI competition so that innovation can continue to thrive.

OpenAI has a unique interest in this case: as a leading GenAI company that competes with Google's general search engine and depends on search-related data to power its own products, it has firsthand knowledge of how Google's scale advantages threaten to entrench Google's search monopoly and choke off

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus curiae* states that no party or counsel for a party authored this brief in whole or in part, and no one other than *amicus curiae* and its counsel have made a monetary contribution to fund the preparation or submission of this brief. All parties have consented to this filing.

competition from GenAI companies. The district court and the parties recognized OpenAI's unique perspective. Both the Plaintiffs and Google subpoenaed OpenAI seeking documents and testimony; OpenAI's Head of ChatGPT, Nicholas Turley, testified at the remedies trial; and the district court cited Mr. Turley's testimony extensively in its remedies opinion.

## INTRODUCTION

The district court's remedy was amply justified as far as it goes; the problem is that the remedy does not go far enough. The court-ordered syndication and data-sharing remedies are squarely aimed at "'the fruits of [Google's] statutory violation.'" JA1621 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001) (en banc) (per curiam)). As the court found – a finding Google barely challenges – Google's unlawful exclusive distribution agreements gave it a "massive" scale advantage over other competitors. JA1652. Absent effective relief, that scale advantage creates a practically insurmountable barrier to competition.

For one thing, Google's search index – a structured database that organizes information from crawled webpages and other content so a search engine can quickly identify and retrieve the most relevant results – is far more extensive and detailed than any rival's. This is not only because Google sees far more queries but also because third-party websites that may restrict "crawling" by other search engines are practically obligated to give Google permission due to websites' dependence on the

scale of user traffic from Google. For another, Google has massive data about user action, which it uses to rank results and improve its search engine. Google has built up this data while blocking serious competition for more than a decade. This data lets Google deliver more useful search results than its rivals. Although third-party syndication and index solutions exist, those solutions are lower quality than Google's – not because Google is outcompeting those parties but because of Google's scale-based advantages.

The district court's remedies address these barriers and will thereby benefit competition. A Qualified Competitor's ability to rely on syndication from Google for a portion of its query responses helps mitigate Google's incumbency advantage in the short term. And the time-limited requirement that Google provide access to its search index and click-and-query data will help bridge the gap between Google and competitors in the medium term, as rivals further develop independent capabilities.

Google's challenge to the extension of the syndication and data-sharing remedies to GenAI companies that "do not offer (or seek to offer) a GSE," Google Br. 95, ignores both the district court's factual findings and governing law. To start, Google's objection does not apply to OpenAI, which (as the trial record makes clear) currently offers a GSE capability within ChatGPT. More fundamentally, the district court correctly determined that GenAI products pose a potential challenge to

Google's GSE dominance, even if they do so by offering an alternative to Google's GSE technology. Google itself implicitly conceded this by proposing that restrictions on exclusionary practices extend to its own GenAI products, including its GenAI assistant, Gemini. *See* JA1253-54 (explaining that Google's proposal "extend[s] beyond the conduct deemed exclusionary to conduct 'of the same type or class' by restricting how Google may distribute Assistant and Gemini") (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 132 (1969)).

Google suggests that GenAI is beyond the scope of this case because GenAI products are outside the relevant market or unconnected to Google's exclusionary conduct. Not so. GenAI competes with legacy GSE products today and will increasingly compete in the future. GenAI products also depend on search to complement large language models ("LLMs"), which train on a time-limited universe of data. GenAI companies need search capabilities to answer queries calling for recent information and to check responses that may reflect unsupported inferences by the model (i.e., "hallucinations"). Google's claim that GenAI innovators have access to capital ignores the district court's finding that Google's scale advantages are insurmountable without access to data that depends on broad usage – something money cannot buy. Moreover, GSE and GenAI products depend on many of the same distribution channels to gain users and usage; Google uses its monopoly profits – and integration of its own GenAI products into its suite of

products – to prevent competing GenAI companies from gaining access to preferred distribution channels and thus from competing effectively.

