**ORAL ARGUMENT NOT YET SCHEDULED**

**Nos. 26-5023, 26-5047, 26-5049**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

UNITED STATES OF AMERICA, *et al.*,

*Plaintiffs-Appellees/Cross-Appellants*,

v.

GOOGLE LLC,

*Defendant-Appellant/Cross-Appellee.*

---

On Appeals from the United States District Court for the District of Columbia, Nos. 20-cv-3010 & 20-cv-3715 (Hon. Amit P. Mehta)

---

# FINAL BRIEF OF *AMICUS CURIAE* DUCK DUCK GO, INC. IN SUPPORT OF PLAINTIFFS-APPELLEES/CROSS-APPELLANTS

---


MELISSA H. MAXMAN
RONALD F. WICK
COHEN & GRESSER LLP
2001 Pennsylvania Ave, NW,
Suite 300
Washington, D.C. 20006
(202) 851-2082
mmaxman@cohengresser.com
rwick@cohengresser.com

*Counsel for Amicus Curiae*
*Duck Duck Go, Inc.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), undersigned counsel for *amicus curiae* Duck Duck Go, Inc. ("DuckDuckGo") states that:

**Parties and Amici.** All parties, intervenors, and amici appearing before the district court and in this court are listed in Plaintiffs' Certificate as to Parties, Rulings, and Related Cases filed on October 21, 2026 (App. Dkt. 2199506), and/or in Plaintiffs' Certificate as to Parties, Rulings, and Related Cases filed on February 23, 2026 (App. Dkt. 2160541), referenced therein.

**Rulings Under Review.** References to the rulings at issue appear in the Parties' Certificates as to Parties, Rulings, and Related Cases (App. Dkts. 2160428, 2160541).

**Related Cases.** A list of related cases appears in the Parties' Certificates as to Parties Rulings, and Related Cases (App. Dkts. 2160428, 2160541).

*/s/ Ronald F. Wick*
Ronald F. Wick

## STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(b), the undersigned counsel for *amicus curiae* DuckDuckGo states that all parties have consented to DuckDuckGo's participation as *amicus curiae*. Pursuant to D.C. Circuit Rule 29(d), the undersigned counsel for DuckDuckGo states that a separate brief is necessary because the perspective that DuckDuckGo brings is distinct from those likely to be submitted by other amici. As further detailed in its brief below, DuckDuckGo operates the leading privacy-focused search engine in the United States, is the leading differentiated competitor to Google in the U.S. general search engine market, and has done substantial research on the "stickiness" of Google's search engine defaults and how they distort consumer demand and choice. Thus, DuckDuckGo has unique insight into how Google's conduct impacts competition in the relevant markets.

*/s/ Ronald F. Wick*
Ronald F. Wick

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICUS CURIAE ........................................................ 1

SUMMARY OF ARGUMENT ........................................................ 2

FACTUAL BACKGROUND ........................................................ 3

ARGUMENT ........................................................ 6

I. THE GOOGLE DEFAULT CONTRACTS WERE EXCLUSIVE CONTRACTS ........................................................ 6

A. Contracts that permit arrangements with a monopolist's competitors can be exclusive dealing arrangements where they deprive rivals of the most cost-efficient method of distribution and effectively prevent meaningful competition ........................................................ 6

B. Being preset as the default for a search access point on a browser or device is the most cost-efficient means of distribution for a search engine. ........................................................ 9

C. Google's distribution contracts have foreclosed rivals from the most cost-efficient means of distribution. ........................................................ 13

II. GOOGLE'S EXCLUSIVE CONTRACTS HAVE HAD THE ANTICOMPETITIVE EFFECT OF PREVENTING DIFFERENTIATED SEARCH ENGINES FROM COMPETING MEANINGFULLY IN THE RELEVANT MARKETS ........................................................ 15

A. By responding to consumer demand for search privacy, DuckDuckGo has engaged in precisely the competition the antitrust laws seek to foster. ........................................................ 16

B. Google's exclusive contracts have hindered DuckDuckGo's ability to distribute its privacy-focused search engine. ........................................................ 19

C. Google's argument that its dominance is solely a function of third parties' "product design" fails. ........................................................ 22

CONCLUSION ........................................................ 27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aerotec Int'l, Inc. v. Honeywell International, Inc.*,
836 F.3d 1171 (9th Cir. 2016) .......... 8, 9

*Brown v. Google LLC,* No. 4:20-cv-03664-YGR, ECF No. 1153-1, at 9-13 (filed Mar. 20, 2025) (N.D. Cal.) .......... 17

