**ORAL ARGUMENT NOT YET SCHEDULED**
**Nos. 26-5023, 26-5047, 26-5049**

IN THE
# United States Court of Appeals for the District of Columbia Circuit

UNITED STATES OF AMERICA, et al.,
*Plaintiffs-Appellees-Cross-Appellants*,

v.

GOOGLE LLC,
*Defendant-Appellant-Cross-Appellee*.

On Appeal from the
United States District Court for the District of Columbia
Nos. 1:20-cv-3010, 1:20-cv-3715 (Hon. Amit P. Mehta)

## REPLY BRIEF ON CROSS-APPEAL FOR THE UNITED STATES AND CO-PLAINTIFF STATES


STANLEY E. WOODWARD, JR.
*Associate Attorney General*

EMILY CLAIRE MIMNAUGH
*Deputy Associate Attorney General*

STEPHANIE A. GRECO
*Deputy Assistant Attorney General, Litigation*

ETHAN S. HOFFMAN
*Counsel to the Assistant Attorney General*

TRAVIS R. CHAPMAN
GRANT FERGUSSON
RYAN T. KARR
CLAIRE M. MADDOX
MICHAEL G. MCLELLAN
*Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION

DANIEL E. HAAR
NICKOLAI G. LEVIN
PATRICK M. KUHLMANN
MATTHEW A. WARING
*Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave., N.W.
Room 3224
Washington, D.C. 20530-0001
(202) 532-4186
matthew.waring@usdoj.gov


(additional counsel in signature block)

# TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ........ ii

GLOSSARY ........ iv

INTRODUCTION AND SUMMARY OF ARGUMENT ........ 1

ARGUMENT ........ 2

I. Google Misdescribes The District Court's Factual Findings And The Record. ........ 2

A. The Court Did Not Find that a Remedy Without a Payment Ban Would Be Effective. ........ 2

1. The court did not expressly find the remedy effective. ........ 2

2. The court did not make a functional effectiveness determination. ........ 7

B. The Court Did Not Find that a Payment Ban Would Reduce Competition in the Relevant Markets. ........ 13

II. This Court Should Vacate And Remand The Payment-Ban Decision. ........ 21

CONCLUSION ........ 23

CERTIFICATE OF COMPLIANCE ........ 28

CERTIFICATE OF SERVICE ........ 29

# TABLE OF AUTHORITIES

Page(s)

## Cases

*FTC v. Actavis, Inc.*,
570 U.S. 136 (2013) ........................................................................ 13

*Ginsburg v. InBev NV/SA*,
623 F.3d 1229 (8th Cir. 2010) .......................................................... 2, 5, 6

**International Salt Co. v. United States*,
332 U.S. 392 (1947) .................................................................. 7, 22, 23

*Major League Baseball Players Ass'n v. Garvey*,
532 U.S. 504 (2001) .......................................................................... 5

*Massachusetts v. Microsoft Corp.*,
373 F.3d 1199 (D.C. Cir. 2004) ..................................................... 20, 21

*Tampa Electric Co. v. Nashville Coal Co.*,
365 U.S. 320 (1961) ........................................................................ 15

*United States v. American Tobacco Co.*,
221 U.S. 106 (1911) ........................................................................ 20

*United States v. AT&T, Inc.*,
916 F.3d 1029 (D.C. Cir. 2019) ........................................................ 16

**United States v. E.I. du Pont de Nemours & Co.*,
366 U.S. 316 (1961) ............................................. 1, 2, 5, 6, 11, 17, 20

*United States v. Google LLC*,
No. 25-5016, 2025 WL 880552 (D.C. Cir. Mar. 21, 2025) ................... 12

*United States v. Malenya*,
736 F.3d 554 (D.C. Cir. 2013) ............................................................ 2

---

* Authorities upon which we chiefly rely are marked with asterisks.

## TABLE OF AUTHORITIES—Continued

Page(s)

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ........................................ 5, 15

*United States v. United Shoe Machinery Corp.*,
391 U.S. 244 (1968) ........................................ 19

## GLOSSARY

| | |
|---|---|
| GenAI | Generative Artificial Intelligence[†] |
| GSE | General Search Engine |
| OEM | Original Equipment Manufacturer |

[†] This brief uses "GenAI" to match the district court proceedings; it includes generative use of Super Intelligence.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Google does not dispute the key legal principles governing this cross-appeal: Relief in government antitrust enforcement actions must effectively redress the violation and restore competition in the relevant market(s). Google.Third.Br.65-66, 69. A remedy's effectiveness depends on whether it restores the competitive *process* in the relevant market(s), not its short-term market *outcomes*. Google.Third.Br.86. And courts may not forgo an effective remedy because of harm to private interests. Google.Third.Br.69.

