Case Nos. 26-5023, 26-5047, 26-5049

# IN THE UNITED STATES COURT OF APPEALS FOR THE D.C. CIRCUIT

STATE OF COLORADO, et al.,

*Plaintiff – Appellees – Cross-Appellants*,

– v. –

GOOGLE LLC,

*Defendant – Appellant – Cross-Appellee.*

Appeal from the United States District Court
for the District of Columbia
Hon. Amit P. Mehta
Case No. 1:20-cv-03010-APM

## REPLY BRIEF OF THE STATE ATTORNEYS GENERAL

PHILIP J. WEISER
Attorney General

JONATHAN SALLET
Special Assistant Attorney General
*Counsel of Record*

Colorado Department of Law
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone: 720-508-6000
Email: Jon.Sallet@coag.gov

RUSSELL D. JOHNSON
Deputy Solicitor General

CONOR MAY
Assistant Attorney General

RADHIKA M. KATTULA
Assistant Attorney General Fellow

*Attorneys for State of Colorado*

*(Additional counsel on signature page)*

October 29, 2026

# TABLE OF CONTENTS

TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... ii

GLOSSARY .......... iv

INTRODUCTION .......... 1

ARGUMENT .......... 2

I. The district court recognized that the payment ban would help restore competition. .......... 2

II. The district court wrongly protected Google's business partners, neglecting its paramount duty to restore in-market competition. .......... 3

A. The alleged "harms" from the payment ban do not override the need to require an efficient distribution channel for rivals. .......... 4

B. The district court failed to restore in-market competition because of its erroneous treatment of out-of-market impacts on Apple and other Google partners. .......... 8

III. An effective remedy must create an efficient distribution channel. .......... 13

IV. The district court failed to deny Google the revenue fruit of its violation. .......... 16

V. The district court's "hope" surrounding the impacts of GenAI is legally insufficient. .......... 19

CONCLUSION .......... 21

## TABLE OF AUTHORITIES

### Cases

*Ashley Meadows Farm, Inc. v. Am. Horse Shows Ass'n, Inc.*,
617 F. Supp. 1058 (S.D.N.Y. 1985) .......... 17

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) .......... 4

*Ford Motor Co. v. United States*,
405 U.S. 562 (1972) .......... 3

*Int'l Salt Co., v. United States*,
332 U.S. 392, (1947) .......... 14

*Massachusetts v. Microsoft Corp.*,
373 F.3d 1199 (D.C. Cir. 2004) .......... 6, 7, 9, 14, 15, 18

*McWane, Inc. v. FTC*,
783 F.3d 814 (11th Cir. 2015) .......... 15, 16

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
435 U.S. 679 (1978) .......... 8

*Pullman-Standard v. Swint*,
456 U.S. 273 (1982) .......... 21

*United States v. Am. Tobacco Co.*,
221 U.S. 106 (1911) .......... 8, 9

*United States v. Dentsply Int'l*,
399 F.3d 181 (3d Cir. 2005) .......... 15, 16

*United States v. E.I. du Pont de Nemours & Co.*,
366 U.S. 316 (1961) .......... 4, 5, 7, 8, 9, 20, 21

*United States v. Paramount Pictures, Inc.*,
334 U.S. 131 (1948) .......... 17

*United States v. Topco Assocs., Inc.*,
405 U.S. 596 (1972) .......... 8

*United States v. United Shoe Mach. Corp.*,
391 U.S. 244 (1968) .......... 2, 3, 18

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
395 U.S. 100 (1969) .......... 14

**Other Authorities**

Hunt Allcott et al., *Sources of Market Power in Web Search: Evidence from a Field Experiment* (Nat'l Bureau of Econ. Rsch., Working Paper No. 33410, 2025), https://perma.cc/D528-U2U8 .......... 12

Hyunjoo Jin, *Samsung to Double AI Mobile Devices to 800 Million Units This Year*, Reuters (Jan. 5, 2026, 4:51 AM MST) .......... 20

Richard Gilbert & David M. Newbery, *Preemptive Patenting and the Persistence of Monopoly*, 72 Am. Econ. Rev. 514 (1982) .......... 6

Samantha Subin, *Apple Picks Google's Gemini to Run AI-Powered Siri Coming This Year*, CNBC (Jan. 12, 2026, 1:41 PM EST) .......... 20

*Search Engine Market Share in United States of America – September 2026*, StatCounter .......... 20

William Shakespeare, *Hamlet* act 3, sc. 2, l. 254 .......... 1

## GLOSSARY

| | |
|---|---|
| GenAI | General Artificial Intelligence |
| GSE | General Search Engine |

## INTRODUCTION

When Google objects to the payment ban because it "would likely *increase* Google's profits," Google.Third.Br.62, Google, as Hamlet's mother observed, "doth protest too much." William Shakespeare, *Hamlet* act 3, sc. 2, l. 254. On what basis would a highly capitalized, for-profit company turn away greater profits? Only where, as here, its protest hides a deeper truth: If Google can avoid the imposition of an effective distribution remedy, Google will be free to use its monopoly fruits to pay its partners and maintain its dominance. And all the while, Google can continue overcharging and profiting off its advertisers in the search text advertising markets because they still have nowhere else to go.