While the district court's remedies are meaningful, its refusal to restrict Google's ability to pay for default placement practically guarantees that Google will be able to keep and extend its monopoly. The court found that the fruits of Google's monopolization include both "freedom from threats" – the entrenchment of Google as the default general search engine, with the attendant benefits of "default bias and network effects," JA1645-46 – and massive profits that let Google easily outbid other search engines for default placement. The court barred Google from entering into *exclusive* agreements with original equipment manufacturers ("OEMs"), wireless providers, and browser makers, but it still let Google pay for default placement, apparently out of concern that a broader ban would raise costs for consumers in other markets. Yet, based on the court's own findings, absent restrictions, Google will be able to perpetuate preferred distribution, foreclosing rivals and inviting Google to leverage its GSE dominance into similar dominance over GenAI products. This will bring about the very consumer harm that is the proper focus of antitrust enforcement. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979); *cf. United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 370 (1963) (rejecting argument that "anticompetitive effects in one market could be justified by procompetitive consequences in another"). And this further relief is needed *now*

because Google is already reprising the tactics it used to monopolize search to similarly boost its GenAI products such as Gemini.

## ARGUMENT

OpenAI and other GenAI providers compete with Google to offer users the best search experience. To have a reasonable opportunity to overcome the barriers to entry created by Google's unlawful monopolization, however, OpenAI needs access to search index data and high-quality syndicated query results that only Google can provide. The remedy thus helps to lower those barriers.

At the same time, no rival can compete without distribution, and the district court's failure to bar Google from paying for default placement is an abuse of discretion in light of the court's own findings that Google's ability to foreclose rivals' distribution is one of the advantages it gained through its unlawful conduct. Even now, Google is running the same playbook to extend its GSE dominance to new GenAI products.

### I. THE DISTRICT COURT'S SYNDICATION AND DATA-SHARING REMEDIES ARE FULLY JUSTIFIED, INCLUDING AS APPLIED TO GENAI COMPETITORS

#### A. GenAI Products Compete with GSEs

The district court found "ample evidence that GenAI chatbots grounded in general search perform an information-retrieval function that is similar to GSEs" and found that "the capacity 'to fulfill a broad array of informational needs' constitutes

a defining feature of both products, as Google implicitly acknowledges." JA1662-63 (citation omitted). Furthermore, GenAI's capacity to fulfill a broad range of information needs "renders [it] a potential threat to Google's dominance in the market for general search services." JA1663. Those findings are firmly grounded in the record.

Users turn to ChatGPT for many different uses, including asking the same questions they would ask a GSE. As OpenAI's Head of ChatGPT, Nicholas Turley, testified, "one of the core-use cases that people came to ChatGPT for, it turns out, is asking questions." JA1327 (382:11-12). OpenAI has "observed . . . that users were doing a slice of the things that they used to do on Google.com or in Google Search in general, using ChatGPT." JA1331 (386:8-10). *See also* JA2185-93 (observing that OpenAI products are reasonably interchangeable with GSE products for many uses).

One reason consumers turn to ChatGPT is that OpenAI can provide a *better* search experience than traditional GSEs. JA2186. By combining OpenAI's LLMs with more traditional search tools, OpenAI can "solve similar user problems [to what Google addresses] in our own way." JA1333 (389:24). A user who asks questions of a traditional GSE receives a list of links and quotation blocks. ChatGPT, by contrast, allows users to ask questions in natural language and responds using natural language. While ChatGPT, like Google's GSE products, surfaces sources and

information from the web, it presents that information and highlights those sources in a more convenient way, so users are likely to open and explore them.

Since the liability trial, convergence between GenAI and GSE products has increased; Google has also sought to leverage its search monopoly to prevent competition from GenAI companies. Google's GSE products (including Google.com and the Google app) increasingly resemble ChatGPT and other GenAI offerings.[2] In responding to queries, Google puts its own AI Overviews at the top of the page; it also transitions AI Overviews into AI Mode, instantly distributing Google's AI to Google Search's huge user base. Google's AI Overviews are provided for substantially the same purpose as Google Search – i.e., to provide users with answers to search queries – but Google is changing its GSE user interface to resemble GenAI competitors. OpenAI recognized that its "competitors," including Google, are "working on better Search with LLMs." JA2189.

GenAI users, meanwhile, are increasingly asking queries that require searching the web to inform the answer. GenAI companies are responding by offering search products. For example, ChatGPT offers users web search and has a search engine, which competes directly with GSEs. There was competition between

[2] In May 2026, Google announced "A new era for AI Search"; when users go to Google.com, they now enter their queries in an "intelligent AI-powered Search box." Elizabeth Reid, *A new era for AI Search*, Google (May 19, 2026), https://blog.google/products-and-platforms/products/search/search-io-2026/ (last visited Aug. 3, 2026).