*LePage's Inc. v. 3M*,
324 F.3d 141 (3d Cir. 2003) .......... 7, 8

*New York v. Meta Platforms*,
66 F.4th 288 (D.C. Cir. 2023) .......... 8

*Tampa Elec. Co. v. Nashville Coal Co.*,
365 U.S. 320 (1961) .......... 9

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) .......... 6, 7, 21

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012) .......... 7

**Statutes**

15 U.S.C. § 2 .......... 1

**Rules**

Federal Rule of Appellate Procedure 29 .......... 1

**Other Sources**

DuckDuckGo, *Dear Google: We Agree Search Competition Should Be "Only 1 Click Away" – So Why Is It 15+ on Android?* (Oct. 14, 2020), https://spreadprivacy.com/one-click-away/ .......... 12

DuckDuckGo, *Is Private Browsing Really Private?* (Mar. 1, 2022), https://spreadprivacy.com/is-private-browsing-really-private/ .......... 18

DuckDuckGo, *New DuckDuckGo Research Shows People Taking Action on Privacy* (Oct. 3, 2019), https://spreadprivacy.com/people-taking-action-on-privacy/ .......... 18

DuckDuckGo, *Roadblocks to Competition: Investigate Google's Non-Compliance with the EU's Digital Markets Act* (Nov. 20, 2024), https://spreadprivacy.com/investigate-google-dma/ .......... 25

Geoffrey A. Fowler, *Google Spent $26 Million to Hide This Phone Setting From You*, Washington Post (Nov. 8, 2023), https://www.washingtonpost.com/technology/2023/11/08/google-search-default-iphone-samsung/ .......... 12

Rand Fishkin, *New Research: 20% of Americans Use AI Tools 10X+/Month, but Growth Is Slowing and Traditional Search Hasn't Dipped*, SparkToro (Aug. 26, 2025), https://sparktoro.com/blog/new-research-20-of-americans-use-ai-tools-10x-month-but-growth-is-slowing-and-traditional-search-hasnt-dipped/ .......... 21

YouGov, *How Americans Feel About Online Search Privacy* (May 4, 2022), https://yougov.com/articles/42382-how-americans-feel-about-online-search-privacy/ .......... 17, 18

## INTEREST OF AMICUS CURIAE[1]

Duck Duck Go, Inc. ("DuckDuckGo") is an online privacy company that for almost two decades has been operating a privacy-focused search engine in direct competition with Google LLC's ("Google") search engine. As such, DuckDuckGo has substantial experience with, and performed substantial research regarding, the power of defaults in the search industry, the extent of consumer demand for private search and browsing products, and the real-world impact of Google's default search agreements on the ability to distribute a privacy-focused search engine to consumers.

DuckDuckGo submits this amicus brief to assist the Court's analysis of the district court's holding that Google's agreements violated Section 2 of the Sherman Act, 15 U.S.C. § 2. As the leading differentiated search competitor to Google, DuckDuckGo has a unique perspective on the anticompetitive effects that Google's exclusive default agreements have had on the markets at issue in this case.

---

[1] This brief is filed pursuant to Federal Rule of Appellate Procedure 29(a)(2) and Rule 29(b) of the United States Court of Appeals for the District of Columbia Circuit. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), DuckDuckGo states that no party's counsel authored the brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person other than the *amicus curiae*, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief.

## SUMMARY OF ARGUMENT

DuckDuckGo operates the leading privacy-focused search engine in the United States. It developed its search engine as an alternative to Google for the millions of consumers who are concerned about how their searches are tracked, monitored, and used to profile them. By offering consumers a legitimate, differentiated alternative to Google that addresses an identified demand, DuckDuckGo has engaged in precisely the type of vigorous competition against a dominant monopolist that the antitrust laws are designed to promote.

Notwithstanding the district court's finding that Google is "widely recognized as the best" search engine, an apparent reference to results quality, Google may not be the most desirable search engine for the millions of Americans who place a paramount value on privacy. Nevertheless, many privacy-focused users continue to use Google—often without even knowing they are doing so—for the sole reason that they use a device or browser that is contractually obligated to have Google preset as the default search engine. For many, if not most, users of these devices, the presetting of Google as the default ends the competition for the user's search traffic before it even begins. A competing search engine's only hope of reaching those users is to make them aware that they have a choice of search engines, that their device or browser has a preset default search engine, that that search engine is Google, and that the default can be changed. If the competing search engine

succeeds, it must still rely on the user's ability to execute that change—a process that can require in excess of 10-15 steps for just one device.

DuckDuckGo submits this brief as *amicus curiae* to provide its perspective as the leading differentiated competitor to Google, and to make two points in particular:

*First,* preset default search engines, as currently designed, are extraordinarily powerful and highly resistant to change, particularly when held by an entrenched monopolist. Thus, Google's contracts with browsers and device manufacturers that effectively require those distributors to preset Google as the exclusive default search engine on multiple (or all) search access points are *de facto* exclusive agreements. They should be treated as such under the antitrust laws.