Instead, Google relies on findings that the district court never made: Google claims the court found that its remedy *would be* effective and that a payment ban would likely harm competition and consumers. But those findings are not in the remedies opinion. The court cited *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 326-27 (1961) (requring effective relief), and it *hoped* that a remedy without a payment ban would effectively restore competition. But the court made no finding that competition would likely be restored. To the contrary, the court expressed serious unresolved doubts about whether competition would return without a payment ban. And the possible

harms to competition the court feared were in other markets—not in the *relevant* markets.

Because the court's analysis did not "apply the correct legal standard," the court abused its discretion. *United States v. Malenya*, 736 F.3d 554, 559 (D.C. Cir. 2013). Remand is necessary.

## ARGUMENT

### I. Google Misdescribes The District Court's Factual Findings And The Record.

#### A. The Court Did Not Find that a Remedy Without a Payment Ban Would Be Effective.

*Du Pont* required the court to find that the ordered remedy "reasonably assure[d]" that competition would be restored before considering private interests. 366 U.S. at 326-27. But Google cannot point to an express effectiveness finding, and the court's isolated comments on other remedies do not add up to one.

##### 1. The court did not expressly find the remedy effective.

a. The court never stated the remedy would be effective without a payment ban. To the contrary, the court expressly declined to make such a finding, citing *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1235 (8th Cir. 2010), for the proposition that it should "balance the

benefit to competition" from a ban "against the hardship or competitive disadvantage [it] may cause" to third parties, JA1684(Rem.Op.121), and stating that the ban's potential effects on third parties in other markets were "reason enough not to proceed." JA1688(Rem.Op.125).

Indeed, the court expressly doubted whether a remedy without a ban would be effective. The court "recognize[d] what eschewing a payment ban may mean for competition": it would "leav[e] in place the very forces" that froze the search ecosystem and "could blunt the effectiveness of the remedies imposed." JA1690(Rem.Op.127). The court left this question of effectiveness open, allowing Google's payments to continue "for now" while recognizing that it might need to "revisit a payment ban" later. JA1691(Rem.Op.128).

b. Google is wrong that there was an express effectiveness determination. Google.Third.Br.65.

Google relies mainly on the court's summary statement in the final-judgment opinion that the remedies opinion had "determined the scope of remedies sufficient to 'pry open'" the relevant markets. Google.Third.Br.65 (quoting JA1840(F.J.Op.2)). But the final-judgment opinion made no factual findings on the remedy's effectiveness—it

simply explained the court's "reasons for adopting, rejecting, or modifying the specific provisions of the parties' most recent proposed final judgments." JA1841(F.J.Op.3). Thus, as Google acknowledges, the question is whether the *remedies opinion* found that the remedy will be effective. Google.Third.Br.66. And Google never cites an actual effectiveness finding in the remedies opinion.

Google suggests that the court's willingness to revisit a payment ban later "if competition is not substantially restored," JA1691(Rem.Op.128), expressed the court's "expectation" that its ordered remedies would be effective. Google.Third.Br.66-67. But the opposite is true. That statement—coming on the heels of the court's expressed wariness about "eschewing a payment ban" and mere "hope" that new entrants would somehow overcome Google's monetization advantage, JA1690-91(Rem.Op.127-28)—shows a court concerned about remedial failure, not confident of remedial success. Google also notes that the court rejected certain remedies that it found would not promote competition, Google.Third.Br.66.&.n.11, but those findings do not establish the decree's effectiveness.

Google observes that the court cited the requirement of effective relief. Google.Third.Br.66, 69 (citing JA1622(Rem.Op.59) & JA1862.n.5(F.J.Op.24.n.5)). But in analyzing the payment ban, the court relied improperly on *Ginsburg*—which Google does not defend, other than by arguing incorrectly that Plaintiffs "invited" the court's error. *Infra* pp.6-7. Moreover, a court that "recite[s]" correct legal rules still errs if "[t]he substance of the court's discussion reveals" it did not correctly *apply* those rules. *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 510 (2001) (per curiam). Here, the remedies opinion's substance violated *du Pont*.