The district court recognized the efficacy of the payment ban as a distribution remedy but declined to impose it because *other companies*, including potential competitors like Apple, might receive a diminished stream of payments born of Google's illegal conduct. That decision leaves rivals without an effective distribution remedy; lets Google continue to use the fruits of its illegal conduct to maintain its monopoly; and results in a substantial likelihood that Google will be able to continue its

monopoly. These legal errors require a remand to the district court to craft a remedy using the correct legal standard.

## ARGUMENT

### I. The district court recognized that the payment ban would help restore competition.

The district court concluded that "the bases for a payment ban are sound" because it would advance the remedial interests in "help[ing] restore competition," "pry[ing] open the market to competition," "encourag[ing] new entrants," and denying Google the fruits of its statutory violation. JA1683-84, 1689(Rem.Op.); *see United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968).

The record supports these conclusions: Default placement is the "most efficient" general search engine ("GSE") distribution channel. JA1564(Rem.Op.). Google's default payments "freeze the ecosystem in place," fund the next round of distribution agreements that maintain the status quo, and "blunt the effectiveness of the remedies imposed." JA1055(Liab.Op.), 1690(Rem.Op.). Thus, "[t]he rationale for a payment ban is straightforward: It would pry open the market to competition." JA1683(Rem.Op.).

The court also recognized that the absence of a payment ban would "incentivize" distributors "to stick with Google" because of Google's "massive financial advantage" and ability to pay more, "leaving in place the very forces that effectively have made the ecosystem exceptionally resistant to change." JA1690(Rem.Op.) (citation modified). Moreover, Google's payments deter potential rivals, particularly the one firm with the current ability to challenge Google: Apple. JA0850, 0932(Liab.Op.), 1683(Rem.Op.).

Despite all of this, the district court rejected the payment ban out of concern over its out-of-market impacts. This was a legal error.

## II. The district court wrongly protected Google's business partners, neglecting its paramount duty to restore in-market competition.

Legal error exists where a court fails to apply the correct legal standard and thus fails in its remedial duties to "unfetter a market from anticompetitive conduct," "deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future." *United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001) (en banc) (quoting *Ford Motor Co. v. United States*, 405 U.S. 562, 577 (1972) and *United Shoe*, 391 U.S. at

250)); *see FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1034 (D.C. Cir. 2008). And the district court must adequately explain how it has met these objectives. *Microsoft*, 253 F.3d at 103.

### A. The alleged "harms" from the payment ban do not override the need to require an efficient distribution channel for rivals.

Google asserts that the rejection of the payment ban is needed to avoid impacts on those, like Apple, that have come to rely on the fruits of Google's monopolies. Google.Third.Br.82. Antitrust law, however, focuses on the restoration of the competitive process, not effects on particular companies. *See Microsoft*, 253 F.3d at 58; *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962) (holding competition, not individual companies, requires protection).

The caselaw on which Google relies proves the point. *See* Google.Third.Br.82. In *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961) ("*du Pont*"), the Supreme Court emphasized the importance of "restor[ing] competition . . . whatever the adverse effect . . . on private interests." *Id.* at 326. "Economic hardship can influence choice *only as among two or more effective remedies*." *Id.* at 327 (emphasis added).

That principle alone is dispositive here because none of the district court's remedies addressed the fundamental distribution problem that Google's default payments created. Short- or medium-term remedies like data sharing and syndication temporarily improve the quality of rival GSEs. But they do nothing to address distribution, and they do not give rivals the opportunity to establish the user base needed to sustain themselves. Colo.Br.11-12; JA1670-71(Rem.Op.).

Impacts on third parties that benefit from the absence of competition do not justify rejecting an effective remedy. *Du Pont* rejected the idea that impacts on du Pont's shareholders could justify withholding an effective remedy where du Pont's shareholders would likely act in "their own self-interest" to perpetuate the monopoly. 366 U.S. at 328, 331-32.

The same is true here. Apple, and Google's other partners, have continued to accept their share of Google's monopoly profits—which Google has every incentive to keep paying—regardless of the impact on competition. *See* JA0708(Liab.Tr.6100:6-9) ("The dominant firm will win. Because the dominant firm . . . has the protection of those monopoly

profits and will spend them if it needs to to [sic] win.”).[1] As the court recognized, Apple and the other partners have nowhere else to go to receive their lucrative subsidies. JA1029, 1053(Liab.Op.). Their “self-interest” in maintaining these payments, however, is no more a barrier to an effective remedy than were the shareholders’ interests in *du Pont*.

*Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004), similarly demonstrates that the “harm” to be avoided is harm to the competitive process. Google depicts this Court as rejecting a remedy in *Massachusetts* because it would harm vendors and consumers. Google.Third.Br.80 (citing *Massachusetts*, 373 F.3d at 1208, 1210-12). But there, the court focused on the impact on competition: the proposed remedy would have caused fragmentation of Microsoft’s operating system that could have left it “unstable or unpredictable.” *Massachusetts*, 373 F.3d at 1210 (citation omitted). That would have put Microsoft’s operating system itself at risk, threatening developers (and through

[1] *See also* Econ.Bus.Profs.Br.6 (“Because competition dissipates profits, . . . an incumbent monopolist [has] the incentive and ability to outbid an equally or more efficient rival for exclusivity on every contract needed to maintain its monopoly and supracompetitive profits.” (citing Richard Gilbert & David M. Newbery, *Preemptive Patenting and the Persistence of Monopoly*, 72 Am. Econ. Rev. 514 (1982)).

them, consumers). Those risks were unnecessary, however, because the district court had ordered a different, adequate remedy to address the harm to competition. *Id.* at 1211-12.[2]

No such circumstances exist here. Nothing in the payment ban adversely affects the operation of Google's search engine or text-ad platform, and the district court did not order a remedy to cure the fundamental distribution problem Google's illegal conduct created. Thus, *du Pont* and *Massachusetts* support the conclusion that the alleged impacts on Apple and other partners do not justify rejection of the payment ban.[3]

---

[2] Nor do other conclusions in *Massachusetts* support Google. For instance, *Massachusetts* rejected a separate remedy because it "would give rivals the ability to clone Microsoft's software products." 373 F.3d at 1219. But Google does not claim the payment ban would result in "cloning." Nor could it. *See* JA1725(FJ.Op.) (explaining that no cloning will result). And Google's reference to a potential remedy in *Massachusetts* concerning Web services is even farther afield. *See* Google.Third.Br.81. There, the proposed remedy was "simply too far removed from the source of Microsoft's liability." *Massachusetts*, 373 F.3d at 1225. Here, however, the district court recognized that "the bases for a payment ban are sound." JA1684(Rem.Op.).

[3] Google argues that merger cases, like *du Pont*, are inapposite. Google.Third.Br.82 (quoting *du Pont*, 366 U.S. at 331). But nothing in *du Pont* suggests that requiring the restoration of competition is a merger-specific requirement; indeed, *Microsoft* proves the opposite. *See*

### B. The district court failed to restore in-market competition because of its erroneous treatment of out-of-market impacts on Apple and other Google partners.

Irony abounds when Google seeks legal protection for its monopoly subsidies to Apple and other partners after boasting that it wants to aid "the smallest businesses in the world" and serve "millions of advertisers, big and small," Liab.Tr.1334:23-1335:5(Dkt.927), while also systematically overcharging its advertisers, big and small, for the text ads funding those subsidies. JA0832(Liab.Op.). Google's partners also claim that good things come from anticompetitive acts, a position inconsistent with the Sherman Act. *Compare* Apple.Br.17-18 (indicating Apple will innovate more if it continues to receive Google's payments), *with Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 692-94 (1978) (rejecting claim that limiting competition was a "public benefit"). Congress established competition as the basis for our economic system. *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972) (holding

---

*Microsoft*, 253 F.3d at 58-60. And regardless, Google's attempt to draw a distinction between merger and monopoly cases, Google.Third.Br.82, is fully answered by *du Pont*'s own reliance on monopolization precedent decided under the Sherman Act. *Du Pont*, 366 U.S. at 327 (citing *United States v. Am. Tobacco Co.*, 221 U.S. 106, 185 (1911)).

that "[a]ntitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise.").

The need to effectively remedy in-market harm and restore competition is "not novel; it is deeply rooted in antitrust law." *Du Pont*, 366 U.S. at 327-28 (citing *Am. Tobacco*, 221 U.S. at 185); *see Whole Foods*, 548 F.3d at 1033-34. This precedent cannot be squared with Google's suggestion that a court may prioritize claims of out-of-market harm over in-market competition. *See* Google.Third.Br.86.

That is not to say a court can never consider out-of-market harms. The parties all agree that under *du Pont*, a court can choose among similarly effective equitable remedies, which might include the consideration of out-of-market harm. 366 U.S. at 327. But a prerequisite for that consideration is that the court should be choosing between effective remedies.

What a court cannot do is reject an effective remedy based on possible out-of-market impacts while failing to impose another remedy solving the continuing effects of the core issue of liability: the continuing exclusionary effects of defaults. *See Massachusetts,* 373 F.3d at 1211-12 (explaining that a proposed remedy could be denied where the court had

adopted a different remedy to "foster[] competition by opening the channels of distribution"). Indeed, if courts begin rejecting effective remedies based on such claimed entitlements, then aspiring monopolists will be incentivized to encourage dependency on their anticompetitive conduct to avoid being held accountable for their antitrust violations.

Here, the district court plainly viewed the harms Google cites as occurring out-of-market, contrary to Google's contentions. *See* Google.Third.Br.87. The court's express concern was about the "substantial risk of harm to OEMs, carriers, and browser developers" through "downstream effects," i.e., effects outside the relevant search-related markets. JA1684, 1686(Rem.Op.); *see* Colo.Br.29-30.