GenAI and GSE companies in search at the time of the remedies trial, and that competition has continued to increase.

### B. GenAI Companies Need Access to GSE Capabilities and Data To Compete Effectively

The district court recognized that GenAI companies require search capabilities to compete. OpenAI is working to build its own high-quality search infrastructure. But doing so requires overcoming high barriers to entry created by Google's long-time dominance; the district court's syndication and data-sharing remedies will help OpenAI to do so.

**1.** The court found that grounding – "taking the query the user enters and referring to an outside database such as a search index" – "reduces an LLM's hallucinations and improves its factuality"; it also "provides a solution to the recency issue, because the LLM can pull from and incorporate up-to-date information." JA1596. The record supports those findings. OpenAI's business documents reflect that "'Search' ultimately is critical for OpenAI's mission." JA2192. Mr. Turley similarly testified that search is "a necessary component" of both ChatGPT today and OpenAI's vision for more capable GenAI consumer products. JA1332 (388:2-5).

The need for search capabilities to complement GenAI technology stems from the nature of the LLMs on which GenAI products rely. LLMs are trained on a finite and date-limited (though very large) universe of data. Training is a one-time

process; an LLM cannot "know" information on which it was not trained, including information that postdates its training data. This is known as a "knowledge cut-off." JA1327 (382:18-20).

If a user asked a previous version of ChatGPT (which lacked search capabilities) a question about events after its model's knowledge cut-off, ChatGPT would infer the answer based on dated information. Today, however, ChatGPT can "ground" its answers, searching for information about recent events and answering the query based on the latest information available on the Internet. Grounding also helps prevent "[h]allucination[s]," which occur when ChatGPT "will make up facts that are maybe probable to be true but not actually true." JA1328 (383:5-8). This is one way in which OpenAI needs "a source of real-time information to complement" its LLM product. JA1329 (384:16-18).

**2.** OpenAI has faced significant obstacles in integrating search capabilities into its GenAI products. One key barrier has been that OpenAI lacks the high-quality search index that Google enjoys as one of the fruits of its search monopoly.

Building a comprehensive, high-quality index requires enormous scale. Google has the largest and most sophisticated search index – by far – which reflects the benefits of its scale advantage arising from long-time search dominance. No rival, including OpenAI, can replicate the breadth and quality of data that Google

enjoys. Due to Google's search dominance, many websites depend on Google for traffic and ad revenue. As a result, many sites give Google, but not Google's competitors, full access to crawl them. Google's search infrastructure also leverages direct data feeds from its extensive ecosystem of online properties (e.g., YouTube, Google Maps, Shopping, etc.) and from major third-party properties that have deals with Google. Furthermore, Google has access to an array of "content silos" (e.g., content behind a paywall or login, internal company databases, dedicated databases for crawlable video timestamps and mapped local business directories, email inboxes) that other companies cannot access.

Building a search index is highly resource-intensive. *See* JA1334 (392:2-5). OpenAI has invested heavily, with an initial goal of serving "about . . . 80 percent or so of our traffic from our own first-party index." JA1336 (394:23-25). Even if ChatGPT reaches that 80% goal, that would still leave 20% of queries that are difficult to answer for OpenAI but not for Google, thanks to Google's search monopoly position (and related feedback loops).

OpenAI has partnered with third-party search providers, but those providers lack Google's resource and scale advantages, and OpenAI has "encountered quality issues" with those providers. JA1334 (392:19-20). And while Google has licensed its Search API to Meta (as it has to other third parties) "to provide search features" and to "link grounding in Meta's AI chat," JA2194, Google rebuffed OpenAI's

efforts to license a Search API, JA2194. Google should not be permitted to limit access to its Search APIs to companies it determines are not competitive threats.

A further difficulty OpenAI faces is the need for click-and-query data – information about how users interact with search results. A high-quality search engine provides users with the information they are most likely to find relevant. For example, a user might search "best noise cancelling headphones"; if a large percentage of users click on a particular website among the results of that search, that helps to identify the website that can best satisfy the user's query. Such usage data is critical to building a search product because it shows which responses users prefer.