*Second,* the anticompetitive impact of Google's exclusive contracts is so pervasive that even a rival such as DuckDuckGo—which has clearly differentiated itself to meet an identified consumer demand—cannot effectively serve as a competitive check on Google or achieve the scale necessary to do so. While Google attributes this lack of competition to product design choices made by third parties, Google ignores its own role in ensuring exclusivity for itself.

## FACTUAL BACKGROUND

DuckDuckGo is an online privacy company. Its flagship product is a privacy-focused search engine, which is the third-largest search engine in the United States overall and the second-largest U.S. search engine on mobile devices. JA1366. Since

its founding in 2008, DuckDuckGo has expanded its offerings to include additional products that protect online privacy beyond search, including a privacy-focused browser that blocks targeted ads, trackers, and cookies and can be downloaded on all major operating systems. DuckDuckGo also offers two artificial intelligence ("AI") products: Duck.ai, which provides private access to popular chatbots, and Search Assist, which offers answers to search queries that are sourced from the web and appear alongside traditional search results.

From its inception, DuckDuckGo's competition for search traffic has consisted almost exclusively of Google. DuckDuckGo competes with Google in search by offering a differentiated product: a search engine that prioritizes the privacy of its users in order to attract users who want to enjoy the privacy protections DuckDuckGo offers. Unlike Google, DuckDuckGo does not track user search sessions or use click data to build profiles of its users. JA0872. It does not log users' IP addresses. JA0873. And it does not have an option for users to "sign in" to its search engine platform. JA0873.

DuckDuckGo developed its privacy focus in response to consumer research that reflects widespread concerns about online privacy and suggests a significant demand for a privacy-focused search engine. Notwithstanding this demand, DuckDuckGo's share of the U.S. market is only approximately 2½ percent. JA0517. DuckDuckGo's ability to grow its user base has been hamstrung by contracts

between Google and most major search distribution outlets (*i.e.,* browsers, device manufacturers, and wireless carriers) that, when coupled with Google's search default on its Chrome browser, ensured that Google would be the preset default search engine on roughly 70% of search access points on U.S. devices. JA0853-0854. DuckDuckGo has found that even users who would prefer to use a privacy-focused search engine frequently lack awareness that their devices give them a choice of search engines, that they are preset to Google as the default search engine, or that they have the option of changing the setting—let alone an understanding of the labyrinthine series of steps involved in doing so. Thus, Google's control of the preset defaults has prevented DuckDuckGo from effectively distributing its search engine and has deprived privacy-focused consumers of an informed choice.

# ARGUMENT

## I. THE GOOGLE DEFAULT CONTRACTS WERE EXCLUSIVE CONTRACTS.

Google argues that its contracts with distributors were not exclusive dealing arrangements because they permitted distributors to do *some* business with rival search engines. Google's argument, however, mischaracterizes the law regarding exclusive dealing arrangements and ignores the practical effect of the contractual restrictions it places on distributors. By tying up the vast majority of defaults and demanding exclusivity, Google foreclosed to its rivals the most cost-efficient means of distribution. It ensured that few users would even realize they had an opportunity to switch their default to a rival like DuckDuckGo, and that even fewer would be able to do so successfully.

### A. Contracts that permit arrangements with a monopolist's competitors can be exclusive dealing arrangements where they deprive rivals of the most cost-efficient method of distribution and effectively prevent meaningful competition.

In *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001), this Court made clear that an exclusive dealing arrangement need not foreclose *all* distribution of a rival's product to violate Section 2 of the Sherman Act. For example, the Court rejected Microsoft's argument that its license agreements with OEMs were not anticompetitive merely because "Netscape is not completely blocked from distributing its product." *Microsoft*, 253 F.3d at 64. The Court held that argument "insufficient to shield Microsoft from liability for those restrictions because,

although Microsoft did not bar its rivals from all means of distribution, it did bar them from the cost-efficient ones." *Id.* Similarly, the Court held Microsoft's deal with Apple to make Internet Explorer the default browser on Mac OS to be anticompetitive, even though it did not prohibit users or OEMs from accessing rival browsers, because "pre-installation of a browser . . . is one of the two most important methods of browser distribution, and Apple had a not insignificant share of worldwide sales of operating systems." *Id.* at 73.

Google points to the Court's holding that Microsoft's agreement with AOL was exclusive where it forbade AOL from "provid[ing] software using any non-Microsoft browser *except at the customer's request.*" *Id.* at 68 (emphasis added). But the italicized language disproves Google's argument. The fact that the agreement enabled some AOL subscribers to bypass the default and affirmatively request the non-default browsing software did not prevent the Court from treating the agreement as an exclusive dealing arrangement. The Court's holding was entirely consistent with other cases recognizing that *de facto* exclusivity is sufficient to establish an exclusive dealing arrangement. *See, e.g., ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012) ("we look past the terms of the contract to ascertain the relationship between the parties and the effect of the agreement in the real world") (internal quotations omitted); *LePage's Inc. v. 3M,* 324 F.3d 141 (3d Cir.