Furthermore, even a blanket statement that the remedy is effective would have been insufficient. A district court must "explain[] how its remedies decree would accomplish" the applicable remedial goals. *United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001) (en banc). But the court never did so for some of the goals: unfettering the market, by restoring competition and redressing the anticompetitive effect of the Apple payments, and denying Google its monopoly-derived "revenue" fruit. U.S.Pls.'Br.131-34. This Court thus cannot satisfy its

own "duty" to ensure the decree "will effectively redress" the violations. *Du Pont*, 366 U.S. at 323.

c. Contrary to Google's assertion, Google.Third.Br.79, Plaintiffs never invited balancing of *private interests* against effective relief. After stating the proposition that courts should "balance the benefit to competition against the hardship to competitive disadvantage the remedy may cause,"[1] the court asked Plaintiffs whether "that is a principle I ought to be thinking of." JA1546(Rem.Tr.4904:8-12). Plaintiffs' counsel said "yes," *id.*(Rem.Tr.4904:13), which was correct because a court can balance benefits and harms *to competition*. And Plaintiffs' counsel later stated that private hardships in other markets were "not something you need to ignore," JA1548(Rem.Tr.4906:5-7), which was true because they could be considered in choosing "among two or more effective remedies." *Du Pont*, 366 U.S. at 327.

Plaintiffs did not, however, prioritize avoiding private hardships *above* effective relief. Indeed, Plaintiffs argued that distributors'

---

1 Google alters its quotation of the court to match *Ginsburg*'s language ("hardship [or] competitive disadvantage"), Google.Third.Br.79, but the transcript states "hardship *to* competitive disadvantage." JA1546(Rem.Tr.4904:9-10) (emphasis added).

objections to a payment ban improperly "ask[ed] the Court to weigh private interests against the public interest" in effectively restoring competition. JA1544(Rem.Tr.4902:3-9) (citing *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947)). And Plaintiffs consistently made clear that the remedy must "focus on prying open these markets" harmed by Google's conduct and that third-party harms outside the relevant markets should not be "the driving purpose or motivation behind [the court's] decision." JA1548(Rem.Tr.4906:8-11); *accord* JA1545(Rem.Tr.4903:10-13).

**2. The court did not make a functional effectiveness determination.**

Google next contends that, even if the court did not expressly determine effectiveness, its isolated findings on the purposes of different remedies add up to an overall finding of "effective[ness] in combination." Google.Third.Br.67. Google's argument again fails. The court found that the data-sharing and syndication remedies would yield important benefits—as Google acknowledges. But the court did not find that those measures, without a payment ban, would effectively accomplish all the required remedial objectives. U.S.Pls.'Br.131-34, 145-46.

a. To unfetter the relevant markets, a remedy must break Google's stranglehold over efficient search distribution. U.S.Pls.'Br.145-46. Google is wrong that the court found that the contractual, data-sharing, and syndication remedies achieve this objective. Google.Third.Br.69-70.

First, the court was clear that although contractual remedies were *necessary* for Google's rivals to have any chance of obtaining efficient distribution, such remedies would not be *sufficient* to unlock distribution on their own. JA1669-73(Rem.Op.106-10). The court found that, absent additional relief, distributors would likely continue to choose Google as the default based on the quality and monetization advantages Google unlawfully accumulated through years of exclusionary conduct.[2] JA1671(Rem.Op.108).

Second, the court did *not* find that rivals' improved quality from data-sharing and syndication would enable them effectively to "vie for

---

[2] Amicus Apple proclaims it now has "the kind of contractual flexibility that [it] previously sought in 2009 and 2012," which will "ensure open and active competition." Apple.Br.8, 10, 12. But it is no surprise Apple wants to continue sharing Google's monopoly profits, and there is no basis for concluding that Apple will meaningfully consider other GSEs without a payment ban.

distribution." Google.Third.Br.70. On the contrary, the court found that without a payment ban, distributors' financial "incentiv[e] to stick with Google" "could *blunt* the effectiveness of the remedies imposed," including data-sharing and syndication, by continuing to block rivals from efficient distribution. JA1690(Rem.Op.127) (emphasis added). That blunting matters because the sharing remedies are limited in duration and scope: Qualified Competitors receive only a "one-time disclosure" of certain search-index data, JA1711(Rem.Op.148), and at least two disclosures of certain user-side data, which "will be subject to privacy-enhancing techniques that will diminish their full utility." JA1721, 1724(Rem.Op.158, 161). After those disclosures, if rivals are unable to obtain meaningful distribution, the "feedback effects" of scale will resume. *See* Econ.&.Bus.Professors.Br.19.