Google tries—and fails—to find record evidence supporting its separate claim that the payment ban would harm in-market competition through reduced output and quality. *See* Google.Third.Br.85. The pages Google cites do not reference those outcomes. *See* JA1686-88(Rem.Op.). Indeed, at the liability phase, the district court rejected the notion that Google's revenue-share payments increased output in the relevant markets. JA1080(Liab.Op.). The court similarly rejected the idea that "browser developers invest Google's revenue-share payments in

improving their browsers" in any meaningful way. JA1084(Liab.Op.). And the "quality" of which Google boasts was inflated by its determined campaign to deprive rivals of scale, and thus quality. JA1655-56(Rem.Op.).

None of the negative effects flowing from the absence of a payment ban—including supracompetitive prices charged to advertisers, JA1659(Rem.Op)—were measured against any assertion of harm to competition from adopting the payment ban. *See* JA1687-88(Rem.Op.); *Microsoft*, 253 F.3d at 104. Yet the court detailed "what eschewing a payment ban may mean for competition" including that: (i) "distributors will be incentivized to stick with Google because it can pay more, thus leaving in place the very forces that effectively have made the ecosystem exceptionally resistant to change," and (ii) "[c]ontinuing payments also could blunt the effectiveness of the remedies imposed." JA1690(Rem.Op.) (citation modified).

Instead, the district court artificially separated the supposed harm from imposing the ban from the continuing harm of not ordering it. The

court followed its discussion of potential consumer harm[4] from ordering the ban with a detailed paragraph explaining what the rejection of the payment ban "may mean for competition." JA1693(Rem.Op.).

But they cannot be so readily separated because harm to consumers flows from harm to the competitive process. *Microsoft*, 253 F.3d at 58 (explaining that "anticompetitive effects" refer to impacts on the competitive process and whether they "thereby harm consumers"). And that harm is compounded by the failure to consider that competition would relieve advertisers, and through them consumers, who will ultimately bear the costs the advertisers pass along, of the loss imposed by "supracompetitive" text advertising prices. JA0832, 1087-91(Liab.Op.).

---

[4] Google's claim of direct consumer harm from a payment ban invokes, as did the court, an academic study of a remedy that would ban Google from placing itself as the default on its own Chrome browser. *See* JA1689-90(Rem.Op.) (citing Hunt Allcott et al., *Sources of Market Power in Web Search: Evidence from a Field Experiment* (Nat'l Bureau of Econ. Rsch., Working Paper No. 33410, 2025), https://perma.cc/D528-U2U8). The measure of consumer loss uses data collected in field experiments to calculate hypothetical results based on estimates of an assumed model of consumer demand. The hypothetical neither accounted for any rivals other than Bing nor considered the impact on the marketplace of any of the remedies the court did order, including syndication that would create "immediate" parity with Google. Google.Third.Br.68.

In sum, any impacts on Apple and other partners from the reduction of default payments, *see, e.g.*, Apple.Br.17-18, cannot substitute for remedying the in-market harm that continues absent an efficient distribution remedy. The district court placed great weight on out-of-market impacts before determining effectiveness, and that by itself was error. *Supra* Section II.A. Any in-market effects of the payment ban would have to be assessed in comparison to the ongoing harm redressed by a payment ban, including to advertisers, that flow from the continuing effects of Google's illegal acts. But the district court never undertook such an analysis. *See* JA1687-88(Rem.Op.).

## III. An effective remedy must create an efficient distribution channel.

Google contends that the district court did, in fact, find that "its remedies would allow rivals to compete for efficient distribution." Google.Third.Br.70. To the contrary, the district court expressly recognized that the revised contracts will "do nothing to 'eliminate' the consequences of [the] exclusionary acts." JA1671(Rem.Op.); *see* U.S.Fourth.Br.8-9. And even more tellingly, it recognized that with the payment ban denied, "[c]ontinuing payments [for default status] . . . could blunt the effectiveness of the remedies imposed." JA1690(Rem.Op.).

The references Google cites discussing the remedies the district court did order, *see* Google.Third.Br.70 (citing JA1669, 1695, 1734(Rem.Op.)), do not support its argument. A rival's use of syndication can give it a quality boost, but absent an efficient means of reaching users, it cannot sustain a GSE once the syndication and data-sharing remedies end. Colo.Br.11-12. And the court's recognition that the reformed contracts it ordered offer some additional options to distributors is overshadowed by its observation that a default is by far the most efficient means of distribution. JA0852(Liab.Op.).

Google also argues that the payment ban is unjustified because paying for defaults was not itself held unlawful. *See* Google.Third.Br.88-91. That misunderstands the Sherman Act, which requires that remedies restore competition, regardless of whether the remedy focuses on conduct previously deemed unlawful. *See Int'l Salt Co., v. United States*, 332 U.S. 392, 400 (1947). When the harm comes from lack of efficient distribution, the remedy must empower efficient distribution. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 132 (1969); *Massachusetts*, 373 F.3d at 1215; *see also* U.S.Br.114-15.