Amassing useful click-and-query data requires massive scale; again, Google's GSE monopoly gives it unrivaled access to such data. Google's ranking algorithms are optimized using an extensive feedback loop powered by billions of daily user interactions. Google taps into hundreds of ranking signals – from user behavior (clickthrough rate, user hovers, time spent on subsequent result page, etc.) to content quality and query intent – to determine the best search result. OpenAI lacks the click-and-query data necessary to build a search engine that could compete with Google.

Google's advantage is especially pronounced with respect to "the less common" "long-tail" queries. JA1338 (396:5-7); No. 20-cv-3010 (APM), Dkt. 1395, at 403:7-10. Long-tail queries often involve search phrases that are longer, more specific, and reflect a stronger user intent than broad keywords. For example, instead of a general query such as "best summer vacation in New England," some users might ask: "Assume you are a budget travel advisor. Find me the best summer vacation in New England that is reasonably priced, has few mosquitos, and is within a two-hour drive of Boston." Although each long-tail query is asked infrequently, "a bit more than half of what . . . users want to do in ChatGPT relies on long-tail queries." JA1338 (396:5-6). OpenAI's ranking system lacks the advantage that Google obtains from a dominant market position that has generated billions of daily interactions over many years.

OpenAI cannot replace the need for click-and-query data by improving its LLM models; the click-and-query data is what "allows [OpenAI] to train the search system itself or make the search system itself. Put another way, the [click data] helps [OpenAI] build the search piece." JA1340-41 (401:23-402:1). Nor can OpenAI access it today – Google refuses to license this data (which it acquired as a fruit of its monopolization). In sum, Google uniquely possesses high-quality, scale-dependent data that challengers such as OpenAI need to compete.

### C. The Remedy Appropriately Addresses the Fruits of Google's Unlawful Monopolization

The search syndication and data-sharing remedies are squarely aimed at the fruits of Google's anticompetitive distribution agreements. The district court found that "Google gets substantially more queries than its rivals as a result of the defaults." JA1058. As a result, "Google's vast trove of User-side Data is a fruit of its anticompetitive agreements." JA1718. Google's massive scale advantage freezes competition; as the court found, because competitors face "perpetual scale and quality deficit[s]," they have "no genuine hope of displacing Google." JA1060.

The remedies imposed by the district court – search syndication, search index data sharing, and user-side data sharing – work together to foster competition in the short and medium term. As Mr. Turley explained, the court's search syndication and data-sharing remedies are "very, very helpful," but they "are helpful on different timelines." JA1345-46 (424:25, 425:24).

The syndication remedy is designed to close gaps in "'real-time information and currency'" (i.e., freshness) while Qualified Competitors build their own index. JA1734 (quoting JA1346 (425:1-10)). This remedy would allow OpenAI to license Google's search results for a percentage of annual queries, capped at 40% in the first year. JA1739. That "would be helpful now" because it would enable OpenAI "to immediately improve" the "real-time information" ChatGPT can access. JA1346 (425:1-10). Google's search results – especially for long-tail queries – will help

OpenAI overcome barriers it currently faces to accessing sufficient, high-quality, real-time web data, while it continues to build an independent search product. Without search syndication, a "chicken and egg" problem arises: OpenAI (and other Google competitors) need more users to improve quality, but OpenAI faces a challenge to attract users at the scale necessary to compete because Google has higher-quality, scale-dependent data (such as click-and-query data). The district court thus did not abuse its discretion in concluding that the search syndication remedy "would enable Qualified Competitors to compete in the short term as they work towards developing a GSE that can independently compete against Google." JA1734.

The search index and user-side data will aid OpenAI "in the medium run" because it will better enable OpenAI to "build a great, high-quality index" and search capability. JA1346 (425:16-22). Access to Google's search index data will improve the "comprehensive[ness]" of OpenAI's index, which will help OpenAI "respon[d] to a wide range of user queries." JA1656 (citing JA713, JA715-17 (6303:18-25, 6307:18-23, 6308:12-6309:1) (Nayak) (explaining that the "comprehensiveness of the index is crucial to being able to serve long-tail queries")). As Mr. Turley testified, "access to the data that underlies Google's [search] index ... would accelerate the development of [OpenAI's] own index." JA1342-43 (409:11-410:22). For example, as mentioned above, some website publishers block non-Google

crawlers,[3] because publishers depend on monopoly search traffic driven by Google. The district court thus appropriately concluded that the search index remedy was necessary to "enable rivals to overcome the scale gap by allowing them to more quickly build a competitive search index—one that is robust in volume, freshness, and utility." JA1707.