2003) (holding discounts and rebates conditioned on exclusivity were sufficient to foreclose competition).

The cases cited by Google are not to the contrary. Google cites this Court's opinion in *New York v. Meta Platforms*, 66 F.4th 288 (D.C. Cir. 2023), for the proposition that an exclusive dealing theory fails anytime that counterparties are free to deal with competitors, App. Br.[2] at 70, but *Meta Platforms* said nothing of the kind. In *Meta Platforms,* the Court rejected an exclusive dealing claim based on a policy that merely prohibited apps built to be used on Meta's Facebook platform from linking to competing social networking platforms, on the ground that the policy did not prohibit free-standing apps from interoperating with competitors. Notably, the Court cited the *absence* of any allegation that such network-bridging apps were the most efficient channels for Facebook's competitors to acquire users—unlike the restrictions on Netscape in Microsoft, and unlike the default search settings in this case. *See Meta Platforms,* 66 F.4th at 304.

Google similarly cites *Aerotec International, Inc. v. Honeywell International, Inc.,* 836 F.3d 1171 (9th Cir. 2016), for the proposition that a court should review a contract's "actual terms" without regard to how those terms will impact consumers. App. Br. at 72. But *Aerotec* itself acknowledges that the purpose of analyzing those

---

[2] "App. Br." refers to Google's initial principal brief (Document # 2174652), filed May 22, 2026.

terms, as articulated by the Supreme Court, is to "weigh the probable effect of the contract on the relevant area of effective competition." *Aerotec,* 836 F.3d at 1181 (*quoting Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 329 (1961)).

As discussed more fully below, Google's exclusive default contracts were designed to foreclose, and have effectively foreclosed, rival search engines like DuckDuckGo from competing for users. While they did not prohibit distributors from allowing rivals to compete through less efficient means (such as promoting their apps), and they allowed users to circumvent the default settings, they effectively forced distributors to devote all available "shelf space" to the monopolist's product, making alternative products available only to those customers who specifically sought them out. The relevant inquiry is not whether Google's contracts have blocked its distributors from doing business with competing search engines altogether, but whether they have had the effect of foreclosing meaningful competition for users. The district court correctly determined that they clearly have.

### B. Being preset as the default for a search access point on a browser or device is the most cost-efficient means of distribution for a search engine.

The district court found that "[t]he most efficient channel of GSE distribution is, by far, placement as the preloaded, out-of-the-box default GSE." JA0852. Google does not dispute this finding, nor can it.

The district court found a consensus among behavioral economists that "defaults have a powerful impact on consumer decisions." JA0854 (quoting testimony of behavioral economist Dr. Antonio Rangel). It further found that the fact that users overwhelmingly use Google through preloaded search access points "is explained in part by default bias, or the 'power of defaults.'" *Id.*

As Dr. Rangel testified, search engine defaults generate a "sizeable and robust bias," particularly with respect to mobile search. JA0481. The vast majority of individual searches are carried out "by habit." JA0854. This is because habits develop strongly within situations of high repetition (consumers search with high frequency, using a familiar device and application) and immediate feedback (search users are able to determine immediately whether their query was successful). JA0483. Thus, when a consumer uses a device for the first time and begins searching with the default search engine, and the default search engine generates an "adequate" experience, the consumer becomes "habitized" to that search engine. JA0483.

As the district court found, search users "often are not aware that they are acting out of habit." JA0855. Indeed, "[m]any users do not know that there is a default search engine, what it is, or that it can be changed." JA0855. And the ubiquity of Google's search engine is sufficiently subtle that in one study, nearly half of users interviewed did not even notice "a surreptitious change from Google to Bing on their iPhone." JA0855. Moreover, Google's own user research in 2020 found

that a majority of U.S. Safari users, when searching through the Safari search bar, were unaware that they were actually searching through Google. JA0747-0751; JA2326. Simply put, many of Google's users have never chosen to use Google, and often they are even unaware that they are using Google when they search on their devices.

Google's control of defaults thus insulates it from competitive pressure for searches on devices or browsers where it is the preset default. To compete effectively, a non-default search provider like DuckDuckGo must (i) educate consumers about the fact that they are using Google and are doing so only because they have not overridden a preset default; (ii) convince them to change their default to a different search engine; and (iii) ensure that they know how to implement the many steps necessary to make that change, across multiple devices and search access points. These are hurdles that few consumers will overcome, particularly where the existing default—Google—creates the "adequate" search experience that Dr. Rangel described.

As the district court found, defaults are at their strongest when the product is well-known to users and users are "satisfied" with the product, JA0856, even if they might find an alternative preferable—meaning that as long as Google retains the default, it need not offer the best search engine, but merely a satisfactory one. Deciding to change the default, and deciding which search engine to change it to,

requires a level of effort—such as researching alternatives or having conversations with other consumers—that may prevent users from seeking a preferable alternative to an offering they already find adequate. JA0491.