Google claims that higher-quality rivals will have "greater access to distribution" because "quality is what drove Google's own success." Google.Third.Br.71. But that ignores the court's findings that Google's payments—funded by its monopoly rents—significantly contributed to its distribution advantage, JA1658-60(Rem.Op.95-97), by making it "financially infeasible" for distributors to switch their defaults to other

GSEs. JA1029(Liab.Op.201). Even higher-quality rivals cannot obtain defaults if distributors find it "financially infeasible" to switch. As Microsoft explains, "[e]ven if rivals improve quality using the shared data, they cannot compete on price" without a payment ban "given Google's entrenched advantage." Microsoft.Br.15.

Google also posits that improving rivals' search quality would "improve their prospects" to attract users and improve their monetization of searches, which would enable them to match Google's payments someday. Google.Third.Br.71. That again overreads the court's findings. The court held that data-sharing and syndication were justified given the quality and monetization gaps that Google's conduct enhanced, JA1696, 1734(Rem.Op. 133, 171); JA1869(F.J.Op.31), and that the need for data-sharing was "heightened" without a payment ban. JA1695(Rem.Op.132). But the court never found that data-sharing and syndication would enable rivals to match Google financially. And Google's own expert testified that if Google could continue paying for defaults, Google was "probably" "going to outbid" rivals even "in the medium-to-longer run." JA1531(Rem.Tr.4327:6-8); *cf.* JA1358-59(Rem.Tr.726:22-727:4) (Perplexity executive's testimony that "it will

take a long time for any challenger that has a better product for users to be able to directly replace[] [Google] dollar for dollar").

The closest the court came to suggesting that rivals could obtain significant distribution in the face of Google's "massive financial advantage," JA1690(Rem.Op.127), was when it expressed "hope" that GenAI firms would prevent Google from "simply outbid[ding] competitors for distribution if superior products emerge." JA1691(Rem.Op.128). Even if that hope were justified, *but see* OpenAI.Br.26 (OpenAI has been "stymied in [its] efforts to gain default distribution anywhere"), *du Pont* requires "reasonabl[e] assur[ance]" of effective relief *and* resolving doubts in the government's favor—not just hope. 366 U.S. at 326, 334.

b. Google's argument also fails because the court never found that a remedy without a payment ban would fully deny Google the revenue fruit of its unlawful conduct, *see* JA1684(Rem.Op.121), or remedy the loss of potential competition from Google's payments to Apple. *See* JA1683(Rem.Op.120).

On the revenue fruit, Google rebuts a strawman—i.e., that the remedy must deny Google some quantum of revenue.

Google.Third.Br.89-91. The relevant "fruit" was not limited to Google's monopoly profits themselves; rather, it encompassed Google's ability to "reinvest th[at] revenue," JA1658(Rem.Op.95), by "us[ing] these monopoly profits to secure the next iteration of exclusive distribution deals." JA1659(Rem.Op.96); *see* U.S.Pls.'Br.133. A payment ban would deprive Google of that ability by preventing Google from buying up the distribution that rivals need to compete. Thus, even if a ban might increase Google's short-term profits, Google.Third.Br.89-90, it would deny the revenue fruit by precluding Google from *using* those profits to control efficient distribution channels.

Google denies, meanwhile, that the court found any anticompetitive effect from its payments to Apple—only a "disincentive" for Apple to compete. Google.Third.Br.89.n.14 (brackets omitted). Not so. The court explained that Apple's disincentive to enter the market was among the "main anticompetitive effects" of Google's conduct, JA1641(Rem.Op.78); JA1069-70(Liab.Op.241-42), a finding this Court acknowledged in Apple's intervention appeal. *United States v. Google LLC*, No. 25-5016, 2025 WL 880552, at *3 (D.C. Cir. Mar. 21, 2025) (per

curiam).[3] Google's suggestion that this reasoning would improperly "condemn" "*[a]ny* meaningful payment" to a counterparty, Google.Third.Br.89.n.14, disregards the court's findings why Google's paying Apple was not like a common payment for services: Apple was an important potential competitor that had invested in "search development," JA0932(Liab.Op.104); *see* U.S.Pls.'Br.104, and had the capability and incentive to develop a GSE. JA1069(Liab.Op.241); JA1643(Rem.Op.80). And Apple's own witness "confirmed" that the "significant amount of money" from Google skewed Apple's incentives to compete. JA1643(Rem.Op.80) (quoting JA1487(Rem.Tr.3825:15-20)).