The district court expressly found that Google's conduct would cause continuing harm even with the revised contracts. JA1671(Rem.Op.). That harm is built upon user habit and network effects that create the positive feedback loop that spins the flywheel, JA1058(Liab.Op.), 1650(Rem.Op.); the scale gap continuously widening to the detriment of rivals' ability to challenge Google's quality or ad monetization, JA1655-57(Rem.Op.); and the freedom from competitive threats that allows Google to increase "the prices of text ads" because it is "[u]nconstrained by rivals' pricing," JA1659(Rem.Op.). Faced with these realities, the district court was required to "'pry open' the channels of distribution Google has long had all to itself." JA1651(Rem.Op.) (quoting *Massachusetts*, 373 F.3d at 1233).

Precedent confirms that a court must create an efficient distribution path when efficient distribution has been denied. *Massachusetts* recognized that the remedial goal was to open "the channels of distribution for rival middleware," 373 F.3d at 1232-33, and upheld relief opening channels for efficient distribution, *id.* at 1212.

*United States v. Dentsply Int'l*, 399 F.3d 181 (3d Cir. 2005), and *McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015), further confirm that

foreclosing efficient distribution channels is a competitive harm that cannot be remedied by competitively impractical alternatives. *See Dentsply*, 399 F.3d at 193 (stating the question "is not whether direct sales enable a competitor to 'survive,' but rather whether direct selling 'poses a real threat' to defendant's monopoly" (quoting *Microsoft*, 253 F.3d at 71)); *McWane*, 783 F.3d at 838, 840 (explaining that exclusivity deprived rivals "of distribution sufficient to achieve efficient scale" and unavailability of viable alternative channels made foreclosure "particularly likely to harm competition" (citation omitted)). Here, the district court failed to create a path to efficient distribution for Google's rivals.

## IV. The district court failed to deny Google the revenue fruit of its violation.

The district court's reasoning contains another fatal problem. Although recognizing that a "payment ban would be one way to deny Google" the use of revenues that "are a 'fruit' of Google's exclusionary conduct," JA1684(Rem.Op.), and the legal principle that remedies must "'deny to the defendant the fruits of its statutory violation,'" JA1621(Rem.Op.) (quoting *Microsoft*, 253 F.3d at 103), the court left those fruits undenied.

Google's justifications for this error miss the mark. First, Google claims that the payment ban is about denying it revenue. Google.Third.Br.62, 89-91. That is incorrect. The payment ban would deny Google the ability to use the fruits of its violation to maintain its monopoly; it is not an attempt to reduce Google's revenue. Colo.Br.25.

Second, Google appears to suggest that the district court needed to quantify exactly which revenue Google received from its monopolistic conduct, as opposed to revenue it would have received from legal conduct. Google.Third.Br.90-91. But quantification is not necessary, and no case law supports Google's contrary assertions. *See, e.g.*, *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 148 (1948) ("For equity has the power to uproot all parts of an illegal scheme—the valid as well as the invalid—in order to rid the trade or commerce of all taint of the conspiracy."); JA1660-61(Rem.Op.) (noting that neither Google nor the district court could identify any case requiring quantifying the benefits of illegal versus legal conduct); *see also Ashley Meadows Farm, Inc. v. Am. Horse Shows Ass'n, Inc.*, 617 F. Supp. 1058, 1064 (S.D.N.Y. 1985) (explaining that an antitrust plaintiff "need not quantify the damages sustained in order to obtain injunctive relief"). It is enough to know that

there are continuing effects of the violation that have not been denied. *See United Shoe*, 391 U.S. at 250; *Massachusetts*, 373 F.3d at 1233 (denying Microsoft the "ability to take the same or similar actions to limit competition in the future" without requiring quantification); *Microsoft*, 253 F.3d at 103.

Finally, in a footnote, Google addresses a central point of the Colorado Plaintiffs' argument—namely, that Google should not be allowed to use its monopoly revenues to buy future defaults. *See* Google.Third.Br.91 n.15. Google argues that the argument is not well taken because "[l]ike most businesses in our market economy, Google reinvests some of its revenue in continuing to improve and promote its products." *Id.*

Google's argument, however, promotes a false equivalence between legitimate competition in the marketplace and its monopolistic conduct. The payment ban would not prohibit Google from hiring more engineers or advertising more to improve and promote its products. Google would remain free to compete based on the procompetitive strength of its products and its ability to persuade consumers to use its GSE.

But Google would not—and should not—be permitted to use the fruits of its illegal conduct to perpetuate its monopoly by continuing to monopolize the single-most efficient form of GSE distribution: default placement. Default placement is king in the GSE world, and Google knows it. JA0769(Liab.Tr.7786:2-8) (Google's CEO testifying that it will not make a browser agreement without a Google default even where it would receive valuable traffic through a choice screen).[5] That is why it is fighting so hard in this case.