The user-side data remedy (including click-and-query data) will likewise help OpenAI "directly improve[ ] quality," including "in responding to long-tail queries." JA863, JA1718. User data allows a search product to "learn[ ] not only about the user's interests but also the relevance of the search results and quality of the webpages that the user visits." JA862. For example, "[b]ecause humans are imperfect, so too are their queries. Google relies on user data to decipher what a user means when a query is typed imprecisely." JA864. "User-interaction data is the raw material that Google uses to improve search services." JA1715. Testimony during the remedies trial confirmed this. For example, Microsoft's Vice President of Bing Growth, Michael Schechter, testified that access to queries that Bing had not seen before potentially would improve pattern-matching recognition. JA1718 (citing JA1383-84 (1019:10-1020:18)). Ranking data is difficult for competitors to replicate without data on historical usage – an inherent incumbency advantage. User

---

[3] A crawler is a generic term for any program that is used to automatically discover and scan websites by following links from one webpage to another.

data is critical for OpenAI to build an independent search engine that generates relevant results for users.

Google complains (at 97) that, because there was no finding that GenAI products compete in the GSE market, the search syndication and data-sharing remedies cannot be properly tailored to address Google's unlawful conduct. This makes little sense. It is black-letter law – and Google conceded below – that courts may prohibit "acts 'of the same type or class' as the unlawful acts." JA1662 (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 132 (1969)). Google does not challenge that its unlawful exclusive distribution agreements gave it a "massive" scale advantage over its competitors. JA1652. Nor does it dispute that the district court found that GenAI products compete with GSEs and that GenAI products threaten Google's monopoly position. Those findings are sufficient to show that the court's syndication and data-sharing remedies are squarely aimed at "'the fruits of [Google's] statutory violation.'" JA1621 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001) (en banc) (per curiam)).

### D. The District Court Correctly Included GenAI Companies Among "Qualified Competitors"

The district court correctly extended syndication and data-sharing remedies to GenAI companies. In fashioning an effective remedy, the court had to predict where future competition would emerge. And the record strongly supports the court's finding that "GenAI [is] a potential threat to Google's dominance in the market for

general search services." JA1663. For example, Google serves as the default search engine for Apple's Safari web browser. At trial, one of Google's witnesses, Apple executive Eddy Cue, was asked what it would take for a competitor "to provide genuine competition to Google for Apple's default on Safari." Cue answered: "I don't think the incumbents can do it. . . . The people that have the opportunity to do it are" those "leveraging the new technologies, . . . the Perplexities, the OpenAIs of the world." JA1498-99 (3845:15-3846:2).

Google's argument (at 95) that the district court "committed an obvious and serious error in forcing Google to aid companies that offer GenAI products but do not offer (or seek to offer) a GSE" misses the mark. For one thing, OpenAI *has* a proprietary general search engine in its products, so Google's objection does not apply to OpenAI. Moreover, the court found "ample evidence that GenAI chatbots grounded in general search perform an information-retrieval function that is similar to GSEs." JA1662. Google's complaint thus fails on its own terms.

Google is also incorrect when it argues (at 95) that "the district court never found that GenAI products had anything to do with either Google's conduct or its maintenance of monopoly power." On the contrary, as noted above, the court found that GenAI poses a threat to Google's search-market dominance. *See* JA1663. Google does not challenge that finding.

Finally, although Google complains (at 95) that "[n]obody claims Google has ever had (or threatened to have) a monopoly over GenAI products," the district court justified its remedies in part on its concern that Google could "use the same anticompetitive playbook for its GenAI products that it used for Search," JA1662, a concern that is amply justified. Google's dominance is reinforced by an ecosystem that spans upstream inputs and downstream distribution. That ecosystem lets Google distribute and integrate its AI in ways no independent competitor can match. OpenAI and other independent competitors must win each user from scratch; they cannot steer existing users of other services to their AI products or bundle products together the way Google bundles, say, Gemini with Workspace. Nor do GenAI companies have any monopoly profits to pay distributors, as Google does. Absent robust remedies – including, as discussed below, restrictions on payments for default placement – Google's monopoly profits and its interlocking platforms and products (e.g., Search, Chrome, Gemini, Android, Google Workspace) will form a self-reinforcing loop that locks out GenAI competition. Google ran this playbook once to fortify its search monopoly; left unchecked, it will run it again to keep GenAI from unseating it.[4]