Even after a user decides to change their default search engine, the district court found that "choice friction" causes users to become "frustrated and stop the process." JA0855. There is substantial choice friction associated with many, if not all, of the Google search defaults. JA0500-0501. For example, replacing the Google search widget with Bing's rival widget is a 10-step process. JA0856. Switching default search engines on Android can require at least 15 steps because there is no "search default" setting on Android. JA0532; *see also* DuckDuckGo, *Dear Google: We Agree Search Competition Should Be "Only 1 Click Away" – So Why Is It 15+ on Android?* (Oct. 14, 2020), https://spreadprivacy.com/one-click-away/ (listing steps); Geoffrey A. Fowler, *Google Spent $26 Million to Hide This Phone Setting From You*, Washington Post (Nov. 8, 2023), https://www.washingtonpost.com/technology/2023/11/08/google-search-default-iphone-samsung/) (showing difficulties encountered by random "people on the street" when asked to change their default search engine).

Instructing users about these steps is an exercise in futility. JA0529. Most users use multiple devices between work and personal use, including phones, tablets, desktops, and/or laptops. JA0530-0531. Each device, in turn, typically has multiple

search defaults, such as browser vs. operating system defaults, or even multiple browsers installed on a single device. JA0531. Thus, fully switching from Google to another search engine requires a user to take between 30 and 50 steps across multiple devices and defaults, which is prohibitive for most users. JA0531. Further, most users do not automatically know the steps involved and must research them and have them close at hand while changing each default and each device. JA0491.

As a result, even DuckDuckGo's most ardent users—those who regularly recommend DuckDuckGo to friends and family—report that they have not switched all of their defaults away from Google. JA0531-0532. As Google has long recognized, being the preset default at a search access point is the most cost-efficient method of search engine distribution, and no other method comes close.

### C. Google's distribution contracts have foreclosed rivals from the most cost-efficient means of distribution.

By ensuring that Google is the default search engine on the vast majority of search access points, Google's distribution contracts have foreclosed DuckDuckGo and other search engines from the most efficient means of distribution. Google's Internet Services Agreement ("ISA") with Apple, which is illustrative of its impositions on other browsers,[3] required Apple to preset Google as the default search

[3] The district found that Google had comparable agreements with other browsers. JA0946.

engine on Apple's Safari browser for all devices. JA0930. As a result, Apple was prohibited from offering users a choice screen that would have allowed them to select their default search engine at the time they set up their device. JA0669. It was prohibited from offering a different default at alternative access points, such as a separate default in Safari's private browsing mode. *Id*. And it was prohibited from offering different default search engines on different devices, such as by offering a device targeted at more privacy-focused consumers that might set DuckDuckGo as the default search engine. *Id*. Although the ISA allowed non-Google search engines to have bookmarks in Safari and allowed users to change the default away from Google, the vast majority of queries were entered on the preset Google default, which was foreclosed to rivals. JA0670.

Google's agreements with Android OEMs and carriers gave it additional exclusive defaults. Google's Mobile Application Distribution Agreements ("MADAs") signed by all Android OEMs, and its Revenue Share Agreements ("RSAs"), signed by all major wireless carriers as well as the two primary Android OEMs, required that the Google search widget appear on each device's home screen. JA0670-0671. The RSAs further required that Google be set as the default on all search access points and prohibited the pre-installation of any other GSE. *Id*. Because the requirement to carry the Google search widget on the home screen appeared in both the MADAs and the RSAs, neither an OEM nor a carrier could

unilaterally escape these requirements with respect to an Android device: "[I]f a carrier decided it wanted to just completely ditch Google, it can't because the OEM has agreed to the MADA." JA0671.[4]

Because of the enormous power of defaults, the Google contractual provisions requiring default exclusivity were *de facto* exclusive contracts, in that they effectively foreclosed to Google's rivals the most cost-efficient means of search engine distribution. Google's hyper-technical arguments to the contrary are inconsistent with both the real-world effect of defaults and the law governing exclusive dealing arrangements. They should be rejected.

## II. GOOGLE'S EXCLUSIVE CONTRACTS HAVE HAD THE ANTICOMPETITIVE EFFECT OF PREVENTING DIFFERENTIATED SEARCH ENGINES FROM COMPETING MEANINGFULLY IN THE RELEVANT MARKETS.