### B. The Court Did Not Find that a Payment Ban Would Reduce Competition in the Relevant Markets.

Google also is wrong that the court found that "a payment ban would likely *undermine* competition and harm consumers" in the

[3] Google is wrong that, to redress this harm, a payment ban would have to "actually cause Apple to build its own GSE." Google.Third.Br.77. The Apple payments were anticompetitive because they "prevent[ed] the risk of competition," *FTC v. Actavis, Inc.*, 570 U.S. 136, 157 (2013), by deterring Apple from entering the general-search market. Stopping the payments redresses that effect, irrespective of what Apple chooses to do.

relevant markets. Google.Third.Br.73. The court found that a payment ban could *restore* competition but rejected it for other reasons.

1. The court recognized that in refusing a payment ban, it was "forgoing a remedy that could help restore competition," JA1689(Rem.Op.126), and "bring about a much-needed thaw." JA1683(Rem.Op.120). While the court disagreed with Plaintiffs' prediction of the specific market-share shift from a ban, JA1683.n.11(Rem.Op.120.n.11), it did not doubt a ban's potential benefits, stating that "the bases for a payment ban are sound." JA1684(Rem.Op.121).

The court rejected a payment ban due to potential "downstream harms"—*not* any lack of procompetitive benefit. JA1567(Rem.Op.4). That contrasted with its denial of other remedies because they had "not been shown to enhance" or "promote" competition in the relevant markets. JA1568(Rem.Op.5).

Moreover, the court stated it might "revisit a payment ban" later. JA1691(Rem.Op.128). That would make no sense if, as Google contends, the court found "the net effect" of a ban "would be a *reduction* in competition." Google.Third.Br.73.

2. The court posited two possible outcomes of a payment ban. First, distributors might continue setting Google as the default "[o]n 'day one' post-judgment," which would increase Google's profits and "likely advantage Google, at least in the short term." JA1684-85(Rem.Op.121-22). Second, distributors might select rival GSEs as defaults, which could cause distributors to "earn less than they do now." JA1685(Rem.Op.122). Google wrongly contends that the court found that both outcomes would likely reduce long-term competition in the general-search-services market. *See* Google.Third.Br.73-74.

The first outcome—a short-term increase in Google's profits—would not involve reduced competition in a relevant market. JA1684-85(Rem.Op.121-22). The health of the competitive process does not turn on temporary effects to Google's bottom line, but rather on rivals' "opportunities" to "enter into or remain in th[e] market" and reach users. *See Microsoft*, 253 F.3d at 69 (quoting *Tampa Elec. Co. v. Nash. Coal Co.,* 365 U.S. 320, 328 (1961)). Thus, even if a payment ban did not immediately "promote competition" in the sense of producing different defaults on "day one," JA1684(Rem.Op.121), it would enhance the competitive *process*, by suspending the massive payments that "shape

the market" "in Google's favor" and giving rivals a meaningful opportunity to obtain efficient distribution as they improve their quality. JA1683(Rem.Op.120).[4]

Google's opposition to a payment ban underscores the point. A rational business generally "will seek to maximize its total profits." *United States v. AT&T, Inc.*, 916 F.3d 1029, 1043 (D.C. Cir. 2019). Thus, if a payment ban would increase Google's profits while reducing competition, Google.Third.Br.74, 84, it would be irrational for Google to oppose it. The rational explanation for Google's stance, then, is that its payments for defaults *inhibit* actual and potential competition against Google, and Google makes money from this reduction of competition. As amici explained, if Google's payments for defaults do not "exclude actual or potential competitors," Google is "acting as an irrational economic actor that is paying tens of billions of dollars for little benefit." Econ.&.Bus.Professors.Br.12.