**V. The district court's "hope" surrounding the impacts of GenAI is legally insufficient.**

The closest the district court comes to addressing an efficient distribution remedy is to express "hope" that emerging GenAI competition might keep Google from using its monopoly-revenue fruits to "simply outbid competitors for distribution." JA1691(Rem.Op.). But "hope" does not meet the *du Pont* admonition that a remedy is inadequate

[5] Google's CEO, Sundar Pichai, refers to both defaults and other "clearly enhanced promotion of our services." JA0769(Liab.Tr.7786:6-8). This latter reference is to Google obtaining enhanced, and illegal, advantage through preferred placement on Android devices. JA1038-42(Liab.Op.).

if there is a "substantial likelihood that the tendency towards monopoly" has not been stopped. *Du Pont*, 366 U.S. at 331-32.[6]

The district court recognized just that tendency. The absence of a ban risks "leaving in place the very forces that effectively have made the ecosystem exceptionally resistant to change," while the presence of the ban could "encourage new entrants," "deny Google the fruits of its statutory violation," and "help restore competition." JA1683-84, 1689-90(Rem.Op.). And were there some doubt about whether the tendency towards monopoly maintenance exists, that cuts against Google because "all doubts as to the remedy are to be resolved in [the Government's]

---

[6] Samsung devotes pages to extra-record claims of GenAI strength, Samsung.Br.27-30, while conspicuously failing to note its own agreement with Google's Gemini to incorporate Gemini's functionality in 800 million devices by the end of 2026, *see* Hyunjoo Jin, *Samsung to Double AI Mobile Devices to 800 Million Units This Year*, Reuters (Jan. 5, 2026, 4:51 AM MST), https://www.reuters.com/world/china/samsung-double-mobile-devices-powered-by-googles-gemini-800-mln-units-this-year-2026-01-05/, or Apple's agreement to use Gemini, not OpenAI, as its primary source of on-device GenAI, *see* Samantha Subin, *Apple Picks Google's Gemini to Run AI-Powered Siri Coming This Year*, CNBC (Jan. 12, 2026, 1:41 PM EST), https://www.cnbc.com/2026/01/12/apple-google-ai-siri-gemini.html?msockid=30f5902ee866646f11f885efe99e656d. In fact, Google's share of general search has not declined at all since the Remedies Opinion was issued in September 2025. *See Search Engine Market Share in United States of America – September 2026*, StatCounter, https://gs.statcounter.com/search-engine-market-share/all/united-states-of-america/#monthly-202509-202609 (last visited Oct. 29, 2026).

favor." *Du Pont*, 366 U.S. at 334. With little more than hope to rely on, the district court erred in rejecting a remedy that it recognized would promote competition in the market. That is reversible error requiring remand.[7] *See Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982).

## CONCLUSION

The Colorado Plaintiffs respectfully request that this matter be remanded and that the district court be instructed to reconsider the payment ban, applying the required legal standards.

Dated: October 29, 2026

Respectfully Submitted,

PHILIP J. WEISER
Attorney General

*/s/Jonathan Sallet*
Jonathan Sallet, 31608
Special Assistant Attorney General
Russell D. Johnson
Deputy Solicitor General
Conor May

---

[7] Google claims the Colorado Plaintiffs seek a remand to offer alternative remedies to the district court. Google.Third.Br.73 n.12. In fact, the Colorado Plaintiffs seek a remand because of the legal errors made below. The offer to discuss other options on remand is a respectful response to the court's openness to consider both the payment ban and "lesser" remedies in the future, JA1691 n.14(Rem.Op.), and *du Pont*'s recognition that a district court can choose among effective remedies. *Du Pont*, 366 U.S. at 125.

Assistant Attorney General
Radhika M. Kattula
Assistant Attorney General Fellow
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Jon.Sallet@coag.gov
*Attorneys for the State of Colorado*
*Counsel of Record

MIKE HILGERS
Attorney General of Nebraska

Justin C. McCully, Assistant Attorney General
Nebraska Department of Justice
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-9305
E-Mail: justin.mccully@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

KRISTIN K. MAYES
Attorney General of Arizona

Jayme Weber, Senior Litigation Counsel
Arizona Office of the Attorney General
400 West Congress, Ste. S-215
Tucson, Arizona 85701
Telephone: (520) 628-6609
E-Mail: jayme.weber@azag.gov

*Counsel for Plaintiff State of Arizona*

BRENNA BIRD
Attorney General of Iowa

Noah Goerlitz, Assistant Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
Telephone: (515) 725-1018
E-Mail: noah.goerlitz@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

LETITIA JAMES
Attorney General of New York

Barbara D. Underwood
Judith N. Vale
Philip J. Levitz
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-6325
E-Mail: philip.levitz@ag.ny.gov

*Counsel for Plaintiff State of New York*

JEFF JACKSON
Attorney General of North Carolina

James Wellner Doggett
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
Telephone: (919) 716-6400

E-Mail: jdoggett@ncdoj.gov

*Counsel for Plaintiff State of North Carolina*

JONATHAN SKRMETTI
Attorney General of Tennessee

J. David McDowell
Austin C. Ostiguy
Tyler T. Corcoran
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 741-1671
E-Mail: david.mcdowell@ag.tn.gov
austin.ostiguy@ag.tn.gov
tyler.corcoran@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

DEREK E. BROWN
Attorney General of Utah

Marie W.L. Martin
Utah Office of Attorney General
160 E 300 S, 5th Floor
P.O. Box 140811
Salt Lake City, Utah 84114
Telephone: (801) 440-9825
E-Mail: mwmartin@agutah.gov