[4] Google argues (at 96) that third-party GenAI products are "wildly successful" and that "a leading competitor, OpenAI[,] reported a market share of approximately 85%." But Google's claim about OpenAI's "market share" misrepresents the record. During the remedies proceeding, Google introduced an

It is true here (as in every antitrust case) that the district court cannot know what competition will look like in the future. But the record clearly shows that GenAI and GSE companies compete; that Google amassed critical data through its anticompetitive conduct; and that, without those data inputs, GenAI companies will struggle to compete and innovate. The record thus fully supports the district court's extension of the remedies to GenAI companies.

## II. GOOGLE'S UNRESTRAINED DEFAULT PAYMENTS WILL LIKELY ALLOW GOOGLE TO MAINTAIN ITS MONOPOLY POSITION

Google monopolized the GSE market by using its monopoly profits to secure favored distribution that foreclosed rivals and protected Google from meaningful threat. The district court's own findings compel the conclusion that, without restrictions on default payments, Google will remain free to lock up preferred

---

OpenAI document stating that, back in 2024, OpenAI had an 85% share of *web visits* out of a pool of other select websites. JA2222. Google did not attempt to show (and could not have shown) that a share of web visits equates to a share of GenAI usage. Indeed, the district court asked Mr. Turley to clarify "what web market share means," including whether it "include[d] queries on any app, chatbot app[?]" JA1356 (488:12-16). Mr. Turley replied that the 85% number simply compared the number of users who visited ChatGPT.com with the number who visited a select group of competitor websites such as Claude.ai and gemini.google.com – it did not include mobile apps, for example. Mr. Turley also highlighted the document's disclaimer that "[n]on-chat competitive products such as Meta's integrations (FB, WhatsApp etc) and [Microsoft] and Google integrations into existing products [including Gemini] may be significantly larger than we have visibility into from competitive web data." JA2222. And, of course, in the dynamic GenAI space, these figures can shift.

distribution channels, block effective competition in search, and secure dominance for its GenAI assistant, Gemini. The failure to bar those payments was an abuse of discretion.

**A.** Google pays massive sums to third parties – including OEMs, browser companies, and wireless carriers – to secure preferential positions in the distribution channels it does not own. The district court correctly held that Google's previous "distribution agreements [we]re exclusionary contracts that violate Section 2." JA1044. And the court found that, because of Google's anticompetitive conduct, Google entrenched itself as the default GSE, giving Google the attendant benefits of "default bias and network effects." JA1646.

One of these benefits is Google's monopoly profits. As the district court found, "default status meant default monopoly profits, which Google used to lock in the next round of distribution agreements." JA1643. The trial testimony bears this out. For example, Google executive Dr. Sridhar Ramaswamy explained that "the revenue share payments 'provide an incredibly strong incentive for the ecosystem to not do anything'; they 'effectively make the ecosystem exceptionally resistant to change'; and their 'net effect is to basically freeze the ecosystem in place.'" JA1643-44 (citations omitted; cleaned up). Microsoft's CEO, Satya Nadella, likewise testified that Google's distribution advantage creates a "vicious cycle that [Microsoft is] trapped in" because the "defaults get reinforced." JA1644. In short,

as the district court found, Google "used [its] monopoly profits to secure the next iteration of exclusive distribution deals, paying out billions of dollars in revenue share each year." JA1659.

Even without third-party agreements, Google's ownership of key distribution channels creates a significant obstacle for rivals. For example, Google owns the web browser Chrome and Chrome's default search engine is Google. When a user types a query into Chrome, the browser automatically routes it to Google (unless the user has changed Chrome's settings, which is rare). Chrome does not affirmatively prompt users in the United States to choose a search engine, and, although users can manually change their settings to route Chrome queries to other legacy GSEs (e.g., Bing), Google has rebuffed OpenAI's repeated requests to let Chrome users select ChatGPT as an alternative search option. Google thus uses its ownership of Chrome to foreclose competition from GenAI rivals. As Mr. Turley explained, "most people don't even think about what search engine to use or how to get their real-time information; they will just type into their browser bar, which, for most people, is Chrome." JA1355 (477:5-8).