By offering a differentiated product in response to an identified demand, DuckDuckGo has offered privacy-focused consumers a viable alternative to Google,

[4] Google's reliance on the European Commission's 2020 Android choice screen mandate as evidence that "very few Android users might have preferred a different default [search engine] on those devices" is misleading. *See* App. Br. 76. It ignores, among other things, numerous flaws in the initial Android choice screen—such as the absence of descriptive information about rival search engines and the user's inability to return to the choice screen after viewing it initially—as well as the fact that Google charged competitors a fee that made initial participation unprofitable for DuckDuckGo (and presumably other rival search engines). JA0529; JA1375. Since the European Union's adoption of the Digital Markets Act led to Android's introduction of better-designed and more prominently displayed choice screens beginning in 2024, DuckDuckGo has seen a boost in app installs and search traffic.

exemplifying the competition that the antitrust laws are intended to encourage. But meaningful competition has not materialized because Google's exclusive contracts have prevented DuckDuckGo from distributing its product sufficiently to impose a competitive constraint on Google. While Google attributes its dominance to the product design decisions of third parties, its arguments ignore Google's own calculated efforts to prevent distributors from permitting competing defaults and prevent users from switching to rival defaults.

### A. By responding to consumer demand for search privacy, DuckDuckGo has engaged in precisely the competition the antitrust laws seek to foster.

Search engine providers and browser developers recognize that users increasingly care about the privacy of their online activity. JA0871. Without privacy protections such as those offered by DuckDuckGo, users' behavior online exposes them to the risk of collection of massive amounts of personal information that companies use to create and subsequently monetize detailed behavioral profiles. JA0518. Google collects users' search history and most of their browsing history based on the pages a user clicks on during searches. JA0518-0519. This information can be combined with a user's location history and purchase history to harm users by enabling discrimination in access to, or pricing of, essential goods and services such as employment, housing, education, healthcare, and financial products. *Id.*

By profiling its users, Google is also able to manipulate the search results that individual users see. JA0519. DuckDuckGo has done multiple studies suggesting that Google search results vary by user profile, even for users who have chosen enhanced privacy on Google's Chrome browser. JA0520-0521. The same profiling drives the ads that "follow" users from one search or website to the next. JA0519. This is not a mere annoyance: It can broadcast a user's private interests to anyone who happens to share or glance at their screen. A user who researches a health condition, a new job, or an engagement ring may find ads for it trailing the user across the web, exposing to others precisely what the user meant to keep private (and, in the last case, spoiling a planned surprise).

Although some browsers have adopted separate privacy modes with enhanced privacy protections, they generally have not included search privacy or other protections sufficient to combat these harms. JA0525. Some, like Chrome's Incognito mode, continued to collect users' browsing data notwithstanding representations that the feature kept browsing private. *See Brown v. Google LLC,* No. 4:20-cv-03664-YGR, ECF No. 1153-1, at 9-13 (filed Mar. 20, 2025) (N.D. Cal.) (seeking approval of settlement of class action, including Google's agreement to delete or de-identify browsing records).

Consumer research, including by DuckDuckGo, has found that a large percentage of Americans want to avoid these harms. JA0519; *see also* YouGov, *How*

*Americans Feel About Online Search Privacy* (May 4, 2022), https://yougov.com/articles/42382-how-americans-feel-about-online-search-privacy/ (finding 91% of Americans said it was very important or somewhat important that search engines obtain explicit user consent before sharing personal data); DuckDuckGo, *New DuckDuckGo Research Shows People Taking Action on Privacy* (Oct. 3, 2019), https://spreadprivacy.com/people-taking-action-on-privacy/ (finding 79% of respondents had adjusted privacy-related setting on social media accounts or reduced social media usage). About 45 percent of Americans have used browser privacy modes, often operating under the misconception that they rendered searches anonymous. JA0527; *see also* DuckDuckGo, *Is Private Browsing Really Private?* (Mar. 1, 2022), https://spreadprivacy.com/is-private-browsing-really-private/ (noting widespread misunderstanding of functions of privacy modes).

DuckDuckGo has conducted more than 50 large-scale surveys of U.S. consumers' concerns around online privacy. JA0521. Those surveys have shown that approximately 30-40% of Americans have a strong preference for search privacy. JA0522. When asked the top factor that would motivate them to switch search engines, about 40 percent of Americans consistently select enhanced privacy—ranking it ahead even of better search results as the leading answer. JA0522. And about one-third of Americans say they have engaged in several

behaviors designed to protect their online privacy, such as clearing cookies or downloading a privacy app or extension. JA0523.

In response to this demand, DuckDuckGo has endeavored to "differentiate itself from other GSEs through a focus on user privacy." JA0839. DuckDuckGo offers a free browser with its private search engine built in, along with numerous other privacy protections directed at protecting email, browsing, and other online activity. JA0516. DuckDuckGo does not profile its users, and it therefore does not maintain an individual user's browser or search histories. Nor does the information it collects allow it to link together different searches by the same user. For example, if "cat pictures" are searched for 100 times on DuckDuckGo in a given day, DuckDuckGo does not know whether those searches are being performed by 100 people, or by a single person 100 times—let alone which other search queries, if any, were entered by those users. JA0519. DuckDuckGo's product vision, in short, is to be the "easy button" for privacy. JA0516.