The second possible outcome the court identified likewise does not involve reduced competition in a relevant market. The court found only

---

[4] If Google used increased profits to "improve its products," JA1685(Rem.Op.122), that too would be better for competition and consumers.

that any lowering of payments to distributors would have "downstream effects" in *other markets*. JA1686(Rem.Op.123). As the court had stated earlier, its concern was that "fix[ing] one market"—the relevant general-search-services market—through a payment ban would run "the risk of harming *others*." JA1543(Rem.Tr.4901:20-25) (emphasis added). Namely, the ban could mean "[l]ost competition and innovation from small developers in the browser market," JA1686(Rem.Op.123), or "reduce[d] competition in the U.S. mobile phone market" from Android OEMs. JA1687(Rem.Op.124). Apple might produce "[f]ewer products and less product innovation." *Id.* Or there might be "[h]igher mobile phone prices and less innovative phone features." JA1688(Rem.Op.125).[5]

Google's assertion that these potential effects would "limit[] the accessibility of GSEs" and thereby "reduc[e] query output in the

---

[5] Google criticizes Plaintiffs for "cit[ing] no case holding that a district court abuses its discretion by rejecting an antitrust *remedy* due to concerns about harm to actors in related markets," Google.Third.Br.83, but never explains why actors in related markets receive greater protection than actors in the relevant market (as in *du Pont*). A district court cannot deny effective relief to avoid "[e]conomic hardship" to third parties—wherever it occurs. *Du Pont*, 366 U.S. at 327.

[relevant] GSE market," Google.Third.Br.76, lacks support. The court made no such finding—unsurprisingly, since users who switch from one smartphone or browser to another (or decide against purchasing a new phone) would not necessarily search less. Indeed, the only search-output finding Google cites is that a GSE gets more search traffic when it is the default. Google.Third.Br.85 (citing JA0857(Liab.Op.29)). And Google does not argue that a payment ban would eliminate search defaults.

Google also suggests that the second outcome would produce a Microsoft/Google "duopoly." Google.Third.Br.75. But the court found otherwise: if distributors "look[ed] to other GSEs to earn revenue share," that could both "stimulat[e] competition among Google's rivals to secure default distribution" and "encourage new entrants." JA1683(Rem.Op.120); *see* JA1410-11(Rem.Tr.2169:10-2170:8) ("Microsoft would have to compete with high-quality search products."); JA1405-06(Rem.Tr.2147:24-2148:1) (same). And even if a payment ban did produce a short-term duopoly, that would be better for consumers and advertisers than if "Google does not face true market competition" at all. JA1029(Liab.Op.201).

Finally, even assuming *arguendo* that a payment ban might cause some reduction in competition in a relevant market, a remand would still be necessary to weigh any such reduction against the ban's benefits to competition to determine its "net effect." Google.Third.Br.73. And if the court concluded the ban would harm competition on balance, it would need to find another way to meet its "inescapable responsibility" to decree effective relief. *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968).

3. Google highlights the court's fear that a payment ban would reduce "consumer welfare" in the general-search-services market by leading to greater use of rival GSEs, which currently have lower quality. Google.Third.Br.73. But as Google concedes, effectiveness looks to long-term effects. Google.Third.Br.86. Far from presuming that "the government knows [consumers'] interests better than they do," Google.Third.Br.86, focusing on the long-term competitive process implements Congress's determination that competition—not enforcers' or courts' choices—best protects consumer welfare. U.S.Pls.'Br.138-41.

Google contends that the court permissibly focused on short-term effects because "the court *did* find that its package of remedies would be

effective in restoring competition" in the long term. Google.Third.Br.79; *see* Google.Third.Br.86 ("[h]aving made that finding" of effectiveness, the court properly addressed "'short-term' harm to consumers"). But the court never made such an effectiveness determination, *see supra* pp.2-13, so Google's argument fails.

Google argues that Plaintiffs improperly relied on "cases involving mergers and acquisitions" and that "the district court's payment-ban analysis tracked" the analysis affirmed in *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004) (en banc). Google.Third.Br.79, 82.[6] Both contentions are wrong. First, *United States v. American Tobacco Co.* was a monopolization case, 221 U.S. 106, 184 (1911), and *du Pont* relied on *American Tobacco* with respect to "deeply rooted" principles governing all antitrust cases. *Du Pont*, 366 U.S. at 327. Second, *Massachusetts* did not reject remedies potentially necessary for effective relief based on third-party harms or short-term effects. *Massachusetts*

---

6 Google's complaint that U.S. Plaintiffs did not cite *Massachusetts* in the cross-appeal section of their brief, Google.Third.Br.82, is misplaced. U.S. Plaintiffs cited *Massachusetts* earlier in discussing the legal principles for antitrust remedies—including that a decree should "restor[e] conditions in which the competitive process is revived." *See* U.S.Pls.'Br.113, 115-17.