*Counsel for Plaintiff State of Utah*

STEPHEN J. COX
Attorney General of Alaska

Jeff Pickett
Senior Assistant Attorney General
State of Alaska, Department of Law
Office of the Attorney General
1031 W. Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5275
E-Mail: jeff.pickett@alaska.gov

*Counsel for Plaintiff State of Alaska*

WILLIAM TONG
Attorney General of Connecticut

Nicole Demers
Office of the Attorney General of Connecticut
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
Telephone: (860) 808-5202
E-Mail: nicole.demers@ct.gov

*Counsel for Plaintiff State of Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware

Michael A. Undorf
Delaware Department of Justice
Fraud and Consumer Protection Division
820 N. French St., 5th Floor
Wilmington, DE 19801
Telephone: (302) 683-8816

E-Mail: michael.undorf@delaware.gov

*Counsel for Plaintiff State of Delaware*

BRIAN L. SCHWALB
Attorney General of the District of Columbia

Caroline S. Van Zile
Ashwin P. Phatak
Office of the Attorney General for the District of Columbia
400 6th Street NW
Washington, DC 20001
Telephone: (202) 724-6609
E-Mail: caroline.vanzile@dc.gov
ashwin.phatak@dc.gov

*Counsel for Plaintiff District of Columbia*

DOUGLAS MOYLAN
Attorney General of Guam

Norman Lee Miller, Jr.
Office of the Attorney General of Guam
590 S. Marine Corps Drive, Suite 901
Tamuning, Guam 96913
Telephone: (671) 475-2710
E-Mail: nmillerjr@oagguam.org

*Counsel for Plaintiff Territory Guam*

ANNE E. LOPEZ
Attorney General of Hawaiʻi

Rodney I. Kimura
Department of the Attorney General,
State of Hawaiʻi
425 Queen Street
Honolulu, HI 96813
Telephone (808) 586-1180
E-Mail: rodney.i.kimura@hawaii.gov

*Counsel for Plaintiff State of Hawaiʻi*

RAÚL LABRADOR
Attorney General of Idaho

John K. Olson
Office of the Idaho Attorney General
Consumer Protection Division
954 W. Jefferson St., 2nd Floor
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 332-3549
E-Mail: john.olson@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

KWAME RAOUL
Attorney General of Illinois

Sarah A. Hunger
Office of the Attorney General of Illinois
115 S. LaSalle St.
Chicago, IL 60603
Telephone: (312) 771-3885
E-Mail: sarah.hunger@ilag.gov

*Counsel for Plaintiff State of Illinois*

KRIS W. KOBACH
Attorney General of Kansas

Christopher Teters
Kansas Office of the Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612
Telephone: (785) 368-8429
E-Mail: chris.teters@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

AARON M. FREY
Attorney General of Maine

Christina M. Moylan
Office of the Attorney General of Maine
6 State House Station
August, ME 04333
Telephone: (207) 626-8838
E-Mail: christina.moylan@maine.gov

*Counsel for Plaintiff State of Maine*

ANTHONY G. BROWN
Attorney General of Maryland

Schonette J. Walker
Office of the Attorney General of Maryland
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Telephone: (410) 576-6473
E-Mail: swalker@oag.maryland.gov

*Counsel for Plaintiff State of Maryland*

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

Jennifer E. Greaney
Office of the Attorney General of Massachusetts
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 963-2981
E-Mail: jennifer.greaney@mass.gov

*Counsel for Plaintiff Commonwealth of Massachusetts*

KEITH ELLISON
Attorney General of Minnesota

Zach Biesanz
Senior Enforcement Counsel
Office of the Minnesota Attorney General
Antitrust Division
445 Minnesota Street, Suite 600
St. Paul, MN 55101
Telephone: (651) 757-1257
E-Mail: zach.biesanz@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*

AARON D. FORD
Attorney General of Nevada

Michelle C. Badorine
Nevada Office of the Attorney General
100 N. Carson Street
Carson City, NV 89701
Telephone: (775) 684-1164

E-Mail: mbadorine@ag.nv.gov

*Counsel for Plaintiff State of Nevada*

JOHN FORMELLA
Attorney General of New Hampshire

Brandon Garod
Office of Attorney General of New Hampshire
1 Granite Place South
Concord, NH 03301
Telephone: (603) 271-1217
E-Mail: brandon.h.garod@doj.nh.gov

*Counsel for Plaintiff State of New Hampshire*

JENNIFER DAVENPORT
Attorney General of New Jersey

Abiola G. Miles
Deputy Attorneys General
New Jersey Attorney General's Office
25 Market Street, P.O. Box 106
Trenton, NJ 08625
Telephone: (862) 381-4159
E-Mail: abiola.miles@law.njoag.gov

*Counsel for Plaintiff State of New Jersey*

RAÚL TORREZ
Attorney General of New Mexico

Anthony R. Juzaitis
Assistant Attorney General
New Mexico Department of Justice
408 Galisteo St.