**B.** Despite finding that Google's ability to pay for favored distribution is one of the fruits of its unlawful conduct, the district court did not prevent Google from paying for default distribution. That was an abuse of discretion. Indeed, the court found that competition would likely be foreclosed absent such a ban,

recognizing that, "[d]ue to Google's massive financial advantage and its superior monetization, distributors will be incentivized to stick with Google because it can pay more, thus leaving in place the very forces that effectively have made the ecosystem exceptionally resistant to change." JA1690 (cleaned up).

The district court thus abused its discretion in declining to issue a default payment ban – a remedy that the court itself recognized "could bring about a much-needed thaw" and "stimulat[e] competition among Google's rivals to secure default distribution." JA1683-84. It does not matter whether the payments that the court allowed would themselves support a finding of exclusionary conduct: even if Google's future default agreements are not technically exclusive, any agreement in which Google pays for default position will perpetuate its dominant market share and foreclose rivals' (and would-be rivals') efforts to mount a realistic challenge. And Google will continue to enjoy the fruits of its unlawful monopolization.

**C.** To the extent the district court based its refusal to bar default payments on its "hope" that "Google will not simply outbid competitors for distribution if superior products emerge," given GenAI companies' access to capital, JA1690-91, that "hope" has no support in the record and is contrary to OpenAI's experience.

Distribution is "existential" for GenAI companies. JA1349 (464:6-11). Even if OpenAI were able to provide users "the best offering," "if people can't discover it or if people can't find it even after they've discovered it or if there are significant

hurdles in getting to the product, we don't have the best product." JA1348-49 (463:25-464:5). Google, however, is rapidly extending its longstanding OEM distribution for search into GenAI. For example, in January 2026, Apple and Google announced that they "entered into a multi-year collaboration under which the next generation of Apple Foundation Models will be based on Google's Gemini models"; this "will help power future Apple Intelligence features, including a more personalized Siri coming this year."[5] And in June 2026, Apple announced that its GenAI assistant, Siri AI, will run "on a custom version of Google's Gemini model."[6]

Google leverages its dominant market position in three main ways: (a) access to distribution, (b) access to inputs, and (c) interoperability:

- **Distribution:** Google locks out competing GenAI companies from key distribution channels. It uses its monopoly profits from search to pay third-party distribution partners to ship and favor its AI assistant as the default, which in turn favors Google's GSE in a mutually reinforcing cycle. Crucially, Google also bundles its GenAI with its other products to discourage consumers from using third-party GenAI products. For example, Google

---

[5] Press Release, Google, *Joint Statement from Google and Apple* (Jan. 12, 2026), https://blog.google/company-news/inside-google/company-announcements/joint-statement-google-apple/.

[6] Elias Virtanen, *WWDC 2026: Siri AI Runs on Google's $1B Gemini Deal*, Tech Insider (June 9, 2026), https://tech-insider.org/wwdc-2026-siri-ai-gemini-deal/.

Workspace enterprise customers could previously purchase a Gemini integration as an add-on. But when not enough businesses bought Gemini, Google began bundling it inside Google Workspace (and raised Workspace's overall price).[7]

- **Inputs:** At least in part because of its anticompetitive conduct, Google enjoys an unparalleled, extensive ecosystem of data and user-generated content. Yet Google forecloses or disadvantages third-party access to that data, which provides key inputs for Gemini. For example, in June 2026, Google changed its privacy settings to permit itself to train its AI products on any media uploaded to Google Search, including users' images, files, and audio and video recordings.[8] Thus, if a user uses Google Translate to practice speaking, that audio may now be saved and used as training data.[9] Similarly, if a user uploads a photo to Google Lens – which lets users search for something visually – that photo may be saved and used for training. Google's competitors,

---

[7] *See* Samuel Axon, *Google Is About To Make Gemini a Core Part of Workspaces—with Price Changes*, Ars Technica (Jan. 16, 2025, 12:15 PM), https://arstechnica.com/ai/2025/01/google-increases-workspace-plan-base-prices-while-adding-gemini-features/.

[8] Sarah Perez, *If You Use Google, You're Training Its AI. Here's How to Opt Out*, TechCrunch (July 6, 2026, 10:04 AM PDT), https://techcrunch.com/2026/07/06/if-you-use-google-youre-training-its-ai-heres-how-to-opt-out.