### B. Google's exclusive contracts have hindered DuckDuckGo's ability to distribute its privacy-focused search engine.

Notwithstanding DuckDuckGo's response to an identified consumer demand, its development of a strong differentiated product has been limited by Google's exclusive contracts. Not only does Google's control of the vast majority of defaults limit rivals' ability to optimize their search traffic, but by doing so, it also prevents

rivals from receiving the queries necessary to train their algorithms and build independent search indexes—thereby allowing them to compete on quality.

"At every stage of the search process, user data is a critical input that directly improves quality." JA0863. For search engines with little scale, "even a small amount of data can result in meaningful improvements." JA0867. Thus, when DuckDuckGo seeks to experiment with new product features by presenting alternative versions and observing how users react to each—the most common form of experimentation in enhancing a search engine—it is severely limited by its lack of scale. JA0536-0537.

For example, DuckDuckGo calculated that obtaining default status in Safari's private browsing mode, alone, would have increased its market share "multiple times over," through increased exposure to DuckDuckGo's brand and privacy focus. JA0556. This scale increase, entirely aside from the revenue DuckDuckGo would have generated from the additional traffic, would have enabled DuckDuckGo to run "many, many more experiments" and thereby dramatically improve its search engine. JA0557.

By tying up the vast majority of search defaults, the most cost-efficient means of distributing a general search engine, Google's exclusive contracts have prevented DuckDuckGo from both reaching potential users and obtaining the scale necessary to compete meaningfully with Google. This is precisely the type of anticompetitive

effect condemned by this Court in *Microsoft*. *See, e.g.*, *Microsoft*, 253 F.3d at 62 ("Microsoft reduced rival browsers' usage share not by improving its own product but, rather, by preventing OEMs from taking actions that could increase rivals' share of usage."). Moreover, as Plaintiffs' economic expert testified, the power of a default is magnified substantially where, as here, the default is held by a strong incumbent and its rivals are relatively weak, because the default adversely impacts rivals' investment incentives. JA0676. DuckDuckGo's knowledge that its scale limits the efficiency with which it can improve its results, particularly vis-à-vis Google, has informed its decision to focus its investments on its privacy features rather than on results enhancements and related features that Google can implement far more quickly.[5]

Even a clear differentiation on privacy—a product feature of indisputable interest to consumers—has made little dent in Google's dominance. Google's then-

[5] The rapid adoption of generative AI tools only threatens further entrenchment of Google's position. Even as adoption of AI tools has grown rapidly, more than 95 percent of Americans continue to use traditional search engines each month, a figure that has fallen by less than one percent over two and one-half years while AI-tool usage nearly quintupled, and the share of heavy Google users has, if anything, increased. Rand Fishkin, *New Research: 20% of Americans Use AI Tools 10X+/Month, but Growth Is Slowing and Traditional Search Hasn't Dipped*, SparkToro (Aug. 26, 2025), https://sparktoro.com/blog/new-research-20-of-americans-use-ai-tools-10x-month-but-growth-is-slowing-and-traditional-search-hasnt-dipped/. The arrival of AI has not opened a new, unobstructed path to consumers; instead, it has given Google a new surface on which to exercise the same default power.

head of search testified at trial that he had rejected a proposal that Google adopt some of DuckDuckGo's privacy features, because there was a lack of evidence that they were causing Google to lose queries to DuckDuckGo. JA0741-0744. To the contrary, he referred to DuckDuckGo as "ankle biters." JA0745. Thus, consumers—again, many of whom use Google without even realizing it—have been harmed not only by the absence of a meaningful, informed privacy choice that they might prefer, but by Google's disincentive to compete vigorously on privacy and other features.

### C. Google's argument that its dominance is solely a function of third parties' "product design" fails.

Google argues that it bears no responsibility for the exclusionary effect of its contracts because its contracts were "necessarily bounded by what the browser-makers designed." *See* App. Br. at 45. But this argument ignores the exclusive nature of Google's contracts, the existence of multiple access points, and Google's own behavior in maximizing choice friction.

Google's contracts provided not only for the placement of Google's search engine as the preset default search engine for particular search access points; they provided an irrefusable economic incentive for distributors to preset Google as the default search engine on multiple, and in some cases *all*, search access points controlled by the distributor. For example, in 2022, Google's revenue share payment to Apple was an estimated $20 billion. JA0931. Google's revenue share payment

to Mozilla in 2021 was more than $400 million, or about 80% of Mozilla's operating budget. JA0944. And as the district court recognized, Mozilla is completely dependent on those payments from Google: "Mozilla has repeatedly made clear that without these payments, it would not be able to function as it does today." *Id.* It is therefore unsurprising that, as the district court observed, "[t]ime and again, Google's partners have concluded that it is financially infeasible to switch default GSEs or seek greater flexibility in search offerings because it would mean sacrificing the hundreds of millions, if not billions, of dollars that Google pays them as revenue share." *Id.*