simply affirmed the rejection of remedies that would have harmed long-term competition, would not serve their purpose, or were unnecessary because other measures redressed the harm. *See* 373 F.3d at 1209, 1212 (code-removal remedy would not promote competition), 1218-19 (API disclosure would have "undermine[d] Microsoft's incentive to innovate" and led competitors to "mimic" Microsoft's products), 1225 (proposed Web-services remedy had not been shown to "reduce Microsoft's monopoly"), 1227 (rejecting a broader prohibition on discounts because "Massachusetts has not shown that any additional restraint is necessary"), 1229 (open-source Internet-Explorer remedy would not help "the process of competition"). Here, by contrast, the court rejected a remedy it acknowledged might be necessary for effective relief. *Supra* p.3.

## II. This Court Should Vacate And Remand The Payment-Ban Decision.

This Court should vacate and remand for the district court to determine, under the correct legal standard, whether a payment ban is necessary for effective relief. This Court should make clear that the district court must make that determination *before* any efforts to mitigate harm to private interests or effects in other markets. If the

court concludes that the current decree is not effective under the proper legal framework, then it will have discretion to consider a complete payment ban or alternative payment prohibitions as appropriate. *Int'l Salt*, 332 U.S. at 400-01 (district courts "are invested with large discretion to model their judgments to fit the exigencies of the particular case").

Google wrongly argues that, if this Court vacates the data-sharing and syndication remedies for insufficient causation findings (which it should not, U.S.Pls.'Br.109-22), a payment ban could not be ordered. Under the applicable proportionality standard, *see* U.S.Pls.'Br.115-16, there could be a sufficient causal connection for a payment ban even if not for the affirmative data-sharing and syndication remedies. Indeed, Google itself recognized that the court can prohibit distribution restrictions "of the same type or class" as Google's illegal agreements. JA1254(Google.Remedies.PCOL.15).

Moreover, a ruling in Google's favor on data-sharing and syndication would make a payment ban even more imperative. The court found that prohibiting Google's exclusive deals "will not unleash competition" by itself. JA1671(Rem.Op.108). Thus, if data sharing or

syndication were vacated, additional relief would be needed, or Plaintiffs would have "won a lawsuit and lost a cause." *Int'l Salt*, 332 U.S. at 401.

The need for an effective remedy is vital given the "dynamic moment" of GenAI. Google.Third.Br.58. Contrary to Google's argument, Google.Third.Br.93, the record below amply established how Google's revenue-share payments would stifle GenAI's threat to Google by limiting distribution of rival GenAI products. JA1316-19(U.S.Pls.'Rem. PFOF.100-03) (citing testimony from GenAI executives and both sides' experts). The court expressly recognized the need to prevent Google from "us[ing] the same anticompetitive playbook for its GenAI products," JA1662(Rem.Op.99), which includes its paying distributors to prevent effective competition.

## CONCLUSION

This Court should vacate and remand the denial of a payment ban to apply the correct legal framework.

Dated: October 29, 2026

Respectfully submitted,

s/ *Matthew A. Waring*

STANLEY E. WOODWARD, JR.
*Associate Attorney General*

EMILY CLAIRE MIMNAUGH
*Deputy Associate Attorney General*

STEPHANIE A. GRECO
*Deputy Assistant Attorney General, Litigation*

ETHAN S. HOFFMAN
*Counsel to the Assistant Attorney General*

TRAVIS R. CHAPMAN
GRANT FERGUSSON
RYAN T. KARR
CLAIRE M. MADDOX
MICHAEL G. MCLELLAN
*Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION

DANIEL E. HAAR
NICKOLAI G. LEVIN
PATRICK M. KUHLMANN
MATTHEW A. WARING
*Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave., N.W.
Room 3224
Washington, D.C. 20530-0001
(202) 532-4186
matthew.waring@usdoj.gov

*Counsel for the United States*

*/s/ Lee Istrail*
James Uthmeier, Attorney General
Lee Istrail, Assistant Attorney General
R. Scott Palmer, Special Counsel, Complex Enforcement Chief
Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com