Santa Fe, NM 87504
Telephone: (505) 651-7565
E-Mail: ajuziatis@nmdoj.gov

*Counsel for Plaintiff State of New Mexico*

DREW WRIGLEY
Attorney General of North Dakota

Elin S. Alm
Assistant Attorney General
Consumer Protection and Antitrust Division
Office of the Attorney General of North Dakota
1720 Burlington Drive, Suite C
Bismarck, ND 58504
Telephone: (701) 328-5570
E-Mail: ealm@nd.gov

*Counsel for Plaintiff State of North Dakota*

DAVE YOST
Attorney General of Ohio

Sarah Mader, Assistant Attorney General, Antitrust
Jennifer L. Pratt
Office of the Ohio Attorney General
30 E Broad Street, 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
E-Mail: sarah.mader@ohioago.gov
jennifer.pratt@ohioago.gov

*Counsel for Plaintiff State of Ohio*

GENTNER DRUMMOND
Attorney General of Oklahoma

Sylvia Lanfair
Assistant Attorney General
Office of the Oklahoma Attorney General
313 NE 21st Street
Oklahoma City, OK 73105
Telephone: (405) 522-8159
E-Mail: sylvia.lanfair@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*

DAN RAYFIELD
Attorney General of Oregon

Robert A. Koch, Attorney-in-Charge of Civil & Administrative Appeals
Oregon Department of Justice
1162 Court St NE
Salem, OR 97301
Telephone: (503) 378-4402
E-Mail: robert.a.koch@oregon.gov

*Counsel for Plaintiff State of Oregon*

DAVID W. SUNDAY, JR.
Attorney General of Pennsylvania

Tracy W. Wertz
Daniel B. Mullen
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
Telephone: (717) 787-4530

E-Mail: twertz@attorneygeneral.gov
dmullen@attorneygeneral.gov

*Counsel for Plaintiff Commonwealth of Pennsylvania*

LOURDES L. GÓMEZ TORRES
Secretary of Justice

TANIA L. FERNÁNDEZ-MEDERO
Assistant Secretary of Justice

SAMUEL WISCOVITCH-CORALI
Deputy Undersecretary

Pablo Tufiño-Soto
Senior Attorney
Diana Jordán-González
Office of Monopolistic Affairs
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, Puerto Rico 00902-0192
Telephone: (787) 721-2900, Ext. 1205
E-Mail: ptufino@justicia.pr.gov
diana.jordan@justicia.pr.gov

*Counsel for Plaintiff Territory Puerto Rico*

PETER NERONHA
Attorney General of Rhode Island

Nicholas M. Vaz
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400

E-Mail: nvaz@riag.ri.gov

*Counsel for Plaintiff State of Rhode Island*

MARTY J. JACKLEY
Attorney General of South Dakota

Amanda Miiller
Office of the Attorney General of South Dakota
1302 E. South Dakota Hwy 1889, Suite 1
Pierre, SD 57501
Telephone: (605) 773-3215
E-Mail: amanda.miiller@state.sd.us

*Counsel for Plaintiff State of South Dakota*

CHARITY R. CLARK
Attorney General of Vermont

Christopher J. Curtis, Assistant Attorney General
Office of the Attorney General of Vermont
109 State St.
Montpelier, VT 05609
Telephone: (802) 828-3171
E-Mail: christopher.curtis@vermont.gov

*Counsel for Plaintiff State of Vermont*

JAY JONES
Attorney General of Virginia

Tyler T. Henry
Senior Assistant Attorney General
Antitrust Unit
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, VA 23219
Telephone: (804) 692-0485
E-Mail: thenry@oag.state.va.us

*Counsel for Plaintiff State of Virginia*

NICHOLAS W. BROWN
Attorney General of Washington

Amy N.L. Hanson
Senior Managing Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-5419
E-Mail: amy.hanson@atg.wa.gov

*Counsel for Plaintiff State of Washington*

JOHN B. McCUSKEY
Attorney General of West Virginia

Douglas Lee Davis
Office of the Attorney General, State of West Virginia
1900 Kanawha Boulevard East
Building 6, Suite 401
P.O. Box 1789

Charleston, WV 25326
Telephone: (304) 558-8986
E-Mail: douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*

KEITH KAUTZ
Attorney General of Wyoming

Michael Kahler
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Telephone: (307) 777-7196
E-Mail: mike.kahler@wyo.gov

*Counsel for Plaintiff State of Wyoming*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of this Court's order dated April 30, 2026, because, excluding the parts exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1), this brief contains 3,999 words and the reply brief on cross-appeal for the United States Plaintiffs contains 3,971 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in Microsoft Word using 14-point Century Schoolbook font, a proportionally spaced typeface.

This document has been submitted in compliance with the court's ECF requirements.

/s/ *Jonathan Sallet*
Jonathan Sallet
Special Assistant Attorney General

## CERTIFICATE OF SERVICE

I certify that I served the foregoing Reply Brief on all parties herein by e-filing with the CM/ECF system maintained by the Court, this 29th day of October, 2026.

/s/ *Jonathan Sallet*
Jonathan Sallet
Special Assistant Attorney General