[9] *Id.*

including GenAI companies, have no access to this data (or anything comparable).[10]

- **Interoperability:** Google uses its array of products to disadvantage GenAI competitors. For example, for users who have certain Gemini AI features enabled on Chrome, Chrome automatically downloads a 4GB file so that the Gemini Nano AI model can run locally on the user's device.[11] In addition, Android lets users voice-control third-party apps using Google's GenAI assistant, but not through any third-party assistant.[12]

Despite OpenAI's best efforts, it has been stymied in those efforts to gain default distribution anywhere. JA1352 (472:16-18). For example, OpenAI has tried to acquire preferred distribution channels with OEMs, including Samsung, but could not. "Samsung is going with Google as the default [GenAI assistant] for a large amount of money. So it's hard to argue that Google has not . . . affected our ability

---

[10] *Id.*

[11] Jess Weatherbed, *Chrome's AI Features May Be Hogging 4GB of Your Computer Storage*, The Verge (May 6, 2026, 6:13 AM EDT), https://www.theverge.com/tech/924933/google-chrome-4gb-gemini-nano-ai-features.

[12] In July 2026, the European Commission issued two sets of binding specification measures to Google under the European Union's Digital Markets Act because, "on Android phones, competitors' AI assistants only have restricted access to key functionalities of the Google Android operating system. Without this access, alternative AI assistants are not competing on an equal footing with Google's own AI services that have full access." European Comm'n, *Commission provides guidance to Google for AI interoperability on Android and sharing of Google Search data under the Digital Markets Act* (July 16, 2026).

to have that deal given that they got the deal and we didn't get far enough to even be at the table." JA1354 (474:10-17).

The Samsung-Google agreement shows how Google intends to keep using distribution agreements to prevent competition. The agreement requires Google to pay Samsung a confidential fixed monthly fee, plus a percentage of "Gemini Ad Revenue" and "Qualified Net Subscription Revenue." JA2196-97. In exchange, Gemini is tightly integrated into Samsung's devices. The agreement requires that the Gemini mobile application be preloaded; that users be able to "long press" the device's side button to launch Gemini; and that users be able to launch Gemini by saying "Hey Google" or "Hey Gemini." JA2198. True, this agreement is not technically exclusive. But just as the district court recognized that "Google's browser agreements are exclusive [in practice] insofar as they establish Google as the out-of-the-box default search engine," JA1032, the practical effect of the Samsung-Google agreement is to prevent competition from other GenAI companies that might otherwise gain seamless access to Samsung device users. And by building a fence around seamless distribution to Samsung users, Google seeks to prevent OpenAI and other GenAI companies from acquiring the user base necessary to generate scale-dependent user data. This is a self-reinforcing cycle: Google pays for default distribution, which increases Google Search queries; those queries are then automatically routed through Google's GenAI products, giving Google even

greater user data that its competitors cannot obtain. Unless this Court bars Google's default payments, Google will continue to use its monopoly profits to foreclose competition from GenAI competitors, just as it did in becoming a GSE monopolist.

The district court also suggested that a ban on default payments may not be necessary because "Rival GenAI products have had some success in obtaining distribution with OEMs and other companies. OpenAI, for instance, has partnered with Apple, T-Mobile, Yahoo, DuckDuckGo, and Microsoft." JA1605. These partnerships, however, did not relate to critical distribution channels. And, while OpenAI has some "partnerships" with companies, OpenAI has been unable to secure the *default placements* with OEMs and other distributors that are key to challenging Google's incumbent position. OpenAI's existing partnerships do not represent meaningful competition for distribution channels that would help to mitigate Google's unlawful monopoly.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's syndication and data-sharing remedies and reverse the district court's decision to permit Google to pay for default placement.

Dated: October 27, 2026

Respectfully submitted,

/s/ *Aaron M. Panner*

AARON M. PANNER
ALEX A. PARKINSON
GEOFFREY J.H. BLOCK
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
aparkinson@kellogghansen.com
gblock@kellogghansen.com

*Counsel for Amicus Curiae OpenAI*

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(g), that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), the brief contains 6,386 words.

I further certify that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared using Microsoft Word in a proportionally spaced typeface (Times New Roman, 14 point).

/s/ *Aaron M. Panner*
Aaron M. Panner

October 27, 2026

## CERTIFICATE OF SERVICE

I hereby certify that, on October 27, 2026, I caused to be filed electronically the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ *Aaron M. Panner*
Aaron M. Panner