While Google insists that its wide-reaching control of search defaults is attributable solely to its quality, and not to the exclusivity for it which pays so handsomely, simple economics dictate otherwise. As Plaintiffs' economic expert testified: "When you see Google paying billions and billions and billions of dollars, there's got to be a reason . . . it's worth doing it." JA0674. The reason is that Google's exclusivity provisions have had the effect of preventing rivals like DuckDuckGo from gaining even a foothold—such as a default in private browsing mode—that would allow them access to consumers who might not otherwise learn that Google is not their only option. *See, e.g.,* JA0952 (citing Google employee writing, regarding the Android RSAs, "Without an exclusive search deal, a large carrier can and will ship alternatives to Google[.]")

Google argues that distributors, not Google, have made the determination that users prefer to have a preset, "out of the box" default search engine for each search access point. Putting aside Google's own self-serving contribution to this design as the operator of Chrome, a major browser, this argument ignores that devices and browsers typically have multiple search access points. Nothing in the design of those products requires that the default search engine be the same across all search access points in a device, or even across all devices. Google understands this, having recognized early on the ability of distributors to use multiple default search engines and taken steps to prevent them from doing so. JA0937-0938.

DuckDuckGo has repeatedly pitched browsers about bifurcating the defaults for private and non-private modes and considering DuckDuckGo as the default browser in private mode. DuckDuckGo engaged Apple for two years on this idea. JA0942-0943. Although the proposal was ultimately rejected, Apple's top Safari executives received it with enthusiasm and engaged DuckDuckGo in extensive discussion around implementation—even expressing plans to consider incorporating the option into Apple's 2019 product release and proposing specific default-related contract terms to DuckDuckGo—reflecting, at a minimum, the technological viability of having multiple default search engines. JA0538-0553; JA0556. DuckDuckGo has made similar private browsing mode default proposals to other browser developers, including Samsung, Mozilla, and Opera, but none moved

forward. The common concern shared by these browsers was not any technological obstacle, but their exclusive default contracts with Google. JA0946. The exclusivity in those contracts is not mandated by product design; it is solely a creation of Google's contracts.

Google's argument also ignores its own role in maximizing the choice friction in changing the default and inducing habit, rather than choice, in the use of search engines. *See, e.g.,* DuckDuckGo, *Roadblocks to Competition: Investigate Google's Non-Compliance with the EU's Digital Markets Act* (Nov. 20, 2024), https://spreadprivacy.com/investigate-google-dma/ (noting Google's non-compliance with European Union Digital Markets Act's "easy switching" requirements on both Android and Chrome). As DuckDuckGo's founder and CEO testified, there is no technological reason why users could not have the ability to change their default search engine with a single click. JA0532-0533.

The district court, however, found that "Google appreciates that increased choice friction discourages users from changing the default." JA0857. Google's own documents recognize the importance of getting users to develop a habit of using Google's products. JA0485-0486. For example, Google tracks the number of steps that it takes to change the default in different devices. JA0494. Google also has discouraged Android OEMs from providing consumers with too much information

about how to change the default or otherwise reducing choice friction. JA0494-0496.

For this reason, Google's complaint that the district court relied on "after-the-fact user behavior" (App. Br. 68) and that its decision would "make it impossible for businesses to judge in advance whether their agreements might be unlawful" (App. Br. 69) rings hollow. Google clearly knew, and intended, that its behavior would have the effect of deterring consumers from using competing search engines.

By preventing even differentiated rivals from the most cost-efficient means of distributing their products in response to identified need, and by ensuring that most consumers use Google without regard to whether it is their preferred search engine, Google's exclusive agreements have had profound anticompetitive effects on the general search engine market. Google is directly responsible for those effects.

## CONCLUSION

Google's exclusive default contracts with its distributors are exclusive dealing arrangements and should be analyzed as such for purposes of Section 2 of the Sherman Act. Because they have prevented even differentiated rivals from effective competition, the district court's finding that Google violated Section 2 should be affirmed, and the district court should be permitted to proceed with the administration of remedies that will foster competition in the relevant markets.

Respectfully submitted,

*/s/ Ronald F. Wick*

**COHEN & GRESSER LLP**

Melissa H. Maxman
Ronald F. Wick
2001 Pennsylvania Avenue, N.W.
Suite 300
Washington, D.C. 20006
Phone: (202) 851-2070
mmaxman@cohengresser.com
rwick@cohengresser.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned certifies:

1. This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), this document contains 5,883 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

*/s/ Ronald F. Wick*
Ronald F. Wick

**CERTIFICATE OF SERVICE**

I hereby certify that on October 29, 2026, I electronically filed the foregoing document using the CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and will be served through the CM/ECF system.

Dated: October 29, 2026

*/s/ Ronald F. Wick*
Ronald F. Wick