*Counsel for the State of Florida*

*/s/ Carolyn D. Jeffries*
Rob Bonta, Attorney General
Paula L. Blizzard, Senior Assistant Attorney General
Brian D. Wang, Deputy Attorney General
Carolyn D. Jeffries, Deputy Attorney General
Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Cari.Jeffries@doj.ca.gov

*Counsel for the State of California*

*/s/ Diamante Smith*
Ken Paxton, Attorney General
Ralph Molina, Deputy First Assistant Attorney General
William D. Wassdorf, Deputy Attorney General for Civil Litigation
Thomas York, Division Chief, Antitrust Division
Diamante Smith, Assistant Attorney General, Antitrust Division
Office of the Attorney General, State of Texas
P.O. Box 12548
Austin, Texas 78711-2548
Diamante.Smith@oag.texas.gov

*Counsel for the State of Texas*

*/s/ Amanda J. Wentz*
Amanda J. Wentz
Senior Assistant Attorney General
Office of the Arkansas Attorney General
101 West Capitol Avenue
Little Rock, Arkansas 72201
Amanda.Wentz@ArkansasAG.gov

*Counsel for the State of Arkansas*

*/s/ Logan Winkles*
Chris Carr, Attorney General
Logan Winkles, Deputy Attorney General
40 Capitol Square SW
Atlanta, GA 30334
lwinkles@law.ga.gov

*Counsel for the State of Georgia*

*/s/ Scott L. Barnhart*
Theodore Edward Rokita, Attorney General
Scott L. Barnhart, Chief Counsel and Director, Consumer Protection Division
Jacob Patterson, Deputy Attorney General
Office of the Attorney General, State of Indiana
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Scott.Barnhart@atg.in.gov
Jacob.Patterson@atg.in.gov

*Counsel for the State of Indiana*

*/s/ Jonathan E. Farmer*
Jonathan E. Farmer
Deputy Executive Director of Consumer Protection
Office of the Attorney General of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, KY 40601
Jonathan.Farmer@ky.gov

*Counsel for the Commonwealth of Kentucky*

*/s/ Asyl Nachabe*
Liz Murrill, Attorney General
Asyl Nachabe, Assistant Attorney General
Office of the Attorney General
State of Louisiana
Public Protection Division
909 Poydras St. Suite 1850
New Orleans, LA 70112
NachabeA@ag.louisiana.gov

*Counsel for the State of Louisiana*

*/s/ Scott Mertens*
Dana Nessel, Attorney General
Scott Mertens, Assistant
Attorney General
Michigan Department of
Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for the State of Michigan*

*/s/ Alison Esbeck*
Alison Esbeck
Assistant Attorney General
Missouri Attorney General's Office
815 Olive Street | Suite 200
Saint Louis, Missouri 63101
Alison.Esbeck@ago.mo.gov

*Counsel for the State of Missouri*

*/s/ Christian B. Corrigan*
Christian B. Corrigan
Solicitor General, State of
Montana
Anna K. Schneider
Bureau Chief, Montana Office of
Consumer Protection
P.O. Box 200151
Helena, MT 59602-0150
Christian.Corrigan@mt.gov

*Counsel for the State of Montana*

*/s/ Mary Frances G. Jowers*
Alan Wilson, Attorney General
Mary Frances G. Jowers, Assistant
Deputy Attorney General
Office of the Attorney General,
State of South Carolina
1000 Assembly Street
Rembert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-
1549
mfjowers@scag.gov

*Counsel for the State of South Carolina*

*/s/ Gabe Johnson-Karp*
Joshua L. Kaul, Attorney General
Gabe Johnson-Karp, Assistant
Attorney General
Wisconsin Department of Justice
17 W. Main St.
Post Office Box 7857
Madison, Wisconsin 53707-7857
Gabe.Johnson-Karp@wisdoj.gov

*Counsel for the State of Wisconsin*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limit of this Court's order dated April 30, 2026, because, excluding the parts exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1), this brief contains 3,971 words and the reply brief on cross-appeal for the Colorado Plaintiffs contains 3,999 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in Microsoft Word for Microsoft 365 using 14-point Century Schoolbook font, a proportionally spaced typeface.

s/ *Matthew A. Waring*
Matthew A. Waring
*Counsel for the United States*

## CERTIFICATE OF SERVICE

I certify that on October 29, 2026, I caused the foregoing brief to be filed through this Court's CM/ECF system, which will serve a notice of electronic filing on all registered users.

s/ *Matthew A. Waring*
Matthew A. Waring
*Counsel for the United States*